## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

DR DISTRIBUTORS, LLC,

        Plaintiff/Counter-Defendant,

v.

21 CENTURY SMOKING, INC., and BRENT DUKE,

        Defendants/Counterclaimant,

v.

CB DISTRIBUTORS, INC., and CARLOS BENGOA,

        Counter-Defendants/Counterclaimants.

**Case Number:** 3:12 – cv – 50324

**Judge:** Frederick J. Kapala

**Magistrate Judge:** Iain D. Johnston

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiff/Counter-Defendant DR Distributors, LLC ("DR"), and Counter-Defendants/Counterclaimants CB Distributors, Inc. ("CB") and Carlos Bengoa ("Bengoa")(collectively the "Plaintiffs") respectfully submit the following Memorandum of Law in support of their motion for Summary Judgment under F.R.C.P. 56 dismissing all claims asserted by Defendant/Counterclaimant 21 Century Smoking, Inc. and Defendant Brent Duke ("Duke") (collectively, the "Defendants") in this action.

## <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

TABLE OF AUTHORITIES ……………………………………………………………ii

PRELIMINARY STATEMENT……………………………….................................1

FACTUAL BACKGROUND…………………………………..................................1

LEGAL ARGUMENT…..………………………………………………………..9

I. Defendants Have No Enforceable Common Law Trademark Rights Because They Failed to Achieve Legally Sufficient Market Penetration in Any Specific Geographic Area in the U.S.A………………………9

II. Defendants Market Activity Is So Di Minimus Or Nonexistent That It Cannot Meet The Legal Standard And Requirements To Establish Any Market Penetration……………………………………………11

    A. Defendants' Market Activity Never Achieved Any Consumer Recognition in any Geographic Territory..………………..…14

        1. Defendants Have No Common Law Rights In Ten States Where They Had No Market Activity………………...14

        2. Defendants Have No Common Law Rights In Five States Where They Had Di Minimus Sales in 2009 and No Sales in 2010………………………………………..15

        3. Majority of Defendants' Sales Were in only Five States and Their Sales only Exceeded $5,000.00 In Four States………………….…...15

        4. Defendants Chose to Sell Through Mall Kiosks and Stores Targeted to the Smallest Segment of Customers ………………………………...16

        5. Website Sales On The Internet That Are Di Minimus Do Not Equate To Market Penetration……..…………………………………………16

        6. Defendants Have Done Little Advertising and Their Sales Have Not Been Continuous And Growing As They Closed All Kiosks and Stores……………………………………………………………17

i

B.     Plaintiffs Selected Their Mark 21ST Century Smoke In Good Faith Without Prior Knowledge of Defendants And Without Any Intent to Derive Any Benefit From Defendants' Alleged Goodwill…………………………………………………………...18

C.     Defendants Unfair Competition Claim Fails As Defendants Have No Enforceable Trademark Rights…………………………………………19

D.     Defendants' Claims For Damages For "Disparagement" Fails As A Matter of Law, As Money Damages Are Not Available Under The IDTPA……………………………………………20

E.     Defendants' Claim Of Disparagement Also Fails Under The IDTPA As The Act Only Applies To Actions Occurring In The State of Illinois………………………………………22

F.     Defendants' Cannot Establish Defamation Where The Alleged Statements Were Made To Defendants' Agent………………...23

G.     Defendants' Unlawful Conduct Before and During Litigation Bars Them From Any Relief Under The Doctrine of Unclean Hands………………………………………………25

III.    CONCLUSION………………………………………….………………..28

# **TABLE OF AUTHORITIES**

Page(s)

## **CASES**

*Accu Personnel, Inv. v. Accustaff, Inc.*,
  846 F. Supp. 1191 (D. Del. 1994)…………..…………………………………10, 11, 12

*Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*,
  146 F.3d 350, 46 U.S.P.Q.2d 1865 (6th Cir. 1998) …………………………..…13, 17

*Allard Enterprises Inc. v. Advanced Programming Resources Inc.*,
  249 F.3d 564, 58 U.S.P.Q.2d 1710 (6th Cir. 2001)……………………..………10, 13

*Alpha Delta Phi Int'l, Inc. v. Chi Delta Chi*,
  No. 93 C. 2012, 1995 U.S. Dist. LEXIS 889 (N.D. Ill. 1995)………………………22

*AHP Subsidiary Holding Co. v. Stuart Hale Co.,*
  1 F.3d 611 (7th Cir. 1993)……………………………………..………………………20

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,
  792 F. Supp. 969 (S.D.N.Y. 1992) *aff'd*, 983 F.2d 1048 (2d Cir. 1992)……………25

*Avery v. State Farm Mut. Auto. Ins. Co.*,
  216 Ill. 2d 100, 835 N.E.2d 801, 296 Ill. Dec. 448 (Ill. 2005),
  *cert. denied*, 547 U.S. 103 (2006)……………...................................................22

*Brandt Indus. v. Pitonyak Mach. Corp.*,
  No. 1:10-cv-0857-TWP-DML, 2012 U.S. Dist. LEXIS 122901
  (S.D. Ind., August 29, 2012)…………....................................................11, 12

*BNC Bancorp. V. BNCCORP, Inc.*,
  No. 1:15-cv-793, 2016 U.S. Dist. LEXIS 78450
  (M.D. N.C., June 16, 2016)…………….......................................................11

*Brown & Williamson Tobacco Corp. v. Jacobson*,
  827 F.2d 1119 (7th Cir. 1987), *cert. denied*, 485 U.S. 993 (1988)…….……………27

*C.C.S. Comm'n Control, Inc. v. Sklar*,
  Case No. 86-cv-7191-WCC, 1987 U.S. Dist. LEXIS 4280,
  1987 WL 12085 (S.D. N.Y. 1987)……….……….................................................26

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.,*
  921 F.2d 467 (3d Cir. 1990)………………………………….......……..…………12, 13

*Chevron Corp. v. Donziger*,
   974 F. Supp. 2d 362 (S.D.N.Y. 2014)…………………………………….........12, 13

*Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation*,
   No. 05-3555, 2005 U.S. Dist. LEXIS 15798, 2005 WL 1838364
   (N.D. Ill, Aug. 1, 2005), *aff'd*, 464 F.3d 651 (7th Cir. 2006)……………………..22

*Clearline Techs., Ltd. v. Cooper B-Line*,
   No. H-11-1420, 2012 U.S. Dist. LEXIS 2116
   (S.D. Tex. Jan. 9, 2012)……………………………………...………………………22

*Clements Indus., Inc. v. A. Meyers & Sons Corp.*,
   712 F. Supp. 317 (S.D. N.Y. 1989)…………………………………….......…..26

*Domanus v. Lewicki*,
   284 F.R.D. 379 (N.D. Ill. 2012)……………………………………...…………….27

*DSM Desotech, Inc. v. 3D Sys. Corp.*,
   749 F.3d 1332 (Fed. Cir. 2014)……………………………………...……………21

*Dutson v. Farmers Ins. Exchange*,
   815 F. Supp. 349 (D. Or. 1993), *aff'd*, 35 F.3d 570 (9th Cir. 1994)…………………24

*Fed. Folding Wall Corp. v. Nat'l Folding Wall Corp.*,
   340 F. Supp. 141 (S.D.N.Y. 1971)……………………………………..……………26

*FLIR Sys., Inc. v. Sierra Media, Inc.*,
   965 F. Supp.2d 1184 (D. Or. 2013)……………………………………..……………...26

*Giant Screen Sports v. Canadian Imperial Bank of Commerce*,
   553 F.3d 527 (7th Cir. 2009)……..……………………………………..………………24

*Glow Indus., Inc. v. Lopez*,
   252 F. Supp. 2d 962 (C.D. Cal. 2002)……..………………………………..………..11

*Hanginout, Inc. v. Google, Inc.*,
   54 F. Supp. 3d 1109 (S.D. Cal. 2014)……..………………………………..………..10

*Hanover Star Milling Co. v. Metcalf*,
   240 U.S. 403 (1916)…………………………..……………………………..…………9

*IFC Credit Corp. v. Aliano Bros. Gen. Contractors, Inc.*,
   No. 04-CV-6504, 2007 U.S. Dist. LEXIS 3595, 2007 WL 164603
   (N.D. Ill., Jan. 12 2007)…………………………..…………………………………23

iv

*International Order of Job's Daughters v. Lindeburg and Co.*,
  633 F.2d 912 (9th Cir. 1980), *cert. denied*, 452 U.S. 941 (1981)………………..….20

*Int'l Union, United Auto., etc. v. NLRB*,
  148 U.S. App. D.C. 305, 459 F.2d 1329 (D.C. Cir. 1972)……..…………………….27

*Johnson v. Schnuck Mkts., Inc.*,
  495 Fed. App'x 733 (7th Cir. 2012)………………….…….…………………….24

*LG Electronics USA, Inc. v. Whirlpool Corp.*,
  809 F.Supp. 2d 857 (N.D. Ill. 2011)……………….…….…………………….23

*Mas v. Coca-Cola Co.*,
  163 F.2d 505 (4th Cir. 1947)……..…………………….…….…………………….25

*Metro Publishing, Ltd. v. San Jose Mercury News, Inc.*,
  861 F. Supp. 870 (N.D. Cal. 1994)……..…………………..….…..…..………25

*MPC Containment Sys. v. Moreland*,
  No. 05 C 6973, 2008 U.S. Dist. LEXIS 60546
  (N.D. Ill. July, 23 2008)……..…………………..……………..…………..22

*Natural Footwear Ltd., v. Hart, Schaffner & Marx*,
  760 F.2d 1383 (3d Cir. 1985), *cert. denied*, 474 U.S. 920 (1985)……...11, 12, 13, 14

*Optimal Pets, Inc. v. Nutri-Vet, LLC*,
  877 F. Supp. 2d 953 (C.D. Cal. 2012)……..…………………..……..…..10, 11, 17

*Ptasznik v. St. Joseph Hosp.*,
  464 F.3d 691 (7th Cir. 2006)……..…….……..…………………..……..…………..24

*Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*,
  No. 03 C 6070, 2004 U.S. Dist. LEXIS 23064 (N.D. Ill. Nov. 12, 2004)…………11

*Purepecha Enters. v. El Matador Spices & Dry Chiles*,
  No. 11 C 2569, 2012 U.S. Dist. LEXIS 120499, *45
  (N.D. Ill. Aug. 24, 2012)……….…….……..…………………..………….…………23

*Root Ref. Co. v. Universal Oil Prods. Co.*,
  169 F.2d 514 (3d Cir. 1948), *cert. denied sub nom.*………..……..…………….26

*Saudi Basic Indus. Corp. v. ExxonMobil Corp.*,
  401 F. Supp. 2d 383 (D. N.J. 2005)……………...……….……..…………..…26

*Shaffer v. RWP Grp.*,
  169 F.R.D. 19 (E.D. N.Y. 1996)…..………………...……….…..…..…………..27

*Smith v. Ames Dep't Stores*,
  998 F. Supp. 827 (D.N.J. 1997)………………......………..………..…………..…11

*Smith v. Prime Cable of Chi.*,
  276 Ill. App. 3d 843, 859-60, 658 N.E.2d 1325, 1337, 213
  Ill. Dec. 304 (1st Dist. 1995)………………......………..………....…………….…22

*Specht v. Google, Inc.*,
  660 F.Supp. 2d 858 (N.D. Ill. 2009)………………......………..………..……………23

*State ex rel. Advanced Dictating Supply, Inc. v. Dale*,
  269 Ore. 242, 247, 524 P.2d 1404 (1974)…………......………..………..……………24

*Super Wash, Inc. v. Sterling*,
  No. 04 C 4618, 2006 U.S. Dist. LEXIS 8277, 2006
  WL 533362 (N.D. Ill. Mar. 2, 2006)…………......………..………..………..…22, 23

*Sweettarts v. Sunline, Inc.*,
  380 F.2d 923 (8th Cir. 1967)…………..………..………......………..………..…………….12

*Tarin v. Pellonari*,
  253 Ill. App. 3d 542, 625 N.E.2d 739, 192 Ill. Dec. 584 (Ill. App. Ct. 1993)……….20

*Thrifty Rent-A-Car Sys. V. Thrift Cars, Inc*.,
  831 F.2d 1177 (1ˢᵗ Cir. 1987)…………..………..………......………..………..…………13

*TMT N. Am., Inc. v. Magic Touch GmbH*,
  124 F.3d 876 (7th Cir. 1997)…………..………..………......………..………..…………….20

*Unilogic, Inc. v. Burroughs Corp.*,
  10 Cal. App. 4th 612, 12 Cal. Rptr. 2d 741 (1992)…………..………..………..………..26

*United Drug Co. v. Theodore Rectanus Co*.,
  248 U.S. 90, 100 (1918)……………..………………………………………..………9

*U.S. Ethernet Innovations, LLC v. Texas Instruments Inc.*,
  Case No. 6:11-cv-491-MHS, 2014 U.S. Dist.
  LEXIS 131334, 2014 WL 4683252 (E.D. Tex. Sept. 18, 2014)……………..………26

*Weiner King, Inc. v. Wiener King, Corp.*,
  615 F.2d 512 (C.C.P.A. 1980)……………………………..…………..………..……..…19

*WNS, Inc. v. Deck the Walls, Inc*,
No. 84 C 3880, 1986 U.S. Dist. LEXIS 17659 (N.D. Ill. Nov. 14,
1986)…………………………………………………………………...….10

*Worthington v. Anderson,*
386 F.3d 1314 (10th Cir. 2004)...…………………….....………....….…..….26

*YCB Int'l, Inc. v. UCF Trading Co.*,
No. 09-CV-7221, 2012 U.S. Dist. LEXIS 104887
(N.D. Ill. June 12, 2012)………..………………….....………...….…..….27

## STATUTES AND COURT RULES

Illinois Uniform Deceptive Trade Practices Act,
(815 ILCS 510/2 and 3)………………………………………...….20, 21, 22, 23

## SECONDARY SOURCES

5 McCarthy on Trademarks and Unfair Competition § 26:11 (5th ed.)……........…..…18

5 McCarthy on Trademarks and Unfair Competition §26:53-54 (5th ed.)…………..…13

Restatement of the Law, Torts § 577……………………………………………….24

## PRELIMINARY STATEMENT

This is a trademark dispute concerning the sale of electronic cigarettes ("e-cigs"). Plaintiff/Counter-Defendant DR Distributors, LLC ("DR"), and Counter-Defendants/Counterclaimants CB Distributors, Inc. ("CB") and Carlos Bengoa ("Bengoa") (collectively "Plaintiffs") seek summary judgment as to all claims asserted by Defendant/Counterclaimant 21 Century Smoking, Inc. and Defendant Brent Duke ("Duke") (collectively "Defendants"). As an important threshold matter, Defendants have failed to establish any common law trademark rights in this case given the lack of their e-cigarette product to achieve legally cognizable "market penetration" in any geographic territory in the U.S.A. Given Defendants non-existent or *di minimus* e-cig sales, and/or non-existent or di minimus advertising of such products while using their purported common law trademark, Defendants cannot succeed on any claim, however characterized in its Complaint, for common law trademark infringement or unfair competition. Notably, Defendants have essentially withdrawn from the market after closing their retail kiosks and stores, while Plaintiffs' sales through a separate trade channel – primarily convenience stores – have continued and it remains a recognized market leader.

Similarly, Defendants cannot succeed on their claims of defamation or violations of the Illinois Deceptive Trade Practices Act which also fail for lack of proof. Finally, given Defendants misconduct before and during this litigation, the doctrine of unclean hands bars Defendants from obtaining any relief or damages in this action against Plaintiffs, and Plaintiffs' federal trademark registrations should remain in full force and effect.

## FACTUAL BACKGROUND

Carlos Bengoa, a resident of Roscoe, Illinois, solely owns and operates CB and DR. From his humble beginnings driving a van and distributing products store-by-store in 1994, Bengoa

developed experience in the nationwide sale and distribution of hundreds of consumer products, including his own trademarked products, primarily through the convenience store sales channel. Bengoa had extensive and early knowledge of U.S. e-cig market starting in 2008 and became a national distributor of a brand of e-cigs named "Gamucci" in 2009. In that same year, Bengoa made multiple trips to China (where e-cigs were manufactured) in order to explore making his own branded e-cigs. Bengoa established DR for the purpose of creating and importing his own brand of e-cigs, and CB, based in Beloit, Wisconsin, became the primary distributor of such products. On this substantial canvas of market knowledge and research, Bengoa identified several brand names he liked and believed were available Bengoa retained legal counsel to do searches of his proposed marks, and one of his proposed marks -- 21ST CENTURY SMOKE --was available. DR filed an application to register 21ST CENTURY SMOKE with the USPTO on May 3, 2010 for "electronic cigarettes." DR made its first sales of e-cigs on August 5, 2010, and Registration on the Principal Register issued on May 3, 2011 under Registration No. 3,953,768. DR filed another application for the mark SMOKE THIS BY 21ST CENTURY SMOKE for "electronic cigarettes" on February 29, 2012 and Registration on the Principal Register issued on June 11, 2013 under Registration No. 4,351,153. Prior to being sued by Plaintiffs in this case in September 2012, Defendants took no legal action to oppose or formally object to DR's trademark applications or registrations and never filed any opposition or cancellation proceeding in the USPTO. See Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF") at paras. 1-3, 5, 7-19 and 88-92.

CB, as DR's primary distributor, launched nationwide sales and distribution of DR's e-cigs bearing the 21ST Century Mark in May 2010. E-cigarettes are targeted to smokers who, in the U.S. market, make the majority of their purchases of smoking products in convenience stores.

Given CB's extensive contacts, well established distribution network and extensive marketing and advertising support, the sales of 21ST CENTURY SMOKE e-cigs in convenience stores rapidly took off. Plaintiffs e-cig product was and has always had its trademark printed on the actual e-cig product and packaged in a sealed, point-of-purchase hanging tag format that clearly displays the product and has the trademark prominently featured. SUMF at paras. 29-45.

Plaintiffs sales and marketing of its 21ST CENTURY SMOKE e-cigs has been continuous and extensive in thousands of convenience stores, gas stations and pharmacies located in every state in the U.S. (e.g., Rite-Aid, Circle K, Murphy Oil and Speedway). From August 2010 through May 2014, Plaintiffs advertising expenses for its e-cig products totaled $2,462,192, including television and radio advertising, trade shows, mailing lists, promotions, sponsorships and prizes. Plaintiffs unit sales in this period were 13,893,595 and gross sales totaled $74,274,476. By the end of 2011, Plaintiffs trademarked e-cigs were sold in all 50 states and the District of Columbia and they were experiencing a compounded annual growth rate for sales of 35%. The popularity of its products was confirmed by independent industry data, such as Nielsen and other sources, showing that 21ST CENTURY SMOKE trademarked products had become a leading brand of e-cigarettes soon after their launch. *Id.*

In 2009, through a website based business that he personally created, programmed and owned, Defendant Brent Duke started selling e-cigs that were manufactured in China, and later hand assembled by Duke. A 2000 Stanford University graduate with a degree in Economics, Duke who now lives in California, formerly resided in Chicago, Illinois. He has experience owning and operating website based businesses including his "21 Century Smoking" website. In 2009 and 2010, his website said "21 Century Smoking" is a "store" selling various e-cigs under the names "Blackjack," "Roulette," and "Pocket Ace." At that time, his "Blackjack" brand name was printed

directly on his e-cig product and he sold e-cigs in unsealed and hand assembled boxes -- not in sealed plastic, hanging tag point-of-purchase packaging like Plaintiffs. He sold e-cigs primarily through his website until March 2010 when he began to sell at a mall kiosk in Ventura, CA. SUMF at paras. 47-55.

Defendants never used the "TM" symbol on any product and did not file a trademark application until March 1, 2011. Defendants filed an application to register 21 CENTURY SMOKING long after Duke became aware of DR's trademark and product in July 2010 when he received an email from a Chinese manufacturer representative that emailed him a picture of DR's product with its trademark prominently displayed. Defendants' trademark application was rejected by the USPTO because of DR's trademark, and Defendants abandoned their application. In their March 2011 application, Defendants claimed a date of First Use in Commerce of March 29, 2009. In 2014, two years after being sued by DR in this litigation, Defendants filed another application for the same mark, which was also rejected by the USPTO due to DR's trademark, but Defendants' second filing claimed a First Use in Commerce date of May 30, 2009. SUMF at paras. 82-86, 88-91.

Regardless of what date of first use in commerce Defendants claim, in the timeframe before Plaintiffs filed its trademark application and entering the e-cig market on May 3, 2010, Defendants had total gross sales of $120,264, which is approximately 180 unique customers, zero sales in at least 10 states, and had virtually no advertising expenditures. Based on market data, Defendants sales over this time period constituted approximately 0.18% of the total e-cig market. In California, the State where Defendants had their largest gross, they had approximately 81 customers during that same time period. SUMF at paras. 57-62.

Bengoa had no prior knowledge of Defendants, their website or their e-cig products prior to selecting the 21ST CENTURY SMOKE trademark, filing an application for registration with the USPTO and starting his e-cig business. Thereafter, when he first discovered Defendants' website online on or after June 17, 2010, he saw an online store named 21 Century Smoking selling an array of e-cigs under brand names such as Blackjack, Roulette and Pocket Ace. Several months later, a sales person at CB received a call in Fall 2010 from someone who said they have a store in the Chicago suburbs called 21 Century Smoking. Bengoa directed his sales person to send DR's 21ST CENTURY SMOKE products to that person as Bengoa believed that person was calling to sell Plaintiffs' e-cigs with their other brands. After DR's 21ST CENTURY SMOKE trademark was registered with the USPTO, CB received a letter in June 2011 from an attorney representing Defendants which stated that their trademark application was rejected and there was a customer service issue that CB should be aware of concerning the e-cigs. SUMF at paras. 18-21.

After the letter from Defendants in June 2011, Plaintiffs never heard from Defendants again until after Plaintiffs filed this action. Plaintiffs monitored Defendants periodically thereafter. Using investigators, Plaintiffs confirmed that Defendants were still selling e-cigs under the Blackjack name (with the name Blackjack printed on the e-cig), as well as other named e-cigs, in unsealed boxes from kiosks and through their Internet store in December 2011. In March 2012, through continued investigation, Plaintiffs learned that Defendants had adopted packaging similar to Plaintiffs, deemphasized their Blackjack name and were selling e-cigs using their store name, and now in a sealed, plastic package designed for sale in convenience stores. At an important convenience store trade show in Las Vegas, Bengoa learned from several of his convenience store customers, distributors and buyers, that there was a booth at the show that was using DR's trademark to sell e-cigs. Bengoa personally observed that it was Defendants with a booth that had

a banner using their store name 21 CENTURY SMOKING to try and sell e-cigs in the convenience store channel. This suit followed in September 2012. SUMF at paras. 23-25.

During the pendency of this action, Plaintiffs learned that DR's registered trademark 21ST CENTURY SMOKE was hidden in the metadata of Defendants' internet website. As a result of Plaintiffs' Motion for a Preliminary Injunction in 2013 addressing this issue, Duke personally removed Plaintiffs' registered trademark from Defendants' website and Defendants consented to an Order prohibiting, among other things, Defendants from using Plaintiffs' registered mark during the pendency of this action. Despite repeated denials that they did not insert, and did not know how, DR's registered trademark was in the hidden metadata of their website, Duke, Robert Hough (Duke's employee), and Defendants' various Search Engine Optimization (SEO) and website agents had the knowledge, ability, experience and the access to do it. SUMF at paras. 125-131.

Duke had the knowledge and ability to make a simple change to the code on his website to add Plaintiffs' trademark given his education and experience including a Resume that boasts "proficient" in HTML and JavaScript, working for a SEO Marketing Company, owning and operating multiple website based businesses and being the person in charge of the website and digital marketing with full access and control of his websites at all times. In this litigation, Duke withheld key email communications with his SEO marketing consultants WEBRECSOL. home. Despite having an email folder labeled "KIRTI" to hold emails on his computer with his SEO consultant Kirti Saraswat from WEBRECSOL, Duke did not produce any email communications with Kirti Saraswat despite Duke's contrary sworn testimony in this case that he did email with her and did not delete any emails. These withheld emails revealed Duke's communications and approval of changes to Defendants' website for online SEO marketing reasons including changing

hidden metadata and keywords to insert competitors' trademarks and names, such as DR's registered trademark, at the relevant time.  SUMF at paras. 132-159.

Plaintiffs also learned that Defendants solicited Plaintiffs' customers and misrepresented that they were affiliated with CB.  In one instance, Defendants' foreign marketing sales representative based in Nepal called CB's customer Don Kunz who owns and operates Four Seasons Distributors in Belleville, Illinois that distributes products to over 350 convenience stores. Defendants bought another brand of e-cigs for approximately $7,500 in 2012 and unsuccessfully tried to sell that brand of e-cigs named AUTOMATIC to Kunz in November 2012.  In December 2012, Duke's foreign sales representative called Kunz again – this time to attempt to sell him 21 Century Smoking e-cigs.  During that call, Defendants' sales representative falsely and repeatedly claimed to Kunz that Defendants e-cigs were affiliated with "CB Distributors" based in "Wisconsin."  SUMF at paras. 113-124.   Kunz reported this conduct to Plaintiffs and these facts were part of Plaintiffs' application for the Preliminary Injunction Order that was issued in 2013. [See Dkt. 26].

Further, Plaintiffs learned during this litigation that Defendants were getting emails from Plaintiffs' customers after Plaintiffs' customers bought Plaintiffs' products in convenience stores and thereafter searched online to contact CB with a customer service issue.  Based on the emails in Defendants' document production, Defendants took this as an opportunity to try and sell their products to Plaintiffs' customers and make defamatory comments about Plaintiffs' products to Plaintiffs' customers.   While Defendants' email document production shows they had approximately 662 unique customer service email inquiries from Plaintiffs' customers, Defendants withheld emails as their document production showed that they purportedly did not respond by email to nearly 468, or 70%, of these emails.  Plaintiffs learned from their own customers that

Defendants did respond to many of these emails, and that Defendants tried to divert Plaintiffs' customers and defame Plaintiffs products. For example, Plaintiffs obtained an email exchange with Duke directly from Plaintiffs' customer Barbara Wood in 2013 -- after the PI Order was entered prohibiting Defendants from using Plaintiffs' trademark. While Defendants produced the two initial emails that Wood sent to Defendants -- the entire email exchange of eleven emails with Defendants were improperly withheld from Defendants' document production. In his emails with Wood, Duke tries to deceive her, sell her Defendants' e-cig products and defames Plaintiffs. SUMF at paras. 93-112.

As part of a national advertising and marketing strategy, CB attended trade shows and displayed its trademarked e-cig products in its trade show booth. In September 2013, Plaintiffs co-sponsored a trade show booth at the Global Gaming Expo show in Las Vegas. One of Plaintiffs e-cig distributors and long-time supplier of other consumer goods to CB, Gibson Enterprises, based in San Luis Obispo, CA, wanted to attend the show to promote and sell Plaintiffs' e-cigs. During this trade show where Plaintiffs had a booth staffed by Gibson's personnel, William Edmiston, an authorized agent for Defendants (with a written contract to be paid 50% of Defendants' product sales), who was aware of this litigation, attended the trade show in order to secretly record his conversations with a sales person at Plaintiffs' booth. Defendants' agent destroyed one of the two recordings he made and only captured one sentence from one of the conversations. SUMF at paras. 67-80.

Defendants allege that a sales person at Plaintiffs' booth made defamatory statements about Defendants. This was denied by that sales person at his deposition and of course there is no recording to substantiate same. But what is undisputed is that the alleged defamatory statements were only made to Defendants' agent and no one else. Before Edmiston's deposition, Defendants

denied that they had any relationship with Edmiston and concealed their written agreements with Edmiston. At his deposition, Edmiston admitted that he had a written agreement with Defendants and was their agent. After his deposition, Edmiston admitted that he spoke with Duke and sent an email providing another written agreement with Defendants that gave him a 2% stock option in Defendants' company. Other than Edmiston, Defendants have not identified anyone who heard these alleged statements or was influenced in anyway by any such statements in making e-cig purchases – and no alleged statements were made in the State of Illinois. *Id.*

## LEGAL ARGUMENT

I. **Defendants Have No Enforceable Common Law Trademark Rights Because They Failed To Achieve Legally Sufficient Market Penetration in Any Specific Geographic Area in the U.S.A.**

Fatal to Defendants' trademark infringement claims is the lack of evidence to prove any legally sufficient "market penetration" in any geographic territory in the U.S. Even when Defendants have been found to be the first to use the name at issue, or the senior user of a mark as previously found by this Court, that does not create or give Defendants any enforceable trademark rights. Legally enforceable and protectable trademark rights only accrue through market activity such as sales and advertising that rise to a sufficient level that creates consumer recognition and familiarity such that consumers associate a product with a particular source. Evaluating the market activity of Defendants at the time Plaintiffs entered the e-cig market in May of 2010, and filed their trademark application with the USPTO, Defendants either had no sales or their market activity was so *di minimus* that they never acquired any enforceable trademark rights to assert or enforce in this action.

A common law trademark owner is only entitled to protection in those markets where the trademark has actually been used in some meaningful capacity. *Hanover Star Milling Co. v.*

*Metcalf*, 240 U.S. 403, 415-16 (1916); and *United Drug Co. v. Theodore Rectanus Co*., 248 U.S. 90, 100 (1918). This is known as the *Tea Rose-Rectanus* Doctrine. In *Hanover Star Milling Co.*, the United States Supreme Court detailed the scope of protection for a common law trademark and held that it is limited to the geographical area where the mark is both known and recognizable by an articulable population of possible customers. *Id*. The rights afforded to any party through its trademark arise out of use of the trademark and through the good will that becomes associated with the mark. *Id*. at 413. Courts have followed this rule and consistently held that common law trademark rights are only awarded when that party's mark has reached a level of market penetration that is significant enough to pose a real likelihood of confusion among consumers in the specific area of market penetration. *WNS, Inc. v. Deck the Walls, Inc*., 1986 U.S. Dist. LEXIS 17659 at *14 (N.D. Ill. 1986); *see also*, *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 959 (C.D. Cal. 2012)("[T]o establish enforceable common law trademarks in a geographical area, a plaintiff must prove that, in that area, (1) it is the senior user of the mark, and (2) it has established legally sufficient market penetration."); *Hanginout, Inc. v. Google, Inc*., 54 F. Supp. 3d 1109, 1121 (S.D. Cal. 2014)(A party asserting common law trademark rights must "show that it has 'legally sufficient' market penetration in a specific territory to establish those trademark rights.")(*quoting Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 958 (C.D. Cal. 2012)); *Allard Enters. v. Advanced Programming Res., Inc*., 249 F.3d 564 (6th Cir. 2001)(where appellate court vacated nation-wide injunction awarded in favor of party with senior trademark rights, on the basis that it proscribed an overly broad range of conduct without findings to support the geographic range of such relief); *Accu Personnel, Inc. v. Accustaff, Inc*., 846 F. Supp. 1191, 1205 (D. Del. 1994)("No senior user…'can monopolize markets that his trade has never reached and where the mark signifies not his goods but those of another.'")(quoting *Hanover Star Milling, supra.)*

When a party is asserting a common law trademark, courts have found that summary judgment dismissing such claims is appropriate where the claimant has failed to demonstrate legally sufficient market penetration.  *See, e.g.*, *Brandt Indus. v. Pitonyak Mach. Corp.*, 2012 U.S. Dist. LEXIS 122901 (S.D. Indiana, August 29, 2012)(Court, in summary judgment context, and without expert evidence, determines sufficient market penetration throughout five (out of 20 proffered) states to support exclusive trademark rights in those territories); *Smith v. Ames Dep't Stores*, 998 F. Supp. 827, 838 (D. N.J. 1997)(Court entered summary judgment against plaintiff because it had failed to demonstrate sufficient market penetration to establish common law trademark rights); *Accu Personnel, Inv. V. Accustaff, Inc.*, 846 F. Supp. 1191 (D. Del. 1994); *see also*, *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 984 (C.D. Cal. 2002)(Court denies plaintiff's application for preliminary injunction on the basis that it had failed to prove sufficient market penetration to establish common law rights in the challenged trademark).

Use alone is insufficient to establish common law trademark rights in a given territory; that use must be deliberate and continuous.  *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*, 2004 U.S. Dist. LEXIS 23064 at *37 (N.D. Ill. Nov. 12, 2004)("it's not the simple question of which party demonstrates it was the first user…the party without a federal registration must prove prior and continuous rights in a market that preempts the registrant's constructive nationwide rights"); *Natural Footwear Ltd., v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1397 (3d Cir. 1985)(defense of prior use applies only for the area in which continuous prior use is proven); *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 959 (C.D. Cal. 2012)(quoting Ninth Circuit precedent that, to maintain a common law trademark right, "the use must be maintained without interruption" and "there must be an active and public attempt to establish trade"); *BNC Bancorp. V. BNCCORP, Inc.*, 2016 U.S. Dist. LEXIS 78450, *15 (M.D. N.C., June 16, 2016)(citing Fifth and Sixth Circuit precedent that common law trademark rights rest upon deliberate and continuous - and not sporadic, casual, and transitory – use).  The record shows that

Defendants have not achieved market penetration in any geographic area in the U.S. and have virtually withdrawn from the market by closing all of their kiosks and stores.

## II. Defendants Market Activity Is So Di Minimus Or Nonexistent That It Cannot Meet The Legal Standard And Requirements To Establish Any Market Penetration

The party seeking common law trademark rights must make a showing of "clear entitlement" to protection of its mark in a particular market. *Accu Personnel, Inv. v. Accustaff, Inc.*, 846 F. Supp. 1191, 1206 (D. Del. 1994) (citing *Natural Footwear*, 760 F.2d at 1397. When evaluating whether a party has demonstrated market penetration sufficient to sustain common law trademark rights in a specific territory, courts generally consider the following four factors: (1) the volume of sales of products using the trademark; (2) positive and negative growth trends in the geographic region; (3) the number of purchasing customers compared to the total number of possible customers; and (4) the amount of advertising in the geographical region. See *Natural Footwear Ltd., v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398-99 (3d Cir.), *cert. denied*, 474 U.S. 920 (1985)(citing *Weiner King, Inc. v. Wiener King, Corp.*, 615 F.2d 512 (C.C.P.A. 1980) and *Sweettarts v. Sunline, Inc.*, 380 F.2d 923, 929 (8th Cir. 1967)(market penetration must be "significant enough to pose the real likelihood of confusion among consumers in that area")); see also *Brandt Indus. v. Pitonyak Mach. Corp.*, 2012 U.S. Dist. LEXIS 122901, *9 (S.D. Ind. Aug. 27, 2012)(for approval of this four part test from the Seventh Circuit).

Courts have instructed that this is a fluid test and the significance of any one of these factors may vary with the facts of a particular case, and there is no hard and fast rule governing the number of sales that might sustain a claim of market penetration. See *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 473-74 (3d Cir. 1990); and *Accu Personnel, Inc. v. Accustaff, Inc.*, 846 F. Supp. 1191, 1206 (D. Del. 1994)("The degree of market penetration required cannot be precisely defined."). What counts as *di minimus* sales in one action (and

insufficient to sustain a finding of market penetration) is not necessarily determinative in another. Additionally, a claimant may not be entitled to automatic protection merely because it has surpassed a *di minimus* sales threshold. *Charles Jacquin*, 921 F.2d at 473 (discussing *Natural Footwear Ltd*, 760 F.2d at 1403, as an example where the court found that the sales at issue surpassed a *di minimus* standard, but were still insufficient to support a claim for common law trademark rights).

In the *Natural Footwear* case, the court found the fact that sales were made throughout the country, were steady, and had grown, was insufficient – in order to be probative, this information should have also been made with reference to the actual volume of sales. *Id*. at 1399. They noted that courts should also consider whether the person claiming nationwide market penetration had the advertising budget necessary to support nationwide recognition of its product. *Id*. at 1400. Information regarding the size of the relevant market, or a business' reputation in that market, may be useful in the analysis, but that has to be provided through direct evidence. *Id*. at 1402.

The market penetration analysis is made at the time Plaintiffs entered the e-cig market and applied for Registration with the USPTO. See 5 McCarthy on Trademarks and Unfair Competition § 26:53-54 (5th ed.)(citing Report of the Trademark Review Commission and *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 46 U.S.P.Q.2d 1865 (6th Cir. 1998) (Junior user who was a federal registrant "retained the right to use its mark in those geographic regions" that the senior user had not entered at the time of the junior user's federal registration.), later proceedings, *Allard Enterprises Inc. v. Advanced Programming Resources Inc*., 249 F.3d 564, 58 U.S.P.Q.2d 1710 (6th Cir. 2001)("In the case in which a junior user applies for registration, however, the extent of the senior user/non-registrant's territory is frozen as of the date of actual registration to the junior user."); see also *Thrifty Rent-A-Car Sys. v. Thrift Cars, Inc*., 831 F.2d

1177, 1181 (1st Cir. 1987)("A pre-existing good faith user's rights are frozen to the geographical location where the user has established a market penetration as of the date of registration. Such users are unable thereafter to acquire additional protection superior to that obtained by the federal registrant.")).  Courts, such as *Thrifty Court* and *Natural Footwear*, have stated that the date for analysis should be the date when the junior user initially registered its mark and the courts use the date that the junior user actually *applied* for registration of the mark for the market penetration analysis.  See *Natural Footwear*, supra, at 1391.  Here, the relevant time for the analysis in May 3, 2010 when Plaintiffs filed their first application for registration with the USPTO.

A.     **Defendants' Market Activity Never Achieved Any Consumer Recognition in any Geographic Territory**

With no direct evidence of any consumer recognition in the market, such as surveys or direct consumer testimony, Defendants only offer indirect evidence in an effort to show sufficient consumer awareness in the e-cig market.  Under any analysis of the legal standards offered by the courts that have addressed this issue, such as *Natural Footwear*, Defendants' use of the mark 21 CENTURY SMOKING is either nonexistent or *di minimus* such that they have not created any enforceable common law trademark rights in any geographic territory as of May 3, 2010.

1.     **Defendants Have No Common Law Rights In Ten States Where They Had No Market Activity**

With no sales or market activity in the following ten states, Defendants cannot establish and did not create any goodwill or consumer awareness of their products: Alabama, Delaware, Hawaii, New Hampshire, New Mexico, North Dakota, Oregon, Vermont, West Virginia, and Wyoming.[1]  SUMF at para. 62.  Defendants offer no proof that they even entered these markets let

---

[1]  For purposes of this motion only, Plaintiffs contend that the geographic territories are individual U.S. States.  However, given the limited and localized sales of Defendants in certain kiosks and stores, Plaintiffs reserve the right to contend that the markets are much smaller than a State.

alone penetrated them. As Plaintiffs have registered trademarks with the presumption of ownership and nationwide rights as well as their extensive market activity in these States, Plaintiffs would be the senior user in these States and Defendants have no rights in these geographic territories to enforce in this action.

2. **Defendants Have No Common Law Rights In Five States Where They Had Di Minimus Sales in 2009 and No Sales in 2010**

Under any market activity analysis, Defendants' sales in the following five States are so *di minimus* in 2009 and nonexistent in 2010 that they cannot establish any customer awareness of their products: Alaska, Connecticut, Idaho, Rhode Island and South Dakota. SUMF at para. 64. Again, Defendants have offered no proof that they did anything in these States in terms of sales or advertising that could meet any of the applicable legal standards to establish any enforceable common law trademark rights.

3. **Majority of Defendants' Sales Were in only Five States and Their Sales only Exceeded $5,000.00 In Four States**

Based on the sales data produced for the relevant time period, the majority of Defendants' gross sales of $120,264 were made in only five States: Illinois (31%), Ohio (22%), California (19%), Nebraska (14%) and Indiana (4%). SUMF at paras. 61 and 65. Defendants' economic expert, Mr. David Haas, confirmed that Defendants' e-cig sales only exceeded $5,000.00 in four of these States: Illinois, California, Nebraska, and Minnesota. SUMF at para. 67. While some courts have suggested that a certain sales amount is a minimum amount for market pentation, there is no set bright line rule and each case must be evaluated on its own merits. Under the circumstances of this case and given the size of the e-cig market, Defendants' will likely claim that its sales exceeded some minimum threshold, such as $5,000, as stated in another case concerning different products and different markets which is not controlling. The Court must

evaluate each factor of the test to see if their sales volume equates to any consumer recognition or market penetration for the e-cig market. The level of sales alone is not determinative and is just part of the analysis. Here, where the sales are so *di minimus* given the market size, Defendants cannot establish legally enforceable trademark rights with these level of sales. Plaintiffs' economic expert, Mr. Robert Vigil, determined that Defendants' overall market share at the relevant time period would equate to only 0.18% of the e-cig market. SUMF at para. 76. Given that customers spend $675 annually on e-cigs, he further concluded that Defendants' sales in these four States equated to only 93 individual customers which breaks down as follows: Illinois (31), California (44), Nebraska (10), and Minnesota (8). SUMF at paras. 68-72.

### 4. Defendants Chose to Sell Through Mall Kiosks and Stores Targeted to the Smallest Segment of Customers

After initially selling e-cigs through their online website, Defendants began to sell through leased kiosks in malls as well as some newsstands and tobacco outlets. SUMF at para. 78. These physical locations were very limited and only in six States. *Id*. While Defendants opened several mall kiosks and two stores, one in Chicago and one in California, most of the kiosks closed after opening. SUMF at paras. 78-80. Despite some initial sales growth after Plaintiffs entry into the market, Defendants' sales were still *di minimus* in the scope of the market. Generally, the majority of e-cig sales in the U.S., approximately 73% in 2011, were made in the convenience store channel of trade. This is a channel of trade where Defendants had no presence as they focused on mall kiosks and the internet which is the smallest channel of trade for the sales of e-cigs. SUMF at paras. 43. Moreover, Defendants sales thereafter began to decline and they have now closed all of their kiosks and stores and essentially withdrawn from the market. SUMF at paras. 78-80.

### 5. Website Sales On The Internet That Are Di Minimus Do Not Equate To Market Penetration

Given their expert's opinions, it is clear Defendants will argue that their sales over the Internet somehow equate to nationwide market penetration. For trademark market penetration analysis, most courts have rejected the notion that the Internet is its own distinct market. For example, in *Allard Enters. v. Advanced Programming Res., Inc*., the Sixth Circuit vacated an injunction that barred one party from using its mark at all on the Internet. 249 F.3d 564, at 575 (6th Cir. 2001). Similarly, in *Dudley v. HealthSource Chiropractic, Inc*., a District Court in New York observed that, "[b]y claiming exclusivity to [its] mark on the internet, the Plaintiff assumes that the internet is a territory in which he can establish exclusive rights. The internet is not, however, a geographic territory to be subdivided; instead, it is a global communication medium that is accessible from anywhere on the planet." 883 F. Supp. 2d 377, 394 (W.D.N.Y. 2012)(addressing rights of concurrent senior and junior users on the internet). The *Dudley* court further reasoned that "[i]f, … a senior common law user could claim exclusive use on the internet, then it would undermine the benefits and security provided by federal registration." *Id.* Even courts that consider internet sales have held that a party seeking common law trademark rights must still show market penetration and doing little more than having a website and making sales through the internet does not meet the test. For example, in *Optimal Pets* a California District court suggested, in *dicta*, that it "may be possible to view cyberspace as its own distinct market," but then found that plaintiff had not established market penetration anywhere, including on the Internet, to prove trademark use. *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F.Supp. 2d 953, 961-62 (C.D. Cal. 2012). Given their limited sales and virtually no advertising or marketing to generate any consumer recognition, Defendants cannot establish any trademark right simply because they also made sales through a website on the Internet.

6. **Defendants Have Done Little Advertising and Their Sales Have Not Been Continuous And Growing As They Closed All Kiosks and Stores**

A noted above, Defendants experienced some growth in sales, albeit *di minimus* when viewed in the context of the overall market size. They also started to close all of their kiosks and stores, and now have virtually withdrawn from the market at this time. Significantly, Defendants invested little into their marketing and advertising. SUMF at paras. 81-84. For 2009 and the entire year of 2010, Defendants spent $4,348 on advertising and Duke admitted his marketing efforts were inefficient and their focus was malls and kiosks. *Id*. Defendants' limited investment in advertising does not rise to any level that can support a finding of market penetration. Moreover, Defendants cannot satisfy any of the elements of the test to establish enforceable common law trademark rights and their claims should be dismissed.

**B.** **Plaintiffs Selected Their Mark 21ST Century Smoke In Good Faith Without Prior Knowledge Of Defendants And Without Any Intent To Derive Any Benefit From Defendants' Alleged Goodwill**

Plaintiffs have acted in good faith at all times as they adopted and filed their application for registration for their trademark with no prior knowledge of Defendants, their website, their kiosks/stores or any of their products. A junior user's knowledge of a senior user can defeat a claim of "good faith" use required to establish common law trademark rights. See *Commerce Bancorp, Inc. v. BankAtlantic*, 285 F. Supp. 2d 475, 499 (D.N.J. 2003)(citing *Money Store v. Harriscorp Fin., Inc*., 689 F.2d 666, 674-75 (7th Cir. 1982)). In *Money Store*, the Seventh Circuit observed that a good faith user is one who begins using a mark with no knowledge that someone else is already using it. *Id*. at 674. In this context, a junior user's "good faith use" will be measured from the date of its first use. See 5 McCarthy on Trademarks and Unfair Competition § 26:11 (5th ed.). And, a later user who has adopted in good faith is not required to forgo any further expansion after learning of the prior user. *Id*. (citing *Weiner King, Inc. v. Wiener King, Corp*., 615 F.2d 512, n. 6 (C.C.P.A. 1980).

As the record makes clear, Bengoa, acting on behalf of his two companies, acted in good faith at all times in adopting and using Plaintiffs' registered trademarks at issue in this case. Bengoa had extensive experience in the e-cig market selling another brand called Gamucci nationwide in 2009 as well as traveling to China to investigate manufacturers when he considered making his own trademarked e-cig product. After selecting several names that he did not recognize or see anywhere in the e-cig market based on his extensive research and experience, he hired lawyers to search, clear and apply for trademark registration. Thereafter, Plaintiffs obtained the federal registration for their trademarks from the USPTO.

The first time Bengoa saw Defendants' website was no earlier than June 17, 2010, which was after he had already researched, selected his product name and filed an application for registration with the USPTO on May 3, 2010. Bengoa explained that he observed that Defendants had a store selling various e-cig products under names such as Blackjack and Pocket Ace, but not any products named 21 Century Smoking. Given he had never heard of any one selling an e-cig under Defendants' alleged trademark, he did not see any problem with using his trademark. SUMF at paras. 18-19.

Despite a call from Duke in the fall of 2010, the only written communication he recalls receiving was from Defendants' attorney advising CB that Defendants' trademark application was rejected by the USPTO and there was some customer service problem that they were experiencing with calls from Plaintiffs' customers. Plaintiffs never received any further communications from Defendants until after this lawsuit was filed. Given the circumstances, Plaintiffs have acted in good faith and are a junior user with no prior knowledge of Defendants. Without any such knowledge, Plaintiffs could not, and did not, have any intention to derive any benefit from

Defendants or their business or products.  Plaintiffs are entitled to assert their rights in this action and seek a dismissal of Defendants trademark claims.

### C.  Defendants Unfair Competition Claim Fails As Defendants Have No Enforceable Trademark Rights

Defendants' claims for "unfair competition" (Second Amended Counterclaim at Counts One and Three) and state law trademark infringement claim under the IDTPA (Second Amended Counterclaim at Count IV) likewise fail as Defendants have no enforceable trademark rights.  See *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir. 1997)("federal and state laws regarding trademarks and related claims of unfair competition are substantially congruent")(quoting *International Order of Job's Daughters v. Lindeburg and Co*., 633 F.2d 912, 916 (9th Cir. 1980); see also *AHP Subsidiary Holding Co. v. Stuart Hale Co*., 1 F.3d 611, 619 (7th Cir. 1993) (state unfair competition claims mirror federal infringement claims); *Tarin v. Pellonari*, 253 Ill. App. 3d 542, 551, 625 N.E.2d 739, 745-46, 192 Ill. Dec. 584, 590-91 (Ill. App. Ct. 1993)("under both State and Federal statutes, the principles of trademark law and the tests for infringement are the same as the ones traditionally applied at common law.").

As Defendants' claims under these Counts are based on allegations of trademark infringement, they must be dismissed as a matter of law where Defendants have no enforceable trademark rights.  The law is well settled on this point and Defendants' failure to have any enforceable trademark rights means they cannot sustain claims of Unfair Competition or state law claims for trademark infringement.

### D.  Defendants' Claim for Damages for "Disparagement" Fails As a Matter of Law, As Money Damages Are Not Available Under the IDTPA

Defendants' assert claims for "disparagement" under the Illinois Uniform Deceptive Trade Practices Act ("IDTPA") (815 ILCS 510/2), as set forth under Count V of Defendants' Second

Amended Counterclaim, must be dismissed as a matter of law.  The IDTPA does not apply to past conduct, and only provides for injunctive relief for *ongoing or future* practices.  Defendants have not alleged any ongoing disparaging statements allegedly made by Plaintiffs or its alleged agents or representatives.  Defendants only allege one instance of an allegedly disparaging statements made about its products and business to Mr. Edmiston at the trade show in Las Vegas in September of 2013.  Therefore, there is not material issue of fact with regard to this claim and summary judgment should be granted.

Count V of Defendant's Second Amended Counterclaim, titled "Illinois Deceptive Trade Practices Act – Disparagement (815 ILCS 510/2)" claims that Defendants "suffered financial injury in an amount that cannot presently be determined."  (See Defendant's Second Amended Counterclaim, p. 12, ¶67).  Defendants further demand that "Counter-Defendants be required to pay to Counterclaimant all damages Counterclaimant has suffered by reason of Counter-Defendants' disparagement and defamation of Counterclaimant and its products." *Id.* at 16, ¶ F).  However, Section 3 of the IDTPA only provides for injunctive relief for ongoing or future practices. See 815 ILCS 510/3.  See also *DSM Desotech, Inc. v. 3D Sys. Corp*., 749 F.3d 1332, 1348 (Fed. Cir. 2014).

Section 3 states: "A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable."  The underlying District Court in *DSM Desotech,* whose decision was affirmed on appeal, had granted defendants' motion for summary judgment dismissing plaintiff's UDTPA claims, stating:  "The allegations in the Third Amended Complaint specifically addressed to this count all refer to past conduct….  Accordingly, this Court finds that Desotech has presented insufficient evidence to support its

allegations that the statements made by 3D were … ongoing.  3D is entitled to summary judgment on Count VI." Id. (citing 2013 U.S. Dist. LEXIS 13017, *44 (N.D. Ill. 2013).

The UDTPA "does not provide a cause of action for damages, but it does permit private suits for injunctive relief."  *MPC Containment Sys. v. Moreland*, 2008 U.S. Dist. LEXIS 60546, *59-60 (N.D. Ill. 2008) (citing *Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation*, No. 05-3555, 2005 U.S. Dist. LEXIS 15798, 2005 WL 1838364, *24 (N.D. Ill. 2005), *aff'd*, 464 F.3d 651, 659 (7th Cir. 2006); and *Smith v. Prime Cable of Chi.*, 276 Ill. App. 3d 843, 859-60, 658 N.E.2d 1325, 1337, 213 Ill. Dec. 304 (1st Dist. 1995)).  Because the UDTPA only allows for prospective injunctive relief, it can only provide relief for ongoing deceptive practices. *Id.* (citing *Alpha Delta Phi Int'l, Inc. v. Chi Delta Chi*, No. 93 C. 2012, 1995 U.S. Dist. LEXIS 889, at *8-9 (N.D. Ill. 1996); and *Smith*, 276 Ill. App. 3d at 859-60, 659 N.E.2d at 1337).

Defendants only allege <u>one</u> occurrence of any allegedly disparaging statements made about their products and business made in September of 2013.  Defendants have no evidence of any other – let alone any <u>ongoing</u> – allegedly disparaging statements made by Plaintiffs, its alleged agents or representatives.  Plaintiffs are entitled to summary judgment dismissing Count V of the Second Amended Counterclaim.

### E.    **Defendants' Claim Of Disparagement Also Fails Under The IDTPA As The Act Only Applies To Actions Occurring In The State Of Illinois**

Defendants' claims for disparagement under the IDTPA cannot succeed as the alleged conduct occurred outside of Illinois.  The IDTPA only prohibits deceptive trade practices occurring "primarily and substantially in Illinois."  *Clearline Techs., Ltd. v. Cooper B-Line*, 2012 U.S. Dist. LEXIS 2116, *25-26 (S.D. Tex. 2012) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 835 N.E.2d 801, 296 Ill. Dec. 448 (Ill. 2005)).  S*ee also  Super Wash, Inc. v. Sterling*, 2006 U.S. Dist. LEXIS 8277, 2006 WL 533362, at *2 (N.D. Ill. 2006) (applying *Avery* to the IDTPA

because the Consumer Fraud Act explicitly incorporates § 2 of the IDTPA); *Purepecha Enters. v. El Matador Spices & Dry Chiles*, 2012 U.S. Dist. LEXIS 120499, *45 (N.D. Ill. Aug. 24, 2012). See also *LG Elecs.*, 809 F.Supp. 2d at 857, 859 (N.D. Ill. 2011); *Specht v. Google, Inc.*, 660 F.Supp. 2d 858, 866 (N.D. Ill. 2009); *Super Wash, Inc. v. Sterling*, No. 04 C 4618, 2006 U.S. Dist. LEXIS 8277, 2006 WL 533362, at *9 n. 10 (N.D. Ill. 2006).

The *Avery* court enumerated the following factors to guide the Court's analysis in applying the territorial limitations to the IDTPA: (i) plaintiff's residence, (ii) where the deception occurred, (iii) where the damage to plaintiff occurred, and (iv) whether plaintiff communicated with defendants or its agents in Illinois. *IFC Credit Corp. v. Aliano Bros. Gen. Contractors, Inc.,* No. 04-CV-6504, 2007 U.S. Dist. LEXIS 3595, 2007 WL 164603, at *9-10 (N.D. Ill. 2007).

Here, Defendants have no facts to show that the alleged conduct occurred "primarily and substantially" in Illinois. In a similar case, *LG Electronics USA, Inc. v. Whirlpool Corp.*, 809 F.Supp. 2d 857, 859 (N.D. Ill. 2011), the Court granted summary judgment on counterclaims under the IDTPA and Illinois Consumer Fraud Act, because the undisputed facts showed that none of the alleged violations could have occurred within the state of Illinois. *Id*. The Court stated: "Neither the IDTPA nor the ICFA have any extraterritorial effect, meaning that they only apply to acts that occur substantially and primarily within Illinois." *Id.*

In the present case, the only allegedly disparaging statements occurred were made in Nevada at a trade show. The alleged statements were made by a sales person from Gibson Enterprises, based in California, while he was selling Plaintiffs' products in Nevada. The statements were heard by Mr. Edmiston who was a Colorado resident at the time and an agent of Defendants. The undisputed facts show that no alleged violation occurred within the state of

Illinois. Plaintiffs motion for summary judgment dismissing Count V of Defendant' Second Amended Counterclaim should also be granted on these grounds.

### F. Defendants' Cannot Establish Defamation Where the Alleged Statements were Made to Defendants' Agent

Defendants' claims for "Defamation Per Se" as alleged in Count VIII of Defendant's Second Amended Counterclaim also fail as Defendants cannot satisfy the basic elements of such a claim. A party claiming defamation must show that the someone made a false statement concerning that party, and that there was an unprivileged publication of the defamatory statement to a third party by the person making such statement, and that the claimant suffered damages as a result. *Johnson v. Schnuck Mkts., Inc.*, 495 Fed. App'x 733, 736 (7th Cir. 2012) (citing, with emphasis added, *Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 532 (7th Cir. 2009). Illinois law recognizes a "per se" cause of action for defamation where damages are presumed. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 698 (7th Cir. 2006).

Courts have long held that an essential element of a claim for defamation is "publication of a statement to a third person." *Dutson v. Farmers Ins. Exchange*, 815 F. Supp. 349, 353 (D. Ore. 1993), aff'd, 35 F.3d 570 (9th Cir. 1994)(citing *State ex rel. Advanced Dictating Supply, Inc. v. Dale*, 269 Ore. 242, 247, 524 P.2d 1404 (1974)); see also Restatement of the Law, Torts § 577 (To constitute a publication it is necessary that the defamatory matter be communicated to someone other than the person defamed). "No publication to a third person occurs where the allegedly defamatory statements are made to plaintiff's officers or employees." *Dutson*, 815 F. Supp. at 353.

Even when giving all reasonable inferences, Defendants still cannot establish the basic elements of a defamation claim even if damages are presumed. After denying under oath that Mr. Edmiston had any relationship with Defendants, Mr. Edmiston testified that he was Defendants

authorized agent to act on their behalf and produced documents signed by Duke confirming same. On behalf of Defendants, Edmiston intentionally went to see Plaintiffs' trade show booth in Las Vegas and was aware of the pending litigation between the parties before he went. Even putting aside the fact that Edmiston destroyed one of the recordings he made of the alleged conversations, it does not matter what was said at the trade show as there is no evidence that these, or any other statements, were made to anyone other than Defendants' own agent. Under controlling law, there is no evidence that any alleged defamatory statement was made to a third-party and Defendants claim of defamation or defamation per se was dismissed.

**G.** **Defendants' Unlawful Conduct Before and During Litigation Bars Them from Any Relief under the Doctrine of Unclean Hands**

Before and during the course of this litigation, Defendants engaged in multiple acts of unlawful conduct such as: misuse of DR's trademark in the hidden metadata of their website; withholding critical email communications concerning that issue; falsely claiming to be affiliated with CB when selling e-cigs to CB's customers; withholding email communications with Plaintiffs' customers when trying to divert them and disparage Plaintiffs' products and business; false testimony under oath that Defendants had no relationship with Edmiston when Edmiston had a written agreement to act on behalf of Defendants when the alleged defamatory statements were made; and with knowledge of Plaintiffs' trademark take the opportunity to divert Plaintiffs' customers and disparage Plaintiffs' business and products, any of which standing alone, would be sufficient to invoke the doctrine of unclean hands. *Metro Publishing, Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870, 880 (N.D. Cal. 1994)(plaintiff's deliberate attempt to create trademark confusion constituted unclean hands; summary judgment against trademark holder granted on this basis alone); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 970 (S.D.N.Y. 1992) *aff'd*, 983 F.2d 1048 (2d Cir. 1992)(unclean hands where defendant's

president lied under oath); *Mas v. Coca-Cola Co.*, 163 F.2d 505, 511 (4th Cir. 1947) (finding of unclean hands where plaintiff submitted false testimony and forged documents to the Patent Office); *C.C.S. Comm'n Control, Inc. v. Sklar*, Case No. 86-cv-7191-WCC, 1987 U.S. Dist. LEXIS 4280, 1987 WL 12085, at *2-3 (S.D. N.Y. 1987)(denying equitable remedy to plaintiff who committed perjury); *FLIR Sys., Inc. v. Sierra Media, Inc.*, 965 F. Supp.2d 1184, 1197 (D. Or. 2013) (where party asserting false advertising claims also engaged in false advertising, claims are barred by the doctrine of unclean hands); *U.S. Ethernet Innovations, LLC v. Texas Instruments Inc.*, Case No. 6:11-cv-491-MHS, 2014 U.S. Dist. LEXIS 131334, 2014 WL 4683252, at *6 (E.D. Tex. 2014)(unprofessional conduct, including attempted interference with to interfere with adversary's expert, constituted unclean hands); *Fed. Folding Wall Corp. v. Nat'l Folding Wall Corp.*, 340 F. Supp. 141, 146 (S.D. N.Y. 1971) (unclean hands warranted dismissal of case where plaintiff breached employment contract with defendant and induced trademark owner to cancel license to defendant); *Clements Indus., Inc. v. A. Meyers & Sons Corp.*, 712 F. Supp. 317, 318 (S.D. N.Y. 1989)(deceptive dealing in order to obtain confidential trade secrets supports finding of unclean hands and dismissal of plaintiff's claims); *Worthington v. Anderson*, 386 F.3d 1314, 1321-22 (10th Cir. 2004)(unclean hands warranted dismissal of trademark claims where plaintiff "threw economic obstacles in the way of" defendant's ability to comply with arbitration agreement); *Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 401 F. Supp. 2d 383, 395 (D. N.J. 2005) (unclean hands doctrine applicable where business partner engaged in acts of self-dealing.); *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 617-621, 12 Cal. Rptr. 2d 741 (1992) (legal claim for conversion barred on the basis of unclean hands where plaintiff failed to return defendant's software and used same after development agreement terminated).

Defendants' litigation practices have been punctuated with misconduct as aforesaid, which likewise supports dismissal of their claims on the basis of unclean hands. See *Root Ref. Co. v. Universal Oil Prods. Co*., 169 F.2d 514, 534-35 (3d Cir. 1948)("No principle is better settled than the maxim that he who comes into equity must come with clean hands and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim.").

Not only does Defendants' withholding of documents material to this case support a finding of unclean hands, it also supports an inference that the missing documents would have been unfavorable to Defendants. See *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134-36 (7th Cir. 1987)(where employee selectively destroyed documents that were known to be relevant to litigation, while litigation was pending and in violation of employer' retention policy, and offered a non-credible justification for such destruction, fact finder was entitled to presume that documents would have been unfavorable to him), *cert. denied*, 485 U.S. 993 (1988); *YCB Int'l, Inc. v. UCF Trading Co*., No. 09-CV-7221, 2012 U.S. Dist. LEXIS 104887, at *31 (N.D. Ill. June 12, 2012)(violation of records retention regulation creates the presumption that missing records contained evidence adverse to violator); *Domanus v. Lewicki*, 284 F.R.D. 379, 386, 391-91 (N.D. Ill. 2012)(court has broad discretion to fashion an appropriate sanction when responding to a party's misconduct; even absent a clear showing of bad faith, spoliating party's failure to preserve evidence still justified an instruction that permitted the jury to presume that the lost evidence was both relevant and favorable to the innocent party); see also, *Shaffer v. RWP Grp*., 169 F.R.D. 19, 28 (E.D. N.Y. 1996)(in light of trial court's discretion to pursue a wide range of responses to level the evidentiary playing field and sanction improper conduct, adverse inference was deemed "eminently appropriate" where destroyed documents were not only relevant but bore

upon a critical issue in the case); *Int'l Union, United Auto., etc. v. NLRB*, 148 U.S. App. D.C. 305, 459 F.2d 1329, 1335-36 (D.C. Cir. 1972)(adverse inference rule "is more a product of common sense than of the common law").

Taken together, these acts committed by Defendants clearly rise to the level of contumacious conduct that either equals or exceeds the misconduct found by other courts to constitute unclean hands. Under these circumstances, this Court should infer that the withheld evidence is relevant and favorable to Plaintiffs. When viewing the totality of the circumstances, the Court should exercise its equitable power and hold that Defendants' wrongful acts constitute unclean hands thereby barring Defendants from any relief or remedy in this action.

## III.  CONCLUSION

For the foregoing reasons, Plaintiffs motion for summary judgment should be granted dismissing all of Defendants' claims. Given Defendants lack of any market penetration in the U.S. and their misconduct before and during this action, Defendants do not have any enforceable trademark rights and should be barred from obtaining any relief against Plaintiffs in this action.

Dated:  January 15, 2018     Respectfully submitted,
            NICOLL DAVIS & SPINELLA, LLP

         By:   /s/ Anthony J. Davis
            ANTHONY J. DAVIS
            adavis@ndslaw.com
            95 Route 17 South, Suite 316
            Paramus, New Jersey 07652
            201-712-1616
            201-712-9444 (fax)
              and
            ROBERT C. VON OHLEN
            Robert C. von Ohlen & Associates
            1340 W. Deerpath Road
            Lake Forest, IL 60045
            Phone: (888) 376-7475
            rvo@vonohlenlaw.com