```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      WESTERN DIVISION

 3   DR DISTRIBUTORS, LLC,            )Docket No. 12 C 50324
                                      )
 4     Plaintiff-Counterdefendant,    )Rockford, Illinois
                                      )Tuesday, April 17, 2018
 5            v.                      )10:00 o'clock a.m.
                                      )
 6   21 CENTURY SMOKING, INC.         )
     and BRENT DUKE,                  )
 7                                    )
       Defendants-Counterplaintiffs,)
 8                                    )
     CB DISTRIBUTORS, INC. and        )
 9   CARLOS BENGOA,                   )
                                      )
10     Counterdefendants.            )

11                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE IAIN D. JOHNSTON
12
     APPEARANCES:
13
     For the Plaintiff:         NICOLL, DAVIS & SPINELLA LLP
14                              (95 Route 17 South,
                                 Suite 316,
15                               Paramus, NJ  07652) by
                                MR. ANTHONY J. DAVIS
16
                                ROBERT C. von OHLEN & ASSOCIATES
17                              (1340 Deerpath Road,
                                 Lake Forest, IL  60045) by
18                              MR. ROBERT C. von OHLEN, JR.

19   For the Defendants:        LEAVENS, STRAND & GLOVER, LLC
                                (203 N. LaSalle Street,
20                               Suite 2550,
                                 Chicago, IL  60601) by
21                              MR. THOMAS R. LEAVENS

22                              LAW OFFICE OF PETER S. STAMATIS, PC
                                (77 W. Wacker Drive,
23                               Suite 4800,
                                 Chicago, IL  60601) by
24                              MR. PETER S. STAMATIS

25
```

```
 1   Court Reporter:          Heather M. Perkins-Reiva
                              327 S. Church Street
 2                            Rockford, Illinois  61101
                              (779) 772-8309
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE CLERK:  Calling 12 CV 50324, DR Distributors, LLC
 2  vs. 21 Century Smoking, Inc.
 3            MR. STAMATIS:  Good morning, your Honor.
 4            THE COURT:  Good morning, Mr. Stamatis.
 5            MR. von OHLEN:  Good morning, your Honor.
 6            THE COURT:  Let's get appearances, please.
 7            MR. von OHLEN:  Robert von Ohlen and Anthony Davis
 8  for the Plaintiffs.
 9            THE COURT:  Good morning, Mr. Von Ohlen.  Good
10  morning, Mr. Davis.
11            MR. STAMATIS:  Peter Stamatis for 21.
12            MR. LEAVENS:  Good morning, your Honor.  Thomas
13  Leavens on behalf of 21 and Brent Duke.
14            THE COURT:  Good morning, Mr. Leavens.  Good morning,
15  Mr. Stamatis.
16            I will try to do, in theory, the easy one first,
17  maybe.
18            On the sealing of the documents, who thinks the
19  documents are confidential and need to be sealed?  And tell me
20  why.  They have been on the record for like weeks now, right?
21            MR. STAMATIS:  Yes, your Honor.  The protective order
22  had been in place, and these were documents that had been
23  marked, and when we saw that we reached out to counsel.  We
24  advised him that we thought they ought to remain confidential
25  or at a minimum have gone through the process that was set
```

1   forth in your Honor's protective order, which reached out to

2   us for us to make that determination.

3           From our perspective, we would like to keep the

4   documents confidential, if for no other reason that they do

5   contain customer information, addresses and that type of

6   information, and there is also a tax return that was included

7   in there that was marked.  All these had been marked

8   confidential.

9           THE COURT:  Okay.

10          MR. STAMATIS:  We are happy to put together, in short

11  order, our position in writing to your Honor with this, as we

12  are to the other motions before the court today.

13          THE COURT:  Okay.  How much time do you need?

14  Because it is kind of a little awkward.  If it is confidential

15  for you, but they are saying, "Seal them, prove your point

16  that they are confidential," it is just a little bit kind of

17  backwards.

18          MR. von OHLEN:  We don't want to win our motion,

19  Judge.

20          THE COURT:  Okay.  All right.

21          MR. DAVIS:  And for housekeeping, your Honor, the

22  motion that we filed to provisionally seal last night, Docket

23  244 and 245, should probably just -- we have it, I think, on

24  for next Thursday for presentment.

25          THE COURT:  No, I was here at 8:00 o'clock last

1  night, but I didn't read your guys motion, okay?

2           MR. DAVIS:  The sum and substance is the same.

3           THE COURT:  Is the same, okay.

4           MR. DAVIS:  We have attached and provisionally sealed

5  these, and it would be the same issue for Defendants to do

6  just as we did before.  I think it was in February or March.

7  We went item by item through each exhibit, and the burden was

8  on the party wanting to protect it, you know, following

9  Baxter.  That's how we proceeded before.

10          THE COURT:  Okay.  Well, I said this was going to be

11 the easy one, and now I'm kicking myself.

12          What kind of time frame, Mr. Stamatis, Mr. Leavens,

13 would you be looking at to get something on file relating to

14 keeping these types of documents under seal?

15          MR. STAMATIS:  14 days, your Honor.

16          THE COURT:  And I said I was kicking myself because

17 on the other motion, we had cross-motions for summary

18 judgment, obviously not fully briefed.  So it is just kind of

19 in the holding pattern over with Judge Kapala.

20          I guess I'm going to state the obvious:  You guys

21 want to win your motion, right?

22          MR. DAVIS:  Yes, your Honor.

23          MR. von OHLEN:  Yes, we do want to win this one.

24          THE COURT:  And you guys want to win your motion,

25 right?

1       MR. STAMATIS:  That's right.

2       THE COURT:  Okay.  For the detached, neutral reader

3  of both motions, meaning Judge Kapala, if both sides want to

4  win their motions, one of the first rules of writing -- well,

5  the first rule of writing is good writing is rewriting, the

6  second is know your audience, and the third is make it easy on

7  the reader.  From my outside perspective, I'm thinking right

8  now Judge Kapala has a mess on his hands, and the last thing I

9  want him to do is look at the mess and throw up his hands and

10  say, "Re-file," and then we restart the whole process.

11       We have got the issue relating to the documents that

12  were provided -- yes -- provided recently.  Just throwing this

13  out there:  Does it make sense, because you are not going to

14  lose your place in queue because you have already started the

15  briefing schedule, so that you don't have the situation of

16  Judge Kapala saying, "This is a mess; I can't make heads or

17  tails of this; I have got cross-motions; I have got motions on

18  statements of fact; I have got motions to strike; I have got

19  these statements of fact that have these issues; I have got

20  all this in front of me," to avoid him just throwing up his

21  hands and telling you to redo it, do you want to restart now

22  and file a nice, clean set so that the reader knows what he

23  has in front of him?

24       You are not going to lose your place in queue.

25       MR. von OHLEN:  Well, we are already -- as of today,

1  we are fully briefed, except for our request before the court

2  to supplement on the, you know, literally eleventh-hour

3  production of documents.

4  THE COURT:  But you want to file an amended document,

5  right?

6  MR. von OHLEN:  I think what we want is a supplement,

7  Judge, to address only wherever these documents lead us.

8  THE COURT:  So you don't want to go back and amend

9  what you previously filed?

10  MR. von OHLEN:  No, it is supplement.

11  THE COURT:  Okay.  All right.  So that's a helpful

12  clarification.

13  All right.  The documents -- I saw Mr. Stamatis's

14  e-mail.  It was attached as an exhibit somewhere, and I will

15  find it.  But I think the quote was, "These aren't relevant,

16  but here they are anyway."  Were they cited in any way in any

17  of the briefings, those documents that were provided?

18  MR. STAMATIS:  Are we back to the documents that we

19  contend should have been filed under seal?

20  THE COURT:  No, we have moved beyond that.  We are

21  talking about there is a motion regarding --

22  MR. STAMATIS:  Oh, yes, the motion to amend.  Okay.

23  THE COURT:  Right.  It is not really amending the

24  filings now.  It is a motion to get a supplement.

25  MR. STAMATIS:  Okay.

1          THE COURT:  And it is based upon the argument that

2   you folks at the eleventh hour provided them with documents.

3   All the dates had run, certainly the supplement date had run,

4   and so now they want to file an additional filing addressing

5   those documents or issues relating to those documents.  Your

6   e-mail when they were produced said, "They are not relevant."

7   Is that accurate that you said they are not relevant?  I can

8   find the e-mail somewhere.

9          MR. STAMATIS:  Yes, that's generally -- that's our

10  position with regard to the documents.  I can shed a little

11  light.

12         THE COURT:  Yes.  So my question to you was:  Did you

13  cite those documents?  Were you relying upon those documents

14  in any way on your -- in your filings?

15         MR. STAMATIS:  No, your Honor.

16         THE COURT:  Okay.

17         MR. STAMATIS:  And what had happened was in the

18  Plaintiff's motion they had made an issue that there were

19  certain papers that hadn't been produced and that that somehow

20  evidenced some kind of unclean hands or something like that.

21         So we went back to our client and we so advised him,

22  and he went and took another look and said, "Here."  One I

23  think was, perhaps, a copying error.  The other documents that

24  were produced were documents that he found, and once we

25  received them we tendered them.  It is nothing we have relied

1  upon, nor would we.

2          THE COURT:  But were they requested?  Did they fall

3  within a discovery request?

4          MR. STAMATIS:  I would say they probably did, your

5  Honor.

6          THE COURT:  Okay.

7          MR. STAMATIS:  They were documents that existed I

8  think prior to the Plaintiff's adoption of our mark, but

9  documents that the client only found when we asked him to go

10 back and take another look.

11         THE COURT:  I appreciate that.  That is helpful

12 information.

13         It is your motion.  I will hear from you.  And then I

14 will hear from Mr. Stamatis and Mr. Leavens.

15         So, Mr. Davis, go ahead.

16         MR. DAVIS:  Thank you, your Honor.

17         Just one point of clarification:  The records that

18 were produced on the evening of March 19th are referenced and

19 referred to in their briefing, and that's part of the issue

20 here.

21         So as we are e-filing our final opposition brief on

22 the night of the 19th at 8:30 p.m., we get the e-mail from

23 counsel, the one you are referencing, which is Exhibit A to

24 our motion, and it says, "Within the last 48 hours, we

25 received these documents," from their client, and they are

1    related to our argument about missing documents.  They say,

2    "We don't believe they are relevant to any other claim, but

3    here they are."  And then two hours later, they filed their

4    briefing and referenced those documents in their briefing in

5    particular.

6           So we are here because of this issue that essentially

7    48 hours -- they had the documents for 48 hours.  Without

8    explanation, they deliver them to us literally moments before

9    we are all required to file our final briefs, and this is a

10   tactical decision if they are holding them for 48 hours.  Put

11   aside for a moment that they have had these records for years.

12   Discovery closed over a year and a half before.  But they just

13   withheld the documents.  They incorporate them into their

14   briefing, and then -- what it really raises for us is the

15   production of these e-mails about the key issue in the case.

16          These are e-mails that we sought at least three

17   different ways.  They had three opportunities to produce these

18   in the case, which I will go over briefly with your Honor, but

19   these e-mails are with their outside SEO consultant, and as

20   you may recall, one of the key allegations in the case is that

21   our federally registered trademark was in their hidden

22   metadata in their website, and Judge Kapala in ruling on the

23   prior motion for summary judgment they had filed stated in

24   that ruling that if the jury found that to be -- or a jury

25   could find that's a basis for the unclean hands --

1          THE COURT:  Right.

2          MR. DAVIS:  -- and denying them all relief in this

3   case.  So it is a critical issue in this case.

4          But it raises the issue, on that night we got these

5   documents, sort of unbelievably, a hundred pages of e-mails,

6   communications with this outside company we sought many times

7   during discovery, where are they from, how were they found,

8   who did it, why were they not part of the original e-discovery

9   protocol.  Every e-mail in here has words and terms, the ones

10  they produced, that were part of our e-discovery protocol,

11  "Kirti Saraswat, Webrecsol."  They were right in the list,

12  "Search these terms."  We all met and conferred years ago.

13  "Pull all your e-data."

14         No one ever said data was missing, but we learn now

15  in this, their last filing, that Brent Duke, the owner of the

16  Defendant company, says, "Oh, I actually lost data.  I didn't

17  preserve it.  In 2014, things were being deleted, and I

18  learned of it then, and I stopped it."  But for two years he

19  had an obligation to preserve data in this case and never once

20  disclosed that.

21         THE COURT:  I'm going to pause you right there for a

22  second.

23         I have got to imagine there were multiple litigation

24  hold letters, right?  There was a flurry of litigation hold

25  letters?

1          MR. DAVIS:  Oh, right.  That's what you are supposed

2    to do.

3          THE COURT:  Was data lost?

4          MR. STAMATIS:  Not to our knowledge, your Honor.

5          THE COURT:  Okay.

6          MR. LEAVENS:  I think there was something in place

7    that -- and we have to confirm this with the client -- that it

8    wasn't any data that was being destroyed by our client, but

9    there was some data that was held by another service that has

10   as a regular protocol the deletion of information that --

11         THE COURT:  So a third-party contractor had your

12   client's data; is that right?

13         MR. LEAVENS:  I probably even shouldn't be speaking,

14   your Honor.  I just understand that there was something that

15   occurred along those lines.  We are going to have to get some

16   detail on it.  I can't speak to what that is.

17         THE COURT:  You will have to get a lot of detail

18   because if there is a third-party vendor that has your

19   client's data and a litigation hold letter was sent -- I

20   assume one was sent -- if there was one sent, and a

21   third-party contractor of a party deletes data, loses data,

22   spoils data, whatever verb you want to put on it, that goes to

23   the client, okay?

24         MR. STAMATIS:  May I suggest something, your Honor?

25         We would like to have the opportunity to respond to

1  the motion to strike and the motion for leave to amend -- I

2  think these are the two motions that encompass these

3  issues -- in writing so we can present it to your court, to

4  your Honor in writing, in a cogent manner, whether that is two

5  responses or one combined response that deals with it all, so

6  we could lay out the timing of all this and your Honor could

7  have it in front of you.

8          THE COURT:  Okay.  I'm trying to get a 2012 case

9  resolved.  Now that that other case, the Alacran case, is

10 almost dead, you are going to be next on the oldest case in

11 the building.  So I'm going to come back to that.  But I

12 interrupted Mr. Davis in the middle of an argument.

13         Go ahead.  I'm taking the pause button off you.

14         MR. DAVIS:  Thank you, your Honor.

15         During the course of the discovery, not only would

16 these e-mails with the search terms have been responsive to

17 the search terms, no one ever told us data was lost at that

18 time.  They were the subject of specific document demands, to

19 which objections were asserted, a Bates range of documents

20 were recited to which is completely not related to any

21 e-mails, followed up with a written meet-and-confer, "Where

22 are these records?"  None were produced.

23         At the deposition of Brent Duke, we asked him, "Did

24 you have e-mail communications with the person, the SEO

25 company?"  It is called "Webrecsol."  The person's name is

1    Kirti Saraswat.  And he said --

2         THE COURT:  You are going to have to provide

3    Ms. Perkins-Reiva with the spellings.

4         MR. DAVIS:  Yes, I will.

5         But we asked about it because Mr. Duke produced a

6    picture of his Outlook e-mail folders, and one of them says

7    "Kirti" on it.  So I remember that deposition very clearly,

8    asking him, "Did you have e-mails with this outside vendor?"

9    Because it is this critical piece of "Who put our trademark in

10   your website," right?  How did it get there?  The mystery

11   still continues, and these e-mails are part of that puzzle,

12   but I don't think it is a full production.

13        But we asked him about that that day, and he said, "I

14   did have e-mails with her.

15        "Well, where are they?

16        "Well, I don't delete them.

17        "Well, isn't that a folder from your own e-mail?

18        "Yes, but I don't know."

19        Nothing was ever produced.  He said he e-mailed with

20   her.  He said he had a folder.

21        In our original filing on the motion for summary

22   judgment, we said, "Given these facts, they are withheld."  I

23   don't know what else to call it.  When it is asked for, and

24   you say you have them, if you don't produce them, they are

25   withheld.  That's part of our argument about the litigation

1    misconduct that goes to the unclean hands portion of our

2    defense in this case.

3           In the response to that, this is what we got on the

4    night of the 18th at 8:30 p.m.: "Here's these e-mails," no

5    explanation, and used in their briefing.  They are cited in

6    there as part of their opposition they filed two hours later.

7           We have got to get to the bottom of this.  A part of

8    this equation -- I think I have seen this before in cases.

9    Usually, the adversary says, "Sorry, let me explain what

10   happened.  Let me give you a deposition at our cost.  You

11   know, we will try to sort it out."  I never had it this late

12   in the game, but this is a tactical decision, in my view, to

13   give them at that last minute.  They say in their e-mail, "We

14   had them for 48 hours."  They didn't give them to us.  They

15   waited so we couldn't use them in any way, review them.  We

16   might still be here, but I view that as a tactical decision.

17          More importantly is it goes to the critical issue in

18   this case, and while counsel may want to put something in

19   writing, we filed this over a week ago.  We filed this ten

20   days ago.

21          MR. von OHLEN:  Ten days ago.

22          MR. DAVIS:  Nothing has been filed in response to it.

23   And usually on an issue like this, I want to swear someone in.

24   I want to get Brent Duke on record.  I don't want a 16-page

25   explanation from the lawyers.  If they are representing to

1    this court that Brent Duke just found these documents, I want

2    to know when did he learn he was losing data, who did he

3    communicate it, where are these records from.  We want this

4    data.  It goes to a core issue in this case.  We don't need to

5    wait 14 days for a written response.  Let's swear him in.

6    Let's take a dep.  That's how you get to the bottom of it.

7         THE COURT:  Okay.  Mr. von Ohlen?

8         MR. von OHLEN:  Yes, right.  I know the court is

9    short on time.  So I think what we want is a remedy to move

10   the case along.  I don't think -- I mean, I didn't hear

11   anything.  They don't even know where these things came from.

12   The only way you are going to get the truth is you swear

13   somebody in.

14        So, basically, what we would like is to represent to

15   the court a 30(b)(6) notice, who has the most information

16   regarding these documents, where they were, where they came

17   from, why they weren't produced.  If that's Brent Duke, fine,

18   produce him.  We will take his deposition very quickly.  You

19   know, give us three weeks to do it, and we will file a

20   supplement or we won't.  Maybe we will find out, "Hey, no

21   harm, no foul," like they represent, or maybe we will find out

22   there is something sinister going on.  But the only way you

23   get to the bottom of that is you swear somebody in under the

24   penalty of perjury, not some, you know, filtered, ten-page

25   response to the court, and I think that's the resolution that

1    we seek.

2          THE COURT:  How about if I just bar the documents,

3    they can't be used?

4          MR. von OHLEN:  Well, I think the problem is that

5    they might be helpful to us if they are hiding, you know,

6    something or helpful --

7          THE COURT:  The documents that you have now, do they

8    help or hurt you, the documents that were produced at "the

9    eleventh hour"?  Do they help or hurt you?

10         MR. DAVIS:  They help to show that the previously

11   nonexistent communications with the outside SEO consultant,

12   they don't reference or talk about how our trademark ended up

13   in their website.  So if they are being barred, and there is a

14   negative inference that goes with that under Rule 37(e),

15   that's a good outcome for us.  But to have come this far in

16   the litigation, to get this stuff at the last second -- we

17   have been looking for these communications because we want to

18   see an e-mail from Brent Duke and his SEO consultant in India

19   that says, "Here is the keywords we want to put in your

20   website.

21         "Okay.  They look good.  Make sure to add 21 Century

22   Smoking, this competitor's trademark."

23         I mean, here is the smoking gun, the proverbial

24   smoking gun.

25         But barring the records, it doesn't get to the issue

1    that we are talking about.  But if it is under 37(e) for

2    failure to comply with the ESI obligations, and it goes a step

3    further and says not only they are barred, but the jury is

4    advised that those e-mails would have been unfavorable to

5    them, we would take that as a resolution.

6              THE COURT:  Okay.  First, take a look at -- oh,

7    geez -- Snider v. Danfoss.  There we go.  I'm having one of

8    those days.  Snider v. Danfoss, it will tell you what you need

9    to know about my particular view of 37(e).  You can go on the

10   Seventh Circuit Electronic Discovery Pilot Program website and

11   you can hear what I say about it, plus I have a handy-dandy

12   flow chart that tells you everything you need to know about

13   37(e) because that's what I will be looking at, because that's

14   what I have figured out.

15             MR. von OHLEN:  What is that case again, Judge,

16   Snider v. --

17             THE COURT:  Snider v. Danfoss.

18             And there is a flow chart floating around.  It was on

19   the webinar.  That's sort of an aside.

20             But I keep coming back to my concern.  As much as we

21   talk about what magistrate judges do, the main thing is to

22   make the district judges' lives better.

23             So what I'm hearing is a whole blowup.  Now, maybe

24   Mr. von Ohlen is right, and maybe it turns out there is

25   nothing, no big deal, no harm, no foul, and that's my quote

1    right out of Snider v. Danfoss, "No harm, no foul."

2          But you have got your briefing going on the motion

3    for summary judgment.  We head down the 37(e) route and that

4    blows up.  What happens with your cross-motions for summary

5    judgment and what is in front of Judge Kapala?

6          MR. von OHLEN:  Well, right now, as we are standing

7    here, literally last night, we filed the answers --

8          THE COURT:  Yes.

9          MR. von OHLEN:  -- to their last facts, however you

10   want to characterize that.

11         THE COURT:  I saw that.

12         MR. von OHLEN:  There is no other filings that are

13   going to occur, and I think we had a status that was set in

14   the early summer, presumably for your Honor to say --

15         THE COURT:  Yes.

16         MR. von OHLEN:  -- we are ready to present this to

17   Judge Kapala for decision.  So we are in mid-April.  We have a

18   little bit of time between now and then.  And presumably

19   nothing else is due, other than their response to the

20   confidential -- basically, following Baxter v. Abbott Labs.

21         Other than that, and I assume the court will just

22   decide on the papers on that, this is the only other issue

23   outstanding.  So we have a little bit of time, meaning a few

24   months, and if you were to order the Defendants to produce

25   Brent Duke for a deposition, you know, relatively soon, we can

1  follow up, and, like I said, maybe we come back in six weeks

2  for a telephone status and say we don't need it or we do need

3  to have the ability to file a supplemental brief.

4          MR. STAMATIS:  May I address the court, your Honor?

5          THE COURT:  July 24th is when the next status is.

6          Go ahead, Mr. Stamatis.

7          MR. STAMATIS:  Thank you, your Honor.

8          So I have heard some things from counsel:  That we

9  withheld documents; we never withheld any documents.  That we

10  made a tactical decision; we did not make a tactical decision.

11  This is a case, frankly, I think we ought to prevail on

12  summary judgment.

13          THE COURT:  Can I pause you right there?

14          MR. STAMATIS:  Sure.

15          THE COURT:  Setting the tactical decision aside.

16          MR. STAMATIS:  Yes, sir.

17          THE COURT:  And that was one of my first questions,

18  were they requested in discovery, and the answer I got was

19  yes, and then I think you said, yes, they were requested and

20  they were responsive.

21          Were they produced?  Obviously, they weren't produced

22  pursuant to the discovery request, and they certainly weren't

23  produced before the supplemental date, and they were just

24  produced now.  And if they are responsive, I don't know what

25  other verb you put on that other than "withheld."

1          I mean, weren't they withheld?

2          MR. STAMATIS:  They hadn't been located.  He hadn't

3    found them.  He just found them when we asked -- Mr. Duke just

4    found them when we asked him to go back and take a look.  The

5    reason this came up was there was an allegation in their

6    motion that by not having these documents, these were the

7    smoking gun that they were looking for.  There is no smoking

8    gun.

9          We said, "Mr. Duke, here is what they are saying."

10   He went.  He came back and said, "Here, I found these

11   documents.  Are these documents responsive?"  These are

12   responsive.  What they show is that this entire idea of "Oh,

13   there is a smoking gun; oh, there was all this bad conduct" is

14   a red herring.  It is a road to nowhere.  So that's what they

15   show.

16         Do they help us?  No, they are not relevant to the

17   case.  Do they help them?  No, they hurt them because they

18   establish that there is no "there" there.

19         THE COURT:  Let me pause you there.

20         They are telling me that you -- I specifically asked

21   you did you refer or rely upon or cite the documents in your

22   brief.  You said no.  They say yes.

23         MR. STAMATIS:  They are correct in terms of us

24   responding and saying, "These are the documents.  There is no

25   bad faith.  There is no 'there' there."  It is not -- what I

1   had meant to say was it is not an element or it is not a

2   document that we are going to use to prove our case.

3            THE COURT:  Well, if they are moving on it, and then

4   you are --

5            MR. STAMATIS:  Judge, in our affirmative case, your

6   Honor.

7            THE COURT:  Well, they have an affirmative case, too,

8   and you are using it to rebut their affirmative case, right?

9            MR. STAMATIS:  Well, in terms of them saying that the

10  failure to -- that these documents were not produced and they

11  are a smoking gun, and then Mr. Duke found them -- look, there

12  is no smoking gun.  There is nothing there.  So it takes off

13  the table this idea that there is some hidden smoking gun.

14           THE COURT:  If the documents were responsive, and

15  there was an ESI protocol and there were search terms, and

16  these documents have the search terms in them and they were

17  not produced, that seems to be a problem, doesn't it?

18           MR. STAMATIS:  And so this is something -- I don't

19  believe there is a problem.  However, this is something that

20  predates my involvement in the case, my appearance in the

21  case.  So I have to go back and figure it all out.  I have to

22  go back and look, your Honor.

23           THE COURT:  Okay.

24           MR. STAMATIS:  With regard to protocols --

25           THE COURT:  Why wouldn't there be a problem if there

1   is a document request, it captures ESI, we go through the

2   whole ESI protocol process, you go through the back-and-forth

3   and you develop your search terms, the search terms are

4   identified, everybody agrees on the search terms, the search

5   is done which should capture documents with the search terms,

6   that's the whole reason for the process, and you didn't do it?

7   That seems to -- that is causing me some concern.

8           MR. LEAVENS:  I believe these documents, your Honor,

9   were at an account, an e-mail account, that was not something

10  that appeared on the hard drives that were searched.

11          THE COURT:  Possession, custody, and control.

12          MR. LEAVENS:  I'm sorry?

13          THE COURT:  Possession, custody, or control, that's

14  Rule 34.  Possession, custody, and control, that clearly means

15  contractors, and especially in the world of ESI, e-mails held

16  by third parties.  I mean, that's like Black Letter Law stuff.

17          How much time do you need to get something on file?

18  Because it better be really good and supported by an

19  affidavit, and I will take a look at it.  I don't want the ESI

20  tail wagging the summary judgment dog here, but this has to be

21  resolved because as much as I'm hearing, and maybe

22  optimistically, that it is not going to affect the summary

23  judgment, I see this thing blowing up, and then we jump down

24  the ESI rabbit hole, and it is going to be a problem, and

25  there will be sanctions motions and motions to exclude,

1    motions for adverse instructions.  Whether you have an adverse

2    instruction on summary judgment, that seems kind of odd

3    because the district judge is reading it.

4              I'm giving you 14 days on the sealing order.

5              How much time do you need to respond to this motion

6    for leave to amend, which is technically a motion to file a

7    supplement?

8              MR. STAMATIS:  28 days, your Honor.

9              THE COURT:  We have got to -- here is what we will

10   do:  May 14th, get your response on file.

11             MR. STAMATIS:  Thank you, your Honor.

12             THE COURT:  We will have a status.

13             MR. von OHLEN:  Would you like a reply, your Honor?

14             THE COURT:  No, we are going to have a status right

15   after that.  I'm going to give you time to take a look at the

16   response, and then we are going to figure out whether we are

17   going to have an evidentiary hearing on this issue.

18             So May 17th at 1:30 for a telephonic.  Will that work

19   for the Plaintiff?

20             MR. DAVIS:  Yes, your Honor.

21             MR. von OHLEN:  Telephonic?

22             THE COURT:  Telephonic.

23             MR. von OHLEN:  Telephonic.

24             THE COURT:  Does that work, Mr. Stamatis?  Does that

25   work for you?

1          MR. STAMATIS:  That's fine, your Honor.

2          THE COURT:  Mr. Leavens, does that work for you?

3          MR. LEAVENS:  Yes.  Thank you.

4          THE COURT:  May 17th, 1:30 for a telephonic.  That

5     will give you a couple days to take a look at the response.

6     You can tell me --

7          MR. von OHLEN:  When is it due again, your Honor,

8     what date, their brief?

9          THE COURT:  May 14th.

10         MR. von OHLEN:  May 14th.

11         And just as a housekeeping matter, for the motion

12    that we filed yesterday for seal, will the court take that off

13    calendar?  Because it addresses the same issue of them

14    identifying --

15         THE COURT:  What do you mean take it off calendar?

16         MR. von OHLEN:  It was noticed for next Thursday.

17         THE COURT:  We will strike it.

18         MR. von OHLEN:  You will strike it?

19         THE COURT:  Right, the presentment.  Got you.

20         MR. von OHLEN:  The presentment.

21         THE COURT:  We have got it.  They are going to file a

22    response in 14 days.  We will figure out what we do with that.

23         And I would spent a lot of time talking to Mr. Duke

24    about what happened with the ESI.  Maybe there is no "there"

25    there, but that's a problem currently, as it is currently

```
 1   framed --

 2             MR. STAMATIS:  Okay.

 3             THE COURT:  -- production requests, document requests

 4   responsive pursuant to an ESI protocol that are produced in

 5   the middle of summary judgment briefing, long after the

 6   supplement date, okay?

 7             So we will talk on May 17th at 1:30.  Provide

 8   Ms. Pedroza with your contact information, and we will place

 9   the call, okay?

10             MR. STAMATIS:  Thank you, your Honor.

11             MR. von OHLEN:  Thank you, your Honor.

12    (Which were all the proceedings heard.)

13                       CERTIFICATE

14     I certify that the foregoing is a correct transcript from

15   the record of proceedings in the above-entitled matter.

16   /s/ Heather M. Perkins-Reiva          May 11, 2018

17   _____    _____
     Heather M. Perkins-Reiva                    Date
18   Official Court Reporter

19

20

21

22

23

24

25
```