```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           WESTERN DIVISION

 3    DR DISTRIBUTORS, LLC,           )Docket No. 12 C 50324
                                      )
 4       Plaintiff-Counterdefendant, )Rockford, Illinois
                                      )Thursday, May 17, 2018
 5              v.                    )1:30 o'clock p.m.
                                      )
 6    21 CENTURY SMOKING, INC.        )
      and BRENT DUKE,                 )
 7                                    )
         Defendants-Counterplaintiffs,)
 8                                    )
      CB DISTRIBUTORS, INC. and       )
 9    CARLOS BENGOA,                  )
                                      )
10       Counterdefendants.          )

11                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE IAIN D. JOHNSTON
12
      APPEARANCES:
13
      For the Plaintiff:           NICOLL, DAVIS & SPINELLA LLP
14                                 (95 Route 17 South,
                                    Suite 316,
15                                  Paramus, NJ  07652) by
                                   MS. ALASHIA L. CHAN
16                                 MR. ANTHONY J. DAVIS
                                   MR. BRIAN E. MOFFITT
17
                                   ROBERT C. von OHLEN & ASSOCIATES
18                                 (1340 Deerpath Road,
                                    Lake Forest, IL  60045) by
19                                 MR. ROBERT C. von OHLEN, JR.

20    For the Defendants:          LEAVENS, STRAND & GLOVER, LLC
                                   (203 N. LaSalle Street,
21                                  Suite 2550,
                                    Chicago, IL  60601) by
22                                 MR. THOMAS R. LEAVENS
                                   MR. TRAVIS W. LIFE
23
                                   LAW OFFICE OF PETER S. STAMATIS, PC
24                                 (77 W. Wacker Drive,
                                    Suite 4800,
25                                  Chicago, IL  60601) by
                                   MR. PETER S. STAMATIS
```

```
 1  Court Reporter:            Heather M. Perkins-Reiva
                               327 S. Church Street
 2                             Rockford, Illinois  61101
                               (779) 772-8309
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE CLERK:  Calling 12 CV 50324, DR Distributors, LLC
 2   vs. 21 Century Smoking, Inc.
 3              THE COURT:  Good afternoon, counsel.  Could I get
 4   appearances for the record starting with the Plaintiff,
 5   please.
 6              MR. DAVIS:  Good afternoon, your Honor -- go ahead,
 7   Robert.
 8              THE COURT:  Go ahead, Mr. von Ohlen.
 9              MR. von OHLEN:  Robert von Ohlen for the Plaintiff.
10              THE COURT:  Good afternoon, Mr. von Ohlen.
11              MR. von OHLEN:  Good afternoon.
12              MR. DAVIS:  And Anthony Davis also for the
13   Plaintiffs, and I'm at my office on speakerphone with two of
14   my colleagues who are assisting me on the case, Brian Moffitt
15   and Alashia Chan.
16              THE COURT:  Good afternoon.
17              And for the Defendant?
18              MR. STAMATIS:  Peter Stamatis, your Honor, for the
19   Defendants.
20              MR. LEAVENS:  Thomas Leavens on behalf of the
21   Defendants.
22              MR. LIFE:  Travis Life, L-i-f-e, on behalf of the
23   Defendants.
24              THE COURT:  Good afternoon, Mr. Leavens.
25              Good afternoon, Mr. Stamatis.
```

 1             Good afternoon, Mr. Life.

 2             Okay.  First of all, we are running late because we

 3    had a criminal matter that ran long.  So I apologize for

 4    running late.  I thought it would be quicker than it was, and

 5    I thought this would be -- when I set this for status, I

 6    didn't think it would be easy, but I didn't think it would be

 7    what I anticipate it is going to be today.

 8             So I know I have various motions before me -- or a

 9    motion before me.  There is also -- actually, there are two

10    motions before me -- there is three motions, but one is set

11    for next week.  Those were entered and continued to allow

12    Mr. Davis and Mr. von Ohlen to take a look at some things, do

13    some investigation, and also the Defendants were going to take

14    a look at the ESI issue, and that's the motion that's set up

15    for the 20 -- well, no, it is not.  There is motions set up

16    for the 24th, but I did receive the status report about the

17    ESI and the Yahoo account.  I have read that.

18             I don't know if the four banker's boxes of responsive

19    documents have been provided to Mr. von Ohlen and Mr. Davis

20    yet.

21             MR. von OHLEN:  They have not.

22             MR. STAMATIS:  May I address the court?  Peter

23    Stamatis.

24             THE COURT:  Okay.  Go ahead, Mr. Stamatis.

25             MR. STAMATIS:  Thank you, your Honor.

 1          So where we left off last, at the last court

 2     appearance, we took a hard look to get to the bottom of what

 3     had happened, as I advised the court, this is something that

 4     happened before my involvement.  So it was something that

 5     really, at least from my perspective, I needed to look at with

 6     counsel to get our arms around what had happened, and to our

 7     chagrin, we discovered what had happened, and that's what we

 8     set forth in the declarations of Mr. Leavens and Mr. Life for

 9     what had happened early in the case with the disclosures and

10     with Ms. Liberman, the attorney, and one thing is for sure,

11     there has been at no time whatsoever any bad faith or any

12     intent to hide any documents or anything like that, okay?

13     That's clear.

14          But the fact of the matter is that because counsel

15     had represented very early in the case, and Mr. Leavens would

16     be happy to address this to your Honor --

17          THE COURT:  Could you back up, Mr. Stamatis?  You

18     broke up, and I didn't quite hear you.  You said counsel had

19     been, and then something.  You said something, and you broke

20     up.

21          MR. STAMATIS:  Sure, literally sat with Mr. Duke

22     early in the case when he had accessed his e-mails and had

23     produced documents from that, and this is the very first

24     document disclosure.

25          THE COURT:  Who said -- Mr. Stamatis, again, I'm

1   sorry, you broke up.  Who sat with Mr. Duke?

2              MR. STAMATIS:  Mr. Leavens and Ms. Lieberman.

3              THE COURT:  Okay.  Go ahead.

4              MR. STAMATIS:  Early in the case and had obtained

5   documents from that Yahoo, the Brent Duke personal Yahoo

6   e-mail account and produced documents from that account that

7   either referenced that account or that there were screenshots

8   from that account that were in the original document

9   production.  They just didn't know the imaging of that hard

10  drive and the other 21 Century hard drives would not pick up

11  that Yahoo account when the hard drives were imaged against

12  the search terms that the Plaintiff's lawyers had provided.

13             So we figured all that out and came to the conclusion

14  that we had to cure it, obviously.  So we then retained the

15  same search company to run the search terms against that Yahoo

16  account, and they did, and we have gone through and assembled

17  the responsive documents and finally got them boxed last night

18  into two -- what I would call two and three-quarters banker's

19  boxes that are ready to be produced.  All they need to do is

20  to be Bates stamped and be produced.  We just wanted to tell

21  your Honor, as we said in our submission to the court, to get

22  your Honor's imprimatur to go ahead and produce those, and

23  then we would do that as very quickly as we could.

24             THE COURT:  Why would you need my imprimatur to

25  produce documents that were previously requested in discovery?

1        MR. STAMATIS:  It is only because we are, obviously,

2   well past the discovery deadline, and we didn't have them all

3   ready for that last time anyway, your Honor.

4        THE COURT:  Okay.

5        MR. STAMATIS:  So we wanted to make sure that -- you

6   know, we just wanted to have your Honor's direction or

7   blessing to do it.  So we are ready to do it.

8        So in terms of that, we thought, at least moving

9   forward on this, perhaps the thing to do would be to get the

10  documents over to counsel and then to give them time to review

11  those documents, after which we would confer with counsel and

12  then come back to the court at least to report what to do

13  about those documents.

14       At the last court appearance, there was a suggestion

15  to depose Mr. Duke, and in terms of this production, I really

16  would be hard-pressed to say that they should not be able to

17  depose Mr. Duke about these documents and the contents of

18  these documents.

19       So in looking at it, I thought that we could even

20  talk with counsel to see if we can come to some agreement with

21  regard to what that might look like, and then come back and

22  report to the court on that issue.

23       MR. von OHLEN:  Does your Honor want to hear from the

24  Plaintiff?

25       THE COURT:  I was going to say something or hear from

1  you, but, yes, I would like to hear from you.  It is just when

2  I want to hear from you.

3          Go ahead, Mr. Davis or Mr. von Ohlen.

4          MR. von OHLEN:  I will let Mr. Davis go first.

5          MR. DAVIS:  Thank you, your Honor.

6          As you can imagine, we have taken a look at this

7  newest story that the Defendants have laid before the court.

8  What we see is a new and much bigger problem than was laid

9  before us on March 19th that was the subject of our motion.

10         The last time we were before you, you had given them

11 leave to explain this 120 pages, to explain it with

12 affidavits, to explain the late production of those documents

13 that they produced on the eve of March 19th, when we were

14 filing our last brief, and explain the data loss that they

15 certified and declared in those papers that there was a loss

16 of data, and now we have a new filing with a new story that

17 has more questions than answers.

18         As the court can imagine, when we filed our motion in

19 January raising this issue of withheld documents, and in the

20 last few weeks we looked hard at the discovery, the course of

21 discovery in this case, the response that's in front of the

22 court and the story that they have given, this new story, is

23 inconsistent, is flat-out inconsistent with the history and

24 the true state of affairs in this case.

25         I think what we have now is a problem that raises

1  issues under Rule 37 not only with discovery and

2  noncompliance, but also failure to preserve and failure to

3  comply with the court order, specifically the June 2015 order

4  about producing these e-mails.

5       We have loss of ESI data, spoliation, and the biggest

6  problem I see throughout all this is that the Defendants and

7  counsel knew about it and sat on it, and here we are at this

8  hearing, and they are coming up with thousands of new pages of

9  documents that they never looked at or have some story about

10  now, despite us chasing these e-mails for years in this case,

11  and it is the most simple -- their client is operating out of

12  an apartment with a couple of computers, and it is ESI 101.

13  You grab the e-mails.  You search them.  They never did that

14  or they did it piecemeal and never preserved it and lost data.

15       So in this latest briefing, they don't even explain

16  the data loss, which you gave them leave to do.  They are

17  silent as to that.  But what we don't know is what the true

18  state of affairs are.  And as we talked about at the last

19  hearing, we need to get to the bottom of that, and what we are

20  proposing is a reasonable roadmap for the court to follow to

21  try to get to the bottom of these potential violations of

22  Rule 37, and we don't even know what we want yet until we know

23  what the problems are.

24       But in terms of getting this production of new

25  documents, we certainly would like to see that, but we want

1   them in a searchable format, not in a box of documents with
2   Bates stamps that we have to spend hours and hours going
3   through.  It is now I hear it said four boxes of papers -- I
4   just heard two and a half boxes, but we don't want what they
5   have culled it down to.  We want the entire data set.  They've
6   got the privilege.  Give us the whole thing.
7           At this point, there is no credibility on their side
8   to be believed that they are removing the right documents or
9   producing responsive documents.  We want that in native,
10  searchable format, and we want all of it.
11          The other thing we want to do is I think at this
12  point, given the moving stories and the history here, is we
13  need a neutral forensic ESI company to come in, an expert of
14  our choice at their experience, to come in and get the data,
15  get the hard drive, get all of this e-mail data, get their
16  online accounts.  Whatever they did, didn't do, or apparently
17  failed to do, failed to preserve, get it, have it forensically
18  held and preserved so it can be properly searched, and outside
19  of their hands so there is some validity to what is happening
20  here, and then we can have this outside forensic person do the
21  searches and do an analysis of the data to find out what was
22  deleted, when it was deleted, how things happened.
23          The other thing we want is we want to review this
24  data.  Whatever they give us and whatever is found through the
25  forensic examination, I don't know how much it is, I don't

 1    know how much time it will take us to do that, but we will
 2    look at it, and then we need an evidentiary hearing to get to
 3    the bottom of this.  We have got all these conflicting
 4    representations, changing stories over the years in the
 5    briefing.  Your Honor, these were subject to multiple,
 6    multiple conversations, e-mails, deficiency letters, discovery
 7    demands, motions to compel on new, specific issues about these
 8    e-mails that if we didn't raise it in our motion that they
 9    withheld it, we wouldn't even be talking about it.  They got
10    caught.  It is that simple.
11            And they gave us attorney affidavits, not their
12    clients, but the attorneys, with lots of "I think," "I
13    believe," "I understood."  We need the real people with the
14    real knowledge here.  Brent Duke has to be on the stand in
15    your Honor's courtroom so you can ask your own questions,
16    evaluate his credibility.  The same with the vendors that were
17    involved in this.  Mr. Leavens, Mr. Life, whoever else was
18    involved in this, we need to get to the bottom of it, and all
19    this has to be done at their expense.  We think this is a
20    reasonable roadmap to do a full evaluation of the violations
21    of Rule 37 here under all the circumstances.
22            THE COURT:  Mr. von Ohlen, anything to add?
23            MR. von OHLEN:  I think that that covers most of it,
24    Judge.  I guess what concerned me probably the most was maybe
25    the last thing, is what we got in the briefing by the

1    Defendants were attorney affidavits and a lot of attorney

2    speak, and, you know, fair enough.  I mean, we all do it

3    because that's the way we talk.  But I think that we and the

4    court might have fairly expected an explanation from the

5    client under oath, under the penalty of perjury.

6         When you have shifting stories and such late-changing

7    stories, and only stories that have been revealed because we

8    brought this up in our motion for summary judgment saying the

9    absence of these documents tells a very compelling story,

10   there is an aha moment, obviously, on the other side to say,

11   "Hey, maybe we should really look for these documents now to

12   dispel the Plaintiff's argument," and they apparently did,

13   they really did a better search because they found, first,

14   122, and now apparently a thousand more documents that are

15   responsive.

16        So at this point, we just can't take the word of

17   Mr. Stamatis, as good as it is generally speaking, that the

18   documents are not relevant or they are not prejudicial.  He

19   doesn't get to make that decision.  It is the court who gets

20   to make that decision, obviously, after we have the

21   opportunity as part of the adversary process to evaluate

22   whether they are relevant or evaluate whether they are

23   prejudicial.

24        Now, let me say this:  Let's say there is nothing

25   that's bad in there, that everything supports their case.

1    Well, we spent years in this case pursuing those documents,

2    pursuing lines of analysis and strategy that we didn't have

3    to.  If that is not the definition of prejudice to a party,

4    our client has incurred legal fees associated with going down

5    all those rabbit holes.

6          So even if everything that Mr. Stamatis says is true,

7    it still is, in my view, violations of Rule 37, and the court

8    needs to decide what to do, and I looked at your Honor's very

9    interesting and well-done color coded chart.  I know the court

10   has thought about these issues, but there has to be some

11   consequence to causing all of this mess.

12         So that's my two cents.

13         THE COURT:  Okay.  All right.  Mr. Stamatis,

14   Mr. Leavens?

15         MR. LEAVENS:  Your Honor, this is Tom Leavens.  I

16   just want to respond.

17         First of all, we don't see that there is any shifting

18   story here in terms of any inconsistencies.  There were things

19   that we discovered as we learned more about this particular

20   account.  I can speak to what happened.  It is laid out in my

21   declaration, but essentially it did not occur to us that the

22   Yahoo account needed to be dealt with as a separate matter in

23   the e-discovery that was done.  I just don't have the

24   technological background necessarily to make the technical

25   distinction that escapes us here, which is that those e-mails

1    would not be revealed in the search that was done of those

2    four computers.

3          A lot of this is just informed by my own personal

4    experience in e-mail being maintained on the computers.

5    Clearly, there was nothing done that was with any intent.  I

6    was in disbelief.  I read the motion, the summary judgment

7    motion that was filed by the Plaintiffs, that asserted without

8    any qualification that there existed documents that

9    essentially said that there were instructions given by

10   Mr. Duke to an SEO expert to insert names in the metadata, and

11   those documents were not produced.  We had not seen those

12   documents.  Certainly, nothing was withheld.  I was confused

13   because if those documents existed --

14         THE COURT:  Look, I don't want to have the same

15   semantic fight as -- well, the same semantic discussion that

16   was had before.  There were documents that were requested and

17   not produced.  You can say withheld, you can say you didn't

18   turn them over, but they didn't get them, and they asked for

19   them and they were responsive.

20         MR. LEAVENS:  They were not produced, that's correct.

21   I'm giving an explanation for why that happened.  We have

22   tried to correct that to try to put the Plaintiffs in a

23   position where they would receive now those documents they

24   would have received if the account had been within the

25   e-discovery that was conducted.  There was certainly no bad

1   faith on our part.

2           THE COURT:  I can't make that call now.  I don't have

3   enough evidence to make that call.

4           MR. STAMATIS:  I'm sorry, we can't hear you.

5           THE COURT:  I don't have enough evidence to make the

6   call on intent and bad faith.

7           MR. STAMATIS:  Okay.

8           THE COURT:  Here is what we are going to do:  The

9   first problem we have is there are mounds, stacks, boxes of

10  documents, materials relating to an incomplete cross-motion

11  for summary judgment before Judge Kapala which are still in

12  the process of being amended and changed, revised, corrected,

13  whatever verb you want to slap on it.  That's all sitting

14  there, and then what I said the last time is I assume

15  everybody wanted to win their motion, and one of the first

16  rules of writing is to make it easy on the reader.  Nobody who

17  is going to try to dive into that stack of materials is going

18  to be engaged in an easy process.

19          We have -- meaning me and my staff have -- painful

20  and intricate knowledge of the docket sheet in this case and

21  we have difficulty figuring out what's what.  And like I said,

22  that process of briefing the summary judgment isn't even

23  finished at this point, even before the whole ESI thing blew

24  up.  If the ESI thing blows up, well, is that going to change

25  what people wrote in their filings for summary judgment?

1    Maybe, maybe not.  Likely?  Probably.

2         Are we going to have piecemeal briefings for the

3    remainder of the calendar year 2018?  It can't happen.  It

4    cannot happen.  I cannot push all this over to Judge Kapala in

5    this manner and with this kind of time frame.

6         So that being said, I'm going to strike all the

7    summary judgment pleadings to date without prejudice so that

8    the parties, whenever we are done with this process that we

9    are going to talk about in a moment relating to ESI, whenever

10   we are done with that whole process, the parties can draft,

11   compile, and file proper summary judgment motions, statements

12   of fact and memorandum before Judge Kapala so that he doesn't

13   need to wade through the mounds of confusing, conflicting

14   documents that are currently before him.  So everybody will be

15   allowed to do that again.

16        The second point, it is not 2004 anymore, it is not

17   even 2009.  It is not 2004 with Zubalake.  We are at 2018.

18   Zubalake is Z-u-b-a-l-a-k-e.  We are in 2018.  The Rules of

19   Professional Conduct require counsel to be reasonably

20   competent in ESI and in electronic information.  I am baffled

21   as to what I'm being told, how it occurred, because it doesn't

22   make a whole lot of sense to me, but I don't have all the

23   facts again.

24        Having said all of that, again, we are not 2004 or

25   even 2009.  We are 2018.  Rule 37(e) was amended and amended

1    in large part to streamline the process and to focus on the

2    key issues relating to ESI so that the ESI tail does not wag

3    the litigation dog, so that we don't have a big production

4    with evidentiary hearings and motions and experts if at the

5    end of the process it is not going to make a difference, if

6    there is no prejudice.

7         The problem is we need to go through some of that to

8    figure out what the next step is.  The obvious first step to

9    take is that all the documents that have been compiled in

10   these two-and-three-quarter banker boxes need to be produced

11   to the Plaintiff in native format so they can search them.

12        My question for Mr. -- I'm going to guess it is

13   Mr. Leavens, since Mr. Stamatis wasn't on the case at that

14   point, is were clones made of the hard drive?  Do we have

15   duplicates that we can provide to a forensic analyst who can

16   then look at the hard drive or wherever the stuff is kept to

17   determine what was on it and when it was on it and if things

18   have been removed, when they were removed, and the simple way

19   to do that is let's just make a copy, make a clone.  Now

20   you've got a clone, and it is all captured on there, and we

21   will be able to know that based on the hash values.

22        So, Mr. Leavens, was a clone made?

23        MR. STAMATIS:  So, your Honor, this is Peter

24   Stamatis, your Honor.

25        So when the parties engaged in e-discovery, whenever

1    it happened, five years ago, there was the four hard drives

2    from 21 Century Smoking were imaged at that time.

3            THE COURT:  Okay.

4            MR. STAMATIS:  That image still resides with the

5    forensic company.

6            THE COURT:  The vendor.  Okay.

7            MR. STAMATIS:  I spoke to the gentleman there within

8    the last ten days, and he advised me orally over the telephone

9    that they have it.  So --

10           THE COURT:  And, Mr. Stamatis, you said that was five

11   years ago?

12           MR. STAMATIS:  The image was from five years ago.

13           THE COURT:  Okay.

14           MR. STAMATIS:  Three years ago.  Forgive me, your

15   Honor, three years ago is when the e-discovery was done.

16           So the e-discovery was done in a way that is more

17   akin -- or let me say it this way:  I'm used to e-discovery

18   being performed in a manner that is more akin to what

19   Mr. Davis said, and why Mr. Davis and Defense counsel didn't

20   do this originally kind of baffles me a little bit, but what

21   we have done in the past is we agree -- the parties will agree

22   on one forensic company to image the hard drives, and then

23   that one forensic company that the parties agree to then

24   performs the searches of the keywords and then provides the

25   results to everybody.

1       THE COURT:  Okay.  Let me pause you there, all right,

2  before we keep tumbling down the rabbit hole.

3       If they were imaged three years ago, that takes us to

4  summer of 2015, if I crunch the numbers correctly.  This case

5  was filed in 2012.

6       MR. STAMATIS:  Well, your Honor --

7       THE COURT:  Can I get a word in edgewise, please?

8       Litigation holds should have gone on, at the latest,

9  when this thing was filed, and since there was discussions

10  before litigation, there should have been a litigation hold

11  filed before then.  One of the obvious questions I have is why

12  weren't images of the hard drives taken at that point?

13       MR. LIFE:  Your Honor, this is Travis Life for

14  Defendants.

15       Your Honor, the e-discovery vendor imaged these

16  computers in December of 2014.  That was in the process of

17  discovery after the search terms and vendors were discussed

18  with opposing counsel.

19       THE COURT:  Okay.  So that gives it a little

20  different time frame.  It doesn't change the point as to,

21  okay, you agreed on the search terms, but what happened before

22  December of '14 if they weren't imaged?  How do we know things

23  aren't gone?

24       MR. LIFE:  Well, the Plaintiff was instructed about

25  not destroying any documents.

```
 1              MR. STAMATIS:  Defendant.

 2              THE COURT:  I assume a litigation hold went out,

 3    right?

 4              MR. LIFE:  I'm sorry, what?

 5              THE COURT:  A litigation hold was sent?

 6              MR. LIFE:  We were told -- we did not send a separate

 7    letter, but he was told multiple times, and he understood

 8    that.

 9              THE COURT:  How do we know that, one, he didn't

10    intentionally do it?  We will find that out.  Two, things can

11    be rewritten, lost in all kinds of ways if they are not imaged

12    immediately, like in 2012, when the case was filed, and

13    everybody in 2012 knew ESI was an issue.

14              MR. LEAVENS:  They never asked for it.

15              THE COURT:  It doesn't matter whether they asked for

16    it in discovery because you are going to assume -- a

17    reasonable attorney in 2012 is going to assume that ESI in a

18    case like this would be at issue.

19              MR. STAMATIS:  Your Honor -- the only thing I can

20    say, your Honor -- Peter Stamatis -- is it didn't happen.  I

21    don't know that the Plaintiff did that.  I know that there

22    were hard drives that were disclosed in the 26(a) disclosures.

23    Going back and looking at those, I didn't see any

24    correspondence or any discussion back and forth about having

25    either side's hard drives imaged at that time.
```

1       THE COURT:  Well, that's a good pivot, and it would

2  be great for politics, but it doesn't work for me in a

3  courtroom.

4       So here is what we are going to do.  I want the

5  native format of all those documents produced to the Plaintiff

6  by May 31st.  Get that to them.  If you have hard copies, and

7  it sounds like you do, and you have already made a copy, send

8  it over to him.  It sounds also like you have removed and

9  culled any attorney-client and work product material from

10  there.  Is that correct?

11       MR. STAMATIS:  Yes, your Honor, and from

12  attorney-client -- is there attorney-client?

13       MR. LEAVENS:  I don't recall seeing any in the

14  original, yes.

15       MR. STAMATIS:  In the original, and this one, too?

16       And then there were just things that were not

17  responsive or were ancillary.  So those were culled out, too.

18       THE COURT:  Let me pause you right there because

19  that's going to cause me some concern unless I get some

20  information.

21       If the search terms were used and they caught those

22  documents, why are you saying that they are not relevant and

23  ancillary if they caught the search terms and were produced?

24       MR. STAMATIS:  They were documents from a trading

25  account that had nothing to do with this.

1      THE COURT:  Well, then how did the search terms catch

2  them, and why shouldn't those be produced to the other side to

3  determine whether or not they are relevant?

4      MR. STAMATIS:  One of the search terms was the word

5  "trademark," so that was triggering a lot of things.  So you

6  would have TD Ameritrade say, for example, is a registered

7  trademark or something, so that would trigger that.  There

8  were other, you know, documents related, off the top of my

9  head, to the Mercantile Exchange or one of the exchanges that

10  had a trademark.  There were some e-mails from Mr. Duke's

11  mother.  There were some e-mails that were strictly on a

12  personal level between Mr. Duke and Mrs. Duke.

13      THE COURT:  And what search term would have caught

14  that?

15      MR. STAMATIS:  You know, I would have to go back and

16  look, but there were some that clearly had nothing to do with

17  anything other than domestic matters between the two.

18      So that's what we -- you know, that's what we did.  I

19  mean, if your Honor orders it, we will put it all back

20  together and they can have it all.  That's fine.  But at least

21  in the past, we did I think what was consistent with what had

22  been done in the past.

23      THE COURT:  In what past?  In what past?  When you

24  say "in the past," what do you mean by that?

25      MR. STAMATIS:  In this case, your Honor, in that only

1 relevant documents -- or discoverable documents, rather, were

2 produced.  So, you know, if your Honor wants us to produce it

3 all, obviously we will.

4        THE COURT:  Well, look, I don't make the call at this

5 point whether they are relevant.  I'm just a little confused

6 as to how agreed search terms were used, documents were

7 captured using those search terms, and then they are withheld.

8 If you are saying you have done an independent investigation,

9 reviewed every single one of those, and are making

10 representations to the court that none of those things are

11 relevant, okay.  And if the Plaintiff wants to knock

12 themselves out and look at e-mail correspondence between

13 Mr. Duke and Mrs. Duke and waste their time on that, well, if

14 they want to do that, you can produce it to them.

15        Mr. von Ohlen, Mr. Davis, do you want to look at

16 those documents?

17        MR. von OHLEN:  I think at this point, Judge, I think

18 we just have to be prophylactic.  It is not that I'm really

19 interested in what Mr. Duke and Mrs. Duke have to say, but at

20 this point I'm past the point of just accepting

21 representations that things are relevant and irrelevant.

22        THE COURT:  Okay.  So put those back into the pool.

23 So that needs to be done by May 31st.  Get that done.

24        I will give the Plaintiff some time to review those

25 materials, and then we will talk about the next step because

1    that will be the first step because I think we have all

2    discussed it, and I think Mr. von Ohlen used the same term

3    that I have used in the reported decisions, "no harm, no

4    foul."  I don't know that at this point.  You have got to let

5    the Plaintiff take a look at those documents and determine

6    what's in them, and maybe this is a big issue that turns out

7    to be completely irrelevant.  It ends with a bang -- not with

8    a bang, but with a whimper, but I need to give them the

9    opportunity to look at those materials.

10          So if they get them by the 31st, I'm thinking -- one,

11   two, three -- I can talk to you on -- that's a terrible day.

12   I can talk to you on June 26th in the afternoon or I can talk

13   to you -- we can go into July.  I could talk to you on

14   July 10th at, say, 2:30.

15          MR. von OHLEN:  Your Honor, this is Mr. von Ohlen.

16   May I be heard briefly?

17          THE COURT:  I'm sorry, who is that?

18          MR. von OHLEN:  This is Mr. von Ohlen.  May I be

19   heard briefly?

20          THE COURT:  Mr. von Ohlen, yes.

21          MR. von OHLEN:  If the court would consider, and

22   either one of those dates is fine, although I would prefer the

23   earlier date to kind of get this moving --

24          THE COURT:  Okay.

25          MR. von OHLEN:  -- is what I have heard today is that

1    snapshots were taken in December 2014 of hard drives and that

2    there was no written litigation hold.  Again, now we are

3    relying on memory in a case that's a 2012 case.

4         So we have representations now to the court that you

5    can work with to say what we need to have is what should have

6    been done, which is preservation at the very least as of the

7    filing date, and the only way we are ever going to know is not

8    by looking at these documents and coming back to the court and

9    saying, "No harm, no foul," or, "Yes, there is a foul, and

10   here's what it is."  The only way we are going to know the

11   answers to those questions is to have an independent ESI

12   expert come in, go back as far as they can to the filing date,

13   and there were discussions, frankly, prior to the filing date

14   that should have put people on notice, and they had the

15   benefit of the representation of counsel even at that point to

16   get what there is to get.

17        That provides the prophylactic, this is what was

18   there, or maybe it is unrecoverable.  I don't know.  There is

19   three or four different e-mail services.  There is apparently

20   three or four hard drives.  I'm fine with our own expert, an

21   independent expert, a court-appointed expert, but somebody,

22   while we are going through these documents, should be

23   performing that function in order that we can look at that and

24   then come back to the court and say, "Here's what's next."

25        THE COURT:  Okay.  And I understand your argument,

1    Mr. von Ohlen, but I need to apply the proportionality

2    principles, and that's an expensive, time-consuming process

3    that I'm pretty confident you are going to say that Mr. Duke

4    is going to have to pay for and Mr. Duke is going to scream

5    about paying for that.

6          So I want to take this in steps and figure out, if

7    you look at those documents, we will have a better sense of

8    what has now been captured, and if there are problems or

9    issues raised, then the next step would possibly be appointing

10   a forensic analyst to obtain the images, which apparently were

11   taken December '14, and do an analysis and figure out what was

12   on the system when, whether anything was removed and how,

13   whether anything that's been removed can be recoverable, if it

14   can be recovered, at what cost, and if it can be recoverable,

15   who would pay for that cost and whether that cost would be

16   reasonable.

17         But to keep things moving forward, the parties will

18   be ordered to provide me a list of three potential ESI

19   vendors, whether you would call it a vendor, forensic analyst,

20   computer expert, whatever label you want to put on, give me

21   three, each side give me three.  I will take a look at those.

22   I'm not saying I will pick somebody off the list.  I have

23   people in my own head, but I think some of them might be

24   conflicted out because they are local.  I know somebody who

25   probably wouldn't be conflicted out, he is fantastic, but he

1   is going to cost you people a pretty penny because he is

2   fantastic, and then we will see how things shake out after the

3   review of the native materials, and if we need to go down that

4   road, we will at least be further down that road on the 31st

5   once I get the lists and I can compare the lists, okay?

6          So submit those --

7          MR. von OHLEN:  When would you like that list?

8          THE COURT:  By the 31st.  And just send them to

9   chambers, only to chambers, so you guys don't fight over who

10  provides the list or whether you do it simultaneous.  Just

11  send them to chambers and I will take a look at the lists.

12  Provide at least three.  Each side will provide three.

13         MR. DAVIS:  Your Honor, this is Mr. Davis.  Can I

14  just ask a point of clarification?

15         THE COURT:  Sure.

16         MR. DAVIS:  When you are talking about the production

17  of the native data, and the Defendants are talking about the

18  hard drives they imaged, will this production include the

19  newly discovered ESI, I guess?  They have surely imaged now

20  whatever these e-mail accounts are that they never looked at

21  before, and I want to make sure that all that native data is

22  produced on the 31st, not just the old stuff, but everything.

23  Is that what your Honor is ordering?

24         THE COURT:  I will say what my mom used to tell me,

25  "I'm confused by your confusion," which probably means I made

1     it confusing.  My intent was these -- what was it?  I'm trying

2     to find the number.  It was four banker's boxes, then it

3     became two-and-three-quarters banker's boxes, and for some

4     reason I have in my head like 4,000 documents or 2,000

5     documents.  Whatever those are that are in the banker's boxes,

6     those need to be produced by the 31st in native format.

7           MR. DAVIS:  Thank you, your Honor.

8           MR. von OHLEN:  Meaning a searchable format, your

9     Honor, correct?

10          THE COURT:  Yes.  If it is in native format, you can

11    search it.

12          MR. STAMATIS:  All right.  So we will produce, your

13    Honor -- Peter Stamatis talking.

14          So I understand, so we are going to produce by the

15    end of the month the native search results -- or the native

16    search results of the four discovery forensics on this Yahoo

17    e-mail account by the 31st?

18          MR. LEAVENS:  With the search terms that were

19    disclosed earlier.

20          MR. STAMATIS:  Yes, with the search results, right?

21          THE COURT:  Right, right.  I assume that's how you

22    got the documents is you ran the search.  You ran the search

23    terms and that's what you caught.

24          MR. STAMATIS:  Correct.  We will produce that by the

25    end of the month.

1        THE COURT:  All right.  And it is in native format,

2   but make sure that native format is searchable.  It should be.

3        MR. STAMATIS:  Yes, your Honor.

4        THE COURT:  Okay.

5        MR. LEAVENS:  Thank you.

6        MR. von OHLEN:  And, your Honor, did you also order

7   that they immediately produce the written documents that they

8   have?

9        THE COURT:  Yes, yes.  They are going to give you the

10  hard copies, too.  They have already got them copied and in

11  boxes.  I guess they are going to Bates stamp them.  You get

12  the hard copies, too.

13       MR. STAMATIS:  Okay.  We will produce those.  We

14  don't have the copies run off, your Honor, but if you are

15  ordering us to run off a copy to them and Bates stamp them, we

16  will do that and get it to Mr. von Ohlen's office or he can

17  pick them up or whatever he wants.

18       THE COURT:  Get them to him by the 31st, okay?

19       MR. STAMATIS:  Okay.

20       THE COURT:  So, Mr. Stamatis, does the 10th work for

21  you -- or, wait, you were looking at the earlier date.  What

22  did I say, the 26th?  The 26th at 2:00 o'clock.

23       MR. STAMATIS:  Yes, your Honor.

24       THE COURT:  Okay.  Provide Ms. Pedroza with your

25  contact information and we will place the call.

1          Thank you, counsel.

2          MR. STAMATIS:  All right.  Very well.  Thank you,

3   your Honor.

4          MR. DAVIS:  Your Honor, your Honor --

5          THE COURT:  Yes.

6          MR. von OHLEN:  Mr. von Ohlen.

7          Just as a housekeeping matter, the Defendants filed a

8   motion to make certain amendments which is set for presentment

9   Tuesday.

10          THE COURT:  Yes, that's stricken.

11          MR. von OHLEN:  Could your Honor strike that and give

12   us a certain amount of time to file a response brief?

13          THE COURT:  Well, it is stricken because all the

14   summary judgment briefings, as I said, they are all gone.

15   They are all gone.  Everything is gone.  Everything is

16   stricken without prejudice.  You have a mess before Judge

17   Kapala.  The mess is probably going to get worse before it

18   gets better.  We have to figure out the ESI issues, okay?

19          MR. STAMATIS:  All right.

20          MR. von OHLEN:  One more housekeeping then.  The

21   motion -- our motion to provisionally seal certain documents,

22   which we don't want to win, is also pending before the court.

23   Is that stricken as well?

24          THE COURT:  Everything is stricken.  Everything

25   related to summary judgment is stricken.

1          MR. STAMATIS:  If I may respond, this is Peter

2     Stamatis, your Honor.  We responded to that because we thought

3     there were some documents that ought to be not in the record.

4     They are confidential.  They had customer names and addresses,

5     and right now they have been, as I understand, provisionally

6     sealed.  Can we just hold it as it is?

7          THE COURT:  Sure, although if they have been -- have

8     they been sitting on a public filing available for everybody

9     to view for the last couple of months?

10          MR. DAVIS:  Yes.

11          MR. STAMATIS:  I understood those were pulled back by

12     counsel for the Plaintiff.

13          THE COURT:  That was their motion.  That's their

14     motion to do that.  That was the motion they don't want to

15     win.  So they have been sitting there.  They have been sitting

16     there for all the world to see.

17          MR. STAMATIS:  Well, let me address that.  My

18     understanding was in my conversation -- so much has happened

19     since then.  I believe it was with Mr. Davis.

20          THE COURT:  You can say that again.

21          MR. STAMATIS:  My understanding is they were just

22     being pulled back and then we would fight about it later

23     because they should never have been filed given the protective

24     order that was in place because all of these had been marked

25     confidential.  So the agreement was that they would just be

1   pulled back and then we would just figure out where we are at.

2          THE COURT:  Well, here is my order again:  Everything

3   is stricken.  So after we strike everything in the next day or

4   two, if you want to go on the system and dig around and see if

5   there is documents that you think are covered by a protective

6   order that you think should be sealed, knock yourself out and

7   file another motion, and we will take a look at it.

8          MR. STAMATIS:  Very well.

9          MR. von OHLEN:  Thank you, Judge.

10          THE COURT:  Have a good day, your Honor.

11  (Which were all the proceedings heard.)

12                         CERTIFICATE

13    I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15  */s/ Heather M. Perkins-Reiva*              *June 6, 2018*

16  _____        _____
     Heather M. Perkins-Reiva                  Date
17  Official Court Reporter

18

19

20

21

22

23

24

25