**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

DR DISTRIBUTORS, LLC,

        Plaintiff/Counter-Defendant,

v.

21 CENTURY SMOKING, INC., and BRENT
DUKE,

        Defendants/Counterclaimant,

v.

CB DISTRIBUTORS, INC., and CARLOS
BENGOA,

        Counter-Defendants/Counterclaimants.

**Case Number:** 3:12 – cv – 50324

**Judge:** Frederick J. Kapala

**Magistrate Judge:** Iain D. Johnston

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**RENEWED MOTION FOR SANCTIONS**

    Plaintiff/Counter-Defendant DR Distributors, LLC ("DR"), and Counter-Defendants/Counterclaimants CB Distributors, Inc. ("CB") and Carlos Bengoa ("Bengoa")(collectively the "Plaintiffs") respectfully submit the following Memorandum of Law in support of their renewed motion for sanctions against Defendant/Counterclaimant 21 Century Smoking, Inc. and Defendant Brent Duke ("Duke") (collectively, the "Defendants").

{00504485 - 1}

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................. 1

II.  DEFENDANTS' LITIGATION MISCONDUCT UNCOVERED TO DATE...................... 2

III. KEY CASE EVENTS AND COURSE OF DISCOVERY ................................. 6

   A. MISCONDUCT GOES TO CRITICAL CASE ISSUES AND IMPACTS
      FACT AND EXPERT DISCOVERY (2012 - 2017) ............................................. 6

   B. DEFENDANTS MOVE FOR SUMMARY JUDGMENT AND FAIL
      TO DISCLOSE KNOWLEDGE OF WITHHELD DISCOVERY/ LOSS
      OF ESI (Jan. – June 2018) ........................................................................... 8

   C. DEFENDANTS' LATE PRODUCTIONS REVEAL CRITICAL EVIDENCE
      WAS IMPROPERLY WITHHELD AND/OR SPOLIATED
      (June – Aug. 2018)...................................................................................... 10

   D. DEFENDANTS TRY TO AVOID SANCTIONS BY SEEKING DISMISSAL
      OF DEFAMATION CLAIM AND FALSE SARASWAT DECLARATION
      (Oct. 2018) ................................................................................................ 11

   E. DEFENDANTS DISCLOSE THEIR ESI DATA WAS SPOLIATED
      (Jan. 2019).................................................................................................. 12

IV.  DEFENDANTS' CONTINUING LITIGATION MISCONDUCT.................................. 13

   A. DEFENDANTS INTENTIONALLY WITHHELD SARASWAT
      EMAILS AND OTHER DOCUMENTS ON MARCH 19, 2018, AND
      CONCEALED THAT THEY NEVER SEARCHED DUKE'S YAHOO
      EMAIL ACCOUNT ....................................................................................... 13

   B. DEFENDANTS CONCEALED EVIDENCE SHOWING THAT THEY
      ORCHESTRATED THEIR DEFAMATION CLAIM…………………………………..22

{00504488 - 1}

C.   DEFENDANTS CONCEALED EVIDENCE THAT EXCULPATES
     PLAINTIFFS IN THE DEFAMATION CLAIM………………………………………..24

D.   COUNSEL CONCEALED EXCULPATORY EVIDENCE, ALLOWED
     DUKE AND EDMISTON TO PERJURE THEMSELVES AND USED
     THAT TESTIMONY TO SUPPORT A SUMMARY JUDGMENT MOTION………...24

E.   WITHHELD EMAILS CONTAIN MORE UNCLEAN HANDS
     EVIDENCE; DUKE SENT DR'S E-CIGARETTE BATTERY TO
     CHINA TO COPY IT; DUKE'S WIFE BRAGS ABOUT SELLING TO
     PLAINTIFFS' CUSTOMERS; AND DEFENDANTS FAILED TO SEARCH
     ALL DEFENDANTS' EMAIL ACCOUNTS…………………………………………26

F.   DEFENDANTS' CONCEALED KEY AND HIGHLY RELEVANT
     EVIDENCE ABOUT THEIR MARKET PENETRATION AND DAMAGES………..29

G.   DOCUMENTS SHOW DEFENDANTS' FALSE CLAIMS ABOUT
     EFFECT OF METATAGS ON SEO RANKING, DUKE'S KNOWLEDGE
     OF SEO AND HIS DESIRE TO MISUSE OTHER COMPETITORS'
     TRADEMARKS………………………………………………………………………31

H.   EMAILS FURTHER CONFIRM DUKE COMMITTED PERJURY
     BY CONCEALING HE WAS CAPABLE OF PLACING PLAINTIFFS'
     TRADEMARK IN DEFENDANTS' METATAGS……………………………………..34

I.   DEFENDANTS OFFER NO EXCUSE FOR WITHHOLDING 2,600
     E-MAILS SENT "TO" BDUKE@21CENTURYSMOKE.COM
     ACCOUNT……………………………………………………………………………39

J.   DEFENDANTS' FALSE "AUTO-PURGE" EXCUSE IS BELIED
     BY THEIR PRE-2018 PRODUCTION OF EMAILS………………………………..42

K.   DEFENDANTS OFFER FALSE "AUTO-FORWARD" EXCUSE……………………48

L.   DEFENDANTS AND THEIR COUNSEL CONSCIOUSLY ALLOWED
     KEY DOCUMENTS TO SPOLIATE……………………………………………...49

V.   LEGAL ARGUMENT FOR SANCTIONS ......................................................... 50

A.   DEFENDANTS' VIOLATION OF THIS COURT'S JUNE 11, 2015,
     APRIL 17, 2018, AND MAY 17, 2018 ORDERS REQUIRES THE
     IMPOSITION OF SANCTIONS UNDER RULE 37(b) ........................................................52

B. RULE 37(c) PRECLUDES DEFENDANTS FROM USING THEIR
NEWLY PRODUCED DOCUMENTS AND SUPPORTS AWARD
OF SANCTIONS ..................................................................................................55

C. DEFENDANTS' FAILURE TO PRESERVE RELEVANT ESI REQUIRES
THE IMPOSITION OF SANCTIONS UNDER RULE 37(e) .................................58

D. SEVERE SANCTIONS ARE WARRANTED BECAUSE OF DEFENDANTS'
EXTREME AND PERVASIVE LITIGATION MISCONDUCT.........................67

E. DEFENDANTS SHOULD BE DENIED ANY AND ALL RELIEF
SOUGHT IN THIS LITIGATION AS A RESULT OF THEIR
"UNCLEAN HANDS"..........................................................................................69

F. PLAINTIFFS ARE ALSO ENTITLED TO REASONABLE EXPENSES,
INCLUDING ATTORNEYS' FEES, UNDER RULES 37(a) and 56(h)...........................71

G. DEFENSE COUNSEL SHOULD ALSO BE REQUIRED TO PAY
PLAINTIFFS' REASONABLE EXPENSES, INCLUDING
ATTORNEYS' FEES ............................................................................................72

VI. CONCLUSION................................................................................................ 75

# TABLE OF AUTHORITIES

**Cases**

*Ablan v. Bank of Am. Corp.*, 2014 U.S. Dist. LEXIS 164751 (N.D. Ill., Nov. 24, 2014) ............ 56

*AngioDynamics, Inc. v. Biolitec AG*, 991 F.Supp.2d 283 (D. Mass. Jan. 14, 2014).................... 65

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969 (S.D.N.Y. 1992),
    *aff'd*, 983 F.2d 1048 (2d Cir. 1992) ................................................................ 70

*Bankdirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 2018 U.S. Dist. LEXIS 57254
    (N.D.Ill., April 4, 2018) ...................................................................... 63, 65

*Barnhill v. United States*, 11 F.3d 1360 (7th Cir. 1993)................................................ 68, 69

*Bratka v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 448 (S.D. Ohio 1995) ...................................... 61

*Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119 (7th Cir. 1987) .................... 66

*C.C.S. Commc'n Control, Inc. v. Sklar*, 1987 U.S. Dist. LEXIS 4280 (S.D.N.Y. 1987) ............ 70

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)................................................................ 51

*Crown Life Inc. Co, v. Craig*, 995 F.2d 1376 (7th Cir. 1993) ...................................... 67

*De Simone v. VSL Pharms., Inc.*, 2018 U.S. Dist. LEXIS 43398 (D. Md., March 16, 2018) ...... 72

*Domanus v. Lewicki*, 284 F.R.D. 379 (N.D. Ill. 2012) ................................................ 59

*Dotson v. Bravo*, 321 F.3d 663 (7th Cir. 2003) ........................................................ 68

*Gilead Scis., Inc. v. Merck & Co., Inc.*, 2016 U.S. Dist. LEXIS 73595
    (N.D. Cal. June 6, 2016) .................................................................... 52

*Global Material Techs., Inc. v. Dazheng Metal Fibre Co.*, 2016 U.S. Dist. LEXIS 123780
    (N.D. Ill., Sept. 13, 2016) ................................................................ 66, 68

*Goudy v. Cummings*, 2017 U.S. Dist. LEXIS 41476 (S.D. Ind., March 22, 2017) .................... 55

*Govas v. Chalmers*, 965 F.2d 298 (7th Cir. 1992)...................................................... 69

*Grochocinksi v. Mayer Brown Rowe & Maw LLP*, 2011 U.S. Dist. LEXIS 71053
    (N.D. Ill. June 30, 2011) ................................................................ 51, 67

*Hal Commodity Cycles Management Co. v. Kirsh*, 825 F.2d 1136 (7th Cir. 1987).................... 69

*Halas v. Consumer Servs.*, 16 F.3d 161 (7th Cir. 1994)............................................ 53

*Hespe v. City of Chicago*, 2016 U.S. Dist. LEXIS 173357 (N.D. Ill., Dec. 15, 2016) ................ 52

*HM Elecs. Inc., v. R.F. Techs., Inc.,* 2015 U.S. Dist. LEXIS 104100
    (S.D. Cal., Aug. 7, 2015) ...................................................................................... 54, 73, 74

*Hot Wax, Inc. v. S/S Car Care*, 1999 WL 966094 (N.D. Ill. Oct. 14, 1999) ............................... 70

*Hunt v. DaVita, Inc.,* 680 F.3d 775 (7th Cir. 2012) ...................................................................... 51

*In re TCI Ltd.,* 769 F.2d 441 (7th Cir. 1985) .............................................................................. 73

*Insight, Inc. v. Spamhaus Project,* 658 F.3d 637 (7th Cir. 2011) ................................................. 68

*Int'l Ins. Co. v. Certain Underwriters at Lloyd's London*, 1992 U.S. Dist. LEXIS 16939
    (N.D. Ill., Nov. 5, 1992) ................................................................................................. 57

*Int'l Union, United Auto., etc. v. NLRB*, 459 F.2d 1329 (D.C. Cir. 1972) ................................... 67

*KCI USA, Inc. v. Healthcare Essentials, Inc., et al*, 339 F. Supp. 3d 672 (N.D. Ohio, 2018) .... 74

*Krumwiede v. Brighton Assocs., L.L.C.*, 2006 U.S. Dist. LEXIS 31669
    (N.D. Ill. May 8, 2006) .................................................................................................... 59

*Lekkas v. Mitsubishi Motors Corp.*, 2000 U.S. Dist. LEXIS 12016
    (N.D. Ill., August 15, 2000) .............................................................................................. 62

*Mach v. Will County Sheriff*, 580 F.3d 495 (7th Cir. 2009) .......................................................... 67

*Metro Publishing, Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870 (N.D. Cal. 1994) ..... 70

*Metropolitan Life Ins. Co. v. Estate of Cammon*, 929 F.2d 1220 (7th Cir. 1991) ....................... 69

*Micron Tech. Inc. v. Rambus Inc.*, 645 F.3d 1311 (Fed. Cir. 2011) ............................................. 59

*Moore v. City of Chi. Heights*, 2011 U.S. Dist. LEXIS 126738 (N.D. Ill., Feb. 15, 2011) .......... 56

*Newman v. Metro. Pier & Exposition Auth.*, 962 F.2d 589 (7th Cir. 1992) ................................. 69

*Olivia v. Trans Union, LLC*, 123 Fed. Appx. 725 (2005) ............................................................. 68

*Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772 (7th Cir. 2016),
    *cert. denied*, 138 S. Ct. 116, 199 L. Ed. 2d 31, 2017 WL 2339748 (U.S. 2017).............. 64

*Root Ref. Co. v. Universal Oil Prods. Co.*, 169 F.2d 514 (3d Cir. 1948) .................................... 70

*Sere v. Bd. of Trustees*, 852 F.2d 285 (7th Cir. 1988) ................................................................. 69

*Shaffer v. RWP Grp.*, 169 F.R.D. 19 (E.D.N.Y. 1996) ................................................................. 66

*Shott v. Rush Univ. Med. Ctr.*, 2015 U.S. Dist. LEXIS 1322 (N.D. Ill., Jan. 7, 2015)................. 56

*Snider v. Danfoss*, LLC, 2017 U.S. Dist. LEXIS 107591 (N.D. Ill., July 12, 2017).............. 58, 63

*Stive v. United States*, 366 F.3d 520 (7th Cir. 2004) ..................................................................... 67

*The Jolly Group v. Medline Industries, Inc.*, 435 F.3d 717 (7th Cir. 2006) ................................. 73

*Tomas v. Ill. Dep't of Emp't Sec.*, 2018 U.S. Dist. LEXIS 49883
(N.D. Ill. Mar. 27, 2018)............................................................................................. 63, 64

*U.S. Ethernet Innovations, LLC v. Texas Instruments Inc.*, 2014 U.S. Dist. LEXIS 131334
(E.D. Tex. 2014) ........................................................................................................... 70

*United States v. Johnson*, 142 F.3d 1041 (7th Cir. 1998)............................................................. 51

*Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497 (D. Md. 2010)................................. 59

*YCB Int'l, Inc. v. UCF Trading Co.*, 2012 U.S. Dist. LEXIS 104887
(N.D. Ill. June 12, 2012) .............................................................................................. 66

*Young v. City of Chi.*, 2017 U.S. Dist. LEXIS 394 (N.D. Ill. Jan. 3, 2017)................................ 55

Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003)....................................... 59, 61

**<u>Statutes and Rules</u>**

28 U.S.C. §636(b)(1)(B) ................................................................................... 52

28 U.S.C.A. §1927 ................................................................................... 51, 73

Fed. R. Civ. P. 11(c)(3) ................................................................................... 51

Fed. R. Civ. P. 26(g)(3) ............................................................................. 51, 73

Fed. R. Civ. P. 37(a) ................................................................................. 50, 71

Fed. R. Civ. P. 37(b) ................................................ 50, 51, 52, 54, 55, 56, 71, 73

Fed. R. Civ. P. 37(c) .................................................... 50, 55, 56, 57, 58, 72

Fed. R. Civ. P. 37(e) ........................................ 50, 53, 58, 62, 63, 64, 65, 66, 72

Fed. R. Civ. P. 56(h) .................................................................. 51, 71, 72, 73

## I.  **PRELIMINARY STATEMENT**

Plaintiffs move for sanctions based on the disturbing conduct of Defendants and their counsel, which was uncovered in early 2018 and has continued to unfold and expand over the past year.  Despite having many months and multiple opportunities to explain their misconduct, they have not done so because the newly produced documents, the admissions of their failure to properly preserve ESI, and their spoliation of evidence establish the most serious kinds of litigation misconduct for which there is only one conclusion.  Defendants and their counsel have engaged in wide ranging litigation misconduct violating multiple Rules of Federal Civil Procedure, which authorize this Court to issue a wide range of sanctions.

This motion addresses the scope and impact of Defendants' deceit, non-compliance with Court orders, spoliation of highly relevant data and disregard of their legal obligations, and what should be done to address it.  The lengthy detailed recitation of facts which follows was necessitated by the broad scope of Defendants' misconduct as uncovered through:  1) a review of Defendants' prior productions and the representations to the Court concerning those productions, 2)  their June 1, 2018 production of previously withheld documents and data, 3) their numerous sworn statements filed with this Court, 4) their counsel's related oral representations and conduct, 5) their admitted spoliation of certain Yahoo Messenger chat communications, and 6) their purported complete loss of all of Defendants' electronically stored information ("ESI") allegedly collected in this litigation.  Through this misconduct, Defendants created a false, selective and incomplete record upon which they asked this Court to make dispositive rulings seeking millions of dollars in damages with the knowledge that the record was fabricated and their claims meritless.

As the Court wades through the mess created by Defendants and their counsels' inexcusable and contemptuous conduct, it may struggle to find the just mix of sanctions to right

this ship. Plaintiffs have suggested some in this brief, but believe that when the Court weighs the withholding of documents and the selective production of other documents, as well as numerous examples of straight out perjury and spoliation of highly relevant data by the Defendants, it may find that the prejudice visited upon Mr. Bengoa (the owner of Plaintiffs DR and CB), and the insults Defendants perpetrated on this Court and its Rules are so broad and gross, that justice can only be served by the dismissal of Defendants' counterclaims, entry of default and severe monetary sanctions against the appropriate individuals.

Defendants and their attorneys have evaded their obligations, covered up the truth, disregarded the Rules, and in some instances, disregarded their oaths. Fortunately, this contemptuous behavior has been uncovered, albeit at the "11th" hour of this seven-year long litigation. This Court has the power, supported by the Rules and the legal precedents cited below, to protect not only parties coming to this Court for justice, but it has the obligation to protect the integrity of the truth finding process, and we respectfully request that it do so by issuing appropriate sanctions in this case.

## II.    DEFENDANTS' LITIGATION MISCONDUCT UNCOVERED TO DATE

Plaintiffs have uncovered clear evidence of the following sanctionable litigation misconduct by Defendants and their counsel, which is summarized and detailed in this Brief:

- Defendant Brent Duke falsely testified that Defendants possessed no e-mails with Kirti Saraswat/Webrecsol, disobeyed a June 2015 Order commanding their production and misrepresented that no such documents existed. Br. at 13, *et seq.*

- On March 19, 2018, Defendants selectively produced withheld Saraswat e-mails with Duke, misrepresenting they were all irrelevant. The production was accompanied by false client and attorney declarations that misrepresented the date of Duke's last communication with

Saraswat, and contradicted documents in that production, while intentionally withholding more than 100 other responsive and relevant e-mails with her. *Id*.

• Defendants submitted a false declaration from Saraswat, setting forth a different date of last communication, contradicting the documents they produced, and belying statements made by Duke to his SEO expert witness that Saraswat was working on his website in September 2011 when Plaintiffs' trademark was placed in Defendants' website metatags. *Id*.

• Defendants concealed documents evidencing the fact that Duke and his agent and business partner, Edmiston, orchestrated an encounter with Plaintiffs' representative at a trade show, and concealed the existence of a second, exculpatory recording. Br. at 22-24.

• Defendants withheld e-mails referencing communications between Edmiston and Defendants' lawyers that make clear there were multiple recordings, and counsel let them perjure themselves and testify there was only one recording. Br. at 24-26.

• Defendants withheld evidence and relied on perjured testimony in trying to avoid summary judgment. Br. at 25.

• Defendants concealed e-mail exchanges between Duke and its Chinese manufacturer advising that Duke had sent one of Plaintiffs' e-cigarette batteries, asking that a compatible product be manufactured for Defendants to sell to Plaintiffs' customers. Br. at 27-28.

• Defendants concealed an e-mail from Duke's wife and employee boasting that she made a sale to Plaintiffs' customers. Br. at 28.

• Defendants and counsel failed to search all employees' email accounts such as Laurie Duke and Brandon Duke who were identified in Rule 26 Disclosures. Br. at 28-29.

• Defendants concealed and withheld online sales data that contradicts their sales, growth, market penetration, and damages arguments, including their expert's opinions. Br. at 29-31.

- Defendants concealed documents evidencing the fact Duke testified falsely that he did not believe that keyword metatags affected SEO rankings because he was told so by a person named Otis Chandler, while concealing e-mails with Chandler stating the opposite. Br. at 31-33.

- Defendants concealed documents evidencing the fact Duke testified falsely that he lacked knowledge of SEO and the skill to edit website metatags allowing him to insert Plaintiffs' trademark in their website. Br. at 35-37.

- Defendants concealed documents evidencing the fact Duke testified falsely about his alleged ignorance concerning SEO, and concealment of his e-mails discussing a scheme to misuse competitors' trademarks to gain an advantage in SEO. Br. at 33-34.

- Defendants concealed documents evidencing the fact Duke testified falsely that he had no involvement in the creation of a certain website, did not represent Webrecsol as to same, and barely knew an alleged customer, while concealing 2008-2009 documents reflecting his HTML coding work on the project, the true name of the customer and that customer's employment as Defendants' Director of Sales and Marketing. Br. at 34-39.

- Defendants concealed of all company e-mails of its Director of Sales and Marketing despite revealing that his hard drive was among those allegedly searched. Br. at 34 and 37-38.

- Defendants' counsel failed to disclose their discovery misconduct when they admitted that, by March 19, 2018, they knew they had not searched Duke's Brentduke@yahoo.com account, yet filed Summary Judgment submissions that day without revealing same, and misrepresented that the 112 hand-selected pages of Saraswat e-mails produced were the full extent of such communications and not relevant. Br. at 15, *et seq.*

- Defendants' counsel failed to disclose Defendants misrepresented that their only mistake was not searching Duke's Yahoo.com e-mail account, and that their 2018 production contains only

"new documents," while concealing that almost 2,600 of the e-mails in their 2018 production are mere duplicates of e-mails that were sent to Duke's bduke@21centurysmoking.com inbox, but were never previously produced. Br. at 39-42.

- Defendants and counsel fabricated an excuse of "auto-purging" of all "sent" e-mails from two GoDaddy e-mail accounts, but which is belied by their prior productions. Br. at 42-48.

- Defendants and counsel, until March 19, 2018, concealed their knowledge of "auto-purging," when they submitted Duke's Declaration stating he was aware of it in 2014. Br. at 42-43.

- Defendants and counsel failed to produce e-mails known to have been sent to Duke's non-"auto-purged" support@21centurysmoking.com inbox, and offered no explanation as to why they cannot now be located despite Duke's testimony he never deletes e-mails. Br. at 45-46.

- Defendants and counsel misrepresent when their duty to preserve ESI arose despite their own privilege log entries establishing that Defendants had retained legal counsel and drafted Complaints against Plaintiffs in 2011. Br. at 48.

- Defendants' counsel failed to issue a litigation hold, failed to take reasonable measures to investigate and preserve ESI, and lost same. Br. at 46-47.

- Defendants and counsel made misrepresentations regarding "auto-forwarding" to a Yahoo.com account from two GoDaddy e-mail accounts, as a review of their productions shows there was never any auto-forwarding involving their support@21centurysmoking.com account, and none as to bduke@21centurysmoking.com at any time prior to April 20, 2013. Br. at 48-49.

- Defendants and counsel failed to ever preserve or search Defendants' Yahoo Messenger chat data, and then allowed same to be spoliated. Br. at 49-50.

- Defendants and counsel spoliated their entire universe of ESI they allegedly collected in 2014, preventing forensic analysis of same.  Br. at 50.

## III.   KEY CASE EVENTS AND COURSE OF DISCOVERY

After reviewing the record, the reason for Defendants' litigation and discovery misconduct becomes apparent.  They concealed evidence that conflicted with the false case narrative that they had knowingly advanced through false pleadings, during fact and expert discovery, and in their summary judgment submissions.  We review the following key milestones to frame the Defendants misconduct, how it specifically prejudiced Plaintiffs, and how it impacts all of the claims and defenses in this action.

### A.   MISCONDUCT GOES TO CRITICAL CASE ISSUES AND IMPACTS FACT AND EXPERT DISCOVERY (2012 - 2017)

Since early in this litigation, Defendants have been aware that evidence of their "unclean hands" would be fatal to their infringement claims and defenses.  In fact, within months of filing this litigation in September 2012, this Court entered a Preliminary Injunction against Defendants for misusing and misappropriating Plaintiffs' registered trademark, 21ST CENTURY SMOKE, within the metatags of the Defendants' website ("Misuse of Metatags").  See Dkt. Nos. 26 (Court's Opinion dated 3/14/13) and 27 (Preliminary Injunction entered 3/14/13).  The following year, Defendants moved this Court to cancel Plaintiffs' registered trademarks, but were unsuccessful, because this Court held that evidence in the record: (a) from which a fact finder might "reasonably conclude that [Defendants] were content to profit from the success of [Plaintiffs'] junior use until [Defendants found themselves] sued for infringement;" and (b) that supported Plaintiffs' equitable defense of "unclean hands."  See Dkt. No. 80 (Court Opinion and Order dated 6/16/14).[1]

---

[1] Judge Kapala found that Defendants had senior user status, but contrary to Defendants' allegations, did not find that Plaintiffs were "bad faith" junior users or that Defendants had any common law rights. *Id.*

During fact discovery, this Court ordered the parties to "reconvene a 26(f) conference to discuss e-discovery issues in detail with the e-discovery custodians for each side." See Dkt. No. 78 (Minute Entry dated 5/15/14). That conference occurred in June 2014, with Defendant Duke participating along with counsel. The parties exchanged e-discovery search terms and conducted e-discovery. Remarkably, during 2014, Duke allegedly learned, _but failed to disclose until 2018_, that many of Defendants' e-mails had been lost as a result of auto-deletion, and that no preservation of this data ever took place. Dkt. No. 234-2 at ¶ 4 (Duke Declaration dated 3/19/18).

In late 2014, Defendants amended their pleadings to add claims -- we now know were meritless and fabricated -- for defamation and trade disparagement. See Dkt. No. 99 (Second Amended Counterclaim dated 11/22/14). These claims were based upon statements that were allegedly made by Adam Olcott ("Olcott") to Bill Edmiston ("Edmiston") at the Global Gaming Exposition in Las Vegas in 2013 ("September 2013 Trade Show"). See _Id._ at ¶¶ 37-47. Although Plaintiffs sought leave to add an affirmative defense of "invited defamation," Defendants opposed the motion and this Court ultimately denied the motion. See Dkt. No. 154 (Court's Opinion and Order dated 10/30/15). Neither Defendants nor their counsel disclosed that they had failed to produce evidence critical to these issues.

Critically, this Court granted Plaintiffs' Motion to Compel Discovery in 2015 concerning two key issues in this case, _i.e._, Defendants' Misuse of Metatags and Defendants' early on-line sales, which are relevant to Plaintiffs' unclean hands defense and the common law trademark rights asserted by Defendants. See Dkt. No. 132 (Court Order dated 6/11/15 Order). Defendants and their counsel represented in writing that "no such documents exist to our knowledge concerning SEO and internet keyword rankings after 2009."[2] See March 25, 2019 Declaration of Brian E.

---

[2] As explored more fully below, this date is significant because Defendants' Misuse of Metatags did not commence until approximately October of 2011.

Moffitt in Support of Renewed Motion for Sanctions ("Moffitt Decl.") at Exhibit CCC (June 12, 2015 e-mail from Travis Life, Esq.). The parties then conducted expert discovery and related motion practice in reliance upon the incomplete and selective information provided by Defendants.

**B.    DEFENDANTS MOVE FOR SUMMARY JUDGMENT AND FAIL TO DISCLOSE KNOWLEDGE OF WITHHELD DISCOVERY/ LOSS OF ESI (JAN. – JUNE 2018)**

On January 15, 2018, the parties filed motions for summary judgment in which Plaintiffs again raised concerns about suspicious deficiencies in Defendants' discovery responses. On the evening of March 19, 2018, the deadline for submitting final briefs, Defendants produced 112 pages of new paper documents (the "March 19 Production") which were attached to an e-mail from Defendants' counsel Peter Stamatis, Esq. stating: (a) the documents were related to Plaintiffs' missing documents claims; (b) Defendants did not believe they were relevant, and (c) this production "belied" Plaintiffs' assertions that Defendants were withholding unfavorable documents. See Moffitt Decl. at Exh. A. At the same time, Defendants filed pleadings further supporting their motion for summary judgment and opposing Plaintiffs' Motion for Summary Judgment, wherein they: (a) falsely maintained that Plaintiffs had never before raised concerns over missing e-mails, had never filed a motion to compel, and that no relevant e-mails had been withheld; (b) simultaneously used and incorporated the withheld documents, composed mostly of e-mails, into their briefing; and (c) never disclosed the scope and extent of their discovery misconduct and withheld documents despite full knowledge of same. See Dkt. No. 233 at pp. 24-25 (Defendants' 03/19/18 Response Brief to Plaintiffs' Motion for Summary Judgment).

Based on the Defendants' production of withheld documents and concerns of other litigation misconduct, Plaintiffs moved for sanctions and leave to amend their motion for summary judgment on April 6, 2018. See Dkt. No. 239 ("Plaintiffs' Motion for Sanctions"). This prompted an April 17, 2018 conference with the Court - *the first of many over the past year* -- to address

Defendants' ongoing discovery misconduct. At that conference, Defendants were warned that their *efforts to explain and defend their discovery deficiencies had "better be really good and supported by an affidavit."* Dkt. No. 249 at 23:17-19 (Transcript of 04/17/18 Conference)(emphasis added). Rather than explaining their misconduct, Defendants opposed Plaintiffs' motion, contesting the sanctions or even an amendment to the briefings. See Dkt. No. 253 (Defendants' Opposition to Plaintiffs' Motion for Sanctions, dated 5/14/18). Defendants "explained" that their newly-produced documents - *and a whole other set of newly discovered (but not yet produced) documents* - were inconsequential to either the pending summary judgment motions or Plaintiffs' Motion for Sanctions because those new documents "d[id] not support any of Plaintiffs' claims." *Id*. at 2, 11. Defendants claimed that their late production was "excusable," "substantially justified," and "harmless," and admitted, for the first time, that relevant e-mails may have also been deleted. *Id*. at pp. 10-14. To date, Defendants and counsel have not explained their misconduct or why they made these baseless and misleading statements to the Court.

From March through May 2018, Defendants and their counsel made representations trying to minimize the significance of their discovery misconduct and resisted any additional document productions.[3] They did this improperly, as Defendants' counsel had full knowledge that the March 2018 Production represented a small fraction of responsive documents that Defendants were continuing to conceal from both Plaintiffs and the Court. See Dkt. 253-2 ¶¶ 11-13 (Declaration of T. Life dated 5/14/18). This Court Ordered that Defendants produce *all* of the documents that they withheld by no later than May 31, 2018, in both paper and native format. See Dkt. No. 254.

---

[3] See, *e.g*., Dkt. No. 233 at p. 22 (where Defendants assert, on 3/19/18, that Plaintiffs' claims about missing documents are "manufactured," "insignificant," and "untrue"); Dkt. No. 249 at 21:1, 22:11-13 (Defendants argue Plaintiffs are pursuing a "road to nowhere" and that their March 19 Production proved there was "no smoking gun," "nothing there," and took the issue of missing e-mails "off the table"); Dkt. No. 253 at. pp. 2, 11 (Defendants claim they investigated the claims, located the alleged missing documents and promptly produced them," and that, "[t]here is no 'smoking gun' or really any evidence that favors Plaintiffs' claims.)

On the evening of May 31, 2018, Defendants produced documents in native format, amounting to approximately 2.5 gigabytes of data contained in over 12,000 documents ("May 31 Native Production"). The following day, Defendants produced five boxes of paper documents ("June 1, 2018 Paper Production") containing over 15,000 pages of documents. As detailed below, a review of the two sets of data confirmed that the Defendants and their counsel had selectively *withheld responsive documents that were in the native data – but were not in the paper set they had reviewed, bates stamped and prepared for production.* Moffitt Decl., ¶ 71-78, Exhs. FFF-III)

## C. DEFENDANTS' LATE PRODUCTIONS REVEAL CRITICAL EVIDENCE WAS IMPROPERLY WITHHELD AND/OR SPOLIATED (JUNE – AUG. 2018)

Plaintiffs reviewed Defendants' newly produced documents in paper and native format and provided an initial assessment of their findings at an August 14, 2018 status conference ("August 2018 Presentation"). Detailed at length below, these documents revealed that Defendants had: (a) seriously misrepresented the relevance of the withheld documents; (b) manufactured and offered false testimony on their defamation claim; (c) concealed evidence that was highly relevant to Plaintiffs' claims regarding Defendants Misuse of Metadata; (d) removed documents that contradicted their market penetration claims relevant to their common law trademark claim; and (e) misrepresented and concealed the scope of their document preservation/collection failures. Plaintiffs also identified e-mails that referenced Yahoo Messenger chat ("Yahoo Messenger Chat") exchanged between Duke and Ms. Kirti Saraswat (an individual who performed SEO consulting services for Defendants) that had never been produced or identified as a source of relevant ESI by Defendants. See Dkt. No. 267 at 31:7-18 (Transcript of 8/14/18 Hearing). Defendants were then given additional time to locate and produce these documents which they had never preserved, collected or searched. *Id*. at 33:1-10; 58:1-5. Neither Defendants' nor their counsel have explained why they failed to fulfil their legal obligations concerning this and other data in this case.

Defendants continued to conduct themselves in a manner that this Court observed was "troubling and disturbing,"[4] and in spite of repeated warnings and direction from this Court, Defendants failed to take appropriate measures to investigate or recover the missing data. For example, although Defendants first reported that their vendor could recover the missing Yahoo Chat documents, they later reported that it could not, and even advised that the data might be lost after November 8, 2018. Dkt. No. 273 (Report to Court dated 10/10/18). Defendants later advised that they were "doing everything in their power" to retrieve the documents and the Court specifically cautioned them about making specific inquiries to Yahoo concerning the preservation of this data. See Dkt. No. 278 at 9:11-20; 37:8-18 and 53:16-18 (Transcript of 10/16/18 Hearing).

Defendants did not act in accordance with their claims or this Court's directives because they later disclosed, without further explanation, that the Yahoo Messenger Chat documents had been spoliated. See Dkt. No. 281 (Defendants' Report to Court dated 11/28/18). Defendants were made aware of the spoliation a month before this was ever disclosed to Plaintiffs and the Court. See Dkt. No. 281 at Exhibit A (October 23, 2018 correspondence to Defense counsel from Oath Holdings Inc. ("Oath")(formerly Yahoo Holdings, Inc.) in response to the Yahoo Subpoena). After the Court received the parties' November 28, 2018 report concerning the loss of the Yahoo Messenger Chat documents, it scheduled another status hearing, for January 29, 2019, to address Defendants' discovery deficiencies and this sanctions motion.

**D. DEFENDANTS TRY TO AVOID SANCTIONS BY SEEKING DISMISSAL OF DEFAMATION CLAIM AND FALSE SARASWAT DECLARATION (OCT. 2018)**

---

[4] See Dkt. No. 274. Minute Entry dated October 10, 2018, where the Court indicates that Defendants' Report was "troubling and disturbing," and reminds Defendants that it was "not up to the court to instruct counsel on how to preserve evidence."

Defendants next sought to minimize sanctions by "removing" their frivolous and meritless defamation claim. As detailed below, Defendants and counsel withheld key documents and made misrepresentations about those documents and claims. On October 15, 2018, Defendants moved for leave to dismiss their defamation claim. See Dkt. No. 275. Plaintiffs agreed to a dismissal but only upon on the condition that Defendants could not dismiss a meritless claim without sanctions. Defendants' motion was denied. See Dkt. Nos. 279 (Plaintiffs' Response dated 11/7/18) and 292 (Court Order dated 2/12/19). In October 2018, Defendants also filed a Declaration from Saraswat that appears to have been drafted by Defendants' counsel and was offered to respond to Plaintiffs' proofs that Defendants withheld and lost relevant e-mails and chat messaging between Duke and Saraswat, and to argue that she did not work on Defendants' website after February 2010 and could not have been responsible for the Misuse of Metatags which occurred between October 2011 and March 2013. See Dkt. 276. As detailed below, this statement is false and belied by Defendants own documents that reveal Saraswat worked with Defendants beyond February 2010.

## E.   DEFENDANTS DISCLOSE THEIR ESI DATA WAS SPOLIATED (JAN. 2019)

In January 2019, Defendants disclosed that the forensic ESI images taken from Defendants' computers in 2014 ("ESI Data Set") were also spoliated during the course of this litigation. See Dkt. No. 288 (Defendants' Report to Court filed on 1/22/19). Defendants have failed to explain: (a) what became of the data sourced on the original hard drives; or (b) why this spoliation of evidence was not disclosed before January 22, 2019, despite multiple court conferences and filings over the last year concerning Defendants' discovery misconduct. It is unclear when this spoliation was discovered by Defendants or their e-discovery vendor. This problem *should* have been discovered at the very latest by January 2018, when the issue of missing discovery was raised in Plaintiffs' motion for summary judgment.

## IV.     DEFENDANTS' CONTINUING LITIGATION MISCONDUCT

Plaintiffs provide the following detailed summary of the numerous instances of litigation misconduct by Defendants as revealed in their conduct during discovery, a review of the withheld documents and the misrepresentations made by Defendants and their attorneys to the Court orally and in writing through briefs and Declarations under oath.

### A.     DEFENDANTS INTENTIONALLY WITHHELD SARASWAT EMAILS AND OTHER DOCUMENTS ON MARCH 19, 2018, AND CONCEALED THAT THEY NEVER SEARCHED DUKE'S YAHOO EMAIL ACCOUNT

On March 19, 2018, Defendants intentionally withheld from production numerous responsive and relevant e-mails exchanged between Duke and Defendants' SEO consultant, Kirti Saraswat.  They simultaneously submitted demonstrably false attorney and client Declarations regarding that production and the nature and timing of Duke's communications with Saraswat. This deceit was further perpetuated when Defendants prepared and filed the Declaration of Ms. Saraswat in which she falsely asserted that her work for Defendants ended in or about February 2010.  See Dkt. No. 276 at ¶ 4 (Declaration of Saraswat dated 10/13/18).

Had Plaintiffs not responded to Defendants' March 19 production by filing a motion for leave to submit additional summary judgment briefing and for sanctions to address that late production, Defendants may have gotten away with concealing the fact that they had, on March 19, 2018, intentionally withheld approximately 109 additional responsive Saraswat e-mails they had discovered and reviewed but left out of their production.  Moffitt Decl. at ¶ 5.  Moreover, instead of alerting the Court and Plaintiffs that they had determined, no later than March 19, 2018, that they had never before performed any search of Duke's Yahoo e-mail account, Defendants

concealed that fact, and misrepresented that the cherry-picked 112 pages produced on March 19, 2018[5] contained the entirety of the previously withheld communications with Saraswat.

As such, they sought to have this Court rule on pending summary judgment with full knowledge of their litigation misconduct and without revealing it, all in the hopes of completing this unlawful course of behavior. By engaging in this improper conduct, Defendants intentionally violated this Court's June 11, 2015 Order, by which they were to produce <u>all</u> documents regarding Saraswat, Webrecsol, and/or SEO, generally, not just those they considered helpful to their case. A timeline of events relevant to this aspect of Defendants' sanctionable misconduct follows.

In Plaintiffs' January 15, 2018 summary judgment motion, they detailed Defendants' failure, during discovery, to produce <u>any</u> e-mails from Saraswat. Dkt 216-2 at ¶¶ 139-142. Plaintiffs also cited to, among other things, Duke's deposition testimony that such e-mails did exist, and Plaintiffs' prior unsuccessful efforts to extract same, including obtaining an Order compelling production. *Id*. and Dkt. No. 132 (Order dated 06/11/15). On the night of March 19, 2018, just a few hours before the deadline for the parties' final summary judgment submissions, Defendants responded by producing, for the first time, 112 pages of documents, comprised almost entirely of e-mail exchanges between Duke and Saraswat.[6] Defendants then cited to and incorporated these e-mails in their accompanying brief, as well as to the Duke and Life Declarations submitted that day, in further support of their motion for summary judgment, and in opposition to Plaintiffs' motion. Dkt. 233 at p. 24, 234-1 at ¶ 4, and 234-2 at ¶ 2.

---

[5] Of those e-mails making up the 112 pages, one string involved Frank Gu, six others were sent by Saraswat to Duke at his support@21centurysmoking.com address, and the other 49 were sent to him at his brentduke@yahoo.com account. As noted, all of these Saraswat e-mails, which hit Plaintiffs' 2014 ESI search terms, were improperly withheld from production for years after discovery closed and after the deadline for summary judgment briefing. Moffitt Decl. at ¶ 4.

[6] The production also included an e-mail between Duke and Gu which had been improperly withheld. *Id*.

Although Defendants had been planning the production of these additional documents for days, they waited until the night of the summary judgment deadline to produce them, to prevent Plaintiffs from having the time to take action with the Court, let alone review and/or utilize same in their final round of briefing. Specifically, in a Declaration of attorney Travis Life submitted on May 14, 2018, he admitted that he had contacted Duke on March 14, 2018, by e-mail, to schedule a call regarding the missing documents, and then spoke with Duke on March 15, 2018. Dkt. 253-2 at ¶ 11. Life stated that he requested that Duke "re-search" his brentduke@yahoo.com e-mail account to "locate any and all emails related to … Kirti Saraswat, and Webrecsol…." *Id*. Life admitted that Duke found emails related to Saraswat and Webrecsol, and that Duke provided those emails to Life on March 17 and 18, 2018. *Id*. Life stated that he "immediately" reviewed those documents, yet admitted they were not produced to Plaintiffs until the night of March 19, 2018, providing no notice that there were issues with their prior productions. *Id*. at ¶ 12.

Life further admitted that, while he was "immediately" reviewing the documents forwarded by Duke on March 17 and 18, 2018, he "questioned whether [Defendants' discovery vendor] 4Discovery searched Mr. Duke's yahoo.com email account." *Id*. at ¶ 13. Life admitted he contacted 4Discovery and said they "confirmed" their searches, using Plaintiffs' search terms, would not have analyzed a web-based email account not stored on hard drives. *Id*. Defendants' counsel Thomas Leavens admitted in his May 14, 2018 Declaration: "During the summary judgment filings, I came to learn that Mr. Duke's personal [sic] *Yahoo.com* email address, brentduke@yahoo.com, were not subject to search terms DR submitted." Dkt. 253-1 at ¶10.

On March 19, 2018, Defendants knew that they were about to produce dozens of e-mails found through an alleged "re-search" of Duke's yahoo.com account, while also including a few from his support@21centurysmoking.com account, and knew that every one of the Saraswat e-

mails they were producing contained, at a minimum, Plaintiffs' 2014 ESI search term "Webrecsol." Defendants knew that all of those documents should have hit Plaintiffs' search terms as allegedly applied back in early 2015, and that they had never before been produced. Both Life and Leavens admit they knew that brentduke@yahoo.com had never before been searched. Yet, they made the calculated decision during the summary judgment briefing and before the March 19, 2018 final briefing deadline to conceal these facts from the Court and Plaintiffs in the hopes they would not be discovered and summary judgment would be granted on their client's claim seeking tens of millions of dollars in damages based upon a false set of facts created by Defendants' and their attorneys' intentional misconduct.

Defendants kept quiet about their scheme and discovery failures and simply produced 112 pages of hand-selected documents almost entirely from Duke's Yahoo.com email account. In the email forwarding the documents at 8:26 p.m., Defendants' counsel Peter Stamatis stated:

> Within the last 48 hours, we received the attached additional documents from 21CS. The documents are related to DR's claim of missing documents, which was raised for the first time in its summary judgment motion. They have been Bates stamped 21C 63515-21C 63626. We do not believe they are relevant to any claim, other than that they belie assertions of withholding unfavorable documents.

See Moffitt Decl. at Exh. A.

This was another false statement by Defendants and their counsel as to the responsiveness and relevance of these documents, and their continued concealment of other discovery misconduct. As detailed below, Plaintiffs' counsel would later determine that Defendants had also intentionally withheld approximately 109 other Saraswat e-mails from their March 19, 2018 production. Dkt. 267 (8/14/18 Hearing Transcript) at p. 47 and Moffitt Decl. at ¶ 5. Even a cursory review of the 112 pages Defendants selectively produced on March 19, 2018 shows that all of those documents were responsive, as they all contained Plaintiffs' ESI search terms, and many went directly to key

issues in the case. See Moffitt Decl. at Exh. A. For instance, although arguing that the 112 pages were not relevant, Defendants simultaneously filed a Brief in which they argued that the 112 pages showed that Saraswat did not work for Defendants <u>after</u> April 2010, and therefore could not have put Plaintiffs' trademark in Defendants' website metatags in 2011. Dkt. 233 at p. 24. Later, Defendants filed the October 2018 Declaration of Ms. Saraswat, in which she claims she did not work for Defendants after February 2010. See Dkt. No. 276 at ¶4. However, Defendants' own recently produced documents show that Ms. Saraswat did work after that time – as such, her Declaration, and Defendants' and Defendants' attorneys' representations to this Court are false.

The 112 pages Defendants selected for production on March 19, 2018 contained highly relevant documents concerning core issues in this case including: 1) a June 1, 2009 e-mail showing when Duke got his first e-cigarette product shipment and made his first sale (See Moffitt Decl. at Exh. B); 2) a June 25, 2009 e-mail that shows Duke owned and operated another website (sportsdoctrine.com) which he failed to reveal at his deposition, falsely testifying he had no other websites except brentduke.com and 21centurysmoking.com, and that he had been working on same with Saraswat for two years (See, *e.g.*, Moffitt Decl. at Exh. C); 3) a September 8, 2009 e-mail that reveals how Duke went about personally installing Zen Cart – the e-commerce program Defendants claim may have "auto-populated" Plaintiffs' mark into Defendants' website metatags -- in Defendants' website without help from anyone, undercutting his false representations that he had no skill or ability to insert Plaintiffs' mark in his website (See Moffitt Decl. at Exh. D); 4) a September 21, 2009 e-mail where Duke complained that he was only getting a couple hundred organic hits on his website per month, which he said was not a lot, belying Defendants' claims, and those of their market penetration expert, that they experienced "impressive growth" during that period (See Moffitt Decl. at Exh. E); 5) a December 4, 2009 e-mail where Saraswat asked

Duke to <u>come online so they could chat</u> so they could work together on the website, revealing that

is how they often communicated and worked collaboratively on websites, yet Defendants had

never before identified or produced any such chat communications and have now spoliated these

relevant documents (See Moffitt Decl. at Exh. F); 6) a December 23, 2009 e-mail when Duke told

Saraswat he made edits to the website, "but didn't mess with the keywords" (See Moffitt Decl. at

Exh. G); 7) a January 15, 2010 e-mail when Duke complained: "I just have to figure out how to

generate some freaking traffic to site to get some sales…." (See Moffitt Decl. at Exh. H);  and 8)

an April 29, 2010 e-mail where Saraswat told Duke she would not do any more work on his 21CS

website until she got paid, to which Duke responded by stating that "my website (21 Century

Smoking) hits haven't really increased at all in the past 6 months" (See Moffitt Decl. at Exh. I).

These  relevant emails belie Defendants' claims of market penetration and Duke's alleged inability

to make changes to his website.

Despite their obvious relevance, Travis Life, Esq. furthered attorney Stamatis'

misrepresentation as to the value of these documents when, in his March 19, 2018 Declaration, he

claimed Defendants produced the 112 pages only "out of an abundance of caution," falsely stating

that Defendants had no communications with Saraswat or Webrecsol <u>after</u> April 2010, but they

"[n]evertheless…obtained the earlier email communications with Kirti Saraswat from 21CS."

Dkt. 234-1 at ¶ 4.  Defendants also submitted a March 19, 2018 Declaration of Brent Duke, in

which he falsely stated:

> I employed Webrecsol to manage 21 Century Smoking's web site and to provide SEO
> services from approximately January 2009 through April 2010. After April 2010, I had
> no further communications with Webrecsol or Kirti Saraswat regarding 21 Century
> Smoking's web site and, in particular, no communications about metadata on the site.

Dkt. 234-2 at ¶ 1.  Duke and Life's Declarations were contradicted by one of the e-mails between

Duke and Saraswat that Defendants' produced on March 19, 2018.  That communication, dated

June 29, <u>2012</u>, discusses Duke's websites potentially making a big SEO splash in India, creating a corresponding website for India, and going into business with Saraswat selling his e-cigarettes there. See Moffitt Decl. at Exh. J. Defendants misrepresented that all the emails they produced fell within the range between March 31, 2009 and April 29, 2010. Dkt 234-2 at ¶ 4 and Moffitt Decl. at Exh. A and ¶ 4. Duke made up his story about having no communications after April 2010 to fit his story that his SEO consultant stopped working for him before Plaintiffs' trademark was in Defendants' website. The documents show this story is an intentional fabrication.

Had Plaintiffs' counsel taken these statements at face value, Defendants might have gotten away with their egregious litigation misconduct, and kept hidden the dozens of other Saraswat e-mails they were aware of on March 19, 2018, but decided not to produce or even disclose their existence. Nowhere in Defendants' March 19, 2018 e-mail, declarations or brief, did they state anything about the existence of other Saraswat emails, or their known failure to ever search the brentduke@yahoo.com email account despite having full knowledge of both. They were content to have Plaintiffs and the Court rely on these misrepresentations and to have this Court rule on summary judgment based upon a fabricated record.

Not only is this conscious effort to deceive elucidated by *what* Defendants and their counsel chose to produce (and not produce) on March 19, 2018, but also *how* they chose to organize that production. The subset of e-mails selected by Defendants for production on March 19, 2018 were conveniently limited to the date range of <u>March 23, 2009 to April 29, 2010</u>, with the one June 29, 2012 e-mail placed in the chronology, as though it was dated June 29, "2009." See Moffitt Decl. at ¶ 4. Upon review of Defendants' June 1, 2018 Paper Production, it became clear that Defendants' had withheld many relevant communications between Duke and Saraswat that occurred before and after the time period to which they limited their March 19, 2018 production.

More specifically, Plaintiffs found that Defendants had intentionally withheld 36 other e-mails between Defendants and Saraswat that occurred prior to March 31, 2009. See Moffitt Decl. at ¶5. Defendants also intentionally withheld another 29 e-mails post-dating their alleged final communication with Saraswat in April 2010. *Id.* These 29 e-mails range between May 13, 2010 and March 10, 2013. *Id.* Also, Defendants intentionally withheld another 44 such e-mails between Duke and Saraswat which fell between March 31, 2009 and April 29, 2010. *Id.* Accordingly, on March 19, 2018, while producing 112 pages, Defendants intentionally withheld a total of 109 other e-mails that hit Plaintiffs' ESI search terms and which had previously been ordered to be produced. *Id.* This establishes that their sworn statements to the Court were knowingly false.

Among the documents intentionally withheld on March 19, 2018 were the March 2013 exchanges where Duke asked Saraswat if she placed Plaintiffs' trademark in Defendants' metatags. See Moffitt Decl. at Exhs. K and L. Saraswat said she did not remember and would have to check, causing Duke to repeatedly ask that she get back to him the next day. *Id.* Despite this and other 2012 e-mails, detailed above, where Saraswat and Duke discussed going into business together selling Duke's e-cigarette products and making a big SEO splash there, as late as the August 14, 2018 court conference, Defendants' counsel continued to misrepresent to the Court that Duke had no communication with Saraswat after April 30, 2010 regarding his website generally, or SEO in particular. Specifically, this Court asked attorney Stamatis: "But wasn't one of their points that Duke also testified that there was no further communications after April 10th and yet there turns out to be one?" See Dkt. 267 (8/14/18 Transcript at p. 57). Stamatis responded with the following misrepresentation: "With regard to his website. With regard to operating the website, doing work for him on the website, that was the end of the relationship with regard to his website." *Id.*

Defendants' counsel knew that, among the documents withheld on March 19, 2018 and that they had been compelled by Court order to produce in their June 1, 2018 Paper Production, was a September 13, 2010 e-mail into which Duke copied "**Our chat on Mon, 9/13/10 7:45 p.m.**" that he had with Kirti Saraswat.  See Moffitt Decl. at Exh. Q.  This was five months after the date ("April 2010") that Duke and attorney Stamatis misrepresented that Duke last communicated with Saraswat about work on Defendants' website.  That September 2010 chat log has two and a half pages of back and forth between Duke and Saraswat regarding nothing but work on his website and SEO such as search analytics, improvement in rankings, keywords and more.  *Id.*

This document is just one example, but it alone renders false Duke and Life's March 19, 2018 Declarations, and counsel's numerous subsequent knowingly false representations to the Court regarding when the last contact with Saraswat occurred and all the arguments they made in seeking summary judgment based on this falsehood.  It also belies numerous other arguments in Defendants' summary judgment briefing, as well as opinions of their experts.  Yet, Defendants' counsel intentionally withheld this document on March 19, 2018, and, after producing it, repeatedly and falsely represented that there is nothing in the production that favors Plaintiffs.

Defendants have no regard for the truth or the Rules of this Court as they have actively concealed their misconduct and relevant evidence.  Their fabricated explanations are belied by their SEO expert, Brian Brown, who produced notes of conversations with Duke and testified regarding same, in which Duke stated to Brown that Saraswat still had access to Defendants' website in September 2011, when Plaintiffs' trademark would have been placed in Defendants' metatags.  See Moffitt Decl. at Exh. R (Exhibit 5 to the 5/13/16 Deposition of Brian Brown).  Those notes, authenticated by Brown, state that Duke had also told him that Saraswat was probably still working on his website in 2012.  *Id.*  On March 19, 2018, Defendants decided to pivot and hope

that no one would review the record, and picked April 30, 2010 as her last day because it fits their fabricated story to deflect from their misconduct, while hiding documents belying same.

As noted, Defendants also intentionally withheld responsive and relevant Saraswat communications **prior to** April 30, 2010. One of those was the April 2009 Otis Chandler exchange, detailed below, which was then forwarded to Saraswat. Numerous other e-mails relate to Duke's previously undisclosed "sportsdoctrine.com" site, a website he created, owned, operated and concealed during his deposition so as to pretend not to have computer or website skills, falsely claiming instead that he only had created and operated his 21centurysmoking.com and brentduke.com websites. See Moffitt Cert. at Exhs. C and S (9/16/15 Duke Dep. at 54:15 – 56:13).

## B. DEFENDANTS CONCEALED EVIDENCE SHOWING THAT THEY ORCHESTRATED THEIR DEFAMATION CLAIM

In November 2014, Defendants were granted leave to file a Second Amended Counterclaim to add an eighth count, for Defamation *Per Se*, based upon allegations that Plaintiffs' representative, Olcott, made false statements about Defendants to Edmiston at the September 2013 Trade Show. See Dkt. No. 88 at ¶¶ 37-47 (Defendants' Second Amended Counterclaim). At the time of that Expo, Edmiston was an authorized agent for Defendants, was aware of this litigation, and shared a financial interest in the success of Defendants' business with a written contract to be paid 50% of Defendants' product sales to various enumerated major retailers. See Dkt. No. 216-2 at ¶¶ 68-73 (Plaintiffs' Jan. 15, 2018 Statement of Undisputed Material Facts ("SUMF") and related Exhibits at Dkt. No. 216-15 (Deposition of Edmiston ("Edmiston Dep.") at 10:21 – 11:4, 34:10-16, 57:1 – 60:6, and 63:20-25, and Exhibit F thereto at p. 21C 61293)); Dkt. No. 216-12 (6/17/2015 Duke Dep. at 320:18 - 321:4 and 321:20 - 322:10, and Exhibit 5 thereto)).

At his June 17, 2015 deposition, Brent Duke was asked: "Did you give him (Edmiston) any direction to record any of the events taking place at the trade show?" Duke's answer, under oath,

was one word: "No." Moffitt Decl., Exh. T (9/17/15 Duke Dep.) at 316:8-10. At Edmiston's

deposition on June 29, 2015, Edmiston also denied that anyone from Defendants' company

instructed him to have a conversation with anyone at Plaintiffs' convention booth. Moffitt Decl.,

Exh. U (6/29/15 Edmiston Dep.) at 34:6-22. Specifically, Edmiston testified that he "took it upon

himself to try and record" the conversation that he had with Olcott. *Id.* Notably, at the time of his

deposition, Edmiston also believed that he was a 3 percent owner of 21 Century Smoking, Inc.

See Dkt. No. 216-2 (SUMF at ¶¶ 75-76) and related Exhibits at Dkt. No. 216-15 (Edmiston Dep.

at 70:7-12) and Dkt. No. 216-16 (Exh. R attaching 21C 63269 - 21C 63271)). However, other

documents revealed by Edmiston at and after his deposition show that Edmiston may have actually

held 2% equity purchase rights through a 2014 Stock Option/Equity Grant from Defendants. See

Dkt. No. 216-2 at ¶¶ 76-77 (SUMF at ¶¶ 76-77 and related Exhibits at Dkt. No. 216-16, Exh. R.

(6/29/15 Edmiston e-mail and agreement, at 21C 63269 - 21C 63271)).

Defendants' newly produced documents demonstrate beyond any doubt that both Duke and

Edmiston perjured themselves:

- In an e-mail dated September 10, 2013, Duke told Edmiston that Plaintiffs have a booth at the upcoming Sept. 25, 2013 Tradeshow and further stated: "maybe you can record them saying something libelous about me, lol."
- Edmiston responded in an email: "that sounds fine to me. I will go to their booth and play dumb about the two names. Will record. And take pics :)."

See Moffitt Decl. at Exh. V. The prejudiced suffered by Plaintiffs as a result of these acts is serious

and obvious. Had Plaintiffs received these e-mails during discovery, they could have used it during

cross-examination of witnesses, promptly amended pleadings (thus avoiding their unsuccessful

motion to leave to amend to include an affirmative defense of "invited defamation" in late 2015),

and also sought summary judgment on this issue, all in indisputable, demonstrable prejudice to

Plaintiffs. Instead, this case was litigated on a false and incomplete record created by Defendants.

## C. DEFENDANTS CONCEALED EVIDENCE THAT EXCULPATES PLAINTIFFS IN THE DEFAMATION CLAIM

Edmiston and Duke asserted that there was an attempt to create two recordings at the trade show, to document allegedly defamatory statements made by Olcott. Edmiston testified that: "there was an attempt to do two because of the length of the conversation we had with the guy, but the second one did not take." See Moffitt Decl., Exh. U (6/29/15 Edmiston Dep. at 30:6-14 and 31:18-22). Edmiston also testified that he only shared the first recording with Duke on October 2, 2013, because there "wasn't anything" on the second one, it did not work." *Id*. at 80:5-23.

However, Defendants' June 1, 2018 production shows this testimony is false and Edmiston perjured himself. Incredibly, these documents include an October 2, 2013 e-mail from Edmiston to Duke entitled "part two," **which attaches a second recording**. See Moffitt Decl. at Exh. W. This recording, which was withheld from all prior discovery and its existence was falsely denied, does not contain any of the defamatory statements alleged by Defendants. Approximately a year later, on October 4, 2014, Edmiston emailed Duke referencing a "second one...we did not get much good info in this one...we are bad spies. :)" See Moffitt Decl. at Exh. X.

The prejudice to Plaintiffs is self-apparent. Defendants continued to prosecute a defamation claim in bad faith. If a prosecutor had withheld this type of exculpatory evidence on a material issue, the case would likely be dismissed under the *Brady* Doctrine, and the prosecutor sanctioned and subjected to disciplinary proceedings.

## D. COUNSEL CONCEALED EXCULPATORY EVIDENCE, ALLOWED DUKE AND EDMISTON TO PERJURE THEMSELVES AND USED THAT TESTIMONY TO SUPPORT A SUMMARY JUDGMENT MOTION

The newly produced documents show that, in or about September and October 2014, while Defendants' motion for leave to add their defamation claim was pending, Edmiston and Duke exchanged e-mails discussing not only the subject recordings, but also conversations with defense

counsel concerning same. See Moffitt Decl. at Exh. Y (9/30/14 e-mail exchange between Duke and Edmiston, with Duke stating that his lawyers wanted to know about the second recording and wanted Edmiston to send it to them, and Edmiston responding: "recordings did not work-could not hear any part of the important stuff—I am not a good "spy" :( sorry"); See Moffitt Decl. at Exh. Z (10/04/14 e-mail exchange between Duke and Edmiston, with Edmiston stating: "You can hear this recording tomorrow," and also asking how to get it forwarded if it is too long. Duke responded by stating "I'm honestly not sure, you could call lawyers directly and play it for them…see if it is worth the trouble of figuring out?" Edmiston then responded, "[l]et them know I have it."); See Moffitt Decl. at Exh. AA[7] (01/26/15 e-mail from Edmiston to Duke advising that he had spoken to Mr. Life: "He was calling for the same questions as prior…wanted the info on the guy I talked to…was it more than one on the tape…instead of looking at all the data – he is calling to 'ask old questions'… I also said I felt it was weird they had to ask again").[8]

Edmiston testified that he not only sent information to Defendants' counsel but was also prepped by them for his deposition. See Moffitt Decl. at Exh. U (6/29/15 Edmiston Dep. at 45:18-46:17). Edmiston testified that in preparation for his deposition, he "walked through what [he] remembered from the meeting" with defense counsel Travis Life, and explained that Mr. Life had "a lot of [his] notes and stuff like that I've already sent." See Moffitt Decl. at Exh. BB (Exh. J to the Edmiston Deposition, in which defense counsel apparently redacted an email conversation between them regarding Edmiston's defamation claims and recordings). Defendants' counsel then relied upon his perjured testimony for their summary judgment motion. See Dkt. No. 234 at ¶113.

---

[7] This document was produced by Defendants only in native format, as part of their May 31, 2018 Native Production and was omitted from their paper production. Plaintiffs' Control No. 8212.
[8] Defendants' privilege log fails to document any communications with Edmiston, and now defense counsel claims that their firm lost all of its own e-mails from the relevant time period. See Moffitt Decl. at Exh. BBB; Dkt. 253-1 at ¶ 6; Dkt. 253-2 at ¶ 7.

The bottom line here is that: 1) Defendants orchestrated the defamation set-up job; 2) Defendants did not record any defamatory material; 3) Defendants lied under oath about the set-up job and withheld this information; 4) Defendants' counsel knew of the second recording's existence and content, and had to know it was exculpatory relative to the allegations pled in the Second Amended Counterclaim; and 5) Defendants' counsel made no effort to produce this second recording years ago when they had an obligation to do so. Defendants' failure to search the Yahoo.com account, and spoliation of emails from the bduke@21centurysmoking.com email offer no excuse here, as four of the five emails cited above were *to* that account, which Defendants were admittedly capable of producing in 2015, but did not. See Moffitt Decl. at Exhs. V, W, Y, and AA.

**E.    WITHHELD EMAILS CONTAIN MORE UNCLEAN HANDS EVIDENCE: DUKE SENT DR'S E-CIGARETTE BATTERY TO CHINA TO COPY IT; DUKE'S WIFE BRAGS ABOUT SELLING TO PLAINTIFFS' CUSTOMERS; AND DEFENDANTS FAILED TO SEARCH ALL DEFENDANTS' EMAIL ACCOUNTS**

In this Court's June 16, 2014 ruling, it held that Defendants were the senior user, but refused to grant partial summary judgment cancelling Plaintiffs' federal trademark registration for 21ST CENTURY SMOKE®, and made no ruling on any other aspect of this case. Dkt. 80. The Court found that there was, even at that early stage, sufficient evidence presented as to multiple contested issues, which, if accepted by the fact finder, would constitute the equitable defense of unclean hands on the part of the Defendants barring them from any relief in this action. Defendants' June 1, 2018 Paper Production and their misconduct outlined herein is relevant and material evidence on the issue of unclean hands.

Defendants have mislead the Court as to the nature of its June 16, 2014 ruling. Defendants' counsel suggested that the Court was on the verge of granting complete summary judgment in their favor as to all issues in the case, and suggested that the Court only held off so as to allow discovery regarding the sole issue of whether there was a "smoking gun" documenting that Kirti Saraswat

alone put Plaintiffs' trademark in Defendants' metatags. See, *e.g.*, Dkt. 253 at p. 7. However, Plaintiffs' theory of Defendants' unclean hands is based on all of Defendants' misconduct before and during the litigation and is not limited to the "metatags issue." See Dkt. 233 at p. 23.

Among the multiple reasons[9] the Court gave in refusing to cancel Plaintiffs' federal trademark registration, it found ample evidence that supports Plaintiffs' equitable defense of Defendants' unclean hands. On this point, the Court stated as follows:

> Moreover, although 21 Century Smoking filed its counterclaim to cancel DR Distributors' mark within the required legal time frame, it did not do so until it had been sued by DR Distributors for infringement. It never petitioned to cancel DR Distributors' mark before the TTAB, even though it was denied registration of its own mark on account of the existence of DR Distributors' mark. Based on that delay and the other evidence in the record, a jury could reasonably conclude that 21 Century Smoking was content to profit from the success of DR Distributors' junior use until 21 Century Smoking found itself sued for infringement, and only then moved to cancel the junior mark in an effort to fend off liability.

Dkt. No. 80, Order at p. 7. Not surprisingly, Defendants' June 1, 2018 Paper Production revealed multiple additional instances where Defendants were content to profit from Plaintiffs' success, and actively sought to do so and even modify their e-cigarette product to be interchangeable with Plaintiffs' product – a fact that was never before disclosed.

Defendants' 2018 production contains a May 24, 2012 Duke e-mail exchange with his Chinese manufacturer, Frank Gu, which occurred nearly two years after Duke became aware of Plaintiffs' 21ST CENTURY SMOKE® product. See Moffitt Decl. at Exh. CC. For the first time, Plaintiffs learned in this May 2012 e-mail exchange that Duke advised Gu that Defendants were being contacted by "a lot" of Plaintiffs' customers. *Id.* Duke stated he was sending Gu the battery

---

[9] In addition to Defendants' failure to take legal action until suit was filed against them, and their use of Plaintiffs' trademark in their website, this Court also found that, with regard to the Defendants' contacts with a distributor named Donald Kunz, this too is "additional evidence on the record that, if accepted, would support a finding of unclean hands" and evidence of Defendant attempting to "appropriate the goodwill or reputation generated by the trademark of its competitor for its own profit." Dkt. No. 80, Order at p. 7.

component of Plaintiffs' 21ST CENTURY SMOKE® e-cigarette, so Gu could design a battery for Defendants with threads that would be compatible with Plaintiffs' product, which Defendants could then sell to Plaintiffs' customers who contacted them. *Id*. There can be no clearer evidence than Defendants' own written words that this Court's suspicions were correct that Defendants were content to appropriate the goodwill and reputation of Plaintiffs and to profit from Plaintiffs' efforts.

Prior to Defendants' March 19, 2018 production, Defendants claim to have had Duke "research" his brentduke@yahoo.com email account to locate an e-mail exchange between Duke and Gu which was placed in issue in the Plaintiffs' Summary Judgment briefing, and which had been produced by Defendants with obvious pages missing. To date, Defendants and their counsel have offered no explanation as to why the <u>entire</u> above-referenced May 24, 2012 e-mail exchange with the same person, Mr. Gu, from the same e-mail account they claim to have searched, was not also produced on March 19, 2018. What possible credible explanation can there be for such selective production? Applying Occam's Razor, the simplest answer is: Defendants and/or their counsel decided it would be devastating to their arguments regarding the case-dispositive issue of their unclean hands, and intentionally withheld it.

As a further example of their misconduct, Defendants' June 1, 2018 Paper Production also contains a February 4, 2012 e-mail exchange between Brent Duke and Laurie Duke, using their respective Yahoo.com e-mail accounts. See Moffitt Decl. at Exh. DD. In that email, Laurie Duke reports that she "had a $220 sale from a 21st Century Smoke customer, highly discounted but big sale…gave her a deal, and she's going to refer all kinds of people to us." *Id*. Again, this improperly withheld document is in stark contrast to Defendants' denials that they ever tried to steal any of Plaintiffs' customers. See, *e.g.*, Dkt. 234-9 (Defendants' 3/19/18 Response to Plaintiffs' Statement of Undisputed Material Facts) at ¶¶ 112-13. It is clear from this and other emails that Defendants

have never searched or produced all relevant email accounts of its employees, such as Laurie Duke and Brandon Duke, who were listed in Defendants' Rule 26 disclosures.

## F. DEFENDANTS' CONCEALED KEY AND HIGHLY RELEVANT EVIDENCE ABOUT THEIR MARKET PENETRATION AND DAMAGES

Defendants have relied upon their early on-line sales of e-cigarettes to support their market penetration and damages claims which are central to their common law trademark claim. See, *e.g.*, Defendants' March 19, 2018 Response Brief, Dkt. No. 233 at p. 12. In their brief, Defendants tout a "significant month to month growth rate" upon their entry into the market. *Id*. at p. 16. Defendants' market penetration expert, David Haas ("Haas"), opined that "21CS's average monthly online sales in approximately 9 months of 2009 sales were approximately $4,100." See Dkt. No. 216-20 (Haas Expert Report at p. 13, note 25). Haas also claims that the Defendants' on-line sales were $27,634.00 in the first quarter of 2010. The new documents tell a different story and show that Defendants' and their counsel concealed and intentionally withheld portions of their online sales reports that show their claims are false.

Defendants' newly produced documents contain a summary of their on-line sales data that was not included in Defendants' pre-2018 production, which can only have been intentionally removed from same prior to production to Plaintiffs. The Court should compare and contrast 21C 0431-0454 from Defendants' earlier production with 21C 1005533-1005558 from Defendants' 2018 production -- Exhibits EE and FF, respectively, to the Moffitt Decl. The version produced in June 2018 is identical to the sales summary produced during discovery **except that it contains two additional pages which directly contradict Defendants' arguments on their sales and growth, and their own expert's opinions**. The missing pages of the online sales data report are the first and second pages of the version produced in 2018, which reflect a summary of the online sales data. This data could have only been purposely removed from the prior production as it is

the first two pages of the report. Specifically, the first page of the newly produced document (See Moffitt Decl. Exh. FF at 21C 1005533) is a February 10, 2013 e-mail from support@21centurysmoking.com to brentduke@yahoo.com titled "lawsuit – monthly sales including online." The second page of that document (21C 1005534) purports to reflect monthly on-line sales from August 2009 through January 2013 ("Missing On-Line Sales Data").

Remarkably, the withheld data directly contradicts what both Defendants and their expert have claimed about their early on-line sales figures to try and meet their burden in establishing market penetration in some market in the U.S. It depicts generally decreasing sales in 2009 beginning with $4,417 in August 2009, moving downward to $2,874 in October 2009; and $1,294 in November and $2,015 in December. *Id*. at 21C 1005534. The withheld summary pages also demonstrate that Defendants' online sales from January through March 2010 totaled only $13,796, or approximately **half** (or 50% less than) the amount relied upon by Defendants' expert.

In a common law trademark case such as the one pursued by Defendants, establishing market penetration in specific geographic territories is an essential element to recovery. In this case, Defendants had modest sales and relied upon an alleged trend of increasing "on-line sales" to justify their nationwide market penetration theory. To make these false arguments, they misled the Court and Plaintiffs by holding back two of the key pages of a summary report prepared by Defendants back in 2013 and e-mailed from support@21centurysmoking.com (Laurie Duke) to Brent Duke at his Yahoo.com account, with all of the pages attached when originally emailed in 2013. They then produced only a part of the summary report and relied upon their fudged data to support an essential element of their case, and they gave the inflated sales and growth data to their market penetration expert. But the problem is: None of it was true! It does not take much imagination to pinpoint how having this data would have changed Plaintiffs' counsel's cross-

examination of the Defendants' market penetration expert at his deposition, not to mention the theories, strategies and subsequent potentially dispositive motions that were filed by both parties relying upon this incomplete and false data. This is yet another example of Defendants' egregious litigation misconduct and the prejudice visited upon Plaintiffs in this case.

**G.    DOCUMENTS SHOW DEFENDANTS' FALSE CLAIMS ABOUT EFFECT OF METATAGS ON SEO RANKING, DUKE'S KNOWLEDGE OF SEO AND HIS DESIRE TO MISUSE OTHER COMPETITORS' TRADEMARKS**

Defendants admit that Plaintiffs' registered trademark, 21ST CENTURY SMOKE®, was present in the metatags of Defendants' website from approximately October 1, 2011 to March 31, 2013. Defendants argue that it had no effect and did not result in any damages, that they gained no advantage, and they had no motive to insert Plaintiffs' trademark in their website. Dkt. 215 at ¶¶ 73 and 76; Dkt. 218-26 (5/13/16 Brown SEO Dep.) at 181:17-183:6, 258:5-260:23. They base this on Duke's false assertion in his deposition that he had, in 2009 or 2010, been told by his friend from Stanford University that search engine algorithms no longer placed any value on the keyword metatag field in a website for search engine rankings. Duke testified that his friend, Otis Chandler -- who Duke characterized as an expert on SEO because Chandler had sold his internet business to Amazon -- had long ago told Duke that keyword metatags did not affect search rankings and did not matter. See Moffitt Decl. at Exh. T (6/17/15 Duke Dep.) at 272:11 – 277:15.

Duke further testified: "I never did anything with meta tags until reading [the Hewes] declaration and removed the meta tags. **Other than that, I never touched the meta tags because, as I stated previously, it was my understanding from my friend who's very successful in text base [sic], they weren't all that important.  So I really stopped paying attention to them**." See Moffitt Decl., Exh. GG (6/23/15 Duke 30(b)(6) Dep.) at 163:23 – 164:5. Defendants' SEO expert, Brian Brown, quoted this false Duke testimony *verbatim* in his report, in arguing that keyword metatags were not used by search engines for ranking purposes. Dkt. 218-29 at p. 45.

The reality as revealed by Defendants' June 1, 2018 Paper Production is that, for the past three-plus years, Defendants have improperly concealed an April 8, 2009 e-mail exchange between Otis Chandler and Duke, which Duke immediately forwarded to Kirti Saraswat, that contradicts his deposition testimony. See Moffitt Decl. at Exh. HH. In the subject 2009 e-mail string, Chandler gave Duke express instructions on how to enhance his website metatags for SEO optimization purposes, so as to improve their search engine rankings. *Id*. Specifically, in direct contrast to Duke's false testimony that Chandler had told him keywords no longer mattered, Chandler's e-mail, entitled "titles and description," expressly instructed Duke to: "Make sure you have really good meta-descriptions and titles," and gave Duke a link to the 21centurysmoking.com website metatags so that Duke could review same. *Id*. (Emphasis added). Contrary to Duke's testimony that he did not have the skills to implement Chandler's recommendations, Duke responded that he would take Chandler's advice and personally modify his website. *Id*.

As if all the foregoing were not disturbing enough, Defendants' concealment of the exchange with Chandler did not end there. On the night of March 19, 2018, the deadline for completion of summary judgment briefing, Defendants purported to produce, for the first time, all "relevant" e-mails with Kirti Saraswat. See Moffitt Decl. at Exh. A. Defendants then relied on those belatedly-produced Saraswat e-mails in their briefing, and misrepresented to the Court that Defendants had no further communications with her after April 30, 2010, and out-right mocked the notion that she could have been involved in inserting Plaintiffs' trademark into Defendants' website's metatags. Dkt. 233 at p. 24, 234-1 at ¶ 4, and 234-2 at ¶ 2.

In reality, the Defendants' production on March 19, 2018 when compared to the June 1, 2018 Paper Production show Defendants once again intentionally withheld most of the Saraswat

e-mails that hit Plaintiffs' ESI search terms, <u>and intentionally withheld the above referenced e-mail exchange with Chandler, which had been forwarded to Saraswat</u>. Moffitt Decl. at ¶¶ 4-5.

These emails reveal the lack of truthfulness by Defendants and counsel as to key issues in this case. The emails belie Duke's testimony and show that Duke did believe, and was advised by his friend and internet guru, that the keywords do make a difference for SEO. His motive in concealing these emails is obvious – he wants to defend the consequences of his misuse of Plaintiffs' trademark and avoid having fabricated claims dismissed. Not only did Duke conceal these emails, he committed perjury and fabricated a story about what he knew from his guru friend about the impact of keywords on SEO. He also provided this false story to his SEO expert, Brown, who relied on this at his deposition. Dkt. 218-26 (5/13/16 Brown SEO Dep.) at 181:17 – 183:6.

Also, Brown argued that Duke was not capable of inserting Plaintiffs' trademark in his website. Dkt. 218-29 (3/25/16 Brown SEO Report) at pp. 13-23. However, these new emails from Duke with his guru and his SEO consultant show Duke had a deep knowledge and understanding of how the keywords worked and SEO in general and, critically, he admits the ability personally modify his website to insert data -- such as Plaintiffs' trademark. See Moffitt Decl., Exh. A, at 21C 63527-63529. One need only review the statements made by Duke in his own withheld emails to see he had the knowledge and skill to insert Plaintiffs' trademark into his website.

The recent production also reveals Defendants' explicit strategy of misusing competitors' trademarks in their digital marketing to mislead consumers – a central issue in this case. Defendants' June 1, 2018 Paper Production also contains a January 29-30, 2012 e-mail exchange using Duke's Yahoo.com account, between Duke and his employee Robert Hough, who assisted with IT and SEO issues. See Moffitt Decl. at Exh. II. They discussed in detail ways to take advantage of the trademarks of other, more popular e-cigarette products, while trying to avoid

"suspicion." *Id.* These emails go to the core issues and show Duke was involved in SEO issues, was willing to engage in deceptive tactics, and manipulated SEO related issues. On and before March 19, 2018, Defendants and their counsel knew that thousands of Yahoo.com e-mails such as this existed and had not been produced, yet they concealed that fact as there is zero mention of these other 15,866 pages in their Response Brief filed on March 19, 2018.

### H. EMAILS FURTHER CONFIRM DUKE COMMITTED PERJURY BY CONCEALING HE WAS CAPABLE OF PLACING PLAINTIFFS' TRADEMARK IN DEFENDANTS' METATAGS

Documents produced for the first time by Defendants on June 1, 2018 reveal that, in order to conceal the true scope of his computer and website coding skills, and to conceal the fact that he was more than capable of placing Plaintiffs' trademark in Defendants' website metatags in 2011, Duke falsely testified that he did not perform any "Website Design and Development" work in or about 2008. Duke also falsely denied performing such work as a representative of Webrecsol. Duke also concealed the identity of his client for that work.

At all times prior to the June 1, 2018 Paper Production, Duke's client when he worked for Webrecsol was known to Plaintiffs only as "Bryan Scott" of "Chicago's Best Cleaning Co." as shown in documents Defendants produced during discovery. Despite extensive questioning of Duke about the subject Website Design and Development work and Scott, Duke made false statements about Scott, Scott's relationship with Defendants, and concealed the nature and scope of the work they did together in 2008 and thereafter. Recently-produced emails between Duke and Scott reveal that Duke did, in fact, perform website development work for "Scott," who Plaintiffs now know was **<u>Defendants' Director of Sales and Marketing</u>**, holding that position at the time this litigation was commenced through at least February 2013. *Cf.* Duke Deposition Testimony on June 17, 2015 (Moffitt Decl., Exh. T (6/17/15 Duke Dep.) at 396:6 – 398:4).

Duke was then shown a document he produced that was identified as Exhibit 15 to his deposition, which contained two versions of an October 16, 2008 proposal entitled "Chicago's Best Cleaning Co. Website Design and Development," both with a client contact of "Bryan Scott." See Moffitt Decl., Exh. JJ (6/17/15 Duke Exh. 15). Both documents bear Webrecsol's letterhead, which lists Duke's W. McLean address in Chicago as Webrecsol's United States address. *Id.* The company contact is listed as "Brent Duke" in both, and they list his phone number and e-mail addresses of brent@webrecsol.com or info@websrecsol.com. *Id.* at 16796 and 16805. The first document states that the client wanted to develop a website, and that Webrecsol and Duke were providing pricing for "HTML type ads, static site (5-10 Pages) as well as for dynamic site (E-Book web site)." *Id.* at 16790. The other document stated: "Bryan Scott is interested in designing and developing a website catering to customers in the local Chicagoland market, **while also creating an E-Book section**, which will be more general in focus." *Id.* at 16798. Although confronted with the forgoing, Duke testified that he did not recognize the document as a company document, was evasive as to its existence or that he ever worked for Webrecsol or offered SEO and website services and he failed to explain that "Bryan Scott" was "Bryan Scott Kos" who was his Director of Sales and Marketing. See Moffitt Decl. at Exh. T (6/17/15 Duke Dep.) at 398:5 - 402:5.

Prior to the June 1, 2018 Paper Production, Defendants' document productions were devoid of any e-mails regarding the work Duke did on that website, or his relationship with "Scott." As detailed below, and in direct contradiction to Duke's sworn testimony, the recently-produced emails reveal for the first time that: (1) "Bryan Scott" is actually named Bryan Scott Kos; (2) Duke did, in fact, do the work for Scott/Kos on the latter's website and eBook, while Duke was working for Webrecsol; (3) Duke admitted in a February 2010 letter that he had met Kos when Duke was working on Kos' website; (4) Kos became Defendants' "Director of Sales and Marketing" in mid-

2012 and held that position when this action was filed in September 2012 and through at least February 2013, but was not identified in Defendants' Initial Disclosures as either "Scott" or his real name;[10] (5) Kos was involved in sales and marketing for Defendants and did some SEO work for Defendants, including while Plaintiffs' trademark was in Defendants' website metadata; and (6) Kos is a convicted felon and Duke knew him before and after his incarceration.

Duke's work on the website and eBook for Kos in 2008 - 2009 is now evident from the documents contained in Defendants' June 1, 2018 Paper Production. For example, in a January 8, 2009 CHAT-like discussion between Duke and Saraswat of Webrecsol, she asked Duke to send her "that Bryan money." See Moffitt Decl. at Exh. KK. Saraswat then asked Duke if she could see "that flyr site" which Duke had made so she could check his work, and Duke described how he had created same. *Id*. On July 24, 2009, "Bryan Scott" asked Duke to review the eBook document referenced in the Webrecsol proposal. See Moffitt Decl. at Exh. LL and see Moffitt Decl. at Exhs. MM, NN, and OO. On October 7 and 9, 2009, Duke and "Brian Scott" exchanged various .html files regarding the subject website. See Moffitt Decl. at Exhs. PP, QQ, RR and SS.

In an October 11, 2009 exchange, Duke further detailed his personal website coding skills and work and attached the eBook.doc and told "Scott": "I'm working on getting the final product to matchup to what im seeing in the program… it is going to take a lot of individual editing… not a problem though… **and going to link ebook on thank you page from paypal**, this should work just fine … give me more finishing touches and we are ready to roll." See Moffitt Decl. at Exh. TT (Emphasis added). Contrary to his sworn deposition testimony, on February 6, 2009, Duke wrote a letter to "Scott" in which he expressly stated: "**Can you believe this all started with us**

---

[10] In their subsequent February 15, 2013 answers to Interrogatories, Defendants added the name "Bryan Kos," but did not state that he worked for Defendants was their Director of Sales and Marketing, or in any way suggest he was one in the same as "Bryan Scott." See Moffitt Decl. at Exh. ZZ.

**meeting about making a website for your cleaning business?**" Moffitt Decl. at Exh. UU, at 21c 1001079. (Emphasis added). The letter was written to "Scott," whose real name is Bryan Scott Kos, who was serving time in federal prison for stock fraud. See Moffitt Decl. at Exh. VV.

The deception and attempt to hide his website coding skills and relationship with Kos did not end there. Duke also failed to mention that in mid-2012, Kos became Defendants' "Director of Sales and Marketing," as identified in his company email signature block sent from his recently revealed bryan@21centurysmoking.com account. See, *e.g.*, Moffitt Decl. at Exh. WW. Kos held that title in September 2012 when this case was filed, on November 26, 2012 when Defendants served their Initial Rule 26 Disclosures, and on December 6, 2012 when Defendants' counsel provided further information about the specific knowledge possessed by the person identified in their Initial Disclosures. See Moffitt Decl. at Exhs. XX and YY. Kos was not identified by Defendants or counsel in their disclosures, even though Kos would continue to work for Defendants through at least mid-February 2013, at which time his title was Director of Sales. See Moffitt Decl. at Exh. AAA. As part of a scheme to conceal Kos's identity and relationship with Defendants, Defendants never searched or produced any emails from their Director of Sales and Marketing using his company email account during this entire case. Incredibly, the "report" Defendants' just filed on January 22, 2019 disclosing the loss of their entire ESI Data Set shows that one of the four drives that was imaged by their vendor was from Kos's company computer – confirming beyond any doubt that Defendants and their attorneys knew who this person was and that he had a key role with Defendants. See Dkt. No. 288 at PageID #12861.

One of the central issues in this case is the parties' respective market penetration, with sales and marketing being two of the most important factors. Yet, Duke concealed "Scott's" identity, never identified him as a Defendants' executive, never searched his emails and withheld dozens,

if not hundreds more, emails documenting Scott/Kos's role in selling and promoting Defendants' products. Moreover, a June 4, 2012 e-mail from Duke to Kos shows that Kos also worked with Duke on SEO, and personally added links and keywords to a press release to be used to generate backlinks to Defendants' website for SEO purposes. See Moffitt Decl. at Exh. WW.

The above shows that Duke, with assistance of counsel, repeatedly committed a fraud on this Court through his perjury and false declarations as now confirmed through the production of these and other documents from Duke's Yahoo email account. Both Mr. Leavens and Mr. Life certified to this Court on May 14, 2018 that they knew before, and on, March 19, 2018 that Duke's Yahoo email account had not been searched. Dkt. 253-1 at ¶ 10 and Dkt. 253-2 at ¶¶ 11-13, respectively. Yet, they did not disclose to the Court or Plaintiffs that they knew the search had never been done when they filed their Summary Judgment briefing on March 19, 2018. They did not disclose on the night of March 19, 2018 at 8:30 p.m. that Duke's email account had not been searched, when counsel for Defendants, Peter Stamatis, emailed counsel for Plaintiffs and produced 112 pages of new documents stating that they represented the full set of newly discovered emails and were not "relevant to any claim, other than that they belie any assertions of withholding unfavorable documents." See Moffitt Decl. at Exh. A. Defendants and their counsel did not disclose on March 19, 2018 that the Duke Yahoo account was not searched or that the 112 pages produced were only a hand selected batch of documents from over 15,000 pages of documents. They did not disclose it when they affirmatively used this hand-selected 112-page production to incorporate into their summary judgment arguments while drafting and working on their briefing in the days before the March 19, 2018 filing deadline -- when they were in possession of these documents and knew the Yahoo account had not been searched. They did not disclose it to the Court or the Plaintiffs in the pleadings they filed with the Court on March 19, 2018 seeking

summary judgment in their favor and pursing tens of millions of dollars in damages. Despite certifying that they knew before March 19, 2018 that the Yahoo emails were not produced, they intentionally withheld that information from the Court and Plaintiffs and used the cherry-picked documents to oppose Plaintiffs' motion. See, *e.g*., Dkt. 233 at p. 24.

## I. DEFENDANTS OFFER NO EXCUSE FOR WITHHOLDING 2,600 E-MAILS SENT "TO" BDUKE@21CENTURYSMOKE.COM ACCOUNT

Defendants falsely assert that the only problem with their prior productions -- other than their admitted spoliation of the contents of the two "GoDaddy" e-mail accounts (bduke@21centurysmoking.com and support@21centurysmoking.com) **"sent"** boxes -- is that they did not know that their search of imaged hard drives from Defendants' company computers would not capture e-mails residing in Duke's internet-based brentduke@yahoo.com account. Dkt. 253 at p. 2. Defendants previously represented that e-mails sent "to" and "from" their two company GoDaddy e-mail accounts, were located on the hard drives imaged in 2014, and were properly searched and produced back in early 2015. Dkt. 253-1 at ¶¶ 8-11; Dkt 253-2 at ¶¶ 3-6, 11-13. In addition to the lost and spoliated "chat" data and other relevant emails accounts and documents that were never searched or produced in this case, the data and documents in Defendants' June 1, 2018 Paper Production shows that these representations about the spoliation of "sent" emails from the Go Daddy email accounts are false.

Defendants fail to explain, among other things, why their June 1, 2018 Paper Production was the first time they produced thousands of **incoming** e-mails addressed not to the Yahoo.com account, but rather "To" Duke at his bduke@21centurysmoking.com account, as well as outgoing e-mails from that account to the extent they were responded to by the sender and ended up back in that inbox, all of which contain Plaintiffs' November 2014 ESI search terms. In fact, a search of the "To" field of the ESI version of Defendants' recent production reveals 1,751 such emails

addressed to bduke@21centurysmoking.com, with that address being "CC'd" on another 780 e-mails, for a total of 2,531 e-mails for which Defendants have offered no explanation whatsoever as to why they withheld these documents from their prior productions. See Moffitt Decl. at ¶61.

Defendants claim, as they must, that they long ago ran Plaintiffs' ESI search terms against that bduke@21centurysmoking.com account, and they have never claimed any alleged "auto-purging" of emails sent "To" the "inbox" of that account. Duke repeatedly testified that he never deleted any e-mails. Dkt. 216-12 (6/17/15 Duke Dep.) at 348:4-5. As such, all of these thousands of recently-produced e-mails addressed "To" Duke at bduke@21centurysmoking.com should have been produced previously from that account, without regard to the alleged duplicates of same recently produced from the brentduke@Yahoo.com account. Defendants have represented in this litigation that they long ago ran Plaintiffs' ESI search terms against all of the emails in the bduke@21centurysmoking.com account and produced those documents in full. Given the emails contained in the June 1, 2018 Paper Production, they must now admit that they ran Plaintiffs' ESI search terms in December 2014 or early 2015 and got the same search results at that time from the bduke@21centurysmoking.com email account, and then intentionally withheld the entire production of the same documents. There can be no other conclusion from a detailed analysis of the prior production against the documents contained in the June 1, 2018 Paper Production.

As just one example, most of the 2013 and 2014 e-mails recently produced by Duke relating to Duke and Edmiston's previously undisclosed secret plan to invite and record conversations at the September 2013 Trade Show in Las Vegas, and their subsequent e-mails regarding the content of multiple recordings taken at same which they thereafter falsely swore did not exist, were addressed by Edmiston "To" Duke at his bduke@21centurysmoking.com inbox, and not at the Yahoo.com account. See Moffitt Decl. at Exhs. V, W, Y, AA. There can be no

dispute, based on Defendants' excuses offered to date, that those "smoking gun" emails, which document perjury on the part of Duke and Edmiston, have been sitting in Duke's bduke@21centurysmoking.com "Inbox" – not his allegedly auto-purged "Sent" folder -- since they were written in 2013 and 2014. This occurred before Defendants' claim to have imaged the hard drives in December 2014, and to have searched same with Plaintiffs' ESI search terms. Defendants offer no explanation whatsoever as to why those critical documents were withheld during discovery since early 2015. They instead mislead the Court with irrelevant discussions of their failure to search a wholly-separate Yahoo.com email account which contains <u>duplicate</u> copies of those e-mails sent "To" bduke@21centurysmoking.com, and by making scurrilous claims of "auto-purging" of the "Sent" folders of bduke@21centurysmoking.com and support@21centurysmoking.com which are also demonstrably false as detailed herein. Any excuses for their failure to produce e-mails "Sent" by Duke have nothing to do with their failure to produce thousands of documents now known to exist, which were addressed "To" those email accounts and were sitting in the "Inbox" that was housed on the hard drives of the Defendants' computers that were allegedly searched as part of the ESI process long ago.

      As such, Defendants further mislead the Court when they now represent that:

> To correct this, 21CS then engaged its e-discovery vendor to search that [Yahoo.com] e-mail account using the same search terms the parties had agreed to previously and <u>thereafter located additional documents. New documents have been identified</u>. With the Court's permission, 21CS will make them available to Plaintiffs.

Dkt. 253 at p. 2. At the August 14, 2018 hearing, Mr. Stamatis argued: "I would like to just take a step back if I could. And during the summary judgment briefing, **we discovered more documents**, and that led us to look deeper, and what we've done in this case, **what you are supposed to when you discover new documents**, that's disclose the documents, and that's what we have done." Dkt. 267 at p. 47.

However, these are, in fact, not "new" documents and Defendants should not be commending themselves for concealing these documents for three years after discovery closed, and after they tried to get away with having the Court grant summary judgment without ever disclosing their alleged "discovery" of these documents and subsequent production on June 1, 2018. The thousands of e-mails Edmiston and others sent "To" Duke's bduke@21centurysmoking.com account **are not new**, have been in Defendants' possession for years and should have been produced when Plaintiffs' ESI terms were applied to that account. These bduke@21centurysmoking.com e-mails were, according to Defendants, on the hard drives imaged in December 2014, likewise hit Plaintiffs' ESI search terms in 2014 and 2015 when that account was searched on the hard drives -- yet were intentionally concealed until June 1, 2018.

## J. DEFENDANTS' FALSE "AUTO-PURGE" EXCUSE IS BELIED BY THEIR PRE-2018 PRODUCTION OF EMAILS

In an attempt to excuse some of their misconduct, Defendants claim that, from the time support@21centurysmoking.com and bduke@21centurysmoking.com email accounts were created in 2009, they were set to "auto-purge" all **"sent"** e-mails from those accounts after 6 months. Dkt. No. 234-2 at ¶ 4 and Dkt. No. 253 at p. 12. Defendants refer to these e-mail accounts as the "21CS's GoDaddy e-mail accounts" and claim the "auto-purge" only applied to the "sent" emails and not that any incoming e-mails in the "in" boxes of those two accounts were ever "auto-purged." Defendants concealed this alleged "auto-purging" for approximately four years, until March 19, 2018, when, on the last day of summary judgment briefing, they provided a Declaration from Duke, revealing for the first time that Duke had "discovered" this alleged fact back "in or around 2014." Dkt. No. 234-2 at ¶ 4. Duke's Declaration states: "In or about 2014, I first learned that the default settings for the provider of 21CS's email server, GoDaddy.com, automatically

deleted email sent from its @21centurysmoking.com email addresses after a short period. As soon as the provider settings were discovered, the settings were adjusted to save all sent email." *Id*.

Defendants have yet to provide any other information as to this alleged discovery and its aftermath, or disclosed when Duke told his attorneys or his ESI vendor about this. Defendants have not disclosed who changed the default settings on the GoDaddy email accounts and instituted the alleged "auto-purging," or disclosed that they have attempted to obtain their own account records that would disclose who and when such changes were made to their email accounts. For instance, in their May 14, 2018 brief in which they were ordered to explain their discovery failures, Defendants stated only the following regarding the alleged "auto-purging":

> As a result of its investigation of the charges in Plaintiffs' Motion for Summary Judgment, 21CS's **current counsel** discovered that **outgoing** email from 21CS's Godaddy email accounts, *support@21centurysmoking.com* and *bduke@21centurysmoking.com*, had been "auto-purged" by GoDaddy after an approximately six-month period. 21CS believes that this setting was in place since 2009, years before any threatened or actual litigation.

Dkt. 253 at p. 12. (Emphasis added). This does not address Duke's alleged discovery in or about 2014, and adds nothing to what was stated in Duke's March 19, 2018 Declaration. Moreover, the above limitation as to what Defendants' "current counsel" discovered and when, raises the question as to who exactly on the Defendants' legal team they are trying to distance themselves from? Defendants have had the same counsel of record from the outset, with the addition of Mr. Stamatis on June 8, 2015. What is not explained, is when Duke made his discovery, what he did in response to same other than allegedly turning off the "auto-purging," who he told about it and when, what efforts were made at that time to recover "purged" e-mails, and why Plaintiffs' counsel was not informed of the alleged discovery prior to March 19, 2018. The only other comments by Defendants in their May 14, 2018 brief regarding the alleged "auto-purging" are:

> Further, although 21CS was told that it had to retain all documents, including email, and it had every incentive to do so after the litigation commenced, it apparently did not review the Godaddy "auto purge" settings at that time. This was reasonable because 21CS was not even aware that "auto purge" was deleting the email.

Dkt. 253 at p. 14. Again, this adds nothing and answers none of Plaintiffs' questions as set forth above. It is noteworthy that, although Defendants' counsel discusses that of which "21CS" was allegedly aware, Defendants failed to provide a Declaration from Duke or any other 21CS representative in support of their May 14, 2018 submission.

The evidence strongly shows that Defendants' excuse of "auto-purging" of the two GoDaddy e-mail accounts is a fabrication. If their claims of "auto-purging" were true, they would not have any "sent" e-mails from either account which were sent more than 6-months before Duke's alleged 2014 discovery, when Duke claims he turned "auto-purging" off. Dkt 234-2 at ¶ 4. If they were telling the truth, all of Defendants' e-mails sent from those two accounts in 2009, 2010, 2011, 2012, etc. should all be lost – their 2018 productions confirms this is false.

In reality, in formulating their latest excuse, Defendants are hoping that Plaintiffs would not review the entire record which shows that throughout discovery from 2013 through 2015, they produced more than one hundred "sent" e-mails from the support@21centurysmoking.com account, which Defendants had authored and sent out between 2009 and 2013. If the Court is to believe their "auto-purge" excuse – then these documents cannot exist and could have never been produced. Specifically, a review of Defendants' 2013 through 2015 productions reveals that Duke was able to locate and produce the "sent" e-mails they now misrepresent to the Court had already been "auto-purged" up to three years before the litigation. Moffitt Decl. at ¶¶ 59-60. The year of authorship, and quantity of those sent e-mails, by year, is as follows: 2009: 11; 2010: 65; 2011: 19; 2012: 6; 2013: 6 (with five of those no later than March of that year). *Id.*

If Defendants' claim of "auto-purging" were true, then all of these e-mails should have been deleted at least 6 months before Duke's alleged discovery "in or about 2014," as they were all sent more than 6 months before he allegedly turned off the alleged "auto-purge" function in 2014. All of the 2009, 2010, 2011, and some of the 2012 e-mails would have been deleted before Plaintiffs' Complaint was filed and could have never been searched and produced in this litigation. However, Defendants excuse is inconsistent with the fact that Duke was able, in 2013 through 2015, to personally go into his "sent" email folder for support@21centurysmoking.com and hand-select documents favorable to his case and withhold damaging emails.

Duke and his counsel must explain how they were able to produce "sent" e-mails from that account with the first production in April 2013, including emails Defendants sent out in 2009 and 2010 that could not exist if the "auto-purging" was in place, and why he supposedly did not notice any alleged "auto-purging" at that juncture. They must also explain how they were able, in 2015, after his alleged "discovery," to produce similar documents from the "sent" folder. Defendants were ordered to provide this Court with an explanation of why they spoliated some documents and withheld others -- they have instead misled the Court with fabrications.

Even if the Defendants were telling the truth about the existence of alleged "auto-purging" of "sent" e-mails, it would not explain their failure to produce e-mails from the **"in"** boxes of support@21centurysmoking.com and bduke@21centurysmoking.com email accounts, as to which they do not claim "auto-purging." For instance, as detailed in Plaintiffs' summary judgment motion, Defendants produced only two, initial incoming e-mails from a consumer named Ms. Wood, which she had addressed to the support@21centurysmoking.com email account **"in"** box. Dkt. 216-2 at ¶¶ 93-95 and Dkt. 216-23 (1/15/18 Moffitt Decl. at Exh. FF). Defendants failed to produce any of the 11 ensuing e-mails that were exchanged back and forth, in which Ms. Wood

repeatedly informed Duke that she had bought Plaintiffs' product and was looking for service as to same, and in which she became angry when she realized Duke had feigned ignorance as to the fact she contacted him in error, and had intentionally mislead her into buying Defendants' product. Dkt. 216-2 at ¶¶ 96-106 and Dkt. 216-24 (1/15/18 Moffitt Decl. at Exh. GG). Plaintiffs know of the existence of this intentionally withheld exchange only because Ms. Wood forwarded the e-mail string directly to Plaintiffs hoping they could do something to stop Duke's misconduct. *Id*.

Defendants now admit that, prior to March 19, 2018, they went back and searched for this e-mail exchange with Ms. Wood but claim Duke was "unable to locate any emails related to Ms. Woods," apparently not even the two initial incoming e-mails which Defendants had produced for their own purposes, as alleged instances of consumer confusion. Dkt. 253-2 (5/14/18 Life Decl.) at ¶ 11. Defendants have offered no explanation as to why they supposedly cannot locate the six (6) incoming e-mails in the subject email string where Wood responded to Duke, which should still be sitting in Duke's non-purged "in" box. Dkt. 216-12 (6/17/15 Duke Dep.) at 348:4-5. Defendants should also be able to locate Duke's (5) outgoing e-mails to Woods – but they are all "missing." Defendants have no explanation that withstands any logical scrutiny.

For instance, in their March 19, 2018 brief, in a section entitled "21CS Did Not Wrongfully Withhold Email Communications with Customers," they argued and certified to this Court only that: "Plaintiffs complain that 21CS failed to produce responses to one of the numerous customers who mistakenly contacted 21CS concerning problems with Plaintiffs' product, in particular, Barbara Woods." Dkt. 233 at p. 24. They then simply regurgitated Duke's claim that he discovered the "auto-purging" in or about 2014 and turned it off. *Id*. Defendants did not explain why Ms. Wood's e-mails "**to**" Duke, and every e-mail in the threads pre-dating her responses were not still located in Duke's intact "**in**" box. They have no explanation for this because the real

answer is that Duke intentionally deleted the Wood emails after they were received and sent, all in mid-2013, after this litigation was commenced and after Defendants' counsel claims they gave Duke verbal instructions not to delete anything and admitting that they never gave Defendants any written instruction such as a litigation hold letter. Dkt. 256 (5/17/18 Transcript) at p. 20.

As detailed in Plaintiffs' summary judgment briefing, the complete Wood e-mail exchange is exactly the scenario Judge Kapala found could constitute unclean hands on the part of Defendants. It is evidence that Defendants were content to sit back and not to take any action as to the alleged infringement, so as to profit from sales to Plaintiffs' customers. Dkt. 80 at p. 7. In the subject e-mail string, Duke made it quite clear that he had been caught red-handed doing just that, and ended up writing full-page, single-spaced hostile responses to Woods. He then apparently deleted ten of those e-mails from his inbox and outbox, or Defendants are otherwise still improperly withholding them. Due to their admitted spoliation, Plaintiffs and this Court have no way to know how many other such exchanges with Plaintiffs' customers Duke engaged in and then deleted, both before and after the litigation was pending.

Defendants also rely on their fabricated "auto-purge" excuse to make arguments to the effect that all of their "sent" e-mails from the GoDaddy accounts were "auto-purged" before their duty to preserve arose. For instance, they argue: "There is no question that the lost information is ESI, much of which was lost well **before there was any thought of litigation** and, therefore there was no obligation to preserve it." Dkt. 253 at p. 14 (Emphasis added).

As demonstrated above, there was no "auto-purge," and all of Defendants' arguments that documents were "auto-purged" before their duty to preserve arose are false, and are just another attempt to mislead the Plaintiffs and this Court away from their litigation misconduct. For instance, Duke's communications with Frank Gu and Kirti Saraswat, as produced to date, with

dates ranging from 2009 through 2015 in the case of Gu, and 2009 through 2013 in the case of Saraswat, were created though the brentduke@yahoo.com email account, or in the case of Saraswat, also by Yahoo Messenger CHAT application. See Moffitt Decl. at ¶¶ 62-64. Defendants have not claimed any sort of auto-purging as to the CHAT documents.

Defendants have misled the Court as to when they believe their duty to preserve arose. They claim that the duty only arose when Plaintiffs filed their Complaint in September 2012, and that the documented prior discussion by Duke of filing his own lawsuit was "just a pipe dream." Dkt. 253 at pp. 13-14. At the same time, according to their Privilege Log, Defendants are withholding from production more than twenty (20) documents dated throughout 2011, which they describe as Duke's communications with attorneys about litigation and drafting of a Complaint against Plaintiffs. Moffitt Decl. at Exh. BBB. Defendants' documents confirm that their obligation to preserve documents and ESI arose well before this case was filed.

**K.    DEFENDANTS OFFER FALSE "AUTO-FORWARD" EXCUSE**

Defendants claim that only those e-mails **sent by them from** the two GoDaddy e-mail accounts were allegedly "auto-purged" and thus spoliated. Defendants disingenuously attempt to minimize their admitted spoliation by assuring the Court that other **e-mails received** in the **inboxes** of those two accounts were "auto-forwarded" to the brentduke@yahoo.com account and were not spoliated. Defendants represented to the Court as follows:

> Finally, this lost ESI is limited to email sent from either *support@21centurysmoking.com* and *bduke@21centurysmoking.com*. Responses showing original sent email would still be retained. Further, while working with its vendor to search Yahoo Email, 21CS confirmed that any email sent to those email addresses was automatically forwarded to and is now located on the Yahoo Email account. Therefore, any email responding to a now lost e-mail sent from *support@21centurysmoking.com* or *bduke@21centurysmoking.com* would also be duplicated in the Yahoo email.

Dkt. 253 at p. 14. Based on Plaintiffs' review of Defendants' June 1, 2018 production, as well as their prior productions during discovery, Defendants' claim of "auto-forwarding" is false. The

only evidence of any "auto-forwarding" is the existence, in the June 1, 2018 production of brentduke@yahoo.com emails, of over 2,500 e-mails that were addressed "**to**" the bduke@21centurysmoking.com account which, inexplicably, were not produced before June 1, 2018, as detailed above. All of those e-mails are dated in April 2013 or thereafter, so there is no evidence of any "auto-forwarding" relating to bduke@21centurysmoking.com prior to April 2013.

As to Defendants' support@21centurysmoking.com account, there is no evidence of **any** auto-forwarding of that account, at any time, to Defendants' brentduke@yahoo.com account. A search of the ESI version of the documents contained in Defendants' June 1, 2018 production, all allegedly sourced from the brentduke@yahoo.com account, results in hits on only 181 support@21centurysmoking.com emails in that entire production, with 129 of those 181 hits containing support@21centurysmoking.com in the "From" field. Moffitt Decl. at ¶¶ 66-70.

Rather than burden the Court with detailed explanations of the falsity of their excuse here, if the Defendants actually believe that even a single e-mail sent to support@21centurysmoking.com, as contained in their June 1, 2018 production was "auto-forwarded," they should come forward with their proof.

**L.    DEFENDANTS AND THEIR COUNSEL CONSCIOUSLY ALLOWED KEY DOCUMENTS TO SPOLIATE**

Defendants have provided various reports to this Court which purportedly demonstrate that they were "doing everything in [their] power" to recover missing Yahoo Messenger Chat documents. See Dkt. Nos. 268 (Report dated 09/13/18); 273 (Report dated 10/10/18), 278 at 9:11-15 (Transcript of 10/16/18 Hearing); 288 (Report dated 1/23/19). However, those reports actually reveal that Defendants allowed the Yahoo Messenger Chat documents to spoliate, *along with all of the other documents that Defendants previously deemed relevant and collected for this case*. This is particularly outrageous as this basic ESI should have been preserved, searched and

produced years ago, and because, by April 2018, this Court had raised specific concerns about spoliation, informed defense counsel that any loss of relevant data by their vendor would "go[] to their client," and instructed that Defendants make a "really good effort" to investigate, "get a lot of detail," and explain their discovery deficiencies. See Dkt. No. 249 at 12:3-23; 23:13-19 (Transcript of April 17, 2018 Hearing). Defendants' reports fail to demonstrate that they took reasonable measures to fulfill their discovery obligations concerning the chat documents. Defendants failed to disclose how they pursued the spoliated data with Yahoo and, despite twice reporting to the Court that Defendants had not used this account in several years, the information provided by Yahoo demonstrates otherwise.

Defendants' lack of candor is highly dubious, and further evidenced in their most recent and shocking disclosure – that they have spoliated the very ESI that lies at the heart of the issues now litigated *over the past year*. This information was contained in a letter from Defendants' e-discovery vendor, 4Discovery, dated 1/18/19. See Dkt. No. 288. Defendants offer no further comment on the letter or its contents which discloses that all of their ESI was irretrievably lost.

## V.    <u>LEGAL ARGUMENT FOR SANCTIONS</u>

Defendants' misconduct violates several Rules of Federal Civil Procedure ("FRCP" or "Rule"). Rule 37 entrusts federal courts with the authority to award sanctions against parties who engage in discovery violations. Multiple provisions of this Rule have been triggered by Defendants' conduct in this case, including: Rule 37(a)(3)(A) which governs motions to compel disclosure and for appropriate sanctions; Rule 37(b) which provides for sanctions for failure to comply with a Court Order; Rule 37(c) which provides for sanctions for failure to timely disclose or supplement discovery; and Rule 37(e) which governs sanctions for failure to preserve electronically stored information ("ESI"). Rule 37 also provides for the recovery of the moving party's expenses, including attorneys' fees, resulting from the non-compliant party's discovery

violations, and *requires* the payment of these expenses for certain misconduct. Rule 56(h) also provides a Court with discretionary authority to sanction an offending party who submits a declaration in support of summary judgment in bad faith or solely for delay.

A court is also *required* to impose sanctions against a party and/or its counsel, pursuant to Rule 26(g)(3), when he/she falsely certifies that "to the best of that person's knowledge, information, and belief formed after *reasonable inquiry*," discovery responses are complete and such disclosures have not been made for an improper purpose. *Id*. (Emphasis added). Rule 37(b)(2)(c), Rule 56(h) and 28 U.S.C.A. §1927 additionally provide federal courts with the authority to personally sanction attorneys for their own litigation misconduct. See Rule 37(b)(2)(c) (expenses incurred as a result of violating a court order); Rule 56(h) (where declaration in support of summary judgment is submitted in bad faith or solely for delay, the court may hold counsel in contempt or subject him/her to other appropriate sanctions) and 28 U.S.C.A. §1927 (expenses payable by attorney who unreasonably and vexatiously multiplies proceedings).

Beyond Rules 26, 37, 56(h), and 28 U.S.C.A. §1927, federal judges also have the inherent authority to manage the cases that come before them, issue sanctions for litigation misconduct, and deny equitable relief to litigants that come to the courts with unclean hands.[11] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012); *United States v. Johnson*, 142 F.3d 1041, 1058 (7th Cir. 1998) (Even in the absence of a discovery order, a court may impose sanctions on a party or attorney for misconduct in discovery under its inherent power to manage its own affairs where a party acts in "bad faith, vexatiously, wantonly, or for oppressive reasons.")(quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 50 (1991)); *Grochocinksi v. Mayer Brown Rowe & Maw LLP*, 06 C 5486, 2011 U.S. Dist. LEXIS 71053, *12

---

[11] Similarly, on its own initiative, this Court may issue sanctions pursuant to Rule 11(c)(3), based upon Defendants' frivolous pleadings and repeated misrepresentations made in court and filings.

(N.D. Ill. June 30, 2011); and *Gilead Scis., Inc. v. Merck & Co., Inc.*, 2016 U.S. Dist. LEXIS 73595, at *80-83 (N.D. Cal. June 6, 2016) (reviewing cases barring claims under unclean hands doctrine for lying under oath, as well as business and litigation misconduct).

While a Magistrate Judge may not have the authority to issue case dispositive sanctions, he/she may issue a Report and Recommendation to the District Judge concerning same pursuant to 28 U.S.C. §636(b)(1)(B). To further understand the scope and extent Defendants' litigation misconduct and their counsel's culpability in withholding and spoliating key evidence, it may compel additional discovery through an evidentiary hearing and/or forensic examination of Defendants' ESI. See *Hespe v. City of Chicago*, 2016 U.S. Dist. LEXIS 173357, at *12 (N.D. Ill., Dec. 15, 2016). This is appropriate in light of Defendants' and counsels' selective production of documents, incomplete and inconsistent explanations, and false claims regarding "auto-forwarding" and "auto-purging" of relevant documents. However, a comprehensive forensic examination may be impossible now that Defendants lost their entire ESI.

### A.    DEFENDANTS' VIOLATION OF THIS COURT'S JUNE 11, 2015, APRIL 17, 2018, AND MAY 17, 2018 ORDERS REQUIRES THE IMPOSITION OF SANCTIONS UNDER RULE 37(b)

Rule 37(b)(2)(A) provides for an array of sanctions when a party fails to obey an order to provide or permit discovery. Under these circumstances, a court may: (a) direct that matters addressed in the order or other designated facts be taken as established: (b) prohibit the disobedient party from supporting or opposing designated claims or defenses, or introducing designated matters into evidence; or (c) strike pleadings, dismiss claims, or enter default, either in whole or in part. *Id*. The court may also find that the disobedient party is in contempt of court. *Id*.

The sanctions listed for disobedience of a court order are understandably severe and, unlike other subsections of Rule 37, subsection (b) does not expressly require a finding of prejudice or harm to the moving party, or bad faith or lack of justification on the part of the disobedient party

before any of the listed sanctions may be imposed. Contra., *e.g.*, Rule 37(c)(1), 37(d)(3), and 37(e); see also *Halas v. Consumer Servs.*, 16 F.3d 161, 164 (7th Cir. 1994) (when a party violates a court order, the non-compliant party's "culpability only determines which sanctions are appropriate, not whether they are appropriate at all."). Even if proof of prejudice to the Plaintiffs and bad faith on the part of Defendants were required, those conditions have been readily demonstrated in this case.

It is quite apparent that the Defendants and their counsel did not make a reasonable effort to comply with this Court's June 2015 Order. Had they done so, they would have learned - before discovery closed and years before summary judgment motions were filed – that they had not identified and searched all relevant document sources. As a result, the parties have been litigating this case based upon Defendants' manufactured version of incomplete "facts" for several years. During that time, Plaintiffs have been deprived of the opportunity to seek additional document and deposition discovery, conduct meaningful depositions of fact and expert witnesses, timely amend their pleadings to assert an affirmative defense of "invited defamation," and prepare motions for summary judgment based upon facts rather than a record fabricated by defendants.

One of the key issues raised and hotly litigated by Plaintiffs in 2015, and which resulted in the June 2015 Order that compelled Defendants' production of additional documents, was the concern that Defendants were deliberately withholding information and documents relating to Defendants' Misuse of Metatags. See Dkt. No. 126 (Plaintiffs' Motion to Compel Discovery filed June 5, 2015). At that time, Plaintiffs argued that there appeared to be missing communications with Defendants' SEO consultant Webrecsol, Kirti Saraswat's employer (including e-mail communications that we now know would have been found by searching Duke's Yahoo account). Plaintiffs' motion to compel these documents in 2015 also sought missing sales documents. This Court's June 2015 Order compelled Defendants to provide all of this information and Defendants

agreed, at the time of the court hearing on the motion, to provide the documents sought. See Dkt. Nos. 269 (Transcript of Hearing on June 11, 2015 at 11:6-8) and 132 (Court Order dated June 11, 2015). As detailed above, it is now established that documents that go to the heart of these key issues -- Defendants' Misuse of Metatags, related communications with Saraswat, and Defendants' early on-line sales -- were withheld in clear violation of the Court's Order and belie defense counsel's assurances that they had produced all the documents requested.

Rule 37(b) expressly contemplates "issue sanctions,"[12] which here might reasonably include a finding that Defendants and/or one of their employees or agents intentionally inserted Plaintiffs' Mark in the metadata of Defendants' website. See Rule 37(b)(2)(i). The Rule also contemplates a sanction that would prohibit Defendants from arguing that neither they, nor anyone working on their behalf, caused that to happen. See Rule 37(b)(2)(ii). Not only are these sanctions appropriate because Defendants failed to properly disclose relevant communications with Saraswat in violation of the June 2015 Order, they are also warranted because Defendants have: (a) intentionally misrepresented the scope of communications exchanged with Saraswat; (b) offered false declarations relative to when she performed work for Defendants; (c) admitted to failing to collect and spoliating the Yahoo Chat messages; and (d) lied about Duke's knowledge and SEO capabilities, and concealed evidence that contradicts his sworn testimony on this topic. Other "issue sanctions" might reasonably include: (a) an order establishing that Defendants' online sales were *de minimus* and decreasing and prohibit Defendants' from arguing otherwise – in response to their intentionally withholding critical information about on-line sales; and (b) a finding that Defendants stole Plaintiffs' customers on the basis of the missing emails.

---

[12] See *HM Elecs., Inc. v. R.F. Techs., Inc*., 2015 U.S. Dist. LEXIS 104100, at * 81-86 (S.D. Cal., Aug. 7, 2015) (recommending issue sanctions and evidentiary and monetary sanctions in light of party's egregious discovery misconduct), *vacated as moot following settlement*, 171 F. Supp. 3d 1020 (S.D. Cal. 2016).

Defendants also violated this Court's recent Orders issued on April 17, 2018 and May 17, 2018.[13] Those Orders granted Defendants the opportunity to explain and correct, at least in part, their discovery deficiencies.  See Dkt. No. 249 (Transcript of 04/17/18 Conference at 23:17-19, where Defendants were given time to provide a "really good" explanation, supported by affidavit, for their discovery deficiencies) and Dkt. No. 254 (which granted Defendants' time to produce documents, weeks after they claimed that they were ready for production).  Defendants were given many months to investigate, explain, and address their discovery deficiencies – years after discovery closed.  Yet, rather than abide by those orders, or even ask for more time to respond, Defendants: mocked Plaintiffs' concerns; resisted discovery; and submitted sworn declarations that are not only evasive and obfuscating, but also contradicted by Defendants' own documents. Defendants have also shirked responsibility for their misconduct by blaming their vendor, "auto-deletion," errors in their "copying process," and even Plaintiffs (ridiculously, on the basis that Plaintiffs should have disclosed Defendants' discovery violations earlier).  Defendants have earned the severe sanctions expressly afforded under Rule 37(b) or simply a dismissal of their claims and entry of default against them.  Based on the foregoing, this case meets all of the conditions required for a contempt of court sanction, namely: (1) a court order that sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply.  See *Young v. City of Chi.*, 2017 U.S. Dist. LEXIS 394, at *13 (N.D. Ill. Jan. 3, 2017).

## B.  RULE 37(c) PRECLUDES DEFENDANTS FROM USING THEIR NEWLY PRODUCED DOCUMENTS AND SUPPORTS AWARD OF SANCTIONS

---

[13] The Seventh Circuit broadly construes what constitutes a court order for purposes of imposing sanctions under Rule 37; an oral directive from the Court is sufficient. See *Goudy v. Cummings*, 2017 U.S. Dist. LEXIS 41476, *38 (S.D. Ind., March 22, 2017) (citing various cases issued by the Seventh Circuit).

Rule 37(c) directs that, if a party "fails to provide information or identify a witness as required under Rule 26(a) or (e)," that party is precluded from using that information or witness to "supply evidence on a motion, at a hearing, or at trial unless the failure was substantially justified or harmless." *Id.*, see also *Ablan v. Bank of Am. Corp.*, 2014 U.S. Dist. LEXIS 164751 at *9 (N.D. Ill., Nov. 24, 2014) (failure to disclose or supplement discovery under Rule 37(c)(1) barring delinquent party from using for summary judgment or at trial); *Moore v. City of Chi. Heights*, 2011 U.S. Dist. LEXIS 126738, at *38-39 (N.D. Ill., Feb. 15, 2011). Also, pursuant to Rule 37(c), in addition to or instead of precluding the use of such information, the court may: (a) order that the dilatory party pay the moving party's reasonable expenses caused by the failure; (b) inform the jury of the failure; and (c) impose other appropriate sanctions as listed under Rule 37(b)(2)(A).

Defendants withheld approximately 15,866 pages of hard copy documents and 2.5 gigabytes of ESI, and have spoliated other key evidence. Not only have Defendants withheld documents that go the heart of the claims and defenses in this case, they have also failed to demonstrate that they acted with reasonable diligence or that their failure to produce these and other documents on a timely basis was either justified or harmless. Plaintiffs and this Court have already devoted substantial effort and time toward unravelling the scope of Defendants' discovery deficiencies and the lack of veracity of their excuses therefor. However, Defendants have continued to frustrate this process with intentionally misleading explanations. This does not amount to "justification" and, in fact, serves as further evidence of their *intentional* litigation misconduct and a basis to issue the additional sanctions listed under Rule 37(c)(1)(A)-(C).

Defendants have also failed to demonstrate that their misconduct was "harmless" or has been cured by their late productions. On this point, a recent opinion from this Court is instructive. In *Shott v. Rush Univ. Med. Ctr.*, Judge Kapala found that a claimant's late production of

documents, after summary judgment was filed, was enough to demonstrate that the late production was not harmless, because it "robb[ed the defendant] of its ability to use discovery mechanisms in order to issue third-party subpoenas or investigate the[] documents further prior to its filing of summary judgment." 2015 U.S. Dist. LEXIS 1322, at *13 (N.D. Ill., Jan. 7, 2015) (party who provided late production carries the burden of proving that its violation was substantially justified or harmless); see also *Int'l Ins. Co. v. Certain Underwriters at Lloyd's London*, 1992 U.S. Dist. LEXIS 16939, at *10-12 (N.D. Ill., Nov. 5, 1992). Defendants cannot be heard to argue that some of the newly produced documents tend to support their own claims, thereby disproving any intent on their part to withhold them. That is not the test.[14] Nor do Defendants raise a valid argument that withheld documents provide evidentiary support for their claims – like Duke's incomplete e-mail to Saraswat inquiring whether she inserted Plaintiffs' Mark into Defendants' website.

Not only does Rule 37(c) preclude Defendants from using any documents produced in March, May or June of 2018 (or any other information or documents that may be discovered thereafter), it also provides for more severe sanctions. These additional sanctions are fully warranted because Plaintiffs were deprived of access to this evidence during fact discovery, causing them severe and irreparable prejudice. Plaintiffs did not have the benefit of these documents when developing and asserting their claims and defenses to Defendants' Counterclaims, drafting supplemental document requests, selecting deponents, taking fact and expert depositions, conducting third-party discovery, determining whether additional documents or testimony should be gathered, and preparing their summary judgment motions, as well as overall

---

[14] Nor is it relevant that Defendants produced more pages of documents than Plaintiffs. Much of their production is duplicative or irrelevant. See *Qualcomm Inc. v. Broadcom Corp.*, 2008 U.S. Dist. LEXIS 911 (S.D. Cal. Jan. 7, 2008), *vacated in part*, 2008 U.S. Dist. LEXIS 16897 (S.D. Cal. Mar. 5, 2008) ("Producing 1.2 Mill. pages of marginally relevant documents while hiding 46,000 critically important ones is not good faith, and does not satisfy the client's or attorney's discovery obligations.")

litigation strategies. Moreover, Plaintiffs had to devote considerable resources to compel Defendants to comply with their discovery obligations, and to uncover their misconduct. Concealment of this evidence has clearly provided Defendants with a litigation advantage, allowing them to leverage frivolous counterclaims, unjustly succeed in motion practice, require that Plaintiffs and their experts respond to deceptive claims raised in motions for summary judgment (which have now been stricken as a result of Defendants' newly discovered discovery violations), and protract this litigation for now well over six and a half years. Not only has Defendants' misconduct delayed this litigation, it has significantly increased litigation costs, unduly burdened this Court, and contributed to the spoliation and decay of relevant evidence.

While many of the June 2018 production documents favors Plaintiffs and uncovered perjury and false testimony of Defendants, Plaintiffs' delayed access to these documents is not enough to cure the harm caused by their late production. Nor is an order merely precluding Defendants from using the newly produced documents. Defendants' egregious misconduct in withholding these critical documents, and the resulting prejudice to Plaintiffs, clearly warrants the additional sanctions allowed under 37(c)(1)(C) including dismissal and the entry of default.

## C. DEFENDANTS' FAILURE TO PRESERVE RELEVANT ESI REQUIRES THE IMPOSITION OF SANCTIONS UNDER RULE 37(e)

Rule 37(e) is implicated when ESI that should have been preserved in anticipation of litigation is lost, because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery. *Id.*; see also *Snider v. Danfoss*, LLC, 2017 U.S. Dist. LEXIS 107591, at *7 (N.D. Ill., July 12, 2017). Under Rule 37(e)(1), upon a finding of prejudice from the loss of information, a court may order measures no greater than necessary to cure the prejudice. Under Rule 37(e)(2), upon finding that the party who lost the information acted with the "intent to deprive another party of the use of the information in the litigation," a court

may issue more severe sanctions, including a negative presumption, adverse inference instruction to the jury, or dismissal of the action or entry of default.

**Defendants' Failure to Meet The Duty to Preserve:** "A party has a duty to preserve evidence, including any relevant evidence over which the party has control and reasonably knew or could reasonably foresee was material to a potential legal action." *Domanus v. Lewicki*, 284 F.R.D. 379, 385 (N.D. Ill. 2012)(quoting *Krumwiede v. Brighton Assocs., L.L.C.*, 2006 U.S. Dist. LEXIS 31669, at *22 (N.D. Ill. May 8, 2006), and *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 525 (D. Md. 2010) (a party breaches its duty to preserve relevant evidence if it fails to act reasonably by taking positive action to preserve material evidence)); see also *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). Here, the Defendants' duty to preserve arose no later than September 2012, when this action was filed, and more likely sooner, insofar as Defendants withheld communications based on attorney-client privilege dating back to March 2011, when Duke was contemplating litigation against Plaintiffs and Complaints were being drafted by his lawyers. The importance of the parties' respective preservation obligations was also specifically discussed at the time of their first and second Rule 26(f) conferences, which took place in November 2012 and June 2014. In fact, at the later conference, the parties' respective document custodians - including Mr. Duke - participated to facilitate discussions regarding relevant ESI sources and searches, pursuant this Court's Order dated May 15, 2014. (Dkt No. 78).

Defendants' obligation to preserve evidence they knew or had reason to know would be relevant to the litigation is judged by an objective standard, so the inquiry is whether "a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron Tech. Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011). As this Court has already observed,

Defendants have not met that standard because they failed to follow the most basic steps for preservation of ESI. See Dkt. No. 256 (Transcript of May 17, 2018 Conference at 16:16-25).

**The Loss of Relevant Information:** There is no question that relevant ESI has been lost. No matter how much spin and pivot they attempt, Defendants admit spoliation of Yahoo Chat documents, their own ESI collection and other ESI throughout this case - but only as a result of Plaintiffs' persistence and this Court's intervention spanning months after the parties had already fully briefed summary judgment. Apart from the admittedly "auto-deleted" e-mail correspondence sent by Defendants up through "about 2014," and the recently disclosed loss of Defendants' ESI Data Set, and failure to search and produce emails of all of their employees, Plaintiffs have identified other relevant documents that should have been included in Defendants' productions, but, suspiciously, were not. This includes e-mails exchanged with customers such as Ms. Wood and similar e-mails that Defendants sent to Plaintiffs' customers which are now are admittedly lost. Plaintiffs can justifiably presume that those "lost" e-mails contained comments similar to those made to Ms. Wood. It is reasonable to presume that Saraswat's missing response about whether she inserted Plaintiffs' Mark into Defendants' website metadata was unfavorable to Defendants. This lost evidence is not only relevant, but, more likely than not, issue and case dispositive.

**Defendants' Failure to Take Reasonable Steps to Preserve ESI:** Defendants and their counsel did not take reasonable steps to preserve relevant information. Instead, what they obviously preserved and selectively produced were those documents that they thought would best help their case. This shows an intent to spoliate or otherwise conceal evidence. In accordance with the most basic of discovery obligations, Defendants and their counsel should have implemented a litigation hold, and had a duty to properly communicate to ensure that all likely document sources were

searched for discoverable information. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004); See also Dkt. No. 256 (Transcript of May 17, 2018 Conference at 16:16-25). They also had an affirmative and non-delegable duty to identify key document sources (e.g., all e-mail accounts and other forms of electronic communication used for business purposes) and make a reasonable effort to ensure that relevant documents were not "lost." "Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents." *Bratka v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 448, 463 (S.D. Ohio 1995). Defendants obviously and admittedly breached these duties.

Defendants' counsel have admitted that they gave no written litigation hold memo or instructions to their clients at any time. See Dkt. No. 256 (Transcript of May 17, 2018 hearing at 20:2-8). This is in spite of multiple events early in this litigation that should have prompted Defendants to investigate whether they had actually met their discovery obligations. This includes two Rule 26(f) conference concerning ESI searches and productions (one with Duke himself participating), multiple meet and confers and depositions exploring Defendants' efforts to locate relevant documents, and a direct order from this Court requiring that Defendants identify and produce, among other things, Defendants' communications with their SEO consultant.

Notwithstanding, Defendants and their counsel continue to deflect responsibility for their actions (and inaction). Defendants' counsel claims to have relied upon an e-discovery vendor, who in turn worked with Duke, to copy Defendants' hard drives and run search terms against the data. Yet, they did not investigate whether Duke had in fact captured all relevant data sources, nor did they question why Duke had separately provided them with documents that were absent from the ESI Data Set. Defendants also offer that certain documents were lost as a result of "auto-deletion," but their explanations in this regard are incomplete and inconsistent, and contradicted

by Defendants' own documents. Even if documents were lost as a result of "auto" (and not selective) deletion, Defendants' failure to de-activate that feature is inexcusable. Their failure to disclose this spoliation when it was discovered "in or about 2014" is also inexcusable, and still unexplained by Defendants and their counsel. Whit is even more disturbing and egregious, although this Court have been engaged in this missing e-discovery issue for over a year now, it was not until recently that Defendants disclosed that their entire ESI Data Set was spoliated.

**Restoration or Replacement of ESI:** Rule 37(e) also requires an evaluation of whether lost ESI can be restored or replaced through additional discovery. Given that Defendants never preserved and lost ESI, never collected and then spoliated the Yahoo Chat data, and lost their entire ESI Data Set, replacement and recovery is apparently impossible. There is no way to cure this compete failure through any other additional discovery.

**Prejudice Caused by Defendants' Misconduct:** Defendants' misconduct resulted in Plaintiffs litigating this case on a false, incomplete and fabricated record. It also required Plaintiffs to devote considerable time and resources toward motion practice and unraveling Defendants' discovery misconduct. This does not account for the prejudice that Plaintiffs will suffer moving forward in this litigation. Insofar as evidence has actually been lost and spoliated, Plaintiffs' ability to present their case, and defend against Defendants' spurious counterclaims, has been compromised.

Both Plaintiffs' and this Court's ability to determine the full measure and impact of Defendants' spoliation is "unavoidably imperfect" because we "can only venture guesses with varying degrees of confidence as to what that missing evidence may have revealed." *Lekkas v. Mitsubishi Motors Corp.*, 200 U.S. Dist. LEXIS 12016, at *11 (N.D. Ill., August 15, 2000). However, documents received from other sources and Defendants' own admissions illustrate the types of key evidence that have been destroyed. For example, all the e-mails sent by Defendants

to Plaintiffs' customers (for which the Wood e-mail chain provides an illustrative example) and the Yahoo Chat messages with Defendants' SEO consultant.

Here, prejudice is pervasive and irreparable, and has not been cured through Defendants' supplemental production of additional documents – which disclosed further discovery failures and established that their explanations and excuses are false. That prejudice to Plaintiffs cannot be cured by simply allowing for additional deposition examination of Duke, who has already perjured himself on various key points (*e.g.*, SEO capabilities, manufacturing a defamation claim, his relationship with Bryan Scott, and withholding key online sales data just to name a few).

**Intent of Defendants and Defendants' Counsel:** Rule 37(e)(2) provides for more severe sanctions when a party like in this case has failed to preserve ESI with "the intent to deprive another party of the information's use in the litigation." *Id*.[15] The crucial element is not that the evidence was destroyed, but that it was destroyed for the purpose of hiding adverse information. *Tomas v. Ill. Dep't of Empl. Sec.*, 2018 U.S. Dist. LEXIS 49883, at *33 (N.D. Ill., March 27, 2018).

The test is not, as Defendants suggest, whether the spoliating party has deprived their adversary of "smoking gun" evidence. Additionally, a party seeking sanctions is not required to provide direct evidence of the non-producing party's intent. In fact, in light of common sense and experience, our courts appreciate that there almost never is "direct" evidence of intent, and that circumstantial evidence is sufficient to prove intentional destruction of evidence. *Bankdirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 2018 U.S. Dist. LEXIS 57254, at *30 (N.D. Ill., April 4, 2018) (also observing that "the Supreme Court has repeatedly stressed that circumstantial evidence is often more certain, satisfying and persuasive than direct evidence."). Additionally, in

---

[15] This Rule was amended in 2015 to better define the parameters for issuance of sanctions *when failure to preserve ESI* is at issue. See Advisory Committee Notes for the Dec. 1, 2015 Amendments to Rule 37(e) (Emphasis added to distinguish between Defendants' violation of court orders, withholding of documents, and unclean hands); see also *Snider*, 2017 U.S. Dist. LEXIS 107591, at *7, note 8.

the Seventh Circuit, evidence of willfulness, bad faith, or fault justifying sanctions against the noncomplying party is proven by a preponderance of the evidence, and not the more stringent "clear and convincing" standard. *Tomas v. Ill. Dep't of Emp't Sec.*, 2018 U.S. Dist. LEXIS 49883, at *33-34 (N.D. Ill. Mar. 27, 2018) (citing *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 781 (7th Cir. 2016), *cert. denied*, 138 S. Ct. 116, 199 L. Ed. 2d 31, 2017 WL 2339748 (2017).

This is not just a case where counsel failed to issue a formal litigation hold letter or even take the most basic steps to ensure that relevant information was located and preserved. Defendants and their counsel did that *and* also "missed" multiple opportunities to timely disclose their discovery failures – including Defendants' admitted 2014 discovery that relevant e-mails had been auto-deleted which was not disclosed until years later) and their discovery that key e-mail accounts had never been searched which was not disclosed until well after final briefings on summary judgment were submitted, and months after Defendants were admittedly informed of deficiencies in their ESI productions. Apart from this extremely suspect behavior, Defendants have: (1) responded to Plaintiffs' concerns with belligerence and sarcasm; (2) sought to stave off claims raised in Plaintiffs' summary judgment motion with false declarations and a selective production of 112 pages of documents in March 2018 after Plaintiffs had filed their final briefing on summary judgment, and with defense counsel knowing full well, but not disclosing, that their e-discovery vendor had never searched Duke's Yahoo.com account; (3) opposed Plaintiffs' motion to supplement their summary judgment papers to address their 11th hour production, at which time they again submitted misleading declarations; and (4) continued to withhold other relevant documents and ESI until the court directed that they produce same. This alone would be enough to find bad faith and the requisite intent required for sanctions under Rule 37(e).

However, now that Plaintiffs have had the opportunity to evaluate whether Defendants' document productions hold up against their sworn declarations concerning same, an even more disturbing pattern of misconduct has become evident. As detailed herein and initially presented at the August 14, 2018 status conference, it is now clear that Defendants have selectively and intentionally withheld and/or spoliated relevant evidence throughout this litigation. The absence of select documents from Defendants' prior productions, combined with surrounding circumstances, the spoliated Yahoo Messenger Chat documents, and the loss of their entire ESI Data Set compels the reasonable inference that Defendants intentionally deleted documents that are relevant to this action and favorable to Plaintiffs.

When viewed together, there are simply too many "oversights" and dubious excuses to ignore -- all supporting a finding that there has been a deliberate attempt to conceal evidence. *Bankdirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 2018 U.S. Dist. LEXIS 57254, at *7 (N.D. Ill., April 4, 2018) (inferring intent and issuing sanctions under Rule 37(e)(2) in light of a "mosaic of evidence leading to a finding of spoliation" including party's failure to issue a litigation hold, incredible and shifting explanations regarding auto-purging of documents, and failure to promptly address the issue).[16] When considering a litigant's excuse for noncompliance with his or her discovery obligations, a court need not accept their excuse where it is contradicted by the record, or by common sense. "[W]here the defendant's wrongful intentions are clear from the record as a whole, no credence is given to their purported excuse . . . . The basic rule is obvious: a party cannot avoid a Rule 37 sanction where the excuse is contradicted by the record evidencing bad faith." *AngioDynamics, Inc. v. Biolitec AG*, 991 F.Supp.2d 283, 292 (D. Mass. Jan. 14, 2014).

---

[16] In *Bankdirect*, the Magistrate Judge opted against recommending a sanction of default judgment, instead recommending that the issue either be presented to a jury for determination or that the jury be given a permissive spoliation instruction. *Id.* at *33-34. The misconduct in our case is more extreme and merits a more severe sanction.

Because Defendants' misconduct has been so extreme and clearly intentional, prejudice to Plaintiffs is not even a prerequisite to the issuance of sanctions under Rule 37(e)(2). See Notes of Advisory Committee on 2015 Amendments to Rule 37(e)(2) (the finding of intent required by this subdivision supports both the inference that the lost information was favorable to Plaintiffs as well as the inference that Plaintiffs were prejudiced by the loss of information that would have favored their litigation position); see also *Global Material Techs., Inc. v. Dazheng Metal Fibre Co.*, 2016 U.S. Dist. LEXIS 123780, at * 36 (N.D. Ill., Sept. 13, 2016) ("a specific finding of prejudice is not required under Rule 37(e)(2) once the court has found [requisite intent]").

Rule 37(e)(2) thus provides additional support for this Court's authority to impose severe sanctions against Defendants. In fact, although subject to the Court's discretion, the rule itemizes three sanctions deemed appropriate for this type of misconduct. Under Rule 37(e)(2), the court may: presume that the lost information was unfavorable to the spoliating party, pursuant to subsection (2)(A); issue an adverse inference instruction to the jury, pursuant to subsection (2)(B); or enter dismissal or default judgment, pursuant to subsection (2)(C). At a minimum, a negative presumption or adverse inference instruction is warranted - on the sole basis of Defendants' spoliation of evidence. See *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134-36 (7th Cir. 1987) (employee selectively destroyed relevant documents, while litigation was pending and in violation retention policy, and offered a non-credible justification, fact finder was entitled to presume that documents would have been unfavorable to him), *cert. denied*, 485 U.S. 993 (1988); *YCB Int'l, Inc. v. UCF Trading Co.*, No. 09-CV-7221, 2012 U.S. Dist. LEXIS 104887, at *31 (N.D. Ill. June 12, 2012); see also, *Shaffer v. RWP Grp.*, 169 F.R.D. 19, 28 (E.D.N.Y. 1996)(in light of trial court's discretion to pursue a wide range of responses to level the evidentiary playing field and sanction improper conduct, adverse inference was deemed "eminently

appropriate" where destroyed documents were not only relevant but bore upon a critical issue in

the case); *Int'l Union, United Auto., etc. v. NLRB*, 459 F.2d 1329, 1335-36 (D.C. Cir. 1972). This

is appropriate as Defendants are at fault for losing this information.[17]

## D. SEVERE SANCTIONS ARE WARRANTED BECAUSE OF DEFENDANTS' EXTREME AND PERVASIVE LITIGATION MISCONDUCT

Defendants' litigation misconduct clearly warrants sanctions – the only question is how

severe those sanctions should be. As demonstrated above, Defendants have not only acted in bad

faith, but have also engaged in serial acts of misconduct, certain of which, even standing alone,

merit "issue sanctions," or the entry of dismissal or default. In this case, we have violations of

multiple court orders, the fabrication of evidence to support frivolous claims, production of

documents after summary judgment motions were filed, perjury during depositions and in false

declarations submitted to the Court as well as admitted spoliation of data that was never collected

or searched and total loss of Defendants' ESI Data Set.

Although the sanctions of dismissal and default are considered severe, they are clearly

warranted where a party exhibits misconduct that is "willful[]," in "bad faith" or "contumacious."

*Crown Life Inc. Co, v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993). The term "bad faith" has been

defined in the Seventh Circuit to include much of the misconduct we have here, i.e., "unnecessary

delay, needless increase in the cost of litigation, willful disobedience, and recklessly making a

frivolous claim." *Grochocinski*, 2011 U.S. Dist. LEXIS 71053, at *13 (citing *Mach v. Will County

Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009); and *Stive v. United States*, 366 F.3d 520, 521-22 (7th

Cir. 2004) (collecting cases). The Seventh Circuit has also explained that "bad faith" "has both a

---

[17] See *Goodyear Tire and Rubber Co*., 167 F. 3d 776, 779 (2d Cir. 1999) (court has broad discretion in fashioning a remedy for spoliation; sanctions should be designed to: (1) deter; (2) *place the risk of an erroneous judgment on the party who wrongfully created the risk*; and (3) restore the prejudiced party to the position s/he would have been in absent the wrongful destruction of evidence)(emphasis added).

subjective and an objective meaning, and often treats reckless and intentional conduct equally." *Id*. However, this is not merely a case of recklessness. On various occasions, Defendants and their counsel took affirmative steps to conceal critical documents, mislead the Court about their conduct, provide false declarations with false explanations, spoliated evidence and cause unnecessary delay, and increase the cost of litigation.

In considering sanctions, this Court should consider the full complement of Defendants' misconduct, and "weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit." *Insight, Inc. v. Spamhaus Project,* 658 F.3d 637, 643 (7th Cir. 2011). Here, the list of misconduct is extensive and disturbing, and includes Defendants' withholding of evidence, destruction of evidence, utter disregard for court orders, sharp litigation practices, prosecution of frivolous claims, deliberate efforts to avoid providing complete discovery responses, selective production of documents, and deceptive representations by both Defendants and their counsel made under oath to this Court. In fact, what we have here is "misconduct that places too high a burden on allowing the case to continue." *Global Material Techs., Inc. v. Dazheng Metal Fibre Co.*, 2016 U.S. Dist. LEXIS 123780, at *32 (N.D. Ill., Sept. 13, 2016) (citing *Dotson v. Bravo*, 321 F.3d 663, 665 (7th Cir. 2003); and *Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993)).

Courts in this Circuit and District have long recognized that the severe sanctions of dismissal and/or default may be warranted in similar, and even less egregious circumstances. See *e.g.*, *Global Material Techs.,* 2016 U.S. Dist. LEXIS 123780, at * 38 (entering default on trade secrets claim because the defendants disposed of corporate computers while the lawsuit was pending, erased e-mails, lied about the extent of destruction, and stubbornly failed to comply with their discovery obligations); see also *Olivia v. Trans Union, LLC*, 123 Fed. Appx. 725 (2005)

(although dismissal is a harsh sanction, a district judge must "be guided by the norm of proportionality" and "as soon as a pattern of non-compliance with the court's discovery orders emerges, the judge is entitled to act with a swift decision.") (quoting, *Newman v. Metro. Pier & Exposition Auth.*, 962 F.2d 589, 591 (7th Cir. 1992)); *Barnhill v. United States*, 11 F.3d at 1367 (a federal court has the inherent authority to issue sanctions and may even impose "the severe sanction of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant."); *Govas v. Chalmers*, 965 F.2d 298, 303 (7th Cir. 1992) ("district court has the discretion to dismiss a claim when a party demonstrates a pattern of dilatory and evasive discovery tactics and when that party willfully persists in such tactics in violation of court warnings and orders.") (citing *Hal Commodity Cycles Management Co. v. Kirsh*, 825 F.2d 1136, 1138 (7th Cir. 1987) (Seventh Circuit has repeatedly upheld the entry of default judgments for discovery violations when a party willfully chooses "not to conduct its litigation with the degree of diligence and expediency prescribed by the trial court . . . ."); *Metropolitan Life Ins. Co. v. Estate of Cammon*, 929 F.2d 1220, 1223 (7th Cir. 1991) (upholding entry of default judgment under *Rule 37* where litigant provided few documents in response to discovery demands despite district court's warning that it would enter default judgment if documents were not produced within a specified amount of time); *Sere v. Bd. of Trustees*, 852 F.2d 285, 290 (7th Cir. 1988) (upholding dismissal against party that willfully failed to comply with court orders)).

The sanctions of dismissal and default are also justified because lesser sanctions, for example, an adverse inference instruction, would not adequately account for the seriousness of Defendants' pervasive misconduct, including their abuse of the litigation process, spoliation, false declarations and affirmative acts of deceit.

### E. DEFENDANTS SHOULD BE DENIED ANY AND ALL RELIEF SOUGHT IN THIS LITIGATION AS A RESULT OF THEIR "UNCLEAN HANDS"

Insofar as Defendants are seeking equitable relief, it is within this Court's discretion to dismiss those claims and deny them any such relief on the basis of the equitable defense of unclean hands. See *Root Ref. Co. v. Universal Oil Prods. Co.*, 169 F.2d 514, 534-35 (3d Cir. 1948) ("No principle is better settled than the maxim that he who comes into equity must come with clean hands and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim."); see also Committee Comments to 12.7.3 Federal Civil Jury Instructions "Defenses – Unclean Hands/Estoppel" (2008 rev.)(noting that the defense of unclean hands is an issue for the court, not the jury, and in turn citing cf. *Hot Wax, Inc. v. S/S Car Care*, 1999 WL 966094, at \*5 (N.D. Ill. Oct. 14, 1999).

Defendants have engaged in multiple acts of litigation as well as business misconduct, many of which, even standing alone, equal or exceed misconduct found in other courts to constitute unclean hands. *Metro Publishing, Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870, 880 (N.D. Cal. 1994) (plaintiff's deliberate attempt to create trademark confusion constituted unclean hands; summary judgment against trademark holder granted "on this basis alone"); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 970 (S.D.N.Y. 1992), *aff'd*, 983 F.2d 1048 (2d Cir. 1992) (unclean hands where defendant's president lied under oath); *C.C.S. Commc'n Control, Inc. v. Sklar*, 1987 U.S. Dist. LEXIS 4280 (S.D.N.Y. 1987) (denying equitable remedy to plaintiff who committed perjury); *U.S. Ethernet Innovations, LLC v. Texas Instruments Inc.*, Case No. 6:11-cv-491-MHS, 2014 U.S. Dist. LEXIS 131334, 2014 WL 4683252, at \*6 (E.D. Tex. 2014) (unprofessional conduct, including attempted interference with adversary's expert, constituted unclean hands). Taken together, these acts by Defendants, including Duke himself, who is the President of 21CS, and their counsel clearly rise to the level of contumacious conduct that merits a finding of unclean hands barring them from any relief in this case.

### F. PLAINTIFFS ARE ALSO ENTITLED TO REASONABLE EXPENSES, INCLUDING ATTORNEYS' FEES, UNDER RULES 37(a) and 56(h)

Essentially all of the expenses that Plaintiffs incurred in 2018 and into 2019 are attributable to Defendants' litigation and discovery misconduct. Plaintiffs have already invested in motion practice, pursuant to Rule 37, resulting in Defendants providing, through various stages of resistance, incomplete document productions. Prior to 2018, Plaintiffs invested time and expense in fact and expert discovery, and engaged in motion practice related to Defendants' discovery deficiencies and frivolous defamation claim. Plaintiffs also invested considerable time and effort in their summary judgment filings, which were ultimately stricken in order to address Defendants' discovery misconduct. During this time, Plaintiffs were disadvantaged by Defendants' concealment of, among other things: (a) Duke's SEO knowledge and abilities; (b) e-mails exchanged between Duke and his SEO consultant; (c) summary data relating to Defendants' early on-line sales; (d) communications exchanged between Duke and Edmiston, including an exculpatory recording, that reveal Defendants' defamation claim to be frivolous; and (e) communications revealing Defendants' efforts to trade on Plaintiffs' good will. Additionally, Plaintiffs invested considerable time and effort in evaluating and responding to Defendants' recent productions and related submissions, in order to provide this Court with an *accurate* assessment of same. This included review time, as well as Plaintiffs' preparation of submissions and presentations at court conferences.

Plaintiffs' recovery of reasonable expenses, including attorneys' fees is required under several provisions of Rule 37. Pursuant to Rule 37(a)(5)(A), Defendants must pay Plaintiffs' reasonable expenses incurred in making this and earlier Rule 37 motions. Additionally, instead of or in addition to the sanctions outlined at Rule 37(b)(2)(A)(i)-(vii) for violation of a court order, Rule 37(b)(2)(c) directs that the Court "*must* order that the disobedient party, the attorney advising

that party, or both pay the reasonable expenses, including attorneys' fees, caused by the failure." *Id.* (Emphasis added). The only way that Defendants might avoid such sanctions would be to demonstrate that such an award is unjust, or that their misconduct was somehow substantially justified. See Rule(37)(a)(5)(A)(ii)-(iii). There is nothing in the current record which might "substantially justify" Defendants' misconduct, nor have Defendants demonstrated that an award of Plaintiffs' reasonable expenses and attorneys' fees incurred as a result of their discovery misconduct would be unjust.

There is also ample authority for a discretionary award of such expenses and fees to Plaintiffs. Rule 37(c)(1)(A), which is implicated as a result of Defendants' withholding documents, provides that the court may order that the dilatory party pay the moving party's "reasonable expenses caused by the failure" to timely produce documents. Additionally, Rule 37(e)(1), which is implicated as a result of Defendants' failure to preserve ESI, provides for sanctions that will "necessarily cure the prejudice" caused by Defendants' failure to preserve relevant evidence. This would include reasonable legal costs and fees. See *De Simone v. VSL Pharms., Inc*., 2018 U.S. Dist. LEXIS 43398, at *26 (D. Md., March 16, 2018) (reasonable costs and fees appropriate because the requesting party had incurred significant costs and attorneys' fees for investigating spoliation and presenting motion to court). Finally, Rule 56(h) is also implicated, because Defendants submitted Declarations to support their summary judgment motions in bad faith. This rule also provides this Court with the discretionary authority to not only award Plaintiffs' reasonable expenses and attorneys' fees, but also hold the offending party and counsel in contempt or subject to appropriate sanctions. *Id.*

## G.   DEFENSE COUNSEL SHOULD ALSO BE REQUIRED TO PAY PLAINTIFFS' REASONABLE EXPENSES, INCLUDING ATTORNEYS' FEES

As discussed above, Rule 37(b)(2)(c) recognizes that, when an Order of the court is violated, the court "*must* order that the disobedient party, *the attorney advising that party*, or both pay the reasonable expenses, including attorneys' fees, caused by the failure." *Id*. (Emphasis added). Additionally, pursuant to 28 U.S.C.A. §1927, a court may require that "[a]ny attorney… who so multiplies the proceedings in any case unreasonably and vexatiously…satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The Seventh Circuit has explained that an attorney's conduct is "unreasonable and vexatious" when counsel engages in "serious and studied disregard for the orderly process of justice . . . or pursued a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." *The Jolly Group v. Medline Industries, Inc*., 435 F.3d 717, 720 (7th Cir. 2006); see also *In re TCI Ltd.,* 769 F.2d 441, 445 (7th Cir. 1985).

This Court is also *required* to impose sanctions against Defendants and their counsel, pursuant to Rule 26(g)(3), because they wrongfully certified that "to the best of that their knowledge, information, and belief formed after *reasonable inquiry*," their discovery responses and objections were complete and disclosures had not been made for an improper purpose. *Id.* (Emphasis added). "The point of Rule 26(g) is to hold someone personally responsible for the completeness and accuracy of discovery responses." *HM Elecs. Inc., v. R.F. Techs., Inc.,* 2015 U.S. Dist. LEXIS 104100, at *34 (S.D. Cal., Aug. 7, 2015, *vacated as moot following settlement*, 171 F. Supp. 3d 1020 (S.D. Cal., March 15, 2016). As noted above, Rule 56(h) also provides the Court with the discretionary authority to sanction counsel for their role in submitting declarations in bad faith to support Defendants' summary judgment submissions.

In light of these various rules, courts have ample authority to issue hefty monetary sanctions against litigants and their counsel when their misconduct is extreme and complicit, and

when those sanctions are intended to reasonably compensate a party for the prejudice caused by such misconduct. See, *e.g.*, *HM Elecs., Inc. v. R.F. Techs., Inc*., 2015 U.S. Dist. LEXIS 104100 at * 82)(finding that the court rules *required* an award of compensatory monetary sanctions against defendant and defense counsel - due to the duration, frequency and severity of their discovery abuses - in the form of reasonable fees and costs incurred by plaintiff from the time that the defense provided false responses and certifications, which covered approximately **two years of litigation expenses**);[18]   *KCI USA, Inc. v. Healthcare Essentials, Inc., et al*, 339 F. Supp. 3d 672, 677, 686)(N.D. Ohio, 2018)(holding **defendants and their counsel jointly and severally liable to pay approximately $700,000.00** in litigation costs and expenses wrongly incurred by plaintiff as a result of their obstructive litigation tactics, withholding of documents, submission of false affidavits, fabrication of evidence, and spoliation of ESI).[19]

Based on the record before the Court, counsel should be obligated to pay a portion of the expenses incurred by Plaintiffs as outlined above, because they participated in the withholding of material evidence, spoliating evidence, and submitted false or otherwise intentionally misleading declarations to this Court and Plaintiffs on multiple occasions. In fact, it is clear from their own sworn Declarations that counsel knew that their vendor had not been given access to Duke's Yahoo account, and that therefore many relevant documents had not been searched and provided, as of the time they filed their summary judgment submissions on March 19, 2018. Rather than promptly disclosing, defense counsel took affirmative steps in the opposite direction. They produced "some" hand selected documents, concealed their knowledge of the withheld evidence and

---

[18] Plaintiff later calculated that amount to be close to **$1.35 million**. See *HM Elecs. Inc.,* 171 F. Supp. 3d 1020, 1025 (S. D. Cal. 2016).
[19] In this case, defendants and their attorneys were ordered to pay a collective amount of $2.5 million in attorneys' fees and costs to plaintiffs, on the basis of defendants' and defense counsel's litigation misconduct and RICO (and its state counterpart).

discovery failures, offered false assurances that sought to remedy any concerns Plaintiffs may have about missing documents, and then proceeded to move forward with summary judgment motions with the intent of not only cancelling Plaintiffs' registered trademarks, but also disgorging "eight figures" in damages from Plaintiffs based on a manufactured and false record. Defendants and Defendants' counsel should all be held accountable for their misconduct.

## VI. CONCLUSION

Based upon the foregoing, Plaintiffs submit there is ample justification to sanction the Defendants by dismissing their counterclaims, and entering a default judgment on Plaintiffs' Complaint. At the very least, the Court should issue evidentiary sanctions, and award the Plaintiffs their attorneys' fees and costs that were necessitated by Defendants' and their counsels' misconduct and deceit. If the Court wants or needs to hear more, the Plaintiffs submit that the Court should order an evidentiary hearing and follow that with a Court Ordered independent forensic examination of Defendants' discovery activities all at Defendants' expense.

Respectfully submitted,                          Dated: March 25, 2019
Attorneys for Plaintiffs

By:    /s/ Anthony J. Davis
       ANTHONY J. DAVIS                          ROBERT C. von OHLEN
       NICOLL DAVIS & SPINELLA, LLP              VON OHLEN & ASSOCIATES
       adavis@ndslaw.com                         rvo@vonohlenlaw.com
       95 Route 17 South                         1340 W. Deerpath Road
       Paramus, New Jersey 07652                 Lake Forest, Illinois 60045
       201-712-1616                              888-376-7475
       201-712-9444 (fax)                        888-354-4244 (fax)