**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC, and CB DISTRIBUTORS, INC. )<br>)<br>) | |
|      Plaintiffs/Counterclaimant, ) | |

DR DISTRIBUTORS, LLC, and CB
DISTRIBUTORS, INC.                                    )
                                                      )
         Plaintiffs/Counterclaimant,                  )
                                                      )
    v.                                                )
                                                      )
21 CENTURY SMOKING, INC., and                         )     Case No. 3:12-cv-50324
BRENT DUKE,                                           )
                                                      )     Judge Thomas M. Durkin
         Defendant/Counterclaim Defendant             )
                                                      )     Magistrate Judge Iain Johnston
_____              )
                                                      )
21 CENTURY SMOKING, INC.,                             )
                                                      )
         Counterclaimant,                             )
                                                      )
    v.                                                )
                                                      )
DR DISTRIBUTORS, LLC, CB                              )
DISTRIBUTORS, INC. and CARLOS                         )
BENGOA,                                               )
                                                      )
         Counterclaim Defendants.                     )

**DECLARATION OF KEVIN B. SALAM IN SUPPORT OF DEFENDANTS'**
**RESPONSE TO PLAINTIFFS' RENEWED MOTION FOR SANCTIONS**

I, KEVIN B. SALAM, of full age, certify and state as follows:

1.      I am an attorney at law in the State of Illinois, and I am counsel for Defendants,

21 Century Smoking, Inc. and Brent Duke (collectively, the "Defendants") in the above-

captioned matter.

2.      I submit this Declaration in support of Defendants' Response to Plaintiffs'

Renewed Motion for Sanctions ("Defendants' Response").

3.      I certify that Exhibits 1-52 to Defendants' Response are each true and accurate copies of the documents described in the Exhibit List attached hereto.

4.      I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Respectfully submitted,

By: _/S/ Kevin B. Salam_
　　Kevin B. Salam
　　kevin@salamlaw.com
　　120 N. LaSalle, Suite 2000
　　Chicago, IL 60602
　　312-606-8730 (ph.)
　　312- 277-2539 (fax)
　　*Attorney for Defendants, Brent*
　　*Duke and 21 Century Smoking, Inc.*


Dated: October 24, 2019

# Exhibit List

*DR Distributors, LLC, et al. v. 21 Century Smoke, et al.*
3:12-cv-50324.

| Exhibit # | Exhibit Name |
|---|---|
| Ex. 1 | **Judge Kapala's Order re: Summary Judgment**<br>June 16, 2019 (Docket #80) |
| Ex. 2 | **Declaration of Thomas R. Leavens**<br>May 14, 2018 (Docket #253-1) |
| Ex. 3 | **Transcript of Proceedings**<br>June 4, 2019 (Docket #315) |
| Ex. 4 | **Email Chain re: ESI Protocol**<br>March 19, 2018 (Docket #234-8) |
| Ex. 5 | **Declaration of Travis W. Life**<br>May 14, 2018 (Docket #253-2) |
| Ex. 6 | *Intentionally Omitted* |
| Ex. 7 | *Intentionally Omitted* |
| Ex. 8 | *Intentionally Omitted* |
| Ex. 9 | **Email from Stamatis to Davis Producing Documents**<br>March 19, 2019 (Docket #294-2) |
| Ex. 10 | **Email from Peter Stamatis to Plaintiffs' counsel re Second Yahoo Email Production**<br>June 7, 2018 |
| Ex. 11 | **Defendants' Status Report Pursuant to Court's June 6, 2019 Order**<br>August 13, 2019 (Docket #318) |
| Ex. 12 | **Defendant's Report to the Court**<br>September 13, 2018 (Docket #268) |
| Ex. 13 | **Defendants' Report to the Court**<br>October 10, 2018 (Docket #273) |
| Ex. 14 | **Minute Order re: Oct. 10, 2018 Status Report**<br>October 10, 2018 (Docket #274) |
| Ex. 15 | **Minute Order re: Yahoo-Messenger Document Production**<br>October 16, 2018 (Docket #277) |
| Ex. 16 | **Joint Report to the Court**<br>November 28, 2018 (Docket #281) |
| Ex. 17 | **Defendant's Report to the Court**<br>January 22, 2019 (Docket #288) |
| Ex. 18 | *Intentionally Omitted* |
| Ex. 19 | **Magistrate Johnston's Order** |

# Exhibit List

*DR Distributors, LLC, et al. v. 21 Century Smoke, et al.*
3:12-cv-50324.

| | |
|---|---|
| | June 6, 2019 (Docket #313) |
| **Ex. 20** | *Snider v. Danfoss, LLC,* 15 CV 4748, 2017 WL 2973464, at *3 (N.D. Ill. July 12, 2017), *Report and Recommendation adopted,* 1:15-CV-04748, 2017 WL 3268891 (N.D. Ill. Aug. 1, 2017). |
| **Ex. 21** | **Minute Order re: Status of Hearing**<br>August 20, 2019 (Docket #320) |
| **Ex. 22** | **Transcript of Proceedings Before the Hon. Iain D. Johnston**<br>August 20, 2019 (Docket #321) |
| **Ex. 23 (Group)** | **Emails from GoDaddy, Brent Duke, and Travis Life**<br>June 29, 2015 |
| **Ex. 24** | **Declaration of Brent Duke**<br>March 19, 2019 (Docket #234-2) |
| **Ex. 25** | **Expert Report of Brian R. Brown – SEO Report**<br>March 25, 2016 (Docket #218-29) |
| **Ex. 26** | **Deposition Transcript for Brent Duke**<br>June 17, 2015 |
| **Ex. 27** | *Intentionally Omitted* |
| **Ex. 28** | **Declaration of Keerti Saraswat**<br>October 15, 2018 (Docket #276) |
| **Ex. 29** | **Declaration of Brian Brown**<br>October 16, 2019 |
| **Ex. 30** | **Minute Order re: Plaintiff's Motion to Compel**<br>June 11, 2015 (Docket #132) |
| **Ex. 31** | **Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-1) |
| **Ex. 32** | **Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts**<br>January 15, 2018 (Docket #216-2) |
| **Ex. 33** | **Exhibit R to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 34** | **Exhibit A to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 35** | **Deposition Transcript for William Ray Edmiston**<br>June 29, 2015 |
| **Ex. 36 (Group)** | **Exhibits W, X, Y and Z to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 37** | **Defendants' Supplemental Local Rule 56.1(a)(3) Statement of Material Facts** |

# Exhibit List

*DR Distributors, LLC, et al. v. 21 Century Smoke, et al.*
3:12-cv-50324.

|  | March 19, 2018 (Docket #234) |
|---|---|
| **Ex. 38** | **Exhibit EE to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 39** | **Exhibit FF to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 40** | **Exhibit CC to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 41** | **Deposition Transcript for Brent Duke**<br>June 23, 2015 |
| **Ex. 42** | **Exhibit DD to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 43** | **Email from Salam to Davis/VonOhlen**<br>September 30, 2019 |
| **Ex. 44** | **Defendants' Response to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts**<br>March 19, 2018 (Docket #234-9) |
| **Ex. 45** | **Exhibit HH to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 46** | **Exhibit ZZ to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 47** | **Deposition Transcript for Brent Duke**<br>June 17, 2015 |
| **Ex. 48** | **Exhibit KK to Declaration of Brian E. Moffitt**<br>March 25, 2019 (Docket #294-2) |
| **Ex. 49** | *Lexpath Techs. Holdings, Inc. v. Welch*, 13-CV-5379-PGS-LHG, 2016 WL 4544344, at *4 (D.N.J. Aug. 30, 2016), aff'd, 744 Fed. Appx. 74 (3d Cir. 2018). |
| **Ex. 50** | **Subpoena to (Yahoo!)Oath Holdings, Inc.**<br>October 11, 2018 |
| **Ex. 51** | **Plaintiffs' Expert Report of Leslie Solomon – Calculation of Damages**<br>March 19, 2018 (Docket #232-45) |
| **Ex. 52** | **Declaration of Laurie Duke**<br>October 23, 2019 |

# EXHIBIT 1

### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DR Distributors, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No: 12 C 50324 |
| | ) | |
| 21 Century Smoking, Inc., et al., | ) | |
| | ) | |
| *Defendants.* | ) | Judge Frederick J. Kapala |

### ORDER

Defendant/Counter-Plaintiff's motion for summary judgment [49] is granted in part and denied in part.

### STATEMENT

Plaintiff, DR Distributors, LLC, has sued defendants, 21 Century Smoking, Inc. and its president Brent Duke (collectively "21 Century Smoking"), for trademark infringement, unfair competition, and deceptive trade practices for its use of DR Distributors' registered trademark "21ST CENTURY SMOKE." 21 Century Smoking has counter-sued DR Distributors and its president Carlos Bengoa (collectively "DR Distributors") for trademark infringement, unfair competition, deceptive trade practices, and cancellation of DR Distributors' 21st CENTURY SMOKE mark and SMOKE THIS BY 21st CENTURY SMOKE application based on 21 Century Smoking's alleged prior use, and thus senior right, to the 21 CENTURY SMOKING mark. Both parties are retailers and distributors in the electronic cigarette business, and their marks are used in connection with their respective businesses. Currently pending before this court is a motion for summary judgment which deals only with the cancellation claims. For the reasons which follow, that motion is granted in part and denied in part.

### I. BACKGROUND

The parties dispute a number of facts in their submissions to this court, but the issues for purposes of this order can be quickly narrowed to the following, entirely undisputed facts.[1] In early 2009, 21 Century Smoking began using the 21 CENTURY SMOKING mark as its store name for an online retail outlet which sold electronic cigarettes. By May 2009, 21 Century Smoking made its first sale to a customer in New Jersey from the online store. 21 Century Smoking did not sell electronic cigarettes printed with the 21 CENTURY SMOKING mark, instead it sold them under

---

[1]In a few cases, the facts contained herein are designated as disputed in the Local 56.1 statement, but the responses and citations attached thereto do not contradict or otherwise dispute the facts cited.

the brand names BLACKJACK, POCKET ACE, and JACKPOT (others brand names were developed thereafter). However, 21 Century Smoking shipped its products in packaging labeled with the 21 CENTURY SMOKING mark, first in boxes with stickers affixed thereto and then in pre-printed boxes with the 21 CENTURY SMOKING mark.

In late 2009, 21 Century Smoking began selling its electronic cigarettes to physical retail locations. In March 2010, 21 Century Smoking opened its first retail location in California under the store name 21 CENTURY SMOKING. That same month, 21 Century Smoking opened another retail location in Chicago, Illinois under the same name, and with a large awning sign displaying the 21 CENTURY SMOKING mark. Between April 2010 and July 2010, 21 Century Smoking opened an additional ten retail locations in Illinois, Nebraska, and Ohio each under the name 21 CENTURY SMOKING.

In the spring of 2010, DR Distributors sold its first electronic cigarettes branded with the 21st CENTURY SMOKE mark. On May 3, 2010, DR Distributors filed an intent-to-use trademark application in the United States Patent and Trademark Office ("USPTO") for its 21st CENTURY SMOKE mark for use on electronic cigarettes. On its application, DR Distributors stated that it began using the 21st CENTURY SMOKE mark on April 27, 2010, with a first use in commerce on August 5, 2010. Prior to its application, DR Distributors engaged in a search for any competing names, including consulting an attorney on the issue, and uncovered nothing. It is undisputed that, at the time of the application, DR Distributors was subjectively unaware of 21 Century Smoking's existence. On May 3, 2011, the registration matured into Registration Number 3,953,768 for electronic cigarettes. On February 29, 2012, DR Distributors filed a related intent-to-use application for the mark SMOKE THIS BY 21st CENTURY SMOKE, once again for use on electronic cigarettes. In 2012, on account of the registration of 21st CENTURY SMOKE by DR Distributors, the USPTO rejected 21 Century Smoking's attempt to register its 21 CENTURY SMOKING mark.

DR Distributors admits becoming aware of at least 21 Century Smoking's retail store in Chicago during the summer of 2010. Nevertheless, DR Distributors did not contact 21 Century Smoking concerning the overlap in naming, and this in spite of at least one call and one letter from 21 Century Smoking to DR Distributors asking for an opportunity to discuss the matter. Following the spring and summer of 2010, both companies have continued to grow in their electronic cigarette sales. 21 Century Smoking added additional retail locations in Ohio, Nebraska, Illinois, and California. Furthermore, 21 Century Smoking has shipped its products through internet sales to forty-six states and the District of Columbia. During that same period, DR Distributors' electronic cigarette expansion has been considerably more explosive. Its 21st CENTURY SMOKE brand has become one of the top-selling electronic cigarette brands in the country, selling millions of branded electronic cigarettes and generating revenue several times greater than 21 Century Smoking.

Both parties, essentially from their inception, have owned domain names in the name of their mark from which they have conducted internet sales. 21 Century Smoking's website, www.21centurysmoking.com, included a keyword metatag and a description metatag "21st century

smoke," DR Distributors' exact mark, as two of its metatags for at least nine months.[2] By including "21st century smoke" in the metatags of its website, DR Distributors asserts that 21 Century Smoking has drawn web traffic to its website that were otherwise searching for DR Distributors' products.

The record also has an affidavit from one of DR Distributors' costumers, a Mr. Kunz, in which he testifies that a representative of 21 Century Smoking contacted him on December 20, 2012 and explicitly stated it was selling 21st CENTURY SMOKE electronic cigarette products and held itself out as affiliated with DR Distributors. 21 Century Smoking admits that one of its agents contacted Mr. Kunz' company on December 20, 2012, but denies knowing that Mr. Kunz was a customer of DR Distributors or making any representations concerning DR Distributors or its products.

The result of all of the above is DR Distributors' instant complaint, alleging, among other things, trademark infringement of its 21st CENTURY SMOKE mark. In response, 21 Century Smoking filed counterclaims, seeking, among other things, cancellation of DR Distributors' 21st CENTURY SMOKE trademark and the related SMOKE THIS BY 21st CENTURY SMOKE mark based on the prior use of the 21 CENTURY SMOKING mark. 21 Century Smoking has now moved for summary judgment on the cancellation claim.

Before addressing those arguments, however, it is worth noting that this case is somewhat unique in that the parties agree that the marks are confusingly similar. Indeed, both parties have received customer queries which have actually confused the two brands, although DR Distributors claims to have only received a "handful" while 21 Century Smoking has received over 800. Nevertheless, the questions raised by the parties are thus: (1) whether the uncontested facts show that 21 Century Smoking was the senior user of its mark, thus subjecting DR Distributors' mark to cancellation; and (2) whether any such cancellation would be blocked by the doctrine of unclean hands. The court will consider each in turn.

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Hemsworth v. Quotesmith.Com, Inc., 476 F.3d 487, 489-90 (7th Cir. 2007). In evaluating such a motion, the court's role is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Hemsworth, 476 F.3d at 490. The court must draw all reasonable inferences in the light most favorable to the party opposing the motion. See id. "If a party moving for summary judgment has properly supported his motion, the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine

---

[2]"Metatags are HTML [HyperText Markup Language] code intended to describe the contents of the web site. There are different types of metatags, but those of principal concern to us are the description and keyword metatags. The description metatags are intended to describe the web site; the keyword metatags, at least in theory, contain keywords relating to the contents of the web site. The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be hit in a search for that keyword and the higher on the list of hits the web page will appear." Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 810 n.1 (7th Cir. 2002) (quotation marks omitted).

issue for trial." Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 951 (7th Cir. 2013) (emphasis and quotation marks omitted). The nonmoving party need not meet, in the court's eyes, the preponderance of the evidence standard, but must still provide more than a "mere scintilla" of evidence to show that there is a genuine issue of material fact. See Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co., 600 F.3d 878, 882 (7th Cir. 2010).

## A. Senior Use

A mark that has been registered for less than five years may be cancelled on any ground which would have justified its original denial by the USPTO. See 15 U.S.C. § 1064; see also Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles, No. 11 C 2569, 2012 WL 3686776, at *12 (N.D. Ill. Aug. 24, 2012). One ground upon which the USPTO may rely in denying a mark is that the mark "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive . . . ." § 1052(d). Here, as mentioned above, the parties agree that the marks are substantially similar enough to cause confusion or mistake, and have, in fact, already caused such confusion and mistake. The record undeniably shows that 21 Century Smoking began using its 21 CENTURY SMOKING mark in electronic cigarette commerce prior to DR Distributors' use of 21st CENTURY SMOKE in the same field. DR Distributors argues that, notwithstanding that fact, its mark is not subject to cancellation because 21 Century Smoking only used its mark as a service mark (the name of its retail and online outlets) but not as a trademark on its goods, until after DR Distributors began to use its mark on its goods. Therefore, DR Distributors argues, it is the senior user of the mark as a trademark. DR Distributors' argument is meritless. First, the record belies its argument that 21 Century Smoking did not use its mark as a trademark prior to DR Distributors' use. Second, even if it had, DR Distributors mark would still be subject to cancellation based on the plain language of the Latham Act.

Turning to the first, the record is undisputed that 21 Century Smoking used its 21 CENTURY SMOKING mark in commerce as a trademark prior to DR Distributors' use of its confusingly similar mark. The Lanham Act defines "use in commerce" as

the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--

(1) on goods when--

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising

4

> of services and the services are rendered in commerce, or the services
> are rendered in more than one State or in the United States and a
> foreign country and the person rendering the services is engaged in
> commerce in connection with the services.

§ 1127 (emphasis added). There is no evidence on the record to rebut 21 Century Smoking's evidence that it has used the 21 CENTURY SMOKING mark on the packages in which it has shipped its electronic cigarettes and related goods since mid-2009, long before DR Distributors' first use in commerce of its 21st CENTURY SMOKE mark. Accordingly, 21 Century Smoking is the senior user of the mark, and DR Distributors' mark is subject to cancellation.

Indeed, even if the use on the packaging were not enough, DR Distributors' mark would still be subject to cancellation on two other grounds. Initially, DR Distributors' above argument presumes that if it is the senior user of the trademark, 21 Century Smoking's undisputed senior use of a confusingly similar service mark is irrelevant. That presumption is wrong. As quoted above, the Lanham Act states that the USPTO should reject a mark registration where it "so resembles . . . a mark or trade name" previously in use as to be confusing. § 1052(d) (emphasis added). "The term 'mark' includes any trademark, service mark, collective mark, or certification mark." § 1127. Accordingly, the fact that DR Distributors' trademark was admittedly confusingly similar to 21 Century Smoking's service mark, requires cancellation of the trademark. See § 1064. Thus, the fact that 21 Century Smoking did not include its mark directly on the electronic cigarettes (and ignoring for the moment the fact that it did include the mark on its packaging) does not mandate a different result.

Moreover, even if 21 Century Smoking had not included its mark as the name of its retail locations, and thus did not have a service mark interest, DR Distributors' mark would still be subject to cancellation based on 21 Century Smoking's trade name. As explained in a leading trademark treatise:

> The names of corporate, business and professional organizations are generally
> labeled "trade names" as opposed to "trademarks" or "service marks." A "trade
> name" symbolizes the reputation of a company or organization and the activities it
> engages in. A "trademark" is used to identify and distinguish the various products
> sold by that business. And a "service mark" is used to identify and distinguish the
> services rendered by that business.

1 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 9:3 (4th ed. 2009) (footnotes omitted); see also Am. Steel Foundries v. Robertson, 269 U.S. 372, 380-81 (1926) ("Whether the name of a corporation is to be regarded as a trade-mark, a trade-name, or both, is not entirely clear under the decisions. To some extent the two terms overlap, but there is a difference, more or less definitely recognized, which is that, generally speaking, the former is applicable to the vendible commodity to which it is affixed, the latter to a business and its good will. A corporate name seems to fall more appropriately into the latter class. But the precise difference is not often material, since the law affords protection against its appropriation in either view, upon the same fundamental principles. The effect of assuming a corporate name by a corporation under the law of

its creation is to exclusively appropriate that name. It is an element of the corporation's existence. . . . The general doctrine is that equity not only will enjoin the appropriation and use of a trade-mark or trade-name, where it is completely identical with the name of the corporation, but will enjoin such appropriation and use where the resemblance is so close as to be likely to produce confusion as to such identity, to the injury of the corporation to which the name belongs." (citation omitted)). Although the Lanham Act does not permit registration of trade names, it does define them, specifically as "any name used by a person to identify his or her business or vocation." § 1127. And, most critically for the purposes of this order, it also prevents the issuance of a trademark for goods where it would be confusingly similar to another entity's trade name. § 1052(d) (denying trademark registration where it "so resembles . . . a mark or trade name" already in use (emphasis added)). Thus, where the 21st CENTURY SMOKE mark is admittedly confusingly similar to 21 Century Smoking's trade name used previously in the United States and not abandoned, the mark is subject to cancellation.

Therefore, because of 21 Century Smoking's undisputed use of its trade name and 21 CENTURY SMOKING trademark and service mark in commerce prior to DR Distributors' use of its 21st CENTURY SMOKE mark, 21 Century Smoking is the senior user of the mark. Because DR Distributor admits that the marks are confusingly similar, its junior registration of the 21st CENTURY SMOKE mark and the related SMOKE THIS BY 21st CENTURY SMOKE are subject to cancellation, as the 21st CENTURY SMOKE mark was registered less than five years ago. Accordingly, on the issue of senior use, the court grants summary judgment in favor of 21 Century Smoking.

### B. Unclean Hands

That leaves DR Distributors' argument that 21 Century Smoking has come before this court with unclean hands, and thus it would be inappropriate to cancel DR Distributors' mark where 21 Century Smoking has allegedly profited from its own misappropriation of DR Distributors' mark and the goodwill and reputation that have arisen around the popularity of the 21st CENTURY SMOKE products.

"The doctrine of 'unclean hands'—colorfully named, equitable in origin, and reflecting, in its name at least, the moralistic background of equity in the decrees of the clerics who filled the office of lord chancellor of England during the middle ages—nowadays just means that equitable relief will be refused if it would give the plaintiff a wrongful gain." Scheiber v. Dolby Labs., Inc., 293 F.3d 1014, 1021 (7th Cir. 2002). "Today, unclean hands really just means that in equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to." Id. (quotation marks omitted).

21 Century Smoking does not directly engage DR Distributors' argument concerning the applicability of the unclean hands doctrine with respect to the specific facts of this case, but instead broadly asserts that the defense is unavailable in trademark cancellation proceedings based on generic authority which states that the doctrine is unavailable in proceedings based on law rather than equity. The Lanham Act explicitly extends some equitable defenses to proceedings before the USPTO Trademark Trial and Appeal Board ("TTAB"), including proceedings for cancellation of a mark. See 15 U.S.C. § 1069 ("In all inter partes proceedings equitable principles of laches,

estoppel, and acquiescence, where applicable may be considered and applied."). The United States Court of Customs and Patent Appeals, which has since been replaced by the Federal Circuit, and the TTAB have extended this principle, holding that unclean hands is an acceptable defense in a cancellation proceeding. See Duffy-Mott Co. v. Cumberland Packing Co., 424 F.2d 1095, 1099 (C.C.P.A. 1970); Hunt Foods & Indus., Inc. v. Gerson Stewart Corp., 367 F.2d 431, 436 (C.C.P.A. 1966); Winnebago Indus., Inc. v. Oliver & Winston, Inc., 207 U.S.P.Q. 335, *8-9 (T.T.A.B. 1980); VIP Foods, Inc. v. V.I.P. Foods Prods., 200 U.S.P.Q. 105, *18-30 (TTAB 1978); see also McCarthy, supra, at § 20:73 n.1. Courts have also permitted the unclean hands doctrine to defend against infringement actions, which similarly arise from the Lanham Act. See, e.g., 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1255 (10th Cir. 2013). The upshot of this authority is that the unclean hands doctrine does apply to cancellation proceedings so long as (1) the inequitable conduct relates directly to the trademark which a party seeks to cancel and (2) the party's conduct was in bad faith. See id.; see also Winnebago Indus., Inc., 207 U.S.P.Q. 335, at *8; VIP Foods, Inc., 200 U.S.P.Q. 105, at *27-30.

Here, the evidence shows that DR Distributors' exact mark, 21st CENTURY SMOKE, was included in two metatags in 21 Century Smoking's website for nine months. At that time, it is undisputed that 21 Century Smoking was aware of the existence of DR Distributors' use of the 21st CENTURY SMOKE mark. The affidavit from DR Distributors' expert opines that, given the way the program used by 21 Century Smoking's website works, the inclusion of DR Distributors' mark was likely a deliberate act.[3] Worth noting, the metatags in the record did not include any other variance of 21 Century Smoking which could lead to the conclusion that 21st CENTURY SMOKE was included simply because 21 Century Smoking was putting in all possible variations of its own, very similar, mark for which its customers might search. Therefore, if a fact finder were to accept DR Distributors' expert's testimony, it would be reasonable to conclude that 21 Century Smoking engaged in inequitable conduct, in that it drew additional customers to its website by appropriating a mark it knew to be registered to a more popular competitor, and that the conduct related directly to the trademark it now seeks to cancel.

Although the expert's testimony concerning the metatags would be sufficient in itself to survive summary judgment, there is additional evidence on the record that, if accepted, would support a finding of unclean hands. In particular, the affidavit from DR Distributors' customer Mr. Kunz, if accepted by the jury, would show at least one additional incident of 21 Century Smoking attempting to appropriate the goodwill or reputation generated by the trademark of its competitor for its own profit. Moreover, although 21 Century Smoking filed its counterclaim to cancel DR Distributors' mark within the required legal time frame, it did not do so until it had been sued by DR Distributors for infringement. It never petitioned to cancel DR Distributors' mark before the TTAB, even though it was denied registration of its own mark on account of the existence of DR

---

[3] 21 Century Smoking objects to consideration of DR Distributors' expert's affidavit because it includes "speculative" language concerning the expert's beliefs. However, the affidavit is not speculative, it instead states the opinion of the expert and the bases for his opinions, which an expert is permitted to do. See Fed. R. Evid. 701-705. If the bases of his opinions are incorrect or the processes he used invalid, that could be a grounds for impeachment or a challenge to the affiant's status as an expert, but those arguments are not advanced by 21 Century Smoking at this juncture (and an impeachment argument is not properly considered at summary judgment in any event).

Distributors' mark. Based on that delay and the other evidence in the record, a jury could reasonably conclude that 21 Century Smoking was content to profit from the success of DR Distributors' junior use until 21 Century Smoking found itself sued for infringement, and only then moved to cancel the junior mark in an effort to fend off liability.

Accordingly, although the court will grant summary judgment on the question of senior use, it will not grant summary judgment as to the entirety of Counts V and VI of the counterclaim, as a reasonable factfinder could determine that cancellation is inappropriate, notwithstanding 21 Century Smoking's senior use, on account of unclean hands. See Fed. R. Civ. P. 56(a) & (g) (noting that a court may grant summary judgment to part of any particular claim on which there is no genuine issue of material fact).

## III. CONCLUSION

For the foregoing reasons, the motion for summary judgment is granted in part and denied in part. 21 Century Smoking is the senior user of its mark in commerce, but there is a genuine issue of material fact as to whether it should be permitted to cancel DR Distributors' marks on account of the unclean hands defense.

Date: 6/16/2014                                    ENTER:

FREDERICK J. KAPALA
District Judge

8

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

| | | |
|---|---|---|
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) ) ) | |
| Plaintiffs/Counterclaimants, | ) ) | |
| v. | ) ) | Case Number: 3:12 – cv – 50324 |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) ) ) | Judge: Frederick J. Kapala |
| Defendant/Counterclaim Defendant, | ) ) | Magistrate Judge: Iain Johnston |
| 21 CENTURY SMOKING, INC., | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) ) ) | |
| Counterclaim Defendants. | ) | |

## DECLARATION OF THOMAS R. LEAVENS

I, THOMAS R. LEAVENS, of full age, certify and state the following, with are within my personal knowledge, to wit:

1.      I am an attorney at law in the State of Illinois, admitted in the Northern District of Illinois, a partner with the law firm of Leavens, Strand & Glover, LLC, and counsel for Defendants 21 Century Smoking, Inc. and Brent Duke (collectively referred to herein as "Defendants") in the above-captioned matter.

1

2.      I submit this declaration in support of Defendants' Response to DR Distributors, LLC's Motion for Leave to Amend Summary Judgment Motion.

3.      On January 18, 2013, Plaintiff DR Distributors, LLC served its First Set of Document Requests on Defendant 21 Century Smoking, Inc. I was involved with the preparation of the response to this document request and the collection of documents responsive to the request, with the assistance of the firm's associate attorney at that time, Heather Liberman. During the course of preparing the defense of the claims brought against 21 Century Smoking, Inc., I sat with Mr. Brent Duke as he disclosed certain electronically stored information for the company, which were produced to DR Distributors, LLC by 21 Century Smoking, Inc. as part of our initial document disclosure.  Included in that disclosure were certain documents that either referenced Mr. Duke's personal email account "BrentDuke@Yahoo.com" or were screenshots from that account.  At all relevant times, Mr. Duke had been advised to preserve any and all of his electronic records relative to the matter.

4.      Based upon information provided by 21 Century Smoking, Inc., 21 Century Smoking, Inc. served a Rule 26(a) disclosure to DR Distributors, Inc. on August 27, 2013, wherein we identified "three or four" computers located at the offices of 21 Century Smoking, Inc. as the location of 21CS's electronically stored information.

5.      Following the settlement conference between the parties held on August 25, 2014, counsel for the parties discussed various discovery matters, including conducting discovery of electronically stored information. Heather Liberman was the principal attorney in contact with counsel for DR Distributors, LLC, CB Distributors, Inc. and Carlos Bengoa (collectively "Plaintiffs") concerning these matters. These discussions were in accordance with the Proposed Case Management Order filed with the Court on September 3, 2014.

6.      Several months later, Heather Liberman resigned from Leavens, Strand & Glover, LLC to become the General Counsel of SXSW, Inc. in Austin, Texas, effective

December 31, 2014. Mr. Travis Life assumed the responsibilities of Ms. Liberman in this case, starting in mid-December, 2014.

*Note: In April, 2017, Leavens, Strand & Glover, LLC, changed its on-line cloud storage service providers. During the course of the change of providers, access to the email account of Ms. Liberman with the firm was lost. Further, on-line access to email messages for all attorneys of the firm for the year 2015 until mid-April, 2016 is currently unavailable, with the resolution of such access currently unknown. Therefore, the following statements have been prepared based upon my very best investigation and recollection, despite the fact that written information and materials may be incomplete.*

7.     On or about October 6, 2014, Ms. Liberman and Brian Gaynor, one of the attorneys for Plaintiffs, discussed e-discovery. Included in those discussions was the designation of search terms to be used by a third-party e-discovery vendor. On October 7, 2014, Ms. Liberman sent Mr. Gaynor the Defendants' proposed search terms. On November 5, 2014, Mr. Gaynor submitted proposed search terms on behalf of the Plaintiffs and on November 24, 2014, Ms. Liberman and Mr. Gaynor discussed the possibility of engaging the same third-party e-discovery vendor for the Plaintiffs and the Defendants. However, on November 26, 2014, Mr. Gaynor informed Ms. Liberman that "the electronic discovery process is underway for our client", and on December 1, 2014, that the Plaintiffs would be using their own third-party vendor. I do not believe a more formal e-discovery plan was entered between the parties.

8.     Following the disclosure that the Plaintiffs were moving ahead with their own e-discovery vendor, Leavens, Strand & Glover, LLC engaged a third-party e-discovery vendor called 4Discovery on behalf of the Defendants. I approved the selection of the vendor and Ms. Liberman coordinated the completion of the engagement agreement with the vendor. I also reviewed the search terms proposed by the Plaintiffs and approved them. The scope of the e-discovery search included four

computer hard drives that were used by Mr. Duke and others at 21 Century Smoking, Inc. It was Ms. Liberman's understanding that the scope of the search to be conducted by the vendor was consistent with the discussions she earlier had with Mr. Gaynor. She did not understand that any email accounts of Mr. Duke might be excluded from the search or believe that the e-discovery search might not pick up all of Mr. Duke's e-mail accounts. I also had the understanding that, while the search was of four computer hard drives, the search to be conducted by the vendor would be comprehensive, within the understanding discussed with Mr. Gaynor, and that no email account of Mr. Duke might be excluded. Further, neither Ms. Liberman nor I was advised by our third-party vendor that any type of email account might not be included in the results of the search it was conducting of the computer hard drives.

9.      The imaging of the four computer hard drives that were searched with the search terms was completed by approximately December 22, 2014, and the search of the imaged hard drives using the search terms submitted by the Plaintiffs was conducted shortly thereafter.

10.     During the summary judgment filings, I came to learn that Mr. Duke's personal *Yahoo.com* email address, BrentDuke@Yahoo.com, were not subject to search terms DR submitted. I have also come to learn that the reason for this is that Mr. Duke accessed this email account through a web browser. At no time was I or my team ever aware, nor were we advised by our e-discovery vendor, nor Plaintiffs or their e-discovery vendor, that this was an issue to watch out for or that might affect search results in the context of e-discovery and search terms.

11.     Since the last court appearance, we launched an investigation into why the Saraswat documents were not previously located. To that end, we obtained the login and passwords to the "BrentDuke@Yahoo.com" email account and directed 4Discovery to conduct a search of that account with the search terms previously used to search the imaged computer hard drives. 4Discovery conducted the search against this email

4

address and produced the hits to us. From that, my team has culled the responsive documents and are ready to produce them in accordance with the direction of this Honorable Court.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: May 14, 2018                                   /s/ Thomas R. Leavens

                                                      THOMAS R. LEAVENS

# EXHIBIT 3

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             WESTERN DIVISION

 3    DR DISTRIBUTORS, LLC,              )Docket No. 12 C 50324
                                         )
 4       Plaintiff-Counterdefendant,     )Rockford, Illinois
                                         )Tuesday, June 4, 2019
 5             v.                        )10:00 o'clock a.m.
                                         )
 6    21 CENTURY SMOKING, INC.           )
      and BRENT DUKE,                    )
 7                                       )
         Defendants-Counterplaintiffs,   )
 8                                       )
      CB DISTRIBUTORS, INC. and          )
 9    CARLOS BENGOA,                     )
                                         )
10       Counterdefendants.             )

11                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE IAIN D. JOHNSTON
12
      APPEARANCES:
13
      For the Plaintiff:          NICOLL, DAVIS & SPINELLA LLP
14                                (95 Route 17 South,
                                   Suite 316,
15                                 Paramus, NJ  07652) by
                                  MR. ANTHONY J. DAVIS
16
                                  ROBERT C. von OHLEN & ASSOCIATES
17                                (1340 Deerpath Road,
                                   Lake Forest, IL  60045) by
18                                MR. ROBERT C. von OHLEN, JR.

19    For the Defendants:         LEAVENS, STRAND & GLOVER, LLC
                                  (203 N. LaSalle Street,
20                                 Suite 2550,
                                   Chicago, IL  60601) by
21                                MS. HEATHER R. VANDYKE

22                                MANDELL MENKES LLC
                                  (1 N. Franklin Street,
23                                 Suite 3600,
                                   Chicago, IL  60606) by
24                                MR. THOMAS R. LEAVENS
                                  MR. PETER J. STRAND
25
```

```
 1    APPEARANCES: (Continued)    THE LAW OFFICE OF STEVEN S. SHONDER
                                  (1 E. Wacker Drive,
 2                                 Suite 2350,
                                   Chicago, IL  60601) by
 3                                MR. STEVEN S. SHONDER

 4                                LAW OFFICE OF PETER S. STAMATIS, PC
                                  (77 W. Wacker Drive,
 5                                 Suite 4800,
                                   Chicago, IL  60601) by
 6                                MR. PETER S. STAMATIS

 7                                SWANSON MARTIN & BELL, LLP
                                  (330 N. Wabash Avenue,
 8                                 Suite 3300,
                                   Chicago, IL  60611) by
 9                                MR. TRAVIS W. LIFE

10    Also Present:               MR. JOHN J. HOLEVAS
                                  MR. KEVIN SALEM
11                                MR. COLIN SMITH

12    Court Reporter:             Heather M. Perkins-Reiva
                                  327 S. Church Street
13                                Rockford, Illinois  61101
                                  (779)772-8309
14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1      (The following is from a tape-recording of proceedings:)
2           THE CLERK:  Calling 12 CV 50324, DR Distributors,
3   LLC, v. 21 Century Smoking, Inc.
4           THE COURT:  Of all days for Ms. Perkins-Reiva not to
5   be present, today is the wrong day, but she's next door, and
6   with the sheer number of attorneys we have, I'm pretty
7   confident someone is going to order the transcript.  So to
8   make her life easier, and to make your lives easier so you
9   don't have to review the transcript in detail if it is
10  ordered, make sure you state your name before -- or as soon as
11  you start talking, okay?
12          So let's get appearances starting on the Plaintiff's
13  side.
14          MR. von OHLEN:  Robert von Ohlen for the Plaintiff.
15          THE COURT:  Good morning.
16          MR. DAVIS:  Anthony Davis for Plaintiffs.
17          MR. STAMATIS:  Peter Stamatis, S-t-a-m-a-t-i-s, for
18  Defendant.
19          MR. SHONDER:  Steve Shonder for the Defendants.
20          MR. LIFE:  Travis Life, L-i-f-e, Defendants.
21          MR. LEAVENS:  Thomas Leavens on behalf of Defendants.
22          I would also like to acknowledge the presence of
23  Colin Smith, who, along with Tricia Rich, is representing
24  Mr. Strand, myself, and Ms. Liberman.
25          MR. STRAND:  Peter Strand for Defendants.
```

1              THE COURT:  Good morning, Mr. Strand.  I haven't seen

2    you for a while.  How are you?

3              MR. STRAND:  Not bad, your Honor.  How are you?

4              THE COURT:  I have been okay.  I was better before

5    this hit.

6              MR. STAMATIS:  If I may, your Honor, there is one

7    more lawyer in the room.

8              THE COURT:  Oh, I see at least one back there.

9              MR. STAMATIS:  Yes, several more.  The one I'm

10   speaking of is Kevin Salem, who is in the front row, and

11   seated next to Mr. Salem is Brent Duke.

12             THE COURT:  Okay.  Do you have a dog in this fight at

13   all, or are you just watching for --

14             MR. HOLEVAS:  Your Honor, I'm affiliated with some of

15   the counsel here.  It's just giving me a place to be outside

16   of the range of my office.

17             Good morning, your Honor.

18             THE COURT:  That's fine.  It's a public courtroom.

19   It's a public courtroom.

20             All right.  I heard Mr. Smith and then Ms. Rich.  Is

21   she hiding somewhere behind this army?

22             MR. SMITH:  No, she's not here today, your Honor.

23             THE COURT:  Okay.  I didn't know.  I have got a lot

24   of gray suits in front of me.  So okay.

25             Good morning, Mr. Smith.

```
 1              I think I probably said this in 2013 at some point.
 2   I know it is 2019.  I know Mr. Strand from Holland & Knight,
 3   and obviously Mr. Smith and Ms. Rich from Holland & Knight as
 4   well.  So just putting that out there.  Okay.
 5              MR. LEAVENS:  Excuse me, your Honor.  I'm not sure
 6   whether Heather Liberman was noted as --
 7              THE COURT:  She might be on the phone.
 8              MR. LEAVENS:  She's on the phone, yes.
 9              THE COURT:  Okay.
10              MS. VANDYKE:  Yes, your Honor.  Heather VanDyke is on
11   the phone.
12              THE COURT:  All right.  Good morning.
13              MS. VANDYKE:  Good morning.
14              THE COURT:  Okay.  And Mr. Bengoa is here?
15              MR. BENGOA:  Yes.
16              THE COURT:  Okay.  Bengoa.
17              And Mr. Duke.
18              Okay.  All right.  The first one filed, Mr. Stamatis
19   and Mr. Shonder filed their motion.  I've read it.  And then I
20   have read the other motions that have been filed.
21              Tell me what you want to tell me.
22              MR. STAMATIS:  Thank you, your Honor.
23              As Mr. Shonder and I were working on the response to
24   the motion for sanctions, the filing deadline, which is today,
25   we had asked our client to fly in from California and were
```

6

1    reviewing the motion with our client, and as we articulated in

2    the motion to stay, which we noticed up for today, we came to

3    learn in that meeting that the 21 Century Smoking e-mail,

4    corporate e-mail, did not reside on the four hard drives which

5    had been imaged back in 2014, and against that image, the ESI

6    discovery terms had been run against.

7         That came as a shock to Mr. Shonder and I in the

8    office, and for a number of reasons, particularly -- or one of

9    the reasons, I should say, is because in that ESI discovery

10   that had taken place against the computers, there had been a

11   myriad of e-mails produced.

12        In any event, after we concluded the meeting, we

13   undertook to disclose it immediately to the court.  We also

14   undertook to contact an ESI company, Elijah, which is not the

15   company we previously used.  That was called 4Discovery.

16        THE COURT:  You used -- okay, you used 4Discovery

17   before.  Okay.

18        MR. STAMATIS:  Yes.  So this is Elijah.  We hired

19   them.

20        THE COURT:  Have they done any work yet?

21        MR. STAMATIS:  Yes.

22        THE COURT:  And I apologize for interrupting you.

23   Okay.

24        MR. STAMATIS:  Yes, your Honor.

25        So when Mr. Duke landed in California, he got them

7

 1    the passwords.  They immediately downloaded e-mail accounts

 2    from -- which apparently are hosted at GoDaddy.  GoDaddy is

 3    apparently where these were saved up in the cloud.  There has

 4    been previously -- so they had been previously -- there had

 5    been e-mails, apparently, saved on the hard drive, but the

 6    e-mails for the 21 Century Smoking employees reside,

 7    apparently, in the cloud.

 8           So they downloaded them or they are downloading them

 9    now, as Mr. Shonder just told me.  We have sent them the

10    search terms as well, with the idea that Elijah, once it

11    downloads everything, would run the search terms and create a

12    production.

13           We filed the motion to stay because there are a lot

14    of allegations that were made in the motion for sanctions,

15    that, frankly, many we can respond to, but there are many or

16    several that bring that GoDaddy account into play.  So we had

17    thought the proper thing to do would be to just stay the

18    briefing on this, let the production happen, get the documents

19    to counsel for Plaintiff, who then would go through them.

20    Having litigated against Plaintiff's counsel for several years

21    now, I had a feeling they would be amending their motion,

22    which from my perspective they should do and should be

23    entitled to do, and we could then fulsomely respond to all

24    that.

25           We share -- Mr. Shonder and I, and I know other

1  counsel here -- the frustration of the court and of

2  Plaintiff's counsel with regard to this.  We are sorry about

3  it happening.  And one of the things that's particularly

4  frustrating is that, in our view, Mr. Duke has a really strong

5  case, and one that should be decided on the merits, and it's a

6  shame that this e-discovery -- or that these accounts were not

7  searched back in '14, and et cetera, et cetera, that were in

8  the morass of this e-discovery.

9        The following morning, Mr. Shonder and I filed our

10  motion to withdraw, which your Honor has, to withdraw our

11  representation in the case completely.  After that, and

12  counsel can speak to that, Attorney Leavens and Peter Strand

13  and Ms. Liberman and Mr. Life have all filed their own motions

14  to withdraw, which I know your Honor has seen.

15        Given that and given your Honor's order, Mr. Salem is

16  here today.  Mr. Salem, Kevin Salem, who we had introduced

17  earlier, is an attorney who had represented Mr. Duke in the

18  coverage action, in the Northern District, Eastern Division,

19  before, I believe it was, Judge Shah.  So he's familiar with

20  the case to the extent that he litigated it in the coverage

21  matter and has been representing Mr. Duke in that.  He has not

22  filed an appearance in the case, but is appearing, and I

23  believe would like to address your Honor if your Honor would

24  entertain that.

25        THE COURT:  Oh, I will be glad to hear him.  I don't

9

 1   know if he really wants to step up, but you keep going.  I

 2   would be wearing a flak jacket if I were him.

 3          But go ahead, Mr. Stamatis.

 4          MR. STAMATIS:  So with regard to the response brief,

 5   we worked through the weekend to try to have a response brief

 6   for today:  Friday, Saturday, Sunday, Monday.  We just kept

 7   going.  And last night, I came to the conclusion that I really

 8   don't think we can file anything today given all these e-mails

 9   that are out there that potentially haven't been viewed in the

10   case.

11          So I will leave it at that and ask that the briefing

12   on this be stayed, as I had said, so the Elijah production can

13   go forward.  If our motion to withdraw is granted, Mr. Duke

14   can get new counsel to represent his interests vis-à-vis the

15   case and this issue.  We are happy to work with new counsel to

16   get them up to speed and to help them get going in the case to

17   the extent that that's desired and necessary.

18          And there is also an issue with regard to I know the

19   insurance company is going to have an interest in what's

20   happening, Diamond State, relative to the case and the motion.

21          I would just conclude by saying that I would be

22   hard-pressed to say there shouldn't be a sanction on this.

23   What I will say is that it's my view that this is a case that

24   ought to be decided on its merits, despite that.

25          And so that's all I have at this time, your Honor.

1    THE COURT:  Okay.  Before I hear from anybody else on

2    the defense side, just so I'm crunching the numbers correctly,

3    the response brief is due today or tomorrow?

4    MR. STAMATIS:  Today, your Honor.

5    THE COURT:  Today.  So that would make it 6/4.

6    The motion to stay was filed on May 30th, and it

7    references a meeting the prior afternoon.  So I will do the

8    high-level math and say that meeting was on May 29th.

9    MR. STAMATIS:  Yes, your Honor.

10    THE COURT:  Okay.  So you have got a 75-page

11    tour de force motion for sanctions, and there is a meeting

12    one, two, three, four, five, six days before the response

13    brief is due.

14    You know where I'm going with this, right?

15    MR. STAMATIS:  I'm sorry, your Honor?

16    THE COURT:  You know where I'm going with this?

17    MR. STAMATIS:  Well, I do.  There have been

18    communications with the client.  The client resides in

19    San Diego, so we communicate with the client via telephone and

20    other technological means.

21    The point of the meeting was just to tell you it was

22    in that meeting that we learned of this fact.

23    THE COURT:  Okay.  Okay.  Hold on one second.

24    Okay.  That will be a question for Mr. Salem.

25    Hold on.  I'm checking to see if I have any other

11

1    questions for you.

2         I do have the big question that I will save for the

3    end.

4         Okay.  Before the searches were run by Elijah, was

5    there -- it's in the cloud, so you can't image the cloud.

6    That would be interesting.  I answered my own question.

7         All right.  Thank you, Mr. Stamatis.

8         MR. STAMATIS:  Thank you, your Honor.

9         THE COURT:  And anybody else over there want to talk?

10        MR. SHONDER:  Well, Judge, I did just want to say

11   that as part of the astonishment that we felt is because, as

12   you recall, in the summary judgment motion, there was issues

13   raised about e-mails from various people, and we went to the

14   client, we got documents.  All those documents were from

15   Yahoo!, right?  And then we went back and found out that, oh,

16   the Yahoo! was not subject to the cloud and --

17        MR. STAMATIS:  The ESI.

18        MR. SHONDER:  It was not subject to the ESI, right.

19   It wasn't part of that search.

20        THE COURT:  Well, they weren't on the hard drive.

21        MR. SHONDER:  They weren't on the hard drive.

22        THE COURT:  They weren't on the CPUs.

23        MR. SHONDER:  Right.

24        THE COURT:  Right?  Because they were Yahoo! Chat,

25   which were saved elsewhere.

12

1          MR. SHONDER:  Well, the Yahoo! Chat is different.

2          THE COURT:  Okay.  That's a whole other --

3          MR. SHONDER:  But the e-mail, though --

4          THE COURT:  -- disaster.

5          Go ahead.

6          MR. SHONDER:  But the e-mail are on, you know, a

7   Yahoo! server somewhere.

8          THE COURT:  All right.

9          MR. SHONDER:  And so they weren't on the computers.

10         So we wanted to make sure that there was no other

11  e-mail out there, and so we had the e-mail that had been

12  produced from, like, 21century.com, all this stuff.  There

13  was -- you know, the client was telling us that some of that

14  stuff had been auto-deleted and the other counsel were telling

15  us that that stuff had all been searched.

16         So I know when your Honor says, "You know, you just

17  met with the client six days before then."  I was mystified as

18  to some of the allegations that were made in the motion for

19  sanctions about, like, these other e-mails had not been

20  produced, and that's sort of how we got to it.

21         But in my mind, you know, I thought that at least the

22  company e-mail had been subject to the ESI back in 2014.  I

23  mean, it should have been, and nobody had said anything about

24  it before.  Then we got the client in, then sort of all the

25  blood rushed out of my body when I found that out.

13

1        So I just wanted to add that perspective for you.

2        THE COURT:  Okay.  Go ahead.  Anybody else want to

3   chime in?

4        Again, I'm going to save the big question for down

5   the road.

6        But just a point of factual clarification:

7   Responsive documents, meaning responsive e-mails, were

8   produced pursuant to a search of the hard drives, correct?

9        MR. STAMATIS:  That's correct, your Honor.

10       MR. SHONDER:  Yes.

11       THE COURT:  So riddle me this, Batman:  How are there

12  responsive e-mails on a hard drive and in the cloud at the

13  same time?  How do you not capture them?

14       MR. SHONDER:  Go ahead.

15       MR. STAMATIS:  So I think I understand.

16       THE COURT:  Okay.

17       MR. STAMATIS:  Because I asked the same question.

18       THE COURT:  Great minds think alike.

19       MR. STAMATIS:  I appreciate that.

20       I believe what happened was at the beginning of the

21  litigation, Mr. Duke had sat down with Mr. Leavens and

22  Ms. Liberman, and they had -- before the ESI, and counsel can

23  address this, but at that time, "We need e-mails about this,

24  we need e-mails about this, we need e-mails about this,"

25  confusion, whatever it was, and then Mr. Duke, then, had

14

```
1    obtained those and downloaded them and saved them onto his
2    computer in a folder or something -- this is my
3    understanding -- so that when the search terms were run
4    against those computers, those were the hits.  It's a lot of
5    e-mails.  There were -- as your Honor -- this is the rare
6    trademark action where likelihood of confusion is not at issue
7    because there were countless confusion e-mails and other
8    e-mails.  That's how I understand it today, and so those were
9    the hits.
10           THE COURT:  Okay.
11           MR. STAMATIS:  Anybody want to add anything to that?
12           MR. SHONDER:  No.
13           THE COURT:  And that does make some sense, but it
14   begs a thousand more questions, including the painfully
15   obvious one, which is if the process started in 2014, and it
16   was, "Oh, we need to download these e-mails off of the cloud
17   and save them onto a hard drive somewhere, in 2014, somebody
18   sure knew that these e-mails were responsive e-mails, e-mails
19   relating to this case, and confusion is part of it, but not
20   the whole case.  They were in the cloud.  Why between 2014 and
21   end of May 2019 was there never an epiphany of, "Wow, there is
22   a boatload of e-mails or there may be a boatload of e-mails in
23   the cloud where we downloaded them in 2014"?
24           Did that question ever come up?
25           MR. LEAVENS:  Your Honor, this is Tom Leavens.
```

1          THE COURT:  And if so, was there an answer?

2          MR. LEAVENS:  The only thing I do want to add is that

3    it was my understanding that starting with our Rule 26(a)

4    disclosures where ESI information, complete ESI information,

5    was contained, it was contained on these computers, and that

6    was our understanding when we submitted those hard drives of

7    the computers to 4Discovery for the search.

8          That was our understanding, that the e-mail for the

9    company existed on those computers.  It is not inconsistent

10   with my experience on a personal level as far as even

11   something like an AOL account or so may exist on a cloud, but

12   it can also be stored locally.

13         THE COURT:  It can.

14         MR. LEAVENS:  Yes, it can.

15         THE COURT:  It doesn't mean it is the only place it's

16   stored.

17         MR. LEAVENS:  So the search that was done at that

18   time was done with that understanding on my part.

19         As far as the others, I was astonished to learn that

20   that was where those -- the e-mail was maintained.

21         THE COURT:  The astonishment that happened, was it

22   lessened at all because we have seen this movie before with

23   Comcast and the chats, that those were stored in the cloud?

24   This is the second -- this is part two.

25         Did somebody go, "Wow, you did this before"?  Maybe

1  it makes it worse.  Actually, it doesn't make it a lesson.

2  Maybe it is "Holy cow, it's happening again."

3         Why didn't we think about that when we were here

4  months ago talking about Yahoo!, and then somebody didn't go

5  back and say, "Just to make sure, before the Plaintiff's

6  launch into their 75-page motion, there were documents stored

7  in a cloud on Yahoo!.  Let's make sure there aren't any other

8  documents stored in a cloud"?

9         Now, I know hindsight is 20/20, but did that ever

10 happen?

11        MR. SHONDER:  Yes, last Wednesday is when that

12 happened, unfortunately.

13        But as I had explained, our mindset was that that

14 issue was resolved because we had been told that these e-mails

15 had been searched as part of the computer.

16        MR. STAMATIS:  Yes.

17        And so if I may, your Honor?

18        THE COURT:  Sure.

19        MR. STAMATIS:  Peter Stamatis.

20        So when the Yahoo! e-mails came out regarding

21 Ms. Saraswat, and then we figured out that, "Gosh, Yahoo!

22 hasn't been searched," I made the statement, "Look, this

23 stuff, we got one shot at this.  This can't come out drip,

24 drip, drip."  What could be worse than drip, drip, drip?

25        THE COURT:  The first rule is crisis management:  You

1   get all the bad news out at once, and all the good news, you

2   drip it out, yes.

3           MR. STAMATIS:  Yes, and --

4           THE COURT:  Have all other devices been searched:

5   cell phones, old cell phones, legacy systems, other hard

6   drives, computers at home, a CPU buried in somebody's closet

7   somewhere, whatever is on North Ashland, at Ashland and North

8   Avenue, next to the Hollywood Diner?  That place, was it

9   scrubbed?  Bring your own device.  I know it is his company

10  and all.

11          Was that all done?  Because that's usually step one,

12  "Bring me your stuff."

13          Do we know if there is anything else out there?

14          MR. STAMATIS:  I'm not willing to make that

15  representation.

16          THE COURT:  Okay.  That's a fair answer.

17          Okay.  Anything else on my left side and your right?

18          Yeah, why don't you step up.

19          MR. SALEM:  Good morning, your Honor.

20          THE COURT:  Come on in.  The water is fine.

21          MR. SALEM:  Well, I'm not wearing a flak jacket, but

22  I understand the court's frustration, and the reason I'm

23  here --

24          THE COURT:  I don't know if you know the level, but

25  go ahead.

1          MR. SALEM:  I certainly don't.  I was -- I

2     started -- my phone started ringing about 6:00 o'clock Friday

3     when I was at dinner with my wife.

4          THE COURT:  Okay.

5          MR. SALEM:  So, you know, my familiarity with the

6     case is because I have litigated the coverage issue and have

7     just sort of participated or assisted in the communications

8     between underlying counsel and the adjuster and outside

9     counsel for the insurance company.

10          Current counsel is Peppers counsel.  They are

11     independent counsel, okay?

12          My concern today is to protect Brent Duke's interests

13     because he has four attorneys who are all seeking to withdraw.

14     So effectively, I'm concerned that he has no representation

15     before this court.  I have not appeared.  I am not

16     sufficiently familiar with the matter, so I don't want to make

17     factual statements.  I want to make sure that any

18     attorney-client privileged communications remain privileged

19     until I can figure out what's going on.

20          I also am trying to get up to speed on this.  You

21     know, my goal is to represent Brent Duke, preserve his -- you

22     know, do what's in his best interests, which is to minimize

23     the -- to avoid the sanctions motion defeating his

24     counterclaim because my understanding is that's exactly how it

25     is being used, okay, is that the ultimate sanction they are

1    seeking is to dismiss his counterclaim, which my understanding

2    is a very good claim based on first use and exposes the other

3    side to significant damages, okay?

4            I am not in a position -- I don't believe that

5    anything was intentionally done improper in discovery.  That's

6    different than they just didn't do well enough and they are

7    going to be sanctioned.  I'm not sure what happened.

8            THE COURT:  What's your experience in ESI?

9            MR. SALEM:  It has developed over time.  I have taken

10   some of the classes.  The Seventh Circuit is very good at

11   running those.  Okay.

12           THE COURT:  Thank you.

13           MR. SALEM:  And I was not real -- and my

14   understanding, just factually, was that Peter Stamatis and

15   Steven Shonder were not involved in the ESI discovery at the

16   beginning.

17           THE COURT:  Okay.

18           MR. SALEM:  And the only reason I'm saying that is

19   ideally I would like to, depending on whether or not they

20   perceive it, and after investigation, I'm trying to avoid my

21   client losing all four of his lawyers and somebody else having

22   to get up to speed.  I don't think that does anybody any good.

23           THE COURT:  Okay.  And that was going to be my

24   question.  And I don't want to minimize this, but you are

25   coverage counsel, right?

1          MR. SALEM:  I do coverage.  I do commercial

2  litigation.

3          THE COURT:  Okay.  But you -- when I say "you are

4  coverage counsel," I'm not just saying your work is limited to

5  insurance defense coverage or coverage.  But for Mr. Duke,

6  your engagement was coverage counsel, right?

7          MR. SALEM:  Right, yes.

8          THE COURT:  So did you look at the insurance policy

9  and look at the allegations in the complaint and compare the

10  two and say, "Coverage applies and litigate that," because

11  that's what coverage counsel does, or were you more intimately

12  involved?

13          MR. SALEM:  No.  It was -- actually, your Honor, it

14  was when -- I believe the way it came about was during

15  settlement conference with you.  You asked how the heck the

16  insurance company was covering this, which led the insurance

17  company to file a dec action and to try to undue their

18  declaration of coverage.  That's what was litigated in front

19  of Mr. Shah.  The current status is there was found to have a

20  duty --

21          THE COURT:  Or Judge Shah.

22          MR. SALEM:  I'm sorry, your Honor, Judge Shah.

23          There was found to be a duty to defend.  Okay.  They

24  were defending under a reservation of rights originally, and

25  so it is Peppers counsel.

1           And so if these four attorneys withdraw, Mr. Duke, I

2    believe, but I don't know yet, would ultimately be provided

3    additional -- yes, more independent counsel, but I don't know

4    what would happen, okay?

5           The insurance company only found out about this --

6           THE COURT:  And I can't remember.  Who is the

7    carrier?

8           MR. SALEM:  It is Diamond State, your Honor.

9           THE COURT:  Oh, that's right.  Mr. Stamatis just

10   mentioned that.

11          MR. SALEM:  So my involvement was as a coverage

12   attorney, not in discovery issues.

13          THE COURT:  Right.

14          MR. SALEM:  I have been aware that this is going on.

15   I was aware from talking to counsel of the Yahoo! issue.  I

16   knew nothing -- I found out about the motions to withdraw and

17   the motion to stay Friday evening when my phone started

18   ringing, okay?  And my concern and the reason I'm here is I

19   don't believe Brent, Mr. Duke -- you know, I'm concerned that

20   there is four attorneys who believe they have a conflict and

21   are seeking to withdraw.  So I want to make sure somebody is

22   representing Brent's interests.  I don't want attorney-client

23   privilege defeated.  I'm concerned that the issue -- or the

24   factual issue everybody wants to know is exactly how this

25   occurred, okay?

    1            THE COURT:  Why?

    2            MR. SALEM:  And why it occurred.

    3            THE COURT:  Why, why, why.  Three question marks and

    4    three exclamation points.  How?

    5            MR. SALEM:  I would like -- what I would hope to do

    6    on behalf of my client is that I would like to get a better

    7    feel for exactly what happened vis-à-vis the original

    8    discovery to determine whether or not we might keep at least

    9    two of the attorneys.

   10            THE COURT:  They want out.

   11            MR. SALEM:  Hmm?

   12            THE COURT:  They want out.

   13            MR. SALEM:  Well, but I have had discussions --

   14            THE COURT:  It is highly unlikely when an

   15    attorney -- when I get, as my friend Jeff Krause says, "a

   16    noisy withdraw," that I'm going to keep them in.

   17            MR. SALEM:  I don't want to interfere with the

   18    court -- I'm not in this case currently.

   19            THE COURT:  It is a 2012 case.

   20            MR. SALEM:  Yes, I am not in this case yet, and I

   21    don't know if I ever will be, okay?

   22            My concern was, again, Mr. Duke, I don't believe,

   23    has -- when you have got four lawyers seeking to withdraw, I

   24    don't believe he has representation.

   25            THE COURT:  Okay.

23

1          MR. SALEM:  I trust all four lawyers not to do
2    anything against their client's interests, but there is either
3    an actual or potential conflict.  He is entitled to
4    un-conflicted counsel.
5          I wanted to figure out whether or not, at least as to
6    Peter Stamatis and Steve Shonder, who were not involved in the
7    original e-discovery -- so I think any potential conflict due
8    to that -- that they would be of much use to whoever comes in
9    next, okay?  And ideally, if they were willing to consider it,
10   which I believe they may be based on my discussions, and we
11   were sure it wasn't a violation of their conflict rules, I
12   would love to keep them on behalf of the client, so that
13   whoever moves this case forward, we don't lose their
14   knowledge.  They are the ones who have been most active in
15   dealing with the sanctions motion and seeking discovery.  For
16   me to call the new e-discovery people and start trying to get
17   up to speed on this is going to be difficult, me or the next
18   lawyer.
19         So what I was hoping was, for me, I would love it if
20   we could get a seven-day continuance, at least as to the
21   withdraw motions for Mr. Stamatis and Mr. Shonder, assuming
22   they agree to that.  I don't have a problem, and I'm not
23   saying anybody did anything wrong.  It is just that because
24   Mr. Leavens and Ms. Liberman or Liebman -- I'm sorry -- and
25   Travis Life, Mr. Life, were the fact witnesses to the relevant

24

1    time period, I think them withdrawing may be the best solution

2    for my client.

3           THE COURT:  Those gentlemen are fact witnesses now,

4    too.

5           MR. SALEM:  Excuse me?

6           THE COURT:  Those gentlemen behind you are fact

7    witnesses now, too, because they were at the meeting, and they

8    had the shock --

9           MR. SALEM:  They are fact witnesses, but here is the

10   thing --

11          THE COURT:  Oh, if you don't think we are not going

12   to have an evidentiary hearing where I'm going to bore down to

13   the core of this thing and cross-examine people on my own to

14   figure out how this thing went so haywire, in a 2012 case,

15   that I had been trying to move since 2013, you have mistaken

16   me, because I am going to ask a lot of very difficult

17   questions.

18          MR. SALEM:  I understand, your Honor, and that is

19   okay.  I mean, obviously, it is okay.  You are free to ask and

20   investigate and run your courtroom.

21          I still -- you know, the facts are the facts.

22   Attorney-client communications are attorney-client

23   communications.  So I want to make clear that I'm not saying

24   you can't -- or I understand you questioning the client,

25   Mr. Duke, once he has counsel to adequately represent him in

25

1    any such questioning.

2          THE COURT:  If there is going to be counsel for him,

3    I would highly recommend having counsel who has experience or

4    knowledge of criminal law as well.

5          But go ahead.

6          MR. SALEM:  I acknowledge your statement, your Honor,

7    and that's another reason to -- you know, that I would be

8    requesting, on behalf of Mr. Duke, time for him to obtain

9    counsel, given the court's statement, that don't believe they

10   have a conflict.

11         Whether or not Mr. Stamatis and Mr. Shonder withdraw

12   today or you grant the motion, I'm still going to or whoever

13   comes in is still going to have to work with them, and the

14   communications between them and Mr. Duke and other counsel are

15   still privileged, and I'm not saying that you can't ask your

16   questions and they can't answer.  I just don't know what those

17   are yet, okay?  And I haven't had a chance to investigate.

18         So, you know, I will end this now, which is I do not

19   want the court to do anything that would adversely affect

20   Mr. Duke right now because I don't believe he has --

21         THE COURT:  That's a tough, tough question, a tough

22   ask on your part, because from my perspective, where I'm

23   sitting right now, this is a disaster of his own making, and

24   so you are asking me to make sure I protect the person who

25   caused this.

1          MR. SALEM:  Your Honor, I don't know the facts

2     sufficient -- I understand that the court has every right to

3     charge his case and his side with -- you know, sanction his

4     side for what happened, even if he is not at fault for it, and

5     it is his attorneys, but I'm not sure what the facts are yet.

6     I understand the court's frustration, but I am not aware of

7     facts that support your current view that it is his fault, and

8     I'm not saying you are not aware of them.  I am not aware of

9     them.

10          Okay.  I'm not here to justify improper conduct by my

11     client if it occurred --

12          THE COURT:  The facts as we know them are discovery

13     was not produced, ESI was not produced, despite requests for

14     it, despite -- and I'm not being hyperbolic here -- years of

15     fighting over this stuff.

16          MR. SALEM:  And there is a duty to supplement.  I

17     understand, your Honor.

18          THE COURT:  Don't talk to me about a duty to

19     supplement.  It is a duty to produce, and produce it when it's

20     requested, and not to hide it, and not to bury your head in

21     the sand and make up a bunch of weak excuses about "I didn't

22     know."

23          I don't know how anybody -- and I'm going to get to

24     the bottom of this -- how anybody can reasonably say, the week

25     before the response is due, "Oh, attorneys, that's what you

27

1   are looking for.  It is all up in the cloud."  I will be glad

2   to hear that testimony because that's what these motions say,

3   right?  That's what they say.  So that's big trouble.

4         So here's my best advice to you:  Stop digging a hole

5   because you are deep already.  I understand your point about

6   Mr. Duke and making sure Mr. Duke's interests are protected.

7         MR. SALEM:  Thank you.

8         THE COURT:  He has got four attorneys -- actually, I

9   think it is five with counsel on the phone, who have filed

10  motions and leaves to withdraw to get out of this thing.  So

11  he is not represented right now, and the extent of his

12  problems are astronomical.  So I will make sure his interests

13  are protected.

14        MR. SALEM:  Thank you, your Honor.

15        THE COURT:  So I understand that.

16        MR. SALEM:  I apologize.  I --

17        THE COURT:  You are coming into a hornet's nest, and

18  I understand that.  The hornet's nest -- I never kicked the

19  nest.  I got the nest handed to me, okay?

20        Anybody else want to say anything?  Probably not.

21        Good.

22        MR. SALEM:  Thank you, your Honor.

23        THE COURT:  Go ahead.

24        MR. von OHLEN:  This is Robert von Ohlen for the

25  Plaintiffs, for the benefit of the court reporter.

28

1          Good morning, your Honor.

2          We oppose the motion to stay.  Not in the papers nor

3     anything I heard today was there any articulation of good

4     cause shown to grant such a motion at the eleventh hour, which

5     would only delay the day of reckoning for the Defendant and

6     their counsel for what the court has called "counsel's

7     troubling and disturbing conduct in this case."

8          The timeline of events illustrates both the Defendant

9     and defense counsel's failures and misrepresentations, all of

10    which have now unquestionably prejudiced the Plaintiff in this

11    case.  At this juncture, such failures and misrepresentations

12    are legion, and they are documented in Plaintiff's motion for

13    sanctions, and at some point, there will have to be a

14    supplementation based upon what we have heard today.

15         I highlight only a couple of key events along this

16    chaotic journey because those events relate to the pending

17    motions today.

18         Your Honor has said that the case was filed in

19    September of 2012.  The Defendants filed their counterclaim

20    shortly thereafter.  The very seed of Defendants' discovery

21    failures starts with defense counsel's admitted and

22    inexplicable failure to issue a litigation hold letter to

23    their client.  Your Honor knows that such a letter would give

24    very specific instructions about not only paper documents, but

25    data anywhere where it may be found and instructing the

1    preservation.  I say "inexplicable" because I don't understand

2    to this day why it didn't occur.

3         But we know that this seed spawns what now appears to

4    be an endless series of failures about the collection,

5    preservation, and, frankly, the diligence of the searches for

6    records in this case.  Despite countless court conferences in

7    this case, defense counsel have told the court that -- and

8    these words are quotes from the transcripts -- "Nothing has

9    been withheld," "Diligent searches have been made," "No stone

10   was left unturned," and the very last one, that they were

11   "doing everything in their power to provide all responsive

12   documents."  Those were taken from the court conferences in

13   the last year and a half.

14        What we have learned, and not only from today, but

15   time and time again, this was hyperbole.  It was beyond

16   hyperbole.  It was misrepresentation.

17        As the court will recall, we raised concerns about

18   the suspicious deficiencies by the Defendant and his attorneys

19   in Plaintiff's motion for summary judgment, which was filed on

20   January 15th, 2018, and that's an important timeline even

21   because we pointed out in that motion the inexplicable

22   irregularities and contradictions about the scope of documents

23   produced and those that were withheld and those that should

24   have existed.

25        So that issue was front and center when they received

30

1    service of our brief, at the very latest, January 15th, 2018.
2    Of course before then, there had been motions to compel, there
3    had been requests, but when somebody says that they have
4    produced everything, you must accept them.  You take
5    depositions.  They say they have produced everything.  You
6    must accept it.  They make representations in open court.  You
7    must accept them, and you then proceed, and you say whether or
8    not it makes sense that those documents don't exist.
9            They knew that on January 15th, 2018, at the very
10   latest.  That was followed by defense counsel's -- and you
11   mentioned -- "moments of epiphany," by a moment of epiphany by
12   counsel Travis Life in March of 2018 and the subsequent
13   disclosure of 112 pages of documents of what now appear to be
14   very carefully curated and handpicked documents that were
15   produced by defense counsel to Plaintiffs on the very day that
16   Defendants filed their response brief, and that date was
17   March 19th, 2018.  If an alarm bell should have gone off, it
18   should have been then.
19           The court may recall Mr. Stamatis's representations
20   in the following status conference about Plaintiff's claims
21   and missing documents.  He stated, and I will use these as
22   quotes again, that Plaintiff's claims were "manufactured,"
23   Plaintiff's claims were "insignificant," Plaintiff's claims
24   were "untrue," and your Honor will find those statements at
25   Docket No. 233 at Page 22.

31

1        He also went on to say at the status conference that

2    Plaintiffs were pursuing a "road to nowhere" and that the

3    March 19th production proved that there was "no smoking gun,"

4    that there was "nothing there," and took the issue of missing

5    e-mails "off the table."

6        Your Honor will find all of Mr. Stamatis's statements

7    to that effect at Docket No. 249, Pages 21 and 22.  Defense

8    counsel's statements were more than advocacy.  They were

9    misrepresentations to the court regarding the diligence of the

10   searches and mischaracterization of the findings.

11       I hear constantly from the other side of the aisle

12   here the very careful word of "It was my understanding."  "It

13   was my understanding," several counsel used it in their

14   presentation, and we know, as very experienced lawyers, that

15   that word means something.  It means "I'm not really making

16   any representation at all.  I don't know anything."

17       All of this led to us filing our initial motion for

18   sanctions on April 6th, 2018, another important date on the

19   timeline.  We asked for sanctions, and we asked for leave to

20   amend our motion for summary judgment.  At a subsequent court

21   conference on April 17th, your Honor warned defense counsel

22   that their efforts to explain and defend their discovery

23   deficiencies had "better be really good and supported by an

24   affidavit."  Your Honor's statement was at Docket No. 249,

25   Page 23, Lines 17 through 19.

32

1           Rather than explaining their conduct and supplying

2      the court with a sworn affidavit requested by your Honor,

3      Defendants' counsel explained that these newly produced

4      documents, meaning the 112 pages, and yet a larger set of

5      newly discovered, but not yet produced documents, were

6      inconsequential to either the pending motion for summary

7      judgment or the motion for sanctions because the court was

8      assured by Mr. Stamatis, who reviewed those documents, he

9      assured the court both in writing and in open court, that

10     those documents "did not support any of Plaintiff's claims."

11     He also claimed that Defendants' late production was

12     "excusable, substantially justified, and harmless."

13          Next, the Defendants produced a cache of 15,000-plus

14     documents on May 31st, 2018, that had been withheld and that

15     should have been produced years before.  Your Honor may recall

16     that you afforded us some time to make an initial review.  We

17     made an initial review and appeared before your Honor on

18     August 14th to give you our report.  I stood here for a very

19     long time, and at the conference, I gave the court and the

20     other side a very detailed, heads up, chapter and verse, with

21     citations, of the problems, at least the problems we had

22     discovered at that point.

23          So when I hear today that they need more time, all of

24     those problems on August 14th, 2018 -- well, I won't say all

25     the problems because we discovered many more, but at least the

1   four that I brought to the court's attention have been known

2   for a very long time.  Frankly, they should have been known

3   when they reviewed their own documents.

4          At that conference, your Honor may recall, that we

5   identified e-mails that referenced the Yahoo! Chat exchanges

6   between Mr. Duke and his SEO consultant, Kirti Saraswat, that

7   had never been produced or identified as a source of ESI.

8   Despite the court giving the Defendants additional time to

9   produce those documents, they never were located, and are now,

10  admittedly, spoliated.

11         That was also the court conference where your Honor

12  advised Defendants that their conduct was both "troubling and

13  disturbing" -- no, excuse me, that was your minute order where

14  you said that, minute order at Docket No. 274, dated

15  October 28th, 2018.

16         After it had been discovered that the Yahoo! Chat

17  documents had been spoliated, the court convened a status

18  conference on January 29th, 2019.  At that conference,

19  Plaintiff's counsel reported to the court that the motion for

20  sanctions was all but finished, except for the addition of the

21  Yahoo! Chat issue.  At that conference, Mr. Stamatis again

22  stood before you, and he stated the following:

23         "Let's get the motion filed.  We went back.  We

24  looked.  We submitted all of this to your Honor.  Let's get on

25  with it.  We will respond fulsomely and get the facts before

1    the court.  We want to move this along.  We will give accurate

2    facts and respond to their allegations."

3            Mr. Stamatis's comments and representations can be

4    found at the transcript of the January 29th, 2019, hearing at

5    Pages 12 through 14.

6            The court ordered the Plaintiff to submit a renewed

7    and combined motion for sanctions of no more than 75 pages and

8    that we should do that by March 25th.  Mr. Stamatis was asked

9    how much time he needed to respond, and he was given all the

10   time that he requested, 71 days to and including today.

11           As the court already noted, 65 days after receiving

12   Plaintiff's motion for counsel, and of which none of the

13   issues should have been a surprise to Defendants' counsel

14   given the fact we already filed one motion for sanctions and

15   had numerous status conferences outlining other issues, we

16   were told, with astonishment, that yet more documents were out

17   there and had been withheld, and that further delays and

18   expense to my client are required so that Defendant may get

19   new counsel, review the documents, transmit them, et cetera.

20           At this stage, we suggest that the court cannot take

21   Defendant or his counsel's statement at face value given that

22   most of the prior explanations, excuses, and assurances have

23   been demonstrably false.  We note that, as in the past, and

24   this is pretty important, that there is nothing in this

25   application for stay under oath.  There is no explanation

1   provided by Defendants' counsel regarding the circumstances

2   surrounding this latest revelation, why it took so long and

3   why there is irrevocable conflict.

4           Whether or not this is another litigation tactic or

5   the culmination of gross malfeasance, gross misfeasance, the

6   impact of granting an extension of time is the same:  It keeps

7   moving consideration of the issue of sanctions down the road,

8   and it costs the Plaintiff, who is here in open court, more

9   legal fees, and it delays the administration of justice.

10          We believe that our motion for sanctions is rock

11  solid and the reasons to sanction Defendant and their counsel

12  are pretty strong and pretty clear, but if they are not, they

13  should illuminate that in their response.

14          We request that the court deny the motion for stay

15  and order the Defendants to immediately file their response to

16  our renewed motion for sanctions.  I have not heard any good

17  cause, and if their cause is they want to do us a favor and

18  let us read the new stuff, we decline that offer.

19          But we also request that the Defendants immediately

20  produce this new cache of withheld documents in both native

21  and paper format at Defendants' expense.  Depending upon the

22  size, the scope, and the import of those documents, we may

23  seek the court's permission to include a discussion of those

24  latest documents in a subsequent either motion or a supplement

25  refiling in conjunction with our motion for sanctions.

1        And now -- with regard to the motion for stay, that's

2    our position, and then I just want to speak very briefly to

3    the motion to withdraw.

4        THE COURT:  Okay.

5        MR. von OHLEN:  As the court may recall from the

6    invited defamation issue regarding Mr. Edmiston at a Las Vegas

7    convention, there is a pattern developing in this case.  It is

8    when the Defendant is caught in a lie and that lie appears to

9    be supported by counsel, either their actions or inactions,

10    the strategic response is to cut and run, as it was with

11    Defendants' failed motion to voluntarily dismiss its

12    defamation claim.

13        We are now, admittedly, seven years down the road in

14    this case, and I think that defense counsel are finally

15    pulling their heads out of the sand with regard to the

16    deficiencies in discovery, but we alerted them to these things

17    years ago.  It just seems especially convenient for defense

18    counsel and inconvenient for the court and the parties that

19    they would now jump ship en mass, especially after collecting

20    seven years' worth of fees in this case.

21        While we very much respect that the court must drill

22    down on its own to determine the ethical obligations at issue,

23    we simply request that whatever order is issued by your Honor

24    with respect to the motions to withdraw that it states that

25    the court will continue to maintain its jurisdiction over all

```
1    defense counsel, over all their firms, who have been of record
2    in this case, and that such individuals and such firms will
3    remain under the court's jurisdictional umbrella as it relates
4    to the imposition of sanctions and the perpetration of
5    testimony as it relates to any issue in this case.
6              If you have any questions, your Honor, we would be
7    happy to entertain them, but that's all we have.
8              THE COURT:  Okay.  Mr. Gaynor, anything?
9              MR. DAVIS:  It is Mr. Davis.
10             THE COURT:  I'm sorry.
11             MR. DAVIS:  That's okay.
12             THE COURT:  I'm looking right at this.  "Gaynor" is
13   the first one on the list.  I'm sorry.
14             Mr. Davis, go ahead.
15             MR. DAVIS:  Your Honor, I am speechless about what is
16   occurring with Defendant and Defendants' counsel in this case.
17   We have raised this years ago, and all it has done is caused
18   extreme expense, delay, prejudice to our client, and to date,
19   despite you asking the other side to answer, they never have.
20   We still have no -- even today, we have no answers as to what
21   they did or how they did it.
22             I think when the court reads our motion, and we spent
23   a ton of time because I'm aware of the court's view from the
24   oft-quoted -- I think it is -- Dunkel case, where it is not
25   the court's job to root through the farm and for the pigs to
```

1   find the truffles.  It is our job to bring it to the court.

2   And over the last year and a half, we have spent an

3   extraordinary amount of time and energy looking at all of the

4   excuses, explanations, and looking at what Defendants and

5   their attorneys did in this case previously to square that up

6   against their explanations and their excuses, auto-forwarding,

7   auto-purging, auto-deleting, it was on hard drives, it is in

8   the cloud.

9          The court will not be surprised to learn that the

10  reason our briefing was so extensive -- we asked for 100

11  pages, you gave us 75 -- we have more stuff.  We couldn't fit

12  it in.  It will be in the reply.  They will be unable to

13  answer it because it is all made-up fiction.

14         I can't implore this court more to look at our papers

15  because to hear them stand here and say that they have got

16  this good case, when the documents before them, upon

17  objective, reasonable inquiry, under Rule 11 would require

18  counsel to withdraw these claims, it's astonishing to me, and

19  we are going to continue down this path, but my client has

20  incurred hundreds of thousands of dollars in fees since the

21  moment this issue arose because we have had to try and

22  understand their misrepresentations, their made-up excuses,

23  and go back and look at hundreds and -- not hundreds, but

24  thousands and thousands of documents and e-mails.

25         But it is one thing to go through a set of documents

1    and another thing to go and say, "Well, when were those

2    produced, and who produced them, and what was in it?"

3              "Oh, wait, that's a selective production of documents

4    from a bigger set.  How did that occur?"

5              And we will be more than ready at any evidentiary

6    hearing to help this court, but, again, at great expense to

7    our client to prepare because these are not one or two or

8    three issues.

9              As we have said at the prior hearing, when what we

10   kind of got focused on was an ESI issue, and as we outlined in

11   detail in our pending motion for sanctions at Docket 294, the

12   list of rules that are in play here from court orders, summary

13   judgment motion rules, we listed them before.  I'm happy to do

14   it.  It is in our brief.  To hear the things I have heard

15   today, to try and explain to a client what's happening, to

16   hear a new attorney say, "I don't want my client to get hurt,"

17   when for years it has been withholding documents, obfuscation,

18   false stories that all demonstrably are false in our motion

19   for sanctions, we need an answer to that.

20             I ask on behalf of my client that the court directs

21   Defendants and their counsel to file affidavits,

22   certifications explaining their conduct in this case.  To

23   date, we don't have that.  Whether it is an evidentiary

24   hearing, that's fine, too, but someone has to answer the call

25   on this.  This isn't just a few e-mails that weren't produced.

40

1  It is false stories, false representations, withholding

2  documents, and you will see the story about "We didn't know

3  things were online."

4         I ask for the opportunity to submit a supplemental

5  document with attachments to that, documents from their own

6  production, from early in this case, that are screenshots of

7  all of Mr. Duke's online accounts, and in the search bar of

8  his Yahoo! account, of his -- I forget exactly, but there is

9  four or five online accounts produced in 2013.  It is a

10  screenshot showing it's online, and the search terms, "Kirti,"

11  "SEO," someone was doing that work.  Someone knew these were

12  online accounts and this data was there.

13         To say today, six years later, "I didn't know the

14  difference, I didn't know it wasn't on the hard drive, this

15  online stuff is news to me," please let me file that.  I will

16  have it filed by Friday.  We have it ready and prepared for a

17  reply.  You will -- if you read our motion --

18         THE COURT:  What do you want to file?

19         MR. DAVIS:  I want to file --

20         THE COURT:  Because I will be honest with you, I

21  haven't read your motion yet.  I have been burned more than

22  once on this case reading things that then I didn't have to

23  read.

24         MR. DAVIS:  Understood.

25         THE COURT:  And I have a lot of cases, and I can't

41

1   lose time.  I just -- and you can't make up time, right?  I

2   don't have a DeLorean with a flux capacitor.

3         MR. DAVIS:  Understood, your Honor.  Thank you.

4         THE COURT:  There is nothing I can do on that.  Okay.

5         But if there is something you want me to read

6   relating to this, there is motions pending, and we can talk

7   about it.

8         MR. DAVIS:  We stand on our motion, your Honor.

9         THE COURT:  Okay.  All right.  Thank you, Mr. Davis.

10        I will let you speak in a moment.  I'm busy pulling

11   up the rule of professional responsibility.

12        1.16(d), as in dog:  "Upon termination of

13   representation, a lawyer must take steps to the extent

14   reasonably practicable" -- only lawyers use that word -- "to

15   protect a client's interests, such as giving reasonable notice

16   to the client, allowing time for employment of other counsel,

17   surrendering papers and property to which the client is

18   entitled, and refunding any advance payment of fee or expense

19   that has not been earned or incurred.  The lawyer may retain

20   papers relating to the client to the extent permitted by other

21   law."

22        It wasn't cited in the motion, but there was a motion

23   to stay piggybacked with a motion to withdraw.  I think

24   Mr. Stamatis and Mr. Shonder were doing what the rule of

25   professional responsibility required them to do, which is if

42

1   they want out of this nightmare, the rule of professional

2   responsibility 1.16(d) requires them, on the way out the door,

3   to protect their client's interests, and I assume that's what

4   was going on there to some extent.

5          MR. LEAVENS: Your Honor, if I might ask if I can be

6   heard?

7          THE COURT: Sure.

8          MR. SMITH: I mean, there are serious 1.6 issues here

9   about client confidentiality also that the parties are

10   attempting to respect.

11         THE COURT: Okay.

12         MR. SMITH: That, of course, is part of why I'm here.

13         THE COURT: When you say "the parties," who are you

14   including in "the parties"?

15         MR. SMITH: I mean treating the lawyers as parties

16   from my standpoint.

17         THE COURT: Okay. I haven't drilled down into all

18   kinds of things, but at some point, the facts are going to

19   have to come out, right?

20         Look, it is 11:13. This is not the first time that

21   this case has been the only case on the motion call, the civil

22   motion call, at 10:00 o'clock and has bled into the

23   11:00 o'clock criminal call where I have got AUSAs, CJA panel

24   attorneys who are billing out at their very paltry rate, but

25   are still entitled to get paid. Private defense counsel,

43

1   family members, they all use this building and use this

2   courtroom and use my time and my staff's time and the court's

3   resources.

4          Let's not forget that the amount of time spent on

5   this case because of these issues alone prevents me from

6   addressing their cases and their matters and their families'

7   cases and matters.  It is not just you.  It is not all about

8   you.  It is about them.  All right.  So everybody who uses

9   this courtroom is entitled to get their fair time in.

10         The issues relating to the ESI in this case doesn't

11  just hurt Plaintiffs, when there is no doubt that they have

12  been prejudiced.  I bill an annual flat rate.  I don't bill by

13  the hour anymore.  It doesn't matter to me.  My staff, I let

14  them go at reasonable times, hopefully.  But I can't make up

15  for them, all those people in the back of the courtroom, all

16  those Social Security appeals that are sitting in my chambers

17  that I can't work on, all the other matters, all the discovery

18  matters, all those things.  The ESI disaster that occurred in

19  this case affects all that.  So I can't forget that, and let's

20  not forget that.

21         What was your billing just for the motion itself, the

22  latest motion, not all the other things, and renewed motions

23  and the summary judgment; just for that docket entry, just for

24  the motion for sanctions that this is now interfering with?

25         MR. von OHLEN:  The motion for sanctions, of course,

44

 1    started with the initial motion.

 2           THE COURT:  Right, correct.

 3           MR. von OHLEN:  So it is starting from that date,

 4    which was, approximately, the beginning of April 2018.

 5           THE COURT:  Yes, I have got that.

 6           MR. von OHLEN:  And then I will turn it over to

 7    Mr. Davis, but that's -- since I'm in charge of the timeline,

 8    that's what I recall was the revelations were made by then

 9    that there were more documents on March 19th, and that we

10    presented the motion for sanctions on April 6th, which would

11    mean that sometime between March 19th and April 6th, we

12    started working.  I don't know what the specific day was.

13           But we do -- Mr. Davis is prepared to speak in

14    response to your request for our billing records.

15           THE COURT:  Okay.

16           MR. DAVIS:  Your Honor, and the line from your minute

17    order, we assembled all of our records back to May of 2018

18    because, as Mr. von Ohlen just noted, the summary judgments

19    were filed and briefed January, February, March, and then

20    really in April, Docket 294 is the culmination --

21           THE COURT:  Right.

22           MR. DAVIS:  -- of everything we have been doing from

23    that date forward.  So that's the date forward.  I assembled

24    all of our bills, totaled them up.  I got Mr. von Ohlen's

25    local counsel bills.

```
1              So if that's what the court is asking, from that date
2      through -- well, it wouldn't -- this wouldn't include the May
3      time, but the total for our firm and for Mr. von Ohlen is
4      $880,000 in fees, and I brought with me the detailed billing
5      records showing every minute and hour of time that my firm and
6      the attorneys that work with me and Mr. von Ohlen's records
7      with me to provide to the court.  I would ask that those be
8      delivered to you as Judge's eyes only.  Attorney-client
9      privilege preservation would be my ask.
10             THE COURT:  Hold on.  I will take a look at them
11     later.  You can hold on to them now.  At least you have got
12     them set aside.
13             So that would have been from just about May of 2018
14     to getting that docket entry on file; that's what that would
15     encompass?
16             MR. DAVIS:  That's correct, your Honor.
17             THE COURT:  $880,000.  Okay.
18             Okay.  Let's see if I have any other questions for
19     you before I throw it back over to Mr. Stamatis.
20             Hold on.
21             Okay.  Go ahead, Mr. Stamatis.
22             I mean, if you want to talk, you can talk.  I'm not
23     making you talk.  I have some questions.  But tell me what you
24     want to tell me.
25             MR. SHONDER:  Well, Judge, I would just like to
```

1   comment on the magnitude of the brief that the Plaintiffs

2   filed and really what it contains.  The problem that we have

3   in filing a response is that -- because it does affect the

4   dynamics.

5           But with respect to some of the individual points

6   that they raise, I can tell you, Judge, one of the things that

7   they bring up is a gentleman named Brian Scott, who apparently

8   is on his way to the joint for some securities fraud, as I

9   understand it.  And I hate to use that phrase, but

10  unfortunately, I'm just going to give you my understanding of

11  what we were going to say, and that is he was cleaning houses

12  during the day, and then the money made, he would sweep at

13  night.  So since he is kind of a wheeler-dealer -- I mean, he

14  is going to jail for securities fraud.  So he is

15  probably a -- you know, I don't want to stereotype -- conman.

16          So he wants to publish some book online, and he gets

17  this Webrecsol company to help him, and Mr. Duke does some

18  work, and there is a chat in which Mr. Duke basically says

19  that he doesn't know what he is doing, and he is just putting

20  words that this guy gave him into a template.

21          So from that, Defendants say, "Well, this shows that

22  Mr. Duke has a deep understanding and knowledge of computer

23  coding."  That's very overblown.  And when the man gets out of

24  the federal penitentiary, he, not surprisingly, does not call

25  himself Brian Scott.  He goes by Brian Kos then.  And I think

47

1   we can all understand why somebody who just got out of the
2   penitentiary might want to do that.
3           THE COURT:  How do you spell Kos?
4           MR. SHONDER:  K-o-s, your Honor.
5           THE COURT:  All right.
6           MR. SHONDER:  So Mr. Kos is working in a tent like
7   outside some festival, and he does a press release, and in the
8   press release, he puts in the URL for 21 Century Smoking, and
9   from that, the Plaintiff says that he is a key figure in
10  search engine optimization and that withholding this document
11  was designed to show -- to hide Mr. Duke's deep knowledge and
12  understanding of SEO, but it doesn't show any of that, and our
13  response would detail a lot of this overreaching that they are
14  doing.
15          So if they are going to come up with an $800,000
16  bill, there is a lot of, you know, overreaching that went into
17  it, when they are just really throwing everything because they
18  know they have got us on the run here, right?  So just
19  everything that they have got, they are going to throw at us.
20  I can understand it, but it doesn't necessarily make it right.
21  So sorry if I'm excited.
22          This is one of the examples that we come up with.  So
23  that's another reason why I was so astounded when I found out
24  that these documents were out there because I thought we had a
25  really good explanation for a lot of the things that they

48

1  said, and now I'm shot in the foot.

2         THE COURT:  Maybe now your explanations aren't going

3  to be so good when all the documents are pulled off of the

4  GoDaddy.

5         MR. SHONDER:  Well, that's another problem that I

6  have.

7         THE COURT:  In my notes from when Mr. Stamatis was

8  talking, I wrote down somewhere here that the process of

9  drafting a response was not complete, obviously, but the

10 drafting process had been undertaken.

11        How far along is the response to Plaintiff's motion

12 for sanctions?

13        MR. STAMATIS:  Here it is.

14        THE COURT:  Okay.  That doesn't mean anything to me

15 because it could be 80 pages and be 5 percent ready to be

16 filed.  It could be 5 pages and be 100 percent.

17        How far along is it to completion, to being file

18 ready?

19        MR. STAMATIS:  We would have filed it today.  It was

20 our intention to file it today.  There has been a ton of work

21 put into this, and a lot of the work has been dealing with

22 this kind of thing that Mr. Shonder just described.

23        I don't know how we finish it.  I thought we could

24 finish it.  I don't know how we finish it with all those

25 e-mails out there and the conflict.  That's an issue that I

49

1   have been really wrestling with and came to the conclusion

2   last night that I don't think we can.

3           But if your Honor ordered us to, we would race back

4   and file something today.  I don't think that's fair to

5   Mr. Duke.  I don't know that in your mind you think Mr. Duke

6   is entitled to fairness.

7           THE COURT:  Everybody is entitled to fairness.

8           MR. STAMATIS:  Okay.  So I don't think it's fair.

9           THE COURT:  But what's fair?

10          MR. STAMATIS:  I think from my perspective, you have,

11  as Mr. Salem said, an individual -- Mr. Shonder and I had

12  moved to withdraw, and then other lawyers had moved to

13  withdraw, too.  So you have lawyers who believe that they are

14  conflicted, and then you have then still our client, because

15  we haven't been let out of the case, he has another lawyer

16  with whom he is consulting, but that lawyer is not able to do

17  this.

18          We have a ton of work into this, but given the

19  conflict, I wouldn't want to be -- I have been accused of a

20  lot of things here.  I wouldn't want to be accused of somehow

21  doing something in here by, perhaps, the client, saying that,

22  "Oh, you guys wrote that to protect yourselves."  It is not

23  what we are doing, but who knows.

24          So I have a -- and then how can I, as a lawyer -- and

25  here we are.  We are here.  Steven -- Mr. Shonder and I are

1   here alone now.  And there is other counsel, but here we are.

2   So it is all -- apparently, it is all on me now.

3          But how am I to submit this to your Honor without the

4   GoDaddy, and that I just learned about last week, and present

5   it to your Honor as fulsome?

6          So I have an obligation to -- I have ethical

7   obligations.  I have obligations to the court.  I have

8   obligations to the client and obligations to myself and my

9   family.  So please forgive the emotion, but I don't know how

10  we file it until this other work is done.

11         I understand what they are doing, okay?  A lot of the

12  things in the motion are not true, and we have gone through

13  meticulously, too, line by line.  "Wait."  We are saying,

14  "Wait.  They are saying this says this?  This doesn't say

15  this."

16         THE COURT:  It's in your opinion, they are untrue,

17  based upon the information you currently possess?

18         MR. STAMATIS:  Yes, your Honor, yes.

19         THE COURT:  God knows what's in those GoDaddy

20  accounts.

21         MR. STAMATIS:  Well, how can I file this?

22         THE COURT:  I'm not -- I'm not -- I haven't gotten to

23  that question yet.

24         MR. STAMATIS:  Okay.  So, yes.

25         And so your Honor asks me, "Are there other e-mails

51

1    out there?"  I don't know.  How can I answer that?

2              So here we are, so hence the motion to stay, and the

3    motion to -- and the motion to stay.  And Mr. Shonder is

4    right.  You know, they smell blood in the water, whatever it

5    is.  Their client is a junior user.  It has been articulated.

6    It has been ruled upon.  And we have established in our

7    summary judgment motion that was stricken a bad faith junior

8    user, a junior user of a mark, when they knew Mr. Duke,

9    operating out of the living room of his house, was selling

10   e-cigarettes using the same name, and he went ahead anyway.

11             So I look at that, and I say, "Geez, why is that

12   fair?  Why is that fair?"

13             But here we are in this morass, as your Honor said,

14   this e-discovery nightmare.

15             I have a duty to Mr. Duke as his lawyer, but I -- so

16   what percentage is it done?  Before the e-discovery, before

17   the GoDaddy, your Honor, I would say it was 85 percent on

18   Wednesday.  That's my estimate.  After the GoDaddy, I have no

19   idea.  I don't know what I don't know at this point.

20             So when I heard about it, I just walked out of the

21   office, and I walked down, and I'm at the corner of Wacker and

22   State, and the building that says "Kemper" on the top, and I

23   walked out, and I crossed the street, your Honor, and I stared

24   at the river, and I said, "What the heck?"

25             THE COURT:  Anything else?

52

1          You're itching to say something.  I can tell.

2          MR. STAMATIS:  Okay.

3          THE COURT:  But anything out of that side, from

4   defense side?

5          Okay.  Mr. Smith, anything?  I know you don't have an

6   appearance in, but you are here.

7          MR. SMITH:  Yes.  No, not at this time.

8          THE COURT:  Okay.  Mr. Davis, Mr. von Ohlen,

9   anything?

10          MR. von OHLEN:  A couple quick things.

11          One, they want to restrict this to ESI.  When you

12   read the motion, you will see that it is not only ESI.  It is

13   testimonial issues that result from not having documents,

14   perjury that has occurred, other issues, damage issues that

15   all have impact.

16          So while you might just say, "Oh, if they had only

17   done a better job ESI-wise," there was an effort, there had to

18   be an effort, by somebody to hide.  There had to be.  You just

19   can't, you know -- I don't know if you are one of those people

20   that believe in coincidence after coincidence after

21   coincidence.  I don't.  I don't believe that you get three or

22   four coincidences back to back.

23          As to what your Honor said, of course you are here to

24   be fair.  You are here to be just.  And we hear a lot of talk

25   about what's fair to Mr. Duke, and at the very least, you

53

1  don't even have to read between the lines about we know why

2  attorneys withdraw, and they don't give any explanation other

3  than irretrievable, irreconcilable.  We can read between those

4  lines.

5        So you have somebody coming to court here saying,

6  "Oh, gee, whiz, I'm going to be prejudiced."  But one, at some

7  point, has to, and unfortunately, you are the guy who has to

8  say they've caused the prejudice.  As a result, justice and

9  fairness demands that the prejudice be stopped to my client,

10  who is 800 -- never mind what occurred before the 800,000, but

11  those bills have been paid, and he deserves some justice, too,

12  your Honor.

13        THE COURT:  Okay.  Let's play a game of what-if.  Say

14  parts of your motion are granted.  You kind of ring of bell,

15  and I enter an order, and you are saying Mr. Duke needs to pay

16  north of seven figures.  Do you believe Mr. Duke has the

17  wherewithal to pay a sanction award north of seven figures, or

18  are you mostly looking to the merits, the bad faith, the

19  actual claims, the merits of it?  Because a sanction award for

20  dollars ain't much of a deterrence or a benefit to you or your

21  client if it doesn't get paid.

22        MR. von OHLEN:  Of course you're right, an

23  unenforceable judgment is not very valuable, but to answer the

24  key question, as you know, there are many cases out there

25  which say when this level of lack of diligence and

54

1    participation in this mess, courts hold both the party and the

2    attorneys responsible, and you may have to get these people

3    under oath to get to the bottom of that, whatever it takes.

4              But you can't just stick your head in the sand and

5    say: "I have a judgment-proof client.  I will go beyond my

6    role as officer of the court, go beyond the zealous advocate,"

7    and start making representations about searches and documents

8    and good faith and accusing people like myself of

9    manufacturing issues.  You can't do that as an officer of the

10   court and not stand and take your medicine when you are

11   completely wrong.

12             So the answer is that's why we ask you to hold these

13   gentlemen in, for purposes of jurisdiction.  If you let them

14   out as advocates, they need to be available for the court to

15   impose whatever justice you determine is appropriate, perhaps,

16   after an evidentiary hearing.

17             Secondly, the other sanctions available to your Honor

18   are to strike the counterclaim --

19             THE COURT:  Right.

20             MR. von OHLEN:  -- to strike their answer and have us

21   in for a one-day prove-up on damages, which may or may

22   not -- every litigant faces the possibility of unenforceable

23   judgments.  To be honest, I don't know what Mr. Duke has or

24   doesn't have.

25             THE COURT:  All right.  Look, it is a great debate

1    among civil procedure and ESI geeks like me about whether

2    attorneys' fees are recoverable under 37(e).  Having said

3    that, I know that you previously -- again, I haven't read the

4    motion, but you previously said it is not just 37(e).  It is

5    1927.  It is Rule 11.  It's a myriad --

6              MR. von OHLEN:  It is all in the motion, chapter and

7    verse.

8              THE COURT:  It is all in there.  It is like Prego.

9              Okay.  Here is what we are going to do -- thank you

10   for your time.

11             Anything else?  It is your motion, so you get the

12   last word.  If there is anything else you think I need to

13   know, tell me.

14             Okay.  All right.  I will enter an order on the

15   motions, and we will go from there.

16             And we are going to take a quick break, and then I

17   will have my 11:00 o'clock call.

18             MR. LIFE:  Your Honor, I apologize.

19             THE COURT:  See, that's why I ask if there is

20   anything else to say, and no one ever takes me up on that.

21             MR. LIFE:  I'm sorry.  I'm sorry, your Honor.

22             This is Travis Life.  I also have my motion to

23   withdraw that is set for Thursday.

24             THE COURT:  All right.  The presentment is struck.

25             MR. LIFE:  Thank you, your Honor.

56

```
 1              THE COURT:  Okay.

 2              MR. LEAVENS:  Your Honor, I'm sorry, but I just

 3    wanted to bring your attention to the motion by Heather

 4    VanDyke for withdraw.  I think at this point, she has been

 5    inactive on the case for four-and-a-half years.

 6              THE COURT:  Okay.

 7              MR. LEAVENS:  And I know it is set for Thursday, but

 8    could we have --

 9              THE COURT:  I will strike the presentment, but I'm

10    not letting anybody out of this case until I figure out what

11    went so horribly, terribly, awfully wrong, okay?

12              MR. von OHLEN:  Your Honor asked us in the minute

13    order to bring our billing records.  Do you want us to leave

14    those with the court now?

15              THE COURT:  No, you can hold on to them now.  Just

16    make sure you've got them preserved, and we will figure out

17    what we do with them, okay?

18              Okay.  I wanted to know the number.  That was the

19    key.

20              MR. von OHLEN:  Okay.  And just so I understand, you

21    are done with us today, your Honor?

22              THE COURT:  I'm done with you today because there is

23    a lot of people back there that have got to do some other

24    things with their lives.

25              MR. SALEM:  And you are going to rule on the motion
```

57

```
 1   to stay as well, correct?

 2            THE COURT:  I'm going to rule on everything --

 3            MR. SALEM:  Thank you, your Honor.

 4            THE COURT:  -- not right now.

 5            I'm going to think about some things.  Okay.

 6            All right.  Last chance:  Anything else you want to

 7   tell me?

 8            Let's take a break.

 9            MR. von OHLEN:  Thank you, your Honor.

10            MR. STAMATIS:  Thank you, your Honor.

11     (Which were all the proceedings heard.)

12                          CERTIFICATE

13     I certify that the foregoing is a correct transcript from

14   the digital recording of proceedings in the above-entitled

15   matter to the best of my ability, given the limitations of

16   using a digital-recording system.

17

18   /s/Heather M. Perkins-Reiva          June 7, 2019

19   _____      _____
     Heather M. Perkins-Reiva                Date
20   Official Court Reporter

21

22

23

24

25
```

# EXHIBIT 4

From: Brian Gaynor [mailto:BGaynor@ndslaw.com]
Sent: Wednesday, November 05, 2014 5:31 PM
To: Heather R. Liberman
Cc: Anthony Davis; Thomas R. Leavens
Subject: RE: Discovery

Heather,

Attached please find the supplemental documents we received from our client concerning customer return memos, from 2012 to Sept. 2014. They are bates stamped DRSTCS 1604-3036. They second .pdf file will be sent in a separate email.

The following is a list of search terms we would like you to use for purposes of electronic discovery:

21ST CENTURY SMOKE
DR Distributors
CB Distributors
Carlos Bengoa
Bill Edmiston
Adam Olcott
Kunz
Four Seasons Distributors
Google AdWords
Meta
Keywords
Trademark(s)
Webrecsol
Zencart
Automatic Cigarettes
Chris Ligutan
Jason Chris
Robert Hough
Brandon Duke

With regard to Mr. Hewes' emails, we have reached out to him about this, but we have yet to hear back from him. We will continue trying to contact him.

ND&S  ... ...  SPINELLA LLP  |  NDSLAW.COM
New Jersey | New York
_____
Founder of the NJ Corporate Compliance Roundtable  |  ComplianceNJ.com

Case: 3:12-cv-50324 Document #: 234-8 Filed: 03/19/18 Page 2 of 6 PageID #:10288

*Brian M. Gaynor*
*Nicoll Davis & Spinella LLP | 95 Route 17 South | Paramus, NJ 07652*
*450 Seventh Avenue | New York, NY 10123*
*voice: 201.712.1616 Ext. 216 | fax: 201.712.9444*
*email: bgaynor@ndslaw.com*
*website: www.ndslaw.com*

**From:** Heather R. Liberman [mailto:hliberman@lsglegal.com]
**Sent:** Monday, November 03, 2014 12:26 PM
**To:** Brian Gaynor
**Cc:** Anthony Davis; Thomas R. Leavens
**Subject:** RE: Discovery

Brian,

We anticipate spending about 3 hours on the Kunz deposition this Friday. However, depending on what you have planned it may take longer. I also want to follow-up with you on the discovery issues I mentioned in my October 7th email below. We are still waiting on your list of electronic discovery search terms, the supplemental documents you said you received from your client on October 14th, and the email messages from Martin Hewes. When should we expect these materials?

Best,

**Heather R. Liberman**
**Associate**
Leavens, Strand & Glover, LLC
203 N. LaSalle Street, Suite 2550
Chicago, IL 60601
hliberman@lsglegal.com
312-488-4168 (Direct)
312-488-4170 (General Office)
312-488-4177 (Fax)
917-446-7932 (Mobile)
**Web Site:** www.lsglegal.com
**Facebook:** /LSGALegal

This message is for the designated recipient only and may contain privileged, proprietary or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any dissemination, distribution, copying or any other use of this message is strictly prohibited.

**From:** Brian Gaynor [mailto:BGaynor@ndslaw.com]
**Sent:** Thursday, October 16, 2014 3:36 PM
**To:** Heather R. Liberman
**Subject:** FW: Discovery

**ND&S** NICOLL DAVIS & SPINELLA LLP | _NDSLAW.COM_
New Jersey | New York

_Founder of the NJ Corporate Compliance Roundtable_ | _ComplianceNJ.com_

**Brian M. Gaynor**
_Nicoll Davis & Spinella LLP | 95 Route 17 South | Paramus, NJ 07652_
_450 Seventh Avenue | New York, NY 10123_
_voice: 201.712.1616 Ext. 216 | fax: 201.712.9444_
_email: bgaynor@ndslaw.com_
_website: www.ndslaw.com_

**From:** Brian Gaynor
**Sent:** Wednesday, October 15, 2014 12:55 PM
**To:** 'Heather R. Liberman'
**Cc:** Anthony Davis; Thomas R. Leavens
**Subject:** RE: Discovery

Heather,

As an update, we are working on dates for Mr. Kunz' deposition. As you are aware, Mr. Kunz is not our client, so we are not in regular contact with him. I should have available dates for you by the end of the day tomorrow.

With regard to the documents referenced in Ms. Hill's deposition, our client forwarded documents to me last night, which I am in the process of reviewing.

I also received your supplemental discovery. Would you be so kind as to forward me copies in Word format? Thank you.

**ND&S** NICOLL DAVIS & SPINELLA LLP | _NDSLAW.COM_
New Jersey | New York

_Founder of the NJ Corporate Compliance Roundtable_ | _ComplianceNJ.com_

**Brian M. Gaynor**
_Nicoll Davis & Spinella LLP | 95 Route 17 South | Paramus, NJ 07652_
_450 Seventh Avenue | New York, NY 10123_
_voice: 201.712.1616 Ext. 216 | fax: 201.712.9444_
_email: bgaynor@ndslaw.com_
_website: www.ndslaw.com_

Case: 3:12-cv-50324 Document #: 234-8 Filed: 03/19/18 Page 4 of 6 PageID #:10290

**From:** Heather R. Liberman [mailto:hliberman@lsglegal.com]
**Sent:** Wednesday, October 15, 2014 10:25 AM
**To:** Brian Gaynor
**Cc:** Anthony Davis; Thomas R. Leavens
**Subject:** RE: Discovery

Brian, I am writing to check-in with you on the list of outstanding discovery issues I mentioned below. If you can't get us answers to all of the issues at once, please at least let us know about dates that you are not available for Kunz's deposition. We plan to notice up that deposition within the next day or two. Best, Heather

**Heather R. Liberman**
**Associate**
Leavens, Strand & Glover, LLC
203 N. LaSalle Street, Suite 2550
Chicago, IL 60601
hliberman@lsglegal.com
312-488-4168 (Direct)
312-488-4170 (General Office)
312-488-4177 (Fax)
917-446-7932 (Mobile)
**Web Site:** www.lsglegal.com
**Facebook:** /LSGALegal

This message is for the designated recipient only and may contain privileged, proprietary or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any dissemination, distribution, copying or any other use of this message is strictly prohibited.

---

**From:** Heather R. Liberman
**Sent:** Tuesday, October 07, 2014 9:36 AM
**To:** bgaynor@ndslaw.com
**Cc:** adavis@ndslaw.com; Thomas R. Leavens
**Subject:** Discovery

Brian,

I'm following-up on our call yesterday. Below is a list of the discovery issues we discussed. I look forward to your feedback.

    1.    We compiled the following list of search terms we would like you to use for purposes of electronic discovery, please send us your search terms as soon as possible:
        a.   21centurysmoking.com
        b.   21stcenturysmoking.com
        c.   21ecigs.com
        d.   Brent Duke
        e.   21 Century Smoking
        f.   Blackjack
        g.   Roulette
        h.   Big Slick

Case: 3:12-cv-50324 Document #: 234-8 Filed: 03/19/18 Page 5 of 6 PageID #:10291

h.  Big Slick

2.  We are selecting the date to continue the deposition of Donald Kunz.  Do any of the following dates <u>not</u> work for you:

    a.  October 13-16
    b.  Oct 20-22
    c.  Nov 3-7
    d.  Nov 10-11
    e.  Nov 20-21
    f.  Dec 1-4
    g.  Dec 8-12

3.  During her deposition, Jill Hill mentioned a file cabinet containing documents related to customer returns (see page 57 of the deposition).  Please indicate whether you would like us to review those documents on your client's premises or if you will be producing them to us by some other means.

4.  During his deposition, Martin Hewes indicated that he forwarded emails to his personal email address (gmail and/or xnet) from his CB Distributors email account and copied himself on his personal email account(s) in connection with correspondence to and from an individual in China (see pages 77, 79, and 80 of the deposition).  Please confirm that you will obtain copies of the emails referred to by Martin, and let us know when we should expect copies of the same.

5.  Finally, let us know whether your client will be forwarding Leavens, Strand & Glover, LLC the fee for copying the documents ($1,329.14).

Best,

**Heather R. Liberman**
**Associate**
Leavens, Strand & Glover, LLC
203 N. LaSalle Street, Suite 2550
Chicago, IL 60601
hliberman@lsglegal.com
312-488-4168 (Direct)
312-488-4170 (General Office)
312-488-4177 (Fax)
917-446-7932 (Mobile)
**Web Site:** www.lsglegal.com
**Facebook:** /LSGALegal

This message is for the designated recipient only and may contain privileged, proprietary or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any dissemination, distribution, copying or any other use of this message is strictly prohibited.

Case: 3:12-cv-50324 Document #: 234-8 Filed: 03/19/18 Page 6 of 6 PageID #:10292

DRSTCS
2832-...B).pdf

# EXHIBIT 5

Case: 3:12-cv-50324 Document #: 253-2 Filed: 05/14/18 Page 1 of 4 PageID #:12342

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

| | | |
|---|---|---|
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) ) ) | |
| Plaintiffs/Counterclaimants, | ) ) | |
| v. | ) ) | Case Number: 3:12 – cv – 50324 |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) ) ) | Judge: Frederick J. Kapala |
| Defendant/Counterclaim Defendant, | ) ) | Magistrate Judge: Iain Johnston |
| 21 CENTURY SMOKING, INC., | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) ) ) | |
| Counterclaim Defendants. | ) | |

## DECLARATION OF TRAVIS W. LIFE

I, TRAVIS W. LIFE, of full age, certify and state to the following, which is within my personal knowledge:

1.      I am an attorney at law in the State of Illinois, admitted in the Northern District of Illinois, a partner with the law firm of Leavens, Strand & Glover, LLC, and counsel for Defendants 21 Century Smoking, Inc. and Brent Duke (collectively referred to herein as "Defendants") in the above-captioned matter.

1

2.       I submit this declaration in support of Defendants' Response to DR Distributors, LLC's Motion for Leave to Amend Summary Judgment Motion.

3.       On December 14, 2014, I accepted a position with the law firm Leavens, Strand & Glover, LLC.  At this time I started to become acquainted with the case *DR Distributors, LLC v. 21 Century Smoking, Inc., et al.*  Discovery had already commenced, the parties had exchanged search terms for e-discovery, each party had engaged their own e-discovery vendor to perform searches on their clients' computers, and Defendants' e-discovery vendor, 4Discovery, had imaged Defendants' computers.

4.       On or about December 19, 2014, 4Discovery searched the images from Defendants' computers.

5.       Through the months of January and February of 2015, I reviewed the documents identified from 4Discovery's search.

6.       The responsive documents were sent to Plaintiffs on February 25, 2015.

7.       In April, 2017, Leavens, Strand & Glover, LLC, changed its on-line cloud storage service providers. During the course of the change of providers, access to email messages for all attorneys of the firm for the year 2015 until mid-April, 2016 is currently unavailable, with the resolution of such access currently unknown. Therefore, the following and above statements have been prepared based upon my memory and records, but admittedly upon information and materials that may be incomplete.

8.       On January 15, 2018, I learned, for the first time, of Plaintiffs' claims that Defendants were "withholding" documents.  I was shocked by this assertion.

9.       Between January 24, 2018, through February 8, 2018, I focused my attention on Defendants' designation of confidential documents previously filed with Plaintiffs' Motion for Summary Judgment and amending the protective order.

10.      On February 23, 2018, I investigated allegations of missing emails, which was presented to me, for the first time, in Plaintiffs' Motion for Summary Judgment.

11.      The Yahoo Email existed in 2009 when Mr. Duke started 21 Century Smoking, and he continued to use it on occasion for company business after his business email, "support@21centurysmoking.com" and "bduke@21century smoking.com" came into existence.  On March 14, 2018, I contacted Mr. Duke, via email, to schedule a call regarding Plaintiffs' claims of missing documents.  I spoke with Mr. Duke the following day.  I requested that Mr. Duke re-search his "BrentDuke@Yahoo.com" email to locate any and all emails related to Ms. Woods (a confused customer), Kirti Saraswat, and Webrescol, and the requested correspondence with Frank Gu.  Mr. Duke was unable to locate any emails related to Ms. Woods, but did find emails related to Kirti Saraswat and Webrescol and the reply to the Frank Gu (a supplier) correspondence.  Mr. Duke produced those emails to me on March 17, 2018 and March 18, 2018.

12.      I immediately reviewed these documents and they were produced to Plaintiffs on March 19, 2018.

13.      When reviewing newfound documents, I questioned whether 4Discovery searched Mr. Duke's Yahoo.com email account.  I contacted 4Discovery and they confirmed that their search-term searches would not have analyzed a web-based email account which was not stored on the computer.  We then requested 4Discovery to search Mr. Duke's personal Yahoo.com email account, using the search terms.

14.     I provided 4Discovery with log-in and password information for Mr. Duke's person email account at "brentduke@yahoo.com." 4Discovery then extracted all of Mr. Duke's emails 4Discovery then ran a search using the previously agreed-upon search terms. Email sent or received prior to the January 1, 2009 was excluded. Thereafter, the documents were printed and reviewed for responsiveness.

15.     I have come to learn that at all relevant times, emails from "support@21CenturySmoking.com" and "bduke@21CenturySmoking.com" were automatically forwarded to the Yahoo Email.

16.     Counsel for Defendants are prepared to produce any responsive documents, subject to the authorization of the Honorable Court.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: May 14, 2018                    /s/ Travis W. Life

                                       TRAVIS W. LIFE

4

# EXHIBIT 6

INTENTIONALLY OMITTED

# EXHIBIT

INTENTIONALLY OMITTED

# EXHIBIT

### INTENTIONALLY OMITTED

# EXHIBIT

## Anthony Davis

| | |
|---|---|
| **From:** | Peter Stamatis <peter@stamatislegal.com> |
| **Sent:** | Monday, March 19, 2018 8:26 PM |
| **To:** | Anthony Davis; rvo@vonohlenlaw.com |
| **Cc:** | Steven S. Shonder; tlife@lsglegal.com; tleavens@lsglegal.com |
| **Subject:** | DR v. 21 Century Smoking, Inc. |
| **Attachments:** | 21C 63515 - 21C 63626.pdf |

Dear Mr. Davis:

Within the last 48 hours, we received the attached additional documents from 21CS. The documents are related to DR's claim of missing documents, which was raised for the first time in its summary judgment motion. They have been Bates stamped 21C 63515-21C 63626. We do not believe they are relevant to any claim, other than that they belie assertions of withholding unfavorable documents.

**Peter S. Stamatis**

**Law Offices of Peter S. Stamatis, PC**

1 East Wacker Drive
Suite 2350
Chicago, Illinois 60601
T: 312 606 0045
F: 312 606 0085
E: Peter@StamatisLegal.com
W: www.StamatisLegal.com



*Circular 230 Disclosure: Under requirements imposed by the Internal Revenue Service, we inform you that, unless specifically stated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax related matter herein*

The information contained in this e-mail message or any attachment may be confidential and/or privileged, and is intended only for the use of the named recipient. If you are not the named recipient of this message, you are hereby notified that any dissemination, distribution, or copying of this message or any attachment thereto, is strictly prohibited. If you have received this message in error, please contact the sender and delete all copies.

# EXHIBIT 10

**From:** Peter Stamatis <peter@stamatislegal.com>
**Subject: 21CS v DR**
**Date:** June 7, 2018 at 5:09:17 PM CDT
**To:** Anthony Davis <adavis@ndslaw.com>
**Cc:** rvo@vonohlenlaw.com, Alashia Chan <achan@ndslaw.com>, Brian Moffitt <bmoffitt@ndslaw.com>, "Thomas R. Leavens" <tleavens@lsglegal.com>, Travis Life <tlife@lsglegal.com>, "Steven S. Shonder" <sshonder@sbcglobal.net>

Tony:

We received your correspondence dated June 4, 2018. Our digital production (in native format) and the five boxes, Bates numbered 21C 1000001 through 21C 1015886 (minus the documents withheld for privilege) completes our production. At this time, no additional productions are anticipated.

Your other inquiries are addressed in turn.

1. To Defendants' knowledge, there is no difference between the native format documents and the hard copy documents except for the differences you noted, such as

that (and as we advised the court) spam and other irrelevant material were not printed out. The physical or hard copy documents do contain a "DOC" reference. I was advised that this reference was inserted into the image file created by the e discovery vendor before the documents were sent to the printer, and from our perspective, are of no significance. The only way we know to correlate the two formats of productions will be by date, time, sender, content, etc. Perhaps your e discovery consultant can provide you with a different insight.

2. From what we observed, attachments to email are sequenced directly after the message and where the native file is not produced, the file name is provided so that it can be matched with the email.

3. Defendants disagree as to any claim of the lack of sufficiency as to Defendants' Privilege Log. However, in the interest of expediency, Defendants has supplemented the descriptions for the privilege documents. It is attached. Obviously, we have neither included in the log nor produced any regular litigation attorney client communication between counsel in this case and Mr. Duke.

4. The reference to "erroneously marked privilege" is listed in Defendants' Privilege Log as it has since its production in 2015. The document, 21C 52422, was produced back in 2015.

5. Defendants have supplemented Defendants' Privilege Log for known dates of documents listed in the log. The question marks ("??") and the asterisk ("*") have been on Defendant's Privilege Log since 2015. The question marks indicate that the date of the document is unknown, and the asterisk was for internal purposes only and has no significance for the document or the Privilege Log.

6. Defendants have provided the native as well as the physical production. The physical production appears to have had some issues when converted to image files as identified by Plaintiffs. Plaintiffs can access these same documents in the native document production. We produced the documents as they were provided to us by the vendor.

7. As Plaintiff is already aware, we ran the search terms against the BrentDuke@Yahoo.com email account, as advised. Those results have been produced, subject to privilege. They contain what they contain.

8. As has been the practice in this case from both sides, defendants have designated these communications as "CONFIDENTIAL" in good faith. If Plaintiff has specific documents which it requests this designation be changed, please provide the bates number of the specific documents and Defendants will consider changing the designation.

Documents were timely produced to you in their native searchable format. Then, at your request, we sent you documents by overnight mail to New Jersey as an accommodation when frankly, our only obligation was to have them delivered to your local counsel. Your claim that our production was not timely is disingenuous and an obvious attempt for you to secure some edge in a case that frankly, your client, a bad faith user of 21CS's mark, should have never filed. Our Motion for Summary judgment, no doubt, made that abundantly clear.

On another matter, in the course of this re examination of ESI discovery, please confirm that DR/CB/Bengoa 1) produced all documents responsive to Defendants' search terms and 2) searched all email accounts with these search terms, including the "c.bengoa@yahoo.com," "cbengoa2500@gmail.com," "cbd2510@aol.com," andthe "21stcenturysmoke.com" email accounts. In comparing Plaintiff's production to Defendants' production, it is troubling how few documents Plaintiff has produced.

A final note is in order: it seems that your email, and the sanctimonious and accusatory tone you have recently taken, is an attempt to hold 21CS to a standard to which DR/CB/Bengoa have themselves not comported. Indeed, one need look no further than the deleted emails of Mr. Hewes  deleted during the course of discovery no less  to confirm this fact. To be sure, the sudden disappearance of Mr. Hewes's emails will be addressed in due course. But as Mr. von Ohlen has repeatedly pointed out, what's good for the goose is good for the gander. And so for now, as ESI searches are at the forefront of this case, we request that you confirm on *your clients' behalf* the completeness of the searches and production of search results, matters that predate my involvement and remain an utter mystery to date.

Sincerely,

**Peter S. Stamatis**

**Law Offices of Peter S. Stamatis, PC**

1 East Wacker Dr ve
Su te 2350
Ch cago, I  no s 60601
T: 312 606 0045
F: 312 606 0085
E: Peter@Stamat sLega .com
W www  ama  ega  com

*Circular 230 Disclosure: Under requirements imposed by the Internal Revenue Service, we inform you that, unless specifically stated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax related matter herein.*

The information contained in this e mail message or any attachment may be confidential and/or privileged, and is intended only for the use of the named recipient  If you are not the named recipient of this message, you are hereby notified that any dissemination, distribution, or copying of this message or any attachment thereto, is strictly prohibited  If you have received this message in error, please contact the sender and delete all copies

**3 attachments**

 **image002.jpg**
4K

**Steven S. Shonder.vcf**
95K

**21C Privilege Log 6.6.18.pdf**
261K

# EXHIBIT

Case: 3:12-cv-50324 Document #: 318 Filed: 08/13/19 Page 1 of 13 PageID #:13854

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DR DISTRIBUTORS, LLC, and CB DISTRIBUTORS, INC. | ) | |
| | ) | |
| Plaintiffs/Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) | Case No. 3:12-cv-50324 |
| | ) | |
| | ) | Judge Thomas M. Durkin |
| Defendant/Counterclaim Defendant | ) | |
| | ) | Magistrate Judge Iain Johnston |
| _____ | ) | |
| 21 CENTURY SMOKING, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

**DEFENDANTS' STATUS REPORT**
**PURSUANT TO THIS COURT'S JUNE 6, 2019 ORDER**

Defendants, 21 Century Smoking, Inc. ("21 Century") and Brent Duke ("Mr. Duke") (and collectively as "Defendants"), by and through their undersigned counsel, respectfully submit the following Status Report pursuant to this Court's June 6, 2019 Order:

**I.     Introduction**

This Court's June 6, 2019 Order directed that:

By 8/13/2019 the defendants shall submit a written report on (1) the status of the search for responsive e-mails and other documents from the GoDaddy account stored in the Cloud; (2) what investigation has been done into whether any e-mails or documents associated with the GoDaddy account were lost, destroyed,

1

not preserved, or spoliated and the results of that investigation including the extent of documents that are no longer available; and (3) the anticipated date of production of the GoDaddy account materials. Additionally, the Court expects to be fully informed as to whether other devices, including but not limited to cell phones or legacy systems have been searched, as well as whether other modes of electronic communications have been searched; for example, text messages, Snapchat messages or Slack messages as opposed to just emails have been searched.

To comply with that directive, the Defendants have, through new defense counsel, undertaken the following steps as outlined below.[1]

I.      **Custodian Interviews**

A.      *Current Employees*

A custodian interview of Mr. Duke, President of 21 Century, was completed on July 29, 2019. That interview lasted approximately nine (9) hours. It was conducted by Defendants' consulting expert, e-discovery attorney, Sean Byrne, and by Yaniv Schiff, Director of Forensics at QDiscovery, an Xact Data Discovery company. The *curriculum vitae* of Mr. Byrne and the affidavit of Mr. Schiff are attached hereto as Exhibits A and B, respectively. Mr. Salam, one of Defendants' attorneys, was also present for that interview. In sum, Mr. Byrne and Mr. Schiff asked Mr. Duke detailed questions and follow-up questions based upon a set of questions created by Mr. Byrne, and additional questions premised upon QDiscovery's standard custodian interview form. *See* Schiff Affidavit at ¶ 3. Both sets of questions were specifically designed to elicit a complete understanding and scope of the electronically stored information ("ESI"), its former and present location(s), and/or its existence or non-existence. Mr. Duke's interview was followed up with numerous communications with Mr. Duke to complete the process.

---

[1] Co-lead counsel, Kevin B. Salam was formally retained on July 1, 2019 and trial counsel and co-lead counsel, Mike Leonard, was retained on or about July 29, 2019.

Additionally, on August 9, 2019, Mr. Byrne and Mr. Schiff conducted a detailed

telephonic custodian interview of Mr. Duke's wife, Laurie Duke ("Mrs. Duke"). Schiff

Aff. at ¶ 3. Mrs. Duke is the only other current employee of 21 Century. Mrs. Duke's

interview confirmed what had previously been learned from Mr. Duke, and no new

material information on ESI was learned.

The custodian interviews of Mr. and Mrs. Duke included, but were not limited to,

the following topics:

❖ Company employees, including roles and responsibilities related to ESI

❖ IT support

❖ Store and kiosk locations from which 21 Century operated

❖ Document retention policies

❖ Sources of ESI
  • Laptops, desktops, mobile devices, storage (local, network and cloud), legacy systems
  • Archives and back ups
  • Communications (email, text, social media messaging, instant messaging and chat)
  • Software applications
  • Databases
  • Company wikis
  • Voice mail
  • Passwords and encryption
  • Calendars and diaries

B. *Former Employees*

The following seven (7) former employees of 21 Century had email accounts that were

provided to them by 21 Century during the course of their employment. Their 21 Century email

3

accounts, like those of Mr. and Mrs. Duke, were also hosted at GoDaddy as part of the hosting

services it provided to 21 Century:

- Brandon Duke (Mr. Duke's brother): brandon@21centurysmoking.com: Employment ended on or about 9/5/2014. Mr. Duke managed/co-owned kiosks, and a store in California. He currently lives in Prague, Czech Republic. He was contacted by Defendants' counsel on August 9, 2019, but he has not yet responded.

- Jim Shimp: froggieandjim@21centurysmoking.com: Employment ended on or about 7/25/2014. He managed stores in Ohio, and he resides in the in Cleveland area. He was contacted by Defendants' counsel on August 9, 2019, but he has not yet responded.

- Bryan Kos: bryan@21centurysmoking.com: Employment ended on or about 3/8/2013. He engaged in marketing activities for 21 Century in its Chicago warehouse location at 1535 N. Ashland. He lives in Northbrook, Illinois. He was contacted by Defendants' counsel on August 9, 2019. He responded by text on August 13, 2019, but has not yet been interviewed.

- Krenar Koleci: krenar@21centurysmoking.com: Duties: (Form 1099 independent contractor) Services ended on or about 4/18/2014. He worked on wholesale sales in the New England area. He was contacted by Defendants' counsel. Although it was quite difficult to hear him during the call, he appeared to indicate that he would not be back in the United States until the last week of August 2019.

- Robert Hough: robert@21centurysmoking.com: Employment ended on or about 3/22/2013. Mr. Hough performed telephonic customer service duties, web development, and IT services. Mr. Hough originally worked at a kiosk in the Old Orchard Mall (Skokie, IL), thereafter briefly in 21 Century's store in Chicago, and then at the Company's warehouse in Chicago. He was contacted by Defendants' counsel on August 9, 2019 and subsequently interviewed by Mr. Byrne on August 10, 2019. Mr. Hough did not provide any new material information beyond what had already been provided by Mr. and Mrs. Duke.

- Robert Link: rob@21centurysmoking.com: Employment ended on or about 9/21/2012. Mr. Link managed/co-owned Illinois and Nebraska kiosks, as well as a store in Joliet, and did graphics for the Company (logos, etc.). He was contacted by Defendants' counsel on August 9, 2019, but he has not yet responded.

- Steve Spraker: spraker@21centurysmoking.com: Employment ended on or about 5/9/2014. He co-owned 21 Century's Chicago store. He also co-owned and assisted in managing kiosks in Ohio. On August 13, 2019, Defense counsel was able to locate Mr. Spraker's work phone number in Denver, Colorado and left a message for Mr. Spraker to return defense counsel's call.

C.    *Former employees for whom custodian interviews have not been conducted and are not contemplated*

Based on records from 21 Century's web-based payroll service, in addition to the seven (7) former employees identified in Section B above, 21 Century has had an additional three hundred and three (303) individuals who worked for it, in some capacity and for some period of time. Many of these employees worked at kiosks, many of them worked at stores, and some of them worked at festivals. A number of these individuals worked in shipping at 21 Century's warehouse. None of these employees were involved in substantive Company decision-making or the website. In other words, they were essentially sales or order fulfilment workers.

Moreover, but for fax machines, 21 Century, did *not* provide Company issued devices or Company issued email accounts to these individuals. Their Company-related electronic communications consisted of faxing sales and inventory data to 21 Century's fax number using a web-based fax service called "MY FAX." These faxes were received as pdf files at support@21centurysmoking.com, which was hosted at GoDaddy. All of these sales report and inventory report faxes should be contained in the GoDaddy email account recovery currently being processed. That statement is based upon current defense counsel's understanding that the auto delete issue related to GoDaddy did not involve emails received at the support@21centurysmoking.com email address hosted by GoDaddy. To the best of Mr. and Mrs. Duke's knowledge, these employees did not use their own personal email accounts to perform their duties as representatives of 21 Century. In addition, according to Mrs. Duke, in the event a fax machine at a store or kiosk was not functioning, the employees would either wait until the next day or would send a picture of the sales report/inventory to either Mr. or Mrs. Duke's cell phone, and Mr. or Mrs. Duke would then email the reports to support@21centurysmoking.com, which was hosted at GoDaddy.

Based on the duties performed by these individuals, their lack of business email accounts, the burden associated with finding and contacting them, and the expected availability of their 21 Century electronic communications (faxes), defense counsel does not contemplate attempting to locate, contact, and interview these individuals unless directed to by this Court.

D. *Non-employee that had "21centurysmoking.com" email accounts provided by 21 Century*

Jason Kois: jason@21centurysmoking.com: Jason Kois and Peter Kois were customers of 21 Century who decided to open their own store. Mr. Duke had extra free email addresses through GoDaddy and provided one to Jason Kois.

## II. Results To-Date Of Identification Of ESI

A. *Email Accounts*

The following email accounts have been identified: *See Schiff Aff. at ¶9.*

| Service | Username/Account | Search Terms Run | Additional Comments |
|---|---|---|---|
| Gmail | brentstantonduke@gmail.com | Yes | |
| Gmail | duke.laurie@gmail.com | | In process |
| Gmail | twentyonecenturysmoking@gmail.com | | In process |
| | | | |
| GoDaddy | bduke@21centurysmoking.com | Yes | |
| GoDaddy | bduke@evtcigs.com | Yes | |
| GoDaddy | bduke@farmersolution.com | Yes | |
| GoDaddy | brandon@21centurysmoking.com | Yes | |
| GoDaddy | bryan@21centurysmoking.com | Yes | |
| GoDaddy | froggieandjim@21centurysmoking.com | Yes | |
| GoDaddy | info@automaticcigarettes.com | Yes | |
| GoDaddy | jason@21centurysmoking.com | Yes | |
| GoDaddy | krenar@21centurysmoking.com | Yes | |
| GoDaddy | laurie@21centurysmoking.com | Yes | |
| GoDaddy | rob@21centurysmoking.com | Yes | |
| GoDaddy | robert@21centurysmoking.com | Yes | |
| GoDaddy | sales@21centurysmoking.com | Yes | |
| GoDaddy | spraker@21centurysmoking.com | Yes | |
| GoDaddy | support@21centurysmoking.com | Yes | |
| GoDaddy | support@sportsdoctrine.com | Yes | |

6

| | | | |
|---|---|---|---|
| GoDaddy | support@wholesaleelectroniccigarettes.com | Yes | |
| GoDaddy | test@21centurysmokes.com | Yes | |
| GoDaddy | test@21centurysmoking.com | Yes | |
| GoDaddy | wholesale@automaticcigarettes.com | Yes | |
| | | | |
| Yahoo | brentduke@yahoo.com | Previously run by 4Discovery | |
| Yahoo | twentyonecenturysmoking@yahoo.com | | In process |
| Yahoo | brentlaurieduke@yahoo.com | | In process |
| Yahoo | laurie.duke@yahoo.com | | In process |
| Yahoo | bsdatsu@yahoo.com | No | Not recoverable |
| Yahoo | laurienomanson@yahoo.com | No | Not recoverable |
| Ymail | laurieduke@ymail.com | No | Not recoverable |

These last three (3) email accounts were used in "craigslist" postings and no longer exist and no data can be recovered from them. Schiff Aff. at ¶9. These three emails were used as contact emails for "craigslist" ads posted by 21 Century. To the best of Mr. Duke's recollection, this occurred for only a few months in mid-2009.

Not included in the above list is the email: 21centurysmoking21@gmail.com. This email is believed by Mr. Duke to have been set up by Mr. Spraker, on a GoDaddy customer account other than 21 Century's, to email sales and inventory reports from the store in Chicago to 21 Century at support@21centurysmoking.com. On August 13, 2019, defense counsel was able to locate Mr. Spraker's work phone number in Denver Colorado and left a message for Mr. Spraker to return defense counsel's call.

B.    *Physical Devices and Media*

On August 6, 2019, at Mr. and Mrs. Duke's home/office located in San Diego County, California, QDiscovery imaged all available devices. Those images were then shipped to QDiscovery's offices in Chicago for processing. Aff. of Schiff at ¶ 6. The processing and running of search terms on that data is anticipated to be completed in approximately two (2)

weeks. At that time, review for privilege will occur. The devices that were recovered and imaged

as set forth below:

| Duke Computers | Device Type | Image Size (GB) | HD Size | Location |
|---|---|---|---|---|
| SDDF001_Duke_LT01 | Samusung NP300V5A LT | 218 | 640 | Main Device |
| SDDF002_Duke_DT06 | PC Clone MidTower DT | 183 | 500 | Office Desk |
| SDDF003_Duke_LT02 | Samusung NP300V5A LT | 141 | 500 | Office Desk |
| SDDF004_Duke_DT01 | Syx MidTower DT | 166 | 500 | Office Desk |
| SDDF005_Duke_DT04 | HP Pavilion 752n DT | 49.8 | 60 | Garage |
| SDDF006_Duke_DT05 | Sony Vaio PCV150 DT | 3.78 | 4.3 | Office |
| SDDF007_Duke_DT02 | Acer Aspire DT | 146 | 500 | Office |
| SDDF008_Duke_DT03 | Acer Aspire DT | 90.8 | 500 | Office |
| | | 998.38 | | |
| **Duke Phones** | | | | |
| SDDF009_Duke_Phone01 | Samsung Galaxy S5 | 1.66 (1st try) | | Duke Main Phone |
| SDDF009_Duke_Phone01 | Samsung Galaxy S5 | 1.4 (2nd try) | | Duke Main Phone |
| SDDF010_Duke_Phone02 | Samsung Galaxy J7 | 3.85 | | Duke 2nd Phone |
| SDDF011_LDuke_Phone01* | Samsung Galaxy S5 | 0* | | Ms. Duke's Phone |

*Not currently able to acquire data because Mrs. Duke was unable to remove security
restrictions necessary for acquisition. QDiscovery is working on this issue.*

Four (4) of the eight (8) devices listed above consist of the "3-4" computers located at the

offices of 21 Century, which was previously disclosed in Defendants' August 27, 2013, Rule

26(a) disclosure. Subsequently, in December 2014 former defense counsel, Thomas Leavens,

retained 4Discovery to image these four devices and search the data with Plaintiffs' twenty (20)

search terms. (*See* Dkt. 253-1, Leavens Declaration at ¶¶ 4-9; *see also*, Dkt. 288, at pp. 4-6,

Janauary18, 2019 letter from 4Discovery attached to "Report to Court"). According to

4Discovery, its copies of the images it acquired from Mr. Duke in 2014, cannot be recovered. *Id.*

On August 12, 2019, all electronic data in the possession of 4Discovery was transferred to

Defendants' consultant, QDiscovery. Aff. of Schiff at ¶ 7

There were two, possibly more phones used by Mr. and Mrs. Duke prior to the phones

that were imaged by QDiscovery. These phones were replaced in the ordinary course of phone

usage and are no longer available. Investigation continues to determine how many such phones existed and when these phones were used and the extent to which they were used for 21 Century business related activities.

      C.    *Social Media*

    The following social media and related accounts have been identified:

| Service | Username/Account | Status of ESI Recovery |
|---|---|---|
| Facebook | brentduke@yahoo.com | Data acquired, not yet processed for search terms |
| Instagram | duke.brent | Data acquired, not yet processed for search terms |
| LinkedIn | brentduke@yahoo.com | Data acquired, not yet processed for search terms |
| Pinterest* | 21 Century Smoking (21ecigs) | Neither Mr. nor Mrs. Duke were custodians.* |
| Twitter | 21csmokes | Data acquired, not yet processed for search terms |

        *\* Mr. Spraker may have been the custodian of this account. On August 13, 2019, defense counsel was able to locate Mr. Spraker's work phone number in Denver, Colorado and left a message for Mr. Spraker to return defense counsel's call.*

      D.    *Other Web-Based Services*

| Service | Username/Account | Status/Comment |
|---|---|---|
| Amazon | support@21centurysmoking.com | Working on getting access |
| Authorize.net | brentduke | Access acquired. |
| bluePay | 21 Century Smoking | Access acquired |
| Carbonite | bduke@21centurysmoking.com | Access acquired |
| Dropbox | brentduke@yahoo.com | Access acquired |
| Ebay | lali1101 | Access acquired |
| Paypal | support@21centurysmoking.com | Access acquired |
| Zencart | brentduke | Access acquired |
| Rankpop* | | Data not recoverable provider |
| Groupon** | | |

        *\*Rankpop: This company went out of business in 2014. 21 Century paid Rank Pop monthly from approximately February 2014 to October 2014 to prepare and post social media content to then existing social media services accounts of 21 Century Smoking and to prepare and maintain a blog post. Communications between Rank Pop and 21 Century were between the following email addresses: guru@rankpop.com and duke@21centurysmoking.com.*

        *\*\* Groupon: Mr. Duke was not the custodian and Mr. Spraker may have been the custodian. On August 13, 2019, defense counsel was able to locate Mr. Spraker's work phone number in Denver, Colorado and left a message for Mr. Spraker to return defense counsel's call.*

### III. Status of Production of ESI:

#### A. *Email Accounts*

As indicated in Section II.A. above, search terms have been run against all GoDaddy hosted email accounts and against brentstantonduke@gmail.com, an additional email account of Mr. Duke. Initial analysis of the hits generated by these search terms for those accounts is contained in Mr. Schiff's Affidavit at ¶ 12.

With the exception of the last three email accounts identified in Section II.A., recovery and processing is continuing, and the 20 search terms will be run. After the running of those search terms, a review for privilege will be conducted and then production will occur. Defendants expect to have an estimate for the timing of such production at the August 20, 2019 status hearing.

As discussed in Section II.A, there are three email accounts identified that no longer exist and for which no data can be recovered. These are bsdatsu@yahoo.com, 21centurysmoking@yahoo.com, laurieduke@ymail.com. These were used as contact emails for prospective purchasers to respond to "craigslist" ads posting certain 21 Century product for sale.

Lastly, as discussed in Section II.A., investigation continues into the email: 21centurysmoking21@gmail.com, believed to have been set up by Mr. Spraker.

#### B. *Physical Devices and Media*

As discussed in Section II. B., the devices and media identified were imaged on August 6, 2019 and received by QDiscovery in Chicago on August 8, 2019. Processing and running of search terms is anticipated to be completed in approximately two (2) weeks. At that time, review

for privilege will occur. Defendants expect to have an estimate for the timing of production at the August 20, 2019 status hearing.

C.    *Social Media*

With respect to the four (4) of the five (5) social media services identified in Section II.C. above, QDiscovery has acquired data and is processing. With respect to Pinterest, QDiscovery is awaiting password/security code information that defense counsel is seeking to discuss with Mr. Spraker. Defendants expect to have an estimate for the timing of production at the August 20, 2019 status hearing.

D.    *Other Web-Based Services*

With respect to other web-based Services identified in Section II.D. above, except for Groupon, discussed in notes (*) to Section II.D., QDiscovery has obtained access to the data from these services. Defendants expect to have an estimate for the timing of production at the August 20, 2019 status hearing.

Again with respect to Groupon, Mr. Duke was not the custodian. Mr. Spraker is believed to have been the custodian. On August 13, 2019, defense counsel was able to locate Mr. Spraker's work phone number in Denver, Colorado and left a message for Mr. Spraker to return defense counsel's call.

IV.    **Status of Investigation Whether any GoDaddy
(or other newly identified ESI) was Lost, Destroyed,
not Preserved, or Spoilated and Recoverability of the same**

Investigation continues. After being retained, defense counsel reviewed a substantial amount of information to gain an initial understanding of the past seven (7) years of this litigation and the history of the current sanctions motion, the discovery failures alleged therein, and the most recent GoDaddy email issue. In addition, defense counsel spent time identifying

and retaining Sean Byrne and QDiscovery, Defendants' electronic data forensic and e-discovery provider/consultant, who is capable of assisting Defendants in complying with the Court's June 6, 2019 Order. After retaining QDiscovery, defense counsel has spent most of its time working with QDiscovery and consulting attorney, Sean Byrne, on the activities described in this Status Report and acquiring the information discussed herein and preparing this Status Report.

Additionally, defense counsel, met with former defense counsel and in the case of Mr. Leavens and Mr. Life, and their attorney, Colin Smith. The purpose of these meetings was to identify the universe of case files, both electronic and hard copy, for transfer to new defense counsel. Those files are spread out between each of the four former defense counsel. While all former defense counsel have been cooperative, at the time of this filing, Defense counsel had received certain case files from only Travis Life, but not from Thomas Leavens, Peter Stamatis or Steven Shonder.

Lastly, defense counsel has not yet had an opportunity to discuss this matter in substance with former defense counsel.

In sum, defense counsel, in conjunction with their retained forensic experts, are working diligently to address all of the issues and concerns raised by this Court in its June 6, 2019 Order. [Signature page follows]

12

Dated: August 13, 2019

Respectfully submitted,
Defendants, Brent Duke and
21 Century Smoking, Inc.

By: /S/ Mike Leonard
    Attorney for Defendants

Michael I. Leonard
mleonard@leonardmeyerllp.com
LeonardMeyer, LLP
120 N. LaSalle, Suite 2000
Chicago, IL 60602
312-380-6559 (ph.)
312- 264-0671 (fax)

    and

By: /S/ Kevin B. Salam
    Attorney for Defendants

Kevin B. Salam
kevin@salamlaw.com
120 N. LaSalle, Suite 2000
Chicago, IL 60602
312-606-8730 (ph.)
312- 277-2539 (fax)

# EXHIBIT

# UNITED STATES DISTRICT COURT FOR THE
# NOTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

| | |
|---|---|
| DR DISTRIBUTORS, LLC, and CB DISTRIBUTORS, INC. ) | |
| ) | |
| Plaintiffs/Counterclaimant, ) | |
| ) | |
| v. ) | Case Number: 3:12 – cv – 50324 |
| ) | |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, ) | |
| ) | Judge: Frederick J. Kapala |
| Defendant/Counterclaim Defendant, ) | |
| ) | Magistrate Judge: Iain Johnston |
| 21 CENTURY SMOKING, INC., ) | |
| ) | |
| Counterclaimant, ) | |
| ) | |
| v. ) | |
| ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, ) | |
| ) | |
| Counterclaim Defendants. ) | |

## REPORT TO THE COURT

At the last hearing in this matter, this Honorable Court inquired about Mr. Duke's Yahoo-Messenger communications. After the Court so inquired, Defendants have been diligently attempted to collect data, if any, from Brent Duke's Yahoo Messenger account that may be responsive to plaintiffs' discovery requests.

1

To that end, Defendants then contacted "4Discovery," Defendants' e-discovery vendor, to inquire as to whether Mr. Duke's Yahoo-Messenger Account had been searched in conjunction with its recent searching of his Yahoo email account to which it had been given access. After investigating the matter, 4Discovery learned that its previous search of Mr. Duke's Yahoo Email Account would not have included Mr. Duke's Yahoo-Messenger chatting. Defendants determined from the Yahoo.com web site that the data on Mr. Duke's Yahoo messenger account may be recoverable even though it has not been used for several years. 4Discovery then advised that it had not seen this issue before and was uncertain as to whether such Yahoo-Messenger searching even *could be performed* and spent time getting to the bottom of the issue.

Today, September 13, 2018, 4Discovery confirmed that it could recover data from Mr. Duke's Yahoo-Messenger Account and will undertake to do so as soon as possible. Defendants expect to get results within the week and will promptly produce the same in accordance with the court's prior direction.

Given that plaintiff's brief is due on September 17 per Your Honor's order of August 14, 2018, defendants have no objection to the extension of said deadline to allow for the parties' consideration of any Yahoo-Messenger production.

Case: 3:12-cv-50324 Document #: 268 Filed: 09/13/18 Page 3 of 3 PageID #:12658

Dated:  September 13, 2018

21 CENTURY SMOKING, INC. and
BRENT DUKE

By:

/s/ Peter S. Stamatis
_____
One of their Attorneys

Thomas R. Leavens (Bar No. 1601016)
Travis W. Life (Bar No. 6279244)
Leavens Strand & Glover, LLC
203 North LaSalle Street, Suite 2550
Chicago, Illinois 60601
(312) 488-4170

Peter S. Stamatis (Bar No. 6217496)
Steven S. Shonder
Law Offices of Peter S. Stamatis, PC
1 East Wacker Drive, Suite 2350
Chicago, Illinois 60601
(312) 606-0045

# EXHIBIT

Case: 3:12-cv-50324 Document #: 273 Filed: 10/10/18 Page 1 of 8 PageID #:12701

UNITED STATES DISTRICT COURT FOR THE
NOTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

| | | |
|---|---|---|
| DR DISTRIBUTORS, LLC, and CB DISTRIBUTORS, INC. | ) ) ) | |
| Plaintiffs/Counterclaimant, | ) ) | |
| v. | ) ) | Case Number: 3:12 – cv – 50324 |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) ) ) | Judge: Frederick J. Kapala |
| Defendant/Counterclaim Defendant, | ) ) | Magistrate Judge: Iain Johnston |
| 21 CENTURY SMOKING, INC., | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) ) ) | |
| Counterclaim Defendants. | ) | |

## REPORT TO THE COURT

21 CENTURY SMOKING, INC. and BRENT DUKE (collectively "21CS"), by their lawyers, THOMAS R. LEAVENS, TRAVIS R. LIFE, PETER S. STAMATIS and STEVEN S. SHONDER, for this Report to the Court, hereby state as follows:

1.     On September 13, 2018, counsel for defendants submitted a Report to this Honorable Court regarding the Yahoo-Messenger account of Mr. Duke (the "First Report", Doc #268).

2.     In the First Report, counsel for 21 Century Smoking, Inc. ("21CS") advised

the Court that it was investigating issues regarding Mr. Duke's Yahoo-Messenger

account data and to that end, had engaged "4Discovery" (Defendants' e-discovery

vendor) to inquire as to whether Mr. Duke's Yahoo-Messenger Account data had been

searched in conjunction with 4Discovery's key-word search of his Yahoo email

account.

3.     We also advised the Court that 4Discovery had come to understand that

its key-word search of Mr. Duke's Yahoo Email Account would *not* have included Mr.

Duke's Yahoo-Messenger chatting.  4Discovery also determined from the information

contained on the Yahoo.com web site that the data on Mr. Duke's Yahoo-Messenger

account would be recoverable, even though it has not been used for several years.  In

reliance on the information on Yahoo's web site, on September 13, 2018, 4Discovery

advised that it could recover data from Mr. Duke's Yahoo-Messenger Account and

would undertake to do so as soon as possible.

4.     The First Report further advised that we expected to "get results within

the week" and would promptly produce them.

5.     Since submitting that Report to the Court, counsel for 21CS and its

consultants at 4Discovery have undertaken extensive efforts to obtain data from Yahoo

Messenger.  Despite these attempts, which are set forth below, Yahoo has, for reasons

unknown to us (or to Yahoo, apparently) not been able to produce the data.  By way of

2

this Report to the Court, we wanted to formally advise Your Honor of our good-faith efforts to track down this data and then to seek the Court's direction regarding further action to be taken.

### *Actions Taken Since the Issuance of the Report*

6.      After discovering Yahoo's representation that Yahoo Messenger data could be recovered, counsel directed 4Discovery to pursue recovery of the data through the mechanism provided by Yahoo.

7.      On September 13, 2018, Jared Sikorski ("Jared"), a Forensic Investigator with 4Discovery, obtained Mr. Duke's Yahoo Messenger log-in credentials and logged into Mr. Duke's BrentDuke@yahoo.com account.  Once logged in, Jared navigated to https://messenger.yahoo.com which redirected him to https://help.yahoo.com/ kb/SLN28776.html?redirect=true.  There, he found the webpage titled "Yahoo Messenger will be discontinued," which indicated that though Yahoo Messenger was a service Yahoo was no longer offering, it would be maintaining the Yahoo Messenger chat data at least through November 8, 2018.  *See* Exhibit 1.

8.      Using this page, Jared then submitted a download request for Mr. Duke's Yahoo Chat history.  "Brentduke@yahoo.com" received a confirmation email from Yahoo acknowledging the request and advising that Mr. Duke would be notified when his data is available.  *See* Exhibit 2.

3

9.    The following day, on September 14, 2018, brentduke@yahoo.com received

an email from Yahoo with the subject, "Download of your data is ready." *See* Exhibit 3.

Jared navigated to the specified website to download the zip file which purported to

contain the data, but the download failed and instead, Jared received the message "failed

– server problem." See Exhibit 4.

10.    Jared attempted the download several more times, and from different web

browsers, each time without success.  He also remotely connected to Brent's computer to

attempt the same process from Brent's computer, but that did not work either.

*Yahoo Support*

11.    On September 17, 2018 Jared emailed Yahoo support about the issue but

received no assistance.  On September 19, 2018, Peter Stamatis contacted Yahoo directly,

(now owned by Verizon/Oath) and inquired about obtaining this data and Yahoo assured

him that Yahoo Messenger data was generally available for download.  He so advised

Jared.

12.    On September 20, 2018, Jared received correspondence from Yahoo,

wherein Yahoo simply provided him with the same download link it had previously

published.  Jared tried again, and once again, Jared received the "Download of your data

is ready" email.  Though that download was seemingly successful, this time it simply

contained no data whatsoever.

4

13.     On September 21, 2018, Jared telephoned Yahoo Tech Support (1-800-305-7664) and in a call that lasted over 30 minutes, inquired as to why Yahoo produced no data.

14.     Yahoo suggested Jared try multiple browsers, which he did, and directed him to update Java, which Jared also did.  None of this worked.  As result, Yahoo advised that it would escalate the case internally within its tech-support department and promised Jared someone with Yahoo would call him back.

15.     Jared did not receive the call back promised by this Yahoo representative.

*Yahoo Account Pro Support Engaged*

16.     On September 24, 2018, Jared signed up for Yahoo Account Pro, a paid-Yahoo-support service, *see* Exhibit 5, and spoke with a tech-support representative named "Yuan."[1]  Yuan is believed to be located in the Philippines.

17.     Yuan tried, but could not get any of the Yahoo Messenger Data to Jared.  Yuan promised Jared that he would look further into the matter, engaged Yahoo's Engineering Team,  and assigned the inquiry a case number.  Yuan also advised that he escalated the matter to the Yahoo Messenger Team.  Yuan promised that Jared would receive a telephone call back in 24-48 hours.  Jared did not receive that call back.

---

[1] Yuan refused to provide his last name.

5

### *Yahoo Engineering Team Engaged*

18.     On September 25, 2018, Yahoo had confirmed the escalation of the matter to its "Engineering Team." Exhibit 6. On September 26, 2018, Jared contacted Yahoo Account Pro support again. At that time, an unnamed support representative from Yahoo advised Jared that the case had been escalated and Yahoo was continuing to work on it.

19.     Jared asked repeatedly to be transferred directly to Yahoo's engineering team, so he could discuss it with them directly, but that request was refused, ostensibly because that team is located in the United States. However, the support person advised Jared that he was simultaneously chatting on-line with a member of Yahoo's engineering team about the ongoing inquiry.

20.     Yahoo's Engineering Team advised Jared that there was nothing further Yahoo could do. Jared requested that Yahoo put that in writing. The representative promised to do so, but despite this promise, Jared has received nothing to date.

### *Yahoo Still Working on It*

21.     On October 2, 2018, attorneys Stamatis and Leavens called Yahoo Messenger to personally follow up on the issue. They spoke with "Stan," who also advised he was located in the Philippines. Stan checked with support, put counsel on hold, and despite the prior claim that there was "nothing more" Yahoo could do, advised that Yahoo's engineers are indeed "still looking into the issue." Though Stan also

6

indicated that Yahoo would get back to counsel, he offered no timeframe, other than to say it would happen "ASAP."

### *Conclusion*

22.     No one at Yahoo has told us that the data has been deleted or is *not* retrievable. On the contrary, Yahoo tech-support advised that it is working to figure out how we can get access to it. To that end, in that October 2 call, Leavens and Stamatis asked Stan whether issuing a subpoena to Yahoo for its Messenger data might be a way to "shake loose" the data from Yahoo. Stan said it might be worth a try, but from his vantage point in the Philippines, he couldn't say for sure one way or another. Of course, Stan's view that it might be worth a try was his own speculation and there was neither any guaranty given, nor any representation made that a subpoena would get us the data from Yahoo.

23.     Although, Yahoo has indicated through its website that Messenger account holders would be provided access to their data until November 8, 2018, we stand ready, willing and able to issue a subpoena to Yahoo, if Your Honor so directs.

Dated:  October 10, 2018

21 CENTURY SMOKING, INC. and
BRENT DUKE

/s/ Peter S. Stamatis

By:  _____

One of their Attorneys

| | |
|---|---|
| Thomas R. Leavens (Bar No. 1601016) | Peter S. Stamatis (Bar No. 6217496) |
| Travis W. Life (Bar No. 6279244) | Steven S. Shonder (Bar No. 6238090) |
| Leavens Strand & Glover, LLC | Law Offices of Peter S. Stamatis, PC |
| 203 North LaSalle Street, Suite 2550 | 1 East Wacker Drive, Suite 2350 |
| Chicago, Illinois 60601 | Chicago, Illinois 60601 |
| (312) 488-4170 | (312) 606-0045 |

# Exhibit 1



# Exhibit 2



Request confirmed for download of your data

**no-reply@cc.yahoo-inc.com**
To: brentd.ike@yahoo.com

Hello,

You requested a download of your Yahoo Messenger data for brentduke. We will notify you at brentduke@yahoo.com when your download is ready.

If this wasn't you, go to https://messenger.yahoo.com/getmydata immediately to cancel the download.

For security, we also recommend that you go to account settings to change your password, and review your recovery phone number(s) and/or email address(es) to remove the ones that don't belong to you.

Regards
Yahoo Messenger'

# Exhibit 3

## Download of your data is ready

no-reply@cc.yahoo-inc.com
to brentoutley@yahoo.com

Hello,

You recently requested a download of your Yahoo Messenger data. Your download request has been completed. To download your data go to this URL: https://messenger.yahoo.com/getmydata .

If this wasn't you, go to the above URL immediately to delete the download. For security, we also recommend that you go to account settings to change your password and review your recovery phone number(s) and/or email address(es) to remove the ones that don't belong to you

Regards,
Yahoo Messenger

# Exhibit 4



Case: 3:12-cv-50324 Document #: 273-5 Filed: 10/10/18 Page 1 of 1 PageID #:12713

# Exhibit 5



# Exhibit 6



# EXHIBIT

Case: 3:12-cv-50324 Document #: 274 Filed: 10/10/18 Page 1 of 1 PageID #:12715

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.2.2
### Western Division

DR Distributors, LLC

                        Plaintiff,

v.

21 Century Smoking, Inc., et al.

                        Defendant.

Case No.: 3:12−cv−50324

Honorable Frederick J. Kapala

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 10, 2018:

      MINUTE entry before the Honorable Iain D. Johnston: Status report [273] was received. The report has been reviewed and the Court finds it to be troubling and disturbing. The Court acknowledges the defendants are "ready, willing and able" to subpoena the Yahoo Messenger data, but it is not up to this Court to instruct counsel how to preserve evidence. (yxp, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# EXHIBIT 15

Case: 3:12-cv-50324 Document #: 277 Filed: 10/16/18 Page 1 of 1 PageID #:12724

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.2.2
### Western Division

DR Distributors, LLC

                                Plaintiff,

v.                                                      Case No.: 3:12−cv−50324

                                                        Honorable Frederick J. Kapala

21 Century Smoking, Inc., et al.

                                Defendant.
_____

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, October 16, 2018:

      MINUTE entry before the Honorable Iain D. Johnston: Status hearing held on 10/16/2018. Defendants shall provide the responsive Yahoo−Messenger chat documents by 5:00 PM CST on 11/21/2018. The parties shall file a joint status report regarding the documents provided by 12:00 PM CST on 11/28/2018. Plaintiff's response to the motion for leave [275] due by 11/7/2018. Defendants' reply due by 11/21/2018. Defendants' motion for sanctions [257] is entered and continued. The motion hearing set for 11/27/2018 is stricken. The next hearing will be set at a later date. (yxp, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# EXHIBIT 16

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

DR DISTRIBUTORS, LLC,

       Plaintiff/Counter-Defendant,

v.

21 CENTURY SMOKING, INC., and BRENT
DUKE,

       Defendants/Counterclaimant,

v.

CB DISTRIBUTORS, INC., and CARLOS
BENGOA,

       Counter-Defendants/Counterclaimants.

**Case Number:** 3:12 – cv – 50324

**Judge:** Frederick J. Kapala

**Magistrate Judge:** Iain D. Johnston

## JOINT REPORT TO THE COURT

    Plaintiff/Counter-Defendant DR Distributors, LLC ("DR"), and Counter-Defendants/Counterclaimants CB Distributors, Inc. ("CB") and Carlos Bengoa ("Bengoa") (collectively "Plaintiffs"), through their lawyers Anthony J. Davis and Robert C. von Ohlen; and Defendant/Counterclaimant 21 Century Smoking, Inc. ("21CS") and Defendant Brent Duke ("Duke")(collectively "Defendants"), through their lawyers, Thomas R. Leavens, Travis R. Life, Peter S. Stamatis and Steven S. Shonder, submit this Joint Report in accordance with this Court's October 16, 2018 Order [Dkt. 277] ("October 16, 2018 Order").

1.    Pursuant to this Court's October 16, 2018 Order, Defendants were required to provide Plaintiffs with responsive Yahoo Messenger chat documents by 5:00 PM CST on November 21, 2018.[1]

**Plaintiffs' Insert:**

2.    Defendants produced no Yahoo Messenger Chat documents.

3.    On November 21, 2018 at 4:09 PM CST, Defendants' counsel, Travis Life, forwarded an email to counsel for Plaintiffs, a true copy of which is attached hereto as Exhibit A. Attached to the email was a PDF copy of correspondence sent to Defendants' counsel on October 23, 2018 from Oath, the company that owns and controls Yahoo.

4.    The PDF is Oath's response to Defendants' Subpoena which is a Letter from Oath's counsel explaining its response, a Declaration authenticating the response to the Subpoena, an Invoice for the cost to respond to the Subpoena, a "User Profile" and Yahoo Account Summary for Defendant Brent Duke's Yahoo account, and a three-page log showing Defendant Brent Duke's logins to his Yahoo Account but only from October 2017 through October of 2018.

5.    The Account Summary and log produced by Oath confirms that Defendant Brent Duke had a Yahoo Account that was created in 1999 and he has been actively using the Yahoo Account.

**Defendants' Insert:**

6.    Defendant 21 Century Smoking reports that it issued a subpoena to Oath, Inc., the successor to Yahoo!, seeking the production of any and all Yahoo! Messenger chat messages from Brent Duke's Yahoo! Account. This includes the period prior to October, 2011, the time in which plaintiff speculates defendant may have instructed someone to insert the "21st Century Smoke"

---

[1] That order required that this Joint Report be filed by 12:00 PM CST on November 28, 2018.

mark into the metadata on 21 Century Smoking's web site. Defendant denies this accusation and

plaintiff has provided no proof to support it.

7.      In response to defendant's subpoena to Oath, Oath produced only a log showing access to

Brent Duke's Yahoo! account for the period approximately October, 2017 through October, 2018,

and nothing more, and in particular produced *no chat messages whatsoever*.


Dated:  November 28, 2018                    Respectfully submitted


                                            Attorneys for Plaintiffs
                                    By:      /s/  *Anthony J. Davis*
                                            ANTHONY J. DAVIS


ANTHONY J. DAVIS                            ROBERT C. VON OHLEN
NICOLL DAVIS & SPINELLA, LLP                rvo@vonohlenlaw.com
adavis@ndslaw.com                           1340 W. Deerpath Road
95 Route 17 South                           Lake Forest, Illinois 60045
Paramus, New Jersey 07652                   888-376-7475
201-712-1616                                888-354-4244 (fax)
201-712-9444 (fax)


                                            Attorneys for Defendants
                                    By:      /s/  *Peter S. Stamatis*
                                            PETER S. STAMATIS


THOMAS R. LEAVENS                           PETER S. STAMATIS
TRAVIS R. LIFE                              STEVEN S. SHONDER
Leavens Strand & Glover, LLC                Law Offices of Peter S. Stamatis, PC
203 North LaSalle Street, Suite 2550        1 East Wacker Drive, Suite 2350
Chicago, Illinois 60601                     Chicago, Illinois 60601
(312) 488-4170                              (312) 606-0045


{0065-1370/00492396-1}          -3-

# Exhibit A

**Anthony Davis**

| | |
|---|---|
| **From:** | Travis Life <tlife@lsglegal.com> |
| **Sent:** | Wednesday, November 21, 2018 5:09 PM |
| **To:** | Anthony Davis; rvo@vonohlenlaw.com |
| **Cc:** | Peter Stamatis; Steven S. Shonder; Thomas R. Leavens |
| **Subject:** | DR Distributors, LLC, et al. v. 21 Century Smoking, Inc., et al. |
| **Attachments:** | SKM_C65818112115080.pdf |

Dear Counsel,

Pursuant to the Court's October 17, 2018 Order (Dkt #277), Defendants shall provide the responsive Yahoo-Messenger chat documents by 5:00pm CST on today's date. On October 23, 2018, Defendants received the attached correspondence and production from Oath regarding Brent Duke's Yahoo-Messenger chat data. As you may recall Oath owns Yahoo! and controls all of the data retained by Yahoo!. Attached is all of the information produced to Defendants from Oath.

Travis W. Life
Leavens, Strand & Glover, LLC
203 North LaSalle Street
Suite 2550
Chicago, Illinois 60601
Email: tlife@lsglegal.com
Office: 312-488-4170
Direct: 312-488-4163
Fax: 312-488-4177
Web Site: www.lsglegal.com
Facebook: /LSGALegal

This message is for the designated recipient only and may contain privilege, proprietary, or otherwise private information. If you have received this message in error, please notify the sender immediately and delete the original. Any dissemination, distribution, copying, or any other use of this message is strictly prohibited.

**From:** Travis Life
**Sent:** Wednesday, November 21, 2018 3:20 PM
**To:** 'Peter Stamatis' <peter@stamatislegal.com>; Steven S. Shonder <sshonder@sbcglobal.net>; Thomas R. Leavens <tleavens@lsglegal.com>
**Subject:** Draft correspondence to Plaintiff's regarding Oath Disclosure

"Dear Counsel,

Pursuant to the Court's October 17, 2018 Order (Dkt #277), Defendants shall provide the responsive Yahoo-Messenger chat documents by 5:00pm CST on today's date. Please be advised that Defendants have received no Yahoo-Messenger chat documents to date, thus have no documents to produce. "

Travis W. Life
Leavens, Strand & Glover, LLC

203 North LaSalle Street
Suite 2550
Chicago, Illinois 60601
Email: tlife@lsglegal.com
Office: 312-488-4170
Direct: 312-488-4163
Fax: 312-488-4177
Web Site: www.lsglegal.com
Facebook: /LSGALegal

This message is for the designated recipient only and may contain privilege, proprietary, or otherwise private information.  If you have received this message in error, please notify the sender immediately and delete the original.  Any dissemination, distribution, copying, or any other use of this message is strictly prohibited.



October 23, 2018

*Via Express Mail*

Peter S. Stamatis, Esq.
Law Offices of Peter Stamatis, PC
1 East Wacker Drive
Suite 2350
Chicago, IL 60601

      Re:    Request for Information Pertaining to User Account: brentduke@yahoo.com
              *DR Distributors, et al. v. 21 Century Smoking, Inc., et al., Case No. 12 CV 50324*
              (Internal Reference No. 391482)

Dear Mr. Stamatis:

Oath Holdings Inc. ("Oath") (formerly Yahoo Holdings, Inc.) is in receipt of a subpoena dated October 10, 2018, in the above-referenced matter.

Based upon its interpretation of the subpoena and considerable experience with requests for user data, Oath took the subpoena to require and be satisfied by the production of the following enclosed information regarding the specified user account, for the time period specified, to the extent available from our system: (1) the user profile, as produced by the Yahoo Account Management Tool and (2) the dates, times, and Internet protocol addresses for logins (if any), as produced by the Yahoo Login Tracker Tool. A declaration authenticating these records also is enclosed.

To the extent any document provided herein contained information that exceeded the scope of your request, is protected from disclosure, or is otherwise not subject to production, we have redacted or otherwise removed such information. When reviewing the information provided, please note that Oath may not require or verify user information because it offers many of its services to users for free.

Finally, as authorized by 18 U.S.C. § 2706, Oath requests reimbursement in the amount of $50.00 for reasonable costs incurred in searching for, assembling, and providing information in response to your request.

Please contact me if you have any questions.

Sincerely,

Sherry Hoyt, Manager
Oath Holdings Inc. Legal Department
Desk: 408-349-8479

Enclosure

## BUSINESS RECORDS DECLARATION

| | | |
|---|---|---|
| Request for information regarding:<br>brentduke@yahoo.com | )<br>)<br>) | **DECLARATION OF<br>SHERRY HOYT** |

I, Sherry Hoyt, declare:

1.  I am a Custodian of Records for Oath Holdings Inc. ("Oath") (formerly Yahoo Holdings, Inc.), located in Sunnyvale, California. I am authorized to submit this declaration on behalf of Oath. I make this declaration pursuant to the Federal Rules of Evidence Rule 902(11) and the California Code of Evidence section 1561 and in response to a subpoena dated October 10, 2018 ("the request"). I have personal knowledge of the following facts, except as noted, and could testify competently thereto if called as a witness.

2.  Attached hereto are 6 pages that contain true and correct copies of the following data pertaining to the user account identified in the request: (1) the user profile, as produced by the Yahoo Account Management Tool and (2) the dates, times, and Internet protocol addresses for logins (if any), as produced by the Yahoo Login Tracker Tool. Oath's servers record this data automatically at the time, or reasonably soon after, it is entered or transmitted, and this data is kept in the course of this regularly conducted activity and was made by regularly conducted activity as a regular practice. Oath may not require or verify user information because it offers many of its services to users for free.

3.  To the extent any document attached hereto contained information that exceeded the scope of the request, is protected from disclosure, or is otherwise not subject to production, such information has been redacted or otherwise removed.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

DATED: _____October 25, 2018_____          _Sherry Hoyt_____
                                                                    Sherry Hoyt, Custodian of Records

Internal reference number: 391482



# invoice for services

date:     October 23, 2018

to:       Peter S. Stamatis, Esq.
          Law Offices of Peter S. Stamatis, PC
          312-606-0045

re:       (Internal Reference No. 391482)
          (DR Distributors, et al. v. 21 Century Smoking, Inc., et al.,
          Case No. 12 CV 50324)

As authorized by 18 U.S.C. § 2706, the below amount is for costs, which have been directly incurred in responding to your legal process.

|                                  |            |
|----------------------------------|-----------:|
| Search, Retrieval, and Assembly  |    $50.00  |
| Shipping                         |     00.00  |
| Media                            |     00.00  |
| Notary                           |     00.00  |
| Less Prior Payment               |   (00.00)  |
| **TOTAL**                        |  **$50.00**|

Reimbursement for the costs associated with responding to legal process is important to enable Oath to continue responding expeditiously to future legal process. Please remit payment by one of the means listed below at your earliest convenience.

**By Mail:**
Oath Accounts Receivable
P.O. Box 3003
Carol Stream, IL 60132-3003
Tax ID 77-0398689

**By Wire:**
Citibank N.A., New York, NY
Account: 30525078
ABA/Routing # 021000089

**By Credit Card:**
Fax accompanying credit card authorization form to 1-866-888-5481

If you have any questions, please contact Oath's Finance Department at ar-cash@yahoo-inc.com.

**Fax To: 1 (866) 888-5481**



GL - 110-604160-0000-3840-200-502470-000-0000

# CREDIT CARD PAYMENT AUTHORIZATION FORM
Please include invoice(s) with this form when faxing.

Date: _____

Internal Reference Number(s):_____

Agency:_____

Payment Amount:_____

## CARD TYPE: Check One

| Master Card | VISA | American Express | Discover |
|---|---|---|---|
|  |  |  |  |

Card Number: _____

Expiration Date: _____

Name as it appears on card: _____

Billing address for credit card: _____

_____

_____

Special billing instructions: _____

    ***Note: Credit Card will be charged at the time of receipt of this authorization***

*I authorize Oath Holdings Inc. to charge the above credit card in the payment amount shown.*

_____          _____
Signature                                                              Date

# YAHOO! ACCOUNT MANAGEMENT TOOL

| | |
|---|---|
| Login Name: | **brentduke** |
| GUID: | **3LFUA6VEIE2PYJ4G46Q54WAGPE** |
| Yahoo Mail Name: | **brentduke@yahoo.com** |
| Alternate Communication Channels: | **bduke@stanfordalumni.org** *Verified* |
| | **brentstantonduke@gmail.com** *Unverified* |
| | **1 3125233244** *Verified* |
| | **1 5704062025** *Verified* |
| Registration IP address: | **171.64.173.105** |
| Account Created (reg): | **Thu Mar 11 01:49:39 1999 GMT** |
| Other Identities: | **brentduke (Yahoo! Mail)** |
| Full Name | **Mr Brent Stanton Duke** |
| Address1: | **2313 W. McLean** |
| Address2: | **#1W** |
| City: | **Chicago** |
| State, territory or province: | **IL** |
| Country: | **United States** |
| Zip/Postal Code: | **60647** |
| Phone: | **312-523-3244** |
| Time Zone: | **ct** |
| Birthday: | **April 23, 1978** |
| Gender: | **Male** |
| Occupation: | |
| Business Name: | **Roach Ag.** |
| Business Address: | |
| Business City: | |
| Business State: | |
| Business Country: | **us** |
| Business Zip: | |

| | |
|---|---|
| Business Phone: | 312-823-2244 |
| Business Email: | |
| Additional IP Addresses: | Fri Sep 14 15:26:49 2018 GMT  96.68.38.137 |
| | Tue Jun 10 19:23:48 2014 GMT  67.165.177.25 |
| | Thu Nov 7 18:53:05 2013 GMT  98.212.122.204 |
| | Sat Apr 30 03:48:11 2011 GMT  71.201.63.11 |
| | Wed Dec 27 21:50:34 2006 GMT  74.0.19.155 |
| | Sat Jun 4 18:26:26 2005 GMT  69.222.139.10 |
| Yahoo Mail Agreed (ym_agreed): | Sun Aug 29 15:56:56 1999 |
| Account Status: | Active |

Case: 3:12-cv-50324 Document #: 281 Filed: 11/28/18 Page 13 of 16 PageID #:12847

| | | |
|---|---|---|
| Search for | brentduke | |
| Date Range | 2017-10-23 / 2018-10-10 | |
| Time zone | (GMT) Greenwich Mean Time : London | |
| Total Results | | 123 |

| User ID | IP Address | Port | Brand | Login Time |
|---|---|---|---|---|
| brentduke | 76.176.164.43 | 56557 | yahoo | 10/7/18 2:45 |
| brentduke | 96.68.38.137 | 36801 | yahoo | 10/5/18 15:57 |
| brentduke | 96.68.38.137 | 49814 | yahoo | 10/2/18 16:11 |
| brentduke | 96.68.38.137 | 14660 | yahoo | 10/2/18 15:57 |
| brentduke | 76.176.164.43 | 47027 | yahoo | 9/30/18 0:53 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 62806 | yahoo | 9/28/18 21:02 |
| brentduke | 96.68.38.137 | 31460 | yahoo | 9/26/18 20:25 |
| brentduke | 96.68.38.137 | 31152 | yahoo | 9/26/18 20:24 |
| brentduke | 96.68.38.137 | 24711 | yahoo | 9/24/18 19:20 |
| brentduke | 96.68.38.137 | 22477 | yahoo | 9/24/18 18:52 |
| brentduke | 2607:fb90:6623:eb8f:0:1:3d57:4601 | 45292 | yahoo | 9/22/18 15:23 |
| brentduke | 96.68.38.137 | 42708 | yahoo | 9/21/18 20:46 |
| brentduke | 96.68.38.137 | 56709 | yahoo | 9/21/18 20:46 |
| brentduke | 96.68.38.137 | 62674 | yahoo | 9/21/18 20:37 |
| brentduke | 96.68.38.137 | 36985 | yahoo | 9/21/18 20:37 |
| brentduke | 96.68.38.137 | 7986 | yahoo | 9/20/18 18:38 |
| brentduke | 96.68.38.137 | 62306 | yahoo | 9/20/18 18:38 |
| brentduke | 96.68.38.137 | 16223 | yahoo | 9/19/18 16:12 |
| brentduke | 96.68.38.137 | 48988 | yahoo | 9/19/18 16:07 |
| brentduke | 96.68.38.137 | 28067 | yahoo | 9/18/18 21:11 |
| brentduke | 2607:fb90:8697:2d9d:0:b:b918:fe01 | 37358 | yahoo | 9/15/18 15:19 |
| brentduke | 2607:fb90:8697:2d9d:0:b:b918:fe01 | 37348 | yahoo | 9/15/18 15:19 |
| brentduke | 2607:fb90:8697:2d9d:0:b:b918:fe01 | 37347 | yahoo | 9/15/18 15:19 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 59296 | yahoo | 9/14/18 20:57 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 59224 | yahoo | 9/14/18 20:56 |
| brentduke | 96.68.38.137 | 11261 | yahoo | 9/14/18 20:17 |
| brentduke | 96.68.38.137 | 39671 | yahoo | 9/14/18 18:40 |
| brentduke | 96.68.38.137 | 13314 | yahoo | 9/14/18 18:36 |
| brentduke | 96.68.38.137 | 22307 | yahoo | 9/14/18 15:23 |
| brentduke | 96.68.38.137 | 56251 | yahoo | 9/13/18 17:56 |
| brentduke | 96.68.38.137 | 38612 | yahoo | 9/13/18 17:56 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 54867 | yahoo | 9/12/18 19:55 |
| brentduke | 2607:fb90:662a:ac44:0:5:af42:2b01 | 50133 | yahoo | 9/11/18 19:20 |
| brentduke | 2607:fb90:8622:ed86:0:11:9ae9:1501 | 56071 | yahoo | 9/10/18 10:07 |
| brentduke | 2607:fb90:4aee:a577:0:11:f6fd:a601 | 35447 | yahoo | 9/4/18 19:09 |
| brentduke | 2607:fb90:6692:d83a:0:14:4521:9c01 | 46957 | yahoo | 9/3/18 8:53 |

| | | | | |
|---|---|---|---|---|
| brentduke | 72.197.63.36 | 51035 | yahoo | 8/29/18 19:55 |
| brentduke | 2607:fb90:662f:839f:0:17:fdcc:a201 | 55152 | yahoo | 8/28/18 18:54 |
| brentduke | 2607:fb90:862c:b9:0:10:1a05:c201 | 35598 | yahoo | 8/27/18 8:31 |
| brentduke | 2607:fb90:6639:109:0:15:e38c:3f01 | 47562 | yahoo | 8/21/18 18:52 |
| brentduke | 2607:fb90:8437:9072:0:12:2ef1:7401 | 53233 | yahoo | 8/20/18 8:21 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 56111 | yahoo | 8/15/18 18:37 |
| brentduke | 2607:fb90:4cec:e51b:0:11:4a96:8501 | 53160 | yahoo | 8/14/18 18:41 |
| brentduke | 2607:fb90:4e94:ca70:0:1f:e598:b01 | 52510 | yahoo | 8/13/18 7:58 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 53374 | yahoo | 8/9/18 17:12 |
| brentduke | 2607:fb90:843f:3ca3:0:d:c74d:b201 | 33053 | yahoo | 8/7/18 18:27 |
| brentduke | 2607:fb90:663b:9b16:0:4:9259:b201 | 46077 | yahoo | 8/6/18 4:03 |
| brentduke | 2607:fb90:6622:50a0:0:1f:1484:601 | 53800 | yahoo | 7/31/18 18:27 |
| brentduke | 2607:fb90:8497:3884:0:5:219b:1101 | 55681 | yahoo | 7/30/18 3:35 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 58255 | yahoo | 7/26/18 16:53 |
| brentduke | 2607:fb90:6622:50a0:0:1f:1484:601 | 57802 | yahoo | 7/24/18 18:27 |
| brentduke | 2607:fb90:843d:eb46:0:11:af9:e201 | 44850 | yahoo | 7/23/18 2:53 |
| brentduke | 2607:fb90:2164:7207:0:1e:3914:3201 | 42354 | yahoo | 7/17/18 18:27 |
| brentduke | 2607:fb90:4c9c:380a:0:1c:1e3b:f801 | 47141 | yahoo | 7/16/18 2:33 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 50973 | yahoo | 7/12/18 16:52 |
| brentduke | 2607:fb90:21c1:5075:0:45:d340:801 | 55042 | yahoo | 7/10/18 18:16 |
| brentduke | 192.225.123.45 | 60115 | yahoo | 7/9/18 1:39 |
| brentduke | 2607:fb90:8691:61f5:0:b:a9ca:3e01 | 53905 | yahoo | 7/3/18 18:10 |
| brentduke | 2607:fb90:6699:25fd:0:1f:f36f:aa01 | 36636 | yahoo | 7/2/18 1:09 |
| brentduke | 2607:fb90:6699:25fd:0:1f:f36f:aa01 | 36635 | yahoo | 7/2/18 1:09 |
| brentduke | 2607:fb90:6699:25fd:0:1f:f36f:aa01 | 36582 | yahoo | 7/2/18 1:08 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 60999 | yahoo | 6/29/18 21:15 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 50410 | yahoo | 6/28/18 16:52 |
| brentduke | 76.176.164.43 | 40472 | yahoo | 6/26/18 18:06 |
| brentduke | 2607:fb90:6673:3e52:0:16:1958:a01 | 32832 | yahoo | 6/19/18 18:03 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 50573 | yahoo | 6/14/18 16:14 |
| brentduke | 192.225.123.45 | 40656 | yahoo | 6/12/18 18:03 |
| brentduke | 192.225.123.45 | 54473 | yahoo | 6/11/18 21:40 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 51463 | yahoo | 6/11/18 17:51 |
| brentduke | 2605:e000:1c03:c2dc:0:9eb7:891d:f02c | 52564 | yahoo | 6/9/18 2:33 |
| brentduke | 2607:fb90:8630:d35b:0:1e:1f6b:1001 | 55793 | yahoo | 6/5/18 17:50 |
| brentduke | 2607:fb90:6639:2ca6:0:1a:d6ae:2c01 | 45545 | yahoo | 5/29/18 17:47 |
| brentduke | 104.61.134.228 | 51068 | yahoo | 5/25/18 23:10 |
| brentduke | 192.225.123.45 | 41767 | yahoo | 5/22/18 17:21 |
| brentduke | 104.61.134.228 | 59126 | yahoo | 5/15/18 17:07 |
| brentduke | 104.61.134.228 | 58749 | yahoo | 5/11/18 19:35 |
| brentduke | 96.68.38.137 | 4065 | yahoo | 5/8/18 19:53 |
| brentduke | 104.61.134.228 | 59569 | yahoo | 5/8/18 16:52 |
| brentduke@yahoo.com | 96.68.38.137 | 4207 | yahoo | 5/8/18 16:46 |

| | | | | |
|---|---|---|---|---|
| brentduke@yahoo.com | 96.68.38.137 | 42182 | yahoo | 5/7/18 22:39 |
| brentduke | 96.68.38.137 | 48832 | yahoo | 5/7/18 22:38 |
| brentduke | 96.68.38.137 | 48832 | yahoo | 5/7/18 22:38 |
| brentduke | 104.61.134.228 | 33326 | yahoo | 5/1/18 16:48 |
| brentduke | 104.61.134.228 | 49884 | yahoo | 4/26/18 17:21 |
| brentduke | 104.61.134.228 | 60055 | yahoo | 4/24/18 16:33 |
| brentduke | 104.61.134.228 | 38355 | yahoo | 4/17/18 16:31 |
| brentduke | 104.61.134.228 | 53217 | yahoo | 4/12/18 16:33 |
| brentduke | 104.61.134.228 | 50198 | yahoo | 4/10/18 20:55 |
| brentduke | 2607:fb90:28cf:1ef:0:1b:c376:3101 | 56418 | yahoo | 4/10/18 16:17 |
| brentduke | 2607:fb90:6652:7108:0:39:8f9d:f201 | 52978 | yahoo | 4/3/18 16:06 |
| brentduke | 104.61.134.228 | 57043 | yahoo | 3/27/18 17:23 |
| brentduke | 172.56.40.200 | 28487 | yahoo | 3/27/18 16:02 |
| brentduke | 2607:fb90:4d10:a86a:0:4b:b9ef:5201 | 55324 | yahoo | 3/20/18 15:56 |
| brentduke | 2607:fb90:664a:f283:0:49:f93b:b201 | 49927 | yahoo | 3/13/18 15:40 |
| brentduke | 104.61.134.228 | 56286 | yahoo | 3/12/18 22:42 |
| brentduke | 2607:fb90:865c:9f34:0:3a:3642:b201 | 36344 | yahoo | 3/6/18 15:38 |
| brentduke | 2607:fb90:21b1:c2f2:0:47:b7fe:4101 | 39830 | yahoo | 2/27/18 15:31 |
| brentduke | 104.61.134.228 | 49787 | yahoo | 2/26/18 19:31 |
| brentduke | 2607:fb90:4d1c:73e0:0:4f:b47:b901 | 52177 | yahoo | 2/20/18 15:28 |
| brentduke | 2607:fb90:4d1c:73e0:0:4f:b47:b901 | 48675 | yahoo | 2/13/18 15:06 |
| brentduke | 104.61.134.228 | 56518 | yahoo | 2/12/18 19:31 |
| brentduke | 104.61.134.228 | 40398 | yahoo | 2/6/18 15:03 |
| brentduke | 104.61.134.228 | 54142 | yahoo | 1/30/18 13:47 |
| brentduke | 104.61.134.228 | 54840 | yahoo | 1/27/18 3:11 |
| brentduke | 104.61.134.228 | 54458 | yahoo | 1/23/18 13:21 |
| brentduke | 104.61.134.228 | 38498 | yahoo | 1/16/18 11:57 |
| brentduke | 104.61.134.228 | 64750 | yahoo | 1/13/18 1:03 |
| brentduke | 104.61.134.228 | 54002 | yahoo | 1/9/18 11:51 |
| brentduke | 104.61.134.228 | 60654 | yahoo | 1/2/18 11:06 |
| brentduke | 104.61.134.228 | 62304 | yahoo | 12/29/17 16:56 |
| brentduke | 104.61.134.228 | 47373 | yahoo | 12/26/17 9:03 |
| brentduke | 2607:fb90:8449:4495:0:4a:1cd0:3e01 | 47567 | yahoo | 12/19/17 7:31 |
| brentduke | 104.61.134.228 | 60235 | yahoo | 12/14/17 20:02 |
| brentduke | 104.61.134.228 | 50217 | yahoo | 12/12/17 6:11 |
| brentduke | 104.61.134.228 | 33851 | yahoo | 12/5/17 4:12 |
| brentduke | 104.61.134.228 | 52469 | yahoo | 11/30/17 20:01 |
| brentduke | 104.61.134.228 | 55635 | yahoo | 11/28/17 4:05 |
| brentduke | 104.61.134.228 | 60590 | yahoo | 11/21/17 3:56 |
| brentduke | 2600:8801:1c8b:faa0:c0e5:b4d:d995:b93e | 49784 | yahoo | 11/15/17 22:21 |
| brentduke | 2607:fb90:864d:9579:0:3f:e900:4201 | 38231 | yahoo | 11/14/17 3:38 |
| brentduke | 2607:fb90:8508:5369:0:4d:80e7:d201 | 55825 | yahoo | 11/7/17 3:38 |
| brentduke | 104.61.134.228 | 52021 | yahoo | 11/1/17 22:13 |

brentduke          104.61.134.228                    46770  yahoo   10/26/17 17:57

# EXHIBIT 1

Case: 3:12-cv-50324 Document #: 288 Filed: 01/22/19 Page 1 of 6 PageID #:12858

### UNITED STATES DISTRICT COURT FOR THE
### NOTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

| | | |
|---|---|---|
| DR DISTRIBUTORS, LLC, and CB DISTRIBUTORS, INC. | ) | |
| | ) | |
| Plaintiffs/Counterclaimant, | ) | |
| | ) | |
| v. | ) | Case Number: 3:12 – cv – 50324 |
| | ) | |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) | |
| | ) | Judge: Frederick J. Kapala |
| Defendant/Counterclaim Defendant, | ) | |
| | ) | Magistrate Judge: Iain Johnston |
| 21 CENTURY SMOKING, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## REPORT TO THE COURT

21 CENTURY SMOKING, INC. and BRENT DUKE (collectively "21CS"), by their lawyers, THOMAS R. LEAVENS, PETER S. STAMATIS and STEVEN S. SHONDER, for this Report to the Court, hereby state as follows:

1. This Report follows up the parties' November 28, 2018 Status Report on Defendants' Yahoo! Chat Documents.

      2.      On January 18, 2019, Counsel for 21CS received correspondence from 4Discovery, its computer consultant in the instant action. The correspondence involves the hard drives 4Discovery had imaged on behalf of Defendants in this matter.

      3.      The correspondence is attached hereto.

Dated:  January 22, 2019

                          21 CENTURY SMOKING, INC. and
                          BRENT DUKE

                              /s/ Steven S. Shonder

                   By:  _____
                            One of their Attorneys

Thomas R. Leavens (Bar No. 1601016)    Peter S. Stamatis (Bar No. 6217496)
Leavens Strand & Glover, LLC         Steven S. Shonder (Bar No. 6238090)
203 North LaSalle Street, Suite 2550    Law Offices of Peter S. Stamatis, PC
Chicago, Illinois 60601             1 East Wacker Drive, Suite 2350
(312) 488-4170                   Chicago, Illinois 60601
                              (312) 606-0045

## CERTIFICATE OF SERVICE

      Steven S. Shonder, an attorney, certifies that he caused a true and correct copy of the foregoing **Report to the Court**, to be served upon Plaintiff and with the Clerk of Court via the CM/ECF electronic filing system on January 22, 2019.

                                      /s/ Steven S. Shonder

**4Discovery**

January 18, 2019

RE: 21st Century - Drive Failure

To Whom It May Concern:

My name is Chad Gough. I am the Manager of 4Discovery, LLC. In this position, my duties and responsibilities include managing all aspects of computer forensics and electronic discovery cases. I am directly involved in computer forensics imaging, analysis, and production. I provide both expert testimony for court cases and reports including affidavits and declarations. I have over 15 years of experience in computer forensic and electronic discovery matters and have worked on hundreds of matters involving disputes over digital evidence and electronic data.

On or about December 9, 2014, the individual defendant, Brent Duke, through his counsel, Leavens Strand & Glover, LLC, retained 4Discovery to examine digital media related to this matter. On or about December 9, 2014, 4Discovery shipped a remote collection drive to Brent Duke at 6190 Hidden Valley Rd., Fallbrook, CA 92028. On or about December 12, 2014, 4Discovery remotely imaged four computers, which included Brent Duke's Samsung NP3005VA laptop. Once the images were verified as successful, Brent Duke shipped the hard drive containing the forensic images back to 4Discovery. The forensic images were stored on a Seagate Backup Plus Portable External Hard Drive bearing the external serial number NA7GEP7E and the internal serial number S30CJ9AF987261. Included on this External Hard Drive (S30CJ9AF987261), there were images of a total of four hard drives in all:

> (1) 21Century_syxp8h61mlx2_Laurie;
> (2) 21CenturySmoke_Acerax3950-ur30p_RobHough;
> (3) 1CenturySmoke_samsungnp3005va_BrentDuke; and,
> (4) 21CenturySmoke_syx-p8h61-mlx2_BryanKos.

A forensic analysis was then performed by 4Discovery on the forensic images stored on this hard drive.

After the analysis was complete, this hard drive was stored in 4Discovery's long term evidence storage. When a case is moved to long term evidence storage, it is stored on a single non-redundant hard drive. Under the 2014 Statement of Work, 4Discovery was not required to maintain any electronically stored information beyond one (1) year from the last invoice date. The last invoice date on this matter was February 10, 2015. 4Discovery was not requested to do any further work at that time.

On or about May 7, 2018, this case was reactivated at the request of Travis Life of Leavens, Strand & Glover, LLC. In September of 2018, 4Discovery was requested to download, by defense counsel, Brent Duke's Yahoo! Messenger chat history from Yahoo!. This is Yahoo! data that would have been stored online and would have been accessible through Brent Duke's Yahoo! account. This is separate from data that is stored on Brent Duke's laptop. After multiple attempts and phone calls with Yahoo! Support to gain access to the data, 4Discovery was unsuccessful. Yahoo! Messenger service was discontinued as of July 17, 2018. Yahoo!'s help page states, "Yahoo Messenger will no longer be supported after July 17, 2018. Until then, you can continue to use the service normally. After July 17, you'll no longer be able to access your chats and the service will no longer work. Read our FAQs below for more info on what this means for you." (https://help.yahoo.com/kb/SLN28776.html). Yahoo!'s help page continues, "Through the end of November, 2018, you can download your chat history to your personal computer or device."

Since the Yahoo! Messenger chat history from Brent Duke's online account was not obtained, 4Discovery was requested by defense counsel to examine the forensic image of Brent Duke's laptop for the presence of the Yahoo! Chat program, which may have stored chats locally. 4Discovery agreed to do so and retrieved the hard drive from its long-term storage. The hard drive containing the forensic image was located in 4Discovery's evidence storage. At the time, this hard drive had not left 4Discovery's possession since it was first utilized for this project in 2014. To the best of my knowledge, this drive has never been intentionally or unintentionally damaged by dropping or mishandling in any fashion.

The hard drive was connected to a forensic workstation, but it was non-responsive and appeared to have failed. 4Discovery did everything within its ability to recover as much data as possible from the failed drive but was unsuccessful in recovering the forensic image of Brent Duke's laptop. 4Discovery then sent the failed hard drive to a specialty data recovery facility and 4Discovery spent $2,333.28 of its own funds in an attempt to recover the forensic image. The specialty data recovery facility was not able to fully recover the forensic image, but it was able to recover a file which contained an index of all files that were stored on Brent Duke's laptop.

4Discovery examined the file index for any Yahoo! Messenger software and chat databases, and it does not appear Yahoo! Messenger chats were saved to this laptop at the time of imaging.  At the time of this letter's drafting, the failed drive is in 4Discovery's possession along with the drive containing the data that was restored by the specialty data recovery facility.

Best Regards,

Chad Gough
chad@4discovery.com
312-924-5761

# EXHIBIT 18

INTENTIONALLY OMITTED

# EXHIBIT 19

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC,        ) | |
|        Plaintiff,     ) | |
| v.           ) | |
|         ) | |
| 21 CENTURY SMOKING, INC., and  ) | No. 12 CV 50324 |
| BRENT DUKE,     ) | Magistrate Judge Iain Johnston |
|        Defendants,   ) | |
|         ) | |
| and         ) | |
|         ) | |
| 21 CENTURY SMOKING, INC.,   ) | |
|        Counterclaimant,  ) | |
| v.           ) | |
|         ) | |
| DR DISTRIBUTORS, LLC, et al.,   ) | |
|        Counterdefendants,  ) | |

**ORDER**

This is the way the world ends.

Not with a bang but a whimper.

*The Hollow Men*

T.S. Elliot

Before the Court are five related motions by the defendants: a motion to stay briefing a motion for sanctions after the recent revelation of yet another source of potentially responsive documents that has not yet been searched [298], and four separate motions to withdraw by defense counsel because of a break down in the attorney-client relationship in light of the document revelation, [300], [303], [305] and [307].

Over the understandable objection of the plaintiff/counterdefendants ("plaintiffs"), the Court reluctantly grants the motion to stay [298]. The Court acknowledges the argument by plaintiffs' counsel during the motion hearing on 6/4/2019 that the stay will further delay this case. However, given the defendants' obligation to produce responsive documents and the plaintiffs presumed desire to obtain them, the time needed to search for the e-mails or documents maintained in

1

the Cloud associated with the defendant's GoDaddy account, review those materials for responsiveness and privilege, and produce them to the plaintiffs will already cause delay.

In addition, delay will also attend the withdrawal of defense counsel. The decision whether to allow counsel to withdraw is within the sound discretion of the district court. *Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1087 (7th Cir. 1982). When counsel feels unable to adequately continue representing the client, and the client does not oppose the motion to withdraw, allowing withdrawal is not an abuse of the court's discretion. *Id.* at 1087-88. In support of the motions to withdraw by attorneys Thomas Leavens, Travis Life, Steven Shonder, Peter Stamatis, and Peter Strand, counsel have stated that the attorney-client relationship is "irrevocably impaired" and that a conflict of interest arose as a result of the recent discovery of more potentially responsive documents. Attorney Heather Liberman seeks to withdraw because she long ago left her former firm and her failure to move to withdraw at the time was an oversight [307]. Given defense counsel's belief that they can no longer represent the defendants, and defendant Brent Duke's presence at the motion hearing and lack of any objection by him or the attorney who accompanied him (who has not appeared in this case), and in an exercise of its discretion, the Court grants the motions to withdraw, [300], [303], [305] and [307].

However, counsel's obligations do not end with their withdrawal. Counsel's knowledge about the production of documents (or, more accurately, the lack thereof) and information in this case will be relevant to further proceedings on the pending motions for sanctions, as well as other possible proceedings, including contempt of court (both civil and criminal) and counsel may find themselves subpoenaed to testify (in granting the motion to withdraw the Court is mindful that one attorney is no longer within 100 miles of the Northern District of Illinois, and so it granted her motion trusting that she would appear to defend herself if subpoenaed). In addition, "a district court retains jurisdiction to impose sanctions after the proceeding in which the sanctionable conduct occurred has ended." *Martinez v. City of Chicago*, 823 F.3d 1050, 1056 (7th Cir. 2016) (*citing Cooter & Gell Hartmax Corp.*, 496 U.S. 384, 395-6, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)); *see also Adams v. Lever Bros. Co.*, 87 CV 9037, 1991 U.S. Dist. LEXIS 13065, at **17-19, 39-40 (N.D. Ill. Sept. 16, 1991) (sanctions imposed on attorney based on conduct that occurred before his withdrawal).

Meanwhile, the motion for sanctions [294] remains entered and continued, as the Court wants to know more about the production before proceeding. Status

hearing is set for 8/20/2019 at 1:30PM. Counsel and the parties must appear in person, except for Ms. Liberman, who may appear telephonically. 21 Century Smoking, Inc. can only appear through counsel. *Williams v. National Housing Exchange, Inc.*, 110 F. Supp. 2d 694, 698 (N.D. Ill. 2000). The Court fully expects that Mr. Duke will have engaged counsel by then, and if not, explain in detail the efforts he made to obtain counsel. By 8/13/2019 the defendants shall submit a written report on (1) the status of the search for responsive e-mails and other documents from the GoDaddy account stored in the Cloud; (2) what investigation has been done into whether any e-mails or documents associated with the GoDaddy account were lost, destroyed, not preserved, or spoliated and the results of that investigation including the extent of documents that are no longer available; and (3) the anticipated date of production of the GoDaddy account materials. Additionally, the Court expects to be fully informed as to whether other devices, including but not limited to cell phones or legacy systems have been searched, as well as whether other modes of electronic communications have been searched; for example, text messages, Snapchat messages or Slack messages as opposed to just emails have been searched.

Upon reflecting on the events reported in this case over the past week, the Court makes the following observations about where matters appear headed. If the plaintiffs succeed on the motion for sanctions including an award of attorneys' fees (which already exceed $880,000), it is not clear what if any portion of the award they would collect. Meanwhile, sanctions could include dismissal of the defendants' counterclaim, leaving the defendants with no chance collecting against the plaintiffs while still subject to possible liability to the plaintiffs including a monetary sanction. The Court assumes that Mr. Bengoa is in the business of business, not litigation, particularly litigation that might result in a meaningless, unrecoverable monetary judgment. So, the Court intends to discuss with the parties during the 8/20/2019 status hearing the benefits of working to resolve this case, an agreement that could decide who gets use of the disputed mark in exchange for freeing the parties and their counsel from further sanctions proceedings, the time and expense involved in restarting fact discovery (including the appointment of a special master at defendants' expense), the need for any new counsel to focus considerable effort to become acquainted with 7 years of zealous litigation spanning over 300 docket entries, and possible satellite litigation relating to the multiple failures to preserve or produce responsive ESI.

CONCLUSION

For the reasons given, the Court grants the motions to stay [298] and to withdraw [300], [303], [305], and [307]. The clerk is directed to terminate the appearances of Thomas Leavens, Heather Liberman, Travis Life, Steven Shonder, Peter Stamatis, and Peter Strand, though counsel are advised that their obligations to the Court and this case do not end with their withdrawal. Status hearing set for 8/20/2019 at 1:30PM. Counsel for the parties, the parties, and counsel who have been allowed to withdraw must appear in person, except Ms. Liberman. *This means that everybody who was in court for the presentment of the motions to withdraw and the motion to stay must personally appear in court on 8/20/19 at 1:30 PM, but Ms. Liberman may appear telephonically.* It would be advisable for an attorney or representative of Diamond State Insurance to be present as well. The Court observed Diamond State's counsel in the courtroom on 6/4/19. By 8/13/2019 the defendants shall file a written report on the status of the search for additional documents associated with the GoDaddy account, including the investigation into any missing documents, as detailed in this order. Counsel should anticipate and be prepared to stay to at least 5:00 PM.


Entered: June 6, 2019          By: _____

                                    Iain D. Johnston
                                    United States Magistrate Judge


4

# EXHIBIT 20

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 169 of 581 PageID #:14509

Snider v. Danfoss, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 2973464
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Western Division.

Marvel SNIDER, Plaintiff,
v.
DANFOSS, LLC, Defendant.

15 CV 4748
|
Signed 07/12/2017

**Attorneys and Law Firms**

Rene Hernandez, Attorney at Law, Rockford, IL, for Plaintiff.

Kwabena Agyepong Appenteng, Littler Mendelson, Chicago, IL, Jeannie M. DeVeney, Littler Mendelson, P.C., Kansas City, MO, for Defendant.

**MEMORANDUM OPINION AND
ORDER AND REPORT AND
RECOMMENDATION ON PLAINTIFF'S
MOTION FOR RULE 37(e) SANCTIONS**

Iain D. Johnston, United States Magistrate Judge

**\*1** Federal Rule of Civil Procedure 37(e) incorporates the long-standing legal principle embodied in the phrase used on basketball courts everyday across the country: "No harm; no foul." Under the particular facts of this case, Defendant's admitted and erroneous destruction of electronically stored information (ESI), which does not appear to be relevant, has not prejudiced Plaintiff. Accordingly, sanctions are not warranted under Rule 37(e).

**I. FACTS**

Plaintiff Marvel Snider (nee Marvel Boisvert) worked for Defendant Danfoss LLC since 1999. In 2013, Plaintiff worked as a quality assurance coordinator for Danfoss. She claims that during this time, for several months, she was sexually harassed by another employee named Curtis White. In March of 2014, Plaintiff informed Susan Blood of the harassment. Ms. Blood was not technically Plaintiff's supervisor but essentially acted in that capacity. Ms. Blood informed a Danfoss human resources representative, Kimberly Kuborn, of the claims of sexual harassment of Plaintiff by Curtis White. Danfoss then conducted an internal investigation, finding that the allegations were supported and suspended Curtis White for two weeks without pay.

About two months later, on about May 20, 2014, Plaintiff was transferred from her position as quality assurance coordinator to an assembler position. Plaintiff viewed this transfer as a demotion and retaliation for her sexual harassment complaint.

On May 28, 2014, on behalf of Plaintiff, an attorney sent Danfoss a preservation letter.[1] The letter foreshadowed legal action.

On about June 15, 2014, Plaintiff left Danfoss' employment.

Pursuant to Danfoss policy, on September 15, 2014—90 days after her employment terminated—it deleted Plaintiff's emails.

In about March of 2015, Ms. Blood left Danfoss' employment. And again, pursuant to Danfoss policy, 90 days later, on June 14, 2015, Ms. Blood's emails were deleted.

These deletions were not best practices, to put it mildly. The fact that Danfoss is not being sanctioned should in no way be viewed as the Court approving of Danfoss' reckless or careless actions.

On May 29, 2015, unrepresented by counsel, Plaintiff filed this lawsuit.

On December 9, 2015, current counsel filed an appearance for Plaintiff, and on January 5, 2016, filed the First Amended Complaint on behalf of Plaintiff.[2] The case was then transferred from the Eastern Division to the Western Division.

**\*2** Per this Court's standard practice, within about 30 days of the filing of the amended complaint, on February 17, 2016, the Court entered a case management order. This order cut off fact discovery on October 28, 2016.

Depositions of witnesses began well in advance of the discovery cut-off date. During the depositions, Rick White testified that he was Plaintiff's supervisor and that he decided to transfer Plaintiff from quality assurance coordinator to assembler. Other testimony supported Rick White's testimony. Rick White testified that he transferred Plaintiff,

Snider v. Danfoss, LLC, Not Reported in Fed. Supp. (2017)

in part, because she had conflicts with other employees and problems communicating with other employees, including Ms. Blood. Although Ms. Blood provided Plaintiff her daily assignments, there is no evidence that Ms. Blood was involved in the decision to transfer Plaintiff. And after some attempts, on October 7, 2016, Ms. Blood appeared for her deposition pursuant to a subpoena. Apparently, Ms. Blood suffered from a case of "testimonial amnesia" and was unable to recall a variety of facts, even benign, irrelevant facts. [3] Understandably frustrated, Plaintiff's counsel immediately requested copies of Ms. Blood's and Plaintiff's emails. [4] Obviously, by that time, the emails were deleted.

Between October 7, 2016 and October 12, 2016, the parties exchanged communications regarding the status of the requested emails. On October 27, 2016, the Court extended the fact discovery deadline to allow Danfoss to respond to the supplemental discovery.

Following the disclosure that Ms. Blood's and Plaintiff's emails had been deleted, Danfoss and its counsel agreed to search for and produce emails of other employees; namely, all non-privileged emails between human resources representative Kimberly Kuborn to and from either Ms. Blood and Plaintiff as well as non-privileged emails between Ms. Kuborn and another person employed in human resources. That search required the review of over 22 gigabytes of data and the production of over 400 pages of emails. [5] That search and production did not resolve the issue or Plaintiff's counsel's concern.

On March 13, 2017, Plaintiff filed the current motion seeking sanctions for the destruction of Plaintiff's and Ms. Blood's emails. Dkt. 47. On April 7, 2017, Danfoss responded. And on April 13, 2017, the Court heard arguments on the motion.

**\*3** During the argument, it became clear that, in the absence of Ms. Blood's and Plaintiff's emails, Plaintiff's counsel was seeking emails to help establish that the proffered reason for Plaintiff's transfer was a pretext. Namely, Plaintiff's counsel was looking for emails to and from Ms. Blood—remember that this issue was teed up because Ms. Blood had great difficulty recalling basic information at her deposition— showing that Plaintiff was performing well, had no conflicts with other employees and was communicating appropriately with other employees. Similarly, Plaintiff's counsel sought these emails to show the lack of complaints about and problems with Plaintiff. In other words, Plaintiff wanted these emails not for what was contained in the emails but what was

*not* contained in the emails. Obviously, Plaintiff would also be happy with an email from Rick White stating that Plaintiff should be transferred because she complained about Curtis White's sexual harassment. (Not surprisingly, no such email exists to the Court's knowledge.) After the Court questioned Danfoss' counsel, it learned that Rick White's emails to and from Ms. Blood still existed. Accordingly, the Court ordered that Rick White's emails to and from Ms. Blood during the relevant time frame be produced to the Court for an *in camera* inspection. These emails were in addition to the 400 pages of emails Danfoss previously produced to Plaintiff's counsel after it was learned that Ms. Blood's and Plaintiff's emails had been deleted. [6] The search for these emails produced more than 400 additional emails.

The Court has spent a considerable number of hours reviewing the hundreds of responsive emails. Having completed that unenviable task, the Court concludes that those emails do not support Plaintiff's claims. Indeed, some of the emails support Danfoss' theory of the case. [7]

Regardless of this Court's conclusions after the *in camera* inspection, the Court must still address Plaintiff's motion for sanctions.

## II. ISSUE

The issue before this Court is whether, under these particular facts, Danfoss should be sanctioned under Rule 37(e) for its failure to preserve the emails of Ms. Blood and Plaintiff.

## III. AMENDED RULE 37(e)

After December 1, 2015, Rule 37(e) provides the specific— and sole [8] – basis to sanction a party for failing to preserve electronically stored information. Rule 37(e) provides the following:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding of prejudice to another party from loss of the information, may order measures no great than necessary to cure the prejudice; or

(2) only upon a finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A) presume that the information was unfavorable to the party;

    (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

    (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Dissecting the rule into its various requirements might be helpful. As will be seen, the amendments to Rule 37(e) limited a court's discretion to impose sanctions. *Jenkins*, 2017 U.S. Dist. LEXIS 9581 at *32, 2017 WL 362475.

**\*4** The rule contains a five-part winnowing process courts must apply before they can even consider imposing sanctions.

1. The information must be ESI. The rule only applies to ESI. Fed. R. Civ. P. 37(e), Advisory Committee Notes, 2015 Amendments ("The new rule applies only to electronically stored information ...").

2. There must be anticipated or actual litigation. This provision establishes that litigation—anticipated or ongoing—triggers the duty to preserve ESI.

3. Because of anticipated or current litigation, the ESI "should have been preserved." This provision limits the scope of the ESI to be preserved in three ways. Initially, the phrase "should have been preserved" encompasses the concept of the duty to preserve ESI. If there were no duty to preserve the ESI, then it need not have been preserved. Moreover, this provision appears to be based on a prospective standard. Using hindsight to determine that the ESI "should have been preserved" is far too easy. Accordingly, the better interpretation of this provision is that the determination of what ESI "should have been preserved" is viewed at the time litigation is anticipated or ongoing, not when it is discovered that the ESI was lost. And this prospective standard is from the viewpoint of the party who controls the ESI. *Alabama Aircraft*, 2017 U.S. Dist. LEXIS 33527 at *27, 2017 WL

930597. Finally, this provision limits the preservation to only relevant ESI. Curiously, the rule does not use the term "relevant." But the Advisory Committee Notes do. Fed. R. Civ. P. 37(e), Advisory Committee Notes, 2015 Amendments ("Many court decisions hold that potential litigants have a duty to preserve *relevant* information when litigation is reasonably foreseeable. Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve.") (emphasis added). [9] Of course, limiting sanctions to the failure to preserve relevant ESI makes complete sense on many levels, including the lack of prejudice in the loss of irrelevant ESI and the lack of a need to even produce irrelevant ESI, let alone preserve it. So, not surprisingly, courts have consistently assumed that Rule 37(e) only applies to relevant ESI. *See Storey v. Effingham County*, CV415-149, 2017 U.S. Dist. LEXIS 93147, *13, 2017 WL 2623775 (S.D. Ga. June 16, 2017); *Eshelman v. Puma Biotechnology, Inc.*, 16 CV 18, 2017 U.S. Dist. LEXIS 87282, *11, 2017 WL 2483800 (E.D.N.C. June 7, 2017); *Jenkins*, 2017 U.S. Dist. LEXIS 9581 at *34-35, 2017 WL 362475.

4. The ESI must have been (a) lost because (b) a party failed to take (c) reasonable steps to preserve it.

5. The lost ESI must be unable to be restored or replaced through additional discovery. Although the rule speaks of the lost ESI, more accurately it is the loss of the content of or information contained in the ESI that appears to be the focus. *See* Fed. R. Civ. P. 37(e), Advisory Committee Notes, 2015 Amendments (referring to the "content of the lost information"). [10]

If any of these five prerequisites are not met, the court's analysis stops and sanctions cannot be imposed under Rule 37(e).

**\*5** If, however, these prerequisites are all met, the court looks to the prejudice suffered by the party seeking the ESI. If the court finds that another party was prejudiced from the loss of the ESI, the court may order measures no greater than necessary to cure the prejudice. And if the court finds that the party intended to deprive another party of the use of the ESI (in which case prejudice is presumed, *see* Fed. R. Civ. P. 37(e), Advisory Committee Notes, 2015 Amendments), then the court may impose the harsher sanctions available, including presuming that lost ESI was unfavorable, instructing the jury that it may or must presume the information was unfavorable, or entering default or dismissal.

Obviously, establishing prejudice is tricky business. All involved—the court, the party that failed to preserve, and the seeking party—are at a disadvantage because none know precisely what the lost ESI contained or showed. It is difficult for a court to determine prejudice when the ESI no longer exists and cannot be viewed. Likewise, it is difficult for the party that failed to preserve the ESI to show the absence of prejudice, again because the ESI was lost. Of course, this party is inclined to minimize the prejudice and importance of the lost ESI. And similarly, it is difficult for the party that seeks the ESI to establish prejudice because it does not know what was contained in the ESI. This party is predisposed to over emphasize the prejudice and importance of the lost ESI. The Advisory Committee Notes recognize this dilemma but offer no solutions:

> The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in some such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed. R. Civ. P. 37(e), Advisory Committee Notes, 2015 Amendments. To evaluate prejudice, the court must have some evidence regarding the particular nature of the missing ESI. *Eshelman,* 2017 U.S. Dist. LEXIS 87282 at *16, 2017 WL 2483800.

Notably absent from Rule 37(e) is the mention of attorneys' fees as a sanction, either for having to file the motion or for the failure to preserve the ESI. And the Advisory

Committee Notes are shockingly silent on the issue as well. In fact, the minutes of the Advisory Committee meetings reflect that those in attendance recognized this absence, but simply chose not to do anything about it. Advisory Committee on Civil Rules, Notes of Conference Call Discovery Subcommittee Advisory Committee on Civil Rules, page 440 (March 4, 2014) www.uscourts.gov/sites/default/files/fr_import/CV2014-04.pdf (last visited July 5, 2017). Significantly, every other provision of Rule 37 that addresses a discovery violation provides for the imposition of attorneys' fees. Fed. R. Civ. P. 37(a)(5)(A),(B);(b)(2)(C); (c)(1)(A),(2);(d)(3);(f). [11] Although the authority to impose attorneys' fees does not appear to have been raised as an issue, at least two courts have imposed attorneys' fees as a sanction for the loss of ESI. *Jenkins,* 2017 U.S. Dist. LEXIS 9581 at *46-47, 2017 WL 362475; *DiStefano,* 2017 U.S. Dist. LEXIS 72137 at *85-86, 2017 WL 1968278. Because the issue of the authority to impose fees under Rule 37(e) was not addressed, this Court finds those decisions of limited value. *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 38 (1952) (issues not argued or addressed are not precedential).

## IV. ANALYSIS

*6 Applying Rule 37(e)'s requirements to the facts of this case reveals the following.

First, Ms. Blood's and Plaintiff's emails are ESI.

Second, litigation was anticipated. The May 28, 2014 preservation letter clearly put Danfoss on notice that litigation would be forthcoming. *See, e.g., Storey,* 2017 U.S. Dist. LEXIS 93147 at *11, 2017 WL 2623775 ("The Court cannot fathom a reasonable defendant who would look at those facts and not catch the strong whiff of impending litigation on the breeze.").

Third, there was a duty to preserve the emails. The duty to preserve Plaintiff's emails is obvious. She had threatened to sue. The duty to preserve and the relevance of Ms. Blood's emails is less clear. Throughout Danfoss' response brief, it downplays Ms. Blood's supervision of Plaintiff. The response brief was written without the benefit of the subsequently produced emails. These emails reflect a far more nuanced supervisory relationship than Danfoss portrays. At least some of the emails show that Ms. Blood was communicating with Rick White about Plaintiff's work performance. Danfoss should have known of this supervisory relationship and upon

Snider v. Danfoss, LLC, Not Reported in Fed. Supp. (2017)

receipt of the preservation letter at least investigated whether the emails should have been preserved rather than robotically applying its 90 day destruction policy. Indeed, as mentioned above, had Danfoss done a proper investigation it may have wanted to use some of the emails it has now disclosed to the Court.

Additionally, based upon a review of the emails from Ms. Blood to Rick White, a reasonable argument could be made that some of Ms. Blood's deleted emails might be relevant to Plaintiff's claims, as the term is used under Rule 26(b) (1). But importantly, the possible relevance of Ms. Blood's emails is minimized by the existence of Rick White's emails, as well as the other emails to and from the human resources department that were produced earlier. This fact, while somewhat applicable to the relevance inquiry, is more important to the prejudice element than to the ability to restore or replace the content of the lost ESI through additional discovery. Therefore, the relevance inquiry will be discussed below with the prejudice component.

Fourth, the ESI was lost (no doubt about that) because Danfoss mechanically and blindly followed its 90 day destruction policy in the face of a clear threat of litigation. Danfoss cannot honestly contest this factor with respect to Plaintiff's emails. With respect to Ms. Blood's emails, again Danfoss should have known of the supervisory relationship between Ms. Blood and Plaintiff, as well as the communications between her and Rick White about Plaintiff's work performance. Faced with the May 28, 2014 preservation letter in conjunction with Plaintiff's departure shortly thereafter a reasonable step would be to simply stop the deletion of Ms. Blood's emails. Danfoss has failed to offer any evidence why that action would have been unreasonable either in terms of costs or effort.

Fifth, although the entirety of the ESI cannot be restored or replaced through additional discovery, some of those emails were preserved. In particular, the emails to and from Ms. Blood and Plaintiff to Rick White and the emails to the human resources department were preserved. Moreover, the content of much of that ESI has been provided through the preservation and production of the other emails. Because this factor, like the relevance factor, dovetails into the prejudice component, the Court will address it more fully below.

*7 Although the Court could possibly stop its analysis at this point and deny Plaintiff's motion for failing to meet the fifth prerequisite for sanctions, for the sake of completeness and

because the Court must issue a report and recommendation on sanctions issue, [12] it will discuss the lack of prejudice in more detail. Fundamentally, it is the lack of prejudice to Plaintiff that dooms the motion for sanctions.

Critically, the possible prejudice resulting from the deletion of Ms. Blood's and Plaintiff's emails must be put in the proper context. Again, it is important to recall that emails not only to and from the human resources department were preserved and produced, but also that Danfoss preserved and has produced to the Court all of Rick White's emails to and from Ms. Blood and Plaintiff during the relevant time period. With regard to Ms. Blood's and Plaintiff's emails—the only emails the subject of this motion—there are four possible characterizations: (1) Plaintiff's emails could have refuted Rick White's proffered reasons for the transfer; (2) Plaintiff's emails could have supported Rick White's proffered reasons for the transfer; (3) Ms. Blood's emails could have refuted Rick White's proffered reasons for the transfer; and (4) Ms. Blood's emails could have supported Rick White's reasons for the transfer.

As to Plaintiff's deleted emails, Plaintiff is obviously a party to the suit and has first-hand knowledge of the substance of emails she sent or received. She is a party who was deposed. She could have been asked about her emails at the deposition, and if the case goes to trial, she can testify as to any emails at that time, assuming the testimony is admissible. Accordingly, no prejudice exists as to Plaintiff's emails. Moreover, if emails sent and received by Plaintiff were positive, she may be able to testify about those. If Plaintiff's emails were negative and supported Rick White's proffered bases for transferring her, the deletion of those emails does not harm her; indeed, the deletion of those emails would buoy Plaintiff's case. So, again, the failure to preserve Plaintiff's emails in this case did not prejudice her.

As to Ms. Blood's emails, again, although her emails were purged, Danfoss was able to locate and produce other ESI. As noted above, the emails to the human resources department have already been produced. The emails to and from Rick White were produced to the Court for an *in camera* inspection. As these emails are non-privileged, the Court orders that they be produced to Plaintiff. Plaintiff can then use these emails to attempt to prove the negative; namely, that Rick White and Ms. Blood did not communicate about Plaintiff's alleged shortcomings. Danfoss can certainly continue to assert that Ms. Blood was not involved in the decision to transfer Plaintiff. All that can be hashed out in the inevitable summary

Snider v. Danfoss, LLC, Not Reported in Fed. Supp. (2017)

judgment filings. And again, there are two possible types of emails that were deleted: those casting a negative light on Plaintiff and those casting a positive light on Plaintiff. The deletion of the possible negative emails in no way prejudices Plaintiff. And the deletion of the possible positive emails is minimized by the production of the other emails as well as the deposition of Rick White and other witnesses. In the end, regardless of which party bears the burden on the prejudice component, the Court has very little evidence regarding the particular nature of the missing ESI. What ESI exists has been and will be produced, and it is not necessarily helpful to Plaintiff. It is pure speculation that the lost ESI would benefit Plaintiff under these circumstances.

*8 Finally, Plaintiff has presented no evidence that Danfoss destroyed the emails with the intent to deprive Plaintiff of this ESI. Instead, what little evidence presented on the issue of intent indicates that Danfoss acted with a pure heart but empty head. *DiStefano*, 2017 U.S. Dist. LEXIS 72137 at *16, 2017 WL 1968278.

### V. CONCLUSION

The following is this Court's report and recommendation:

- Plaintiff's motion for sanctions under Rule 37(e) be denied.

- Plaintiff's motion for sanctions, to the extent it relies upon the Court's inherent authority, be denied.

- Danfoss is barred from using any of the emails provided to the Court for its *in camera* inspection in any summary judgment motion or at trial.

This Court's recommendation that Danfoss not be sanctioned for its disturbing actions in deleting Plaintiff's and Ms. Blood's emails should not be viewed as condoning those actions. But under the December 1, 2015 amendments to Rule 37, Rule 37(e) now focuses on the prejudice caused by the failure to preserve ESI. Under these facts, no prejudice has been shown, and, consequently, no sanctions are warranted.

Any objection to this Report and Recommendation must be filed by July 28, 2017. Failure to object may constitute a waiver of objections on appeal. *See Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260 (7th Cir. 1989).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2973464

Footnotes

1   The letter, written by prior counsel, was a classic "preserve all evidence" letter, stating the following: "This letter serves as formal notice of your ongoing legal duty to preserve any and all information relevant to the facts surrounding this claim. Your duty to preserve evidence extends to the following: 1) business records, 2) paper, digital, or electronic files, 3) data generated by and/or stored on your or your client's computers and storage media (e.g., hard disks, floppy disks, backup tapes), 4) any other electronic data, such as: voice mails, text messages, emails, digital/analog audio recordings, 5) any related physical evidence, and 6) any form of video recordings (please prevent the automatic deletion of video footage by preprogrammed deletion cycles)." Dkt. 49-7.

2   Although this case was filed before December 1, 2015, neither party has argued that amended Rule 37(e) should not apply and that the previous law should apply. Even if a party would have made that argument, the Court would have applied amended Rule 37(e) in its discretion. For good reason, courts have consistently applied amended Rule 37(e) as to motions filed after December 1, 2015, in cases filed before December 1, 2015. *See, e.g., DiStefano v. Law Offices of Barbara H. Katsos, P.C.*, 11-2893, 2017 U.S. Dist. LEXIS 72137, *8-13, 2017 WL 1968278 (E.D.N.Y. May. 11, 2017); *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 11 CV 3577, 2017 U.S. Dist. LEXIS 33527, *25-26, 2017 WL 930597 (N.D. Ala. Mar. 9, 2017); *Citibank, N.A. v. Super Sayin' Publishing, LLC*, 14 CV 5841, 2017 U.S. Dist. LEXIS 38089, *5-6, 2017 WL 946348 (S.D.N.Y. Mar. 1, 2017); *Jenkins v. Woody*, 15 CV 355, 2017 U.S. Dist. LEXIS 9581, *32, 2017 WL 362475 (E.D. Va. Jan. 21, 2017). The amendments to Rule 37 regarding ESI improved ESI discovery sanctions motions. The amendments provided uniformity and clarity to a haphazard array of case law. *See* Fed. R. Civ. P. 37(e), Advisory Committee Notes, 2015 Amendments. Additionally, the amendments focused on the harm resulting from the spoliation. *Id.* (emphasizing that efforts to restore or replace lost information through discovery should be proportional to the apparent importance of the lost information). No longer was the ESI spoliation tail wagging the litigation merits dog.

**Snider v. Danfoss, LLC, Not Reported in Fed. Supp. (2017)**

3     To be clear, there is no evidence that defense counsel caused this amnesia. Indeed, it appears defense counsel fulfilled his ethical obligations and attempted to correct faulty testimony. Moreover, there is no evidence that defense counsel was involved in the failure to preserve either Plaintiff's or Ms. Blood's emails.

4     Although technically the request was untimely—as there were less than 30 days remaining for fact discovery—the timing is irrelevant. Dkt. 39 (entering cut off); Dkt. 47-1 (requesting emails). Had Plaintiff's counsel sent a request for all emails at the very first opportunity, the emails would have already been deleted by Danfoss. Moreover, the preservation letter was received long before then.

5     To provide a reference for old school attorneys, one gigabyte of emails is over 100,000 pages of documents, assuming there are no attachments, which is a faulty assumption. Doug Austin, eDiscovery Best Practices: The Number of Pages in Each Gigabyte Can Vary Widely, CLOUDNINE July 31, 2012, www.ediscovery.com (visited July 5, 2017).

6     Danfoss whined a little about producing these additional documents. But Danfoss wisely chose not to throw a tantrum, probably because it knew that it would not have been in this situation had it not deleted Plaintiff's and Ms. Blood's emails.

7     If any of the emails produced to the Court were not previously produced to Plaintiff and those emails support Danfoss' case, Danfoss is prohibited from using those emails in a summary judgment motion or at trial. Fed. R. Civ. P. 26(a)(1)(ii); Fed. R. Civ. P. 37(c). Danfoss should not be allowed to use these newly discovered emails at this late date, having only searched for and located them pursuant to a Court order after the fact discovery cut off.

8     Plaintiff also sought sanctions under this Court's inherent authority. But the Advisory Committee Notes for the December 1, 2015 amendments make clear that amended Rule 37(e) "forecloses reliance on inherent authority or state law to determine when certain measures should be used." Removing inherent authority from a federal court's quiver to sanction a party for failing to preserve ESI makes sense. The purpose of the amendment was to address the "significantly different standards" that the various federal courts were using. If federal courts could simply fall back onto their inherent authority, the goals of uniformity and standardization would be lost. Accordingly, to the extent Plaintiff seeks sanctions pursuant to this Court's inherent authority, this Court recommends that the motion be denied.

9     Of course, if the Committee merely intended the phrase "should have been preserved" to mean "relevant" (presumably, "relevance" under Federal Rule of Civil Procedure 26(b)(1), not Federal Rule of Evidence 401), then why didn't the Committee just use that term, which was re-articulated in the same December 1, 2015, amendments, rather than a phrase not previously used? And if "should have been preserved" means "relevant," why would the drafters have used four words when one would suffice? A little help here would have been nice. This Court assumes that the phrase "should have been preserved" was used because it encompasses both the concept of relevance and duty to preserve.

10    The Court is fully aware that sometimes the ESI itself contains valuable information, such as metadata, and therefore, the ESI itself may be just as critical, if not more so, as the content.

11    Conceivably, attorneys' fees might be imposed under Rule 37(c) if ESI were lost despite a court order to preserve it. Fed. R. Civ. P. 37(c) (allowing for attorneys' fees as a discovery sanction when a court order is violated).

12    *Retired Chicago Police Ass'n v. City of Chicago,* 76 F.3d. 856, 868-69 (7th Cir. 1996) (finding that motions for sanctions under Rule 37 are "dispositive" and require a magistrate judge to issue a report and recommendation).

---

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 176 of 581 PageID #:14516

Snider v. Danfoss, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 3268891
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Western Division.

Marvel SNIDER, Plaintiff,
v.
DANFOSS, LLC, Defendant.

No. 15 C 4748
|
Signed 08/01/2017

**Attorneys and Law Firms**

Rene Hernandez, Attorney at Law, Rockford, IL, for Plaintiff.

Kwabena Agyepong Appenteng, Littler Mendelson, Chicago, IL, Jeannie M. DeVeney, Littler Mendelson, P.C., Kansas City, MO, for Defendant.

**ORDER**

Philip G. Reinhard, United States District Court Judge

**\*1** On July 12, 2017, Magistrate Judge Johnston entered a report and recommendation [54] that plaintiff's motion [47] for sanctions pursuant to Fed. R. Civ. P. 37(e) be denied. No timely objection has been filed. The court has reviewed the record and accepts the report and recommendation. Plaintiff's motion [47] for sanctions pursuant to Fed. R. Civ. P. 37(e) is denied. Plaintiff's motion for sanctions, to the extent it relies on the court's inherent authority is denied. Defendant is barred from using any of the emails provided to the court for *in camera* inspection in any summary judgment motion or at trial.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3268891

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.1**
**Western Division**

DR Distributors, LLC

                Plaintiff,

v.                                   Case No.: 3:12−cv−50324

                                   Honorable Thomas M. Durkin

21 Century Smoking, Inc., et al.

                Defendant.
_____

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, August 20, 2019:

    MINUTE entry before the Honorable Iain D. Johnston: Status hearing with settlement discussion held on 8/20/2019. By 9/18/2019, Diamond State Insurance Company shall file a written status report as discussed on the record. The Court will determine the next step upon review of the 9/18/2019 status report. This case is stayed in its entirety. (yxp, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# EXHIBIT 22

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            WESTERN DIVISION

 3   DR DISTRIBUTORS, LLC,            )Docket No. 12 CV 50324
                                      )
 4      Plaintiff-Counterdefendant,   )Rockford, Illinois
                                      )Tuesday, August 20, 2019
 5             v.                     )1:30 o'clock p.m.
                                      )
 6   21 CENTURY SMOKING, INC.         )
     and BRENT DUKE,                  )
 7                                    )
        Defendants-Counterplaintiffs,)
 8                                    )
     CB DISTRIBUTORS, INC. and        )
 9   CARLOS BENGOA,                    )
                                      )
10      Counter-Defendants.          )

11                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE IAIN D. JOHNSTON
12
     APPEARANCES:
13
     For the Plaintiff:   NICOLL, DAVIS & SPINELLA LLP
14                        (95 Route 17 South,
                           Suite 316,
15                         Paramus, NJ  07652) by
                          MR. ANTHONY J. DAVIS
16
                          ROBERT C. von OHLEN & ASSOCIATES
17                        (1340 Deerpath Road,
                           Lake Forest, IL  60045) by
18                        MR. ROBERT C. von OHLEN, JR.

19   For the Defendants:  THE LAW OFFICES OF KEVIN SALAM
                          (120 N. LaSalle Street,
20                         Suite 2000,
                           Chicago, IL  60602) by
21                        MR. KEVIN B. SALAM

22                        LEONARD MEYER LLP
                          (120 N. LaSalle Street,
23                         Suite 2000,
                           Chicago, IL  60602) by
24                        MR. MICHAEL I. LEONARD

25
```

```
 1   APPEARANCES: (Continued)

 2   Also Present:          MR. CARLOS BENGOA
                            MR. SEAN BYRNE
 3                          MS. JESSICA L. DAGLEY
                            MR. BRENT DUKE
 4                          MR. DANIEL I. GRAHAM, JR.
                            MR. JOHN J. HOLEVAS
 5                          MR. THOMAS R. LEAVENS
                            MS. HEATHER R. LIEBERMAN VAN DYKE
 6                          MR. TRAVIS W. LIFE
                            MS. TRISHA M. RICH
 7                          MR. YANIV SCHIFF
                            MR. STEVEN S. SHONDER
 8                          MR. GEORGE W. SPELLMIRE
                            MR. PETER S. STAMATIS
 9                          MR. PETER J. STRAND

10   Court Reporter:        Heather M. Perkins-Reiva
                            327 S. Church Street
11                          Rockford, Illinois  61101
                            (779)772-8309
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1           THE CLERK:  Calling 12 CV 50324, DR Distributors,

2      LLC v. 21 Century Smoking, Inc.

3           THE COURT:  Hold on one second so I can get a

4      scorecard.

5           Oh, we have got more people than this that are going

6      to be talking today.  Every lawyer in the room, step on up.

7           All right.  Mr. von Ohlen.

8           MR. von OHLEN:  Robert von Ohlen for the Plaintiffs

9      and Counter-Defendants.

10          MR. DAVIS:  Good afternoon, Judge.  Anthony Davis,

11     with the firm Nichols, Davis and Spinazzola, for Plaintiffs,

12     Counter-Defendants, and Carlos Bengoa, who is also present in

13     the courtroom, your Honor.

14          THE COURT:  Okay.

15          MR. LEONARD:  Good afternoon, Judge.  Mike Leonard

16     and Kevin Salam on behalf of Brent Duke and 21 Century

17     Smoking.  We also have with us here Mr. Duke as well as two

18     gentlemen from QDiscovery, Sean Byrne and Yaniv Schiff.

19          MR. SALAM:  Just a correction:  Mr. Byrne is not with

20     QDiscovery.

21          THE COURT:  Okay.

22          MR. SALAM:  He is a consulting attorney for us.

23          THE COURT:  Got you.

24          And it is S-a-l-a-m?

25          MR. SALAM:  Correct, your Honor, S-a-l-a-m.

1           MR. GRAHAM:  G-r-a-h-a-m, your Honor.

2           THE COURT:  Okay.  Thank you.

3           Were you here at the settlement conference?

4           MR. GRAHAM:  Yes.

5           THE COURT:  That's what I thought, okay, which was

6    years ago.

7           All right.  And then I saw Mr. Leavens back there.

8           Then there is Mr. Duke.

9           All right.  I received the filing the other day.

10   I've got the caption on here "Defendants' Status Report

11   Pursuant To This Court's Order of June 6th, 2019."  I reviewed

12   that.

13          Mr. Davis, Mr. von Ohlen, it was filed on CM/ECF.  I

14   assume you had the opportunity to take a look at it?

15          MR. von OHLEN:  Yes, your Honor.

16          THE COURT:  Okay.  All right.  I have that.

17          I have my order that I entered on June 6th.  The

18   order is as subtle as a sledgehammer.  I'm not smart enough to

19   be subtle, and I don't have the patience to be subtle.  So it

20   is all in there.  Anybody that doesn't know my practice at

21   this point, I don't know how else to explain it.

22          There is nothing hidden with anything I do in this

23   job because there can't be.  I didn't like it when judges were

24   playing hide-the-ball with me, and I didn't like it when law

25   professors played hide-the-ball.  Just tell me.

1        Mr. Holevas knows, right?

2        So there is nothing that's -- there is no hidden

3    agenda.  It is all out there.  We have been dealing with this

4    case since 2012, before I even got this job.  So hopefully

5    people read the order, got the drift.

6        As I said, I read the status report.  It's good news,

7    bad news, and it is the same news.  It is "Look at all this

8    stuff we found."  Okay.  I could see that being good news.  I

9    can also see it being terrible news that there is all this

10   other stuff out there that has been found in 2019, in a 2012

11   case, after the close of fact discovery, after summary

12   judgment briefings, after sanction motions were filed, after

13   $800,000 has been spent.  So I know people are going to pitch

14   it as good news, I know people are going to pitch it as bad

15   news, but those are the facts.

16       One of the things that keeps kicking around in my

17   small brain is back in June when we had the last hearing,

18   Mr. von Ohlen told me what the dollar amount was.  I think I

19   entered an order saying, "Be prepared to tell me how much has

20   been spent," and Mr. von Ohlen said, "800,000-plus dollars" at

21   that point, and he made it a point to say, "And those bills

22   have been paid."  I'm pretty sure he told me those bills have

23   been paid for at least one reason:  One, prejudice to

24   Mr. Bengoa.  The other reason may have been, as we all know, a

25   paid bill is presumptively reasonable.  So they've got that

1  going for them.  That's a lot of money.

2        So that's what I have read.  I wasn't expecting

3  anything else to be filed, but I'm all ears today.  This has

4  to end.  This case gets no better for anybody in this room,

5  including me and poor Judge Durkin, who got caught on the

6  wheel.  It was a Judge Kapala case.  Judge Durkin was kind

7  enough to be one of the Eastern Division judges who is taking

8  cases here.  This gets no better for anybody at all.  It just

9  gets worse.

10        Not only do we have satellite litigation, we have got

11  satellite litigation on satellite litigation, and potentially

12  satellite litigation on satellite litigation on satellite

13  litigation, on a 2012 case.

14        So between June 6th, 2019, and August 20th, 2019,

15  anybody talk about what it will take to resolve this case, or

16  are you all waiting for me to drop a hammer?

17        MR. LEONARD:  We haven't had those discussions,

18  Judge.  With regard to us, particularly myself, who represents

19  Mr. Duke and 21, I have been in the case a couple of weeks.

20  We don't even have the benefit, Judge, of the expert reports,

21  the damages reports, the depositions, quite frankly, because

22  defense counsel won't turn them over to us yet, the files.

23        So we are not in a position to talk about settlement

24  because we don't even have a good faith basis to know what our

25  claims are worth at this point, and obviously we are

8

```
 1   continuing to --
 2            THE COURT:  That's not a good answer.
 3            MR. LEONARD:  It's all --
 4            THE COURT:  Did you read the 300-plus filings on
 5   CM/ECF?
 6            MR. LEONARD:  I did, Judge.  I'm very familiar with
 7   the case.  I can only do so much in two weeks.
 8            THE COURT:  Oh, I understand, I understand.
 9            MR. LEONARD:  But we --
10            THE COURT:  That's why I set it for August, back in
11   June, so that I wouldn't have an attorney standing in front of
12   me with only two weeks into the case.
13            MR. LEONARD:  One thing, Judge, just to bring to your
14   attention, so there was different counsel hired.  It turned
15   out, once they began their analysis of the case, they realized
16   they had a conflict with their relationships with some of the
17   attorneys involved, and so that's why --
18            THE COURT:  Isn't that why we do conflicts checks
19   before we sign engagement agreements?
20            MR. LEONARD:  I can't speak for what they did or
21   didn't do.
22            MR. SALAM:  Your Honor, if I may speak?
23            THE COURT:  Sure.
24            MR. SALAM:  They didn't have a formal conflict,
25   at least they weren't sure if there was a conflict.  So we
```

 1   were -- they continued for a couple of weeks until it became

 2   clear that they decided they needed to withdraw or no longer

 3   represent the client.  They hadn't filed an appearance.  I

 4   replaced them with Mr. Leonard.  I have been involved,

 5   obviously.

 6          THE COURT:  Right.

 7          MR. SALAM:  And I have been involved at some level

 8   since I was here before your Honor before.

 9          THE COURT:  Uh-huh.

10          MR. SALAM:  There was a lot of communications and

11   dealings with an insurance company first, before we could get

12   things taken care of on the coverage side and move forward.

13   We have been as diligent as possible, given time to initially

14   figure out the universe of ESI and what we have indicated in

15   our status report.

16          THE COURT:  Okay.  Anybody else talk among themselves

17   about how do we get out of this nightmare?

18          Your silence is very reassuring.

19          Let's start talking.  Anybody want to speak up?

20          MR. SALAM:  Your Honor, just to reemphasize what my

21   co-counsel said, while I am aware of -- my understanding -- a

22   lot of my understanding of the case is based on my prior

23   conversation with former defense counsel.  I have not yet

24   gotten to the source material.  I didn't want -- you know, I

25   had met with former defense counsel to identify the universe

1    of case files, and we have been working on getting those

2    turned over.  It is not that they haven't been cooperative.

3    It is just in light of the court's order and the situation,

4    each former defense counsel had to get attorneys, and so now

5    we have got another set of lawyers and carriers involved,

6    which only slows things down, et cetera.

7          So we are not in a position to have had substantive

8    conversations with former defense counsel.  We still haven't

9    reviewed certain things, okay?  I mean, I have an

10   understanding of the trademark claims and stuff and

11   counterclaims, but, again, this is where we find ourselves.

12   I'm happy to --

13          THE COURT:  Look, again, let's go back to my point

14   about not being subtle and not having the patience to be

15   subtle.  If you are telling me on August 20th, 2019, that I am

16   wasting my time today and wasting everybody-in-this-room's

17   time, and you have taken my time away from other cases, I'm

18   not going to be too happy, especially when -- I will read it

19   for the record -- "Upon reflecting on the events reported in

20   this case over the past week, the court makes the following

21   observations about where matters appear headed:  If the

22   Plaintiffs succeed on the motion for sanctions, including an

23   award of attorneys' fees (which already exceed $880,000), it

24   is not clear what, if any, portion of the award they would

25   collect.  Meanwhile, sanctions could include dismissal of the

1   Defendant's counterclaim, leaving the Defendants with no

2   chance of collecting against the Plaintiffs, while still

3   subject to possible liability to the Plaintiffs, including a

4   monetary sanction.  The court assumes Mr. Bengoa is in the

5   business of business" --

6           You are, aren't you?  We have talked in the past.

7   You are a businessman.

8           -- "not litigation, particularly litigation that

9   might result in a meaningless, unrecoverable monetary

10  judgment.  So the court intends to discuss with the parties

11  during the 8/20/2019 status hearing the benefits of working to

12  resolve this case, an agreement that could decide who gets use

13  of the disputed mark in exchange for freeing the parties and

14  their counsel from further sanctions proceedings, the time and

15  expense involved in restarting fact discovery (including the

16  appointment of a special master at Defendants' expense), the

17  need for any new counsel to focus considerable effort to

18  become acquainted with seven years of zealous litigation,

19  spanning over 300 docket entries, and possible satellite

20  litigation relating to the multiple failures to preserve or

21  produce responsive ESI."

22          That's all of two sentences.

23          Anybody confused as to what I was trying to get at

24  there?

25          We are talking.

12

1          Let's have Plaintiffs stay here.

2          Let's see how many folks we've got here.

3          I think I can keep Mr. Shonder and Mr. Stamatis

4     together.

5          Let's do this:  Raise your hand so that he knows

6     where to take you.

7          Mr. Shonder and Mr. Stamatis's group, you will be

8     going to Judge Reinhard's courtroom, okay?  So there is

9     Mr. Holevas.

10          So hold on one second.

11          Keep track of where you are going.

12          So that takes care of that and that.

13          Ms. Rich, take you and your clients -- they are going

14     to go to the Mahoney conference room at the end, the big room

15     with the spider phone so that they can get --

16          MR. RICH:  That's what I was going to ask.

17          THE COURT:  Yes, there is a phone in there.

18          MR. RICH:  So will we be able to dial out from that

19     phone?

20          THE COURT:  You will be able to dial out from that

21     phone, yes.

22          MR. RICH:  Thank you, Judge.

23          COURT SECURITY OFFICER:  We will take you there.

24          THE COURT:  It will be all the way at the end.

25          Okay.  And then let's take Mr. Duke's group over

13

1   to -- I'm still going to call it "Judge Kapala's courtroom,"

2   okay?

3           I think that's it.  I think we have got everybody.

4           Ah, I knew I needed you.

5           We are going to -- I'm going to put you in the

6   attorney conference room right out here for now, okay?

7           MR. GRAHAM:  Absolutely, your Honor.

8           THE COURT:  Okay.  Just hang out there.

9           MR. GRAHAM:  Thank you, sir.

10          MR. LEAVENS:  Your Honor, we have the two people on

11  the phone.  I didn't know whether they should stay on the

12  phone or whether we should be calling them.

13          THE COURT:  That's why I'm having you go to that

14  particular conference room, at the end of the hallway, in the

15  Mahoney conference room, because there is a phone in there,

16  and so you can reengage them on that phone.

17          MR. LEAVENS:  So they can hang up now?

18          THE COURT:  They can hang up now, and you will call

19  them from that conference phone in there.

20          MR. LEAVENS:  Thank you, Judge.

21          MR. von OHLEN:  Are you starting with us, your Honor?

22          THE COURT:  No, I'm going to start with Mr. Graham,

23  and then I will come back and talk to you.

24          MR. von OHLEN:  Thank you.

25          THE COURT:  You're welcome.

14

1    (Whereupon, settlement discussions commenced off the

2      record.)

3            THE CLERK:  Recalling 12 CV 50324, DR Distributors,

4    LLC v. 21 Century Smoking, Inc.

5            THE COURT:  All right.  Let's have counsel step up

6    again.

7            We can just show the same appearances.  We don't need

8    to have appearances.  We can just show the same appearances.

9            The court discussed with all the parties as well as

10   counsel possibilities of a global settlement.  What the court

11   is going to do is the court will stay the matter, stay this

12   case, 12 CV 50324.  The case is stayed in its entirety.

13           In 28 days, Diamond State Insurance Company will file

14   a written status report.  So that's September -- I'm going to

15   give you an extra day because of Labor Day.  So September

16   18th, Diamond State Insurance Company will file a written

17   status report with the court.  I will review that status

18   report and determine what the next steps are in the case.

19   Again, everything is stayed.

20           I will make the judicial finding that there is no

21   need, other than to preserve any additional ESI, there is no

22   need to do any additional legal work in this case, the

23   underlying case, 12 CV 50324.  There is no need to do any

24   additional legal work in this case, other than ensure the

25   preservation of ESI.

15

1        I will also make the judicial finding that former

2  defense counsel have not disclosed any confidential

3  attorney-client privileges at any time in these settlement

4  discussions, and I will also state that even if they did, in

5  light of the nature of the representations made, including

6  threats of legal malpractice, they would be within their

7  rights under the rules of professional conduct to make those

8  disclosures, but they didn't.

9        I will see the written status report in 28 days, and

10 then you will hear from me.

11       Have a good night, everybody.

12       MR. LEONARD:  Thank you, your Honor.

13       MR. von OHLEN:  Thank you, your Honor.

14       MR. DAVIS:  Thank you, your Honor.

15       MR. SALAM:  Thank you, your Honor.

16       (Which were all the proceedings heard.)

17                    CERTIFICATE

18   I certify that the foregoing is a correct transcript from

19  the record of proceedings in the above-entitled matter.

20  /s/Heather M. Perkins-Reiva        August 29, 2019

21  _____    _____
    Heather M. Perkins-Reiva                    Date
22  Official Court Reporter

23

24

25

# EXHIBIT 23

**From:** "GoDaddy" <donotreply@godaddy.com>
**To:** brentduke@yahoo.com
**Sent:** 29 Jun 2015 14:23:35 -0700
**Subject:** Thanks for calling. Tell us how we did.



24/7 Support:(480) 505-8877
Customer Number: 15264045

# We value your feedback

Thanks for contacting our Customer Support Department.

Customer service is a top priority at GoDaddy, and we hope our team provided you the first-class service we're known for. We'd love it if you clicked the link below to tell us how Teresa did during your recent experience.

Complete the survey

Complete the survey now, **then take 25%* off your next order.** Simply enter **gdbbj1005** in your shopping cart or mention the offer code when you call (480) 505-8877.

Ready to set up your email on your PC, Mac or mobile device? We have step-by-step walkthroughs that can help you out. Click here to get started now.

Feel like sharing more? You can always tweet your kudos to @GoDaddy, or post them to Facebook at facebook.com/GoDaddy.

**Enjoy 25%* off your next order.**

Use promo code: gdbbj1005

*Not applicable to ICANN fees, taxes, transfers, premium domains, premium templates, Professional Design Service fees (including Web Design, eCommerce Design, and Logo Design), gift cards or Trademark Holders/Priority Pre-registration or pre-registration fees. Cannot be used in conjunction with any other offer, sale, discount or promotion. After the initial purchase term, discounted products will renew at the then-current renewal list price. Offer does not apply to renewals.

If you do not wish to receive our non-promotional emails, please unsubscribe to non-promotional notices here: http://www.godaddy.com/unsubscribe?isc=gdbbj1005&ci=94606&cvosrc=bounceback.1005.gdbbj1005, or mail us a written request to the attention of: GoDaddy Customer Contact Manager, 14455 N. Hayden Rd, Ste. 219, Scottsdale, AZ 85260. Please allow up to two weeks for the complete unsubscribe process to take place. NOTE: If you have multiple accounts with us, you must opt out of all of them so the mailings will be fully discontinued.

Please do not reply to this email. Emails sent to this address will not be answered.

Copyright © 1999-2015 GoDaddy Operating Company, LLC. 14455 N. Hayden Rd, Ste. 219, Scottsdale, AZ 85260. All rights reserved.

**Sent:** Mon, 29 Jun 2015 19:49:10 +0000 (UTC)
**From:** Brent Duke <brentduke@yahoo.com>
**To:** Travis Life <tlife@lsglegal.com>
**Subject:** Re: Please call me

Just tried to call you.


Regards,
Brent


On Monday, June 29, 2015 12:37 PM, Travis Life <tlife@lsglegal.com> wrote:


Brent,

We just completed Bill Edmiston's deposition and I have a couple of questions for you. Please give me a call.

**Travis Life**
Leavens, Strand & Glover, LLC
203 North LaSalle Street
Suite 2550
Chicago, IL 60601
Email: tlife@lsglegal.com
Office: 312-488-4170
Direct: 312-488-4163
Fax: 312-488-4177
Web Site: www.lsglegal.com
Facebook: /LSGALegal

This message is for the designated recipient only and may contain privileged, propriety or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any dissemination, distribution, copying or any other use of this message is strictly prohibited.

**From:**    Travis Life <tlife@lsglegal.com>
**To:**       "'brentduke@yahoo.com'" <brentduke@yahoo.com>
**Cc:**      "Thomas R. Leavens" <tleavens@lsglegal.com>
**Sent:**    Mon, 29 Jun 2015 15:37:28 -0400
**Subject:**  Please call me

Brent,

We just completed Bill Edmiston's deposition and I have a couple of questions for you.  Please give me a call.

**Travis Life**
Leavens, Strand & Glover, LLC
203 North LaSalle Street
Suite 2550
Chicago, IL  60601
Email: tlife@lsglegal.com
Office: 312-488-4170
Direct: 312-488-4163
Fax:  312-488-4177
Web Site: www.lsglegal.com
Facebook: /LSGALegal

This message is for the designated recipient only and may contain privileged, propriety or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any dissemination, distribution, copying or any other use of this message is strictly prohibited.

# EXHIBIT 24

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

| | |
|---|---|
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) |
| | ) |
| Plaintiffs/Counterclaimants, | ) |
| | ) |
| v. | ) Case Number: 3:12 – cv – 50324 |
| | ) |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) |
| | ) Judge: Frederick J. Kapala |
| Defendant/Counterclaim Defendant, | ) |
| | ) Magistrate Judge: Iain Johnston |
| | ) |
| 21 CENTURY SMOKING, INC., | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| v. | ) |
| | ) |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) |
| | ) |
| Counterclaim Defendants. | ) |

## DECLARATION OF BRENT DUKE

I, Brent Duke, based on my own personal knowledge and being otherwise fully competent, declare the following:

1.      I employed Webrescol to manage 21 Century Smoking's web site and to provide SEO services from approximately January 2009 through April 2010.  After April 2010, I had no further communications with Webrescol or Kirti Saraswat regarding 21 Century Smoking's web site and, in particular, no communications about metadata on the site.

2.      The 21 Century Smoking web site has always prominently displayed the mark "21 Century Smoking" on each page of its site.  Attached hereto as Exhibit A are true and accurate printouts of the 21CS website home page and contact information page as they existed during the period from March 2010 through August 2010.

3.    From 21CS' first sale, the mark 21 CENTURY SMOKING has always appeared on the packaging of 21CS' products

4.    In or about 2014, I first learned that the default settings for the provider of 21CS's email server, Godaddy.com, automatically deleted email sent from its @21centurysmoking.com email addresses after a short period.  As soon as the provider settings were discovered, the settings were adjusted to save all sent email.

5.    At all relevant times, 21CS marketed its products throughout the United States. While it may have closed certain locations, it continues to sell product nationwide through its Internet site.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 3/19/1

Brent Duke

EX. A

http://www.21centurysmoking.com:80/    Go

Case: 3:12-cv-50324 Document #: 234-2 Filed: 03/19/18 Page 5 of 8 PageID #:10065

FEB MAR JUL
◀ **28** ▶
2009 **2010** 2011

**161 captures**
30 Mar 2009 – 3 Nov 2017

▼ About this capture

   



Century **21** Smoking
the future of smoking today

**Visit Our Store Now!**

888-PUFF-021 (888-783-3021)

Sign Up For Free Newsletter Today!

home

what the heck is an e-cig?

why switch?

our store

about us

how it works

q&a

will it save me money?

wholesale opportunities

contact

where to find us

news

electronic cigarettes

smoke free cigarettes

buy electronic cigarettes

electronic cig buy

# Free Shipping On All Orders Greater Than $100!

We are very excited about all of the new editions to our 21 Century Smoking Store. We now have sleek all black, all white, and all silver Blackjack starter kits. We are also offering our best deals ever, with our Super and Mega Blackjack Starter kits. If you have any questions as all, just call 888-PUFF-021. As our way of saying Happy 2010, ALL starter kits now come with a home charger included as well!

21 Century Smoking has the highest quality electronic cigarette on the market today, and at a very reasonable price! Our first rate service team will ensure that once you come join us in the 21st century of smoking, you will never choose to go anywhere else. Finally, a high quality e-cig at a price that everyone can afford.

If you have any questions at all, give us a call or send us an email anytime! We know that a lot of you have questions about this hot new technology, and we want to do everything we can to provide you with answers. The future of smoking begins today, and with our huge assortment of flavors (Monte Carlo (Marlboro flavor), Menthol, Vegas (Camel flavor), Vanilla, Coffee, Chocolate, Cola, Energy Drink and many more) and **30 DAY MONEY BACK GUARANTEE** you have nothing to lose.

## Just Decide Which One (or Two) is Best For You

**The Blackjack**          **The Pocket Ace**          **The Jackpot**

                    

- Battery: Lasts 650 puffs
- Cartridge: Lasts for 300 puffs (equivalent of 30 cigarettes)
- The atomizer and the cartridge are connected
- Approx. 4 1/2 inches
- Weighs 20 grams
- Our full assortment of strengths & flavors

- Battery: Lasts 300 puffs
- Cartridge: Lasts for 150 puffs (equivalent of 15 cigarettes)
- Our smallest electronic cigarette
- Approx. 3 1/2 inches
- Weighs 20 grams

- Our full assortment of strengths & flavors

- Battery: Lasts 400 puffs
- Cartridge: Lasts for 150 puffs (equivalent of 15 cigarettes)
- Our lightest electronic cigarette
- Approx. 4 inches

- Weighs 17 grams
- Our full assortment of strengths & flavors



**Featured Products**



The Pocket Ace



The Blackjack

Free Live Chat Software

*Nicotine is an addictive substance. Our electronic cigarettes are intended for use by adults of legal smoking age. This product is not intended for children, pregnant or breastfeeding women, those sensitive to nicotine or inhalants, or individuals at risk of having any heart condition, high blood pressure, or diabetes. This product has not been approved by the FDA as a smoking cessation device. Keep this product away from children and pets. Ingestion of non-vaporized cartridges may be toxic and present a choking hazard.*

http://www.21centurysmoking.com:80/contact.php    Go    FEB **MAR** APR
29 captures    ◀ **12** ▶
5 Apr 2009 – 2 Sep 2011    2009 2010 2011    ▼ About this capture

Case: 3:12-cv-50324 Document #: 234-2 Filed: 03/19/18 Page 6 of 8 PageID #:10060




Century **21** Smoking
the future of smoking today

**Visit Our Store Now!**

**Sign Up For Free Newsletter Today!**

888-PUFF-021 (888-783-3021)

home

what the heck is an
e-cig?

why switch?

our store

about us

how it works

q&a

will it save me
money?

wholesale
opportunities

contact

where to find us

news

electronic
cigarettes

smoke free
cigarettes

buy electronic
cigarettes

electronic cig buy

## Contact Information

Contact us anytime, day or night - we would love to hear from you! We take pride in having
the best customer service in the industry. We will always go the extra mile for you. Give us
a ring, send us a text, or drop us an email - let us know what we can do to help you!

Customer Service:

21 Century Smoking
PO BOX 578327
Chicago, IL 60657

Email us:
**support@21centurysmoking.com**

Call Our **TOLL FREE** Hotline 24 Hours a Day, 7 Days a Week:
**1-888-PUFF-021**
**(1-888-783-3021)**

Or You Can Call or Text:
**1-312-823-ACIG**
**(1-312-823-2244)**

And if you just can't get enough you can now follow us on Facebook and Twitter!!

*Nicotine is an addictive substance. Our electronic cigarettes are intended for use by adults of legal
smoking age. This product is not intended for children, pregnant or breastfeeding women, those
sensitive to nicotine or inhalants, or individuals at risk of having any heart condition, high blood
pressure, or diabetes. This product has not been approved by the FDA as a smoking cessation
device. Keep this product away from children and pets. Ingestion of non-vaporized cartridges may
be toxic and present a choking hazard.*

### Featured Products



The Pocket Ace



The Blackjack

Free Live Chat Software

Home | Privacy | Terms | Contact Us | Links Exchange 1 | Blog | RSS

VISA    MasterCard    DISCOVER

© 2009 21 Century Smoking. All rights reserved.

http://www.21centurysmoking.com:80/ Go
161 captures
30 Mar 2009 – 3 Nov 2017
Case: 3:12-cv-50324 Document #: 234-2 Filed: 03/19/18 Page 7 of 8 PageID #:10067
JUL AUG OCT
◀ 22 ▶
2009 2010 2011
About this capture



Century 21 Smoking
the future of smoking today

**Visit Our Store Now!**

**Sign Up For Free Newsletter Today!**

888-PUFF-021 (888-783-3021)

home

what the heck is an e-cig?

why switch?

our store

about us

how it works

q&a

will it save me money?

wholesale opportunities

contact

where to find us

news

electronic cigarettes

smoke free cigarettes

buy electronic cigarettes

link exchange

download instruction manual

## Free Shipping On All Orders Greater Than $100!

We are very excited about all of the new editions to our 21 Century Smoking Store. We now have sleek all black, all white, and all silver Blackjack starter kits. We are also offering our best deals ever, with our Super and Mega Blackjack Starter kits. If you have any questions as all, just call 888-PUFF-021. As our way of saying Happy 2010, ALL starter kits now come with a home charger included as well!

21 Century Smoking has the highest quality electronic cigarette on the market today, and at a very reasonable price! Our first rate service team will ensure that once you come join us in the 21st century of smoking, you will never choose to go anywhere else. Finally, a high quality e-cig at a price that everyone can afford.

If you have any questions at all, give us a call or send us an email anytime! We know that a lot of you have questions about this hot new technology, and we want to do everything we can to provide you with answers. The future of smoking begins today, and with our huge assortment of flavors (Monte Carlo (Marlboro flavor), Menthol, Vegas (Camel flavor), Vanilla, Coffee, Chocolate, Cola, Energy Drink and many more) and 30 DAY MONEY BACK GUARANTEE you have nothing to lose.

## Just Decide Which One (or Two) Is Best For You

**The Blackjack** **The Pocket Ace** **The Jackpot**

  

- Battery: Lasts 650 puffs
- Cartridge: Lasts for 200-300 puffs
- The atomizer and the cartridge are connected
- Approx. 4 1/2 inches
- Weighs 20 grams
- Our full assortment of strengths & flavors

- Battery: Lasts 300 puffs
- Cartridge: Lasts for 50-100 puffs
- Our smallest electronic cigarette
- Approx. 3 1/2 inches
- Weighs 20 grams
- Our full assortment of strengths & flavors

- Battery: Lasts 400 puffs
- Cartridge: Lasts for 50-100 puffs
- Our lightest electronic cigarette
- Weighs 17 grams
- Our full assortment of strengths & flavors

### Featured Products



The Pocket Ace

The Blackjack

Free Live Chat Software

 Go To Store Now

*Nicotine is an addictive substance. Our electronic cigarettes are intended for use by adults of legal smoking age. This product is not intended for children, pregnant or breastfeeding women, those sensitive to nicotine or inhalants, or individuals at risk of having any heart condition, high blood pressure, or diabetes. This product has not been approved by the FDA as a smoking cessation device. Keep this product away from children and pets. Ingestion of non-vaporized cartridges may be toxic and present a choking hazard.*

Home | Privacy | Terms | Contact Us | Links   

http://www.21centurysmoking.com:80/contact.php

29 captures
5 Apr 2009 – 2 Sep 2011

Case: 3:12-cv-50324 Document #: 234-2 Filed: 03/19/18 Page 8 of 8 PageID #:10089

JUL **AUG** SEP
◄ **29** ►
2009 **2010** 2011

  


Visit Our Store Now!

Sign Up For Free Newsletter Today!

888-PUFF-021 (888-783-3021)

home

what the heck is an
e-cig?

why switch?

our store

about us

how it works

q&a

will it save me
money?

wholesale
opportunities

contact

where to find us

news

electronic
cigarettes

smoke free
cigarettes

buy electronic
cigarettes

link exchange

download
instruction manual

## Contact Information

Contact us anytime, day or night - we would love to hear from you! We take pride in having the best customer service in the industry. We will always go the extra mile for you. Give us a ring, send us a text, or drop us an email - let us know what we can do to help you!

Customer Service:

21 Century Smoking
PO BOX 578327
Chicago, IL 60657

Email us:
support@21centurysmoking.com

Call Our **TOLL FREE** Hotline 24 Hours a Day, 7 Days a Week:
**1-888-PUFF-021**
**(1-888-783-3021)**

Or You Can Call or Text:
**1-312-823-ACIG**
**(1-312-823-2244)**

And if you just can't get enough you can now follow us on Facebook and Twitter!!

### Featured Products



The Pocket Ace



The Blackjack

Free Live Chat Software

*Nicotine is an addictive substance. Our electronic cigarettes are intended for use by adults of legal smoking age. This product is not intended for children, pregnant or breastfeeding women, those sensitive to nicotine or inhalants, or individuals at risk of having any heart condition, high blood pressure, or diabetes. This product has not been approved by the FDA as a smoking cessation device. Keep this product away from children and pets. Ingestion of non-vaporized cartridges may be toxic and present a choking hazard.*

  

Home | Privacy | Terms | Contact Us | Links

© 2009 21 Century Smoking. All rights reserved.

# EXHIBIT 25

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

# UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS WESTERN DIVISION

DR DISTRIBUTORS, LLC,

Plaintiff/Counterclaim Defendant,

v.

21 CENTURY SMOKING, INC., and BRENT DUKE

Defendants-Counterclaimants,

v.

CB DISTRIBUTORS, INC., AND CARLOS BENGOA

Counter-Defendants

**Case Number:** 3:12 – cv - 50324

**Judge:** Frederick J. Kapala

**Magistrate Judge:** Iain D. Johnston

**EXPERT REPORT OF BRIAN R. BROWN**

**SEO REPORT**

**March 25, 2016**

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

## Contents

I.   Assignment ................................................................................................... 7

II.  Qualifications ................................................................................................ 7

III. Compensation ............................................................................................... 9

IV. Materials Considered ................................................................................... 9

V.  Methodology ................................................................................................. 9

VI. Background Information .............................................................................. 10

VII. Basis for Opinions ....................................................................................... 11

VIII. My Opinions ................................................................................................ 12

    A.    Mr. Duke Was Neither Capable Nor Had He Demonstrated the Skills or Knowledge Required to Manually Modify the Meta Tags ............................................................... 13

        1.    Mr. Duke's Skills Are Not Directly Applicable ....................................... 13

        2.    Mr. Duke Broke the HTML Code on His Personal Site as Well as on 21centurysmoking.com .................................................................................... 14

        3.    Mr. Kent's Example Is Over-Simplified ................................................... 20

    B.    There Is No Evidence of Mr. Duke Modifying Meta Tags in Zen Cart ....................... 23

    C.    While Robert Hough Would Have Been Capable of Modifying Meta Tags, I Found No Evidence That He Added the "21st century smoke" Text, and Its Inclusion into 21centurysmoking.com as It Was Done Would Have Been Contrary to the SEO Knowledge and Logic He Displayed ......................................................................................... 27

    D.    Zen Cart Does Auto-populate Meta Tags Throughout the Website ............................. 30

    E.    Ceon URI Mapping Could Not Auto-populate Meta Tags, However Ceon URI Mapping May Not Have Been the Only Plugin Used ........................................................... 33

    F.    The "21st Century Smoke" Text May Have Been Added Accidentally ........................ 36

G.      There Is No Evidence That Defendants Added the "21st Century Smoke" Text, Provided It to Anyone Else, or Instructed Anyone to Include It ............................................................ 38

H.      The Meta Keywords Tag Is Not Specific to Search Engines Nor Was It Used by Search Engines for Ranking ............................................................ 41

I.      The Meta Description Tag Was Not Used by Search Engines for Search Result Ranking 46

J.      There Is No Evidence that Searchers Saw the "21st Century Smoke" Text in Search Results for 21centurysmoking.com or Clicked on Search Results for 21centurysmoking.com Because of It. ............................................................ 48

K.      No Evidence That the "21st Century Smoke" Text Was Used in Title Tags ................. 57

L.      Archive.org's Wayback Machine is Viewed as an Authoritative Resource, However There are Instances Where the Archived Content May Not Fully Match the Source Content. 58

M.      Defendants Demonstrated No Effort to Optimize for the "21st Century Smoke" Text.. 59

IX.    Conclusion ............................................................ 62

X.     Exhibits ............................................................ 65

A.      Curriculum Vitae ............................................................ 65

B.      Article Publications ............................................................ 68

C.      Materials – Cited ............................................................ 76

   1.      Declarations ............................................................ 76

   2.      Depositions ............................................................ 76

   3.      Interviews ............................................................ 76

   4.      Final Reports ............................................................ 76

   5.      Google Analytics ............................................................ 77

   6.      Archive.org Wayback Machine – BrentDuke.com ................................................. 77

   7.      Archive.org Wayback Machine – 21centurysmoking.com ........................................ 77

   8.      Archive.org Wayback Machine – 21stCenturySmoke.com ........................................ 80

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

9.    Archive.org Wayback Machine – Zen Cart ............................................................... 81

10.   Archive.org Wayback Machine – Ceon ................................................................... 81

11.   Archive.org Wayback Machine – AmericanRetailersMarketplace.com ................... 81

12.   Reference ................................................................................................................... 82

13.   Reference – Google ................................................................................................... 83

D.    Materials – Reviewed ........................................................................................................ 83

1.    Documents & Exhibits............................................................................................... 83

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

## Figures

1 Figure 1 Broken homepage on BrentDuke.com. ......................................................................... 15

2 Figure 2 Source code view of unclosed HTML on BrentDuke.com homepage [Exhibit X.C.6.b)].
3 ......................................................................................................................................... 16

4 Figure 3 July 14, 2009, properly closed HTML with Google Analytics tracking code in 21CS
5 homepage. ......................................................................................................... 17

6 Figure 4 August 11, 2009, unclosed HTML and missing Google Analytics tracking code in 21CS
7 homepage. ......................................................................................................... 18

8 Figure 5 July 14, 2009, 21CS homepage; properly closed HTML [Exhibit X.C.7.c)]. ............... 19

9 Figure 6 August 11, 2009, 21CS homepage; unclosed HTML and missing analytics tracking
10 code [Exhibit X.C.7.d)]. ..................................................................................... 19

11 Figure 7 Google Analytics Pageviews report showing drop and subsequent return of homepage
12 analytics. ............................................................................................................ 20

13 Figure 8 Enlarged view of homepage drop from analytics. .......................................................... 20

14 Figure 9 Return of analytics reporting for homepage. .................................................................. 20

15 Figure 10 Zen Cart meta_tags.php file from backup folder on 21CS server. ............................... 23

16 Figure 11 Zen Cart default installation meta_tags.php file [Exhibit X.C.12.h)]. ........................ 24

17 Figure 12 September 24, 2009, Zen Cart main page on 21CS with default Zen Cart text. .......... 24

18 Figure 13 January 6 2010, new products page on 21CS with default Zen Cart text. ................... 24

19 Figure 14 August 27, 2010, Blackjack Starter Kit product page on 21CS with default Zen Cart
20 text. ..................................................................................................................... 25

21 Figure 15 November 30, 2010, How It Works page on 21CS with default Zen Cart text. ........... 25

22 Figure 16 January 8, 2011, Reviews page on 21CS with default Zen Cart text. ......................... 25

23 Figure 17 September 18, 2011, Discount Coupon page on 21CS with default Zen Cart text. ...... 26

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   Figure 18 21CS homepage after migrating Zen Cart to site root with commented out sample text.

2   .................................................................................................................................................. 28

3   Figure 19 Source-code view of capture of 21CS homepage on October 18, 2011, highlighting

4   title tag, meta keywords, and meta description. ............................................................................. 31

5   Figure 20 Category navigation on 21CS, showing product categories used for programmatic

6   optimization of meta tags [Exhibit X.C.7.l)]. ............................................................................. 32

7   Figure 21 Description and sample URL transformations for the Ultimate SEO URLs plugin. ... 34

8   Figure 22 Example of mistaken linking to 21centurysmoking.com with 21st Century Smoke

9   anchor text........................................................................................................................................ 37

10  Figure 23 Viewing meta keywords and meta description tags requires viewing of source code as

11  this content is not visible on the web page itself. ........................................................................ 41

12  Figure 24 Contents of Google's own SEO Guide, with no mention of meta keywords. .............. 44

13  Figure 25 Search result example from Google. ............................................................................. 49

14  Figure 26 Longest timeframe "21st century smoke" may have appeared in search result snippet

15  was between Aug. 28, 2012, to Mar. 25, 2013, during which the homepage, which did not have

16  the text in the meta description, drove over 68% of organic search traffic. ................................. 50

17  Figure 27 Organic Keyword Sessions - Total and "21st century smoke"................................... 52

18  Figure 28 Google Analytics Organic traffic to whatis.php page. ................................................. 54

19  Figure 29 21CS "What is" page from April 6, 2009..................................................................... 55

20  Figure 30 21stCenturySmoke.com homepage from January 28, 2011........................................ 56

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  ## I.    Assignment

2  I have been retained by Leavens, Strand & Glover, LLC, on behalf of Defendants-

3  Counterclaimants 21 Century Smoking, Inc., ("21CS") and Brent Duke ("Duke")(collectively the

4  "Defendants") to review and analyze certain evidence in this case and provide an opinion

5  relating to assertions made by Plaintiffs DR Distributors, LLC, ("DR") CB Distributors, Inc.,

6  ("CB") and Carlos Bengoa ("Bengoa") (collectively the "Plaintiffs") that Defendants misused

7  Plaintiffs' registered trademark, 21st Century Smoke, and included Plaintiffs' mark in the

8  keyword metadata of Defendants' website, www.21centurysmoking.com. This report

9  summarizes my analysis and conclusions regarding these issues.

10 The opinions expressed in the report are based on my background and experience, my review of

11 materials provided to me by counsel, websites I reviewed in relation to this case, interviews with

12 Mr. Duke, and my examination of related resources. If called to testify, I expect to offer the

13 opinions expressed in this report and the basis for those opinions. I may modify or supplement

14 the opinions that I express in this report if additional evidence or information comes to my

15 attention.

16 ## II.    Qualifications

17 I am the Director of Search Marketing for SilkRoad Technology as well as the President and

18 Founder of Identity Developments, LLC. I have worked in the digital marketing field since 2003,

19 in both in-house as well as agency roles, which exposed me to different industries, brands, and

20 businesses. My experience includes working with ecommerce clients who utilized different

21 ecommerce carts, content management systems, faceted navigation systems, and web analytics

22 software packages.

23 I joined SilkRoad Technology, an HR SaaS solutions provider, in May 2012, in the newly

24 created role of Director, Search Marketing. Through that role, I have been responsible for all of

25 SilkRoad's SEO (search engine optimization) efforts across SilkRoad websites, both domestic

26 and international. In addition to organic search, I have also been responsible for overseeing

27 SilkRoad's paid search program through Google AdWords. Though not specifically listed under

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    my job title or description, I also took over management of SilkRoad's Google Analytics

2    program across all SilkRoad domains. Additionally, I also served as an internal technical advisor

3    for the migration of SilkRoad's websites from SilkRoad's proprietary CMS (content

4    management system) to WordPress.

5    Prior to joining SilkRoad, I was on the management team of Rio SEO where I served as Director,

6    Product Management for Rio's Search Optimizer product. Rio SEO (since spun off as a separate

7    company) was a newly formed division of Covario, Inc. (since acquired by iProspect), which

8    provided both SEO and paid search services to global brands and ecommerce companies. While

9    at Covario, I served in SEO roles (ending as Senior Manager, SEO) where I managed the

10    Midwest arm of the SEO consulting team, managed the allocation of consulting resources, as

11    well as consulted directly with key clients, including: Samsung Mobile, Samsung USA, Urban

12    Outfitters, American Girl (Mattel), Orvis, and Allen Edmonds.

13    Prior to Covario, I served in SEO roles (ending as Lead Consultant & Natural Search Marketing

14    Strategist) at Netconcepts, LLC, (which was itself acquired by Covario, Inc.), an ecommerce-

15    focused search agency providing both SEO services and software, paid search services, as well

16    as a proprietary ecommerce platform. While at Netconcepts I developed and refined many of the

17    SEO services teams' methodologies and client deliverables, managed the allocation of team

18    resources, as well as consulted directly with SEO clients, including: Café Press, Nordstrom,

19    Allen Edmonds, Cooking.com, Thompson Cigar, Onlineshoes, Hanes Brands, B|Net, DMinSite,

20    and REI.

21    My entry into SEO and digital marketing in general began August 2003, when I founded Identity

22    Developments (Registered as an Illinois LLC in August 2014).  Identity Developments began by

23    offering web design, hosting, and domain name registration and management services, and

24    quickly evolved with the addition of SEO services. Since that time, Identity Developments has

25    continued to serve a small client base as well as manage various personal and owned websites.

26    Before that, I served 5-6 years in Sales and Marketing roles (ending as Consumer Segment

27    Manager) within two divisions of Newell Rubbermaid, Inc. This consisted of more traditional

28    product marketing and development, as well as sales roles.

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 217 of 581 PageID #:14557
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 9 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   I have written on SEO and have articles published online at MarketingProfs, the C|Net Blog

2   Network, and SEOmoz; online and print at Multichannel Merchant; and in print for the former

3   Business Watch Magazine (Madison, WI) [Exhibit X.B]. My contributions have been used for

4   the online "The Beginners Guide to SEO" from SEOmoz and also the book, "The Art of SEO,"

5   from O'Reilly publishing authored by Enge, Spencer, Fishkin, and Stricchiola.

6   I have spoken regarding SEO at American Marketing Association's Marketing Workshops

7   (2008, '09, '10, and '11), and at the Lindsay, Stone, and Briggs' Brandworks University (2009).

8   I received a BA degree in Business Administration from Coe College of Cedar Rapids, IA, in

9   1995.

10   Further details regarding my professional experience and education are contained in the attached

11   curriculum vitae [Exhibit X.A].

## III.   Compensation

13   I am being compensated at the rate of $250 per hour for my services.

14   My fees and compensation are not contingent upon my opinions expressed herein, at deposition,

15   or trial.

## IV.   Materials Considered

17   Materials – Cited [Exhibit X.C]

18   Materials – Reviewed [Exhibit X.D]

## V.   Methodology

20   • Installed and tested Zen Cart version 1.5.0 on a local web server testing environment. In

21       reviewing feature lists, change logs, and the meta_tags.php file, my opinion, based on a

22       reasonable degree of certainty, is that the functions and operation of v.1.5.0 are

23       comparable to versions of Zen Cart used on 21centurysmoking.com.

24   • Installed and tested the Ceon URI Mapping version 4.4.1. Comparing an assortment of

25       Ceon files from a backup folder on the 21centurysmoking web server to various Ceon

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    URI Mapping versions, version 4.4.1 was selected as a, more likely than not, comparable
2    if not identical version to the one used on 21centurysmoking.com. Upon reviewing
3    against change logs and feature lists, more likely than not, the functions and operation of
4    v.4.4.1 is comparable to what was used on the website.
5  • Crawled the Archive.org Wayback Machine's captures of 21centurysmoking.com with
6    the ScreamingFrog SEO Spider Tool [Exhibit X.C.12.k)].
7  • Constructed timeline of 21centurysmoking.com events [Exhibit X.C.12.j)]
8  • Reviewed Google Analytics data for 21centurysmoking.com as well as exported out
9    reports for aggregation and analysis within Microsoft Excel. I was provided my own
10   login to the analytics for the website and pulled all data and reports used for analysis
11   personally.

12  **VI.  Background Information**

13  There are some basic definitions and concepts that need to be established.

14  Google provides a good overview that is applicable to search engines in general:

15  *"Crawling is the process by which Googlebot discovers new and updated pages to be added to*
16  *the Google index.*

17  *We use a huge set of computers to fetch (or "crawl") billions of pages on the web. The program*
18  *that does the fetching is called Googlebot (also known as a robot, bot, or spider). Googlebot*
19  *uses an algorithmic process: computer programs determine which sites to crawl, how often, and*
20  *how many pages to fetch from each site.*

21  *...*

22  *Indexing*

23  *Googlebot processes each of the pages it crawls in order to compile a massive index of all the*
24  *words it sees and their location on each page. In addition, we process information included in*
25  *key content tags and attributes, such as Title tags and ALT attributes. Googlebot can process*
26  *many, but not all, content types. For example, we cannot process the content of some rich media*
27  *files or dynamic pages.*

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1     *Serving Results*

2     *When a user enters a query, our machines search the index for matching pages and return the*

3     *results we believe are the most relevant to the user. Relevancy is determined by over 200 factors,*

4     *one of which is the PageRank for a given page. PageRank is the measure of the importance of a*

5     *page based on the incoming links from other pages. In simple terms, each link to a page on your*

6     *site from another site adds to your site's PageRank. Not all links are equal: Google works hard*

7     *to improve the user experience by identifying spam links and other practices that negatively*

8     *impact search results. The best types of links are those that are given based on the quality of*

9     *your content.*

10    *...*

11    *Google's Did you mean and Google Autocomplete features are designed to help users save time*

12    *by displaying related terms, common misspellings, and popular queries. Like our google.com*

13    *search results, the keywords used by these features are automatically generated by our web*

14    *crawlers and search algorithms. We display these predictions only when we think they might*

15    *save the user time. If a site ranks well for a keyword, it's because we've algorithmically*

16    *determined that its content is more relevant to the user's query."* [Google, Exhibit X.C.13.a)]

17    While Google's PageRank is a proprietary algorithm, most if not all, major search engines have

18    some variation that measures and incorporates the general concept of link authority and citation

19    analysis into search ranking.

20    **VII. Basis for Opinions**

21    This report is based on information available to me as of the date of filing.

22    All opinions expressed are based on a reasonable degree of certainty and are based on the

23    following:

24    • My education, training, and experience developed in search engine optimization and web

25       analytics

26    • My review of materials provided to me by counsel

27    • Websites I reviewed in relation to this case

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1     •   Interviews with Mr. Duke [Exhibit X.C.3.a)]

2     •   My examination of related resources, crawl data, and web analytics data

3   I respectfully reserve the right to amend or supplement my findings or opinions set forth in this

4   report if additional information is presented to me for review.

5   **VIII. My Opinions**

6   I was asked to provide a response to the opinions expressed by Peter Kent, expert witness

7   retained on behalf of the Plaintiffs. I was also asked to opine on whether the Defendants

8   demonstrated effort to optimize the 21centurysmoking.com website for the "21st century smoke"

9   text.

10   My opinions, in detail to follow, are:

11     •   Mr. Duke Was Neither Capable Nor Had He Demonstrated the Skills or Knowledge

12        Required to Manually Modify the Meta Tags

13     •   There Is No Evidence of Mr. Duke Modifying Meta Tags in Zen Cart

14     •   While Robert Hough Would Have Been Capable of Modifying Meta Tags, I Found No

15        Evidence That He Added the "21st century smoke" Text, and Its Inclusion into

16        21centurysmoking.com as It Was Done Would Have Been Contrary to the SEO

17        Knowledge and Logic He Displayed.

18     •   Zen Cart Does Auto-populate Meta Tags Throughout the Website

19     •   Ceon URI Mapping Could Not Auto-populate Meta Tags, However Ceon URI Mapping

20        May Not Have Been the Only Plugin Used

21     •   The "21st Century Smoke" Text May Have Been Added Accidentally

22     •   There Is No Evidence That Defendants Added the "21st Century Smoke" Text, Provided

23        It to Anyone Else, or Instructed Anyone to Include It

24     •   The Meta Keywords Tag Is Not Specific to Search Engines Nor Was It Used by Search

25        Engines for Ranking

26     •   The Meta Description Tag Was Not Used by Search Engines for Search Result Ranking

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   • There Is No Evidence that Searchers Saw the "21st Century Smoke" Text in Search

2      Results for 21centurysmoking.com or Clicked on Search Results for

3      21centurysmoking.com Because of It.

4   • No Evidence That the "21st Century Smoke" Text Was Used in Title Tags

5   • Archive.org's Wayback Machine is Viewed as an Authoritative Resource, However

6      There are Instances Where the Archived Content May Not Fully Match the Source

7      Content

8   • Defendants Demonstrated No Effort to Optimize for the "21st Century Smoke" Text

9   **Opinions in detail:**

10  **A. Mr. Duke Was Neither Capable Nor Had He Demonstrated the Skills or**

11  **Knowledge Required to Manually Modify the Meta Tags**

12  Mr. Kent opined: *"Thus, in my opinion Mr. Duke likely did have the skills necessary to manually*

13  *modify meta tags."* [Peter Kent, Expert Report, November 23, 2015, p.17, #55, Exhibit X.C.4.a)]

14  **1. Mr. Duke's Skills Are Not Directly Applicable**

15  Mr. Kent mentions Mr. Duke's computer skills to illustrate his capabilities:

16  *"While in High School Mr. Duke took a word-processing class, and his resume states that he is*

17  *proficient with Microsoft Word (a sophisticated word-processing program) and Microsoft Excel,*

18  *a spreadsheet program (Duke Deposition, June 16th, 36:23)."* [Peter Kent, Expert Report,

19  November 23, 2015, p.14, #48, Exhibit X.C.4.a)]

20  Just because someone can use Microsoft Word or Excel does not mean they are capable of, or

21  understand, making changes to web pages. Word processing software, such as Microsoft Word,

22  should not be used for creating or editing text files, like those used with web servers. Word

23  processing programs may include special code or formatting in the file that may be problematic

24  for web servers, which expect and require a truly "pure" text-based file. I've not encountered any

25  static or dynamic websites, to my knowledge, that have been built or edited using Microsoft

26  Excel; therefore, I'm not aware of the relevancy of that skill.

27  Mr. Kent also references college classes that:

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  *"...included some HTML (Duke Deposition, June 16th, 48:3—7), as well as JavaScript, a subject*
2  *far more advanced than HTML (Duke Deposition, June 16th, 48:21—22)."* [Peter Kent, Expert
3  Report, November 23, 2015, p.14, #49, Exhibit X.C.4.a)]

4  Colleges and Universities provide many introductory classes on many subjects. Ecommerce
5  carts, like Zen Cart, are very complex. In my experience, they are more complex than other
6  common web platforms, such as blog or content management systems (CMSs), and non-
7  database, static websites. Their interfaces are also considerably different than common software
8  like Microsoft Word and Excel.

9  Mr. Duke stated in a phone interview regarding the initial website for 21centurysmoking.com
10 that:

11 *"I used Dreamweaver and a template I found...copy/pasting over the sample text."* [Brent Duke,
12 paraphrased from phone interview, 3/15/16, Exhibit X.C.3.a)]

13 Dreamweaver was a visual editor used for creating websites. It "simplified" the creation of
14 websites compared to creating them "by hand" in Notepad (Windows' basic text editor).
15 Dreamweaver was promoted both as a "professional" tool as well as the tool for novices to be
16 able to build websites with minimal knowledge of HTML (HyperText Markup Language).

17 Outside of standardized certification testing, proficiency is a subjective term. Whatever
18 "proficiency" Mr. Duke may have felt he had with regard to Microsoft Word and Excel, was also
19 a relative assessment based on specific use cases and expectations. Proficiency in personal and
20 business software does not necessarily equate or transfer to a purpose-built ecommerce platform.

21  **2.  Mr. Duke Broke the HTML Code on His Personal Site as Well as on**
22  **21centurysmoking.com**

23 Mr. Kent referenced the creation of Mr. Duke's personal website, brentduke.com:

24 *"...he had created at least one other Web site..."* [Peter Kent, Expert Report, November 23,
25 2015, p.15, #52, Exhibit X.C.4.a)]

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  I disagree with Mr. Kent's assessment that Mr. Duke's personal website serves as an example of

2  Mr. Duke's proficiency in this area. Mr. Duke's personal website demonstrates Mr. Duke's lack

3  of HTML skills.

4  I reviewed the homepage of the brentduke.com website through the Wayback Machine around

5  the same time period when the "21st century smoke" text first appeared on

6  21centurysmoking.com to gauge Mr. Duke's skills relative to the time period in question. I found

7  that the HTML code for Mr. Duke's personal website's homepage was broken, and remained so

8  at the time of writing this report.



9

10  Figure 1 Broken homepage on BrentDuke.com.

11  [Archive.org, Exhibit X.C.6.a)]

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    Viewing the page, visually the bottom of the page does not appear "correct."

2    Reviewing the source code of the page, I found that part of the HTML was missing:

```
<div class="content">
  <ul>
    <li>
      <a href="/web/20110807200758/http://www.sportsdoctrine.com/">SportsDoctrine</a>
    </li>
    <li>
      <a href="/web/20110807200758/http://www.goodreads.com/">goodreads</a>
    </li>
    <li>
      <a href="/web/20110807200758/http://www.roachag.com/">Roach Ag. Marketing</a>
    </li>
    <li>
      <a href="/web/20110807200758/http://www.getrichsmoking.com/">My inLife</a>
    </li>
  </ul>
</div>
<div class="content showcase">
  <img src="images/thumbs/1.jpg" width="65" height="65" alt="1" /> <img
  src="images/thumbs/2.j">

<!--
  FILE ARCHIVED ON 20:07:58 Aug 7, 2011 AND RETRIEVED FROM THE
  INTERNET ARCHIVE ON 21:33:34 Mar 9, 2016.
  JAVASCRIPT APPENDED BY WAYBACK MACHINE, COPYRIGHT INTERNET ARCHIVE.

  ALL OTHER CONTENT MAY ALSO BE PROTECTED BY COPYRIGHT (17 U.S.C.
  SECTION 108(a)(3)).
-->
```

3

4    **Figure 2 Source code view of unclosed HTML on BrentDuke.com homepage [Exhibit X.C.6.b)].**

5    In addition to the final image tag appearing to reference an incomplete or incorrect image,

6    "/thumbs/2.j", most likely "/thumbs/2.jpg", the HTML code was missing the closing div tags for

7    the:

8    • "content showcase" class

9    • one of the "container" class divs

10   • "footBody" id

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1 • "footer" id

2 • closing "body" tag

3 • closing "html" tag

4 This page is not an example of Mr. Duke's HTML skill or proficiency, but of the forgiving

5 nature of web browsers.

6 This was not an isolated incident. The initial 21centurysmoking.com site homepage was broken

7 in the same way, but with more critical impact.

8 Reviewing the Wayback Machine capture for the 21centurysmoking.com website's homepage as

9 seen on July 14, 2009, the HTML source code reveals: 1) a properly closed HTML page with

10 closing body (</body>) and closing html (</html>) tags, and 2) the Google Analytics tracking

11 code.



13 **Figure 3 July 14, 2009, properly closed HTML with Google Analytics tracking code in 21CS homepage.**

14 [Archive.org, Exhibit X.C.7.a)]

15 *Note: red notes added.*

16 In the next Wayback Machine capture of the homepage on August 11, 2009, the HTML is cut

17 short without either closing body or html tags. The Google Analytics tracking code (lines 475-

18 483 in the screen capture above) was also missing. The segment of HTML code in the following

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  screen capture representing the "end of the HTML code," lines 638-647 correspond to lines 465-

2  469 in the screen capture above:

```
<tr>
    <td width="155"> </td>
    <td width="50"> </td>
    <td width="540"> </td>
    <td width="10"> </td>
```

3

4  **Figure 4 August 11, 2009, unclosed HTML and missing Google Analytics tracking code in 21CS homepage.**

5  [Archive.org, Exhibit X.C.7.b)]

6  The 21centurysmoking.com web page appears visually sound even though the underlying HTML

7  is broken. The Google Analytics tracking code passes information to Google Analytics for

8  reporting and does not impact page appearance.

9  Unlike the homepage on brentduke.com, the page on 21centurysmoking.com provided no visual

10  cues to signal otherwise. In fact, the August capture appears identical to the July capture.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY



**Figure 5 July 14, 2009, 21CS homepage; properly closed HTML [Exhibit X.C.7.c)].**

**Figure 6 August 11, 2009, 21CS homepage; unclosed HTML and missing analytics tracking code [Exhibit X.C.7.d)].**

1    There are two explanations here:

2    • The Wayback Machine did not capture the entire HTML for that page for some reason,
3      yet it "was there" on the website at that point in time.

4    • The actual page itself was "broken" in some way, that 1) prevented the HTML code from
5      being delivered to the browser, or 2) the HTML was no longer on the page.

6    Google Analytics data confirmed the 2nd explanation above based on the web traffic for the

7    21centurysmoking.com homepage dropped to zero on July 19, 2009, where it remained until

8    April 26, 2012.

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 228 of 581 PageID #:14568
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 20 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY



Figure 7 Google Analytics Pageviews report showing drop and subsequent return of homepage analytics.

Figure 8 Enlarged view of homepage drop from analytics.    Figure 9 Return of analytics reporting for homepage.

1    [Google Analytics, Exhibit X.C.5.a)]

2    The full graph and the enlarged views above show when the homepage (initially reported as "/"
3    then as "/index.php") tracking stopped and when it recovered when tracking for the entire site
4    was reinstated on April 26, 2012. This drop in reporting for the homepage is significant, as the
5    homepage is, more times than not, the most frequented page of a website. This is further
6    evidence that Mr. Duke was neither capable nor did he demonstrate the skills necessary to
7    modify the meta tags on 21centurysmoking.com.

8    **3.  Mr. Kent's Example Is Over-Simplified**

9    *"Modifying meta tags is an extremely simple thing to do; anyone who can edit a piece of text in*
10   *an HTML file can easily modify a meta tag; HTML files are merely text files that can be modified*

1 *with a word processor or text editor, and Mr. Duke clearly has these abilities."* [Peter Kent,
2 Expert Report, November 23, 2015, p.14, #47, Exhibit X.C.4.a)]

3 However, what Mr. Kent describes relates to a static website where the pages of the website are
4 simple HTML files…find a file, open it, edit, and save, then on to the next file and repeat.
5 Furthermore, as already mentioned, these files should not be edited with a word processor as
6 they may contain extraneous data pertaining to the word processor used, even when saved as
7 text.

8 A website using Zen Cart is not, however, a bunch of simple HTML pages. Zen Cart is a
9 complex shopping cart system built in PHP (Hypertext Preprocessor),

10 *"…an HTML-embedded scripting language. Much of its syntax is borrowed from C, Java and*
11 *Perl with a couple of unique PHP-specific features thrown in."* [PHP, Exhibit X.C.12.c)],

12 that utilizes the MySQL database [MySQL, Exhibit X.C.12.d)]. What appears as a simple text
13 file rendered in a user's browser by "viewing source" is actually constructed by the Zen Cart
14 program from multiple data fields and tables, stored in a database, and combined with many
15 individual Zen Cart PHP files.

16 Mr. Kent's specific example of how simple it is to modify meta tags in Zen Cart is over-
17 simplified as meta tags can be modified in various locations within Zen Cart, some of which take
18 precedence over other entries, while others are additive.

19 *"The following image, for example, is from a tutorial on Zen Cart*
20 *{https://www.siteground.com/tutorials/zencart/zencart_meta_tags.htm}, showing how to change*
21 *the meta Keywords and meta Description tags:*

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY



1

2   *Thus anyone capable of using such a program is capable of modifying the tags very easily. The*
3   *system shown above is the sort of system used by the Defendants to modify their Web pages (they*
4   *were using a Zen Cart ecommerce system)."* [Peter Kent, Expert Report, November 23, 2015,
5   p.14, #32-33, Exhibit X.C.4.a)]

6   Based on my evaluation, more likely than not, the "21st century smoke" text was not input into
7   the Zen Cart interface as Mr. Kent illustrates, but from the meta_tags.php file located within the
8   includes/languages/ hierarchy. Because it is a PHP coding file, making edits in the meta_tags.php
9   file [Exhibit X.C.12.i)], unlike breaking HTML, is unforgiving. An incorrect keystroke can leave
10  the website nothing more than a blank page.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

```php
<?php
/**
 * @package languageDefines
 * @copyright Copyright 2003-2008 Zen Cart Development Team
 * @copyright Portions Copyright 2003 osCommerce
 * @license http://www.zen-cart.com/license/2_0.txt GNU Public License V2.0
 * @version $Id: meta_tags.php 10330 2008-10-10 20:14:32Z drbyte $
 */

// page title
define('TITLE', '21 Century Smoking');

// Site Tagline
define('SITE_TAGLINE', 'Your source for premium electronic cigarettes');

// Custom Keywords
define('CUSTOM_KEYWORDS', 'electronic cigarette, e-cig, e cig, ecig, refills, cartridges, e liquid, 21st century smoke, vapor, lifetime, warranty');

// Home Page only:
    define('HOME_PAGE_META_DESCRIPTION', '21 Century Smoking sells the finest electronic cigarettes, liquid, and accessories on the market today.');
    define('HOME_PAGE_META_KEYWORDS', 'electronic, cigarette, cigarettes, vape, vapor, e-liquid, e-juice, kit, ');

    // NOTE: If HOME_PAGE_TITLE is left blank (default) then TITLE and SITE_TAGLINE will be used instead.
    define('HOME_PAGE_TITLE', ''); // usually best left blank
```

Figure 10 Zen Cart meta_tags.php file from backup folder on 21CS server.

In my opinion, based on a reasonable degree of certainty, whether Mr. Duke felt at one time that he was proficient in using Microsoft Word or Excel, or that he took an introductory course on HTML and JavaScript in college, is not indicative of the skills he would need to make the changes in Zen Cart that caused the "21st century smoke" text to appear on 21centurysmoking.com. Furthermore, the only demonstration of Mr. Duke's skills in this area involved breaking HTML code on both his personal website as well as 21centurysmoking.com, the latter resulting in two years of under-reporting of important web analytics data.

## B. There Is No Evidence of Mr. Duke Modifying Meta Tags in Zen Cart

In reviewing the title and meta tags of 21centurysmoking.com as archived in the Wayback Machine, the earliest capture of Zen Cart on 21centurysmoking.com was September 18, 2009, [Archive.org, Exhibit X.C.7.e)]. For the next two years, the title and meta tags on all Zen Cart pages retained the default information used for the initial installation of Zen Cart. These tags reference "Zen Cart!, The Art of E-commerce" specifically.

The Zen Cart version that would have, more likely than not, been used initially on 21centurysmoking.com was some variation of v.1.3.8. A section of the meta_tags.php file from that version with the default "fresh install" information is shown below:

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

```
// page title
define('TITLE', 'Zen Cart!');

// Site Tagline
define('SITE_TAGLINE', 'The Art of E-commerce');

// Custom Keywords
define('CUSTOM_KEYWORDS', 'ecommerce, open source, shop, online shopping');

// Home Page Only:
  define('HOME_PAGE_META_DESCRIPTION', '');
  define('HOME_PAGE_META_KEYWORDS', '');

// NOTE: If HOME_PAGE_TITLE is left blank (default) then TITLE and SITE_TAGLINE will be used instead.
  define('HOME_PAGE_TITLE', ''); // usually best left blank
```

Figure 11 Zen Cart default installation meta_tags.php file [Exhibit X.C.12.h)].

Below are samples of the title and meta tags on the Zen Cart pages between September 18, 2009, and September 29, 2011, showing the default Zen Cart text:

- September 24, 2009, Zen Cart Main Page

```
<title>Zen Cart!, The Art of E-commerce</title>
<meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1" />
<meta name="keywords" content="Gift Certificates Starter Kits Blackjack Cartridges Chargers Carrying Cases Pocket Ace
& Jackpot Cartridges Replacement Batteries Replacement Atomizers ecommerce, open source, shop, online shopping " />
<meta name="description" content="Zen Cart! : - Gift Certificates Starter Kits Blackjack Cartridges Chargers
Carrying Cases Pocket Ace & Jackpot Cartridges Replacement Batteries Replacement Atomizers ecommerce, open source,
shop, online shopping" />
<meta http-equiv="imagetoolbar" content="no" />
<meta name="author" content="The Zen Cart&trade; Team and others" />
<meta name="generator" content="shopping cart program by Zen Cart&trade;, http://www.zen-cart.com eCommerce" />
```

Figure 12 September 24, 2009, Zen Cart main page on 21CS with default Zen Cart text.

[Archive.org, Exhibit X.C.7.f)]

- January 6, 2010, New Products Page

```
<title>New Products : Zen Cart!, The Art of E-commerce</title>
<meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1" />
<meta name="keywords" content="Gift Certificates Starter Kits Blackjack Cartridges Chargers Carrying Cases Pocket Ace
& Jackpot Cartridges Replacement Batteries Replacement Atomizers ecommerce, open source, shop, online shopping New
Products" />
<meta name="description" content="Zen Cart! : New Products - Gift Certificates Starter Kits Blackjack Cartridges
Chargers Carrying Cases Pocket Ace & Jackpot Cartridges Replacement Batteries Replacement Atomizers ecommerce, open
source, shop, online shopping" />
<meta http-equiv="imagetoolbar" content="no" />
<meta name="author" content="The Zen Cart&trade; Team and others" />
<meta name="generator" content="shopping cart program by Zen Cart&trade;, http://www.zen-cart.com eCommerce" />
```

Figure 13 January 6 2010, new products page on 21CS with default Zen Cart text.

[Archive.org, Exhibit X.C.7.g)]

- August 27, 2010, Blackjack Starter Kit Product Page

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

```
<title>Blackjack Starter Kit - $69.95 : Zen Cart!, The Art of E-commerce</title>
<meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1" />
<meta name="keywords" content="Blackjack Starter Kit Carrying Cases Pocket Ace & Jackpot Cartridges Chargers Gift
Certificates Starter Kits Blackjack Cartridges Replacement Atomizers Replacement Batteries ecommerce, open source,
shop, online shopping" />
<meta name="description" content="Zen Cart! Blackjack Starter Kit - The Blackjack is one of the easiest electronic
cigarettes to use. With the atomizer built into the cartridge, this e-cig has only two parts. The Blackjack is one of
the longest lasting electronic cigarettes on the market. Each cartridge lasts for nearly 300 puffs. That is
equivalent to 1 1/2 " />
<meta http-equiv="imagetoolbar" content="no" />
<meta name="author" content="The Zen Cart&trade; Team and others" />
<meta name="generator" content="shopping cart program by Zen Cart&trade;, http://www.zen-cart.com eCommerce" />
```

1

2    **Figure 14 August 27, 2010, Blackjack Starter Kit product page on 21CS with default Zen Cart text.**

3    [Archive.org, Exhibit X.C.7.h)]

4    • November 30, 2010, How It Works Page

```
<title>How It Works : Zen Cart!, The Art of E-commerce</title>
<meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1" />
<meta name="keywords" content="Carrying Cases Pocket Ace & Jackpot Cartridges Chargers Gift Certificates Starter Kits
Blackjack Cartridges Replacement Atomizers Replacement Batteries ecommerce, open source, shop, online shopping How It
Works" />
<meta name="description" content="Zen Cart! : How It Works - Carrying Cases Pocket Ace & Jackpot Cartridges Chargers
Gift Certificates Starter Kits Blackjack Cartridges Replacement Atomizers Replacement Batteries ecommerce, open
source, shop, online shopping" />
<meta http-equiv="imagetoolbar" content="no" />
<meta name="author" content="The Zen Cart&trade; Team and others" />
<meta name="generator" content="shopping cart program by Zen Cart&trade;, http://www.zen-cart.com eCommerce" />
```

5

6    Figure 15 November 30, 2010, How It Works page on 21CS with default Zen Cart text.

7    [Archive.org, Exhibit X.C.7.i)]

8    • January 8, 2011, Reviews Page

```
<title>Reviews : Zen Cart!, The Art of E-commerce</title>
<meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1" />
<meta name="keywords" content="Carrying Cases Pocket Ace & Jackpot Cartridges Chargers Gift Certificates Starter Kits
Blackjack Cartridges Replacement Atomizers Replacement Batteries ecommerce, open source, shop, online shopping
Reviews" />
<meta name="description" content="Zen Cart! : Reviews - Carrying Cases Pocket Ace & Jackpot Cartridges Chargers Gift
Certificates Starter Kits Blackjack Cartridges Replacement Atomizers Replacement Batteries ecommerce, open source,
shop, online shopping" />
<meta http-equiv="imagetoolbar" content="no" />
<meta name="author" content="The Zen Cart&trade; Team and others" />
<meta name="generator" content="shopping cart program by Zen Cart&trade;, http://www.zen-cart.com eCommerce" />
```

9

10   Figure 16 January 8, 2011, Reviews page on 21CS with default Zen Cart text.

11   [Archive.org, Exhibit X.C.7.j)]

12   • September 18, 2011, Discount Coupon Page

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

```
<title>Discount Coupon : Zen Cart!, The Art of E-commerce</title>
<meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1" />
<meta name="keywords" content="Chargers Carrying Cases Gift Certificates Starter Kits Blackjack Cartridges
Replacement Batteries Replacement Atomizers USB Passthroughs Disposables 10 mL Liquid ecommerce, open source, shop,
online shopping Discount Coupon" />
<meta name="description" content="Zen Cart! : Discount Coupon - Chargers Carrying Cases Gift Certificates Starter
Kits Blackjack Cartridges Replacement Batteries Replacement Atomizers USB Passthroughs Disposables 10 mL Liquid
ecommerce, open source, shop, online shopping" />
<meta http-equiv="imagetoolbar" content="no" />
<meta name="author" content="The Zen Cartitude; Team and others" />
<meta name="generator" content="shopping cart program by Zen Cartitude;, http://www.zen-cart.com eCommerce" />
```

1

2     **Figure 17 September 18, 2011, Discount Coupon page on 21CS with default Zen Cart text.**

3     [Archive.org, Exhibit X.C.7.k)]

4     The variations within the tags in these examples are based on programmatic patterns built into

5     Zen Cart, like the following (with a slight variation for the main page title):

6            Title = {PAGE_NAME} : {TITLE}, {SITE_TAGLINE}

7            Meta Keywords = {PRODUCT_CATEGORIES} {CUSTOM_KEYWORDS}

8            {PAGE_NAME}

9            Meta Description = {TITLE} : {PAGE_NAME} - {PRODUCT_CATEGORIES}

10          {CUSTOM_KEYWORDS}

11     In a phone interview with Mr. Duke, he stated that when Robert Hough wasn't around, he

12     utilized:

13     *"Karti and WebRecSol and freelancers through Odesk and Craigslist for work on Zen Cart."*

14     [Brent Duke, paraphrased from phone interview, 3/15/16, Exhibit X.C.3.a)]

15     In my opinion, based on a reasonable degree of certainty, Mr. Duke had not demonstrated

16     making any changes in or outside of the Zen Cart interface that would modify meta tags. That the

17     titles and meta tags on the Zen Cart pages went unchanged and contained the default Zen Cart

18     information for two years further demonstrates that Mr. Duke had no knowledge of the

19     meta_tags.php file.

1    **C.    While Robert Hough Would Have Been Capable of Modifying Meta Tags, I**
2    **Found No Evidence That He Added the "21st century smoke" Text, and Its**
3    **Inclusion into 21centurysmoking.com as It Was Done Would Have Been Contrary**
4    **to the SEO Knowledge and Logic He Displayed.**

5    Mr. Kent opined: *"Based on his own statements, I would say that Defendants' employee Mr.*
6    *Hough was undoubtedly capable of modifying meta tags."* [Peter Kent, Expert Report,
7    November 23, 2015, p.17, #59, Exhibit X.C.4.a)]

8    Robert Hough provided a response regarding his related knowledge and proficiency:

9    *"Q. So with two years of computer classes in college and five to six years of self teaching Web*
10   *coding, Web development, software programming, would you consider yourself proficient in*
11   *these areas now?*

12   *A. Yes.*

13   *...*

14   *BY MR. GAYNOR:*

15   *Q. How proficient would you say you are?*

16   *BY THE WITNESS:*

17   *A. Pretty proficient"*

18   [Robert Hough, Deposition, 2093298-Robert Hough-1.PDF, p.19, #2-19, Exhibit X.C.2.c)]

19   Again, self-evaluation regarding proficiency should be viewed subjectively; however, Mr.
20   Hough would appear to have the knowledge and enough understanding of Zen Cart to modify
21   meta tags.

22   This knowledge may still have been rudimentary, considering Mr. Hough was asked about a
23   specific file of code called "functions.php:"

24   *"BY MR. GAYNOR:*

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   *Q. Handing you what's been marked as Exhibit 5 for identification. Again, I ask that you give it a*

2   *quick look and identify the document if you can.*

3   *A. Yes, these are the functions that Zen Cart uses to perform its -- its operation.*

4   *Q. What types of functions are you talking about?*

5   *...*

6   *A. In programming if you use a certain set of code often, it's easier to create one function that*

7   *you can just call that function repeatedly instead of retyping all this code. This specifically -- I*

8   *believe this makes the boxes."*

9   [Robert Hough, Deposition, 2093298-Robert Hough-1.PDF, p.66, #3-19, Exhibits X.C.2.c),

10   X.C.2.d)]

11   However, this code was not a Zen Cart file at all, but a WordPress file that had no connection to

12   Zen Cart.

13   I also found an entire section of default "sample" text that was commented out in the homepage

14   of 21centurysmoking.com from October 2011 that is still on the site today. This sample HTML

15   and copy is completely unnecessary and should have been removed.



16

17   Figure 18 21CS homepage after migrating Zen Cart to site root with commented out sample text.

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 237 of 581 PageID #:14577
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 29 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    [Archive.org, Exhibit X.C.7.r)]

2    Mr. Hough was not specifically trained in SEO but appeared to have a basic, though not entirely
3    accurate, understanding:

4    *"Q. Who have you performed SEO and Web marketing services for?*

5    *A. I really have not. I've installed plugins, which are additional codes to add that feature for a*
6    *Website.*

7    *Q. And what does that mean "add that feature to a Website"?*

8    *A. Where it would create data to help search engines find a specific page.*

9    *Q. Okay. And how does that work exactly?*

10   *A. For Brent's it took a URL and made it user readable or human readable so search engines*
11   *would recognize it easier and then pull content off the page."*

12   [Robert Hough, Deposition, 2093298-Robert Hough-1.PDF, p.22, #3-16, Exhibit X.C.2.c)]

13

14   *"Q. What are some of the ways to achieve that optimization?*

15   *...*

16   *BY THE WITNESS:*

17   *A. You can pay for services like these, which I don't really know how they operate. My choice for*
18   *SEO is to have accurate descriptions on your page. If that matches, that will also raise your*
19   *ranking.*

20   *BY MR. GAYNOR:*

21   *Q. And when you say "accurate descriptions," what do you mean by that?*

22   *A. If somebody is searching for electronic cigarette and somewhere in the text on your Website it*
23   *has electronic cigarette, that can pop up on a search as well.*

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   *Q. Are you talking about visible text on the Website?*

2   *A. Yes.*

3   *Q. Text that is visible to anybody who is viewing the Website Internet browser?*

4   *A. Correct."* [Robert Hough, Deposition, 2093298-Robert Hough-1.PDF, p.71, #10-24 – p. 72,

5   #2-8, Exhibit X.C.2.c)]

6   Mr. Hough also made a statement about keywords in meta tags without those keywords

7   appearing on the page itself:

8   *"Not to mention, there would be no benefit to include the words 21st CENTURY SMOKE as a*

9   *meta tag if the words were not also included in the text visually presented to visitors to the site,*

10  *as I understand these words consequently would be ignored by the search engines when*

11  *generating a search result."* [Robert Hough, Declaration, March 12, 2013, p.4, #8, Exhibit

12  X.C.1.b)]

13  In my opinion, based on a reasonable degree of certainty, while Mr. Hough's knowledge is

14  questionable, he would have been capable of modifying meta tags; however, I found no evidence

15  that he added the "21st century smoke" text, and its inclusion into 21centurysmoking.com as it

16  was done would have been contrary to the SEO knowledge and logic he displayed.

17  ## D.   Zen Cart Does Auto-populate Meta Tags Throughout the Website

18  Mr. Kent opined: *"Zen Cart could not auto-populate meta tags with a competitor's mark without*

19  *operator input."* [Peter Kent, Expert Report, November 23, 2015, p.17, #C, Exhibit X.C.4.a)]

20  "Auto-population" does not refer to some magical or artificial intelligence where Zen Cart

21  creates or identifies terms to use and then inserts them into the site. The more appropriate

22  industry terminology here would be "programmatic." In this way, Zen Cart (as well as

23  ecommerce carts in general, content management systems, blogs, and other website platforms)

24  follows sets of instructions and rules to construct various website elements, which would include

25  meta tags. Zen Cart follows this programmatic instruction, first checking to see if a manual entry

26  has been made for a specific web page, and if so uses it. If no manual entry is found, Zen Cart

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 239 of 581 PageID #:14579
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 31 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  pulls information from other various locations to construct the particular element, such as the site

2  name, list of product categories, and in this case, entries made into the meta_tags.php file.

3  More likely than not, the "auto-population" that happens for most pages within Zen Cart in the

4  absence of explicitly provided information is as follows:

5  **Page Title Tag:**

6  {PAGE_NAME} : {TITLE}, {SITE_TAGLINE}

7  **Page Meta Description:**

8  {TITLE} : {PAGE_NAME} - {PRODUCT_CATEGORIES} {CUSTOM_KEYWORDS}

9  **Page Meta Keywords:**

10  {CUSTOM_KEYWORDS} {PAGE_NAME}

11  The TITLE, SITE_TAGLINE, and CUSTOM_KEYWORDS are pulled from the meta_tags.php

12  file. The PRODUCT_CATEGORIES comes from the product categories created within Zen

13  Cart. The PAGE_NAME is the name assigned to the specific page of the website, unless it is the

14  homepage, in which case it is left blank (although the "-" separator still appears).

15



16  **Figure 19 Source-code view of capture of 21CS homepage on October 18, 2011, highlighting title tag, meta keywords, and**
17  **meta description.**

18  [Archive.org, Exhibit X.C.7.r)]

19  *Notes added, left side in red.*

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   Above is the source-code captured in the Wayback Machine for the 21centurysmoking.com
2   homepage from October 18, 2011.

3   Specifically in this example then:

4   TITLE = 21 Century Smoking

5   SITE_TAGLINE = The future of smoking today!

6   PAGE_NAME =

7   PRODUCT _CATEGORIES = Chargers Carrying Cases Gift
8   Certificates Starter Kits Blackjack Cartridges Replacement Batteries
9   USB Passthroughs Disposables 10 mL Liquid CLEARANCE DEAL OF
10  THE WEEK

11  CUSTOM_KEYWORDS = electronic cigarette, e-cig, refills, 21st
12  century smoke, vapor,



Figure 20 Category navigation on 21CS, showing product categories used for programmatic optimization of meta tags [Exhibit X.C.7.l)].

13  The majority of the title tags, meta descriptions, and meta keywords on 21centurysmoking.com
14  were not manually or explicitly entered, but created automatically as part of Zen Cart's
15  programmatic functionality. Furthermore, every instance of the "21st century smoke" text was
16  through this programmatic "auto-population." At no point, outside of the input into the
17  meta_tags.php file itself, have I seen any instance of the "21st century smoke" text appear on the
18  site through manual entry.

19  I do agree with Mr. Kent that the inclusion of the "21st century smoke" text was, more likely than
20  not, through some operator input. However it wasn't through individual entry through the
21  interface Mr. Kent demonstrated in his report, but, more likely than not, through a single instance
22  within the meta_tags.php file.

23  In my opinion, based on a reasonable degree of certainty, the "21st century smoke" text did
24  appear in the meta tags of some pages on 21centurysmoking.com through default Zen Cart
25  programmatic "auto-population," as the result of the text being entered by someone into the
26  custom keywords section of the meta_tags.php file.

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 241 of 581 PageID #:14581
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 33 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    **E.    Ceon URI Mapping Could Not Auto-populate Meta Tags, However Ceon URI**
2    **Mapping May Not Have Been the Only Plugin Used**

3    Mr. Kent opined: *"Ceon could not auto-populate meta tags with a competitor's mark without*
4    *operator input."* [Peter Kent, Expert Report, November 23, 2015, p.18, #D, Exhibit X.C.4.a)]

5    Mr. Hough stated in his declaration:

6    *"Later in 2012, 21 Century Smoking, Inc. installed a third party plug-in software program called*
7    *Ceon to its web site to provide search engine optimization. Ceon overrides the auto-population*
8    *feature of Zencart and requires manual entry of meta tags to a web site."* [Robert Hough,
9    Declaration, p.4, #11, Exhibit X.C.1.b)]

10    Ceon itself, however, was the name of a company that had created over a dozen plugins for use
11    on Zen Cart. Through my research, I found files for the Ceon URI Mapping plugin in the
12    21centurybackup2012 folder on the GoDaddy server. Furthermore, the changes to URLs for the
13    website match the functionality of that plugin.

14    I have reviewed archived web pages of the Ceon website [Archive.org, Exhibit X.C.10.a)] as
15    well as the Zen Cart website [Archive.org, Exhibit X.C.9.a)] that discuss the Ceon URI Mapping
16    plugin and found no mention of meta tags or any functionality that would involve the meta tags
17    of a page. The functionality of this plugin appears to be solely related to page URLs. The
18    function of the Ceon URI Mapping plugin was to create static, keyword-based URLs that would
19    be beneficial to humans and search engine friendly, therefore, I cannot support a theory that the
20    Ceon URI Mapping plugin could have been responsible.

21    Upon reviewing the URL patterns, I also found that another plugin besides the Ceon URI
22    Mapping plugin was used on 21centurysmoking.com. After reviewing files from the
23    "21centurybackup2012" directory on the web server for 21 Century Smoking, I located files
24    specific to the Ultimate SEO URLs version 2.101 plugin.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

## Ultimate SEO URLs

| Description |
|---|

** USE AT OWN RISK **

Updates to the contribution ported by Dreamscape
Original version was available here:
http://www.dream-scape.com/pub/zencart/Ultimate_SEO_URLs
but is not designed for Zen Cart v1.3.0 and higher.
This is a quick conversion of code for 1.3-compatibility.

Example URL Transformations:

From: http://yoursite.com/index.php?main_page=product_info&products_id=24
To: http://yoursite.com/disciples-sacred-lands-linked-p-24.html

From: http://yoursite.com/index.php?main_page=index&cPath=2_20
To: http://yoursite.com/software-strategy-c-2_20.html

From: http://yoursite.com/index.php?main_page=contact_us
To: http://yoursite.com/contact_us.html

| | |
|---|---|
| Zen Cart® Versions: | v1.5.0 |
| Original Author: | dreamscape |
| Downloads: | 66,068 |

Figure 21 Description and sample URL transformations for the Ultimate SEO URLs plugin.

[Archive.org, Exhibit X.C.9.b)]

The functionality of the Ultimate SEO URLs plugin is also to transform parameter-based URLs into friendlier, keyword-based URLs. I found less information about this plugin, however.

The URLs below illustrate different URL variations for the same 21centurysmoking.com product page (based on Archive.org captures) with Zen Cart, Ultimate SEO URLs, and Ceon URI Mapping URLs:

**Default Zen Cart URL:**

http://www.21centurysmoking.com/catalog/index.php?main_page=product_info&products_id=180

**Ultimate SEO URLs version:**

http://21centurysmoking.com/blackjack-starter-kit-p-180.html

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 243 of 581 PageID #:14583
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 35 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   **Ceon URI Mapping version:**

2   http://21centurysmoking.com/starter-kits/blackjack-starter-kit

3   Robert Hough stated that Ceon was used on the website:

4   *"Q. Okay. Drawing your attention again to Paragraph 8, Exhibit 11, your declaration, you state*

5   *that: "While the site could have been optimized for search engine purposes without the software,*

6   *that would have been an arduous task that would have taken months to complete." Why would*

7   *that task take months to complete?*

8   *A. Because then you would have to personally go on each and every single file and manually*

9   *override changes. However, we use Ceon which eliminated that because it was already software*

10  *that was created.*

11  *Q. What is Ceon?*

12  *...*

13  *A. It's an SEO-type tool that also let's you manually enter information for metadata.*

14  *...*

15  *Q. And that makes this arduous task much less arduous?*

16  *A. Correct."* [Robert Hough, Deposition, 2093298-Robert Hough-1.PDF, p.118, #8-23 – p. 119,

17  #2-8, Exhibits X.C.2.c), X.C.1.b)]

18  As mentioned, Ceon did produce other plugins [Archive.org, Exhibit X.C.10.b)]; though none

19  listed on their website appear to deal with meta tags. The functionality Mr. Hough described in

20  his deposition is different than the functionality of Ceon URI Mapping. As the developer for

21  Ceon has passed away, I cannot confirm that Ceon did not create or test other plugins, beyond

22  those listed on their website, which may have modified meta tags.

23  Archive.org's Wayback Machine provides a glimpse of "rendered" pages of

24  21centurysmoking.com from the past. Any number of plugins and configuration settings in

25  infinite combinations go into creating the "finished product" as the pages were rendered in the

26  browser.

1  In my opinion, based on a reasonable degree of certainty, the Ceon URI Mapping plugin was not
2  capable of modifying meta tags. I found evidence that at least one other plugin, Ultimate SEO
3  URLs, was most likely used on the site at some point as well; though I have no reason to believe
4  that it would modify the meta_tags.php file either.

5  **F.    The "21st Century Smoke" Text May Have Been Added Accidentally**

6  Mr. Kent opined: *"The mark '21st Century Smoke' was intentionally provided for inclusion into*
7  *meta tags."* [Peter Kent, Expert Report, November 23, 2015, p.21, #E, Exhibit X.C.4.a)]

8  I agree with Mr. Kent that the "21st century smoke" text did not appear "magically." The
9  appearance within the meta keywords and meta description tags on the public-facing website, as
10  stated previously, was done programmatically through standard Zen Cart functionality. In this
11  way, it was done through "auto-population."

12  I have not reviewed any documents or depositions, or through interview of Mr. Duke, been made
13  aware of anything that would indicate involvement by the Defendants, either in placing the text
14  in the meta_tags.php file directly or by instruction to anyone else, or that the Defendants were
15  necessarily aware of the file.

16  I interviewed Mr. Duke regarding who had access to the web server to work on Zen Cart:

17  *"Robert Hough, Karti Saraswat and her employees at WebRecSol, and that he also relied on*
18  *freelancers through ODesk or off Craigslist as needed."* [Brent Duke, paraphrased from phone
19  interview, 3/15/16, Exhibit X.C.3.a)]

20  Both the Defendants and Plaintiffs acknowledge confusion between the terms "21 Century
21  Smoking" and "21st Century Smoke."

22  In Mr. Kent's initial Declaration, he provided an example of what he described as a SEO linking
23  strategy on the part of the Defendants:

24  *"I was able to find a page (http://www.americanretailersmarketplace.com/e-cigs.html) that*
25  *discusses and displays Plaintiff's 21st Century Smoke products, and yet links to Defendant's*
26  *21CenturySmoking.com Web site, with a link that says '21st Century Smoke."* [Peter Kent,
27  Declaration, November 19, 2013, p.8, #29, Exhibit X.C.1.a)]

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY





1

2    Figure 22 Example of mistaken linking to 21centurysmoking.com with 21st Century Smoke anchor text.

3    In reviewing the archive of the website called out in Mr. Kent's example [Archive.org, Exhibit

4    X.C.11.a)], more likely than not, this is a case where one of the Plaintiffs' own customers

5    mistakenly linked to the wrong website.

6    In my opinion, based on a reasonable degree of certainty, the inclusion of the "21st century

7    smoke" text within the meta_tags.php file could have been made by a vendor or contractor who

8    was unfamiliar with the specifics of the business. They may have added the "21st century smoke"

9    text to the meta_tags.php file, believing it was a term related to 21 Century Smoking or a variant

10   of 21 Century Smoking, which would already be on the website in the title tag and body copy

11   section of every page of the website. I have not seen any evidence confirming or indicating that

12   this act was at the instruction of the Defendants or that the text "21st century smoke" was ever

13   provided to anyone for any purpose.

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 246 of 581 PageID #:14586
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 38 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1     **G.**    **There Is No Evidence That Defendants Added the "21st Century Smoke"**
2         **Text, Provided It to Anyone Else, or Instructed Anyone to Include It**

3    Mr. Kent opined: *"Even with "auto-population" the mark "21st Century Smoke" must have*
4    *been provided by defendants"* [Peter Kent, Expert Report, November 23, 2015, p.23, #F, Exhibit
5    X.C.4.a)]

6    I agree with Mr. Kent's assessment, in part:

7    *"…the text string '21st Century Smoke' must still have been provided by a human being for*
8    *inclusion into the meta tags…"* [Peter Kent, Expert Report, November 23, 2015, p.23, #78,
9    Exhibit X.C.4.a)].

10    However, I disagree that:

11    *"…that text would still need to be provided by the person managing the Zen Cart store for*
12    *Defendants."* [Peter Kent, Expert Report, November 23, 2015, p.24, #81, Exhibit X.C.4.a)]

13    I have not seen any evidence that mentions the meta_tags.php file, instruction to anyone to add
14    the text "21st century smoke" to the website, or any analytics or search ranking monitoring for
15    the term (Note: ranking monitoring refers to the process of checking search results for specific
16    search terms to see what pages rank in which search result positions).

17    The majority of the Zen Cart pages appear to have had title and meta tags generated based on
18    Zen Cart's built in programmatic function. Of which, part of the text was derived from the
19    meta_tags.php file. These were the only instances where the "21st century smoke" text appeared
20    in either meta description or meta keywords tags. Some pages do not appear to follow the
21    programmatic patterns. In these instances, they appear to be manually entered through the Zen
22    Cart interface and there is no usage of the "21st century smoke" text. The keywords entered in
23    these instances are also specific to the products and used within the page copy. Some examples
24    follow:

25    **Date:** June 27, 2012

26    **URL:** http://21centurysmoking.com/index.php?main_page=index&cPath=67

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  **Title Tag:** Electronic Cigarette Chargers

2  **Meta Description:** A charger is what replenishes the energy inside your electronic cigarette
3  battery after it is drained.

4  **Meta Keywords:** electronic, cigarette, charger

5  [Archive.org, Exhibit X.C.7.m)]

6

7  **Date:** July 15, 2012

8  **URL:** http://21centurysmoking.com/starter-kits-c-65.html

9  **Title Tag:** Electronic Cigarette Starter Kits

10  **Meta Description:** electronic cigarette starter kits

11  **Meta Keywords:** e-cig, electronic cigarette, blackjack, 21, century, smoking, 21 century
12  smoking, vaporizer, healthy

13  [Archive.org, Exhibit X.C.7.n)]

14

15  **Date:** November 24, 2012

16  **URL:** http://21centurysmoking.com/

17  **Title Tag:** 21 Century Smoking, Your source for premium electronic cigarettes

18  **Meta Description:** 21 Century Smoking sells the finest electronic cigarettes, liquid, and
19  accessories on the market today.

20  **Meta Keywords:** electronic, cigarette, cigarettes, vape, vapor, e-liquid, e-juice, kit,

21  [Archive.org, Exhibit X.C.7.o)]

22

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    **Date:** February 15, 2013

2    **URL:** http://21centurysmoking.com/replacement-batteries

3    **Title Tag:** Electronic Cigarette Replacement Batteries

4    **Meta Description:** The electronic cigarette battery is the heart of the system.  It provides power
5    to energize the atomizer and allows vapor to be produced.

6    **Meta Keywords:** electronic, cigarette, battery

7    [Archive.org, Exhibit X.C.7.p)]

8

9    **Date:** February 18, 2013

10   **URL:** http://21centurysmoking.com/liquid

11   **Title Tag:** Electronic Cigarette Refill Liquid

12   **Meta Description:** E-Liquid is perfect for renewing your electronic cigarette cartridges after
13   they are finished.  This is extremely helpful to save money along the way.

14   **Meta Keywords:** electronic, cigarette, refill, liquid

15   [Archive.org, Exhibit X.C.7.q)]

16

17   In my opinion, based on a reasonable degree of certainty, the meta_tags.php file was the source
18   of the text "21st century smoke" appearing in the meta tags on 21centurysmoking.com. This file
19   could have be modified or replaced by anyone with access to the web server located at GoDaddy.
20   No access to the actual Zen Cart interface would have been required. Furthermore, I have not
21   seen any evidence indicating that the Defendants placed this text in the meta_tags.php file,
22   instructed anyone to edit the meta_tags.php file, or were aware of the "21st century smoke" text
23   being on the 21centurysmoking.com website prior to Plaintiffs' filing. Outside of the

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    programmatic content used from the meta_tags.php file, there was no usage of the "21st century

2    smoke" text in any areas that were, more likely than not, manually entered by someone.

3    **H.  The Meta Keywords Tag Is Not Specific to Search Engines Nor Was It Used**

4    **by Search Engines for Ranking**

5    Mr. Kent opined: *"Terms Are Placed Into Keywords Meta Tags to Improve Search*

6    *Optimization"* [Peter Kent, Expert Report, November 23, 2015, p.24, #G, Exhibit X.C.4.a)]

7    It is important to note that the meta keywords tag and its contents are not "normally" visible to

8    website visitors. A website visitor would need to view the source code of the web page,

9    assuming they know how, at which point they would be able to view the HTML code of the page

10    and find the meta keywords (line 13 below):

```
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN" "http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" dir="ltr" lang="en">
<head>

<script type="text/javascript" src="/static/js/analytics.js"></script>
<script type="text/javascript">archive_analytics.values.server_name="wwwb-app17.us.archive.org";archive_analytics.values.server_ms=299;
</script>
<link type="text/css" rel="stylesheet" href="/static/css/banner-styles.css"/>

<title>21 Century Smoking, The future of smoking today!</title>
<meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1" />
<meta name="keywords" content="Chargers Carrying Cases Gift Certificates Starter Kits Blackjack Cartridges Replacement Batteries USB
Passthroughs Disposables 10 mL Liquid CLEARANCE DEAL OF THE WEEK electronic cigarette, e-cig, refills, 21st century smoke, vapor, " />
<meta name="description" content="21 Century Smoking : - Chargers Carrying Cases Gift Certificates Starter Kits Blackjack Cartridges
Replacement Batteries USB Passthroughs Disposables 10 mL Liquid CLEARANCE DEAL OF THE WEEK electronic cigarette, e-cig, refills, 21st
century smoke, vapor, " />
<meta http-equiv="imagetoolbar" content="no" />
<meta name="author" content="The Zen Cart::trade; Team and others" />
<meta name="generator" content="shopping cart program by Zen Cart::trade;, http://www.zen-cart.com eCommerce" />

<base href="/web/20111018001152/http://21centurysmoking.com/" />
<link rel="canonical" href="http://21centurysmoking.com/" />

<link rel="stylesheet" type="text/css" href="includes/templates/black_pure_free/css/stylesheet.css" />
<link rel="stylesheet" type="text/css" href="includes/templates/black_pure_free/css/stylesheet_css_buttons.css" />
<link rel="stylesheet" type="text/css" media="print" href="includes/templates/black_pure_free/css/print_stylesheet.css" />
</head>
```

11    ```
<body id="indexHomeBody">
```

12    **Figure 23 Viewing meta keywords and meta description tags requires viewing of source code as this content is not visible**
13    **on the web page itself.**

14    [Archive.org, Exhibit X.C.7.r)]

15    The keywords meta tag may be used for other purposes than search optimization. Two other uses

16    for keywords meta tag that I am aware of include:

17    •    Software used for the website. Some content management systems (CMSs), ecommerce

18         carts, or add-on site search tools (i.e., third-party functionality added to a website to

19         provide site visitors the ability to search for content on the site itself) have utilized the

Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 42 of 91 PageID #:7610

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1      keywords meta tag for site-specific functionality, such as internal site search, filtered or
2      faceted navigation, or content tagging.

3      •  Assisting those working on the website. When various individuals, teams, or contractors
4      are all working on a single website, the meta keywords tag provides an easy cross-
5      reference for members to make simple notes about the content on a page.

6  One specific example where the meta keywords tag could be utilized was in Google's "Search
7  Appliance," which is an enterprise level search hardware tool used for company intranets:

8  *"Q: Does Google ever use the "keywords" meta tag in its web search ranking?*

9  *A: In a word, no. Google does sell a Google Search Appliance, and that product has the ability*
10  *to match meta tags, which could include the keywords meta tag. But that's an enterprise search*
11  *appliance that is completely separate from our main web search. Our web search (the well-*
12  *known search at Google.com that hundreds of millions of people use each day) disregards*
13  *keyword metatags completely. They simply don't have any effect in our search ranking at*
14  *present."* [Google, Exhibit X.C.13.c)]

15  Ranking, as mentioned above, refers to the ordering of a search engine's search results based on
16  how likely they feel a particular result satisfies the searcher's query. In other words, is the
17  searcher going to find what they are looking for by choosing one ranking page vs. another?

18  Mr. Kent himself ascribes little to no search optimization value to meta keywords, saying as
19  much in his final report *"It is probable that in fact placing keywords into the Keywords meta tag*
20  *has no effect on search-engine optimization."* [Peter Kent, Expert Report, November 23, 2015,
21  p.25, #87, Exhibit X.C.4.a)]

22  This in fact is an opinion Mr. Kent expressed as well in 2012:

23  *"Some search engines may use it, but many don't, and even those that do use it don't give it*
24  *much value. (Google and Bing almost certainly don't use it. Ask.com may, but again, it doesn't*
25  *give it much weight.)"*

26  Which he further expounded...

1  *"Make sure that most of the keywords in the tag are also in the body text. If they aren't, the tag*
2  *probably won't do you any good."* [Kent, Peter. Search Engine Optimization for Dummies
3  p.121, 5th Edition, ©2012, John Wiley & Sons, Inc., Exhibit X.C.12.a)]

4  I have found no references to "21st century smoke" within the "body" section of any of the
5  current or archived pages of 21centurysmoking.com. I also have not seen any mention of such an
6  occurrence in any of the depositions or reports that I have reviewed. The only body copy
7  references I have found that are even similar to "21st century smoke" were:

8  • "21st Century" and "21 Century smokes" which were references in customer submitted
9     content found within testimonial and reviews sections, or when those pieces of content
10    were served up within other pages of the website.
11  • "21st century of smoking" found on the "About" page and homepage since the website's
12     creation.
13  • "21st century" found on the "What Is" page (as well as being a sub-phrase of the above
14     bullet) since the website's creation.
15  • "21csmokes" as the Twitter username for 21 Century Smoking.

16  In my experience, the only search engines that showed signs of using the meta keywords for
17  retrieval (Note: retrieval is simply the process of returning all documents that match a query,
18  where the goal of ranking is to order those results based on relevancy) were Yahoo! (prior to
19  2010 when Yahoo! shelved their search engine and licensed results from Bing; [Wikipedia,
20  Exhibit X.C.12.f)]) and Ask. In both cases, the only verification that this was happening was
21  through placement of a "unique" string of text within the meta keywords tag that was
22  "uncontested" by any other existing content on the web. However, this was an example of
23  retrieval, not of ranking.

24  In my experience, neither Google nor Bing/MSN/Live showed indication of using the meta
25  keywords tag even for retrieval.

26  Mr. Kent referenced "some search engines" in his report do use it, though fails to mention any
27  specifically. Based on a comScore Search Engine Market Share report for December 2011, the
28  search market share broke out with Google sites 65.9%, Microsoft sites 15.1%, Yahoo! sites
29  14.5%, Ask Network 2.9%, and AOL, Inc. at 1.6%. [comScore, Exhibit X.C.12.g)].

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    As stated above, the search results on Yahoo! sites were being powered by Microsoft at this

2    point, and over the years, AOL results have been powered at different times by Google or

3    Microsoft.

4    Google has clearly stated that they do not use the meta keywords tag for ranking:

5    *"At least for Google's web search results currently (September 2009), the answer is no. Google*

6    *doesn't use the "keywords" meta tag in our web search ranking.*

7    *...*

8    *Q: Does this mean that Google will always ignore the keywords meta tag?*

9    *A: It's possible that Google could use this information in the future, but it's unlikely. Google has*

10   *ignored the keywords meta tag for years and currently we see no need to change that policy.*

11   *Posted by Matt Cutts, Search Quality Team"* [Google, Exhibit X.C.13.c)]

12   Google didn't even include information regarding the meta keywords in their own SEO guide:



13

14   Figure 24 Contents of Google's own SEO Guide, with no mention of meta keywords.

1    [Google, Search Engine Optimization Starter Guide, p.3, ©2010, Exhibit X.C.13.d)]

2    Mr. Kent had even expressed in his views in his book regarding meta tags in litigation:

3    *"What's ironic is that firms are being sued for putting other companies' names and brand names*

4    *in their KEYWORDS tag, when it has very little influence on search engine rank these days."*

5    [Kent, Peter. Search Engine Optimization for Dummies p.129, 5th Edition, ©2012, John Wiley &

6    Sons, Inc., Exhibit X.C.12.a)]

7    Mr. Duke also stated his view regarding meta keywords:

8    *"I never did anything with any meta tags until reading that declaration and removed the meta*

9    *tags. Other than that, I never touched the meta tags because, as I stated previously, it was my*

10   *understanding from my friend who's very successful in the text base[sic], they weren't all that*

11   *important. So I stopped really paying attention to them."* [Brent Duke 30(b)(6) Deposition,

12   2092927-Brent Duke-1.PDF p.163, #23-24 – p.164, #1-5, Exhibit X.C.2.a)]

13   This view wasn't just shared by the Defendants and Mr. Kent. Martin Hewes, whose research in

14   the Wayback Machine was what brought the placement of the "21st century smoke" text on the

15   Defendants' website to the Defendants' attention, shares this view as well:

16   *"Q. When you said early days, what time period are you talking about?*

17   *A. Oh, man, I mean the early, what's called black hat SEO, which is basically bad guys doing it*

18   *wrong for profit, that started early 2000s, 2002, 2003, and it was as simple as putting popular*

19   *search terms all over your page in white text on a white background so users couldn't see it. You*

20   *could put anything in there. If somebody searched for that term, they would end up on your site.*

21   *It didn't have to be relevant to your content.*

22   *...*

23   *But early search engine optimization was probably around 2001, 2002. Then you get into do you*

24   *really want to bring people to your site for something that's not what they're looking for because*

25   *they'll just leave again anyway.*

26   *...*

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    *It has gotten more and more sophisticated to the point where the search engines can weed out --*

2    *if you put something in a meta tag that's not related to anything in your visible pages, then they'll*

3    *ignore it. So they have gotten a little smarter about what to pay attention to and what not to."*

4    [Martin Hewes, Deposition, Hewes, Martin   DR Distributors vs_ 21 Century Smoking   - Vol_

5    I.pdf, p.26, #3-24 – p.27, #1-7, Exhibit X.C.2.f)]

6    A similar view was shared by Mr. Jade Gaber:

7    *"BY MR. GAYNOR:*

8    *Q. I see. Would one of the variables be the inclusion of meta tags in a source code of a website?*

9    *...*

10    *A. I would say five years -- five to ten years ago maybe. But meta tags in keywords even back*

11    *then would have been pretty much gone by the wayside because they were being manipulated so*

12    *much. As soon as something starts getting manipulated, Google tends to shut it down. Because*

13    *everyone was just stuffing all sorts of stuff into the meta description, meta keywords, Google took*

14    *the weight away from that so that it wasn't actually effecting search results."* [Jade Gaber,

15    Deposition, Gaber, Jade   DR Distributors vs.pdf, p.133, #12-24, p.134, #1-2, Exhibit X.C.2.e)]

16    In my opinion, the meta keywords tag is not necessarily exclusive to search optimization. There

17    are no rules or regulations that dictate for what the meta keywords element must be used. Based

18    on a reasonable degree of certainty, meta keywords had no impact on ranking

19    21centurysmoking.com pages for searches containing the "21$^{st}$ century smoke" text. This

20    concept appears to be shared by Mr. Kent and myself, as well as representatives from both

21    Plaintiffs and Defendants.

22    **I.    The Meta Description Tag Was Not Used by Search Engines for Search**

23    **Result Ranking**

24    Mr. Kent discussed the meta description tag in his final report:

25    *"In regards to the Description tag, major search engines do read and index the tag, and*

26    *commonly use the tag to provide a description 'snippet' in the search results pages. However,*

27    *Google has stated that putting keywords within the tag does not help with search ranking: 'Even*

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 255 of 581 PageID #:14595
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 47 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   *though we sometimes use the description meta tag for the snippets we show, we still don't use the*

2   *description meta tag in our ranking.'"* [Peter Kent, Expert Report, November 23, 2015, p.25,

3   #89, Exhibit X.C.4.a)]

4   This is a long-standing view of Mr. Kent's:

5   *"'Google claims it doesn't use the tag for page ranking, but other search engines may."* [Kent,

6   Peter. Search Engine Optimization for Dummies p.119, 5th Edition, ©2012, John Wiley & Sons,

7   Inc., Exhibit X.C.12.a)]

8   In my experience, I do not recall any instances that would confirm or lead me to believe that a

9   search engine was using content within a meta description tag for ranking.

10  Mr. Kent commented regarding the meta description tag contents:

11  *"As for the Description tag, it appears that the Description tag shown in Exhibit 32 to the Brent*

12  *Duke deposition was 'stuffed' with keywords, presumably based on the widespread belief that*

13  *keywords in Description tags help with search ranking (it's likely that it does help in some*

14  *search engines, though not in others):*

15      *21 Century Smoking :  - Gift Certificates Starter Kits Chargers Carrying Cases*

16      *Replacement Batteries USB Passthroughs Disposables CLEARANCE Cartridges E-Cig*

17      *Liquids Deals Magazine Redemption Items Drip Tips electronic cigarette, e-cig, refills,*

18      *21st century smoke, vapor,*

19  *21CS 6172B, Exhibit 32 to the Brent Duke Deposition of June 22$^{nd}$, 2015"*

20  [Peter Kent, Expert Report, November 23, 2015, p.25, #86, Exhibits X.C.4.a), X.C.2.b)]

21  This meta description example Mr. Kent provides, as well as most of the Zen Cart pages from

22  the Wayback Machine archive, is auto-generated as part of the default programming of the Zen

23  Cart software. This was not a concerted effort on behalf of the Defendants to "stuff" keywords as

24  he states. This example was constructed by Zen Cart itself using a programmatic formula.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    In my opinion, based on a reasonable degree of certainty, like meta keywords, I do not know of

2    any search engine that uses the meta description for the purposes of ranking search results. Mr.

3    Kent stated as much as well both in his report and in his SEO book.

4    **J.    There Is No Evidence that Searchers Saw the "21st Century Smoke" Text in**

5    **Search Results for 21centurysmoking.com or Clicked on Search Results for**

6    **21centurysmoking.com Because of It.**

7    First, like the meta keywords tag, the meta description tag and its contents are not "normally"

8    visible to website visitors. A website visitor would first need to view the source code of the web

9    page, assuming they know how, at which point they would be able to view the HTML code of

10   the page and find the meta description.

11   Mr. Kent does touch on a "call-to-action" aspect of the meta description:

12   *"... However, there is an additional reason to put keywords into the Description tag; so that the*

13   *keywords are seen in the search results, thus encouraging searchers to click on the result."*

14   [Peter Kent, Expert Report, November 23, 2015, p.26, #90, Exhibit X.C.4.a)]

15   Not only is relevancy a factor as Google explained, but there are physical constraints as well, as

16   Mr. Kent has written about himself:

17   *"As is the <TITLE> tag, the DESCRIPTION is truncated; in Google search results, the text will*

18   *be truncated to around 140 or 150 characters.*

19   *...*

20   *So if you want part of the text to be seen, make sure it appears before that 140th-or-so*

21   *character."* [Kent, Peter. Search Engine Optimization for Dummies p.120, 5th Edition, ©2012,

22   John Wiley & Sons, Inc., Exhibit X.C.12.a)]

23   Google's own SEO guide confirms that the meta description may not even be used for the

24   snippet in the search results:

25   *"Description meta tags are important because Google might use them as snippets for your*

26   *pages. Note that we say 'might' because Google may choose to use a relevant section of your*

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    *page's visible text if it does a good job of matching up with a user's query. Alternatively, Google*

2    *might use your site's description in the Open Directory Project if your site is listed there"*

3    [Google, Search Engine Optimization Starter Guide, p.6, ©2010, Exhibit X.C.13.d)].

4    
Title > Brandon's **Baseball Cards** - Buy **Cards**, **Baseball** News, Card Prices
Snippet > Brandon's **Baseball Cards** provides a large selection of vintage and modern **baseball cards** for sale. We also offer daily **baseball** news and events in ...
URL > www.brandonsbaseballcards.com/ - Cached - Similar

5    [Exhibit, p. 4, X.C.13.d)]

6    Figure 25 Search result example from Google.

7    The snippet, which may be constructed from the meta description tag, is illustrated above in an

8    example from Google's own SEO guide. In the example above, only 147 characters of the meta

9    description before the ellipses (…) are visible.

10   Based on my analysis of the Wayback Machine archives, the earliest instance of the "21$^{st}$ century

11   smoke" text appearing on 21centurysmoking.com was on September 28, 2011. From that date

12   until August 28, 2012, the "21$^{st}$ century smoke" text did not appear within the first 160

13   characters of the meta description.

14   There was, however, a period of around seven months, from September 8, 2012, to March 13,

15   2013, when the "21$^{st}$ century smoke" text did appear within the 160 character mark on some

16   pages of 21centurysmoking.com. Based on my analysis, the longest timeframe "21$^{st}$ century

17   smoke" would have appeared during this time was from August 28, 2012, to March 25, 2013.

18   The appearance of the text "21$^{st}$ century smoke" did not, however, include the homepage. During

19   this time, the homepage earned over 68% of the organic search traffic to 21centurysmoking.com

20   based on Google Analytics data:

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 258 of 581 PageID #:14598
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 50 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY



2  **Figure 26 Longest timeframe "21st century smoke" may have appeared in search result snippet was between Aug. 28,**
3  **2012, to Mar. 25, 2013, during which the homepage, which did not have the text in the meta description, drove over 68%**
4  **of organic search traffic.**

5  [Google Analytics, Exhibit X.C.5.b)]

6  The text "21$^{st}$ century smoke" did appear within the 160 character mark on a small subset of

7  pages (estimated to be 76 based on Archive.org), though some of those pages also had "noindex"

8  directives (which I have estimated to be 17), telling search engines not to include the page in

9  their index or use it for search results. Based on these estimates and what was archived at

10  Archive.org during this time period, that leaves 59 pages that 1) may have been returned in

11  search results, and if returned, 2) may have included the "21$^{st}$ century smoke" text within a result

12  listing for 21centurysmoking.com within the approximately 7-month timeframe.

13  The appearance of the "21$^{st}$ century smoke" text within the 160 character mark was, more likely

14  than not, unintentional. This change, in fact, reduced the number of pages that had the "21$^{st}$

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 259 of 581 PageID #:14599
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 51 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   century smoke" text on them. The timing of this, more likely than not, also corresponds with Mr.

2   Hough's original declaration:

3   *"Later in 2012, 21 Century Smoking, Inc. installed a third party plug-in software program called*

4   *Ceon to its web site to provide search engine optimization. Ceon overrides the auto-population*

5   *feature of Zencart and requires manual entry of meta tags to a web site."* [Robert Hough,

6   Declaration, p.4, #11, Exhibit X.C.1.b)]

7   Though, more likely than not, unaware of the presence of the "21st century smoke" text, as the

8   Defendants began the manual entry of meta tags required as Mr. Hough states in his declaration,

9   the number of appearances further diminished over time as the Defendants began to naturally

10   remove it through their own manual entry of meta tags.

11   While the Archive.org captures provide an indication of what website pages looked like

12   historically, they only represent what was on a website, not what was visible in search results.

13   Archive.org cannot capture search results in search engines and I know of no tool that does so.

14   It is, however, relatively easy to take a screengrab or to save a web page within a browser. For a

15   search results page, this would capture the specific search engine, search query, and the search

16   results. Depending on the specific results, a screen capture might also provide some reference to

17   the location of the searcher as well as some relative idea of the date the screengrab was made.

18   At the time of writing this report, I have not seen nor am I aware of any such screengrabs of

19   search results showing the "21st century smoke" text appearing within a listing for

20   21centurysmoking.com.

21   Furthermore, I have not seen any statements from the Plaintiffs that indicate that the "21st

22   century smoke" text was observed in the search results they were monitoring:

23   *"Q. How often during your employment would you go to the website 21centurysmoking.com?*

24   *A. Not very often. If I was checking something out, you know. I didn't really browse their website.*

25   *It was more of the search engine rankings, what's happening there. What was happening on their*

26   *site I didn't really care about."* [Jade Gaber, Deposition, Gaber, Jade   DR Distributors vs.pdf,

27   p.81, #4-11, Exhibit X.C.2.e)]

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1

2   *"Q. How did you become aware of the company 21 Century Smoking?*

3   *A. I think everyone was talking about it because of the confusion between the two. And then from*

4   *there it was -- I'm looking at our search rankings. So if I'm searching for 21st Century Smoke*

5   *obviously I'm going to see they're not us and had a similar line.*

6   *Q. Did anyone ask you to review the search rankings in comparison to 21 Century Smoking?*

7   *A. Yeah, that was part of the job was checking the search rankings and looking at who is in first,*

8   *who is in second, and then trying to figure out how we can get in first."* [Jade Gaber, Deposition,

9   Gaber, Jade   DR Distributors vs.pdf, p.40, #14-24 – p.41, #1-3, Exhibit X.C.2.e)]

10   Mr. Gaber states that monitoring search rankings was a regular part of his job. I found no

11   statement in his deposition indicating that he ever saw the "21$^{st}$ century smoke" text within a

12   search result listing for 21 Century Smoking, Inc.

13   Furthermore, Google Analytics on 21centurysmoking.com reveals that searchers for "21$^{st}$

14   century smoke" did come to the website. However, searchers came to the website before the

15   "21$^{st}$ century smoke" text ever appeared in the meta keywords or meta description tags, during

16   the time the text appeared, as well as after the text was removed.



17

18   Figure 27 Organic Keyword Sessions - Total and "21st century smoke"

19   [Exhibit X.C.5.c)]

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    *Milestones indicated: #1) July 2009 Homepage analytics tracking stops. #2) September 2009*

2    *Zen Cart launched on "catalog" directory, without analytics tracking. #3) September 2011*

3    *Tracking in analytics stops completely and the first appearance of the "21$^{st}$ century smoke" text.*

4    *#4) April 2012 Analytic tracking restore. #5) September 2012 "21$^{st}$ century smoke" text falls*

5    *within 160 characters in some meta descriptions. #6) March 2013 "21$^{st}$ century smoke" text no*

6    *longer appears within any meta keywords or meta description tags.*

7    Organic search sessions for queries that included the exact text, "21$^{st}$ century smoke," are shown

8    by the solid green line in the graph below. Total organic search traffic is shown by the light blue

9    line. The dotted green line represents the respective percentage of all organic sessions, excluding

10   the "not provided" sessions (e.g., formula: 21$^{st}$ century smoke Sessions / {Total Organic Sessions

11   – Not Provided Sessions} * 100). The % of 21$^{st}$ century smoke sessions shows no signs of

12   significant change during the times when the "21$^{st}$ century smoke" text appeared on the website,

13   even after the text fell below the 160$^{th}$ position where it may have been visible in some search

14   results.

15   "Not Provided" refers to the growth of secure search, which started in October 2011 when

16   Google began to phase-in secure search, moving searches on Google to the https secure protocol

17   [Google, Exhibit X.C.13.e)]. This was initially claimed to only impact "single digit" percentages

18   of searches, but quickly jumped to double-digits, but which by 2014 for many websites equated to

19   well-over 50%. Analytics data was further impacted by a move by web browser makers and

20   browser plugin makers to create similar functionality for searches on any search engine and web

21   browsing in general.

22   The effect on web analytics reporting was that keyword referral data (i.e., the keywords

23   searched) was stripped out and not passed to the destination site's analytics. The direct impact to

24   web analytics was that keyword-based reports saw declining numbers of keywords as well as

25   metrics (i.e., sessions and pageviews) related to those keywords. In place of keyword-specific

26   metrics, a new keyword placeholder was created, designated as "not provided" in Google

27   Analytics, that would report on the various metrics, such as pageviews and sessions, but not the

28   actual keyword that the user searched for that brought them to the website.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    Just before milestone #3, the green line for the "21st century smoke" queries increases

2    considerably. Note that this was prior to the "21st century smoke" text appearing in any meta

3    tags. Google Analytics reports that the "whatis.php" page is the leading landing page for all

4    organic searches, not just for the "21st century smoke" text, from July 1, 2011, through October

5    31, 2011.



6

7    **Figure 28 Google Analytics Organic traffic to whatis.php page.**

8    [Exhibit X.C.5.d)]

9    The whatis.php page was receiving visitors for organic searches related to the "21st century

10   smoke" text, more likely than not, because of a single reference in the last paragraph that had

11   been on the page since the website was launched in March 2009:

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

So why keep living in the past when the future is right in front of you? 21 Century Smoking is a cigarette for the 21st century. Why keep smoking that dangerous product that your grandma and grandpa smoked? There is no time like today to give it a shot. Choose which one is best for you

1

2    **Figure 29 21CS "What is" page from April 6, 2009.**

3    [Archive.org, Exhibit X.C.7.s)]

4    The 21centurysmoking.com website was being visited by searchers for the "21$^{st}$ century smoke"
5    text for these primary reasons:

6    • 21centurysmoking.com was an older, more established website, launched in March 2009,
7       whereas the 21stcenturysmoke.com website was launched in January 2011.

8    • Search engines, more likely than not, considered the "21 century smoking" and "21$^{st}$
9       century smoke" texts as being synonymous, therefore both websites were, more likely
10      than not, being returned in search results.

11   • 21centurysmoking.com also had the text "21$^{st}$ century" on the "whatis" page since March
12      2009.

13   • The homepage of the 21stcenturysmoke.com website did not include the "21$^{st}$ century
14      smoke" text anywhere accessible to search engines. The text was not used in a pure,
15      textual form anywhere in the HTML code.

16   • There was almost no accessible text on the homepage at all. Upon reviewing the page's
17      source code, the only text accessible to search engines on the homepage of the
18      21stcenturysmoke.com website was the following: "Privacy Policy | Terms of Use |
19      Copyright ©2011 CB Distributors, Inc. Website & E-Marketing by Nadi Creative
20      Branding Group." The homepage was primarily one large image and search engines
21      cannot "read" text within an image. This lack of any quality text would have, more likely
22      than not, limited the homepage specifically, and the rest of the website in general, to rank
23      in search results [Exhibit X.C.8.b)].

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY



1

2    Figure 30 21stCenturySmoke.com homepage from January 28, 2011.

3    [Archive.org, Exhibit X.C.8.a)]

4    The green line for the "21st century smoke" sessions does increase slightly after milestone #5,

5    when the text fell below the 160th position in the meta description in some pages and may have

6    been visible in search result snippets. However, the green line also decreases before milestone

7    #6, the point when the text was no longer appearing in any meta keywords or meta description

8    tags. Similarly, there are additional spikes in sessions after milestone #6. The fluctuations in

9    sessions for the "21st century smoke" text are, more likely than not, the natural ebb and flow of

10    organic search traffic.

11    The large drop in sessions for both texts after milestone #6 was due, more likely than not, the

12    result of more organic searches falling under "not provided," which the dashed gray line shows

13    us increasing significantly after milestone #6. Again, turning to the dotted green line that shows

14    what percentage the "21st century smoke" traffic represented, this line remains relatively

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   unchanged during the time, for which Google Analytics data is available, the "21st century

2   smoke" text appeared on 21centurysmoking.com.

3   In my opinion, based on a reasonable degree of certainty, I found no evidence showing that the

4   "21st century smoke" text was seen in any search result listings for 21 Century Smoking, Inc.,

5   nor have I reviewed anything that would indicate that it influenced searchers to click on a listing

6   for 21centurysmoking.com. The discovery itself by the Plaintiffs was the result of viewing

7   source code of archived captures of 21centurysmoking.com web pages:

8   *"As part of my research, I reviewed each archived copy of the defendant's website over that time*

9   *period and that were available on the Internet Archive.*

10  *In each instance, I looked at and reviewed not only the website as seen through an Internet web*

11  *browser but I also looked at the actual source code for each archived version of the defendant's*

12  *website.*

13  *This is done by viewing the archive website in an Internet web browser and selecting 'View' on*

14  *the top line menu and then choosing "Source" or right clicking on the screen with your pointer*

15  *in the web page you are viewing and then selecting 'View Source.'*

16  *...*

17  *The source code that is viewed when doing this is not normally displayed or visible to the user or*

18  *viewer of a website."* [Martin Hewes, Declaration, p. 3, #11-15, Exhibit X.C.1.c)]

19  I did not find any evidence that the Plaintiffs, who were specifically monitoring search results

20  between themselves and the Defendants, ever encountered the "21st century smoke" text within a

21  search result listing for the Defendants. Furthermore, 21centurysmoking.com received organic

22  search traffic for queries related to "21st century smoke" prior to, during, and after the text was

23  present in 21centurysmoking.com's meta tags. Reviewing the Google Analytics data, I saw

24  nothing that would indicate that sessions between milestones #3 and #6 were being influenced by

25  the "21st century smoke" text appearing in the meta tags.

26  **K.   No Evidence That the "21st Century Smoke" Text Was Used in Title Tags**

27  Mr. Kent mentioned the title tag:

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  *"As for the Title tag—which, as I explained before is not a true meta tag, but which is thought,*
2  *by many people, to be a meta tag—all major search engines do read the tag and do use keywords*
3  *within the tag for ranking purposes."* [Peter Kent, Expert Report, November 23, 2015, p.26, #91,
4  Exhibit X.C.4.a)]

5  I agree with Mr. Kent on the importance of the title tag and this view represents a core tenet of
6  the SEO industry. Standard SEO advice is to include the keywords a page is being optimized for
7  within the title tag:

8  *"For keyword placement, title tags are the most critical element for search engine relevance.*
9  *The title tag is in the <head> section of an HTML document, and is the only piece of "meta"*
10 *information about a page that influences relevancy and ranking. To give you an idea, when 72*
11 *well-known SEOs voted on what they believed were the most important ranking factors in*
12 *Google's algorithm, the majority of them said that a page's title tag was the most important*
13 *attribute..."* [Enge, Eric; Spencer, Stephan; Fishkin, Rand; Stricchiola, Jessie C. The Art of SEO
14 p.212, 1st Edition, ©2010, O'Reilly Media, Inc., Exhibit X.C.12.b)]

15 In my opinion, based on a reasonable degree of certainty, the "21st century smoke" text was not
16 used in title tags, the most critical element for keyword relevance for search engines, of
17 21centurysmoking.com pages and I have found no such instance from the crawl of the Wayback
18 Machine's captures of the website.

19 **L.   Archive.org's Wayback Machine is Viewed as an Authoritative Resource,**
20 **However There are Instances Where the Archived Content May Not Fully Match**
21 **the Source Content**

22 Mr. Kent Opined: *"WayBackMachine is an authoritative resource that does not modify page*
23 *content"* [Peter Kent, Expert Report, November 23, 2015, p.26, #H, Exhibit X.C.4.a)]

24 I agree with Mr. Kent's opinion that Archive.org's Wayback Machine is viewed as an
25 authoritative resource and that it does not modify page content.

26 The Wayback Machine however is subject to some limitations though as noted:

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 267 of 581 PageID #:14607
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 59 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    • Archived pages represent a capture of that page at a specific point in time and do not
2      reflect any changes made between captures.
3    • Captured pages that rely on JavaScript, AJAX (asynchronous JavaScript and XML),
4      cookies, an authenticated state (i.e., a logged in user, age verification), or content delivery
5      based on geo-location, IP address, or user-agent may not contain the same content,
6      HTML, or user-experience [Archive.org, "How do you archive dynamic pages?", Exhibit
7      X.C.12.e)].

8    In my opinion though, based on a reasonable degree of certainty, the meta description and meta
9    keywords content found in the archived pages from 21centurysmoking.com are, more likely than
10   not, accurate captures of what was found on those pages on the 21centurysmoking.com website
11   at the specific time of capture.

12   **M.   Defendants Demonstrated No Effort to Optimize for the "21$^{st}$ Century**
13   **Smoke" Text**

14   The placement and usage of the "21$^{st}$ century smoke" text on 21centurysmoking.com has been
15   limited to a single instance within the meta_tags.php file. That single instance did populate the
16   text through Zen Cart's default programmatic system into the meta keywords and meta
17   description tags on some pages for a period of time. By contrast, manual entry within the Zen
18   Cart interface of meta keywords, meta descriptions, and all other text on the website, did not
19   include the "21$^{st}$ century smoke" text, and doing so eliminated instances where the "21$^{st}$ century
20   smoke" text may have appeared.

21   As mentioned, the meta description and meta keywords are not normally visible to website
22   visitors, nor do they have any effect on search ranking. The meta keywords are not visible in
23   search results. Approximately 160 characters of the meta description may be visible in search
24   results, unless the search engine has elected to create their result snippet from other text, often
25   found within the page itself.

26   Furthermore, from my analysis, the "21$^{st}$ century smoke" text does not appear to have been used
27   within other elements that are regarded as being important and useful for search engine
28   optimization:

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   • title tag

2   • h1 or other heading tags

3   • anchor text within internal links

4   • within the body copy in general

5   • in alt attributes within any image tags

6   Another common sign of optimization efforts relates to prominence within a tag or the page

7   itself. When optimizing, it is common to place the desired keywords in prominent locations, such

8   as toward the start of a tag, the top of the page code, and/or the beginning of the copy on the

9   page itself. The placement within the other keywords in the CUSTOM_KEYWORDS section of

10  the meta_tags.php file as well as the resultant programmatic placement within meta keywords

11  and meta description tags was not a prominent placement.

12  There are valid methods that could be employed on a website to rank for another company's

13  name or trademarked terms.

14  Mr. Kent outlines one valid method to incorporate competitive product or brands into a website:

15  *"For instance, you can have a product page in which you compare your products to another,*

16  *named competitor.*

17  ...

18  *If you have information about competing products and companies on your pages, used in a valid*

19  *manner, you can also include the keywords in the <TITLE>, DESCRIPTION, AND KEYWORDS*

20  *tags, as Terri Welles did:"* [Kent, Peter. Search Engine Optimization for Dummies p.129, 5th

21  Edition, ©2012, John Wiley & Sons, Inc., Exhibit X.C.12.a)]

22  A simpler method, especially given the confusion between the "21 Century Smoking" and "21st

23  Century Smoke" terms, would be to include text right on the homepage of

24  21centurysmoking.com. A simple statement, "We're sorry, if you are looking for 21st Century

25  Smoke, you have come to the wrong website. This is 21 Century Smoking, home of the

26  Blackjack, Roulette, and other ecig products. We have no connection with 21st Century Smoke,"

27  which would have been seen by search engines and be considered for ranking purposes.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1 The 21centurysmoking.com website ranked for the "21st century smoke" search query because it
2 and the text "21 century smoking" were, more likely than not, to be considered synonymous
3 variations. Search engines rank and serve up search results based on what their algorithm has
4 determined would be relevant to the searcher, which often involves phrase variations as well as
5 synonymous variations.

6 Google analyzed and shared the impact on synonyms in their searches in this blog post on
7 January 19, 2010:

8 *"Our synonyms system is the result of more than five years of research within our web search*
9 *ranking team. We constantly monitor the quality of the system, but recently we made a special*
10 *effort to analyze synonyms impact and quality. Most of the time, you probably don't notice when*
11 *your search involves synonyms, because it happens behind the scenes. However, our*
12 *measurements show that synonyms affect 70 percent of user searches across the more than 100*
13 *languages Google supports.*

14 *...*

15 *[song words], 'lyrics' is bolded for 'words'.*

16 *[what state has the highest murder rate], 'homicide' is bolded for 'murder'.*

17 *[himalayan kitten breeder], Google knows that 'cat breeder' is the same as 'kitten breeder'."*
18 [Google, Exhibit X.C.13.b)]

19 Google's understanding of synonyms goes well beyond simple stemming, which describes the
20 comparison between "21" and "21st," or "21 century" and "21st century," or "smoking" and
21 "smoke."

22 In my opinion, based on a reasonable degree of certainty, the Defendants have not demonstrated
23 effort to optimize 21centurysmoking.com for the "21st century smoke" text. Analysis of the
24 crawl of the Wayback Machine data resulted in 748 total captures during the time period when
25 the "21st century smoke" text appeared in either the meta keywords or meta description tags on
26 any pages of 21centurysmoking.com. Of those 748 captures, 623 had the text in the meta
27 keywords. However, only 50% of those 748 captures had the text in the meta description tag.

1    Less than 52% of those captures had ever had the text in the "sub-160" character position, and 28

2    of which had a "no index" directive telling search engines not to index or include the URL in

3    search results. The net result being, 166 out of 748 of the URLs captured between September 28,

4    2011, and March 13, 2013, included the "21st century smoke" text in a position where it "might

5    have been included in the search result snippet."

6    Finally, it should be noted that the analysis above does not attempt to weight the URLs by

7    importance, but as noted earlier, the homepage, which would be the most important and

8    authoritative URL of the website, only had the "21st century smoke" text until sometime between

9    August 27, 2012, and September 26, 2012, and no capture shows the text within the 160

10   character position.

11   ## IX.    Conclusion

12   The "21st century smoke" text appeared on the website. How this happened, by whom and by

13   what means, is unclear to the Defendants. Through my research and analysis, it is also unclear to

14   me. Mr. Duke demonstrated his lack of skill and knowledge when he broke the HTML on his

15   own site as well as 21centurysmoking.com. Furthermore, Mr. Duke demonstrated that he wasn't

16   even aware of the meta_tags.php file, which retained the default Zen Cart sample text in the meta

17   keywords, meta descriptions, and more importantly, the title tags, in the Zen Cart pages for two

18   years after Zen Cart was installed on the 21centurysmoking.com website.

19   Mr. Hough would have had the skills and knowledge to input the "21st century smoke" text into

20   the website. I found nothing that would indicate that he did, and doing so would have run counter

21   to his understanding and views regarding the meta keywords and meta description tags related to

22   SEO. Furthermore, it is unknown how many people had access to the web server for

23   21centurysmoking.com. Mr. Duke relied on others, such as the WebRecSol consulting company

24   and freelancers from ODesk and Craigslist, in addition to Mr. Hough to access and work on the

25   website. No instruction appears to have been given to anyone outside the company to add the

26   text to the website, nor does there appear to be any confirmation of such back to the Defendants.

27   However, the "21st century smoke" text also could have been added to the website by anyone

28   who had access to the webserver, without record or any notification to the Defendants.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    Robert Hough states that the appearance of the "21$^{st}$ century smoke" text may have come

2    through the "Ceon plugin." Through my research, I cannot support a theory that Ceon URI

3    Mapping plugin could have been responsible. The Ceon plugin Mr. Hough speaks of may not be

4    the same plugin though. Ceon did make several other plugins that we know of, and the

5    functionality that Mr. Hough speaks of with regard to Ceon does not specifically align with the

6    known functionality of Ceon URI Mapping or any of the other posted plugins. Furthermore, my

7    research indicates that at least one other plugin may have been used on the website, and there is

8    no way to know whether any other plugins were installed and subsequently removed from the

9    website.

10    This prompts the question regarding effort. I cannot, in any way, classify the placement of a

11    single phrase into meta tags, as any kind of demonstration of SEO effort.

12    Mr. Duke and Mr. Hough on the Defendants' side do not subscribe to the meta keywords or meta

13    description tags as having any SEO value, at least without the "21$^{st}$ century smoke" text being

14    used elsewhere visible on the page. Mr. Hewes and Mr. Gaber on the Plaintiffs' side do not

15    subscribe to the meta keywords or meta description tags as having any SEO value, again at least

16    without the "21$^{st}$ century smoke" text being used elsewhere visible on the page. Furthermore,

17    Mr. Kent doesn't subscribe to these having any SEO value as well, except that some unnamed

18    search engines might use these for ranking search results.

19    Furthermore, there has been no evidence presented nor have I encountered anything through my

20    research showing that the "21$^{st}$ century smoke" text was used elsewhere on the

21    21centurysmoking.com website. The crawl of the Wayback Machine captures did not include the

22    "21$^{st}$ century smoke" text within any URLs, title tags, h1 or h2 headings.

23    The placement of the "21$^{st}$ century smoke" text within the meta description and meta keywords

24    tags of any pages of 21centurysmoking.com was in fact, not done directly by any human. The

25    text appeared, within the subset of pages where the text ever appeared, as a result of the default,

26    programmatic operation of Zen Cart through the inclusion of the text within the custom

27    keywords section of the meta_tags.php file. An entry that bears a single notation, "// Custom

28    Keywords." How or where anything entered here was going to be used on the website or within

29    Zen Cart would be unknown to anyone without specific knowledge of Zen Cart.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    So one single entry, in one file outside of the Zen Cart interface, somehow, lead to the inclusion

2    of the "21st century smoke" text in some meta description and meta keywords tags across some

3    pages of the 21centurysmoking.com website. Neither of those meta tags carried ranking

4    influence in a major U.S. search engine at that time.

5    Finally, what is left is the possibility that the "21st century smoke" text may have appeared in a

6    search result snippet and lead to someone clicking through to the 21centurysmoking.com

7    website. The most likely occurrence of which would have been when changes were made to how

8    Zen Cart programmatically constructed meta descriptions, unintentionally causing the "21st

9    century smoke" text to fall within the 160 character position, making it potentially visible in

10   search results…assuming Google didn't use text from the page itself in place of the meta

11   description.

12   There has been no evidence showing that the "21st century smoke" text was visible in rankings.

13   Nor have any statements to this effect been made by the Plaintiffs, who were actively monitoring

14   the search results and most likely of anyone to notice the "21st century smoke" text within the

15   search results under another company's search result listing.

16

17

18

19

20

21   Dated: March 25, 2016

22                                                   Brian R. Brown

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  **X.  Exhibits**

2  **A.  Curriculum Vitae**

3  # Brian R. Brown

4  brian@i-devs.com
5  Crystal Lake, IL 60012

6  **Experience**

7  **SilkRoad Technology, Inc.,** Director, Search Marketing | 5/2012 – present

8  • Directed domestic and international SEO & paid search marketing to drive traffic, customer
9  acquisition, and revenue.
10  • Managed Google Analytics, TagManager, and Webmaster Tools implementations.
11  • Developed & analysis tools for general site analytics, SEO, and paid search.
12  • Advised and assisted on site redesigns, migration of websites to WordPress CMS platform.
13  • Drove 43% YOY site-wide organic growth and 135% YOY site segment growth.
14  • Managed paid search program efforts through Marketo, Pardot, and with external agency,
15  driving 173% increase in conversions and an 8% decrease in cost.

16

17  **Covario, Inc.,** Director, Product Management | 9/2011 – 5/2012

18  • Product management & development of Covario's SEO SaaS products.
19  • Served on management team for Rio SEO, Covario's dedicated software business unit.
20  • Assisted with client presentations, technical evaluations & pre-sales discussions.

21  **Covario, Inc.,** Senior Manager, SEO | 5/2010 – 9/2011

22  • Lead Midwest-based SEO Services team of SEO Strategists.
23  • Assisted with department management: staffing, profitability, hiring, and training.
24  • Developed & refined SEO services' methodologies & client deliverables.
25  • Lead strategic initiatives for key global brands.

26  **Select Clients:** Samsung USA, American Girl (Mattel), Orvis, Urban Outfitters.

27  **Covario, Inc.,** Senior Search Consultant | 1/2010 – 5/2010

28  • Developed & lead strategic SEO initiatives for high profile global brands.
29  • Developed & refined SEO services' methodologies & client deliverables.
30  • Assisted with pre-sales analysis & recommendations.

31  **Select Clients:** Samsung Mobile, Allen Edmonds.

32

33  **Netconcepts, LLC,** Lead Consultant & Natural Search Marketing Strategist | 2008 – 2010

Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 66 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   • Consulted & guided leading online brands through strategic SEO engagements.
2   • Developed & refined natural search marketing product offerings, methodologies & client
3     deliverables.
4   • Educated & guided internal staff on SEO best practices.
5   • Key driver for development of internal training programs.

6   **Select Clients:** Café Press, Nordstrom, Allen Edmonds, Cooking.com, Thompson Cigar, Hello
7   Direct, Taylor Corporation & Hiebing Group.

8   **Netconcepts, LLC,** Natural Search Consultant | 2008

9   • Oversaw SEO engagements with leading online retailers.
10  • Developed & delivered SEO strategies.
11  • Educated & trained client teams on SEO best practices.

12  **Select Clients:** Onlineshoes, Hanes Brands, B|Net, Dreams Retail & The Planet.

13  **Netconcepts, LLC,** Natural Search Analyst | 2007 – 2008

14  • Analyzed client websites for SEO obstacles & opportunities.
15  • Performed detailed keyword research.
16  • Constructed client deliverables.

17  **Select Clients:** REI, The Planet & Institute for International Research (IIR).

18  **Netconcepts, LLC,** Natural Search Program Manager | 2007

19  • Managed client engagements.

20  **Select Clients:** REI & The Planet.

21

22  **Identity Developments, LLC,** President & Founder | 2003 – present

23  • Managed all aspects of the business: sales, marketing, client management & development.

24  **Select Clients:** Dykman's Time Shop, Economic Development Partners, LLC, Manitowoc
25  Foodservice Group, TDS Telecom, Conney Safety Products & Direct Safety Company, Krupp
26  General Contractors, Doctor's Choice Supplements, Baumgardt Home Inspection, Professional
27  Kitchen, Winterhorse Park, 105.5 Triple M/Entercom Communications, Relevé, & Hostbaby.

28

29  **Eldon (Newell Office Products),** Consumer Segment Manager | 2002

30  • Led cross-functional new product development team focused on development of new product
31    categories.

32  **Newell Office Products,** Product Manager | 1999 – 2002

33  • Managed $60M, 70% market share product category.
34  • Achieved 20% sales growth in 2000.

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1 • Developed over 30 new products.

2 **Newell Office Products,** Associate Product Manager | 1998 – 1999

3 • Managed $31M Back-To-School (90% mkt. share & 13% sales growth) & miscellaneous
4 office supply product categories.
5 • Developed over 10 new products.

6 **Newell Office Products,** Senior Account Representative | 1997 – 1998

7

8

9 **Levolor Home Fashions,** National Sales Rep | 1995 – 1997

10 • Managed $1M annual sales territory.
11 • Created "Product Knowledge Training Manual" for accounts.

12

13 14 **Skills**

15 • SEO – including content & technical site
16 optimization
17 • Keyword Research
18 • Social Media
19 • Link Building
20 • Web Analytics

21 • Team Management
22 • Training
23 • Web design – tables-less, web-standards
24 • XHTML & CSS
25 • Project management
26 • Product development
27 • Product management

28

29 **Writing**

30 • Multichannel Merchant
31 • CNET Blog Network
32 • Natural Search Blog

33 • MarketingProfs
34 • BusinessWatch Magazine
35 • SEOmoz (now moz.com) Blog

36

37 **Speaking**

38 • American Marketing Association's Marketing Workshop ('08, '09, '10, '11)
39 • Brandworks University (Lindsay, Stone & Briggs) 2009

40

41 **Education**

42 • Business Administration BA, Coe College
43 • Executive Presentation Skills
44 • Professional Selling Skills
45 • Desktop Publishing

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    **B.   Article Publications**

2    "Amos Pewter," Multichannel Merchant, 4/1/2011,

3    (http://multichannelmerchant.com/ecommerce/polishing-pewter-site-0401md7/)

4    "Specialty Store Services: Shaping up a store-supplies site," Multichannel Merchant, 11/1/2010,

5    (http://multichannelmerchant.com/ecommerce/shaping-store-supplies-site-1101/)

6    "In This Corner…Title MMA," Multichannel Merchant, 2/1/2010,

7    (http://multichannelmerchant.com/ecommerce/news/0201-title-mma-specializes/)

8    "LinkedIn, But NoFollow Link Love," Natural Search Blog, 12/8/2009,

9    (http://www.naturalsearchblog.com/archives/2009/12/08/linkedin-but-nofollow-link-love/)

10    "Essential Tools for SEO," Multichannel Merchant, 12/1/2009,

11    (http://multichannelmerchant.com/ecommerce/1201-seo-essential-tools/index.html)

12    "Get Annual Local Demand from Google AdWords Keyword Tool," MOZ.com, 11/17/2009,

13    (https://moz.com/ugc/get-annual-local-demand-from-google-adwords-keyword-tool)

14    "New Tool to Annualize Google Keyword Data," Natural Search Blog, 11/13/2009,

15    (http://www.naturalsearchblog.com/archives/2009/11/13/new-tool-to-annualize-google-keyword-data/)

16    "A tough look at Tender Heart," Multichannel Merchant, 11/1/2009,

17    (http://multichannelmerchant.com/ecommerce/1101-tender-heart-treasures/index.html)

18    "SEO Tools: Using Xenu and Excel – Blindfolded SEO Audit Part 2," Natural Search Blog,

19    10/22/2009, (http://www.naturalsearchblog.com/archives/2009/10/22/seo-tools-using-xenu-and-excel-

20    blindfolded-seo-audit-part-2/)

21    "SEO Services: Blindfolded SEO Audit Part 1," Natural Search Blog, 10/21/2009,

22    (http://www.naturalsearchblog.com/archives/2009/10/21/seo-services-blindfolded-seo-audit-part-1/)

23    "Social Media Costs … More Than Just ROI Calculations," Natural Search Blog, 10/13/2009,

24    (http://www.naturalsearchblog.com/archives/2009/10/13/social-media-costs-more-than-just-roi-

25    calculations/)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    "Social Media Measurement," Natural Search Blog, 10/5/2009,
2    (http://www.naturalsearchblog.com/archives/2009/10/05/social-media-measurement/)

3    "Social Media Marketing Goals," Natural Search Blog, 7/23/2009,
4    (http://www.naturalsearchblog.com/archives/2009/07/23/social-media-marketing-goals/)

5    "Measuring Link Bait," Natural Search Blog, 7/15/2009,
6    (http://www.naturalsearchblog.com/archives/2009/07/15/measuring-link-bait/)

7    "Natural Search Marketing is Just in Time Conversation," Natural Search Blog, 7/1/2009,
8    (http://www.naturalsearchblog.com/archives/2009/07/01/natural-search-marketing-is-just-in-time-
9    conversation/)

10   "60-Second Website Audit," Natural Search Blog, 6/19/2009,
11   (http://www.naturalsearchblog.com/archives/2009/06/19/60-second-website-audit/)

12   "CHEFScatalog Gets Critiqued," Multichannel Merchant, 4/1/2009,
13   (http://multichannelmerchant.com/ecommerce/0401-chefs-catalog-outfitting/)

14   "Social Scenes," Identity Developments, LLC, 2/7/2009,
15   (http://www.identitydevelopments.com/social-scenes/)

16   "Social Scenes," Business Watch Magazine, February 2009. Republished
17   (http://www.identitydevelopments.com/social-scenes/)

18   "Online New Year's Resolution: Socialize," Business Watch Magazine, January 2009.
19   Republished (http://www.identitydevelopments.com/time-to-socialize/)

20   "Measuring Success by the Click," Business Watch Magazine, December 2008. Republished
21   (http://www.identitydevelopments.com/measuring-success-by-the-click/)

22   "Buying Position," Business Watch Magazine, November 2008. Republished
23   (http://www.identitydevelopments.com/buying-position/)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1 "Perusing the Patagonia site," Multichannel Merchant, 10/1/2008,

2 (http://multichannelmerchant.com/ecommerce/1001-patagonia-site-revies/index.html)

3 "Are You Accessible?," Business Watch Magazine, October 2008. Republished

4 (http://www.identitydevelopments.com/are-you-accessible/)

5 "Oh oh. Made Google Drop an 'o'," MOZ.com, 9/5/2008, (https://moz.com/blog/oh-oh-made-

6 google-drop-an-o)

7 "Do You Know SEO?," Business Watch Magazine, September 2008. Republished

8 (http://www.identitydevelopments.com/do-you-know-seo/)

9 "Being Blog Worthy," Business Watch Magazine, August 2008. Republished

10 (http://www.identitydevelopments.com/being-blog-worthy/)

11 "It's That Time Again," Business Watch Magazine, July 2008. Republished

12 (http://www.identitydevelopments.com/its-that-time-again/)

13 "Blog for Your Dinner," MOZ.com, 6/11/2008, (https://moz.com/ugc/blog-for-your-dinner)

14 "Are you Linked In?," Business Watch Magazine, June 2008. Republished

15 (http://www.identitydevelopments.com/are-you-linkedin/)

16 "Be unique to avoid duplicate content," Searchlight | CNET, 5/31/2008,

17 (http://news.cnet.com/8301-13530_3-9956596-28.html)

18 "Selling duplicate content," Searchlight | CNET, 5/14/2008, (http://news.cnet.com/8301-13530_3-

19 9944772-28.html)

20 "Search To Be Found," Business Watch Magazine, May 2008. Republished

21 (http://www.identitydevelopments.com/search-to-be-found/)

22 "Understanding duplicate content: Outside view," Searchlight | CNET, 4/11/2008,

23 (http://news.cnet.com/8301-13530_3-9916833-28.html)

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

1    "SEOmoz Is Clueless," MOZ.com, 4/8/2008, (https://moz.com/blog/seomoz-is-clueless)

2    "Duplicate content: separating the penalty from the filter," Searchlight | CNET, 4/7/2008,
3    (http://news.cnet.com/8301-13530_3-9912675-28.html)

4    "Use SEO to optimize your recession," Searchlight | CNET, 4/3/2008, (http://news.cnet.com/8301-
5    13530_3-9911273-28.html)

6    "Digging in to Michigan Bulb," Multichannel Merchant, 4/1/2008
7    (http://multichannelmerchant.com/webchannel/creative/digging_michigan_bulb/)

8    "Talking to spiders," Business Watch Magazine, April 2008. Republished
9    (http://www.identitydevelopments.com/talking-to-spiders/)

10   "Recession – the best thing for SEO," Searchlight | CNET, 3/31/2008, (http://news.cnet.com/8301-
11   13530_3-9906433-28.html)

12   "Analyze and create robots.txt files in Google," Searchlight | CNET, 3/29/2008,
13   (http://news.cnet.com/8301-13530_3-9906027-28.html)

14   "No. 1 in Google may not be enough," Searchlight | CNET, 3/24/2008, (http://news.cnet.com/8301-
15   13530_3-9901796-28.html)

16   "It's about the experience," Searchlight | CNET, 3/22/2008, (http://news.cnet.com/8301-13530_3-
17   9901382-28.html)

18   "LinkedIn goes corporate," Searchlight | CNET, 3/21/2008, (http://news.cnet.com/8301-13530_3-
19   9900554-28.html)

20   "Quick header response check a list of domains," Searchlight | CNET, 3/20/2008,
21   (http://news.cnet.com/8301-13530_3-9899573-28.html)

22   "LinkedIn: your SEO card file," Searchlight | CNET, 3/17/2008, (http://news.cnet.com/8301-
23   13530_3-9896437-28.html)

"Realizing Recessionary Gains," Business Watch Magazine, March 2008. Republished (http://www.identitydevelopments.com/realizing-recessionary-gains/)

"Special relationships with the search engines," Searchlight | CNET, 2/11/2008, (http://news.cnet.com/8301-13530_3-9869851-28.html)

"Super Bowl ads reveal big companies don't get it," Searchlight | CNET, 2/4/2008, (http://news.cnet.com/8301-13530_3-9864012-28.html)

"Leap Onto the Web," Business Watch Magazine, February 2008. Republished (http://www.identitydevelopments.com/leap-onto-the-web/)

"Social media . . . just say no?," Searchlight | CNET, 1/31/2008, (http://news.cnet.com/8301-13530_3-9862596-28.html)

"How to make spiders crawl backwards," MOZ.com, 1/28/2008, (https://moz.com/ugc/how-to-make-a-spider-crawl-backwards)

"The Office, CSI, and Ugly Betty get it," Searchlight | CNET, 1/25/2008, (http://news.cnet.com/8301-13530_3-9858459-28.html)

"Counting links the easy way," Searchlight | CNET, 1/18/2008, (http://news.cnet.com/8301-13530_3-9853637-28.html)

"$15 Official Super Deluxe Search Marketer's Kit," Searchlight | CNET, 1/4/2008, (http://news.cnet.com/8301-13530_3-9840412-28.html)

"How to Strengthen a Site through Title Tag Strategies: Part Two, Advanced," MarketingProfs, January 2008, (http://www.marketingprofs.com/8/title-tag-strategies-advanced-brown.asp)

"How to Strengthen a Site Through Title Tag Strategies: Part One, The Basics," MarketingProfs, January 2008, (http://www.marketingprofs.com/8/title-tag-strategies-basics-brown.asp)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    "Get In Shape for 2008," Business Watch Magazine, January 2008. Republished

2    (http://www.identitydevelopments.com/get-in-shape/)

3    "MSN Handing out lumps of coal for the holidays?," Searchlight | CNET, 12/18/2007,

4    (http://news.cnet.com/8301-13530_3-9835283-28.html)

5    "Ten games for search marketers," Searchlight | CNET, 12/18/2007, (http://news.cnet.com/8301-

6    13530_3-9835279-28.html)

7    "Visualizing a balanced link profile," Searchlight | CNET, 12/13/2007, (http://news.cnet.com/8301-

8    13530_3-9833705-28.html)

9    "Holiday Tips for Procrastinators," Business Watch Magazine, December 2007. Republished

10   (http://www.identitydevelopments.com/holiday-tips-procrastinators/)

11   "How sustainable is Black Friday?," Searchlight | CNET, 11/28/2007, (http://news.cnet.com/8301-

12   13530_3-9825449-28.html)

13   "Searchy Thankfulness," Searchlight | CNET, 11/21/2007, (http://news.cnet.com/8301-13530_3-

14   9821435-28.html)

15   "MSN's Live Search Webmaster Center goes…live," Searchlight | CNET, 11/15/2007,

16   (http://news.cnet.com/8301-13530_3-9818841-28.html)

17   "How do you Role your SEO?," MOZ.com, 11/12/2007, (https://moz.com/blog/how-do-you-role-

18   your-seo)

19   "What's the sound of PageRank falling?," Searchlight | CNET, 11/11/2007,

20   (http://news.cnet.com/8301-13530_3-9814855-28.html)

21   "It's not about you," Business Watch Magazine, November 2007. Republished

22   (http://www.identitydevelopments.com/its-not-about-you/)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    "5 Simple Marketing Ideas Learned From Lands' End Business Outfitters," Identity
2    Developments, LLC, 10/2/2007, (http://www.identitydevelopments.com/landsend-business-
3    outfitters/)

4    "Reputection – the other half of Reputation Management," Business Watch Magazine, October
5    2007. Republished (http://www.identitydevelopments.com/reputection-reputation-management/)

6    "Maximize Your Search Potential through BS," MarketingProfs, October 2007,
7    (http://www.marketingprofs.com/8/maximize-potential-blended-search-brown.asp)

8    "Greetings from Google Local!," InsideSEM, October 2007. Republished
9    (http://www.identitydevelopments.com/greetings-from-google-local/)

10   "Got a Rep to Protect?," Business Watch Magazine, September 2007. Republished
11   (http://www.identitydevelopments.com/got-a-rep-to-protect/)

12   "Is your website Flash in the pan?," Business Watch Magazine, August 2007. Republished
13   (http://www.identitydevelopments.com/website-flash-in-the-pan/)

14   "The New 4Ps of Marketing… 4 Ps 2.0," Identity Developments, LLC, 7/12/2007,
15   (http://www.identitydevelopments.com/marketing-4-ps-20/)

16   "The Web, coming to a location near you," Business Watch Magazine, July 2007. Republished
17   (http://www.identitydevelopments.com/web-near-you/)

18   "Identifying long tail patterns," MOZ.com, 6/12/2007, (https://moz.com/blog/identifying-long-tail-
19   patterns)

20   "Is Your Website Headstrong?," InsideSEM, June 2007. Republished
21   (http://www.identitydevelopments.com/headstrong-website/)

22   "Creating Content for Your Website 101," Identity Developments, LLC, 4/11/2007,
23   (http://www.identitydevelopments.com/creating-content-101/)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1   "5 Sources for New Content Ideas You Probably Never Thought Of," Identity Developments,
2   LLC, 3/23/2007, (http://www.identitydevelopments.com/unique-sources-for-content-ideas/)

3   "5 Ideas to kick-start your marketing ideas…or anything else," MOZ.com, 3/19/2007,
4   (https://moz.com/ugc/5-ideas-to-kickstart-your-marketing-ideas-or-anything-else)

5   "You Are Your Website," Identity Developments, LLC, 3/13/2007,
6   (http://www.identitydevelopments.com/you-are-your-website/)

7   "Drive More Business While Decreasing Your Advertising Costs," Identity Developments, LLC,
8   3/10/2007, (http://www.identitydevelopments.com/drive-business-decrease-advertising-costs/)

9   "You Don't Need A New Website," Identity Developments, LLC, 3/7/2007,
10  (http://www.identitydevelopments.com/you-dont-need-a-new-website/)

11  "Web Design… Who to Hire?," Identity Developments, LLC, 3/7/2007,
12  (http://www.identitydevelopments.com/website-design-company/)

13  "Web Design… What Is It? ," Identity Developments, LLC, 3/7/2007,
14  (http://www.identitydevelopments.com/website-design/)

15  "Webvolution," Identity Developments, LLC, 3/7/2007,
16  (http://www.identitydevelopments.com/webvolution/)

17  "10 Dead giveaway signs you are a self-employed search marketer and/or web designer,"
18  MOZ.com, 3/3/2007, (https://moz.com/ugc/10-dead-giveaway-signs-you-are-a-selfemployed-search-
19  marketer-andor-web-designer)

20  "Search Engine Marketing Diet," InsideSEM, March 2007. Republished
21  (http://www.identitydevelopments.com/search-engine-marketing-diet/)

22  "SEO – Well if it isn't rocket science?," MOZ.com, 2/15/2007, (https://moz.com/ugc/seo-well-if-it-
23  isnt-rocket-science)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    **C.    Materials – Cited**

2    **1.    Declarations**

3    a)    Peter Kent – Declaration, November 18, 2013, (Peter Kent - Declaration.pdf)

4    b)    Robert Hough – Declaration, March 12, 2013, (Robert Hough - Declaration.pdf)

5    c)    Martin Hewes – Declaration, March 4, 2013, (Martin Hewes - Declaration.pdf)

6    **2.    Depositions**

7    a)    Brent Duke – 30(b)(6) Deposition, June 22, 2015, (2092927-Brent Duke-1.PDF)

8    b)    Brent Duke – 30(b)(6) Deposition Exhibit #32, June 22, 2015, (2092927-Exhibit-32-1-
9    Brent Duke.PDF)

10   c)    Robert Hough – Deposition, June 25, 2015, (2093298-Robert Hough-1.PDF)

11   d)    Robert Hough – Deposition Exhibit #5, (2093298-Exhibit-5-1-Robert Hough.PDF)

12   e)    Jade Gaber – Deposition, June 26, 2015, (Gaber, Jade   DR Distributors vs.pdf)

13   f)    Martin Hewes – Deposition, May 6, 2014, (Hewes, Martin   DR Distributors vs_ 21
14   Century Smoking   - Vol_ I.pdf)

15   **3.    Interviews**

16   a)    Brent Duke – Phone Interviews, (21CS - Telephone Interviews.pdf)

17   **4.    Final Reports**

Case 3:12 – cv – 50324            SEO Expert Report – Brian R. Brown            76 of 91

1    a)    Peter Kent – Expert Report, November 23, 2015, (Kent - Expert SEO report FINAL.pdf)

2    **5.    Google Analytics**

3    a)    21CS Homepage Pageviews March 1, 2009 – December 31, 2014, (21CS - Homepage

4    PV - Analytics www.21centurysmoking.com Pages 20090301-20141231.pdf

5    b)    21CS – Homepage Traffic During sub-160 – Analytics, (21CS - HP traffic during sub-

6    160 - Analytics www.21centurysmoking.com Landing Pages 20120828-20130325.pdf)

7    c)    21CS – Google Analytics Organic Keyword Search Data, (21CS - Google Analytics

8    Organic Keyword Search Data.pdf)

9    d)    21CS – Whatis page – Organic – Analytics, (21CS - Whatis page - Organic - Analytics

10    www.21centurysmoking.com Landing Pages 20110701-20111031.pdf)

11    **6.    Archive.org Wayback Machine – BrentDuke.com**

12    a)    BrentDuke.com, https://web.archive.org/web/20110807200758/http://brentduke.com/,

13    (web.archive.org_web_20110807200758__brentduke.com.pdf)

14    b)    BrentDuke.com, view-

15    source:https://web.archive.org/web/20110807200758/http:/brentduke.com/, (view-

16    source_web.archive.org_web_20110807200758__brentduke.com.pdf)

17    **7.    Archive.org Wayback Machine – 21centurysmoking.com**

18    a)    view-

19    source:https://web.archive.org/web/20090714172344/http:/www.21centurysmoking.com/,

20    (view-source_web.archive.org_web_20090714172344__www.21centurysmoking.com.pdf)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1      b)    view-

2      source:https://web.archive.org/web/20090811070200/http://www.21centurysmoking.com/,

3      (view-source_web.archive.org_web_20090811070200__www.21centurysmoking.com.pdf)

4      c)   https://web.archive.org/web/20090714172344/http://www.21centurysmoking.com/,

5      (web.archive.org_web_20090714172344__www.21centurysmoking.com.pdf )

6      d)   https://web.archive.org/web/20090811070200/http://www.21centurysmoking.com/,

7      (web.archive.org_web_20090811070200__www.21centurysmoking.com.pdf)

8      e)   https://web.archive.org/web/20090918043653/http://www.21centurysmoking.com/,

9      (web.archive.org_web_20090918043653__www.21centurysmoking.com.pdf)

10     f)   view-

11     source_web.archive.org/web/20090924194631/http://www.21centurysmoking.com/catalog,

12     (view-

13     source_web.archive.org_web_20090924194631__www.21centurysmoking.com_catalog.pdf)

14     g)   view-

15     source_web.archive.org/web/20100106013516/http://www.21centurysmoking.com/catalog/index.php?

16     main_page=products_new, (view-

17     source_web.archive.org_web_20100106013516__www.21centurysmoking.com_catalog_inde

18     x.php-main_page=products_new.pdf)

19     h)   view-

20     source_web.archive.org/web/20100827222525/http://www.21centurysmoking.com/catalog/ind

21     ex.php?main_page=product_info&cPath=65&products_id=180, (view-

22     source_web.archive.org_web_20100827222525_www.21centurysmoking.com_catalog_index.

23     php-main_page=product_info&cPath=65&products_id=180.pdf)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1      i)    view-

2      source_web.archive.org/web/20101130160950/http://www.21centurysmoking.com/catalog/ind

3      ex.php?main_page=page&id=3&pos=v&chapter=10, (view-

4      source_web.archive.org_web_20101130160950__www.21centurysmoking.com_catalog_inde

5      x.php-main_page=page&id=3&pos=v&chapter=10.pdf)

6      j)    view-

7      source_web.archive.org/web/20110108221728/http://www.21centurysmoking.com/catalog/ind

8      ex.php?main_page=reviews, (view-

9      source_web.archive.org_web_20110108221728__www.21centurysmoking.com_catalog_inde

10    x.php-main_page=reviews.pdf)

11    k)    view-

12    source_web.archive.org/web/20110918133206/http://www.21centurysmoking.com/catalog/ind

13    ex.php?main_page=discount_coupon, (view-

14    source_web.archive.org_web_20110918133206__www.21centurysmoking.com_catalog_inde

15    x.php-main_page=discount_coupon.pdf)

16    l)    https://web.archive.org/web/20111018001152/http://www.21centurysmoking.com/,

17    (web.archive.org_web_20111018001152__21centurysmoking.com.pdf)

18    m)   view-

19    source:https://web.archive.org/web/20120627080135/http://21centurysmoking.com/index.php

20    ?main_page=index&cPath=67, (view-

21    source_web.archive.org_web_20120627080135__21centurysmoking.com_index.php-

22    main_page=index&cPath=67.pdf)

23    n)    view-

24    source:https://web.archive.org/web/20120715061936/http://21centurysmoking.com/starter-

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1  kits-c-65.html, (view-
2  source_web.archive.org_web_20120715061936__21centurysmoking.com_starter-kits-c-
3  65.html.pdf)

4  o)    view-
5  source:https://web.archive.org/web/20121124010913/http://21centurysmoking.com/, (view-
6  source_web.archive.org_web_20121124010913__21centurysmoking.com.pdf)

7  p)    view-
8  source:https://web.archive.org/web/20130215050724/http://21centurysmoking.com/replaceme
9  nt-batteries, (view-
10  source_web.archive.org_web_20130215050724__21centurysmoking.com_replacement-
11  batteries.pdf)

12  q)    view-
13  source:https://web.archive.org/web/20130218062613/http://21centurysmoking.com/liquid,
14  (view-source_web.archive.org_web_20130218062613__21centurysmoking.com_liquid.pdf)

15  r)    view-
16  source:https://web.archive.org/web/20111018001152/http://21centurysmoking.com/, (view-
17  source_web.archive.org_web_20111018001152__21centurysmoking.com.pdf)

18  s)    https://web.archive.org/web/20090406011039/http://www.21centurysmoking.com/whatis
19  .php,
20  (web.archive.org_web_20090406011039__www.21centurysmoking.com_whatis.php.pdf)

21  **8.    Archive.org Wayback Machine – 21stCenturySmoke.com**

22  a)    https://web.archive.org/web/20110128170228/http://21stcenturysmoke.com/,
23  (web.archive.org_web_20110128170228__21stcenturysmoke.com.pdf)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    b)    view-source_web.archive.org_web_20110128170228__21stcenturysmoke.com, (view-
2    source_web.archive.org_web_20110128170228__21stcenturysmoke.com.pdf)

3    **9.    Archive.org Wayback Machine – Zen Cart**

4    a)    https://web.archive.org/web/20130317195102/http://www.zen-
5    cart.com/downloads.php?do=file&id=889,
6    (web.archive.org_web_20130317195102__www.zen-cart.com_downloads.php-
7    do=file&id=889.pdf)

8    b)    https://web.archive.org/web/20120707024115/http://www.zen-
9    cart.com/downloads.php?do=file&id=132,
10    (web.archive.org_web_20120707024115__www.zen-cart.com_downloads.php-
11    do=file&id=132.pdf)

12    **10.    Archive.org Wayback Machine – Ceon**

13    a)    https://web.archive.org/web/20120711124726/http://ceon.net/software/business/zen-
14    cart/uri-mapping, (web.archive.org_web_20120711124726__ceon.net_software_business_zen-
15    cart_uri-mapping.pdf)

16    b)    https://web.archive.org/web/20120711124632/http://ceon.net/software/business/zen-cart,
17    (web.archive.org_web_20120711124632__ceon.net_software_business_zen-cart.pdf)

18    **11.    Archive.org Wayback Machine – AmericanRetailersMarketplace.com**

19    a)    https://web.archive.org/web/20111124124704/http://www.americanretailersmarketplace.c
20    om/e-cigs.html,
21    (web.archive.org_web_20111124124704__www.americanretailersmarketplace.com_e-
22    cigs.html.pdf)

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    **12.  Reference**

2    a)   Kent, Peter. <u>Search Engine Optimization for Dummies</u>, 5th Edition, ©2012, John Wiley

3    & Sons, Inc., (Kent - SEO for Dummies 5th edition.pdf)

4    b)   Enge, Eric; Spencer, Stephan; Fishkin, Rand; Stricchiola, Jessie C. <u>The Art of SEO</u>, 1$^{st}$

5    Edition, ©2010, O'Reilly Media, Inc., (Enge-Spencer-Fishkin-Stricchiola - The Art of SEO 1st

6    edition.pdf)

7    c)   http://php.net/manual/en/faq.general.php, (php.net_manual_en_faq.general.php.pdf)

8    d)   http://www.mysql.com/about/, (www.mysql.com_about.pdf)

9    e)   https://archive.org/about/faqs.php#Beta_Archive.org_Site,

10    (archive.org_about_faqs.php#Beta_Archive.org_Site.pdf)

11    f)   https://en.wikipedia.org/wiki/Yahoo!_Search,

12    (en.wikipedia.org_wiki_Yahoo!_Search.pdf)

13    g)   https://www.comscore.com/Insights/Press-Releases/2012/1/comScore-Releases-

14    December-2011-US-Search-Engine-Rankings, (www.comscore.com_Insights_Press-

15    Releases_2012_1_comScore-Releases-December-2011-US-Search-Engine-Rankings.pdf)

16    h)   Zen Cart v. 1.3.8 Default "Languages" meta_tags.php Code File, (Zen Cart 1.3.8 -

17    meta_tags.php.pdf)

18    i)   21 Century Smoking "Languages" meta_tags.php Code File from Backup Folder, (21CS

19    - meta_tags.php.pdf)

20    j)   21CS Constructed Timeline, (21CS - Constructed Timeline.pdf)

1     k)    ScreamingFrog crawl of 21centurysmoking.com pages on Archive.org's Wayback

2    Machine (20160121 21CS - WB Crawl Analysis v2.xlsx)

3    **13.    Reference – Google**

4    a)    Google,

5    https://web.archive.org/web/20120428172447/http://support.google.com/webmasters/bin/answ

6    er.py?hl=en&answer=70897,

7    (web.archive.org_web_20120428172447__support.google.com_webmasters_bin_answer.py-

8    hl=en&answer=70897.pdf)

9    b)    https://googleblog.blogspot.com/2010/01/helping-computers-understand-language.html,

10    (googleblog.blogspot.com_2010_01_helping-computers-understand-language.html.pdf)

11    c)    https://webmasters.googleblog.com/2009/09/google-does-not-use-keywords-meta-

12    tag.html, (webmasters.googleblog.com_2009_09_google-does-not-use-keywords-meta-

13    tag.html.pdf)

14    d)    http://static.googleusercontent.com/media/www.google.com/en//webmasters/docs/search-

15    engine-optimization-starter-guide.pdf, (Google-search-engine-optimization-starter-guide.pdf)

16    e)    https://googleblog.blogspot.com/2011/10/making-search-more-secure.html,

17    (googleblog.blogspot.com_2011_10_making-search-more-secure.html.pdf)

18    **D.    Materials – Reviewed**

19    **1.    Documents & Exhibits**

20    a)    Order on Preliminary Injunction.pdf

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 292 of 581 PageID #:14632
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 84 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    b)   Case 3-12-cv-50324-Doc-80.pdf

2    c)   Case-3-12-cv-50324-Doc-98.pdf

3    d)   2081761-Brent Duke-1.PDF

4    e)   2081761-Exhibit-1-1-Brent Duke.PDF

5    f)   2081761-Exhibit-2-1-Brent Duke.PDF

6    g)   2081761-Exhibit-3-1-Brent Duke.PDF

7    h)   2081766-Brent Duke-1.PDF

8    i)   2081766-Exhibit-10-1-Brent Duke.PDF

9    j)   2081766-Exhibit-11-1-Brent Duke.PDF

10   k)   2081766-Exhibit-12-1-Brent Duke.PDF

11   l)   2081766-Exhibit-13-1-Brent Duke.PDF

12   m)   2081766-Exhibit-14-1-Brent Duke.PDF

13   n)   2081766-Exhibit-15-1-Brent Duke.PDF

14   o)   2081766-Exhibit-16-1-Brent Duke.PDF

15   p)   2081766-Exhibit-17-1-Brent Duke.PDF

16   q)   2081766-Exhibit-18-1-Brent Duke.PDF

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

| | | |
|---|---|---|
| 1 | r) | 2081766-Exhibit-19-1-Brent Duke.PDF |
| 2 | s) | 2081766-Exhibit-20-1-Brent Duke.PDF |
| 3 | t) | 2081766-Exhibit-21-1-Brent Duke.PDF |
| 4 | u) | 2081766-Exhibit-22-1-Brent Duke.PDF |
| 5 | v) | 2081766-Exhibit-23-1-Brent Duke.PDF |
| 6 | w) | 2081766-Exhibit-24-1-Brent Duke.PDF |
| 7 | x) | 2081766-Exhibit-25-1-Brent Duke.PDF |
| 8 | y) | 2081766-Exhibit-26-1-Brent Duke.PDF |
| 9 | z) | 2081766-Exhibit-27-1-Brent Duke.PDF |
| 10 | aa) | 2081766-Exhibit-28-1-Brent Duke.PDF |
| 11 | bb) | 2081766-Exhibit-29-1-Brent Duke.PDF |
| 12 | cc) | 2081766-Exhibit-3A-1-Brent Duke.PDF |
| 13 | dd) | 2081766-Exhibit-4-1-Brent Duke.PDF |
| 14 | ee) | 2081766-Exhibit-5-1-Brent Duke.PDF |
| 15 | ff) | 2081766-Exhibit-6-1-Brent Duke.PDF |
| 16 | gg) | 2081766-Exhibit-7-1-Brent Duke.PDF |

Case: 3:12-cv-50324 Document #: 348 Filed: 10/24/19 Page 294 of 581 PageID #:14634
Case: 3:12-cv-50324 Document #: 218-29 Filed: 01/15/18 Page 86 of 91 PageID #:7610
RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    hh)   2081766-Exhibit-8-1-Brent Duke.PDF

2    ii)   2081766-Exhibit-9-1-Brent Duke.PDF

3    jj)   2092927-Brent Duke-1.PDF

4    kk)   2092927-Exhibit-10-1-Brent Duke.PDF

5    ll)   2092927-Exhibit-11-1-Brent Duke.PDF

6    mm) 2092927-Exhibit-1-1-Brent Duke.PDF

7    nn)   2092927-Exhibit-12-1-Brent Duke.PDF

8    oo)   2092927-Exhibit-13-1-Brent Duke.PDF

9    pp)   2092927-Exhibit-14-1-Brent Duke.PDF

10   qq)   2092927-Exhibit-15-1-Brent Duke.PDF

11   rr)   2092927-Exhibit-16-1-Brent Duke.PDF

12   ss)   2092927-Exhibit-17-1-Brent Duke.PDF

13   tt)   2092927-Exhibit-18-1-Brent Duke.PDF

14   uu)   2092927-Exhibit-19-1-Brent Duke.PDF

15   vv)   2092927-Exhibit-20-1-Brent Duke.PDF

16   ww) 2092927-Exhibit-21-1-Brent Duke.PDF

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1      xx)   2092927-Exhibit-2-1-Brent Duke.PDF

2      yy)   2092927-Exhibit-22-1-Brent Duke.PDF

3      zz)   2092927-Exhibit-23-1-Brent Duke.PDF

4      aaa) 2092927-Exhibit-24-1-Brent Duke.PDF

5      bbb) 2092927-Exhibit-25-1-Brent Duke.PDF

6      ccc) 2092927-Exhibit-26-1-Brent Duke.PDF

7      ddd) 2092927-Exhibit-27-1-Brent Duke.PDF

8      eee) 2092927-Exhibit-28-1-Brent Duke.PDF

9      fff)   2092927-Exhibit-29-1-Brent Duke.PDF

10     ggg) 2092927-Exhibit-30-1-Brent Duke.PDF

11     hhh) 2092927-Exhibit-31-1-Brent Duke.PDF

12     iii)   2092927-Exhibit-3-1-Brent Duke.PDF

13     jjj)   2092927-Exhibit-32-1-Brent Duke.PDF

14     kkk) 2092927-Exhibit-33-1-Brent Duke.PDF

15     lll)   2092927-Exhibit-4-1-Brent Duke.PDF

16     mmm)     2092927-Exhibit-5-1-Brent Duke.PDF

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    nnn) 2092927-Exhibit-6-1-Brent Duke.PDF

2    ooo) 2092927-Exhibit-7-1-Brent Duke.PDF

3    ppp) 2092927-Exhibit-8-1-Brent Duke.PDF

4    qqq) 2092927-Exhibit-9-1-Brent Duke.PDF

5    rrr)  2093298-Exhibit-10-1-Robert Hough.pdf

6    sss)  2093298-Exhibit-11-1-Robert Hough.pdf

7    ttt)  2093298-Exhibit-1-1-Robert Hough.PDF

8    uuu) 2093298-Exhibit-12-1-Robert Hough.pdf

9    vvv) 2093298-Exhibit-13-1-Robert Hough.pdf

10   www)      2093298-Exhibit-14-1-Robert Hough.pdf

11   xxx) 2093298-Exhibit-15-1-Robert Hough.pdf

12   yyy) 2093298-Exhibit-2-1-Robert Hough.PDF

13   zzz) 2093298-Exhibit-3-1-Robert Hough.PDF

14   aaaa)     2093298-Exhibit-4-1-Robert Hough.PDF

15   bbbb)     2093298-Exhibit-5-1-Robert Hough.PDF

16   cccc)     2093298-Exhibit-6-1-Robert Hough.pdf

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1    dddd)      2093298-Exhibit-7-1-Robert Hough.pdf

2    eeee)      2093298-Exhibit-8-1-Robert Hough.pdf

3    ffff) 2093298-Exhibit-9-1-Robert Hough.pdf

4    gggg)      2093298-Robert Hough-1.pdf

5    hhhh)      Bengoa Carlos Part 2 DR Distributors vs. 21 Century Smoking.pdf

6    iiii) Bengoa, Carlos 30 (b) (6) 6-24-15 DR Distributors vs.pdf

7    jjjj) Bengoa, Carlos 30 (b) (6) 6-25-15 DR Distributors vs.pdf

8    kkkk)      Bengoa, Carlos DR Distributors vs. 21 Century Smoking.pdf

9    llll) Brent Duke-1 - Vol.pdf

10   mmmm)      Chris Menken Deposition Exhibit 1.pdf

11   nnnn)      Chris Menken Deposition Exhibit 2.pdf

12   oooo)      Chris Menken Deposition Exhibit 3.pdf

13   pppp)      Chris Menken Deposition Exhibit 4.pdf

14   qqqq)      EXHIBITS C2812 Carlos Bengoa.pdf

15   rrrr) EXHIBITS LK415 Loreen MacDonald.pdf

16   ssss) EXHIBITS LK437 Carlos Bengoa 30 (b) (6).pdf

1      tttt)  EXHIBITS LK437 Loreen MacDonald 30 (b) (6).pdf

2      uuuu)     scan0044.pdf

3      vvvv)     scan0045.pdf

4      wwww)    Expert damages report FINAL.pdf

5      xxxx)     Expert marketing report FINAL.pdf

6      yyyy)     Gaber Exhibits 11-29.pdf

7      zzzz)     Gaber Exhibits 1-9.pdf

8      aaaaa)    Gaber, Jade DR Distributors vs.pdf

9      bbbbb)    Hewes Exhibit 1.pdf

10     ccccc)    Hewes Exhibit 2.pdf

11     ddddd)    Hewes Exhibit 3.pdf

12     eeeee)    Hewes Exhibit 4.pdf

13     fffff)Hewes Exhibit 5.1.pdf

14     ggggg)    Hewes Exhibit 5.2.pdf

15     hhhhh)    Hewes, Martin DR Distributors vs_ 21 Century Smoking - Vol_ I.pdf

16     iiiii) Jeff Piper-Volume I.pdf

RESTRICTED CONFIDENTIAL -- OUTSIDE COUNSEL ONLY

1     jjjjj) Jeff Piper-Volume II.pdf

2     kkkkk)   Kent - Expert SEO report FINAL.pdf

3     lllll) Kent DRDistributorsvs21CenturySmoking 1-2 1 27 16.PDF

4     mmmmm)   Kent DRDistributorsvs21CenturySmoking 3 (1 of 2) 1 27 15.PDF

5     nnnnn)   Kent DRDistributorsvs21CenturySmoking 3 (2 of 2) 1 27 16.PDF

6     ooooo)   MacDonald, Loreen 30 (b) (6) 6-25-15 DR Distributors vs.pdf

7     ppppp)   MacDonald, Loreen DR Distributors, LLC vs. 21 Century Smoking, Inc.pdf

8     qqqqq)   Menken, Chris DR Distributors vs_ 21 Century Smoking - Vol_ I.pdf

9     rrrrr)Piper, Jeff 30 (b) (6) 6-25-15 DR Distributors vs.pdf

# EXHIBIT 26

Page 222

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

```
DR DISTRIBUTORS, LLC, an          )
Illinois limited liability        )
company,                          )
     Plaintiff and                )
     Counter-Defendant,           )   Case No.
 vs.                              )   3:12-cv-50324
21 CENTURY SMOKING, INC., an      )
Illinois corporation and          )
Brent Duke, individually,         )
     Defendants and               )
     Counter-Claimants,           )
vs.                               )
CB DISTRIBUTORS, INC., an         )
Illinois corporation, and         )
CARLOS BENGOA, individually,      )
     Counter-Defendants.          )
```

The continued videotaped deposition of

BRENT DUKE, called for examination pursuant to the

Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before GINA M. LUORDO, a notary

public within and for the County of Cook and State

of Illinois, at One North Franklin, Suite 3000,

Chicago, Illinois, on the 17th day of June, 2015,

at the hour of 9:09 a.m.

Reported by:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 483

1    archived versions on the Wayback Machine?

2    **A.   Yes.**

3    Q.   Was that hard to do?

4    **A.   As I stated before, it's not hard to do.**

5    **I just could not tell you in words how to do it.**

6    Q.   And your testimony is that the first time

7    that you were aware that the meta tags for your

8    company's website contained the words 21st Century

9    Smoke was when you read the declaration of

10   Mr. Marty Hughes in this case in March of 2013?

11   **A.   No, that was not the first time I was**

12   **aware.  The first time I was aware is when I**

13   **checked myself because I didn't believe it when I**

14   **saw it in the declaration.  I did not think that**

15   **the declaration was true until I saw it with my own**

16   **eyes.**

17   Q.   And when you read that statement in

18   Mr. Hughes's declaration, did you immediately go to

19   your computer to check the website?

20   **A.   I don't recall if it was immediate, but I**

21   **did not believe it was true, so I did go look**

22   **because I believe that it absolutely was false, so**

23   **I went to check and see.**

24   Q.   And at that time you were checking the

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 484

1      live version of your website that was publicly

2      available on the internet through a browser on your

3      computer?

4          MR. STAMATIS:  Objection.  Form.  Foundation.

5          THE WITNESS:  No, the Wayback Machine as we

6      discussed.

7      BY MR. DAVIS:

8          Q.   And did you -- so at the time you read

9      Mr. Hughes's statement in his declaration in March

10     of 2013, you didn't look at the current version of

11     your website as it was publicly displayed at that

12     time to see what the keywords contained?

13         **A.    I read the declaration, and I would have**

14     **looked at whatever dates were in the declaration**

15     **because again, I did not think that it was true, so**

16     **I immediately went to look to disprove that it was**

17     **true.**

18         Q.   And so you personally went and used the

19     Wayback Machine to look at the archived versions of

20     your company website at that time?

21         MR. STAMATIS:  Objection.  Asked and answered.

22         THE WITNESS:  Yes.

23     BY MR. DAVIS:

24         Q.   And what did you see when you looked at

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 485

1    the keywords in your metadata on your archived

2    versions of your website?

3        A.    **I saw that it did contain things that I**

4    **truly did not know were there.**

5        Q.    And did your website, the metadata in your

6    website include the words 21st Century Smoke?

7        A.    **Yes.**

8        Q.    And when you checked all the dates that

9    Mr. Hughes had set forth in his declaration, did

10   that confirm that your archived versions of your

11   website contained the 21st Century Smoke terms in

12   the keywords for each instance he identified?

13       MR. STAMATIS:  Objection.  Foundation.

14   Speculation.  Form.  Answer if you can.

15       THE WITNESS:  I don't recall exactly how many

16   dates I checked, but everything that I checked, it

17   was in there.

18   BY MR. DAVIS:

19       Q.    It was in there?

20       A.    **Oh, yes.**

21       Q.    And after you confirmed that the terms

22   21st Century Smoke were in your -- in the keywords

23   in the metadata in your company's website, did you

24   instruct anyone to review the keywords on your

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 486

1    website as it was -- the current version as it was

2    publicly displayed at the time in March of 2013?

3        MR. STAMATIS:  Objection.  Foundation.  Form.

4    Speculation.  Answer if you can.

5        THE WITNESS:  Unfortunately, I did not have

6    anyone to direct to do anything, so I had to try to

7    figure it out myself.

8    BY MR. DAVIS:

9        Q.    And did you figure it out yourself?

10       MR. STAMATIS:  Same objection.

11       THE WITNESS:  Yes.

12   BY MR. DAVIS:

13       Q.    And what did you see in the current

14   version of your website in March of 2013 in terms

15   of the keywords?

16       **A.    I saw that there were sporadic places on**

17   **the website where that keyword still existed.**

18       Q.    And that keyword is being 21st Century

19   Smoke, correct?

20       **A.    Yes.**

21       Q.    And how many instances did you find on

22   your website that that term 21st Century Smoke

23   existed on your website in March of 2013?

24       **A.    I do not recall.**

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 487

1     Q.   And did you -- strike that.

2        What did you do next in terms of taking

3  action to remove those keywords, or excuse me, what

4  did you do next in terms of removing the terms 21st

5  Century Smoke from your company website in March of

6  2013?

7     MR. STAMATIS:  Object to form.  Answer if you

8  can.

9     THE WITNESS:  I didn't know how to do it

10  myself, so I called Rob Hough, and he walked me

11  through the steps of getting to the program which

12  could access the meta tag.

13  BY MR. DAVIS:

14     Q.   And which program is that?

15     **A.   I don't remember.  I never used it.  I**

16  **didn't know how to use it, so I needed help using**

17  **it to make sure I could -- I didn't want that on my**

18  **site, so I wanted to get it off as soon as**

19  **possible.**

20     Q.   And so you're the one that personally

21  removed the term 21st Century Smoke from your

22  company's website in March of 2013?

23     MR. STAMATIS:  Objection.  Foundation.  You can

24  answer.

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 488

1          THE WITNESS:  Yes.

2     BY MR. DAVIS:

3          Q.   And after you did that, how did you

4     further confirm or verify that the terms 21st

5     Century Smoke were no longer in your company

6     website?

7          MR. STAMATIS:  Objection.  Foundation.  Form.

8     Answer if you can.

9          THE WITNESS:  I'm not a skillful, talented

10    person that could figure that out.  I think I got

11    them all off.  That was my goal.  There was an

12    auto-populating program, and I switched it off in

13    that program, so I don't think there should have

14    been any in there after that point.

15    BY MR. DAVIS:

16         Q.   Is the program you're talking about Zen

17    Cart?

18         **A.   Something in Zen Cart.**

19         Q.   And when you referred to the

20    auto-population features, what is that?

21         **A.   It populated the website.  It populated**

22    **all of the pages of the website with that data.**

23         Q.   And where did -- that auto-population

24    feature, where did it draw its data from?

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 489

1      MR. STAMATIS:  Objection.  Calls for

2  speculation.  Foundation.  Answer if you can.

3      THE WITNESS:  Whatever that program was.

4  BY MR. DAVIS:

5      Q.  So at that time was Mr. Hough the one that

6  told you how to turn off the auto-population

7  feature?

8      **A.  He explained to me, to the best of my**

9  **recollection, how to get that meta tag off of my**

10  **website.**

11      Q.  And he said that was done by turning off

12  the auto-population feature?

13      MR. STAMATIS:  Objection.  Foundation.  Form.

14      THE WITNESS:  Maybe auto-population is not the

15  right term.  You seem to keep using that, but the

16  program which populated the entire website or not

17  all of the website, but many pages of the website,

18  with that term, there was a program that did that,

19  and that program is what I needed to learn to use

20  to get it off of the website.

21  BY MR. DAVIS:

22      Q.  And how did you communicate with Mr. Hough

23  at this time in terms of needing his help to remove

24  the terms 21st Century Smoke from your company

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 490

1     website?

2          A.    **Phone, I believe.**

3          Q.    Did you have any e-mail messages with him?

4          A.    **I don't think so.  Possible, but I don't**

5     **remember talking to him on the phone.**

6                              (Whereupon, DUKE Deposition

7                              Exhibit No. 29 was marked for

8                              identification.)

9     BY MR. DAVIS:

10         Q.    I've handed you a document that's been

11    marked as Exhibit 29 for identification purposes

12    and ask you to take a look at it and tell me if you

13    recognize it.

14         A.    **This doesn't really look familiar, but I**

15    **just read through it.**

16         Q.    I'll ask you to turn to the very last

17    page.

18         A.    **Okay.**

19         Q.    Is that your signature --

20         A.    **Yes.**

21         Q.    -- above where it says Brent Duke?

22         A.    **Uh-huh.**

23         Q.    You signed that on June 15th of 2015?

24         A.    **Uh-huh.**

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 491

1        MR. STAMATIS:  Is that yes?  Is that a yes?

2        THE WITNESS:  Yes, I did sign it.  It's my

3   signature.

4   BY MR. DAVIS:

5        Q.   And I'll ask you to turn to the page that

6   has the response to interrogatory No. 16.  It's

7   towards the end.

8             Do you recognize this document as being

9   answers to interrogatories served by your company?

10       **A.   Yes.**

11       Q.   And your response to No. 16 at the top of

12  the page you have in front of you, it says

13  defendant is unaware as to the exact date the terms

14  21st Century Smoke in its entirety was removed as a

15  meta tag from the source code of defendant, 21

16  Century Smoking Inc.'s internet website,

17  WWW.21centurysmoking.com.

18            Is it your testimony today that you don't

19  know the exact date when you personally removed the

20  terms 21st Century Smoke from the tab?

21       **A.   If you gave me the date of the delivery of**

22  **the thing from Mr. Hughes, the declaration of**

23  **Mr. Hughes, the date I was made aware of that, that**

24  **would be the date, but I don't know that date off**

Page 492

1    **the top of my head.**

2       Q.   I can tell you that Mr. Hughes -- his

3    declaration was filed in this case on March 7,

4    2013.  Does that refresh your recollection as to

5    the date when the terms 21st Century Smoke were

6    removed from the meta tag from the source code of

7    your company's website?

8       **A.   Does that mean I would have been aware**

9    **March 7th?**

10       Q.   Your attorneys would have been aware that

11    day.

12       **A.   March 7th, okay.  Well, then I would have**

13    **made my best effort on March 7th to make sure there**

14    **was no occurrence on the website.**

15       Q.   And do you have any record or any kind of

16    confirmation of any kind of the actions you took

17    that day in terms of removing the 21st Century

18    Smoke terms from the source code and the metadata

19    from your company's website?

20       **A.   As I described previously, I asked Rob**

21    **Hough for help because I did not know how to do**

22    **that.**

23       Q.   Has your company ever used any other SEO

24    consultant other than Webrecsol in connection with

Page 493

1    your company's website?

2        **A.    Rank Pop.**

3        Q.    Any kind of SEO consulting.

4        **A.    Rank Pop.**

5        Q.    That would include Rank Pop?

6        **A.    That's the only company I can think of.**

7        MR. GAYNOR:  Spell that, please.

8        THE WITNESS:  R-a-n-k, P-o-p.

9    BY MR. DAVIS:

10        Q.    And where are they located?

11        **A.    Somewhere in the east coast.**

12        Q.    And did they do work directly on your

13    company's website?

14        **A.    I don't believe so.**

15        Q.    Did you ever give Rank Pop the credentials

16    or the user information to have access to your

17    company's website files?

18        **A.    I don't recall.**

19        Q.    Could someone else from your company like

20    Mr. Hough given it to them?

21        MR. STAMATIS:  Objection.  Calls for

22    speculation.  Foundation.

23        THE WITNESS:  I don't recall.

24

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 494

1  BY MR. DAVIS:

2      Q.   And how did you communicate with the

3  people at Rank Pop?

4      MR. STAMATIS:  Objection.  Foundation.

5      THE WITNESS:  Phone calls, e-mail.

6  BY MR. DAVIS:

7      Q.   Do you remember your contact at Rank Pop?

8      **A.   It kept changing.**

9      Q.   Any particular person that you dealt with

10  there?

11      **A.   No, not really.**

12      Q.   Do you have any type of written

13  documentation from Rank Pop in terms of the

14  services they were providing to you in terms of SEO

15  consulting?

16      **A.   It was mostly like Facebook posts and**

17  **things like that.**

18      Q.   Mr. Duke, do you know what the damages are

19  you're claiming from my client in this case?

20      MR. STAMATIS:  Objection.  Attorney-client

21  privilege.  Calls for legal conclusion.  If you can

22  answer without disclosing communications or the

23  content thereof with your lawyers, do so.

24  Otherwise, do not.

Page 495

1          THE WITNESS:  I cannot answer that without --

2    BY MR. DAVIS:

3          Q.   I take it then at the time of trial in

4    this case, you will be not offering any opinion of

5    your own as to what the damages are for your

6    company; is that correct?

7          MR. STAMATIS:  Same objection.

8          THE WITNESS:  My opinion would be what I'm

9    entitled to by law or by a jury or by a judge.

10   BY MR. DAVIS:

11         Q.   And you haven't done any of your own

12   independent calculation or assessment of those

13   damages as of today; is that correct?

14         MR. STAMATIS:  One second.  Read back the

15   question, please.

16                        (Whereupon, the record was

17                         read as requested.)

18         MR. STAMATIS:  You can answer.

19         THE WITNESS:  Independent, no.

20   BY MR. DAVIS:

21         Q.   And outside of your collaboration with

22   your lawyers in this case, have you done any kind

23   of assessment or calculation of your alleged

24   damages in this case?

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 496

1      **A.   I don't recall.**

2      Q.   And are you going to be using an expert in

3  this case for assisting you with your damage claim?

4      MR. STAMATIS:  Objection.  Attorney-client

5  privilege.  Don't answer.

6  BY MR. DAVIS:

7      Q.   Do you know who David Hass is from Stout

8  Risius Ross, Inc.?

9      **A.   I cannot answer.**

10     Q.   Have you ever spoken to Mr. Haas?

11     **A.   No.**

12     Q.   But you have heard of him?

13     **A.   No.**

14     MR. STAMATIS:  You can answer that.

15  BY MR. DAVIS:

16     Q.   And you've never heard of the firm Stout

17  Risius Ross, Inc. based in Chicago, Illinois?

18     **A.   It's not ringing a bell, no.**

19     Q.   Have you ever heard of someone named Brian

20  Brown from Crystal Lake, Illinois?

21     **A.   No.**

22     Q.   Have you ever heard of a person named

23  Michael J. Donohue from Jersey City, New Jersey?

24     **A.   No.**

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 497

1      Q.   I'm asking you those names because you've

2   identified them -- your company has identified them

3   as people you intend to call as expert witnesses at

4   the time of trial.  Are you aware of that?

5      MR. STAMATIS:  Objection.  Attorney-client

6   privilege.  Don't answer.

7      THE WITNESS:  I can't answer that.

8   BY MR. DAVIS:

9      Q.   And you don't have any personal

10   relationship with a person named Michael Donohue

11   from Jersey City, New Jersey?

12      **A.   Not that I'm aware of.**

13      Q.   Have you ever spoken to Michael J. Donohue

14   from Jersey City, New Jersey?

15      **A.   I've never heard of him, so no.**

16      Q.   The same answer for Brian R. Brown from

17   Crystal Lake, Illinois?

18      **A.   I've never heard of these people.  I've**

19   **never heard of Brian Brown.**

20      MR. DAVIS:  Go off the record for a minute.

21   Let me just look at my notes.

22      THE VIDEOGRAPHER:  Going off the record at

23   4:52.

24

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 498

1                    (Whereupon, a short break was

2                    taken.)

3        THE VIDEOGRAPHER:  Back on the record at 5:15.

4   BY MR. DAVIS:

5        Q.   Mr. Duke, would you agree that while my

6   client's trademark 21st Century Smoke was in your

7   company's website, it was a part of your company's

8   website metadata?

9        MR. STAMATIS:  Objection.  Calls for

10  speculation.  Foundation.  Answer it if you know.

11       THE WITNESS:  Looking over this stuff, I'm not

12  exactly sure that I'm clear what metadata is, so I

13  don't know.

14  BY MR. DAVIS:

15       Q.   And would you agree that while my client's

16  trademark, 21st Century Smoke, was in your

17  company's website that it was a keyword on your

18  company's website?

19       MR. STAMATIS:  Same objection.

20       THE WITNESS:  It appeared to have been a

21  keyword.

22  BY MR. DAVIS:

23       Q.   On your company's website?

24       **A.   To the best of my knowledge.**

Page 499

```
 1        Q.    Sorry.   On your website?
 2        A.    To the best of my knowledge, it appeared
 3   to have been a keyword on my company's website.
 4        Q.    On your company's website?
 5        A.    Yes.
 6        Q.    I just didn't hear the last part of what
 7   you said.
 8        A.    Yes.
 9        Q.    And would you agree that while my client's
10   trademark, 21st Century Smoke was in your company's
11   website, it was being used as a keyword on your
12   company's website?
13        MR. STAMATIS:   Objection.   Foundation.   Calls
14   for speculation.
15        THE WITNESS:   I would not agree that it was
16   being used.   Used infers knowledge of its
17   existence.   I don't feel that I used it or my
18   company used it when we didn't know it existed.
19   BY MR. DAVIS:
20        Q.    But while your website was publicly
21   available, the keywords were in it at the time you
22   were aware of, correct?
23        MR. STAMATIS:   Objection.   Calls for
24   speculation.
```

Page 500

1      THE WITNESS:  I don't know because I didn't

2    check it every day, so it may very well may have

3    been off and on.  I have no idea how often it was

4    on there.  I just don't know.

5    BY MR. DAVIS:

6      Q.   But at the times -- you are aware that

7    there were times that the terms 21st Century Smoke

8    were part of your company's website while it was

9    publicly available, correct?

10     **A.   That appears to be the case, yes.**

11     Q.   And at those times when it was publicly

12   available, the terms 21st Century Smoke would have

13   been part of the website that was analyzed by the

14   search engines for search engine rankings and

15   optimization; is that correct?

16     MR. STAMATIS:  Objection.  Foundation.  Calls

17   for speculation.

18     THE WITNESS:  I have no idea how search engines

19   work.

20   BY MR. DAVIS:

21     Q.   And did you personally investigate how my

22   client's trademark, 21st Century Smoke became part

23   of the metadata on your company's website?

24     MR. STAMATIS:  Objection.  Calls for

Page 501

1    speculation.  Calls for legal conclusion.  Contains

2    a legal conclusion.  Foundation.  Answer if you

3    can.

4         THE WITNESS:  To the best of my knowledge, I

5    inquired, and I was unable to determine it.

6    BY MR. DAVIS:

7         Q.   And did you ever ask Mr. Hough if he put

8    the terms 21st Century Smoke in your company's

9    website keywords?

10        **A.   Yes.**

11        Q.   And what did he say to you?

12        **A.   No.**

13        Q.   And did you share with him Mr. Hughes's

14   declaration?

15        **A.   I don't recall.  I don't believe so.**

16        Q.   Did you share with him the information you

17   had about all the instances where the terms 21st

18   Century Smoke appeared in the keywords of your

19   website as archived by the Wayback Machine?

20        MR. STAMATIS:  Objection.  Foundation.

21   Hearsay.  Calls for speculation.  Answer if you

22   know.

23        THE WITNESS:  I explained to him everything I

24   knew in terms of what I had seen.

# EXHIBIT 27

INTENTIONALLY OMITTED

# EXHIBIT 28

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

| | | |
|---|---|---|
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) | |
| | ) | |
| Plaintiffs/Counterclaimants, | ) | |
| | ) | |
| v. | ) | Case Number: 3:12 – cv – 50324 |
| | ) | |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) | Judge: Frederick J. Kapala |
| | ) | |
| Defendant/Counterclaim Defendant, | ) | Magistrate Judge: Iain Johnston |
| | ) | |
| 21 CENTURY SMOKING, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## DECLARATION OF KEERTI SARASWAT

I, KEERTI SARASWAT, of legal age, certify and state to the following, which is within my personal knowledge:

1.  My name is Keerti Saraswat and I currently live in central India, near New Delhi.

2.  I am involved in web development, and I am the owner and sole operator of Webrecsol. Webrecsol is a company that provides its clients with

1



website development and design services, internet marketing services, and SEO services.

3.    In or about 2008, 2009 and early, 2010, I worked with Brent Duke and 21 Century Smoking providing certain services, including web development and SEO consulting services for his company website "21CenturySmoking.com".

4.    My work for Mr. Duke and 21 Century Smoking ended in or about February of 2010 and this is reflected in my invoicing for 21 Century Smoking, Inc. A true and accurate copy of my last invoice to 21 Century Smoking, Inc. is attached hereto as Exhibit 1.

5.    I did not do any work of any kind on 21 Century Smoking's website after February of 2010, I did not make any changes to its website content, keywords or metadata after that month. In particular, neither in 2011 nor at any time did I or anyone acting on my behalf ever insert "21st Century Smoke" into the metadata of the 21 Century Smoking website.

6.    Over the years, Brent Duke and I communicated about his website and other, unrelated businesses. At no time did Brent Duke, or anyone acting on his behalf, ever ask me to insert "21st Century Smoke" into the metadata of the 21 Century Smoking website.

2



I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 13, 2018

Delhi, India

Keerti Saraswat

3

# Your Xoom Money Transfer Receipt X061839090949690

**Xoom Order Status Team**                                          ↰ Reply | ⌄

Sun 2/7/2010, 10:15 AM

You ⌄

xoom transactions

*last Paid Invoice*

XOOM - Global Money Transfer

Dear Brent Duke,

Thank you for using Xoom. We appreciate your business!

Xoom must get approval from your bank before sending the money to your recipient. When the electronic withdrawal is complete, we will notify you by email and send your transfer to our partner for Bank Deposit.

To view the current status of your transaction, visit Track your transaction

For Customer Service, visit Xoom.com/help or call 1-877-815-1531

## Transaction Details

| | |
|---|---|
| Xoom Tracking Number: | X061839090949690 |
| Transaction Date: | 6 February, 2010 10:44:10 AM PST |
| Amount Received: | 9,235.00 INR |
| Exchange Rate: | 46.1771 |
| Amount Sent: | 200.00 USD |

↰ Reply | ⌄       🗑 Delete     Junk | ⌄     •••

| | |
|---|---|
| Total Cost: | 202.99 USD |

## Recipient Details

Keerti Saraswat
2nd Floor, C-339, Sector-10

Noida

Uttar Pradesh

201301

India

## Sender Details

Brent Duke

2313 W. McLean

#1W

Chicago

Illinois

60647

United States

## Thanks again for using Xoom!

Refund claims must be submitted in writing by electronic mail, fax or U.S. mail. The request must at a minimum reference (a) the customer's name, (b) the beneficiary's name and country of residence, (c) the date of the transaction or the transaction number, (d) the dollar amount of the transaction, and (e) the reason for the refund. Refunds will not be provided if funds have already been disbursed to the recipient at the time this claim is processed.

Send your request by fax to 415-777-8690, or email to customerservice@xoom.com or by mail to 100 Bush St. Suite 300, San Francisco, CA 94104-3908 USA. Oral cancelation requests will not be accepted.

Refunds will be made in the same form of payment originally made. Refunds will only be made in U.S. dollars.

About Xoom Privacy and Security | User Agreement | Privacy Policy | Affiliates | Site Map | About Us | Locations

Copyright © 2001-2010 Xoom Corporation. All rights reserved.



# EXHIBIT 29

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| DR DISTRIBUTORS, LLC, and CB DISTRIBUTORS, INC. | ) |
| | ) |
| Plaintiffs/Counterclaimant, | ) |
| | ) |
| v. | ) |
| | ) |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) Case No. 3:12-cv-50324 |
| | ) |
| | ) Judge Thomas M. Durkin |
| Defendant/Counterclaim Defendant | ) |
| | ) Magistrate Judge Iain Johnston |
| | ) |
| 21 CENTURY SMOKING, INC., | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| v. | ) |
| | ) |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) |
| | ) |
| | ) |
| Counterclaim Defendants. | ) |

## DEECLARATION OF BRIAN BROWN

I, BRIAN R. BROWN, state subject to penalties of perjury that I have personal knowledge of the following information and if called to testify, would testify competently and truthfully as follows:

1.          I previously submitted a 91-page Expert Report, dated March 25, 2016 (referred to herein as SEO Report"), to this Court on January 15, 2018. (See Docket No. 218-29). It is referred to at pages 31 and 33 of Plaintiffs' Memorandum in Support of Renewed Motion for Sanctions, which I am informed by current defense counsel is Docket No. 294.

1

2.    I have read and considered pages 31through 33 of Plaintiffs' Memorandum in Support of Renewed Motion for Sanctions, including reading and considering Moffitt Decl. Exh. HH and Moffitt Decl. EX A at 63527-63529, both of which are cited therein and are attached to this Declaration.

3.    Upon my review and consideration, neither Moffitt Decl. Exh. HH, or Moffitt Decl. EX A at 63527-63529, convince me that I need to amend or supplement my findings or opinions set forth in my SEO Report, including but not limited to the following opinions contained at pages 12 of 91 and 13 of 91 of my SEO Report:

- Mr. Duke Was Neither Capable Nor Had He Demonstrated the Skills or Knowledge Required to Manually Modify the Meta Tags

- There Is No Evidence of Mr. Duke Modifying Meta Tags in Zen Cart

- There Is No Evidence That Defendants Added the "21st Century Smoke" Text, Provided It to Anyone Else, or Instructed Anyone to Include It

- The Meta Keywords Tag Is Not Specific to Search Engines Nor Was It Used by Search Engines for Ranking

- The Meta Description Tag Was Not Used by Search Engines for Search Result Ranking

- There Is No Evidence that Searchers Saw the "21st Century Smoke" Text in Search Results for 21centurysmoking.com or Clicked on Search Results for 21centurysmoking.com Because of It.

- No Evidence That the "21st Century Smoke" Text Was Used in Title Tags

- Defendants Demonstrated No Effort to Optimize for the "21st Century Smoke" Text

FURTHER AFFIANT SAYETH NOT.

Dated: _____          _____
                                   Brian R. Brown

# ILLINOIS NOTARY ACKNOWLEDGMENT

State of Illinois

County of _Mc Henry_

This instrument was acknowledged before me on _____ (date) by

_Brian B Brown_ (name of person acknowledged).

(Seal)

RONALD BRYAR
Official Seal
Notary Public - State of Illinois
My Commission Expires Mar 8, 2022

_____
(Signature of person taking acknowledgment)

_____
(Title or rank)

_____
(Serial number, if any)

3

# Exhibit HH

# Re: titles and descriptions

| | |
|---|---|
| **From:** | Brent Duke <brentduke@yahoo.com> |
| **To:** | Otis Chandler <otis@goodreads.com> |
| **Date:** | Wed, 08 Apr 2009 19:58:18 -0500 |

Thanks for the tips man...I appreciate it.

So the other thing you were saying was like put the actual cigarette options inside a folder called electronic cigarette so that the link contains that name? so like www.21centurysmoking.com/electronic-cigarette/blackjack.php

As opposed to now, www.21centurysmoking.com/blackjack.php

Is this what you were saying?

b

---

**From:** Otis Chandler <otis@goodreads.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, April 8, 2009 5:58:29 PM
**Subject:** titles and descriptions

Make sure you have really good meta-descriptions and titles. You can see your titles and descriptions here:

http://www.google.com/search?q=site%3A21centurysmoking.com&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a

---

my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown

DOC-000000096_0001

Confidential                                                      21C 1000235

Re: titles and descriptions Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 312 of 732 PageID #:13008

# Re: titles and descriptions

| | |
|---|---|
| **From:** | Brent Duke <brentduke@yahoo.com> |
| **To:** | Otis Chandler <otis@goodreads.com> |
| **Date:** | Wed, 08 Apr 2009 22:04:20 -0500 |

i will absolutely do this...i'm loving it big o...

would it matter how high my blog ranks, or just so long as links are coming from somewhere?

b

---

**From:** Otis Chandler <otis@goodreads.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, April 8, 2009 8:13:03 PM
**Subject:** Re: titles and descriptions

Exactly. Google will then know that you really want to rank for "electronic cigarette" queries.

I also think she's putting too many keywords in your titles, but she might know better...

You might want to consider making a blog that talks about electronic cigarettes and links to your site a lot. Google loves new content - it factors much more into their algorithm than people think...

O

—
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown

On Wed, Apr 8, 2009 at 5:58 PM, Brent Duke <brentduke@yahoo.com> wrote:
Thanks for the tips man...I appreciate it.

So the other thing you were saying was like put the actual cigarette options inside a folder called electronic cigarette so that the link contains that name? so like www.21centurysmoking.com/electronic-cigarette/blackjack.php

As opposed to now, www.21centurysmoking.com/blackjack.php

Is this what you were saying?

b

---

**From:** Otis Chandler <otis@goodreads.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, April 8, 2009 5:58:29 PM
**Subject:** titles and descriptions

DOC-000000097_0001

Confidential                                                                 21C 1000236

Re: titles and descriptions

Make sure you have really good meta-descriptions and titles. You can see your titles and descriptions here:

http://www.google.com/search?q=site%3A21centurysmoking.com&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a

--
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown

Confidential

# Fw: titles and descriptions

| | |
|---|---|
| **From:** | Brent Duke <brentduke@yahoo.com> |
| **To:** | kirti@webrecsol.com |
| **Date:** | Thu, 09 Apr 2009 08:35:51 -0500 |

here is an email from otis..i don't know if he is right about this stuff, just thought i'd pass it along..i showed him the site yesterday.

----- Forwarded Message ----
From: Otis Chandler <otis@goodreads.com>
To: Brent Duke <brentduke@yahoo.com>
Sent: Wednesday, April 8, 2009 8:13:03 PM
Subject: Re: titles and descriptions

Exactly. Google will then know that you really want to rank for "electronic cigarette" queries.

I also think she's putting too many keywords in your titles, but she might know better...

You might want to consider making a blog that talks about electronic cigarettes and links to your site a lot. Google loves new content - it factors much more into their algorithm than people think...

O

--
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown


On Wed, Apr 8, 2009 at 5:58 PM, Brent Duke <brentduke@yahoo.com> wrote:

Thanks for the tips man...I appreciate it.

So the other thing you were saying was like put the actual cigarette options inside a folder called electronic cigarette so that the link contains that name? so like www.21centurysmoking.com/elextronic-cigarette/blackjack.php

As opposed to now, www.21centurysmoking.com/blackjack.php

Is this what you were saying?

b


From: Otis Chandler <otis@goodreads.com>
To: Brent Duke <brentduke@yahoo.com>
Sent: Wednesday, April 8, 2009 5:58:29 PM
Subject: titles and descriptions

Make sure you have really good meta-descriptions and titles. You can see your titles and descriptions here:

DOC-000000098_0001

Confidential                                                                 21C 1000238

# Exhibit A

3/17/2018                                      Print Window

Re: google

kirti@webrecsol.com
brentduke@yahoo.com
Thursday, June 25, 2009, 9:42:36 AM PDT

Hi Brent,

You can upload Google analytics code at FTP from your side with your email
id, then it will work fine. if still it doesn't work out then let me know
you have to remove existing google analytics file from server and upload
new one.

Everything is done on sportsdoctrine whatever you asked for, just one
thing is remaining that is Facebook integration rest everything is done
and all modifications also before 3-4 months and with all modifications
it's uploaded on your server also.

And regarding facebook application you can check it out tomorrow.

Thanks,
Kirti


>
> i need to know what on earth you did to google analytics if you did
> anything. i use that all of the time to figure out how to get traffic to
> the site and it has been working great, and now it isn't working anymore.
> i need to know what was changed.
> and i need to know what is going on with sportsdoctrine. you haven't
> gotten back to me and it has been close to a month. this has now almost
> taken 2 years to complete and cost 8k.. i still don't have one of the
> first things i asked for.
>
>
>
>

--
Thanks & Best Regards,
Kirti Saraswat
WEBRECSOL LTD. (Mc Aska Group of Company)
kirti@webrecsol.com
www.webrecsol.com

CONFIDENTIAL RESTRICTED - OUTSIDE COUNSEL ONLY        21C 63527

3/17/2018                                    Print Window

## Re: hi

kirti@webrecsol.com
brentduke@yahoo.com
Friday, June 26, 2009, 12:48:09 AM PDT

Hi Brent,

have a look at centurysmoking analytics code now and please let me know if
it's working fine. well we were confuse that on which index page you added
right code so we just used index.php codes.

>
> please let me know as soon as possible...i put in the correct code, and
> yet certain pages are still just not showing hits. please fix the problem.
>
> the code on the index page is proper. i believe.
>
>
> ----- Original Message ----
> From: "kirti@webrecsol.com" <kirti@webrecsol.com>
> To: Brent Duke <brentduke@yahoo.com>
> Sent: Thursday, June 25, 2009 2:13:53 PM
> Subject: Re: hi
>
> OKay Brent i will check this out tomorrow & Get back to you
>
>
>>
>> everything seems to be going fine with the seo work...let me know when
>> you
>> have the facebook app ready..
>>
>> and can you please make sure that analytics is working...i put the code
>> on
>> the first page, but it looks like there is some kind of code on every
>> single page? all of that is wrong?
>>
>>
>>
>>
>
>
> --
> Thanks & Best Regards,
> Kirti Saraswat
> WEBRECSOL LTD. (Mc Aska Group of Company)
> kirti@webrecsol.com
> www.webrecsol.com
>
>
>
>

--
Thanks & Best Regards,
Kirti Saraswat

CONFIDENTIAL RESTRICTED - OUTSIDE COUNSEL ONLY        21C 63528

3/17/2018                                                      Print Window

WEBRECSOL LTD. (Mc Aska Group of Company)
info@webrecsol.com
www.webrecsol.com

2/2

CONFIDENTIAL RESTRICTED - OUTSIDE COUNSEL ONLY      21C 63529

w: titles and descriptions

http://www.google.com/search?q=site%3A21centurysmoking.com&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a

--
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown

DOC-000000098_0002

Confidential                                                      21C 1000239

# EXHIBIT 30

Case: 3:12-cv-50324 Document #: 132 Filed: 06/11/15 Page 1 of 1 PageID #:3534

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6,1
### Western Division

DR Distributors, LLC

                        Plaintiff,

v.
                                                Case No.: 3:12−cv−50324

                                                 Honorable Frederick J. Kapala

21 Century Smoking, Inc., et al.

                        Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, June 11, 2015:

      MINUTE entry before the Honorable Iain D. Johnston: Motion hearing held on 6/11/2015. Plaintiff's motion to compel [126] is granted in part and denied in part. By 6/15/2015, defendants shall provide complete answers to the interrogatories and produce the requested documents as explained in open court. The objections raised by the defendants in their supplemental responses are stricken. Plaintiff's request for fees and costs is denied. Defendants motion to compel [127] is granted in part. Plaintiff shall produce the documents as agreed to in open court. Defendant withdraws the remainder of the motion. Defendant's request for fees and costs is denied. Telephonic status hearing remains set for 7/2/2015 at 9:00 AM. (yxp, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# EXHIBIT 31

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC, <br><br>         Plaintiff/Counter-Defendant, <br><br> v. <br><br> 21 CENTURY SMOKING, INC., and BRENT DUKE, <br><br>         Defendants/Counterclaimant, <br><br> v. <br><br> CB DISTRIBUTORS, INC., and CARLOS BENGOA, <br><br>         Counter-Defendants/Counterclaimants. | **Case Number:** 3:12 – cv – 50324 <br><br> **Judge:** Frederick J. Kapala <br><br> **Magistrate Judge:** Iain D. Johnston <br><br> **DECLARATION OF BRIAN E. MOFFITT IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR SANCTIONS** |

I, BRIAN E. MOFFITT, of full age, certify and state as follows:

1.     I am an attorney at law of the States of New Jersey and New York, and I am of counsel to the law firm of Nicoll Davis & Spinella LLP, counsel for Plaintiff/Counter-Defendant DR Distributors, LLC ("DR"), and Counter-Defendants/Counterclaimants CB Distributors, Inc. ("CB") and Carlos Bengoa ("Mr. Bengoa") (collectively the "Plaintiffs") in the above-captioned matter.

2.     I submit this Declaration in support of Plaintiffs' Renewed Motion for Sanctions.

3.     Attached hereto as Exhibit A is a true and correct copy of a March 19, 2018 e-mail sent by Defendants' counsel attaching and commenting upon documents produced by Defendants on that date as 21C 63515 – 63626.

4.     My review of 21C 63515 – 63626, attached hereto as Exhibit A, as produced by Defendants on March 19, 2018, has revealed that the subject range includes one e-mail string involving

{00485216 - 2}

Frank Gu (21C 63610-63626), six other e-mails and e-mail strings exchanged by Kirti Saraswat of Webrecsol

and Brent Duke using Duke's support@21centurysmoking.com address, and 49 other emails or e-mail strings

exchanged by Saraswat and Duke using Duke's BrentDuke@yahoo.com account. All of the Saraswat-related

e-mails contain at least one of Plaintiffs' 2014 search terms, such as "Webrecsol" and/or "keyword." The

Saraswat emails appear in chronological order in Defendants' production, with the exception of one June 29,

2012 e-mail (21C 63530 – 63532) that appears in that chronology as though it were sent on June 29, "2010,"

rather than its actual date of 2012. With that exception, Defendants' March 19, 2018 chronological production

of Saraswat e-mails begins with a March 31, 2009 e-mail and ends with an April 29, 2010 e-mail.

     5.     Upon reviewing Defendants' June 1, 2018 production, I discovered that Defendants

had not, on March 19, 2018, produced 34 e-mails and e-mail strings that had been exchanged

between Defendants and Saraswat prior to March 31, 2009, nor had they produced two other e-mails

pre-dating March 31, 2009 from Duke to himself setting forth the content of his online chats with

Saraswat.[1] Defendants' June 1, 2018 production also included an additional 29 e-mails and e-mail

strings post-dating Defendants' alleged final communication with Saraswat on April 29, 2010, and

those 29 e-mails and e-mail strings were not included in Defendants' March 19, 2018 production.[2]

Those 29 e-mails range between May 13, 2010 and March 10, 2013, and consist of 26 e-mails and

e-mails strings between Duke and Saraswat, as well a Duke e-mail to himself setting forth an online

chat between them, as well as two other documents regarding Saraswat. In addition, Defendants'

June 1, 2018 production included another 44 e-mails or e-mail attachments exchanged between Duke

_____

[1] 21C 1000001, 100002, 1000004-1000016, 1000017, 1000018, 1000019, 1000020, 1000021, 1000022, 1000023, 1000034-1000036, 1000037, 1000039, 1000040, 1000041, 1000042, 1000043, 1000047, 1000148, 1000167, 1000168, 1000169, 1000170, 1000171-1000172, 1000173, 1000196-1000197, 1000203, 1000204, 1000208, 1000209, 1000210, 1000211, 1000212-1000213, 1000214-1000216, 1000217, 1000218, 1000219.
[2] 21C 1001342, 1001343, 1001344, 1001345, 1001346, 1001347-1001348, 1001349-1001350, 1001351-1001352, 1001353-1001374, 1001951-1001953, 1002488, 1003751, 1003752, 1003950-1003951, 1003952, 1003953, 1003954, 1003955, 1003956, 1003957, 1003958, 1003959-1003960, 1003961-1003962, 1003963-1003964, 1003971-1003973, 1003974-1003976, 1004003-1004006, 1005730-1005734, 1005720-1005724.

and Saraswat during the period March 31, 2009 and April 29, 2010,[3] or regarding such communications, yet which were not included in Defendants' March 19, 2018 production. Accordingly, on March 19, 2018, while producing 112 pages, Defendants withheld a total of 109 e-mails that hit Plaintiffs' ESI search terms, including the searchs term "Webrecsol" and/or "keyword."

6.      Attached hereto as Exhibit B is a true and correct copy of a June 1, 2009 e-mail string produced by Defendants on March 19, 2018 as 21C 63520.

7.      Attached hereto as Exhibit C is a true and correct copy of a June 25, 2009 e-mail string produced by Defendants on March 19, 2018 as 21C 63527.

8.      Attached hereto as Exhibit D is a true and correct copy of an August 17, 2009 and September 8, 2009 e-mail string produced by Defendants on March 19, 2018 as 21C 63551 - 65552.

9.      Attached hereto as Exhibit E is a true and correct copy of a September 21, 2009 e-mail string produced by Defendants on March 19, 2018 as 21C 63557.

10.     Attached hereto as Exhibit F are true and correct copies of a November 24, 2009 and December 4, 2009 e-mail string and December 15, 2009 string produced by Defendants on March 19, 2018 as 21C 63572 - 63574.

11.     Attached hereto as Exhibit G is a true and correct copy of a December 23, 2009 e-mail string produced by Defendants on March 19, 2018 as 21C 63579.

---

[3] 21C 1000224-1000225, 1000226, 1000227, 1000228, 1000229-1000230, 1000231-1000232, 1000233-1000234, 1000238-1000239, 1000270, 1000272 (top e-mail), 1000281-1000282, 1000283, 1000284, 1000286, 1000289-1000291, 1000305, 1000306, 1000310, 1000323 (top e-mail), 1000387, 1000390-1000391, 1000458, 1000469-1000471, 1000472, 1000473, 1000501, 1000511-1000512 (top e-mail), 1000513-1000514 (top e-mail), 1000515-1000516 (top e-mail), 1000519, 1000520, 1000521-1000525, 1000591-1000595 (top e-mail), 1000614-1000615 (top e-mail), 1000617-1000620, 1000636-1000638, 1000639-1000641, 1000689-1000695, 1000703, 1000886, 1000921 (top e-mail), 1000944-1000950, 1000955-1000956, 1000967-1000974.

{00485216 - 2}                                                                   3

12.     Attached hereto as Exhibit H is a true and correct copy of a January 2010 e-mail string produced by Defendants on March 19, 2018 as 21C 63583 - 63584.

13.     Attached hereto as Exhibit I is a true and correct copy of an April 29, 2010 e-mail string produced by Defendants on March 19, 2018 as 21C 63609.

14.     Attached hereto as Exhibit J is a true and correct copy of a June 2012 e-mail string produced by Defendants on March 19, 2018 as 21C 63530 - 63532.

15.     Attached hereto as Exhibit K is a true and correct copy of a March 2013 e-mail string produced by Defendants on June 1, 2018 as 21C 1005720 -1005724, together with the ESI version of the document.

16.     Attached hereto as Exhibit L is a true and correct copy of a March 2013 e-mail string produced by Defendants on June 1, 2018 as 21C 1005730 -1005734, together with the ESI version of the document.

17.     Attached hereto as Exhibit M is a true and correct copy of a March 2009 document produced by Defendants on June 1, 2018 as 21C 10000208 - 10000209.

18.     Attached hereto as Exhibit N is a true and correct copy of a June 2009 e-mail string produced by Defendants on June 1, 2018 as 21C 10000310.

19.     Attached hereto as Exhibit O is a true and correct copy of a July 31, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 10000519.

20.     Attached hereto as Exhibit P is a true and correct copy of an August 1, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 10000520.

21.     Attached hereto as Exhibit Q is a true and correct copy of a September 13, 2010 document produced by Defendants on June 1, 2018 as 21C 1001951 - 1001953. This document contains two and a half pages of back and forth between Duke and Saraswat regarding work on his

website and SEO. Among other topics, Saraswat and Duke discussed: his ranking in SEO for "buy electronic cigarettes" and various other terms; their review of search analytics; being in first place for the search term "blackjack electronic cigarette;" lack of improvement in rankings for non-company keywords; the issue of whether searchers know who 21CS is before they perform a search; the problem of their failure to get hits for terms where people do not already know who 21CS is; their earlier work finalizing keywords; Saraswat's plan in September 2010 to update keyword lists; that Duke felt he was selling "Blackjack" and no one else was; Saraswat's intent, going forward, to target only specific keywords; Duke's statement that "right now most hits are from our stores and people going online and looking up our company;" and Saraswat's instructions to Duke to create more SEO related articles to post.

22.     Attached hereto as Exhibit R is a true and correct copy of Exhibit 5 to the May 13, 2016 deposition of Defendants' expert Brian Brown, which he identified as his notes of his conversation with Brent Duke.

23.     Attached hereto as Exhibit S are true and correct copies of relevant excerpts from the June 16, 2015 deposition of Brent Duke.

24.     Attached hereto as Exhibit T are true and correct copies of relevant excerpts from the June 17, 2015 deposition of Brent Duke.

25.     Attached hereto as Exhibit U are true and correct copies of relevant excerpts from the June 29, 2015 deposition of William Edmiston.

26.     Attached hereto as Exhibit V is a true and correct copy of a September 10, 2013 e-mail string produced by Defendants on June 1, 2018 as 21C 1007876 - 1007877.

27.     Attached hereto as Exhibit W is a true and correct copy of an October 2, 2013 e-mail produced by Defendants on June 1, 2018 as 21C 1007924 - 1007925. It attaches a 5.27 MB ".MOV"

file that was not produced with Defendants June 1, 2018 production, but which I was able to access via Defendants ESI production.

28.      Attached hereto as Exhibit X is a true and correct copy of an October 4, 2014 e-mail string produced by Defendants on June 1, 2018 as 21C 1013062.

29.      Attached hereto as Exhibit Y is a true and correct copy of a September 30, 2014 e-mail string produced by Defendants on June 1, 2018 as 21C 1013015.

30.      Attached hereto as Exhibit Z is a true and correct copy of an October 4, 2014 e-mail string produced by Defendants on June 1, 2018 as 21C 1013068.

31.      Attached hereto as Exhibit AA is a true and correct copy of a January 26, 2015 e-mail which was first produced by Defendants on May 31, 2018 as part of their ESI, but which is not found in their June 1, 2018 Bates-numbered production.

32.      Attached hereto as Exhibit BB is a true and correct copy of Exhibit J to the June 29, 2015 deposition of William Edmiston. It was produced by Defendants during discovery as 21C 62840-62849.

33.      Attached hereto as Exhibit CC is a true and correct copy of a May 23-25, 2012 e-mail string produced by Defendants on June 1, 2018 as 21C 1002946 - 1002947.

34.      Attached hereto as Exhibit DD is a true and correct copy of a February 4, 2012 e-mail produced by Defendants on June 1, 2018 as 21C 1002518.

35.      Attached hereto as Exhibit EE is a true and correct copy of a document as produced by Defendants during discovery as 21C 0431 – 0454.

36.      Attached hereto as Exhibit FF is a true and correct copy of a February 10, 2013 document produced by Defendants on June 1, 2018 as 21C 1005533 - 1005558.

37.    Attached hereto as Exhibit GG are true and correct copies of relevant excerpts from the June 23, 2015 30(b)(6) deposition of Brent Duke.

38.    Attached hereto as Exhibit HH are true and correct copies of April 8-9, 2009 e-mail strings produced by Defendants on June 1, 2018 as 21C 1000235 - 1000239.

39.    Attached hereto as Exhibit II is a true and correct copy of a January 2012 e-mail string produced by Defendants on June 1, 2018 as 21C 1002509 - 1002510, together with the ESI version of the document.

40.    Attached hereto as Exhibit JJ is a true and correct copy of Exhibit 15 to the June 17, 2015 deposition of Brent Duke.

41.    Attached hereto as Exhibit KK is a true and correct copy of a January 8, 2009 document produced by Defendants on June 1, 2018 as 21C 1000004 - 1000016.

42.    Attached hereto as Exhibit LL is a true and correct copy of a July 24, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000474 - 1000500.

43.    Attached hereto as Exhibit MM is a true and correct copy of an August 3, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000526 - 1000586.

44.    Attached hereto as Exhibit NN is a true and correct copy of a September 3, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000650 - 1000654.

45.    Attached hereto as Exhibit OO is a true and correct copy of an October 6, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000697 - 1000702.

46.    Attached hereto as Exhibit PP is a true and correct copy of an October 7, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000713 - 1000719.

47.    Attached hereto as Exhibit QQ is a true and correct copy of an October 9, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000728 - 1000730.

48.     Attached hereto as Exhibit RR is a true and correct copy of an October 9, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000731 - 1000734.

49.     Attached hereto as Exhibit SS is a true and correct copy of an October 9, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000735 - 1000736.

50.     Attached hereto as Exhibit TT is a true and correct copy of an October 11, 2009 e-mail string produced by Defendants on June 1, 2018 as 21C 1000737 - 1000800.

51.     Attached hereto as Exhibit UU is a true and correct copy of a February 6, 2010 e-mail produced by Defendants on June 1, 2018 as 21C 1001077 - 1001140.

52.     Attached hereto as Exhibit VV is a true and correct copy of a December 18, 2009 e-mail produced by Defendants on June 1, 2018 as 21C 1000957 - 1000958.

53.     Attached hereto as Exhibit WW is a true and correct copy of a June 4, 2012 e-mail string produced by Defendants on June 1, 2018 as 21C 1003095 -1003099, together with the ESI version of the document.

54.     Attached hereto as Exhibit XX is a true and correct copy of Defendants' November 26, 2012 Initial Disclosures.

55.     Attached hereto as Exhibit YY is a true and correct copy of an email string regarding Defendants' November 26, 2012 Initial Disclosures.

56.     Attached hereto as Exhibit ZZ is a true and correct copy of relevant excerpts from Defendant 21 Century Smoking, Inc.'s February 15, 2013 Response to DR Distributors, LLC's First Set of Interrogatories.

57.     Attached hereto as Exhibit AAA is a true and correct copy of a February 13, 2013 e-mail produced by Defendants on June 1, 2018 as 21C 1005570 -1005571.

58.     Attached hereto as Exhibit BBB is a true and correct copy of the most recent privilege log produced by Defendants, encompassing their June 1, 2018 production.

59.     My review of Defendants' 2013 through 2015 productions reveals that Defendants were, during discovery, able to locate and produce over one hundred "sent" e-mails from Duke's support@21centurysmoking.com e-mail account, despite Defendants' current claim that such e-mails had already been "auto-purged" up to three years before the litigation commenced in 2012. The year of authorship, and quantity of the above-referenced sent e-mails, by year, is as follows:

1. 2009: 11
2. 2010: 65
3. 2011: 19
4. 2012:  6
5. 2013:  6 (with five of those no later than March of that year).

60.     The Bates numbers of the e-mails referenced in the preceding paragraph are as follows: 21C 81-82, 83, 84-141, 151-154, 261-263, 342-343, 398, 399, 408, 572, 615-616, 748-750, 767, 768, 1839-1840, 52613-52615, 52617-52618, 52622-52624, 52635-52637, 52638, 52660, 52661, 52662, 52663-52707, 52708, 52709, 52710, 52711, 52712-52732, 52733-52753, 52754-52774, 52775-52795, 52796-52807, 52808, 52809, 52810, 52811, 52812, 52813, 52814, 52815, 52816, 52818, 52819-52824, 52831, 52832-52840, 52841-52844, 52845, 52846, 52847, 52860-52861, 52862-52868, 52869, 52870-52871, 52872-52903, 52915-52916, 52917-52918, 52919, 52920-52921, 52922, 52923-52924, 52939, 52940, 52941, 52942, 52943, 52944, 52945, 52946-52948, 52949, 52950, 52976-52978, 52979-52980, 52981-52983, 53398, 53479, 53508, 53510, 53518-53519, 54625-54626, 54627, 54629, 54630-54631, 54654, 54655, 54662, 54672, 54673, 54674, 54675, 54676, 54679-54680, 54681, 54692, 54693, 54694, 54695, 54696, 54697, 54698, 54758, 54759, 54784, 54806-54807, 54847, 54865, 54869, 54870, 54881, and 54908-54909.

61.     A search of Defendants' May 31, 2018 ESI production in native format for "bduke@21centurysmoking.com" reveals that 1,751 e-mails in that May 31 production were addressed "to" bduke@21centurysmoking.com, with that address being "cc'd" on another 780 such e-mails, for a total of 2,531 such e-mails.

62.     A search of Defendants' May 31, 2018 ESI production in native format for communications between Duke and Frank Gu reveals that such communications took place between 2009 through at least 2015. A search of that production for communications between Duke and Kirti Saraswat reveals that such communications took place between 2009 through at least 2013.

63.     Attached hereto as Exhibit CCC is a true and correct copy of a June 12, 2015 e-mail from Defendants' counsel, Travis Life, Esq.

64.     Attached hereto as Exhibit DDD is a true and correct copy of relevant e-mails from Defendants' March 19, 2018 production, which reference the existence of online chat communications between Brent Duke and Kirti Saraswat of Webrecsol. These e-mails include:

- o   21C 63552 - Duke: "kirti, I urgently need your help..can you please come online sometime soon? paypal has shut down my account and I need help installing a shopping cart…"

- o   21C 63572 - Kirti: "Hi Brent, can you please come online today so we can chat and i can tell you how to place my email id…", and Duke response: "… so if you want to come online and show me you can, but I didn't see you here th times I logged on today."

- o   21C 63574 - Kirti: "… Also can you please come online at yahoo i need to discuss with you regarding the site changes…."

- o   21C 63530 - Kirti: "Are you not online at any messenger? We can chat…."

65.     Attached hereto as Exhibit EEE is a true and correct copy of relevant e-mails from Defendants' June 1, 2018 production, which reference the existence of online chat communications between Brent Duke and Kirti Saraswat. These e-mails include:

- 21C 1000018 – Duke: "you coming online today? … buzz me if you do!"

- 21C 1000004 – 1000016: "Our chat on Thu, 1/8/09 3:18 PM … chat with seo examples of kirti"

- 21C 1000148 - Duke: "from chat after you left…"

- 21C 1000167 – Duke: "where are you…you asked for money all last night and now you are not getting online?"

- 21C 1000170 – Duke: "are you coming online?"

- 21C 1000173 – Duke: "can you come online… is there some reason why you aren't coming online? … i sent you an email that had the ftp details, and until you come online, this site is never going to be up."

- 21C 1000208 – 1000209: "Our chat on Mon, 3/16/09 1:48 PM"

- 21C 1000211 – Duke: "it looks like you are online, but you aren't responding to my messages…i need some help with the headers on my site…"

- 21C 1000218 – Duke: "i couldn't hear you on the phone at all…"

- 21C 1000219 – Duke: "can you come online when you get a chance?"

- 21C 1000283 - Duke: "I don't see you online anymore,…"

- 21C 1000655 - Duke: "kirti, I urgently need your help..can you please come online sometime soon? paypal has shut down my account and I need help installing a shopping cart…"

    o   21C 1000938 - Kirti: "Hi Brent, can you please come online today so we can chat and I can tell you how to place my email id…"

    o   21C 1001351 - Kirti: "…i can't attach all those files through emails, so could you please come online at g-talk so that I can send you through g-talk…"

    o   21C 1001951 – 1001953: "Our chat on Mon, 9/13/10 7:45 PM"

    o   21C 1003752 - Kirti: "Are you not online at any messenger? We can chat…."

66.    My electronic search of Defendants' May 31, 2018 ESI production, as sourced from Duke's BrentDuke@yahoo.com account, resulted in 181 hits on support@21centurysmoking.com in the top, or most recent, e-mail in a given e-mail chain. Of those 181 hits, support@21centurysmoking.com appeared in the "from" field 129 times, in the "to" field 45 times, and in the "cc" field 7 times.

67.    The hits in the "from" field are found in Defendants' June 1, 2018 paper/Bates-numbered production at 21C 1001438, 1001992-1001994, 1001997, 1002002, 1002003, 1002067, 1002068, 1002074-1002076, 1002077-1002078, 1002081, 1002110, 1002179, 1002183, 1002257-1002261, 1002496, 1002499, 1002501-1002503, 1002504, 1002696, 1002808, 1002886-1002888, 1002889, 1003051-1003070, 1003167, 1003993, 1004020, 1004025, 1004037-1004038, 1004306-1004308, 1004315-1004317, 1004339-1004340, 1004341-1004343, 1004363, 1004784-1004786, 1004787-1004789, 1004790-1004791, 1004836-1004837, 1004838-1004840, 104881-1004884, 1004892-1004894, 1005155-1005157, 1005260-1005261, 1005533-1005558, 1005696-1005697, 1005735, 1006344, 1006945-1006946, 1007273-1007282, 1007368-1007371, 1007372-1007379, 1007381-1007384, 1007385-1007388, 1007393-1007396, 1007567-10017569, 1007574-1007578, 1007579-1007580 (Redacted), 1007584-1007586 (Redacted), 1007589-1007590 (Redacted), 1007591-1007592 (Redacted), 1007596-1007598 (Redacted), 1007605-1007607, 1007608-

1007610, 1007625-1007626 (Redacted), 1007627-1007628, 1007639, 1008070-1008071, 1008077-1008079, 1008114-1008115, 1008248, 1008251-1008252, 1008332-1001008338, 1008392-1008394, 1008454-1008462, 1008695, 1008730, 1009366-1009370, 1009527-1009530, 1009793-1009796, 1009813-1009816, 1009858-1009859, 1009922, 1009949-1009950, 1009951-1009952, 1009953-1009954, 1009955-1009956, 1009958-1009959, 1009962-1009963, 1009975-1009976, 1009988-1009989, 1010173-1010174, 1010271-1010272, 1010280-1010281, 1010610-1010611, 1010758, 1010952-101953, 1011077-1011078, 1011088-1011089, 1011189 (Redacted), 1011190-1011192, 1011193-1011194 (Redacted), 1011753-1011755, 1011766-1011767, 1011775-1011776, 1012268-1012279, 1012415-1012416, 1012619-1012620, 1012621-1012623, 1013129-1013130, 1013279-1013280, 1013286-1013287, 1013288-1013289, 1013345-1013346, 1013550-1013552, 1014036-1014040, 1014117-1014118, 1014242-1014243, 1014282-1014283, 1014456-1014457, 1014498-1014499, 1014500-1014501, 1015045-1015052, 1015053-1015078, 1015079-1015108, 1015297-1015299, 1015300-1015303, 1015304-1015305, 1015306-1015308, 1015553-1015556, 1015557, 1015712-1015713, 1015865, 1015869-1015870, 1015871.

68.     The hits in the "to" field are found in Defendants' June 1, 2018 paper/Bates-numbered production at 21C 1001353, 1001414, 1001925-1001926, 1001969-1001970, 1002071-1002073, 1002170, 1002214-1002215, 1002500, 1002511, 1002921, 1003222, 1003843, 1003857-1003859, 1003928-1003930, 1003943, 1004899-1004902, 1004927-1004928, 1004961, 1005159, 1005179, 1007577-1007578, 1007581-1007583 (Redacted), 1007587-1007588 (Redacted), 1007593-1007595 (Redacted), 1007917-1007920, 1007946, 1008062, 1008072, 1008135-1008139, 1008445-1008453, 1008475-1008485, 1008517, 1009375, 1009661, 1009957, 1009960-1009961, 1009965, 1009966, 1010273-1010274, 1010275, 1015860-1015864.

69.    The hits in the "CC" field are found in Defendants' June 1, 2018 paper/Bates-numbered production at 21C 1002774-1002775, 1003871-1003874, 1003875-1003878, 1004050, 1004265-1004266.

70.    The hits in more than one field are found in Defendants' June 1, 2018 paper/Bates-numbered production at 21C 1001415 (From and To).

71.    Accompanying Defendants' June 1, 2018 Bates-stamped, paper production was a letter, a true copy of which is attached hereto as Exhibit FFF, in which Defendants' counsel, Peter Stamatis, wrote: "As we previously advised, we did not print the spam emails that the search terms generated, though they should appear in the digital files we sent today."

72.    Earlier, during a May 17, 2018 Court conference, Stamatis stated to the Court that the ESI documents that were not printed and Bates-numbered by Defendants in assembling their June 1, 2018 paper production were either privileged or "were just things that were not responsive or were ancillary. So those were culled out, too…They were documents from a trading account that had nothing to do with this." Dkt. 256 at p. 21.

73.    In response to the Court's question as to why Defendants did not produce all documents that hit on Plaintiffs' search terms, Stamatis went on to state: "One of the search terms was the word 'trademark,' so that was triggering a lot of things. So you would have TD Ameritrade say, for example, is a registered trademark or something, so that would trigger that. There were other, you know, documents related, off the top of my head, to the Mercantile Exchange or one of the exchanges had a trademark. There were some e-mails from Mr. Duke's mother. There were some e-mails that were strictly on a personal level between Mr. Duke and Mrs. Duke." Dkt. 256 at p. 22. Counsel stated that this was consistent with their past practices in producing documents. Id.

74.     A side-by-side comparison of Defendants' 2018 ESI and paper productions reveals that there are dozens, if not hundreds, of documents in Defendants' ESI set that are responsive and relevant, but which Defendants did not print, Bates number and produce in their June 1, 2018 paper production. Nor did they log them on their privilege log. Plaintiffs would not be in possession of these documents had the Court not, on May 17, 2018, instructed Defendants to also produce their ESI in native format.

75.     As to Defense counsel's representation to the Court on May 17, 2018, that they were then planning to withhold e-mails between Duke and his mother, attached hereto is Exhibit GGG. It is a true and correct copy of such an e-mail, dated February 8, 2009, which was never before produced and is now found only in the ESI, which Defendants did not print and were not going to produce but for the Court's May 17, 2018 instructions. It has been redacted to omit wholly personal aspects of their conversation. In this document, Duke and his mother discuss work on his website, her efforts to sign up e-cigarette customers on Duke's website, the amount of website hits and sales, as well as Duke's plans to launch another website selling lower cost e-cigarettes. Duke also discusses choosing Chinese suppliers, potential website layouts for the other site, ordering, an advertising budget, and beginning to focus on SEO, explaining to his mother what SEO was and how it worked.

76.     As to Defense counsel's representation to the Court on May 17, 2018, that they were then planning to withhold "personal" e-mails between Duke and his wife, attached hereto is Exhibit HHH. It is a true and correct copy of such an e-mail, dated September 7, 2009, which was never before produced and is now found only in the ESI, which Defendants did not print and were not going to produce but for the Court's May 17, 2018 instructions. It has been redacted to omit wholly personal aspects of their conversation. In Defendants' Initial Disclosures, attached hereto as Exhibit XX, they identified Duke's wife, Laurie Duke, as having "knowledge relating to the use of the mark

21 CENTURY SMOKING by Defendant and sales and marketing efforts with respect to products and services offered under the mark 21 CENTURY SMOKING." In this e-mail, they discuss their personal relationship with Bryan Scott Kos, Duke's work on the 21 Century Smoking website, lost sales, Kirti Saraswat's work on Defendants' website, the previously undisclosed "SportsDoctrine website, Defendants being banned from PayPal and Duke having to personally add ZenCart to Defendants' website as a replacement, Duke's understanding of SEO tactics and keywords, advice he received from Otis Chandler, and being turned down for merchant accounts.

77.    Attached hereto as Exhibit III are several more e-mails found only in Defendants' ESI production, which they did not print or Bates number and were not going to produce but for the Court's May 17, 2018 instructions. Each of these e-mails are dated between November 2013 and January 2014 and were never before produced. They reveal that William Edmiston's girlfriend and now wife, Kai Sibley, was working with Defendants to sell their Blackjack and other e-cigarette products at or about the time Defendants claim she witnessed alleged defamatory statements. In Defendants' March 19, 2018 summary judgment brief, they represented to the Court that Sibley, allegedly unlike Edmiston, was an independent third-party, with no relationship to Defendants' business. Dkt. 233 at p. 21. They argued that summary judgment should not be entered dismissing their defamation claims because there was publication of the alleged defamatory comments to Sibley, and not just to Defendants' authorized agent and stock options holder, Edmiston.

78.    Defendants' counsel argued: "DR's claim that this [defamation] count should be dismissed because the defamatory statements were made to 21CS's agent ignores the fact that regardless of whether Bill Edmiston's arrangement with 21CS made it its agent, there was another person present: Kai Sibley. SOF ¶ 100-115. As no one alleges Ms. Sibley was 21CS's agent, she is a third-person to whom the defamatory statements were made." Dkt. 233 at p. 21. At the time they

made this argument, Defendants were in possession of the e-mails documenting the fact that Sibley was also working to sell Defendants products and profiting from same. Thereafter, in May 2018, they then chose not to print and Bates number those documents for production.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: March 25, 2019                    /s/ *Brian E. Moffitt*
                                         BRIAN E. MOFFITT

# EXHIBIT 32

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC, <br><br>        Plaintiff/Counter-Defendant, <br><br> v. <br><br> 21 CENTURY SMOKING, INC., and BRENT DUKE, <br><br>        Defendants/Counterclaimant, <br><br> v. <br><br> CB DISTRIBUTORS, INC., and CARLOS BENGOA, <br><br>        Counter-Defendants/Counterclaimants. | **Case Number:** $3:12-cv-50324$ <br><br> **Judge:** Frederick J. Kapala <br><br> **Magistrate Judge:** Iain D. Johnston |

**PLAINTIFFS' LOCAL RULE 56.1 STATEMENT**
**OF UNDISPUTED MATERIAL FACTS**

NOW COMES Plaintiff/Counter-Defendant DR Distributors, LLC ("DR"), and Counter-Defendants/Counterclaimants CB Distributors, Inc. ("CB") and Carlos Bengoa ("Mr. Bengoa") (collectively the "Plaintiffs"), and respectfully submit their Local Rule 56.1 Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

{0065-1370/00461596-1}

service by Duke and Webrecsol, "Meta Tag Optimization" presumably refers to Keywords and Description meta tags. (Moffitt Cert. at Exh. N (6/17/15 Duke Dep. at Exh. 15, at 21C 16804) and Exh. Z 11/23/15 Kent Report at ¶ 92)

136.     Duke testified that he started the company in January 2009, because that is the month when he thought of the company name, purchased the web domain and began submitting the plans. When he started the company, Duke's role included finding a template to try and get something to work that would be a website, and trying to figure out how it would be integrated with PayPal. He personally started creating the company website in either January or February 2009, using an old laptop at his residence, although he does not recall the name of the template program he used. (Moffitt Cert. at Exh. M (6/16/15 Duke Dep. at 118:24 – 120:16, 132:9-21 and 140:7-12)).

137.     When Duke was working on the creation of his website in January or February 2009, his company did not yet have any employees, stores or kiosks. Duke testified that he started his company in January 2009, but did not form the 21 Century Smoking, Inc. corporation until August 2009. (Moffitt Cert. at Exh. M (6/16/15 Duke Dep. at 133:24 – 135:2)).

138.     When he made his company website go live in February or March 2009, Duke was the one responsible for all of its content, including all the images he then used on the website. He does not know if that also included all the graphics he used then, because, while everything was from a template, he testified he needed help in creating some of the graphics, although all of the words he used in the website were from him. Moffitt Cert. at Exh. M (6/16/15 Duke Dep. at 139:14 – 140:6)).

139.     Duke does not recall the date he gave access to the company website to overseas people, but thinks it was before he formed 21 Century Smoking, Inc. in August 2009, and that a

woman named "Kirti Saraswat" was the main one. When asked if he had any written communications with those overseas consultants who had credentials to access his company website, Duke replied "E-mails possibly" and said he believed he had produced them all in this litigation. (Moffitt Cert. at Exh. M (6/16/15 Duke Dep. at 141:6 – 142:13)).

<div align="center">

(i)      **Defendants' Failure to Produce
Relevant E-mails Exchanged with
Webrecsol and "Kirti" Concerning
CEO and Metadata**

</div>

140.      Duke testified that he exchanged e-mails with Saraswat, but when asked if he maintained a separate fold labeled "Kirti" in his e-mail inbox, to keep all the e-mails that he saved from communications with Saraswat, he initially testified that he did not remember. However, at his subsequent 30(b)(6) deposition, Duke identified a list of folders that were in 21 Century Smoking, Inc.'s webmail, meaning support@21centurysmoking.com, that were all used in connection with that e-mail address, and he testified that he searched all of them for responsive documents in this case. (Moffitt Cert. at Exh. N (6/17/15 Duke Dep. at 387:16 – 388:12) and Exh. O (6/23/15 Duke Dep. at 197:6 – 198:4 and Exh. 25 thereto)).

141.      Duke testified that he knows only one "Kirti," and agreed that if he produced an image of all the folders from his e-mail inbox and there was one labeled "Kirti," that would be the folder in which he saved his e-mail communications with Saraswat of Webrecsol. When directed to the second page of the list of e-mail folders and, specifically, to one titled "kirti," he confirmed that folder referred to Saraswat. (Moffitt Cert. at Exh. N (6/17/15 Duke Dep. at 388:13-21) and Exh. O (6/23/15 Duke Dep. at 198:5-16 and Exh. 25 thereto, at 21C 26742)).

142.      Duke confirmed that he searched for all e-mails between Defendants and Saraswat, or with other individuals at Webrecsol, but he claims not to know what is in the "kirti"

folder or whether it contains e-mails between Defendants and Saraswat. Duke testified that Saraswat did SEO work before and after he formed 21 Century Smoking, Inc. in August 2009. (Moffitt Cert. at Exh. M (6/16/15 Duke Dep. at 142:14 - 143:7, 146:3 – 147:2, 198:19 - 199:9)).

143.    When asked if he was monitoring and approving all of the work that Saraswat was doing for him and his company and his website at that time, Duke testified: "What I understood, I monitored and approved, yes." Duke was the owner of the company and authorized and gave Saraswat access credentials to the website so that she could make changes to it any time, and she had full access to Duke's credentials at GoDaddy to upload files for his website at any time. (Moffitt Cert. at Exh. M (6/16/15 Duke Dep. at 143:12 – 144:19)).

144.    Duke testified that Saraswat told him she was just going to pick keywords, and was going to get Duke high up on Google for those words. Duke testified that Saraswat gave him a list of keywords, but he did not remember the content of the same. It was in a written communication, but Duke was not sure he turned the list over to his attorneys in this action, but he thought so. Defendants failed to produce documents regarding Saraswat or Webrecsol in this litigation (Moffitt Cert. at Exh. M (6/16/15 Duke Dep. at 149:11-20)).

145.    Duke testified that, after 21 Century Smoking, Inc. was formed in August 2009, the ownership of the company website went from him to the corporation, and he continued to personally oversee the website for his corporation, continued to be involved in reviewing its content, and, when needed, continued to personally make changes to the website. (Moffitt Cert. at Exh. M (6/16/15 Duke Dep. at 155:11 – 156:4)).

146.    Duke testified that, after he formed 21 Century Smoking, Inc. in August 2009, he continued to use Saraswat to make changes and modifications to his company website, and she and her colleagues continued to provide SEO consulting services to 21 Century Smoking, Inc.,

{0065-1370/00461598-1}                        - 53 -

# EXHIBIT 33

# Exhibit R

## 21CS Telephone Interviews

1/19/16
Brent Duke
Zen Cart was initially installed in a sub-directory because he didn't know how to integrate it into the existing website.

In October 2011 Zen Cart was "integrated" into the rest of the site, and moved to the homepage.

3/15/16
Brent Duke

Who had login access to the GoDaddy account during September 2011?
BD, Karti & WebRecSol, wife, maybe Rob
during September 2012?
Most likely same, India, Odesk; less Karti with Rob's help
during March 2013?
Most likely more after Rob left due to using Craigslist, Odesk

What was the original site (pre-Zen Cart) developed on?
In Dreamweaver
Who built that?
BD - found a template, copy-paste or replace sample text, Karti for any specific coding

Who setup Google Analytics?
Don't recall, maybe BD did - copy-paste, maybe Karti

What versions of Zen Cart were used & when?
Don't recall specifically
Who originally installed Zen Cart in 2009?
BD, maybe had help, only recalls having it placed in the "catalog" directory b/c wasn't able to figure out how to put on homepage
How was it installed...FTP, Auto-installer in GoDaddy?
Believe uploaded files, maybe Filezilla, didn't recall being aware of any auto-installer
Who would have updated that to newer version?
Rob would have handled updates

Who worked on the integration of Zen Cart into the main site in Sept./Oct. 2011 when it moved from /catalog/ to "shop." to site root?
Rob; remembers paying for some things, don't recall whether software or services
When Zen Cart was integrated, the template "Black Pure Free" from 12leaves.com was used. They also offer an "installation" service. Who installed/setup this template?
Rob would have probably done it, probably didn't pay to install, but not sure.

Robert Hough's employment dates?
direct deposit shows at least Jan 2013.

Helped or accessed the site/server post-employment?



Not that he recalls, other than call about meta tags and removing text

Who handled Zen Cart after Robert left?
Odesk, Craigslist -- freelance

Who all ever "worked" on ZenCart?
WebRecSol, Kancart, DudaMobile, designers, developers, etc.
Kirt & WebRec Soli, Odesk/Craigslist; anything with Kancart or DudaMobile most likely
Odesk/Craigslist, but don't remember anything specific.

Who all had access to Zen Cart?
BD, RH, Karti, wife, employees, outsourced as needed

Which CEON plugin specifically was used?
Don't recall
Who chose and installed that?
Would have been Rob
Enabled around Jan. 2013?
Rob would have installed, don't recall when
Is it still enabled on the site today?
Not even sure

Who installed the Ultimate SEO URLs plugin?
Maybe installed, around 6/27/12 - 7/14/12?
No recollection or even aware of the plugin; given timeframe, thinks it would have been Rob

Any other plugins used?
No idea; would have been Rob

Who created the tagline, "21 Century Smoking, the future of smoking today?"
BD

Was there always a lifetime warranty? Who suggested that?
Doesn't recall, may have initially been 1 year, or maybe always lifetime

Who created the tagline, "Your source for premium electronic cigarettes?"
Maybe Rob, wanting to get electronic cigarettes in title.

Changes made between 8/28/12 - 9/8/2012?
(Smoke text drops sub-160)
No idea, would have been Rob

Who updated the site/software in Jan. 2013?
Don't recall

Familiar with the meta_tags.php file? Ever make changes in the meta_tags.php file?
Don't recall the file or making changes in it.

If changes were made to a file, would it have been done within GoDaddy file manager, or
downloaded and reuploaded?

Filezilla FTP program and notepad maybe file manager in GoDaddy for uploading. Wasn't aware of editing files in GoDaddy.

When informed about the Plaintiff's text and you went to look for it, where did you look?
Checked Wayback Machine

When the mark was removed...How was the mark removed?
ZC UI?
Don't remember. Didn't know, had to reach out to Rob. Wherever Rob told me to go to find or whatever changes to make to remove it

Given a list of pages/URLs that had the mark?
When was that?
Don't recall getting a list, whatever was in the Plaintiff's filing. Think it stated the homepage, but it appeared in other places.

Familiar with the folder/directory on web server 21centurybackup2012?
What is it?
Where did that come from?
Who created it?
Didn't create, not familiar with it, assume Rob.

EXHIBIT 34

# Exhibit A

## Anthony Davis

| | |
|---|---|
| **From:** | Peter Stamatis <peter@stamatislegal.com> |
| **Sent:** | Monday, March 19, 2018 8:26 PM |
| **To:** | Anthony Davis; rvo@vonohlenlaw.com |
| **Cc:** | Steven S. Shonder; tlife@lsglegal.com; tleavens@lsglegal.com |
| **Subject:** | DR v. 21 Century Smoking, Inc. |
| **Attachments:** | 21C 63515 - 21C 63626.pdf |

Dear Mr. Davis:

Within the last 48 hours, we received the attached additional documents from 21CS. The documents are related to DR's claim of missing documents, which was raised for the first time in its summary judgment motion. They have been Bates stamped 21C 63515-21C 63626. We do not believe they are relevant to any claim, other than that they belie assertions of withholding unfavorable documents.

**Peter S. Stamatis**

**Law Offices of Peter S. Stamatis, PC**

1 East Wacker Drive
Suite 2350
Chicago, Illinois 60601
T: 312 606 0045
F: 312 606 0085
E: Peter@StamatisLegal.com
W: www.StamatisLegal.com



*Circular 230 Disclosure: Under requirements imposed by the Internal Revenue Service, we inform you that, unless specifically stated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter herein*

The information contained in this e-mail message or any attachment may be confidential and/or privileged, and is intended only for the use of the named recipient. If you are not the named recipient of this message, you are hereby notified that any dissemination, distribution, or copying of this message or any attachment thereto, is strictly prohibited. If you have received this message in error, please contact the sender and delete all copies.

EXHIBIT 35

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

Case Number 3:12 - cv - 50324

Judge: Frederick J. Kapala
Magistrate Judge: Iain D. Johnston

--------------------------------------------------------

DEPOSITION OF WILLIAM RAY EDMISTON

RESTRICTED CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

--------------------------------------------------------

DR DISTRIBUTORS, LLC, an Illinois limited liability
company,

                    Plaintiff and Counter-Defendant,

v.

21 CENTURY SMOKING, INC., an Illinois corporation and
BRENT DUKE, individually,

                    Defendants and Counterclaimants,

v.

CB DISTRIBUTORS, INC., an Illinois corporation, and
CARLOS BENGOA, individually,

                    Counter-Defendants.

--------------------------------------------------------

Monday, June 29, 2015

9:00 A.M.

RESTRICTED CONFIDENTIAL - OUTSIDE  ATTORNEYS' EYES ONLY

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

Page 32

1    Expo in 2013?

2         **A   Yeah.  I'm -- as I said earlier, I'm still**

3    **very clear on that conversation.**

4         Q   Okay.

5              MR. LIFE:  And at this time, Madam Court

6    Reporter, could you please prepare the audio?

7              THE COURT REPORTER:  Okay.  Can we go off

8    the record?

9              MR. LIFE:  Yeah, we can go off the record

10   if you need.

11             (Discussion off the record.)

12             THE DEPONENT:  (To Messrs. Life, Davis, and

13   Gaynor)  It's on.

14             (At this time, the following audio was

15   played:)

16             FEMALE SPEAKER:  I've seen 21 Century

17   Smoking.

18             MALE SPEAKER:  Okay.  That -- that is --

19   that's a website, actually . . .

20             (End of audio.)

21             THE DEPONENT:  Okay.

22             MR. LIFE:  And Madam Court Reporter, were

23   we on the record for that, please?

24             THE COURT REPORTER:  Yes.

25             MR. LIFE:  Okay.

RESTRICTED CONFIDENTIAL - OUTSIDE  ATTORNEYS' EYES ONLY

Page 33

1       Q  (BY MR. LIFE) And Mr. Edmiston, were you

2  able to hear the audio recording marked as Exhibit N, as

3  in Nancy?

4       **A  Yes, I was.**

5       Q  And are you familiar with that audio

6  recording, sir?

7       **A  Yes, I am.  And that female voice is Kai,**

8  **who is mentioned in the thing and, as I said, was -- is**

9  **my wife at this time.**

10       Q  And who recorded this audio?

11       **A  I did.**

12       Q  Is there anything in that audio that is

13  different, altered, or changed from the audio that you

14  recorded in September of 2013?

15       **A  No, other than it obviously didn't continue**

16  **like we thought.**

17       Q  Regarding your conversation with Mr. Olcott

18  at the 21st Century Smoke booth, did he state anything

19  regarding the quality of the products of 21 Century

20  Smoking, Inc.?

21       **A  Yes, he did, more than once.**

22       Q  And what did he state about the quality of

23  the products for 21 Century Smoking, Inc.?

24       **A  He said that 21 Century Smoking, Inc.**

25  **product was inferior to 21 Century Smoke, stated again**

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

Page 79

1  told me, but what he did tell me.  I did bring him up to

2  speed.

3          Q    (BY MR. DAVIS) Right.  And when I say that,

4  what you claim, so far, you're the only person that

5  heard that.  I --

6          A    I have a -- I have a wife that was there

7  that also heard it if you need her testimony sometime.

8          Q    Okay.  And she's the one that you can hear

9  on the recording, right?

10         A    That's correct.

11         Q    Right.  And you're not -- you can't be

12  heard on the recording at all; is that right?

13         A    No.  My -- she -- she was standing maybe

14  closer to the pocket where the thing was, and she was

15  talking to Adam.  And at that point in time, she was

16  very interested also in learning about the product, just

17  with some people that she knows, and she was just asking

18  a lot of questions.

19              And that's her voice on the recorder, and

20  I -- my voice is -- I mean, I talked to Adam a lot, too,

21  but unfortunately, it's worked -- after the recorder, I

22  got more detailed into the stuff after, obviously, the

23  recorder quit working.

24         Q    And you also took a second recording at

25  that -- at the time when you did --

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

Page 80

```
 1              A    I -- I stopped and tried to record again
 2    and it wouldn't work.
 3              Q    And --
 4              A    I didn't know it didn't work until later.
 5              Q    But both of those recordings you captured
 6    and you emailed to Brent Duke, the owner of defendant
 7    company here, on October 2, 2013; is --
 8              A    Well, I think --
 9                   MR. LIFE:  Objection.  Misstates prior
10    testimony.
11                   I'm sorry, Mr. Edmiston.  Go ahead.
12              A    No.  I think it was just the first one
13    because the second one, there wasn't anything.
14              Q    (BY MR. DAVIS) But you took a second
15    recording?
16              A    I attempted to take --
17                   MR. LIFE:  Objection --
18                   THE DEPONENT:  Go ahead.
19                   MR. LIFE:  I'm sorry.  Objection.  Asked
20    and answered.
21                   I'm sorry, Mr. Edmiston.  Go ahead.
22              A    I attempted to take a second one that did
23    not work.
24              Q    (BY MR. DAVIS) And that recording you took
25    on the same -- was it your phone that you were doing
```

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

Page 81

1    these recordings?

2          A    Yes, just an Apple phone.

3          Q    And did you save a copy of that recording?

4          A    You know what?  I've since changed Apple

5    phones, and I don't think it's around.

6          Q    And was there ever a time when you sent

7    that second recording to Mr. Duke?

8          A    No, because there wasn't --

9               MR. LIFE:  Objection.

10              THE DEPONENT:  Go ahead.

11              MR. LIFE:  Objection.  Asked and answered.

12              I'm sorry, Mr. Edmiston.  Go ahead.

13         A    No.  As I said, there was no recording to

14   send.

15         Q    (BY MR. DAVIS) And when was the first

16   time -- well, strike that.

17              Did Mr. Duke ever ask you to send him a

18   copy of that second recording?

19         A    I told Brent about my conversation with

20   Adam afterwards.  I don't know if it was that day --

21   that night or the next day because I was busy at the

22   conference.  Told him about my conference and told

23   him -- I mean, my meeting with Adam, and I asked him if

24   he knew who the guy was.  He said he did not.

25              And then I said I attempted to make a

Page 82

1    recording.  And I said, "I have that recording if you

2    want it."  And he said, "If you have it, that would be

3    great."

4              Q    And after that conversation with Mr. Duke,

5    when was the next time you spoke to Mr. Duke about

6    this -- the circumstances or the event at the Global

7    Expo -- Global Gaming Expo?  Sorry.

8              A    You know, it might have been a week.  We --

9    with -- with our attempted ongoing business, we would

10   have Monday conference calls.

11             Q    And what -- in those Monday conference

12   calls, what did you say to him and what did he say to

13   you about the Global Gaming Expo incident?

14             A    Exactly what I told you before.  I told him

15   that -- what Adam told me about they having the name

16   first and about him throwing, you know, bad information

17   about 21 Century Smoking, damaging 21 Century Smoking's

18   reputation, at least that's what he was telling -- Adam

19   was telling me, and that they had their own factory in

20   China, which, you know, I believe you all know is not

21   true.

22             Q    And did -- as part of those conversations,

23   did Mr. Duke tell you that my client, the owner of the

24   21st Century Smoke registered trademark, had indeed

25   filed their application and obtained a registration for

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

Page 83

1    their trademark before Mr. Duke?

2          **A  No.**

3          MR. LIFE:  Objection.

4          THE DEPONENT:  Go ahead.

5          MR. LIFE:  Foundation.  Calls for

6    speculation.  Beyond the scope.

7          Go ahead, Mr. Edmiston.

8          **A  No.  As I stated earlier, we did not have**

9    **those kind of conversations.**

10         Q  (BY MR. DAVIS) Okay.  And if I understand

11    your testimony correctly, one of the things that you

12    heard Mr. Olcott say was that Mr. Duke and his company

13    did not manufacture their own products; is that right?

14         **A  Said they -- said they acquired a lot of**

15    **different products from different, inferior companies.**

16         Q  As I heard you -- well, strike that.

17         It's correct, right, that Mr. Duke and his

18    company, they do not manufacture their own products,

19    right?

20         MR. LIFE:  Objection.  Foundation, scope.

21         Go ahead.

22         **A  That is correct.  If you do your research**

23    **into the industry, you'll see that basically none of**

24    **them do.  The products are made in China.  There are**

25    **some that -- that say they're made in the U.S., and if**

RESTRICTED CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

Page 84

1    you do your research in that, you'll see that they're

2    assembled in the U.S., and that's the reason some of

3    them are a little more expensive.  There are some that

4    try to use the U.S. as a manufacturing place, but they

5    are assembled here, to my knowledge.

6              But once again, 21 Century Smoke -- which I

7    had already done my homework to know that there wasn't

8    factories being owned by companies in China that did the

9    e-cigarettes -- and 21st Century Smoke, more than once,

10   stated that they had their own factory and they

11   personally followed through with the quality of that

12   product.

13        Q    (BY MR. DAVIS) Okay.  In your view, would

14   it be a negative if the company was hand-assembling

15   their own products here in the U.S. and representing to

16   customers that they -- they're assembled in the United

17   States?

18             MR. LIFE:  Objection.  Foundation.

19   Incomplete hypothetical.

20             Go ahead, Mr. Edmiston.

21        A    In my view, as a lot of companies do, it's

22   just false advertisement if it's not manufactured here,

23   and every -- and how many companies are doing false

24   advertisement?

25        Q    (BY MR. DAVIS) And that would include if

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

Page 85

1    they were assembling it here?

2           **A    In my opinion --**

3           MR. LIFE:  Same objection.

4           THE DEPONENT:  Go ahead.

5           Q    (BY MR. DAVIS) Yes, your opinion.

6           **A    In my opinion, yes.  If they say they're**

7    **made in the U.S. and they're not made in the U.S., then**

8    **I -- that's false advertising, lying, whatever you want**

9    **to call it.**

10          Q    Okay.  And did there come a time after you

11   were speaking to Mr. Duke about these events at the

12   Global Gaming Expo when you spoke to his attorneys about

13   those events?

14          **A    Yes.  As -- well, that's when I became more**

15   **aware, you know, of the lawsuit as far as it was**

16   **actually -- it was moving forward and Brent asked me if**

17   **I would talk to his lawyers about this.**

18          Q    And when was that?

19          **A    I couldn't tell you.  Travis would probably**

20   **have a record of when we had the first conversation with**

21   **his people.**

22          Q    Well, I'm looking at Exhibit J, and it

23   looks like there's an email on June 18, 2015.  Does that

24   refresh your recollection as to about when you first

25   spoke to them?

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

Page 86

1          A    No.   That's -- that's this month, is what

2     you're saying.

3          Q    Yeah.   I'm just trying to find out the date

4     because I don't know.

5          A    Well, no.   That -- that was the date

6     when -- for this thing that came up, but there was

7     conversation with his attorneys going back, oh, a year

8     ago probably.

9          Q    And did you have any email communications

10    with the attorneys or Mr. Duke about those conversations

11    a year ago?

12         A    To my knowledge, we didn't have email -- we

13    may have had some email.   I don't know.   But the -- we

14    had a verbal conversation with -- I don't know.   Travis,

15    there's two of -- two people from your organization were

16    on the phone, and we had a -- a conference call one

17    morning --

18         Q    Okay.

19         A    -- where I went over this same information

20    we're doing today.

21         Q    And at that time, did they ask you to do a

22    search for the second recording?

23         A    I told him I did not -- that second

24    recording did not go through.

25         Q    And when you were at the Global Gaming

cfc3b76b-b1c9-4ff4-8e1e-b9c810f08ed4

# EXHIBIT 36

# Exhibit W

Part two

## Part two

| | |
|---|---|
| **From:** | Bill Edmiston <bill@bedmiston.com> |
| **To:** | Brent Duke <bduke@21centurysmoking.com> |
| **Date:** | Wed, 02 Oct 2013 16:55:21 -0500 |
| **Attachments:** | IMG_0118.MOV (5.27 MB); Untitled attachment 98542.txt (25 bytes) |

S
Video too long to send but I have it

DOC-000002181_0001

Confidential                    21C 1007924

Untitled attachment 98542.txt

Sent from my iPhone

DOC-000002182_0001

Confidential                                                        21C 1007925

# Exhibit X

Re: Here is the recording

# Re: Here is the recording

| | |
|---|---|
| **From:** | Bill Edmiston <bill@bedmiston.com> |
| **To:** | Brent Duke <brentduke@yahoo.com> |
| **Date:** | Sat, 04 Oct 2014 11:40:23 -0500 |

I found a longer one that I cannot forward. Too long but i have it. So there is a second one.
Mostly just general talking but he does state "they have gone to the FDA and they have Washington lobbyist.
Also states this guy is the One that goes to the factory and tests the vaporing for the units.
Long recording and we did not get much good info in this one that much clearer.
We are bad spies. :):)
But this proves they were there and maybe his voice can be identified.

Sent from my iPhone

On Oct 4, 2014, at 9:22 AM, Brent Duke <brentduke@yahoo.com> wrote:

> I think they have that one, but will send again just to be sure..sucks that it cuts off right there, lol
>
> how are things looking for tomorrow?
>
> heading to chavez ravine in about 5 hours (go dodgers)
>
> thanks!
>
> On Saturday, October 4, 2014 9:15 AM, Bill Edmiston <bill@bedmiston.com> wrote:
>
>
>
>
> Sent from my iPhone

DOC-000004585_0001

Confidential                                                                        21C 1013062

# Exhibit Y

Re: your run-in with 21st Century Smoke and availability

# Re: your run-in with 21st Century Smoke and availability

| | |
|---|---|
| **From:** | Bill R Edmiston <bill@be-consultantsintl.com> |
| **To:** | Brent Duke Brent Duke <bduke@21centurysmoking.com> |
| **Date:** | Tue, 30 Sep 2014 14:19:12 -0500 |
| **Attachments:** | BEC_BusinessCard.pdf (351.84 kB); Untitled attachment 139605.htm (247 bytes) |

recordings did not work— could not hear any part of the important stuff-- I am not a good "spy"  :(  sorry
lets pay it as it comes with SD schedule  - i go tomorrow am and straight to the conf.
On Sep 30, 2014, at 12:37 PM, <bduke@21centurysmoking.com> <bduke@21centurysmoking.com>
wrote:


Here are the questions lawyers have:
1.     Whether there is a second recording (you remember there was a 2nd recording you
thought?)
2.     If it exists, do you  still has the recording?
3.     If you have the recording, is there any way to send it?

I feel like you said something about it being too large, can't remember exactly??

Haven't heard back regarding your schedule. Did you get my latest somewhat confusing
email on availability? Are you already in California?

Brent Duke
312.823.2244 (mobile)
888.783.3021 (toll free)
www.21CenturySmoking.com

Confidential

DOC-000004551_0001

21C 1013015

# Exhibit Z

Re: Here is the recording

# Re: Here is the recording

| | |
|---|---|
| **From:** | Bill Edmiston <bill@bedmiston.com> |
| **To:** | Brent Duke <brentduke@yahoo.com> |
| **Date:** | Sat, 04 Oct 2014 13:29:19 -0500 |

It is very long.
Let them know I have it
Can prove they were there to some degree. And the two claims he made as I mentioned

Sent from my iPhone

On Oct 4, 2014, at 10:27 AM, Brent Duke <brentduke@yahoo.com> wrote:

> I'm honestly not sure, you could call lawyers directly and play it for them...see if it worth the trouble of figuring out?
>
>
> On Saturday, October 4, 2014 9:44 AM, Bill Edmiston <bill@bedmiston.com> wrote:
>
> You can hear this recording tomorrow.
> Any idea how to get it forwarded when too long?
> Sent from my iPhone
> On Oct 4, 2014, at 9:22 AM, Brent Duke <brentduke@yahoo.com> wrote:
>
>> I think they have that one, but will send again just to be sure..sucks that it cuts off right there, lol
>>
>> how are things looking for tomorrow?
>>
>> heading to chavez ravine in about 5 hours (go dodgers)
>>
>> thanks!
>>
>> On Saturday, October 4, 2014 9:15 AM, Bill Edmiston <bill@bedmiston.com> wrote:
>>
>>
>>
>>
>> Sent from my iPhone

DOC-000004591_0001

Confidential

21C 1013068

# EXHIBIT 37

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

| | | |
|---|---|---|
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) ) ) | |
| Plaintiffs/Counterclaimants, | ) ) | |
| v. | ) ) | Case Number: 3:12 – cv – 50324 |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) ) ) | Judge: Frederick J. Kapala |
| Defendant/Counterclaim Defendant, | ) ) | Magistrate Judge: Iain Johnston |
| | ) | |
| 21 CENTURY SMOKING, INC., | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, | ) ) ) | |
| Counterclaim Defendants. | ) ) | |

**21 CENTURY SMOKING'S AND BRENT DUKE'S
SUPPLEMENTAL LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS**

In support of their Combined Motion for Partial Summary Judgment and in Response to

Plaintiff's Motion for Summary Judgment, defendants 21 Century Smoking ("21CS") and Brent

Duke ("Duke") herewith submit their Supplemental Local Rule 56.1(a)(3) Statement of Material

Facts as to which there is no genuine issue and which entitle 21CS and Duke to summary judgment

as a matter of law and denial of DR's Motion for Summary Judgement.

A.    **21CS'S USE OF ITS MARK ON ITS STORE SIGNAGE, PRODUCT PACKAGING AND WEBSITE**

92.    The name and mark 21 CENTURY SMOKING appeared on 21CS's website in June of 2010.  Each page of the website had the name and mark 21 CENTURY SMOKING prominently displayed on the top-right corner of each page:



93.    At the bottom of each page of the website Bengoa admittedly viewed was the statement: "Copyright © 2009 21 Century Smoking.  All rights reserved."  Moreover, each page made reference to the 21 CENTURY SMOKING mark and more than one page on the website referred to it as the "cigarette for the 21st Century."  The page that lists "Contact Information" reads as follows:

> 21 Century Smoking
>
> PO Box 578327
> Chicago, IL 60657
>
> Email us:
> support@21centurysmoking.com[1]

94.    From 21CS' first sale, the mark 21 CENTURY SMOKING has always appeared on the packaging of 21CS' products.[2]

95.    The December 2011 reports from Plaintiffs' hired investigators' erroneously state that the phrase "21st Century Smoking" was used by 21CS.  All of the photographic evidence

---

[1]    Tab 36, March 19, 2018 Duke Declaration at ¶ 2; DRSTCS 1389- 1392.
[2]    *Id.;* Tab 3, ¶ 13.

provided by Bengoa's investigators show that 21CS employed the mark 21 CENTURY SMOKING and not "21st Century Smoke" on its store signage and product packaging. [3]

96.     Plaintiff knew that 21CS's products were labeled with the mark 21 CENTURY SMOKING through Bengoa's investigators' photographs.[4]

97.     By March of 2012, when Bengoa ordered a second investigation into 21CS, he had already received photographic evidence from these investigators of 21CS' packaging using the mark 21 CENTURY SMOKING.[5]

**B.     PLAINTIFFS' MISUSE OF 21CS TRADEMARK**

98.     CB's first sale of product under its "21st Century Smoke" mark was on August 5, 2010.[6]

99.     21CS' expert, David Hass, reports that DR's total sales in 2010 were 1,673,264, in 2011 were 15,870,464, in 2012 were 16,872,924, in 2013 were 19,231,662, and in 2014 were 25,397,034.[7]

**C.     PLAINTIFFS' DISPARAGING COMMENTS**

100.     Duke was aware of Plaintiffs' disparaging remarks about 21CS' products. Specifically, 21CS's customers informed Duke that Plaintiff had told these customer disparaging and false information about 21CS's products.[8]

101.     William Edmiston owns BE Consultants International, an international company which assists small and medium sized companies grow.[9]

---

[3]     Tab 37 at DRSTCS 956-1127.
[4]     *Id.* at DRSTCS 971, 989-91, 1022-23, 1027, 1038-41, 1044-46, 1069, 1074, 1087, 1094.
[5]     *Id.* at DRSTCS 989, 1065, 1074
[6]     Tab 38
[7]     Tab 12 at 17.
[8]     Tab 1, Brent Duke 06/16/15 Dep at 312:12 – 315:13
[9]     Tab 39, Edmiston Dep. 10:6 – 11:1.

102.    Edmiston met Duke at a trade show in 2013 and offered to help Duke grow 21CS.[10]

103.    Edmiston was able to arrange a couple of meetings with Dollar General to inquire if Dollar General would carry 21CS' product.[11]

104.    In return for Edmiston's assistance, BE Consulting International would receive a percentage of the deals which it was involved in.[12]

105.    In September of 2013, Edmiston attended the Global Gaming Expo.[13]

106.    The Global Gaming Expo is a convention for the casino and restaurant industries as well as other gaming industries to network and learn about new products.[14]

107.    21CS did not request Edmiston to attend this convention.[15]

108.    Edmiston attends this convention regularly.[16]

109.    While at the convention, Edmiston visited e-cigarette booths to learn more about the industry.[17]

110.    Edmiston visited Plaintiff's booth with Kai Sibley and talked to an Adam Olcott.[18]

111.    Adam Olcott was wearing a shirt with the markings "21st Century Smoke" and presented Edmiston a business card which said "Adam Olcott, 21st Century Smoke."[19]

112.    When asked about 21CS, Olcott misrepresented that 21st Century Smoke predated 21CS, 21CS copied Plaintiff's product's name, the 21CS product was inferior to Plaintiff's

---

[10]    Tab 39, Edmiston Dep. at 11:20 – 14:11
[11]    *Id.* at 18:24 – 19:4
[12]    *Id.* at 24:3 – 25:1.
[13]    *Id.* at 25:2-15.
[14]    *Id.* at 25:2-15, 26:1-25.
[15]    *Id.* at 25:2-15.
[16]    *Id.*
[17]    *Id.* at 27:3-12.
[18]    *Id.* at 27:13- 28:10, 31:11-17
[19]    *Id.* at 27:21 – 29:14, Ex K, L, & M thereto/

product, 21CS uses several different factories in China, and Plaintiff's product has its own exclusive manufacturer in China to Edmiston and Sibley.[20]

113.    Edmiston attempted to record this conversation, but was only able to record the very beginning of Olcott's claims.[21]

114.    Both Edmiston and his girlfriend, Kai Sibley, were present when Alcott disparaged 21CS.[22]

115.    At the time Alcott disparaged 21CS, Edmiston had not been granted any equity interest in 21 CS.[23]

**D.    INCLUSION OF 21ST CENTURY SMOKE IN METADATA**

116.    DR's expert did not dispute that that the words "21st Century Smoke" in 21CS's website metatags did not direct customers to that cite.[24]

117.    Search engines do not differentiate between "21 Century Smoking" and "21st Century Smoke" at any time during the period when term "21st Century Smoke" was in 21CS's website's metadata.[25]

118.    Although Plaintiffs had a web site in 2010, Plaintiff "never marketed it or did anything to attract initial sales."[26]

119.    Plaintiffs' web site was relaunched in the late summer or early fall of 2011.[27]

---

[20]    *Id.* at 29:19 – 30:5.
[21]    *Id.* at 30:6-33:16.
[22]    *Id.* at 29:19-30:5.
[23]    Plaintiffs' SUMF 80.
[24]    Tab 30, Kent 1/27/16 Dep. at 69:22-24.
[25]    Tab 29, Brown SEO opinion at p. 61; Tab 30, Kent 1/27/16 Dep. at 68.8-68.10 ("Its quite the possible [search engines] would regard [the marks] as similar. I don't know exactly").
[26]    Tab 23, Piper 5/19/2015 Dep. at 87:1-2.
[27]    *Id.* at 87:12-15.

5

120.    During the entire course of this proceeding, Plaintiff did not move to compel the production of any documents.[28]

121.    An electronic search was conducted on three of 21CS's computers for all relevant documents using agreed-upon search terms, and all relevant documents generated by the search were produced by the third-party vendor employed for that purpose.[29]

122.    21CS stopped using Webrescol for website maintenance and SEO services in April 2010 and then hired Robert Hough in May 2010 and had no communications with Kirti Saraswat regarding 21CS's web site or SEO service after March 2010.[30]

123.    The volume of sales of 21CS products using the mark 21 CENTURY SMOKING demonstrates more than sufficient market penetration. 21CS generated over $120,000 in U.S. sales prior to DR's trademark application in May 2010, including $72,000 in online sales.[31]

E.    **21CS'S SALES AND MARKET EXPANSION**

124.    By the end of April 2011, while DR was receiving its trademark registration, 21CS accomplished over $1,265,376 in U.S. sales.[32]

125.    21CS has shown positive growth trends across the U.S. By the end of 2009, 21CS had made sales in 41 states. That number had grown to 44 of 50 states by the time DR began selling 21ST CENTURY SMOKE products in August 2010.[33]

126.    By May 2011, 21CS had sold its products in every state across the U.S.[34]

---

[28]    *See* Case Dkt: 3:12-cv-50324.
[29]    Tab 40, 11/05/2014 email chain between Gaynor to Lieberman.
[30]    03/19/2018 Declaration of Brent Duke at ¶ 2; Tab 2, Duke 6/23/2015 Dep. at 104:8-10.
[31]    Tab 12 p. 41
[32]    Tab 3, ¶ 18.
[33]    Tab 12, p. 42.
[34]    Tab 3, ¶ 19.

127.    During its first approximately 9 months in the market, through December of 2009, 21CS generated approximately $44,000 in revenue. In the following 4 months prior to DR's trademark application, 21CS generated approximately $76,000 in revenue. This was driven by a significant month-to-month growth rate that, when annualized, is considerably higher than either the 80% annual growth rate that Mr. Vigil attributes to DR in its first two years or the 23% annual growth that Mr. Vigil attributes to 21CS in the first year he has measured.[35]

128.    During the first nine months of sales through December of 2009, 21CS generated approximately $4,900 in sales per month. In the following four months prior to DR's trademark application, 21CS generated approximately $19,000 per month. This represents a substantial 292% growth rate in average per-month sales in early 2010 compared to 2009.[36]

**F.    THE INTERNET MARKET**

129.    As 21CS is a business with a large online market, one can derive the numbers of customers by the web analytics for 21CS' website. [37]

130.    A website session is a "container" of activity on a website, which may span several pageviews and interactions with a website.[38]

131.    A website session ends through one of two methods:   1) time, either through inactivity after 30 minutes or at midnight, based on the time zone set in Google Analytics, or 2) a campaign change (e.g., visiting the website through organic search, then exiting the site and returning to the website through paid search), regardless of elapsed time or inactivity.[39]

---

[35]     Tab 12 at 43-4.
[36]     Tab 12 at 51.
[37]     Tab 17 at 29.
[38]     *Id.*
[39]     Tab 17 at 10.

132.    A pageview is counted every time a page is loaded in a visitor's browser, including reloading of a page or navigating away and back to a page.  Several pageviews may be contained in a single session. [40]

133.    Prior to DR's trademark application in May 2010, 21CS had already generated at least 11,532 website sessions.[41]

134.    No state accounted for more than 18% of 21CS's web traffic in that period and web users from all 50 states plus the District of Columbia accessed 21CS's website during that period.[42]

135.    This data suggests a broad-based marketing strategy that targeted the online U.S. market as a whole, with slightly faster adoption in the geographical areas where physical kiosks were also present.[43]

136.    In the month of May 2011, 21CS generated at least 4,000 website sessions in 50 regions.[44]

137.    During the first month 21CS's website was launched, website sessions came from 20 regions, increasing to 38 regions during the second month.[45]

138.    By the third month on through December 2014, 43 or more regions were represented every month. [46]

139.    Over 48% of the months, including the months without reporting, feature 50 or more regions being represented with at least one session.[47]

---

[40]    *Id.*
[41]    Tab 12 at 43, 51.
[42]    Tab 17 at 21.
[43]    Tab 12 at 42-3.
[44]    Tab 17 at 21.
[45]    *Id.*
[46]    *Id.*
[47]    *Id.*

140. Prior to DR's trademark application in May 2010, 21CS had already generated at least 11,532 website sessions.[48]

141. Plaintiffs had over $1M in sales over the Internet in 2012.[49]

142. The Vigil Report relies heavily on market reports and data that describe "smokeless tobacco" or "other tobacco products" categories more broadly, rather than e-cigarettes specifically. Vigil consistently draws conclusions from these documents that he improperly attributes to the specific, e-cigarette product category.[50]

143. The market size sources cited by Vigil are limited to the convenience store sales channel. The market size sources cited by Vigil mention the online sales channel. [51]

144. 21CS did sell its product in stores and gas stations through distributors.[52]

145. 21CS' expert, David Hass, states in his report that some studies show that as of 2014, approximately 50% of e-cigarette sales were generated in convenience stores, 25% in other types of stores (such as "tobacco-only outlets and other e-cig retail locations"), and 25% online.[53]

G.    **ADVERTISING**

146. In 2009, 21CS's advertising expenditures – as calculated by Mr. Vigil – were approximately 5.0% of its sales revenue.[54]

147. By 2010, 21CS had spent approximate 42% of its sales revenue on advertising. In 2011, 21CS had spent approximately 21% of its sales revenue on advertising.[55]

---

[48] Tab 12, Haas Report at 51.
[49] Tab 12 at Ex. 8.3.
[50] Tab 12 at 21, 38.
[51] Tab 12 at 38.
[52] Tab 1 at 120:21-24.
[53] Tab 12 at 21.
[54] Tab 12 at 46.
[55] Tab 12 at 21.

9

148.    DR has spent approximately 3% of its revenue in advertising for its product 21st Century Smoke.[56]

149.    At the time of its market entry in 2009, 21CS had selected a national online sales strategy as opposed to limiting itself to distribution through unique physical locations. Selling products online allowed 21CS to reach customers, build brand awareness, create goodwill, and generate sales throughout the U.S.[57]

150.    Through its 21centurysmoking.com website, it was just as easy for 21CS to cultivate customer relationships in Florida (where it had no physical presence) as it was in Illinois (where it did have a physical presence).[58]

151.    Based on this calculation, 21CS spent $2,152 (or 5% of revenue) on advertising in 2009, $288,442 (or 42% of revenue) on advertising in 2010, and $350,981 (or 21% of revenue) on advertising in 2011.[59]

152.    DR's advertising expenses of 3% of sales revenue, which Mr. Vigil felt was sufficient to support his opinion that DR had achieved market penetration.[60]

## H.    CHRIS LIGUTAN DID NOT REPRESENT TO DONALD KUNZ THAT HE WAS ASSOCIATED WITH CB DISTRIBUTORS OR WITH 21ST CENTURY SMOKE[61]

153.    During 2012, Ligutan worked as an independent contractor for 21CS, making telephone calls to potential customers from his office in Nepal.[62]

---

[56]    Tab 12 at 46.
[57]    Tab 12 at 50.
[58]    *Id.*
[59]    Tab 12 at 52.
[60]    *Id.*
[61]    Dkt Case: 3:12-cv-50324 Document #: 24-23 at ¶ 13.
[62]    *Id.* at ¶¶ 2-5.

154.    When Chris Ligutan contacted Donald Kunz on November 6, 2012, he identified himself as a representative of 21 Century Smoking.[63]

155.    Ligutan followed up his conversation with Kunz by sending him a wholesale price list by email that day, which showed 21CS's web address, www.21centurysmoking.com.[64]

156.    Kunz recalls that Ligutan called him on November 6, 2012 and that he received Ligutan's November 6, 2012 email to him.[65]

157.    By November 8, 2012, Ligutan had not received a response from Kunz to his email, and he made a follow-up call with Kunz. Kunz, who admitted to having an 85% hearing loss and to wearing hearing aids all the time,[66] was confused that Ligutan worked for Plaintiffs. Ligutan corrected him and Kunz acknowledge that Ligutan was calling on behalf of 21 Century Smoking.[67]

158.    After the November 8, 2012 call, Ligutan sent Kunz a second email that recounted their conversation, explicitly stated the products were from "21 Century Smoking," and again included 21CS's web address, www.21centurysmoking.com.[68]

159.    Kunz acknowledged receipt of Ligutan's November 8, 2012 email and was "sure" it is correct.[69]

160.    When, in December 2012, Kunz received a third call from the same phone number Ligutan had called on, the caller had an accent and Kunz did not recognize the caller's voice.[70]

---

[63]    *Id.* at ¶ 8.
[64]    *Id.* and Exhibit A thereto.
[65]    Moffitt Cert at Ex. K (Kunz Dep. at 43:9-47:1).
[66]    Tab 41, Kunz 05/05/2014 Dep. at 4:15-24.
[67]    Dkt Case: 3:12-cv-50324 Document #: 24-23 at ¶ 9.
[68]    *Id.* at ¶ 10 and Exhibit B thereto.
[69]    Moffitt Cert at Ex. K (Kunz Dep. at 48:11-48:22).
[70]    *Id.* at 21:15-22:2.

161.    Kunz took the December 2012 call from the same phone number Ligutan had called on in his warehouse, which because it is a steel structure that interferes with cell phone service.[71]

162.    During the period 2009-2014 21CS exceed $5,000 in sales in 38 states.[72]

163.    Duke did not notice the TM marking on the photo produced by Frank Gu.[73]

164.    The entirety of Plaintiffs CB's email account for its employee Mr. Martin Hewes was **destroyed** during the course of this litigation after its requested production by 21CS and was not produced by Plaintiffs, preventing 21CS from discovering Mr. Hewes communications concerning the allegations Plaintiffs have made in support of their affirmative defense.[74]

165.    At all relevant times, 21CS marketed its products throughout the United States. While it may have closed certain locations, it continues to sell product nationwide through its Internet site.[75]

Dated: March 19, 2018

                                        CENTURY SMOKING, INC. and
                                        BRENT DUKE


                              By:      /s/ Thomas R. Leavens
                                        One of their Attorneys

Thomas R. Leavens (Bar No. 1601016)        Peter S. Stamatis (Bar No. 6217496)
Travis W. Life (Bar No. 6279244)           Steven S. Shonder (Bar No. 6238090)
Leavens Strand & Glover, LLC               Law Offices of Peter S. Stamatis, PC
203 North LaSalle Street, Suite 2550       1 East Wacker Drive, Suite 2350
Chicago, Illinois 60601                    Chicago, Illinois 60601
(312) 488-4170                             (312) 606-0045

---

[71]    *Id.* at 17:10-17:17.
[72]    Tab 12, Hass Report, Fig. 8.2.4.
[73]    Tab 1, Duke 6/16/15 Dep. at 352:22-23.
[74]    Tab 25, Piper 30(b)(6) Dep. at 27:19-32:12; Tab 21, MacDonald Dep. at 50:8-57:8.
[75]    Tab 36 at ¶ 5.

# EXHIBIT 38

# Exhibit EE

**Pacific View Mall**
**3301 E Main St**
**Ventura CA 93003**

2010 sales: opened 3/5/10

| | |
|-----|-----------|
| Mar | 6,274.32 |
| Apr | 15,476.14 |
| May | 17,474.80 |
| Jun | 11,165.41 |
| Jul | 15,406.84 |
| Aug | 11,560.45 |
| Sep | 9,789.12 |
| Oct | 11,804.93 |
| Nov | 7,960.83 |
| Dec | 10,321.25 |

Total: $117,234.09

2011 sales:

| | |
|-----|-----------|
| Jan | 10,433.46 |
| Feb | 12,441.28 |
| Mar | 12,599.71 |
| Apr | 17,313.38 |
| May | 16,527.09 |
| Jun | 18,140.34 |
| Jul | 18,485.79 |
| Aug | 16,552.61 |
| Sep | 18,084.03 |
| Oct | 18,789.60 |
| Nov | 15,913.59 |
| Dec | 21,304.12 |

Total: $196,585.00

2012 sales:

| | |
|-----|-----------|
| Jan | 19,170.92 |
| Feb | 19,389.99 |
| Mar | 20,159.52 |
| Apr | 20,044.81 |
| May | 17,008.35 |
| Jun | 18,985.87 |
| Jul | 18,046.83 |
| Aug | 16,373.65 |
| Sep | 15,944.67 |
| Oct | 16,828.78 |
| Nov | 17,321.58 |
| Dec | 20,261.47 |

Total: $219,986.44

2013 sales:

| | |
|-----|-----------|
| Jan | 16,591.13 |

21C-0431-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

21 Century Smoking
2516 N Lincoln Ave
Chicago IL 60614

2010 sales: opened 3/14/10

| | |
|-----|----------|
| Mar | 1,915.56 |
| Apr | 3,963.74 |
| May | 4,117.20 |
| Jun | 3,963.88 |
| Jul | 5,171.55 |
| Aug | 5,350.78 |
| Sep | 5,076.92 |
| Oct | 6,846.99 |
| Nov | 5,597.42 |
| Dec | 6,290.80 |

Total: $47,754.84

2011 sales:

| | |
|-----|-----------|
| Jan | 9,377.41 |
| Feb | 6,292.10 |
| Mar | 9,484.52 |
| Apr | 12,501.46 |
| May | 14,018.82 |
| Jun | 12,615.72 |
| Jul | 7,770.99 |
| Aug | 12,513.00 |
| Sep | 10,902.46 |
| Oct | 11,977.00 |
| Nov | 11,661.23 |
| Dec | 11,715.98 |

Total: $130,830.69

2012 sales:

| | |
|-----|-----------|
| Jan | 14,369.21 |
| Feb | 12,007.19 |
| Mar | 11,967.40 |
| Apr | 11,545.53 |
| May | 10,606.79 |
| Jun | 11,599.43 |
| Jul | 12,269.13 |
| Aug | 12,617.03 |
| Sep | 15,676.03 |
| Oct | 14,453.13 |
| Nov | 14,220.45 |
| Dec | 16,039.52 |

Total: $157,370.84

2013 sales:

| | |
|-----|-----------|
| Jan | 16,854.17 |

21C-0432-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**Westroads Mall**
**10000 California St**
**Omaha NE 68114**

**2010 sales: opened 4/01/10**

| | |
|---|---|
| Apr | 6,416.96 |
| May | 6,400.00 |
| Jun | 1,838.75 |
| Jul | 1,774.22 |
| Aug | 6,910.87 |
| Sep | 4,816.44 |
| Oct | 8,865.17 |
| Nov | 4,253.83 |
| Dec | 4,415.20 |

Total: $45,689.44

**2011 sales:**

| | |
|---|---|
| Jan | 4,851.06 |
| Feb | 8,161.15 |
| Mar | 11,617.26 |

Total: $24,629.47 (closed 3/31/11)

21C-0433-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Westfield Louis-Joliet Mall
3340 Mall Loop Dr
Joliet IL 60431

2010 sales: opened 4/15/10

| | |
|---|---|
| Apr | 2,031.97 |
| May | 6,596.85 |
| Jun | 5,924.76 |
| Jul | 4,430.62 |
| Aug | 4,155.20 |
| Sep | 2,826.45 |
| Oct | 3,031.77 |
| Nov | 5,126.13 |
| Dec | 10,456.20 |

Total: $44,579.95

2011 sales:

| | |
|---|---|
| Jan | 8,325.69 |
| Feb | 9,182.71 |
| Mar | 14,597.34 |
| Apr | 5,965.33 |

Total: $38,071.07 (closed 4/14/11)

21C-0434-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Old Orchard Mall
4999 Old Orchard Center
Skokie IL 60077

2010 sales: opened 5/1/10

| May | 3,262.64 |
|-----|----------|
| Jun | 4,459.11 |
| Jul | 5,165.34 |
| Aug | 7,982.29 |
| Sep | 5,192.42 |
| Oct | 1,435.62 |

Total: $27,492.42 (closed 10/10)

2012 sales: opened 5/1/12

| May | 3,850.57 |
|-----|----------|
| Jun | 3,506.05 |
| Jul | 5,751.89 |
| Aug | 4,335.08 |
| Sep | 3,801.24 |
| Oct | 3,418.60 |

Total: $24,663.43  (closed 10/31/12)

21C-0435-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**Westfield Gateway**
**#5 Gateway**
**Lincoln NE 68505**

2010 sales: opened 5/15/10

| May | 4,093.24 |
|-----|----------|
| Jun | 6,112.55 |
| Jul | 4,358.79 |
| Aug | 6,996.79 |
| Sep | 5,740.86 |
| Oct | 5,501.19 |
| Nov | 4,066.53 |
| Dec | 5,975.32 |

**Total: $42,845.27**

2011 sales:

| Jan | 6,009.50 |
|-----|-----------|
| Feb | 8,508.14 |
| Mar | 9,397.45 |
| Apr | 12,492.32 |
| May | 13,455.21 |
| Jun | 12,651.00 |
| Jul | 11,146.91 |
| Aug | 7,512.04 |
| Sep | 7,654.00 |
| Oct | 5,324.00 |
| Nov | 6,664.60 |
| Dec | 6,284.00 |

**Total: $107,099.17**

2012 sales:

| Jan | 8,913.38 |
|-----|-----------|
| Feb | 11,141.81 |
| Mar | 11,680.95 |
| Apr | 12,975.58 |
| May | 12,699.96 |
| Jun | 9,760.59 |
| Jul | 7,628.70 |
| Aug | 9,904.23 |
| Sep | 7,706.00 |
| Oct | 7,967.99 |
| Nov | 7,231.17 |
| Dec | 9,013.56 |

**Total: $116,623.92**

2013 sales:

| Jan | 9,607.75 |
|-----|----------|

Westfield Hawthorn
122 Hawthorn Center
Vernon Hills IL 60061

2010 sales: opened 5/21/10

| May | 605.12 |
|-----|--------|
| Jun | 2,352.67 |
| Jul | 3,473.10 |
| Aug | 3,759.81 |
| Sep | 3,335.65 |
| Oct | 5,230.49 |
| Nov | 3,287.60 |
| Dec | 5,982.96 |

Total: $28,027.40

2011 sales:

| Jan | 5,628.11 |
|-----|----------|
| Feb | 3,799.70 |
| Mar | 7,407.44 |
| Apr | 12,250.01 |
| May | 3,296.81 |

Total: $32,382.07 (closed 5/20/11)

21C-0437-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Westfield Southpark
500 Southpark Center
Strongsville OH 44136

2010 sales: opened 5/29/10

| May | 844.76 |
|---|---|
| Jun | 2,889.03 |
| Jul | 6,081.41 |
| Aug | 5,538.15 |
| Sep | 3,774.00 |
| Oct | 4,474.91 |
| Nov | 4,401.88 |
| Dec | 8,932.48 |

Total: $36,936.62

2011 sales:

| Jan | 8,798.96 |
|---|---|
| Feb | 10,504.13 |
| Mar | 9,238.61 |
| Apr | 10,856.55 |
| May | 7,752.72 |

Total: $47,150.97 (closed 5/28/11)

21C-0438-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Westfield Franklin Park
5001 Monroe St
Toledo OH 43623

2010 sales: opened 6/12/10

| | |
|-----|-----------|
| Jun | 933.70 |
| Jul | 2,007.89 |
| Aug | 7,474.10 |
| Sep | 6,195.89 |
| Oct | 6,384.07 |
| Nov | 7,663.31 |
| Dec | 12,089.67 |

Total: $42,748.63

2011 sales:

| | |
|-----|-----------|
| Jan | 10,684.57 |
| Feb | 10,599.36 |
| Mar | 13,794.36 |
| Apr | 11,668.08 |
| May | 8,382.91 |
| Jun | 6,145.74 |
| Jul | 4,978.15 |
| Aug | 6,878.03 |
| Sep | 6,754.53 |
| Oct | 5,704.02 |
| Nov | 6,834.16 |
| Dec | 9,341.49 |

Total: $101,765.40

2012 sales:

| | |
|-----|-----------|
| Jan | 7,546.11 |
| Feb | 6,313.69 |
| Mar | 6,950.02 |
| Apr | 7,243.38 |
| May | 6,610.56 |
| Jun | 6,788.51 |
| Jul | 6,732.39 |
| Aug | 6,669.23 |
| Sep | 8,335.89 |
| Oct | 7,291.39 |
| Nov | 7,589.80 |
| Dec | 11,584.93 |

Total: $89,655.90

2013 sales:

| | |
|-----|----------|
| Jan | 9,641.80 |

Westfield Fox Valley
722 Fox Valley Center Dr
Aurora IL 60504

2010 sales: opened 6/19/10

| | |
|-----|-----------|
| Jun | 1,366.44 |
| Jul | 1,428.29 |
| Aug | 3,291.70 |
| Sep | 1,958.12 |
| Oct | 3,465.16 |
| Nov | 4,453.47 |
| Dec | 12,308.56 |

Total: $28,271.74

2011 sales:

| | |
|-----|-----------|
| Jan | 10,297.08 |
| Feb | 8,388.36 |
| Mar | 11,234.05 |
| Apr | 11,602.02 |
| May | 10,326.61 |
| Jun | 5,853.55 |

Total: $57,701.67 (closed 6/18/11)

21C-0440-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Westfield Belden Village
4230 Belden Village Mall
Canton OH 44718

**2010 sales: opened 7/10/10**

| Jul | 5,809.00 |
|-----|----------|
| Aug | 9,671.73 |
| Sep | 9,831.29 |
| Oct | 7,946.51 |
| Nov | 5,108.01 |
| Dec | 13,715.52 |

Total: $52,082.06

**2011 sales:**

| Jan | 13,823.19 |
|-----|-----------|
| Feb | 11,164.25 |
| Mar | 12,654.25 |
| Apr | 12,095.20 |
| May | 9,016.01 |
| Jun | 7,722.11 |
| Jul | 1,286.55 |

Total: $67,761.56 (closed 7/9/11)

21C-0441-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Westfield Great Northern
4954 Great Northern Mall
North Olmsted OH 44070

2010 sales: opened 7/11/10

| | |
|-----|----------|
| Jul | 1,943.88 |
| Aug | 3,132.23 |
| Sep | 3,474.33 |
| Oct | 2,816.23 |
| Nov | 3,032.07 |
| Dec | 6,225.66 |

Total: $20,624.40

2011 sales:

| | |
|-----|-----------|
| Jan | 6,313.09 |
| Feb | 9,300.67 |
| Mar | 11,042.42 |
| Apr | 11,053.51 |
| May | 8,916.52 |
| Jun | 6,638.66 |

Total: $53,264.87 (closed 6/30/11)

21C-0442-RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

Westfield Southlake
2109 Southlake Mall
Merrillville IN 46410

**2010 sales: opened 9/3/10**

| Sep | 4,785.25 |
|-----|----------|
| Oct | 4,664.27 |
| Nov | 5,113.55 |
| Dec | 12,940.92 |

Total: $27,503.99

**2011 sales:**

| Jan | 9,749.90 |
|-----|----------|
| Feb | 11,293.40 |
| Mar | 14,023.45 |
| Apr | 11,596.23 |
| May | 9,489.51 |
| Jun | 8,289.62 |
| Jul | 9,507.38 |
| Aug | 398.41 |

Total: $74,356.90 (closed 8/2/11)

21C-0443-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Great Lakes Mall
7850 Mentor Ave
Mentor OH 44060

2011 sales: opened 5/3/11

| May | 4,573.92 |
|-----|----------|
| Jun | 4,373.34 |
| Jul | 4,201.89 |
| Aug | 5,765.80 |
| Sep | 7,955.81 |
| Oct | 7,565.21 |
| Nov | 7,682.43 |
| Dec | 14,016.85 |

Total: $56,135.25

2012 sales:

| Jan | 10,503.14 |
|-----|-----------|
| Feb | 11,714.05 |
| Mar | 11,081.34 |
| Apr | 11,568.98 |
| May | 10,200.68 |
| Jun | 9,748.49 |
| Jul | 8,259.61 |
| Aug | 8,831.37 |
| Sep | 8,827.85 |
| Oct | 10,995.27 |
| Nov | 9,446.32 |
| Dec | 12,768.54 |

Total: $123,945.64

2013 sales:

| Jan | 12,581.61 |
|-----|-----------|

21C-0444-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Summit Mall
3265 W Market St
Akron OH 44333

2011 sales: opened 5/6/11

| | |
|------|-----------|
| May | 1,523.23 |
| Jun | 5,912.13 |
| Jul | 6,451.45 |
| Aug | 9,429.31 |
| Sep | 9,374.00 |
| Oct | 10,263.23 |
| Nov | 8,459.22 |
| Dec | 12,634.99 |

Total: $64,047.56

2012 sales:

| | |
|------|-----------|
| Jan | 8,930.05 |
| Feb | 10,080.08 |
| Mar | 10,587.49 |
| Apr | 8,639.00 |
| May | 8,492.97 |
| Jun | 9,109.99 |
| Jul | 9,044.02 |
| Aug | 8,364.88 |
| Sep | 6,533.10 |
| Oct | 7,497.64 |
| Nov | 7,455.99 |
| Dec | 11,371.71 |

Total: $106,106.92

2013 sales:

| | |
|------|-----------|
| Jan | 12,672.15 |

21C-0445-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Lincolnwood Town Center
3333 W Touhy Ave
Skokie IL 60712

2011 sales: opened 5/15/11

| May | 2,120.85 |
|-----|----------|
| Jun | 5,442.98 |
| Jul | 5,775.22 |
| Aug | 5,522.44 |
| Sep | 5,750.35 |
| Oct | 5,546.30 |
| Nov | 5,991.80 |
| Dec | 7,285.91 |

Total: $43,435.85

2012 sales:

| Jan | 6,702.39 |
|-----|----------|
| Feb | 6,836.13 |
| Mar | 11,795.33 |
| Apr | 6,183.20 |
| May | 5,506.12 |
| Jun | 7,483.40 |
| Jul | 7,410.58 |
| Aug | 6,837.37 |
| Sep | 4,760.83 |
| Oct | 5,912.92 |
| Nov | 6,462.72 |
| Dec | 8,886.03 |

Total: $84,776.02

2013 sales:

| Jan | 8,206.79 |
|-----|----------|

21C-0446-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Parmatown Mall
7899 W Ridgewood Dr
Parma OH 44129

2011 sales: opened 5/17/11)

| May | 1,239.12 |
|-----|----------|
| Jun | 6,181.22 |
| Jul | 7,582.12 |
| Aug | 8,340.84 |
| Sep | 10,164.43 |
| Oct | 10,740.34 |
| Nov | 9,568.71 |
| Dec | 15,209.29 |

Total: $69,026.07

2012 sales:

| Jan | 13,796.48 |
|-----|-----------|
| Feb | 12,256.58 |
| Mar | 14,044.42 |
| Apr | 9,799.47 |
| May | 10,362.11 |
| Jun | 9,306.65 |
| Jul | 8,447.07 |
| Aug | 9,543.68 |
| Sep | 8,955.89 |
| Oct | 9,148.78 |
| Nov | 9,783.63 |
| Dec | 11,026.86 |

Total: $126,154.62

2013 sales:

| Jan | 10,799.13 |
|-----|-----------|

21C-0447-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Richmond Town Square
691 Richmond Rd
Richmond Heights OH 44143

2011 sales: opened 5/24/11

| May | 204.72 |
|-----|--------|
| Jun | 1,515.54 |
| Jul | 1,194.52 |
| Aug | 1,552.75 |
| Sep | 2,165.37 |
| Oct | 4,334.13 |
| Nov | 2,965.29 |
| Dec | 3,663.53 |

Total: $17,595.85

2012 sales:

| Jan | 2,683.89 |
|-----|----------|
| Feb | 4,547.87 |
| Mar | 4,116.21 |
| Apr | 3,787.36 |
| May | 2,847.27 |
| Jun | 2,796.43 |
| Jul | 2,716.01 |
| Aug | 2,858.48 |
| Sep | 2,458.18 |
| Oct | 2,306.05 |
| Nov | 2,916.42 |
| Dec | 3,074.03 |

Total: $37,108.20

2013 sales:

| Jan | 2,558.22 |
|-----|----------|

**The Promenade Bolingbrook**
**631** E Boughton Rd
Bolingbrook Il **60440**

2011 sales: opened 7/1/11

| Jul | 1,997.03 |
|-----|----------|
| Aug | 2,835.97 |
| Sep | 3,050.93 |
| Oct | 1,028.26 |

Total: $8,912.19 (closed 10/15/11)

21C-0449-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

River Oaks Center
96 River Oaks Center Dr
Calumet City IL 60409

2011 sales: opened 8/1/11

| Aug | 6,582.51 |
|-----|----------|
| Sep | 5,246.72 |
| Oct | 5,024.08 |
| Nov | 5,958.93 |
| Dec | 7,851.80 |

Total: $30,664.04

2012 sales:

| Jan | 6,493.57 |
|-----|----------|
| Feb | 6,240.05 |
| Mar | 6,093.21 |
| Apr | 4,623.63 |
| May | 4,601.68 |
| Jun | 4,508.81 |
| Jul | 4,442.00 |
| Aug | 3,843.87 |
| Sep | 3,522.00 |
| Oct | 4,285.00 |

Total: $48,653.82 (closed 10/31/12)

21C-0450-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

The Great Mall
447 Great Mall Dr
Milpitas CA 95035

**2011 sales: opened 8/19/11**

| Aug | 2,124.75 |
|-----|----------|
| Sep | 2,506.70 |
| Oct | 2,916.55 |
| Nov | 2,186.83 |
| Dec | 3,345.41 |

Total: $12,080.24

**2012 sales:**

| Jan | 2,152.07 |
|-----|----------|

Total: $2,152.07 (closed 1/31/12)

21C-0451-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**21 Century Smoking Store**
**1551 Plainfield Rd**
**Joliet IL 60435**

**2011 sales: opened 10/16/11**

| Oct | 730.73 |
|-----|--------|
| Nov | 2,982.96 |
| Dec | 4,511.91 |

Total: $8,225.60

**2012 sales:**

| Jan | 3,716.68 |
|-----|----------|
| Feb | 3,052.15 |
| Mar | 3,124.99 |
| Apr | 3,016.71 |
| May | 3,128.45 |
| Jun | 4,178.75 |
| Jul | 4,126.06 |
| Aug | 3,856.00 |
| Sep | 2,886.12 |
| Oct | 3,398.07 |
| Nov | 2,912.86 |
| Dec | 3,365.31 |

Total: $40,762.15

**2013 sales:**

| Jan | 3,162.92 |
|-----|----------|

21C-0452-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

21 Century Smoking Store
7 W Haley St
Santa Barbara CA 93101

2012 sales: opened 5/5/12

| | |
|---|---|
| May | 4,264.17 |
| Jun | 5,687.27 |
| Jul | 6,020.72 |
| Aug | 6,530.46 |
| Sep | 6,037.84 |
| Oct | 7,965.16 |
| Nov | 6,553.03 |
| Dec | |

Total: $

2013 sales:

| | |
|---|---|
| Jan | 7,776.29 |

21C-0453-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Beachwood Place Mall
26300 Cedar Rd
Beachwood OH 44122

2012 sales: opened5 /14/12

| May | 1,488.21 |
|-----|----------|
| Jun | 2,433.52 |
| Jul | 3,617.75 |
| Aug | 3,659.73 |
| Sep | 2,887.78 |
| Oct | 4,687.31 |
| Nov | 4,958.89 |
| Dec | 7,049.56 |

Total: $30,782.75

2013 sales:

| Jan | 5,323.65 |
|-----|----------|

21C-0454-RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

# EXHIBIT 39

# Exhibit FF

lawsuit - monthly sales including online

# lawsuit - monthly sales including online

| | |
|---|---|
| **From:** | support@21centurysmoking.com |
| **To:** | Brent Duke <brentduke@yahoo.com> |
| **Date:** | Sun, 10 Feb 2013 16:31:40 -0600 |
| **Attachments:** | monthly sales.doc (349.7 kB) |

monthly sales.doc

Online Sales

**2009 sales**

| | |
|------|----------|
| Aug | 4,417.89 |
| Sep | 5,013.46 |
| Oct | 2,874.77 |
| Nov | 1,294.26 |
| Dec | 2,015.99 |

Total: $15,616.37

**2010 sales**

| | |
|------|-----------|
| Jan | 3,066.41 |
| Feb | 5,352.77 |
| Mar | 5,377.18 |
| Apr | 5,495.76 |
| May | 5,262.02 |
| Jun | 7,132.69 |
| Jul | 8,653.84 |
| Aug | 7,933.04 |
| Sep | 9,943.08 |
| Oct | 10,367.60 |
| Nov | 9,169.41 |
| Dec | 10,954.90 |

Total: $88,708.70

**2011 sales**

| | |
|------|-----------|
| Jan | 15,288.37 |
| Feb | 13,357.07 |
| Mar | 22,955.20 |
| Apr | 24,702.05 |
| May | 27,757.58 |
| Jun | 28,598.34 |
| Jul | 38,229.43 |
| Aug | 40,928.72 |
| Sep | 40,832.38 |
| Oct | 42,956.86 |
| Nov | 36,260.82 |
| Dec | 52,342.65 |

Total: $384,209.47

**2012 sales**

| | |
|------|-----------|
| Jan | 53,230.89 |
| Feb | 49,284.07 |
| Mar | 44,075.87 |
| Apr | 44,455.09 |
| May | 43,428.30 |
| Jun | 40,400.48 |
| Jul | 41,637.57 |
| Aug | 47,288.77 |
| Sep | 42,029.68 |
| Oct | 47,605.44 |
| Nov | 54,166.93 |
| Dec | 50,142.91 |

Total: $557,746.00

**2013 sales**

| | |
|------|-----------|
| Jan | 57,040.73 |

Confidential

monthly sales.doc

Pacific View Mall
3301 E Main St
Ventura CA 93003

2010 sales: opened 3/5/10:

| Mar | 6,274.32 |
|-----|----------|
| Apr | 15,476.14 |
| May | 17,474.80 |
| Jun | 11,165.41 |
| Jul | 15,406.84 |
| Aug | 11,560.45 |
| Sep | 9,789.12 |
| Oct | 11,804.93 |
| Nov | 7,960.83 |
| Dec | 10,321.25 |

Total: $117,234.09

2011 sales:

| Jan | 10,433.46 |
|-----|-----------|
| Feb | 12,441.28 |
| Mar | 12,589.71 |
| Apr | 17,313.38 |
| May | 16,527.09 |
| Jun | 18,140.34 |
| Jul | 18,485.79 |
| Aug | 16,552.61 |
| Sep | 18,084.03 |
| Oct | 18,789.60 |
| Nov | 15,913.59 |
| Dec | 21,304.12 |

Total: $196,585.00

2012 sales:

| Jan | 19,170.92 |
|-----|-----------|
| Feb | 19,389.99 |
| Mar | 20,159.52 |
| Apr | 20,044.81 |
| May | 17,008.35 |
| Jun | 18,985.87 |
| Jul | 18,046.83 |
| Aug | 16,873.65 |
| Sep | 15,944.67 |
| Oct | 16,828.78 |
| Nov | 17,321.58 |
| Dec | 20,261.47 |

Total: $219,986.44

2013 sales:

| Jan | 16,591.13 |
|-----|-----------|

Confidential

DOC-000001582_0002

21C 1005535

monthly sales.doc

21 Century Smoking
2516 N Lincoln Ave
Chicago IL 60614

2010 sales: opened 3/14/10

| | |
|------|-----------|
| Mar | 1,915.56 |
| Apr | 3,963.74 |
| May | 4,117.20 |
| Jun | 3,963.88 |
| Jul | 5,171.55 |
| Aug | 5,350.78 |
| Sep | 5,076.92 |
| Oct | 6,846.99 |
| Nov | 5,597.42 |
| Dec | 6,290.80 |

Total: $47,754.84

2011 sales:

| | |
|------|-----------|
| Jan | 9,377.41 |
| Feb | 6,292.10 |
| Mar | 9,484.52 |
| Apr | 12,501.46 |
| May | 14,018.82 |
| Jun | 12,815.72 |
| Jul | 7,770.99 |
| Aug | 12,513.00 |
| Sep | 10,902.46 |
| Oct | 11,977.00 |
| Nov | 11,661.23 |
| Dec | 11,715.98 |

Total: $130,830.69

2012 sales:

| | |
|------|-----------|
| Jan | 14,369.21 |
| Feb | 12,007.19 |
| Mar | 11,967.40 |
| Apr | 11,545.53 |
| May | 10,606.79 |
| Jun | 11,599.43 |
| Jul | 12,269.13 |
| Aug | 12,617.03 |
| Sep | 15,676.03 |
| Oct | 14,453.13 |
| Nov | 14,220.45 |
| Dec | 16,039.52 |

Total: $157,370.84

2013 sales:

| | |
|------|-----------|
| Jan | 16,854.17 |

DOC-000001582_0003

Confidential

21C 1005536

monthly sales.doc

Westroads Mall
10000 California St
Omaha NE 68114

2010 sales: opened 4/01/10

| Apr | 6,416.96 |
|-----|----------|
| May | 6,400.00 |
| Jun | 1,838.75 |
| Jul | 1,774.22 |
| Aug | 6,910.87 |
| Sep | 4,816.44 |
| Oct | 8,865.17 |
| Nov | 4,253.83 |
| Dec | 4,415.20 |

Total: $45,689.44

2011 sales:

| Jan | 4,851.06 |
|-----|----------|
| Feb | 8,161.15 |
| Mar | 11,617.26 |

Total: $24,629.47 (closed 3/31/11)

Confidential
21C 1005537

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 281 of 732 PageID #:13008

monthly sales.doc

Westfield Louis-Joliet Mall
3340 Mall Loop Dr
Joliet IL 60431

2010 sales: opened 4/15/10

| Apr | 2,031.97 |
| May | 6,596.85 |
| Jun | 5,924.76 |
| Jul | 4,430.62 |
| Aug | 4,155.20 |
| Sep | 2,826.45 |
| Oct | 3,031.77 |
| Nov | 5,126.13 |
| Dec | 10,456.20 |

Total: $44,579.95

2011 sales:

| Jan | 8,325.69 |
| Feb | 9,182.71 |
| Mar | 14,597.34 |
| Apr | 5,965.33 |

Total: $38,071.07 (closed 4/14/11)

DOC-000001582_0005

Confidential

21C 1005538

monthly sales.doc

Old Orchard Mall
4999 Old Orchard Center
Skokie IL 60077

2010 sales: opened 5/1/10

| May | 3,262.64 |
| --- | --- |
| Jun | 4,459.11 |
| Jul | 5,165.34 |
| Aug | 7,982.29 |
| Sep | 5,192.42 |
| Oct | 1,435.62 |

Total: $27,492.42 (closed 10/10)

2012 sales: opened 5/1/12

| May | 3,850.57 |
| --- | --- |
| Jun | 3,506.05 |
| Jul | 5,751.89 |
| Aug | 4,335.08 |
| Sep | 3,801.24 |
| Oct | 3,418.60 |

Total: $24,663.43 (closed 10/31/12)

DOC-000001582_0006

Confidential                                                                21C 1005539

monthly sales.doc

Westfield Gateway
#5 Gateway
Lincoln NE 68505

2010 sales: opened 5/15/10

| May | 4,093.24 |
|---|---|
| Jun | 6,112.55 |
| Jul | 4,358.79 |
| Aug | 6,996.79 |
| Sep | 5,740.86 |
| Oct | 5,501.19 |
| Nov | 4,066.53 |
| Dec | 5,975.32 |

Total: $42,845.27

2011 sales:

| Jan | 8,009.50 |
|---|---|
| Feb | 8,508.14 |
| Mar | 9,397.45 |
| Apr | 12,492.32 |
| May | 13,455.21 |
| Jun | 12,651.00 |
| Jul | 11,146.91 |
| Aug | 7,512.04 |
| Sep | 7,654.00 |
| Oct | 5,324.00 |
| Nov | 6,664.60 |
| Dec | 6,284.00 |

Total: $107,099.17

2012 sales:

| Jan | 8,913.38 |
|---|---|
| Feb | 11,141.81 |
| Mar | 11,680.95 |
| Apr | 12,975.58 |
| May | 12,699.96 |
| Jun | 9,760.59 |
| Jul | 7,628.70 |
| Aug | 9,904.23 |
| Sep | 7,706.00 |
| Oct | 7,967.99 |
| Nov | 7,231.17 |
| Dec | 9,013.56 |

Total: $116,623.92

2013 sales:

| Jan | 9,607.75 |
|---|---|

DOC-000001582_0007

Confidential

21C 1005540

monthly sales.doc

Westfield Hawthorn
122 Hawthorn Center
Vernon Hills IL 60061

2010 sales: opened 5/21/10

| May | 605.12 |
|-----|--------|
| Jun | 2,352.67 |
| Jul | 3,473.10 |
| Aug | 3,759.81 |
| Sep | 3,335.65 |
| Oct | 5,230.49 |
| Nov | 3,287.60 |
| Dec | 5,982.96 |

Total: $28,027.40

2011 sales:

| Jan | 5,628.11 |
|-----|----------|
| Feb | 3,799.70 |
| Mar | 7,407.44 |
| Apr | 12,250.01 |
| May | 3,296.81 |

Total: $32,382.07 (closed 5/20/11)

DOC-000001582_0008

Confidential                                    21C 1005541

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 285 of 732 PageID #:13000

monthly sales.doc

Westfield Southpark
500 Southpark Center
Strongsville OH 44136

2010 sales: opened 5/29/10

| May | 844.76 |
|-----|--------|
| Jun | 2,889.03 |
| Jul | 6,081.41 |
| Aug | 5,538.15 |
| Sep | 3,774.00 |
| Oct | 4,474.91 |
| Nov | 4,401.88 |
| Dec | 8,932.48 |

Total: $36,936.62

2011 sales:

| Jan | 8,798.96 |
|-----|----------|
| Feb | 10,504.13 |
| Mar | 9,238.61 |
| Apr | 10,856.55 |
| May | 7,752.72 |

Total: $47,150.97 (closed 5/28/11)

Confidential

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 286 of 732 PageID #:13008

monthly sales.doc

Westfield Franklin Park
5001 Monroe St
Toledo OH 43623

2010 sales: opened 6/12/10

| Jun | 933.70 |
|-----|--------|
| Jul | 2,007.89 |
| Aug | 7,474.10 |
| Sep | 6,195.89 |
| Oct | 6,384.07 |
| Nov | 7,663.31 |
| Dec | 12,089.67 |

Total: $42,748.63

2011 sales:

| Jan | 10,684.57 |
|-----|-----------|
| Feb | 10,599.36 |
| Mar | 13,794.36 |
| Apr | 11,668.08 |
| May | 8,382.91 |
| Jun | 6,145.74 |
| Jul | 4,978.15 |
| Aug | 6,878.03 |
| Sep | 6,754.53 |
| Oct | 5,704.02 |
| Nov | 6,834.16 |
| Dec | 9,341.49 |

Total: $101,765.40

2012 sales:

| Jan | 7,546.11 |
|-----|----------|
| Feb | 6,313.69 |
| Mar | 6,950.02 |
| Apr | 7,243.38 |
| May | 6,610.56 |
| Jun | 6,788.51 |
| Jul | 6,732.39 |
| Aug | 6,669.23 |
| Sep | 8,335.89 |
| Oct | 7,291.39 |
| Nov | 7,589.80 |
| Dec | 11,584.93 |

Total: $89,655.90

2013 sales:

| Jan | 9,641.80 |
|-----|----------|

Confidential

21C 1005543

monthly sales.doc

Westfield Fox Valley
722 Fox Valley Center Dr
Aurora IL 60504

2010 sales: opened 6/19/10

| Jun | 1,366.44 |
| Jul | 1,428.29 |
| Aug | 3,291.70 |
| Sep | 1,958.12 |
| Oct | 3,465.16 |
| Nov | 4,453.47 |
| Dec | 12,308.56 |

Total: $28,271.74

2011 sales:

| Jan | 10,297.08 |
| Feb | 8,388.36 |
| Mar | 11,234.05 |
| Apr | 11,602.02 |
| May | 10,326.61 |
| Jun | 5,853.55 |

Total: $57,701.67 (closed 6/18/11)

DOC-000001582_0011

Confidential

21C 1005544

monthly sales.doc

Westfield Belden Village
4230 Belden Village Mall
Canton OH 44718

2010 sales: opened 7/10/10

| Jul | 5,809.00 |
|-----|----------|
| Aug | 9,671.73 |
| Sep | 9,831.29 |
| Oct | 7,946.51 |
| Nov | 5,108.01 |
| Dec | 13,715.52 |

Total: $52,082.06

2011 sales:

| Jan | 13,823.19 |
|-----|-----------|
| Feb | 11,164.25 |
| Mar | 12,654.25 |
| Apr | 12,095.20 |
| May | 9,016.01 |
| Jun | 7,722.11 |
| Jul | 1,286.55 |

Total: $67,761.56 (closed 7/9/11)

Confidential

21C 1005545

monthly sales.doc

Westfield Great Northern
4954 Great Northern Mall
North Olmsted OH 44070

2010 sales: opened 7/11/10

| Jul | 1,943.88 |
|-----|----------|
| Aug | 3,132.23 |
| Sep | 3,474.33 |
| Oct | 2,816.23 |
| Nov | 3,032.07 |
| Dec | 6,225.66 |

Total: $20,624.40

2011 sales:

| Jan | 6,313.09 |
|-----|----------|
| Feb | 9,300.67 |
| Mar | 11,042.42 |
| Apr | 11,053.51 |
| May | 8,916.52 |
| Jun | 6,638.66 |

Total: $53,264.87 (closed 6/30/11)

Confidential

monthly sales.doc

**Westfield Southlake**
2109 Southlake Mall
Merrillville IN 46410

2010 sales: opened 9/3/10

| | |
|------|----------|
| Sep | 4,785.25 |
| Oct | 4,664.27 |
| Nov | 5,113.55 |
| Dec | 12,940.92 |

Total: $27,503.99

2011 sales:

| | |
|------|-----------|
| Jan | 9,749.90 |
| Feb | 11,293.40 |
| Mar | 14,023.45 |
| Apr | 11,596.23 |
| May | 9,489.51 |
| Jun | 8,289.62 |
| Jul | 9,507.38 |
| Aug | 398.41 |

Total: $74,356.90 (closed 8/2/11)

Confidential

DOC-000001562 0014

21C 1005547

monthly sales.doc

Great Lakes Mall
7850 Mentor Ave
Mentor OH 44060

2011 sales: opened 5/3/11

| May | 4,573.92 |
|---|---|
| Jun | 4,373.34 |
| Jul | 4,201.89 |
| Aug | 5,765.80 |
| Sep | 7,955.81 |
| Oct | 7,565.21 |
| Nov | 7,682.43 |
| Dec | 14,016.85 |

Total: $56,135.25

2012 sales:

| Jan | 10,503.14 |
|---|---|
| Feb | 11,714.05 |
| Mar | 11,081.34 |
| Apr | 11,568.98 |
| May | 10,200.68 |
| Jun | 9,748.49 |
| Jul | 8,259.61 |
| Aug | 8,831.37 |
| Sep | 8,827.85 |
| Oct | 10,995.27 |
| Nov | 9,446.32 |
| Dec | 12,768.54 |

Total: $123,945.64

2013 sales:

| Jan | 12,581.61 |
|---|---|

DOC-000001582_0015

Confidential

21C 1005548

monthly sales.doc

Summit Mall
3265 W Market St
Akron OH 44333

2011 sales: opened 5/6/11

| May | 1,523.23 |
| --- | --- |
| Jun | 5,912.13 |
| Jul | 6,451.45 |
| Aug | 9,429.31 |
| Sep | 9,374.00 |
| Oct | 10,263.23 |
| Nov | 8,459.22 |
| Dec | 12,634.99 |

Total: $64,047.56

2012 sales:

| Jan | 8,930.05 |
| --- | --- |
| Feb | 10,080.08 |
| Mar | 10,587.49 |
| Apr | 8,639.00 |
| May | 8,492.97 |
| Jun | 9,109.99 |
| Jul | 9,044.02 |
| Aug | 8,364.88 |
| Sep | 6,533.10 |
| Oct | 7,497.64 |
| Nov | 7,455.99 |
| Dec | 11,371.71 |

Total: $106,106.92

2013 sales:

| Jan | 12,672.15 |
| --- | --- |

Confidential
21C 1005549

monthly sales.doc

Lincolnwood Town Center
3333 W Touhy Ave
Skokie IL 60712

2011 sales: opened 5/15/11

| Month | Amount |
|---|---|
| May | 2,120.85 |
| Jun | 5,442.98 |
| Jul | 5,775.22 |
| Aug | 5,522.44 |
| Sep | 5,750.35 |
| Oct | 5,546.30 |
| Nov | 5,991.80 |
| Dec | 7,285.91 |

Total: $43,435.85

2012 sales:

| Month | Amount |
|---|---|
| Jan | 6,702.39 |
| Feb | 6,836.13 |
| Mar | 11,795.33 |
| Apr | 6,183.20 |
| May | 5,506.12 |
| Jun | 7,483.40 |
| Jul | 7,410.58 |
| Aug | 6,837.37 |
| Sep | 4,760.83 |
| Oct | 5,912.92 |
| Nov | 6,462.72 |
| Dec | 8,886.03 |

Total: $84,776.02

2013 sales:

| Month | Amount |
|---|---|
| Jan | 8,206.79 |

DOC-000001582_0017

Confidential

21C 1005550

monthly sales.doc

Parmatown Mall
7899 W. Ridgewood Dr
Parma OH 44129

2011 sales: opened 5/17/11)

| May | 1,239.12 |
|-----|----------|
| Jun | 6,181.22 |
| Jul | 7,582.12 |
| Aug | 8,340.84 |
| Sep | 10,164.43 |
| Oct | 10,740.34 |
| Nov | 9,568.71 |
| Dec | 15,209.29 |

Total: $69,026.07

2012 sales:

| Jan | 13,796.48 |
|-----|-----------|
| Feb | 12,256.58 |
| Mar | 14,044.42 |
| Apr | 9,799.47 |
| May | 10,362.11 |
| Jun | 9,306.65 |
| Jul | 8,447.07 |
| Aug | 9,543.68 |
| Sep | 8,955.89 |
| Oct | 9,148.78 |
| Nov | 9,783.63 |
| Dec | 11,026.86 |

Total: $126,154.62

2013 sales:

| Jan | 10,799.13 |
|-----|-----------|

Confidential

monthly sales.doc

Richmond Town Square
691 Richmond Rd
Richmond Heights OH 44143

2011 sales: opened 5/24/11

| May | 204.72 |
|-----|--------|
| Jun | 1,515.54 |
| Jul | 1,194.52 |
| Aug | 1,552.75 |
| Sep | 2,165.37 |
| Oct | 4,334.13 |
| Nov | 2,965.29 |
| Dec | 3,663.53 |

Total: $17,595.85

2012 sales:

| Jan | 2,683.89 |
|-----|----------|
| Feb | 4,547.87 |
| Mar | 4,116.21 |
| Apr | 3,787.36 |
| May | 2,847.27 |
| Jun | 2,796.43 |
| Jul | 2,716.01 |
| Aug | 2,858.48 |
| Sep | 2,458.18 |
| Oct | 2,306.05 |
| Nov | 2,916.42 |
| Dec | 3,074.03 |

Total: $37,108.20

2013 sales:

| Jan | 2,558.22 |
|-----|----------|

Confidential

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 296 of 732 PageID #:13008

monthly sales.doc

The Promenade Bolingbrook
631 E Boughton Rd
Bolingbrook Il 60440

2011 sales: opened 7/1/11

| Jul | 1,997.03 |
|-----|----------|
| Aug | 2,835.97 |
| Sep | 3,050.93 |
| Oct | 1,028.26 |

Total: $8,912.19 (closed 10/15/11)

Confidential

DOC-000001582-0020

21C 1005553

monthly sales.doc

River Oaks Center
96 River Oaks Center Dr
Calumet City IL 60409

2011 sales: opened 8/1/11

| Aug | 6,582.51 |
| Sep | 5,246.72 |
| Oct | 5,024.08 |
| Nov | 5,958.93 |
| Dec | 7,851.80 |

Total: $30,664.04

2012 sales:

| Jan | 6,493.57 |
| Feb | 6,240.05 |
| Mar | 6,093.21 |
| Apr | 4,623.63 |
| May | 4,601.68 |
| Jun | 4,508.81 |
| Jul | 4,442.00 |
| Aug | 3,843.87 |
| Sep | 3,522.00 |
| Oct | 4,285.00 |

Total: $48,653.82 (closed 10/31/12)

Confidential

DOC-000001582_0021

21C 1005554

monthly sales.doc

The Great Mall
447 Great Mall Dr.
Milpitas CA 95035

2011 sales: opened 8/19/11.

| Aug | 2,124.75 |
|-----|----------|
| Sep | 2,506.70 |
| Oct | 2,916.55 |
| Nov | 2,186.83 |
| Dec | 3,345.41 |

Total: $12,080.24

2012 sales:

| Jan | 2,152.07 |
|-----|----------|

Total: $2,152.07 (closed 1/31/12).

DOC-000001582 0022

21C 1005555

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 299 of 732 PageID #:13008

monthly sales.doc

21 Century Smoking Store
1551 Plainfield Rd
Joliet IL 60435

2011 sales: opened 10/16/11

| Oct | 730.73 |
| Nov | 2,982.96 |
| Dec | 4,511.91 |

Total: $8,225.60

2012 sales:

| Jan | 3,716.68 |
| Feb | 3,052.15 |
| Mar | 3,124.99 |
| Apr | 3,016.71 |
| May | 3,128.45 |
| Jun | 4,178.75 |
| Jul | 4,126.06 |
| Aug | 3,856.00 |
| Sep | 2,886.12 |
| Oct | 3,398.07 |
| Nov | 2,912.86 |
| Dec | 3,365.31 |

Total: $40,762.15

2013 sales:

| Jan | 3,162.92 |

Confidential

21C 1005556

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 300 of 732 PageID #:13008

monthly sales.doc

21 Century Smoking Store
7 W Haley St.
Santa Barbara CA 93101

2012 sales: opened 5/5/12

| May | 4,264.17 |
|-----|----------|
| Jun | 5,687.27 |
| Jul | 6,020.72 |
| Aug | 6,530.46 |
| Sep | 6,037.84 |
| Oct | 7,965.16 |
| Nov | 6,553.03 |
| Dec | |

Total: $

2013 sales:

| Jan | 7,776.29 |
|-----|----------|

DOC-000001582_0024

Confidential

21C 1005557

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 301 of 732 PageID #:13008

monthly sales.doc

Beachwood Place Mall
26300 Cedar Rd
Beachwood OH 44122

2012 sales: opened 5/14/12

| May | 1,488.21 |
|-----|----------|
| Jun | 2,433.52 |
| Jul | 3,617.75 |
| Aug | 3,659.73 |
| Sep | 2,887.78 |
| Oct | 4,687.31 |
| Nov | 4,958.89 |
| Dec | 7,049.56 |

Total: $30,782.75

2013 sales:

| Jan | 5,323.65 |
|-----|----------|

Confidential

# EXHIBIT 40

# Exhibit CC

# Re: Re: order 54

**From:** Frank-BU Industry <chinafrankgu@gmail.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Date:** Thu, 24 May 2012 22:27:11 -0500

Hello Brent
Ok. no problem.

*With Kind Regards,*
*FRANK GU*
*BU Industry | ShenZhen China*

2012/5/25 Brent Duke <brentduke@yahoo.com>

lol, idrink will be next week...very busy...just going to post office.takes an hour with these returns....lol!!

**From:** Frank-BU Industry <chinafrankgu@gmail.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Thursday, May 24, 2012 9:48 PM
**Subject:** Re: Re: order 54

Dear Brent
Ok. i got the list... but i didn't see the idrink?
Yes, we can make the thredaing. i will let you know when we receive it.

*With Kind Regards,*
*FRANK GU*
*BU Industry | ShenZhen China*

**From:** Brent Duke
**Date:** 2012-05-25 02:41
**To:** Frank-BU Industry
**Subject:** Re: order 54

i'm sending this to you today. i also put a 21st century smoke bat in there...i wanted to see if you had a way to make this threading....we get a lot of their customers, and it would be nice to have that threading....and what about 510 threading?

does this spreadsheet make sense? i just put the total amount on the left and then what i want along the top.

brent

**From:** Frank-BU Industry <chinafrankgu@gmail.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Thursday, May 24, 2012 3:28 AM
**Subject:** Re: order 54

Dear Brent
Ok. pls check the attachment new invoice.

*With Kind Regards,*

**Confidential**

DOC-000001032_0001

21C 1002946

Re: Re: order 54    Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 247 of 732 PageID #:13008

*FRANK GU*
*BU Industry | ShenZhen China*

2012/5/24 Brent Duke <brentduke@yahoo.com>
order looks great except cartridge price is wrong...you have cartridge price, but i want that many boxes!

**From:** Frank-BU Industry <chinafrankgu@gmail.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, May 23, 2012 11:21 PM
**Subject:** Re: order 54

Dear Brent
Pls check the attachment new invoice.
1. yes. you can get the disposable in different colors.
2. pls check the attachment artwork and pics for new disposable.
3. yes. the lanyards print your logo.
4. new idrink already finished. so you will return 130pcs or 135pcs.right?

*With Kind Regards,*
*FRANK GU*
*BU Industry | ShenZhen China*

2012/5/24 Brent Duke <brentduke@yahoo.com>
few questions:
1. can we get disposables in different colors?
2. what is packaging like for 1 piece disposable?
3. do lanyards have our logo on them?

so in terms of priorities, really, really need menthol carts and black bats ASAP!!!

let me know when the new idrinks are ready. i will need to count again, i think i only have like 130 or 135 or something like that left.

DOC-000001032_0002

Confidential                                                              21C 1002947

# EXHIBIT 41

ATTORNEYS EYES ONLY

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION
 3
 4      DR DISTRIBUTORS, LLC, an        )
        Illinois limited liability      )
 5      company,                        )
                                        )
 6      Plaintiff/Counter-Defendant     )
                                        )
 7                  vs.                 ) No. 12-cv-50324
                                        )
 8      21 CENTURY SMOKING, INC., an    )
        Illinois corporation, and       )
 9      BRENT DUKE,                     )
                                        )
10      Defendants/Counter-Claimants    )
                                        )
11                  vs.                 )
                                        )
12                                      )
        CB DISTRIBUTORS, INC., and      )
13      CARLOS BENGOA,                  )
                                        )
14      Counter-Defendants.            )
15      Job No. NJ2092927
16                  The deposition of BRENT DUKE, called
17      by the Plaintiffs for examination, taken pursuant to
18      Rule 30(b)(6) of the Federal Rules of Civil Procedure
19      for the United States District Courts pertaining to
20      the taking of depositions, taken before Meagan M.
21      Cahill, Certified Shorthand Reporter, at One North
22      Franklin Street, Suite 3000, Chicago, Illinois,
23      commencing at 9:07 a.m. on the
24      23rd day of June, 2015.
```

ATTORNEYS EYES ONLY

Page 13

1      Q.   Okay.  And you said you spoke to Brandon
2   Duke; is that correct?
3      A.   Yes.
4      Q.   Is that your brother that lives in the
5   Czech Republic?
6      A.   Yes.
7      Q.   And when did you speak to him?
8      A.   Yesterday and today.
9      Q.   And what did you speak to him about?
10     A.   Do you mind if I -- it's about one of
11  these questions, but I don't remember.
12     Q.   Sure, please.  And for the record, you're
13  referring to Exhibit 1 which is the 30(b)(6) notice
14  to your company.
15     A.   I believe 11.
16     Q.   Any other topics?
17     A.   No.
18     Q.   And what did you discuss with him
19  regarding topic 11?
20     A.   I just texted him and asked if he
21  experienced any confusion while working at the kiosk
22  in Ventura.
23     Q.   Did you actually speak with him over the
24  phone or just communicate with him by electronic

ATTORNEYS EYES ONLY

Page 14

1    messages?

2         A.   I just used text because I don't know

3    what time it is.  I wasn't thinking about the time.

4    I didn't want to wake him up.

5         Q.   So to be clear, when you said you

6    interviewed or spoke to an employee, you didn't

7    actually speak to Brandon Duke; is that right?

8         A.   It was a text.  It was through text.

9         Q.   Okay.  And what did you say in your text

10   to him?

11        A.   And for clarity sake, some of those were

12   texts, some of those were phone conversations of the

13   names I listed.

14        Q.   Thank you.

15             So Brandon Duke was text?

16        A.   Yes.

17        Q.   Andre Hernandez?

18        A.   Text.

19        Q.   Brandon Eisenberg?

20        A.   Call and text.

21        Q.   Rob Link?

22        A.   Text.

23        Q.   And what did you -- Going back to my

24   question, what did you text to Brandon Duke?

ATTORNEYS EYES ONLY

Page 15

1          A.    Something to the effect, was there ever

2    any instance of confusion between 21 Century Smoke

3    and our product while you were working at kiosk.

4          Q.    And which kiosk was that?

5          A.    The Pac View mall in Ventura.

6          Q.    And what was his reply?

7          A.    Yes.

8          Q.    And what else did he tell you?

9          A.    He said he would occasionally get

10   complaints regarding the product that was at the gas

11   station that people were buying and then bringing

12   over to our kiosk expecting us to do something about

13   it.  It was a bad product.

14         Q.    And did he discuss with you the -- that

15   in comparison to your company's 75 percent return

16   rate of your product?

17         MR. STAMATIS:  Objection, form, foundation.

18   BY THE WITNESS:

19         A.    I don't know what you mean by 75 percent

20   return rate.

21   BY MR. DAVIS:

22         Q.    Isn't it true that you had a large volume

23   of returns of your products due to poor quality from

24   2009 to 2010?

ATTORNEYS EYES ONLY

Page 16

1          MR. STAMATIS:  Objection, relevance.  Not

2     sure where this fits in under the schedule here.

3                    But answer if you can.

4     BY THE WITNESS:

5          A.   We have a lifetime warranty of our

6     product, so it would have nothing to do with good or

7     bad quality.  We warranty the product for life to

8     make sure our customers are satisfied.  So if someone

9     has a lithium ion battery for two years, it's going

10    to go dead.  Can't say well that's a bad quality

11    product.  That's just the lifetime of the lithium ion

12    battery.  If a lithium ion batter starts to get weak,

13    we'll replace your product.  So we satisfy our

14    customers.  It has nothing with product quality.

15    It's about customer satisfaction.

16         Q.   But weren't you personally complaining to

17    your Chinese manufacturers in 2009 and 2010 about the

18    poor quality of the products being shipped to you and

19    the high return rate from your customers?

20         MR. STAMATIS:  Objection.  Hold on.  Is this

21    one of the 30(b)(6) topics?

22         MR. DAVIS:  He says it's topic 11.

23         MR. STAMATIS:  I think you've gone beyond

24    topic 11, frankly.  Okay?

ATTORNEYS EYES ONLY

Page 17

```
1          MR. DAVIS:  Well, he --
2          MR. STAMATIS:  You just asked if the
3    complaint was about returns, and he said no, I think
4    pretty clearly, and now you're getting into e-mails
5    with China.  So that's beyond the scope of this.
6    I'll let him answer this question, but we're not
7    going to take another deposition that goes beyond the
8    topic set forth herein.
9                    Answer if you can.
10         THE WITNESS:  Can you repeat the question?
11                    (Record read as requested.)
12         MR. STAMATIS:  Answer if you know.
13                    Same objection.
14   BY THE WITNESS:
15         A.   I don't recall.
16   BY MR. DAVIS:
17         Q.   And your brother, Brandon Duke, reported
18   to you that the incidents of confusion related to
19   people complaining about quality of product?  Do I
20   understand your testimony correct?
21         A.   That's what he told me, yes.
22         Q.   And how many instances did he relate to
23   you?
24         A.   He just said there was a number of times.
```

ATTORNEYS EYES ONLY

Page 18

1    He did not give me an exact number.

2          Q.   And what was the time period he was

3    referring to?

4          A.   I did not get clarity on the time period.

5          Q.   And did he identify for you any of the

6    customers by name that he said occasionally came in

7    and made a complaint about quality?

8          A.   No.  And as it turns out, I was texting

9    him in the middle of the night, so he didn't give

10   very long answers.  That's all he told me.

11         Q.   Did you speak to your brother about

12   anything else related to the case?

13         A.   No.

14         MR. STAMATIS:  The deposition today, right?

15   BY THE WITNESS:

16         A.   No.

17   BY MR. DAVIS:

18         Q.   And what did you -- What topic did you

19   communicate with Mr. Andre Hernandez about?

20         A.   Same question I posed to my brother.

21         Q.   And is Mr. Hernandez a former employee?

22         A.   Yes.

23         Q.   And which kiosk did he work at?

24         A.   Lincolnwood Mall.

ATTORNEYS EYES ONLY

Page 19

```
 1        Q.    What city is that in?

 2        A.    Lincolnwood.

 3        Q.    Is that Illinois?

 4        A.    Yes.

 5        Q.    And what did you say to Mr. Hernandez?

 6        A.    The same question I posed to my brother.

 7        Q.    And what did Mr. Hernandez text back to

 8   you?

 9        A.    That he did have to deal with incidents

10   of confusion.

11        Q.    And did he tell you how many

12   incidentses [sic] -- strike that -- instances he had

13   to deal with?

14        A.    He said there were at least two that he

15   could remember.

16        Q.    And did he describe those events to you?

17        A.    It was just text, so, no, not really.

18        Q.    Did he say what the customer said to him

19   about -- in these two instances?

20        A.    I'd say, in general, what everyone told

21   me is it was people coming to return product to us

22   that they got from 21st Century Smoke.  So that's

23   what he told me.  They were coming with product they

24   were attempting to exchange because of our warranty
```

ATTORNEYS EYES ONLY

Page 20

```
1    policy, and many people would see us in the mall, go
2    buy it at the gas station, and then bring it back to
3    us to attempt to exchange it, thinking we were the
4    same company.
5            Q.    When everyone told that to you, what was
6    your company policy in terms of the response to such
7    instances?
8            A.    Well, we don't exchange product of other
9    companies.
10           Q.    Did you --
11           A.    It doesn't matter if it's blu or Njoy or
12   21st Century Smoke.  We don't exchange product unless
13   it's our product.
14           Q.    And did -- How long did Mr. Hernandez
15   work for your company?
16           A.    I don't recall.  A couple years.
17           Q.    Was he at the same mall kiosk the entire
18   time?
19           A.    Yes.
20           Q.    And which topic from Exhibit 1 did you
21   speak to Brandon Eisenberg about?
22           A.    Same.
23           Q.    And which kiosk did Mr. Eisenberg work
24   at?
```

# EXHIBIT 42

# Exhibit DD

# [No Subject]

| | |
|---|---|
| **From:** | Laurie Duke <laurie.duke@yahoo.com> |
| **To:** | Brent Duke <brentduke@yahoo.com> |
| **Date:** | Sat, 04 Feb 2012 01:13:43 -0600 |

pac view did $1172.85 today...
online did ~$2500...I had a $220 sale from a 21st Century Smoke customer, highly discounted but big sale...called her back and she talked and talked, Brayden started getting really fussy. I explained that he had Autism and didn't always know to be quiet, I earned her respect by being a working mom at home with a special needs child and she even allowed me to call her back after the boys went to bed. Gave her a good deal, and she's going to refer all kinds of people to us (she wants the free cartridges). She's a waitress in her 50's near San Jose. Did a small order for George Newcombe and, Trumpower had a nice little order too. So without Lincoln Park, the biz did $7500 today.

DOC-000000871_0001

Confidential                                                                                      21C 1002518

# EXHIBIT 43



THE LAW OFFICES OF
## KEVIN SALAM

K S <kevin@salamlaw.com>

## DR Dist v 21 Century
1 message

**K S** <kevin@salamlaw.com>                          Mon, Sep 30, 2019 at 9:15 PM
To: Robert von Ohlen <rvo@vonohlenlaw.com>, Anthony Davis <adavis@ndslaw.com>
Cc: Mike Leonard <mleonard@leonardmeyerllp.com>

Counsel:

It is not going to be possible for both Laurie Duke and Brent Duke to come to Chicago
appear at the same time. One of them has to stay with their autistic son and they have
another young child as well. I am willing to work with you on this if you could please
explain what relevant testimony you expect to obtain from Laurie Duke?

Thanks.

*Kevin B. Salam*

Kevin B. Salam
**THE LAW OFFICES**
**OF KEVIN SALAM**
120 N. LaSalle St., Ste 2000
Chicago, IL 60602
(312) 606-8730
(312) 277-2539 (fax)
Website:http://salamlaw.com
Email:kevin@salamlaw.com

**Confidentiality Notice:** The information contained in this e-mail message is intended
for the exclusive use of the addressee. The message may contain information that is
proprietary, legally privileged, confidential and/or exempt from disclosure under
applicable law. If you have received this message in error, please notify the sender
immediately by reply e-mail and then delete this message without copying, printing or
forwarding it.

# EXHIBIT 44

## UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS WESTERN DIVISION

| | |
|---|---|
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, ) | |
| ) | |
| Plaintiffs/Counterclaimants, ) | |
| ) | |
| v. ) | Case Number: $3:12-cv-50324$ |
| ) | |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, ) | Judge: Frederick J. Kapala |
| ) | |
| Defendant/Counterclaim Defendant, ) | Magistrate Judge: Iain Johnston |
| ) | |
| 21 CENTURY SMOKING, INC., ) | |
| ) | |
| Counterclaimant, ) | |
| ) | |
| v. ) | |
| ) | |
| DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, ) | |
| ) | |
| Counterclaim Defendants. ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Counterclaimant/Defendant 21 Century Smoking, Inc. and Counterclaim Defendant Brent Duke respond as follows to Plaintiff/Counter-Defendant DR Distributors, LLC, and Counter-Defendants/Counterclaimants CB Distributors, Inc. and Carlos Bengoa's Local Rule 56.1 Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

### GENERAL OBJECTION

#### A. MULTIPLE FACTS PER PARAGRAPH

With notably few exceptions, many of the 159 statements in Plaintiffs' Statement of Undisputed Facts contains multiple facts such that the Statement contains more than double the number of facts allowed by the Court. In some cases, such as with paragraphs 111 and 112,

1

(Moffitt Cert. at Exh. V).

**Response**: Undisputed that 21CS communicated with customers confused as a result of DR's bad faith adoption of its mark, but Defendants dispute that its communications were improper. SOF ¶57-58.

112. Defendants also used the e-mails as an opportunity to disparage the Plaintiffs and their products, often while sometimes trying to convert them to be their customers, by making statements about Plaintiffs such as:

- 10/09/10: "We don't sell our electronic cigarettes at gas stations and someone is using our identity to sell some cheap knock off product." (21C 1625 to 1626)

- 12/01/10: "I know they are very difficult to reach as we receive many emails/complaints just like yours." (21C 0802)

- 7/11/11: "We actually charge quite a bit more for our kits as we feel they are worth it….We are an actual electronic cigarette company and have been selling e-cigs for nearly 3 years now. 21st Century Smoke is a line of e-cigs being carried by a distribution company. They stole our name last summer…. I actually spend most of my day replying to complaints from their customers! So, if you feel the need to spread the news about a bad e-cig company out there, please be sure to say "21st Century Smoke" and NOT 21 Century Smoking…." (21C 1084 to 1085)

- 10/04/11: "Unfortunately, it seems that you bought a cheap knock off of our electronic cigarette at a gas station…. We get these calls all day long about defective e-cigs from that company, and we hope that you are in no way opposed to the electronic cigarette idea just because an inferior product. Our company specializes in profession [sic] e-cig models that carry a minimum of a 1 year warranty…. If you want a company that backs their products, please see us for your next purchase. I guarantee you will not be disappointed. And if you are, we offer a 30 day money back guarantee*!" (21C 1247 to 1251)

- 4/02/12: "Ok, you seem to have a cheap knock off of our product. The 21st Century Smoke are usually sold at gas stations for around $20-$40 and we get complaints all the time…. If you would like to switch to our product which lasts longer and also carries a 1 year warranty, I would be more than happy to set you up." (21C 1449 to 1451)

- 6/06/12: "We have very tight quality control standards. I think this sounds as though you may be dealing with a knock off brand!" (21C 1492 to 1493)

- 6/18/12: "There is a brand called the "21st Century Smoke" which is an entry level brand with a similar name to ours." (21C 1504 to 1505)

- 6/19/12: "We don't have product issues like what you are describing so I think you are looking for them." (21C 1507-1508)

- 8/02/12: "I know this isn't our company. We don't have glitches like that and we have an amazing product. That is a totally different deal. A much cheaper brand. If you ever want to give us a shot enter coupon code "switch" for $25 off any starter kit. We have 8 colors, 6 strengths, 22 flavors of cartridges, over 80 flavors of liquid, a money back guarantee, and a lifetime warranty!" (21C 54673).

- 10/16/12: "We rarely have a problem with our chargers. Also, why have you purchased so many batteries? We offer a lifetime warranty on batteries/chargers for the Blackjack, Roulette, Big Slick, and the iDrink." (21C-1605)

(Moffitt Cert. at Exh. W).

**Response**: Undisputed that 21CS communicated with customers confused as a result of DR's bad faith adoption of its mark, but Defendants dispute that its communications were improper. SOF ¶57-58.

### 4.   Defendants' Efforts to Mislead Plaintiffs' Customer, a Distributor, Don Kunz of Four Seasons Distributors

113.    Mr. Donald Kunz ("Kunz") is the president and owner of Four Seasons Distributors ("Four Seasons") located in Belleville, Illinois. He owned and operated Four Seasons for approximately 28 years, distributing various products to over 350 independently owned convenience stores located throughout Illinois, Missouri, Kentucky and Indiana, and had been buying products from CB for several years and had gotten to know CB and its owner, Carlos Bengoa. Kunz had never seen or heard of Defendants' products. (02/28/13 Declaration of Donald Kunz ("Kunz Decl."), Dkt. 22-2, at ¶ 1, 3-7; Moffitt Cert. at Exh. K (May 5, 2014 Deposition of Donald Kunz ("5/5/14 Kunz Dep.") at 13:2-15, 16:20-17:5, 19:13-22, 21:5 – 22:14, 25:5-20 and Exh. 2 thereto) and Exh. L (November 7, 2014 Deposition of Donald Kunz ("11/7/14 Kunz Dep.") at 59:14-61:3, 76:3-20, 79:8 – 80:5)).

**Response**: Defendants dispute the heading to Section 113. The remainder of this Section is undisputed.

114.    Kunz, through Four Seasons, began buying and distributing electronic cigarettes in about 2009 and, at that time, bought e-cigarettes from CB that were sold under the name Gamucci, which he then sold to his customers, who, in turn, sold them in their convenience stores. In or about 2010, when Bengoa announced he was going to start selling his own brand of e-cigarettes named 21ST CENTURY SMOKE®, Four Seasons stopped buying the Gamucci brand and started buying the 21ST CENTURY SMOKE® brand from CB in volume, and then distributed same to the 350 stores that Four Seasons served. (Kunz Decl. ¶ 8-10; Moffitt Cert. at Exh. K (5/5/14 Kunz Dep. at 26:4-18)).

**Response**: Undisputed.

46

115.    In or about late February 2013, Kunz contacted CB to report to them a strange phone call he received out of the blue from a person in Chicago trying to sell him e-cigarettes, which the person claimed were 21ST CENTURY SMOKE® e-cigarettes. By contrast, when CB contacts him, it is usually via e-mail, and when CB calls him, the caller states their name and identifies their company as CB Distributors, not "21st Century Smoke." CB only uses the term "21st Century Smoke" when actually talking about their e-cigarette product. (Kunz Decl. ¶ 11-12; Moffitt Cert. at Exh. K (5/5/14 Kunz Dep. at 24:9 – 25:4)).

**Response**: 21CS objects to Plaintiffs' SOF ¶ 115 as incomplete. 21CS disputes that it

claimed to be CB. SOF ¶151-161.

116.    Because Kunz had been buying 21ST CENTURY SMOKE® e-cigarettes from CB for some time, he was surprised to hear the caller, who did not identify himself by name or his company, claim to be selling e-cigarettes under the 21ST CENTURY SMOKE® name, and Kunz therefore repeatedly asked the caller if he was selling 21ST CENTURY SMOKE® e- cigarettes distributed and sold by CB, located in Wisconsin, and the caller repeatedly said that was correct. Kunz asked the caller to send him some samples of the e-cigarette products he was selling to see what they were, the call ended, but Kunz never received them. (Kunz Decl. ¶ 14- 16, 19; Moffitt Cert. at Exh. K (5/5/14 Kunz Dep. at 9:2-3, 11:8-23, 41:22 – 42:23, 53:9-21) and Exh. L (11/7/14 Kunz Dep. at 19:8 – 22:9, 23:11 – 24:2; 82:8 – 85:4)).

**Response**: 21CS objects to the Plaintiffs' Section 116 as incomplete. 21CS disputes that

it claimed to be CB. SOF ¶151-161.

117.    Kunz did not realize the significance of the call until in or about late February 2013, when he spoke with a CB representative, who told Kunz that CB had to sue a company in Chicago that was selling e-cigarettes using a name almost identical to the 21ST CENTURY SMOKE® trademark, thus causing Kunz to check his phone records and determine that the subject call with the unidentified caller came in at 11:00 a.m. on December 20, 2012, from (312) 380-0995. (Kunz Decl. ¶ 20 and 22; Moffitt Cert. at Exh. K (5/5/14 Kunz Dep. at 9:6-16, 36:9- 23, 46:18 – 47:2, 47:13 – 50:16) and Exh. L (11/7/14 Kunz Dep. at 24:16 – 27:3, 30:2-8, 34:5 – 36:23, 56:11 – 57:8, 70:10 – 71:8 and Exh. 7 thereto)).

**Response**:  Undisputed.

118.    On February 26, 2013, Kunz called the number (312) 380-0995 and a man who answered the phone said that he had a company called "Automatic Cigarettes," but Kunz did not recall the man telling him his name. Kunz thought they were a distributor of 21ST CENTURY SMOKE® e-cigarettes. (Kunz Decl. ¶ 23; Moffitt Cert. at Exh. L (11/7/14 Kunz Dep. at 27:4 – 31:1, 31:23 – 32:6, 33:12-24, 36:25 – 37:10, 56:11 – 57:8)).

**Response**:  Undisputed.

119.    On February 26, 2013, after learning of the incident from Kunz, Pat Johnson ("Johnson"), a CB sales and customer service representative also called the number Kunz

47

# EXHIBIT 45

# Exhibit HH

# Re: titles and descriptions

| | |
|---|---|
| **From:** | Brent Duke <brentduke@yahoo.com> |
| **To:** | Otis Chandler <otis@goodreads.com> |
| **Date:** | Wed, 08 Apr 2009 19:58:18 -0500 |

Thanks for the tips man...I appreciate it.

So the other thing you were saying was like put the actual cigarette options inside a folder called electronic cigarette so that the link contains that name? so like www.21centurysmoking.com/electronic-cigarette/blackjack.php

As opposed to now, www.21centurysmoking.com/blackjack.php

Is this what you were saying?

b

---

**From:** Otis Chandler <otis@goodreads.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, April 8, 2009 5:58:29 PM
**Subject:** titles and descriptions

Make sure you have really good meta-descriptions and titles. You can see your titles and descriptions here:

http://www.google.com/search?q=site%3A21centurysmoking.com&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a

--
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown

DOC-000000096_0001

**Confidential** 21C 1000235

# Re: titles and descriptions

| | |
|---|---|
| **From:** | Brent Duke <brentduke@yahoo.com> |
| **To:** | Otis Chandler <otis@goodreads.com> |
| **Date:** | Wed, 08 Apr 2009 22:04:20 -0500 |

i will absolutely do this...i'm loving it big o...

would it matter how high my blog ranks, or just so long as links are coming from somewhere?

b

---

**From:** Otis Chandler <otis@goodreads.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, April 8, 2009 8:13:03 PM
**Subject:** Re: titles and descriptions

Exactly. Google will then know that you really want to rank for "electronic cigarette" queries.

I also think she's putting too many keywords in your titles, but she might know better...

You might want to consider making a blog that talks about electronic cigarrettes and links to your site a lot. Google loves new content – it factors much more into their algorithm than people think...

O

—
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown


On Wed, Apr 8, 2009 at 5:58 PM, Brent Duke <brentduke@yahoo.com> wrote:
> Thanks for the tips man...I appreciate it.

> So the other thing you were saying was like put the actual cigarette options inside a folder called electronic cigarette so that the link contains that name? so like www.21centurysmoking.com/electronic-cigarette/blackjack.php

> As opposed to now, www.21centurysmoking.com/blackjack.php

> Is this what you were saying?

> b

---

**From:** Otis Chandler <otis@goodreads.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, April 8, 2009 5:58:29 PM
**Subject:** titles and descriptions

DOC-000000097_0001

**Confidential**                                                                    21C 1000236

Re: titles and descriptions

Make sure you have really good meta-descriptions and titles.  You can see your titles and descriptions here:

http://www.google.com/search?q=site%3A21centurysmoking.com&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a

--
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown

Confidential

# Fw: titles and descriptions

| | |
|---|---|
| **From:** | Brent Duke <brentduke@yahoo.com> |
| **To:** | kirti@webrecsol.com |
| **Date:** | Thu, 09 Apr 2009 08:35:51 -0500 |

here is an email from otis..i don't know if he is right about this stuff, just thought i'd pass it along..i showed him the site yesterday.

----- Forwarded Message ----
**From:** Otis Chandler <otis@goodreads.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, April 8, 2009 8:13:03 PM
**Subject:** Re: titles and descriptions

Exactly. Google will then know that you really want to rank for "electronic cigarette" queries.

I also think she's putting too many keywords in your titles, but she might know better...

You might want to consider making a blog that talks about electronic cigarettes and links to your site a lot. Google loves new content - it factors much more into their algorithm than people think...

O

–
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown


On Wed, Apr 8, 2009 at 5:58 PM, Brent Duke <brentduke@yahoo.com> wrote:
Thanks for the tips man...I appreciate it.

So the other thing you were saying was like put the actual cigarette options inside a folder called electronic cigarette so that the link contains that name? so like www.21centurysmoking.com/electronic-cigarette/blackjack.php

As opposed to now, www.21centurysmoking.com/blackjack.php

Is this what you were saying?

b

**From:** Otis Chandler <otis@goodreads.com>
**To:** Brent Duke <brentduke@yahoo.com>
**Sent:** Wednesday, April 8, 2009 5:58:29 PM
**Subject:** titles and descriptions

Make sure you have really good meta-descriptions and titles. You can see your titles and descriptions here:

DOC-000000098_0001

Confidential

21C 1000238

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 316 of 732 PageID #:13008

Fw: titles and descriptions

http://www.google.com/search?q=site%3A21centurysmoking.com&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a

--
my books: http://www.goodreads.com/otis
my blog: http://www.otisnotes.com
twitter: http://twitter.com/otown

Confidential

# EXHIBIT 46

# Exhibit ZZ

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC, an Illinois limited liability company, | Case Number: 3:12 – cv – 50324 |
| Plaintiff and Counter-Defendant, | Judge: Frederick J. Kapala |
| v. | Magistrate Judge: P. Michael Mahoney |
| 21 CENTURY SMOKING, INC., an Illinois corporation, | |
| Defendant and Counterclaimant. | |

**21 CENTURY SMOKING, INC.'S RESPONSE TO DR DISTRIBUTORS, LLC'S**
**FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant 21 Century Smoking, Inc. hereby responds and objects to Plaintiff DR Distributors, LLC's First Set of Interrogatories to Defendant as follows:

**General Objections**

1.      Defendant objects to these Interrogatories to the extent they purport to call for information and materials outside the scope of its obligations under the Federal Rules of Civil Procedure. Defendant responds to these Interrogatories only to the extent required under those Rules and applicable law.

2.      Defendant objects to these Interrogatories to the extent they are overbroad, unduly burdensome or oppressive, or seek documents and things that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

3.      Defendant objects to these Interrogatories to the extent they seek information that is not in Defendant's possession, custody, or control, is already in Plaintiff's possession, or is otherwise easily obtainable from another source.

4.      Defendant objects to each Interrogatory to the extent it calls for information or materials protected by applicable discovery exceptions, including the attorney-client privilege, the work product doctrine, the protections for consulting experts, and any other privilege afforded by law. Any inadvertent production or disclosure of such privileged information or materials shall not be deemed to constitute a waiver of any privilege.

5.   In making these Answers, Defendant does not waive (a) the right to object on grounds of privilege or any evidentiary objection to the use of any information or materials disclosed in these Answers in any subsequent proceedings in this action, or in any other action; or (b) the right to object on any and all grounds to any other discovery procedures involving or relating to the subject matter of these Answers.

6.   By stating herein that investigation is ongoing, Defendant does not represent that any information actually exist, but rather that it will make good faith efforts to determine whether responsive information does exist.

These objections are incorporated in each answer made herein.  All answers are made without waiver of these objections.

## INTERROGATORIES

1.   State the date upon which Defendant began its business.
   RESPONSE:

   Defendant's predecessor began researching the sale of electronic cigarettes in October 2008 and began selling electronic cigarettes and researching the creation of a company in November 2008.  Defendant's predecessor purchased the website domains to create 21 Century Smoking in January 2009. Defendant's predecessor began selling electronic cigarettes and accessories under the mark 21 CENTURY SMOKING in March, 2009. Defendant was organized in August, 2009.

2.   Identify all persons who participated in the consideration, creation, design, selection, adoption and use of the 21 CENTURY SMOKING trademark and/or service mark.
   RESPONSE:

   Brent Duke, President
   21 Century Smoking, Inc.
   1535 North Ashland
   Chicago, Illinois 60622
   Tel. No.: 888-783-3021

   Laurie Duke
   21 Century Smoking, Inc.
   1535 North Ashland
   Chicago, Illinois 60622
   Tel. No.: 888-783-3021

   Rob Link
   117 W Harrison
   Oak Park, IL 60304
   Tel. No.: 773-209-9843

2

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 631 of 732 PageID #:13008

3. Identify all persons who are responsible for the marketing, distribution, sale, advertising, or promotion of the product and/or services sold or offered for sale by Defendant under its 21 CENTURY SMOKING trademark and/or service mark.
RESPONSE:

Brent Duke

Laurie Duke

Rob Link

Steve Spraker
2455 N. Seminary
Unit #1
Chicago, IL 60614
Tel. No.: 312-420-5412

Brandon Duke
1243 W Micheltorena
Santa Barbara, CA 93101
Tel. No.: 805-280-5221

Bryan Kos
2313 W. McLean
Unit 1E
Chicago, IL 60647
Tel. No.:312-532-1048

Jim Shimp
1275 Norton Ave
Lot B-1
Norton, OH 44203
Tel No.: 330-310-6704

Sharon Brady
1275 Norton Ave
Lot B-1
Norton, OH 44203
Tel. No.: 330-861-3488

Joe Gatto
3027 W Sumner St
Lincoln, NE 68522
Tel No.: 402-217-5005

3

Defendant has had over 100 employees throughout the years involved with the marketing, distribution, sale, advertising, or promotion of the product and/or services sold or offered for sale by Defendant under its 21 CENTURY SMOKING trademark and/or service mark. There are currently over 40 people directly responsible for selling products and services under or in association with the mark 21 CENTURY SMOKING.

4. State when Defendant first started use of its 21 CENTURY SMOKING trademark and/or service mark, and set forth for all facts and identify all documents and other evidence that support Defendant's claimed date of first use, and identify all persons with any knowledge thereof.
   RESPONSE:

   Defendant's first use of the mark 21 CENTURY SMOKING was in connection with the creation of its web site beginning in January, 2009. Defendant's web site under the mark 21 CENTURY SMOKING was first made publicly available in February, 2009. Defendant's first sale of an electronic cigarette product under the mark 21 CENTURY SMOKING was made on March 29, 2009 by means of its web site and shipped to a customer in New Jersey. Persons having knowledge include Brent Duke, Laurie Duke, and Karol Dvorsky. Defendant opened its first physical retail location under the mark 21 CENTURY SMOKING for the sale of electronic cigarettes and accessories at Pacific View Mall in Ventura, California on March 5, 2010. Persons having knowledge include Brent Duke, Laurie Duke, Brandon Duke and Mike Gardia.

5. State the manner in which Defendant first started use of its 21 CENTURY SMOKING trademark and/or service mark, and identify all persons with any knowledge thereof.
   RESPONSE:

   Defendant's first use of the mark 21 CENTURY SMOKING was in connection with the creation of its web site beginning in January, 2009. Defendant's first sale of an electronic cigarette product under the mark 21 CENTURY SMOKING was made on March 29, 2009 by means of its web site and shipped to a customer in New Jersey. Persons having knowledge include Brent Duke, Laurie Duke, and Karol Dvorsky. Defendant opened its first physical retail location under the mark 21 CENTURY SMOKING for the sale of electronic cigarettes and accessories at Pacific View Mall in Ventura, California on March 5, 2010. Persons having knowledge include Brent Duke, Laurie Duke, Brandon Duke and Mike Gardia.

6. State the manner in which Defendant first started use of its 21 CENTURY SMOKING trademark and/or service mark in interstate commerce, and identify all persons with any knowledge thereof.
   RESPONSE:

   Plaintiff objects to Interrogatory No. 6 on the grounds that it is vague and ambiguous. Subject to objections, Defendant states that its 21 CENTURY SMOKING mark was used on product packaging, advertising and promotional materials, store signage, web sites, and other means.

Defendant objects to Interrogatory 40(c) on the grounds that it exceeds the number of interrogatories authorized by the Case Management Order entered in this case on November 14, 2012.

    d. The basis for your claimed damaged.
       RESPONSE:

Defendant objects to Interrogatory 40(d) on the grounds that it exceeds the number of interrogatories authorized by the Case Management Order entered in this case on November 14, 2012.

41. Identify any and all reports who aided, assisted, or participated in any manner in the preparation of the answers to this set of interrogatories, and state specifically, with reference to interrogatory number, the area of participation of such persons.
RESPONSE:

Defendant objects to Interrogatory 41 on the grounds that it exceeds the number of interrogatories authorized by the Case Management Order entered in this case on November 14, 2012.

DATED: February 15, 2013

                          By:/Thomas R. Leavens/

                          Thomas R. Leavens
                          Heather R. Liberman
                          Leavens, Strand, Glover & Adler, LLC
                          Suite 2550
                          203 North LaSalle Street
                          Chicago, Illinois 60601
                          (312) 488-4170 – Telephone
                          (312) 488-4177 – Facsimile
                          tleavens@lsglegal.com

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of Defendant's Response to Plaintiff's First Set of Interrogatories was served upon:

Anthony J. Davis
Nicoll Davis & Spinella, LLP
95 Route 17 South
Suite 203
Paramus, New Jersey 07652

and

Robert C. von Ohlen
Robert C. von Ohlen & Associates
1340 West Deerpath Road
Lake Forest, Illinois 60045

via United States Postal Service, proper postage prepaid, this 15th day of February, 2013.

*Heather R. Liberman*

# EXHIBIT 47

Page 222

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

| | |
|---|---|
| DR DISTRIBUTORS, LLC, an ) | |
| Illinois limited liability ) | |
| company, ) | |
|     Plaintiff and ) | |
|     Counter-Defendant, ) | Case No. |
|  vs. ) | 3:12-cv-50324 |
| 21 CENTURY SMOKING, INC., an ) | |
| Illinois corporation and ) | |
| Brent Duke, individually, ) | |
|     Defendants and ) | |
|     Counter-Claimants, ) | |
| vs. ) | |
| CB DISTRIBUTORS, INC., an ) | |
| Illinois corporation, and ) | |
| CARLOS BENGOA, individually, ) | |
|     Counter-Defendants. ) | |

      The continued videotaped deposition of

BRENT DUKE, called for examination pursuant to the

Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before GINA M. LUORDO, a notary

public within and for the County of Cook and State

of Illinois, at One North Franklin, Suite 3000,

Chicago, Illinois, on the 17th day of June, 2015,

at the hour of 9:09 a.m.


Reported by:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

Page 388

1    the name of the company.

2        Q.    Did she have an e-mail address of Kirti,

3    K-i-r-t-i, @webrecsol.com?

4        A.    I don't remember her e-mail address, but

5    the name of the company sounds correct.

6        Q.    And did you e-mail with her?

7        A.    Yes.

8        Q.    And in your e-mail inbox, did you maintain

9    a separate folder labeled Kirti to keep all the

10   e-mails that you saved from communications with

11   Ms. Saraswat?

12       A.    I don't remember.

13       Q.    And if you produced to us an image of all

14   the folders from your inbox and there was one

15   labeled Kirti, K-i-r-t-i, would that be the folder

16   that you saved e-mails for your communications with

17   Mrs. Saraswat at Webrecsol?

18       MR. STAMATIS:  Objection.  Speculative.  Answer

19   if you know.

20       THE WITNESS:  If there was a folder entitled

21   Kirti, I only know one Kirti, so yes.

22                         (Whereupon, DUKE Deposition

23                         Exhibit No. 14 was marked for

24                         identification.)

Page 389

1    BY MR. DAVIS:

2        Q.    Handing you a document marked for

3    identification as Exhibit 14, can you take a look

4    at it and tell me if you've ever seen this before?

5            While you're looking, for the record, it's

6    identified as Bates numbers 21C-16695 through

7    16702.

8        **A.    I do not recall ever seeing this.**

9        Q.    And if you look in the top left corner of

10   the document, it says SEO Packages, excuse me, SEO

11   Packages.doc, d-o-c.  Does that refresh your

12   recollection as to having ever seen this document

13   before?

14       **A.    No.**

15       Q.    And you understand this is a document

16   produced by you from your company, correct?

17       **A.    Yeah, I understand that.**

18       Q.    And if you turn to the page that's marked

19   as 16699, if you can turn to that page, do you see

20   the signature block there?

21       **A.    Yes.**

22       Q.    Is that the Mrs. Saraswat you were

23   referring to?

24       **A.    Yeah.   I thought the spelling was**

b4686c64-996c-4d86-a0a0-f5119b6c9b78

1    **K-i-r-t-i, but yeah.  I guess K-e-e-r-t-i is fine**

2    **as well.  I guess that's her.**

3        Q.    And you see right below where she spells

4    her name, she has her e-mail?

5    **A.    Yes.**

6        Q.    And it's K-i-r-t-i?

7    **A.    I see that, yes.**

8        Q.    And is that the e-mail that you remember

9    using to communicate with her?

10        MR. STAMATIS:  Objection.  Asked and answered.

11        THE WITNESS:  I do not remember the e-mail I

12    used with her.

13    BY MR. DAVIS:

14        Q.    And is it your testimony today that you

15    have no recollection of this document?

16        MR. STAMATIS:  Objection.  Asked and answered.

17    You can answer again.

18        THE WITNESS:  I don't remember ever being given

19    this document.

20    BY MR. DAVIS:

21        Q.    Is this a -- based on your review of it

22    today, is this a document from Mrs. Saraswat who is

23    providing SEO services to your company?

24        MR. STAMATIS:  Objection.  Foundation.  Calls

Page 391

1    for speculation.  You can answer if you can.

2         THE WITNESS:  I don't know.  I mean, this has

3    the company name on it.  It's talking about SEO.  I

4    just don't remember it.

5    BY MR. DAVIS:

6         Q.   Do you have any reason to doubt that you

7    received this at your company?

8         MR. STAMATIS:  Objection.  Calls for

9    speculation.  Vague.  Answer if you can.

10        THE WITNESS:  I guess I have no reason to

11   necessarily doubt, but I don't believe any

12   purchasing decision would have been made based on

13   it because I don't remember.

14   BY MR. DAVIS:

15        Q.   And looking at the document and seeing the

16   SEO services that are listed on Page 1 identified

17   as 16695, does that refresh your recollection as to

18   some of the services that Mrs. Saraswat provided to

19   your company?

20        MR. STAMATIS:  Objection.  Foundation.  He

21   never indicated he didn't remember the services

22   that were provided.  Object to form.  You can

23   answer if you can.

24        THE WITNESS:  Like I said yesterday, I do

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 392

1    remember the services provided.  I just -- I don't

2    remember this document.

3    BY MR. DAVIS:

4        Q.    And my question now is yesterday you did

5    testify that Mrs. Saraswat provided SEO consulting

6    services to your company; is that correct?

7        **A.    Yes.**

8        Q.    My question today is looking at this

9    document marked as Exhibit 14 and the first page,

10   does this further refresh your recollection as to

11   the services that were provided to your company by

12   Mrs. Saraswat in connection with SEO for your

13   company?

14       MR. STAMATIS:  Same objection.

15       THE WITNESS:  I don't see anything there that I

16   don't feel like I talked about yesterday that I

17   remember her doing.

18   BY MR. DAVIS:

19       Q.    So it covers some of the things you've

20   already testified to like the website analysis?

21       MR. STAMATIS:  Objection.  Can you read that

22   back, please.

23                        (Whereupon, the record was

24                         read as requested.)

1      MR. STAMATIS:  Objection to form.  Answer if

2    you understand.

3      THE WITNESS:  Specifically website analysis, I

4    don't remember saying that yesterday, so no, I

5    don't specifically remember a very thorough website

6    analysis.

7    BY MR. DAVIS:

8      Q.   And the second item, keyword analysis,

9    that's something you testified about yesterday,

10   correct?

11     **A.    Yes.**

12     Q.   And the last item on that first page, do

13   you recall that they did an initial search engine

14   ranking report for you?

15     **A.    I remember reports that listed our**

16   **ranking.  I don't remember if there was an initial**

17   **search engine report, but I do remember reports.**

18     Q.   I'll ask you to turn to the second page of

19   Exhibit 14 and ask you to review the section at the

20   top labeled ON-Page.  I'll ask you to look at the

21   ON-Page optimization section at the top of Page 2.

22   Do you see that?  I'll ask you to review that and

23   see if there's anything on that list that refreshes

24   your recollection as to the services provided by

Page 394

1    Mrs. Saraswat in regard to the SEO consulting

2    services provided to your company?

3       MR. STAMATIS:  I'll object to the form.  Again,

4    I don't recall him saying that he didn't remember

5    components of the SEO that was done, and so I think

6    the question is improper and that you're asking

7    that this somehow refreshes a recollection that he

8    hasn't testified is -- he hasn't testified he

9    doesn't remember.  So I think I made my record.

10   Answer if you can.

11      THE WITNESS:  I don't know what a lot of these

12   things are.  I mean, the ones that I do remember, I

13   feel like I discussed yesterday.  I don't know what

14   a lot of this is.

15   BY MR. DAVIS:

16      Q.   Does the phrase ON-page optimization mean

17   anything to you?

18      **A.   It's a header for this list of things.**

19      Q.   And beyond that, it means nothing to you?

20      **A.   I feel like I can grasp it as a concept,**

21   **but I don't know what all of these things have to**

22   **do with it because I don't know what they are.**

23      Q.   Have you ever -- in looking at the list,

24   have you ever heard of meta tag optimization?

b4686c64-996c-4d86-a0a0-f5119b6c9b78

1          **A.     I have heard of meta tags.**

2          Q.    Have you heard of meta tag optimization?

3          **A.    I don't know if I've heard them all in one**

4    **word like one phrase like that.  I've heard of a**

5    **meta tag.**

6          Q.    And what is a meta tag?

7          **A.    It's a description on a website.**

8          Q.    Where is it on the website?

9          **A.    Anywhere on the website, I think.**

10         MR. STAMATIS:  Excuse me.  Don't guess.

11         THE WITNESS:  Well, I think, in my opinion,

12   that a meta tag can be anywhere in a website.  I'm

13   not going to say for sure that that's true, but I

14   think a meta tag can be anywhere on a website.

15   BY MR. DAVIS:

16         Q.    Fair enough.  And is it something that is

17   visible to a visitor to your website?

18         MR. STAMATIS:  Objection.  Foundation.

19   Objection foundation.  Calls for speculation.

20   Answer if you know.

21         THE WITNESS:  I don't think so.

22   BY MR. DAVIS:

23         Q.    Looking at Page 2, the second section

24   that's entitled off-page optimization, do you know

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 396

1    what that means?

2         A.    Do you want me to look over this?

3         Q.    Yes.  I'm directing your attention to it.

4         A.    I suppose that makes sense.  It's things

5    happening off of your website.

6         Q.    And would Ms. Saraswat have to be familiar

7    with all of these different SEO services that she's

8    offering to be able to offer them to you as a

9    customer?

10        MR. STAMATIS:  Objection.  Foundation.  Calls

11   for speculation.  Answer if you know.

12        THE WITNESS:  I can't speculate as to what she

13   knows and who -- I can't speculate about that.  I

14   don't have any clue about what she knows.

15   BY MR. DAVIS:

16        Q.    Do you think she would be offering -- or

17   strike that.

18             After you dealt with Ms. Saraswat, did

19   it -- did you have an understanding that she was an

20   experienced SEO consultant?

21        A.    I never tried to determine if it was her

22   or someone working with her, I suppose.  I don't

23   know if she is an expert or the person under her is

24   an expert.  I don't know who the expert is, so I

Page 397

1    **don't know.**

2        Q.    So she could have just been the sales

3    representative who then deployed her staff to do

4    the SEO work?

5        **A.    For all I know, yes.  I don't know.**

6        Q.    And yesterday we reviewed your entire work

7    history; is that correct?

8        **A.    Yes.**

9        Q.    Who is Brian Scott?

10       **A.    He is a gentleman I met in 2008 who**

11   **introduced me to electronic cigarettes.**

12       Q.    And did you -- and how did you meet him?

13       **A.    I believe he was trying to get some type**

14   **of flyer made, and I met up with him at a bar in**

15   **Bucktown.**

16       Q.    And what kind of company does he own?

17       MR. STAMATIS:  Objection.  Foundation.  Answer

18   if you know.

19       THE WITNESS:  I don't remember what he was

20   doing back then.

21   BY MR. DAVIS:

22       Q.    Do you know or do you recall if you

23   offered him any kind of website services of any

24   kind?

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 398

1      **A.   I believe -- I don't remember what -- I**

2    **think I offered him -- to help him make a flyer is**

3    **what I remember, but I don't recall.  That's seven**

4    **years ago.  I don't remember.**

5                   **(Whereupon, DUKE Deposition**

6                   **Exhibit No. 15 was marked for**

7                   **identification.)**

8    BY MR. DAVIS:

9      Q.   Handing you what's been marked as

10   Exhibit 15 for identification.  I'll ask you to

11   take a look at it and tell me if you recognize it.

12   While you're looking at, I'll identify it for the

13   record as 21C-16790, 791, 792, 793, 794, and it

14   continues through 805.

15      **A.   I do not recognize this.**

16      Q.   This is a document that you produced in

17   this case, correct?

18      MR. STAMATIS:  Objection.  Calls for

19   speculation.

20      THE WITNESS:  I don't recognize it, so it's

21   possible it was produced.  I don't recognize it.

22   BY MR. DAVIS:

23      Q.   Well, the Bates numbers here at the bottom

24   of 21C-16790 through 805, I'll represent to you

Page 399

1    were records from your company.  If you look at the

2    top left corner, it says proposal for Chicago

3    percent 92S Best Cleaning Co.doc.  Does that

4    refresh your recollection as to what the document

5    is?

6        **A.    This would most certainly not be from my**

7    **company.  This would be personal.  This would not**

8    **be from my company, but I don't recognize it.**

9        MR. STAMATIS:  Focus on the question.  The

10   question is do you recognize it?

11   BY MR. DAVIS:

12       Q.   When you say it came from you personally,

13   what does that mean?

14       MR. STAMATIS:  Object.  I think that

15   mischaracterizes what he said.

16       MR. DAVIS:  Can you read back his prior answer

17   for me, please.

18                         (Whereupon, the record was

19                          read as requested.)

20   BY MR. DAVIS:

21       Q.   What did you mean by that answer?

22       **A.   This is from a point prior to me ever even**

23   **knowing what an electronic cigarette is, so it's**

24   **not possible that this could have come from my**

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 400

1    **company.**

2        Q.    Yesterday we reviewed your work history,

3    and you never identified Webrecsol as a job that

4    you had; is that correct?

5        **A.    Yes, that's correct.**

6        Q.    Turning your attention to Page 7 of

7    Exhibit 15, this identifies your name, Mr. Brent

8    Duke; is that right?

9        **A.    Yes.**

10       Q.    And your e-mail is listed at

11   Brent@webrecsol.com; is that correct?

12       **A.    It's possible.  I've never used that**

13   **e-mail address, but yes, that's what it says.**

14       Q.    But that's what it says?

15       **A.    Yes.**

16       Q.    And below it, it says Webrecsol, and the

17   address is 2313 West McClain, Chicago, Illinois; is

18   that correct?

19       **A.    Yes, it is.**

20       Q.    And what address is that?

21       **A.    That is my home address at the time.**

22       Q.    And were you the author of this proposal

23   to Brian Scott at Chicago Best Cleaning Company?

24       MR. STAMATIS:  Objection.  Foundation.  Answer

b4686c64-996c-4d86-a0a0-f5119b6c9b78

Page 401

1    if you know.

2         THE WITNESS:  Most certainly not.

3    BY MR. DAVIS:

4         Q.   Do you recall for how long you had a

5    relationship with Webrecsol?

6         MR. STAMATIS:  Objection.  Foundation.  Assumes

7    facts not in evidence.  Answer if you can.

8         THE WITNESS:  This was the only project we

9    attempted to do together.

10   BY MR. DAVIS:

11        Q.   So at some point in time, you were a

12   representative of the company named Webrecsol?

13        MR. STAMATIS:  Objection to form.  Answer if

14   you can.

15        THE WITNESS:  No, I was not a representative.

16   We attempted to do one deal together, and it did

17   not happen, so I never represented the company.

18   BY MR. DAVIS:

19        Q.   But you recall this deal in terms of

20   offering services to Brian Scott at Chicago's Best

21   Cleaners?

22        **A.   I only recall the deal because that's when**

23   **I found out about electronic cigarettes.**

24        Q.   Okay.  And does this document accurately

1    reflect the deal that you were trying to propose to

2    Mr. Scott's company when you were associated with

3    Webrecsol?

4         **A.    As I previously stated, I remember being**

5    **asked to make a flyer.   That's all I remember any**

6    **discussion of, so no, none of this looks remotely**

7    **familiar.**

8         Q.   And this document, in it, it's proposing

9    from Webrecsol to provide certain website

10   development and design services to Mr. Brian Scott.

11   Do you understand that?

12        MR. STAMATIS:  Where are you looking?

13        MR. DAVIS:  Page 16798.

14   BY MR. DAVIS:

15        Q.   If you look at the top of Page 16798, it

16   says project scope, and you testified Mr. Brian

17   Scott is your contact; is that right?

18        **A.    Brian Scott was her contact.   She did**

19   **this.   He was not my contact.   She solely set up a**

20   **meeting between myself and Brian Scott.**

21        Q.   And did Mr. Scott communicate to you in

22   your meeting what he wanted to do in terms of

23   services that he wanted from Webrecsol?

24        **A.    As I said previously, to the best of my**

Page 403

1    recollection, we discussed a flyer, and that's all

2    that I recall.

3        Q.    And when you say she, are you referring to

4    Kirti?

5        A.    Yes.

6        Q.    Mr. Duke, did there come a time when you

7    used Craig's List for advertising the products you

8    sold for your company?

9        A.    21 Century Smoking?

10       Q.    Yes.

11       A.    Yes.

12       Q.    And the company 21 Century Smoking, that's

13   my question, was using Craig's List to sell its

14   products; is that right?

15       A.    We were making an effort to do that, yes.

16       Q.    And in those Craig's List ads, you

17   identified the products you were selling to the

18   public?

19       A.    I don't recall the ads, but I would assume

20   that we would have --

21       MR. STAMATIS:  Don't assume.

22       THE WITNESS:  Okay.  I don't recall what the

23   ads said.

24       MR. STAMATIS:  Tell him you don't recall.

Proposal for    Chicago%92s Best Cleaning Co.doc



764ca74a-aa15-4f4e-a56b-0ba54ccbaaac

**EXHIBIT**
Duke
#15
1-7-1 SGC

web**®**recsol
72313
W. McLean
Chicago
IL
60647
**USA**

web**®**recsol Ltd
15A Suite 1
St Stephens Road
West Drayton
Middlesex
UB7 7RL
UK

## Chicago's Best Cleaning Co. Website Design and Development

| | | |
|---|---|---|
| Client | : | Chicago's Best Cleaning Co. |
| Client Contact | : | Bryan Scott (chicagobestcleaners@gmail.com) |
| Document Scope | : | Timeline and cost estimate |
| Version | : | 1.13 |
| Created Date | : | October 16 2008-10-08    Last Modified: October 16 2008-10-08 |
| Valid till | : | 3 Months |

**TABLE OF CONTENTS**

1. Project Scope.................................................................................................2
2. Proposed Solution.........................................................................................2
3. Materials Required.........................................................................................3
4. Timeline and Cost Estimate..........................................................................4
5. Conclusion.....................................................................................................5

**Please Note:** This proposal document has been written based on the inputs provided by the client during the initial briefing session. The project scope, as well as the timeline and the cost estimate is subject to change based on future client interactions, and / or changes in the functional requirements for the given project.

## 1. Project Scope

The client requires to design and develop a website catering to Worldwide. Though the exact functional specifications for the project are yet to be outlined, the client has provided some of the details

We are providing Quotation for pricing for HTML type ads, static site (5-10 Pages) as well as for dynamic site (E-Book web site).

Proposal for     Chicago%92s Best Cleaning Co.doc

764ca74a-ea15-4f4e-a56b-0ba54ccbaaac

we**b**recsol
72313
W. McLean
Chicago
IL
60647
**USA**

we**b**recsol Ltd
15A Suite 1
St Stephens Road
West Drayton
Middlesex
UB7 7RL
UK

### Project 1.1

1. Craigslist Ads

- HTML type Ads for placement online to advertise

### Project 1.2

2. Static Site containing 5-10 pages with some flash animation.

- Home Page
- About Us Page
- Services Pages
- Testimonials with images
- E-Book Menu (Link to a E-book Dynamic site)

### Project 1.3

3. E-Book Dynamic website with some flash animation.

- Home page
- Inner pages
- Payment integration option (Payment will be done through Paypal
- Users/Customers Registration and Login feature.
- Only Paid members will be able to download the E-book non paid members will not able to download the E-book or copy the E-book.
- E-book will be in English version
- Website will have admin panel to manage users/Customers to edit website content.
- A dynamic section like running news section... to display latest news or display some new offer at home page.

This proposal document details the reader on the proposed solution along with the materials required for production, and a timeline and cost estimate for the different tasks in the project.

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Windows/filterSystem/...

Proposal for    Chicago%92s Best Cleaning Co.doc

764ca74a-ea15-4f4e-a56b-0ba54ccbaaac

**webrecsol**

72313
W. McLean
Chicago
IL
60647
**USA**

**webrecsol Ltd**

15A Suite 1
St Stephens Road
West Drayton
Middlesex
UB7 7RL
**UK**

# 2. Proposed Solution

In this chapter, we have detailed on our proposed solution for the project. The different features addressed in the proposed solution include the following: -

1. Website Architecture
2. Home Page User Interface (UI) Design
3. Inner Page Design Templates
4. Use of Cascaded Stylesheets

## 2.1 Website Architecture

As a first step and best practice in website design and development, we propose to build the architecture and define the sitemap – which also outlines the different sections and sub-sections in the website. The architecture will also highlight on those pages that are database-centric, as well as those that are password-protected. At times, these pages will need to be restricted from listing on search engines.

As a part of the architecture document, a flowchart of the home page ideation will also be presented. The flowchart will present an ideation of the content areas, the topics of interest as well as the utility menus on the home page. There will be clearly defined areas for the header, masthead, body and footer.

## 2.2 Home Page UI Design

We propose to design the home page with pleasing colors and appropriate graphics that reflect the objectives and goals of the organization. All graphics in the website would be designed in 16-bit high color settings and would be optimized for faster downloads.

The website would be best viewed in an 800x600 pixels monitor resolution, and would be made compatible to be viewed across different monitor resolutions and browsers. The home page will have pre-defined spaces to carry the menu items, branding, graphics and text content as well as other utilities. These spaces would be made consistent throughout the website so as to facilitate easy site navigation and website structure retention.

## 2.3 Inner Page Design Templates

The inner web pages for the different sections of the website would be designed as templates so as to maintain consistency in the look and feel across different sub-sections within a section. Thus, for example, a section title "Company" will have a template design that would be used throughout its sub-sections viz. Executives, Board, Advisors etc.

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Windows/System

Proposal for    Chicago%92s Best Cleaning Co.doc

764ca74a-ea15-4f4e-a56b-0ba54ccbaaac

**webrecsol**

72313
W. McLean
Chicago
IL
60647
USA

**webrecsol Ltd**

15A Suite 1
St Stephens Road
West Drayton
Middlesex
UB7 7RL
UK

Similarly, if there are different product / service categories, each category would be made a template. The other advantage with design templates is that it makes the process of site updates and new edditions to the site easier and quicker.

**2.4 Use of Cascaded Stylesheets**

As a rule, we always prefer to make use of the Cascaded Stylesheets (.CSS) feature to provide consistency to the text and table layout in the website. CSS files ensure that the font face, style, size, orientation and color don't vary across different pages, and that a hyperlinked text, a section heading or a highlighted feature within the content area can be easily identified by the browser with its style.

# 3. Materials Required

1. High Resolution Logo of the company
2. Content / specifications for the different sections of the website
3. Hosting Server specifications along with Control Panel and FTP access
   (Provided By Client)
4. Image / Image references for the website. Please note that images sourced from online websites require licenses to be purchased for period of use. We insist the client purchase the required licenses so as so to be safe from any copyright infringement.
5. Answers to queries that might arise during the course of development of the project
6. Any other details the client would like to incorporate in the website

# 4. Timeline and Cost Estimate

The following tables outline the reader on the different project tasks involved in the design and development of the proposed solution including Streamlining of Video Content for Web.

**Craigslist Ads Design**

| # | Project 1.1 | | Man-days | Costs |
|---|---|---|---|---|
| PHASE 1 | | | | (40% of the total amount) |
| 1. | Project Discovery | | 01 | -- |
| 2. | Design Architecture | | 01 | -- |
| | | Total | 02 | US$37.50 |
| PHASE 2 | | | | (50% of the total amount) |
| 3. | Ad Design | | 01 | |
| 4. | HTML Pages and Content Incorporation | | 01 | |

21C 16793

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Windows/...

Proposal for   Chicago%92s Best Cleaning Co.doc

764ca74a-ea15-4f4e-a56b-0ba54ccbaaac

**webrecsol**

72313
W. McLean
Chicago
IL
60647
USA

**webrecsol Ltd**

15A Suite 1
St Stephens Road
West Drayton
Middlesex
UB7 7RL
UK

| | | Total | 04 | US$30 |
|---|---|---|---|---|
| PHASE 3 | | | | (10% of the total amount) |
| 5. | QA and Debugging | | 01 | -- |
| 6. | Final Delivery | | 01 | -- |
| | | Total | 06 | US$7.5 |
| | | GRAND TOTAL | 06 Man-days | US$75 + 13% taxes |

**Static Website Design and Development**

| # | Project 1.2 | | Man-days | Costs |
|---|---|---|---|---|
| PHASE 1 | | | | (40% of the total amount) |
| 7. | Project Discovery | | 01 | -- |
| 8. | Site Architecture (Sections and Sub-sections) | | 01 | -- |
| | | Total | 02 | US$450 |
| PHASE 2 | | | | (50% of the total amount) |
| 9. | Site User Interface Design (Home and Inner Page) | | 02 | |
| 10. | HTML Pages and Content Incorporation | | 01 | |
| 11. | Graphic Design and Flash Animation Elements | | 01 | |
| | | Total | 06 | US$360 |
| PHASE 3 | | | | (10% of the total amount) |
| 12. | QA and Debugging | | 01 | -- |
| 13. | Final Delivery | | 01 | -- |
| | | Total | 08 | US$90 |
| | | GRAND TOTAL | 08 Man-days | US$900 + 13% taxes |

**Dynamic Website Design and Development**

| # | Project 1.3 | | Man-days | Costs |
|---|---|---|---|---|
| PHASE 1 | | | | (40% of the total amount) |
| 14. | Project Discovery | | 01 | -- |
| 15. | Site Architecture (Sections and Sub-sections) | | 02 | -- |
| | | Total | 03 | US$740 |
| PHASE 2 | | | | (50% of the total amount) |

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Wind...

Proposal for    Chicago%92s Best Cleaning Co.doc

764ca74a-ea15-4f4e-a56b-0ba54ccbaaac

webrecsol

72313
W. McLean
Chicago
IL
60647
USA

webrecsol Ltd

15A Suite 1
St Stephens Road
West Drayton
Middlesex
UB7 7RL
UK

| | | | | |
|---|---|---|---|---|
| 16. | Site User Interface Design (Home and Inner Page) | | 03 | |
| 17. | HTML Pages and Content Incorporation | | 02 | |
| 18. | Graphic Design and Flash Animation Elements | | 01 | |
| 19. | Admin Module | | 02 | |
| 20. | News system | | 01 | |
| | | Total | 12 | US$925 |
| PHASE 3 | | | | (10% of the total amount) |
| 21. | QA and Debugging | | 02 | -- |
| 22. | Final Delivery | | 01 | -- |
| | | Total | 15 | US$185 |
| | | GRAND TOTAL | 15 Man-days | US$1850 + 13% taxes |

1 Year technical support will be free like if site have any error etc for one year we will sort out at free of cost.

**Notes:**

* Timeline and costs are based on the initial inputs provided by client. Any change in requirements will also affect the timeline and costs. Man-days are based on 8 man-hours per day, and are calculated from the day of approval of the prototype.

**Payment Terms and Conditions**

1. As per the design and development break down proposed.
2. Phase 1 cost to be paid without due after completion of Phase 1, thereby for all phases of the project.
3. Time required studying new technologies in use, and implementing tasks that involve considerable amount of research over the web, or any other media are not included in this timeline estimate and will incur additional costs.

## 5. Conclusion

If we have not addressed or have missed out on any important project requirement in this outlined proposal, please do highlight us on the same. We would be more than willing to provide you with a comprehensive solution that best suits your needs.

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Wind

Proposal for    Chicago%92s Best Cleaning Co.doc

764ca74a-ea15-4f4e-a56b-0ba54ccbaaac

**we recsol**
72313
W. McLean
Chicago
IL
60647
**USA**

**we recsol Ltd**
15A Suite 1
St Stephens Road
West Drayton
Middlesex
UB7 7RL
**UK**

For any queries, feel free to get in touch with us at the following contacts ...

**Mr. Brent Duke**

Cell No:

Email at: brent@webrecsol.com OR info@webrecsol.com

URL: www.webrecsol.com

**Webrecsol**

2313
W. McLean
Chicago
IL - 60647
**USA**

**Webrecsol Ltd.**

15A Suite 1,
St Stephens Road
West Drayton
Middlesex
UB7 7RL
**UK**

Web Recital Solutions (WEBRECSOL Ltd) www.webrecsol.com        info@webrecsol.com        7
Confidential

21C 16796

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Wind84/S4Rec/Rcstoke-8000]dbb68[c2eb7d b

proposal.doc

9f7b5195-ac8e-452a-8ecf-3476a1f6c3b3

**web⦿recsol**
2313 W. McLean
Unit 1W
Chicago, IL 60647

**we⦿recsol Ltd**
15A Suite 1
St Stephens Road
West Drayton UB7 7RL UK

# Chicago's Best Cleaning Co. Website Design and Development

| | | |
|---|---|---|
| Client | : | Chicago's Best Cleaning Co. |
| Client Contact | : | Bryan Scott (chicagobestcleaners@gmail.com) |
| Document Scope | : | Timeline and cost estimate |
| Version | : | 1.13 |
| Created Date | : | October 16 2008 |
| Last Modified | : | October 16 2008 |
| Valid T | : | January 16 2009 |

## TABLE OF CONTENTS

1. Project Scope ........................................................................................................2
2. Proposed Solution ................................................................................................2
3. Materials Required ...............................................................................................3
4. Timeline and Cost Estimate ...............................................................................4
5. Conclusion ............................................................................................................5

**Please Note:** This proposal document has been written based on the inputs provided by the client during the initial briefing session. The project scope, as well as the timeline and the cost estimate is subject to change based on future client interactions, and / or changes in the functional requirements for the given project.

)

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Wind84S/Filir/System/Boot/G64000l l

proposal.doc

9f7b5195-ac8e-452a-8ecf-3476a1f6c3b3

**we🅱recsol**
2313 W. McLean
Unit 1W
Chicago, IL 60647

**we🅱recsol Ltd**
15A Suite 1
St Stephens Road
West Drayton UB7 7RL UK

# 1. Project Scope

Bryan Scott is interested in designing and developing a website catering to customers in the local Chicagoland market, while also creating an E-Book section, which will be more general in focus. Although the exact functional specifications for the project are yet to be determined, the client has provided some of the details.

We are providing a quote for pricing of HTML type ads, a static website (5-10 Pages), as well as for a dynamic site (E-Book web site).

### Project 1.1

1. **Craigslist Ads**

   - HTML type Ads for placement online to advertise

### Project 1.2

2. **Static Site containing 5-10 pages with some flash animation.**

   - Home Page
   - About Us Page
   - Services Pages
   - Testimonials with images
   - E-Book Menu (Link to a E-book Dynamic site)

### Project 1.3

3. **E-Book Dynamic website with some flash animation.**

   - Home page
   - Inner pages
   - Payment Integration option (Payment will be done through Paypal)
   - Users/Customers Registration and Login feature.

**Web Recital Solutions (WEBRECSOL Ltd) www.webrecsol.com**     info@webrecsol.com     2
Confidential

21C 16798

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Windows/File System B00g00SSR.00021 t

proposal.doc

9f7b5195-ac8e-452a-8ccf-3476a1f6c3b3

web**b**recsol
2313 W. McLean
Unit 1W
Chicago, IL 60647

web**b**recsol Ltd
15A Suite 1
St Stephens Road
West Drayton UB7 7RL UK

- In order to download E-Book, customers will have to purchase. General visitors to the website will not able to download or copy the E-book.
- E-book will be in English.
- The website will include an admin panel to manage users/Customers to edit website content.
- This site will also include a dynamic portion, which will display latest news or offers on home page.

This proposal document details the reader on our solution, along with the materials required for production, a timeline, and a cost estimate for the specific tasks included in the project.

## 2. Proposed Solution

In this chapter, we have detailed our proposed solution for the project. The different features addressed in the proposed solution include the following: -

1. Website Architecture
2. Home Page User Interface (UI) Design
3. Inner Page Design Templates
4. Use of Cascaded Style sheets

### 2.1 Website Architecture

As a first step and best practice in website design and development, we propose to build the architecture and define the sitemap – which also outlines the different sections and sub-sections in the website. The architecture will also highlight those pages that are database-centric, as well as those that are password-protected. At times, these pages will need to be restricted from listing on search engines.

As a part of the architecture document, a flowchart of the home page ideation will also be presented. The flowchart will present an ideation of the content areas, the topics of interest as well as the utility menus on the home page. There will be clearly defined areas for the header, masthead, body and footer.

### 2.2 Home Page UI Design

We propose to design the home page with pleasing colors and appropriate graphics that reflect the objectives and goals of the organization. All graphics in the website would be designed in 16-bit high color settings and would be optimized for faster downloads.

The website will appear its best in an 800x600 pixels monitor resolution, however it will also be compatible across a multitude of different monitor resolutions and browsers. The home page will have pre-defined

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Wind0\4\S4[filera5ysteke R3601jfa661jq0593d I:

proposal.doc

9f7b5195-ac8e-452a-8ccf-3476a1f6c3b3

**weรฐrecsol**
2313 W. McLean
Unit 1W
Chicago, IL 60647

**webรฐrecsol Ltd**
15A Suite 1
St Stephens Road
West Drayton UB7 7RL UK

spaces to carry the menu items, branding, graphics and text content as well as other utilities. These spaces will be consistent throughout the website in order to facilitate easy site navigation and website structure retention.

### 2.3 Inner Page Design Templates

The inner web pages for the different sections of the website would be designed as templates so as to maintain consistency in the look and feel across different sub-sections within a section. Thus, for example, a section title "Company" will have a template design that would be used throughout its sub-sections viz. Executives, Board, Advisors, etc.

Similarly, if there are different product / service categories, each category will have a template. The other advantage with design templates is that it makes the process of site updates and new additions to the site easier and quicker.

### 2.4 Use of Cascaded Style Sheets

As a rule, we always prefer to make use of the Cascaded Style Sheets (CSS) feature to provide consistency to the text and table layout in the website. CSS files ensure that the font face, style, size, orientation and color don't vary across different pages, and that a hyperlinked text, a section heading or a highlighted feature within the content area can be easily identified by the browser with its style.

## 3. Materials Required

1. High Resolution Logo of the company
2. Content / specifications for the different sections of the website
3. Hosting Server specifications along with Control Panel and FTP access
(Provided By Client)
4. Image / Image references for the website. Please note that images sourced from online websites require licenses be purchased for period of use. We insist the client purchase the required licenses so as so to be safe from any copyright infringement.
5. Answers to queries that might arise during the course of development of the project
6. Any other details the client would like to incorporate in the website

## 4. Timeline and Cost Estimate

The following tables outline the reader on the different project tasks involved in the design and development of the proposed solution including Streamlining of Video Content for Web.

**Web Recital Solutions (WEBRECSOL Ltd)** www.webrecsol.com     info@webrecsol.com          4
Confidential

21C 16800

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Windows/File System/B00000665/2004 b

proposal.doc

9f7b5195-ac8e-452a-8ecf-3476a1f6c3b3

**weⓑrecsol**
2313 W. McLean
Unit 1W
Chicago, IL 60647

**weⓑrecsol Ltd**
15A Suite 1
St Stephens Road
West Drayton UB7 7RL UK

### Craigslist Ads Design

| # | Project 1.1 | | Man-days | Costs |
|---|---|---|---|---|
| | PHASE 1 | | | (40% of the total amount) |
| 1. | Project Discovery | | 01 | -- |
| 2. | Design Architecture | | 01 | |
| | | Total | 02 | US$37.50 |
| | PHASE 2 | | | (50% of the total amount) |
| 3. | Ad Design | | 01 | |
| 4. | HTML Pages and Content Incorporation | | 01 | |
| | | Total | 04 | US$30 |
| | PHASE 3 | | | (10% of the total amount) |
| 5. | QA and Debugging | | 01 | -- |
| 6. | Final Delivery | | 01 | -- |
| | | Total | 06 | US$7.5 |
| | GRAND TOTAL | | 06 Man-days | US$75 + 13% taxes |

### Static Website Design and Development

| # | Project 1.2 | | Man-days | Costs |
|---|---|---|---|---|
| | PHASE 1 | | | (40% of the total amount) |
| 7. | Project Discovery | | 01 | -- |
| 8. | Site Architecture (Sections and Sub-sections) | | 01 | -- |
| | | Total | 02 | US$450 |
| | PHASE 2 | | | (50% of the total amount) |
| 9. | Site User Interface Design (Home and Inner Page) | | 02 | |
| 10. | HTML Pages and Content Incorporation | | 01 | |
| 11. | Graphic Design and Flash Animation Elements | | 01 | |
| | | Total | 06 | US$360 |
| | PHASE 3 | | | (10% of the total amount) |
| 12. | QA and Debugging | | 01 | -- |
| 13. | Final Delivery | | 01 | -- |
| | | Total | 08 | US$90 |

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Windows/...

proposal.doc

9f7b5195-ac9e-452a-8ecf-3476a1f6c3b3

**webrecsol**
2313 W. McLean
Unit 1W
Chicago, IL 60647

**webrecsol Ltd**
15A Suite 1
St Stephens Road
West Drayton UB7 7RL UK

| | | GRAND TOTAL | 08 Man-days | US$900 + 13% taxes |
|---|---|---|---|---|

**Dynamic Website Design and Development**

| # | Project 1.3 | | Man-days | Costs |
|---|---|---|---|---|
| | PHASE 1 | | | (40% of the total amount) |
| 14. | Project Discovery | | 01 | -- |
| 15. | Site Architecture (Sections and Sub-sections) | | 02 | -- |
| | | Total | 03 | US$740 |
| | PHASE 2 | | | (50% of the total amount) |
| 16. | Site User Interface Design (Home and Inner Page) | | 03 | |
| 17. | HTML Pages and Content Incorporation | | 02 | |
| 18. | Graphic Design and Flash Animation Elements | | 01 | |
| 19. | Admin Module | | 02 | |
| 20. | News system | | 01 | |
| | | Total | 12 | US$925 |
| | PHASE 3 | | | (10% of the total amount) |
| 21. | QA and Debugging | | 02 | -- |
| 22. | Final Delivery | | 01 | -- |
| | | Total | 15 | US$185 |
| | | GRAND TOTAL | 15 Man-days | US$1850 + 13% taxes |

- One Year technical support will be included; ie we will deal with any technical issues related to this project at no additional costs.

Notes:

- Timeline and costs are based on the initial inputs provided by client. Any change in requirements will also affect the timeline and costs. Man-days are based on 8 man-hours per day, and are calculated from the day of the approval of the prototype.

**Payment Terms and Conditions**

1. As per the design and development break down proposed.
2. Phase 1 cost to be paid without due after completion of Phase 1, thereby for all phases of the project.
3. Time required studying new technologies in use, and implementing tasks that involve considerable amount of research over the web, or any other media are not included in this timeline estimate and will incur additional costs.

Web Recital Solutions (WEBRECSOL Ltd) www.webrecsol.com          info@webrecsol.com          6
Confidential

21C 16802

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Windows/Filter/proposal_doc

proposal.doc

9f7b5195-ac8e-452a-8ecf-3476a1f6c3b3

**webrecsol**
2313 W. McLean
Unit 1W
Chicago, IL 60647

**webrecsol Ltd**
15A Suite 1
St Stephens Road
West Drayton UB7 7RL UK

## 5. Conclusion

If we have not addressed any important project requirement in this outlined proposal, please do inform of us such. We would be more than willing to provide you with a comprehensive solution that best suits your needs.

For any queries, feel free to get in touch with us at the following contacts ...

**Brent Duke**

312-523-3244

Email at: brent@webrecsol.com OR info@webrecsol.com

URL: www.webrecsol.com

**Webrecsol Ltd.**

2313 W. McLean
Unit 1W
Chicago IL  60647

**Webrecsol Ltd.**

15A Suite 1,
St Stephens Road
West Drayton
Middlesex
UB7 7RL
**UK**

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Windows/File System/...

SEO Report Format.doc

23a8d6ec-8438-4207-8041-c92851508893

# SEO Report Format

- Detailed Analysis Report:

  Website Analysis
  Keyword Analysis
  Research for potential buyer's centric Keywords
  Content Analysis
  Competitors Analysis
  Link Popularity Report
  Hits/ visitor count (alexa)
  Initial search engine ranking report

- ON-Page Optimization

  Meta Tag Optimization
  Title Tag Optimization
  Anchor Text Optimization
  Image Optimization
  Site content optimization
  HTML code optimization
  Robot.txt Validation
  Traffic Analysis Set Up
  Google Analytics Set up
  Broken Link fixing
  Beta Search Engine Submissions
  Search Engine Submissions
  Sitemap Creation
  XML Sitemap Setup

- Off-Page Optimization
  Time Frame: On-Going Process and we shall provide you the below mentioned services in 30 days with fortnightly and monthly reporting

  30 Social Networking submission
  Blogs Creation
  Blogs Posting
  Classifieds Ads Submission
  Directory Submission
  Back Links
  Article Creation
   Article Submission
  Press release creation
  Press releases distribution

Confidential

21C 16804

SEO Report Format.doc

23a8d6ec-8438-4207-8041-c92851508893

RSS Feeds creation and 30 Ping
Search Engine Progress Ranking Report + Hit Count

Confidential

21C 16805

/21CenturySmoke_samsungnp3005va_BrentDuke/21CenturySmoke_samsungnp3005va_BrentDuke.E01/[Unnamed Container]/Wind84@8filerystem-80000267 0p20021 t

# EXHIBIT 48

# Exhibit KK

# Our chat on Thu, 1/8/09 3:18 PM

| | |
|---|---|
| **From:** | Brent Duke <brentduke@yahoo.com> |
| **To:** | brentduke@yahoo.com |
| **Date:** | Thu, 08 Jan 2009 15:29:36 -0600 |

chat with seo examples of kirti

----- Our chat on Thu, 1/8/09 3:18 PM -----
kirti_saraswat(9:50 AM): hello brent
Brent(10:12 AM): hey
kirti_saraswat(10:13 AM): wts up dude?
Brent(10:13 AM): work is a circus right now but i promise i will go over site very soon!...everything is ok
Brent(10:13 AM): how are you?
kirti_saraswat(10:13 AM): i m good thnx
kirti_saraswat(10:13 AM): actually i m in need of money thats why i want u to have a look at site
kirti_saraswat(10:13 AM): everything has been done
Brent(10:14 AM): i know!...i promise i'm on top of this asap....i just have to pay the bills here and am trying to set up a big work trip
Brent(10:14 AM): sometime today i will get to it...
kirti_saraswat(10:15 AM): big work trip?
Brent(10:15 AM): ya, i go out to farms
kirti_saraswat(10:15 AM): k
kirti_saraswat(10:16 AM): but check it out site also today
kirti_saraswat(10:16 AM): so that i can get some money...
Brent(10:16 AM): visit with the farmers to sell them insurance, etc...i will i promise
kirti_saraswat(10:16 AM): can u do onething
kirti_saraswat(10:16 AM): can u plz send me that bryan money
kirti_saraswat(10:16 AM): now
Brent(10:17 AM): he hasnt paid yet ...i will ask him about that again today, i promise that as well
Brent(10:17 AM): i don't know what the deal is with that, he always puts it off
Brent(10:17 AM): maybe he is just conning me
kirti_saraswat(10:18 AM): yeah may be
kirti_saraswat(10:19 AM): hey can i see that flyr site
kirti_saraswat(10:19 AM):
kirti_saraswat(10:19 AM): which u made
Brent(10:19 AM): lol, sure
kirti_saraswat(10:19 AM):
Brent(10:19 AM): you can see my handy work
kirti_saraswat(10:19 AM): let me login to teamveiwer
Brent(10:19 AM): i can just email you the zip, right?
kirti_saraswat(10:20 AM): i can see at ur pc as well
kirti_saraswat(10:20 AM): or u can login from gtalk
kirti_saraswat(10:20 AM): can share file with me
Brent(10:20 AM): it is really small, i'll just email it...which address should i send it to?
kirti_saraswat(10:20 AM): kirti@webrecsol.com
Brent(10:21 AM): there are still some typos though!
Brent(10:21 AM): i haven't had time to do that either
kirti_saraswat(10:22 AM): k k
kirti_saraswat(10:22 AM): i just want to check ur work
Brent(10:22 AM): lol, it is a template, so my "work" better be ok
kirti_saraswat(10:22 AM):
kirti_saraswat(10:22 AM): yeah smart guy
Brent(10:24 AM): i wouldn't be able to do that site from beginning to end though, no way!....i love that program you put on here for colors, might use that to change the color of that site
kirti_saraswat(10:24 AM): yeah that software is to do coding
kirti_saraswat(10:25 AM): and use to make sites
kirti_saraswat(10:25 AM): that editor
Brent(10:25 AM): even though it was a template, i still had some issues with it...took a while to make it work...i am going to replace bryan's ad with sportdoctrine

---

**Confidential**

Brent(10:25 AM):  once we are up and running
kirti_saraswat(10:25 AM):  to edit anything
Brent(10:25 AM):  ya, seems like great software
kirti_saraswat(10:25 AM):
Brent(10:25 AM):  do all programmers use it?
Brent(10:25 AM):  i just am using notepad lol
kirti_saraswat(10:26 AM):  noone use notepad
kirti_saraswat(10:26 AM):
Brent(10:27 AM):  except moi!
kirti_saraswat(10:27 AM):
Brent(10:27 AM):  so did you get my site?
kirti_saraswat(10:27 AM):  no students use this to learn
kirti_saraswat(10:28 AM):  yeah checking
Brent(10:32 AM):  see that is perfect as i am still a student!!...do people just use the program cuz it is much easier, and fills in stuff for you?
kirti_saraswat(10:32 AM):  its editor
kirti_saraswat(10:33 AM):  to edit codes
kirti_saraswat(10:33 AM):  and easy and simple
kirti_saraswat(10:33 AM):  in notepad u have to check everything
kirti_saraswat(10:33 AM):  wait i show u somehting
kirti_saraswat(10:33 AM):  can u plz open team veiwer
Brent(10:33 AM):  oh so that will show you when you have a mistake?
kirti_saraswat(10:33 AM):  yeah u can see design
Brent(10:33 AM):  sure
kirti_saraswat(10:33 AM):  and code both at same time
Brent(10:34 AM):  178 045 161
Brent(10:34 AM):  3251
kirti_saraswat(10:35 AM):  whr is ur files
Brent(10:35 AM):  what did you want to show me or do you want me to login to yours?
Brent(10:35 AM):  for the site?
kirti_saraswat(10:35 AM):  yeah
Brent(10:35 AM):  let me download them
kirti_saraswat(10:35 AM):
kirti_saraswat(10:38 AM):  so u can edit anything esily
kirti_saraswat(10:38 AM):  with the help of this software
Brent(10:38 AM):  2 minutes phone
kirti_saraswat(10:38 AM):  k
Brent(10:47 AM):  k i am back
Brent(10:47 AM):  sorry bout that
Brent(10:48 AM):  making some sales of corn
Brent(10:48 AM):  like 250,000 worth, lol
kirti_saraswat(10:48 AM):  good
Brent(10:49 AM):  are you still on my pc?
kirti_saraswat(10:49 AM):  yeah i was just showing that u can edit esily through this software
Brent(10:50 AM):  ok, why was that easier, cuz it shows the website below are you are doing?
Brent(10:50 AM):  as* not are
kirti_saraswat(10:50 AM):  yeah
Brent(10:50 AM):  or were you actually just typing on the website itself, i didn't quite get what you were doing?
kirti_saraswat(10:51 AM):  yeah i was typing at site
kirti_saraswat(10:51 AM):  if u will save it will save
kirti_saraswat(10:51 AM):  n display at ur site
Brent(10:51 AM):  are you serious?
kirti_saraswat(10:51 AM):
Brent(10:51 AM):  that is nuts
kirti_saraswat(10:51 AM):  yup
Brent(10:51 AM):  but if you change the header, you have to go to each page and change it again, right?
Brent(10:51 AM):  just like in notepad?
kirti_saraswat(10:51 AM):  yeah
kirti_saraswat(10:52 AM):  but if u will use php then u have to just edit in header file
kirti_saraswat(10:52 AM):  but as u know html only
kirti_saraswat(10:52 AM):  but in notepad u have to always save then see
kirti_saraswat(10:52 AM):  here u can see at same time
Brent(10:52 AM):  ya, i definitely don't have time to learn a programming language..lol
Brent(10:53 AM):  ya, notepad sucks for that very reason, or you have to keep screen small and refresh all

Confidential

of the time
kirti_saraswat(10:53 AM):
kirti_saraswat(10:53 AM):  ut now u dont need to do
Brent(10:53 AM):  ya, but this is on my work pc not my laptop where i do all my stuff!!
kirti_saraswat(10:53 AM):  u can copy file
kirti_saraswat(10:53 AM):  from document folder
Brent(10:53 AM):  i will have to get you to hook me up at home
kirti_saraswat(10:54 AM):  google folder
kirti_saraswat(10:54 AM):  hehehe
Brent(10:54 AM):  i can't just send this to myself, right, i need that code?
kirti_saraswat(10:54 AM):  no u can copy to pendrive
kirti_saraswat(10:54 AM):  n u can install it in ur laptop
Brent(10:55 AM):  pendrive?
kirti_saraswat(10:55 AM):  USB drive
kirti_saraswat(10:59 AM):  i hv copy files at desktop
kirti_saraswat(10:59 AM):  u can copy from thr n u can install in ur home pc or laptop
Brent(10:59 AM):  ty
Brent(10:59 AM):  lunch,brb
kirti_saraswat(11:00 AM):  k fine bbye tc
kirti_saraswat(11:00 AM):  i m here
kirti_saraswat(11:00 AM):  but plz check site today so that i can get )
Brent(11:58 AM):  can you give me the link to the admin
Brent(11:58 AM):  as i want to try and add some teams, etc.
kirti_saraswat(11:58 AM):  k
Brent(12:05 PM):  do you have the link?
kirti_saraswat(12:06 PM):  www.webrecsol.info/sports
Brent(12:07 PM):  no to the admin
kirti_saraswat(12:07 PM):  www.webrecsol.info/sports/admin
kirti_saraswat(12:08 PM):  user: admin
kirti_saraswat(12:08 PM):  pass: admin
Brent(12:15 PM):  i am trying to add a team to ncaa basketball and nothing is happening
Brent(12:15 PM):  i tried it on the front end and the backend
kirti_saraswat(12:15 PM):  no no
kirti_saraswat(12:15 PM):  why r u adding from both
kirti_saraswat(12:15 PM):  from admin u can only manage team
Brent(12:16 PM):  cuz neither one is working
kirti_saraswat(12:16 PM):  open link of front end
kirti_saraswat(12:16 PM):  no front end is working
kirti_saraswat(12:16 PM):  let me show u
Brent(12:16 PM):  i want to add Duke Blue Devils to NCAA Mens
kirti_saraswat(12:17 PM):  wt's NCAA Mens?
kirti_saraswat(12:19 PM):  NCCA Men is league
kirti_saraswat(12:19 PM):  after this wt do u want to do
Brent(12:20 PM):  i want to add a team
Brent(12:20 PM):  to the Atlantic Coast Conference
Brent(12:20 PM):  or ACC, however it is on there
kirti_saraswat(12:21 PM):  okay
Brent(12:21 PM):  Atlantic Coast
kirti_saraswat(12:21 PM):  in which conference
kirti_saraswat(12:21 PM):  and division
Brent(12:21 PM):  Atlantic Coast
kirti_saraswat(12:21 PM):  ?
Brent(12:21 PM):  there isn't a division
kirti_saraswat(12:21 PM):  League name : NCAA Men
kirti_saraswat(12:22 PM):  Conefernce: ?
kirti_saraswat(12:22 PM):  Division: ?
Brent(12:22 PM):  Atlantic Coast
kirti_saraswat(12:22 PM):  after that Team will come
Brent(12:22 PM):  no division though
kirti_saraswat(12:22 PM):  but in site
kirti_saraswat(12:22 PM):  as in doc itself
kirti_saraswat(12:22 PM):  we can add direct player
kirti_saraswat(12:23 PM):  but for team we have to go through all process
Brent(12:23 PM):  ok, well in college, most conferences don't have divisions
kirti_saraswat(12:23 PM):  then we can delete confernce...

Confidential

kirti_saraswat(12:23 PM): if u want
Brent(12:24 PM): lol, some conferences in college have divisions, some don't
kirti_saraswat(12:24 PM): but now site is totally developed dear
Brent(12:24 PM): ok, what i'm telling you is that it is impossible to add college teams right now
Brent(12:24 PM): if you can do it show me how
kirti_saraswat(12:25 PM): u have to go through full procees
kirti_saraswat(12:25 PM): u cant add direct team
kirti_saraswat(12:25 PM): like in which league
kirti_saraswat(12:25 PM): then coference
kirti_saraswat(12:25 PM): then division
kirti_saraswat(12:25 PM): then team will come
kirti_saraswat(12:25 PM): in team u can see
Brent(12:25 PM): i'm not sure where i'm being confusing exactly, but only about 1/3 of conferences have divisions
kirti_saraswat(12:25 PM): before team 3 drop down come
Brent(12:26 PM): but i need to have all of the teams on the site
Brent(12:26 PM): like i said for golf or whatever, there needs to be a way to get past one level to the next and have it still work
Brent(12:27 PM): cuz all sports aren't the same, unfortunately
kirti_saraswat(12:27 PM): but as doc i had
kirti_saraswat(12:27 PM): all site designed accordingly
Brent(12:27 PM): kirti, if you can show me how to put on college teams as it is right now, it is fine
kirti_saraswat(12:27 PM): cause u said u should be able to add player directly
kirti_saraswat(12:27 PM): then i made a section seperately
Brent(12:28 PM): yes, you should be able to add a golfer to golf
Brent(12:28 PM): cuz he doesn't have a team
kirti_saraswat(12:28 PM): college teams
Brent(12:28 PM): and you shoud be able to add a team that doesn't have a division, as well, etc
kirti_saraswat(12:28 PM): u are saying it doesn't hv division
kirti_saraswat(12:28 PM): or conference
kirti_saraswat(12:28 PM): but thats u r saying now
kirti_saraswat(12:28 PM):
Brent(12:28 PM): i told you before that this was a problem...haven't you looked in the NCAA Men?
kirti_saraswat(12:28 PM): and site has been devloped
Brent(12:29 PM): i have like 10 conferences, and no teams, and you told me that was because i needed to do it on the front end
kirti_saraswat(12:29 PM): also then how the website function will work
Brent(12:29 PM): look in there right now and you will see and i know i discussed this with you
Brent(12:29 PM): ok, kirti if you can add the teams, show me how?
kirti_saraswat(12:30 PM): wait wait brent
kirti_saraswat(12:30 PM): a person can add direct team
kirti_saraswat(12:31 PM): without conefrence and division
kirti_saraswat(12:31 PM): thats it
kirti_saraswat(12:32 PM): or either some can have conference
kirti_saraswat(12:32 PM): and some can have division?
Brent(12:33 PM): i don't understand how when you took the time to make it so that i could put a golfer on there you didn't make it so that anything could be left out from one level to the next.....i assumed that is what has been taking so long
Brent(12:33 PM): if you can show me how to get all of the ncaa teams on there this will work for now, but if not, this won't work
kirti_saraswat(12:33 PM): main thing is article
kirti_saraswat(12:33 PM): and rating for articles
kirti_saraswat(12:34 PM): NCAA teams u r saying it doesn't hv conference
Brent(12:34 PM): yes, but in terms of finding teams, the organizing of where they are is just as important!
kirti_saraswat(12:34 PM): but right now thr is no way to add direct teams
Brent(12:34 PM): no no no
Brent(12:34 PM): they do have a conference
Brent(12:34 PM): they don't have a division
kirti_saraswat(12:34 PM): they dont hv division
kirti_saraswat(12:34 PM): yeah thats what i am saying
Brent(12:34 PM): and sometimes they have both, but this is mostly in football
kirti_saraswat(12:34 PM): okay thats what i am saying
kirti_saraswat(12:35 PM): i will make a seperate section again for site
Brent(12:35 PM): so what i need to be able to do is add the Pac 10 conference, and then put in Arizona,

Confidential 21C 1000007

Our chat on Thu, 1/8/09 3:18 PM

Arizona State, Cal, Stanford, UCLA, USC, Washington, Washington State, Oregon, and Oregon State
kirti_saraswat(12:35 PM): in which some options will be thr
kirti_saraswat(12:36 PM): to add team without conference or division
kirti_saraswat(12:36 PM): right?
Brent(12:36 PM): why can't you just make it so that the main section will allow for a level to be skipped in everything to simplify the process
Brent(12:36 PM): like have the code read that if there is no division, don't worry about it, just list the team
Brent(12:36 PM): or if there is no division, conference, or team, don't worry about it just list the player
Brent(12:37 PM): then we can't have this same problem anymore
kirti_saraswat(12:37 PM): site is mainly
kirti_saraswat(12:37 PM): in drop down
kirti_saraswat(12:37 PM): teams are coming after home
Brent(12:37 PM): and the dropdowns are working fine
kirti_saraswat(12:37 PM): and for direct player players r coming
Brent(12:37 PM): and they even let you skip division ok
Brent(12:37 PM): but then when you put the team nothing happens
kirti_saraswat(12:38 PM): k check other things
Brent(12:38 PM): lol, well that is a big one sweetie!
Brent(12:38 PM):
kirti_saraswat(12:38 PM): yeah yeah i know
kirti_saraswat(12:38 PM): i will do it tonight
kirti_saraswat(12:38 PM): i will work on this
kirti_saraswat(12:38 PM): and tomorrow morning
Brent(12:38 PM): that is like 600 teams that i have to put in
kirti_saraswat(12:38 PM): in ur day time u will get it
Brent(12:38 PM):
kirti_saraswat(12:38 PM): dont worry dear
Brent(12:39 PM): is going to take forever to get every college on there!!
kirti_saraswat(12:39 PM): i will complete it by ur tomorrow morning
kirti_saraswat(12:39 PM): why
Brent(12:39 PM): can you do what i am saying?
kirti_saraswat(12:39 PM): user will do this
kirti_saraswat(12:39 PM): not only u
Brent(12:39 PM): just make it so that if one pulldown doesn't work, it will just allow you to go to the next?
Brent(12:39 PM): i feel like it is almost doing this now as it is
kirti_saraswat(12:39 PM): wait i tell u what will be thr
Brent(12:40 PM): just won't actually show the team
kirti_saraswat(12:40 PM): yeah i know
kirti_saraswat(12:40 PM): but have to change coding
kirti_saraswat(12:40 PM): create league name
Brent(12:40 PM): but it works to the degree that it lets me add the team just fine, so it should be close to being there in that aspect
kirti_saraswat(12:40 PM): then weather u hv conference u ill add
kirti_saraswat(12:40 PM): if u dont have
kirti_saraswat(12:40 PM): then go for next
kirti_saraswat(12:40 PM): division
kirti_saraswat(12:40 PM): add divion
kirti_saraswat(12:40 PM): if u dont hv then skip
kirti_saraswat(12:41 PM): then add team
kirti_saraswat(12:41 PM): now if u dont hv team
Brent(12:41 PM): exactly, and then this can work for adding players directly as well!
kirti_saraswat(12:41 PM): then u can add direct player
Brent(12:41 PM): this is what i thougth you had done
kirti_saraswat(12:41 PM): from direct player tab
kirti_saraswat(12:41 PM): i will make individual tabs
kirti_saraswat(12:41 PM): for individual adding teams
kirti_saraswat(12:41 PM): like i made for Player
Brent(12:42 PM): can't you just change the coding on the pulldown?
kirti_saraswat(12:42 PM): by name Direct Player
kirti_saraswat(12:42 PM): we cant do 2 kind of coding in same field
Brent(12:42 PM): I mean it is almost there, just make it allow me to display what i'm typing....it is letting me type it
Brent(12:43 PM): no just make the field allow me to skip pulldowns, it is already letting me do it!!

DOC-000000004_0005

21C 1000008

Brent(12:43 PM):  just not accepting what is typed
kirti_saraswat(12:43 PM):  yeah it wont
kirti_saraswat(12:43 PM):  cause u didnt select
kirti_saraswat(12:43 PM):  yeah
kirti_saraswat(12:43 PM):  thats what i am saying i will do
Brent(12:44 PM):  good, cuz then people will be able to add whatever they want much easier...as most people will be adding local leagues that only have a league and then teams!
kirti_saraswat(12:44 PM):  k
kirti_saraswat(12:45 PM):  right now u can directly add player
kirti_saraswat(12:45 PM):  at left side thr is a button
kirti_saraswat(12:45 PM):  name direct player
Brent(12:47 PM):  ok, why is there a player description in the player section?
kirti_saraswat(12:47 PM):  if someone wants to check player details
kirti_saraswat(12:48 PM):  they can click thr n users will get all players details
kirti_saraswat(12:48 PM):  which will be add in that league
Brent(12:48 PM):  who is going to put player details?
kirti_saraswat(12:48 PM):  when u add player
kirti_saraswat(12:48 PM):  it ask for player description
kirti_saraswat(12:49 PM):  anyone can add
kirti_saraswat(12:49 PM):  u
kirti_saraswat(12:49 PM):  me
kirti_saraswat(12:49 PM):  any user
Brent(12:49 PM):  ya, lets not have that
Brent(12:49 PM):  i dont' want people putting things i can't keep track of
kirti_saraswat(12:49 PM):  it was before as well
kirti_saraswat(12:49 PM):  but it was not visible at site'
kirti_saraswat(12:49 PM):  then when someone will add player
kirti_saraswat(12:49 PM):  what he/she will add
Brent(12:50 PM):  just there name
Brent(12:50 PM):  i think that is enough
Brent(12:50 PM):  for me to worry about at least
kirti_saraswat(12:50 PM):  n in team
kirti_saraswat(12:50 PM):  this feature is thr
kirti_saraswat(12:50 PM):  to add team description
Brent(12:51 PM):  the header on home says nfl articles, but all of the other ones say available articles
Brent(12:51 PM):  i would kind of like the header of each league to just say "nfl"
Brent(12:51 PM):  or whatever league it is
kirti_saraswat(12:52 PM):  did u send any msg
Brent(12:52 PM):  and home can say "all the best"
kirti_saraswat(12:52 PM):  kirti: n in team
kirti: this feature is thr.
kirti: to add team description
kirti: in team also just team name
kirti: thats it?
kirti_saraswat(12:52 PM):  can u plz copy paste ur msg again
Brent(12:52 PM):  the header on home says nfl articles, but all of the other ones say available articles12:51 PMi would kind of like the header of each league to just say "nfl"12:51 PMor whatever league it is
Brent(12:53 PM):  yes, i don't know how we could control consistency with descriptions, so i don't know about that being on there
kirti_saraswat(12:53 PM):  k
kirti_saraswat(12:54 PM):  okay
kirti_saraswat(12:54 PM):  at Home it will say All the Best above all article
kirti_saraswat(12:54 PM):  and in other leagues'it will display League name
kirti_saraswat(12:54 PM):  right
kirti_saraswat(12:54 PM):  like for NFL
kirti_saraswat(12:55 PM):  it will say NFL Articles
kirti_saraswat(12:55 PM):  ?
kirti_saraswat(12:55 PM):  and what abt Team Logo
kirti_saraswat(12:55 PM):  we should ask for Team logo hen someone add team or not?
Brent(12:55 PM):  just have it say NFL
kirti_saraswat(12:55 PM):  k
Brent(12:55 PM):  we don't need to say article
kirti_saraswat(12:56 PM):  okay fine
Brent(12:56 PM):  ya, the logo thing is fine

DOC-000000004_0006

Confidential                                                                    21C 1000009

Case: 3:12-cv-50324 Document #: 294-2 Filed: 03/25/19 Page 345 of 732 PageID #:13008

Our chat on Thu, 1/8/09 3:18 PM

Brent(12:56 PM):  we can see and control that easy
kirti_saraswat(12:56 PM):
Brent(12:57 PM):  and then the font in the boxes on the side needs to be a little bit more "fun"
Brent(12:57 PM):  since those are like user based....
Brent(12:58 PM):  and there aren't any points for the bottom boxes, they should all have points
kirti_saraswat(12:58 PM):  fun?
Brent(12:58 PM):  just a different font than the rest, not so official
Brent(12:58 PM):  and there should only be 7 boxes not 8
kirti_saraswat(12:59 PM):  ?
Brent(12:59 PM):  and the text in the top box is getting cut off, so increase the amount of space for text, and it can always carry down a line, but shouldn't get cut off
kirti_saraswat(12:59 PM):  i m not getting u
Brent(12:59 PM):  i will make a word document
kirti_saraswat(12:59 PM):  okay
Brent(1:00 PM):  i think this is all pretty small stuff...like i don't think that there should be orange in the profile box
Brent(1:00 PM):  i'm not even sure if you are seeing it as orange!
kirti_saraswat(1:00 PM):  text color?
kirti_saraswat(1:00 PM):  name
kirti_saraswat(1:00 PM):  and email
Brent(1:00 PM):  ya
kirti_saraswat(1:00 PM):  and in location
kirti_saraswat(1:00 PM):  okay
kirti_saraswat(1:01 PM):  that should of which color?
Brent(1:01 PM):  either blue or gray, or if you think something else goes with this ok
kirti_saraswat(1:01 PM):  okay
Brent(1:02 PM):  or even black maybe, i don't know
kirti_saraswat(1:02 PM):  okay i will user skyblue
kirti_saraswat(1:02 PM):  which used in background
kirti_saraswat(1:02 PM):  and at someother places
Brent(1:03 PM):  ya, i was thinking even in the boxes, change and increase the font of the text and maybe make it that blue or a darker blue
Brent(1:03 PM):  so you can still read it...or if you think black looks ok, that is cool too
kirti_saraswat(1:04 PM):  there will be 6 only
kirti_saraswat(1:04 PM):  u dont need friends fav tab
kirti_saraswat(1:04 PM):  ?
kirti_saraswat(1:04 PM):  and in bottom Today's viewed
Brent(1:04 PM):  only 7
Brent(1:04 PM):  not 6
kirti_saraswat(1:04 PM):  which 7
kirti_saraswat(1:04 PM):  which one i need to delete
kirti_saraswat(1:05 PM):  Today's View?
Brent(1:05 PM):  Description of
Box 1:
Most You: most voted on articles related to user's favorite teams (user selects these teams when joining the site, and can update at anytime through personal profile)
Most Viewed: articles with most views
Most Recent: articles most recently posted
Friend's Favs: articles most posted and viewed by friends

Description of
Box 2:
Top User: Biggest user of the site
Today's Best: Biggest user of the site for that day.
Friend Board: User's friends with the highest scores
Brent(1:06 PM):  i'm not sure where today viewed came from i guess?
kirti_saraswat(1:06 PM):  hehehe
kirti_saraswat(1:06 PM):  i added
kirti_saraswat(1:06 PM):
kirti_saraswat(1:06 PM):  i will delete
kirti_saraswat(1:06 PM):  i though 4 n 4 will give good combination
Brent(1:06 PM):  lol, well it is in the section where it is all point related!!...lol..
kirti_saraswat(1:06 PM):  .7 was odd kinda
kirti_saraswat(1:06 PM):
kirti_saraswat(1:08 PM):  some times u rush it sometimes u dont

Confidential

kirti_saraswat(1:08 PM): ooooopppppppssssssss
kirti_saraswat(1:08 PM): sorry
kirti_saraswat(1:08 PM): not for u
kirti_saraswat(1:08 PM):
Brent(1:08 PM): no worries, but good try
kirti_saraswat(1:09 PM):
kirti_saraswat(1:09 PM): actully my b/f is online
kirti_saraswat(1:09 PM): he was typing something
kirti_saraswat(1:09 PM): i was replying to him
kirti_saraswat(1:09 PM):
Brent(1:09 PM): oh ok
kirti_saraswat(1:09 PM): i was telling him
kirti_saraswat(1:10 PM): i m listening a sexy song
kirti_saraswat(1:10 PM):
kirti_saraswat(1:10 PM): enrique iglesias
Brent(1:10 PM): lol...that is too funny
kirti_saraswat(1:10 PM):
kirti_saraswat(1:10 PM): hv u heared this song
kirti_saraswat(1:10 PM): ring my bells
kirti_saraswat(1:10 PM): ??
Brent(1:12 PM): by iglesias? no but i've heard you can ring my bell...70s song
kirti_saraswat(1:12 PM): k
kirti_saraswat(1:12 PM): wait let me send u youtube link
kirti_saraswat(1:12 PM): its good song
kirti_saraswat(1:12 PM):
kirti_saraswat(1:13 PM): http://in.youtube.com/watch?v=ki7H0vwCkSw
kirti_saraswat(1:15 PM): http://in.youtube.com/watch?v=ki7H0vwCkSw
Brent(1:15 PM): lol, i found that same clip when i searched
kirti_saraswat(1:15 PM): did u send any msg
Brent(1:16 PM): i am not really a big fan of his...ya, i was listening to the song!
Brent(1:16 PM): waiting to see if it would become more exciting lol
Brent(1:18 PM): it is ok...do you like him cuz of how he looks or how he sings?
kirti_saraswat(1:19 PM): hi
kirti_saraswat(1:19 PM): got dis connect
Brent(1:19 PM): i am not really a big fan of his...ya, i was listening to the song!1:16 PMwaiting to see if it would become more exciting lol1:16 PMit is ok...do you like him cuz of how he looks or how he sings?
kirti_saraswat(1:20 PM): hmm
kirti_saraswat(1:20 PM): both
Brent(1:20 PM): ha
kirti_saraswat(1:20 PM):
Brent(1:23 PM): i can't send that zip file in yahoo or gmail?
Brent(1:24 PM): did you say i have a google folder of some type?
kirti_saraswat(1:24 PM): yeah u can send
kirti_saraswat(1:24 PM): through gtalk so
Brent(1:25 PM): but my computer is at home
kirti_saraswat(1:25 PM): k
Brent(1:25 PM): so how can i send it there if i'm here?
kirti_saraswat(1:25 PM): i will share with u
kirti_saraswat(1:25 PM): u cam email that file to ur id
kirti_saraswat(1:25 PM): but its too long
Brent(1:26 PM): ya i know i tried
kirti_saraswat(1:26 PM): k
Brent(1:27 PM): lol, so there is a way to do this or it is too long?
kirti_saraswat(1:27 PM): its big file i will share with u when u will at home
Brent(1:28 PM): ok...i used to have a key chain with a ubs on it...i have no idea where it is now though
Brent(1:28 PM): usb
kirti_saraswat(1:28 PM): k
kirti_saraswat(1:32 PM): did u listen that song?
Brent(1:32 PM): ya
kirti_saraswat(1:32 PM): hows that?
kirti_saraswat(1:32 PM):
Brent(1:33 PM): it was ok, i wrote to you a message that i was waiting for the pace to pick up!!..but i did listen to the whole thing...i could see how one could like it, just never really been into him myself
kirti_saraswat(1:33 PM): k
kirti_saraswat(1:34 PM): wt r ur plans for marketing

Confidential

kirti_saraswat(1:34 PM): means internet marketing
kirti_saraswat(1:34 PM): SEO?
kirti_saraswat(1:35 PM): well in desktop screen i saw 2 pic
kirti_saraswat(1:35 PM): both r ir son?
kirti_saraswat(1:35 PM): ur
kirti_saraswat(1:43 PM): r u thr?
kirti_saraswat(1:43 PM): well i am asking because we are into internet marketing also...
kirti_saraswat(1:43 PM):
kirti_saraswat(1:43 PM): so i will support u in this also
Brent(1:44 PM): hey
kirti_saraswat(1:44 PM): yeah
Brent(1:44 PM): ya, my sons
kirti_saraswat(1:44 PM): k
Brent(1:44 PM): i don't have plans, but you said you would host it for a little bit, right?
kirti_saraswat(1:44 PM): u already have hosting
kirti_saraswat(1:45 PM): yeah i can host it
kirti_saraswat(1:45 PM): if u want
Brent(1:45 PM): i was hoping the facebook application would help...
kirti_saraswat(1:45 PM): and what about promotion
Brent(1:45 PM): like adwords?
kirti_saraswat(1:45 PM): no
kirti_saraswat(1:46 PM): search engine optimization
kirti_saraswat(1:46 PM): like u type any keyword in google
kirti_saraswat(1:46 PM): and results open
Brent(1:46 PM): ya, i've been researching this a little bit for my smoking site/flyers/and sportsdoctrine
kirti_saraswat(1:46 PM): k
Brent(1:46 PM): ya, i think that getting a sports site to the top will be tough won't it?
kirti_saraswat(1:47 PM): yeah seo is slow process
Brent(1:47 PM): without paying a little for ads?
kirti_saraswat(1:47 PM): takes time to get high ranking
kirti_saraswat(1:47 PM): like within top 10
kirti_saraswat(1:47 PM): my monthly fee
Brent(1:47 PM): how would we even do that when we don't control content?
kirti_saraswat(1:47 PM):
kirti_saraswat(1:49 PM): we have to do
kirti_saraswat(1:49 PM): blog writing
kirti_saraswat(1:49 PM): it will be little tough to get high ranking
kirti_saraswat(1:49 PM): cause sports is very comptative field
kirti_saraswat(1:54 PM):
Brent(1:55 PM): ya, no kidding...so i need to blog about it?
kirti_saraswat(1:56 PM): in SEO we create
Brent(1:56 PM): so that there are links
kirti_saraswat(1:56 PM): individual blogs
kirti_saraswat(1:56 PM): to promote site
kirti_saraswat(1:56 PM): and we do link exchange
kirti_saraswat(1:56 PM): to many things are there to get higher ranking in google
kirti_saraswat(1:56 PM): to the given keywords
Brent(1:57 PM): do you think it is worth me advertising the site in adwords?
kirti_saraswat(1:58 PM): well
kirti_saraswat(1:58 PM): it will take alot of money
kirti_saraswat(1:58 PM): but u wont see much result from thr
kirti_saraswat(1:58 PM): yeah intially u can start that also
kirti_saraswat(1:58 PM): but once we get high ranking
Brent(1:58 PM): i mean i can pick what keywords and limit how much i spend
kirti_saraswat(1:58 PM): then SEO is best option
kirti_saraswat(1:59 PM): yeah that i know
Brent(1:59 PM): ya, i understand that part of it
kirti_saraswat(1:59 PM): u see
kirti_saraswat(1:59 PM): at my site also
kirti_saraswat(1:59 PM): thr r google ads
kirti_saraswat(1:59 PM): n peple do the same
kirti_saraswat(1:59 PM): n its not necessary that right people will click on that
kirti_saraswat(2:00 PM): but u will loose ur money while anyone will click on that cause u pay per click basis
kirti_saraswat(2:00 PM): but in google search engine if someone is in need of something

Confidential

Brent(2:00 PM): but don't i want people to click on it, isn't that the whole point...they click and i have a good site?
kirti_saraswat(2:00 PM): then only they tpe and search for it
kirti_saraswat(2:02 PM): yeah
Brent(2:05 PM): how long will it take to move my site up the rankings/
Brent(2:05 PM): ?
kirti_saraswat(2:05 PM): its new site
kirti_saraswat(2:06 PM): so it will take much time
kirti_saraswat(2:06 PM): usually site takes 7-8 months
kirti_saraswat(2:06 PM): to get top 10 ranking
kirti_saraswat(2:06 PM): but in SEO we always work on new n new keywords
kirti_saraswat(2:06 PM): cause there is no end...
kirti_saraswat(2:06 PM): intially we have to start with less compitative keywords once we start getting ranking for those then we concentrate on more compitative keywords
kirti_saraswat(2:07 PM): but u will see progress after every 15 days
kirti_saraswat(2:07 PM): in ur site
kirti_saraswat(2:08 PM): as we send seo report after every 15 days
Brent(2:08 PM): how much does this cost to do?
kirti_saraswat(2:09 PM): Monthly costing is US$400
Brent(2:09 PM): k
kirti_saraswat(2:10 PM): Luxury homes - #3
Sacramento luxury homes - #1
Sacramento luxury real estate - #1
Silicon Valley luxury homes - #1
Reno luxury homes - #1
Portland luxury homes - #2
Washington DC luxury homes - #2
Westchester luxury real estate #3
Hawaii luxury homes - #3
Lake Tahoe luxury real estate - #3
Bay Area luxury homes - #3
kirti_saraswat(2:10 PM): Luxury homes - #3
Sacramento luxury homes - #1
Sacramento luxury real estate - #1
Silicon Valley luxury homes - #1
Reno luxury homes - #1
Portland luxury homes - #2
Washington DC luxury homes - #2
Westchester luxury real estate #3
Hawaii luxury homes - #3
Lake Tahoe luxury real estate - #3
Bay Area luxury homes - #3
kirti_saraswat(2:10 PM): type these keywords
kirti_saraswat(2:10 PM): http://www.luxuryhomemagazine.com/
kirti_saraswat(2:10 PM): this site will come up for given keywords
kirti_saraswat(2:10 PM): at
kirti_saraswat(2:10 PM): 3 2
kirti_saraswat(2:10 PM): 1
kirti_saraswat(2:11 PM): 3 2
kirti_saraswat(2:11 PM): ranking
kirti_saraswat(2:11 PM): #1 for Indianapolis homes
#1 for Indianapolis in real estate
#1 Indianapolis Indiana real estate
kirti_saraswat(2:11 PM): http://www.mswoods.com/
kirti_saraswat(2:11 PM): #3 Winter Park Lodging
#3 Winter Park Condos
#1 Winter Park Hotels
kirti_saraswat(2:12 PM): http://www.beavervillage.com/
kirti_saraswat(2:12 PM): #1 Atlanta homes
#2 Atlanta real estate
#1 Atlanta realtor
#1 Atlanta real estate agent
kirti_saraswat(2:12 PM): http://www.homeatlanta.com/
Brent(2:14 PM): do you think you could actually get into the top 10 of sports though??
kirti_saraswat(2:15 PM): yeah we will start fro less compitative keywords to higher compitative keywords

Confidential

kirti_saraswat(2:16 PM): these all r our work
Brent(2:16 PM): but isn't every sports site doing this?
kirti_saraswat(2:16 PM): u will type sport's keywords
kirti_saraswat(2:16 PM): all major sites will come up in top 10
kirti_saraswat(2:17 PM): all website owner do the SEO work for their sites
Brent(2:17 PM): ya, so how would we get above a big site....i mean like detroit free press is up there for sports, and there isn't any reason for them to be on the first google page
kirti_saraswat(2:17 PM): thats our efforts
kirti_saraswat(2:18 PM): keywords are mixer of words
kirti_saraswat(2:18 PM): not just sport
kirti_saraswat(2:18 PM): first we will target USa region
kirti_saraswat(2:18 PM): then will work on worldwide
Brent(2:20 PM): ok, i will think about this...
kirti_saraswat(2:20 PM): well for u
kirti_saraswat(2:20 PM): u will always get discount in every services
kirti_saraswat(2:20 PM):
kirti_saraswat(2:21 PM): i will do at $350 per month
Brent(2:21 PM): i mean what do you think...you tell me, is our site going to be good enough that if we can get in the top 10 we will be able to be successful?
kirti_saraswat(2:22 PM): yeah surely
kirti_saraswat(2:22 PM): i am 100% sure
kirti_saraswat(2:22 PM): it will be litt;e bit tough but surely we will get
kirti_saraswat(2:22 PM): top 10 rankings for most of our keywords
Brent(2:23 PM): like what would be an example
Brent(2:23 PM): of a keyword you are talking about
kirti_saraswat(2:23 PM): NFL sports
kirti_saraswat(2:23 PM): this kind of keywords
Brent(2:24 PM): will it help us that we have a bunch of links on our site or does that not matter
kirti_saraswat(2:24 PM): it helps alot
Brent(2:24 PM): and will it hurt us that we don't have a bunch of text with keywords on our site?
kirti_saraswat(2:24 PM): it will help us alot in SEO
kirti_saraswat(2:24 PM): that we have too many links
kirti_saraswat(2:25 PM): we can set up new articles daily
Brent(2:25 PM): but isn't it a bad thing that we don't have text
kirti_saraswat(2:25 PM): with our keywords
Brent(2:25 PM): ok
Brent(2:25 PM): so that would be the plan
Brent(2:25 PM): make sure articles had titles with keywords?
kirti_saraswat(2:26 PM): yeah
kirti_saraswat(2:26 PM): optimizer will take care of these things
kirti_saraswat(2:26 PM): 2 people work for Optimization
Brent(2:27 PM): what about for like my flyers site and my smoking site i'm going to create...since there is no competition out there, that should be much easier...should i be able to figure that out on my own or will i need help?
kirti_saraswat(2:28 PM): u dont know optimization process
kirti_saraswat(2:28 PM): then how could u do this
kirti_saraswat(2:28 PM): first u have to learn
kirti_saraswat(2:28 PM):
Brent(2:30 PM): lol...but isn't it just putting keywords and links
kirti_saraswat(2:31 PM): nopes
kirti_saraswat(2:31 PM): we have to do title meta updates
kirti_saraswat(2:31 PM): then we have describe each meta and title according to keywoords
Brent(2:31 PM): i could see how it would be tough for a sports site, but there are only like 10,000 people in the world doing my cigarette things...lol
kirti_saraswat(2:31 PM): then we have to optimize each page according to keywords
kirti_saraswat(2:32 PM):
kirti_saraswat(2:32 PM): alot of things
kirti_saraswat(2:33 PM): link exchange
kirti_saraswat(2:33 PM): blog making
kirti_saraswat(2:33 PM): article optimization
kirti_saraswat(2:33 PM): these are daily work
kirti_saraswat(2:33 PM): like u do for ur trading biz
kirti_saraswat(2:33 PM):
Brent(2:34 PM): alright, well there is no way my wife will let me spend anymore money until she thinks my site will make money though ....certainly not that much money!!

Confidential

kirti_saraswat(2:34 PM): wt's ur wife name
kirti_saraswat(2:34 PM): okay
Brent(2:34 PM): 400 a month for a year would be like 5k
kirti_saraswat(2:34 PM): but in marketing u have to spent money
Brent(2:34 PM): i understand this, she doesn't though!
Brent(2:34 PM): laurie is her name
kirti_saraswat(2:35 PM): ohh she sent u template
Brent(2:35 PM): i sent her
Brent(2:35 PM): to edit text
kirti_saraswat(2:35 PM): k
Brent(2:35 PM): i guess the real question is that if i used adsense, how many hits could i actually get
kirti_saraswat(2:36 PM): god knows
Brent(2:36 PM): my demographic is the best there is
kirti_saraswat(2:36 PM): but for keywords it like
kirti_saraswat(2:36 PM): u will spend money
Brent(2:36 PM): all of the money is in my demographic
kirti_saraswat(2:36 PM): but a time will come we will get higher ranking
Brent(2:36 PM): so i would think that it would work if i could just get high enough
kirti_saraswat(2:36 PM): then we will work to maintain them
kirti_saraswat(2:37 PM): n like 500000 people hits ofr that keywords
kirti_saraswat(2:37 PM): if 10 % of people will open site
kirti_saraswat(2:37 PM): n 5% will join
kirti_saraswat(2:37 PM): that will be hure
Brent(2:37 PM): so 2500 would join
Brent(2:37 PM): or 25,000
Brent(2:37 PM): 5% of 10%
kirti_saraswat(2:38 PM): yeah i m giving u a example
kirti_saraswat(2:38 PM): depnds on keywords
kirti_saraswat(2:38 PM): and we will work on 10-20 keywords
kirti_saraswat(2:39 PM): in 1 yr time around 30 keywords
Brent(2:39 PM): alright, i'll talk to her about it soon...she isn't happy with me anytime i spend money on anything, so she obviously isn't happy about this site....lol...she just doesn't see how it will ever make me money
kirti_saraswat(2:39 PM):
Brent(2:39 PM): i think ballhype just got bot for money
Brent(2:39 PM): like serious money and it wasn't even that old
kirti_saraswat(2:40 PM): ur site will be free to sign up
kirti_saraswat(2:40 PM): then how would u generate money
kirti_saraswat(2:40 PM): from advertisements
Brent(2:43 PM): ya
Brent(2:43 PM): and then sell it
Brent(2:43 PM): eventually
kirti_saraswat(2:43 PM): then sell it?
kirti_saraswat(2:44 PM): website/.???
Brent(2:44 PM): what happens here is these specialty sites get bought out by larger sites
kirti_saraswat(2:44 PM): ohhh
Brent(2:45 PM): so i would like to build this site into a viable venture, with a large user base, and then if an espn or whomever chose to buy it out, i would say that would be the nex poential step
kirti_saraswat(2:45 PM):
Brent(2:45 PM): i mean obviously if someone was to say i'll give you 5 million for your site, i would probably consider it..lol
Brent(2:46 PM): so the first focus has to be getting a good user base and high quality articles being written/posted
kirti_saraswat(2:46 PM): yeah
Brent(2:47 PM): i mean our site with a few million users is worth a lot of money
kirti_saraswat(2:47 PM): yeah
Brent(2:47 PM): the best advertising demographic is young to middle aged men...and that is exactly who likes sports
kirti_saraswat(2:47 PM): yeah
Brent(2:48 PM): so that is my thought process...that is why i think we really need to have the bugs out so that we are able to really build momentum from the beginning...all about the first impression
kirti_saraswat(2:48 PM): well ur wife also work somewhr?
Brent(2:48 PM): she is a nurse
kirti_saraswat(2:48 PM): okay
Brent(2:49 PM): she actually makes more than me in the last half of the year, and i make more than her

Confidential

Our chat on Thu, 1/8/09 5:08 PM Document #: 294-2 Filed: 03/25/19 Page 351 of 732 PageID #:13008

in the first half..lol
Brent(2:49 PM): all my business is done from now til july
kirti_saraswat(2:49 PM): okay
kirti_saraswat(2:49 PM): so everything is balance
kirti_saraswat(2:50 PM): she balance when u need it
kirti_saraswat(2:50 PM): n u balance when she needs
Brent(2:50 PM): ya but hers doesn't change, just mine
kirti_saraswat(2:50 PM): financially balanced family
kirti_saraswat(2:50 PM):
kirti_saraswat(2:50 PM): k
kirti_saraswat(2:50 PM): she gets regular income
kirti_saraswat(2:51 PM): u r in ur own biz
kirti_saraswat(2:51 PM): rght
kirti_saraswat(2:51 PM): commodity n trading
Brent(2:51 PM): ya, well i don't own the business...but 100% commission
Brent(2:51 PM): so essentially my own business
kirti_saraswat(2:51 PM): k
Brent(2:52 PM): like we added doing insurance this year...so if i can get 5-10 insurance customers i can
likely triple my income....is i can find like 20-30 i can make a very large amount of money...
kirti_saraswat(2:53 PM): so based on members
kirti_saraswat(2:53 PM): n commission
Brent(3:07 PM): like a farmer with 2k acres would probably do about 100k in crop insurance
Brent(3:07 PM): and i would earn about 8-10k of this
Brent(3:07 PM): are you gone?
kirti_saraswat(3:14 PM): k brent i m leaving now
kirti_saraswat(3:14 PM): bbye tc good night
Brent(3:18 PM): night

DOC-000000004_0013

**Confidential**

**21C 1000016**

# EXHIBIT 49

Lexpath Technologies Holdings, Inc. v. Welch, Not Reported in Fed. Supp. (2016)

2016 WL 4544344

2016 WL 4544344
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

LEXPATH TECHNOLOGIES
HOLDINGS, INC., Plaintiff,
v.
Brian R. WELCH and Welch
Technology Services, LLC, Defendants.

Case No.: 13-cv-5379-PGS-LHG
|
Signed 08/30/2016

**Attorneys and Law Firms**

Victoria M. Brown, Englewood, NJ, for Plaintiff.

Alexander Joseph Kemeny, Kemeny, LLC, East Brunswick, NJ, for Defendants.

**MEMORANDUM AND ORDER**

SHERIDAN, District Judge.

**\*1** The matter before the Court is on the issue of spoliation. On May 9, 2016, the Court held a hearing on the issue. (ECF Nos. 61, 63, and 68.) At the hearing, there were five witnesses: Peter Reganato, Allan Feldman, Andrew Donofrio, Martin Tuohy, and Brian Welch. The parties subsequently filed their findings of fact and conclusions of law.

In addition to this testimony, other facts were set forth at the March 22, 2016 oral argument. (ECF No. 57). In brief, in January 2009, 2e Technology Group ("2e") hired Welch as a technical support contractor, and provided him with a laptop (the "Laptop"). (Plaintiff's Response to Defendants' Findings of Fact ("PR"); ECF No. 68, ¶ 1). In January 2013, 2e merged clients with Plaintiff Lexpath Technology Holdings, Inc. ("Lexpath"), and Welch became an employee of both Lexpath and 2e as a network engineer, responsible for installation, care, and maintenance of the computers and network infrastructure of Lexpath clients. (ECF No. 48, ¶ 4). Welch grew dissatisfied at Lexpath, and on August 2, 2013, Welch told Tuohy that he resigned from the company, and he would start his own business. He also told Tuohy that he sought to bring some Lexpath clients with him, and that

he planned to solicit other clients of Lexpath (Defendants' Response to Plaintiff's Findings of Fact ("DR") ECF No. 63-1, ¶ 30). Two Lexpath clients switched over to Welch's new company, Welch Technology Services, LLC ("WTS"). (DR, ¶ 40). Lexpath terminated Welch's access to its email and timekeeping system on the day of his resignation. (PR, ¶ 10). His 2e email account was terminated on or about August 5, 2013. (PR, ¶ 11).

Lexpath sent Welch a "cease and desist" letter on August 6, 2013, requesting that Welch immediately stop poaching Lexpath customers and disparaging Lexpath's reputation. (DR, ¶ 42; ECF No. 39-17). The letter also stated that Welch had formed a competing business in June 2013, that he had obtained the "welchts.com" domain name on May 13, 2014, and that he uses the email address bwelch@welchts.com. The letter noted that his actions exposed him to claims such as breach of duty of loyalty, tortious interference with contractual relations, breach of implied covenant of good faith and fair dealing, unfair competition, misappropriation, disparagement, violation of the New Jersey Computer Related Offenses Act, violation of the New Jersey Trade Secrets Act, and violation of the Computer Fraud and Abuse Act. (ECF No. 39-17). On August 13, 2013, at 5:14 p.m., Lexpath's counsel emailed a proposed settlement offer to Welch's attorney and a notice that Lexpath intended to commence legal action. (PR, ¶ 6). Defendants claim that Welch's attorney contacted Welch about this offer the next day, on August 14. (PR, ¶ 7). On August 14, 2013 at 6:28 p.m., Welch's attorney rejected Lexpath's settlement demand. (PR, ¶ 8).

Defendants claim that Welch continued to do some limited work for Lexpath after his resignation on August 2, 2013 up until sometime on August 6, 2013, but Plaintiff disputes this point. (PR, ¶ 27). Although Plaintiff asserts that after Welch's resignation, Tuohy never gave Welch permission to delete files from his Laptop or copy files from it, Defendants claim that, at the time of the resignation or shortly thereafter, Welch advised Tuohy that he wanted to "clean up" the Laptop and erase personal data, like banking records and personal information before turning it in. Defendants allege that Tuohy agreed that Welch could clean up the Laptop and said that someone from Lexpath would be in touch. Plaintiff disputes this point, as well. (PR, ¶ 26). Defendants also claim that Tuohy came over to Welch's home after Welch's resignation and picked up a key for one of Lexpath's customers, but did not ask for the Laptop. Plaintiff notes, however, that Tuohy picked up the keys from Welch's mailbox, and not from Welch personally. (PR, ¶ 46). Then, several months went by before

Lexpath Technologies Holdings, Inc. v. Welch, Not Reported in Fed. Supp. (2016)
2016 WL 4544344

Welch received any communications about the Laptop from Lexpath. (DR, ¶ 44).

**\*2** Upon receiving the Laptop from Welch in March 2014, Lexpath hired Andrew Donofrio of DigitaWNX Group Ltd. ("Digital") to conduct a forensic analysis on the Laptop. (DR, ¶ 50). The Court found that Donofrio was a credible witness at the hearing. Donofrio determined that on August 13, 2013, at approximately 10:26 P.M., Welch ran a program called "CCLeaner" on the Laptop, permanently deleting more than 53,000 files from the Laptop and modifying files names to the format "zzzzzzzz.zzz," rendering it impossible to determine the names or types of files that had been deleted. Deleted files were also rendered unrecoverable. (DR, ¶ 45). Welch asserts that the IT community uses CCleaner to optimize performance, but Donofrio claims that this level of file destruction is not part of CCleaner's standard functionality, which is to act as an anti-forensics tool to securely eradicate data. (DR, ¶¶ 46-47). The parties agree that after Welch ran CCleaner, he uninstalled the program from the Laptop, and it is not typical for a user to uninstall CCleaner after running it. (DR, ¶ 49). Donofrio also found that three thumb drives had been attached to the Laptop, most recently on August 2, 2013, at approximately 9:35 P.M. Welch has not provided any thumb drives during discovery. (DR, ¶ 51). Defendants claim that they were never asked to produce thumb drives in discovery, and Defendants assert that Donofrio did not know whether files had been copied from the Laptop onto a thumb drive on August 2. (DR, ¶ 51).

Defendants claim that the 2e email system, which Welch chose to use, unlike the Lexpath email system, did not contain a backup mechanism, so there is no way to recover deleted emails once the "trash folder" is emptied other than locating a remnant or cached version saved locally on a computer hard drive. (PR, ¶ 12). The Laptop would have contained information related to his web-based email, client computer configurations, client computer system types and setups, user names, and passwords. (DR, ¶ 16).

**Analysis:**
Lexpath seeks a spoliation ruling against Defendants due to Welch's use of CCleaner and failure to produce the thumb drives. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Mosaid Technologies, Inc. v. Samsung Electronics Co., Ltd.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (internal quotations omitted). "Spoliation occurs where: the

evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). Generally, the burden of proof for a spoliation claim lies with the party alleging spoliation. *See Nwegbo v. Colwyn Borough*, 2013 WL 3479430, \*1 (E.D. Pa. 2013). Also, "where there is no showing that the evidence was destroyed in order to prevent it from being used by the adverse party, a spoliation instruction is improper." *U.S. v. Nelson*, 481 Fed. Appx. 40, 42 (3d Cir. 2012). Furthermore, "no unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." *Id.* (internal quotations omitted). If the Court determines that spoliation has occurred, then it must determine the appropriate sanctions. *See Bull*, 665 F.3d at 73, n.5.

The evidence here was clearly in Welch's control, since he possessed the Laptop. There is a question as to whether the data stored on the Laptop was relevant evidence. Defendants argue that Lexpath has not provided any evidence to show that relevant information was destroyed. Defendants claim that most of the deleted information consisted of files describing client computer configurations, user names and passwords, and support requests. (Transcript of Hearing on Spoliation, ECF No. 66 ("T.") 113:17-21). In *Mosaid Technologies*, defendant failed to put a litigation hold in place for a patent case and emails were automatically deleted. 348 F. Supp. 2d at 333. The Third Circuit determined that it was sufficient for plaintiff to provide an affidavit testifying to the company's extensive use of email and the general subject matter of company emails. *Id.* at 336. Similarly here, Lexpath provided testimony that the documents deleted could be relevant. (T. 112:25-116:2; 117:4-11). Tuohy, one of Lexpath's principals, testified that the destruction of 53,000 files must have included remnants of emails and webmails, electronic communications, website access history, browsing history, and internet chats pertinent to the customers that Welch was assigned. (T. 112:25-113:35). Moreover, Plaintiff argues that this information could be relevant to solicitation claims and disparagement claims, as well as to allegations that Welch utilized trade secrets and confidential information. The Court finds that the relevance prong is satisfied. Welch's testimony that his intent was to clean up the Laptop and remove personal data lacked credibility in light of the timing

Lexpath Technologies Holdings, Inc. v. Welch, Not Reported in Fed. Supp. (2016)

2016 WL 4544344

of his actions and his motivation to acquire business from Lexpath's customers.

**\*3** The duty to preserve was also reasonably foreseeable. The duty to preserve is objective, and based on the reasonable foreseeability that such information would be requested in discovery. *Bull,* 665 F.3d at 78, n. 12. This is a "flexible, fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Id.* (quoting *Micron Technology, Inc. v. Rambus, Inc.,* 645 F.3d 1311, 1320 (Fed. Cir. 2011)). Plaintiff sent a letter to Defendants on August 6, 2013 requesting that Welch stop pursuing Lexpath's clients and stop disparaging Lexpath, and notified Welch of Lexpath's intention to litigate, and enumerated the claims that Lexpath would bring, including claims for violation of the federal Computer Fraud and Abuse Act and the New Jersey Computer Related Offenses Act. (ECF No. 39-17). Then on August 13, 2013 at 5:14 p.m., Lexpath sent Welch's attorney, Edward Shamy, an email described as a "final settlement offer." (T. 98:20-24). The letter gave Welch 24 hours to respond. (PR, ¶¶ 6, 42). Welch claims that he did not learn of this communication until the following day. (T. 124:7-14; 137:4-17). Five hours later, Welch deleted the emails. (T. 124:15-20). The timing of this deletion is highly suspect, even though Welch thought this was just a "coincidence." (*Id*). But even if the Court were to believe Welch that he never saw this offer, he was still aware of the potential claims against him from the August 6, 2013 letter.

Defendants also claim that it was not reasonably foreseeable that "junk files" would be necessary for litigation. However, as, previously mentioned, these files are most likely relevant. There was testimony that the deleted files could be useful to recover internet history, web chats, and emails, among other things. (T. 66:8-67:12; 112:25-113:25). The Defendants assert that their claim of spoliation was also unforeseeable, because Lexpath never attempted to take possession of the Laptop in the 11 days between Welch's resignation and August 13, even though he discussed the Laptop with Tuohy. (T. 138:10-22; 134:6-21). Tuohy did not even ask for the Laptop when he stopped by Welch's house to pick up keys, according to Defendants. However, there is no requirement that Plaintiff formally make such a request at that time. (DR, ¶ 44). The requirement is only that Defendants begin to preserve such documents as soon as the duty to preserve is reasonably foreseeable, which should have been by the August 6 letter. Also, Plaintiff claims that Tuohy picked up the keys from Welch's mailbox, not from Welch himself. (PR, ¶ 46).

The final requirement for a spoliation finding is that the evidence actually be suppressed or withheld. Defendants claim that many of the email communications that Lexpath is requesting were already in its possession or were available from third parties and could be obtained by subpoenas. At the hearing, Tuohy testified that he reviewed and obtained emails from Welch's 2e email account through the Rackspace server, to which it has direct access. (T. 81:19-84:4; 102:14-103:19; 114:14-19). Also, Tuohy testified that Lexpath had the ability to access Welch's email account in the same way. (T. 103:12-19). In response, Plaintiff claims that it is not only seeking information from the emails, but from the files on the Laptop. Moreover, Lexpath claims that it could not recover deleted emails from Welch's 2e email account anyway, and Welch rarely used his Lexpath email. (PR, ¶¶ 12-14). Lexpath also objects to the suggestion that it could simply seek subpoenas, because Lexpath could not determine with whom Welch was exchanging emails, and this would be a time-consuming fishing expedition. The Court agrees with Lexpath that it should not have to subpoena third parties to find this information. Also, simply because Lexpath may have possession of some of the relevant documents, does not mean that it should not be entitled to the rest of the documents.

Based on the above information, a spoliation finding is warranted. The next issue concerns the appropriate sanctions.

Rule 37(e) of the FED. R. OF CIV. P., which relates to the spoliation of electronically stored information ("ESI") and was amended as of December 1, 2015, provides:

> e) **Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> **\*4 (1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

> **(A)** presume that the lost information was unfavorable to the party;

Lexpath Technologies Holdings, Inc. v. Welch, Not Reported in Fed. Supp. (2016)
2016 WL 4544344

**(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or

**(C)** dismiss the action or enter a default judgment.

Chief Justice Roberts explained that, "the foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." 2015 US Order 0017. This case commenced in September 2013, and the alleged act of spoliation occurred about a month earlier. That being said, the Rule does not seem to have altered the burden on the party moving for sanctions in this Circuit, as any adverse inference still requires a showing that ESI was destroyed in "bad faith." *Accurso v. Infra-Red Services, Inc.*, 2016 WL 930686, at *3, n. 6 (E.D. Pa. March 11, 2016), *citing Bull*, 665 F. 3d at 79. As such, the Court will apply this Rule.

Therefore, the Court must determine whether Defendants "acted with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e). Defendants argue that there is no indication of "bad faith" or "intent to deprive" here, because CCleaner is meant to optimize performance and remove temporary system files, like "cookies," junk files, and user names and passwords. (T. 36:10-12; 128:10-11). Lexpath and 2e had used CCleaner to optimize and billed for use of CCleaner with clients to improve performance. (T. 105:16-106:17; 107:21-112:18). Welch had used CCleaner for that reason since the early 2000s. (T. 128:12-16).

Plaintiff contends that CCleaner is also used to securely destroy data, and it is used as an "anti-forensic tool." (T. 36:10-15). Plaintiff also notes that the level of file destruction that occurred here exceeds CCleaner's standard settings and functionality. (T. 36:22-37:5). The Court acknowledges that it does appear that CCleaner can be used both for optimization and for eradication of data, and that Lexpath, 2e and Welch apparently billed clients for use of this program. Nevertheless, both parties agree that it is not typical for a user to uninstall CCleaner after running it as Welch did here. (DR, ¶ 49). It is also clear that 53,000 files were destroyed soon after Plaintiff informed Defendants of its intent to litigate. (DR, 1f 45). Welch is an information technology professional, and based on his knowledge and use of CCleaner with clients, he was well aware of the program's capabilities, and how it could be used to destroy files permanently.

One of the main issues that the Court struggled with when reviewing the original summary judgment motions, was whether Tuohy gave Welch permission to "clean up" the Laptop before returning it. Plaintiff and Tuohy categorically denied this allegation, and the hearing was no more successful at clearing up this dispute. At the hearing, Welch testified that he asked Tuohy if he should clean up the Laptop before returning it, and on August 2, Tuohy agreed that he should. (T. 138:10-22). Tuohy testified that he did not authorize Welch to copy or delete 53,000 files from the Laptop following his resignation. (T. 94:21-95:4).

**\*5** It is not clear from the hearing that Welch had permission to clean up the Laptop. It seems highly improbable that Tuohy would agree to such a request after Welch had just taken some of Lexpath's clients, and following the deterioration of the relationship between the two. About 53,000 documents were destroyed. While the Court will not speculate on how many of those files were directly relevant to the allegations in this action, Plaintiff has provided sufficient testimony to show that there were relevant documents. The timing of the deletion—a few days after Plaintiff sent its cease and desist letter, which also informed Defendants of the potential claims against them —is especially telling.

When imposing spoliation sanctions, courts consider, "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Bensel v. Allied Pilots Ass'n*, 263 F.R.D. 150, 152 (D.N.J. 2009) (*citing Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)).

As the Third Circuit instructed, courts should consider "whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid*, 13 F.3d at 79. The second option under Rule 37(e)—"instruct the jury that it may...presume the information was unfavorable to the party"—is the least severe of the three, and the Court will adopt it. This remedy seems most appropriate and will allow the jury to consider it in their deliberation.

**ORDER**

Lexpath Technologies Holdings, Inc. v. Welch, Not Reported in Fed. Supp. (2016)

2016 WL 4544344

For the reasons stated herein and for good cause shown,

**IT IS** on this 30th day of August, 2016,

**ORDERED** that Plaintiff's motion for spoliation (ECF No. 63) is GRANTED, and the Court will instruct the jury that

they may presume that the lost information was unfavorable to Defendants.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4544344

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 50

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

DR DISTRIBUTORS, LLC,
an Illinois limited liability company,

        Plaintiff and Counter-
        Defendant,

v.

21 CENTURY SMOKING, INC.,
an Illinois corporation,

        Defendant and
        Counterclaimant,

v.

CB Distributors, Inc., an Illinois corporation,
and Carlos Bengoa, individually,

        Counter-Defendants.

**Case Number:** 3:12 – cv – 50324

**Judge:** Frederick J. Kapala

**Magistrate Judge:** Iain Johnston

TO:    Anthony J. Davis           Robert C. von Ohlen
        Nicoll Davis & Spinella, LLP    Robert C. von Ohlen & Associates
        95 Route 17 South, Suite 203     1340 West Deerpath Road
        Paramus, NJ 07652           Lake Forest, IL 60045

## NOTICE OF SUBPOENA

Please take notice, pursuant to Federal Rule of Civil Procedure 45, that Defendants in the above-captioned matter, 21 Century Smoking, Inc. and Brent Duke, intend to serve a Subpoena, in the form attached hereto, on Oath Holdings, Inc on October 11, 2018, or as soon thereafter as service may be effectuated.

Dated: October 11, 2018

Travis Life
Leavens, Strand & Glover, LLC
203 N. LaSalle St., Ste. 2550
Chicago, IL 60601
Telephone: (312) 488-4170
E-mail: tlife@lsglegal.com

## CERTIFICATE OF SERVICE

Travis Life, an attorney, on oath states that he caused a true and correct copy of the foregoing **Notice of Subpoena** to be served upon DR Distributors, LLC, CB Distributors, Inc., and Carlos Bengoa, by email and First-Class Mail by depositing it in a mail box at 203 N. LaSalle Street, Chicago, IL 60601 to the following addresses:

Anthony J. Davis
Nicoll Davis & Spinella, LLP
95 Route 17 South, Suite 203
Paramus, NJ 07652

Robert C. von Ohlen
Robert C. von Ohlen & Associates
1340 West Deerpath Road
Lake Forest, IL 60045

_____
Travis Life
Leavens, Strand & Glover, LLC
203 N. LaSalle St., Ste. 2550
Chicago, IL 60601
Telephone: (312) 488-4170
E-mail: tlife@lsglegal.com

_____
Date  10/4/2018

2

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Northern Dist. of IL, Western Div.  ☑

| | |
|---|---|
| DR Distributors, et al | ) |
| *Plaintiff* | ) |
| v. | ) |
| 21 Century Smoking, Inc. and Brent Duke | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.   12 CV 50324

(If the action is pending in another district, state where:
                                                          )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Oath Holdings, Inc., C/O CT Corp. System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Any and all data of any kind including but not limited to Yahoo! Messenger communications of any kind regarding the Yahoo Messenger account of BRENT DUKE, user name: BRENTDUKE@YAHOO.COM.

| Place: Law Offices of Peter S. Stamatis, PC, 1 East Wacker Drive, Suite 2350 Chicago, Illinois 60601. Tel: 312 606-0045. | Date and Time: 10/22/18 @ 10:00 A.M. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  10/10/18

_____          OR          _____
*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*                                            *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  21 Century Smoking Inc. and Brent Duke , who issues or requests this subpoena, are:
PETER S. STAMATIS, ESQ
Peter@StamatisLegal.com

1 EAST WACKER DRIVE
SUITE 2350
CHICAGO, IL 60601
312-606-0045

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 12 CV 50324

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* Oath Holdings, Inc

was received by me on *(date)* 10/10/18 .

☑ I served the subpoena by delivering a copy to the named person as follows: In person Service

to Derick Burkett at CT Corp system at 208 S LaSalle St suite 814

Chicago, IL 60604 on *(date)* 10/11/18 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date: 11/11/18

_____
*Server's signature*

Alexander T. Mchtavis
*Printed name and title*

1 E. Wacker Dr, Suite 2150, Chi, IL 60601
*Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT 51

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY



# DR Distributors, LLC et al v. 21 Century Smoking, Inc. et al Civil Action No. 3:12-cv-50324

## Calculation of Damages Incurred by DR Distributors, LLC and CB Distributors, Inc.

### Report Dated: November 23, 2015

RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

# RotenbergMeril
CERTIFIED PUBLIC ACCOUNTANTS

Park 80 West, Plaza One
250 Pehle Avenue, Suite 101
Saddle Brook, NJ 07663

T: (201) 487-8383
F: (201) 490-2080

www.rmsbg.com

*Via e-mail only:*     *bgaynor@ndslaw.com*

November 23, 2015

Anthony Davis, Esquire
Brian Gaynor, Esquire
c/o Nicoll Davis & Spinella LLP
95 Route 17 South, Suite 316
Paramus, NJ 07652

*Re:     DR Distributors, LLC et al v. 21 Century Smoking, Inc. et al
Civil Action No. 3:12-cv-50324*

Dear Mr. Davis and Mr. Gaynor:

*Description and Purpose of Assignment*

We have been engaged to calculate the damages incurred by Plaintiffs, DR Distributors, LLC
and CB Distributors, Inc. (collectively "DR") due to the alleged unlawful use of its registered
trademark, 21ST CENTURY SMOKE® by 21 Century Smoking, Inc. ("21CS") in its website
metadata during the period that began on October 1, 2011 and ended on March 31, 2013.

The purpose of this calculation of damages is to put DR in the same position as to what would
have transpired "but for" the alleged infringement or unlawful use of its trademark by 21CS.

*Assumptions and Calculations*

The damages were calculated using the following assumptions, which were based on information
provided by counsel:

1. DR incurred damages due to the unlawful activities of 21CS, which included
   "expanding their use of their competing and infringing 21 Century Smoking
   designation."[1]

---

[1] Page 6, paragraph number 35 of DR's First Amended Complaint.

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

<div align="right">
Anthony Davis, Esquire<br>
Brian Gaynor, Esquire<br>
Re: DR Distributors LLC v.<br>
21 Century Smoking, Inc.<br>
November 23, 2015<br>
Page 2 of 5
</div>

2. The period that DR incurred damages or the period that 21CS was using the DR trademark in the keyword metadata of 21CS' website, was for the eighteen (18) month period October 1, 2011 through March 31, 2013.

3. All 21CS on-line sales were made by unlawfully using the 21 Century Smoking designation; and the sales consisted exclusively of third-party brands of electronic cigarettes and electronic cigarette accessory products.[2]

4. The sale of the 21CS products using the infringing 21 Century Smoking designation were directed at the same potential customers that DR marketed and sold their competing products to during the relevant time period.

5. 21CS' actions and conduct, which included claiming they were affiliated with DR (and its related entity CB Distributors[3]), deceived consumers into buying their e-cigarette products instead of purchasing DR's products.

6. As a result of 21CS' actions, as described above, DR suffered economic damages which include but may not be limited to lost profits.

*Procedures*

To calculate a certain component of DR's damages in the subject matter we reviewed and analyzed various documents supplied to us which included the following:

1. 21CS' corporate tax returns for the years 2009 through 2014.
2. 21CS' listing of sales by state and year for the years 2009 through 2013 and the first six (6) months of 2014 and 21CS' online sales data.

---

[2] Page 6, Paragraph 37 of DR's First Amended Complaint
[3] Page 10, Paragraph 63 of DR's First Amended Complaint

Rotenberg Meril

Case: 3:12-cv-50324 Document #: 232-45 Filed: 03/19/18 Page 5 of 10 PageID #:9929

RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Anthony Davis, Esquire
Brian Gaynor, Esquire
Re: DR Distributors LLC v.
21 Century Smoking, Inc.
November 23, 2015
Page 3 of 5

    3. DR's monthly sales reports for the years 2011 through 2013, which include sales by customer, dollars and units.

    4. Plaintiff's First Amended Complaint.

In addition we also reviewed 21CS' current website and conducted a phone interview with the owner of DR.

Based upon our review and analysis of this information we calculated one aspect of DR's damages in the form of the infringer's (21CS) profits for the time period it used DR's trademark in its website.[4] These profits were defined as the infringer's revenues from on-line sales, less the cost of the product and other direct costs. The latter two items were calculated using DR's cost structure. It is the intent of this calculation to place DR, the infringed party, in the same position it could have been in, but for the actions of 21CS.

*Findings*

It was determined that the infringer's revenues from on-line sales mitigated by the cost of the products and certain costs directly related to the revenues using DR's cost structure, was the best representation of DR's lost profits or DR's damages due to the unlawful use of its trademark by 21CS in the keyword metadata of 21CS' website for an eighteen (18) month period. The details of the calculation of damages are as follows:

| Year | 2011 | 2012 | 2013 |
|---|---|---|---|
| Applicable sales during infringement period 21CS' on-line sales | $ 131,560 | $ 557,746 | $ 168,396 |
| Mitigated by expenses not incurred: Cost of products, plus credit card fees and shipping at 60% of revenue | (78,936) | (334,648) | (101,038) |
| DR's damages - lost profits | $ 52,624 | $ 223,098 | $ 67,358 |
| Total damages | | | $ 343,080 |

---

[4] AICPA Practice Aid, Calculating Intellectual Property Infringement Damages, page 28, "With respect to trademarks, the Lanham Act explicitly authorizes a trademark owner to recover both the infringer's profits and its own damages sustained "subject to the principles of equity and upon such terms as the court deems reasonable. (Commerce and Trade, USC 15, Section 1125 (c)(1).

www.nitropdf.com

Rotenberg Meril

RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Anthony Davis, Esquire
Brian Gaynor, Esquire
Re: DR Distributors LLC v.
21 Century Smoking, Inc.
November 23, 2015
Page 4 of 5

*Expert Opinion/Conclusion*

In our professional opinion, based upon the information produced and provided to us to date, that one aspect of DR's damages as the Plaintiff, due to 21CS', as the Defendant, unlawful acts as previously described in this report is the sum of DR's lost profits during the relevant time period as calculated above, which is **$343,080.**

The aforementioned narrative and analyses were prepared solely for use in the litigation matter referenced above. We have not audited or reviewed any of the books and records of the Plaintiffs and/or the Defendants or other financial records provided to us nor any of the financial information contained in this report in accordance with standards promulgated by the American Institute of Certified Public Accountants, and accordingly express no opinion on them. We assume no responsibility for the accuracy of any of the aforementioned material provided by an outside source.

This report is not intended for general circulation or publication, nor is it to be reproduced for any purpose without the consent of RotenbergMeril. RotenbergMeril does not assume responsibility or liability for losses to one or others as a result of the circulation, publication, reproduction or use of this report contrary to the conditions of this paragraph. The validity of this report is predicated on the extent to which full, honest and complete disclosure was made by all parties.

Our work was performed in accordance with the Statement on Standards for Consulting Services, CS Section 100, Consulting Services: Definitions and Standards, established by the American Institute of Certified Public Accountants.

My qualifications are set forth in my curriculum vitae, which is attached as Exhibit A. Also attached, as Exhibit B, is my Testimony Log.

Rotenberg Meril

RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Anthony Davis, Esquire
Brian Gaynor, Esquire
Re: DR Distributors LLC v.
21 Century Smoking, Inc.
November 23, 2015
Page 5 of 5

Our compensation in this matter is not dependent on the outcome of this litigation. We bill for time spent reviewing and analyzing the issues in this case, as well as the documents and other materials. We also bill for time spent testifying in this case. Our hourly rates range from $425 to $115.

We reserve the right to revise this report and our opinion as additional information or documents become available.

Respectfully submitted,

Leslie M. Solomon, CPA/ABV/CFF, ASA

LMS:ebp

Rotenberg Meril

RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

# RotenbergMeril

Rotenberg Meril Solomon Bertiger & Guttilla, P.C.
CERTIFIED PUBLIC ACCOUNTANTS

Exhibit A

Park 80 West, Plaza One
250 Pehle Avenue, Suite 101
Saddle Brook, NJ 07663

T: (201) 487-8383
F: (201) 490-2080

www.rmsbg.com

## Leslie M. Solomon, CPA/ABV/CFF, ASA *

**Park 80 West, Plaza One**                                    (201) 487-8383
**250 Pehle Avenue, Suite 101**                              fax (201) 490-2080
**Saddle Brook, New Jersey 07663**                          lsolomon@rmsbg.com

**OCCUPATION:** Certified Public Accountant in the states of New Jersey and New York, and partner responsible for the firm's Business Valuation and Litigation Support Services

**EDUCATION:** University of Connecticut, Bachelor of Science in Accounting, Dean List, 1975

American Society of Appraisers, designated as an Accredited Senior Appraiser (ASA) in Business Valuation, reaccreditation through May 7, 2018

American Institute of Certified Public Accountants, Accredited in Business Valuation

**BUSINESS EXPERIENCE:**

- All matters of accounting, auditing and taxes with special emphasis in business valuation and the accounting, auditing and income tax consequences of forensic matters.

- Business valuations of professional practices, and a variety of closely held entities.

- Fair value accounting for financial reporting, including valuations of intangible assets and purchase price allocations.

- Testified in New Jersey Courts as an expert witness on the valuation of closely held corporations and professional practices.

- Court appointed by various judges in the counties of Bergen and Passaic as business valuation expert for closely held corporations and professional practices.

- Served as a mutually agreed upon expert for numerous litigants.

- Selected as a Financial Referee in resolving matters through Alternative Dispute Resolution.

**PROFESSIONAL MEMBERSHIPS:**

- American Society of Appraisers

- American Institute of Certified Public Accountants

- The New Jersey Society of Certified Public Accountants

- Financial Consulting Group, L.L.C.

* Updated as of July, 2015

Page 1 of 2

RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

*Résumé of Leslie M. Solomon, CPA/ABV/CFF, ASA (Continued)*

## CONTINUING PROFESSIONAL EDUCATION DESIGNATIONS:

- ❖ NJSCPA - Chair of the 2007 to 2009 Valuation and Litigation Services Resource Group, Litigation Services Committee, and Chairman of the 2002 to 2006 Business Valuation Interest Group.

- ❖ Accredited Senior Appraiser (ASA) in Business Valuation as a result of successfully passing the Society's intensive written examinations, submission of appraisal data and other qualifying criteria demanded by the Society's International Board of Examiners.

- ❖ Accredited in Business Valuation (ABV) as a result of successfully passing the written examination and the submission of other qualifying criteria as required by the American Institute of Certified Public Accountants.

- ❖ Certified in Financial Forensics (CFF) as a result of successfully fulfilling the established requirements of eligibility and necessary qualifications as required by the American Institute of Certified Public Accountants.

## LECTURER:

1. ❖ New Jersey Family Law Conference, March 2, 2015, Tax Affecting the Income of a Pass Through Entity: Is it a Family Law Issue?

2. ❖ New Jersey Family Division Education Conference, April 16, 2012, Valuation of Assets in Dissolution and Other Issues.

3. ❖ NJSCPA Business Valuation, Forensic Investigation & Litigation Services Conference, October 4, 2011, Panelist in the open Q&A session: "Developing a Litigation Support Practice."

4. ❖ NJSCPA Business Valuation, Forensic Investigation & Litigation Services Conference, September 23, 2010, Panelist in the open Q&A session: "Hardball with Hitchner."

5. ❖ Inns of Court Family Law Section, January 2009, Presentation on Employee Benefits: "Impact on Equitable Distribution and Support Payments."

6. ❖ AICPA BVE Course Instructor, October 22, 2007, Valuation Introduction, Research and Analysis, and the Asset Approach and October 23, 2007, The Income Approach and Cost of Capital.

7. ❖ Passaic County Bar Association, May 24, 2007, The Impact of the New Jersey Civil Union Act on Taxes.

8. ❖ ATLA NJ Boardwalk Seminar, April 26, 2007, Effectively Presenting the Marital Lifestyle.

9. ❖ New Jersey Institute for Continuing Legal Education (ICLE) May 2006 Seminar, Business Valuation Employee Benefits and Compensation Packages.

10. ❖ Divorce Conference, May 7, 2005, Case Law Update.

11. ❖ Inns of Court Family Law Section, January 2005, Presentation on Stock Options: "What are they and what is their impact in Divorce?"

12. ❖ New Jersey Society of Certified Public Accountants 2003 Litigation Support Conference, Review Experts' Reports - Common Mistakes.

13. ❖ New Jersey Bar Association - Family Law Section: Presenter at the 2004, 2005, 2006, and 2008 Annual Retreat on Business Valuation Issues.

www.nitropdf.com

Case: 3:12-cv-50324 Document #: 232-45 Filed: 03/19/18 Page 10 of 10 PageID #:9929

RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Exhibit B

LESLIE M. SOLOMON, CPA/ABV/CFF, ASA
TESTIMONY LOG SINCE 2011

| DATE | Caption | Docket No. | Appearance at: | Type |
|------|---------|------------|----------------|------|
| 3/29/2013 | Shahram Zamighian v. Deluxe Auto Sales, Inc., ahd Daniel Sanchez | 2:10-cv-2421-WJM-MF | Deposition | Financial Claims |
| 1/15/2013 | NLF Holdings, LLC v. Commerce Plaza, Inc. | MON-C-37-11 | Trial | Financial Claims |
| 8/2/2012 | John Khadem v. Munirih Tahzib-Khadem | FM-09-1871-10 | Trial | Family |
| 7/31/2012 | Plaza Grand at Old Bridge Condominium Association v. D.R. Horton, Inc. - New Jersey, et al | MID-L-5710-09 | Deposition | Financial Claims |
| 6/27/2012 | Plaza Grand at Old Bridge Condominium Associaton v. D.R. Horton, Inc. - New Jersey, et al | MID-L-5710-09 | Deposition | Financial Claims |
| April, 2012 | John Khadem v. Munirih Tahzib-Khadem | FM-09-1871-10 | Trial | Family |
| 1/25/2012 and various | John Khadem v. Munirih Tahzib-Khadem | FM-09-1871-10 | Trial | Family |
| 1/9/2012 | Rosalyn Sausen vs Michael Sausen | FM-02-1999-10 | Trial | Family |
| 9/12/2011 | A.K. Stamping Company, Inc. | | Deposition | Financial Claims |
| 1/24/2011 | Timothy J. Grady vs. Laura L. Grady | FM-16-380-10 | Trial | Family |

# EXHIBIT 52

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC, and CB DISTRIBUTORS, INC. <br><br> Plaintiffs/Counterclaimant, <br><br> v. <br><br> 21 CENTURY SMOKING, INC., and BRENT DUKE, <br><br> Defendant/Counterclaim Defendant <br> ———————————————————— <br> 21 CENTURY SMOKING, INC., <br><br> Counterclaimant, <br><br> v. <br><br> DR DISTRIBUTORS, LLC, CB DISTRIBUTORS, INC. and CARLOS BENGOA, <br><br> Counterclaim Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 3:12-cv-50324 <br> ) <br> ) Judge Thomas M. Durkin <br> ) <br> ) Magistrate Judge Iain Johnston <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEECLARATION OF LAURIE DUKE

I, LAURIE DUKE, state subject to penalties of perjury that I have personal knowledge of the following information and if called to testify, would testify competently and truthfully as follows:

1.    I am the Laurie Duke identified in the February 4, 2012, email, attached hereto ("email").

2.    I am the author of the email.

3.    At the time I took the call from the "21st Century Smoke customer" referred to in the email, I informed her that she had not reached 21st Century Smoke but had instead contacted 21

1

Century Smoking and that the two were not the same company. I informed her of this before she agreed to buy any of 21 Century Smoking's product.

FURTHER AFFIANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 10/23/19                          Laurie Duke
                                         Laurie Duke

2

# [No Subject]

| | |
|---|---|
| **From:** | Laurie Duke <laurie.duke@yahoo.com> |
| **To:** | Brent Duke <brentduke@yahoo.com> |
| **Date:** | Sat, 04 Feb 2012 01:13:43 -0600 |

pac view did $1172.85 today...
online did ~$2500...I had a $220 sale from a 21st Century Smoke customer, highly discounted but big sale...called her back and she talked and talked, Brayden started getting really fussy. I explained that he had Autism and didn't always know to be quiet, I earned her respect by being a working mom at home with a special needs child and she even allowed me to call her back after the boys went to bed. Gave her a good deal, and she's going to refer all kinds of people to us (she wants the free cartridges). She's a waitress in her 50's near San Jose. Did a small order for George Newcombe and, Trumpower had a nice little order too. So without Lincoln Park, the biz did $7500 today.

Confidential