```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           WESTERN DIVISION

 3    DR DISTRIBUTORS, LLC,             )Docket No. 12 CV 50324
                                        )
 4       Plaintiff-Counterdefendant,    )Rockford, Illinois
                                        )Monday, October 28, 2019
 5                  v.                  )9:00 o'clock a.m.
                                        )
 6    21 CENTURY SMOKING, INC.          )
      and BRENT DUKE,                   )
 7                                      )
         Defendants-Counterplaintiffs,  )
 8                                      )
      CB DISTRIBUTORS, INC. and         )
 9    CARLOS BENGOA,                    )
                                        )
10       Counter-Defendants.           )

11                      TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE IAIN D. JOHNSTON
12                    VOLUME 1 - PAGES 1 - 304

13    APPEARANCES:

14    For the Plaintiff:          NICOLL, DAVIS & SPINELLA LLP
                                   (95 Route 17 South,
15                                  Suite 316,
                                    Paramus, NJ  07652) by
16                                 MR. ANTHONY J. DAVIS

17                                 ROBERT C. von OHLEN & ASSOCIATES
                                   (1340 Deerpath Road,
18                                  Lake Forest, IL  60045) by
                                   MR. ROBERT C. von OHLEN, JR.
19
      For the Defendants:         THE LAW OFFICES OF KEVIN SALAM
20                                 (120 N. LaSalle Street,
                                    Suite 2000,
21                                  Chicago, IL  60602) by
                                   MR. KEVIN B. SALAM
22
                                   LEONARD MEYER LLP
23                                 (120 N. LaSalle Street,
                                    Suite 2000,
24                                  Chicago, IL  60602) by
                                   MR. JOHN G. BISBIKIS
25
```

```
 1   For the Leavens, Strand &    HOLLAND & KNIGHT
     Glover Attorneys:            (150 N. Riverside Plaza,
 2                                 Suite 2700,
                                   Chicago, IL  60606) by
 3                                MS. TRISHA M. RICH
                                  MR. COLIN P. SMITH
 4
     For Steven S. Shonder:       TRAUB LIEBERMAN
 5                                (303 W. Madison Street,
                                   Suite 1200,
 6                                 Chicago, IL  60606) by
                                  MR. MARK F. WOLFE
 7
     For Peter S. Stamatis:       WILLIAMS MCCARTHY LLP
 8                                (120 W. State Street,
                                   4th Floor,
 9                                 Rockford, IL  61105) by
                                  MR. JOHN J. HOLEVAS
10
     Also Present:                MR. SEAN BYRNE
11                                MR. FRED CHAPEKIS
                                  MR. THOMAS R. LEAVENS
12                                MS. HEATHER R. LIEBERMAN VAN DYKE
                                  MR. TRAVIS W. LIFE
13                                MR. STEVEN S. SHONDER
                                  MR. PETER S. STAMATIS
14                                MR. PETER J. STRAND

15   Court Reporter:             Heather M. Perkins-Reiva
                                  327 S. Church Street
16                                Rockford, Illinois  61101
                                  (779)772-8309
17

18

19

20

21

22

23

24

25
```

```
 1              THE CLERK:  Calling 12 CV 50324 DR Distributors,
 2    LLC v. 21 Century Smoking, Inc.
 3              THE COURT:  All right.  Let's get appearances for the
 4    record.
 5              MR. von OHLEN:  Robert von Ohlen for Plaintiffs.
 6              MR. DAVIS:  Good morning, your Honor.  Anthony Davis
 7    on behalf of Plaintiffs, and at our counsel table is one of
 8    our colleagues, Brian Moffet, who is here, and also our
 9    client, Carlos Bengoa.
10              MR. SALAM:  Good morning, your Honor.  Kevin Salam.
11              THE COURT:  Hold on one second.
12              MR. SALAM:  Sorry.
13              THE COURT:  All right.  Good morning, Mr. Salam.
14              MR. SALAM:  Kevin Salam on behalf of Defendants.
15              MR. BISBIKIS:  And John Bisbikis, also on behalf of
16    the Defendants.
17              THE COURT:  I just saw your appearance, B-i-s-b-i --
18              MR. BISBIKIS:  -- k-i-s.
19              THE COURT:  Okay.  All right.
20              MR. SALAM:  Mr. Leonard apologizes, but the case that
21    came up in the law division last week, the judge it was
22    assigned to set the trial for this week, so --
23              THE COURT:  Okay.
24              MR. SALAM:  -- he will not be here.
25              THE COURT:  That's fine.
```

1          Who is that judge?

2          MR. SALAM:  Do you know which case?

3          It is a Law Division case.

4          THE COURT:  Yes, they are fun over there.

5          MR. SMITH:  Good morning, your Honor.  Colin Smith on

6   behalf of the Leavens Strand lawyers, Tom Leavens, Travis

7   Life, Peter Strand, and Heather Liberman Van Dyke.

8          MS. RICH:  Good morning, Judge.  Trisha Rich on

9   behalf of the Leavens, Strand & Glover lawyers as well.

10          MR. HOLEVAS:  Good morning, your Honor.  John Holevas

11   on behalf of Mr. Stamatis, who is here in open court.

12          MR. WOLFE:  Mark Wolfe on behalf of Mr. Shonder, who

13   is also here.

14          THE COURT:  All right.

15          MR. SALAM:  And, your Honor, just I forgot to

16   mention, Sean Byrne, one of our consulting experts, is sitting

17   at our table.

18          THE COURT:  Got you.  Okay.

19          All right.  And Mr. Duke is present.  I see him

20   there.  Okay.

21          All right.  Let's do a couple housekeeping matters.

22          Mr. Byrne is here.  As I have done in this case and

23   every other case, I over-disclose.  Mr. Byrne and I are on

24   at least one committee together.  I probably have an

25   un-responded e-mail from him in my inbox somewhere.  We are on

1  the Seventh Circuit Council on e-discovery and some other

2  phrase that I can't remember.  In the same way I disclosed

3  knowing Ms. Rich and Mr. Smith and have been opposing counsel

4  to Mr. Shonder ten-plus years ago.  So I will put that out

5  there.  So that takes care of that.

6        I have lots and lots and lots of documents, and I

7  know people are going to want to get a substantial amount of

8  information in the record.  Having said that, let's not make

9  Ms. Perkins-Reiva's life -- Heather's life difficult, so keep

10 your cadence less than 120 words per minute.

11       What do you max out at, Heather?

12       THE REPORTER:  260.

13       THE COURT:  Okay.  Let's not push her red line too

14 much, okay?  So there is that.

15       Mr. Holevas filed a motion.  I saw sort of an add-on

16 to that by Ms. Rich on witnesses being present.  I see

17 Mr. Leavens in the back, Mr. Strand in the back, Mr. Life in

18 the back.  All right.

19       MS. RICH:  All of our clients are here.

20       THE COURT:  I see them all.

21       And somebody way in the back, who is that?

22       All right.  We have a visitor from Germany, from

23 Deutschland.  So everybody be on your best behavior.  He is an

24 IP lawyer.  It is an IP case, so he just got lucky.  So he is

25 here watching today.

1          And then behind Mr. Shonder, we have?

2          MR. CHAPEKIS:  Yes, my name is Fred Chapekis, and I'm

3    here as an observer.

4          THE COURT:  Okay.  It is public, so not a problem.

5          All right.  I have that motion.  I didn't see any

6    other -- you guys can sit down.

7          I didn't see any other responses to the motion on the

8    system, all right?  Okay.

9          So I think everybody is an interested "party" as the

10   rules and case law interpret it to be, so everybody can be

11   present in court today.

12         All right.  So that takes care of the motion.

13         MR. SMITH:  Your Honor, just could I clarify?  There

14   was also a request of the lawyers for the former counsel to

15   participate, and I'm assuming you're agreeing that we have

16   that right as well.

17         THE COURT:  That was -- yes, that was part of the

18   motion, my understanding.

19         MR. SMITH:  Right.

20         THE COURT:  So, yes, they can participate.  We will

21   have to do this in an orderly manner.  As I mentioned, it is

22   your guys' motion, it is the Plaintiff's motion, so you will

23   be able to put on your witnesses first and do the directs and

24   those types of things, and then we will figure out what the

25   logical way to address cross/redirect is going to be, okay?

 1          All right.  So those are some of the preliminary

 2   matters.

 3          Hold on one second.

 4          I'm directing this question initially to

 5   Mr. von Ohlen because I think he raised it, and I don't

 6   remember in what context.  If you didn't raise it, you can

 7   correct me if I'm wrong.

 8          I know that on the system, it is showing as a jury

 9   demand is made, and it went on, and I know in the Defendants'

10   counterclaim, they specifically make a jury demand.  So that's

11   in there.

12          Why do I think it might be your position that there

13   isn't going to be a jury in this case?  Am I right or wrong on

14   that?

15          MR. DAVIS:  I think that's right, your Honor.

16          THE COURT:  That there is not going to be a jury?

17          MR. DAVIS:  Right, because the nature of the claims

18   under the Lanham Act are equitable, and the defenses are

19   equitable.

20          THE COURT:  All right.  But aren't there more than

21   just the Lanham Act claims?

22          MR. von OHLEN:  There certainly are things, I

23   believe, an Illinois Deceptive Trade Practice Act, and there

24   is -- at least that.  There is defamation, which is a state

25   law claim.

1        THE COURT:  Right.

2        MR. von OHLEN:  So it is a mixed bag, I suppose, of a

3   few state law claims.  We don't know what will actually,

4   obviously, reach trial.

5        THE COURT:  That's true.  Okay.

6        MR. von OHLEN:  So whether the state law claims are

7   there or not, I think, is a fair issue at this point.

8        THE COURT:  Okay.  But then certainly the -- I

9   understand.  Thanks for clarifying.  Now it makes sense.

10        As a Lanham Act with the equitable claims, that's not

11   a right to a jury trial.

12        Some of these other supplemental state law claims,

13   were they to go to trial, those would seem to be jury issues,

14   unless everybody waives the right to a jury trial.

15        MR. SALAM:  We are not waiving a jury trial.

16        THE COURT:  Hold on a second.  I'm still addressing.

17        MR. SALAM:  I'm sorry.

18        MR. von OHLEN:  I think that's right, your Honor.

19        THE COURT:  All right.  Okay.  That takes care of

20   that question.

21        I can ask those ones later.

22        I will ask the Defendants this question now:  Is it

23   the Defendants' position that Rule 37(e) abrogates all other

24   possible applicable rules relating to sanctions and a court's

25   inherent authority?

1          How is that for a question?

2          MR. SALAM:  That's a good question, your Honor.

3          THE COURT:  Thanks.

4          MR. SALAM:  Well, my position is that based on

5 *Snider v. Danfoss*, your recommendation opinion, as you stated

6 in there, Rule 37 is directly on point -- Rule 37(e) is

7 directly on point with respect to spoliation --

8          And I apologize now for how many times I will

9 mispronounce that.

10         THE COURT:  You are not going to be alone.

11         MR. SALAM:  Okay.

12         -- spoliation of evidence, okay?

13         Obviously --

14         THE COURT:  Of ESI?

15         MR. SALAM:  Of ESI.  Thank you, your Honor.

16         THE COURT:  Not a problem.

17         MR. SALAM:  Of ESI.  And that would set the issues

18 with respect to a sanctions motion based on Rule 37(e), okay?

19         Obviously, I believe that to the extent there is

20 other discovery violations, okay, in addition to spoliation of

21 ESI, like intentional withholding of documents and some of the

22 other things that Plaintiffs have accused Defendants and the

23 former defense counsel of, that there is certainly -- the

24 court has authority to address that.

25         THE COURT:  Okay.

1      MR. SALAM:  So is it my position that it is the only

2  basis for which the court can sanction misconduct?  No.

3      Is it on point and directly as a statute address it?

4  Yes, I think that would then play into a question of what is

5  allowed under other statute or trying to refer to other

6  sanction statutes when this one is directly on point.  I would

7  say that those don't apply.

8      And as to inherent authority, I would suggest that to

9  the extent there is a rule directly on point with respect to

10  spoliation of evidence, your inherent authority would not

11  include doing something different than what is specified or

12  not applying Rule 37(e).

13      THE COURT:  Okay.

14      MR. SALAM:  That would be our position, your Honor.

15      THE COURT:  All right.  That is very helpful.  I

16  appreciate that.

17      You don't need to answer this question now, but here

18  is a rabbit hole to fall down when we are talking about

19  inherent authority.  Rule 37(e) itself, the text itself,

20  doesn't say anything about abrogating the court's inherent

21  authority.  It is only referred to.

22      Let me grab some random rule book.

23      In the advisory committee notes, that Rule 37(e)

24  essentially abrogates the court's inherent authority for

25  violations of Rule 37(e) as it relates to ESI, electronically

1   stored information.

2          Something to chew on is can advisory committee notes,

3   not the text of a rule itself, remove a federal court's

4   inherent authority?  Interesting question.  There is at least

5   one draft law review article floating around out there that I

6   have read.

7          Okay.  We don't have to address that now.  That's

8   something to think about.

9          I have got that question for later.  That question is

10  for later.

11         We will probably talk about that at some point.

12         Okay.  I have got Post-its all over the place, but

13  those questions are probably best left for later as the

14  evidence comes out in the hearing.

15         All right.  Let's start with the moving party:

16  Anything to address before we start, procedurally,

17  substantively?

18         MR. DAVIS:  The only thing we are going to ask

19  procedurally, your Honor, as an initial matter, was to move

20  all of the exhibits from Plaintiff's exhibit list that was

21  submitted to the court and provided to all counsel last

22  Thursday, move those exhibits into evidence and make them part

23  of the evidentiary hearing record at this time.

24         THE COURT:  Okay.  Any objection?

25         MR. SALAM:  I would object, your Honor.

1          THE COURT:  Okay.

2          MR. SALAM:  I don't have objections on foundation in

3    terms of the documents are what they are, but I will,

4    obviously, reserve the right to object on relevance, hearsay,

5    those things.  So I don't have a foundation objection, but I'm

6    not willing to stipulate to admission of those exhibits.

7          THE COURT:  Are there any that you will stipulate to

8    the admission of?  There are 79 of them.

9          MR. SALAM:  Right now, I would have to walk through

10   them.  Obviously, docket filings, again, it is foundational.

11   There are things that are in the docket, like the notes of our

12   expert, that may or may not be admissible.  But I'm not in a

13   position -- if you want to go through each individual one

14   right now?

15         THE COURT:  I don't want to do it now.  I thought

16   that would have been something that you would have done before

17   we started today.  Okay.

18         MR. SALAM:  No, it has not been done, your Honor.

19         THE COURT:  Okay.

20         MR. SALAM:  I have seen them, but I was going over

21   them with my client, not deciding whether or not we would be

22   objecting.

23         THE COURT:  Okay.

24         MR. von OHLEN:  Well, could we do it the other way

25   around, that we will assume they are good, unless he wants to

1    object?  Because these are all documents that were produced in

2    discovery.

3            THE COURT:  Why don't you use what you need to use

4    with the witnesses, and if you want to get them in, ask that

5    they be admitted.  There is no jury here.  It is presumed that

6    I will consider only relevant information, and I will make the

7    rulings there.  If there is an objection, I will note them.

8    And at the end, if there is anything else in the 79 exhibits

9    that you want to get in --

10           MR. von OHLEN:  We will just move it at the end.

11           THE COURT:  -- move it at the end.

12           MR. von OHLEN:  Okay.  Thank you.

13           THE COURT:  Mr. Davis, anything else procedurally?

14           MR. DAVIS:  No.

15           THE COURT:  Mr. von Ohlen?

16           MR. von OHLEN:  No.

17           THE COURT:  Mr. Salam, anything procedurally or

18   substantively you want to address now?  Obviously, I have read

19   everything.

20           MR. SALAM:  Obviously, privilege is going to be an

21   issue here.  I can wait until they ask it.  I assume

22   Plaintiff's counsel intends on asking questions about

23   conversations between Mr. Duke and his former defense counsel;

24   am I correct?

25           MR. DAVIS:  Yes, consistent with the e-mails that

1   have been produced between -- disclosing communications and

2   other communications, we will.

3          THE COURT:  Well, we will see how those shake out as

4   they come through.  I can't rule on those in a motion.

5          MR. DAVIS:  Correct, your Honor.

6          THE COURT:  Anything else, Mr. Salam?

7          MR. SALAM:  No, not at this time, your Honor.

8          THE COURT:  Okay.  Mr. Smith, Ms. Rich?

9          MR. SMITH:  One issue, your Honor.  As we indicated,

10  Mr. Peter Strand is here.  I'm sort of following up on your

11  comments at the last hearing, relating to the hearing before

12  that --

13         THE COURT:  And you weren't here, but as I mentioned,

14  as soon as I walked off the bench, I turned to Patrick and

15  went, "Oh, I messed up," because you said Mr. Strand, and I

16  don't know why in my head I'm thinking Mr. Leavens, and I know

17  there is all kinds of things he is involved in, and I went "I

18  don't know why I was thinking of Mr. Strand -- Mr. Leavens,

19  when he specifically said Mr. Strand."  So I didn't

20  know -- and I haven't seen his name on a piece of paper or

21  anything.

22         MR. SMITH:  Well, I will just -- let me comment

23  briefly, which is that Mr. Strand was not involved in the

24  document production issues in this case.

25         THE COURT:  Okay.

1    MR. SMITH:  He filed an appearance basically to be

2  able to stand in for Mr. Leavens if that ever became

3  necessary, and he ultimately billed, over five years, less

4  than eight hours to the case.

5    I have serious doubt that any party will attempt to

6  put him on the stand in this hearing, and I don't know how

7  counsel feel about it.  You know, I would like to ask your

8  permission for him to be excused so he doesn't need to sit

9  through all this hearing that he has very little to add to,

10  and, in fact, nothing to add to, whether that decision can be

11  made now or whether it has to be made later today, but I

12  really think he is spinning his wheels being here, your Honor.

13    THE COURT:  Okay.  I only have what I have in front

14  of me.

15    MR. SMITH:  I understand.

16    THE COURT:  And now it is voluminous.  We have a lot

17  of dead trees in front of me, and I have tried to shepherd

18  this case since 2013, clearly unsuccessfully, and Mr. Strand's

19  name never came up except in this context.  So I don't know

20  what people's views are.  I don't know what communications

21  have occurred with current counsel or prior counsel.  I just

22  don't know.  So I would like to kind of see how it shakes out,

23  but from what I have seen, he is not involved.

24    Go ahead, Mr. Salam.

25    MR. SALAM:  Your Honor, I spoke with my client.  He

1   does not recognize Mr. Strand.  He has had no communications

2   with Mr. Strand.  So I have no objection to him not being

3   required to be present.

4           THE COURT:  Okay.

5           MR. SALAM:  If somehow it becomes -- if on our side,

6   if somehow it seems like we would need him, which I don't

7   expect, we could always plug him in on the extra two and a

8   half hours, but I have no problems with him being excused.

9           THE COURT:  Okay.  Any involvement with Mr. Strand?

10          MR. von OHLEN:  I think it is up to him.  I mean, we

11  don't know what his involvement is.  Those are representations

12  that may be true, but if the answer is, "Yeah, my eight hours

13  involved telling him what to preserve," that's an important

14  question.

15          THE COURT:  Okay.  I assume it was more substantive.

16          MR. von OHLEN:  I don't know, so I can't say, "Send

17  him home."

18          MR. SMITH:  Your Honor, obviously, we could let him

19  go today, and if something pops up today, he could come back

20  on Wednesday, but I highly doubt anything is going to come up

21  based upon what we know about his involvement.

22          THE COURT:  Okay.  Mr. Strand, why don't you step up

23  for a moment.

24          MR. STRAND:  Good morning, your Honor.

25          THE COURT:  Good morning, Mr. Strand.

1    I know you were in the back of the courtroom and you

2  heard the statements made by counsel in this case, and you

3  heard my statements as well.  I know you -- my recollection is

4  you have never stepped up in this case and appeared in court

5  in this case in any way, and I can't remember you filing

6  anything relating to the substance of the case; is that right?

7    MR. STRAND:  That's all correct.  I didn't file

8  anything other than my appearance at the beginning of the

9  case.

10    THE COURT:  Okay.  I will let you leave with the

11  stipulation that if we do need you on Wednesday, you will come

12  back on Wednesday.

13    MR. STRAND:  I would be pleased to come back on

14  Wednesday.

15    THE COURT:  All right.  And that's a voluntary

16  decision on your part.  So if there is something that's said

17  here that you could have been present to observe, watch, hear,

18  that's your choice, okay?

19    MR. STRAND:  I understand.  Thank you, your Honor.

20    THE COURT:  Okay.  All right.  I will excuse

21  Mr. Strand.

22    MR. SMITH:  Thank you, your Honor.

23    One other very minor housekeeping matter:  After

24  seeing the other parties' exhibits and receiving additional

25  exhibits up until last night, we identified a couple more

1    exhibits that I have provided to the Plaintiffs and the

2    Defendants.  I haven't at this moment got punched copies for

3    you, your Honor.  I have copies that we can give you during a

4    break, or we can figure out how we can give you as we move

5    along, but I just wanted to indicate that while they were more

6    in the nature of rebuttal exhibits, we decided to go ahead and

7    disclose them to avoid any issues.

8              THE COURT:  All right.  So currently you are at 15?

9              MR. SMITH:  Yes.

10             THE COURT:  So whatever you are going to do, mark

11   them sequentially after that.

12             MR. SMITH:  Right.  It will be 16 and 17, your Honor.

13             THE COURT:  All right.  Does everybody else have

14   those?

15             MR. SMITH:  I haven't given them to Mr. Holevas yet,

16   but --

17             THE COURT:  Mr. Holevas has it.

18             Mr. Salam?

19             MR. SALAM:  Yes, I do, your Honor.

20             And similarly, in the course of preparing over the

21   weekend, I did send, I think, several other exhibits, which I

22   have numbered.  I have not yet -- in fact, I have the court's

23   binder with me.  I did not previously send the court a binder

24   of our exhibits.

25             THE COURT:  What are these, then?

1          MR. SALAM:  Well --

2          THE COURT:  For the record, I'm showing two big

3     stacks of documents.

4          MR. SALAM:  Yes, the exhibits are the exhibits that I

5     initially -- the exhibit list is, in fact, the same, but I

6     have a new binder of exhibits for the hearing.

7          THE COURT:  Additional?

8          MR. SALAM:  They currently are identical to what was

9     previously provided.

10         THE COURT:  So they are just in a different format?

11         MR. SALAM:  Excuse me?

12         THE COURT:  They are just in a different format?

13         MR. SALAM:  They are in a three-ring binder.

14         THE COURT:  Instead of the spiral bound?

15         MR. SALAM:  Correct, your Honor.  And I will hand

16    that up to the court just in case there is some -- you know, I

17    don't believe there is any difference.

18         THE COURT:  Okay.  So I have got you going up to

19    Exhibit 52.  Are there any beyond 52?

20         MR. SALAM:  I did, over the weekend, offer up a few

21    more to counsel.

22         THE COURT:  What is a "few"?

23         MR. SALAM:  I think it was three, and they were

24    numbered 53, 54, and 57.

25         MR. von OHLEN:  57.

```
 1              MR. SALAM:  I will hand those up to you, your Honor.

 2              THE COURT:  Okay.  And, Mr. von Ohlen and Mr. Davis,

 3  do you have copies of those documents?

 4              MR. DAVIS:  Yes, we received e-mails over the

 5  weekend, your Honor.

 6              THE COURT:  Okay.  All right.  We will get to them

 7  when we get to them, then.

 8              MR. SALAM:  Okay, your Honor.  Thank you.

 9              THE COURT:  I think I left off with Mr. Salam.

10  Anything procedurally or substantively to add?

11              MR. SALAM:  That was it, your Honor.

12              THE COURT:  Ms. Rich, anything?

13              MS. RICH:  Nothing more from us.

14              THE COURT:  Mr. Holevas?

15              MR. HOLEVAS:  Not at this point, your Honor.  Thank

16  you.

17              THE COURT:  All right.  Go ahead.  Call the first

18  witness.

19              MR. DAVIS:  Plaintiff's call Brent Duke as our first

20  witness as part of this evidentiary hearing.

21              MR. SALAM:  Your Honor, may I address the court?  One

22  more thing.

23              THE COURT:  Sure.

24              MR. SALAM:  It is related to Mr. Duke.

25              THE COURT:  Okay.
```

Duke - Direct

21

```
 1            MR. SALAM:  I just wanted to inform you Mr. Duke's

 2   glasses broke this morning.  So if he is fumbling with his

 3   glasses, I just wanted to make people aware of that.

 4            THE COURT:  Do you need any cheaters?  I have got

 5   them all over the place if you need to read.

 6            THE WITNESS:  They're not for reading.

 7            THE COURT:  Okay.

 8            MR. SALAM:  Thank you, your Honor.

 9   (Witness duly sworn.)

10            THE COURT:  Whenever you are ready.

11            MR. DAVIS:  Thank you, your Honor.

12       BRENT S. DUKE, PLAINTIFF'S WITNESS, SWORN (Adversely)

13                      DIRECT EXAMINATION

14   BY MR. DAVIS:

15   Q.  Good morning, Mr. Duke.

16   A.  Good morning.

17   Q.  As a reminder, my name is Anthony Davis, and I'm the

18   attorney for the Plaintiffs in this case.

19            Do you recall that?

20   A.  Yes.

21   Q.  And I was the attorney that took your deposition during

22   three days in June of 2015; do you recall that?

23   A.  Yes.

24   Q.  And prior to this hearing today, you had an opportunity to

25   meet and prepare with your new attorneys in this case; is that
```

Duke - Direct

1   right?

2   A.  Yes.

3   Q.  And that your new attorneys are Mr. Kevin Salam?

4   A.  Yes.

5   Q.  And Mr. Leonard?

6   A.  Yes.

7   Q.  And there is a new attorney also here, and what is his

8   name?

9   A.  I don't know how to say his last name or pronounce his

10  last name.

11  Q.  And you are and have been the sole owner, officer, and

12  director of a company called 21 Century Smoking, Inc., at all

13  times, right?

14  A.  Yes.

15  Q.  And you're named individually also in this lawsuit; is

16  that right?

17  A.  Yes.

18  Q.  And your company, 21 Century Smoking, Inc., is also named

19  as a Defendant, right?

20  A.  Correct.

21  Q.  And do you recall that your company was sued in the fall

22  of 2012 by my client, DR Distributors, LLC?

23          Do you recall that?

24  A.  Yes.

25  Q.  And how did you learn about the lawsuit?

Duke - Direct

1    A.  I received an e-mail from a random lawyer that was -- I

2    don't know how you would even describe it.  "Ambulance chaser"

3    I guess would be the description.  He was e-mailing me and

4    trying to basically get my business, and that's how I

5    discovered there was a lawsuit.

6    Q.  And that e-mail was sent to what e-mail account of yours?

7    A.  I believe support@21centurysmoking.com.

8    Q.  Do you remember the name of that attorney?

9    A.  I do not.

10   Q.  And who were the first attorneys that you hired to provide

11   you with legal guidance regarding this lawsuit?

12   A.  Can you clarify, like, the time frame on that?

13   Q.  Yes.

14        After you first learned of the lawsuit, do you know

15   the date when you received that e-mail?

16   A.  I do not.

17   Q.  Do you recall the time period generally?

18   A.  2012.  May 2012.

19   Q.  And that was the first time you received notice of the

20   lawsuit, right?

21   A.  Yes.

22   Q.  Okay.  I'm saying who were the first attorneys, meaning

23   after you received that e-mail and first learned about the

24   lawsuit, who were the first attorneys that you spoke to or

25   sought guidance from in relation to the lawsuit?

Duke - Direct

24

1    A.  That I hired or that I spoke to?

2    Q.  Well, let's take it in pieces.

3         Who are the first attorneys you spoke to?

4    A.  I spoke to Matt Rieger.

5    Q.  Okay.  And --

6         THE COURT:  Can we get a spelling of "Rieger," if you

7    know?

8         THE WITNESS:  It is either R-i-e-g-e-r or

9    R-e-i-g-e-r.  It is one of the two.

10        THE COURT:  Okay.  All right.

11   BY MR. DAVIS:

12   Q.  And in your mind, there is a difference between when you

13   are communicating with someone between e-mails and speaking,

14   right?

15   A.  Can be, yes.

16   Q.  Can be?

17   A.  Yes.

18   Q.  So if you testify that you are speaking to someone, it

19   could be that you are not actually orally talking to them like

20   on a phone, but you could be communicating with them

21   electronically in some way?

22   A.  I guess, potentially, it could be.

23   Q.  And when you say "potentially," give me an example of

24   that.

25   A.  I'm saying if I said that, I guess potentially I could be

Duke - Direct

25

1  meaning e-mailing if I said I spoke to someone.  I don't

2  recall if I spoke to Matt Rieger or if I e-mailed Matt Rieger.

3  I don't remember exactly how I communicated with him.

4  Q.  I'm asking because you asked me to clarify my question.

5  You said, "Did I speak to him or e-mail him," if I understand

6  your testimony.  I'm trying to understand the distinction in

7  your mind.

8  A.  I guess I didn't -- I don't even remember asking that.  I

9  did speak to him.  I did call him, I believe, Matt Rieger.

10  Q.  And when you spoke to Matt Rieger, is that on a phone?

11  A.  I believe so, yes.

12  Q.  And did you also e-mail him?

13  A.  I don't recall e-mailing him.

14  Q.  Did you ever give him a copy of the lawsuit?

15  A.  No.

16  Q.  And how did he know about the lawsuit, if you didn't give

17  him a copy of the complaint?

18  A.  Because I called him.  After I found out about the

19  lawsuit, I called him.

20  Q.  And why did you call Matt Rieger?

21  A.  Because he was the initial counsel that I had hired

22  regarding this case --

23  Q.  And that was --

24  A.  -- regarding this trademark issue in general.

25  Q.  Okay.  And after you spoke --

Duke - Direct

26

```
 1            THE COURT:  Can I pause you right there?
 2            So did he work on your trademark matter before the
 3   lawsuit?
 4            THE WITNESS:  Exactly.
 5            THE COURT:  That's all I wanted to know.
 6            Okay.  Go ahead.
 7   BY MR. DAVIS:
 8   Q.  And did Mr. Rieger -- what did Mr. Rieger tell you about
 9   the lawsuit or what to do in response to the lawsuit.
10   A.  He was no longer operating his business.  He was working
11   for another company at that point.  So he said that I needed
12   to go find counsel, and he recommended the law firm where Tom
13   Leavens worked.
14   Q.  And what's the name of that law firm?
15   A.  Leavens, Strand & Glover was the name of the law firm.
16   Q.  All right.  And that's the firm where Mr. Tom Leavens
17   works --
18   A.  Yes.
19   Q.  -- or worked.
20            And you also saw a few minutes ago Mr. Peter Strand.
21   He was an attorney at that firm also, right?
22   A.  Yes.
23   Q.  And was that the only other -- after speaking to
24   Mr. Rieger, is that the only other law firm that you spoke to
25   about representing you and your company in this lawsuit?
```

Duke - Direct

27

1          MR. SALAM:  Objection; foundation, your Honor.

2          THE COURT:  It is a foundational question.

3     Overruled.

4          THE WITNESS:  Yes.

5     BY MR. DAVIS:

6     Q.  And Leavens and Strand, the two, did you meet with

7     Mr. Leavens and Mr. Strand at their offices?

8     A.  No.

9     Q.  Did you speak with them over the phone?

10    A.  No.

11    Q.  Okay.  How did you first communicate with the attorneys at

12    the Leavens, Strand & Glover firm?

13    A.  I have never spoken with Strand.

14    Q.  Never?

15    A.  No.

16    Q.  That's part of my questioning.  We are trying to

17    understand.

18          Now, Mr. Strand and Mr. Leavens signed your answer

19    and your first counterclaim that was filed in this case.  You

20    understand that, right?

21    A.  I believe that to be true, yes.

22    Q.  Right.

23          They are listed as your attorneys on the answer and

24    the counterclaim that your company filed against my client in

25    this case, right?

Duke - Direct

1    A.  I believe so.

2    Q.  Okay.  I'm trying to understand.  You heard Mr. Strand and

3    his attorneys before saying he had no involvement in the case,

4    yet he signed the first pleading you filed -- or he's listed,

5    I should say.  Mr. Leavens signed it.  Mr. Strand is listed

6    right under him.

7              MR. SMITH:  Objection.  Objection, your Honor.

8              THE COURT:  Wait.  Stop.  Stop.

9              Let the question be answered, then object, and then I

10   will rule.  We don't have a jury here that will be tainted by

11   the question coming out in any way.

12             MR. SALAM:  Thank you.

13             THE COURT:  So finish the question, then make your

14   objection, then I will rule.

15             Go ahead.  Restate your question.  Make Heather's

16   life easier.

17             MR. DAVIS:  Thank you, your Honor.

18   BY MR. DAVIS:

19   Q.  Your initial answer and counterclaim filed in this case

20   was signed by Mr. Leavens, and Mr. Strand is listed right

21   under his name in that pleading.

22             Do you know what his involvement was in representing

23   you and your company in filing that pleading?

24   A.  I do not.

25   Q.  And is it your testimony that you never met with

Duke - Direct

1    Mr. Strand?

2    A.  Yes.

3    Q.  And you never spoke to him?

4    A.  Yes.

5    Q.  Ever?

6    A.  Not that I can recall.

7    Q.  And did you ever e-mail with him?

8    A.  No.

9    Q.  Okay.  Were you ever aware that he was working on your

10   case internally at the Leavens Strand firm?

11   A.  No one ever discussed it with me.

12   Q.  Okay.  And the Leavens Strand attorneys are the ones that

13   are here in court today, right?

14   A.  Yes.

15   Q.  Okay.  And you are the person that authorized your

16   attorneys to file the counterclaim in this case, right?

17   A.  Yes.

18   Q.  Okay.  Now, you testified that you had previously

19   consulted with and hired an attorney named Matt Rieger; is

20   that right?

21   A.  Yes.

22   Q.  And that was in 2011?

23   A.  That was in 2010.

24   Q.  2010.

25            And in 2011, isn't it true, you were e-mailing and

Duke - Direct

1  communicating with him about filing a lawsuit against my

2  client?

3  A.  Yes.

4  Q.  And isn't it correct that he was actually drafting a

5  complaint to be filed in court against my client on your

6  behalf?

7  A.  I believe so, yes.

8  Q.  And that was in 2011?

9  A.  I don't know the time frame of that.

10  Q.  And to find the time frame out, we would simply have to

11  look at e-mails, right, and that would refresh your

12  recollection as to the date of those communications?

13  A.  Yes.

14  Q.  And Mr. Rieger would have been e-mailing you using what

15  e-mail account of yours?

16  A.  He could have been using bduke@21centurysmoking.com,

17  support@21centurysmoking.com, or brentduke@yahoo.com.

18  Q.  So your testimony before was that Mr. Rieger said, "I

19  don't do that kind of work" or "I closed my business."

20          What time frame did he tell you that?

21  A.  That was late 2012, after the filing.

22  Q.  And that's after he had already started drafting and

23  preparing a complaint on your behalf; isn't that right?

24  A.  I don't understand what you are asking.

25  Q.  You just testified that in 2011, your attorney Mr. Rieger

Duke - Direct

31

1  was drafting and preparing a complaint to be filed against my

2  client; isn't that right?

3  A.  Yes.

4  Q.  And then you further testified that in 2012, he told you,

5  "I no longer do this work," and referred you to the Leavens

6  Strand firm; is that right?

7  A.  Yes.

8  Q.  But prior to him telling you that, he was working for you

9  as your attorney, preparing a lawsuit against my client,

10  right?

11  A.  Yes.

12  Q.  Okay.  And Mr. Rieger, in fact, drafted a complaint for

13  your review and forwarded it to you in 2011, correct?

14  A.  Again, I don't know if that was in 2010 or 2011 or earlier

15  in 2012.  I don't know the year in which that was sent to me.

16  Q.  I will represent to you --

17        MR. DAVIS:  And I will mark for identification

18  purposes Plaintiff's Exhibit 80.

19        And I will hand a copy to counsel.  You guys can all

20  share that.

21        Your Honor, for identification purposes, and I will

22  hand one up to your Honor, I have handwritten on it "P-EX 80"

23  for Plaintiff's Exhibit 80.

24        THE COURT:  All right.

25        MR. DAVIS:  May I approach, your Honor?

Duke - Direct

1            THE COURT:  Sure.

2            And, Mr. Salam, do you have a copy?

3            MR. SALAM:  I do, your Honor.

4            THE COURT:  All right.  Ms. Rich, Mr. Smith, do you

5    have copies?

6            MR. SMITH:  We will share.

7            THE COURT:  All right.  Okay.  You can approach, if

8    you want to.

9            MR. DAVIS:  Your Honor, what I have marked is the

10   privilege log of 21 Century Smoking, Inc.

11           Your Honor, I stand corrected by my colleague.  It is

12   already in our exhibit list.  Sorry about that.  Exhibit 54.

13           THE COURT:  All right.

14           MR. DAVIS:  Plaintiff's Exhibit 54.

15           THE COURT:  54.  Hold on one second.

16           Go ahead.  The document is the document.  Go ahead.

17   BY MR. DAVIS:

18   Q.  Mr. Duke, do you recall your attorneys creating a

19   privilege log in this case for documents that they withheld

20   from production?

21   A.  I don't know what you are talking about, no.

22   Q.  Is that the first time today you have ever heard those

23   words, "privilege log"?

24   A.  I have heard the words, but I don't know what you are

25   talking about right now.

Duke - Direct

33

1   Q.  Independent of my question, prior to today, you have no

2   recollection of ever hearing or dealing with a privilege log

3   in this case?

4   A.  No.

5   Q.  And did your attorneys at any time ever tell you in this

6   case they were withholding certain documents from production

7   based on the attorney-client privilege or other privilege?

8   A.  Yes.

9   Q.  And tell me about the first time you had that conversation

10  with them.

11  A.  I remember during my deposition it was discussed, the

12  attorney-client privilege matter.

13  Q.  And isn't it true that you had provided to your attorneys

14  correspondence between you and your attorney Mr. Rieger that

15  included e-mails and copies of a draft complaint that was

16  going to be filed against my client in this case?

17  A.  I believe I did, yes.

18  Q.  And as you sit here today, you are unaware whether or not

19  your attorneys ever produced those to Plaintiffs or withheld

20  them in this case?

21  A.  I don't know.

22  Q.  Do you recall on September 29th, 2011, receiving a

23  communication from Matt Rieger to you with a draft of the

24  complaint for your review?

25          Do you recall that?

Duke - Direct

34

1   A.  I don't recall.

2   Q.  But that's something that happened, right?

3   A.  If you have an e-mail sitting there, then, yes, it

4   happened.  I don't recall it happening.  I believe you that it

5   happened.  I do not recall the actual date.

6   Q.  So is your confusion about the date of the communication

7   or whether the communication actually happened?

8   A.  The date.

9   Q.  The date?

10  A.  Yes.

11  Q.  So just to be clear on your testimony, you recall it

12  occurring, receiving a draft complaint from your attorney Matt

13  Rieger, right?

14  A.  Yes.

15  Q.  And you recall signing an agreement with him for legal

16  services in November of 2010?

17  A.  Yes.

18  Q.  And that was related to the lawsuit, or was that for

19  trademark services?

20  A.  That was -- well, there was no lawsuit yet.  That was

21  based on the fact someone was using my name, and I was trying

22  to get them to stop.

23          THE COURT:  And when you say your name, do you mean

24  your name, Brent Duke, or are we talking 21 Century Smoking?

25          THE WITNESS:  21 Century Smoking.  Confusion was

Duke - Direct

35

```
1   starting to occur.  I needed someone to try to help me get it

2   to stop.

3           THE COURT:  Okay.  Thank you.

4   BY MR. DAVIS:

5   Q.  And as you sit here today, is it your testimony that your

6   attorneys -- or I will say your prior attorneys, the ones that

7   withdrew from the case, Mr. Leavens, Mr. Strand, Ms. Liberman,

8   Mr. Life, Mr. Stamatis, Mr. Shonder, at no time did they ever

9   provide you with a copy of a document called a "Privilege Log

10  of 21 Century Smoking, Inc."?

11  A.  I don't recall.

12          MR. DAVIS:  I would ask the witness be shown

13  Exhibit 54.

14          THE COURT:  Sure.

15  BY MR. DAVIS:

16  Q.  The way it is going to work today, Mr. Duke, my colleague

17  behind me here, Mr. Moffet, has a computer with the electronic

18  documents, and when I ask him to bring it up, it is going to

19  come up on the computer screen in front of you.

20          Do you understand that?

21  A.  Okay.

22          THE COURT:  Is it showing?

23          MR. DAVIS:  Yes.

24  BY MR. DAVIS:

25  Q.  You can see it?
```

Duke - Direct

36

1   A.  Yes.

2   Q.  Exhibit 54, have you ever seen this document before?

3   A.  Possibly in preparation for this hearing, but I don't

4   recognize it otherwise.

5   Q.  Do you see on the right side of the document, it says

6   "case" and the case number and a document number?

7   A.  Yes.

8   Q.  It means it was filed with the court, right?

9           Do you understand that?

10  A.  Yes.

11  Q.  All right.  And at the top, it says the name of the case,

12  right?

13  A.  Yes.

14  Q.  And it says "Privilege Log of 21 Century Smoking, Inc.,

15  dated June 6, 2018."

16          Do you understand that?

17  A.  Yes.

18  Q.  And I'm going to direct your attention to the third page

19  of this document.

20          Do you see on the left side, the first column?

21          What do those numbers mean to you, those

22  designations?  Do they mean anything?

23  A.  I believe it is the documents that have been produced by

24  21 Century Smoking.

25  Q.  All right.  Or at least that's a number that identifies

Duke - Direct

1  documents from you, right?

2  A.  Right, yes, that sounds right.

3  Q.  Okay.  And then the next column are dates?

4  A.  Okay.

5  Q.  And the next column is a description of the type of

6  document?

7  A.  Okay.

8  Q.  And, again, you have never seen this before?

9  A.  It does not look familiar to me, no.

10  Q.  And none of your prior attorneys that I listed before

11  reviewed this with you for accuracy?

12  A.  I don't recall ever seeing this document.

13  Q.  And the next column over has words in it that have names.

14  Does that mean anything to you?

15  A.  I mean, I see names of my lawyers and myself -- or my

16  previous lawyers and myself.

17  Q.  Okay.  And you didn't help and assist in putting any of

18  these words in this document, right?

19  A.  I don't think so.

20  Q.  Okay.  And the next column is a description.  Do you see

21  that?

22  A.  Yes.

23  Q.  Does that mean anything to you?

24  A.  It seems to be a description of whatever the documents

25  are.

Duke - Direct

1    Q.  All right.  And I'm going to ask you to look at the

2    seventh entry down.  Do you see that one?  It is dated

3    9/29/2011.

4          THE COURT:  You can identify it.  You can touch the

5    screen.  These are all touchscreens.  So when you touch that

6    screen, it will show up on his screen.

7    BY MR. DAVIS:

8    Q.  Do you see -- I'm touching the screen now on mine.

9          Does that show up on your screen?

10         THE COURT:  Is it showing?

11         Do what you need to do.  We can play with it later.

12   But they are touchscreens.

13         THE WITNESS:  Do I touch mine?

14         THE COURT:  No.  You can, but let him do it.

15         We will take care of it at break.

16   BY MR. DAVIS:

17   Q.  Do you see the entry that is dated 9/29/2011?

18   A.  Yes.

19   Q.  And it says it is a document next to that, right?

20   A.  Yes.

21   Q.  And what does the next column say?

22   A.  "Matthew Rieger, Esq., Brent Duke."

23   Q.  And the next column?

24   A.  "Draft of complaint for Brent Duke's review."

25   Q.  Does that refresh your recollection as to you receiving an

Duke - Direct

39

1   e-mail from Mr. Rieger with a draft complaint for your review?

2   A.  If it is in here, yes, that sounds right.

3   Q.  And you don't dispute that entry in any way?

4   A.  I have no reason to, no.

5        MR. DAVIS:  Okay.  Your Honor, with that basic

6   foundation, we ask to move this entire document into evidence.

7        THE COURT:  Any objection?

8        MR. SALAM:  Your Honor, I will stipulate that that

9   is, in fact, the privilege log that was filed in this case.  I

10  won't stipulate that Mr. Duke in any way has seen it prior to

11  preparation for this, which was his testimony.

12       THE COURT:  That has been his clear testimony that he

13  did not prepare the document.

14       MR. SALAM:  I have no objection to the admission of

15  Exhibit 54.

16       THE COURT:  All right.  54 will be admitted.

17    (Plaintiff's Exhibit 54 was offered and received in

18    evidence.)

19  BY MR. DAVIS:

20  Q.  Now, you also -- you testified that you spoke to

21  Mr. Rieger, and the next attorneys you spoke to were who, the

22  Leavens Strand firm; is that right?

23  A.  Yes.

24  Q.  And who is Zeno Baucus?

25  A.  My friend.

Duke - Direct

40

1  Q.  And is your friend an attorney?

2          THE COURT:  Can we have the spelling of --

3          THE WITNESS:  B-a-u-c-u-s.

4          MR. DAVIS:  Zeno; Z-e-n-o, B-a-u-c-u-s.

5          THE COURT:  All right.  You said he was a friend of

6  yours?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.

9          THE WITNESS:  He is an attorney as well.

10         THE COURT:  Also an attorney.  Okay.

11         THE WITNESS:  I believe now he is like a federal

12 prosecutor or something.

13         THE COURT:  Okay.  Thank you.

14 BY MR. DAVIS:

15 Q.  And did you consult with him regarding an infringement

16 lawsuit in 2012?

17 A.  Yes, my friend, I definitely consulted with him.  He's an

18 attorney, or he was an attorney at that time.

19 Q.  In 2012, was Zeno Baucus an attorney?

20 A.  Yes.

21 Q.  And did you consult with him by e-mail or phone regarding

22 this lawsuit?

23 A.  I don't recall if it was this lawsuit, before or after the

24 lawsuit was filed.  So I don't recall if I consulted with him

25 about looking for attorneys or if I consulted with him after

Duke - Direct

1    the lawsuit was filed.  I don't recall.

2    Q.  And were you consulting with him as your friend or as an

3    attorney?

4    A.  My friend.

5    Q.  As your friend.

6             So he wasn't retained in any way as your legal

7    counsel?

8    A.  No.

9    Q.  Okay.  And I will ask you to take a look at Page 8 of this

10   document.

11            MR. DAVIS:  I will ask you to go one more -- no,

12   that's it.

13   BY MR. DAVIS:

14   Q.  I will ask you to take a look at that.

15            Do you see that page in front of you now?

16            It is listed as still part of Exhibit 54, Docket

17   Entry 294-2.  It was filed on 3/25/2019.

18            Do you see at the top there, the second entry, the

19   third entry, the fourth entry, the fifth, the sixth?  Do you

20   see all those entries?

21   A.  Yes.

22   Q.  All right.  Does that refresh your recollection that

23   you're e-mailing with someone named Zeno Baucus about this

24   case?

25   A.  That's not about this case.

Duke - Direct

42

1  Q.  All right.  And that's my question.

2         What is it about?  What says "infringement lawsuit,"

3  what is that about?

4  A.  Well, 4/30/12 says "correspondence regarding patent

5  application."

6  Q.  Okay.  I see that.

7  A.  That's why I was speaking with his firm, and I did hire

8  someone from his firm to do a patent application.

9  Q.  Okay.  All right.  And if you look at the third line, the

10 next entry down, the third document, is a May 9, 2012, e-mail.

11 Do you see it says "Zeno Baucus, Esq., Brent Duke"?

12 A.  Yes.

13 Q.  All right.  "Correspondence regarding infringement

14 lawsuit."  That doesn't say "patent," right?

15 A.  No.

16 Q.  And on the far right, it has the initials "AC."

17        Do you see that?

18 A.  Yes.

19 Q.  I can represent to you that your attorneys have

20 represented to us that means you have withheld that document

21 based on the attorney-client privilege.

22        Do you have any understanding of that?

23 A.  I do not.  I would have to see the e-mail to know.

24 Q.  You would have to -- what would you need to see to know

25 whether or not Zeno Baucus was your lawyer on May 9th of 2012,

Duke - Direct

43

1    anything?

2    A.  Because I retained his firm for the patent work.

3    Q.  Right.

4    A.  So I don't know if that was included.  I don't know if it

5    was a reply to part of that e-mail.  I have no idea what else

6    would be in the e-mail.

7    Q.  I'm trying to understand your testimony a few moments ago.

8    You said that you consulted Mr. Baucus as your friend and not

9    your attorney.

10         So can I ask you, which is it, was Mr. Baucus your

11   attorney or your friend at this time?

12         THE COURT:  With regard to?

13         MR. DAVIS:  With regard to correspondence regarding

14   the infringement lawsuit listed on your privilege log dated

15   May 9th, 2012.

16         THE COURT:  All right.  Hold on one second.

17         Go ahead.

18         MR. SALAM:  My objection is foundation because the

19   witness has said he hasn't seen that correspondence.

20         THE COURT:  Okay.

21         MR. SALAM:  I understand they don't have it because

22   it has been withheld.

23         THE WITNESS:  I mean, if you would like me to --

24         THE COURT:  Hold on one second.  Overruled.

25         Why don't you read back that question, unless you

Duke - Direct

44

1   remember it.

2             Do you want it read back?

3             THE WITNESS:  I can answer this to the best of my

4   ability.

5             THE COURT:  Okay.  Go ahead.

6             THE WITNESS:  At some point, Matthew Rieger, his

7   firm, went out of business, and he began working for someone

8   else.  So I started consulting with people to attempt to find

9   attorneys in order to eventually file the lawsuit against your

10  client.  So I may have reached out to Zeno Baucus regarding

11  that in terms of his firm representing me in this case.  So he

12  is a friend, but I would reach out to his firm in order to get

13  them to try to represent me in this case.  So it could very

14  well be privileged.

15  BY MR. DAVIS:

16  Q.  And did you ever hire his firm outside -- outside of the

17  patent work, did you ever hire Mr. Baucus's firm to represent

18  you in this case?

19  A.  No.

20  Q.  Did you ever hire them in any way to represent you or give

21  you advice in, as you said, bringing a lawsuit against our

22  client?

23  A.  No.

24  Q.  And how would the documents that are listed here, the 2012

25  e-mails -- you are looking at me, but can you look at the

Duke - Direct

1  document?

2  A.  Uh-huh.

3  Q.  Do you see all the e-mails that are listed there

4  between -- in April 30, 2012; May 9th, 2012; May 14th, 2012,

5  and all the way down to the second to last one --

6  A.  Yes.

7  Q.  -- 5/23/2012.

8        How would your attorneys in this case, your prior

9  attorneys, the Leavens firm, how did they get these e-mails?

10  A.  I don't know how they got these e-mails.  I must have

11  given them to them.

12  Q.  And if you didn't give them to them, is there someone else

13  that could have given them to your attorneys, your prior

14  attorneys?

15  A.  No, it must have been me that gave them to them.

16  Q.  So you talked to Mr. Rieger in 2011, is that right, about

17  filing a lawsuit against my client?

18  A.  2010.

19  Q.  Sorry.  Thank you.

20        2010?

21  A.  Yes.

22  Q.  And then the next attorneys you spoke to were Zeno Baucus

23  and his firm about representing you and bringing an action

24  against my client; is that right?

25  A.  I spoke to multiple people.  I don't know if that's the

Duke - Direct

46

```
 1   next people I spoke to, but I did speak to Zeno Baucus, yes.
 2   Q.  And when you say "multiple people," were you consulting
 3   with other attorneys about bringing this action?
 4   A.  Of course.
 5   Q.  And how many different attorneys did you consult with
 6   prior to you hiring the Leavens Strand firm in 2012?
 7   A.  After Matthew Rieger recommended them, I didn't speak to
 8   any other attorneys.  I went with the Leavens, Strand & Glover
 9   firm.
10   Q.  My question is how many did you speak to?
11   A.  I don't recall.
12   Q.  And if you e-mailed with any attorneys, it would have been
13   in 2012, in 2011; is that right?
14   A.  Yes.
15   Q.  Okay.  Now, Mr. Duke, we are here today because of the
16   motion for sanctions that was filed on behalf of our clients,
17   the Plaintiffs, in this case, right, against you and your
18   company.
19        Do you understand that?
20   A.  Yes.
21   Q.  And when you say "yes," I want to understand this.  You
22   received that motion, reviewed it; is that right?
23   A.  Yes.
24   Q.  Okay.  And you and your company are now represented by new
25   attorneys; is that right?
```

Duke - Direct

1  A.  Yes.

2  Q.  Okay.  And that's Mr. Salam and Mr. Leonard, who is not

3  here today, and there is another attorney that's here; is that

4  right?

5  A.  Yes.

6          MR. SALAM:  Mr. Bisbikis, for the record.

7          MR. DAVIS:  Thank you.  I didn't want to mispronounce

8  it.

9          MR. BISBIKIS:  Bisbikis.

10          MR. DAVIS:  Bisbikis.

11  BY MR. DAVIS:

12  Q.  Now, part of the reason we are here is because of issues

13  that were raised in Plaintiff's, my client's, summary judgment

14  motion that was filed in January of 2018.

15          Do you understand that?

16  A.  Yes.

17  Q.  And how do you understand that?

18  A.  Because I have discussed it with my lawyers.

19  Q.  And you have reviewed that January 2018 filing?

20  A.  I believe so, yes.

21  Q.  I just want to make sure, when you say "I believe so,

22  yes," did you review it or not review it?

23  A.  I have reviewed the filing, the sanctions filing, yes.

24  Q.  Okay.  And I'm also talking about Plaintiff's summary

25  judgment motion that was filed in January of 2018, in addition

Duke - Direct

48

1   to what's pending now, the motion for sanctions.  I want to

2   make sure you are aware of that filing, right?

3   A.  I'm not sure I have seen that one.

4   Q.  Do you recall in January of 2018 your lawyers filing a

5   motion for summary judgment on your behalf and your company's

6   behalf?

7   A.  I know it was being worked on.

8   Q.  Okay.  But as you sit here today, you are not aware of the

9   substance of Plaintiff's January 2018 motion for summary

10  judgment?

11  A.  No.

12  Q.  Were you ever given a copy of that motion by your prior

13  counsel, Tom Leavens?

14  A.  It's possible.  I don't recall.

15  Q.  Well, I'm asking you.

16         Do you recall?

17  A.  I don't recall if I did.

18  Q.  Do you recall if your attorney Travis Life gave you a copy

19  of the January 2018 motion?

20  A.  I'm unsure.

21  Q.  Do you recall if Mr. Stamatis gave you one?

22  A.  I'm unsure if any attorney gave me one.  I do not recall

23  seeing the document.

24  Q.  And as part of your preparation for today, you didn't

25  review it?

Duke - Direct

49

1  A.  I went through the exhibits that you attached.  If it was

2  one of those exhibits, I would have reviewed it.

3  Q.  And outside the exhibit list that we produced, you didn't

4  review anything for this case; is that right?

5  A.  I don't believe so.

6           MR. SALAM:  Objection.

7           Strike that, your Honor.

8           MR. DAVIS:  I'm sorry, I didn't hear the answer.

9           THE WITNESS:  With my attorney, I went through the

10  exhibit list, the Defendants' exhibit list and the Plaintiff's

11  exhibit list.

12  BY MR. DAVIS:

13  Q.  So did your attorneys, and I will say -- when I say today

14  "prior attorneys," I mean Mr. Leavens, Mr. Strand,

15  Ms. Liberman, Mr. Life, Mr. Stamatis, Mr. Shonder.

16           Do you understand that?

17  A.  Yes.

18  Q.  When I say the "prior attorneys," I mean all of them, and

19  if I have a specific question about a specific attorney, I

20  will identify them.

21           Can we agree on that?

22  A.  Understood.

23  Q.  Okay.  And is it your testimony today that your attorneys

24  made you aware in January of 2018 that Plaintiffs were

25  claiming that you and your company withheld documents from

Duke - Direct

1    production in this case?

2    A.  I don't recall the exact time frame that I was made aware

3    of it, but it was somewhere in that period of time.

4    Q.  I just want to be clear.

5         You were made aware of that claim, though, that you

6    and your company withheld documents in this case, right?

7    A.  I believe closer to March as opposed to January, though,

8    but, yes, I was made aware.

9    Q.  Do you recall which attorney told you first?

10   A.  I do not.

11   Q.  Do you recall what they told you about it?

12   A.  I remember searching for e-mails.  I remember being told

13   to search for certain e-mails that they felt had not been

14   handed over or whatever you would say.

15             MR. SALAM:  Your Honor, I would like to object.

16             THE COURT:  Hold on one second.

17             All right.  Go ahead, Mr. Salam.  What's the

18   objection?

19             MR. SALAM:  Just so we can get this on the record.

20             THE COURT:  Sure.

21             MR. SALAM:  I would object on the basis of

22   attorney-client privilege.  I'm willing -- I am fine with my

23   client discussing the conversations as it relates to the

24   motion for sanctions and the issues of discovery violations.

25   To the extent, otherwise, I would say that it's a limited

Duke - Direct

1    waiver, understanding I'm not asking you to rule on that at

2    this point, and not for any other purpose.

3            THE COURT:  So is there an objection I need to rule

4    on?

5            MR. SALAM:  Okay.  At this time, no.  I just want to

6    forewarn the court to the extent it goes beyond the discovery

7    issues, I will be objecting and trying to at least assert, for

8    the record, a limited waiver.

9            THE COURT:  Okay.  And I appreciate that.

10           MR. SALAM:  I'm sorry to interrupt, your Honor.

11           THE COURT:  I appreciate that.

12           Here's my view, and anybody who has tried a case in

13   front of me will tell you this is how I try a case:

14           Now, again, for the third or fourth time, there is no

15   jury here.  I am not the straw that stirs this drink.

16           MR. DAVIS:  I'm sorry, your Honor?

17           THE COURT:  I am not the straw that stirs this drink,

18   okay?  I don't need to be part of the show.  I'm here to help.

19   If there is objections, I will rule on the objections.  I will

20   take all the evidence.  I will make a ruling.  I don't want to

21   be the center of this.  It's the clients' case, not mine,

22   okay?

23           So put on your evidence as best you can.  Make

24   objections as best you can.  I will make rulings.  And then we

25   will have a record.  But I'm not running the show.  I'm just

Duke - Direct

1   calling balls and strikes, okay?

2           MR. DAVIS:  Thank you, your Honor.

3           THE COURT:  So go ahead, Mr. Davis.

4           MR. DAVIS:  Thank you.

5   BY MR. DAVIS:

6   Q.  So I'm clear, you don't recall the name of the attorney

7   that first told you about Plaintiff's claim that you

8   were -- that you and your company were withholding documents

9   in this case; is that right?

10  A.  I remember in March of that year discussing with Travis

11  Life certain e-mails, but that's what I recall.

12  Q.  And we will get to those specific communications.  Your

13  attorneys and other attorneys have produced your e-mail

14  communications with Mr. Life.

15          You are aware of that, right?

16  A.  Yes.

17  Q.  Okay.  And you authorized those documents to be produced?

18  A.  Yes.

19  Q.  Okay.  And do you recall what Mr. Life told you in March

20  of 2018 about the allegations that you and your company had

21  withheld documents in this case?

22  A.  Not exactly.  It wasn't anything like that.  It was more

23  of "We need to look for these certain e-mails.  Can you please

24  send us these e-mails?"  I don't remember him saying much more

25  than that.  It was pretty much limited to, "Hey, we need to

1    find these e-mails.  Can you please look these up?" kind of

2    thing, which was not inconsistent with, in the past, when they

3    had been looking for e-mails, and I would look up e-mails.  So

4    I don't think I was fully aware of what was going on.

5    Q.  And we will get to your process of gathering e-mails.

6    That's going to be something we are talking about today.

7         But the last thing you just said, you weren't aware

8    of everything that was going on, is that what you just said?

9    A.  Yes, I was definitely not aware of the scope or the

10   magnitude of what was occurring.

11   Q.  And why do you say that?

12   A.  Because I know I have done nothing wrong, so I can't

13   imagine that I would be accused of anything.  So I figured

14   what was happening is there was a mixup with the e-mails,

15   there was some unintentional mistakes by attorneys.  It wasn't

16   a big deal.  I was unaware that it was of this magnitude.

17   Q.  And is that because your attorneys didn't provide you with

18   a copy of the motion papers and explain to you what the

19   problems were, the allegations by Plaintiffs that you and your

20   company withheld documents in this case?

21   A.  I just simply don't recall if I saw that.

22   Q.  So they may have told you that or may not; you just don't

23   recall as you sit here?

24   A.  I do not recall as I sit here today.

25   Q.  Okay.  And, again, the prior attorneys I referenced, did

Duke - Direct

54

1    they also provide you, if you recall, with a copy of

2    Plaintiff's motion to amend the summary judgment motion and

3    for sanctions that Plaintiffs filed in April of 2018?

4    A.  I remember seeing a sanctions filing recently.  I don't

5    recall seeing all of this stuff in 2018, no.  I'm not saying I

6    didn't see it.  I just do not recall.

7    Q.  So your testimony is that it could be that your

8    attorney -- your prior attorneys, gave you copies of all the

9    motions to look at, and you just don't recall if you received

10   them?

11   A.  It's possible, yes, I don't recall them.

12   Q.  All right.  We have talked about the January 2018 motion

13   for summary judgment, right?  I just want to go back here and

14   make sure.

15   A.  Yes.

16   Q.  You are aware that that motion was filed where Plaintiffs

17   claimed you and your company withheld documents, right?

18   A.  You are telling me that it was filed, yes.  I believe you.

19   Q.  So independent of me telling you that, you had no

20   knowledge of it?

21   A.  As I said, in March, I discussed with Travis Life that

22   there was some issue with e-mails, that's what I recall

23   happening, over the phone.  I do recall -- I do remember that

24   phone call.

25   Q.  Over the phone.

Duke - Direct

55

1          And were there e-mails also?

2     A.  Well, I sent the e-mails, what they were looking for, yes.

3     Q.  And what I'm talking about is after the conversation in

4     March, the next month is April of 2018, right?

5     A.  Yes, it is.

6     Q.  And are you aware that Plaintiffs filed another motion

7     with the court in April of 2018 seeking to amend their summary

8     judgment and seeking sanctions against you and your company

9     for withholding documents?

10         Are you aware of that?  It is a second motion.

11    A.  I don't recall.

12    Q.  You don't recall reading that motion with your attorneys?

13    A.  If I could see it, I could maybe have a better

14    recollection, but I do not recall seeing it, no.

15         MR. DAVIS:  I ask the witness be shown Docket 239.

16    BY MR. DAVIS:

17    Q.  Actually, look at the screen in front of you when Docket

18    Entry 239 in this case comes up.

19         I ask you to take a look at it and tell me if you

20    recognize it.

21    A.  Can I move this page?

22    Q.  I don't know.

23         THE COURT:  You can go to the next page.

24         MR. DAVIS:  Go to the next page.

25         THE COURT:  That's not going to be helpful for you.

Duke - Direct

56

1           Go to the next one.

2           Keep going.

3           MR. DAVIS:  Keep going.

4           THE COURT:  Start with that.

5           MR. SALAM:  Your Honor, may I ask a question?

6           Is there a way that we can get hard copies?  It is

7  going to be much easier for the witness to review the document

8  if he actually has it.

9           THE COURT:  Sure, there is a way, is if you have

10  copies and you give it to him, but I'm not going to make

11  copies and give it to him.

12          MR. SALAM:  I don't know if Plaintiffs counsel had

13  hard copies of these.

14          MR. DAVIS:  I don't.  At the last hearing, you said

15  this was electronic.  We came last week, set up, to avoid

16  making all the copies.

17          MR. SALAM:  That's fine, your Honor.

18          THE WITNESS:  Can someone scroll to the next page,

19  please?

20          MR. DAVIS:  Yes.  If you need to see another page on

21  a document, please, just ask.

22          THE WITNESS:  Next page, please?

23          And next page, please?

24          It looks somewhat familiar.  I don't recall.

25

Duke - Direct

1   BY MR. DAVIS:

2   Q.  What about take a look at the next page?

3            THE COURT:  Which would be Page 5.

4            MR. DAVIS:  Page 5 of Docket 239.

5   BY MR. DAVIS:

6   Q.  Do you see that?

7            Anything in there refresh your recollection?

8   A.  No.

9   Q.  Okay.  Do you recall speaking to any of your attorneys

10  about this motion?

11  A.  If this is the motion that we were filing the response to,

12  then yes.

13  Q.  Okay.  But you don't have any independent recollection, as

14  you sit here, about this document or speaking to your

15  attorneys about it?

16  A.  In May of 2000 -- or was that this year, May of 2019?

17            No, I do not recall this.

18  Q.  You are just guessing now; is that right?

19  A.  No, I saw April, and I'm thinking, well, May, I met with

20  my attorneys, but I think that is May of 2019.  It is not May

21  of 2018.  So, no, I do not recall this.

22  Q.  So in May of 2018, you recall meeting with your attorneys

23  to talk about this motion?

24  A.  I just said May of 2019.

25  Q.  Understood.

Duke - Direct

1    All right.  And I'm trying to make sure that you are

2  fully aware of what Plaintiffs have charged you and your

3  company with, and you have now seen this document, and at the

4  time it was filed on April 6 of 2018, you were represented by

5  your prior attorneys; isn't that right?

6  A.  Yes.

7  Q.  I think at that time, Ms. Liberman was no longer with the

8  Leavens Strand firm; is that right?

9  A.  Correct.

10  Q.  Right?

11    And since the time in April 2018, are you aware that

12  there has been many court hearings regarding issues raised in

13  Plaintiff's motion to supplement its summary judgment and for

14  sanctions?

15    Are you aware of that?

16  A.  In hindsight, I am aware that there were hearings, yes.

17  Q.  Is it your testimony that when those hearings were taking

18  place, you were unaware of what was happening in your case?

19  A.  Yes.

20  Q.  Is it your testimony that none of your prior attorneys

21  advised you that there were hearings taking place in this

22  court before Judge Johnston in relation to Plaintiff's motion

23  for sanctions against you?

24    MR. SALAM:  Objection, your Honor, foundation.  I

25  know he is asking "Are you aware?"  Can we get a time period

Duke - Direct

59

1   that we are dealing with here?  I think that's creating some

2   confusion.

3           THE COURT:  Why don't you try with a time frame.  It

4   is a foundational question, but if you could narrow it, maybe

5   he will be able to --

6           MR. DAVIS:  Sure.

7           THE COURT:  Because I don't know what has happened

8   since, but a reasonable person would think in light of the

9   75-page motion for sanctions, seeking sanctions under almost

10  every conceivable basis that was filed in March of 2019, that

11  there was some discussions at some point.  So if you could

12  kind of give a time frame, that might help.  It may help.  It

13  might not help.  We will find out.

14          THE WITNESS:  Thank you, your Honor.

15          MR. DAVIS:  Thank you.

16  BY MR. DAVIS:

17  Q.  Do you have any recollection of the first time your

18  attorneys told you, after April of 2018, that there was going

19  to be a court hearing about the sanctions being sought against

20  you and your company by Plaintiffs?

21  A.  I do not.

22  Q.  Do you recall, after April of 2018, the first time any of

23  your prior attorneys told you about any court hearing in this

24  case?

25  A.  Yes, they would tell me there was a hearing today, but

Duke - Direct

60

 1   there was not any, necessarily, huge discussions about the

 2   hearings.  Like I was in California.  They were here.  We

 3   weren't meeting about it.  We weren't necessarily discussing

 4   things.  But I knew that there would be hearings as they were

 5   occurring.

 6   Q.  All right.  And what I'm trying to understand is you

 7   previously said, as you were sitting here on the stand today,

 8   you were in the dark about something.

 9        What did you mean by that?

10   A.  I didn't grasp what sanctions were.

11   Q.  So I understand, your testimony is that you knew about the

12   court hearings, but you didn't know about the severity of what

13   the sanctions that were being sought against you and your

14   company were; is that right?

15   A.  That would be accurate, and I also didn't know what the

16   court hearings were about.  My lawyers didn't say, "Oh, today

17   is the hearing about sanctions, today is the hearing about

18   this."  There would be hearings.  They would say, "Today was a

19   hearing."  I had very limited discussions about what would

20   happen in these hearings.

21   Q.  And in those communications where you had limited

22   discussions, you didn't ask your attorneys what was going on

23   in the case?

24   A.  If I had limited discussions, I asked them in those

25   limited discussions, yes.

Duke - Direct

61

1   Q.  In this scenario, though, in this case, you are the

2   client, right?

3   A.  Yes.

4   Q.  And aren't you asking your attorneys, "You went to a

5   hearing.  What's happening?  What happened today?"

6   A.  I was trusting my attorneys.  So whatever they were doing,

7   I was trusting them to do it.

8   Q.  Okay.  I also want to confirm that you have received,

9   read, and are aware of the Plaintiff's sanction motion that

10  was filed against you and your company on March 25th of 2019.

11  A.  I did.  Yes, I definitely read that one.

12  Q.  And that's Docket Entry 294, right?

13          You recall the number of it?

14  A.  No.

15  Q.  All right.  I want to make sure you read the whole thing.

16  There was a memorandum, right, a brief, plus a declaration

17  with lots of exhibits attached to it.

18          Did you see all of that?

19  A.  I don't know about the exhibits.  I read it.  I don't know

20  about the exhibits.

21  Q.  You read the motion, though?

22  A.  Yes.

23  Q.  Okay.  And do you recall reviewing any of the supporting

24  documents or exhibits at all or just the references in the

25  brief to them?

Duke - Direct

1  A.  Just the references in the brief.

2  Q.  All right.  And how did you learn about the filing of the

3  sanctions motion on -- that was filed on March 25th, 2019?

4  A.  From my attorneys.

5  Q.  And that's your prior attorney, right?

6  A.  Prior attorney, yes.

7  Q.  Right.  I just want to keep that clear for the record

8  today, your prior attorney.

9        And who is the one that told you about it?

10 A.  I do not recall.

11 Q.  Would it have been a phone call or an e-mail?

12 A.  I would have to think that would have been risen to the

13 level of a phone call.  I don't recall the actual phone call,

14 but -- I don't recall.

15 Q.  Do you recall what you were told by your attorneys, your

16 prior attorneys?

17 A.  They just sent it to me.  I read it and we discussed it.

18 Q.  All right.  And did you begin immediately investigating

19 the accusations and claims in the motion that Plaintiffs made

20 against you and your company?

21 A.  No.

22 Q.  You didn't?  You did nothing?

23 A.  Well, I don't believe any of it, so what am I going to do

24 about it?

25 Q.  So in response to that motion, you did nothing?

Duke - Direct

63

 1   A.  Their job was to file an answer to it.  That's not my job.

 2   There is nothing I could have done about it.

 3   Q.  So there was nothing you did in connection with your

 4   business in response to the motion, right?

 5   A.  No.

 6   Q.  You didn't contact your ESI vendors about where your data

 7   was or was it stored properly, right?

 8              MR. SALAM:  Objection, foundation, your Honor.

 9              THE COURT:  Overruled.  It is a foundational

10   question.

11              THE WITNESS:  I personally did not, no.

12              THE COURT:  And I assume you are calling this witness

13   as an adverse witness under 615?

14              MR. DAVIS:  I am, your Honor.

15              THE COURT:  Okay.  Go ahead.

16              Thank you.

17              THE WITNESS:  Your Honor, can you explain what that

18   means?

19              THE COURT:  Well, he doesn't represent you, right?

20   So he is calling you in his case.  So that allows him to ask

21   leading questions.

22              THE WITNESS:  Okay.

23              THE COURT:  Okay.  That's what that means.

24              THE WITNESS:  Thank you, sir.

25              THE COURT:  You're welcome.

Duke - Direct

1  BY MR. DAVIS:

2  Q.  And, again, I'm turning your attention to after you got

3  the motion, just to confirm, you did nothing in response to

4  receiving and reading that motion, right?

5  A.  No, I was annoyed and frustrated and furious.  It's

6  outrageous claims in there.  So, yes, I was angered.

7  Q.  Angered.

8       But you didn't do anything specifically in response

9  to the motion yourself?

10  A.  My lawyers were writing the response.  I was not writing

11  the response, so no.

12  Q.  Outside of your lawyers writing a response to the motion,

13  did you or anyone in your company do anything in response to

14  the motion?

15  A.  I do not understand your question.  No, we didn't do

16  anything.

17  Q.  What part of my question don't you understand?

18       THE COURT:  He just answered it, "No, we didn't do

19  anything."

20       MR. DAVIS:  Thank you, your Honor.

21  BY MR. DAVIS:

22  Q.  Okay.  So before July 2019 --

23  A.  Right.

24  Q.  -- none of your company e-mails or any company web-based

25  data or cloud-based data had ever been copied or preserved,

Duke - Direct

65

1  right?

2  A.  No.

3       MR. SALAM:  I'm sorry.  Can I have the question read

4  back, your Honor?

5       THE COURT:  All right.  Hold on one second.

6       "Q.   So before July 2019, none of your company

7  e-mails or any company web-based data or cloud-based data

8  had ever been copied or preserved, right?

9       "A.   No."

10      THE WITNESS:  That's false.  Your statement is false,

11  to be clear.  That's what I mean by "no."

12  BY MR. DAVIS:

13  Q.  All right.  Now I'm confused.

14      I had asked if it had ever been done, and you said

15  "no."  That is confirming it was never done.  Are we

16  speaking -- do we understand each other?

17  A.  You said the data has never been preserved or copied,

18  correct?  Never been preserved?

19  Q.  Before July of 2019, none of your company e-mails had ever

20  been preserved fully, right?

21  A.  False.

22  Q.  Okay.  When did it happen before July 2019?

23  A.  I have never deleted an e-mail, so they have all been

24  preserved.

25  Q.  That's not my question.

Duke - Direct

66

1          All right.  Before July 2019, none of your company

2   e-mails had ever been preserved or copied or backed up in any

3   way, fully, right?

4          MR. SALAM:  Objection, your Honor.  I would like --

5          THE COURT:  Basis?

6          MR. SALAM:  I would say foundation based on

7   vagueness.  I'm not sure what he means by "fully."

8          THE COURT:  Overruled.

9          You can break it up into bite-sized pieces, if you

10  want.

11         THE WITNESS:  Well, every e-mail is backed up right

12  now, so I don't understand the question.

13         THE COURT:  He is asking you before July 2019.  So we

14  are now in October of 2019.  He is saying before 2019, have

15  any of your e-mails been preserved?

16         THE WITNESS:  All e-mails have been preserved at all

17  times.

18         THE COURT:  At all times.  Okay.

19         Go ahead and ask the next question.

20  BY MR. DAVIS:

21  Q.  So your testimony is today that since January of 2009, you

22  have never lost one e-mail from your e-mail account; is that

23  right?

24  A.  False.

25  Q.  Explain, please.

Duke - Direct

67

```
 1   A.   There was an auto-delete function on some of my e-mail
 2   accounts.  So there is some sent e-mails -- if you sent an
 3   e-mail and it was never replied to, some e-mails are lost.
 4   Q.   Okay.
 5   A.   But only e-mails that literally were never replied to.  An
 6   e-mail that was replied to would be in my inbox.  All the
 7   inbox e-mails are still there.
 8   Q.   So I'm clear, and we will get into the auto-deletion
 9   issue, but my question is prior to July of 2019, neither you
10   nor your company ever made a copy of your e-mail accounts; is
11   that right?
12   A.   I don't understand what you mean by a "copy."
13   Q.   Okay.  If I take a piece of paper like this one in front
14   of me, right, this is the original, right?
15   A.   Yes.
16   Q.   And I'm holding up my outline and notes?
17   A.   Yes.
18   Q.   I go to a copy machine, right?
19   A.   Yes.
20   Q.   You have used a copier?
21   A.   I have.
22   Q.   I push the copy button, right?
23   A.   Okay.
24   Q.   Out comes a copy?
25   A.   Correct.
```

Duke - Direct

68

1   Q.  You understand what I mean by "copy"?  You have got the

2   original and a copy, understand?

3   A.  Okay.

4   Q.  Same with electronic data, right?

5   A.  Okay.

6   Q.  When you say it's -- and my question is:  Prior to July of

7   2019, neither you nor anyone at your company ever made a copy,

8   a full copy, of your e-mail accounts; isn't that correct?

9   A.  I'm getting a little lost with this question.  I'm sorry.

10          You are talking like the ESI discovery type, or what

11  exactly are you talking about?

12  Q.  I'm talking about your e-mail accounts, right?

13          So we know from your deposition in this case that you

14  have a bduke@yahoo.com e-mail account, right?

15  A.  No, brentduke, I have that one.

16  Q.  Thank you.

17          That's the one you have been using for like 20 years,

18  right?

19  A.  Yes.

20  Q.  Yes.

21          You use it for personal stuff?

22  A.  Yes.

23  Q.  And you use it in connection with the business stuff?

24  A.  Yes.

25  Q.  Okay.  And I'm saying before July of 2019, right?

Duke - Direct

69

1    A.  I have never copied the e-mails.  I have preserved them,

2    but I have never copied them.

3    Q.  All right.  So in your mind, there is a difference between

4    preserving and copying, right?

5    A.  Yes.

6    Q.  Okay.  And my question is:  At no time prior to July of

7    2019 did you ever make a copy of your Yahoo! e-mail account?

8    A.  Okay, yes, that would be accurate.

9    Q.  That's accurate.  Right.

10          And prior to July of 2019, neither you nor anyone

11   made a copy of your GoDaddy e-mail accounts, right?

12   A.  Of the entire account, no.

13   Q.  Right.

14   A.  Yes.

15   Q.  Right.

16          And prior to July of 2019, no one made a copy of any

17   of your web-based data; is that right?

18   A.  Correct, a full copy, correct.

19   Q.  Right.

20          And prior to July of 2019, no one ever made a

21   complete copy of your cloud-based data; do you understand

22   that?

23          MR. SALAM:  Objection.

24          THE COURT:  Basis?

25          MR. SALAM:  Foundation.  I'm not sure what he means

Duke - Direct

1  by "web-based data" or "cloud-based data."

2         THE COURT:  He is a very smart individual.  If he has

3  any confusion as to the vagueness of the question, I'm sure he

4  will say he doesn't understand it.  He has already done that

5  multiple times when he doesn't understand the question.

6         So overruled.

7         If you don't understand a question, Mr. Duke, just

8  say you don't understand it and explain why you don't

9  understand.

10        THE WITNESS:  Okay.  Thank you, your Honor.

11        THE COURT:  Not a problem.

12        MR. DAVIS:  Did you understand my question?

13        THE WITNESS:  Can you repeat it?

14 BY MR. DAVIS:

15 Q.  Prior to July of 2019, nobody -- you, nobody on your

16 behalf -- made a complete copy of any of your cloud-based

17 data, right?

18 A.  I don't really have cloud-based data.  I don't understand

19 what you mean by that.

20 Q.  All right.  Is it your testimony you have no data that you

21 control in any way in any cloud-based application?

22 A.  Outside of e-mail?

23 Q.  Outside anything.

24 A.  Well, e-mail is cloud-based.

25 Q.  Okay.

Duke - Direct

 1    A.   So that's cloud-based data.

 2              Are you talking about something else, or are you

 3    talking about e-mail right now?

 4    Q.   Well, I said e-mails, and then my second question was

 5    web-based.

 6              Outside of e-mails, what falls in the web-based

 7    bucket?

 8    A.   That's what I'm asking you.  It is your question, right?

 9    Q.   But you answered the question, so I thought you understood

10    the question, and you gave me an answer.

11              So I'm asking you to clarify how you answered my

12    question, and you said it had never been done.

13    A.   The web-based e-mails is what you were discussing, right?

14    Q.   No, I said e-mails first.

15    A.   Yes.

16    Q.   Then I said web-based data of any kind.

17    A.   So including e-mails?

18    Q.   Yes.

19    A.   Okay.  So, yes, it had, obviously, not been -- obviously,

20    no, because, yes, if e-mails are part of that, if the e-mails

21    were not --

22    Q.   The easy question is before July of 2019, neither you nor

23    anyone at your company ever copied any of your data at all,

24    right, in full?

25    A.   Any of my data at all?  That's false.

Duke - Direct

1   Q.  That's false.  Okay.

2           And when you say that, you mean there could be a copy

3   of a piece of the data.  That's why I'm breaking it down.

4           Did anyone ever copy all of your e-mails before July

5   of 2019?

6   A.  No.

7   Q.  And did anyone ever copy, before July of 2019, any of your

8   web-based data entirely?

9   A.  That's where you are losing me.  So web-based e-mails are

10  part of web-based data, so no.

11  Q.  And tell me what the other part of the web-based data is.

12  A.  That's what I don't know what you are adding.  That's what

13  I'm asking you.

14  Q.  Right.  And I'm asking you.  It is your company.  It is

15  your data.

16          Other than e-mails, in your mind, you have something

17  that you are excluding from e-mails.  So what is it?

18  A.  No, you are lumping something in with e-mails.

19  Q.  All right.  So put the e-mails aside.

20          THE COURT:  Stop, stop, stop.

21          Do you know if you have any web-based data from your

22  company?  First question.

23          THE WITNESS:  Outside of e-mails?

24          THE COURT:  Outside of e-mails.

25          THE WITNESS:  I cannot think of anything.

Duke - Direct

1      THE COURT:  Okay.  So if you don't know if there is

2  any web-based data outside of e-mails, you are not going to

3  know whether it was copied or preserved, fair?

4      THE WITNESS:  And, also, if he is including e-mails

5  in web-based data, then, obviously, it wasn't all copied

6  because web-based data plus e-mails would be the entirety of

7  it, and that's where I'm not quite understanding.

8      THE COURT:  We have covered the web-based e-mails.

9  Now we are talking about web-based data.

10      THE WITNESS:  Yes, I can't think of any web-based

11  data outside of e-mails that was not preserved.

12      MR. DAVIS:  Could you repeat the answer back?

13      THE COURT:  He said, "Yes, I can't think of any

14  web-based data outside of e-mails that was not preserved."

15      That's what you said, right, Mr. Duke?

16      THE WITNESS:  Yes.

17  BY MR. DAVIS:

18  Q.  And can you think of any data that was not copied?

19  A.  Like in a cloud, some type of data in a cloud?  Is that

20  what you are discussing?

21  Q.  Anything that's web-based is what I'm talking about.

22  A.  The only thing that was not copied that was web-based that

23  I can think of is e-mails.  I don't know what else would be

24  web-based.  So I'm not sure what we are talking about.

25  Q.  Well, isn't your understanding that your website is

Duke - Direct

1    web-based?

2    A.   It is on my hard drive, though.  So it has been copied.

3    Q.   Got it.

4         And all the files related to your website -- and

5    which website are you talking about?

6    A.   21centurysmoking.com.

7    Q.   Those are all on your laptop?

8    A.   They should be, yes.

9    Q.   Should be or are?

10   A.   I can't think of why they wouldn't be.  They should be,

11   yes.  They are on my laptop.

12   Q.   They are?

13   A.   Yes.

14   Q.   Okay.  And I would ask that Plaintiff's Exhibit 66 be

15   displayed to the witness.

16        In front of you now is a document we have marked as

17   Plaintiff's Exhibit 66.  I ask you to look at it and tell me

18   if you recognize it.

19   A.   Can we scroll down?

20        Yes.

21   Q.   How do you recognize it?

22   A.   It's a very recent document, so I don't have to go back

23   far in memory.

24   Q.   And before it was filed by your attorneys in this case,

25   you reviewed it, right?

Duke - Direct

1   A.  Yes.

2   Q.  And this document is a report to the court about all of

3   your and your company's electronically stored information; is

4   that right?

5   A.  Yes.

6   Q.  And when I say "electronically stored information," you

7   understand what I'm saying, right?

8   A.  Yes.

9   Q.  And what is it?

10  A.  E-mails, social media, stuff like that, anything that's

11  not saved on a hard drive, that's in the cloud.

12          THE COURT:  How about chats?  Do you understand chats

13  are considered electronically stored information?

14          THE WITNESS:  Well, I guess, yes.  So anything on my

15  computer or anything that is electronically stored.

16          THE COURT:  Communication on your computer.

17          THE WITNESS:  Okay.

18          THE COURT:  So that would include, for example,

19  Yahoo! chats.

20          THE WITNESS:  Yes.

21          THE COURT:  You understand that's encompassed in it,

22  ESI?  Do you understand that?

23          THE WITNESS:  I do now, yes.

24          THE COURT:  Okay.  That's why we are doing this.

25          THE WITNESS:  Right.  Thank you.

Duke - Direct

 1   BY MR. DAVIS:

 2   Q.  And I ask you to look at Plaintiff's Exhibit 66, and if we

 3   continue, Page 3, and continue on for me until, there, Page 4;

 4   do you understand what's being listed there?

 5   A.  Yes.

 6   Q.  And what is it?

 7   A.  A list of people and the e-mail accounts that they had

 8   with 21centurysmoking.com.

 9   Q.  And these were all e-mail accounts that are part of your

10   GoDaddy e-mail?

11   A.  Yes.

12          MR. DAVIS:  Okay.  Next page?

13          And next page?

14   BY MR. DAVIS:

15   Q.  Page 6, what is this a listing of here, at the bottom,

16   under the e-mail accounts?

17          Do you understand what that is?

18   A.  More e-mail accounts.

19   Q.  And some of those are not with your company account; is

20   that right?

21   A.  Yes.

22   Q.  And why are they listed here?

23   A.  Because when we did this, whatever this thing is -- what

24   is it?

25          Whatever this thing is called, we were trying to make

Duke - Direct

1    it all-inclusive of everything that possibly could have been

2    because the Judge had said everything that possibly could have

3    been at 1535 North Ashland, find everything, look for

4    everything.  So we went over the top, and there is things

5    listed there that are totally irrelevant to this case, but we

6    put every single thing that was possible to find

7    electronically in this document.

8    Q.  Okay.  And all that information came from you and -- it

9    came from you, right?

10   A.  Yes.

11   Q.  Did it come from anyone else?

12   A.  Well, yes, they had to talk to other people to get some of

13   this information.

14   Q.  All right.  But you were the primary source of the

15   information for this document?

16   A.  I would say so, yes.

17   Q.  And that was filed with the court on August 13th, 2019?

18   A.  Yes.

19         MR. DAVIS:  And next page.

20   BY MR. DAVIS:

21   Q.  And in that first paragraph on Page 7, it says:

22         "These last three e-mails account were used in

23   Craigslist postings that no longer exist?"

24   A.  Yes.

25   Q.  Is that right?

1    A.  Yes.

2    Q.  What does that mean?

3    A.  Like we would post Craigslist ads all over the country

4    trying to get people to go to our website, so you can't use

5    the same e-mail over and over again.  So we had multiple

6    e-mails that we would use.  We would use our -- my

7    brentduke@yahoo, my wife's e-mails, and then these three

8    e-mails as well to post these ads.  We did that for a very

9    brief time period.

10   Q.  And those were used in what time period, though, 2009?

11   A.  Yes.

12   Q.  All right.  And those were all lost, right?

13          I see at the top there, the last three listed there,

14   it says "not recoverable" on the right column; is that right?

15   A.  Because we never used them again, yes.

16   Q.  My question isn't whether you used them.

17          My question is those were not recovered, right?

18   A.  Correct.

19   Q.  That means they are lost?

20   A.  Yes.

21   Q.  Forever?

22   A.  Correct.

23          MR. DAVIS:  Okay.  Next page.

24   BY MR. DAVIS:

25   Q.  On Page 8, there is a listing here of devices.

Duke - Direct

1          Do you see that?

2     A.  Yes.

3     Q.  What is that?

4     A.  It's the -- all of the computers that are still currently

5     in my house.

6     Q.  And how is it that there is more than four listed there?

7     A.  Because my college computer is listed there, a computer I

8     used 15 years ago is listed there; my wife's computer is

9     listed there, a laptop that she doesn't use for business; and

10    a desktop that was never really used -- or never used at all

11    in the course of business.  So there is four that would have

12    been used for this business, four that are totally unrelated.

13    Q.  All right.  And the right side, it says "location."  It

14    lists "office desk" -- sorry, the first one is "main device."

15    That's your main --

16    A.  I believe that's my laptop.

17    Q.  Okay.  And the next one says "office desk"?

18    A.  Yes.

19    Q.  And the next one says "office desk"?

20    A.  Yes.

21    Q.  And the next one says "office desk"?

22    A.  Yes.

23    Q.  And then "garage," and then three list "office," right?

24    A.  Yes.

25    Q.  Those are all at your company's office?

Duke - Direct

1  A. Yes -- well, no, they are in the office in my house.

2  Q. Does your company have an office outside the office at

3  your home?

4  A. No, we have an office in our house at this point.

5  Q. So when it says "office," it means they are in your

6  business office?

7  A. Yes.

8  Q. Okay. And prior to --

9  A. Can I clarify?

10  Q. Please.

11  A. It says "office," but these were things that were in the

12  garage that we then brought into the office. So when the ESI

13  discovery people came to the house to get these, they took

14  them out of the office, but these were not kept in the office.

15  These were from the garage, some of these. Like I don't have

16  my Sony Vaio computer from 20 years ago sitting in an office.

17  It was just sitting in the garage.

18  Q. Okay. And it also says there was an issue with your

19  wife's phone. Was that resolved?

20      Do you know what I'm talking about?

21  A. No, it was not resolved.

22  Q. Do you see under -- it says "Duke Phones," and there is an

23  asterisk?

24  A. I said, no, it was not resolved.

25  Q. Oh, I'm sorry, I thought you said you don't understand.

Duke - Direct

1              It is still unresolved?

2    A.  Yes.

3    Q.  Do you know who is working on that?

4    A.  It is an unresolvable issue because she doesn't know

5    whatever the password is that she needs to know to be able to

6    do this.  So there is some password she must have put in at

7    some point.  She doesn't know what it is, so there is no way

8    to get to that data to my understanding.

9    Q.  So I'm clear, when you say it is still unresolved, it

10   sounds like it is resolved, and it will never be resolved, is

11   that right?

12   A.  I'm not the expert on this.

13              THE COURT:  Hold on one second.

14              He answered.

15              If you don't understand the question, go ahead.  If

16   you can answer it, answer it.  If you don't, tell him you

17   don't understand, and we will try to figure it out.

18              THE WITNESS:  Okay.  Thank you.

19              MR. DAVIS:  The next page of the exhibit.

20   BY MR. DAVIS:

21   Q.  All right.  Do you see Page 9 in front of you of the

22   Exhibit 66?

23   A.  Yes.

24   Q.  All right.  These list social media accounts, right?

25   A.  Yes.

1  Q.  And you understand that all to be electronically stored

2  information, right?

3  A.  I wouldn't have before doing this, but I guess now, yes.

4  Q.  Before doing this, you didn't understand that like a

5  social media account, like Instagram, was based on electronic

6  information?

7  A.  I didn't realize that it was electronically stored

8  information.  Something that is just available to the public,

9  I didn't realize it was a part of this, no.

10 Q.  And no one had ever explained that to you before August of

11 2019?

12 A.  No.

13 Q.  And to be clear --

14        THE COURT:  Hold on one second.

15        Okay.  Go ahead.

16 BY MR. DAVIS:

17 Q.  And to be clear, when I say anyone, I'm including your

18 prior attorneys.  They never explained to you what

19 electronically stored information was before August of 2019?

20 A.  They did explain to me what electronically stored

21 information was.

22 Q.  Do you recall when that was?

23 A.  A very early meeting with Mr. Leavens, he explained not to

24 delete anything, and that was probably the very first time I

25 met with him.  "Don't delete any documents, don't delete any

Duke - Direct

1   data, don't delete anything from your computer because it is

2   going to be searched at some point and discovered," or

3   whatever the term is.  "Someone is going to come, look through

4   your computer.  Don't delete any documents.  Make sure

5   everything is still there."  That's what was explained to me.

6   Q.  All right.  And did he explain to you that included all of

7   your e-mail accounts?

8   A.  I don't know if he specifically said e-mail.  It went

9   without saying, but I don't know if he specifically said

10   e-mail.

11   Q.  Did you understand his instructions to include e-mails?

12   A.  Yes.

13   Q.  And did it include social media accounts?

14   A.  I never even thought about social media accounts in that

15   way.

16   Q.  What about did his instructions include web-based

17   services?

18   A.  Can you give me an example of a web-based service?

19   Q.  Sure.

20        I will draw your attention to Plaintiff's Exhibit 66

21   in front of you.  Page 9 is displayed.  Section D says:

22   "Other Web-Based Services."

23        Do you see that?

24   A.  Yes.

25   Q.  You reviewed this document?

Duke - Direct

84

1  A.  Yes.

2  Q.  You understood what it meant when you read it the first

3  time?

4  A.  Yes.

5  Q.  You authorized and approved this to be filed on behalf of

6  yourself and your company on August 13, 2019?

7  A.  Yes.

8  Q.  What does it mean?

9  A.  I didn't create these subheadings, so I don't know

10 exactly -- I don't know exactly what searching Authorize.Net

11 or any of my payment processes would have to do with anything

12 related to this case.  So I don't fully understand why all

13 this stuff is here or what the point of it is.  So I don't

14 understand.  I don't know.

15 Q.  Do you understand -- are you familiar with Amazon?

16 A.  Yes.

17 Q.  Are you familiar with Carbonite?

18 A.  Yes.

19 Q.  Are you familiar with Dropbox?

20 A.  I don't really use it, but, yes, I know what it is.

21 Q.  I'm sorry?

22 A.  I don't really use it, but, yes, I know what it is.

23 Q.  Do you know what eBay is?

24 A.  Yes.

25 Q.  Do you know what PayPal is?

Duke - Direct

1  A.  Yes.

2  Q.  Do you know what Zen Cart is?

3  A.  Yes.

4  Q.  Do you know what RankPop is?

5  A.  Yes.

6  Q.  Do you know what Groupon is?

7  A.  Yes.

8  Q.  Do you understand all those to be web-based services?

9  A.  Yes, I guess that makes sense.

10 Q.  Well, I'm not asking if it makes sense.  I'm asking you to

11 confirm that you understand that those services are web-based

12 services.

13 A.  Yes.

14 Q.  They are?

15 A.  Yes.

16 Q.  No question in your mind?

17 A.  No question in my mind.

18 Q.  And all the things listed here are web-based services that

19 you or your company used in connection with your business,

20 right?

21 A.  Yes.

22 Q.  And the last two, RankPop and Groupon, do you see those

23 two?

24 A.  Yes.

25 Q.  Your glasses okay?

Duke - Direct

 1   A.   No.  But, yes, I see them.

 2   Q.   Okay.  After RankPop, on the right, it says:  "Data not

 3   recoverable provider."

 4           What does that mean?

 5   A.   I believe they went out of business.

 6   Q.   Do you know when they went out of business?

 7   A.   I do not.

 8   Q.   Can you look at the asterisk after the word "RankPop" and

 9   look at the first asterisk footnote?

10   A.   They went out of business in 2014.

11   Q.   Outside of the information in this document, do you have

12   any personal knowledge of that?

13   A.   No, I don't recall how that got there.  I don't recall if

14   I found that or if they found that independent of me.

15   Q.   And prior to -- prior to this report being filed in August

16   of 2019, neither you nor anyone at your company made a copy of

17   your RankPop web-based service account; is that right?

18   A.   There is no RankPop account that could have been copied.

19   Q.   Is it your testimony that neither you nor your company had

20   a web-based account with RankPop?  You didn't use their

21   services in any way?

22   A.   We used their services.  They posted on our social media

23   and things, but there was no account set up with them.  They

24   would do -- they would do posting for us on our social media

25   websites.  That's what we paid them for.

Duke - Direct

1   Q.  And they would -- and they would have an online account

2   that maintained the information that they were -- and services

3   they were doing for you and your company, right?

4   A.  You can just look on my Facebook.  That would be all of

5   the stuff that they did.

6   Q.  Right.

7           It is all there?

8   A.  Yes.

9   Q.  All right.  So it says here "Data not recoverable by

10  provider."

11          What does that mean?

12  A.  I don't know.

13  Q.  So your testimony today is you have all your RankPop data

14  available, preserved, and ready to be searched; is that right?

15  A.  If you go on my Facebook page, you will see it.

16  Q.  Got it.

17          And all the RankPop data is limited to just your

18  Facebook account?

19  A.  That's where they primarily did their work.  They posted

20  blogs.  I believe all the blogs link to my Facebook.  So I

21  don't know what else they did, but I believe most of what they

22  did would have been on my Facebook, but everything they did is

23  social-media based.  So anything should be searchable.  There

24  would be a time period where if you look through my social

25  media accounts, it was their work.

Duke - Direct

1   Q.  Okay.  And on that same page, under "Social Media," those

2  were all your and your company's social media accounts, right?

3   A.  To the best of my knowledge, yes.

4   Q.  So for today, my shorthand, when I say "ESI," you know

5  what I'm referring to, right?

6   A.  Like discovery stuff.

7   Q.  Electronically stored information.  Do you understand

8  that?

9   A.  Okay.  Okay.  Yes.

10   Q.  All right.  I just want to use that as a shorthand because

11  that's what has been in the motions, that's what we all talk

12  about, and your attorneys have talked to you about ESI, right?

13   A.  Yes.

14   Q.  All right.  And you understand what it is?

15   A.  Yes.

16   Q.  It is electronically stored information?

17   A.  Okay.  Got it.

18   Q.  Do you understand?

19   A.  Got it.

20   Q.  And that's all the stuff that's in this report, this P-66

21  we just reviewed, right?

22   A.  Yes.

23   Q.  e-mails?

24   A.  Yes.

25   Q.  Do you understand?  Yes?

Duke - Direct

89

1      Social media accounts that you have, right?

2   A.  Yes.

3   Q.  Web-based services, right?

4   A.  Yes.

5   Q.  All your hardware, hard drives on your computers, and your

6   phones, right?

7   A.  Yes.

8   Q.  You understand that's what "ESI" is now?

9   A.  Yes.

10      THE COURT:  Hold on one second.

11      In your mind, would the Yahoo! Chat be a web-based

12  service?

13      THE WITNESS:  Yes.  I mean, it was part of -- it was

14  integrated into Yahoo! Mail at some point, yes.

15      THE COURT:  Okay.  All right.  Thank you.

16  BY MR. DAVIS:

17  Q.  And you had described how Yahoo! is your Yahoo! e-mail

18  account.  You have used that for 20 years, and it is your

19  primary e-mail account, right?

20  A.  Yeah.  19, 20 years, yes.

21  Q.  19, 20 years.

22      Yes, I think in 2015, you said 15 years, so that's

23  where I got the 20 from.

24      And since 2012, January of 2012, you have continued

25  to use that Yahoo! e-mail account, right?

Duke - Direct

90

1   A.  Yes, it is my primary e-mail account, yes.

2   Q.  And used it continuously since that time, through today?

3   A.  Yes.

4   Q.  And since 2012, you have continued to use your company

5   GoDaddy e-mail accounts, right?

6   A.  Can you repeat that question?

7   Q.  Yes.

8        Since the year 2012, when this lawsuit started, you

9   were using your two e-mail accounts that are your GoDaddy

10  accounts, right?

11  A.  Yes.

12  Q.  And those are what?

13       For the record, identify them.

14  A.  bduke@21centurysmoking.com is the primary.

15       THE COURT:  Hold on.  bduke@21centurysmoking.

16       THE WITNESS:  .com.

17       THE COURT:  .com.

18       Just so you know, in my head, you are "Smoking," and

19  Mr. Bengoa is "Smoke."

20       So you have got bduke@21centurysmoking.com.

21       What's the next one?

22       THE WITNESS:  support@21centurysmoking.com.  I don't

23  really use that one as much.  I usually use the

24  bduke@21centurysmoking.com or the brentduke@yahoo.com.

25       THE COURT:  So the bduke@21centurysmoking.com and

Duke - Direct

1    support@21centurysmoking.com, those are the two GoDaddy

2    accounts?

3              THE WITNESS:  Yes.

4              THE COURT:  Any other GoDaddy accounts?

5              THE WITNESS:  The ones that are listed on here, but I

6    don't use those other ones.

7              THE COURT:  Okay.  That was going to be my next

8    question.  Did you ever use those GoDaddy accounts for work?

9              MR. DAVIS:  Displaying now Page 6 of P-66.

10             THE WITNESS:  Do you want me to go through all these

11   e-mails accounts?

12             THE COURT:  Yes.

13             Let's start with -- we know that you used

14   bduke@21centurysmoking.com.

15             THE WITNESS:  The bduke@evtcigs was something I

16   believe I created in, like, 2015 or 2016.

17             The bduke@farmers --

18             THE COURT:  Hold on.

19             Did you use that evtcigs?

20             THE WITNESS:  I never actually sent an e-mail --

21             THE COURT:  I'm sorry?

22             THE WITNESS:  I never actually used it for anything.

23             THE COURT:  That was my question.

24             How about bduke@farmersolution.com?

25             THE WITNESS:  Yes, this is very old.  This is from,

Duke - Direct

92

1    like, 2008, maybe.  2008, 2009, something like that.

2            THE COURT:  Did you ever use it for work?

3            THE WITNESS:  For this work or for Farmer Solution

4    work?

5            THE COURT:  I don't know what Farmer Solution is.

6            THE WITNESS:  I was trying to -- I was working with

7    Farmers at that time, trying to -- I branched away from the

8    company I was working with and was trying to -- because I

9    needed to be working at home.  So I was trying to create a

10   company that I didn't really -- this came along.  I stopped

11   doing that.  I don't know if there is one or two e-mails in

12   there.

13           THE COURT:  So bduke@farmersolution.com didn't relate

14   to or do work regarding electronic cigarettes --

15           THE WITNESS:  Absolutely not.

16           THE COURT:  -- fair to say?

17       Okay.

18           THE WITNESS:  And then brandon@21centurysmoking.com

19   would be my brother.  I don't know if he ever really used it

20   that much.  I certainly did not use it.

21           bryan@21centurysmoking would be Bryan Kos.  I never

22   used it.

23           froggieandjim would be some employees we had in Ohio.

24   I never used that one.

25           info@automaticcigarettes, that would be the other

Duke - Direct

93

1    brand I had.  I don't know if I ever used that one.  I might

2    have, but not for this company.

3            jason@21centurysmoking.com, I believe, is a gentleman

4    who set up a -- it is up here -- yes, it is a customer who set

5    up his own store.  I never used that e-mail.

6            krenar@21centurysmoking.com is someone who is doing

7    wholesale stuff.  I never used his e-mail.

8            laurie@21centurysmoking.com, my wife, I never used

9    that e-mail.

10           rob@21centurysmoking.com would be Rob Link.  Again, I

11   didn't use that e-mail.

12           robert, same thing, I didn't use that e-mail.

13           sales@21centurysmoking.com, I don't know what that

14   is.  So I'm not sure if I ever used that.  I don't know what

15   it is.

16           spraker@21centurysmoking would be Steve Spraker, I

17   did not use that e-mail.

18           support, as I have said before, I did use that

19   e-mail.

20           support@sportsdoctrine.com, I don't know if I ever

21   sent e-mails from that, but that would be from 2007.

22           support@wholesaleelectroniccigarettes.com, I do not

23   recall if I ever did anything on that one either, I don't

24   think so, not related to this company.

25           test@21centurysmokes.com, I don't think I ever used

1   that.

2           test@21centurysmoking.com, I don't think I used that.

3           wholesale@automaticcigarettes.com, no idea if I used

4   that one.

5           And then brentduke@yahoo.com and this

6   21centurysmoking@yahoo.com.

7           THE COURT:  It says "in process."

8           THE WITNESS:  I'm not sure what that one is.  That

9   might be related to doing Craigslist ads as well.  I'm not

10  sure.

11          brentlaurieduke@yahoo.com, I think that is also

12  relating to the Craigslist.

13          laurie.duke@yahoo.com is my wife's old e-mail.  She

14  still has it.  She doesn't really use it.

15          And then bsd and those last three, they are,

16  obviously, not GoDaddy either, but those ones are all for the

17  Craigslist stuff.

18          THE COURT:  All right.  Okay.  Thank you.

19          Go ahead, Mr. Davis.

20          MR. DAVIS:  Thank you, your Honor.

21  BY MR. DAVIS:

22  Q.  And, Mr. Duke, turning back to Page 6 of this list, for

23  example, when you said brandon@21centurysmoking.com, I believe

24  your testimony was "I never used it."  Is that what you said?

25  A.  Yes.

Duke - Direct

95

1   Q.  But someone used it, right?

2   A.  My brother may have used it.  It was his e-mail.  I didn't

3   go through his e-mails.  He may never have used it.  I have no

4   idea if he used it.

5   Q.  Right.  And before August -- strike that.

6           Before July of 2019, none of these e-mail accounts

7   listed here, no one had ever made a copy of the entire e-mail

8   accounts; is that right?

9   A.  Correct.

10  Q.  And that's the same -- I could ask you the same question

11  for anyone on this list, and that would be true, right?

12  A.  Absolutely, yes.

13  Q.  Right.

14          And when you said, "I don't use it," for example,

15  like robert@21centurysmoking.com, one of your employees named

16  Robert used that account, right?

17  A.  Possibly.

18  Q.  Did you have employees that worked for your company?

19  A.  Yes.

20  Q.  Did you give them e-mail accounts for your company on your

21  GoDaddy account?

22  A.  Yes.

23  Q.  Did you tell them to use their company e-mails?

24  A.  I didn't direct anyone to use them.  Some people did; some

25  people didn't.

Duke - Direct

96

1   Q.  So for each e-mail account that you set up here on your

2   GoDaddy account, there are e-mails being received and sent

3   from them, right?

4   A.  If they used them, right.

5           THE COURT:  Okay.  Pause for a second.

6           So you have these employees.  You give them the

7   e-mail accounts that are GoDaddy accounts, and they all end

8   with "21centurysmoking.com," right?

9           THE WITNESS:  Correct.

10          THE COURT:  And you have said a couple of times "if

11  they used those accounts," right?

12          THE WITNESS:  Correct.

13          THE COURT:  So to your knowledge, were your employees

14  using other e-mail accounts for work purposes other than the

15  21centurysmoking.com e-mails?

16          THE WITNESS:  I -- as an example, Jim and Froggie, I

17  can't see any reason at all why they would need to use a

18  21 Century Smoking e-mall address, other than to send sales

19  forms back and forth.  I don't know if they also used their

20  personal e-mail addresses to send sales forms back and forth

21  or if they even used this.  I haven't looked through these

22  people's e-mails to see.  I know Rob Hough did not like to use

23  this e-mail, so he would use his personal e-mail.  So when I

24  e-mailed Rob Hough, I would e-mail robhough@live.com.

25          THE COURT:  Hold on one second.

1          You e-mailed Rob Hough.  Spell that.

2          THE WITNESS:  The robert@21centurysmoking.com, that

3    one down there.

4          THE COURT:  Okay.  Robert@21centurysmoking.

5          And Howe, H-o-w-e?

6          THE WITNESS:  H-o-u-g-h.

7          THE COURT:  Or the other version, H-o-u-g-h.

8          So he was using his own personal e-mail account for

9    work purposes?

10          THE WITNESS:  Yes, he didn't like to use this e-mail.

11    He didn't like it.

12          And Steve Spraker wasn't a huge fan of it, so he

13    would forward the e-mails to his personal account.

14          THE COURT:  Steve Spraker, I know that is on here

15    somewhere.

16          THE WITNESS:  So like the spraker@21centurysmoking --

17          THE COURT:  Hold on.  We can't talk over each other.

18          Okay.  Steve Spraker, S-p-r-a-k-e-r.

19          What did Robert Hough and Steve Spraker do for 21

20    Century Smoking?

21          THE WITNESS:  Robert Hough was the guy who did phone

22    calls, he did website stuff for us, just kind of a do-it-all

23    guy.  He did a little bit of everything in our warehouse.

24          THE COURT:  Okay.

25          THE WITNESS:  Steve Spraker was like a co-owner of

1    the store in Ohio and the store in Chicago.

2            THE COURT:  Co-owner of a store, okay, Ohio and

3    Chicago.  All right.

4            Any idea what personal e-mail accounts Robert Hough

5    used when he was doing work for 21 Century Smoking?

6            THE WITNESS:  I believe he was like @live.com or

7    something like that.

8            THE COURT:  At what .com?

9            THE WITNESS:  Like @live.com, robhough@live.com or

10   something like that.

11   BY MR. DAVIS:

12   Q.  Is that @live.com?

13   A.  Something like that, yes.

14           THE COURT:  Okay.  And how about Steve Spraker, what

15   e-mail account did he use for work purposes, if you know?

16           THE WITNESS:  I do not recall.

17           THE COURT:  Okay.  All right.

18           THE WITNESS:  I believe that my discovery team has

19   been reaching out to these people, though, and asking which

20   e-mails they are using and then getting the e-mails.  It is

21   the best they can.  No one deleted e-mails.  I made sure

22   everyone knew this whole time not ever to delete anything.  So

23   whether it was on this or whether it was on their personal

24   e-mails, it should all still be there.

25           THE COURT:  So any time before August 13, 2019, any

1    idea if Robert Hough's e-mails used -- any e-mails sent from,

2    received by the @live e-mail account relating to 21 Century

3    Smoking, were those preserved, if you know?

4            THE WITNESS:  They should all be preserved, yes.

5            THE COURT:  They should all be preserved.

6            What's your basis for thinking that they are all

7    preserved?

8            THE WITNESS:  Because I should have it in my e-mail

9    because I would have sent him e-mails.  So I would have sent

10   him from brentduke@yahoo.com to roberthough@live.com.  So in

11   searching my brentduke, I would think that you get all the

12   Robert Hough e-mails that were related to me.

13           THE COURT:  How about e-mails -- his work e-mails

14   that went to people other than you?

15           THE WITNESS:  He wouldn't have been e-mailing anyone

16   other than me.  Maybe support@21centurysmoking.com to e-mail

17   my wife, but he wouldn't have been e-mailing customers or

18   anything like that.

19           THE COURT:  Okay.  How about Steve Spraker, his

20   e-mails, were those preserved, if you know?

21           THE WITNESS:  I believe that he told my team that he

22   does have all of those e-mails still preserved.

23           THE COURT:  Okay.  Before August 13th of 2019, do you

24   know if Steve Spraker's e-mails were preserved?  And that's

25   his personal e-mail account, not this 21centurysmoking, which

1   apparently he didn't like to use.  I'm asking about whatever

2   else he was using.

3           THE WITNESS:  Yes, that's what I'm talking about,

4   what I just said.  Like when my team reached out to him about

5   his personal e-mail accounts, they said that he had them.  To

6   the best of my knowledge, he still has all of those e-mails.

7   He saved them all.

8           THE COURT:  All right.  As to Robert Hough's

9   work-related e-mails that were sent or received at the @life

10  e-mail account --

11          THE WITNESS:  I think live, l-i-v-e.

12          THE COURT:  -- @live e-mail, were those searched for

13  this case, if you know?

14          THE WITNESS:  As of right now?

15          THE COURT:  As of August 13th, 2019.

16          THE WITNESS:  I believe my team reached out and

17  talked to him, so I'm -- I don't know where they are in terms

18  of where they are in getting this information.

19          THE COURT:  Okay.  How about Steve Spraker, as of

20  August 13th, 2019, regarding his e-mails sent from or received

21  to whatever personal e-mail accounts that he was using that

22  were not the 21centurysmoking, were those preserved, if you

23  know?

24          THE WITNESS:  To the best of my knowledge, yes.

25          THE COURT:  Have those been searched as of

Duke - Direct

101

1    August 13th, 2019?

2            THE WITNESS:  My counsel, Sean, would know this

3    better than me where they are in terms of this production, but

4    I don't know exactly where they are at with all these

5    individuals.  They did custodian individuals, I believe they

6    are called, with every single one of these people, and they

7    found out every single e-mail address that every single person

8    had and could have used, and they were supposed to be

9    searching all of them.

10           THE COURT:  Okay.  When did you know Robert Hough was

11   not using his 21centurysmoking e-mail account for work

12   purposes and using the @live or @life e-mail account?

13           THE WITNESS:  I mean, he preferred to be e-mailed to

14   his personal e-mail.  If he was doing something, sending out

15   to a customer or something business related, he would use this

16   robert or he used support, but if it was me and him

17   communicating, he much preferred me just to write to his

18   personal e-mail.

19           THE COURT:  Okay.  When did you know he was doing

20   that?

21           THE WITNESS:  I mean, whenever he was working for me.

22   2011, 2012, when he was working for me.

23           THE COURT:  All right.  How about Steve Spraker?

24   When did you learn that he was using his personal e-mail

25   account for work purposes?

Duke - Direct

1        THE WITNESS:  He was actually forwarding e-mails from

2    this account to his personal account.  The same, he taught me

3    how to do that because I would much rather just use my Yahoo!

4    account as well.  So he was forwarding all the stuff to, I

5    believe, his Gmail account, and I think from very early on,

6    whenever I gave this to him.  I think it was pretty quickly

7    thereafter forwarding all of the e-mails.

8        So they would be in this inbox if something was sent

9    to him that was business related, but it would also have been

10   sent to his Gmail account, and he may very well have been

11   replying out of his Gmail account.

12       THE COURT:  Okay.  So when did you learn Steve

13   Spraker was using a non-work e-mail account for work purposes?

14       THE WITNESS:  That would have been back in 2010,

15   2011, 2012, I mean the whole time he was working there.

16       THE COURT:  Okay. All right.  Go ahead, Mr. Davis.

17       MR. DAVIS:  Thank you, your Honor.

18   BY MR. DAVIS:

19   Q.  And focusing your attention now back to the GoDaddy --

20       THE COURT:  It is 11:00 o'clock.

21       MR. DAVIS:  Excuse me?

22       THE COURT:  It is 11:00 o'clock.  We are going to

23   take a quick break, okay?

24   (Recess taken.)

25       THE CLERK:  Recalling 12 CV 50324, DR Distributors,

Duke - Direct

1    LLC v. 21 Century Smoking, Inc.

2            THE COURT:  Okay.  So, Mr. Duke, I was asking you

3    some questions about Robert Hough and Steve Spraker's e-mail

4    that was sent from and received at their personal accounts,

5    not their 21 Century Smoking accounts, and I had asked whether

6    they had been preserved, and you talked a little bit about

7    that, and I'm trying to find on the transcript here, I thought

8    you said something about they should be preserved on your

9    e-mails as well.

10           Did I hear you right on that, that if Robert Hough

11   sent you an e-mail from his @live e-mail account, you would

12   have that on your e-mail account as well; is that correct?  I

13   could be wrong.  I'm just trying to remember.

14           THE WITNESS:  Yes.  So if he sent me an e-mail, and

15   they are searching my e-mails, I should have all the e-mails

16   he sent me.

17           THE COURT:  Okay.  Now, if you replied to Robert

18   Hough at the @live e-mail account, would that have been

19   preserved?

20           THE WITNESS:  If I replied to him from

21   brentduke@yahoo.com, yes.  If I replied to him from any other

22   account, and he replied back, yes.

23           THE COURT:  Okay.  Well, when did the

24   auto-purge -- did the auto-purge apply to e-mails sent from

25   your account?

Duke - Direct

104

1    THE WITNESS:  It applies to e-mails that were sent,

2  but never were replied to.  So if I sent an e-mail, and I got

3  an e-mail back, it is going to have the e-mail chain.

4    THE COURT:  But never replied to?

5    THE WITNESS:  Yes.  So only e-mails that I sent that

6  never got a reply, because if I got a reply, then I'm going to

7  have in my inbox what I sent and the reply.

8    THE COURT:  All right.  How about if Bob Hough sent

9  you an e-mail about a topic and you picked up the phone and

10  you called him?

11    THE WITNESS:  If he sent me an e-mail, I would have

12  it because it only auto-purged sent e-mails.  It did not

13  auto-purge the inbox.

14    THE COURT:  Okay.  So any e-mails -- just to be

15  clear, any e-mails from Robert Hough that were sent from the

16  @live e-mail account to you, those have been preserved as far

17  as you know?

18    THE WITNESS:  Absolutely, yes.

19    THE COURT:  Okay.  Go ahead, Mr. Davis.

20    MR. DAVIS:  Thank you, your Honor.

21  BY MR. DAVIS:

22  Q.  And when you say "preserved," you mean they are just

23  sitting in his active, live, being used e-mail account?

24  A.  He said any e-mails from Robert Hough to me are preserved

25  because we have done this discovery, and we have done

Duke - Direct

1   discovery on my e-mail accounts.

2   Q.  Got you.

3        But before August of 2019, there was no preservation

4   of that account, right?

5   A.  Correct.

6   Q.  Right.

7        And just to be clear --

8   A.  There is no copy of the account, but there was

9   preservation.

10  Q.  Right.

11       I understand, in your mind, preservation is different

12  than making a copy of it, right?

13  A.  Yes.

14  Q.  Got it.

15       And prior to August of 2019, no copies were made of

16  these accounts; is that right?

17  A.  Not no copies.

18  Q.  No one made an entire copy of your GoDaddy e-mail account,

19  right?

20  A.  Not the entire account, no.

21  Q.  And there was no copy made of Robert Hough's e-mail

22  account, right?

23  A.  Correct.

24  Q.  And there was no copy made of Robert Link's account,

25  right?

Duke - Direct

1   A.  Correct.

2   Q.  And there was no copy made of Steve Spraker's account,

3   right?

4   A.  Correct.

5   Q.  And no copy made of Krenar Koleci, right?

6   A.  Correct.

7   Q.  And no copy made of Bryan Kos, right?

8   A.  Correct.

9   Q.  And no copy made of Jim Shimp, right?

10  A.  Correct.

11  Q.  And no copy made of Brandon Duke, right?

12  A.  Correct.

13  Q.  And no copy made of Laurie Duke's account, right?

14  A.  Correct.

15  Q.  And no copy made of your account, right?

16  A.  Correct.

17          THE COURT:  Okay.  Hold on one second.

18   (Brief pause.)

19          THE COURT:  Do you want the last question and answer

20  read back?

21          MR. DAVIS:  Please, your Honor.

22          THE COURT:  Okay.  Sorry for interrupting.

23   (Record read.)

24  BY MR. DAVIS:

25  Q.  And I'm directing your attention now back to Exhibit P-66,

Duke - Direct

1    which is in front of you.

2           See Page 4 in front of you?

3    A.  Yes.

4    Q.  Again, that's Docket 318.

5           Do you see the entry there that's the one, two,

6    three -- the fifth one down, it says "Robert Hough"?

7    A.  Yes.

8    Q.  And you see the last one on Page 4, it says "Steve

9    Spraker"?

10   A.  Yes.

11   Q.  All the information in here was given to the ESI vendor,

12   that wrote this report, from you, right?

13   A.  Or they talked with Steve Spraker.

14   Q.  Or they talked with Steve Spraker or Robert Hough, right?

15   A.  Yes.

16   Q.  And I'm looking in the Robert Hough entry.  Where does it

17   talk about him using his live account to e-mail with you?

18   A.  It doesn't talk about that.

19   Q.  And I'm looking at the Steve Spraker entry.  Where does it

20   talk about in there using his personal e-mail account to

21   communicate with you?

22   A.  It does not.

23   Q.  And --

24   A.  It says, "Defense counsel was able to locate his work

25   phone number, left him a message, and waiting to talk to him."

Duke - Direct

1    So since, they have talked to him.  This is only a status

2    report.  This doesn't have the full information.

3    Q.  Right.

4          But they spoke to you, right?

5    A.  Yes.

6    Q.  And you didn't tell them anything about the story you just

7    told the Judge about this live account and this personal

8    account, right?  It is not listed here?

9    A.  Because this is describing the people who have e-mail

10   accounts with my company.  It is not describing every e-mail

11   account they have ever had.

12   Q.  Where does it say in this report that this ESI company is

13   going to be looking at Mr. Spraker's personal account or

14   Mr. Hough's live account?  Where does it say that?

15   A.  They had yet to discuss this with Mr. Spraker.

16   Q.  And you didn't tell them about it, right, because it is

17   not listed here?

18   A.  I'm telling you because I know they have talked to

19   Mr. Spraker.  So I'm telling the Judge because I know they

20   have talked to Mr. Spraker.  So I'm telling you more than is

21   on this report.

22   Q.  Telling us more.

23         And how do we know the ESI company is going to be

24   doing that work and looking into these two e-mail accounts if

25   it is not listed here in their report they filed with the

Duke - Direct

109

1    court on August 13th, 2019, which you reviewed and approved?

2           MR. SALAM:  Objection to the form of the question,

3    your Honor.

4           THE COURT:  Overruled.

5           Go ahead and answer, if you can.

6           THE WITNESS:  This is where they were at when this

7    was filed.

8           THE COURT:  So something has happened between

9    August 13th and October 28th of 2019?

10           THE WITNESS:  Absolutely, your Honor.  They are

11    moving forward every day.

12           THE COURT:  Okay.

13    BY MR. DAVIS:

14    Q.  Have they given you an updated report?

15    A.  We have not taken the time to do an updated report that I

16    have seen.

17    Q.  Okay.  One of the things Judge Johnston asked you was your

18    understanding that chat was included in ESI.

19           Do you recall that question?

20    A.  Yes.

21    Q.  And you answered "yes," correct?

22    A.  Yes.

23    Q.  And I want to understand when you say "chat," does that

24    mean instant messaging accounts that are available?

25    A.  Yes, that's how I understood it.

Duke - Direct

1   Q.  That's how you understood it?

2   A.  Yes.

3   Q.  And that includes all the instant messaging accounts that

4   you used as part of your business; is that right?

5   A.  Yes.

6   Q.  And as far as you know, that includes the Yahoo! Messenger

7   chat application?

8   A.  Yes.

9   Q.  Okay.  And all of the GoDaddy e-mail accounts for your

10  company listed in this report, those were continuously used,

11  whether heavily or lightly, by the people you assigned them

12  to, right, since the time you opened those accounts?

13          Is that right?

14  A.  I have not looked at many of those accounts, so I don't

15  know.

16  Q.  You don't know.

17          You don't know how much they were used, but they were

18  used to some degree?

19  A.  I believe some of them, like Krenar, I believe, was not

20  used at all.  So I believe some were not used at all.

21  Q.  Okay.  At some time in 2014, you and your company, with

22  the assistance of your prior attorneys, you hired an ESI

23  vendor.

24          Do you understand that?

25  A.  Yes.

Duke - Direct

1  Q.  What's the name of that company?

2  A.  I believe 4Discovery.

3  Q.  Were they ever called "Elijah"?

4  A.  No.

5  Q.  Was there ever another company that you contacted called

6  "Elijah"?

7  A.  My previous attorneys in May -- April, May, June,

8  somewhere in that range of this year, reached out to a company

9  called "Elijah," I believe.

10 Q.  And that's -- as you recall, that's the first time you

11 ever spoke to an ESI vendor or heard of one called "Elijah"?

12 A.  To the best of my knowledge, yes.

13 Q.  Can I ask that H Exhibit, Leavens Strand -- I called it

14 the "HK" -- Holland & Knight -- Exhibit 13, but it is the

15 Leavens Strand Exhibit 13 be displayed.

16        THE COURT:  Give me a moment.

17        MR. DAVIS:  Your Honor, just for housekeeping, I move

18 P-66 into evidence.

19        THE COURT:  Any objection to P-66?

20        MR. SALAM:  No objection.

21        THE COURT:  All right.  That will be admitted.

22   (Plaintiff's Exhibit 66 was offered and received in

23   evidence.)

24        THE COURT:  Hold on.  I still do old school.

25        Okay.  It is admitted.

Duke - Direct

1            And then you said you call it the Holland & Knight

2    exhibit, and it is 13, you said?

3            MR. DAVIS:  Yes.

4            THE COURT:  Okay.  It is up on the screen.  Let's use

5    that.

6            Do you have that in front of you, Mr. Duke?

7            THE WITNESS:  I do, your Honor.

8            THE COURT:  Okay.  Go ahead.

9    BY MR. DAVIS:

10   Q.  And I will ask you to take a look at the second page of

11   what is displayed in front of you and identify this as

12   LS Exhibit 13.

13           Look at the second page.  I will ask you -- this is

14   an e-mail string, right, so you go to the last page to read

15   forward, right?

16   A.  Yes.

17   Q.  Do you understand that, Mr. Duke?

18   A.  Yes.

19   Q.  Okay.  And you recognize this as an e-mail string?

20   A.  Yes.

21   Q.  And does this refresh your recollection as to

22   communications or hiring an ESI vendor named "Elijah"?

23   A.  I don't believe we hired them.  I believe we hired

24   4Discovery.  I don't know if we were getting quotes.  I have

25   no idea what this is.

Duke - Direct

113

1  Q.  Fair enough.

2        And this is in November of 2014?

3  A.  Yes.

4  Q.  And this is an e-mail communication between you and one of

5  your prior attorneys, Ms. Liberman?

6  A.  Yes.

7  Q.  Is that right?

8  A.  Yes.

9  Q.  Okay.  Do you recall getting this e-mail?

10  A.  I'm looking at it.  I don't recall it.  But, yes, I'm

11  looking at it.  So yes.

12  Q.  Any doubt in your mind that this e-mail made its way from

13  her computer to your computer and you read it?

14  A.  No, I believe that I read it.

15  Q.  Okay.  And if you look at the top of the second page, it

16  says:  "Brent, See Andy's -- from Elijah's -- response below."

17        Do you understand that?

18  A.  Yes.

19  Q.  And you have no recollection of talking about an outside

20  vendor named "Elijah" at that time?

21  A.  We were, as I said, probably getting quotes.  So, no, I

22  wouldn't remember the company that we didn't choose five years

23  ago, no.

24  Q.  All right.  And look at the first page of this.

25        Do you recall writing back to Ms. Liberman?

Duke - Direct

114

```
1    A.  I'm reading it.  That's my writing.  I don't necessarily
2    recall it, but --
3    Q.  Okay.  And what's the date of your e-mail from your Yahoo!
4    account to Ms. Liberman?
5             Is that right?
6    A.  Monday, December 1st, 2014.
7    Q.  Yes.
8             And was that your --
9             THE COURT:  Let's pause for a second.
10            You said that's your writing.  You mean the
11   handwriting that's on there?
12            THE WITNESS:  No, no, that's the way I would write an
13   e-mail.
14            THE COURT:  Because there is handwriting on the
15   document.
16            THE WITNESS:  Yes.
17            THE COURT:  I just want to clarify the record.
18            Okay.  Go ahead.
19   BY MR. DAVIS:
20   Q.  And that was your practice, was to use your main e-mail
21   account, your yahoo.com account, when communicating with your
22   attorneys in 2014?
23   A.  Sometimes.
24   Q.  And the times when you didn't, which one did you use?
25   A.  Either the bduke@21centurysmoking.com or the
```

Duke - Direct

1    support@21centurysmoking.com.

2    Q.  So those are the three e-mail accounts that you were using

3    to communicate with your prior attorneys?

4    A.  Yes.

5    Q.  And that would be the same for 2012, as for 2013, and

6    2014; is that right?

7    A.  It would be the same until today.  Those are the three

8    e-mails I use.

9    Q.  Okay.  And you authorized the disclosure of this document

10   that's being displayed here in open court as LS Exhibit 13; is

11   that right?

12   A.  I don't know exactly what that means, I authorized.

13   Q.  Did you ever object to anyone producing this to the

14   Plaintiffs in this case?

15          This is a conversation between you and your

16   attorneys, right?

17   A.  Yes.

18   Q.  And we have it.  We have a communication between you and

19   your lawyers about your representation in this case.

20          Do you understand that?

21          MR. SALAM:  Your Honor, I will object,

22   attorney-client privilege, but, again, subject to the -- we

23   are not objecting as to this document, but we will object, if

24   appropriate, when the time comes to express our -- what we

25   believe is a limited waiver --

Duke - Direct

1        THE COURT:  Okay.

2        MR. SALAM:  -- of the attorney-client privilege for

3   matters unrelated to this alleged discovery misconduct.

4        THE COURT:  Okay.  So the foreshadowed objection is

5   going to be foreshadowed-ly overruled.

6        MR. SALAM:  Thank you, your Honor.

7        THE COURT:  You're welcome.

8        MR. DAVIS:  Do you understand my question?

9        THE COURT:  He is saying he got this document, and it

10  is your attorneys.  Did you know that the document was going

11  to be turned over to opposing counsel?

12       THE WITNESS:  I mean, I read it before.  I'm sure

13  they had it.  So I have no idea.  I mean, I guess my attorney

14  probably saw it.  I didn't ever see it until I saw it in that

15  binder.  So I don't know how to exactly answer that I

16  authorized it.

17       THE COURT:  So you saw it in the binder of the

18  exhibits that were going to be used today?

19       THE WITNESS:  Yes, yes.

20       THE COURT:  Okay.

21       THE WITNESS:  So I'm not sure if that is authorizing

22  it, but I did see it.  You have it.

23  BY MR. DAVIS:

24  Q.  Okay.  And so LS Exhibit 13, that's on your screen, is

25  talking about making copies of four hard drives, right?

Duke - Direct

1  A.  Yes.

2  Q.  And before June of 2018, that's the only time that copies

3  of those four computer hard drives was ever made, right?

4  A.  Yes.

5  Q.  And do you remember the date when those copies were made?

6  A.  I do not.

7  Q.  Do you recall if it was in December of 2014, about the

8  time of this e-mail that is LS Exhibit 13 that's in front of

9  you?

10  A.  Late December -- late 2014 at some point.  I don't

11  remember the exact time.

12  Q.  Okay.  And --

13  A.  Or maybe even early 2015.  I know it was after I moved to

14  California, but I don't know.

15  Q.  When did you move to California?

16  A.  September of 2014.

17        MR. DAVIS:  Plaintiffs move LS-13 into evidence.

18        THE COURT:  Any objection?

19        MR. SALAM:  Object, attorney-client privilege.

20        THE COURT:  Overruled.  It's admitted.

21  (Leavens Strand Exhibit 13 was offered and received in

22   evidence.)

23  BY MR. DAVIS:

24  Q.  In January of 2019, you had -- let me back up.

25        So ultimately, you know the name of the ESI vendor

Duke - Direct

1   that your prior attorneys hired, right?

2   A.  I think so, 4Discovery.  I don't think we used Elijah.

3   Q.  Okay.  And you know or somehow you were involved in the

4   process of them making a copy of the data on four computers

5   that were in your possession, right?

6   A.  Yes.

7   Q.  And you are aware that in January of this year, your

8   vendor, 4Discovery, confirmed that the data it captured from

9   those computers is lost and can't be recovered?

10          Are you aware of that?

11  A.  I have been told that, yes.

12  Q.  Could you repeat your answer?

13  A.  I have been told that, yes.

14  Q.  And who told you that?

15  A.  My previous attorneys, I believe.

16          MR. DAVIS:  Okay.  And can we have LS-14 displayed,

17  please?

18  BY MR. DAVIS:

19  Q.  Showing you now what has been marked as LS Exhibit 14,

20  produced by the attorneys -- your prior attorneys, have you

21  ever seen this before?

22  A.  No.

23  Q.  Is this the first time you are seeing it right now, as you

24  are sitting in court?

25  A.  I didn't see it previously.  I believe I saw it in

Duke - Direct

119

1   preparing for this today.

2   Q.  I'm sorry.  Could you --

3   A.  I did not previously ever see it.  I saw it, I believe, in

4   a binder preparing for today.

5   Q.  Prior to your preparation for the hearing with your

6   attorneys, who showed you this document, you have never seen

7   it before?

8   A.  No.

9           THE COURT:  All right.  When did you see it in

10  preparation for today's hearing, if you recall?

11          THE WITNESS:  A couple days ago, I believe.

12          THE COURT:  Okay.  That's fair.

13          And where?

14          THE WITNESS:  At the office of Mr. Salam.

15          THE COURT:  Okay.  And was it your understanding at

16  the time you were reviewing these documents in preparation for

17  your testimony in this hearing?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.  Thank you.

20  BY MR. DAVIS:

21  Q.  And do you understand what this document is?

22  A.  It looks like a meeting with me.  No, I don't know exactly

23  what it is.

24  Q.  Do you recall meeting with any one of your prior attorneys

25  on or about May 29, 2014?

1   A.  No.

2   Q.  And do you recall meeting on or about May 29, 2014, where

3   any of your lawyers confirmed not removing data as is stated

4   on the first line of this document?

5   A.  I don't know.  I don't understand the question.

6   Q.  Okay.  Directing your attention to the second bullet

7   point, can you read what that is on the document?

8   A.  Yes.

9   Q.  Okay.  What does it say?

10   A.  "What other custodians?  Wife?"  A sign pointing to

11   "Laurie."

12        "Use GoDaddy, Yahoo, bduke, support@."

13        "Rob hasn't worked in two years."

14        "ODesk" to "People help with website."

15        "Steve Spraker has done some invoicing for stores in

16   Ohio."

17        "Accounting, Excel spreadsheet."

18   Q.  Good.  I think you read it better than I did the first

19   time I read it.

20        On the right, after the word "Wife?", it says

21   "Laurie," right?

22   A.  Yes.

23   Q.  And "Use GoDaddy," do you know what that means?

24   A.  I'm assuming it's where the e-mail is stored, is GoDaddy.

25   Q.  Right.

Duke - Direct

1      And it says "Yahoo."  That's your other e-mail

2   account, right?

3   A.  Yes.

4   Q.  And under it, it says "bduke" and "support."

5      I mean, these are the e-mail accounts you have just

6   told us and testified those were your primary e-mail accounts,

7   right?

8   A.  Exactly.

9   Q.  Right?

10      And I'm representing to you we have been told this is

11   Ms. Liberman's/your prior attorney's handwritten notes about a

12   meeting she had with you, right?

13   A.  I have no idea.  You are telling me it was Ms. Liberman.

14   Q.  I'm going to represent to you -- she is expected to

15   testify about this, and she is going to be called as a

16   witness -- she is saying she spoke to you on May 29, 2014.

17      Do you understand that?

18   A.  I believe it, yes.  I would have told them everything.

19   Q.  And you would have told her about your e-mail accounts,

20   right?

21   A.  Of course, yes.

22   Q.  So on or about this date, she knew in a meeting with you

23   that you had those e-mail accounts and you used them, right?

24      MR. SALAM:  Objection, your Honor, foundation.

25      THE COURT:  I will sustain that as to this witness's

Duke - Direct

1   knowledge of her mental state.  If there is a statement as to

2   what was said in a conversation, that would be one thing, but

3   I will sustain the objection.

4   BY MR. DAVIS:

5   Q.  Do you recall if you met Ms. Liberman face-to-face on

6   May 29, 2014?

7   A.  I met Ms. Liberman face-to-face on numerous occasions.  So

8   I can't tell you, years ago, what days I met with her.

9   Q.  Do you remember a meeting where she said anything to you

10  about removing data, as suggested in the first line of this

11  document?

12  A.  I was told from the very first meeting ever with their

13  firm to not remove any data.  So I don't know how they are

14  confirming I wasn't removing data.  That seems consistent with

15  everything I was told and what I did.

16  Q.  Right.

17          And so removing data, what does that mean to you?

18  A.  It is her notes.  I have no idea what she means by that.

19  Q.  And in that meeting, she doesn't note anything in here

20  about telling you about copying your data or backing it up,

21  right?

22  A.  Not in these specific notes.  No, I don't see anything.

23  Q.  Okay.  And you see under the fifth item there, it says

24  "settlement"?

25  A.  Yes.

Duke - Direct

1    Q.  Do you recall having meetings with Ms. Liberman where you

2    spoke about settlement in May of 2014?

3    A.  I don't recall.

4    Q.  Do you remember any conferences with Ms. Liberman in May

5    of 2014 where you talked about experts in the case?

6    A.  I do not recall.  I don't recall this meeting.  I don't

7    recall any of this stuff.

8    Q.  I'm going through it to see if anything in the notes

9    prompts your memory.

10   A.  Okay.

11         MR. DAVIS:  Can I go to the second page, please?

12   BY MR. DAVIS:

13   Q.  The seventh item, can you read that?

14   A.  "Prepare to be deposed."

15   Q.  Do you recall a meeting in May of 2014 where you discussed

16   that with Ms. Liberman?

17   A.  No.

18   Q.  Do you know if you ever had any e-mails with Ms. Liberman

19   regarding not removing data?

20   A.  I do not recall.

21   Q.  Do you ever recall any e-mails or conversations with her

22   where she said preserve all your data and back it all up?

23   A.  I recall talking to Mr. Leavens and him telling me to

24   preserve all my data.  I do not necessarily remember

25   specifically discussing it with Ms. Liberman.

Duke - Direct

1    Q.   Okay.  And at the time you told her about your e-mail

2    accounts, did you give her access to those e-mails accounts,

3    give her your credentials to access the accounts?

4    A.   I don't recall.  I offered my credentials to my lawyers on

5    multiple occasions.  I don't recall which times they took them

6    and which times they didn't.

7    Q.   So let me unpack that a little bit.

8          Mr. Leavens was one of your prior attorneys that gave

9    you instructions about preserving and backing up data, right?

10   A.   Yes.

11   Q.   And he said back up your data?

12   A.   He said, "Preserve the data, keep all of your data."

13   Q.   Got it.

14         So he never told you to copy it, right?

15   A.   I had a meeting with all of the attorneys, including, I

16   believe, yourself probably was on the meeting where we

17   discussed copying data, and that's when I got the Carbonite

18   account.  So up until then -- that was the first time I

19   started copying my data is with Carbonite.

20         So it is whenever everyone had discussed how they

21   were preserving, like copying data, I guess.  That's when I

22   started copying data with Carbonite.  So whenever that meeting

23   was.  So that was my lawyers.  That was also your side.  That

24   was a larger meeting on some type of a conference call.

25   Q.   You understood that that was a court-ordered meeting,

Duke - Direct

1   right?  You were required by the Judge, Magistrate Johnston,

2   to attend that?

3   A.  I believe, yes.

4         THE COURT:  Yes.

5         THE WITNESS:  I was there.

6   BY MR. DAVIS:

7   Q.  Right.

8         You were on the phone, right?

9   A.  No, I was in person.

10  Q.  Oh, at your attorneys' offices?

11  A.  Yes.

12  Q.  And they wouldn't allow you to speak in that call, right?

13  A.  I don't recall.

14  Q.  You don't recall them telling you not to talk on the

15  conference call, and they would mute the call and then speak

16  to you about your answers?

17        You don't recall that?

18  A.  I don't recall the meeting.  The only thing I recall from

19  that meeting is I went home and set up Carbonite.  That's what

20  I recall from that meeting.

21  Q.  All right.  And prior to that time, none of your prior

22  attorneys ever told you to preserve any of your data prior to

23  that meeting?

24        MR. SALAM:  Objection, your Honor.

25        MR. SMITH:  Objection to the form, your Honor.

Duke - Direct

126

 1          THE COURT:  Hold on one second.  We have

 2  got -- Mr. Salam, stand up and make your objection first.

 3          MR. SALAM:  Objection, your Honor, that misstates his

 4  testimony.

 5          THE COURT:  Okay.  And, Mr. Smith?

 6          MR. SMITH:  It was the same objection, your Honor.

 7  He has testified repeatedly that he was told to preserve.

 8          THE COURT:  Okay.  Why don't you rephrase the

 9  question.

10  BY MR. DAVIS:

11  Q.  When was the first time you were told to preserve data by

12  any of your prior attorneys?

13  A.  The very first time I met with Mr. Leavens, he told me to

14  preserve everything.

15  Q.  And tell me specifically what he told you in that

16  conversation and when it was?

17  A.  He said, "We are now working together.  We now have

18  attorney-client.  You are now my client."  He sent me the

19  agreement, the retainer agreement.  We did a contract, and he

20  said, "Now that we are working together, you need to make sure

21  you preserve every single piece of data.  You cannot delete

22  things.  Do not delete anything."

23  Q.  Did he tell you anything else?

24  A.  He probably told me lots of things.  That's what I

25  remember about that specifically.

Duke - Direct

1    Q.  Got it.

2         And when you say he told you lots of other things,

3    I'm trying to understand what he told you about your

4    obligations in connection with ESI.

5         You said he told you to preserve it and not to delete

6    anything; is that right?

7    A.  Yes.

8    Q.  Did he tell you to do anything else?

9    A.  That's what I recall.

10   Q.  Okay.  And that was when you first met with him in 2012?

11   A.  Yes, I believe so.

12   Q.  And did you ever have the same conversation with

13   Mr. Strand at that time?

14   A.  I do not believe I have ever spoken with Mr. Strand.

15   Q.  And did you ever have that same conversation with

16   Ms. Liberman?

17   A.  I don't recall.

18   Q.  And do you ever recall receiving any e-mail from

19   Mr. Leavens outlining his advice to you about preserving your

20   data and not deleting it?

21   A.  I think it was verbal.  He said it to me though.

22   Q.  Okay.

23   A.  I heard it.  I understood it.

24   Q.  And he didn't give you any instructions outside of

25   "Preserve it and don't delete it," right?

Duke - Direct

1          MR. SMITH:  Objection, your Honor.  He has testified

2     to a limited recollection of conversations.  He has also

3     testified "He probably told me lots of other things."  And now

4     we are trying to refine it down to this limited recollection,

5     when the witness has already expressed the limits of his

6     recollection.

7          THE COURT:  That's good cross-examination, ain't it?

8     That's what you do in cross-examination.

9          Overruled.

10         MR. SMITH:  I thought I would take a shot at a bad

11    question, your Honor.

12         THE COURT:  Overruled.

13         We start big and go narrow.

14         THE WITNESS:  Can you repeat the question, please?

15         MR. DAVIS:  Sure.

16         Can I have that read back?

17    (Record read.)

18         THE WITNESS:  No, that's not true.

19    BY MR. DAVIS:

20    Q.  Okay.  What other instructions did he give you?

21    A.  I don't recall the entire conversation, as I stated.

22    Those are the things I do remember very specifically.  Send

23    him a check for $10,000 to sign the contract.  I mean, there

24    was other things he told me.  Those are the specific things I

25    remember with regards to what we are discussing today.

Duke - Direct

1    Q.  And when your attorneys come out and ask you about your

2    recollection of this conversation, you will have nothing

3    further to add than what you have just told me?

4    A.  I'm telling you what I remember from the conversation.

5    Q.  And that's the sum total of what you recall from that

6    conversation; is that right?

7    A.  It was probably a 20- or 30-minute meeting.  That's what I

8    remember from that conversation.

9          MR. DAVIS:  Okay.  And we move HK-14 into

10   evidence -- oh, no, strike that.  We will wait for that, your

11   Honor.  Sorry.

12   BY MR. DAVIS:

13   Q.  Did you -- when you said you offered your credentials for

14   your e-mail accounts to your attorneys, you mean Yahoo! and

15   your GoDaddy e-mail accounts, right?

16   A.  Yes.

17   Q.  And when was the first time you made that offer?

18   A.  I don't even recall.  I was constantly searching for

19   e-mails.  So I, at times, would be, like, "Would you guys

20   rather search these yourself?  Because this is a lot of stuff,

21   and I don't know exactly what you are looking for."

22   Q.  And in all those instances, they asked you to do your

23   searches, and they never accessed and used your credentials;

24   is that right?

25   A.  Yes, I do not recall if they ever took me up on the offer

Duke - Direct

130

1    of searching my e-mails.

2    Q.  But you told them the e-mails were online and available

3    and accessible if they wanted to use your credentials to

4    access them?

5    A.  Yes.

6    Q.  When was the first time you told them that?

7    A.  As I said, I do not recall.

8    Q.  Would it have been at or about the time you started

9    searching for e-mails in the case that were going to be

10   produced or used in the case?

11   A.  Probably.  I would guess it would have been in

12   2013 -- 2012, 2013 window would be my best guess.

13   Q.  Yes.

14         Do you remember in 2013 searching for e-mails to use

15   in connection with some court proceedings and motions that

16   were filed?

17   A.  Yes.

18   Q.  Do you remember that?

19   A.  Yes.

20   Q.  Do you remember that first proceeding about the

21   preliminary injunction?

22         Do you recall that in 2013?

23   A.  No.

24   Q.  You don't recall Plaintiffs -- there was a motion filed

25   about Plaintiff's trademark, 21 Century Smoke, being in the

Duke - Direct

1   metadata of your website?

2   A.  Oh, yes, I do remember that.

3   Q.  Do you remember doing searches for e-mails at that time?

4   A.  I believe I did do searches for e-mails at that time, yes.

5   Q.  And before that, when you first met with your attorneys,

6   you did searches for e-mails and provided them documents,

7   right?

8   A.  Yes.

9   Q.  And did you -- and those were from your Yahoo! and GoDaddy

10  accounts?

11  A.  Yes.

12  Q.  All right.  And do you recall if, at that time, you

13  offered your credentials to them for them to review and look

14  at your e-mails independent of you?

15  A.  As I have stated before, I do not recall when I offered

16  it.  I just remember there were times when the searches would

17  become cumbersome, and I would ask if they wanted to do it

18  themselves.

19  Q.  Got it.

20          And they could have done that because these

21  are -- all your e-mails are web-based, right?

22          They are in the cloud, right?

23  A.  Yes, yes.

24  Q.  And if they had the credentials, they could just log in

25  from any computer and see the e-mails, right?

Duke - Direct

132

1   A.  Yes.

2   Q.  And you offered those credentials to them at different

3   times?

4   A.  Yes.

5   Q.  Okay.  And at any time, did Tom Leavens ever run searches

6   in your online e-mail accounts, Yahoo! and GoDaddy,

7   independent of you?

8   A.  Not to the best of my knowledge.

9   Q.  What about any of your other prior attorneys, any of them?

10  A.  As I have stated, I don't recall if they ever took me up

11  on that offer.  I just don't remember.  I know I offered it.

12  I can't remember if they ever did any searches.

13          THE COURT:  I'm going to pause you right there.

14          Did you offer your credentials to search the e-mails

15  to Mr. Stamatis, if you recall?

16          THE WITNESS:  At what time frame?

17          THE COURT:  Any time.

18          THE WITNESS:  Yes.

19          THE COURT:  When?

20          THE WITNESS:  2018 for sure.

21          THE COURT:  Okay.  Did you offer your credentials to

22  search your e-mails to Mr. Shonder at any time?

23          THE WITNESS:  I don't recall.

24          THE COURT:  Okay.  All right.  Go ahead.

25          MR. DAVIS:  Thank you, your Honor.

Duke - Direct

133

```
 1              I'm going to turn your attention now to Exhibit 65,

 2    if I could have that brought up.

 3    BY MR. DAVIS:

 4    Q.  Plaintiff's Exhibit 65, which is Docket 288, dated

 5    January 22nd, 2019, is now displayed in front of you.

 6              Can you look at that, Mr. Duke?

 7    A.  Yes.

 8    Q.  Do you recognize it?

 9    A.  Would you please scroll down?

10              Can you go back up?

11              And could you go back down again?  I'm sorry.

12              And what's the question?

13    Q.  Well, continue on.  There is the paragraph says:  "See

14    attached letter," and this is Page 4 of 6 of Exhibit 65.

15              Do you see that in front of you now, the

16    letter -- it's a letter from 4Discovery; is that accurate?

17              MR. SALAM:  Can the witness have a chance to read it,

18    please?

19      (Brief pause.)

20              THE WITNESS:  Yes.

21    BY MR. DAVIS:

22    Q.  And when was the first time you saw this letter?

23    A.  Right now.  I don't remember seeing this letter.

24    Q.  Did anyone ever tell you anything about the problem that

25    4Discovery had with retrieving the data that it copied from
```

1    your four hard drives?

2           You are aware of that, right?

3    A.   Previously, as I previously said, yes.

4    Q.   Do you remember when you found out about that?

5    A.   I do not.

6    Q.   And this letter that was filed with the court, did your

7    attorneys share it with you before today or before your

8    preparation for this hearing?

9    A.   It does not look familiar to me.  I mean, I may have seen

10   it and not known what it was about.

11   Q.   You don't know what it was about?

12   A.   I may have seen it and not understood what the -- what I

13   was going to be asked about it or what the purpose of it was.

14   So I may have just gone over it.  If this was in the binder

15   that I saw, I don't recall seeing it.

16   Q.   All right.  This is a -- I will represent to you it is a

17   report to the court that your attorneys filed, with this

18   letter, saying they were unable to retrieve the hard drive

19   data that they had copied earlier in the case.

20           You understand that, right?

21   A.   I believe you, yes.

22           THE COURT:  He said that a couple times now.

23   BY MR. DAVIS:

24   Q.   Okay.  And the page that's on the screen right here, those

25   are the four hard drives that were imaged.  It is numbered

Duke - Direct

1   one, two, three, and four towards the bottom of the page?

2   A.  Yes.

3   Q.  So that's Laurie's computer, right?

4   A.  Yes.

5   Q.  Rob Hough's computer?

6   A.  Yes.

7   Q.  Your computer?

8   A.  Yes.

9   Q.  And Bryan Kos's?

10          Am I saying that name right?

11  A.  Yes.

12  Q.  Is that his full name?

13  A.  Bryan Scott Kos.

14  Q.  Bryan Scott Kos.

15          K-o-s?

16  A.  Yes.

17  Q.  And he was an employee of your company?

18  A.  Yes.

19  Q.  And he had a computer at your office?

20  A.  Yes.

21  Q.  Okay.  And you understand from this report that the data

22  from your four hard drives no longer exists, right?

23  A.  No longer exists with 4Discovery, yes.

24  Q.  That's right.

25          And it is gone forever, right?

Duke - Direct

1  A.  No, it is not gone forever.

2  Q.  Well, the images that they took of your computers in 2014,

3  right, is gone forever?  The data that they lost is gone

4  forever?

5  A.  The data that they lost is not gone forever, no.

6  Q.  Where is it?  Do you have it?

7  A.  On these same computers.

8  Q.  On the same computers.

9       But the image they took on December 9th of 2014, and

10  made copies of your hard drives, right?

11  A.  Okay.

12  Q.  And that data is gone, right?  That's what they are

13  reporting to the court here?

14       Do you understand that?

15  A.  This is prior to recopying them.  You are saying right now

16  the data is lost.  Obviously, the data is not lost if the copy

17  now is the exact same as the copy then.  The data is not lost.

18  Q.  So, in your mind, you can copy data any time, and it never

19  changes, and it doesn't matter; is that right?

20  A.  I did not just say that.

21  Q.  Okay.  So I'm asking you a question.  You hired an ESI

22  vendor called 4Discovery, right?

23  A.  Yes.

24  Q.  They took copies of your four work computers in December

25  of 2014, right?

Duke - Direct

1   A.  Yes.

2   Q.  That data was set aside, right?

3   A.  Yes.

4   Q.  And it was used in this case for searching and production

5   of documents, right?

6   A.  Yes.

7   Q.  When documents were to be produced, they didn't come back

8   to your house and search your computers again, right?

9   A.  Of course not.

10  Q.  Right.

11          So it was an important step in the process of this

12  case, right?

13  A.  Absolutely, yes.

14  Q.  Yes.

15          And what I'm asking you is you understand that all

16  the data that this company captured from your hard drives in

17  December of 2014, that they captured and made copies of, no

18  longer exists.

19          Do you understand that?

20  A.  Yes, their copy does not exist, yes.

21  Q.  That's right.

22  A.  Yes.

23  Q.  Their copy?

24  A.  Yes.

25  Q.  The forensic copy they made, right?

Duke - Direct

138

```
 1   A.  Yes.

 2   Q.  It is gone forever, right?

 3   A.  Yes.

 4   Q.  Okay.  And that's the same for your Yahoo! Messenger chat

 5   account, right, it is gone forever?

 6   A.  They discontinued the program, so, yes, it is gone.

 7   Q.  And it is gone forever, right?

 8   A.  Yes.

 9           MR. SALAM:  Your Honor --

10   BY MR. DAVIS:

11   Q.  And it was something you used in connection with your

12   business, right?

13   A.  A long time ago, yes.

14   Q.  And what's a long time ago?

15   A.  Ten years.

16   Q.  Ten years ago?

17   A.  Yes.

18   Q.  You used Yahoo! Messenger in 2009, right?

19   A.  Yes.

20   Q.  And that was in connection with your communications with

21   people like Webrecsol and Kirti Saraswat?

22   A.  Yes.

23   Q.  And you used it to communicate with them because, what,

24   they are in India, right?  They are in a different time zone,

25   and you are communicating by chat?
```

Duke - Direct

1   A.  E-mail and chat, yes.

2   Q.  And why would you use chat?

3   A.  For more instant responses.

4   Q.  And you used this -- do you remember what your login

5   credentials were, what your name was for your Yahoo! Chat

6   messenger account?

7   A.  Brent Duke.

8   Q.  Just Brent Duke?

9   A.  Same as my e-mail, yes.

10  Q.  Yes.

11      And at no time, right, did you ever copy all of the

12  data that was in your Yahoo! Messenger chat account; is that

13  right?

14  A.  Not all of it, no.

15  Q.  And at no time did you ever preserve all of the data that

16  was in your Yahoo! Messenger chat account, right?

17  A.  Correct.

18  Q.  Okay.  And at no time did you or anyone on your behalf

19  ever search the Yahoo! Messenger chat data for responsive

20  documents in this case, right?

21  A.  Correct.

22  Q.  Now, I'm going to ask you the same questions for an

23  application called Gtalk.  Are you familiar with that?

24  A.  I believe it is the Gmail instant messenger program, yes.

25  Q.  Okay.  And that's also another instant messaging

Duke - Direct

1   application you used in connection with your business, right?

2   A.  It would have been a lot more rare than the Yahoo! one.  I

3   used the Yahoo! one mostly.  I very rarely use my Gmail

4   account.

5   Q.  So you used Gtalk in connection with your business, right?

6   A.  I believe so.

7   Q.  Do you remember when you used it in connection with your

8   business?

9   A.  I do not.  I don't actually recall any conversations on

10  Gtalk.  I do recall seeing an e-mail that said something about

11  Gtalk.

12  Q.  Right.

13          We move Plaintiff's Exhibit 65 into evidence, your

14  Honor.

15          MR. SALAM:  No objection, your Honor.

16          THE COURT:  All right.  65 will be admitted.

17    (Plaintiff's Exhibit 65 was offered and received in

18    evidence.)

19          THE COURT:  Are you moving to a different subject

20  matter?

21          MR. DAVIS:  Yes.

22          THE COURT:  Okay.  It is almost straight-up noon.  We

23  will take a break.

24          All right.  You are still under oath.  Don't talk to

25  anybody about your testimony.

1          Let's come back at 1:15.

2          Mr. Holevas can give you recommendations on where to

3     go, unless you brought your lunch, like I did.

4       (Recess taken.)

5          THE CLERK:  Recalling 12 CV 50324, DR Distributors,

6     LLC v. 21 Century, Inc.

7          THE COURT:  All right.  Mr. Duke, why don't you have

8     a seat again.

9          And, Mr. Salam, a question for you on attorney-client

10    privilege waiver.  I know that we have kind of touched on it,

11    danced around it a little bit.  Are we going to have a 502(a)

12    issue on subject matter waiver in this case?

13         MR. SALAM:  Can you educate me on 502(a), your Honor?

14    I apologize.

15         THE COURT:  Sure.

16         MR. SALAM:  My trial attorney is unavailable.

17         THE COURT:  Sure.

18         You know, it is not that long, but, boy, it can be

19    complicated.  We will talk about 502(a), not 502(b).

20         502 --

21         MR. SMITH:  Your Honor, I could offer you a nickel's

22    worth on that.  The problem is --

23         THE COURT:  Hold on.  Hold on.  Hold on.

24         MR. SMITH:  Sorry, Judge.

25         THE COURT:  You just said the magic words, and so I

1   just want to make sure, if we are going to have an issue,

2   whether we can flesh it out.

3           502:  "The following provisions apply, in the

4   circumstances set out, to disclosure of a communication or

5   information covered by the attorney-client privilege or work

6   product doctrine, (a) disclosure made in a federal proceeding

7   or to a federal office or agency; scope of waiver" -- that's

8   all in bold -- "When the disclosure is made in a federal

9   proceeding or to a federal office or agency and waives the

10  attorney-client privilege or work-product doctrine, the waiver

11  extends to an undisclosed communication or information in a

12  federal or state proceeding only if:  (1) the waiver was

13  intentional; (2) the disclosed or undisclosed communication or

14  information concern the same subject matter; and (3) they

15  ought in fairness to be considered together."

16          That's 502(a).

17          Go ahead, Mr. Smith.  You want to chime in?

18          MR. SMITH:  All I was going to say is the problem

19  with these issues always is the definition of "subject

20  matter," and there is not a lot of good case law.  We have

21  certainly been talking about the discovery issues raised by

22  this motion, so one would think a fence could be put around

23  this one pretty clearly, but you are correct that it is a

24  bucket of thorns whenever you start deciding what the subject

25  matter is and how far a subject matter waiver goes.

Duke - Direct

143

 1          MR. SALAM:  So, your Honor, may I?

 2          THE COURT:  Sure.

 3          MR. SALAM:  And thank you for allowing me the time to

 4   review the rule.

 5          My goal was, obviously, I wanted to allow Plaintiff's

 6   counsel, as well as former defense counsel, as well as us,

 7   current defense counsel, to explore the communications related

 8   to discovery and the sanctions issues in this matter, okay?

 9          THE COURT:  Okay.

10          MR. SALAM:  Because it is, obviously, important to

11   all parties involved, obviously, and to your Honor.

12          I wanted to, to the extent possible, under applicable

13   law and case law, avoid, if possible, waiving the privileges

14   to other communications, attorney-client communications,

15   related to the trademark case, the merits, things unrelated to

16   this discovery issue.

17          THE COURT:  We were just talking about that.

18          Go ahead.

19          MR. SALAM:  So that is what I was attempting to

20   express as far as a limited waiver.

21          THE COURT:  Got you.

22          MR. SALAM:  Okay.

23          THE COURT:  All right.  And go ahead.  I don't want

24   to interrupt you.

25          MR. SALAM:  That's my explanation.

Duke - Direct

144

1          THE COURT:  That's where I thought you were going,

2     and then that leads into what we were mumbling to each other

3     about walking down the stairs.  We were both talking about,

4     "Well, what is the subject matter," and then Mr. Smith chimed

5     in with "bucket of thorns."  Was that the metaphor?

6          MR. SMITH:  Yes.  I think that is a very good

7     metaphor.

8          THE COURT:  Hold on one second.

9          MR. SALAM:  I just wanted to preserve the record.

10          THE COURT:  Sure.  Okay.

11          Well, so far, it has all been issues relating to this

12     discovery issue, and the subject matter -- clearly, the

13     subject matter of the motion.

14          But if you give me a moment.

15          Hanley is up on Tuesday or Thursday?

16          Oh, come on, Hanley is up -- or *McCullough v. Hanley*

17     is up this Thursday?

18          THE CLERK:  Tuesday, your Honor.

19          THE COURT:  Well, that explains it.  It is in the

20     afternoon.

21          Just so you know, I'm looking at a case called

22     *McCullough v. Hanley*.  It is my attempt to figure out 502(a),

23     an alleged wrongful conviction of Mr. McCullough relating to

24     the murder of a child back in the '50s because those are the

25     kinds of cases I get, and I thought I had a discussion of what

Duke - Direct

145

1    subject matter because it is a little messy.

2           Waiver of subject matter.  Hold on.  I might have

3    dodged it.

4           "The case law addressing whether communications

5    'concern the same subject matter' is not particularly helpful,

6    probably due to the fact-specific nature of the analysis.

7    Indeed, some case law is reminiscent" -- God, I'm such a

8    jerk -- "Indeed, some case law is reminiscent of the

9    less-than-specific guidance found in Palms 37:27, 'Avoid evil,

10   do good, and live forever.'

11          "For example, in *Yarberry v. Gregg Appliances*, the

12   court noted that subject matter can be broadly or narrowly

13   defined, but ultimately a waiver must be based upon the facts

14   and guided by fairness.  While recognizing that the scope of

15   the 'same subject matter' has not been precisely defined, some

16   courts caution that same subject matter should be narrowly

17   interpreted."

18          Yes, it is going to be tough to wade through.  All

19   right.  So that is there for whatever value it is.

20          All right.  So we have got that covered.  I

21   appreciate that, Mr. Salam.

22          MR. SALAM:  Thank you, your Honor.

23          THE COURT:  Mr. Davis, go ahead.

24          MR. DAVIS:  Thank you, your Honor.

25

Duke - Direct

1    BY MR. DAVIS:

2    Q.  Mr. Duke, before the lunch break, we were talking about

3    four computers that were imaged by an ESI vendor.

4            Do you recall that testimony?

5    A.  Yes.

6    Q.  And those four computers were computers that you used at

7    your office or with your business, right?

8    A.  Correct.

9    Q.  And since the time they were imaged the first time by

10   4Discovery, you continued to use them in your business, right?

11   A.  Correct.

12   Q.  And they were in the office of your business, not in the

13   garage?

14   A.  Those four, yes.

15   Q.  And they were turned on?

16   A.  Yes.

17   Q.  And they were connected to the Internet?

18   A.  All but one, yes.

19   Q.  Okay.  Which one was it?

20   A.  I would have to see that list again.

21           Do you have that list?  Can you put the list up for

22   me?

23   Q.  What about the list would tell you whether it is connected

24   or not, the list of the --

25   A.  Brand.

Duke - Direct

147

1  Q.  What's that?

2  A.  The brand that it is.

3  Q.  The brand of the computer?

4  A.  Yes, if I could look at that list, I could figure it out,

5  at least --

6  Q.  It's the Exhibit, I believe, 65.

7  A.  One of those two last ones has not been plugged in.

8  Q.  You see in front of you, I think it is, Exhibit 66?

9  A.  Yes.  I saved the computer, but it was no longer being

10  plugged in.  One of those last two is one of the ones that was

11  searched.

12  Q.  One of the last two?

13  A.  Yes.  They both say the same thing, but one of those last

14  two.

15  Q.  Like where on the list?  What are they called?  Just read

16  it.

17  A.  Acer Aspire DT.  Acer Aspire DT.

18  Q.  All right.  And one of those was previously imaged by

19  4Discovery, and now it is just sitting there?

20  A.  Exactly.

21  Q.  Okay.  And the other three are actively used in your

22  business?  They are in your office?

23  A.  My laptop is actively used and whatever one -- my wife's

24  computer is actively used.  The other one is not.

25  Q.  All right.  And that has been continuously since 2014,

Duke - Direct

1  when they were imaged by 4Discovery?

2  A.  Yes.

3  Q.  And are they password protected computers?

4  A.  Yes.

5  Q.  And those three are connected to the Internet?

6  A.  Those two.

7  Q.  Sorry, those two?

8  A.  Yes.

9  Q.  And did you ever have any problems with viruses with any

10 of those machines?

11 A.  I do not believe so.

12 Q.  And as you sit here today, when you say you don't believe

13 so, did you ever have any virus problems with any of your

14 computers that you used in your business?

15 A.  I don't recall ever having a problem.  I don't remember if

16 my wife ever had a problem.  Everything was backed up on

17 Carbonite.  I mean, if we ever did have a problem, we would

18 have everything backed up, but I don't recall ever having any

19 problem myself.  I'm not sure if she did.

20 Q.  Okay.  So you don't know if you ever lost any files to a

21 virus problem?

22 A.  We didn't lose any files because it was backed up on

23 Carbonite.  If we ever would have had a virus, it would have

24 been backed up, so we couldn't lose any files.

25 Q.  And did you ever have an event where you had to restore

Duke - Direct

1   data from Carbonite because you had a problem on one of your

2   machines?

3   A.  I have not.  I'm not sure if my wife has.

4   Q.  Other than the two of you, would there be anyone else that

5   would know about that?

6   A.  No.

7           THE COURT:  Hold on.

8           When were things backed up on Carbonite, though?

9   That wasn't until after that meeting, right?  You had the

10  Carbonite -- Carbonite didn't come into play until there was

11  the meeting, or were you using Carbonite back in 2010?

12          THE WITNESS:  No, no, no, whenever that meeting was

13  in 2014, whenever that was.

14          THE COURT:  Okay.  But before you had Carbonite?

15          THE WITNESS:  No, we never had any viruses.  We have

16  never lost any documents.

17          THE COURT:  Okay.  Go ahead, Mr. Davis.

18          MR. DAVIS:  Thank you.

19  BY MR. DAVIS:

20  Q.  And prior to Carbonite, you never had a virus problem; is

21  that right?

22  A.  On my computer, no.

23  Q.  And on your other machine that you are thinking of, which

24  one was that that had the problem?

25  A.  Our website has had problems.

Duke - Direct

1 Q. Your website had problems. Describe that for me.

2 A. Just there were viruses on the website.

3 Q. How does that happen?

4 A. Someone hacks into your website and inserts information

5 that they want on the website.

6 Q. And when did that happen?

7 A. It happened on a few occasions.

8 Q. And how did they hack into your website?

9 A. I have no idea how hackers hack.

10 Q. Do they have to hack into your home computer to hack into

11 your website?

12 A. No, they would have to hack into my files on my GoDaddy

13 account.

14 Q. And that's the GoDaddy account is where your website is

15 hosted?

16 A. Yes.

17 Q. So they hack into your online account?

18 A. Yes.

19 Q. And that's where the files for your website are?

20 A. Yes.

21 Q. And you also have copies of those files on your computer,

22 your laptop?

23 A. Yes.

24 Q. Yes.

25        And did you ever get any viruses on the files that

Duke - Direct

1    were -- your website files on your laptop?

2    A.   No.

3    Q.   And do you still use Carbonite today?

4    A.   Yes.

5    Q.   And what was backed up on Carbonite?

6    A.   Everything on my wife's computer, everything on my

7    computer.

8    Q.   Okay.  Just those two computers?

9    A.   That's where everything from our company is, basically.

10   Q.   Right.

11         And it didn't back up any of your e-mail accounts,

12   right?

13   A.   No.

14   Q.   Okay.  And it didn't back up any of your websites that

15   were online, right?

16   A.   No.

17   Q.   And it didn't back up any of your web-based data, right?

18   A.   No.

19   Q.   And it didn't back up any of your Yahoo! Messenger chat,

20   right?

21   A.   Unless it's saved on my computer, no, it just backs up the

22   files on the computers.

23   Q.   And do you know if your Yahoo! Chat messenger was ever

24   backed up on your computer?

25   A.   I don't believe so, no.

Duke - Direct

1  Q.  I'm going to ask you the same questions that I was asking

2  you before the break about Yahoo! Messenger.

3          Right, that was the chat program that you used,

4  right?

5  A.  Yes.

6  Q.  I'm going to ask you the same questions about Gtalk.  You

7  know what that is, right?

8  A.  The Gmail messenger program, yes.

9  Q.  Right.

10          And you used that in connection with your business,

11  right?

12  A.  As I said before, I don't recall.  I have seen e-mails

13  saying, "Let's talk on Gtalk," but I don't recall ever

14  actually using Gtalk.  So I use it very rarely, if at all.

15  Q.  Well, I guess my question is did you use it or not use it?

16  A.  Yes.

17  Q.  Okay.  And you used it in connection with running your

18  business, right?

19  A.  Possibly, yes.  This is about ten to twelve years ago.

20  It's possible, yes.

21  Q.  Right.

22          But that's the time period we are talking about,

23  right?  Because this case started in 2012, but the discovery

24  period was 2009 through sometime in 2015 is the relevant time

25  period, right?  You know that, right?

Duke - Direct

1    A.   Yes.

2    Q.   So I know it is a long time ago, but here we are, right?

3    A.   Absolutely.

4    Q.   So you used Gtalk, right, and you never saved any of the

5    data from Gtalk, right?

6    A.   No.

7    Q.   And it is an online messaging app, just like Yahoo!

8    Messenger chat?

9    A.   Yes.

10   Q.   And you never searched it for any responsive documents,

11   right?

12   A.   Never would have thought to.

13   Q.   Right.

14           And no one ever told you to do it?

15   A.   No.

16   Q.   And you never produced any of those documents in this

17   case, right?

18   A.   No.

19   Q.   And you are aware that that service has been discontinued,

20   right?

21   A.   Yes.

22   Q.   And so that data is gone forever, right?

23   A.   I'm not sure about that.

24   Q.   Explain.

25   A.   I believe they did a bunch of research into Yahoo! and

Duke - Direct

1    that seems to be -- they don't seem to be able to get that.  I

2    don't know if they have done that same amount of exhaustive

3    research into the Gtalk.  I just don't know.

4    Q.  Have you told your ESI vendor to look into your Gtalk

5    online chat messaging data?

6    A.  I believe they would have done it.  I don't know what they

7    are doing it.

8    Q.  Did you tell them, the new vendor, that you used Gtalk as

9    part of your interview with them?

10   A.  Yes.

11   Q.  Okay.  And is it your understanding they are investigating

12   that right now?

13   A.  I believe so, yes.

14   Q.  Okay.  And are you aware of that data -- and when did you

15   report to them that you used Gtalk chat messaging?

16   A.  I believe it came up in an e-mail somewhere, which

17   triggered my memory.  I mean, this is something that I have

18   not used in forever, so I hadn't even thought about it.

19   Q.  Right.

20          And those e-mails, those e-mails where you are

21   talking about Gtalk, came up when you produced your Yahoo!

22   e-mail account on June 1 of 2018, right?

23   A.  Possibly, yes.

24   Q.  Okay.  I'm going to direct your attention to -- well,

25   before I go to that, is Gtalk referenced anywhere in this new

Duke - Direct

1  ESI vendor report that was filed with the court on

2  August 13th, 2019?

3  A.  I'm not sure.

4  Q.  And if it is not there, you didn't tell the ESI vendor

5  about it, right?

6  A.  That is not true.

7  Q.  Where else would they get the information for this report

8  other than you?

9  A.  This is a partial report.  This is not a completed report.

10  We discussed things after this report because we were working

11  on it.  This was the date of the court hearing, so we had what

12  we had at the time.  We have continued to work on it.  They

13  are continuing to work on it until this day.

14  Q.  And so do you have something in writing that you have

15  given the ESI vendor where you disclosed your use of your

16  Gtalk messaging account with them?

17  A.  No, my lawyers have discussed it though.

18  Q.  Okay.  And do you know when they are going to report to

19  the court about their investigation of your Gtalk messaging?

20  A.  You would have to ask my lawyers.

21  Q.  All right.  But if the service is discontinued and you

22  don't have the data, how are they going to get it?

23  A.  Again, you would have to ask my lawyers.  I have no idea.

24  Q.  Can you say that again?  I can't hear you.

25  A.  Again, you would have to ask my lawyers.  I have literally

Duke - Direct

1   no idea.

2   Q.  So other than asking your attorneys for that information,

3   you don't have the data from your Gtalk messaging, right?

4   A.  To the best of my knowledge, I do not have it.  I don't

5   know if it is recoverable.

6   Q.  Thank you.

7           I'm going to turn your attention to Plaintiff's

8   Exhibit 57, and I'm going to represent to you this was

9   attached to our motion for sanctions, and it is a collection

10  of e-mails that were produced for the first time on June 1,

11  2018.

12          Do you remember you testified you saw the motion?

13  A.  Yes.

14  Q.  Right.

15          And I'm going to go to Page 28 and 29 of this

16  exhibit.

17          MR. SALAM:  Is the exhibit numbered?

18          MR. DAVIS:  It's Exhibit 57.

19          MR. SALAM:  I'm sorry.  You said Page 28 and 29?

20          MR. DAVIS:  It's Bates number 21C1001351-52.

21  BY MR. DAVIS:

22  Q.  I ask you to look at the documents on the screen.

23          Can you tell me if you recognize it?

24          MR. SALAM:  Your Honor, I'm trying to find it in the

25  hard copy that I have.

Duke - Direct

1          THE COURT:  Okay.  I know I have seen it.  I have a

2   copy on my desk.

3          You said 57?

4          MR. DAVIS:  Yes, Exhibit 57, Plaintiff's Exhibit 57.

5          THE COURT:  Plaintiff's Exhibit 57?

6          MR. DAVIS:  It is.

7          THE COURT:  Do you have a hard copy?

8          MR. SALAM:  I found it.  It is Page 694 of 732.  I

9   have got the exhibit.

10          THE COURT:  Okay.  It is Exhibit 57 is what I have.

11   All right.

12          Do you have it in front of you, Mr. Duke?

13          THE WITNESS:  Yes, I do.

14   BY MR. DAVIS:

15   Q.  Do you recognize that?

16   A.  I recognize it from seeing it when I was searching for the

17   e-mails to give it to my attorneys.

18   Q.  And when was that?

19   A.  It was March of 2018, I believe.

20   Q.  Okay.  So this is -- do you recognize an e-mail that you

21   received from kirti@webrecsol.com on or about May 15, 2010?

22   A.  Yes.

23   Q.  And this is something you would have received from her in

24   the ordinary course of your business, right?

25          THE COURT:  That is just a fancy lawyer way of saying

Duke - Direct

158

1  did you get this while you were working on your company from

2  her?

3          THE WITNESS:  Yes, I'm not sure which company -- I'm

4  not sure what this is for, though, because it says "Re: Sports

5  Doctrine."  So I am not sure if this is from a totally

6  different topic matter than 21 Century Smoking.  So I'm unsure

7  what this is from.

8  BY MR. DAVIS:

9  Q.  You are unsure.

10          You received an e-mail on May 15, 2010, from Kirti at

11  Webrecsol, right?

12  A.  Yes.

13  Q.  Okay.  And you see in the first paragraph there --

14  A.  Yes.

15  Q.  -- she says:  "Brent, I checked.  There are so many files.

16  But how will I send all those to," and on and on, right?

17          And then the second to last line, can you read that?

18  A.  "Can you please come online at Gtalk so that I can send

19  you through Gtalk, or do you want me to upload all these files

20  somewhere."

21  Q.  So you are using Gtalk with Kirti at Webrecsol in 2010,

22  right?

23  A.  It looks like for my Sports Doctrine website, yes.

24  Q.  And that's a business you owned and operated and worked

25  with Kirti at Webrecsol on?

1   A.  I mean, a business would be a stretch, but, yes, it is a

2   website she created for me.

3   Q.  Okay.  She created for you?

4   A.  Yes.

5   Q.  All right.  And you worked on it with her?  She was your

6   outside website consultant?

7   A.  No, she built the website.

8   Q.  She built it herself?

9   A.  Yes.

10  Q.  Okay.  And how did she deliver it to you?

11  A.  Put it on my GoDaddy account.

12  Q.  Got it.

13          All right.  And you can see in the message, a little

14  bit below, where it says:  "Thanks, Kirti"?

15          Right below, it says on Friday, 14 May 2010.  Do you

16  see that?

17  A.  Yes.

18  Q.  It says:  "brentduke@yahoo.com wrote."

19          Can you read that?

20  A.  "Script put in PHP files.  Try opening on Firefox.  So I

21  need clean files that I can keep on my PC as a backup.  I was

22  never sent anything from you before.  Thanks."

23  Q.  And what is that "script put in PHP files"?

24          That is something you did based on your e-mail,

25  right?

Duke - Direct

160

1   A.  Not necessarily.

2   Q.  Okay.  What are you saying there to her?

3   A.  That it was in PHP files and that I don't have them.

4   Q.  What is in the PHP files?

5   A.  The Sports Doctrine website.

6   Q.  And what are "PHP files"?

7   A.  I don't know what that stands for.  It's some type of web

8   language or something.

9   Q.  Before you -- and you wrote that, right?

10  A.  Yes.

11  Q.  So when you wrote that, you must have known what PHP files

12  were to write it in your e-mail, no?

13  A.  I mean, it is a type of web -- some type of like -- I

14  don't even know how to describe it.  It is a way that websites

15  are built somehow with PHP files.  I don't know exactly what

16  they are or how to describe them.  I know that if you save a

17  file as a PHP, you can make it be on the web, but I don't know

18  a lot about it.

19  Q.  So you know what it is.  You just don't know the, like,

20  the Caltech definition of what a PHP file is?

21          Is that what you are trying to say?

22          MR. SALAM:  Objection, your Honor, to the form of the

23  question.

24          THE COURT:  I don't know what the reference to

25  "Caltech" is, other than isn't that the Big Bang Theory?

Duke - Direct

1        MR. DAVIS:  Well, he went to Stanford University, so

2   I'm trying to give him a reference he might understand.

3        THE COURT:  All right.  So hold on a second.

4        Sustained.  Just rephrase the question.

5   BY MR. DAVIS:

6   Q.  So you know what a PHP file is, right?  You just don't

7   understand like how the -- like the actual mechanics of how it

8   works, right?

9   A.  I would say that is a fair assessment, yes.

10  Q.  Okay.  So it's like a word processor.  You know how to use

11  the word processor, but you don't know how it actually works,

12  right?

13  A.  I think that's not quite an accurate metaphor.

14  Q.  Okay.  All right.  And this collection of e-mails that we

15  have marked as Plaintiff's Exhibit 57 are all e-mails that

16  were produced by you through your attorneys on June 1, 2018.

17  It's a collection of e-mails between you and Ms. Saraswat.

18        If I reviewed all of them with you, you would

19  identify you as the receiver or sender and her as the receiver

20  or sender on these e-mails, right?

21  A.  Yes, that's correct.

22        MR. DAVIS:  Your Honor, we move all these e-mails

23  that are collected at Plaintiff's Exhibit 57 into evidence.

24        THE COURT:  All right.  Hold on one second here.

25        Any objection?

Duke - Direct

1      MR. SALAM:  No, your Honor.

2      THE COURT:  All right.  Plaintiff's Exhibit 57 will

3   be admitted.

4    (Plaintiff's Exhibit 57 was offered and received in

5     evidence.)

6   BY MR. DAVIS:

7   Q.  All right.  I want to turn your attention to something you

8   talked to the Judge about earlier called "auto-purge."

9   A.  Okay.

10   Q.  Do you understand that?

11   A.  Yes, I do.

12   Q.  You know what it is, right?

13   A.  Yes.

14   Q.  And the auto-purge setting was applied to all your company

15   GoDaddy e-mails accounts; is that right?

16      All the sent e-mail accounts; is that right?

17   A.  Yes, I believe so.

18   Q.  So it is not just bduke, it is not just support, but it

19   was every GoDaddy e-mail account that you had for your

20   company, that setting applied to, right?

21   A.  I would assume so, yes.  I checked the two, obviously,

22   that I used.  Those are the two I made sure to switch because

23   I knew that I was using them, and I wanted to preserve that

24   data.  I didn't go look through all the other ones because no

25   one was even using them at that time.

Duke - Direct

163

1    Q.  At what time?

2    A.  When I discovered it, I believe, was 2015, like June of

3    2015.

4    Q.  Okay.  And what's your understanding of how that setting

5    was applied to your account?

6    A.  When you opened up the e-mail account, so you created the

7    account, it was automatically set to auto-purge after six

8    months, anything in the sent folder, which I was unaware of.

9    Q.  So from the time that you set up your GoDaddy e-mail

10   account, all sent e-mails from all e-mail accounts on your

11   company GoDaddy account were auto-deleted after six months; is

12   that right?

13   A.  Provided there was no reply, yes.

14   Q.  Well, let's not talk about the replies.

15           I just want to confirm everything was deleted

16   automatically from the sent folder of every one of your

17   company e-mail accounts from the time you set it up until

18   sometime in 2015, when you changed for two of those e-mail

19   boxes, right?

20   A.  Well, no, because it was six months' trailing.  So I

21   discovered it in 2015.  They were able to recover two weeks of

22   data.  So it's six months and two weeks back is what I was

23   able to get recovered.

24   Q.  Got it.

25           So what's the date where the auto-purging ended just

Duke - Direct

1  for your two e-mail accounts, if you know?

2  A.  Late 2014.

3  Q.  Late 2014, as in December 2014?

4  A.  I would have to look at the exact date.

5  Q.  Well, if you discovered it in June of 2015, and we go back

6  six months, would that be December of --

7  A.  I want to say it was like November, but I'm not a hundred

8  percent sure.

9  Q.  Okay.  And who knows that answer?

10  A.  My sent box by looking at it.

11  Q.  You would just do it yourself and go look at it?

12  A.  Yes, that's the way to find it.

13  Q.  And you can tell because the e-mails, they're gone, right?

14  A.  Exactly.

15  Q.  And that is for your bduke and your support e-mail

16  accounts, right?

17  A.  Yes.

18  Q.  Okay.  Now, your prior lawyers just produced an e-mail

19  that you had with lawyer Travis Life.

20          MR. DAVIS:  Can we see your exhibit -- I think,

21  maybe -- it is, maybe, your exhibit, Exhibit 23, BD 23.

22  BY MR. DAVIS:

23  Q.  So this is your -- I'm sorry -- not your prior lawyers,

24  but you have produced it.

25          THE COURT:  What's the exhibit number?

Duke - Direct

1      MR. DAVIS:  23.  Defendants' 23.

2      MR. SMITH:  It is a Defendants' exhibit.

3      MR. SALAM:  Defendants' Exhibit 23.

4      MR. DAVIS:  Yep.

5  BY MR. DAVIS:

6  Q.  I ask you to take a look at the screen and look at the

7  first page of this e-mail.

8  A.  Okay.

9  Q.  And what is this?

10  A.  Piecing this together, I know that my lawyers were asking

11  me for documents.  They were doing Bill Edmiston's deposition,

12  it looks like, that day.

13      MR. SALAM:  Your Honor, may I object and ask

14  that -- I would prefer that he not discuss attorney-client

15  privileged communications and if we could ask him what this is

16  or what this exhibit shows.

17      THE COURT:  Well, the question is:  "What is this?"

18      MR. DAVIS:  It is their exhibit.

19      THE COURT:  Yes.

20      MR. SALAM:  I was just trying to -- continue.

21      THE COURT:  Go ahead.

22      THE WITNESS:  Okay.  I mean, it looks to be the day

23  that I discovered the GoDaddy e-mail issue.  So piecing this

24  together, by looking at what happened that day, it looks like

25  they were doing Bill Edmiston's deposition, and he had a

Duke - Direct

1  misstatement, and they wanted me to find a file in my e-mails.

2  BY MR. DAVIS:

3  Q.  And how do you know all that from this e-mail?

4  A.  Because it says:  "We have completed Bill Edmiston's

5  deposition.  I have a couple of questions for you."

6        And I said:  "I just tried to call you."

7        And the thing before you showed me was a GoDaddy

8  thing saying "Thank you for calling," or whatever it said,

9  that showed that I called GoDaddy that day.

10        MR. DAVIS:  All right.  Can we go to the first page

11  of, I think, this exhibit?

12  BY MR. DAVIS:

13  Q.  And what is this?

14  A.  So this was when I called GoDaddy, when I discovered what

15  was going on.  This is the day I discovered the issue.  So I

16  called GoDaddy to see why my e-mails were all missing.

17  Q.  And where on this document does it say what you called

18  GoDaddy about?

19  A.  Well, it doesn't say it.  It shows that I called them that

20  day.

21  Q.  And how many more of these types of documents do you have

22  in your e-mail collection, in your account?

23  A.  I do not know.

24  Q.  How many times have you called GoDaddy?

25  A.  Many times.

Duke - Direct

1  Q.  Many times?

2  A.  Yes.

3  Q.  Okay.  And every time you call, you get an e-mail saying:

4  "Thanks for calling.  Fill out the survey"?

5  A.  That I don't know.

6  Q.  That's pretty common, though, right?  You get these every

7  time.  You get a survey request of "How did we do?"  Is that

8  what this is?

9  A.  I haven't tracked, but, yes, that's what this is:  "You

10  just called.  Do a survey."

11  Q.  Okay.  And what did Mr. Life want to talk to you about?

12  A.  Bill Edmiston had a misstatement in his deposition about

13  ownership of the company.

14  Q.  All right.  And what specifically was the misstatement?

15  A.  He didn't own any of the company, and he thought he did.

16         MR. SALAM:  Your Honor, I'm going to object on

17  relevance grounds.

18         THE COURT:  I will overrule.  Let's see how far it

19  goes.  I think I know where it is going, but I'm not that

20  smart.  So we will see if I need to reign it in.

21  BY MR. DAVIS:

22  Q.  So was it that after the deposition, your attorney was

23  calling you to get copies of some agreements that Mr. Edmiston

24  talked about at his deposition?

25  A.  Exactly.

Duke - Direct

168

1  Q.  Okay.  And what did you tell your attorney that day about

2  this issue you learned about GoDaddy?

3  A.  I mean, I told him what happened, that the e-mails had

4  auto-purged, and that I fixed it, but all of the e-mails

5  between -- from up until 2014, to the best of my knowledge, in

6  my sent folder were gone.

7  Q.  And was that before you -- you told Mr. Life, your

8  attorney, before you called GoDaddy or after?

9  A.  I don't recall.

10  Q.  Okay.  And what specifically did you learn from GoDaddy

11  when you called that day?

12  A.  That that's an automatic account setting, and that's the

13  way the e-mail comes, and if you don't change it, that's what

14  it does, and they then directed me how to fix it.  So I was

15  able to fix it while I was on the phone with them to stop

16  doing it in the future, and then they said they could recover

17  whatever it was, ten days or two weeks of data.

18  Q.  And did you report all of that to Mr. Life?

19  A.  If I spoke to him after the call, I did report it to him.

20  If I spoke to him before the call, I would have just said:

21  "All the e-mails are missing.  I don't know what's going on."

22  Q.  Okay.  And you don't have a recollection one way or the

23  other?

24  A.  I am pretty certain I called him afterwards, but I'm not a

25  hundred percent sure.

Duke - Direct

1  Q.  And did Mr. Life give you any directions about what to do

2  in connection with that?

3  A.  I don't recall.

4  Q.  Okay.  Did he send you any e-mails in regard to -- that

5  day in regard to this auto-purge problem?

6  A.  I don't believe so.  I'm not sure, though.

7  Q.  Do you recall if he ever sent you any e-mails at all about

8  the auto-purge problem?

9  A.  I'm sure at some point I received e-mails about it.  I

10  don't know when.

11  Q.  Right.

12       And other than telling him orally -- or the only way

13  you told him was telling him over the phone about it?

14  A.  Yes.

15  Q.  There was no e-mail from you to him about an auto-purge

16  problem?

17  A.  I don't believe so.

18  Q.  Now, I'm going to direct your attention to your

19  Defendants' Exhibit No. 5.  I will have that brought in front

20  of you.

21       This is identified in your exhibit list as a

22  Declaration of Travis Life, dated May 14, 2018, Docket 253-2.

23       Do you see that in front of you?

24  A.  Yes, I do.

25  Q.  Do you recognize it?

Duke - Direct

 1   A.  Yes, I have seen it in preparation.

 2   Q.  All right.  And this was filed with the court; do you

 3   understand that?

 4   A.  Yes.

 5   Q.  And it was -- it's dated May 14th, 2018.

 6            Do you understand that?

 7   A.  Yes.

 8   Q.  Okay.  And this is a couple of years after the auto-purge

 9   problem, right?

10   A.  Yes, definitely.

11   Q.  Yes.

12            Like three years later?

13   A.  Exactly.

14   Q.  And taking a look at the first page and the second page of

15   the declaration -- let me know when you are ready for the

16   second page.

17   A.  I'm ready for the second page.

18   Q.  Review this declaration.

19   A.  Okay.

20   Q.  And the next page.

21   A.  Okay.

22   Q.  And this last page, No. 4.

23   A.  Okay.

24   Q.  Anywhere in that exhibit on May 14th, 2018, describe this

25   auto-purge problem?

Duke - Direct

```
 1  A.  No.

 2  Q.  Did you review this declaration from your attorney

 3  Mr. Life before it was filed?

 4  A.  I don't believe so.

 5  Q.  No?

 6  A.  No.

 7  Q.  During the course of this case, was it your practice with

 8  your attorneys to review things they were filing on your

 9  behalf and your company's behalf in the case?

10  A.  It's my understanding this is on his behalf; is it not?

11  Q.  He is your attorney at the time he wrote this, right?

12  A.  Yes.

13  Q.  And he's representing you in the case?

14  A.  Yes.

15  Q.  And your company?

16  A.  Yes.

17  Q.  So he is filing this on your behalf, right, and your

18  company's behalf?

19  A.  I suppose so.

20  Q.  Okay.  And nowhere in this document does he disclose the

21  auto-purge problem that you told him about in 2015, right?

22          MR. SALAM:  Objection, your Honor, asked and

23  answered.

24          THE COURT:  Overruled.

25          Just answer it.
```

Duke - Direct

172

```
1              THE WITNESS:  Okay.  It's not in here.
2              THE COURT:  There we go.
3  BY MR. DAVIS:
4  Q.  Okay.  Did you ever use any chat or instant messaging
5  applications with any of the attorneys in this case?
6  A.  No.
7  Q.  And the setting change on the two e-mail accounts, you did
8  that yourself, right?
9  A.  This is actually not accurate.
10             THE COURT:  When you say "this," what are you
11 referring to, Mr. Duke?
12             THE WITNESS:  The setting change on No. 15.
13             THE COURT:  Oh, Paragraph 15 in Exhibit No. 5 --
14             THE WITNESS:  Yes.
15             THE COURT:  -- that you have in front of you?
16             Okay.
17 BY MR. DAVIS:
18 Q.  All right.  Why is Paragraph 15 of this exhibit -- this is
19 your Exhibit No. 5.  It is your attorney's declaration.  What
20 is wrong with Paragraph 15?
21 A.  support@21centurysmoking was never forwarded.
22 Q.  Explain that.
23 A.  bduke@21centurysmoking.com was forwarded to my Yahoo!
24 e-mail.  support@21centurysmoking.com was never forwarded.
25 Q.  Never forwarded.
```

Duke - Direct

173

```
 1         So all the times that your attorneys put that in
 2  papers and filed it with the court and told us and the court
 3  about it, that was inaccurate; is that what you are saying?
 4  A.  Yes, if it was -- if it was told a bunch of times, yes, it
 5  is inaccurate.
 6  Q.  All right.  And it never happened that any documents or
 7  e-mails were forwarded, to make sure I understand it, from
 8  support?
 9  A.  Correct.
10  Q.  That's your support@21centurysmoking.com e-mail account,
11  they were never automatically forwarded to your personal
12  Yahoo! e-mail account; is that right?
13  A.  Yes, that's correct.
14  Q.  All right.  And why would anyone tell us about that?  Why
15  is auto-forwarding important?
16         MR. SALAM:  Object, your Honor.
17         THE COURT:  Yes, I will sustain.
18  BY MR. DAVIS:
19  Q.  Do you understand what auto-forwarding it?
20  A.  Yes.
21  Q.  Why is the attorney apprising the court of this issue in
22  this declaration, if you know?
23         MR. SALAM:  Objection, your Honor.
24         THE COURT:  Let him finish the question.
25         And the basis for the objection?
```

1    Again, I got real simple rules:  Stand up, object,

2  tell me a rule or basis.

3        MR. SALAM:  He is asking why the attorney did

4  something.

5        THE COURT:  Okay.  If you know.  Do you know?

6        THE WITNESS:  I have no idea.

7        THE COURT:  Okay.

8  BY MR. DAVIS:

9  Q.  All right.  I'm going to -- again, this is --

10        MR. DAVIS:  We will move this -- ask that this be

11  moved into evidence.  It is a pleading or document filed in

12  this case.  Similarly, we would ask for anything that's on the

13  record to be part of the evidentiary hearing.

14        THE COURT:  I assume there is no objection?

15        MR. SALAM:  I have no objection, your Honor.

16        THE COURT:  Okay.  Defendants' Exhibit No. 5, which

17  is Mr. Life's declaration, will be admitted.

18   (Defendants' Exhibit 5 was offered and received in

19    evidence.)

20  BY MR. DAVIS:

21  Q.  And just so I'm clear, is there anything else in this

22  May 14, 2018, declaration that you just read, that was drafted

23  by your attorney, filed with the court, anything else in there

24  that's wrong or false?

25        THE COURT:  And if you need time to review it --

Duke - Direct

175

```
 1          THE WITNESS:  Yes, that stands out to me.  I would
 2    have to reread the whole thing again slowly to make sure, but
 3    that is clearly wrong.
 4          MR. DAVIS:  Please do.
 5          THE WITNESS:  Okay.  Next page?
 6          Next page?
 7          Next page?
 8          No, it looks fine.
 9          MR. DAVIS:  Thank you.
10    BY MR. DAVIS:
11    Q.  Did you ever tell your attorney Mr. Life not to disclose
12    the auto-delete problem to anyone?
13    A.  No.
14    Q.  Did you ever tell him not to disclose it to the court or
15    Plaintiffs in this case?
16    A.  No.
17    Q.  All right.  Did your attorney Mr. Life tell you any
18    obligations you had to disclose that problem?
19    A.  I disclosed it to my attorneys.
20    Q.  And did he tell you anything about your further obligation
21    to disclose that information to anyone?
22    A.  No.
23    Q.  A few days later, June 29th of 2015, your testimony is you
24    disclosed this auto-purge problem to Mr. Life, right?
25    A.  Yes, if that's the date, yes.
```

Duke - Direct

1  Q.  That's the date on your e-mail with him.

2  A.  Okay.

3  Q.  And a few days later, your attorneys disclosed additional

4  documents between Mr. Edmiston and your company, right, the

5  agreements with Mr. Edmiston?

6       Do you remember that?

7  A.  I do not.  I believe you, but I do not remember.

8  Q.  Well, your attorneys -- well, do you remember looking, at

9  the time, for documents related to your agreement with

10 Mr. Edmiston?

11 A.  Looking at the these e-mails, refreshing my memory, yes,

12 because he had misspoke in his deposition.

13 Q.  You did.

14      But you found some documents or he had them after the

15 dep that showed he had some kind of an agreement with your

16 company, right?

17 A.  Yes, yes.

18 Q.  And your attorneys produced those documents?

19 A.  I don't know what my attorneys produced.  I will take your

20 word for it.

21 Q.  I'm going to direct your attention to a section of -- your

22 attorneys just filed a brief on your behalf, right, you are

23 aware of that, last Thursday?

24 A.  Yes.

25 Q.  And that was responding to the pending motion for

Duke - Direct

 1   sanctions against you, right?

 2   A.  Yes.

 3          MR. DAVIS:  All right.  I'm going to ask that that be

 4   displayed, that is -- what is the docket of that?

 5          It is Docket 347, your Honor.

 6          THE COURT:  I have got it right in front of me.

 7          MR. DAVIS:  Defendants' brief.  It is up on the

 8   screen now.

 9   BY MR. DAVIS:

10   Q.  Are you familiar with that?

11   A.  Yes.

12   Q.  Did you assist your attorneys in preparing this filing?

13   A.  Yes, I did.

14          MR. DAVIS:  And I'm going to ask for Page 14 to be

15   displayed of the brief.

16   BY MR. DAVIS:

17   Q.  You see there is a section here about "GoDaddy Accounts

18   Auto-Purge."

19          Do you see that?

20   A.  Yes.

21   Q.  Okay.  And you see the second paragraph under that?

22   A.  Yes.

23   Q.  Could you read it out loud, please?

24   A.  "On or about June 29, 2015, Mr. Duke discovered the

25   corporate e-mail accounts" --

Duke - Direct

178

```
 1              THE COURT:  Hold on.  A little bit slower.

 2              THE WITNESS:  Sorry.

 3              THE COURT:  This is -- context is artificial.  So go

 4    a little slower.

 5              THE WITNESS:  I talk a little too fast.

 6              THE COURT:  Not a problem.

 7              THE WITNESS:  "On or about June 29, 2015, Mr. Duke

 8    discovered that the corporate e-mail accounts" --

 9              MR. DAVIS:  I'm sorry.  The second paragraph, not the

10    first one, the second one.

11              THE WITNESS:  "On or about June 29, 2015, he called

12    GoDaddy to find out why he could no longer access those

13    e-mails.  During that call with Go Daddy's representative, he

14    learned for the first time of Go Daddy's default auto-purge

15    setting.  Mr. Duke immediately took steps to notify former

16    defense counsel of these facts."

17    BY MR. DAVIS:

18    Q.  Does that accurately reflect what happened?

19    A.  Yes, I believe so, yes.

20    Q.  And was it the case that you realized you had this problem

21    in 2014, but you never looked into it until 2015?

22              MR. SALAM:  Object, your Honor, that wasn't his

23    testimony.

24              THE COURT:  Well, you can answer it.

25              THE WITNESS:  I don't understand where you are
```

Duke - Direct

179

1   getting 2014 from.

2   BY MR. DAVIS:

3   Q.  You had made a representation in a prior document that you

4   said in or about 2014 you learned of this problem.

5          Do you recall that?

6   A.  I do recall seeing that, and that was, obviously, an

7   incorrect statement.

8   Q.  Okay.  And the thing that's -- what's changed your

9   testimony is the e-mail from GoDaddy and the e-mail from

10  Mr. Life?

11  A.  I actually spoke with GoDaddy and discussed with them what

12  the contents of the call were, and they told me.

13  Q.  Right.

14         Because if you look at the bottom of this page of

15  your brief, right, the last two lines, it says March 19, 2018,

16  you signed a declaration which states in part:

17         "In or about 2014, I first learned that the default

18  settings for the provider of 21CS's e-mail server,

19  godaddy.com, automatically deleted e-mails sent from its

20  @21centurysmoking.com e-mail addresses after a short period.

21  As soon as the provider settings were discovered, the settings

22  were adjusted to save all sent e-mail?"

23         That is what you said in your March 19th declaration,

24  right?

25  A.  Correct.

Duke - Direct

1   Q.  Okay.  And if we can go back one page, Page 14, in the

2   first paragraph, under this heading, "GoDaddy Account

3   Auto-Purge," right, do you see in the middle where it says:

4           "Mr. Duke discovered this setting while searching for

5   certain e-mails at the direction of former defense counsel?"

6           Do you see that?

7   A.  Yes.

8   Q.  And the next line says what?

9   A.  "During that process, he discovered he could no longer

10  access or find certain e-mails that he had previously located

11  and which had previously been -- which had been previously

12  provided to former defense counsel for production."

13  Q.  So that means at that time you were looking, you couldn't

14  find e-mails that you previously found because they were gone,

15  right?

16  A.  Exactly.

17  Q.  And they were gone forever?

18  A.  I don't know if they are gone forever, but they were gone.

19  Q.  And you can't find them?

20  A.  I couldn't find them in the sent folder.

21  Q.  Right.

22          And did you continue searching to see if you could

23  find them anywhere else?

24  A.  Well, yes, I believe I was looking for a document, so I

25  would have looked on my computer for the document as opposed

Duke - Direct

181

1   to in my e-mail.

2   Q.  Got it.

3           But the e-mails itself were gone?  You couldn't find

4   them?

5   A.  Not necessarily.  He probably replied to me.

6   Q.  And you don't say that in this brief, though, right?

7   A.  No.

8   Q.  You say you could no longer access or find certain e-mails

9   that you previously located, right?

10  A.  Because that is what happened at that moment, yes.

11  Q.  At that moment in time?

12  A.  Yes.

13  Q.  Okay.  And that's your testimony as to what that means in

14  this brief?

15  A.  Yes.

16  Q.  I'm going to direct your attention now to --

17          THE COURT:  Can you hold on one second here?

18          MR. DAVIS:  Thank you, your Honor.

19          THE COURT:  You don't need to thank me.  I need to

20  just double-check something here.

21   (Brief pause.)

22          THE COURT:  Go ahead.

23  BY MR. DAVIS:

24  Q.  I'm going to turn your attention now to two exhibits that

25  your attorneys just produced over the weekend.  These are your

Duke - Direct

182

1   exhibits, Exhibits 53 and 54, Defendants' Exhibits 53 and 54.

2        And do you know what those exhibits are?

3   A.  Can you --

4   Q.  Yes, sorry, I didn't see those up yet.

5        MR. DAVIS:  No. 53.

6   BY MR. DAVIS:

7   Q.  All right.  What is displayed in front of you is the way

8   it was produced to us.  It doesn't have a Defendants' exhibit

9   marking, but this is the e-mail -- or I should say the

10  document we got by e-mail this weekend.

11       Do you recognize it?

12       THE COURT:  And is this Exhibit 53 or 54 that's in

13  front of me right now?

14       MR. DAVIS:  That's 53 that's on the screen, your

15  Honor.

16       THE COURT:  Because, remember, I don't have either

17  one of these documents.  So I just want to keep track.

18       MR. SALAM:  Your Honor, during the break, I provided

19  a binder of exhibits in the folder on the inside.

20       THE COURT:  A different folder?

21       MR. SALAM:  It has 53, 54, and 57.

22       THE COURT:  And even though it says Exhibits 1

23  through 52, they are in the --

24       Got it.  Okay.  Got it.  Thank you.

25       THE WITNESS:  Is this the whole document, just one

Duke - Direct

1   page?

2           MR. DAVIS:  This is the second page, is this.

3           THE WITNESS:  Okay.

4   BY MR. DAVIS:

5   Q.  Do you recognize it?

6   A.  Yes.

7   Q.  You authorized your attorneys to produce it and disclose

8   it in this proceeding?

9   A.  Yes.

10  Q.  And what is it?

11  A.  It was just an effort we were making to send the

12  recordings that Bill Edmiston had sent over, and that is when

13  he sent that over to me, and I sent it over to my lawyer.

14  Q.  So you received it from who?

15  A.  Bill Edmiston.

16  Q.  And you sent it to one of your prior attorneys,

17  Ms. Liberman?

18  A.  Yes.

19  Q.  And what's attached to that e-mail is what?

20  A.  A video or audio of a recording from a trade show in

21  Las Vegas.

22  Q.  And that's what you can see there, that IMG_0117.MOV file?

23  A.  Yes.

24  Q.  Right.

25          And this was sent from you, from your Yahoo! e-mail

Duke - Direct

184

1  account, to your attorney Ms. Liberman, right, in October of

2  2014?

3  A.  Yes.

4  Q.  Okay.  And you received -- you received it that date from

5  Mr. Edmiston, right?

6  A.  Correct.

7  Q.  And was it your decision alone not to forward to your

8  attorneys the other recordings that you received from

9  Mr. Edmiston?

10          MR. SALAM:  Objection, foundation.

11          THE COURT:  Back it up a little bit.  Ask him if he

12  received the other recordings.

13  BY MR. DAVIS:

14  Q.  Did you receive any other recordings from Mr. Edmiston

15  that he took at that trade show you just referenced?

16  A.  I'm not sure which one this is, but, yes, I received two.

17  Q.  All right.  And was it your decision alone not to

18  forward it to --

19          THE COURT:  When did you receive those?

20          THE WITNESS:  I believe like right away, he sent two.

21          THE COURT:  Right away.

22          Give me a month and a year.

23          THE WITNESS:  Probably around this time.  I'm not

24  sure exactly when this happened.

25          THE COURT:  October of 2014?

 1       THE WITNESS:  Whenever this happened, I'm not exactly

 2  sure what date this was.

 3       THE COURT:  I don't know when it happened, so I can't

 4  help you.

 5       MR. SALAM:  I believe there is an e-mail.

 6       THE COURT:  Okay.

 7       MR. SALAM:  We can make life easy if we just go into

 8  the exhibit with the e-mail with the second video.

 9       THE COURT:  All right.  I interrupted.  I

10  interrupted.

11       Go ahead, Mr. Davis.

12       MR. DAVIS:  Thank you.

13  BY MR. DAVIS:

14  Q.  So you had two recordings e-mailed to you from

15  Mr. Edmiston, right?

16  A.  Yes.

17  Q.  And you provided this one, 0117, to your attorneys, right?

18  A.  Yes.

19  Q.  And did you provide the second one to your attorneys?

20  A.  I do not think so.  I'm not sure.

21  Q.  All right.  And my question is:  Was it your decision

22  alone not to forward to your attorneys the second recording?

23  A.  Yes.

24  Q.  Why?

25  A.  Because the recording literally said on it, basically,

Duke - Direct

1    something -- or not literally, something to the effect of

2    "There is no recording. I didn't get it. Will try to send

3    later" or something to that effect.

4            And although there was an attachment, every e-mail of

5    his seems to have an attachment because his business card is

6    an attachment. So every Bill Edmiston e-mail has an

7    attachment. So if his e-mail said there is nothing here, I'm

8    not going to forward it. So I never even looked at the

9    attachment. I did not realize there was a second recording

10   until very recently.

11   Q. And when was that, how recently?

12   A. Whenever this came up through my lawyers.

13   Q. And did you listen to the second recording?

14   A. I am not even sure which one I sent and which one I didn't

15   send. So I never -- I don't think I ever even listened to

16   them when I sent them. I just sent them.

17           THE COURT: But the question is have you ever

18   listened to them.

19           THE WITNESS: I know I have listened to at least one

20   of them. I don't know that I have listened to both of them.

21   I didn't even realize there was a second one.

22           THE COURT: Do you know if you listened to the first

23   one or the second one?

24           THE WITNESS: That I don't know.

25           THE COURT: Okay.

Duke - Direct

1   BY MR. DAVIS:

2   Q.  So you have more e-mails in your possession between you

3   and Mr. Edmiston, is that right, that you haven't produced?

4   A.  I would believe so, yes.

5   Q.  Okay.  And you are saying in this e-mail -- this is your

6   new Exhibit 53.  You are saying there -- it is from you, and

7   what do you write to your attorney Ms. Liberman?

8   A.  "I think you already have this, but he just sent this to

9   me."

10  Q.  All right.  So you previously already sent a recording to

11  your attorneys, right?

12  A.  Yes, so I was hopeful this was the second recording.

13  Q.  Okay.

14  A.  But it wasn't.

15  Q.  And --

16          THE COURT:  Why did you think it was the second

17  recording?

18          THE WITNESS:  Well, because he had sent one before,

19  and he said, "I'm going to send you the other one later," and

20  then later, he sends another one.  So I'm like, "Maybe this is

21  it," and I sent it on.

22          THE COURT:  But I thought you just said that you

23  didn't know there was anything on that second e-mail because

24  he always has an attachment?

25          THE WITNESS:  No, no, there is a first e-mail and

Duke - Direct

188

1   there is a second e-mail.  The second e-mail actually did have

2   the recording.  I didn't realize it.  I don't even think he

3   realized it.  So there is a first e-mail with a recording.

4   There is a second e-mail with a recording.  He still doesn't

5   realize that he has ever sent that second e-mail.  So a few

6   days later, he sends me the first one again, if that makes

7   sense.  So he sent, again, trying to help send the second

8   e-mail.  He believed that only one e-mail had gone through.  I

9   believed only one e-mail had gone through.  So he was, a few

10  days later, following up with a second e-mail -- or I guess it

11  would be a third e-mail, following up with a third e-mail, to

12  try to send this second recording.

13          There is one e-mail with one recording, a second

14  e-mail with a second recording.  He doesn't realize he sent

15  two.  I don't realize he sent two.  Days later, he sends a

16  recording, thinking that he is sending the second recording,

17  if that makes sense, but it just ends up being the same

18  recording that I had already seen that he sent.

19          THE COURT:  Okay.  Go ahead.

20  BY MR. DAVIS:

21  Q.  This is in 2014, right?

22  A.  Yes.

23  Q.  And at this time, whenever your attorneys need you to

24  search for e-mails, they contact you and have you search your

25  records, right?

1    A.  Yes.

2    Q.  Because they don't have any access in 2014 to your Yahoo!

3    e-mails or your GoDaddy e-mails, right?  You have them?

4    A.  Correct.

5    Q.  Okay.  And --

6         THE COURT:  And that's because they weren't imaged.

7    Only the hard drives were imaged, right?

8         MR. DAVIS:  That's right.

9    BY MR. DAVIS:

10   Q.  And they are not preserved anywhere, and no ESI vendor has

11   made a copy of them, right, in October of 2014, right?

12   A.  I don't remember when ESI even happened.  I don't remember

13   when the vendor -- when that happened.  I don't know if this

14   is before that or after that, but yes.

15   Q.  All right.  Well, we had our conference in the middle of

16   2014, and your ESI vendor, I think, did it in December of

17   2014, right?

18   A.  So this would have been before that anyway.

19   Q.  Right.  But I just wanted to confirm your process.

20        And at this time, you are communicating and e-mailing

21   with Mr. Edmiston on the same day, right?

22   A.  Yes.

23   Q.  All right.  I'm going to have you look at --

24        MR. DAVIS:  Move this into evidence, Defendants'

25   Exhibit 53.

Duke - Direct

1          THE COURT:  Any objection?

2          MR. SALAM:  No objection, your Honor.

3          THE COURT:  All right.  53 will be admitted.

4     (Defendants' Exhibit 53 was offered and received in

5      evidence.)

6  BY MR. DAVIS:

7  Q.  I would like you to look at Plaintiff's Exhibit 24.

8          THE COURT:  Plaintiff's 24.

9  BY MR. DAVIS:

10  Q.  Could you take a look at that and tell me if you recognize

11  it?

12  A.  Yes.

13  Q.  And that's an e-mail from who to who?

14  A.  Bill to me.

15  Q.  And is it your testimony today that you never forwarded

16  the e-mail you received on October 4th, 2014, marked as

17  Plaintiff's Exhibit 24, in front of you, to your attorneys?

18  A.  I said I forwarded one, not the second one.

19  Q.  Right.

20          So this one you didn't send to your attorneys or you

21  did?

22  A.  I believe I sent it from my bduke account.

23          THE COURT:  To?

24          THE WITNESS:  The bduke@21centurysmoking account.  I

25  don't think I sent it from this account.

Duke - Direct

1          THE COURT:  All right.  And you sent it to who -- or

2    to whom?  Sorry.

3          THE WITNESS:  I don't recall.  My previous counsel.

4    I don't know which one.

5          THE COURT:  Okay.  But you do recall sending it to

6    your previous counsel?

7          THE WITNESS:  Sending at least one, yes.

8          THE COURT:  At least one what?

9          THE WITNESS:  Recording.  I sent one recording, not

10   two recordings.

11         THE COURT:  This e-mail, the one that's in front of

12   you, Exhibit 24, do you recall if you sent that e-mail?

13         THE WITNESS:  This e-mail, no.

14         THE COURT:  You don't remember sending it?

15         THE WITNESS:  This e-mail I would not have sent.

16         THE COURT:  Go ahead, Mr. Davis.

17   BY MR. DAVIS:

18   Q.  If you could read out loud the first paragraph from

19   Mr. Edmiston to you on October 4, 2014.

20   A.  "I found a longer one that I cannot forward.  Too long,

21   but I have it.  So there is a second one.  Mostly, just

22   general talking, but he does state they have gone to the FDA

23   and they have Washington lobbyists.  Also states this guy is

24   the one that goes to the factory and tests the vaporing for

25   the units.

Duke - Direct

1    "Long recording, and we did not get much good info in

2    this one that much clearer.  We are bad spies :):)  But this

3    proves they were there and maybe his voice can be identified."

4    Q.  All right.  Is it your testimony that you never informed

5    your attorneys about this e-mail marked as Exhibit 24?

6    A.  I informed my attorneys that he was there and that he

7    spoke with them.  I didn't necessarily inform them of this

8    specific e-mail.

9    Q.  Did you inform them that Mr. Edmiston had another

10   recording that was too long to forward?

11   A.  This is exactly what we were just talking about.

12   Q.  This particular recording is what you are talking about.

13   This is the one he says he can't forward because it is too

14   long, right?

15   A.  There is another e-mail where he says the same thing, but,

16   yes, there is two recordings.  He thought he only sent one.

17   He thought the other one was too long to send.

18   Q.  All right.  So I'm clear, you never told your attorneys

19   about this information about a file that was too long to be

20   able to be forwarded, right?

21   A.  Yes, I did tell them.

22   Q.  When did you tell them?

23   A.  That same time.

24   Q.  And did you say it orally or in writing?

25   A.  I believe orally.

Duke - Direct

1    Q.  Orally.  Okay.

2           And did you alone decide not to forward this e-mail

3    to your attorneys?

4    A.  Yes, I alone decided not to forward this e-mail.

5    Q.  Okay.  And why did you decide to withhold the information

6    about another recording that was made at this event?

7           MR. SALAM:  Objection, your Honor, that's not his

8    testimony.  He said --

9           THE COURT:  Yes, I will sustain.

10          Rephrase that.

11   BY MR. DAVIS:

12   Q.  Why did you decide to withhold that information and not

13   give it to your attorneys or disclose it in this case?

14          MR. SALAM:  Objection, your Honor.

15          THE COURT:  Yes, sustained.

16   BY MR. DAVIS:

17   Q.  Why did you decide not to disclose the information in this

18   e-mail to anyone?

19          MR. SALAM:  Objection, your Honor.

20          THE COURT:  I will sustain.

21          If you ask him "Why did you decide not to forward

22   this e-mail?" --

23          MR. SALAM:  I won't object.

24          THE COURT:  -- that's a perfectly good question.

25

Duke - Direct

1   BY MR. DAVIS:

2   Q.  Why did you decide not to forward this e-mail to anyone?

3   A.  I told my lawyers the content of the e-mail on this

4   occasion.

5   Q.  And what did you tell them?

6   A.  That "I'm sending one recording.  There is a second

7   recording that's too long.  We have to figure out a way for

8   him to get it to you."

9          MR. DAVIS:  All right.  We move Plaintiff's

10  Exhibit 24 into evidence.

11         MR. SALAM:  No objection, your Honor.

12         THE COURT:  Okay.  Plaintiff's Exhibit 24 will be

13  admitted.

14    (Plaintiff's Exhibit 24 was offered and received in

15     evidence.)

16  BY MR. DAVIS:

17  Q.  I'm going to turn your attention now to Defendants'

18  exhibit -- your exhibit -- 54, which we received this weekend.

19  I ask you to take a look at that document.  Again, it is not

20  marked.  This is the way we received it.  It doesn't have the

21  Bates stamp number.

22         Can you tell me if you recognize it?

23  A.  Yes.

24  Q.  And what is it?

25         THE COURT:  54.  Okay.

Duke - Direct

1          THE WITNESS:  It appears to be Travis, when he is

2    asking me to look for the e-mails for those specific topics.

3    BY MR. DAVIS:

4    Q.  And can I just -- can you look at the first page of this?

5          All right.  This is an e-mail between you -- and when

6    you say "Travis," that's one of your attorneys, right?

7    A.  Yes.

8    Q.  And Mr. Shonder, one of your other attorneys, is copied on

9    this?

10   A.  Yes.

11   Q.  All right.  And you authorized the disclosure of this

12   document?

13   A.  Yes.

14   Q.  And if we go down to the first e-mail in the string again,

15   go to the last page, right?

16   A.  Okay.

17   Q.  So there is the footer --

18          THE COURT:  Let me get this.  One second.

19          Sorry, sorry.

20          MR. DAVIS:  That's okay.  It is Page 3 of 5.

21          THE COURT:  Okay.  I'm with you.  Go ahead.

22   BY MR. DAVIS:

23   Q.  All right.  There.

24          So the original message was sent on Saturday,

25   March 17th, 2018; is that right?

Duke - Direct

1  A.  Page 3 of 5?

2         THE COURT:  3 of 5, at the bottom.

3         THE WITNESS:  There is nothing on Page 4?  I just

4  want to confirm.

5  BY MR. DAVIS:

6  Q.  There is a Page 4 of 5.

7  A.  4 of 5, yes.  So this would be the beginning.

8  Q.  So there is the very bottom.

9         So this is 3 of 5, again.

10  A.  Okay.

11  Q.  It is the beginning of the e-mail string.

12         Do you see that?

13  A.  Yes.

14  Q.  Where it says "original message"?

15  A.  Yes.

16  Q.  And this is an e-mail from Mr. Life to you?

17  A.  Yes.

18  Q.  And he sends it to your Yahoo! account, right?

19  A.  Yes.

20  Q.  And to your GoDaddy account?

21  A.  Yes.

22  Q.  And was this pretty much the standard way your attorneys

23  sent e-mails to you, to both your GoDaddy and Yahoo! account

24  throughout your case?

25  A.  Not necessarily.

Duke - Direct

1  Q.  No?

2  A.  No.

3  Q.  What account did they primarily send you e-mails on?

4  A.  Any of my three accounts that I use.

5  Q.  Okay.  Was it typical that they sent e-mails to both

6  accounts, in most e-mails, to make sure you got it?

7  A.  I wouldn't say necessarily, no.

8  Q.  Okay.  And what does your attorney ask you here?

9       This is, again, March 17, 2018, right?

10 A.  Yes.

11 Q.  And this confirms he is asking you a couple of questions.

12      Let's look at the last page.  Do you see that

13 paragraph?

14 A.  Yes.

15 Q.  And why don't you read that?

16 A.  "Did you ever find e-mails from the confused customer

17 Wood?  We never produced any e-mails from her, so I assumed

18 that her e-mails were not retained, but I need to get that

19 confirmed from you.

20      "Also, we have invoices from Kirti/Webrecsol;

21 however, we have no e-mails.  Do you have any Kirti or

22 Webrecsol e-mails?

23      "Finally, I'll send you the signature page in a

24 little bit for you to sign.  Thanks!"

25 Q.  All right.  So your attorney is writing to you asking you

Duke - Direct

198

1   to find e-mails, right?

2   A.  Correct.

3   Q.  And that's because your attorneys don't have access to any

4   of the e-mails, right?

5   A.  Correct.

6   Q.  Right.

7        And they are not with some ESI vendor because their

8   first course of action is to call you when they need you to

9   find e-mails, right?

10  A.  Yes.

11  Q.  Okay.  And describe the efforts or explain your prior

12  efforts to find those customer Wood's e-mails he describes.

13  A.  I don't recall.  Over the last seven, eight years, however

14  long this has been, I have searched for every e-mail they have

15  ever asked me for.  I don't recall if I have ever been asked

16  to search for this, so I don't know.

17  Q.  As you sit here today, you don't have any recollection

18  about searching for and finding the e-mails you sent back and

19  forth with your customer Ms. Wood?

20  A.  I do not recall.

21  Q.  All right.  Let's go to your response to Mr. Life.

22        All right.  Do you see at the bottom of 2, you are

23  writing back to him, right, on Saturday?

24  A.  Yes.

25  Q.  That's from your GoDaddy account, right?

Duke - Direct

```
 1              And you say on Page 3 -- what does it say?
 2   A.  "So I searched for Kirti e-mails, and I mean there are
 3   hundreds of them.  Not sure if you just want my password or
 4   what?  But I don't really know what you want me to do with
 5   this information."
 6   Q.  All right.  And in there you don't say anything about the
 7   Wood's e-mails, right?  You just reference the Kirti e-mails?
 8   A.  Yes.
 9   Q.  And did you have a phone call on March 17th with your
10   attorney Mr. Life or any other attorneys at that time?
11   A.  I believe we talked on the phone around that time.  I'm
12   not sure exactly when.
13   Q.  Do you recall having a phone call outside of this e-mail
14   about these issues of looking for lost e-mails?
15   A.  I believe so, yes.
16   Q.  Okay.  And what did you discuss?
17   A.  That there were topics that had been brought up that they
18   wanted me to search for in my e-mails.
19   Q.  And were those conversations with just Mr. Life or with
20   all of your attorneys?
21   A.  I don't recall who all I talked to about it.
22   Q.  Do you remember talking to Mr. Stamatis about it?
23   A.  I don't recall.
24   Q.  What about Mr. Shonder?
25   A.  I don't recall.
```

Duke - Direct

1   Q.  Okay.  But they are all calling you because you are the

2   one that had access to the e-mails to do the searching, right?

3   A.  Yes.

4   Q.  None of your attorneys did at this time?

5   A.  I don't believe so.

6   Q.  And your attorney Mr. Life is saying here --

7           THE COURT:  Can we pause here for a second?

8           I thought a long time ago this morning, you mentioned

9   that you gave your credentials to the attorneys so that they

10  could search, or did you offer to give it to them?

11          THE WITNESS:  Do you see how I did it here in this

12  e-mail:  "Not sure if you want my password or not"?  I was

13  constantly asking them "Do you want my password?"

14          THE COURT:  So that's basically what you did

15  previously?

16          THE WITNESS:  And I don't recall if they ever took it

17  and looked up something.

18          THE COURT:  Okay.  That clarifies it.  Okay.  All

19  right.

20  BY MR. DAVIS:

21  Q.  And you see from the e-mail from Mr. Life, he is saying,

22  "We don't have" --

23          MR. DAVIS:  Go back to Page 4 of 5, please.

24  BY MR. DAVIS:

25  Q.  All right.  So he says, right, "Did you ever find the

Duke - Direct

201

1   e-mails from Ms. Wood?  We never produced any e-mails for

2   her."

3            You know at this time that those e-mails are lost,

4   right?

5   A.  I have no idea.

6   Q.  Okay.  But if we search your e-mails, and they are gone,

7   they are gone forever, right?

8   A.  I would say the search engines for these e-mails are not

9   necessarily the most robust of search engines.  So it is

10  possible it is there, and I didn't search well enough for it,

11  but it could be there.

12  Q.  So the tools --

13           THE COURT:  Anybody planning on doing a robust search

14  in this case?

15           THE WITNESS:  This is all being searched currently.

16           THE COURT:  We are going to take a quick break so I

17  don't blow a gasket.

18   (Recess taken.)

19           THE CLERK:  Recalling 12 CV 50324, DR Distributors,

20  LLC v. 21 Century Smoking, Inc.

21           THE COURT:  All right.  I'm just perusing the docket.

22           Quoting the Grateful Dead:  "What a long, strange

23  trip it has been" doesn't do this thing justice.

24           Unless somebody has a different date, Docket

25  Entry 116, I believe.  It is like 200 docket entries

Duke - Direct

1    ago -- more than 200 docket entries.

2           March 4th, 2015, were we even back up here then?  I

3    don't remember.

4           March 4th, 2015, this is one of the -- this is, I

5    think, the last scheduling order because it says:  "This is a

6    final extension."

7           "This is a final extension" in all caps.

8           MR. SALAM:  I'm sorry, your Honor, Docket 116?

9           THE COURT:  116.

10          "26(e) supplements due 6/1/2015."  It seems like an

11   important date to me.  That's all I'm saying.

12          Go ahead, Mr. Davis.

13          MR. SALAM:  Your Honor, may I just ask a timing

14   question?

15          Do you know how late we are going to go today?

16          THE COURT:  At least 5:00.

17          MR. SALAM:  Thank you, your Honor.

18          THE COURT:  Go ahead.  Any time you are ready.

19          MR. DAVIS:  Thank you, your Honor.

20          We move Defendants' Exhibit 54 into evidence.

21          MR. SALAM:  No objection, your Honor.

22          THE COURT:  I'm sorry?

23          MR. SALAM:  No objection, your Honor.

24          THE COURT:  Okay.  And it is Defendants' 54?

25          MR. DAVIS:  Yes, your Honor.

Duke - Direct

1       THE COURT:  Okay.  Defendants' Exhibit 54 will be

2    admitted.

3     (Defendants' Exhibit 54 was offered and received in

4     evidence.)

5    BY MR. DAVIS:

6    Q.  Mr. Duke, is it your testimony today that at the time you

7    forwarded the file we were talking about, the recording, 117,

8    is that the only recording that was in your possession at the

9    time?

10   A.  No.

11   Q.  What other one did you have?

12   A.  I don't know what the name of the other one was, but there

13   was two recordings.

14   Q.  And the second recording was never given to your

15   attorneys; is that right?

16   A.  Correct.

17   Q.  Okay.  Directing your attention back to the exhibit on the

18   screen, Page 4 of 5, your attorney says, after the question

19   about Ms. Wood, "We never produced any e-mails from her, so I

20   assumed that her e-mails were not retained."

21       What does your attorney mean by the word "not

22   retained" -- or the phrase?

23       MR. SALAM:  Objection, your Honor.

24       THE COURT:  I will sustain.

25

Duke - Direct

1  BY MR. DAVIS:

2  Q.  Have you ever heard your attorneys -- any of your prior

3  attorneys use the words "not retained" in connection with any

4  of the documents you were retrieving for them?

5  A.  I don't recall.

6  Q.  Okay.  And as you sit here today, you don't have an

7  independent understanding of what your attorney was saying

8  when he said, "So I assume that her e-mails were not

9  retained"?  It doesn't mean anything to you?

10           MR. SALAM:  Objection, your Honor.

11           THE COURT:  Overruled.

12           THE WITNESS:  What's the date of this again?

13           MR. DAVIS:  It is an e-mail from Mr. Life on

14  Saturday, March 17th, 2018.

15           THE WITNESS:  So he could be referring to if it was

16  just a sent e-mail, with no reply, it could, theoretically, be

17  lost is what I'm guessing he would be referring to by "not

18  retained."

19  BY MR. DAVIS:

20  Q.  Because of the auto-purge problem?

21  A.  Exactly.

22  Q.  Got it.  Okay.

23           And he could only confirm that by talking to you,

24  right?

25  A.  Yes.

Duke - Direct

1 Q. He also says in here about "We have invoices from

2 Kirti/Webrecsol; however, we have no e-mails," right?

3 A. Yes.

4 Q. And is that the first time your attorneys are asking you

5 to search for Kirti/Webrecsol e-mails?

6 A. I believe so.

7 Q. And did they tell you why that was important to search for

8 that in March of 2018?

9 A. Because it had come up in whatever had been produced, and

10 the other side was asking for these e-mails for some reason.

11 Q. And they have no e-mails between you and Kirti at that

12 time, right?

13 A. I don't know. I don't recall how many they have. I don't

14 believe they had any.

15 Q. All right. Well, let's look at your response, again.

16 MR. DAVIS: All right. One more page.

17 BY MR. DAVIS:

18 Q. At the top there, this is your e-mail, right?

19 A. Yes.

20 Q. You say you have hundreds of them, right?

21 A. Yes.

22 Q. And you personally ran that search for those e-mails?

23 A. Correct.

24 Q. In your own account?

25 A. Yes.

Duke - Direct

1   Q.  And you searched the live, active, online Yahoo! account,

2   right?

3   A.  Correct.

4   Q.  And did you also search the GoDaddy, the live online

5   GoDaddy account?

6   A.  Yes, I did.

7   Q.  And how did you do that?

8   A.  By going into the search bar and searching for the terms

9   they asked me to search for, as I would always do.

10  Q.  Okay.  And you can do that from any computer anywhere,

11  right?

12  A.  Yes.

13  Q.  Okay.  And did you save the results of that search

14  anywhere?

15  A.  Yes.

16  Q.  Okay.  And where did you save it?

17  A.  My laptop.

18  Q.  And how did you designate it as saved?  What is it?  How

19  did you do it?

20          How would you know what that saved information is

21  from that search?

22  A.  I would either print to .pdf or I would save on the -- the

23  GoDaddy ones can be saved as .eml files.  I don't know if I

24  saved those as .eml or if I printed a .pdf for all of them.  I

25  don't recall.

Duke - Direct

1  Q.  Okay.  And in this instance, we are talking about here

2  Exhibit 54, did you send the hundreds of e-mails you found

3  from your search to your attorneys on that date?

4  A.  I sent -- yes, I sent the e-mails.  I don't know if it was

5  on that date, but I collected them all and sent them as fast

6  as I could.

7  Q.  And you gave -- everything you found in your search, you

8  gave to your attorneys?

9  A.  Correct.

10  Q.  Okay.  And let's look at Mr. Life's response to you.  He

11  writes:  "Brent, we need you to send those e-mails to us."

12          Right?

13  A.  Correct.

14  Q.  He says:  "Please download those e-mails and send them

15  over as soon as you can."

16          Right?

17  A.  Correct.

18  Q.  So Mr. Life, why is he using the word "download"?  Have

19  you done this with him before?

20          MR. SMITH:  Objection, your Honor.  Again, calls for

21  the state of mind of somebody else.

22          THE COURT:  Do you know what he meant by "download"?

23          THE WITNESS:  Download the e-mails, save them, and

24  send them.

25          THE COURT:  Go ahead.

Duke - Direct

208

1  BY MR. DAVIS:

2  Q.  All right.  Do you know how many times prior to March 17,

3  2018, you have gone through this process with your attorneys

4  of searching your live online e-mails and downloading the

5  results?

6  A.  A lot of times.

7  Q.  How many?

8  A.  A lot of times.  I don't know the number, but a lot.

9  Q.  And each time, did you save the results of that, as you

10  described previously?

11  A.  Yes.

12  Q.  And did each time you take the full result and send it to

13  your attorneys?

14  A.  Of course.

15  Q.  Okay.  And in this case, do you remember approximately how

16  many -- you said it is hundreds of e-mails.  So would it have

17  been hundreds of pages of a .pdf or something shorter than

18  that?

19  A.  I don't recall exactly what I meant.  I'm guessing I meant

20  hundreds of pages, hundreds of e-mails.  I don't know.  It was

21  a lot of documents.  I don't know if I was exaggerating a

22  little bit, but it was a lot of documents.

23  Q.  And do you still have the e-mail that you sent to your

24  attorneys that attached that .pdf or that download?

25  A.  Yes.

Duke - Direct

209

1              MR. DAVIS:  Okay.  Is this 54 we are looking at?  I'm

2    sorry.  It is not marked.

3              THE COURT:  It is 54.

4              MR. DAVIS:  And I have that already in evidence.

5    Okay.  Thank you.

6    BY MR. DAVIS:

7    Q.  All right.  So let's go back to when you were first hired

8    by -- or you first hired, I should say, Mr. Leavens.

9              You described, at the beginning of the litigation,

10   instructions that he gave you in that first meeting, is that

11   right, about preserving data?

12   A.  Correct.

13   Q.  All right.  And I just want to confirm, but at no time did

14   Mr. Leavens ever give you written instructions about how to

15   preserve data in this case, right?

16   A.  I can't say that with certainty.  I don't recall getting

17   anything written.

18   Q.  And if he did, we would search the e-mails to find it, if

19   it would have been an e-mail, most likely, if he sent you some

20   instruction like that?

21   A.  It's not in my e-mail, but he could have handed me

22   something in one of these meetings, potentially.

23   Q.  And are you guessing that's what happened, or do you have

24   a specific recollection that Mr. Leavens handed you a piece of

25   paper at the beginning of this case with directions about your

Duke - Direct

210

1   obligations to preserve data in this case?

2   A.  I'm not guessing at anything.  I'm just telling you I

3   don't recall.  It's not in my e-mail.  I have searched my

4   e-mail for it, so I do not believe it to be in my e-mail.  I'm

5   not sure if it was given to me some other way.

6   Q.  Right.

7           And you said it is possible he gave you a piece of

8   paper.  I mean, a lot of things are possible.  I'm trying to

9   find out what happened here.

10          So is it your recollection that he handed you written

11  instructions about preserving data in this case?

12  A.  No, I do not recall --

13  Q.  Okay.

14  A.  -- receiving it.

15  Q.  Okay.  And same thing:  Mr. Strand, did he give you any

16  written instructions?

17  A.  I, again, have never spoken with Mr. Strand.

18  Q.  You have never spoken to him, right, okay.

19          And we have reviewed the oral instructions he gave

20  you, and that's -- he gave that to you several times; is that

21  right?

22  A.  I believe so, yes.

23  Q.  Right.

24          And did you follow those instructions?

25  A.  Yes.

Duke - Direct

1    Q.  All right.  And, again, we are speaking about the

2    beginning of this case in 2012; is that right?

3            You are clear on that?

4    A.  Yes.

5    Q.  Okay.  And are you aware of or you have learned what

6    something called the "litigation hold" is through this

7    process?

8    A.  No.

9    Q.  You never heard that phrase before right now?

10   A.  No.

11   Q.  Okay.  None of your attorneys have ever described to you

12   what a "litigation hold memo" is?

13   A.  I don't know what it is, so I don't know if they described

14   it to me.

15   Q.  And that's for all your prior attorneys and your current

16   attorneys, right?

17           MR. SALAM:  Object, your Honor.  Attorney-client

18   privileged communications with current attorneys aren't at

19   issue here.

20           MR. DAVIS:  Well, I think there is case law that says

21   litigation hold is not a privileged communication.

22           THE COURT:  Well, it's not relevant.  So if you ask

23   the same question, but take it out as to current attorney --

24           MR. DAVIS:  Sure.

25           THE COURT:  -- that's fine.

Duke - Direct

1   BY MR. DAVIS:

2   Q.  And to make sure I'm asking the question the right way,

3   when I say "litigation hold memo," this is something that the

4   Judge has discussed in open court.  Your attorneys, I

5   represent to you, have admitted in open court they never

6   issued to you.

7           No one has ever described to you or discussed what a

8   litigation hold memo is ever, before today, outside of your

9   current counsel?

10  A.  I don't know what it is, so I don't know if it has been

11  discussed with me, because I'm not even sure what you are

12  talking about.

13  Q.  And so you have never been provided or no one has

14  described to you a written document that you should receive

15  from your attorneys describing your obligations in the case to

16  preserve and hold your electronic data and all your documents;

17  is that right?

18  A.  As I said, it was oral.  Through a meeting, he told me to

19  preserve the documents.  I don't recall receiving anything in

20  writing, if that's what you are talking about.

21  Q.  Got it.

22          No, I'm trying to understand whether you were told

23  anything in writing or orally, and you are confirming you

24  never received anything in writing?

25  A.  I do not believe so, no.

Duke - Direct

213

1    Q.  Right.

2         From any of your prior attorneys?

3    A.  I do not believe so, no.

4    Q.  All right.  And I also want to be clear:  This includes

5    your first attorney Mr. Rieger who you hired to draft the

6    complaint for you, the draft complaint -- draft a draft

7    complaint -- in 2011.

8         Did Mr. Rieger give you any instructions, written or

9    oral, about preserving data in connection with this case?

10   A.  I don't recall, but I have never looked through e-mails

11   from him to see if he did, but I'm not sure.

12   Q.  Okay.  And same question for your friend/attorney Mr. Zeno

13   Baucus:  In 2012, did he give you any instruction about

14   holding and preserving your data for this case?

15   A.  I never hired him as an attorney, so I have never

16   discussed that with him.

17   Q.  Right.

18        My question is did he discuss it with you?

19   A.  No.

20   Q.  You consulted with him, though, right?

21   A.  He knew what was happening to me, and he was trying to

22   help me find a lawyer, but I never discussed things like that

23   with him.

24   Q.  All right.  At some point in time, the attorneys that were

25   representing you originally, it was Mr. Leavens, right?

Duke - Direct

```
 1   A.  Correct.

 2   Q.  And he was assisted by Heather Liberman, right?

 3           Do you recall that?

 4   A.  Yes, correct.

 5   Q.  And you worked with both of them at the beginning of the

 6   case?

 7   A.  Yes.

 8   Q.  E-mailed with them?

 9   A.  Yes.

10   Q.  Spoke to them?

11   A.  Yes.

12   Q.  All right.  Did there come a time when -- did there come a

13   time when Ms. Liberman left the firm and was replaced by

14   another attorney?

15   A.  Yes.

16   Q.  And who is that?

17   A.  Travis Life.

18   Q.  And when did that happen?

19   A.  Somewhere in 2014, 2015, I believe.

20   Q.  All right.  And Mr. Life began representing you and your

21   company about that time?

22   A.  Correct.

23   Q.  And when he joined the firm and started representing you,

24   did Mr. Life give you any form of written instructions about

25   preserving data?
```

Duke - Direct

215

1   A.  No.

2   Q.  Okay.  And so I'm clear, did any lawyer representing you

3   or your company ever give you specific instructions about your

4   obligations to preserve electronically stored information,

5   what we have been calling "ESI" today, at any time?

6           MR. SALAM:  Object, your Honor.  I just would like to

7   make sure it is limited to former defense counsel, not current

8   defense counsel.

9           MR. DAVIS:  Excluding your current attorneys.  Thank

10  you.

11          THE WITNESS:  As I believe I have stated multiple

12  times, yes, they did tell me to preserve it.  There is just

13  nothing written.

14  BY MR. DAVIS:

15  Q.  Okay.  And how did you come --

16          THE COURT:  Can I pause you right there?

17          When I asked you the question about the Yahoo! Chat,

18  I think I asked you whether you understood that that was ESI

19  or electronically stored information.  My recollection is your

20  specific answer was "I do now."

21          Did you know back at the time when you were being

22  told to preserve the information that you were to preserve the

23  Yahoo! Chat as well?

24          THE WITNESS:  Yes, and I didn't delete the Yahoo!

25  Chat.  The program just disappeared.  So it is not like I went

Duke - Direct

1   out of my way and deleted the files.  The literal program is

2   gone.  So everything from the program is gone.

3          THE COURT:  So fair to say it wasn't preserved?

4          THE WITNESS:  Yes, fair to say.

5          THE COURT:  Okay.  All right.

6          Go ahead.

7   BY MR. DAVIS:

8   Q.  And part of those conversations you had with Mr. Leavens

9   in the case, did he give you specific instructions, as the

10  Judge is asking you about, specific instructions about what

11  was to be included and the things to be preserved?

12  A.  I don't recall.

13  Q.  Did he say, "Don't throw out any of your computers"?

14  A.  Of course.

15  Q.  Did he say, "Copy all your online accounts and make sure

16  we have everything"?

17  A.  It was "Don't delete anything off your computers" is what

18  I remember.  "Don't delete any files.  Your computers are

19  going to get searched.  Don't delete anything."  I remember

20  that being very specific, very important not to delete

21  anything.

22  Q.  Got it.

23          And that's the sum and substance of your recollection

24  of the instructions from Mr. Leavens at the beginning of this

25  case and all those further times he told you about your

Duke - Direct

1    obligation to preserve?

2         MR. SMITH:  Let me object to the form, your Honor.

3    This has been gone over about three times, and he has

4    previously described there was a lot more to the conversation.

5    He said it went on for 20 to 30 minutes at the beginning of

6    the case.

7         THE COURT:  Okay.

8         MR. SMITH:  We keep seeing this attempt to ask the

9    question over and over again and get a much narrower answer,

10   and it has been asked and answered.

11        MR. SALAM:  Your Honor, I respectfully disagree with

12   Mr. Smith.  I believe that the conversation that Mr. Davis has

13   been going at has been with respect to preservation and that

14   the witness testified they discussed other things besides

15   preservation or holding on, not destroying documents.

16        THE COURT:  Hold on.

17        MR. SALAM:  Specifically, I think something about a

18   $10,000 check and other issues unrelated to --

19        THE COURT:  The question was specifically to the

20   obligation to preserve.

21        So go ahead and ask that question regarding the

22   preservation, or I can read it back, whatever you want.

23        MR. DAVIS:  That would be fine, your Honor.

24        THE COURT:  Mr. Duke, the question is:

25        "And that's the sum and substance of your

Duke - Direct

1   recollection of the instructions from Mr. Leavens at the

2   beginning of the case and all those further times he told you

3   about your obligation to preserve?"

4          So you understand that there is -- clearly, the

5   lawyers and the court are making a distinction between copying

6   and preserving, deleting?  Those are all different verbs,

7   right?  So he is asking you about preservation of those.

8          THE WITNESS:  Okay.

9          THE COURT:  Okay.  So with that instruction, why

10  don't you reframe the question in a way that hasn't been asked

11  already.

12  BY MR. DAVIS:

13  Q.  Can you tell me everything Mr. Leavens told you in your

14  conversation with him the first time when he said, "Don't

15  delete anything"?

16          You know the conversation we are talking about?

17  A.  Everything I said earlier is what I can recall at this

18  time.  Nothing has changed.

19  Q.  And is there anything else you want to add as part of your

20  testimony about what you spoke to Mr. Leavens about when he

21  told you "Don't delete anything"?

22  A.  No.

23  Q.  Okay.  And one of the attorneys said you said you had a

24  20-, 30-minute conversation with him about "Don't delete

25  anything from your computers."  Is that correct?  Is that what

Duke - Direct

219

1   you had?

2   A.  As my attorney just stated, we talked about retainers, we

3   talked about contracts, we talked about plans going forward.

4   I mean, we talked about a lot of things.  We didn't just talk

5   about preserving data.  It was very clear to me "Don't delete

6   anything, keep everything."  There is not -- there was no

7   confusion there, "Preserve all documents."

8   Q.  Got it.

9          I'm trying to understand if he gave you any other

10  instructions in that conversation, and I'm not limiting you in

11  any way.  Say whatever you would like.  Give me your full

12  testimony.

13         What did he tell you about preserving data and not

14  deleting things?

15         MR. SALAM:  Object, your Honor.

16         THE COURT:  Is there anything in addition?

17         THE WITNESS:  Not that I recall at this point.

18         THE COURT:  Okay.  All right.  That lilly has been

19  gilded.

20  BY MR. DAVIS:

21  Q.  Now, at some point in time, other attorneys began

22  representing you in this case, in addition to Mr. Leavens,

23  Ms. Liberman, and Mr. Life; is that right?

24  A.  Yes.

25  Q.  All right.  And, again, you learned -- you were referred

Duke - Direct

1  to Mr. Leavens from your -- from Mr. Rieger; is that right?

2  A.  Yes.

3  Q.  Okay.  And at some point in time, an attorney, one of your

4  prior attorneys, named Peter Stamatis also began representing

5  you and your company in this case, right?

6  A.  Correct.

7  Q.  Do you remember when that was?

8  A.  Prior to my deposition.

9  Q.  Okay.  And did your company sign a retainer agreement with

10  he and his firm?

11  A.  I believe so, yes.

12  Q.  Okay.  And did he represent to you he had experience in

13  handling federal court litigation cases?

14  A.  I don't recall what was told to me.

15  Q.  Okay.  Did Mr. Stamatis ever provide you anything in

16  writing about your obligation to preserve data in this case?

17  A.  I don't recall.

18  Q.  Do you recall if he ever issued you anything in writing

19  about your obligation to copy anything, any of your

20  electronically stored information, in this case?

21  A.  I don't recall.

22  Q.  Do you recall ever having an oral conversation with

23  Mr. Stamatis when he began representing you and your company

24  about preserving data?

25  A.  I don't recall.

Duke - Direct

221

1   Q.  Do you recall Mr. Stamatis ever telling you anything about

2   not deleting data at any time?

3   A.  I just don't remember.  It's possible.  I don't remember.

4   Q.  Okay.  And at some point in time, you hired another

5   attorney, right?

6   A.  Which one?

7           THE COURT:  An additional attorney.

8   BY MR. DAVIS:

9   Q.  An additional attorney named Mr. Shonder, right?

10  A.  Yes, yes.

11  Q.  Okay.  Do you remember when that happened?

12  A.  I do not know.

13  Q.  Was he referred to your team by any particular attorney?

14          Why did he join your team?

15  A.  I actually don't know why he joined the team.  I'm not

16  sure how that happened.  I believe he worked with Peter

17  Stamatis on things.

18  Q.  And did you sign a retainer agreement -- you and your

19  company sign a retainer agreement with Mr. Shonder?

20  A.  I imagine I did, yes.

21  Q.  You say "I imagine I did."

22  A.  I don't recall signing it, but I'm sure I did.  He was

23  working for me.

24  Q.  Okay.  When Mr. Shonder started representing you and your

25  firm, did he provide you with anything in writing about your

Duke - Direct

1    obligation to preserve data in any way in this case?

2    A.  No.

3    Q.  Did he give you anything in writing about copying data in

4    this case?

5    A.  I don't believe so.

6    Q.  Okay.  Did he ever speak to you orally about your

7    obligations to preserve data in this case?

8    A.  No.  I only had met with him one time, and that one

9    meeting, we did not discuss that, no.

10   Q.  Okay.  And did you ever speak to Mr. Stamatis about

11   searching your data to find responsive e-mails?

12   A.  Yes.

13   Q.  And when was that?

14   A.  Over the years, I have searched for a lot of responsive

15   e-mails.  I can't tell you a specific time necessarily, but I

16   have done a lot of searching through e-mails over the last

17   seven years.

18   Q.  And to be clear, I'm talking about attorney -- your prior

19   attorney Mr. Peter Stamatis.

20   A.  Yes.

21   Q.  Is it your testimony that you spoke to him and he would

22   have you go online and run searches on your online e-mail

23   accounts, Yahoo!?

24   A.  If he was asking for something, I would search for it,

25   yes.

Duke - Direct

1   Q.  And you have a specific recollection that he asked you to

2   do that?

3   A.  I know I have done a lot of searches.  I don't recall any

4   specific time that he specifically asked me.  I believe I

5   likely did.

6   Q.  Okay.

7   A.  I was constantly searching for e-mails.

8   Q.  And do you recall doing that specifically for your prior

9   attorney Mr. Tom Leavens?

10  A.  Yeah, for sure.

11  Q.  And do you recall doing that specifically for your

12  attorney Ms. Heather Liberman?

13  A.  Definitely.

14  Q.  And you recall doing that for your prior attorney

15  Mr. Travis Life?

16  A.  Yes.

17  Q.  Do you recall -- and you have already testified you did it

18  for Mr. Stamatis, right?

19  A.  It would be hard for me to believe I did not.  I don't

20  recall any specific time, but, yes, I believe I likely looked

21  up e-mails for Mr. Stamatis as well.

22  Q.  And what about your prior attorney Mr. Shonder:  Did he

23  ask you at any time to search your online e-mail accounts to

24  find responsive documents?

25  A.  I'm not sure.

Duke - Direct

224

1  Q.  And I just want to confirm that at no time did you

2  give -- you offered, but you never actually gave your online

3  e-mail account credentials to your attorneys; is that right?

4  A.  I never gave it to them?

5  Q.  That's my question, is you offered it to them, but you

6  never gave them your online e-mail account credentials; is

7  that right?

8  A.  That's not right.

9  Q.  Okay.  When did you first give your online e-mail account

10  credentials to your attorneys?

11  A.  I don't know the first time.  There may have been multiple

12  times.  I know for sure I did it in 2018.

13  Q.  Okay.  Prior to 2018, did you ever do it?

14  A.  I just can't remember.

15  Q.  And how would you have given it to them, if you did?

16  A.  I would have either told them over the phone or e-mailed

17  them.  Likely, over the phone, as not to be e-mailing my

18  passwords.

19  Q.  Do you know how many times, approximately, you gave your

20  attorneys, prior to 2018, the credentials for your online

21  e-mail accounts?

22  A.  As I said, I don't recall.  It could be zero times.  It

23  could be four times.  I know I offered it.  I don't recall if

24  they ever took me up on the offer.

25  Q.  Do you know if your attorneys ever reported to you in any

Duke - Direct

225

1    way that after you offered your online e-mail account

2    credentials, that they reported to you that they accessed your

3    account and were able to search and pull off from your account

4    e-mails?

5            Did you ever hear of that?

6    A.  I just don't have a recollection.  I don't know.

7    Q.  And you recall your deposition in June of 2015, right?

8    A.  Yes.

9    Q.  And I asked you at your deposition about whether or not

10   you ever delete e-mails.

11           Do you recall your answer?

12   A.  I do not.

13   Q.  Okay.  I will tell you.  You said no.

14   A.  That would be consistent.

15   Q.  Right?

16   A.  Yeah, I don't delete e-mails.

17   Q.  And is it still your testimony today that you never delete

18   any e-mails from any of your e-mail accounts?

19   A.  I do not delete e-mails, no.

20   Q.  You have never deleted an e-mail?

21   A.  Junk mail.

22   Q.  Okay.

23   A.  I believe my Yahoo! account has hundreds of thousands of

24   e-mails.  I really don't delete e-mail.

25   Q.  Have you looked?

Duke - Direct

```
 1           What's the size of your Yahoo! e-mail account today?
 2    A.  Very large.
 3    Q.  Very large?
 4    A.  Yes.
 5    Q.  Okay.  And I also asked you at your deposition of June in
 6    2015 if you had searched all your e-mail accounts to find
 7    documents that were requested of you in this case.
 8           Do you remember that?
 9    A.  Yes.
10    Q.  And you remember your answer, right?
11    A.  Yes.
12    Q.  It was unqualified "Yes" just like you gave, right?
13    A.  Yes.
14    Q.  And I asked if you had turned all those records over to
15    your attorneys.
16           Do you remember that?
17    A.  Yes.
18    Q.  And you answered?
19    A.  I'm sure I answered yes.
20    Q.  Yes.  Okay.
21           And do you still stand by that representation and
22    answer you made under oath on January 17th of 2015?
23    A.  Yes.
24    Q.  Okay.  And so on June 1st of 2018, your attorneys produced
25    15,000 pages of e-mails that had never been produced, right?
```

Duke - Direct

227

1   A.  Correct.

2   Q.  Right?

3   A.  Correct.

4   Q.  So how could it be true that you searched and produced all

5   your e-mails when you said that at your deposition in 2015?

6   A.  Well, I'm not an expert on discovery or any of this stuff.

7   I have not been through a lot of lawsuits.  This is my first

8   lawsuit I have ever been involved in like this.  I did

9   everything my lawyers asked.  If they asked me to search for

10  e-mails, I gave them to them.  I didn't have these search

11  terms.  I didn't know what search terms we were supposed to be

12  looking for.  They never told me those, the search terms.  But

13  every single e-mail they asked me for, I sent the e-mail.  So

14  if you are asking me did I give them the e-mails they were

15  requesting, absolutely, yes.

16  Q.  And is it your testimony that prior to June 1 of 2018 that

17  you had never personally applied or used the search terms that

18  we agreed upon in this case and searched your online e-mail

19  accounts?

20          MR. SALAM:  Object, your Honor, foundation.

21          THE COURT:  I was going to ask the same question

22  myself, so I'm going to overrule it.

23          THE WITNESS:  I never, ever was asked to go through

24  my e-mail and search all 20 of those terms, no.

25

Duke - Direct

228

1  BY MR. DAVIS:

2  Q.  And you say "all 20 of those terms."  You know exactly

3  what I'm talking about, right?

4  A.  Well I have seen them now, yes.

5  Q.  Yes, you have seen the list.

6        And is it your testimony that none of your prior

7  attorneys ever provided you a copy of that list?

8  A.  I don't remember seeing that list.

9  Q.  And at the time, in 2014, that's when the list was

10  created, right?  Those were Plaintiff's search terms.  The

11  only way your lawyers could have gotten those e-mails is

12  calling you, right?

13  A.  Correct.

14  Q.  And your testimony is they never did that?

15  A.  That's correct.

16  Q.  Okay.  And did you -- all the times they did ask you for

17  e-mails -- sorry.

18        All the times they asked you to search for responsive

19  e-mails, you downloaded a copy, right?  Is that what you

20  described?

21  A.  Yes, for sure.

22  Q.  I just want to understand the process.

23        And you saved that to your computer, right?

24  A.  Yes.

25  Q.  Is that your laptop?

Duke - Direct

1   A.  Correct.

2   Q.  The one you still have?

3   A.  Correct.

4   Q.  And have you saved all of those instances of finding

5   e-mails and saving them?

6   A.  Yes.

7   Q.  Okay.  And you still have them today?

8   A.  Yes.

9   Q.  And have you turned them all over to the ESI vendor?

10  A.  They would have been turned over in that initial discovery

11  because they would have been saved on my hard drive.  So the

12  initial discovery, they would have come up because --

13  Q.  I just want to make sure -- I'm sorry.

14        Let me make sure I understand.  When you say "the

15  initial discovery," you mean back in 2014?

16  A.  When they searched my computers in 2014, 2015?

17  Q.  Yes.

18  A.  Yes, when they searched my computers, all of the things I

19  saved would have been on my computer, so there would have been

20  a lot of e-mails.

21  Q.  And those would have been on your hard drives?

22  A.  Exactly.

23  Q.  All right.  And after those images were made, did you

24  continue to search for e-mails and save them on your hard

25  drive after December of 2014?

Duke - Direct

1  A.  Whenever I was asked, yes.

2  Q.  And you continued to save those on your computer, right?

3  A.  Yes.

4  Q.  None of those would be on the images that were taken by

5  4Discovery at that time, though, right, because they took a

6  copy of your hard drives and left with it?

7  A.  Yes, and any of the postdates.

8  Q.  Any postdates.

9       The stuff that postdates that, have you retained

10  copies of all those files?

11  A.  Absolutely, yes.

12  Q.  And have you turned all that over to your new ESI vendor?

13  A.  Yes, they have gone through my computers, again, so, yes,

14  they would have all that.

15  Q.  And did you retain all the e-mails that you forwarded

16  these results of your e-mail search to your prior counsel?

17  A.  I'm confused.

18       Can you repeat the question, please?

19  Q.  You did the search for your attorneys, right?

20  A.  Correct.

21  Q.  You saved it on your computer, right?

22  A.  Yes.

23  Q.  And then you sent it to your attorneys somehow?

24  A.  E-mail, yes.

25  Q.  E-mail.

Duke - Direct

231

1            You would attach it?

2    A.  Yes, put it in a folder, zip file, and send it.

3    Q.  Zip file and send it.

4            And it was easy to do?

5    A.  Yes.

6    Q.  And did the attorneys ever report to you that they didn't

7    get it?

8    A.  Not -- I don't remember them ever saying that.

9    Q.  Okay.  Focusing on those search terms, we talked earlier

10   today about what I called a "court-ordered phone conference,"

11   and I asked you if you recalled that.  That was in the middle

12   of -- it was in June of 2014.

13           You recall participating in that?

14   A.  I do recall participating, yes.

15   Q.  Did you understand that that was a court-ordered

16   conference required by Judge Johnston in this case?

17   A.  You said that earlier.  I don't recall my state of mind at

18   that point.  I may have known that.  I may not have known

19   that.

20   Q.  Do you recall your attorneys telling you:  "We have to

21   participate in this pursuant to a court order from the Judge"?

22   A.  I just did what my attorneys told me.  They said, "Come to

23   the call."  I don't recall the details they gave me.

24   Q.  And did you understand or recognize it as an important

25   phone call?

Duke - Direct

1   A.  Of course.

2   Q.  Okay.  And did you recognize the focus of that conference

3   or phone call was going to be to review ESI and -- ESI that is

4   stored and searching it and producing it in this case?

5   A.  I don't recall.  I don't have a lot of experience with

6   this, so I don't recall exactly what my frame of mind would

7   have been in a call like that.  It would have been a little

8   overwhelming for me, so I'm not sure what I was thinking.

9   Q.  Okay.  Do you recall meeting and speaking to your

10  attorneys about and preparing for this conference about the

11  time, or before June 2014, to prepare for it?

12  A.  I don't necessarily remember preparing for it.  I remember

13  being in the room with them.

14  Q.  And who was in the room with you?

15  A.  I don't even remember who was in the room.  I remember on

16  the conference call, I'm pretty sure Tom Leavens was there.  I

17  believe someone else was there with him.  I can't remember if

18  it was Heather or Travis.  I remember there was lawyers on the

19  phone.  I can't remember if the Judge was on the phone.  I do

20  not remember.  I know there was a lot of people on the call.

21  And as I said, the only thing I really recollect from that

22  meeting was "Go home and get Carbonite and back everything

23  up."

24  Q.  Is that something you recognized yourself or did someone

25  tell you to do that?

Duke - Direct

1    A.  There seemed to be disbelief in the room that I was not

2    copying my files or storing my files or had some backup, so I

3    immediately went and took care of that.

4    Q.  And explain that to me.  What do you mean there was

5    disbelief in the room?

6    A.  Everyone was saying, "We back up our files, we back up our

7    files, we back up our files."  They got to me, and I was not,

8    so I resolved that by backing up my files.

9    Q.  I asked you earlier if you recall fully participating in

10   that conference.

11          Do you have any recollection about that?

12   A.  I don't recall.

13   Q.  Do you recall whether or not your attorneys allowed you to

14   speak in that conference or prohibited you from speaking?

15   A.  As I stated before, I really don't recall anything else

16   from that call, other than "Go home.  Download Carbonite."

17   Q.  And you don't recall from that conference that you were

18   then obligated to preserve certain -- continue to preserve

19   your electronically stored information and get ready to search

20   it and produce it?

21   A.  Again, I don't recall exactly.  I know that I was told to

22   go and make sure that I backed up everything.

23   Q.  And you have already described what you did with

24   Carbonite, and I just want to be clear:  You are still using

25   Carbonite; is that right?

1    A.  Yes.

2    Q.  Okay.  One of the things that your attorneys have said in

3    their motion -- I should say in the response to our motion to

4    amend our summary judgment, one of the first times we filed

5    for sanctions, your attorneys said in their court papers that

6    they filed:  "At all relevant times, 21 Century Smoke had been

7    advised to preserve any and all of its electronic records

8    relative to this matter"?

9    A.  Are you talking about yourself or me?  You said "21

10   Century Smoke."

11              THE COURT:  You said "smoke."

12              MR. DAVIS:  I did, but I'm reading what was in the

13   brief.

14              THE COURT:  Okay.

15              MR. DAVIS:  So let me just -- I will correct it.

16   BY MR. DAVIS:

17   Q.  So at all relevant times, your company had been advised by

18   your attorneys to preserve any and all of its electronic

19   records relative to this matter?

20   A.  Correct.

21   Q.  That's correct?

22   A.  Yes.

23   Q.  And that statement is true?

24   A.  Yes.

25   Q.  Okay.  And you reviewed and approved this filing with that

Duke - Direct

1   statement?

2   A.  I do not even know what filing you are talking about, but

3   that is a correct statement.

4   Q.  Okay.  When this was filed in April of 2018, your

5   attorneys filed supporting declarations.

6           Do you have any recollection of that?

7   A.  I do not.

8           MR. DAVIS:  I ask to have Docket 253 brought up on

9   the screen, please.

10          Thank you.  Exhibit 64.

11  BY MR. DAVIS:

12  Q.  I ask you to take a look at that.  That's on the screen.

13  Tell me if you recognize it.

14  A.  In my preparation for this, I do recognize it.  I don't

15  recall seeing it previously.

16  Q.  Do you recall if you reviewed and approved it in or about

17  May 14th of 2018?

18  A.  I don't recall ever seeing it, so no.

19  Q.  Before your preparation for this hearing today?

20  A.  Exactly.

21  Q.  So you never saw this declaration at the time?

22  A.  I don't recall seeing it.  I'm not saying I didn't see it.

23  I do not recall seeing it.

24  Q.  So to prepare for today, you reviewed Plaintiff's

25  Exhibit 64; is that right?

Duke - Direct

 1   A.  Yes.

 2   Q.  And when you read it, is there anything in there that

 3   refreshes your recollection as to whether or not you saw it at

 4   the time it was prepared and filed with the court?

 5          THE WITNESS:  Can you scroll down the page?

 6          MR. SALAM:  Your Honor, I'm going to object, asked

 7   and answered.

 8          THE COURT:  Well, he is, essentially, showing him the

 9   document to see if it refreshes his recollection on whether he

10   saw it before.  So I will overrule the objection.  I don't

11   know what his answer is going to be.

12          THE WITNESS:  I don't recall seeing this document,

13   no, until recently.

14          THE COURT:  Until preparing for today's hearing?

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.

17          THE WITNESS:  Thank you, your Honor.

18   BY MR. DAVIS:

19   Q.  And as part of this case, did there ever come a time when

20   you personally sat down with Mr. Leavens and accessed your

21   online e-mail accounts in his presence?

22   A.  Yes.

23   Q.  And when did that happen for the first time?

24   A.  Late 2012, early 2013.

25   Q.  Okay.  And where were you when that happened?

Duke - Direct

1  A.  In Chicago at 1535 North Ashland.

2  Q.  Is that Mr. Leavens's office?

3  A.  No, that's where the warehouse -- that's where our

4  headquarters were.

5  Q.  So Mr. Leavens came to you?

6  A.  Yes.

7  Q.  Okay.  And was there any other attorney with you?

8  A.  I believe it was just him.

9  Q.  And he sat with you at that time, is that right, and you

10  reviewed your online accounts with him?

11  A.  Correct.

12  Q.  Okay.  And this was in 2012?

13  A.  It would have either been late 2012 or early 2013.  I

14  believe it was 2012.

15  Q.  Okay.  And describe for me what you showed him on your

16  computer regarding your online accounts at that time in that

17  first meeting.

18  A.  I don't recall if it was the first or the second meeting

19  or if there was a second meeting.  I know one of the times he

20  came.  I believe it was the first meeting we went through like

21  the confusion customer e-mails.  I showed him the different

22  confusion customer e-mails, and we just kind of went over how

23  I was going to get these to him.  So save them, send them to

24  him, that kind of thing.

25  Q.  Right.

Duke - Direct

1    And when you say you showed them to him, did you have

2    them printed out in manila folders, in paper, or did you have

3    your computer open, and you were showing him live while you

4    were searching and looking at the e-mails live on your online

5    account?

6    A.  He sat with me at my laptop, and we went into my different

7    e-mail accounts and looked at the different instances of

8    confusion and other things I was showing him.

9    Q.  And he saw you accessing like your online Yahoo! e-mail

10   account?

11   A.  Yes.

12   Q.  And he saw you putting in the search terms and searching

13   for e-mails that responded to whatever terms you put in the

14   search bar?

15   A.  And going to different folders that we had stuff saved in,

16   yes.

17   Q.  Right.

18       And the folders would have been on the online e-mail

19   account?

20   A.  Yes.

21   Q.  Not folders on your computer, right?

22   A.  Exactly, exactly.

23   Q.  Right.

24       And did you explain to your attorney at that time the

25   difference between stuff being online and stuff being on your

 1   computer?

 2   A.   No.

 3   Q.   Okay.   Did he ask you anything about that?

 4   A.   No.

 5   Q.   And why didn't you explain the difference to him, if you

 6   know?

 7   A.   I mean, in my mind, it kind of is common sense that Yahoo!

 8   Mail is online.   I guess everyone didn't know that or doesn't

 9   know that, but in my mind, that just goes without saying.   So

10   I wouldn't be just walking around describing that Yahoo!

11   e-mail is in the cloud.

12   Q.   And did you access other online accounts that you had at

13   that time while you were sitting with Mr. Leavens at your

14   office, at your laptop?

15   A.   The GoDaddy for sure, the support@21centurysmoking.   I'm

16   not sure if we went into the bduke, but we for sure went into

17   the support.

18   Q.   And that was, again, you accessed your GoDaddy e-mail

19   online, right?

20   A.   Correct.

21   Q.   You didn't use any application like Office that was

22   resident on your computer?

23   A.   I don't have anything like that, no.

24   Q.   Right.

25        And after that first time, you showed Mr. Leavens on

Duke - Direct

1   your computer the online accounts, how many times after that

2   did you actually sit with him at your computer and show him

3   your online accounts?

4   A.  I don't recall.  I remember one time specifically.  I

5   don't know if there were other times.

6   Q.  Did you ever do it at his office, on any of his computers?

7   A.  I don't believe so.

8   Q.  Did you ever do it on any other computer with him, other

9   than your laptop?

10  A.  Possibly my wife's computer, the desktop.

11  Q.  At your house --

12  A.  Yes.

13  Q.  -- or your office?

14  A.  Yes.

15  Q.  Right.  Okay.

16          MR. DAVIS:  Judge, this might be a time for a short

17  break.  I'm trying to move a little forward and transition

18  into another topic.

19          THE COURT:  That's fine.  Okay.  We will take a quick

20  break.

21          MR. DAVIS:  Thank you.

22    (Recess taken.)

23          THE COURT:  All right.  Before we get started, I

24  assume at some point somebody is going to explain to me why 4D

25  did not search the web-based e-mails.  I assume that's going

Duke - Direct

241

1   to be explained to me at some point in a day and a half.

2           All right.  Go ahead.

3           MR. DAVIS:  Thank you, your Honor.

4   BY MR. DAVIS:

5   Q.  You testified earlier about your new ESI vendor, right,

6   QDiscovery?

7   A.  Yes.

8   Q.  And --

9           MR. SALAM:  There is QDiscovery, which is now Xact

10  Data, which is our current --

11          THE COURT:  Hold on a second.

12          MR. SALAM:  I'm sorry.  I want to clarify for the

13  record.

14          THE COURT:  Okay.  Hold on.

15          MR. SALAM:  I'm sorry.

16          THE COURT:  Okay.  Go ahead.

17          MR. SALAM:  The discovery vendor we have been talking

18  about is 4Discovery, not to be confused with QDiscovery, who

19  did the status report -- or who is our e-discovery provider --

20          THE COURT:  Right.

21          MR. SALAM:  -- and did the status report.  I just

22  wanted to make sure.

23          MR. DAVIS:  Right.  That's Plaintiff's Exhibit 66 in

24  evidence.

25          MR. SALAM:  Okay.  Sorry to interrupt.  I just

Duke - Direct

1  thought you were --

2           THE COURT:  I know he is from a different place, but

3  I did start with a question.  Maybe it is a rhetorical.  At

4  some point, I would assume someone is going to tell me why 4D

5  didn't do what is pretty basic stuff.

6  BY MR. DAVIS:

7  Q.  Mr. Duke, your new ESI vendor is QDiscovery, right?

8  A.  Yes.

9  Q.  And they are the ones that submitted the report to the

10 court that's Plaintiff's Exhibit 66, that was the August 13,

11 2019, report we discussed?

12          MR. SALAM:  Objection to the form of the question.

13 Counsel submitted the report.  We did attach an affidavit from

14 the head of forensics.

15          THE COURT:  All right.  Why don't you just rephrase

16 the question.

17          QDiscovery is your current ESI vendor, right?

18          THE WITNESS:  Yes.

19 BY MR. DAVIS:

20 Q.  And in connection with that, you were interviewed by them,

21 right?

22 A.  Yes.

23 Q.  All right.  And as part of that interview, was it a

24 conversation face-to-face?

25 A.  Yes.

Duke - Direct

243

1   Q.  And did they come to your offices and do that?

2   A.  We did it in Chicago.

3   Q.  And did you also exchange e-mails with them?

4   A.  I do not recall.  It was a face-to-face discussion in

5   Chicago.

6   Q.  And that interview was to find out about all the sources

7   of electronic data that you and your company had; is that

8   right?

9   A.  Correct.

10  Q.  All right.  And my question is did you ever have that same

11  type of interview with your prior attorneys at any time?

12  A.  No.

13  Q.  Did you ever have that type of interview with your first

14  or a prior e-discovery vendor 4Discovery?

15  A.  No.

16  Q.  You never had an interview or a meeting with people from

17  4Discovery about all the sources of your electronic data?

18  A.  No.

19  Q.  Okay.  And we know from the report that we were just

20  talking about and your new vendor, QDiscovery, that there are

21  more sources of electronically stored information that you

22  have outside of the four computers that 4Discovery copied and

23  searched?

24  A.  Correct.

25  Q.  Right?

Duke - Direct

244

1   A.  Yes.

2   Q.  And my question is -- and I'm going to ask the Judge's

3   question, but my question is was it you alone that decided not

4   to search all those additional sources of electronically

5   stored information in 2014 and just search the four hard

6   drives?

7           MR. SALAM:  Objection, your Honor.  There is no

8   foundation that he made any decision with respect to what was

9   searched.

10          THE COURT:  Did you decide what to search in 2014?

11          THE WITNESS:  No, no.

12          THE COURT:  Who did?

13          THE WITNESS:  My lawyer said they were going to

14  search the four computers that were in my office.

15          THE COURT:  And did you tell your attorneys, any

16  attorneys, other than your current attorneys, about the

17  web-based e-mails?

18          THE WITNESS:  I mean, they all knew that I had these

19  e-mail accounts.

20          THE COURT:  Did you tell them about those?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  Did you tell them that you

23  communicated about work on those web-based e-mail systems?

24          THE WITNESS:  I had communicated with them through

25  those systems, so, yes, they knew I was using them.

Duke - Direct

1      THE COURT:  All right.  But did you tell them that

2  you used those web-based e-mails --

3      THE WITNESS:  Yes.

4      THE COURT:  -- for work?

5      Okay.  Go ahead.  Keep asking, Mr. Davis.

6      MR. DAVIS:  Thank you, your Honor.

7      Could I have Exhibit 64 displayed on the screen?

8      THE COURT:  Mr. Davis, I interrupted you.  I don't

9  know if you said that you were going to ask my question or you

10  were not going to ask my question.

11      MR. DAVIS:  I thought you just asked it.

12      THE COURT:  I didn't ask about 4D.

13      Did 4D or 4Discovery ever ask you about your

14  web-based e-mail systems?

15      THE WITNESS:  No.

16      THE COURT:  Did you ever tell 4D or 4Discovery about

17  your web-based e-mail systems?

18      MR. SALAM:  Your Honor, I --

19      THE COURT:  Don't -- are you going to object to my

20  question?

21      MR. SALAM:  No.

22      THE COURT:  Okay.  Well, then let the witness answer

23  my question.

24      THE WITNESS:  No, I did not ever discover -- or I

25  never discussed with 4Discovery really anything.  They just

Duke - Direct

1    were the company that were going to be searching the four hard

2    drives.

3              THE COURT:  Okay.  Mr. Salam, you wanted to say

4    something?

5              MR. SALAM:  Not anymore, your Honor.  The witness

6    spoke clearly.

7              THE COURT:  Okay.  Go ahead, Mr. Davis.

8    BY MR. DAVIS:

9    Q.  Drawing your attention to Plaintiff's Exhibit 64 that's in

10   front of you, can you take a look at that?

11             And I direct your attention -- take your time looking

12   at it.  It is the declaration of your prior attorney Thomas

13   Leavens.

14             Do you see that on the first page?

15   A.  Yes, it is the one we were previously looking at.

16   Q.  It is.

17   A.  Yes.

18   Q.  And it was filed under Docket 253-1.

19             I ask you to take a look at Paragraph 10, and can you

20   read that out loud?

21   A.  "During the summary judgment filings, I came to learn that

22   Mr. Duke's personal yahoo.com e-mail address,

23   brentduke@yahoo.com, were not subject to search terms DR

24   submitted.  I have also come to learn that the reason for this

25   is that Mr. Duke accessed his e-mail account through a web

Duke - Direct

1   browser.  At no time was I or my team ever aware, nor were we

2   advised by our e-discovery vendor, nor Plaintiffs or their

3   e-discovery vendor, that this was an issue to watch out for

4   that might affect search results and the context of

5   e-discovery and search terms."

6        THE COURT:  Is somebody from 4D going to testify?

7   Anybody got them under subpoena?

8        MR. DAVIS:  We have them on our witness list, not

9   under subpoena.

10        THE COURT:  Okay.  All right.  That's all.

11        Go ahead.

12  BY MR. DAVIS:

13  Q.  And after reading that, did you -- when did you first

14  learn about this statement made in this May 14th, 2018,

15  declaration of your prior attorney Tom Leavens?

16  A.  My lawyers explained to me that they were needing my

17  e-mail address to search for my brentduke@yahoo e-mails.

18  Q.  Do you understand from this statement the distinction

19  Mr. Leavens is making about where the data resides?

20        Do you understand the distinction he is making?

21  A.  Yes.

22  Q.  And what's the distinction?

23  A.  That I had to access it through a web browser.

24  Q.  And he is making the statement to the court on May 14th of

25  2018, right?

Duke - Direct

1  A.  Correct.

2  Q.  And he is confirming that your Yahoo! e-mail address had

3  never been subject to the search terms that you just

4  described, right?

5  A.  Correct.

6  Q.  Okay.  And do you understand why that was never done based

7  on this paragraph?

8  A.  No, I do not.

9  Q.  Okay.  Were you surprised to learn, when you first saw

10  this, that your attorneys didn't know the difference between

11  information that's on a computer versus on a web-based

12  application or online?

13         MR. SMITH:  Objection, your Honor.

14         MR. DAVIS:  If you know.

15         MR. SMITH:  Objection, your Honor.  Again, seeks to

16  ask the witness to peer into somebody else's mind and

17  understanding.

18         THE COURT:  I will overrule because the question is

19  "Were you surprised to learn, when you first saw this, that

20  your attorneys didn't know the difference between information

21  on a computer versus on a web-based application," and based

22  upon his prior testimony, I think I know what his answer is.

23         So objection overruled.

24         Do you want me to read back that question?

25         THE WITNESS:  I was surprised to learn, of course.

Duke - Direct

 1          THE COURT:  Okay.

 2   BY MR. DAVIS:

 3   Q.  All right.  And you had previously disclosed those online

 4   accounts to your prior attorneys?

 5   A.  Yes.

 6   Q.  And you had sat with Mr. Leavens and showed him your

 7   online accounts?

 8   A.  Yes.

 9   Q.  And so I understand your testimony, did your prior

10   attorneys bring this to your attention in May of 2018, when

11   the problem arose?

12   A.  Well, I mean, in March of 2018, I believe, is when they

13   brought to my attention that there was a problem.  I believe

14   that by May, they had figured out what the problem was.

15   Q.  Okay.  And then is it in March of 2018 when you and your

16   company hire 4Discovery to access your Yahoo! e-mail account

17   and search it for the first time?

18   A.  I don't think so.

19   Q.  Okay.  Do you know when that happened for the first time,

20   when 4D accessed and got credentials for your Yahoo! e-mail

21   account and got the data --

22   A.  My apologies.  4D is the old company, 4Discovery.

23   Q.  It is.

24   A.  Yes, so then they got access.

25          My apologies.  My last answer was incorrect.

Duke - Direct

1    4Discovery did do the search around that time.

2    Q.  And what time is that?

3    A.  I believe May of 2018.

4    Q.  And that was the first time that your entire Yahoo! e-mail

5    account had ever been copied and searched using the ESI search

6    terms, right?

7    A.  Correct.

8    Q.  Okay.  Now, directing your attention to March of 2018,

9    again, after those searches were done, right -- we just talked

10   about 4D runs the searches, puts the terms in of your Yahoo!

11   e-mail account.  And do you recall how many pages of e-mail

12   documents were produced to us on June 1st, 2018?

13   A.  I never saw it.

14   Q.  All right.  I can tell you it was over 15,000 pages.

15        Have you heard that or do you have any recollection

16   about that?

17   A.  No.

18   Q.  But you knew it was a lot of e-mails, right?

19   A.  Upon seeing these search terms that you guys had, that

20   they are extremely broad, so that's not surprising.

21   Q.  Okay.  And I want to turn your attention to the night of

22   March 19th, 2018, and do you recall the e-mails earlier

23   between you and Mr. Life?

24   A.  Okay, yes.

25   Q.  Do you remember that weekend, March 17th?  It is a

Duke - Direct

1  Saturday.

2  A.  Okay, yes.

3  Q.  Okay.  You had already looked at the e-mail from him?

4  A.  Yes.

5  Q.  And he asked you to run a search for Kirti/Webrecsol

6  e-mails, right?

7  A.  Yes.

8  Q.  And what was your answer to him; do you recall?

9  A.  I don't remember my exact term.  Yes, I went and did it.

10  Q.  We can bring it up again, but you saw you had hundreds of

11  e-mails?

12  A.  Hundreds of e-mails, and I asked him if he wanted the

13  password.

14  Q.  Right.

15          And you were aware at that time that my clients,

16  Plaintiffs, were claiming that you and your company were

17  withholding documents in this case, right?

18  A.  Yes.

19  Q.  Okay.  And what I want to know is out of those 15,000

20  documents that were produced from your Yahoo! e-mail account

21  on June 1st of 2018, whose decision was it just to pull out

22  those 112 documents that were actually e-mailed to our team on

23  the evening of March 19, 2018?

24          MR. SALAM:  I'm going to object.

25          MR. DAVIS:  Do you know what I'm talking about?

Duke - Direct

1              MR. SALAM:  I'm sorry, your Honor.

2              THE COURT:  Hold on a second.

3         Go ahead.

4              MR. SALAM:  I'm going to object on foundation.  There

5    is a lot in that question that is not established or that I

6    think there needs to be foundation questions about.

7              THE COURT:  First of all, are you aware that -- you

8    are aware that there were a lot of documents, I think you

9    said, and you were not surprised that there was 15,000

10   documents?

11             THE WITNESS:  No.

12             THE COURT:  I don't know if it is pages or documents.

13   You weren't surprised by that?

14             THE WITNESS:  No.

15             THE COURT:  Do you know how those documents were

16   produced to the Plaintiff?

17             THE WITNESS:  How they were produced?

18             THE COURT:  Yes, when they were produced, in what

19   format.  Were you involved in the production of those

20   documents?

21             THE WITNESS:  No.

22             THE COURT:  Turning those documents over to the

23   Plaintiff?

24             THE WITNESS:  No, I just gave my e-mail credentials,

25   and they handled it.

Duke - Direct

 1            THE COURT:  And then you were done with it?

 2            THE WITNESS:  Yes.

 3            THE COURT:  Okay.  So at the time of the briefing,

 4    you didn't search through those 15,000 pages and say, "Here,

 5    turn these ones over" or anything like that?

 6            THE WITNESS:  They asked me for specific things.  So

 7    it was for very specific -- so it was like Saraswat, Kirti.

 8            THE COURT:  Of the 15,000, they asked you for

 9    specific ones?

10            THE WITNESS:  No, that March e-mail was asking me for

11    these four things.  So I looked up those four things, which

12    then produced 100 documents.  They didn't say, "Look for these

13    20 search terms."  That would have produced --

14            THE COURT:  Right.  So those were two different

15    things.  You did search for the Saraswat documents, which

16    turned up 100.

17            We still haven't talked about the Wood's issue, which

18    is floating around somewhere in this room.

19            But the 15,000 that were produced after 4D went into

20    your web-based programs, were you involved in turning any of

21    those over to the Plaintiff?

22            THE WITNESS:  No.

23            THE COURT:  Did you have any discussions with counsel

24    about which documents to turn over, which documents not to

25    turn over?

Duke - Direct

1          THE WITNESS:  No.

2          THE COURT:  All right.  Was it your assumption that

3    they would all be turned over?

4          THE WITNESS:  Unless there was privileged stuff that

5    they were withholding.

6          THE COURT:  Okay.  Go ahead, Mr. Davis.

7          MR. DAVIS:  Thank you.

8    BY MR. DAVIS:

9    Q.  And on that e-mail you sent with your prior attorney

10   Mr. Life on March 17th, you said you had hundreds of e-mails,

11   right?

12   A.  Correct.

13   Q.  Correct.

14         All right.  And then are you aware that two days

15   later, there was a production of e-mails made by your

16   attorneys to the Plaintiffs, to our firm, on the 19th?

17   A.  Yes, that's correct.

18         MR. DAVIS:  Okay.  And can we have Plaintiff's

19   Exhibit 1 on the screen?

20   BY MR. DAVIS:

21   Q.  I ask you to take a look at this e-mail and tell me if you

22   are familiar with it.

23   A.  I have seen it in preparation for today.

24   Q.  And were you aware of it being sent on or about March 19th

25   of 2018?

1   A.   No, I'm not attached on this or anything.  It is not sent

2   to me.

3   Q.   Okay.  And attached to this document, as you can see, if

4   we scroll to the next page, is what?

5        Do you recognize that document?

6   A.   It's an invoice from Kirti Saraswat.

7   Q.   And it was sent to your Yahoo! e-mail account?

8   A.   Correct.

9   Q.   On March 31st, 2009, right?

10  A.   Yes.

11  Q.   And the next page, what's this?

12  A.   It must have been some type of attachment to an e-mail.

13  It is an invoice.

14  Q.   From?

15  A.   Kirti Saraswat, Webrecsol.

16  Q.   And that's sent to your brentduke@yahoo.com account?

17  A.   Correct.

18  Q.   All right.  And underneath that, it says a website, too.

19  Is that your website?

20  A.   Yes.

21  Q.   Okay.  That's www.brentduke.com, right?

22  A.   That is the old word for 21centurysmoking.com.  I don't

23  know why it says that.

24  Q.   Do you recall -- when you responded to Mr. Life, you wrote

25  "hundreds of e-mails."

Duke - Direct

1    Is it your recollection that you sent him all of

2    those hundreds of e-mails?

3    A.  I do not recall exactly what was sent.  I sent

4    whatever -- I discussed with him what to send, and I sent

5    whatever I was told to send.

6    Q.  And did you have any discussion with your attorneys about

7    what to remove from that production, if anything, before it

8    was produced to Plaintiffs in the case?

9    A.  I do not recall.  There may have been auto-responses or

10   something that weren't actual e-mails that may have been in

11   there or something like that.  That's the only thing I could

12   think that wouldn't have been produced.

13   Q.  And going back to the first page of this document, this is

14   an e-mail from your prior attorney Mr. Stamatis, right, to me

15   and to my colleagues, right, copying your other attorneys; is

16   that right?

17   A.  Yes.

18   Q.  All right.  And you can see that it has an attachment; do

19   you see that?  At the top, it says "Attachments" under

20   "Subject"?

21        THE COURT:  Under "Subject," in the header.

22        THE WITNESS:  Okay.  Sorry, yes.

23        MR. DAVIS:  Right?

24   BY MR. DAVIS:

25   Q.  It says "From," "Sent To," "Cc," and "Attachments"?

Duke - Direct

1    A.  Yes.

2    Q.  And it has got those numbers for the documents, which you

3    referenced before?

4         You know what those are, right?

5    A.  Yes.

6    Q.  And so these are numbers on your documents being produced,

7    right?

8    A.  Correct.

9    Q.  And it says the number ranges from 63515 to 63626, right?

10   A.  Yes.

11   Q.  And is that about 112 pages?

12   A.  Or 112 documents.  I don't know how this works, but, yes,

13   112.

14   Q.  Yes, each page gets a number, right?

15   A.  111, 112, whatever.

16   Q.  Okay.  And your e-mail said there were hundreds of

17   e-mails.  Do you have a recollection if that was about 112

18   pages of information or is it more than that?

19   A.  I don't recall if I was using hyperbole or if there were

20   hundreds of e-mails or if there is e-mails that were just

21   Kirti Saraswat replied, but there wasn't actually anything

22   there.  It was just "Thank you," but it wasn't a real e-mail.

23   It was an auto-generated e-mail.  So it could have been a

24   bunch of false ones that popped up potentially.

25   Q.  So you don't know --

Duke - Direct

1    THE COURT:  What do you mean by "false ones"?

2    THE WITNESS:  So, like, if I e-mailed her, and she

3 replies to me, I would probably have included that, but if I

4 e-mailed her, and her reply was just an auto-reply that wasn't

5 actually her replying, I probably wouldn't have, at the time,

6 copied that.

7    THE COURT:  Okay.  Thank you.

8 BY MR. DAVIS:

9 Q.  The auto-reply, what does that mean?

10    THE COURT:  Like an out of office, right?

11    THE WITNESS:  She has a literal auto-reply to

12 everything.  So there is an auto-reply that comes to each

13 e-mail.  So it says:  "Thank you for e-mailing me.  Thank you

14 for e-mailing me."  As soon as you send an e-mail to her, you

15 get an e-mail back saying:  "Thank you for e-mailing me."

16    MR. DAVIS:  I got you.

17 BY MR. DAVIS:

18 Q.  And as you sit here today, you don't have a recollection

19 of how many pages that search result for e-mails that you

20 e-mailed your prior attorney Mr. Life about; is that right?

21 A.  I imagine it is 111, whatever is here.

22 Q.  All right.  And we could check that because you saved that

23 file to your hard drive on your computer, right?

24 A.  And I sent an e-mail to him with the attachment, so you

25 could count whatever is in that e-mail.

Duke - Direct

259

1   Q.  And are you aware of any -- that your attorneys removed or

2   withheld any documents from that production before -- when

3   they received it from you, and before they sent it to me?

4           Did they remove any e-mails from that or documents;

5   do you know?

6   A.  I don't think they did.  They didn't tell me they did.

7   Q.  Okay.  And other than Mr. Life, did you e-mail or speak to

8   any of the other prior attorneys that weekend of March 17, 18,

9   or 19 in connection with this production of these documents?

10  A.  I do not recall.

11          MR. DAVIS:  Can I have Defendants' Exhibit 5, please?

12  BY MR. DAVIS:

13  Q.  I'm going to have you take a look at your prior attorney

14  Travis Life's declaration of May 15, 2018.  This is just two

15  months after the weekend you searched for those e-mails.  It

16  was filed under Docket 253-2.  This is already, I believe, in

17  evidence.

18  A.  Yes.

19  Q.  And could I have you take a look at Paragraph 11, please?

20          Could you read that, please?

21  A.  "The Yahoo! e-mail existed in 2009, when Mr. Duke started

22  21" --

23          THE COURT:  Wait.  Slow down a little bit.

24          THE WITNESS:  Sorry.

25          THE COURT:  That's okay.

Duke - Direct

1       THE WITNESS:  "The Yahoo! e-mail existed in 2009 when

2   Mr. Duke started 21 Century Smoking, and he continued to use

3   it on occasion for company business after his business e-mail

4   support@21centurysmoking.com and bduke@21centurysmoking.com

5   came into existence.

6       "On March 14th, 2018, I contacted Mr. Duke via e-mail

7   to schedule a call regarding Plaintiff's claim of missing

8   documents.  I spoke with Mr. Duke the following day.  I

9   requested that Mr. Duke research his brentduke@yahoo.com

10  e-mail to locate any and all e-mails related to Ms. Wood, a

11  confused customer; Kirti Saraswat and Webrecsol; and the

12  requested correspondence with Frank Gu.

13      "Mr. Duke was unable to locate any e-mails related to

14  Ms. Wood, but did find e-mails related to Kirti Saraswat and

15  Webrecsol, and the reply to Frank Gu, a supplier,

16  correspondence.  Mr. Duke produced those e-mails to me on

17  March 17th, 2018, and March 18th, 2018."

18  BY MR. DAVIS:

19  Q.  Is that an accurate statement?

20  A.  I believe so, yes.

21  Q.  Okay.  And, again, so he calls you on March 15th, and you

22  spoke to him directly, right?

23  A.  Yes.

24  Q.  Okay.  And do you recall what you spoke about?

25  A.  Hold on a second.

Duke - Direct

1    On this, it says on March 14th.  Okay.

2    So we spoke on the phone on the 15th.

3    Okay.  I'm sorry.

4    So, yes, we spoke about locating these e-mails on the

5    15th, then.

6  Q.  All right.  And he had to contact you because he knew you

7  were the one, the only one, that could search and find e-mails

8  on your online e-mail accounts, right?

9  A.  I wouldn't say I'm the only one.  Anyone with my password

10  could, but I'm the only one with the password.  So, yes, at

11  that moment in time, but he could have gotten the password

12  from me and searched them, yes.

13  Q.  And did he get the password from you?

14  A.  No.

15  Q.  Did you offer it to him?

16  A.  I believe there is an e-mail in here where I say, "Do you

17  want the password?"  So, in theory, he could have used the

18  password.

19  Q.  Okay.  And at this time, he knows he is asking you

20  to -- and I think the word he uses in here, in the middle,

21  is -- "re-search" your yahoo.com account, right?

22    So he had already previously spoken to you about

23  searching that e-mail account, right?

24  A.  I was constantly searching for e-mails, yes.

25  Q.  Constantly.  Okay.

Duke - Direct

1    And, do you know, did your attorneys say anything to

2  you about not disclosing to the court this problem that they

3  identified at this time --

4  A.  Can you repeat that?

5  Q.  -- about not having searched the Yahoo! e-mail accounts?

6  A.  Can you repeat that?

7  Q.  Yes.

8    Do you know if your -- do you recall your attorneys

9  telling you about whether or not they were going to disclose

10  to the court the problem they had identified about not having

11  searched the Yahoo! e-mail accounts?

12    MR. SMITH:  Objection to the foundation.  It assumes

13  that the attorneys had identified the issue at that point.  I

14  don't think that has been established.

15    THE COURT:  It is right there in Paragraph 11.  Read

16  it.

17    MR. SMITH:  I have read it, your Honor.  It doesn't

18  say they've identified a problem that they hadn't previously

19  been searched.  It just says he asked him to search it.

20    THE COURT:  Are you kidding me?

21    Objection overruled.

22    THE WITNESS:  Can you please repeat the question?

23    THE COURT:  Sure.  Hold on one second.

24    MR. SMITH:  I can explain my objection further.

25    THE COURT:  I heard your objection.

Duke - Direct

 1          MR. SMITH:  Okay.

 2          THE COURT:  Mr. Duke, did you have any conversations

 3   with your attorneys about what the attorneys were going to

 4   tell me or not tell me about the documents that were disclosed

 5   relating to Kirti Saraswat?

 6          THE WITNESS:  No, your Honor, I don't remember them

 7   discussing strategic -- or communications with you, your

 8   Honor.

 9          THE COURT:  Okay.

10   BY MR. DAVIS:

11   Q.  Going back to Page 1 of Plaintiff's Exhibit 1, again, this

12   is the e-mail from your prior attorney Mr. Stamatis, to me, on

13   the night of March 19th.

14          Did you ever have a conversation with your attorneys

15   advising them not to disclose that your entire Yahoo! e-mail

16   account had never been searched with the ESI search terms

17   prior to March 19, 2018?

18   A.  I don't think at this point anyone was aware that this had

19   happened.  This is March of 2018.  They were still figuring

20   out what had even gone wrong.

21   Q.  And at this time, you thought you had done it, and they

22   didn't know if you had done it or not, right?

23          MR. SALAM:  Object to the foundation.

24          THE COURT:  Overruled.

25          THE WITNESS:  I was constantly searching for e-mails.

Duke - Direct

1    So I, unfortunately, assumed that, yes, I had done whatever

2    had been asked because I didn't know what the search terms

3    were.  I just knew that I was always searching through

4    e-mails, sending e-mails to my lawyers.  There is a ton of

5    e-mails out there that had showed up in discovery.  I thought

6    that, yes, we had done what we were supposed to do.

7    BY MR. DAVIS:

8    Q.  Throughout this case, your attorneys have kept you and

9    your company apprised of all the developments in the case,

10   right?

11   A.  For the most part, yes.

12   Q.  Okay.  When you say "For the most part," is there a

13   certain area of the case that they don't tell you about, that

14   you have now learned they should have told you about?

15        MR. SALAM:  Your Honor, I'm going to object on

16   foundation grounds.  I would like a little more specificity

17   and time element.  A general question about a seven-year case,

18   about you have been informed in general, and then they are

19   going to assume that he knows whatever they would like to next

20   bring up.

21        I apologize for the talking objection.

22        THE COURT:  The question prior was:

23        "Q.   Throughout the case, your attorneys have kept

24        you and your company apprised of all the developments

25        in the case, right?

1          "A.   For the most part, yes."

2          The follow-up question, which any decent attorney

3     would ask, relates to the "For the most part."  He wants to

4     know what he thinks the attorneys told him and what might not

5     have been told to him, so that seems like a fair inquiry.

6          So why don't you just rephrase the question.  I

7     understand where you are going.  You are just trying to drill

8     down.  He said, "For the most part."  You want to know what

9     was told and what wasn't told.  Now, it is kind of hard

10    because he isn't going to know what wasn't told to him.

11         MR. DAVIS:  Well, in specific, I was asking, during

12    the course of this case, did your prior attorneys keep you

13    apprised of, for example, all the court orders that were

14    entered in this case.

15         THE COURT:  Okay.

16         THE WITNESS:  I don't know exactly what a court order

17    is, but this has been going on for years.  Tons of things have

18    happened.  There has been a lot of filings.  There has been a

19    lot of hearings.  I don't feel like they have literally

20    discussed every single one of these things with me, no.

21    BY MR. DAVIS:

22    Q.  Okay.  For example, I have -- before this hearing, your

23    attorneys produced an exhibit list, right?

24    A.  Correct.

25    Q.  And you worked with them on that?

Duke - Direct

1   A.  Yes.

2   Q.  All right.  And the first exhibit on the list,

3   Exhibit No. 1, your exhibit, your company, is Judge Kapala's

4   order regarding summary judgment, June 16, 2014?

5   A.  Yes.

6   Q.  You are aware of that order, right?

7   A.  Yes.

8   Q.  Any question in your mind what it says or the contents of

9   it?

10  A.  No.

11  Q.  Okay.  And we talked before about participating in the ESI

12  conference or the conference to talk about the discovery, the

13  electronic discovery.

14          Do you recall that?

15  A.  Yes.

16  Q.  And were you aware that that was a court-ordered

17  conference?

18  A.  I believe I told you before I didn't know exactly what it

19  was.  I didn't even know it was an ESI conference.  I don't

20  have a recollection of that.  I just remember being in a

21  meeting, leaving there, downloading Carbonite.

22  Q.  During the course of the case, did your attorneys ever

23  tell you -- your prior attorneys ever tell you that Plaintiffs

24  had made motions seeking you and your company, to compel them,

25  to produce certain documents that hadn't been produced?

1      Do you recall that?

2   A.  I do recall them mentioning it, but they didn't believe,

3   to the best of my knowledge, that there were things that had

4   not been produced.

5   Q.  All right.  And what I'm talking about now is not recent

6   events, but I'm talking about in 2015.

7      Do you recall that?

8   A.  I'm saying that I don't believe at any point my attorneys

9   felt that stuff had not been produced.

10  Q.  All right.  Are you aware --

11      THE COURT:  But the question is do you recall having

12  conversations with your attorneys about them claiming that

13  e-mails had not been produced?

14      Do you understand the distinction?

15      He is asking you whether or not you talked to your

16  attorneys about them squawking, complaining, and making

17  allegations that e-mails and ESI and chats had not been

18  produced.

19      THE WITNESS:  I can't tell you the first time that I

20  was told about this.  I don't recall if it was in 2015 or -- I

21  know, obviously, recently I have heard about it.  I don't

22  recall the first time that I was made aware that this was an

23  issue.

24      THE COURT:  Okay.  And for the record, "squawking,

25  complaining, and making allegations" isn't being used as a

Duke - Direct

268

1    disparaging term.  I think it has been established they had a

2    pretty good basis for squawking, complaining, and making

3    allegations.

4           So go ahead.

5           MR. DAVIS:  Thank you, your Honor.

6    BY MR. DAVIS:

7    Q.  I'm specifically asking you about a June 11, 2015, order

8    entered by Magistrate Johnston which ordered your company to

9    produce certain documents.

10          Are you aware of that?

11   A.  I would have to see the order.

12          MR. DAVIS:  Can you bring up Docket 132, please?

13   BY MR. DAVIS:

14   Q.  What is being displayed is Docket Entry 132.  I ask you to

15   take a look at it and tell me if you recognize it or have ever

16   seen it before.

17   A.  It does not look familiar, no.

18   Q.  It doesn't look familiar?

19   A.  No.

20   Q.  Do you recall reviewing it to prepare for today's hearing?

21   A.  No.

22   Q.  Okay.  Do you recall in or about June of 2015

23   investigating or doing anything in connection with searching

24   and producing documents in this case for your prior attorneys?

25   A.  As I have said before, numerous occasions, I was doing the

Duke - Direct

269

1  investigations for my attorneys.  I don't know specifically

2  the dates that I was doing them.

3  Q.  And the best way for you to determine when and what you

4  did would be looking at your e-mails and the date on your

5  computer, right?

6  A.  Of course.

7  Q.  Okay.  And I'm going to direct your attention now to and

8  ask you to look at Plaintiff's Exhibit 55.  This is an e-mail

9  from your prior attorney Travis Life, dated June 12, 2015.

10       Look at that and tell me if you recognize it.

11  A.  I mean, no.  It is not to me, so no.

12  Q.  Have you ever seen it before?

13  A.  I maybe saw it in preparing for today.  I see some things

14  in there that look a little familiar.

15  Q.  Okay.  And is it fair to say that sitting here today, you

16  have no independent recollection if you did anything to assist

17  your attorneys with searching or gathering documents or seeing

18  if documents exist prior to June 12, 2015, when your prior

19  attorney Mr. Life issued this e-mail?

20       MR. SALAM:  Objection, your Honor, that is not his

21  testimony.  He has described numerous instances of --

22       THE COURT:  Well, then he can say it is not fair to

23  say, right?

24       MR. SALAM:  Correct.

25       THE WITNESS:  Can you repeat the question?

Duke - Direct

 1          MR. DAVIS:  Sure.

 2          THE COURT:  Overruled.

 3          The question was "Is it fair to say?"

 4          Again, from my dealings with Mr. Duke, he is a very

 5   bright, articulate individual.  If a question starts out with

 6   the preface "Is it fair to say, sitting here today," he's

 7   smart enough to know whether it is fair to say or not.

 8          Go ahead and ask your question.

 9   BY MR. DAVIS:

10   Q.  Is it fair to say that, sitting here today, you don't have

11   any independent recollection if you looked for documents or

12   searched for documents or assisted your prior attorneys in any

13   way, prior to June 12 of 2015, when Mr. Life wrote this

14   e-mail?

15   A.  If he is saying "I will have the second supplemental

16   response to DR Distributors by Monday," that means I must have

17   helped with something.

18   Q.  And that -- you are reading that from the e-mail, right?

19   A.  Reading the e-mail, it looks as though something is going

20   to be presented.  I can't imagine how something could have

21   been found without me searching for documents.

22   Q.  Fair.

23          And the next paragraph, then, what does that one say?

24   A.  I'm looking at the last paragraph.

25   Q.  I'm directing you to the middle paragraph.

Duke - Direct

 1   A.   Okay.

 2          THE COURT:  The one that starts with "In regards"?

 3          MR. DAVIS:  Yes.

 4          THE WITNESS:  "In regards to the document request,

 5   please be advised that no such documents exist, to our

 6   knowledge, concerning SEO and Internet keyword rankings after

 7   2009.  Document 21C 61146, which appears to have been cut off,

 8   is produced here as 21C 62780 to 21C 62783."

 9   BY MR. DAVIS:

10   Q.  And I'm trying to understand if you have any particular

11   awareness or recollection of you assisting your prior

12   attorneys in determining that no such documents exist at or

13   before June 12 of 2015, when they are responding to a document

14   demand and, in particular, responding to a court order

15   directing you and your company to produce certain documents.

16   A.  As I stated previously, I can only surmise based on the

17   last paragraph.  I have no clue about the second paragraph, as

18   it appears as though they may be going off of what was in

19   discovery, not realizing that there were these issues.  They

20   were looking at the discovery documents, which had been

21   presented, and maybe looking through them again.  That's the

22   only thing that I could imagine they were doing.

23   Q.  And, again, the best way to determine this would be to

24   look at your own e-mails with your attorneys at this time

25   period to see what they were asking you for; is that right?

Duke - Direct

1    A.  The only way I could have an accurate assessment would be

2    to look at e-mail.

3           MR. DAVIS:  We move P-55 into evidence.

4           THE COURT:  Any objection?

5           MR. SALAM:  He has no basis to know whether or not it

6    is what it purports to be, but if Mr. Life's attorney has no

7    objection, I have no objection.

8           THE COURT:  Any objection to Exhibit 55, Plaintiff's

9    Exhibit 55?

10          MR. SMITH:  No, your Honor.

11          THE COURT:  Okay.  It will be admitted.

12    (Plaintiff's Exhibit 55 was offered and received in

13     evidence.)

14   BY MR. DAVIS:

15   Q.  I want to turn back to the Yahoo! Chat messenger data.

16          Do you recall us talking about that before?

17   A.  Yes.

18   Q.  And one of the things I wanted to confirm was did you

19   ever, yourself, try to preserve or obtain a copy of your

20   Yahoo! Messenger chat data in this case?

21   A.  My counsel attempted to get it.

22   Q.  My question is did you ever try and do it yourself?

23   A.  No.  By the time I had discovered that the program was

24   gone, it would have been too late for me to try to do it

25   myself.  So I believe the lawyers tried to do it through

Duke - Direct

1  forcing Yahoo! to comply.

2  Q.  When you say the -- you say it was gone.  What do you mean

3  by that?

4  A.  The program didn't exist anymore.

5  Q.  And it was removed from your computer?

6  A.  It was within your e-mail, and now it was no longer within

7  your e-mail, which I was incredibly disappointed about because

8  I had personal instant messages from my wife and me when we

9  first met that I definitely would have wanted to save.  I

10  would have saved everything in there.  So, no, I was not happy

11  to learn it was gone for personal reasons.

12  Q.  Do you remember when that happened?

13  A.  I do not.

14  Q.  Do you remember getting any notifications from Yahoo!

15  about the end of that service coming?

16  A.  I do not.

17  Q.  Okay.  And that Yahoo! Messenger data was communications

18  between you and others regarding things to do with your

19  business, right?

20  A.  It's 99.9 percent personal, so I lost a lot of personal

21  things, but there was some business stuff.  I can't imagine it

22  was any more than Kirti Saraswat.

23  Q.  Well, did you use it with any of your Chinese suppliers or

24  manufacturers?

25  A.  No.

Duke - Direct

1   Q.  That you just used Skype with?

2   A.  I generally didn't even use Skype.  I occasionally would

3   use Skype, but I never would use Yahoo! Mail with any of those

4   people.

5   Q.  Yahoo! Mail or Yahoo! Chat?

6   A.  Well, Yahoo! Chat was within Yahoo! Mail, if that makes

7   sense.

8   Q.  It does make sense, but I'm trying to understand.

9        So if you have your Yahoo! e-mail account, then why

10  don't you have your Yahoo! Chat if it is within it?

11  A.  Because the person in China I'm talking to isn't using a

12  Yahoo! e-mail address, so they are not going to pop up on my

13  chat window unless it is another Yahoo! customer.

14  Q.  Got it.

15       And that's why you used things like Gtalk, right?

16  A.  That's why I used things like Skype.

17  Q.  Skype, right?

18  A.  That's what I more commonly would use than Gtalk.

19  Q.  And you used the instant messaging function on Skype,

20  right?

21  A.  Yes.

22  Q.  And has that been copied and preserved in this case?

23  A.  Yes, it is on my hard drive.  That saves to the hard

24  drive.

25  Q.  Right.

Duke - Direct

```
 1              And that was searched in this case, right?
 2   A.  Yes.
 3   Q.  Okay.  And you still use Skype today?
 4   A.  It is on my computer.  I wouldn't say I use it.
 5   Q.  Do you use any form of instant messaging today?
 6   A.  No, not that I can think of.
 7   Q.  And when did you first learn that your attorneys -- your
 8   prior attorneys at the firm Leavens, Strand & Glover had lost
 9   their e-mails for all attorneys for their firm from 2015
10   through April of 2016?
11   A.  I can't recall when they notified me, but they did let me
12   know.
13   Q.  And do you know when they let you know?
14   A.  I don't recall the date, no.
15   Q.  And how did they let you know?
16   A.  Either a phone call or an e-mail.
17   Q.  And what did they tell you?
18   A.  That all of the e-mails were lost for a certain time
19   period.
20   Q.  And what did you do, if anything, in response to that
21   disclosure?
22   A.  I don't understand what do you mean, what did I do.
23   Q.  Did you take any action in response to that disclosure to
24   you?
25   A.  No, I don't know what type of action you are discussing.
```

Duke - Direct

1   Q.  Did your prior lawyers ask you to do anything?

2   A.  Not that I recall.

3   Q.  Did they ask you to retrieve any e-mails from your

4   accounts and provide them with copies of the e-mails they sent

5   you during the course of the case?

6           THE COURT:  Because of their e-mails being lost.

7           THE WITNESS:  Yes, there were times they would ask me

8   to send them -- to look for e-mails that they had sent me,

9   yes.

10  BY MR. DAVIS:

11  Q.  Let me make sure, and I'm not talking about you searching

12  your Yahoo! e-mail account, right?

13  A.  I understand.

14          You are saying did they ask me to look through my

15  account for e-mails from them because they had lost e-mails?

16  Q.  Yes.

17  A.  Correct, yes.

18  Q.  And when did that first occur?

19  A.  I don't recall.

20  Q.  And did you comply with the request?

21  A.  Of course.

22  Q.  Okay.  And did they tell you that they had lost all of

23  your prior attorney Ms. Liberman's e-mails when she worked on

24  the case?

25  A.  I believe that, yes, that was mentioned.

Duke - Direct

1  Q.  And your prior attorneys, I think we established already,

2  you were communicating with them by Yahoo! and your GoDaddy

3  accounts, right, before they withdrew?

4  A.  Correct.

5          MR. DAVIS:  Your Honor, could we take a brief break?

6  I'm trying to -- a lot of the questions in my outline we have

7  answered, and if I have, like, two minutes, I can try and

8  quickly get to the next spot.

9          THE COURT:  Okay.  I'm not going to hold you to this,

10  but if you were to cull out those questions that we have

11  already covered and that Mr. Duke has already answered, you

12  cull those out, how much more questioning do you have of

13  Mr. Duke?

14          MR. DAVIS:  I'm not sure.  I'm trying to --

15          THE COURT:  Why don't you cull them out.  We will

16  come back, and we will see.  You guys give me an estimate,

17  okay?

18          MR. DAVIS:  I'm trying to shorten it down.

19          THE COURT:  Okay.  All right.  We will take a break.

20          THE CLERK:  All rise.

21  (Recess taken.)

22          THE CLERK:  Recalling 12 CV 50324, DR Distributors,

23  LLC v. 21 Century Smoking, Inc.

24          THE COURT:  All right.  What's your best estimate?

25          MR. DAVIS:  I'm going to need -- well, as you know,

Duke - Direct

1    from the length of our motion, the size of it, my best

2    estimate is two hours more.

3            THE COURT:  I heard the "two hours," and then my

4    heart stopped.  I didn't hear the second part.  What?

5            MR. DAVIS:  We have got a lot of other witnesses to

6    cover, so we are trying to sharpen the pencil, but I will -- I

7    don't want to say --

8            THE COURT:  Two hours with Mr. Duke or two hours

9    total?

10           MR. DAVIS:  Two hours with Mr. Duke, and then we are

11   going to move to Mr. Leavens.

12           THE COURT:  Okay.

13           MR. DAVIS:  Those are our primary witnesses.

14           We have our witness list, which we have submitted.

15   We intend to take as many of those witnesses we can.  We are

16   covering what we think is the appropriate ground with

17   Mr. Duke.

18           THE COURT:  Okay.  All right.  Let's continue with

19   the examination of Mr. Duke.

20           MR. DAVIS:  Thank you.

21   BY MR. DAVIS:

22   Q.  I'm going to turn your attention, Mr. Duke, to May and

23   June of this year, when your prior attorneys all withdrew from

24   the case.

25           Are you familiar with that?

1   A.  Yes.

2   Q.  And in connection with that, your prior attorneys filed a

3   motion with the court asking to stay the briefing or the

4   deadline to file a response to the motion that was pending,

5   and they also filed their motions to withdraw.

6           You are aware of all that?

7   A.  Yes.

8   Q.  And I got displayed on the screen here as Docket 298.

9   This was filed by your prior attorneys on May 30, 2019.  This

10  is the motion to stay briefing schedule on motion for

11  sanctions.

12          Do you recognize this?

13  A.  Yes.

14  Q.  Okay.  And did you review and approve the filing of this

15  motion?

16  A.  No, I did not review this motion.

17  Q.  You never reviewed it?

18  A.  Could you scroll down a page?

19  Q.  Sure.

20  A.  If you are talking about what I think you are talking

21  about, no.

22  Q.  Yes, sure.

23  A.  No, of course not.

24  Q.  And why do you say "of course not"?

25  A.  No, I didn't review this.  I don't know why I would review

Duke - Direct

280

1    this.  But, no, I did not review this.

2    Q.  Did your prior attorneys advise you they were filing this

3    motion before it was filed?

4    A.  I don't remember.  I do not believe so.

5    Q.  Okay.  And is it your testimony that the filing of this

6    motion was the first time you learned something from your

7    attorneys about the searching of your GoDaddy e-mail accounts,

8    that there was a problem with that?

9            MR. SALAM:  Objection, your Honor.  That wasn't his

10   testimony.

11           THE COURT:  Well --

12           MR. SALAM:  He has never even established when he

13   first found out about the GoDaddy.

14           THE COURT:  Well, the question is "And is it your

15   testimony."

16           THE WITNESS:  No, this is not the first time I found

17   out.

18           THE COURT:  There you go.

19   BY MR. DAVIS:

20   Q.  All right.  When is the first time you discussed your

21   failure to search your entire GoDaddy e-mail account for

22   responsive documents in this case?

23           MR. SALAM:  Object to the form of the question, your

24   Honor.  There is no testimony saying "your failure."  I object

25   to the form of the question.

Duke - Direct

1         MR. DAVIS:  Shall I rephrase, your Honor?

2         THE COURT:  Go ahead and rephrase.

3    BY MR. DAVIS:

4    Q.  When was the first time you learned that your GoDaddy

5    e-mail accounts were not "subject" to the e-discovery search

6    process in this case or the ESI terms?

7         When is the first time you learned that from your

8    lawyers -- "prior lawyers," I should say?

9    A.  I told my prior lawyers.  They didn't tell me.

10   Q.  Could you describe for me when that happened?

11   A.  When we were meeting to prepare for the motion that they

12   were filing or counter -- I don't know, the thing replying to

13   whatever was filed by you guys.

14        I'm sorry.  I don't know the terms.  Whatever we were

15   working on, I was sitting on my computer, and that's when I

16   pulled up my GoDaddy account and discussed with them my belief

17   that certain things had not been searched.

18        THE COURT:  All right.  Thank you.

19        Are you done?  I don't want to interrupt you.

20        THE WITNESS:  Yes.

21        THE COURT:  Let me pause for one second.

22    (Brief pause.)

23        THE COURT:  Okay.  Go ahead.

24   BY MR. DAVIS:

25   Q.  Can you tell me who you were with when this occurred?

Duke - Direct

1  A.  Peter Stamatis and Steve Shonder.

2  Q.  And were there any other lawyers there with you?

3  A.  No.

4  Q.  And where were you?

5  A.  In one of their offices.  I'm not sure which one.

6  Q.  And describe for me how you came to the realization that

7  your entire GoDaddy e-mails were not subject to the

8  e-discovery search terms?

9  A.  I was speaking with them and loaded up my e-mails and

10 said -- not realizing kind of where this case was at at this

11 point.  I had been searching for stuff all the time, so it was

12 just a question, "Should we be searching these ones as well?"

13         And they were like, "What do you mean?  What do you

14 mean, should we be searching them?"

15         I said, "Well, I do not believe -- I am not sure, but

16 I do not think they have been searched," and they believed

17 they had been searched.

18         So we discussed, and that's where it went.

19 Q.  And at that time, did Mr. Stamatis and Mr. Shonder share

20 with you the ESI search terms?

21 A.  No.

22 Q.  And when did you first learn about the ESI search terms in

23 this case?

24 A.  Very recently.

25 Q.  Very recently?

Duke - Direct

283

1  A.  Yes.

2  Q.  And what else do you recall about that meeting with

3  Mr. Stamatis and Mr. Shonder when you realized that your

4  GoDaddy e-mail account had not been searched for responsive

5  documents?

6  A.  I mean, we were still preparing the response, so we were

7  still working.  I would -- yes, we were still working on the

8  response.  So we just kept working together on what we were

9  working on.  They kind of looked into it a little bit more, I

10  believe, at that point.

11  Q.  Do you know if they spoke to Tom Leavens or Travis Life

12  about it?

13  A.  I do not know.

14  Q.  Okay.  And during the case, you had testified that you had

15  worked with your other attorneys, Tom Leavens, Heather

16  Liberman, Travis Life searching for e-mails, right?

17  A.  Correct.

18  Q.  And that included your Yahoo! and GoDaddy account, right?

19  A.  Correct.

20  Q.  Okay.  And when you did that, you would run the searches

21  and select out the documents that resulted from the search

22  terms, right?

23  A.  Exactly.

24  Q.  And you would give them to your attorneys?

25  A.  Yes.

1    Q.  And you don't know what they did with them, but they

2    produced them in the case or didn't produce them, right?

3    A.  Correct.

4    Q.  Okay.  And did your attorneys advise you of any obligation

5    in terms of disclosing to the court about this problem?

6    A.  Peter Stamatis, upon the realization of what had happened,

7    immediately, yes.  He said as an agent of the court -- or I

8    don't know exactly what it is called, but he said something

9    like, "I need to let everyone know immediately."

10   Q.  Okay.  And as part of this process in this case, prior to

11   your realization about the GoDaddy account not being searched,

12   you had done searches and looked for e-mails, right?

13   A.  A lot of them, yes.

14   Q.  Okay.  And had you searched that GoDaddy e-mail account

15   for the confused consumer e-mails?

16   A.  Yes.

17   Q.  Yes.

18          And you produced some, right?

19   A.  Hundreds, yes.

20   Q.  Yes.

21          THE COURT:  Hold on.  Now I'm confused.

22          My understanding of the "confused consumer," was that

23   Ms. Wood?

24          THE WITNESS:  There is thousands.  So there is many,

25   many e-mails.  That's one of many, many hundreds.

Duke - Direct

1      THE COURT:  So Ms. Wood is a subset of the world of

2  confused consumers?

3      THE WITNESS:  Of a giant.

4      THE COURT:  Understood.  That clarifies it.

5      Go ahead.

6      I understand now.

7      MR. DAVIS:  Thank you, your Honor.

8  BY MR. DAVIS:

9  Q.  And you had searched previously for e-mails with Ms. Wood,

10  right, in your GoDaddy e-mail account, right?

11  A.  I believe so, yes.

12  Q.  Yes.

13      And you had never produced all of the e-mails that

14  you exchanged with Ms. Wood; isn't that right?

15      Do you understand that?

16  A.  I do not recall it was produced.

17      THE COURT:  Let's back this up.

18      Were there e-mail communications with Ms. Wood?

19      THE WITNESS:  They have shown e-mail communications.

20  I would have to see the sent inbox thing because that would be

21  the same issue that I was having where e-mails were getting

22  deleted.  I would need to see did she reply to me, when was

23  the reply, to be able to know what I would have and what I

24  wouldn't have.

25      THE COURT:  Okay.  So do you know if you communicated

Duke - Direct

1   with Ms. Wood via e-mail?

2          THE WITNESS:  I have seen proof from them that, yes,

3   absolutely, we communicated with Ms. Wood via e-mail.

4          THE COURT:  Okay.  All right.  I understand where you

5   are going.  I apologize.

6          MR. DAVIS:  I ask Plaintiff's Exhibit 69 be

7   displayed.

8   BY MR. DAVIS:

9   Q.  What's in front of you is Plaintiff's Exhibit 69.  It's

10  labeled DRSTCS numbers 5269 through 5274.

11          Have you seen this before?

12  A.  In preparation for today, yes.

13  Q.  All right.  Before preparation for today, do you have an

14  independent recollection of ever seeing this before?

15  A.  I recall it coming up in the past.

16  Q.  Okay.  And you have just testified you recall receiving

17  e-mails between yourself and a customer named Debra Wood?

18  A.  Yes.

19  Q.  And I will represent to you that this is a document that

20  the Plaintiff produced in this case, all the pages of it,

21  right?

22          You see at the top it is Debra Wood to

23  jeffpiper@CBDISTRIBUTORSinc.com?

24  A.  Yes.

25  Q.  We didn't get this from you or your company.

Duke - Direct

1          Do you understand?

2    A.  Yes.

3    Q.  Okay.  And you said earlier today, in one of the documents

4    we saw, that you had trouble finding -- right, you searched,

5    but couldn't find some of the e-mails that you had found

6    before; is that right?

7    A.  Correct.

8    Q.  And you had searched previously, separate from that, for

9    e-mails with Ms. Wood?

10   A.  I believe that someone had asked me to search for that

11   before.

12   Q.  And that was your attorney Travis Life?  We saw that

13   e-mail, right?

14   A.  I believe prior to that, this had come up.

15   Q.  And were you able to find any Ms. Wood e-mails at that

16   time?

17   A.  There is thousands of these confused customers.  I don't

18   recall this specific confused customer.

19   Q.  But this one in particular, it's an exchange you had with

20   her back and forth, if we look at this entire e-mail string,

21   right?

22          It is she replied to you at least six times, and we

23   can go through it page by page, but --

24   A.  And this is exactly what was happening and wasting all of

25   our time.

Duke - Direct

1  Q.  Exactly.

2  A.  That was the issue with the confusion because we were

3  wasting time replying to all these e-mails.

4  Q.  And when we asked you to go back and look for these

5  e-mails, you couldn't find them all, right, in your e-mail

6  collection?

7  A.  I don't recall.  It could be misfiled.  I don't know where

8  this e-mail is.

9  Q.  But if she replied to you six times, those would be sent

10  to your inbox, right?

11  A.  They should be in the support inbox.

12  Q.  Right.

13      So you should be able to search your e-mail, and

14  these were to your GoDaddy support account, right?

15  A.  As long as they were not misfiled, there is a 21st Century

16  confused customers folder.

17  Q.  Okay.

18  A.  So I can search that folder.  But if it was misfiled

19  somehow into some other folder, I would have a hard time

20  finding it.

21      THE COURT:  Can I pause you right there?

22      There is a 21st Century Smoking confused customer

23  folder?

24      THE WITNESS:  In our e-mail.  If we had a confused

25  customer, we just threw it in the folder.

Duke - Direct

1          THE COURT:  Threw it in that folder.

2          Anybody copy that folder and produce it?

3          THE WITNESS:  They have got it, yes.  Every e-mail

4  that was in that folder we produced.

5          THE COURT:  Okay.  As the 21st Century Smoking

6  confused consumer folder, that folder was just simply copied

7  and given to the Plaintiffs?

8          THE WITNESS:  I downloaded, saved every single e-mail

9  that was in that folder.

10         THE COURT:  That was in that folder?

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.  So you didn't just have to copy

13  that folder.  You copied individually each one?

14         THE WITNESS:  It wasn't easy.  Yes, you had to copy

15  every single one.

16         THE COURT:  When did that happen?

17         THE WITNESS:  In the very beginning of this case,

18  when showing that we were suffering from the confusion, we

19  presented the hundreds and hundreds of e-mails.

20         THE COURT:  Okay.  Well, Ms. Wood's e-mails from

21  2013, would that have happened?  You said very early in the

22  case.  The case is from 2012.  Would her e-mail have been

23  produced in that process, if you know?

24         THE WITNESS:  I am not sure.

25         THE COURT:  Okay.  Go ahead.

Duke - Direct

1   BY MR. DAVIS:

2   Q.  Well, we know from that production that you did produce an

3   e-mail from Ms. Wood, right, as part of the string, but you

4   only produced one e-mail?

5   A.  Okay.  Yeah, I don't know.

6   Q.  You don't know, independent of --

7   A.  I believe what you are telling me, yes.

8   Q.  Okay.  Yes.

9           And my question is -- we have produced, because she

10  happened to forward the entire string of e-mails with you that

11  she had back in 2013 to our client, and we produced it in the

12  case because it hit the search terms, and we produced it,

13  right?

14          But my question for you is if she replied to

15  you -- and I have read the string several times -- six times

16  she wrote to you at your support@21centurysmoking.com, GoDaddy

17  e-mail account, if she writes to you, and it goes to your

18  inbox, it is not auto-purged, right?

19  A.  In my inbox, it is not auto-purged.

20  Q.  Say that one more time.

21  A.  In my inbox, no, it is not auto-purged.

22  Q.  That's right.

23          So when you apply your search terms, the ESI search

24  terms, or look for --

25          MR. SALAM:  Objection, your Honor.

Duke - Direct

1        THE COURT:  Let him finish the question.  I don't

2   know how many times I have to say that.

3   BY MR. DAVIS:

4   Q.  -- you should be able to retrieve all of the e-mails that

5   came to you from Ms. Wood, right?

6        THE COURT:  Okay.  If you have an objection, make it

7   now, and tell me what the objection is.

8        MR. SALAM:  Objection, your Honor, foundation.  He

9   has already -- he has already testified he didn't apply the

10  search terms.  He has never seen the search terms.

11       THE COURT:  That's why he had the word "if" in his

12  question.

13       Overruled.

14       THE WITNESS:  Yes, obviously, I did not apply the

15  search terms because I had not seen the search terms, and I

16  didn't know which e-mail we presented, but I wouldn't -- if I

17  had a confused customer, I would have found one confused

18  e-mail and sent it.  I wouldn't have sent six.  That's

19  misleading.  I wouldn't have sent seven e-mails from one

20  person and pretend that there was seven instances of

21  confusion.  That is extremely misleading.  So I would have

22  sent a chain of e-mails, to the best of my ability, for each

23  confused customer is what my goal would have been.

24       MR. DAVIS:  Right.

25

1  BY MR. DAVIS:

2  Q.  So your testimony, then -- and we know from your prior

3  e-mail with your prior attorney Mr. Life, he asked you to look

4  for the Ms. Wood e-mails, right?

5  A.  Yes.

6  Q.  You never produced them.  Why not?

7  A.  I couldn't find them.  Like I said, it could be misfiled.

8  I don't know where it is, but I couldn't find it.

9  Q.  But you couldn't find it?

10  A.  Yes.

11  Q.  And if they were sent to your inbox, you would have them,

12  right?

13  A.  It would be -- it should be filed in the 21st Century

14  Smoke confusion folder.  I couldn't find it in that folder.

15  Q.  And did you search your entire Yahoo! e-mail account for

16  her e-mails?

17  A.  My wife has probably 100 folders, and you can't -- or

18  maybe 200 folders, but you can't search -- I don't know how to

19  search all those folders at once.  You have to individually go

20  into each folder.  I don't have any clue where this got filed

21  away to.  It is just not where it should be.  I know that.

22  Q.  Did you instruct your new ESI vendor to -- well, not your

23  new one, but 4Discovery took an image of all of your Yahoo!

24  e-mails earlier this year, right?

25  A.  This isn't Yahoo! e-mail though.

Duke - Direct

1  Q.  Right.

2       But your Yahoo! e-mail was imaged earlier this year,

3  right?

4  A.  Yes.

5  Q.  And now your GoDaddy e-mail account has been imaged most

6  recently by your new ESI vendor, right?

7  A.  Correct.

8  Q.  Have you asked them to search for the Ms. Wood e-mails?

9  A.  You just told me it is going to come up with the search

10 terms.  So they are going to use the 20 search terms, and then

11 this should come up, correct?

12 Q.  I'm asking you if you have asked your new vendor to search

13 for the Ms. Wood e-mails.

14 A.  I am not partaking in discovery.  They are searching, and

15 they are going to do the terms.  I'm not directing discovery

16 or directing ESI.

17 Q.  And is it your testimony that you haven't directed the new

18 ESI vendor to address all the issues that have been raised in

19 the pending motion for sanctions, the reason why we are here,

20 you haven't given them any instructions from you to address

21 all the issues raised in that motion?

22 A.  My lawyers have given instructions and my experts have

23 given instructions.

24 Q.  But you haven't personally?

25 A.  I have not personally given instructions to them, no.

Duke - Direct

1  Q.  Mr. Duke, at the end of May, in the beginning of June, all

2  of your prior lawyers withdrew from their representation of

3  you and your company; is that right?

4  A.  Correct.

5  Q.  Okay.  And did they tell you why they can no longer

6  represent you and your company in this case?

7  A.  They said they were conflicted.

8  Q.  All right.  And when they said they were conflicted, did

9  they explain to you what the conflict was?

10  A.  These errors that have been made in discovery.

11  Q.  Okay.  And what did they tell you about the errors made in

12  discovery?

13  A.  We didn't have a lot of discussions.  They were

14  withdrawing as my counsel.  They weren't --

15  Q.  I'm sorry.  I can't hear you.

16  A.  They were withdrawing as my counsel, so we didn't have a

17  lot of discussions about this.

18  Q.  So they didn't -- when you say they didn't give you a lot

19  of discussion, what did they tell you specifically?

20        Like what did Mr. Leavens tell you specifically about

21  why he was conflicted with his continued representation of

22  you?

23  A.  I don't even believe I discussed this with Mr. Leavens --

24  Q.  You never --

25  A.  -- prior to his withdraw.

Duke - Direct

1  Q.  Did you have any conversation with him after his withdraw?

2  A.  Other than where to be and when to be there, no.

3  Q.  I can't understand what you are saying.

4  A.  Other than like where to be and when to be there, no, an

5  e-mail, "Show up at court at this time."

6  Q.  And when he said he was conflicted, how did he communicate

7  that to you?

8  A.  As I just stated, I don't recall Leavens specifically

9  telling me that at all.

10  Q.  Do you remember having a conversation with your prior

11  attorney Travis Life about why he withdrew from the case?

12  A.  No.

13  Q.  Did he e-mail you or communicate with you in any way why

14  he was withdrawing from the case?

15  A.  I don't believe so.

16  Q.  Okay.  And did your prior attorney Mr. Peter Stamatis, did

17  he communicate to you why he was withdrawing from the case?

18  A.  No.

19  Q.  Did he -- when I say "communicate," did he write you an

20  e-mail and tell you why he was withdrawing?

21  A.  I guess no one told me why they were withdrawing.  They

22  all just simultaneously withdrew.  I found out about the

23  conflicted thing, I guess, when I was in here in June.  So I

24  don't think that anyone actually told me anything.  They still

25  had been talking to me up to the day before, and then the next

Duke - Direct

1   day, they all withdrew.

2   Q.  And is it your testimony that none of your prior attorneys

3   communicated anything in writing to you, outside of what they

4   said in court and filed in their papers, about what you have

5   just described as "errors" in this case?

6   A.  At what time period?

7   Q.  The time period from when they told you they were

8   withdrawing until we were standing in court.

9   A.  I don't believe so.

10  Q.  What about before that time period?

11  A.  At which time period in particular are you talking about?

12  Q.  I'm trying to understand if there came a point in time

13  when any of your prior attorneys communicated to you

14  specifically the errors they were raising with you that led to

15  the conflict, that led them to withdraw.

16      Do you understand what I'm saying?

17  A.  Yes, way previous to all of this, sometime in 2018, this

18  was discussed.

19  Q.  So in 2018 -- I want to make sure I understand -- your

20  attorneys discussed with you the errors in discovery in this

21  case that were going to conflict them out and lead them to

22  withdraw from the case in 2019?

23  A.  No.  In November of 2018, Tom Leavens came to San Diego,

24  and we met, and he had offered to withdraw as my counsel, and

25  it was because of the errors in discovery.  That is what my

Duke - Direct

1  understanding was.

2  Q.  When you say it was your understanding, did you get that

3  understanding from Mr. Leavens speaking to you or from some

4  other source?

5  A.  From speaking to Mr. Leavens.

6  Q.  All right.  And when you say you got that understanding,

7  what did he tell you?

8          THE COURT:  Now I'm going to ask for some foundation:

9  Where, when, who was present, who said what to who?

10  BY MR. DAVIS:

11  Q.  Yes, I'm focusing in on the conversation you just

12  described.  I believe it was in November of 2018, in

13  San Diego, with Tom Leavens; is that correct?

14  A.  Correct.

15  Q.  And was anyone else there with you?

16  A.  No.  Peter Stamatis was on the phone.  He was still in

17  Chicago.

18  Q.  And was this the first time -- let me go back.

19          Were you at home, at your house, with Mr. Leavens?

20  A.  No.

21  Q.  Where were you?

22  A.  San Diego.

23  Q.  In the city of San Diego.

24          Where in the city of San Diego?

25  A.  Somewhere near the airport, maybe the Sheraton, I believe,

Duke - Direct

298

1  something like that.

2  Q.  Was it in a conference room?

3  A.  Yes.

4  Q.  Okay.  And did you know prior to that meeting what the

5  agenda on that meeting was when you were meeting with

6  Mr. Leavens?

7  A.  I believe that we had some discussions.  I had some

8  discussions with my attorneys.  I don't quite recall where

9  they had gone, but I knew it was a very important meeting and

10 something had seemingly gone wrong.

11 Q.  So prior to this November 2018 meeting, your prior

12 attorneys had communicated to you that there were problems or

13 errors in the case relating to discovery; is that right?

14 A.  Yes, we had searched all of the Yahoo! e-mails in May of

15 2018, I believe.  So at that point, we knew there was

16 problems.

17 Q.  Got it.  All right.

18       And did they, prior to your meeting -- prior to that

19 meeting in November of 2018, when was the first time any of

20 your prior attorneys raised with you an issue about an error

21 or problem with discovery, if you recall?

22 A.  March to May of 2018 is when they figured out what was

23 going wrong, or at least partially what was going wrong.

24       THE COURT:  And that related to the Yahoo! e-mails,

25 right?

Duke - Direct

1      THE WITNESS:  Exactly, yes.

2      THE COURT:  Did that include the Yahoo! chats, or

3  would that have been raised at that point?

4      THE WITNESS:  I think you had already been dealing

5  with that here prior to that.

6      THE COURT:  Okay.  Thank you.

7      THE WITNESS:  Yes.

8  BY MR. DAVIS:

9  Q.  And was the first time that you discussed Mr. Leavens

10  withdrawing from the case at that November 2018 meeting?

11  A.  I remember that being the topic of the meeting.  I don't

12  remember if we had discussed it prior to the meeting.

13  Q.  Do you remember getting any e-mails from your attorneys

14  regarding the errors and problems in discovery prior to that

15  November 2018 meeting?

16  A.  May of 2018 is when we -- as I said, they were figuring

17  out what was going wrong with the Yahoo!.

18  Q.  Other than figuring out what was going on, did they send

19  you e-mails detailing the error or problems that they had

20  identified and their concerns about it that may lead to them

21  withdrawing from the case?

22  A.  As I said, only one attorney had discussed withdrawing

23  from the case.  So that was Tom Leavens.  That wasn't -- you

24  just said all of the attorneys discussed withdrawing.  Only

25  one attorney had ever discussed with me withdrawing from the

Duke - Direct

1    case.

2    Q.  And my question is:  Prior to that meeting in November of

3    2018, did you know Mr. Leavens was going to propose to

4    withdraw from the case at that time?

5    A.  As I previously stated, I can't remember the exact date

6    that I came to that realization.  It was around that time.  I

7    knew he was coming.  I can't remember if I knew he was coming

8    for that reason.  I believe that we had discussed it

9    beforehand, though.

10           THE COURT:  Had he ever flown to San Diego to meet

11   with you before that?

12           THE WITNESS:  No.

13           THE COURT:  Okay.  Go ahead.

14   BY MR. DAVIS:

15   Q.  Did he come out there specifically just to meet with you

16   about the case?

17   A.  I don't know what else he was doing in his life.  I know

18   he came to San Diego specifically to meet with me.  That's why

19   the meeting was by the airport.

20   Q.  And did Mr. Leavens tell you anything about any action

21   that he or the other attorneys were taking on your behalf to

22   address the discovery issues?

23   A.  I mean, I know we had searched the Yahoo! e-mails.  Those

24   were being presented.  I don't recall what other actions we

25   had discussed.

Duke - Direct

1  Q.  Okay.  Did they tell you they were hiring an ESI vendor or

2  an ESI expert to help with the problem?

3  A.  I think that the ESI company did do the -- or the

4  4Discovery did do the search of the Yahoo! e-mails.

5  Q.  And it was limited to just the Yahoo! e-mails, right?

6  A.  I believe so, yes.

7  Q.  All right.  And this is -- the meeting is in November of

8  2018.  Was there blame assigned at that meeting?

9  A.  No.

10  Q.  Okay.  No one was saying whose fault it was or there was

11  an error that was caused by the attorneys or by you?

12  A.  I mean, we all know it was unintentional, so there was

13  unintentional errors for sure.  It was hard to lay blame for

14  something that wasn't on purpose.

15  Q.  When you say "we all know that," who are you referring to?

16  A.  I know it is unintentional, and Tom Leavens knows it is

17  unintentional.  That is who was in the meeting.  Peter

18  Stamatis knows it is unintentional.  Those were the three

19  people that were in the meeting.

20  Q.  Right.

21       And that's what I'm trying to understand.  If it is

22  unintentional, why is your attorney flying to San Diego to

23  tell you he was going to withdraw from the case because of the

24  errors and problems with discovery?

25       Do you know?  Did he tell you?

Duke - Direct

```
 1              MR. SALAM:  Objection, your Honor.

 2              THE COURT:  Rephrase by saying "Did he tell you," and

 3    then ask the question.

 4              Sustained.  Rephrase it.

 5    BY MR. DAVIS:

 6    Q.  Did your attorney tell you why he was flying to San Diego

 7    to tell you he may withdraw from the case because of discovery

 8    problems?

 9              MR. SALAM:  Objection to the form.

10              THE COURT:  I would overrule.

11              THE WITNESS:  No, I don't know his mindset.  I don't

12    know his mindset and how to answer it.

13              THE COURT:  And that wasn't his mindset.

14              The question was -- that I told him to ask is "Did he

15    tell you?"  That's a fairly innocuous question.

16              Did he say that before he flew out there?

17              THE WITNESS:  And that's what I have been saying over

18    and over again.  I can't remember if he told me right before,

19    if he told me there.  I don't recall how it went down.

20              THE COURT:  And I think you testified repeatedly you

21    kind of knew something was up, right?

22              THE WITNESS:  Definitely knew something was up.

23              THE COURT:  Okay.  Go ahead, Mr. Davis.

24    BY MR. DAVIS:

25    Q.  And you are saying everyone knew it was unintentional,
```

Duke - Direct

1    right?  That's what your position is?

2    A.  Yes.

3    Q.  And so in June of this year, all six of your prior counsel

4    withdrew from the case, right?

5    A.  Correct.

6    Q.  And they all cited and said to this court and represented

7    that they have irreparable conflicts of interest with you.

8          Do you understand that?

9    A.  Yes.

10   Q.  And what are those conflicts?

11         THE COURT:  If you know.

12         MR. DAVIS:  If you know.

13         THE WITNESS:  Continued discovery errors.

14   BY MR. DAVIS:

15   Q.  Can you say that again?  I can't understand what you are

16   saying.

17   A.  Continued unintentional discovery mistakes.

18   Q.  And are they assigning blame to you for all of these

19   mistakes?

20   A.  I have never been told by any of them that I am to blame,

21   no.

22   Q.  And is there anyone to blame in your opinion?

23   A.  That's hard to say.  I mean, if someone does something

24   unintentionally, I guess you can blame them, but it is hard to

25   assign blame when you know that no one did anything with any

Duke - Direct

304

1    intent.

2    Q.  And your testimony, as you sit here today, is that all of

3    the things that we have covered today about the failure to

4    search the Yahoo!, failure to search GoDaddy, failure to

5    preserve your data, loss of your ESI data, all of those things

6    are unintentional errors; is that your position today?

7    A.  Absolutely, yes.

8            THE COURT:  Look at that, it is 5:15, which is the

9    name of a good Who song.

10           We are done.

11           Wednesday, the 30th, we have got you starting at

12   9:00 o'clock.  We will see you then, okay?

13           MR. DAVIS:  Thank you, your Honor.

14           THE WITNESS:  Thank you, your Honor.

15           THE COURT:  Have a good day.

16   (The hearing was adjourned to October 30, 2019, at

17     9:00 o'clock a.m.)

18                         CERTIFICATE

19    I certify that the foregoing is a correct transcript from

20   the record of proceedings in the above-entitled matter.

21   /s/Heather M. Perkins-Reiva              November 4, 2019

22   _____      _____
     Heather M. Perkins-Reiva                      Date
23   Official Court Reporter

24

25