```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            WESTERN DIVISION

 3   DR DISTRIBUTORS, LLC,             )Docket No. 12 CV 50324
                                       )
 4      Plaintiff-Counterdefendant,    )Rockford, Illinois
                                       )Wednesday, October 30, 2019
 5                 v.                  )9:00 o'clock a.m.
                                       )
 6   21 CENTURY SMOKING, INC.          )
     and BRENT DUKE,                   )
 7                                     )
        Defendants-Counterplaintiffs,)
 8                                     )
     CB DISTRIBUTORS, INC. and         )
 9   CARLOS BENGOA,                    )
                                       )
10      Counter-Defendants.            )

11                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE IAIN D. JOHNSTON
12                   VOLUME 2 - PAGES 305 - 573

13   APPEARANCES:

14   For the Plaintiff:        NICOLL, DAVIS & SPINELLA LLP
                               (95 Route 17 South,
15                              Suite 316,
                                Paramus, NJ  07652) by
16                             MR. ANTHONY J. DAVIS

17                             ROBERT C. von OHLEN & ASSOCIATES
                               (1340 Deerpath Road,
18                              Lake Forest, IL  60045) by
                               MR. ROBERT C. von OHLEN, JR.
19
     For the Defendants:       THE LAW OFFICES OF KEVIN SALAM
20                             (120 N. LaSalle Street,
                                Suite 2000,
21                              Chicago, IL  60602) by
                               MR. KEVIN B. SALAM
22
                               LEONARD MEYER LLP
23                             (120 N. LaSalle Street,
                                Suite 2000,
24                              Chicago, IL  60602) by
                               MR. JOHN G. BISBIKIS
25
```

```
 1   For the Leavens, Strand &   HOLLAND & KNIGHT
     Glover Attorneys:           (150 N. Riverside Plaza,
 2                                Suite 2700,
                                  Chicago, IL  60606) by
 3                               MS. TRISHA M. RICH
                                 MR. COLIN P. SMITH
 4
     For Steven S. Shonder:      TRAUB LIEBERMAN
 5                               (303 W. Madison Street,
                                  Suite 1200,
 6                                Chicago, IL  60606) by
                                 MR. MARK F. WOLFE
 7
     For Peter S. Stamatis:      WILLIAMS MCCARTHY LLP
 8                               (120 W. State Street,
                                  4th Floor,
 9                                Rockford, IL  61105) by
                                 MR. JOHN J. HOLEVAS
10
     Also Present:               MR. SEAN BYRNE
11                               MR. FRED CHAPEKIS
                                 MR. THOMAS R. LEAVENS
12                               MS. HEATHER R. LIEBERMAN VAN DYKE
                                 MR. TRAVIS W. LIFE
13                               MR. STEVEN S. SHONDER
                                 MR. PETER S. STAMATIS
14
     Court Reporter:             Heather M. Perkins-Reiva
15                               327 S. Church Street
                                 Rockford, Illinois  61101
16                               (779)772-8309

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Calling 12 CV 50324, DR Distributors,

2    LLC v. 21 Century Smoking, Inc.

3          THE COURT:  All right.  Let's just show the same

4    appearances.  There is nobody new.

5          All right.  We left off in the examination of

6    Mr. Duke.  When we are done with Mr. Duke's examination, I

7    just want to go through and double-check to make sure whatever

8    exhibits are admitted correspond with what everybody else has,

9    so we are all on the same page as far as admitted exhibits go,

10   okay?

11         All right.  Before you resume your examination of

12   Mr. Duke, anything else we need to address?  I know I have

13   received sort of random, stray exhibits.  We will try to keep

14   track of them.  I have got -- somebody's copies were put on

15   top.

16         MR. SMITH:  Those are our additional exhibits, the

17   Leavens Strand lawyers' additional exhibits, your Honor.

18         THE COURT:  Got it.  Okay.  16 through 25.

19         And then I think from Mr. Salam, I know I received an

20   e-mail from him that those are --

21         THE CLERK:  Those are in the binder.

22         THE COURT:  Actually in the binder.  Okay.  So I have

23   got everything.

24         All right.  Anything else to talk about procedurally

25   before we continue?

```
 1              MR. DAVIS:  No, your Honor.

 2              THE COURT:  Okay.  How about from you folks?

 3              MR. SALAM:  Just briefly.

 4              THE COURT:  Sure.

 5              MR. SALAM:  I sent your operations assistant an

 6    e-mail yesterday that I believe we will have 4Discovery

 7    available for next Thursday --

 8              THE COURT:  Okay.

 9              MR. SALAM:  -- if you want or if defense counsel

10    wants them depending on where we go today.

11              THE COURT:  Okay.  All right.  Anything else?

12              MR. SMITH:  No, your Honor.

13              I guess I do have a concern about the time, and among

14    my concerns are we have Ms. Liberman Van Dyke here from Texas.

15    I had hoped we might get to a point where we could suggest,

16    some part of this, she might not -- I'm worried we are going

17    past the 7th, your Honor, is what I'm worried about now.

18              THE COURT:  There is a club forming.

19              MR. SMITH:  Pardon me?

20              THE COURT:  There is a club forming.  We have

21    jackets, a secret handshake.  It is wonderful.

22              But if we could get Ms. Liberman, so she can move on

23    with other things she is doing, and figure out how it works

24    into a schedule, that's fine with me.

25              MR. SMITH:  And perhaps something we will discuss as
```

Duke - Direct

309

1   we proceed, but, I mean, I don't want to interfere with

2   counsels' presentations.  On the other hand, it is a matter of

3   some concern to me.

4           THE COURT:  Okay.  All right.

5           MR. DAVIS:  One item, your Honor.  They have just

6   referenced 16 through 25 exhibits.  I think we have received

7   up to 23.  I don't have 24 and 25.

8           MR. SMITH:  Yes, we put the extra two tabs in the

9   notebook just in case something else came up.

10          THE COURT:  I was just looking at the tabs.  That's

11  all.

12          MR. SMITH:  Everybody is right about what they've

13  got.

14          THE COURT:  So it is 16 through 23, right?

15          MR. SMITH:  Yes.

16          THE COURT:  Okay.  Good.

17          All right.  Mr. Duke, have a seat again.

18          Remember you are still under oath.

19          THE WITNESS:  Yes, your Honor.

20                  DIRECT EXAMINATION (Continued)

21  BY MR. DAVIS:

22  Q.  Good morning, Mr. Duke.

23  A.  Good morning.

24  Q.  I'm going to show you now an exhibit we received for the

25  first time yesterday from your new attorneys.  Can you look at

Duke - Direct

310

 1   your screen and see Defendants' Exhibit 60?  I don't see a

 2   marking on it, but this is how it was produced to me.

 3          Do you recognize that document?

 4          THE COURT:  Hold on one second.

 5          And then just as a -- not warning -- reminder,

 6   Heather tops out at 260.  Let's make sure she's comfortable

 7   throughout today.  It is a long day for her, okay?

 8          THE WITNESS:  Thank you, your Honor.

 9          MR. SALAM:  Your Honor, if need be, I have extra

10   copies.

11          THE COURT:  I have got it on the screen.  Thank you.

12          All right.  Go ahead, Mr. Davis.  I apologize.

13          MR. DAVIS:  Thank you, your Honor.

14   BY MR. DAVIS:

15   Q.  Mr. Duke, do you recognize the exhibit on the screen,

16   Defendants' Exhibit 60?

17   A.  Yes.

18   Q.  And you authorized this document to be disclosed in this

19   case?

20   A.  Yes.

21   Q.  And this is an e-mail between you and your prior attorney

22   Travis Life, right?

23   A.  Correct.

24   Q.  So what does this e-mail mean?

25          MR. SALAM:  Object to the form of the question, your

Duke - Direct

311

 1    Honor.

 2              THE COURT:  What's the matter with the form?

 3    BY MR. DAVIS:

 4    Q.  Does this --

 5              THE COURT:  I don't know -- what's the matter with

 6    the form?  It is his document, right?  I think you are talking

 7    about --

 8              MR. SALAM:  "What does it mean?"  Is it "What are you

 9    talking about here?" or something like that?

10              THE COURT:  Do you understand the question was what

11    are you trying to convey?

12              THE WITNESS:  It is a little vague.

13              THE COURT:  Okay.  Go ahead.  What were you trying to

14    convey with this e-mail?

15              THE WITNESS:  I was unaware that the e-mails were

16    purging from my GoDaddy e-mail accounts.

17    BY MR. DAVIS:

18    Q.  And does this e-mail refresh your recollection as to when

19    you first learned of the auto-purge problem?

20    A.  No.

21              MR. SALAM:  Objection, your Honor, foundation.  He

22    hasn't testified --

23              THE COURT:  It is a foundational question.

24    Overruled.

25              THE WITNESS:  No, this does not necessarily refresh

Duke - Direct

312

1    my memory.

2    BY MR. DAVIS:

3    Q.  All right.  Is this e-mail truthful and accurate?

4    A.  As you scroll to the next page, yes, this does help

5    refresh my memory.  That first page did not, but this page

6    does.

7    Q.  All right.  So you are looking at the entire Exhibit 60,

8    not just a part of it.  That does refresh your recollection

9    about when you first learned of auto-purge; is that right?

10   A.  Yes.

11   Q.  And these are e-mails you exchanged with your

12   attorney -- your prior attorney Mr. Life, right?

13   A.  Correct.

14   Q.  And so this means the auto-deletion ended on what date,

15   sir?

16   A.  What date did I correct it, or what date was the

17   last -- does the last e-mail exist?

18   Q.  We will take both.

19   A.  I believe the correction was in June of 2015.  According

20   to here, my last e-mail would be 11/22 of 2014.

21   Q.  So you made the correction in June of 2015?

22   A.  Correct.

23   Q.  And that's a month after the e-mail where you -- this

24   e-mail, Defense Exhibit 60, where you became aware of the

25   problem, right?

Duke - Direct

313

    1           MR. SALAM:  Objection, your Honor, to -- his

    2    testimony is that he became aware of it in June of 2015.

    3           THE COURT:  Just tell me the form.

    4           Look, as I said the last time, object, tell me a rule

    5    anywhere in FREs or a basis.

    6           MR. SALAM:  Misstates the testimony.

    7           THE COURT:  Okay.  It is cross-examination.  It is a

    8    fair question.

    9           Overruled.

   10           If you can answer the question, I think you will know

   11    how to say that.

   12           So do you want to have the question reread, or do you

   13    just want to restate it?

   14           MR. DAVIS:  I will restate it.

   15           THE COURT:  Okay.

   16    BY MR. DAVIS:

   17    Q.  I want to understand:  This e-mail refreshes your

   18    recollection as to when you first became aware of the

   19    auto-purge problem with your e-mail account, right?

   20           Isn't that what you just said?

   21    A.  Yes.

   22    Q.  All right.  And the date of this e-mail is what?

   23    A.  May 14th, 2018.

   24    Q.  And when did you make the correction to the settings on

   25    your e-mail account to fix this problem?

Duke - Direct

314

1   A.   June of 2015.

2   Q.   Okay.  So it wasn't sometime in 2014, as you stated in a

3   sworn declaration you filed with the court in April 2018,

4   right?

5   A.   Correct.

6   Q.   And it's not on June 29th, 2015, that you testified to

7   about Monday under oath in this courtroom, right?

8   A.   I just said June of 2015.

9   Q.   Yes.  But on Monday, you said that's when you first became

10  aware of it, on June 29th, 2015, right?  That's what you said

11  in this court?

12  A.   And that's what I said just now.

13  Q.   You just said, and this is your e-mail that says in May of

14  2018, you became aware of an auto-purge problem, right?

15  A.   Approximately May of 2015.  Approximately.  This was a

16  guess.  This was not -- this was not the e-mail that shows the

17  date.  This was an approximate guess based on a six-month time

18  frame.  I was doing math.  I said 11/22/14.  My best guess is

19  May.

20          THE COURT:  All right.  Hold on.

21          Again, this isn't stuff I should have to do.

22          Mr. Duke, just so you know, if your attorney objects,

23  just hold on.

24          THE WITNESS:  Okay.  I'm sorry, your Honor.

25          THE COURT:  Look, you aren't familiar with the rules,

Duke - Direct

315

1   so don't worry about that.

2          Just hold on.

3          If there is an objection, then I can rule on the

4   objection, and then we can move forward, so we have a clean

5   record, and then, again, Ms. Perkins-Reiva can only type down

6   one person talking at a time.  So I will try to, you know, put

7   the brakes on.  But if you hear an objection, just hold on,

8   and we will go from there.

9          THE WITNESS:  Sorry.

10         THE COURT:  You don't have anything to apologize for.

11  Don't worry about it.

12         Go ahead.

13         MR. DAVIS:  Thank you.

14  BY MR. DAVIS:

15  Q.  So looking at the page that's on your screen from Defense

16  Exhibit 60, this is your e-mail, right?

17         Do you see in the middle it says "From:  Brent Duke"?

18  A.  Correct.

19  Q.  "To:  Travis Life"?

20  A.  Correct.

21  Q.  What's the date of that e-mail?

22  A.  May 14th, 2018.

23  Q.  So May 14th, 2018, right, you are talking about the date.

24  The content of this talks about when you first learned and

25  became aware of the problem, right?

 1  A.  Correct.

 2  Q.  All right.  And it says -- well, why don't you read the

 3  second line starting with the word "meaning."

 4  A.  "Meaning that I would have discovered this issue in,

 5  approximately, May of 2015 if that six months is correct."

 6  Q.  Right.

 7        And this is your e-mail from May 14th of 2018, right?

 8  A.  Correct.

 9  Q.  Okay.  And a date in May of 2015 is not June 29th, 2015,

10  that you testified about on Monday, right?

11  A.  Approximately May, I would say, is June, yes.

12  "Approximate" does not mean exact.

13  Q.  Okay.  And so this call in May would have not been on the

14  day you supposedly called GoDaddy and spoke to them about it

15  for the first time on June 29th, 2015, right?

16  A.  I don't even understand what you are asking at this point.

17  Q.  Do you recall your testimony on Monday?

18  A.  Yes.

19  Q.  Do you recall talking about calling GoDaddy to talk to

20  them about this problem with the auto-purge from your e-mail?

21  A.  Yes, I don't think I maybe called GoDaddy.  I called

22  GoDaddy in June of 2015.  I'm positive of that.

23  Q.  You testified that you called them on June 29, 2015,

24  because you had an e-mail, and we showed it to you.  You have

25  an e-mail from GoDaddy, and you said that refreshed your

Duke - Direct

1    recollection as to when you called them, right?

2    A.  Yes, that's correct.

3    Q.  Okay.  And you said on Monday that's when you first

4    learned of the auto-purge?

5    A.  Correct.

6    Q.  Okay.  But this e-mail that you just produced yesterday

7    for the first time, right, it says a different date, right?

8    It says May of 2015?

9    A.  Incorrect.

10   Q.  So --

11   A.  It says "approximately May."

12   Q.  Okay.  So you are dissembling it, so when you put the word

13   "approximately" on it, your recollection is that this e-mail

14   you sent doesn't reflect the actual date; is that right?

15   A.  It is a guess.

16   Q.  It is a guess?

17   A.  An approximate, yes.

18   Q.  And that's like you are doing today, is guessing, right?

19   A.  No.  I'm saying, no, I am not guessing today.

20   Q.  So on May 14th of 2018, right, you didn't know the date

21   you contacted GoDaddy, right?

22   A.  It is pretty close.

23   Q.  Okay.  And after you testified under oath on Monday about

24   this issue, we now have this new e-mail with a different date,

25   right?

Duke - Direct

318

1           For the first time, we are seeing this today?

2           THE COURT:  If he knows.

3           MR. DAVIS:  If you know.

4           THE COURT:  I don't know if he knows that's the first

5    time you are seeing it, but I take your -- I take you at your

6    word this is the first time it has been dropped on you.  Okay.

7           THE WITNESS:  I don't think "approximately May" is a

8    different date than June.  So I would disagree with that

9    statement.

10   BY MR. DAVIS:

11   Q.  All right.  And nowhere in this e-mail does it say "I

12   called GoDaddy on June 29th to get an answer, and that's when

13   I first became aware of the auto-purge problem," right?

14   A.  Correct.

15   Q.  Okay.  And who was the first attorney you told about the

16   problem with auto-purge?

17   A.  That I do not recall.

18   Q.  Okay.  And now I want to get really clear on something.

19   On Monday, if I recall your testimony, you said you didn't

20   understand what a court order was; was that right?

21   A.  I don't understand what a court order is?

22   Q.  Yes.

23           You said, "I don't understand what court orders are."

24           Did I understand your testimony right?

25   A.  I don't recall saying that.  I don't know.

Duke - Direct

1  Q.  Do you know what a court order is?

2  A.  When a court orders you to do something would be my guess.

3  Q.  Right.

4       And you said, "I didn't know about court orders in

5  this case," if I recall your testimony right; is that right?

6  A.  That's kind of ambiguous.  I may have been saying I don't

7  know about every court order that existed.

8  Q.  Right.

9       Do you understand what a court order is?

10  A.  An order given by the court would be my guess.

11  Q.  Okay.  And do you have to obey that order?

12  A.  Absolutely.

13  Q.  All right.  And do you know what it means to testify under

14  oath in a courtroom?

15  A.  Yes.

16  Q.  Okay.  You understand it means to tell the whole truth,

17  right, not just a part of it that fits your excuse in this

18  case?

19       Do you understand that?

20  A.  Yes.

21  Q.  Okay.  And you have been aware of the motion for sanctions

22  that our clients filed against you and your company for over a

23  year and a half, right?

24  A.  Correct.

25  Q.  And you said you prepared for this hearing with your new

Duke - Direct

1    attorneys?

2    A.  Yes.

3    Q.  Yet you just produced a new document that contradicts the

4    testimony you gave on Monday about the date that you became

5    first aware of auto-purge; isn't that right?

6    A.  You are totally misstating what I said.

7    Q.  All right.

8    A.  So, no, I do not believe this contradicts anything I said.

9    Q.  Okay.  I guess we will let the record speak for itself,

10   then, based on your testimony Monday and this new document.

11          But you use a smartphone, Mr. Duke?

12   A.  Yes.

13   Q.  What kind of smartphone?

14          THE COURT:  Well, now, I need some foundation.  What

15   time frame?

16          MR. DAVIS:  Today.

17          THE WITNESS:  Today, I have a Samsung Galaxy and an

18   iPhone.

19   BY MR. DAVIS:

20   Q.  And have you been using smartphones since 2009?

21   A.  I don't recall.  I gave a list of the phones that I was

22   using in the most recent discovery.  I don't recall if they

23   were all smartphones.

24   Q.  But you have had smartphones since that time, right?

25   A.  I literally just said I gave a list of all the phones I

Duke - Direct

1  have been using.  I don't recall if they were all smartphones.

2  Q.  Right.  And I didn't ask you if you gave a list to anyone.

3  I asked you if you used a smartphone starting in 2009.

4        MR. SALAM:  Objection, your Honor, asked and

5  answered.  My client is being clear.

6        THE COURT:  Okay.  His testimony is "I don't recall

7  if they were all smartphones."  So he doesn't know if they

8  were all smartphones.

9        MR. DAVIS:  All right.

10 BY MR. DAVIS:

11 Q.  And is it the case that since 2009, you have used some

12 sort of phone that you were able to access your e-mail

13 accounts on?

14 A.  I believe you could access e-mail on most phones I have

15 had since 2009, yes.

16 Q.  All right.  And that when you access your e-mail, that's

17 your Yahoo! account and your GoDaddy accounts on your phone,

18 right?

19 A.  GoDaddy never had the best app for phone use, so I would

20 probably have used my phone more for Yahoo! e-mails.

21 Q.  All right.  And that was -- and you would send and receive

22 e-mails on your phone?

23 A.  Correct.

24 Q.  Okay.  And you did that -- from the time you had a

25 smartphone in 2009 to the present time, you have been doing

Duke - Direct

322

1  that, using your Yahoo! e-mail account?

2  A.  That sounds right.

3  Q.  Okay.  Now, let's go back to Ms. Wood.  Do you remember

4  talking about that customer named Ms. Wood on Monday?

5  A.  Yes.

6  Q.  And I want to focus you on the e-mails you exchanged with

7  her.

8        We know from all the e-mails that you produced with

9  your communications with your lawyers that at least on two

10  occasions, your attorneys asked you to look and find those

11  e-mails, right, the ones that you exchanged with Ms. Wood?

12  A.  Yes.

13  Q.  And they asked you for all the e-mails with her, right?

14  A.  I believe so, yes.

15  Q.  And you couldn't find them, right?

16  A.  Correct.

17  Q.  And they were never produced in this case, right?

18  A.  I'm unsure of what was produced.

19  Q.  Okay.  And in one of the e-mails we saw on Monday, you

20  said you had hundreds of e-mails with -- sorry, strike that.

21        At the time -- we were looking at an e-mail where you

22  mentioned hundreds of e-mails with Kirti Saraswat, and at that

23  same time, your attorney was asking you to look for the Wood

24  e-mails, right?  That's one of those e-mails?

25  A.  Correct.

Duke - Direct

1  Q.  All right.  And you have known about this problem with the

2  lost Wood e-mails for about two years, right, and you still

3  can't produce those documents; isn't that true?

4  A.  I'm unsure what my attorneys have been able to find, so I

5  don't know if it is true or untrue.

6  Q.  Right.

7          But prior to your new attorneys and prior to June of

8  this year, you have been unable to find the Wood e-mails,

9  right?

10  A.  We have issues with our sent e-mails, we know.  So, yes, I

11  have had difficulty finding some of these e-mails.

12  Q.  And we know from your testimony on Monday that the only

13  way your lawyers could -- prior attorneys could get e-mails is

14  from you, right?

15  A.  That's correct.

16  Q.  And we know that they asked you on those two prior

17  occasions to find those, and they weren't produced, right?

18  A.  Some were produced is what I believe you said.

19  Q.  Right.

20  A.  So I think that some were produced.

21  Q.  The ones that you just confirmed you couldn't find, you

22  are the one that couldn't find them, right, not your

23  attorneys?

24  A.  Correct.

25  Q.  Yes.

Duke - Direct

324

1        And you are the one who looked for them and didn't

2    find them and didn't produce them, right?

3    A.  Correct.

4    Q.  Okay.  And we have the e-mails where your attorney is

5    asking for them, and the e-mails that we do have, the ones

6    that you didn't produce, that we do have, are the ones from

7    Plaintiff, right, because Ms. Wood sent them to my client.

8        Do you recall that?

9    A.  Thankfully, yes.

10   Q.  Yes.

11       But you have looked at that Plaintiff's Exhibit 69,

12   right?  I'm going to have that shown to you now.

13   A.  Yes, absolutely.

14   Q.  And you say "thankfully," and that's because you couldn't

15   find them, right?

16   A.  Yes.

17   Q.  Yes.

18       And you lost them, right?

19   A.  I don't know that I lost them.

20   Q.  Okay.  But up until June of 2018, you didn't produce them,

21   right, all the Wood e-mails?  You just confirmed that in your

22   testimony.

23   A.  You told me that the other day.  I'm not arguing that you

24   are correct.  You said there were two e-mails that were

25   produced by us.  They were not all produced.  That's what you

Duke - Direct

325

1   said two days ago.  So I'm not arguing with your assessment of

2   the situation.

3   Q.  You are agreeing with it?

4   A.  Yes, I don't have any reason not to.

5   Q.  Okay.  And you have seen this Plaintiff's Exhibit 69,

6   right?

7   A.  Yes.

8   Q.  It was produced long ago in this case, right?

9   A.  Yes.

10  Q.  And you reviewed it as you prepared for your testimony

11  today?

12  A.  Yes.

13  Q.  Okay.  And this is an e-mail string between you and

14  Ms. Wood, right?

15  A.  Yes.

16  Q.  Do you dispute the accuracy of these e-mails?

17  A.  No reason not to.

18  Q.  All right.

19  A.  Or no reason to dispute them.

20  Q.  Okay.  And these are e-mails sent to your GoDaddy e-mail

21  inbox account, right?

22  A.  Do you have --

23  Q.  Yes, let's take a look at some of them.

24          All right.  You are receiving e-mails from Ms. Wood,

25  right?

Duke - Direct

1   A.  "Website Inquiry from 21 Century Smoking" would indicate

2   to me that she did it through our website.  She didn't send us

3   an e-mail; hence, we wouldn't be replying to her; hence, there

4   could be missing sent e-mails from us.

5          THE COURT:  You said -- hold on one second.

6          Okay.  I see it now, "Subject:  Website Inquiry."

7          THE WITNESS:  So it is coming from the website.  It

8   is not coming from her directly.

9   BY MR. DAVIS:

10  Q.  Well, let's look at the page that's on the screen, which

11  is DRSTCS 5273.

12  A.  Yes.

13  Q.  In the middle where it says "Original Message," right?

14  A.  Yes.

15  Q.  What is the subject?

16  A.  "Website Inquiry from 21 Century Smoking."

17  Q.  Okay.  That's not the sender, right?

18  A.  Correct.

19  Q.  Okay.  And the e-mail is from who?

20  A.  D.S. Wood.  debra@rdinc.us.

21  Q.  Oh, I see.  You are at the bottom of the screen.  Okay.  I

22  understand now.

23  A.  Yes.

24  Q.  So let's stay with that example.  That's at the bottom.

25  That is from D.S. Wood.

Duke - Direct

327

```
 1              MR. DAVIS:  Can we go back one page?

 2              Thank you.

 3   BY MR. DAVIS:

 4   Q.  That is D.S. Wood.  What's the date of the e-mail?

 5   A.  June 20th, 2013.

 6   Q.  Right.

 7              And who is the e-mail to?

 8   A.  support@21centurysmoking.

 9   Q.  .com, right?

10   A.  Correct.

11   Q.  That is your GoDaddy e-mail account?

12   A.  Correct.

13   Q.  And that's sent to the inbox of that account, right?

14   A.  Yes.

15   Q.  And if you look further up the screen, the next e-mail in

16   the string, do you recognize that one?

17   A.  Yes.

18   Q.  And the subject says what?

19   A.  "Re:  Website Inquiry from 21 Century Smoking."

20   Q.  And the e-mail is from who?

21   A.  Debra Wood.

22   Q.  Okay.  And that's her e-mail address there?

23   A.  Yes.

24   Q.  And what's the date of the e-mail?

25   A.  June 20th, 2013.
```

Duke - Direct

328

1    Q.  And who is it to?

2    A.  support@21centurysmoking.com.

3    Q.  Right.

4         So this is not -- those two e-mails are not to some

5    website inquiry inbox, right?  They are to your GoDaddy e-mail

6    account, right?

7    A.  She is not directly e-mailing us in that first case.  She

8    is doing it through the website.

9    Q.  So even though the e-mail says it is to

10   support@21centurysmoking.com, your testimony is that was not

11   to your support@21centurysmoking.com e-mail account?

12   A.  Yes, I am saying she did not write subject matter "Website

13   Inquiry from 21 Century Smoking," correct.

14   Q.  I don't understand your answer.

15   A.  She did not write "Website Inquiry from 21 Century

16   Smoking" as a subject matter.  She did it to the website and

17   then it came to the support inbox.

18   Q.  Have you spoken to Debra Wood?

19        How do you know what she wrote?

20   A.  Because that's how e-mails come when they are done through

21   the website.

22   Q.  Right.

23   A.  Through the 21 Century Smoking website.

24        I apologize.

25   Q.  Got you.  Understood.

Duke - Direct

1        All right.  But the question you didn't answer is

2    both of these e-mails are sent to your -- that's

3    you -- support@21centurysmoking.com GoDaddy e-mail account,

4    right?

5        Do you dispute that from this document?

6    A.  I am unsure where the confusion is.  The first e-mail is

7    definitely not sent directly to our website.

8    Q.  So stop right there.  Let me interrupt you because I want

9    to understand this.

10        It says in the e-mail "From," "Date," and "To."  It

11    says:  "To:  support@21centurysmoking.com."

12        Do you dispute and deny that this e-mail was sent to

13    your support@21centurysmoking.com inbox in your GoDaddy e-mail

14    account on or about June 20th of 2013?

15    A.  I'm just saying it was not sent from her.  The program

16    automatically sent it to us.  She put in a complaint or a

17    comment through our website and then it came to our

18    support@21centurysmoking e-mail account.

19    Q.  So even if she didn't do what you just said, it came into

20    your GoDaddy e-mail inbox at support@21centurysmoking.com?

21    A.  Yes, absolutely, yes.  That's where it ended up, yes.

22    Q.  Okay.  And that's the same for every e-mail in PX-69 where

23    it says:  "To:  support@21centurysmoking.com," right?

24    A.  No, the next one, she definitely is replying to the

25    message that we have sent back to her.  So the next one, I

Duke - Direct

1   believe, she is directly sending to us.  The first one, she is

2   not sending directly.  The second one she is sending directly

3   is what I'm seeing when I look at this.

4   Q.  Got it.

5         So the bottom one didn't go directly into your

6   support@21centurysmoking.com inbox in your GoDaddy e-mail

7   account.  It did get there though, right?

8   A.  Correct, yes.

9   Q.  And the other ones all went directly in, right?

10  A.  I would have to see the other ones.  The one I'm looking

11  at here, it looks like one was not sent directly to us.  One

12  was sent directly to us.

13  Q.  But they all, everything -- and you have reviewed this.

14  You have had it for a couple of -- you know that all of the

15  e-mails that you exchanged with Ms. Wood ended up in your

16  inbox, right, your support@21centurysmoking.com inbox on your

17  GoDaddy e-mail account; is that right?

18  A.  Yes, for sure, those two definitely did.

19  Q.  And I'm asking you about the rest of them.

20        You have had this document for years, and you

21  reviewed it to prepare for today, right?

22        Do you dispute anything in this string of e-mails

23  with the customer, Ms. Wood?

24        MR. SALAM:  Your Honor --

25        MR. DAVIS:  I'm asking the question.

Duke - Direct

331

 1              THE COURT:  Hold on.

 2              MR. DAVIS:  If you have an objection, state it.

 3              THE COURT:  Stop.  Stop.

 4         This is the third or fourth time I have said this:

 5    This is not your first rodeo, folks.  Let him finish the

 6    question.  You object.  I will rule.  Witness answers.  Do we

 7    got that, or do we need to say it all together?

 8              Finish, objection, rule, answer.

 9         Let him finish the question.  It is an objectionable

10   question currently, but wait until he is done with it.  Make

11   your objection.  I will sustain it.  He will rephrase it.  The

12   witness will answer.

13              Go ahead.

14         There is a lot in that question.  It's compound.

15   BY MR. DAVIS:

16   Q.  Do you dispute the accuracy of any of the e-mails that are

17   contained in Plaintiff's Exhibit 69?

18              MR. SALAM:  Objection, your Honor, asked and

19   answered.

20              THE COURT:  Okay.

21              THE WITNESS:  As I said previously, I have no reason

22   to dispute these e-mails.

23              MR. DAVIS:  We move Exhibit 69 into evidence.

24              MR. SALAM:  No objection, your Honor.

25              THE COURT:  Okay.  69 will be admitted.

Duke - Direct

332

1         Okay.  Thank you.

2     (Plaintiff's Exhibit 69 was offered and received in

3     evidence.)

4     BY MR. DAVIS:

5     Q.  Now, I want to go back to something else you said on

6     Monday.  If I recall your testimony, you said something in

7     connection with these Wood e-mails that -- on Monday, you said

8     it would be unjust for you to have to produce all of these

9     confusion e-mails.

10         Did I recall your testimony correctly?

11    A.  I don't recall saying that.

12    Q.  In your testimony, did you say it would be unjust for you

13    to have to produce all of the customer confusion e-mails that

14    you sent and received in this case?

15    A.  I don't believe I said that.

16    Q.  Did you say that somehow it would be unfair for you to

17    have to find them all and produce them all, even the ones that

18    were critical of you?

19    A.  I do not recall saying anything of the sort.

20    Q.  Okay.  So you don't recall your testimony that somehow

21    your excuse in not producing them all was sort of out of

22    fairness to you, right?

23         MR. SALAM:  Objection -- I withdraw the objection.

24         THE COURT:  All right.  Go ahead and respond.  Can

25    you --

Duke - Direct

1          THE WITNESS:  I mean, that sounds like a

2     mischaracterization of something I said.  I have no clue what

3     you are --

4     BY MR. DAVIS:

5     Q.  You don't remember your testimony from Monday?

6     A.  I don't recall saying anything like that.

7     Q.  Okay.  And you are the one that chose not to produce all

8     of the e-mails with Ms. Wood, right, even though your lawyers

9     asked for it previously?

10    A.  I produced whatever I found.

11    Q.  Okay.  Now, let's go to Mr. Edmiston.  I want to turn your

12    testimony back to the e-mails you exchanged with him.

13          Do you recall that testimony?

14    A.  Yes.

15    Q.  Okay.  Now, despite getting numerous e-mails from

16    Mr. Edmiston, including an e-mail with a second recording

17    attached to it, your testimony on Monday was that you only

18    told your attorneys about the second recording orally, right?

19    A.  I may have e-mailed them, too, but I notified them of a

20    second recording through e-mail and I believe verbally.

21    Q.  You say you told them.  You told them verbally about the

22    second recording, right?

23    A.  For sure, yes.

24    Q.  Okay.  For sure?

25    A.  I believe so, yes.

Duke - Direct

334

1  Q.  All right.  Well, all of your attorneys are here listening

2  to your testimony, so let's be clear.

3         Which attorney did you tell?

4  A.  I do not recall who I told.

5  Q.  What did you tell them?

6  A.  That there were two recordings from Bill Edmiston.

7  Q.  And when did you tell them that?

8  A.  Whatever day Bill told me.

9  Q.  And how would you know what date that is?

10  A.  If I had the e-mail from Bill telling me.

11  Q.  That would be the only thing you would look at, right?

12  A.  That would be the best way to figure it out, yes.

13  Q.  Okay.  And just to confirm, you never sent your attorneys

14  an e-mail with the second recording, right?

15  A.  Correct.

16  Q.  Okay.  And you know from reviewing our motion for

17  sanctions that the second recording is attached to an e-mail

18  that you received from Mr. Edmiston in your Yahoo! e-mail

19  account, right?

20  A.  I believe it went to the bduke@21centurysmoking, which

21  ends up in the Yahoo!, but, yes, I did receive it.

22  Q.  Can you say your answer one more time?

23  A.  I believe that it went directly to the

24  bduke@21centurysmoking.com e-mail, which then forwards to the

25  Yahoo! e-mail.  So he didn't send it to the Yahoo! e-mail, but

Duke - Direct

335

1   I do have it in the Yahoo! e-mail, yes.

2   Q.  Okay.  And we only know about the existence of this e-mail

3   with the second recording attached because you were ordered to

4   produce -- and finally produced -- your Yahoo! e-mail accounts

5   that were subject to the ESI terms on or about June 1 of 2018,

6   right?

7           MR. SALAM:  Objection, your Honor, to the form of the

8   question.  He is saying "we only know."  I'm not sure who he

9   is referring to.

10          THE COURT:  I will sustain it.

11  BY MR. DAVIS:

12  Q.  The Plaintiffs in this case and the court only know about

13  you having the second recording in your inbox because you were

14  ordered to produce your Yahoo! e-mail accounts responsive to

15  the ESI terms in June of 2018, right?

16          MR. SALAM:  Objection to the form of the question.

17          THE COURT:  If you know.

18          THE WITNESS:  I suppose so, yes.

19  BY MR. DAVIS:

20  Q.  And in that conversation you had with your attorney, was

21  it one conversation that you had about disclosing the second

22  recording to your attorneys -- your prior attorneys?

23  A.  No.  I mean, I believe we were looking for it on multiple

24  occasions, not just once.

25  Q.  I'm sorry.

Duke - Direct

336

1   A.   It was not just once.  I believe we were looking for it on

2   multiple occasions.

3   Q.   And you told them on multiple occasions that the second

4   recording existed?

5   A.   Yes, I believe that it existed, yes.

6   Q.   Yes.

7         THE COURT:  But the question is:  Did you tell your

8   attorneys on multiple occasions that it existed?

9         Do you understand the distinction there?

10        THE WITNESS:  Yes, I don't remember how many times I

11  told them it existed.  I know we were looking for it on

12  multiple occasions.  I do not know how many times I told them

13  that it existed.

14        THE COURT:  Okay.  Go ahead, Mr. Davis.

15  BY MR. DAVIS:

16  Q.   All right.  And what did you tell your prior attorneys

17  about the content of the second recording?

18  A.   I can't really have described content when I didn't ever

19  hear it.  I didn't know what was on it.

20  Q.   So you personally had never heard it?

21  A.   I personally didn't know it existed until I was made aware

22  of it through these recent occurrences.

23  Q.   All right.  But it is your own e-mails that disclose a

24  second recording exists, and you received it just a few

25  minutes after you received the first recording from

Duke - Direct

337

1  Mr. Edmiston based on your own e-mails, right, in 2013?

2         Isn't that true?

3  A.  Correct.

4  Q.  So let's take a look at that exhibit right now.  That's

5  Plaintiff's Exhibit 23.

6         MR. DAVIS:  I ask that to be shown.

7  BY MR. DAVIS:

8  Q.  For the record, this is an October 2nd, 2013, e-mail from

9  Mr. Edmiston to Mr. Duke.  It is from the Defendants' June 1,

10  2018, production.  The paper copy is Bates-stamped

11  21C 1007924-1007925.

12         THE COURT:  All right.  Hold on one second while it

13  comes up on the screen.

14         I assume you have it in front of you now, Mr. Duke?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  Okay.  Go ahead.

17         MR. DAVIS:  And there we go.

18         Thank you.

19  BY MR. DAVIS:

20  Q.  You see Plaintiff's Exhibit 23 clearly now?

21  A.  Yes.

22  Q.  Do you recognize it?

23  A.  Yes.

24  Q.  That's the e-mail you got from Mr. Edmiston?

25  A.  Correct.

Duke - Direct

1    Q.  And it was on October 2nd, 2013?

2    A.  Correct.

3    Q.  Right.

4        And it came to your GoDaddy e-mail account, bduke@?

5    A.  Correct.

6    Q.  Okay.  And it was also in your Yahoo! e-mail account,

7    right?

8    A.  Yes, that's correct.

9    Q.  Okay.  And you see the attachments, right?

10   A.  Yes.

11   Q.  And what's the first attachment?

12   A.  IMG_0118.MOV (5.27 MB).

13   Q.  Right.

14       And is there another attachment?

15   A.  Untitled attachment 98542.txt (25 bytes).

16   Q.  All right.  And what's the message from Mr. Edmiston to

17   you?

18   A.  "S.  Video too long to send, but I have it."

19   Q.  All right.  So he is sending to you an attachment here,

20   right?

21   A.  Correct.

22   Q.  And this is the second recording, right, not the first

23   one?

24   A.  I believe so, yes.

25   Q.  That's right.

Duke - Direct

339

1    And this is the e-mail you never forwarded to your

2    attorneys, right?

3    A.  Correct.

4    Q.  And on Monday, you also said you got lots of e-mails from

5    Mr. Edmiston, right?

6    A.  Over the time -- and what time frame?

7    Q.  In this time, in 2012 and 2013.

8    A.  Yes, yes, there is a lot of e-mails from Bill Edmiston.

9    Q.  Yes.

10   And you were deciding, going through them, trying to

11   pick through them, because you said they always had like a

12   business card attached to it, so it was hard to tell what

13   attachments were on the e-mail?

14   Was that your testimony on Monday?

15   A.  What I'm saying is every single e-mail he sends me appears

16   to have an attachment.  So I don't look at the bottom of every

17   e-mail of his because every single one has this business card

18   attachment.

19   Q.  And you were on notice several times by e-mail that the

20   second recording existed, right?

21   You would just look at the e-mails from Mr. Edmiston.

22   They are in your Yahoo! e-mail box, right?

23   You saw them, right?

24   This has a specific file attached with a file number,

25   right?  Look at the exhibit.

Duke - Direct

1    A.  Correct.

2    Q.  Right.

3          That's not a business card, right?

4    A.  Correct.

5    Q.  Okay.  And that is a large file, is it not, 5.27

6    megabytes?

7    A.  Yes, it is.

8    Q.  Okay.  And it's the recording your attorneys were asking

9    you for, right, the second recording?

10   A.  Yes, it is.

11   Q.  And it was important to your defamation case in this case

12   against my clients, right?

13   A.  I do not know.

14   Q.  You don't know if these recordings were important to your

15   defamation case?

16   A.  No, I do not know if they are important to the defamation

17   case.

18   Q.  But you asked Mr. Edmiston to go to the trade show, right?

19   You know which one, the Global Gaming Expo, to try and record

20   my client saying something about you and your company, right?

21   A.  Incorrect.

22   Q.  You didn't exchange those e-mails with Mr. Edmiston asking

23   him to go to the trade show?

24   A.  Incorrect.  I did not ask him to go to a trade show.

25   Q.  You stand by that testimony here today in court under

Duke - Direct

341

 1   oath?

 2   A.  That I asked Bill Edmiston to go to a trade show?

 3   Q.  Correct.

 4   A.  Correct, yes, I did not ask him to go to a trade show.

 5   Q.  Did you send him an e-mail asking him to go to make a

 6   recording?

 7              MR. SALAM:  Object, your Honor, that wasn't -- I'm

 8   sorry, I withdraw the objection.

 9              THE COURT:  Okay.  Go ahead.

10              Why don't you rephrase it -- or just restate it, not

11   rephrase it, or I can read it back.

12              "Did you send him an e-mail asking him to go to make

13   a recording?"  That's the question.

14              THE WITNESS:  This is hard to answer for me, your

15   Honor.  I don't know exactly.

16              I don't understand the question.

17              THE COURT:  Okay.  Well, my understanding of his

18   question is did you send Bill Edmiston an e-mail saying "Go to

19   this trade show in Vegas."  That's my understanding of the

20   question.

21              If you want to restate it or rephrase it, go ahead.

22              MR. DAVIS:  I will take that question first.

23   BY MR. DAVIS:

24   Q.  Do you understand the Judge's question?

25   A.  I absolutely understand that question.

Duke - Direct

342

1   Q.  And your answer is?

2   A.  The answer to that one is no.

3   Q.  You didn't ask him to go, right?

4   A.  I have never asked Bill Edmiston to go to any trade show

5   ever.

6   Q.  But you knew he was going to the trade show, right?

7   A.  He goes to thousands of trade shows.

8   Q.  And at or about that time, you send him an e-mail saying:

9   "Go and try and record the Plaintiffs at the trade show that

10  you are going to," right?

11       MR. SALAM:  Objection, your Honor, on relevance.  I'm

12  not sure where we are going on this.

13       THE COURT:  I will overrule.  I think I know where

14  it's going.  If it turns out that I'm totally wrong, and it is

15  irrelevant, I will strike it.  I could be wrong.

16       THE WITNESS:  Can you repeat the question, please?

17       THE COURT:  Sure.

18       Do you want to have it read back?

19       MR. DAVIS:  Please.

20       THE COURT:  Okay.  "And at or about that time, you

21  send him an e-mail saying:  'Go and try and record the

22  Plaintiffs at the trade show that you are going to,' right?"

23       THE WITNESS:  I made a joke with him about it.  I did

24  not tell him to do anything.  I made a joke.

25

1   BY MR. DAVIS:

2   Q.  But you acknowledge today that you sent him an e-mail that

3   asked him to tape the Plaintiffs at the trade show, right?

4   A.  As a joke, correct.

5   Q.  I'm not asking you whether it was a joke or not a joke.

6   I'm asking you to acknowledge you sent an e-mail to him asking

7   him to record Plaintiffs at the trade show.  Is that true or

8   false?

9   A.  If it was a joke, I would say it is a little out of

10  context to say that I asked him to do something.

11  Q.  But it is a joke he followed up on, right?

12  A.  Correct.

13  Q.  And he went to the trade show, right?

14  A.  He was already going to the trade show.

15  Q.  I don't understand your answer.  I asked you if he went to

16  the trade show, not was he already going or not.  I don't

17  understand your response.

18  A.  Because you --

19  Q.  Did he go to the trade show?

20  A.  Yes, he did.

21  Q.  Prior to the trade show, you sent him an e-mail saying

22  "Tape Plaintiffs," right?

23  A.  As a joke, correct, yes, I did.

24  Q.  And as a joke, he continued to do it, right?

25  A.  Yes, he did.

Duke - Direct

1   Q.  And he sent you the recordings, right?

2   A.  Yes, he did.

3   Q.  All right.  And you are the one that had those recordings,

4   right, from him?

5   A.  Yes, I did have the recordings.

6   Q.  Right.

7           And you are the one that didn't send them to your

8   lawyers, right?

9   A.  I suppose I did not send one of them to my lawyers,

10  correct.

11  Q.  And you testified you got lots of e-mails from him and you

12  picked through the ones to forward to your attorneys, right?

13          MR. SALAM:  Objection, your Honor.  I don't believe

14  that was his testimony.

15          THE COURT:  Okay.  Well, if it is not his testimony,

16  he can say that.

17          THE WITNESS:  Yes, I don't recall saying that.

18  BY MR. DAVIS:

19  Q.  All right.  But you are the one who decided which Edmiston

20  e-mails to forward to your attorneys, right, you?

21  A.  Correct, yes.

22  Q.  Okay.  All right.  So let's turn to this file that we now

23  have.

24          MR. DAVIS:  We move Plaintiff's Exhibit 23 into

25  evidence.

Duke - Direct

345

 1          MR. SALAM:  No objection, your Honor.

 2          THE COURT:  Okay.  23 will be admitted.

 3     (Plaintiff's Exhibit 23 was offered and received in

 4     evidence.)

 5          MR. DAVIS:  Now I'm going to ask for the file to be

 6     played in open court with the court's permission.  We have it

 7     listed on our exhibit list as Plaintiff's Exhibit 71.

 8          Can you pause it, please?

 9          For the record, it's Plaintiff's Exhibit 71.  It came

10     from the Defendants in the native production on May 31st of

11     2018.  When we got the native data, the file is actually

12     attached to it as it was in Mr. Duke's e-mail account, and we

13     would like to play it.

14          THE COURT:  I have got no problem with hearing the

15     video or seeing the video.

16          Any objection?

17          MR. SALAM:  No objection, your Honor.  We will

18     stipulate to its description and its admission.

19          THE COURT:  Okay.  All right.  Go ahead and play it.

20     (Audio recording played in open court.)

21     BY MR. DAVIS:

22     Q.  Did you hear that, Mr. Duke?

23     A.  Just now?

24     Q.  Just now.

25     A.  Yes.

Duke - Direct

1  Q.  Did you understand it?

2  A.  Yes.

3  Q.  Did you hear any discussion in there about your company?

4  A.  No.

5  Q.  Did you hear any statements made by the people being

6  recorded talking about any of your products?

7  A.  No.

8  Q.  Okay.  When is the first time you heard that ever?

9  A.  Last year, when it was brought up.

10  Q.  Last year, after June of 2018?

11  A.  Whenever it was brought up in this case, yes.

12  Q.  Okay.  Now, I'm going to draw your attention to

13  Plaintiff's Exhibit 25.  This is a September 30th, 2014,

14  e-mail string between you and Mr. Edmiston.  It was produced

15  on June 1, 2018, at 21C 1013015.

16        Can you look at that and tell me if you recognize

17  this e-mail?

18  A.  Yes, I do.

19  Q.  And what is it?

20  A.  It's an e-mail from Bill to myself.

21  Q.  And in that e-mail, what are you conveying to

22  Mr. Edmiston?

23  A.  Questions that my lawyers had asked.

24  Q.  Okay.  And which lawyer?

25  A.  It says "lawyers."  I'm not sure which lawyer in specific.

Duke - Direct

1   Q.  And how would you find out which lawyers asked you the

2   questions to ask Mr. Edmiston in this e-mail dated

3   September 30th, 2014?

4   A.  I would have to look in my e-mail to see which lawyers

5   sent those questions.

6   Q.  But these were questions from your prior attorneys asking

7   you to ask Mr. Edmiston; is that right --

8   A.  Yes.

9   Q.  -- about the recordings he made at the trade show?

10  A.  Correct.

11  Q.  And why didn't you say in here that it was all just a big

12  joke?

13  A.  Where are you saying that I'm saying it is a joke?

14  Q.  Anywhere in this e-mail.

15          THE COURT:  He is asking why in the e-mail you did

16  not say it was a joke to Edmiston.

17          That's your question, right?

18          MR. DAVIS:  It is.

19          THE COURT:  Okay.

20          THE WITNESS:  I don't recall ever saying that I said

21  it was a joke.

22  BY MR. DAVIS:

23  Q.  Other than testifying under oath in court today, you never

24  said your e-mail was a joke to Mr. Edmiston to ask him to

25  record Plaintiffs at the trade show?

Duke - Direct

348

1  A.  Not in this e-mail.

2  Q.  Other e-mails, you said it was a joke?

3  A.  For certain, yes.

4  Q.  For -- excuse me?

5  A.  For certain, another e-mail was a joke, yes.

6  Q.  But when your lawyers were asking you to follow up on the

7  recordings, you didn't say to them, "Hey, this is a big joke.

8  Why are you asking about this," right?

9  A.  Correct.

10  Q.  Okay.

11         THE COURT:  And I apologize for interrupting,

12  Mr. Davis.  I want to make sure I understand the testimony.

13         Are there other e-mails that you wrote where you said

14  to Mr. Edmiston or anybody else that the recording was a joke?

15  I'm having a disconnect.  I just want to make sure I get that

16  clear.

17         THE WITNESS:  Your Honor, there is an e-mail before

18  he goes where I say something to the effect of -- this is

19  during the lawsuit, mind you, so this would be crazy to

20  happen -- I said, "Why don't you record them saying something

21  libelous about me, LOL," laugh out loud.

22         THE COURT:  I recall that.  I'm clear.

23         I thought there were other e-mails out there where

24  you say "This is a joke."

25         THE WITNESS:  No, I have zero expectation that

Duke - Direct

349

1    someone would say something libelous.

2           THE COURT:  I was just concerned that there was other

3    e-mails referring to it as a joke.

4           THE WITNESS:  No.

5           THE COURT:  Okay.  I understand now.  I'm clarified.

6           Sorry for interrupting, but if that was the

7    situation, then there would be another problem.

8           So go ahead.

9           MR. DAVIS:  We move 25 into evidence, Plaintiff's

10   Exhibit 25.

11          MR. SALAM:  No objection, your Honor.

12          THE COURT:  25 will be admitted.

13     (Plaintiff's Exhibit 25 was offered and received in

14     evidence.)

15   BY MR. DAVIS:

16   Q.  We know why your attorneys are asking these questions,

17   right, because we just got some new documents yesterday.

18          I'm going to ask you to take a look at the Leavens

19   Strand Defendants' Exhibit 18 that was produced, I believe,

20   yesterday for the first time, HK-18.

21          THE COURT:  Okay.  Hold on one second.  HK No. 18.

22          Give me a moment.

23          Do you have it in front of you, Mr. Duke?

24          THE WITNESS:  I do.

25          THE COURT:  Let's take a moment.  I have to take a

Duke - Direct

1    look at it.  I haven't seen it before.

2          Go ahead.  I'm the one that's almost done flipping

3    through it.  I wanted to read it before you start asking

4    questions.

5          MR. DAVIS:  I understand, your Honor.

6          THE COURT:  Go ahead, Mr. Davis.

7    BY MR. DAVIS:

8    Q.  Mr. Duke, do you recognize this exhibit?

9    A.  Yes.

10   Q.  Do you recognize the e-mail that you received on

11   September 30th, 2014, from your prior attorney Ms. Heather

12   Liberman?

13   A.  Yes, I do.

14   Q.  Do you dispute the accuracy of this e-mail in any way that

15   you sent to her on September 30th, 2014?

16   A.  No, I do not.

17   Q.  Okay.  And what do you say in the contents of your e-mail

18   sent from your brentduke@yahoo.com account to your prior

19   attorney Ms. Liberman?

20         What's the first line of your e-mail at 2:37 p.m.?

21   A.  "Said recording did not work, so there isn't another

22   recording."

23   Q.  And do you see the follow-up e-mail above?  Ms. Liberman

24   reports in an e-mail to Mr. Leavens, one of your other prior

25   attorneys.  Do you see what she wrote there?

Duke - Direct

1   A.  "See Brent's response below.  There is no second

2   recording."

3   Q.  Right.

4          When is the first time that you saw this e-mail?

5   A.  The e-mail from me or the e-mail between the lawyers?

6   Q.  I'm sorry.  The last e-mail that's displayed on LS

7   Exhibit 18, that's on the screen now.  The time of it is

8   2:38 p.m. on September 30th, 2014.

9   A.  Well, I'm not attached on it, so yesterday --

10  Q.  Yesterday?

11  A.  -- when it was presented.

12  Q.  That's the first time you saw it?

13  A.  I don't know how I could have seen it any other way.

14  Q.  Okay.  Now, based on the documents that you and your

15  company have now produced -- that was on May 31st of 2018,

16  right?  Do you remember that?  We got all the native data, and

17  then you were also required to produce a paper copy of your

18  Yahoo! e-mail account on June 1st, 2018?

19          Do you recall that?

20  A.  I didn't handle that.  I know what you are talking about.

21  Q.  You know what happened, though, right?

22  A.  Yes.

23  Q.  Okay.  And we know from reviewing that entire production

24  now that there is a third recording that was never produced or

25  ever identified in this case, right?

Duke - Direct

1    A.  Now you have lost me.

2    Q.  You have got no idea that there is a third recording that

3    you received in your e-mail account -- or, sorry, that you

4    were aware of from e-mails from Mr. Edmiston; is that right?

5    A.  I had no idea there was a second recording.  I really

6    don't know what you are talking about right now.

7    Q.  All right.  Let's go to Plaintiff's Exhibit 24.

8            THE COURT:  Just so we don't lose track, HK-18, are

9    you waiting to get that introduced later?

10           MR. SALAM:  I have no objections to it.

11           THE COURT:  Do you want to admit it?

12           MR. DAVIS:  Sure.

13           THE COURT:  I just don't want to --

14           MR. DAVIS:  We talked about doing something at the

15   end.

16           THE COURT:  Yes, we did.

17           MR. SALAM:  I'm fine with doing it as we go.  If it

18   is at the end, we can follow up.

19           THE COURT:  We will make sure we got everything

20   cleaned up at the end, but it was in front of me, and before

21   he moved to another exhibit, I just wanted to address that.

22           So we have got an e-mail relating to a supposed third

23   recording.

24           Exhibit 24, do you have that in front of you?

25     (Exhibit HK-18 was offered and received in evidence.)

Duke - Direct

1  BY MR. DAVIS:

2  Q.  Mr. Duke, you have Plaintiff's Exhibit 24 displayed in

3  front of you?

4  A.  Yes.

5  Q.  Do you see that?

6  A.  Yes.

7  Q.  And that's an e-mail string between you and Mr. Edmiston

8  from October 4th of 2014, right?

9  A.  What date?

10        Did you say October 24th?

11  Q.  October 4, 2014.

12  A.  October 4, yes, yes.

13  Q.  All right.  And this was produced as part of your June 1,

14  2018, production, and the paper, for purposes of

15  identification, is 21C 1013062.

16        Do you see that on the document?

17  A.  Yes.

18  Q.  Okay.  And this is an e-mail string, and it was produced

19  for the first time in June of 2018.

20        Please review that e-mail, all right?

21        And at the top of it, confirm that Mr. Edmiston is

22  describing something to you, right?

23        Can you read that, read what he wrote, the first

24  paragraph?

25  A.  "I found a longer one that I cannot forward.  Too long,

Duke - Direct

1    but I have it.  So there is a second one.  Mostly just general

2    talking, but he does state they have gone to the FDA and they

3    have Washington lobbyist.  Also states this guy is the one

4    that goes to the factory and tests the vaporing for the units.

5    Long recording, and we did not get much good info in this one

6    that much clearer.  We are bad spies :):)  But this proves

7    they were there, and maybe his voice can be identified."

8    Q.  All right.  And when did any of your prior attorneys first

9    learn of the existence of this longer third recording

10   referenced in PX-24?

11   A.  To the best of my knowledge, he was discussing the

12   recording that was the second recording.  I don't know where

13   this is -- where a third recording is coming from.

14   Q.  All right.  But this isn't the same as the second

15   recording, right?

16        You just listened to it in open court, right?

17   A.  He believed that he had not sent a second recording.  I

18   believed that he had not sent a second recording.  So my

19   lawyers never received a second recording.

20   Q.  The recording from file 118 that you just listened to in

21   open court, was there anyone saying they have gone to the FDA

22   and they have Washington lobbyists?

23        Did you hear that on the tape?

24   A.  It might be an inaccurate description of that tape.

25   Q.  My question to you, sir, is did you hear those words on

Duke - Direct

1   the tape that you just listened to in open court?

2   A.  I believe he said something about Washington in that tape,

3   didn't he?

4         You would have to replay the tape for me, and then I

5   would have to compare it to this.

6   Q.  That would be the only way you could do it, right?

7   A.  I wasn't memorizing what was being said in the tape, no.

8   Q.  Did you hear anything where the guy states that he is the

9   one that goes to the factory and tests the vaporing for the

10   units?

11   A.  No.

12   Q.  Okay.  And this says it is a long recording, right?

13   A.  Correct.

14   Q.  And this is one that you never obtained from Mr. Edmiston

15   or produced in this case, right, this third recording?

16         MR. SALAM:  Object, your Honor.  It --

17         THE COURT:  Basis?

18         MR. SALAM:  I apologize.  I would like to strike my

19   objection.

20         THE COURT:  That's okay.  You don't have to

21   apologize.

22         All right.  Show it as withdrawn.

23         Just to keep this clear -- and I understand what you

24   are saying, Mr. Davis, is you played what was referred to as

25   the second recording.

Duke - Direct

356

1        This document, Exhibit 24, says "So there is a second

2   one."  But we have already talked about the second one, and we

3   played it.  And this e-mail, Exhibit 24, has quotes of

4   statements made that I didn't hear either.

5        So you are sort of referring to it as a third, and so

6   I understand where you are going.

7        I just want to make that clear because we are all

8   sitting here right now, and if someone is reading a cold

9   record, they are going to say, "What's he talking about, a

10  third recording," which I think is your point, is where is

11  this third recording.

12       MR. DAVIS:  That's exactly my point.

13       THE COURT:  Okay.

14       MR. DAVIS:  And if we would have had these not dumped

15  on us in June of 2018, we might have been able to understand

16  this much more clearly and taken depositions timely and done

17  other things in this case.  I'm sorry for the frustration in

18  some of my questions.

19       THE COURT:  I'm not frustrated.  I just want the

20  record clear --

21       MR. DAVIS:  Thank you.

22       THE COURT:  -- to what's in my head.  So if this goes

23  up, and someone is reading a cold record, I could see that

24  person being confused as to references to second recordings

25  and third recordings.

Duke - Direct

357

1        So I understand what you are saying about third

2   recording, and I can understand sort of what Mr. Salam is

3   saying, is, "Okay, where is the third recording," but that's

4   your whole point, is where is the third recording.

5        MR. DAVIS:  That's exactly my point.

6        THE COURT:  Okay.

7        MR. DAVIS:  We move Plaintiff's Exhibit 24 into

8   evidence.

9        MR. SALAM:  No objection, your Honor.

10       THE COURT:  Okay.  24 will be admitted.

11    (Plaintiff's Exhibit 24 was offered and received in

12    evidence.)

13   BY MR. DAVIS:

14   Q.  I would like to turn your attention to Plaintiff's

15   Exhibit 26 now.  It's being shown to you.

16       This is an October 4, 2014, e-mail string between you

17   and Mr. Edmiston.  It is from Defendants' June 1, 2018,

18   production.  It is Bates 21C 1013068.

19       Do you see that in front of you, Mr. Duke?

20   A.  Yes, I do.

21   Q.  Do you dispute the accuracy in any way of your e-mail with

22   Mr. Edmiston on or about that date?

23   A.  No, I do not.

24   Q.  Okay.  And what does Mr. Edmiston say to you?

25       Right in the middle, he is writing to you.

Duke - Direct

1       There is -- the first e-mail at the bottom is blank,

2  right, the one at 9:15 a.m.?

3  A.  Correct.

4  Q.  Right.

5       And going in reverse order, from the bottom up, the

6  next one is at 9:22 a.m., right?

7  A.  Correct.

8  Q.  That's your e-mail to him?

9  A.  Correct.

10  Q.  And what did you say to him?

11  A.  "I think they have that one, but will send again just to

12  be sure.  Sucks that it cuts off right there.  LOL.  How are

13  things looking for tomorrow?  Heading to Chavez Ravine in

14  about five hours (go Dodgers).  Thanks!"

15  Q.  And then Mr. Edmiston writes back to you.

16       Again, this is all in your Yahoo! e-mail account,

17  right?

18  A.  Yes.

19  Q.  I'm sorry.  That was yes?

20  A.  Yes.

21  Q.  And that was at 9:44 a.m. on October 4th, 2014?

22  A.  Yes.

23  Q.  And what does Mr. Edmiston say to you?

24  A.  "You can hear this recording tomorrow.  Any idea how to

25  get it forwarded when too long?"

Duke - Direct

1  Q.  Okay.  And you write back later that day at 10:27 a.m.?

2  A.  "I'm honestly not sure.  You could call lawyers directly

3  and play it for them, see if it is worth the trouble of

4  figuring out."

5  Q.  All right.  And did you meet with Mr. Edmiston?

6  A.  I have met with him before.

7  Q.  Before October 4th, 2014, at 10:27 a.m.?

8  A.  I can't tell you the exact dates that I met with him, but

9  I met with him on multiple occasions.

10  Q.  Directing your attention to Plaintiff's Exhibit 26, you're

11  exchanging communications with Mr. Edmiston, right?

12  A.  Yes, I am.

13  Q.  And you just read an e-mail from him to you that says:

14  "You can hear this recording tomorrow."

15          Am I reading that correctly in the e-mail?

16  A.  Yes, that's what it says.

17  Q.  So you were meeting with him the next day, right?

18  A.  That is incorrect.

19  Q.  Okay.  My question is:  Did you meet with Mr. Edmiston as

20  a follow-up to this e-mail?

21  A.  I don't believe so.

22  Q.  And why would you have not met with him?

23  A.  Because we have never lived anywhere near each other.

24  Q.  Why is he saying "You can hear it tomorrow," then, in his

25  e-mail?

Duke - Direct

1  A.  Because we have telephones.

2  Q.  Is he saying to you that he was going to play it for you

3  in a phone conference that you had scheduled for the next day?

4  A.  I don't know that you need a phone conference.  You can

5  call someone and play something for them.

6  Q.  And that's what happened on the next day, you had a phone

7  call with him?

8  A.  As I stated previously, I have never heard that recording.

9  So, no, I didn't hear it in 2014 if I had never heard it.  We

10  didn't talk the next day.  He never played this for me.

11  Q.  Got it.

12       And did you ever tell your prior attorneys about this

13  additional long recording that Mr. Edmiston had and was

14  referenced in Plaintiff's Exhibit 26?

15  A.  I don't believe it's an additional long recording.  I

16  believe it is the one we just saw -- or heard or whatever.

17  Q.  Okay.  My question is, and let me say it again, based on

18  Plaintiff's Exhibit 26, did you ever tell any of your prior

19  attorneys about this longer recording that he couldn't forward

20  to you because it was too long?

21       Do you recall that?

22  A.  Yes, we had discussions that there was a second recording

23  that we were having trouble figuring out how he was going to

24  forward it.  That was a known issue, yes.

25  Q.  Right.

Duke - Direct

1       And in Plaintiff's Exhibit 26, he's talking about a

2   longer recording that he can't forward to you, right?

3   A.  I feel like issues are being conflated here.  There

4   is -- I do not believe that there is a third recording.  You

5   are conflating incorrect details in what he wrote and then

6   some imaginary third recording.  I don't think that there is a

7   third recording.  I didn't think there was a second recording,

8   so what do I know, but I don't think that there is a third

9   recording.

10  Q.  All right.  So let me go back to my questions.  I didn't

11  ask you what you were thinking about these things.  I was

12  asking for your truthful answers about what you recall, okay?

13      So he is e-mailing you saying, right, "How do I send

14  this longer e-mail to you," right?

15  A.  Yes.

16  Q.  All right.

17          THE COURT:  Can I pause you right there?

18          Hold on one second.

19   (Brief pause.)

20          THE COURT:  Okay.  Go ahead.

21  BY MR. DAVIS:

22  Q.  Do you understand my question?

23  A.  Can you repeat it?

24  Q.  Yes.

25          Mr. Edmiston says to you at 9:44 a.m. -- you read

Duke - Direct

1   this -- "Any idea how to get it forwarded when too long?"

2         Do you recall that?

3   A.  I'm reading it.  I don't have any reason to think it is

4   not true.  I don't necessarily recall it.  But, yes, I know we

5   were having issues forwarding the second e-mail.  I do know

6   that, yes.

7   Q.  Right.

8         And you already have, and we now know from your

9   Yahoo! e-mail account, you already have the first recording,

10  which is the IMG 117 file, right?

11  A.  Yes.

12  Q.  And we now know from the e-mail that we just went over and

13  listened to the file in open court, in your inbox, also, was

14  the IMG 118 file, right?

15  A.  Yes, that's correct.

16  Q.  And after that e-mail, Mr. Edmiston is e-mailing you about

17  a longer one that he can't forward to you because it's too

18  long; isn't that correct?

19  A.  Yes, that's what he is writing, yes.

20  Q.  Okay.  And my question is:  Did you ever tell your prior

21  attorneys about this recording that he said he couldn't

22  forward to you because it was too long?

23         MR. SALAM:  Objection, your Honor, asked and

24  answered.

25         THE COURT:  Go ahead.

Duke - Direct

1          That specific question has been danced around, but

2   not specifically answered.  So I will read it.

3          I will overrule the objection.

4          "And my question is:  Did you ever tell your prior

5   attorneys about this recording that he said he couldn't

6   forward to you because it was too long?"

7          You have kind of answered that before, but go ahead.

8          THE WITNESS:  Yes, I feel like I have answered it,

9   your Honor.

10         Yes, there was a second recording that was too long

11  to send, that it turns out I did have, yes.

12         THE COURT:  Okay.

13         THE WITNESS:  I did tell my lawyers "I can't send it.

14  It's not there."

15         I'm so confused as to what you are asking.

16         THE COURT:  Okay.

17         THE WITNESS:  I hope that answers it, but I'm

18  confused.

19         MR. DAVIS:  All right.  We move Plaintiff's

20  Exhibit 26 into evidence.

21         MR. SALAM:  No objection, your Honor.

22         THE COURT:  It will be admitted.  26 is admitted.

23    (Plaintiff's Exhibit 26 was offered and received in

24     evidence.)

25

Duke - Direct

364

 1  BY MR. DAVIS:

 2  Q.  I want to turn your attention now to Plaintiff's

 3  Exhibit 27.  This is a January 26, 2015, e-mail from

 4  Mr. Edmiston to you.

 5        I ask you to take a look at Plaintiff's Exhibit 27,

 6  on the screen, and tell me if you recognize it.

 7        Take your time and read the whole e-mail.

 8        Thank you.

 9  (Brief pause.)

10  A.  Okay.

11        THE COURT:  Hold on one second.  Let me finish

12  reading it.  You read much faster than I do.

13  (Brief pause.)

14        THE COURT:  Okay.  Go ahead.

15  BY MR. DAVIS:

16  Q.  And this is the second page of the exhibit, if you want to

17  take a look at that, Mr. Duke.

18        All right.  And you recognize this e-mail?

19  A.  I don't want to say I recognize it, but it looks correct.

20  Q.  Do you dispute --

21  A.  I don't dispute the accuracy of it.  It's fine.

22  Q.  Thank you.

23        That's an e-mail you received to one of your GoDaddy

24  e-mail accounts, your bduke one, right, on or about

25  January 26, 2015, right?

Duke - Direct

1   A.  Correct.

2   Q.  All right.  And you see at the top there it has got the

3   business card .pdf?

4   A.  Yes.

5   Q.  All right.  And there is another untitled attachment,

6   right?

7   A.  Yes.

8   Q.  And there are no files attached to this, right?

9   A.  Correct.

10  Q.  And this e-mail is referencing questions --

11  A.  Right.

12          Can I --

13          THE COURT:  Go to the next page.

14          THE WITNESS:  There are files attached because there

15  is a business card.  So, I'm sorry, there is something

16  attached, obviously.

17          MR. DAVIS:  Sorry.

18          THE WITNESS:  My apologies.

19  BY MR. DAVIS:

20  Q.  Let me clarify my question.

21          As it shows on the first page of this exhibit, there

22  is a business card .pdf and an untitled attachment 152758.txt

23  file, right?

24  A.  Yes, and I believe I just said there are no attachments,

25  but there are, obviously, two attachments.

Duke - Direct

366

1   Q.  Right.

2           And to keep it really clear, my question was there

3   were no other attachments than the two that are displayed

4   there?

5   A.  Okay.  My apologies.  Correct.

6   Q.  Thank you.

7           And this is -- does this reflect that your prior

8   attorney Travis Life is calling Mr. Edmiston and asking

9   questions about the trade show?

10          Is that right?

11  A.  Hypothetically.  I am not involved.  I was not involved in

12  that discussion.  I'm not sure what they talked about.

13  Q.  I'm not asking if you were involved in the discussions.

14  I'm asking you if this is what it says in the e-mail to you.

15  A.  I don't know where you are seeing that they are talking

16  about the trade show.

17  Q.  All right.  Go to the first line.

18          It is addressed to you, right, Brent?

19  A.  Correct.

20  Q.  And the second line says:  "I talked to your

21  attorney-Travis-".

22          Do you understand that?

23  A.  I do.

24  Q.  And that means what?

25  A.  Travis Life.

Duke - Direct

1  Q.  That means Mr. Edmiston talked to your prior attorney

2  Travis Life?

3  A.  I don't dispute that they spoke, but you are adding in

4  what their conversation was, and I don't know how I could know

5  that.

6  Q.  Well, let's look at the next line.  What does that say?

7  A.  "He was calling for the same questions as prior.  Feel you

8  are overpaying these guys."

9  Q.  Okay.  And the next line?

10 A.  "He wanted the info on the guy I talked to-who was it?

11 Was it more than one on the tape??"

12 Q.  All right.  Does that refresh your recollection as to

13 whether your prior attorney is calling Edmiston, asking him

14 questions about the trade show?

15 A.  Again, I can hypothesize by reading this, but I

16 didn't -- I don't understand how you want me to say what they

17 were talking about.  I could guess that this looks like they

18 are talking about the tape from the trade show, but what if it

19 is not?  My guess would be it's about the tape from the trade

20 show.  That be would a good guess.

21         THE COURT:  A fair inference, right?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.

24         MR. DAVIS:  Okay.

25

Duke - Direct

368

 1    BY MR. DAVIS:

 2    Q.  And Mr. Life is contacting Mr. Edmiston about the trade

 3    show, asking him questions.  Do you know if by "the tape" he

 4    is talking about the recordings that we just reviewed?

 5            MR. SALAM:  Object, your Honor, asked and answered.

 6    The witness -- well, objection, asked and answered.

 7            THE COURT:  Overruled.

 8            THE WITNESS:  I believe I just said, yes, my guess is

 9    that that would be the tape from the trade show.

10    BY MR. DAVIS:

11    Q.  And your attorneys are calling, asking him for

12    information, but did they also call you and ask you to find

13    these recordings in your e-mails?

14    A.  Yes, I believe we just have discussed that.  Yes, they

15    definitely asked me.

16            MR. DAVIS:  We move Plaintiff's Exhibit 27 into

17    evidence.

18            MR. SALAM:  No objection, your Honor.

19            THE COURT:  27 will be admitted.

20     (Plaintiff's Exhibit 27 was offered and received in

21      evidence.)

22    BY MR. DAVIS:

23    Q.  All right.  Now, I want to focus your attention on your

24    company's sales data in this case, right?

25            The data about how much product you sold, when you

Duke - Direct

1    sold it, where you sold it, all that sales data comes from

2    you, right?

3    A.  Correct.

4    Q.  Okay.  And it's not information your attorneys have unless

5    you give it to them, right?

6    A.  Correct.

7    Q.  And during the course of this case, in your initial

8    discovery, before 2018, you produced a spreadsheet that had

9    your company's sales data as of a certain date, right?

10   A.  Lots of spreadsheets with sales, correct.

11   Q.  When you say "lots of them," particularly, you produced

12   one spreadsheet summarizing all of your company's sales

13   through a certain date; isn't that right?

14          Do you recall doing that?

15          MR. SALAM:  Objection, your Honor, foundation.  I

16   don't know what time period or what date he is talking about.

17          THE COURT:  All right.  Do you have the document?

18          MR. DAVIS:  I do.

19          Let's take a look at Plaintiff's Exhibit 31.

20          THE COURT:  Sustained.  We will take a look at the

21   document.

22          31, right?

23          MR. DAVIS:  Plaintiff's Exhibit 31 was produced by

24   Defendants during discovery, and it is Bates-stamped by

25   Defendants as 21C-0431 through 0454.

Duke - Direct

370

1    BY MR. DAVIS:

2    Q.   Mr. Duke, I ask you to take a look at what's displayed in

3    front of you.  And it's multiple pages.  If you need my

4    colleague to flip through more pages of it, just say what you

5    need to take a look at.

6    A.   No, I know what this is.

7    Q.   You are fully familiar with this document?

8    A.   Yes.

9    Q.   And it's from Pages 431 at the bottom, you can see that,

10   and it goes all the way to 454, right?

11   A.   Correct.

12   Q.   Okay.  And this is the sales data you produced in this

13   case, right?

14   A.   I produced a lot of sales data for this case.

15   Q.   But this is the summary, the spreadsheet summary, you

16   produced through a certain point of time, January of 2013, I

17   think, right?

18         Isn't that correct?

19   A.   Yes, I did produce this, yes.

20   Q.   Okay.  And this is the summary that you and your prior

21   attorneys gave to your expert, right, the damages expert in

22   this case?

23         You know that, right?

24   A.   I believe we probably gave him much more than just this

25   one spreadsheet.

Duke - Direct

1   Q.  But you gave him this one, right?

2   A.  I don't know what they gave to my damages expert.

3   Q.  And how would you know what you gave him?

4       How do you know what your prior attorneys gave him?

5   Would you look at his report to see?

6   A.  I would have to look at my prior attorneys' e-mails to the

7   damages expert to know what they gave him.

8   Q.  Right.

9       And you could also look at his report, too, and see

10  that, right?

11      Doesn't he reference in his report all the documents

12  he got from you and your company to base his damages

13  calculation on?  Isn't that right?

14      THE COURT:  Have you read your expert's report?

15      THE WITNESS:  Not recently, your Honor.  I would have

16  to see where that was listed in that report to answer that

17  question.

18  BY MR. DAVIS:

19  Q.  All right.  But focusing on Plaintiff's Exhibit 31 -- you

20  have read our motion for sanctions against you and your

21  company in this case, right?

22  A.  Yes.

23  Q.  You reviewed it with your prior attorneys?

24  A.  Yes.

25  Q.  And you reviewed it with your new attorneys?

1    A.  Yes.

2    Q.  So you know the allegation about this report, right?

3    A.  Yes.

4    Q.  Okay.  So let's take a look at Plaintiff's Exhibit 32.

5          All right.  This is a February 10th, 2013, e-mail,

6    right --

7    A.  Yes.

8    Q.  -- from support@21centurysmoking.com.

9          That's your e-mail account, right?

10   A.  In this case, my wife sent it to me, but, yes, it is a

11   company e-mail account.

12   Q.  How do you know from looking at this your wife sent it to

13   you?

14   A.  Because she is the one that does these sales figures.

15   Q.  All right.  But you have full access to and use your

16   support@21centurysmoking.com e-mail account?

17   A.  Yes.

18   Q.  And that was sent to you at your brentduke@yahoo.com

19   account?

20   A.  Yes.

21   Q.  All right.  And this e-mail and the attachment we only

22   have after you finally searched for the first time your Yahoo!

23   e-mail account on or about June 1, 2018, when those documents

24   were produced.  You understand that?

25          MR. SALAM:  Objection, your Honor, to the form of the

Duke - Direct

373

1    question.

2             THE COURT:  Yes.  Hold on one second here.

3             I will sustain.  Why don't you break that into two or

4    three questions.

5             MR. DAVIS:  Sure.

6    BY MR. DAVIS:

7    Q.  You have already confirmed that you read our motion for

8    sanctions, right?

9    A.  Yes.

10   Q.  You read it with your prior attorneys?

11   A.  Yes.

12   Q.  And you read it with the new attorneys?

13   A.  Correct.

14   Q.  And you know the allegation about this report, right?

15   A.  Yes.

16   Q.  That when you first produced it, it was missing two pages,

17   right?

18   A.  That's the allegation, yes.

19   Q.  You understand it?

20   A.  Yes.

21   Q.  You are aware of it?

22   A.  Absolutely.

23   Q.  Okay.  Now, the allegation, right, is that Plaintiff's

24   Exhibit 32, we received -- Plaintiffs -- for the first time

25   after you produced your Yahoo! e-mail account on June 1, 2018?

Duke - Direct

374

```
 1          You understand that, right?

 2   A.  I do understand that, yes.

 3   Q.  Okay.  And this Plaintiff's Exhibit 32 is the complete

 4   report; is that not correct?

 5   A.  That is incorrect.

 6   Q.  This e-mail you received from your wife to you on

 7   February 10th, 2013, attaches a monthly sales.doc document;

 8   does it not?

 9   A.  It does, yes.  This is the work product we were working

10   on, correct.

11   Q.  And that's the attachment, right?

12   A.  Yes.

13   Q.  And attached to it, in the pages that follow in this

14   document -- we are going to review them -- is the entire

15   monthly sales.doc document referenced in that e-mail, right?

16   A.  Yes.

17   Q.  Okay.  And so the first page is an e-mail from support to

18   your Brent Duke Yahoo! account, right?

19   A.  Correct.

20   Q.  And let's look at the first page of PX-32.

21          And you don't dispute the authenticity of this e-mail

22   in any way, right?

23   A.  No, it is a real e-mail.

24   Q.  And it is a real attachment?

25   A.  Yes, a real attachment.
```

Duke - Direct

1    Q.  And you don't dispute any of the contents of the

2    attachment that are being displayed here to you?

3           MR. SALAM:  Your Honor, I'm sorry, no objection at

4    this time.

5           THE COURT:  Go ahead and answer.

6           THE WITNESS:  I don't know what you mean by "dispute

7    the contents."

8    BY MR. DAVIS:

9    Q.  All right.  Well, I'm going to ask you to take a moment

10   and look at PX-32.

11          And for the record, it is identified by Bates number

12   21C 1005533 to 5558.

13          And you looked at this before today to prepare,

14   right, for your testimony?

15   A.  Of course, yes.

16   Q.  You flipped through all the pages?

17   A.  Yes, I have no dispute about the pages following those

18   first two pages.  But, yes, but I flipped through all the

19   pages.

20   Q.  And that's what I want to be clear about, right, you don't

21   dispute the accuracy of any of these pages that follow from

22   the e-mail on the first page, right?

23          MR. SALAM:  Your Honor, object to the form of the

24   question.  I'm having trouble understanding.  Is he asking

25   does he dispute the accuracies of the numbers contained

Duke - Direct

376

 1    therein or just what's on the page?

 2              I mean, does that make sense, or I'm confusing the

 3    issue?

 4              THE WITNESS:  I'm having that same issue.

 5              THE COURT:  Well, I assume you didn't put false sales

 6    data in the document, but all right.

 7              THE WITNESS:  This isn't a document that was given to

 8    the IRS.  This is not a document that was --

 9              THE COURT:  I don't know, when I had a business, I

10    made sure my financials were pretty accurate.

11              THE WITNESS:  All of the pages are accurate, other

12    than the first two.

13              THE COURT:  Other than the first two?

14              THE WITNESS:  Yes, that they are disputing and

15    discussing.

16              THE COURT:  Okay.  All right.

17              THE WITNESS:  Or the first one.  The first one.  I

18    guess, the first one page.

19              THE COURT:  The first one showing the sales document.

20    It says "Online Sales," "2009 Sales" at the top.

21              THE WITNESS:  Yes, the "Online Sales" one is not.

22    These are not accurate numbers.  But it's -- there is numbers

23    on the page, that's accurate, but these numbers are not actual

24    accurate sales figures.

25              THE COURT:  Okay.  Does that answer your question?

Duke - Direct

1          MR. DAVIS:  It does, and it leads me to another

2     question.

3          THE COURT:  Another question.

4     BY MR. DAVIS:

5     Q.  So when you received this e-mail on May 31st -- strike

6     that.

7          What's the first page of this again?

8          On February 10th, 2013, right, it attached the entire

9     monthly sales.doc report, right?

10    A.  It attached the monthly sales report, including online,

11    which is a slightly different document.

12    Q.  But the first page of the e-mail only recites or

13    references one attachment, right?

14    A.  Correct.

15    Q.  And if we go to the second page, 5534, at the top, you can

16    see it says "monthly sales.doc," right?

17         At the top?

18    A.  Correct.

19    Q.  So this is the first page of that attachment, right, that

20    document that was attached to the e-mail?

21    A.  I'm not disputing that this is a real document.  I

22    don't -- so that's where I'm unclear on your question.  This

23    is definitely a real document, yes.

24    Q.  Okay.  And this page is part of that monthly sales.doc

25    document, right?

1  A.  Absolutely, yes.

2  Q.  Okay.  And we only have this e-mail and the attachment

3  because it was produced for the first time in your June 1,

4  2018, production; isn't that right?

5  A.  Yes.  I don't generally hand out partial work products to

6  people, so yes.  I'm not sure why anyone would ever have had a

7  partial work product from me.  My lawyers wouldn't have gotten

8  a partial work product, nor would you have gotten a partial

9  work product.  So, no, no one else would have gotten this

10  product, other than my wife sending it to me.

11         MR. DAVIS:  Can you read back my question to the

12  witness, please?

13         THE COURT:  "And we only have this e-mail and

14  attachment because it was produced for the first time in your

15  June 1, 2018, production; isn't that right?"

16         THE WITNESS:  Yes, correct.

17  BY MR. DAVIS:

18  Q.  And let's go to the first page of the exhibit because now

19  your answer makes me wonder something else.

20         Where on this first page of the e-mail does your wife

21  write to you and say anything about this being a partial

22  document or incomplete in some way?

23  A.  It was the online -- it was the part of online sales that

24  she tracked.  So that's the incomplete.  She doesn't need to

25  explain it to me.

Duke - Direct

1    Q.  And that doesn't say that on this e-mail, right?

2    A.  It would go without saying.  I know.  It's my wife.  I

3    know what she is sending me.

4    Q.  Okay.  And --

5             THE COURT:  Okay.

6      (Brief pause.)

7             THE COURT:  Oh, were you waiting for me, and I was

8    waiting for you?

9             MR. DAVIS:  Yes.

10            THE COURT:  Go ahead.

11   BY MR. DAVIS:

12   Q.  I'm going to ask you to look back at Plaintiff's

13   Exhibit 31, and this is the document that was attached to your

14   expert report, your market penetration expert, Mr. David Haas.

15            Do you understand that?

16   A.  I have no reason to dispute that.  This is an accurate

17   document, yes.

18   Q.  Okay.  And you and your prior attorneys provided your

19   sales data to your market penetration expert, Mr. Haas, right?

20   A.  Yes.

21   Q.  All right.  Did you participate in the meetings or

22   decisions about what documents to give your expert, Mr. Haas?

23   A.  I don't recall.  I provided them with accurate sales

24   figures; I know that.

25   Q.  Okay.  But you never provided them the first page of PX-2

Duke - Direct

380

1   as part of the sales data you provided to your expert; isn't

2   that right?

3           You know the allegation in the motion, right?

4           THE COURT:  32.

5           MR. DAVIS:  Thank you, your Honor.

6           THE WITNESS:  Because that's not accurate data.  Why

7   would I provide my expert with inaccurate data?

8   BY MR. DAVIS:

9   Q.  And I'm asking you -- strike that response.

10          I'm not asking you for --

11          THE COURT:  Hold on.  I get to strike responses.

12          MR. DAVIS:  I'm asking you --

13          THE COURT:  Hold on.  Let's back this up.

14          Go ahead and ask a question.

15  BY MR. DAVIS:

16  Q.  I'm asking you not about your thinking about it, but I'm

17  asking you to confirm that the first page of Plaintiff's

18  Exhibit 32 was not given to your expert, Mr. Haas, as part of

19  his analysis in this case, right?

20  A.  Correct.  Yes.  Correct.

21  Q.  And it was also never produced in this litigation to

22  Plaintiffs, right?

23  A.  Correct.

24  Q.  Okay.  And my question is was it your decision alone to

25  not provide the e-mail in the first page of this report to

Duke - Direct

1  your expert?

2          MR. SALAM:  Which?

3          MR. DAVIS:  PX-32.

4          THE WITNESS:  Well, yes.  Yes, absolutely.

5  BY MR. DAVIS:

6  Q.  Okay.  And --

7          THE COURT:  Which says "Online Sales" at the top,

8  upper left-hand corner, right?

9          MR. DAVIS:  Yes, that's 21C 1005534.  It's the second

10 page of PX --

11         THE COURT:  That's a better way of describing it.

12         MR. DAVIS:  -- 32.

13 BY MR. DAVIS:

14 Q.  That one, it was your decision alone, right?

15 A.  I believe so, yes.

16 Q.  Okay.  And Plaintiff's Exhibit 32 is dated January of

17 2013, right?

18 A.  February of 2013, right?

19 Q.  I'm sorry.  I think I'm looking at --

20         THE COURT:  Correct.

21 BY MR. DAVIS:

22 Q.  Let's go to the first page of PX-32.  What's the date of

23 that?

24 A.  Sunday, the 10th of February, 2013.

25 Q.  Thank you.  February 2013.

Duke - Direct

1    And that's several years before the deposition of

2    your expert, Mr. Haas, took place, right?

3    A.  I don't recall when that deposition took place.

4    Q.  Well, it was in 2016.  That's when the experts were

5    deposed.  And that's several years before this e-mail was

6    generated -- I'm sorry.  It was several years after this

7    e-mail was generated in 2013, right?

8    A.  Okay.  Yes.

9    Q.  Right.

10    And now that we know we have PX-32 from the search of

11    your Yahoo! e-mail account, we know that if the ESI search

12    terms were applied to your e-mail account at the proper time,

13    we would have had this e-mail and report that's PX-32 prior to

14    the deposition of your expert, right?

15    A.  Correct.

16    Q.  Okay.  Did you ever give the whole report, meaning this

17    e-mail and the first page of it -- or part of PX-32, which is

18    21C 1005533 and 34, did you ever give those pages to any of

19    your prior lawyers at any time before June 1, 2018?

20    A.  I do not recall.

21    Q.  And would it be a matter of reviewing your e-mails for you

22    to refresh your recollection about that?

23    A.  Yes, that's the only way I would know if I sent it to

24    them, yes.

25    Q.  That would be the only way?

Duke - Direct

383

1   A.  Yes.

2   Q.  You checked your Yahoo! and your GoDaddy e-mail accounts,

3   right?

4   A.  Yes.

5   Q.  Have you done that?

6   A.  No.

7   Q.  Okay.  Now, I want to draw your attention to something we

8   talked about at your deposition in June of 2015.

9           THE COURT:  Are you changing subject matters?

10          MR. DAVIS:  I am, your Honor.

11          THE COURT:  Let's take a break.

12          Okay.  You are still under oath.  Don't talk to

13   anybody about your testimony.

14          THE WITNESS:  Okay, your Honor.

15    (Recess taken.)

16          THE COURT:  Before you start, I need to look at a

17   document.

18    (Brief pause.)

19          THE COURT:  Okay.  Whenever you are ready.

20          MR. DAVIS:  Thank you, your Honor.

21          We move Plaintiff's Exhibits 31 and 32 and 71 into

22   evidence.

23          THE COURT:  Any objection?

24          MR. SALAM:  No objection, your Honor.

25          THE COURT:  All right.  31, 32 --

Duke - Direct

384

```
 1          MR. DAVIS:  71 was the recording.

 2          THE COURT:  Ah.  That's why we go through this

 3   exercise.  I didn't even write it down.

 4          Oh, I do.  I thought we already had 71 admitted, but,

 5   okay, it is admitted twice now.  We're good.

 6          MR. DAVIS:  Thank you, your Honor.  I wasn't sure.

 7          THE COURT:  That's okay.

 8    (Plaintiff's Exhibits 31 and 32 were offered and received in

 9     evidence.)

10          THE COURT:  All right.  Go ahead, Mr. Davis.

11   BY MR. DAVIS:

12   Q.  Mr. Duke, do you remember at your deposition in 2015, I

13   asked you about whether you had ever created or owned

14   websites?

15          Do you remember that?

16   A.  Yes.

17   Q.  And do you remember how many websites you told me you had

18   created and owned at that time?

19   A.  I don't recall the number, no.

20   Q.  All right.  Well, we learned from reviewing the documents

21   you produced for the first time on June 1, 2018, that you

22   owned many, many, many websites, right?

23   A.  Yes.

24   Q.  Okay.  And at your deposition, in 2015, when I asked you

25   about it, you disclosed two websites to me, right?
```

Duke - Direct

1   A.  Yes.

2   Q.  Okay.  And you testified that the first website you

3   created, the first one, was brentduke.com, right?

4   A.  That sounds correct, yes.

5   Q.  Yes.

6        And you said the next one you created was

7   21centurysmoking.com, right?

8   A.  I would have to -- I think that is what I said, yes.  I

9   would have to see the part of the transcript, if possible.

10  Q.  Sure.

11       We have in front of you Plaintiff's Exhibit 19, which

12  is a portion of your testimony from your June 16, 2015,

13  deposition.  I'm going to ask you to review Pages 54 and 55

14  and tell me if that refreshes your recollection about the

15  first and next websites you created that I asked you about at

16  that time.

17  A.  Can you go down one page?

18  Q.  You are seeing now Page 55 --

19  A.  Okay, yes.

20  Q.  -- of Exhibit 19?

21  A.  Yes.

22       So, yes, I agree with you, yes.

23  Q.  You agree, right?

24  A.  Yes.

25  Q.  Okay.  So you testified the first one was brentduke.com

Duke - Direct

386

1   and the next one was 21centurysmoking.com, right?

2   A.  Correct.

3   Q.  Right.

4          And we now know from your Yahoo! e-mail production in

5   June of 2018 that you created and owned multiple websites

6   during that time period, right?

7          You just said yes, right?

8   A.  I don't believe that I said yes to that time period.  I

9   believe I said, yes, I own multiple websites, right.

10  Q.  All right.  Well, I'm specifically asking you between the

11  time period when you created your first one --

12  A.  Correct.

13  Q.  -- brentduke.com, right?

14  A.  Yes.

15  Q.  And your next one that you testified and confirmed that

16  was accurate was 21centurysmoking.com, right?

17  A.  Correct.

18  Q.  All right.  And I'm saying to you we learned from your

19  June 1, 2018, production that you actually owned many other

20  websites that were created during that time period, right?

21  A.  All during about this same exact time period, there were a

22  bunch of websites, yes, correct.

23  Q.  Okay.  But you didn't tell us about them at your

24  deposition in 2015, right?

25  A.  Correct, yes.

1   Q.  Okay.  How many URLs or domain names for websites do you

2   own?

3   A.  Approximately, 50 domains.

4   Q.  Okay.  And how many did you buy after you set up

5   brentduke.com, but before you set up 21centurysmoking.com?

6           Do you know?

7   A.  I do not know.

8   Q.  Okay.  And of the websites that you said you own

9   currently, how many are live on the Internet right now?

10  A.  I do not know.

11  Q.  Okay.  Well, we looked at your June 1, 2018, production,

12  right, and we found all kinds of GoDaddy invoices and billing

13  information, with all of your domains listed, okay?

14          Do you understand that?

15  A.  Yes.

16          MR. SALAM:  Objection, your Honor.

17  BY MR. DAVIS:

18  Q.  And you know that was in the production --

19          THE COURT:  I will say it again:  Question,

20  objection, ruling, answer.

21          So the answer before any of that happened, you are

22  learning things in the production.  You can ask him "Did you

23  produce?  Are you aware that we have it?"

24          Okay.  So you can just kind of take out that

25  assumption in the questions going forward, okay?

Duke - Direct

1          MR. DAVIS:  Thank you.

2          THE COURT:  So overruled at this point.

3    BY MR. DAVIS:

4    Q.  Are you aware that in your June 1, 2018, production that

5    there were GoDaddy invoices and billing information about the

6    domains and URLs that you owned?

7    A.  There should be, yes.

8    Q.  Okay.  Do you own a website and a domain called

9    "inhaleinside.com"?

10   A.  Yes.

11   Q.  Okay.  And do you own one called "getrichsmoking.com"?

12   A.  Yes.

13   Q.  Do you own one called "nicotinedream.com"?

14   A.  I believe so, yes.

15   Q.  Okay.  And do you have a recollection of when you

16   purchased all of those domain names?

17          MR. SALAM:  Objection, your Honor.  My objection is

18   on relevance.  I'm trying to understand -- if we are just

19   going to impeach -- if they are just going to seek to impeach

20   Mr. Duke on documents they have, which obviously aren't lost,

21   okay, that is not relevant to the sanctions motion.

22          So that is my general relevance objection.  That's my

23   concern.  I will leave it to the court to decide what is or

24   isn't relevant, but I just wanted to put that on the record.

25          THE COURT:  And that's fine.  I understand where you

Duke - Direct

1   are coming from.  I will get a response from Mr. Davis.  I

2   think I know what he is doing, although in my head, there is a

3   difference between creating and owning a website.

4           So what's the response to the general relevance

5   objection?

6           MR. DAVIS:  The relevance is that in 2015, I asked

7   Mr. Duke specifically about websites, the first one and the

8   next one, and the ones I have just listed were all created and

9   purchased by him between brentduke.com and

10  21centurysmoking.com.

11          THE COURT:  And the purpose of --

12          MR. DAVIS:  Because the contents of those websites

13  contains data and information relevant to the core issues in

14  this case, particularly about whether Mr. Duke has the skill

15  and ability to put my client's trademark in the metadata of

16  his website, and I'm going to go into that next.

17          THE COURT:  Based upon that, overruled.  That's where

18  I assumed he was going.

19          MR. SALAM:  And, your Honor, I just -- I respect your

20  ruling.

21          THE COURT:  Oh, thanks.

22          MR. SALAM:  My concern is I still don't see how that

23  is relevant to the issues in the sanctions motion, as

24  to -- when I say "sanctions," I know they have raised it.  I'm

25  trying to understand what the relevance is to Rule 37

1    sanctions, the issues in Rule 37 about whether or not there

2    has been any ESI lost and not otherwise recovered.

3            THE COURT:  Well, remember that their motion was much

4    more than just Rule 37(e).

5            So overruled.

6            MR. SALAM:  Thank you, your Honor.

7    BY MR. DAVIS:

8    Q.  My question is do you have a recollection of when you

9    purchased the domain names that I just read off to you?

10           And I can read them again to you, if you would like.

11   A.  It would have been all about the same time frame as

12   21centurysmoking.com.  There was a bunch of domains I

13   purchased within a couple of months of each other.

14   Q.  Well, according to your own records, is it accurate that

15   you purchased 21centurysmoking.com on or about January 13th of

16   2009?

17   A.  Sometime in January of 2009, that sounds right.

18   Q.  And inhaleinside.com was purchased, if you recall -- do

19   you recall a date?

20   A.  If I had to guess, I would say November of 2008.

21   Q.  Okay.

22   A.  December of 2008, somewhere in that range.

23   Q.  And your records reflect November 12th, 2008?

24   A.  It sounds accurate.

25   Q.  It sounds accurate.  Okay.

Duke - Direct

1         And that was on the same day that you purchased

2    getrichsmoking?

3         Do you recall?

4    A.  I don't recall.  That sounds about accurate.  I don't

5    recall the exact dates of any of these.

6    Q.  Is that the same day you purchased nicotinedream.com?

7    A.  It's possible.

8    Q.  Okay.  And your GoDaddy domain name records that you

9    produced on June 1, 2018, would be the best evidence of when

10   you purchased those domains?

11   A.  Or, yes, I can look in my account and see, but yes.

12   Q.  Yes.

13        You can just go online and access your GoDaddy

14   account, right?

15   A.  Yes.

16   Q.  And it lists all your domains you own?

17   A.  Yes.

18   Q.  And it tells you when you bought them?

19   A.  Correct.

20   Q.  Yes.

21        And I don't recall, but I asked how many of those

22   websites are live on the Internet now.

23   A.  I am entirely unsure.

24   Q.  Okay.  And for each domain name, you set up a website,

25   right?

Duke - Direct

1  A.  No.

2  Q.  And what's -- is there any part of that question you don't

3  understand?

4  A.  You said for each domain name, I set up a website, and

5  that's false.

6  Q.  Okay.  For any of those domain names, did you set up a

7  website?

8  A.  I'm pretty sure I set up inhaleinside.com, and I set up

9  the getrichsmoking.com.  My wife did something with one of

10  them.  I don't recall which one.  So, yes, I know those two I

11  do remember definitely doing.

12  Q.  All right.  For inhaleinside.com, you are the one that

13  created that website, right?

14  A.  As I stated in my deposition, I edited the template that I

15  then put on the website.  I didn't actually create any

16  websites.  But, yes, as we described before, I edited a

17  template, and that was my website.  I did do that website,

18  yes.

19  Q.  So it went from nothing to a website, right?

20  A.  Correct, yes.

21  Q.  And you were the person that did that, right?

22  A.  Yes.

23  Q.  And you are the one that made the site go live on the

24  Internet, right?

25  A.  Yes.

Duke - Direct

1    Q.  And you are the one that decided what content was in that

2    website, right?

3    A.  Yes.

4    Q.  Okay.  And is that the same for the websites you purchased

5    and the other ones you purchased in 2009?

6    A.  As I'm saying, I'm not sure exactly which ones I made

7    live.  I do remember doing inhaleinside.  I do remember doing

8    getrichsmoking.  I do remember my wife using one of them -- I

9    don't know which one it was -- or maybe she used two of them.

10   Q.  And you said about how many do you currently own?

11   A.  Around 50.

12   Q.  Okay.  And you are the one that maintains those websites,

13   right?

14   A.  50 domains.

15   Q.  Right.

16        But each one is a website, right?

17        A domain is a name for a website?

18        MR. SALAM:  Object to the form of the question, your

19   Honor.  I think the problem is the difference between a domain

20   and a website.

21        THE COURT:  He can answer that.  I understand.  I

22   have the same confusion, but he has got a quizzical look on

23   his face.

24        So if you can answer it, answer it.  If you don't

25   understand the question --

Duke - Direct

394

1        THE WITNESS:  I don't understand the question.

2   BY MR. DAVIS:

3   Q.  All right.  Do you understand what a URL is?

4   A.  Yes.

5   Q.  What is that?

6   A.  Where the website would be listed.

7   Q.  What does it stand for, URL?

8   A.  I don't know.

9   Q.  Do you know if it is different than a domain name?

10  A.  I do not know.

11  Q.  And do you understand that a domain name is the address of

12  a website?

13  A.  That would make sense, yes.

14  Q.  Right.

15        That's what a person using the Internet types into

16  the search bar, right?

17        They put in the domain name, and when they hit

18  "enter," their browser takes them to the website that they are

19  looking for?

20        Isn't that how it works?

21  A.  Yes, absolutely.

22  Q.  Okay.  And you have 50 of those, right?

23  A.  I have 50 domains, yes.

24  Q.  Right.

25        And how many live Internet websites do you have?

Duke - Direct

 1          THE COURT:  He says he doesn't know.

 2          MR. DAVIS:  You don't know.

 3  BY MR. DAVIS:

 4  Q.  And for those -- but you do have some that are live,

 5  right?

 6  A.  Yes.

 7  Q.  All right.  And for those to be live, someone has got to

 8  maintain them, right, to make sure they are working?

 9  A.  You have to put them up once, yes, and then they are

10  working.

11  Q.  That's it, and then you never look at them again?

12  A.  Yeah, correct, you don't need to look at them again.

13  Q.  All right.  Is it your testimony that the websites you

14  have live don't need any maintenance or service or any work to

15  them done at any time?

16  A.  That would be an accurate statement for some of my

17  websites, yes.

18  Q.  And what about the ones that it is not accurate for?  Tell

19  me about those.  What do you do to keep them active?

20  A.  I mean, you have to pay to keep them active.

21  Q.  Right.

22          And do you do anything yourself, is my question, to

23  maintain your websites?

24  A.  I'm not understanding this question.

25  Q.  All right.  Well, let's take a look at PX-74, please.

Duke - Direct

396

 1          I ask you to take a look at PX-74.  It is a printout

 2   from -- as you can see at the bottom left corner, it is the

 3   inhaleinside.com website that you say you own, right?

 4   A.  Correct.

 5   Q.  And you received and reviewed this prior to today,

 6   correct?

 7   A.  Yes.

 8   Q.  All right.  And do you dispute the accuracy of this in any

 9   way?

10          Does it accurately reflect your website as it

11   appeared on or about July 19th of 2019?

12   A.  It is definitely possible.  I haven't looked at it in a

13   long time, but, yes, it is possible.

14   Q.  Okay.  Do you have any reason to dispute it or deny it in

15   any way?

16   A.  No.

17   Q.  Okay.  And I'm asking you to look at the -- well, we just

18   looked at the second page of it.

19          Would you like to flip through the first three pages

20   and tell me if that accurately depicts your inhaleinside.com

21   website?

22   A.  It looks right.

23   Q.  Okay.  And now the next page of this exhibit is --

24          MR. DAVIS:  We move 74 into evidence.

25          THE COURT:  Any objection to 74?

Duke - Direct

 1          MR. SALAM:  No, your Honor.

 2          THE COURT:  Okay.

 3   BY MR. DAVIS:

 4   Q.  I'm asking you now to take a look at PX --

 5          THE COURT:  It will be admitted.

 6     (Plaintiff's Exhibit 74 was offered and received in

 7     evidence.)

 8          MR. DAVIS:  -- 75.

 9          MR. SALAM:  I'm sorry, 75?

10          THE COURT:  Did you say 75?

11          MR. DAVIS:  Yes, your Honor, PX-75.

12   BY MR. DAVIS:

13   Q.  Mr. Duke, can you take a look at this and tell me if you

14   recognize this?

15   A.  I have seen it in your exhibits.

16   Q.  Okay.  And is this what's called the "source code" from

17   your inhaleinside.com website as it existed on July 19th of

18   2019?

19   A.  Yes.

20   Q.  Okay.  And directing your attention to the first page of

21   PX-75, and the lines are numbered.  I will ask you to look at

22   the third line.

23          Can you tell me what that says?

24   A.  <Meta name="Author" content="Brent Duke" ><meta name=

25   "keywords" content="e-cigarette, e-cig electronic, cigarette,

Duke - Direct

398

1    myinlife, inlife, revelle, elite, prestige, nicotine,

2    smoking">

3    Q.  And this is the source code of your website, right?

4    A.  Correct.

5    Q.  And at the very first line, it says "html."

6         Do you know what that means?

7    A.  It is like the web -- the web language or whatever, but I

8    don't know what it stands for.

9    Q.  In your life, you have never understood what "html" stands

10   for?

11   A.  It is the web language.  I know what it is, what it does.

12   I don't know what it stands -- I don't know what it stands for

13   though.

14   Q.  Okay.  How many other websites are you the author of the

15   content of the meta names and keywords that you own?

16   A.  I would not know without looking.

17   Q.  But there are others, right?

18   A.  Possibly, yes.

19   Q.  All right.  And you are the person that is the author of

20   the content of the keywords in this website, right?

21   A.  Correct.  Yes, I filled this in.

22   Q.  Okay.  And the words that come after "content," and you

23   read them out loud, "e-cigarette," "e-cig," "electronic," all

24   the way to the last, which was the "smoking," those got into

25   your website because you are the author, and you inserted

Duke - Direct

399

 1  those words into the keywords, right?

 2  A.  Yes.

 3          MR. DAVIS:  Could I just take one moment, your Honor?

 4          THE COURT:  Sure.

 5          And if I crunch the numbers correctly from yesterday,

 6  when we had two hours left, and we probably did at least a

 7  half hour, and now we are at 11:00, I think we are getting

 8  close, right?  Or my math could be wrong.

 9   (Brief pause.)

10          MR. DAVIS:  Thank you, your Honor.

11          THE COURT:  No problem.

12  BY MR. DAVIS:

13  Q.  I'm going to turn your attention now to a person named

14  Bryan Scott Kos.

15          Do you know who that is?

16  A.  Yes.  Kos, but yes.

17  Q.  Kos?

18  A.  Yes.

19  Q.  Okay.  And I want to get it right this time, right, so I'm

20  going to ask you:  What's his full name?

21  A.  Bryan Scott Kos.

22  Q.  And for the record, can you spell it, please?

23  A.  B-r-y-a-n, S-c-o-t-t, K-o-s.

24  Q.  And do you remember me asking you about him at your

25  deposition?

Duke - Direct

400

 1  A.  Yes.

 2  Q.  And do you recall ever telling me or testifying that Bryan

 3  Scott was also the same as Bryan Scott Kos?

 4      Did you ever say the name "Kos" at your deposition?

 5  A.  I don't recall.

 6  Q.  You don't remember?

 7  A.  No.

 8  Q.  All right.  But your transcript would tell us, right,

 9  whatever you testified about?

10  A.  Yes.

11  Q.  Okay.  And you told me at your deposition that this was a

12  gentleman that introduced you to e-cigarettes in 2008.  It was

13  a guy you met in Bucktown.

14      Do you remember that testimony?

15  A.  Yes.

16  Q.  Okay.  And you said his name at that time, you said he was

17  Bryan Scott.  Does he go by that name?

18  A.  Yes, it is his middle name.

19  Q.  All right.  And does he go by "Bryan Scott" and leave off

20  the "Kos" at times?

21  A.  Yes.

22  Q.  And why does he do that?

23  A.  I don't know why he does what he does.  You would have to

24  ask him.

25  Q.  And why did you represent him to me as a person named

Duke - Direct

1  "Bryan Scott" at your deposition and leave off the name "Kos"?

2      Do you know why you did that?

3  A.  If you asked me about Bryan Scott, I would have told you

4  about Bryan Scott.  If you asked me about Brian Kos, I would

5  have known who you were talking about.

6  Q.  It is one in the same person, though, right?

7  A.  Yes, but I would have known who you were talking about.

8  So whatever you said to me, that's what I would have replied

9  to.

10 Q.  Got you.

11     So your deposition, why did you never disclose that

12 Mr. Kos was the director of sales and marketing for your

13 company?

14 A.  Did you ask me that?

15 Q.  I did.  I asked you who is he.

16     MR. SALAM:  Objection, your Honor.  I have reviewed

17 the deposition, and --

18     MR. DAVIS:  I'm going to object to a speaking

19 objection.

20     THE COURT:  Hold on.

21     Are you going to say it is not impeaching?  Because

22 we can go through the exercise --

23     MR. SALAM:  I would ask him to refer to the

24 deposition testimony where he asks the question that requires

25 that answer, and I don't believe there is any.

Duke - Direct

402

```
 1            THE COURT:  Okay.  Show him the dep transcript.

 2   BY MR. DAVIS:

 3   Q.  Let's pull up your transcript from June 17th at Page 397.

 4            THE COURT:  So sustained.

 5            MR. SALAM:  Thank you, your Honor.

 6   BY MR. DAVIS:

 7   Q.  June 17th, Page 397, of Mr. Duke's deposition.

 8            Page 397.

 9   A.  It only appears to be 334 pages.

10   Q.  Mr. Duke, you are now being shown a page from your

11   deposition transcript.

12            Do you understand that?

13   A.  Yes.

14   Q.  This is from your June 17th, 2015, deposition.

15            Do you understand that?

16   A.  Yes.

17   Q.  I'm going to ask you to take a look at that, read it, and

18   tell me if it refreshes your recollection as to what you told

19   me about Mr. Bryan Scott.

20   A.  Can you go to the next page?

21   Q.  Yes, now displaying Page 398 of your June 17th, 2015,

22   deposition.

23   A.  Is there --

24            THE WITNESS:  May I ask for clarity, your Honor?

25            THE COURT:  He is asking if it refreshes your
```

Duke - Direct

403

1    recollection as to what you testified about Bryan Scott.

2            Did that help you remember what --

3            THE WITNESS:  It doesn't help with the question.

4    BY MR. DAVIS:

5    Q.  So go back to Page 397.

6            Do you see that in front of you?

7    A.  Yes.

8    Q.  All right.

9            THE COURT:  Now, give me a moment.

10           MR. SALAM:  Your Honor --

11           THE COURT:  Give me a moment.

12           MR. SALAM:  Oh, sorry.

13           THE COURT:  Okay.  So go ahead and ask a question,

14   and then we will see what the objection is.

15   BY MR. DAVIS:

16   Q.  At Page 397 of your deposition, Line 9, I asked you:

17           "Q.    Who is Bryan Scott?"

18           And your answer was at Lines 10 and 11:

19           "A.    He is a gentleman I met in 2008 who introduced

20       me to electronic cigarettes."

21           Is that right?

22   A.  That's a correct statement, yes.

23   Q.  Right.

24           And you did not disclose at that time that he was

25   your director of sales and marketing, right?

Duke - Direct

```
 1          That's not part of your answer?
 2   A.  He was not, at that time, my director of sales and
 3   marketing.
 4          THE COURT:  When you say "at that time," do you mean
 5   2008 or when your deposition was taken?
 6          THE WITNESS:  Either of those two times.
 7          THE COURT:  Okay.
 8          MR. SALAM:  Your Honor, my objection is to the extent
 9   he asked "Does this refresh your recollection?"  I'm fine if
10   it is as to this question and answer.  He had asked broadly
11   "to your testimony about Bryan Scott."  There is a significant
12   amount of testimony about Bryan Scott in the deposition, and
13   I'm uncomfortable with the witness being asked about his
14   testimony when he has not had a chance to review the stuff
15   that relates to Bryan Scott.
16          THE COURT:  Okay.  Overruled.  He is simply asking
17   him about Bryan Scott, whether he was identified as Bryan
18   Scott, Bryan Scott Kos or Kos, and whether he was the director
19   of sales.
20          The deposition transcript has the question:
21          "Q.   Who is Bryan Scott?
22          "A.   He is a gentleman I met in 2008 who introduced
23      me to electronic cigarettes."
24          The follow-up questions related to whether or not
25   Bryan Scott or Bryan Scott Kos was director of sales, I think
```

Duke - Direct

405

 1   Mr. Duke just said that Bryan Scott or Bryan Scott Kos was not

 2   a director of sales and marketing either in 2008 or when his

 3   deposition was taken.

 4          Is that accurate?

 5          THE WITNESS:  That would be accurate, your Honor.

 6          THE COURT:  Okay.  Go ahead and follow up.

 7   BY MR. DAVIS:

 8   Q.  And at the time of your deposition, my question of who was

 9   Bryan Scott, did I limit the question to a time period?

10   A.  I mean, no, you did not.  No, you did not limit the time

11   period.

12   Q.  Right.

13          And you knew in 2015, when I took your deposition,

14   that Mr. Bryan Scott was also known as Bryan Scott Kos, right?

15   A.  Yes.

16   Q.  And you knew that he was your director of sales and

17   marketing, right?

18   A.  In the past, he had been.

19   Q.  In the past, this gentleman had been the director of sales

20   and marketing for your company, right?

21   A.  Yes.

22   Q.  Okay.  And nowhere during your deposition over three days

23   did you disclose Mr. Bryan Scott as your

24   director -- previously as your director of sales and

25   marketing, right?

Duke - Direct

 1  A.  Correct.

 2  Q.  Okay.  And --

 3          THE COURT:  When was he your director of sales and

 4  marketing?

 5          THE WITNESS:  It would have been, like, 2012, 2013.

 6          THE COURT:  Okay.

 7          THE WITNESS:  For a brief period of time.

 8          THE COURT:  Okay.  Go ahead, Mr. Davis.

 9  BY MR. DAVIS:

10  Q.  And if we can now look at PX-37.

11          PX-37 is a January 8, 2009, e-mail from Mr. Duke to

12  himself, forwarding a chat session with Ms. Saraswat.  It is

13  Defendants' June 1, 2018, paper production, Bates-stamped

14  21C 1000004 through 16.

15          Can we go to the first page?

16          I ask you to look at the screen in front of you and

17  tell me if you recognize this document.

18  A.  I saw it when preparing for this.

19  Q.  Do you recognize this document?

20  A.  It's ten years old, so not really, but I saw it preparing

21  for this.  I'm sure it is real, if that's what you are asking.

22  Q.  I'm asking you do you recognize it?

23  A.  I recognize it because I saw it a few days ago in

24  preparation.

25  Q.  You recognize it as an e-mail that you sent to yourself on

Duke - Direct

407

1   January 8th, 2009?

2   A.  I do not remember sending myself an e-mail January 8,

3   2009.

4   Q.  Do you dispute in any way that you sent yourself this

5   e-mail on January 8, 2009?

6   A.  I do not dispute that I sent it.

7   Q.  Okay.  And this is an accurate copy of the e-mail that you

8   sent yourself on January 8, 2009, right?

9   A.  Yes.

10  Q.  Okay.  And what is contained in this e-mail?

11  A.  A lot.

12  Q.  Excuse me?

13  A.  There is a lot of stuff in this e-mail.

14  Q.  Well, tell me what's contained in it.

15          You sent it to yourself.  What did you send yourself?

16          MR. SALAM:  Your Honor, I would ask that the witness

17  be allowed to actually read the whole document.

18          THE COURT:  Do you need to read the whole document?

19  I assume the question that is being asked is does it contain a

20  Yahoo! Chat between you and Kirti Saraswat?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  Do you need to read the text?

23          THE WITNESS:  If he wants something specific.

24          THE COURT:  All right.  If you want something

25  specific, go ahead and direct him to that point, okay?

Duke - Direct

```
 1              MR. SALAM:  Thank you, your Honor.
 2              THE COURT:  Okay.
 3   BY MR. DAVIS:
 4   Q.  And just so I'm clear, this contains a Yahoo! -- a copy of
 5   a Yahoo! Chat session that you copied and pasted into an
 6   e-mail you sent yourself on or about that date, January 8th,
 7   2009; is that right?
 8   A.  Yes.
 9   Q.  And that was a chat with SEO examples with someone named
10   Kirti; is that right?
11              I'm looking at the first line of the e-mail you sent
12   yourself.
13   A.  That seems to be how I memorialized it, yes.
14   Q.  And you wrote that first line, right?
15   A.  Yes.
16   Q.  Okay.  And when you look at that string of information
17   throughout the balance of this e-mail, it's a chat session,
18   meaning you're instant messaging; is that right?
19   A.  Yes.
20   Q.  And it is between you and -- who is the person you are
21   messaging with?
22   A.  Kirti Saraswat.
23   Q.  All right.  And that's the same throughout this entire
24   string, right?
25   A.  Yes, I assume so.
```

Duke - Direct

409

1  Q.  Okay.

2  A.  Scrolling all the way to the bottom of it.

3         But, yes, I would imagine it would be with her.

4         MR. DAVIS:  All right.  We move 37 into evidence.

5         MR. SALAM:  No objection, your Honor.

6         THE COURT:  Okay.  37 will be admitted.

7    (Plaintiff's Exhibit 37 was offered and received in

8     evidence.)

9         MR. DAVIS:  Oh, if I didn't do it before, I'm asking

10  to move in 74 and 75.  That was the exhibits -- Plaintiff's

11  Exhibit 74 was the Defendants' inhaleinside.com website.

12         THE COURT:  I have that as admitted already.

13         75 is the deposition transcript, right?

14         MR. DAVIS:  No, 75 is the source code.

15         THE COURT:  Oh, yes, sorry.

16         MR. SALAM:  No objection.

17         THE COURT:  All right.  Thank you.

18         75 will be admitted.  Thank you.

19    (Plaintiff's Exhibit 75 was offered and received in

20     evidence.)

21  BY MR. DAVIS:

22  Q.  I'm going to turn your attention, Mr. Duke, now to an

23  e-mail you exchanged with Robert Hough in January of 2012.

24  I'm going to ask you to take a look at Plaintiff's Exhibit 35.

25  This is from your June 1, 2018, paper production.

Duke - Direct

1        THE COURT:  Oh, and before I forget, just to add more

2    confusion as to Bryan Scott, Bryan Scott Kos, in the

3    deposition transcript, his name is spelled B-r-i-a-n.  I heard

4    it was B-r-y-a-n.

5        So I don't know what it is, but it is all one in the

6    same person.  We can all agree on that, right?

7        THE WITNESS:  Yes.

8        THE COURT:  Okay.  Go ahead.

9        MR. DAVIS:  Thank you.

10   BY MR. DAVIS:

11   Q.  Plaintiff's Exhibit 35 is Bates-stamped 21C 1002509

12   through 2510, I believe.

13       And I think the third page of it doesn't have a Bates

14   number because it comes from the native version of the same

15   document that was produced electronically on May 31, 2018.

16       And just so the record is clear, this is a three-page

17   exhibit, and the reason we have all three pages is because the

18   second page has something in the middle that I don't know what

19   it is, but it makes it difficult to read the entire e-mail.

20   So the third page, we went to the native data and retrieved it

21   the way it was produced without that portion that's hard to

22   read.

23       Mr. Duke, can you take a look at this and tell me if

24   you recognize it?

25       MR. SALAM:  Objection, your Honor, to form.  I'm not

Duke - Direct
411

1  sure which page he is referring to.

2          THE COURT:  Is it all one exhibit?

3          MR. DAVIS:  It is one exhibit.

4          THE COURT:  Okay.  Do you recognize the exhibit?

5          THE WITNESS:  I recognize it from preparing for

6  today.

7          THE COURT:  Overruled.

8          MR. SALAM:  Thank you, your Honor.

9  BY MR. DAVIS:

10  Q.  And do you confirm this is an accurate e-mail that you

11  exchanged with Mr. Hough on January 30th of 2012?

12  A.  It looks like it.

13  Q.  Okay.  And any question in your mind on the first page, at

14  the bottom, you sent an e-mail from your Yahoo! e-mail account

15  to Mr. Hough at his live.com account, right?

16  A.  Correct.

17  Q.  You don't dispute that you sent this e-mail, right?

18  A.  No.

19  Q.  Okay.  And focusing your attention on the first paragraph,

20  could you read that, please?

21  A.  "I am hoping you can start really focusing on general

22  online" --

23          THE COURT:  Wait.  Slow down.

24          THE WITNESS:  I'm sorry.

25          THE COURT:  That's okay.

Duke - Direct

412

1    THE WITNESS:  "I am hoping you can start really

2  focusing on general online visibility...answering yahoo,

3  answer questions, and sourcing us, etc, etc."

4  BY MR. DAVIS:

5  Q.  And the next paragraph?

6  A.  "And then we need to get working on the site that will

7  list automatic, 21 century smoking, and maybe blu, and

8  greensmoke possibly?...obviously we need to figure out how to

9  actually make the link to their site not even work but still

10  have the site on this site...then when sourcing on yahoo

11  answers, etc, it will allow us to appear to be giving unbiased

12  links."

13  Q.  And continue.

14  A.  "Like right now with just the term electronic cigarettes,

15  I think there are like 9 open questions.  Gracias."

16  Q.  And who is Blu and Green Smoke?

17  A.  Two electronic cigarette companies.

18  Q.  And were they electronic cigarette companies in or about

19  January of 2012?

20  A.  Yes.

21  Q.  And are they big competitors of yours?

22  A.  They were the two biggest online competitors, I would say,

23  yes.

24    MR. SALAM:  Objection, your Honor, relevance.

25    THE COURT:  Hold on.

Duke - Direct

1          MR. SALAM:  Objection to relevance.

2          THE COURT:  Okay.  Response?

3          MR. DAVIS:  The response is, your Honor, that the

4    relevance is one of the central questions in this case that

5    was addressed by Judge Kapala in his ruling was that if it is

6    true that the Defendant misused my client's trademark in his

7    website or used it as part of his marketing with contacting

8    wholesalers like Don Kunz or did other things to mislead

9    consumers, like taking their e-mails and misleading them as to

10   who they were and trading off of my client's goodwill, then

11   that would go to our affirmative defense, equitable defense,

12   of unclean hands.

13         THE COURT:  Right.

14         MR. DAVIS:  Here, an e-mail that was never produced

15   before, and withheld from production, we contend -- we didn't

16   get it until June 1 of 2018 -- shows that Mr. Duke is

17   directing Rob Hough, at his live.com e-mail account, which is

18   one of the sub-issues here, but he is asking him to use

19   competitors' names in connection with his website and his

20   marketing of his business.

21         THE COURT:  So he got this e-mail in 2018, which goes

22   to a main issue in the case.  You didn't get it until 2018.

23   Obviously, you deposed him in 2015.  It affects how you would

24   have deposed Mr. Duke and how you would have litigated the

25   case had you gotten it before 2018?

Duke - Direct

414

```
 1              MR. DAVIS:  Yes, your Honor.

 2              THE COURT:  Is that what you are saying?

 3              Okay.  I think it is relevant to the motion.

 4              MR. SALAM:  And I believe this has all been

 5     established.

 6              Yes, your Honor, I understand it is relevant to that.

 7              THE COURT:  Okay.

 8              MR. SALAM:  Okay.  I will let him continue -- I'm

 9     sorry.  I will sit down and wait for the next question.

10              THE COURT:  Okay.  All right.  That's how I see it as

11     relevant.  You objected to relevance.  He explained.  And

12     that's where I thought he was going, but I want to make sure

13     because I try not to assume too much because it is dangerous,

14     but that's exactly where I thought it was going, which is a

15     main component to the sanctions motion.  So I will overrule

16     the objection.

17              And let's go ahead and ask your next question.

18              MR. DAVIS:  Thank you, your Honor.

19     BY MR. DAVIS:

20     Q.  My question was:  What are you telling your employee,

21     Robert Hough, to do in this e-mail?

22     A.  We were going to try to create a review site, and we were

23     just spit-balling ideas.

24     Q.  And that review site would have been used in connection

25     with the marketing of your company's products, right?
```

Duke - Direct

1    A.  Of course, yes.

2    Q.  Yes.

3         And you were going to use competitors' names like Blu

4    and Green Smoke in connection with that strategy, right?

5    A.  The largest competitors, yes.

6    Q.  Yes.

7         And you were going to use their names, but put

8    it -- to use your words, to make the link to their site not

9    even work, right, so that if they came to your site, they

10   couldn't leave your site, right?

11        Is that what that means?

12   A.  I don't know exactly what I was saying there, but, no, it

13   wouldn't be going to my site, no.

14   Q.  You are creating a site to trick your customers into

15   buying your products, right, by using competitors' names and

16   putting broken links in?

17        Isn't that what you are doing?

18   A.  No.

19   Q.  Okay.  And was it your decision alone to withhold this

20   e-mail and never produce this e-mail prior to the court order

21   in 2018?

22   A.  I don't understand that question.

23   Q.  We never got it before June 1, 2018, when the court

24   ordered you to produce this.

25        I'm asking you:  You had it.  It was in your Yahoo!

Duke - Direct

 1   e-mail account.  It hit our ESI search terms.  Was it your

 2   decision alone to withhold this document from production?

 3           MR. SALAM:  Objection, your Honor, foundation and

 4   asked and answered.

 5           THE COURT:  Those seem to be mutually exclusive in my

 6   head.

 7           I will sustain as to foundation.

 8           Break it up into a couple -- two or three questions

 9   and unpack it a little bit, okay?

10   BY MR. DAVIS:

11   Q.  At some point in time, your attorneys in this case were

12   asking you to find e-mails, right?

13   A.  Yes.

14   Q.  And that was throughout the course of the litigation,

15   right?

16   A.  Yes.

17   Q.  And you were the one that was searching your e-mails to

18   find responsive e-mails, right?

19   A.  Whatever the attorneys were asking for, I was searching

20   for, yes.

21   Q.  And you got them and gave them to your attorneys, right?

22   A.  Correct.

23   Q.  And this e-mail was in your Yahoo! e-mail account as of

24   January 29th, 2012, right?

25   A.  Correct.

Duke - Direct

1    Q.  All right.  And my question is:  Was it your decision not

2    to give this e-mail to your attorneys when they were asking

3    you for e-mails during the course of the litigation?

4    A.  I don't know exactly how to answer that question.

5    Q.  Okay.  What would you need to know to answer it?

6    A.  I just don't understand the question.

7    Q.  What part of it don't you understand?

8    A.  The entire question.  I do not understand the question.

9           THE COURT:  Did you apply the search terms -- I think

10   I know the answer to this.

11          Did you apply the search terms to your Yahoo! e-mail

12   account?

13          THE WITNESS:  As previously stated, no.

14          THE COURT:  Yeah, okay, that's what I thought the

15   answer was.

16          THE WITNESS:  So there was no conscious decision not

17   to give this.  So I don't know exactly --

18          THE COURT:  Okay.

19          THE WITNESS:  -- what the question is.

20          THE COURT:  Did you know that there was an issue as

21   to the meta tag being in the Plaintiff's website?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.  When did you learn of that?

24          THE WITNESS:  The day of the Marty Hughes -- is that

25   his name?  The day of the Marty Hughes's filing, whatever the

Duke - Direct

418

 1    date is.

 2              THE COURT:  And I don't know what the date of that

 3    is.

 4              MR. DAVIS:  March of 2013, when we filed an

 5    application for a preliminary injunction against the Plaintiff

 6    [sic] and his company, and contained in that motion was a

 7    declaration from someone from my client's office who found the

 8    meta -- found the source code or looked at the source code and

 9    determined that in the Defendants' website, my client's

10    registered, federally registered trademark, 21 Century Smoke,

11    was contained in the keywords of the metadata of his website.

12              THE COURT:  So that was in 2013.  You were aware that

13    that was an issue.  Did you go back and search to find this

14    e-mail that relates to, essentially, placing metadata in a

15    website?

16              THE WITNESS:  I'm not really discussing metadata in

17    this e-mail, and I don't know what search term I would have

18    done that would have brought me to this e-mail.

19              THE COURT:  Well, you said you don't know the search

20    terms, right?

21              THE WITNESS:  No, that's what I'm saying.  I don't

22    know what I would have hit as a search term that would have

23    taken me to this specific e-mail.

24              THE COURT:  Okay.  I don't know how else -- this

25    e-mail is abundantly relevant to the case.

Duke - Direct

419

 1          Go ahead and make your objection, and we will see if

 2   we can --

 3          MR. SALAM:  Well, I object, that I believe it's based

 4   on a misstatement of his prior testimony.

 5          THE COURT:  The question or his answer?

 6          MR. SALAM:  The whole line of --

 7          THE COURT:  Overruled.

 8          Go ahead and ask a new question.

 9   BY MR. DAVIS:

10   Q.  Did you ever give this e-mail that's in front of you,

11   Plaintiff's Exhibit 35, did you ever give this e-mail to any

12   of your prior attorneys in this case prior to June 1, 2018?

13   A.  No.

14   Q.  And following up on something you said a moment ago, you

15   said the first time you learned about the issue the Judge just

16   asked you about, which was Plaintiff's registered trademark

17   being in the metadata of your website, was when you first read

18   the Marty Hughes declaration; is that right?

19   A.  Correct.

20          MR. DAVIS:  I have nothing further, your Honor.

21          THE COURT:  Okay.  The exhibit you have in front of

22   you, while we are on it, Exhibit 35, you said you didn't give

23   it to your attorneys.

24          Obvious question is:  Why not?

25          THE WITNESS:  Apparently, there is 15,000 e-mails.

1  There appears to be 15,000 documents produced, of which none

2  of them were given to the attorneys because the terms were

3  never searched on my e-mail.

4          THE COURT:  Well, we know that the terms weren't

5  searched on the GoDaddy accounts, correct?

6          THE WITNESS:  Correct.

7          THE COURT:  Maybe it is going on now.

8          Search terms were applied to the CPUs, right, the

9  towers?

10          Were they applied, if you know, to the Yahoo!

11  accounts, if you know?

12          THE WITNESS:  That was the May, is the Yahoo!

13  account.

14          THE COURT:  Okay.  All right.

15          THE WITNESS:  That's where this came from.

16          THE COURT:  Okay.  Are you done?

17          MR. DAVIS:  Move 35 into evidence.

18          THE COURT:  Okay.  Any objection?

19          MR. SALAM:  No objection, your Honor.

20          THE COURT:  Okay.  35 will be admitted.

21    (Plaintiff's Exhibit 35 was offered and received in

22    evidence.)

23          THE COURT:  Give me a moment.  We have got most of

24  that.

25          All right.  Have you talked on your side who wants

1  to -- how to coordinate questioning of witnesses, whether,

2  Mr. Salam, you want to start, and then we follow up with

3  Mr. Smith, Ms. Rich, and other counsel?

4          MR. SALAM:  I had discussed with attorneys for former

5  defense counsel and Plaintiff's counsel that we would prefer,

6  and I think it will make it more efficient, if they go ahead

7  and ask -- former defense counsel's attorneys ask questions of

8  Mr. Duke, and that way I can then address or redirect, however

9  you want to call it --

10          THE COURT:  Okay.

11          MR. SALAM:  -- and hopefully cover everybody, as

12  opposed to I go, and then they go, and then it would just make

13  for a lot.

14          THE COURT:  Look, if you have an agreement on that --

15          MR. SMITH:  No, this is the first time I have heard

16  this, and I believe your Honor indicated, when we first

17  discussed this, that you assumed, and I recognize, your Honor,

18  it was an offhand comment, that the Plaintiffs would go, and

19  the Defendants would go, and we will follow on.

20          If you want me to go next, I'm happy to do that, but

21  I didn't see it coming.

22          THE COURT:  Okay.

23          MR. SMITH:  I'm sorry.

24          THE COURT:  Mr. Holevas, are you going to ask any

25  questions?

```
 1          MR. HOLEVAS:  Yes, I will, your Honor, whatever the
 2  court's preference is as to the order.
 3          THE COURT:  Look, again, I'm listening to the
 4  evidence, and I want to hear as best -- in a way that's going
 5  to be easy for my brain to digest.  So whatever works
 6  procedurally among you folks, I'm not going to squabble.  If
 7  you want to think about it -- it is 11:30.  Do you want a
 8  couple of minutes to think about it?
 9          MR. SMITH:  No, I can tell you exactly my preference.
10          THE COURT:  Okay.  What's your preference?
11          MR. SMITH:  I mean, my preference is -- we have
12  already sat here and we have seen Mr. Duke at certain times
13  place certain blame on the lawyers.  I assume we may hear more
14  of that.  I would like to follow up after we hear what
15  Mr. Salam's direct is.  That would be my preference.
16          THE COURT:  All right.  What is your view,
17  Mr. Holevas?
18          MR. HOLEVAS:  That seems to make sense as far as
19  procedurally and the most efficient way to approach it.
20          THE COURT:  All right.  Somebody is popping up in the
21  back.
22          MR. WOLFE:  Yes, Mark Wolfe for Mr. Shonder.
23          I know I have been quiet, but I represent
24  Mr. Shonder, and I agree.
25          MR. SALAM:  I have no problems going next, your
```

1    Honor.  That's all right.

2            THE COURT:  That's fine.  See, it works out.

3            So the witness just finished.  Do you want some time

4    to get prepared?

5            MR. SALAM:  I would, your Honor.

6            THE COURT:  Okay.  It is 11:30.  Do you want to come

7    back at -- I have got to go explain the Fourth Amendment to

8    the United States Government again.

9            Do you want to come back at 1:00 so you have the

10   lunch hour?

11           MR. SALAM:  That would be fine, and I hope to get

12   done within a couple hours.

13           MR. SMITH:  Are you sure, your Honor, that's enough

14   time for you to get the Fourth Amendment explained?

15           THE COURT:  Clearly, it is not enough time, because

16   we have had these conversations.

17           So we will come back at 1:00.  That will give you

18   some time to prep.  And we will go from there.

19           Again, you are under oath.  Don't talk about your

20   testimony.

21           We will come back right at 1:00 o'clock, ready to go,

22   okay?

23           MR. HOLEVAS:  Your Honor, one thing:  I would assume

24   after Mr. Salam, would you like Mr. Smith to go first, and

25   then me?

```
 1            THE COURT:  Whoever wants to go.

 2            MR. HOLEVAS:  It doesn't matter to me.

 3            MR. SMITH:  We are happy to do that.  We assumed as

 4   much.

 5            THE COURT:  Okay.  Thank you.

 6            MR. HOLEVAS:  Thank you, Judge.

 7   (Recess taken.)

 8            THE COURT:  All right.  Is Mr. Duke going to testify?

 9            MR. SALAM:  Excuse me?

10            THE COURT:  I'm ready.

11            MR. SALAM:  Mr. Duke?

12            Your Honor, I'm going to go old school.  I'm

13   referring to exhibits that are in the binder.

14            THE COURT:  Okay.

15            MR. SALAM:  As opposed to -- when I'm referring to

16   Plaintiff's and Defendants'.

17            THE COURT:  Do you have all your binders in front of

18   you or just your binders?

19            MR. SALAM:  I have all the ones I will be referring

20   to, and I have left copies for the witness as well.  I just

21   wanted to give you a heads up.

22            THE COURT:  Well, I appreciate that.  I just need to

23   pull them up front and get them in front of me.  So thanks for

24   letting me know.

25            MR. SALAM:  And I believe -- and Ms. Rich has been
```

Duke - Cross

1    kind enough that when we refer to LS exhibits, she will

2    project them for us since I don't have an extra copy for the

3    witness.

4         THE COURT:  I have to promise to plant a tree on

5    Arbor Day.

6         All right.  I have all the exhibits.  So whenever you

7    are ready, let me know.

8                        CROSS-EXAMINATION

9    BY MR. SALAM:

10   Q.  Good afternoon, Mr. Duke.

11   A.  Good afternoon.

12   Q.  What I would like to do is start by going in reverse

13   order.  I would like to direct your attention to Plaintiff's

14   Exhibit 35 in the binders.  There should be a set.

15        And let me know when you have found Plaintiff's

16   Exhibit 35.

17   A.  Okay.

18   Q.  And you recall being questioned about this e-mail from

19   Mr. Hough to you?  It is dated January 30th.

20   A.  Yes.

21   Q.  I think, and correct me if I'm wrong, but you testified

22   yesterday that you did not decide what your attorneys produced

23   in this case, correct?

24   A.  Correct.

25   Q.  Whenever your attorneys asked you for documents, you would

Duke - Cross

426

1    run searches through the e-mails; is that correct?

2    A.  Correct.

3            MR. DAVIS:  Objection, leading.

4            THE COURT:  It's foundational.

5            Go ahead.

6            MR. SALAM:  Thank you, your Honor.

7            THE COURT:  Overruled.

8    BY MR. SALAM:

9    Q.  And when you ran those searches, you would find certain

10   e-mails, correct?

11   A.  Correct.

12   Q.  And what would you do with those?

13   A.  Save them and then send them to the lawyers.

14   Q.  Do you recall if you ever did not send something to your

15   lawyers that came up as a result of one of the searches they

16   asked you to run?

17   A.  No, I sent everything that came up in searches.

18   Q.  Now, directing your attention to Plaintiff's Exhibit 35,

19   do you recall if this document ever came up as one of the

20   documents that you found as a result of one of the searches

21   your attorneys asked you to conduct?

22   A.  No, I was never asked for a search that brought up this

23   document.

24   Q.  If that document had come up, what would you have done

25   with it?

Duke - Cross

1   A.  I would have sent it to the attorneys.

2   Q.  Earlier today, Mr. Davis -- I'm sorry, Mr. Davis was

3   referring to Exhibit 35 and asked you or stated that this

4   shows you trying to trick a customer into buying your product.

5           Do you recall that?

6   A.  Yes.

7   Q.  Had you ever tried to trick a customer into buying your

8   product?

9   A.  No.

10  Q.  Can you explain to me what you and Mr. Hough were

11  discussing here in Exhibit 35 as far as the -- I'm referring

12  to that bottom half of this document that he asked you to

13  read.  Can you explain to me what you and Mr. Hough were

14  discussing there?

15  A.  Just trying to figure out how to put together a review

16  site for electronic cigarettes, and, obviously, prominently

17  feature our own websites, of course.  But, yes, that's what we

18  were working on.  We never did it, but that's what we were

19  discussing.

20  Q.  Okay.  And so -- and you said you never did it.  So

21  although you discussed it, you never actually put together a

22  review website, correct?

23  A.  No.

24  Q.  Okay.  So you never put together a review website that had

25  links that didn't work, correct?

Duke - Cross

428

1   A.  No.  As Robert Hough said, that wouldn't be a good idea

2   anyway.

3   Q.  Okay.  I would like to direct your attention to

4   Plaintiff's Exhibit 37.

5           I have one more question on Plaintiff's Exhibit 35:

6   Does what's being discussed in Plaintiff's Exhibit 35 between

7   you and Mr. Hough involve manipulating metadata at all?

8   A.  No, of course not.

9           MR. DAVIS:  Objection, leading.

10           THE COURT:  What does it discuss?

11  BY MR. SALAM:

12  Q.  Did you discuss -- with respect to the matters here, did

13  you discuss manipulating metadata?

14           THE COURT:  What, if anything, relating to metadata

15  is discussed in Exhibit 37?

16           THE WITNESS:  Nothing.

17           THE COURT:  Okay.

18           MR. SALAM:  Thank you, your Honor.

19  BY MR. SALAM:

20  Q.  Again, I direct your attention now to Exhibit 37, and I

21  would like you to take the time to review this chat.

22           Well, let me strike that.

23           You have seen this chat before today, correct?

24  A.  Yes.

25  Q.  I think you testified that you had seen it in preparation

Duke - Cross

1    for this hearing?

2    A.  Yes.

3    Q.  In preparation for this hearing, do you recall reading

4    this whole chat?

5    A.  Yes.

6    Q.  Okay.  Can you tell me which website -- or strike that.

7          From reading this chat, can you tell what website is

8    involved -- I'm sorry, strike that, let me rephrase that.

9          What you and Ms. Saraswat are discussing here, does

10   it refer -- which website does it refer to?

11   A.  Primarily, Sports Doctrine.

12   Q.  Okay.  And what's Sports Doctrine?

13   A.  It was a website that I had her design for me -- or

14   create, design.

15   Q.  And what's the date of this e-mail?

16   A.  January 8th, 2009.

17   Q.  Did 21 Century Smoking exist at that date, if you recall?

18   A.  Right at around that date, I had purchased that website.

19   I don't recall if it was right before or right after that.

20   Q.  You said you purchased that website.

21          Did you purchase a website or a domain?

22   A.  Domain.

23   Q.  Had you yet put your -- had the 21 Century Smoking website

24   been created as of January 2009?

25   A.  No, no.

Duke - Cross

1  Q.  All right.  I would like to direct your attention to

2  Plaintiff's Exhibit 74, and I believe -- do you recall

3  testifying about Plaintiff's Exhibit 74 this morning or prior

4  to lunch?

5  A.  Yes.

6  Q.  Okay.  And this is inhale's -- a web page from

7  inhaleinside.com, correct?

8  A.  Yes.

9  Q.  Do you see at the top, there is a line that says -- well,

10  let me ask you:  Do you see the line at the top of Plaintiff's

11  Exhibit 74?

12  A.  Yes.

13  Q.  Can you read that for the record, please?

14  A.  "Great MLM Opportunity with the Best Electronic Cigarette,

15  Living the inLife."

16  Q.  Can you -- do you have an understanding of what "MLM"

17  means?

18  A.  Yes.

19  Q.  And what is your understanding?

20  A.  Multilevel marketing.

21  Q.  And are you aware of -- can you explain to the court what

22  multilevel marketing -- what you understand "multilevel

23  marketing" to be?

24  A.  It is kind of like Amway.  So you have a product you are

25  selling, and you have distributors below you and above you,

Duke - Cross

1  and you get a little piece of the action, essentially, for

2  anything that happens below you.

3  Q.  Okay.  And can you explain what -- or it says "Great MLM

4  Opportunity."  Can you explain what -- or why you created this

5  website?

6  A.  Because I had joined a company called "My inLife," and it

7  was an MLM for electronic cigarettes, and that's how I

8  discovered electronic cigarettes.  That's how I had discovered

9  electronic cigarettes initially.

10 Q.  So how would you use a website that -- inhaleinside.com or

11 what were you trying to achieve by creating this website?

12 A.  Basically, just promote this product that I was trying to

13 sell in a way that I could have somewhere where I could

14 promote it as opposed to the landing page for the overall

15 website.  So there is a My inLife website.  I was trying to

16 find a way to get a landing page that was aside and apart from

17 that landing page.

18 Q.  And so what was your -- would you benefit -- how would you

19 benefit from that?

20 A.  It gave me an opportunity to advertise.  I could make

21 flyers, I could hand them out, and I could then have somewhere

22 where people would go.  So it gave me an opportunity to

23 promote the product.

24 Q.  Okay.  And if they came to this website, then what would

25 you do with a visitor?  What were you trying to achieve with

Duke - Cross

432

1   them?

2   A.  I was trying to get them to sign up as a distributor below

3   me or call me and buy product from me.

4   Q.  Did you create more than one website for, like, this

5   purpose, for this MLM marketing?

6   A.  Yes.

7   Q.  Do you recall how many?

8   A.  The getrichsmoking we discussed earlier.  I believe this

9   steamnicotine, the My inLife -- or not My inLife -- the

10  inhaleinside, and there may be a couple others.

11  Q.  I would like to direct your attention to Plaintiff's

12  Exhibit 76.

13          Do you recall your testimony from prior to lunch

14  concerning this exhibit?

15          I'm sorry.

16          THE COURT:  I don't remember 76.

17  BY MR. SALAM:

18  Q.  Plaintiff's Exhibit 75, the source code.

19          THE COURT:  I do remember 75.

20          MR. SALAM:  I apologize.

21          THE COURT:  I thought I missed a document.

22          MR. SALAM:  I could tell from the witness's dazed

23  look I was looking in the wrong place.

24          THE COURT:  75.

25          THE WITNESS:  Yes, I do recall.

Duke - Cross

1    BY MR. SALAM:

2    Q.  And this is the source code for Plaintiff's Exhibit 74,

3    correct?

4    A.  Correct.

5    Q.  Okay.  Did you write this source code?

6    A.  No.

7    Q.  How did you create the inhaleinside.com website?

8         MR. DAVIS:  Objection, asked and answered.

9         MR. SALAM:  Not during -- I'm sorry.

10        THE COURT:  Well, I know you asked him about it.

11        But overruled.

12        Go ahead.

13   BY MR. SALAM:

14   Q.  How did you create -- you testified that you created this

15   website, correct?

16   A.  Yes.

17   Q.  How did you create that website?

18   A.  At this point, I'm not sure if I yet had Dreamweaver.  It

19   may have been Notepad, just the Notepad app on a normal

20   computer, or maybe I had Dreamweaver at this point.  I don't

21   recall.  But I just took a template and just filled in what I

22   wanted filled in over the template.

23   Q.  Okay.  What is -- when you said "Dreamweaver," what are

24   you referring to?

25   A.  It is a program that helps you create a website.

Duke - Cross

434

1  Q.  Okay.  And you testified you didn't write this code that's

2  appearing on Page 75, correct?

3  A.  No.  I mean, there is places I filled in, but I did not

4  write the code.

5  Q.  All right.  So you would have written -- referring back to

6  74, the contents of Plaintiff's Exhibit 74, that would have

7  been content you created, correct, or wrote?

8  A.  Yes.

9  Q.  Okay.  And then how did you -- how did this content become

10  the coding on Plaintiff's Exhibit 75?

11  A.  You just save it as an .html.

12  Q.  In Notepad or Dreamweaver?

13  A.  Yes, through Notepad or Dreamweaver, you save it as .html.

14  Q.  Okay.  And you testified -- looking, again, at the top of

15  Plaintiff's Exhibit 75, and then on the left, you see there

16  are line numbers?

17  A.  Yes.

18  Q.  Okay.  And do you recall testifying that -- I'm

19  sorry -- Mr. Davis asked you to read lines 3 through,

20  approximately, 5?

21        Do you recall that?

22  A.  Yes.

23  Q.  Okay.  Or 4, maybe, is what the record will reflect.

24        And it indicates you are the author, correct?

25  A.  Yes.

Duke - Cross

435

1   Q.  Okay.  And then it has keywords, correct?

2   A.  Yes.

3   Q.  And did you insert these keywords here, "e-cigarette,"

4   "e-cig," et cetera?

5   A.  Yes.

6   Q.  And how did you do that?

7   A.  By putting them where it said "Insert keywords here."  I

8   put keywords there.

9   Q.  And when you say by putting it in where it said "Insert

10  keywords," now you are referring to the Dreamweaver software

11  or Notepad?

12  A.  Whatever template I was using.

13  Q.  Okay.  So there would be a template, and there would be

14  some section that says "keywords"?

15  A.  Exactly, yes.

16  Q.  And that's where you would enter the information that

17  shows up in lines 3 through 5?

18  A.  Yes.

19  Q.  Okay.  And the other websites that you created for this

20  multilevel marketing that you just mentioned, I think

21  getrich --

22  A.  -- smoking.

23  Q.  Okay.  And there was one other.

24  A.  steamnicotine.

25  Q.  Okay.  Did you create those websites?

Duke - Cross

 1   A.  I can't remember.  My wife used Wix or some other program

 2   to create one or two of them.  I don't remember -- I know I

 3   did getrichsmoking and inhaleinside for sure.

 4   Q.  And you referenced "Wix."  Is that a similar program as

 5   Dreamweaver?

 6   A.  No, it is even easier.  It is you just go on the website,

 7   and it literally creates it for you without doing anything.

 8   Q.  Okay.  You are aware that at some point on or about

 9   September 28th, 2011 -- between September 28th, 2011, I

10   believe, and like October, early October 2011, 21st Century

11   Smoke appeared in some of the metadata of your website?

12        You are aware that's one of the issues in this case?

13   A.  Yes, of course.

14   Q.  Is what -- do you know if -- how -- well, strike that.

15        THE COURT:  No, that's a fine question.  How did it

16   get there?  That's what everybody wants to know.

17        MR. SALAM:  Well, it is what came after is what I was

18   trying to ask.

19        THE COURT:  Okay.  Go ahead.

20   BY MR. SALAM:

21   Q.  With what you know from having put the meta -- the

22   keywords in Exhibit 75, would you have been able -- from what

23   you know, in doing, creating Plaintiff's Exhibit 74 and the

24   coding in Plaintiff's Exhibit 75, would that have allowed you

25   to place 21st Century Smoke in the metadata in your

Duke - Cross

1   web -- when I say "your," in 21 Century Smoking's website in

2   2011?

3   A.  No.

4   Q.  Why not?

5   A.  Because you can't just go onto the main file and change

6   the keywords.  There is some type of override feature that

7   doesn't allow you to change keywords, and then the back-end

8   admin panel where it says "Enter keywords here," where it

9   should be -- any dummy should be able to do it, it doesn't

10  work.  So you can't actually change the keywords without some

11  type of -- I don't even know.  I don't know how you change the

12  keywords.

13  Q.  I would like to direct your attention briefly to

14  Plaintiff's Exhibit 76, and I will give you a moment if you

15  can look at all of Plaintiff's Exhibit 76.

16          Well, let's walk through it for a second.

17          The first page is an e-mail, correct?

18  A.  Correct.

19  Q.  And it has -- under "Attachments," can you read what that

20  says?

21  A.  "brianindex.html" and "cleaning.html."

22  Q.  And that's an e-mail from you to --

23  A.  Myself.

24  Q.  Okay.  And the subject is?

25  A.  "Cleaning website."

Duke - Cross

1  Q.  All right.  If you go to the next page, and, actually, I

2  will ask you to briefly look at the pages of content prior to

3  hitting HTML code.  I just want you to have a chance to review

4  that.

5          Do you know what that is?

6  A.  It looks like the cleaning -- or the cleaning e-book that

7  Bryan was trying to create.

8  Q.  When you say "Bryan," which Bryan are you -- who are you

9  referring to?

10  A.  Bryan Kos.  Bryan Scott Kos.

11  Q.  And at this time -- okay, Bryan Scott Kos.

12          And did you create this -- did you create this

13  content?

14  A.  No.

15  Q.  Who created this content?

16  A.  Bryan.

17  Q.  Okay.  Did you put this content into a website?

18  A.  I don't believe it ever went live.  So, no, not in a

19  website.

20  Q.  Okay.  Did you -- well, if you now turn to -- do you see

21  the first page of coding?  If you keep flipping through, the

22  first place that there is -- at line 1, it says "html" between

23  brackets?

24  A.  Yes.

25  Q.  And let me make the record a little cleaner here for a

Duke - Cross

439

1   second.  Let me count the pages.

2           All right.  I'm referring you to the fourth page of

3   Plaintiff's Exhibit 75.

4   A.  76, right?

5   Q.  I'm sorry.  76.

6           THE COURT:  We are on Exhibit 76.

7           MR. SALAM:  76, I apologize.

8           THE COURT:  That's okay.

9   BY MR. SALAM:

10  Q.  Did you write this source code?

11  A.  Yes.

12  Q.  You, personally?

13  A.  Well, no, I didn't write the source code, but I'm the one

14  who entered in the times.

15  Q.  Okay.

16  A.  Sorry, I did not write the entire source code.

17  Q.  Okay.  Where did you get the first three pages of

18  Exhibit 76 -- I'm sorry -- the pages 452 through -- the first

19  page is an e-mail, correct?

20  A.  Yes.

21  Q.  Okay.  And the next page has text content, correct?

22  A.  Yes.

23  Q.  Okay.  And do you see at the top -- what's the top line

24  there?

25          Could you read that?

Duke - Cross

1  A.  "Brian (003).html".

2  Q.  I'm sorry.  The second page of Exhibit 76.

3  A.  Oh, sorry.

4        "Great MLM Opportunity with the Best Electronic

5  Cigarette, Living the inLife."

6  Q.  Do you have an understanding as to why that appears on

7  this document?

8  A.  Because I was just taking, literally, the content he put

9  and just putting it on the electronic cigarette website.

10  Q.  And you say on the website or in a template?

11  A.  And just whatever the template that I used for the

12  electronic cigarettes, I just plopped whatever he wrote on the

13  exact same template.

14  Q.  Okay.  And then I would like to direct your attention to

15  Page 5 of Exhibit 76 that has the first page of the coding.

16  A.  Yes.

17  Q.  Okay.  And at the top, in line 3, it says:  <Meta

18  name="Author".

19        Do you see that?

20  A.  Yes.

21  Q.  Do you see that?

22  A.  Yes.

23  Q.  And who is listed?

24  A.  Brent Duke.

25  Q.  Okay.  And you see it says "keywords"?

Duke - Cross

1  A.  Yes.

2  Q.  And it says "keywords" and it says "content=".

3       Can you read what it says there?

4  A.  "E-cigarette, e-cig, electronic, cigarette, myinlife,

5  inLife, revelle, elite, prestige, nicotine, smoking."

6  Q.  Okay.  And I would refer you back to Plaintiff's

7  Exhibit 75.

8       And you see at the top lines 3 through 5?

9  A.  Yes.

10 Q.  Those are the same in both Exhibit 75 and Page 5 of

11 Exhibit 76, correct?

12 A.  Yes.

13 Q.  Why is that, if you know?

14 A.  Because I had literally just taken it and cut and paste a

15 bunch of text over the Inhale Inside website that I already

16 had.

17 Q.  Okay.  I would like to direct your attention to

18 Plaintiff's Exhibit 31 and Plaintiff's Exhibit 32.

19      Can you tell me what Plaintiff's -- what information

20 is contained in Plaintiff's Exhibit 31?

21 A.  Sales by store, by month for 2010 and 2011, 2012, and the

22 beginning of 2013.

23 Q.  Okay.  And is there any online sales information in

24 Exhibit 31?

25 A.  No.

Duke - Cross

1  Q.  I would like to direct your attention to Exhibit 32, and

2  to the third page, which is Bates-numbered, for the record,

3  21C 1005535, and I would like to direct your attention to the

4  last page of that exhibit, 21C 1005558.

5       The pages from 21C 1005535, where at the top it says

6  "Pacific View Mall," to the last page of this exhibit, which

7  references Beachwood Place Mall, would I be correct, this is

8  sales information for your stores, correct?

9  A.  Correct.

10 Q.  Okay.  And the sales information for your stores in these

11 two exhibits is the same, correct?

12 A.  Correct.

13 Q.  So the only difference between Exhibit 31 and Exhibit 2

14 [sic] is the first page -- I'm sorry, Page 2, that talks about

15 online sales, correct?

16 A.  Correct.

17 Q.  All right.  Now -- strike that.

18      Do you recall at some point in this case whether or

19 not your attorneys asked you for sales information?

20 A.  Yes, on multiple occasions.

21 Q.  And when was the first time they asked you for sales

22 information?

23 A.  Pretty early on.  I don't recall exactly.

24 Q.  Okay.  Just some background here.  I want to try and place

25 timing.

Duke - Cross

1    According to the docket, I believe this complaint was

2  filed on September 7th, 2012, so accept that for purposes of

3  this question.

4    And, as well, Mr. Leavens, the record indicates,

5  filed his appearance on October 3rd, 2012.

6    Do you -- does that refresh your recollection as to

7  when your attorneys might have first asked you for sales

8  information?

9  A.  Yes, probably late 2012, they would have been asking me

10  for sales figures.

11  Q.  Did you have an understanding of why they were asking you

12  for sales information at that time?

13  A.  Because we were showing first use of the name.  So we had

14  to look for sales information, proving that there were sales

15  in 2009, 2010, prior to the other side using the name.

16  Q.  Did they ask you for information by state or geographic

17  area?

18  A.  At some point, yes.

19  Q.  Do you recall if, at some point, your former defense

20  counsel asked you for sales information to provide to

21  the -- to your experts?

22  A.  Yes.

23  Q.  Do you recall when that was?

24  A.  I do not.

25  Q.  Okay.  Did you provide your attorneys sales information

Duke - Cross

444

1   for the experts?

2   A.  Yes.

3   Q.  What information -- if you recall, what information did

4   you provide?

5   A.  I don't recall exactly.  Whatever they asked for.

6   Whatever they asked for, I provided.

7   Q.  Do you recall if you provided your tax returns?

8   A.  If they asked for them, yes.  I do not recall.

9   Q.  Do you recall if you would have provided them the second

10  page of Exhibit 32, Plaintiff's Exhibit 32?

11  A.  No, I would not have.

12  Q.  Why not?

13  A.  Because it is incomplete sales data.  My wife keeps track

14  of literal sales that she sends out, and she keeps track of

15  the store-by-store sales she was doing at this time.  So this

16  is kind of her spreadsheet that she would work with.  So if an

17  order came in online, and she processed it, she would kind of

18  track it herself.  It didn't track any of the online sales

19  that I assisted with over the phone or over the computer.  So

20  it leaves out 80, 90 percent of our online sales.  So, no,

21  there would be no reason to present this to someone.  It is

22  only a partial sales record.

23  Q.  And how does a customer of yours, if they were going

24  through your website, as opposed to a store, pay to purchase

25  product?

Duke - Cross

445

1    A.  Right now, they would use a company called

2    "Authorize.Net," and at this point in time, they would have

3    used a company called "BluePay."

4    Q.  Do you know if any BluePay records were provided to your

5    attorneys?

6    A.  Oh, I'm sorry, on PayPal.  On PayPal in the very

7    beginning, and then BluePay, and now Authorize.Net.

8    Q.  Okay.  And do you know if any of those records were

9    provided to your attorneys?

10            Strike that.  Let me ask a different question.

11            You provided the online sales information to your

12   attorneys, correct?

13   A.  Yes.

14   Q.  And you decided what information -- what online sales

15   information to provide to them, correct?

16   A.  Oh, yes, the total information.

17   Q.  Okay.  And where did you collect that information?

18   A.  I would have used something like my wife's spreadsheet.  I

19   would have used my records on my computer.  I would have used

20   BluePay because BluePay actually does track sales.

21            So I would use BluePay.  I would use PayPal, if it

22   was the time of PayPal.  It just depends on what we were using

23   to process, but I would compile the data from the different

24   sources that were necessary.

25   Q.  Okay.  And did you provide those compilations to your

1    attorneys?

2    A.  Yes.

3    Q.  Are you aware of whether or not they provided those

4    compilations to your experts?

5    A.  I would expect so, yes.

6    Q.  Are you aware of whether or not they provided that

7    information to Plaintiff's counsel?

8    A.  My sales data?

9    Q.  I'm just asking if you are aware.

10   A.  I don't know.  I don't know.

11        THE COURT:  Tell me when you are at a good place to

12   pause.  Just keep going, but when you are at a transition, let

13   me know.

14        MR. SALAM:  Let me check to see if I have anything

15   else on this.

16        I'm finished as to this exhibit, your Honor, if you

17   have a question.

18        THE COURT:  Okay.  Briefly.

19        We were talking about 31 and 32.  32, the very first

20   page, at the title, it says "lawsuit-monthly sales including

21   online," and then attached to that e-mail are sales, as you

22   mentioned, by store, by month, 2010 through 2013, right?

23        THE WITNESS:  Correct, your Honor.

24        THE COURT:  And it also has online sales, 2009, 2010,

25   '11, and '12, and then for January of '13, right?

Duke - Cross

1           THE WITNESS:  Correct, your Honor.

2           THE COURT:  And so was 32 and the entirety of 32

3    provided to your attorneys, or just everything starting with

4    Pacific View Mall, which is 21C 1005535?

5           My point -- my question is:  The first page with

6    online sales, was that provided to your attorneys back in

7    2012?

8           THE WITNESS:  I don't know why it would have been,

9    your Honor.  It is not the total sales number.  So I would

10   have supplemented this with the additional online sales that

11   we had before presenting it to my attorneys.

12          THE COURT:  All right.  If you know, why would your

13   wife have sent you an e-mail that says "lawsuit-monthly sales

14   including online," and then have a separate page that says

15   "online sales" from 2009 through the beginning of 2013 if it

16   was not going to be used for the lawsuit?

17          THE WITNESS:  Where are you seeing that title, your

18   Honor?

19          THE COURT:  Right on the first page, "lawsuit-monthly

20   sales including online."  She must have thought it was

21   important.

22          THE WITNESS:  I mean, is this the title of the

23   e-mail?  I'm just confused.

24          THE COURT:  Yep.

25          THE WITNESS:  Okay.

1     THE COURT:  I don't know.  Look, I didn't type it.

2     I'm just reading it, and it is in two places.  It

3  says "lawsuit-monthly sales including online," and below that,

4  in bold, it says "lawsuit-monthly sales including online."

5     THE WITNESS:  Because I would have requested from her

6  the online sales that she did, and then all of the store

7  sales, and then I would have taken the online sales that I

8  did, supplemented her numbers, to get the total online sales

9  figures.

10     So the store figures are correct because she entered

11  those every day on her own.  So I would need those from her.

12  The online sales, she couldn't finish this document without my

13  help.  So she gave what she had.  I supplemented it with what

14  I had.

15     THE COURT:  Okay.  So is there a document for online

16  sales between 2009 and the beginning of 2013 that has both

17  your wife's information and your information out there?

18     THE WITNESS:  Any BluePay spreadsheet would contain

19  all of the sales that went through the BluePay program.  So I

20  have many spreadsheets that have the total numbers of sales

21  that were transacted through online, yes.

22     THE COURT:  Okay.  Were those provided to your

23  attorneys?

24     THE WITNESS:  The final figures were.  I don't know

25  if the spreadsheets I used to get to the final figures were.

Duke - Cross

1      THE COURT:  Were they broken out between online sales

2  and store sales?

3      THE WITNESS:  Yes, yes, the store sales wouldn't

4  include BluePay because we didn't use BluePay for store sales.

5  So BluePay would still only be the online sales record.

6      THE COURT:  Okay.  All right.  Go ahead.

7  BY MR. SALAM:

8  Q.  Just staying on this topic for a second, you said you

9  prepared spreadsheets and put together the numbers, correct?

10  A.  Yes.

11  Q.  Okay.  Where would those documents -- where did you keep

12  those?  Where would those spreadsheets be?

13  A.  On my computer.

14  Q.  And those were the computers that were imaged by

15  4Discovery?

16  A.  Correct.

17  Q.  Okay.  So if those computers were -- had the 20 search

18  terms that you never saw, if the 20 search terms had been run

19  against -- strike that.

20      They were on the computers that you understand were

21  imaged, correct?

22  A.  Correct.

23   (Brief pause.)

24      THE COURT:  And while he is talking to co-counsel, so

25  31 and 30, I understand the distinction between the two

Duke - Cross

1    documents.

2          My question is this:  Sales information that was

3    provided to your attorneys, was it the same sales information

4    that was provided to your expert?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  All right.  Go ahead.

7    BY MR. SALAM:

8    Q.  To be clear, did you provide your lawyers with

9    accurate -- when your lawyers asked you for sales information,

10   they were looking for totals, correct?

11   A.  Correct.

12   Q.  And did you provide them accurate sales information?

13   A.  Absolutely, yes.

14   Q.  I would like to direct your attention to LS

15   Exhibit No. 18, and it is going to come up on the screen.

16         MR. SALAM:  We are going to go old style.

17         18, Ms. Rich.

18   BY MR. SALAM:

19   Q.  I'm going to hand you what is marked as LS Exhibit 18 and

20   ask you to take a look at that.

21         And you recall being asked questions about this

22   earlier today, correct?

23   A.  Yes.

24   Q.  And you testified -- or this e-mail, as you read into the

25   record, says:  "See Brent's response below.  There is no

Duke - Cross

1   second recording."

2          Do you recall seeing that?

3   A.  Yes.

4   Q.  And you testified that you never sent a second recording

5   to your lawyers, correct?

6   A.  Correct.

7   Q.  But you did say you -- strike that.

8          I would like to direct your attention to Plaintiff's

9   Exhibit 23.  I believe this has been admitted into evidence,

10  but you received this e-mail from Mr. Edmiston on or about

11  October 2nd, 2013?

12  A.  Correct.

13  Q.  And can you, again, read for the record what it says?

14  A.  "S.  Video too long to send, but I have it."

15  Q.  And you received this on or about that date, correct?

16  A.  Correct.

17  Q.  You did not forward it to your attorneys, correct?

18  A.  Correct.

19  Q.  And at the time you received this, was your -- I'm trying

20  to recall your testimony, and I think it was from day one,

21  that you said you didn't realize that the movie -- what we are

22  calling "a movie" -- the recording was attached?

23  A.  Correct.

24  Q.  Why not?

25  A.  Because it literally says in the text that it's too long

Duke - Cross

1   to send, so I didn't even think to look down below and see if

2   he sent it.  It says "too long to send."  I don't interpret

3   that to mean check for attachments.  I interpret that to mean:

4   I'm going to try to figure out another way to get it to you.

5   Q.  Okay.  All right.  But you would agree on this that,

6   according to this e-mail, it does appear, and nobody -- I

7   don't believe anybody is disputing it, that this recording

8   designated IMG_0118.MOV was, in fact, attached?

9   A.  It definitely was, yes.

10  Q.  How did you miss that?

11  A.  Because, as I stated previously, every e-mail he sends has

12  attachments, so I don't check all of his e-mails down below

13  for attachments because it would be a waste of time if they

14  all have attachments, and this one says, literally, this thing

15  is too long to send, I'm going to have to find another way to

16  send it, is what I'm interpreting this as.  So I didn't go

17  look down below to see if there was an attachment.

18  Q.  And then just briefly, referring back to LS Exhibit 18,

19  when you told your attorneys that there was not a second

20  video -- or, I'm sorry, a second recording, at the time you

21  told them that, you truly -- you believed you were correct?

22  A.  Yes, I did believe I was correct.

23  Q.  I would like to direct your attention to Plaintiff's

24  Exhibit 66.

25          And for the record, this is Docket No. 318,

Duke - Cross

1    "Defendants' Status Report Pursuant to this Court's June 6,

2    2019 Order."

3            You have seen this before, correct?

4    A.  Correct.

5    Q.  And you have reviewed this, correct?

6    A.  Yes.

7    Q.  I'm going to be asking you a series of questions related

8    to the information contained in here.

9            And I would direct your attention to Page 4, the

10   first bullet point.

11           Who is Brandon Duke?

12   A.  My brother.

13   Q.  All right.  And the information contained under bullet

14   point -- this first bullet point with respect to Mr. Duke,

15   could you please review that and tell me if you believe it's

16   accurate?

17           THE COURT:  What page are we on?

18           MR. SALAM:  Page 4.

19           THE COURT:  Okay.  Thank you.

20           THE WITNESS:  Yes, it was accurate at this time -- or

21   accurate up to date.

22   BY MR. SALAM:

23   Q.  The second bullet point --

24   A.  I'm sorry.  I don't understand the question.

25           Are you asking if it is accurate now or is it

Duke - Cross

454

1   accurate then?

2   Q.  Well, this was filed -- let's see, this was filed on

3   August 13th, 2019.  Mr. Duke is your -- or Brandon Duke is

4   your brother, correct?

5   A.  Yes.

6   Q.  And it is your understanding that his employment ended on

7   or about September 5th, 2014?

8   A.  Correct, yes.

9   Q.  And that he managed/co-owned kiosks?

10  A.  Yes.

11  Q.  So what I mean by it is do you see anything in there that,

12  as you sit here today, you believe is not correct?

13  A.  Just that last sentence, I would question.  I believe he

14  has responded.

15  Q.  Oh, okay.  I understand what you are saying, yes.

16        This was -- as of this date, he had not responded?

17  A.  Correct.

18  Q.  Okay.  So, yes, the information as of this date.  I

19  apologize.

20  A.  Okay.

21  Q.  Because I am aware that other things have occurred with

22  respect to investigating electronically searched --

23  A.  Yes.

24  Q.  Let me finish.

25        It is your understanding that additional efforts have

Duke - Cross

1  been made since this report, correct?

2  A.  Yes, of course.

3  Q.  With respect to recovering electronically searchable

4  information?

5  A.  Yes.

6  Q.  Okay.  So certain people that might be -- it says in here

7  might not have been contacted as of this date may have been

8  contacted subsequently, correct?

9  A.  Yes.

10 Q.  Okay.  And the people doing that contacting would not be

11 you, correct?

12 A.  Correct.

13 Q.  And who do you understand is doing that?

14 A.  My current lawyers.

15 Q.  Thank you.

16      The third bullet point with Bryan Kos, can you take a

17 look at that and tell me, other than he has not yet been

18 interviewed, which you may or may not know, is the other

19 information in there correct to the best of your knowledge?

20 A.  Yes.

21 Q.  The fourth bullet point, Krenar Koleci, same question.

22 A.  Yes.

23 Q.  With respect to Mr. Hough, the next bullet point -- let

24 me -- except for the last sentence, since I'm going to assume

25 you have no independent knowledge of what Mr. Hough discussed

Duke - Cross

1  with -- well, let me ask:  Do you have any independent

2  knowledge of what Mr. Hough discussed with Mr. Byrne?

3  A.  No.

4  Q.  Well, let's walk through this.

5        Mr. Hough -- it says:  "Mr. Hough" -- I'm reading

6  from the second line.

7        "Mr. Hough performed telephonic customer service

8  duties, web development, and IT services"; is that correct?

9  A.  Yes.

10 Q.  And it says:  "Mr. Hough originally worked at a kiosk in

11 the Old Orchard Mall (Skokie, Illinois), thereafter, briefly

12 in 21 Century's store in Chicago, and then at the company's

13 warehouse in Chicago"; is that correct?

14 A.  Yes.

15 Q.  Okay.  Rob Link, other than when or how he was contacted

16 by Defendants' counsel, is that information correct to the

17 best of your knowledge?

18 A.  Yes.

19 Q.  With respect to Steve Spraker, is it correct that his

20 employment ended on or about May 9th, 2014?

21 A.  Yes.

22 Q.  And that he co-owned 21 Century's Chicago store?

23 A.  Yes.

24 Q.  And that he also co-owned and assisted in managing kiosks

25 in Ohio?

Duke - Cross

457

1  A.  Yes.

2  Q.  Are you aware of whether or not current defense counsel

3  was able to contact Mr. Spraker since this -- since

4  August 9th -- I'm sorry, since August 13th, 2019?

5  A.  I believe they have, yes.

6  Q.  Directing your attention to Page 6, under -- there is a

7  paragraph or a title "D. Nonemployee."

8      Do you see that section?

9  A.  Yes.

10  Q.  And below that, can you read the sentence?

11      It says:  "Jason" -- how do you pronounce that?

12  A.  Jason Kois.

13  Q.  K-o-i-s --

14  A.  Yes.

15  Q.  -- for the court reporter.

16      And it references an e-mail account,

17  jason@21centurysmoking.com?

18  A.  Correct.

19  Q.  Okay.  And then if you can read the next two sentences out

20  loud.

21  A.  "Jason Kois and Peter Kois were customers of 21 Century

22  who decided to open their own store.  Mr. Duke had extra free

23  e-mail addresses through GoDaddy and provided one to Jason

24  Kois."

25  Q.  Is that correct?

Duke - Cross

1   A.  Correct.

2   Q.  Okay.  Let's move down to the next section, the e-mail

3   accounts.

4           The first one there, brentstantonduke -- all one

5   word, for the court reporter -- brentstantonduke@gmail.com, is

6   that your e-mail address?

7   A.  Yes.

8   Q.  What do you use that -- well, have you ever used it

9   before?

10  A.  Yes.

11  Q.  Have you ever used it with respect to

12  21centurysmoking.com?

13  A.  I'm not sure.

14  Q.  To the extent that e-mail has been downloaded by your

15  current e-discovery providers, you would be able to determine

16  if you used it for 21centurysmoking.com by reviewing those,

17  correct?

18  A.  Correct.

19  Q.  As you sit here today, do you -- what is your expectation

20  as to whether or not you used -- if you have one, as to

21  whether or not you used that for 21centurysmoking.com?

22  A.  There wouldn't be very much --

23          MR. DAVIS:  Objection, calls for looking into a

24  crystal ball.

25          THE COURT:  Do you know if it was used?

Duke - Cross

```
 1          THE WITNESS:  I didn't -- if I used it at all, it
 2   would be very rare.  I mean, I know that for a fact.
 3   BY MR. SALAM:
 4   Q.  Did you reasonably believe that that e-mail address would
 5   not have any e-mails related to 21centurysmoking.com?
 6          MR. DAVIS:  Objection, foundation.
 7          THE COURT:  Yes, why don't you ask a different
 8   question.
 9          Sustained.
10   BY MR. SALAM:
11   Q.  When your lawyers asked you to search for e-mails, what
12   accounts did you search?
13   A.  bduke@21centurysmoking.com, support@21centurysmoking.com,
14   and brentduke@yahoo.com.
15   Q.  Did you search any other e-mails when your former defense
16   counsel would ask you to find information?
17   A.  No.
18          MR. DAVIS:  Objection, vague.
19          THE COURT:  Overruled.
20          THE WITNESS:  Those are the three I searched.
21   BY MR. SALAM:
22   Q.  And why did you only search those three?
23   A.  Because those are the ones I used.
24   Q.  I'm sorry?
25   A.  Because those are the ones I used.
```

Duke - Cross

1  Q.  Used for what?

2  A.  Business, for 21 Century Smoking business.

3  Q.  So when they asked you to search for e-mails, you searched

4  all the e-mail accounts that you understood or expected to

5  have responsive information to what your lawyers were asking

6  for?

7  A.  Correct.

8          MR. DAVIS:  Objection, foundation.

9          THE COURT:  Overruled.

10          THE WITNESS:  Correct.

11 BY MR. SALAM:

12 Q.  The second e-mail on there, duke.laurie@gmail.com, whose

13 e-mail account is that?

14 A.  My wife.

15 Q.  Do you know what she used that e-mail account for?

16 A.  I do not know.

17 Q.  Do you know if she used it for 21centurysmoking.com

18 business?

19 A.  I can't imagine she would have, but I don't know what she

20 uses her e-mail for.

21 Q.  When you say that you can't imagine that she would have,

22 what's the basis for that?

23 A.  She doesn't really e-mail anyone.  I mean, she handles

24 support@21centurysmoking e-mails, but she doesn't really do a

25 lot of outside e-mailing.

Duke - Cross

461

1   Q.  So when she was doing work related to

2   21centurysmoking.com, what e-mail accounts are you aware that

3   she used?

4   A.  support@21centurysmoking.com.

5   Q.  Are you aware of any others that she used?

6   A.  She has a laurie@21centurysmoking.com.  I think it is like

7   on her business card, but I don't know if she has ever

8   actually used it.

9   Q.  The third e-mail on there, again, it says "Service,

10  Gmail," and the e-mail account is 21 spelled out, so

11  twentyonecenturysmoking@gmail.com.

12          Do you see that?

13  A.  Yes.

14  Q.  What e-mail account is that, if you know?

15  A.  I don't even remember.

16  Q.  At the time your attorneys were asking you to search for

17  information, did you -- were you aware of this account?

18  A.  I'm not sure exactly what it is, so I would never have

19  looked at it for anything I was doing.  I have never logged in

20  to it.  I'm not sure what it is.

21  Q.  You've never used it?

22  A.  No.

23  Q.  The next one at GoDaddy, that's

24  bduke@21centurysmoking.com, that's the same one we have been

25  discussing repeatedly, correct?

Duke - Cross

1   A.  Correct.

2   Q.  Okay.  The next one, bduke@evtcigs -- I'm sorry, let

3   me -- and I apologize to the court reporter.  I know I'm

4   talking fast.  I will try to slow down.

5          The next e-mail, bduke@evtcigs.com, can you tell me

6   what that e-mail account is?

7   A.  It's an e-mail account created in 2015 or 2016, I believe.

8   Q.  By you?

9   A.  Yes.

10  Q.  And what for?

11  A.  My friend and I were trying to develop a different

12  technology for electronic cigarettes.

13  Q.  Is that related to your business at 21centurysmoking.com?

14  A.  No.

15  Q.  The next e-mail, bduke@farmers -- I'm

16  sorry -- bduke@farmersolution.com, can you tell me what that

17  e-mail account is?

18  A.  It was an e-mail account for the domain

19  farmersolution.com.

20  Q.  And is that e-mail account related to your business at

21  21centurysmoking.com?

22  A.  No.

23  Q.  The next e-mail, brandon@21centurysmoking.com, what e-mail

24  is that?

25  A.  My brother's 21 Century Smoking e-mail.

Duke - Cross

1  Q.  Do you know if he used that for 21 Century Smoking

2  business?

3  A.  Possibly.  I'm not sure.

4  Q.  The next e-mail, bryan@21centurysmoking.com, whose e-mail

5  account is that?

6  A.  Bryan Kos.

7  Q.  Do you know if he used that for 21centurysmoking.com

8  business?

9  A.  I believe that he did.

10 Q.  froggieandjim@21centurysmoking.com, do you know what that

11 e-mail is?

12 A.  It's Sharon Brady, I think, and James Shimp.  It was the

13 two of them were -- I believe they are married now, but they

14 were together, and they were helping manage our kiosks in

15 Ohio.

16 Q.  And is that the Jim Shimp from the bullet point on Page 4?

17 A.  Yes.

18 Q.  And it says here that he managed stores in Ohio,

19 yet -- this Froggie, that's his now wife?

20 A.  Correct.

21 Q.  Okay.  Was she an employee of 21 Century Smoking, if you

22 know?

23 A.  I know she helped him out.  I can't remember if she ever

24 actually worked for us.  I know she did help him out though.

25 Q.  info@automaticcigarettes.com, what e-mail -- what can you

Duke - Cross

464

1    tell me about that e-mail account?

2    A.  It's for the website automaticcigarettes.com.  It was the

3    info e-mail from that website.

4    Q.  And does that website have anything to do with

5    21centurysmoking.com?

6    A.  No.

7    Q.  jason@21centurysmoking.com, can you tell me about that

8    e-mail account?

9    A.  That's the one from above for Jason and Peter Kois, who

10   opened the store in, I believe, Joliet or somewhere in that

11   area.

12   Q.  And the krenar@21centurysmoking.com?

13   A.  He was a wholesaler somewhere in New England.

14   Q.  And that's the Krenar Koleci bullet point from Page 4?

15   A.  Correct.

16   Q.  laurie@21centurysmoking.com?

17   A.  That's my wife.

18   Q.  And do you know if she used that e-mail account for

19   business?

20   A.  As I stated, I can't remember her ever using it.  She may

21   have used it.  I don't know.

22   Q.  rob@21centurysmoking.com.

23   A.  That would be -- I think that one is Rob Link.

24   Q.  And do you know if he used that for business, for

25   21centurysmoking.com business?

Duke - Cross

465

1   A.   He may have a little bit.

2   Q.   robert@21centurysmoking.com?

3   A.   That would be Robert Hough.

4   Q.   Excuse me?

5   A.   That would be Robert Hough.

6        One of those is Rob Hough, one of those is Rob Link.

7   I think the "Robert" is Rob Hough.

8   Q.   Okay.  sales@21centurysmoking.com, can you tell me about

9   that e-mail account?

10  A.   At this moment, I cannot recall exactly who that is.

11  Q.   But that's different than support@21centurysmoking.com,

12  correct?

13  A.   Correct.

14  Q.   spraker@21centurysmoking.com?

15  A.   That would be Steve Spraker.

16  Q.   And I think your testimony was you are not sure whether he

17  used that for 21 Century Smoking business?

18  A.   Yes, he may have used it a little bit, but I don't think

19  that was primarily what he used.

20  Q.   And was it your testimony that he was the one who

21  explained to you or you talked to that led you to forwarding

22  certain e-mails to your other account?

23  A.   Yes.

24  Q.   support@sportsdoctrine.com, what is that e-mail account?

25  A.   It was for that website that Kirti built called Sports

Duke - Cross

1    Doctrine.

2    Q.  Going to the next page, Page 7, top,

3    support@wholesaleelectroniccigarettes.com, what can you tell

4    me about that e-mail account?

5    A.  It was a web page set up to be able to do general

6    wholesale.

7    Q.  And did that involve 21centurysmoking.com business?

8    A.  I don't know if we ever actually did any business at that

9    website, but it would have been listed on there, yes.

10   Q.  Okay.  So that was set up -- or you were trying to -- what

11   was the purpose of setting up that e-mail?

12   A.  To integrate the wholesale function between Automatic

13   Cigarettes and 21 Century Smoking.

14   Q.  Okay.  test@21centurysmokes.com, can you tell me about

15   that e-mail address?

16   A.  I don't think it has ever been used.

17   Q.  Excuse me?

18   A.  I don't think that has ever been used.

19   Q.  But it is an e-mail account that you set up on GoDaddy,

20   correct?

21   A.  Correct.

22   Q.  Do you recall why you set that up?

23   A.  I do not.

24   Q.  The next one, test@21centurysmoking.com?

25   A.  Yes, I don't know.  I have no idea why that was created.

Duke - Cross

1  Q.  But you did create it?

2  A.  Either myself or Rob Hough, yes.

3  Q.  And wholesale@automaticcigarettes.com, what can you tell

4  me about that e-mail account?

5  A.  That probably would have been used -- or I guess that

6  would have been used for any wholesale customers for the

7  Automatic Cigarettes website.

8  Q.  And you had testified the Automatic Cigarettes website was

9  unrelated to 21centurysmoking.com?

10  A.  Correct.

11  Q.  All right.  The next one is brentduke@yahoo.com, which we

12  have heard about, correct?

13  A.  Correct.

14  Q.  And it is your understanding that at some point 4Discovery

15  did download that, correct?

16  A.  Yes.

17  Q.  And it is your understanding that, at some point, the 20

18  search terms that you had not seen were run against that,

19  correct?

20  A.  Yes.

21  Q.  Okay.  Moving on with the Yahoo! accounts here -- it is

22  spelled out, not by numbers --

23  twentyonecenturysmoking@yahoo.com, what can you tell me about

24  that account?

25  A.  I think that was one of the accounts we created to do

Duke - Cross

1   Craigslist ads.

2   Q.  And can you explain to me why you would create that

3   account and what you -- strike that.

4        MR. SALAM:  Can I have his last answer read back,

5   please?

6        (Record read.)

7   BY MR. SALAM:

8   Q.  Can you explain how you used that account with Craigslist?

9   A.  Because when you go on Craigslist, you have to have an

10  e-mail address.  So we created a few different e-mail

11  addresses for a few different geographical locations

12  throughout the United States.

13  Q.  And what were you -- Craigslist is the place you sell

14  product or can sell product?

15  A.  Yes, try to get people to go to the website to sell

16  product, yes.

17  Q.  So explain to me how this e-mail would be used with

18  respect to trying to sell product on Craigslist.

19  A.  Well, I mean, when you put an ad on Craigslist, you have

20  to have an e-mail address, and then you confirm it through the

21  e-mail address, and then the ad goes live.

22  Q.  So you needed an e-mail address that Craigslist could use

23  to confirm.  When you said -- explain to me who or what's

24  being confirmed.

25  A.  The ad.

Duke - Cross

1  Q.  Excuse me?

2  A.  The ad itself and your e-mail address being accurate.

3  Q.  So when you place an ad on Craigslist, they need to have

4  an e-mail address to contact you to confirm that you are the

5  person placing the ad?

6  A.  Yes.

7  Q.  Okay.  So what e-mails would -- what would you understand

8  to be the e-mails that would be in such e-mail account that

9  you used for Craigslist?

10  A.  It would have just been the link from Craigslist saying,

11  "Is this your ad," and then you click on it, or something like

12  "Click on this to make ad live" kind of thing.  So you just

13  click on that, just to confirm that it is a real person and

14  not some fake e-mail address.

15  Q.  Okay.  So when you said you created certain e-mail

16  accounts for Craigslist, that's what you are referring to?

17  A.  Yes.

18  Q.  The next one, brentlaurieduke@yahoo.com, what can you tell

19  me about that e-mail account?

20  A.  Same thing.

21  Q.  When you say "same thing," you mean it was--

22  A.  The same thing as the twentyonecenturysmoking@yahoo.com.

23  Q.  So it was created for -- so you could -- so when

24  Craigslist wanted to confirm the placement of an ad that it

25  would come to that e-mail account?

 1   A.   Correct.

 2   Q.   And why did you need multiple e-mail accounts to do that?

 3        Why couldn't you just put up lots of Craigslist ads

 4   and only use one e-mail account?

 5   A.   Because it would be easier for us to track if one e-mail

 6   account was for, say, Chicago, and one e-mail account was for

 7   Ventura, or one e-mail account for Atlanta.  If we could have

 8   one e-mail account located with each area, it made it easier

 9   to keep track of.

10   Q.   The bsdatsu@yahoo.com, what can you tell me about that

11   account?

12   A.   I believe same thing.

13   Q.   And by "same thing," you mean related to Craigslist?

14   A.   Yes.

15   Q.   laurienomanson@yahoo.com, what can you tell me about that

16   e-mail account?

17   A.   My wife's old e-mail address.  That's her maiden name.

18   Q.   And when did you and Laurie get married?

19   A.   20 --

20        THE COURT:  You can't think that long.

21        THE WITNESS:  2007.

22        She is not here.

23        2007.

24        MR. SALAM:  She may read the transcript.

25        2007.

Duke - Cross

1    BY MR. SALAM:

2    Q.  Are you aware if she used that e-mail account for

3    21centurysmoking.com business?

4    A.  It is theoretically possible she would use it for the same

5    Craigslist type thing, but I can't recall.

6    Q.  Okay.  But other than that, you are not aware of her using

7    it for 21centurysmoking.com business, correct?

8    A.  No.

9    Q.  And laurieduke@ymail.com, what do you know about that?

10   A.  Same thing, one of her old e-mail accounts, not sure if

11   she used that one for the Craigslist ads though.

12   Q.  Are you aware of whether or not she used it for

13   21centurysmoking.com business?

14   A.  Only if she would have been using it for Craigslist ads.

15   Other than that, no.

16   Q.  Okay.  So the Craigslist ad, you were trying to sell

17   21centurysmoking.com product, correct?

18   A.  Correct.

19   Q.  So when you say "We used it for Craigslist," that's how it

20   was being used with respect to 21centurysmoking.com?

21   A.  Correct, and a little bit of that, My inLife as well.  So

22   we were trying to -- that could have been on Craigslist as

23   well.

24   Q.  Okay.  So you were also trying to sell the product for

25   My inLife?

Duke - Cross

1   A.  Simultaneously, yes.

2   Q.  Okay.  And that's why you created the inhaleinside.com

3   website?

4   A.  Correct.

5   Q.  And the couple others you mentioned?

6   A.  Correct.

7   Q.  Did you ever tell -- did any of your former defense

8   counsel, prior to May 30th, 2019 -- strike that.

9        When your former defense counsel asked you to find

10  information, and you would then go search e-mails, I think you

11  testified you searched your e-mails, correct?

12  A.  Correct.

13  Q.  And by your e-mails, you mean -- or do you mean the

14  bduke@yahoo.com, the brent --

15  A.  brentduke@yahoo.com.

16  Q.  I'm sorry.  brentduke@yahoo.com,

17  bduke@21centurysmoking.com, and support@21centurysmoking.com?

18  A.  Correct.

19  Q.  And both you and your wife used the

20  support@21centurysmoking.com, correct?

21  A.  Yes.

22  Q.  Did other employees use that account?

23  A.  Rob Hough, occasionally.

24  Q.  And why would he be using that account?

25  A.  Because we had him doing response to e-mails.

Duke - Cross

1    Q.   Response to whom?

2    A.   Customer e-mails.

3    Q.   Okay.  So the support@21centurysmoking.com was the main

4    e-mail you used, the business used, to communicate with

5    customers, correct?

6    A.   Correct.

7    Q.   Okay.  Now, what other e-mails would you receive at

8    support@21centurysmoking.com besides e-mails from customers?

9    A.   All of like sales data would go there.  So online sales

10   data goes there, the store sales data through the -- they

11   would send like faxes every day that the fax would turn into a

12   .pdf and then would come to the e-mail.  So all of the sales

13   data for the company would be in the support e-mail, and then

14   customer interactions as well.

15   Q.  All right.  Let me try and unpack that answer for the

16   record.

17         The sales information from physical stores -- when I

18   say "physical stores," I'm referring to kiosks or storefronts.

19         I believe you had a store in Chicago that was

20   actually -- what was the address of your store in Chicago?

21   A.   It was like 2516 North Lincoln.

22   Q.   Okay.  So that would be an actual store you could walk

23   into off of that address, correct?

24   A.   Correct.  Yes, we had a few stores.

25   Q.   Okay.  And by "kiosks," can you describe for the court

Duke - Cross

474

1   what you mean by a -- or what you mean by "kiosk"?

2   A.  Like a cart that is sitting in a walkway in a mall.

3   Q.  All right.  Like when you are walking down in the mall,

4   and they want to spray you with perfume or something, you were

5   selling -- you had kiosks that were selling your product,

6   correct?

7   A.  Exactly.

8   Q.  And so how did you -- how did 21centurysmoking.com track

9   the sales or keep track of the sales from those physical

10  locations?

11  A.  The employees would -- they had a fax machine in each

12  location, and the employees would keep track of sales on a

13  piece of paper, and then they would put it into the fax

14  machine, which would then fax it, which would go to like eFax

15  or MyFax or one of those fax services, and it would become a

16  .pdf, and then would e-mail to support@21centurysmoking.

17  Q.  And was that the source of the information Laurie would

18  keep to -- or track to generate the summary we saw on

19  Plaintiff's Exhibit 31?

20  A.  Correct.

21  Q.  And it is your understanding that all e-mails that were

22  sent to support@21centurysmoking.com would still reside in

23  that e-mail account that is hosted by GoDaddy, correct?

24          MR. DAVIS:  Objection, foundation.

25          MR. SALAM:  I asked if it was his understanding.

Duke - Cross

```
 1              THE COURT:  Yes.

 2              Do you know?

 3              THE WITNESS:  Yes, everything should be in there.

 4              THE COURT:  All right.  How do you know?

 5              THE WITNESS:  Because we haven't deleted any e-mails.

 6    BY MR. SALAM:

 7    Q.  Do you know if any of your employees would have used the

 8    e-mail accounts that they had at 21 Century -- strike that.

 9              To the extent some of the e-mail accounts we went

10    through that end in "@21centurysmoking.com," do you know if

11    the employees used that to e-mail information or if it would

12    just be through the fax, if you understand my question?

13              Strike that.  Let me try to clean that up a little.

14    A.  I can't think of very many of these employees that would

15    have been working at kiosks.  So most of these

16    21centurysmoking.com e-mails, I can't think that there would

17    be a lot of faxes that would have been sent or images or any

18    type of thing that would have sent from these e-mails to

19    support with sales.

20    Q.  Okay.  Let me go back to the employees for a second, if

21    you go back to the bullet points.

22              Brandon Duke, your brother, to the best of your

23    knowledge, did he have any dealings with Kirti Saraswat?

24    A.  No.

25    Q.  Did he have any dealings with Mr. Edmiston?
```

Duke - Cross

476

1  A.  Yes.

2  Q.  Can you describe what those dealings would have been?

3  A.  When we met Bill Edmiston at a trade show, my brother was

4  the one that actually met him in the initial meeting.  He was

5  working the trade show with me.

6  Q.  Did Brandon -- did your brother, Brandon Duke, have any

7  involvement with the trade show at which -- and dealings

8  with -- strike that.

9          As to the trade show where these recordings were

10  made -- I direct your attention to that trade show -- was your

11  brother involved in that trade show?

12  A.  No.

13  Q.  Was he involved in dealings with Mr. Edmiston related to

14  that trade show?

15  A.  No.

16  Q.  Jim Shimp, did Mr. Shimp or his now wife, Sharon, who

17  apparently -- strike that.

18          Sharon apparently went by the name "Froggie" as well?

19  A.  Yes.

20  Q.  And she is now his wife?

21  A.  Yes.

22  Q.  Okay.  Did Jim Shimp, to the best of your knowledge, have

23  any dealings with Kirti Saraswat?

24          MR. DAVIS:  Objection, foundation, hearsay.

25          THE COURT:  It is a foundational question.  See if he

Duke - Cross

 1   knows and how.

 2          So overruled.

 3   BY MR. SALAM:

 4   Q.  Do you know if Mr. Shimp had any dealings with Kirti

 5   Saraswat?

 6   A.  No, she did not deal with him or he did not deal with her.

 7   Q.  Do you know if Mr. Shimp had any dealings with Bill

 8   Edmiston?

 9   A.  No.

10   Q.  Bryan Kos --

11   A.  Or sorry, I do know, and the answer is no.

12   Q.  Thank you.

13          Bryan Kos, first, do you know if Mr. Kos had any

14   dealings with Kirti Saraswat?

15   A.  Yes, he did.

16   Q.  And I think you answered my next question.

17          So, yes, you know if he did or did not have dealings

18   with Ms. Saraswat, correct?

19   A.  Yes, he did have dealings with her.

20   Q.  Okay.  And can you tell me what those dealings involved,

21   or what, if you know -- do you know what his dealings with

22   Ms. Saraswat related to?

23   A.  I met Ms. Saraswat through Bryan in 2008.  So he was

24   looking to make a flyer or something for -- I can't remember

25   what he was working on at that time, and she was engaged with

Duke - Cross

1  him in making that flyer, and then wanted me to be the kind of

2  front person here in the U.S. to meet with Bryan.

3  Q.  Okay.  And was Bryan Kos going by the name Bryan Kos at

4  that time in 2008?

5  A.  No, I think he was going by Bryan Scott.

6  Q.  Okay.  Do you have an understanding -- yes or no, do you

7  have an understanding of why Bryan Kos was going by the name

8  Bryan Scott in 2008?

9  A.  I know he may have legal issues that were going on, that

10  might have been part of it, but I'm not a hundred percent

11  sure.  I mean, that's his middle name, so I don't know.

12  Q.  And what legal issues are you referring to?

13  A.  He was currently awaiting going to prison at that time.

14  Q.  Krenar Koleci, the next bullet point there on Page 4, do

15  you know whether or not Mr. Koleci had any dealings with

16  Ms. Saraswat?

17  A.  No, he would not have.

18  Q.  He would not have had any dealings with Ms. Saraswat?

19  A.  Correct.

20  Q.  Do you know if Mr. Koleci would have had any dealings with

21  Mr. Edmiston?

22  A.  He would not have had any dealings with Mr. Edmiston.

23  Q.  Robert Hough, do you know if Mr. Hough had any dealings

24  with Kirti Saraswat?

25  A.  I do not believe so.

Duke - Cross

1    Q.  Do you know if Mr. Hough had any dealings with

2    Mr. Edmiston?

3    A.  I don't think so.

4    Q.  Robert Link, do you know if Mr. Robert Link had any

5    dealings with Ms. Saraswat?

6    A.  No.

7    Q.  Do you know if Mr. Link had any dealings with

8    Mr. Edmiston?

9    A.  No.

10   Q.  Steve Spraker, do you know if Steve Spraker had any

11   dealings with Kirti Saraswat?

12   A.  I do not believe so.

13   Q.  Do you know if Mr. Spraker had any dealings with

14   Mr. Edmiston?

15   A.  I don't recall any situation where they would have met.  I

16   mean, it is possible Bill might have met me in my store, and

17   Steve may have been working at the store or something like

18   that, but that's the only way they could have met that I could

19   think of.

20   Q.  So let me direct your attention to the trade show at which

21   Mr. Edmiston recorded conversations.

22          Are you aware if Mr. Spraker had any involvement with

23   Mr. Edmiston and Mr. Edmiston's presence or activity at that

24   trade show?

25   A.  No.

Duke - Cross

480

1   Q.  I would like to direct your attention to Page 8 of the

2   status report.

3           As background, and correct me if I'm wrong, but I

4   believe your testimony on the first day was that you are not

5   sure which of these eight computers is which, correct?

6           From looking at Page 8, you were not able to tell

7   exactly which computer was which, correct?

8   A.  No.  I can get close, but, yes, I can't.

9   Q.  The four computers -- it's your understanding that the

10  four computers that were imaged by 4Discovery are included in

11  this list, correct?

12  A.  Correct.

13  Q.  And the four that were not -- you are aware that four of

14  these computers were not imaged by 4Discovery?

15  A.  Correct.

16  Q.  What is your understanding as to why they were not imaged?

17  A.  Because they were not used for the business.

18  Q.  And when you say "the business," you mean

19  21centurysmoking.com?

20  A.  Yes, for 21 Century Smoking.

21  Q.  Okay.  The phones that are listed, did any of your former

22  defense counsel ask you to search your phones?

23  A.  No.

24  Q.  Did any of your former defense counsel ask you if there

25  was information concerning your business on your phones?

Duke - Cross

481

 1   A.  No.

 2   Q.  When you were asked to search for information by your

 3   attorneys, did you search your phones?

 4   A.  No.

 5   Q.  Why not?

 6   A.  I cannot think of anything that would have been on my

 7   phones that would have been relative to any of the searches I

 8   was doing.  I wasn't saving files on there.  If I was checking

 9   an e-mail, that's all on the Web, so it doesn't matter if I'm

10   doing it from my phone or a computer.

11   Q.  If you go to the next page?

12           Under C, social media, I want to ask you a few

13   questions about that.

14           The Facebook service, the user account is listed as

15   brentduke@yahoo.com; do you see that?

16   A.  Yes.

17   Q.  The Facebook page, is that the Facebook page for

18   21centurysmoking.com?

19   A.  Yes.  I mean, I have a few pages, but, yes, I believe.

20   Q.  Okay.  So you have other pages as well?

21   A.  I mean, I have a regular Brent Duke page, and then I have

22   the company page.

23   Q.  Okay.  You have a personal Facebook page, and then you

24   have a Facebook page for your business?

25   A.  Correct.

Duke - Cross

1  Q.  Okay.  And what type of information is on your -- visible

2  to visitors on your business Facebook page?

3  A.  Articles, links to ads -- or not links to ads -- like

4  promotional stuff, articles, customer posts, things like that.

5  Standard Facebook page.

6  Q.  Does it have a link to your website?

7  A.  Yes.

8  Q.  And visitors could go buy product -- if they saw your

9  company -- if they were at your Facebook site or Facebook

10  page, is there a way they could, if they wanted to, buy

11  product from your company?

12  A.  If they linked to my website.

13  Q.  Okay.  So if they clicked on a link on your Facebook page,

14  it would take them to the website, correct?

15  A.  Yes.

16  Q.  There is a -- let me rephrase that.

17        There is link on your Facebook page that, if clicked

18  on, would take them to your website, correct?

19  A.  Yes.  There better be, yes.

20  Q.  And so the purpose of your Facebook page was to drive

21  customers to your website?

22  A.  Of course, yes.

23  Q.  As well as, I assume, there was other purposes for your

24  Facebook page, as well, related to your brand, customer

25  loyalty?

Duke - Cross

1   A.  Yes, like "like us and get a discount" kind of thing.

2   Q.  Okay.  Could they communicate or e-mail you from your

3   Facebook page?

4   A.  There is a Facebook messaging system, yes.

5   Q.  Okay.  Did you ever communicate with Ms. Saraswat through

6   Facebook -- this Facebook chat application?

7   A.  Through the 21 Century Smoking Facebook?

8   Q.  Yes.

9   A.  No.

10  Q.  Okay.  The Instagram account where the user account name

11  is duke.brent, does that refer to an Instagram for your

12  business?

13  A.  I am not even certain.  I don't know what the Instagram

14  would be for our business.

15  Q.  Are you aware of -- strike that.  Let me ask another

16  question.

17          Are you aware of whether or not 21 Century Smoking

18  has an Instagram page?

19  A.  It might sound ridiculous, but I'm not a hundred

20  percent -- it might sound ridiculous, but I'm not a hundred

21  percent sure.  I am aware we use our Facebook page.  We don't

22  really use anything else.

23  Q.  When you say you are not sure, you have not been involved

24  in creating an Instagram page for 21centurysmoking.com?

25  A.  Yes, someone else may have created it, but I did not.

Duke - Cross

484

1   Q.  Pinterest, ignoring the asterisk, are you aware of a

2   Pinterest page for 21 Century Smoking?

3   A.  I mean, I have seen it, yes.

4   Q.  And what is -- what information would be on your Pinterest

5   page for your business?

6   A.  I haven't looked it over very thoroughly.  I didn't make

7   it.  I don't think it is very active.

8   Q.  The Twitter service, can you tell me how or what

9   21centurysmoking.com uses Twitter for?

10  A.  We rarely use it, but we used it a little bit more in the

11  past, just like anyone else uses Twitter, just to promote our

12  brand.

13  Q.  Okay.  I would like to then direct your attention

14  to -- well, strike that for a second.

15          When your lawyers asked you to search for

16  information, did you ever look for information on Facebook?

17  A.  No.

18  Q.  Or in the Facebook account for your company?

19  A.  No.

20  Q.  Why not?

21  A.  Because I can't think of any search that they would have

22  asked for that anything pertinent would have been in Facebook.

23  Q.  What about Instagram?  Same question.

24  A.  No.

25  Q.  So the same answer?

Duke - Cross

485

```
 1   A.   Yes.

 2   Q.   LinkedIn?

 3   A.   Same answer.

 4   Q.   Pinterest?

 5   A.   Same answer.

 6   Q.   Twitter?

 7   A.   Same answer.

 8   Q.   All right.  I would like to move down to what's

 9   described -- and I wrote this report, or at least put the

10   titles in -- as "Other Web-Based Services."

11        The service Amazon, what did -- explain to me what

12   21centurysmoking.com used Amazon for.

13   A.   I believe about two to three months, maybe, in 2009, we

14   were selling on Amazon.

15   Q.   And you said for two to three months.  Is there -- do

16   you -- do you know the reason why 21centurysmoking.com stopped

17   selling on Amazon?

18   A.   Because they did not allow electronic cigarettes, is the

19   rule that they created.  So we were selling them prior to that

20   rule, and then they created a rule where you couldn't sell

21   electronic cigarettes.

22   Q.   Okay.  And you believe that they stopped allowing you to

23   sell.  Do you know what date that was, or when you said a few

24   months in 2009, as you sit here, do you have a recall of when

25   that might have been?
```

Duke - Cross

486

1   A.  No, it was -- I would guess somewhere between November,

2   December of 2009.

3   Q.  Okay.  Authorize.Net, what is Authorize.Net?

4   A.  It's our current payment processor.

5   Q.  And explain to me how -- what service Authorize.Net

6   provides.

7        When you say "payment processor," can you explain to

8   me how this works?

9   A.  So a customer goes on our website, and if they buy

10  product, they are giving us money with a credit card, and they

11  are doing it through Authorize.Net.

12  Q.  Okay.  Similar to if you were on Amazon, and you clicked,

13  and you paid through PayPal or some other payment system?

14  A.  Correct.

15  Q.  Okay.  And when did you start using Authorize.Net, if you

16  recall?

17  A.  Within the last year or two, BluePay stopped allowing

18  electronic cigarettes as well.  So we used BluePay from 2009

19  through, I want to say, 2017, 2018, somewhere in there, and

20  then they shut our account down because they weren't doing

21  electronic cigarettes, and we had to shift over to

22  Authorize.Net.

23  Q.  Okay.  And BluePay, I think you mentioned.  When we were

24  talking about sales data, you mentioned BluePay, correct?

25  A.  Correct.

Duke - Cross

1  Q.  Okay.  Again, tell me what BluePay does.

2  A.  Same exact thing as Authorize.Net, payment processor.

3  Q.  Okay.  And Carbonite, that's the backup service that you

4  described using once you were involved in that conference

5  call?

6  A.  Correct.

7  Q.  Okay.  Dropbox, tell me what information related to

8  21centurysmoking.com would be in Dropbox.

9  A.  I can't think of anything, unless there was some super

10  large file for a sign or something that we would have needed.

11  I can't think of any reason why we would have been using

12  Dropbox.

13  Q.  Okay.  eBay, can you tell me about eBay?

14  A.  That's my wife's eBay account.

15  Q.  Do you know if she used it for 21centurysmoking.com

16  business?

17  A.  I don't believe so.

18  Q.  PayPal, that's -- when did you stop using PayPal for

19  business?

20  A.  That would have been middle to late 2009.  They, as well

21  as everyone else, stopped processing electronic cigarettes.

22  Q.  And was that part of the Amazon not selling electronic

23  cigarettes anymore or was that separate?

24  A.  No, unrelated.

25  Q.  Unrelated.

1        It just happened to be around the same time?

2    A.  Yes, we just got hit by a bunch of them right in the

3    beginning.

4    Q.  So when PayPal would no longer process e-cigarette

5    payments, is that when you moved to BluePay?

6    A.  Yes.

7    Q.  And that's separate than a shopping -- well, let's go to

8    the next thing.

9        Zen Cart, what is Zen Cart?

10   A.  That's the actual shopping cart.  So that's what the

11   customer is seeing in terms of we put all the products on, and

12   the customer is able to go through it and pick what they want.

13   Q.  Okay.  And did there come a time -- well -- so "Access

14   acquired."

15       So Zen Cart is a shopping cart, correct?

16   A.  Correct.

17   Q.  Okay.  Did there come a time -- did you ever use Zen Cart

18   on the 21 Century -- when I say "you," did

19   21centurysmoking.com's website ever use Zen Cart?

20   A.  Yes, we currently use Zen Cart.

21   Q.  Okay.  When was the first time that the

22   21centurysmoking.com website used Zen Cart?

23   A.  Whenever PayPal shut us down, then we switched over to

24   Zen Cart and BluePay.

25   Q.  Okay.  And so that would have been sometime in mid --

Duke - Cross

489

1    A.   I'm pretty sure it was 2009.

2    Q.   2009.

3         And can you place it middle, early, late?

4    A.   I don't recall.

5    Q.   Okay.  And at that time, the website -- let's go with

6    2009.  That was the first time you had a website for

7    21centurysmoking.com, correct?

8    A.   Correct.

9    Q.   Who created that site?

10   A.   I did.

11   Q.   And how did you create it?

12   A.   The same kind of template program that I had been using.

13   There is a program called "Dreamweaver," and that's how I did

14   it.

15   Q.   Okay.  And do you -- and how did you get Dreamweaver?

16   A.   Kirti.

17   Q.   Ms. Saraswat gave that to you?

18   A.   Yes.

19   Q.   Okay.  And so can you describe for me how you used

20   Dreamweaver to create the website in 2009?

21   A.   Just picked a template that I liked and started plopping

22   whatever text I wanted on it.

23   Q.   Okay.  So you picked a template that was -- Dreamweaver

24   had multiple templates?

25   A.   Yes.

Duke - Cross

1  Q.  Okay.  So you would pick a template, correct?

2  A.  Yes.

3  Q.  All right.  And then after you picked a template, you said

4  you would drop stuff or text in.

5          Can you describe exactly how you would do that?

6  A.  On the Dreamweaver program, like what the page would look

7  like is on the right or whatever, and then the other side is

8  what you are writing, and you can put whatever text you want,

9  and you will see what it looks like on the website.  So there

10  is two separate screens you are looking at at the same time.

11  Q.  So on one screen, you are literally just typing in text,

12  correct?

13  A.  Yes.

14  Q.  And then on the other screen, it shows what it would look

15  like on the website?

16  A.  Exactly.

17  Q.  Okay.  Were you writing code?

18  A.  No, just the text part, wherever it tells you to put the

19  text.  Wherever there is space for text is where you would

20  write the text.

21  Q.  Okay.  But the website, what makes something show up on

22  the website is code, correct?

23  A.  Correct.  Yes, it automated the code on the other side of

24  the screen.

25  Q.  Okay.  So you just typed in the text, and the program took

Duke - Cross

1    care of turning that into code that made the website show what

2    you were seeing?

3    A.   Correct.

4    Q.   Okay.  And did the template allow for keywords?

5    A.   Yes.

6    Q.   And how did that work?

7    A.   It is the same as the inhaleinside page.  There is a spot

8    that said "Put keywords here," and then you put the keywords

9    there.

10   Q.   Okay.  And so that's -- and did you put any keywords in,

11   in 2009, in this time period when you were creating the

12   website?

13           Did you put keywords in?

14   A.   Actually, Kirti Saraswat would have put in the keywords in

15   2009.

16   Q.   Okay.  All right.  Now, when -- now, you said Zen Cart.

17   You switched to Zen Cart, or at some point Zen Cart

18   became -- again, how did you refer to Zen Cart?  What does it

19   do?

20   A.   It is a shopping cart.

21   Q.   Okay.  So at some point in 2009, you used Zen Cart as part

22   of your website, correct?

23   A.   Yes.

24   Q.   Okay.  And that was because PayPal stopped taking payment?

25   A.   Correct.

Duke - Cross

1  Q.  Okay.  So before you used Zen Cart, how would a customer

2  on your website pay through PayPal, like what would they be

3  clicking on?  How would it work?

4  A.  With PayPal, it gives you just a little button you put on

5  there, and they click on that button, and then it loads them

6  over to PayPal, and then they are able to purchase it.

7  Q.  Okay.  And so then PayPal stopped allowing processing for

8  e-cigarettes, correct?

9  A.  Correct.

10 Q.  Okay.  And then you switched over to Zen Cart, but

11 Zen Cart is a shopping cart, correct?

12 A.  Correct.

13 Q.  All right.  It is not itself a payment processor?

14 A.  No.

15 Q.  So how did you handle -- how did -- how were payments

16 handled?

17 A.  Like I said, I had to integrate BluePay and Zen Cart

18 together in order to be able to process payments.

19 Q.  Okay.  Did that require you to write code?

20 A.  No.

21 Q.  So how did you put Zen Cart and arrange for BluePay to be

22 the payment processor?  This is in 2009, when PayPal is no

23 longer available to you.

24       How did you then get your website to work with Zen

25 Cart and BluePay?

Duke - Cross

493

1   A.  Basically, what I had to do is -- I was able to figure out

2   after a long time -- it took me hours, and it probably should

3   have taken minutes, because I didn't know what I was

4   doing -- I was finally able to get Zen Cart and BluePay

5   together.  There was no way I could integrate it actually onto

6   my website.  That was out of my league.

7           So what I did is I did a backslash catalog, and then

8   on my actual website that I had taken a role in creating, I

9   just put a link on there like "Visit our store" or something

10  like that.  So then you could click on that button, and then

11  it would take you over to the shopping cart, and then you

12  could purchase the product.

13  Q.  Okay.  Did you consider that -- did you have any opinion

14  at the time as to whether or not that was the efficient

15  solution?

16  A.  No, it was a terrible solution, but it was the best I

17  could do.

18  Q.  Okay.  And at this time, the website that 21 Century

19  Smoking had was still based on Dreamweaver, correct?

20  A.  Yes.

21  Q.  Now, at some point in time -- well, let me ask:  Did the

22  integration of Zen Cart with your website ever change?

23  A.  Yes.  Eventually, Rob Hough was able --

24  Q.  Let me ask a question.

25          So the answer is yes?

1    A.   Yes.   The answer is yes.

2    Q.   Okay.   When did it change?

3    A.   2011.   When Rob Hough started working for us, he was able

4    to then -- he had the skills necessary to be able to take this

5    catalog page and integrate it all into the one page so that

6    there was just a 21centurysmoking.com page and you could

7    actually buy from.

8    Q.   Okay.   And let me understand.

9         So prior to -- and do you know off -- do you have a

10   more specific recall of when Mr. Hough would have been doing

11   this?  You said 2011.  Do you know if it was early, late?

12   A.   Something like September, October, somewhere in there.

13   Q.   Okay.   So before Mr. Hough did something, you described

14   they would have to click a link that says "Visit our store,"

15   and then that would take them to Zen Cart, correct?

16   A.   Yes, some link, and it would take you over to the store.

17   Q.   To a catalog page?

18   A.   Yes.

19   Q.   And then that would just have a list of all the product

20   you sold?

21   A.   It would have the different links to go to the different

22   products and stuff like that, yes.

23   Q.   And why was that not the ideal solution?  What is it that

24   Mr. Hough was doing or changed that made it more efficient?

25   A.   You don't ever want to have your customer having to click

Duke - Cross

1    a button to get to your store.  You want them to go to your

2    website, and you want it to be your store.  So he made it so

3    that when you go to my website, now you are at my store, as

4    opposed to going into my website and searching around for a

5    button, clicking that button, and now being at the store.

6    Q.  Okay.  So the difference would be that when you were able

7    to get Zen Cart to work with your website, they would have to

8    click on a Zen Cart button or go-to-my-store button, correct?

9    A.  Yes.

10   Q.  And then that would take them to a new page where they

11   could then arrange to buy your product, correct?

12   A.  Exactly.

13   Q.  And what you wanted -- and in the newer, or after

14   Mr. Hough was done, they could literally buy it from the

15   landing page?

16   A.  Yes.  You go to 21centurysmoking.com, and it was all

17   integrated.

18   Q.  And purchase product from the page they landed on?

19   A.  Exactly.

20   Q.  Okay.  And you said Mr. Hough did something with the Zen

21   Cart in your website, and this was in September or October of

22   2011, correct?

23   A.  Correct.

24   Q.  Do you understand what he did with your website at that

25   time?

Duke - Cross

1      When I say "do you understand," I know you -- strike

2  that.

3      Do you understand -- strike that.

4      THE COURT:  Do you know how he did it?

5      MR. SALAM:  There you go.

6  BY MR. SALAM:

7  Q.  Do you know how he did it?

8  A.  Basically, he was taking all of the content from what was

9  the home page, the home page and the different links that I

10  had created, so he was able to take all that content and just

11  basically transfer it over to the shopping cart, and then

12  integrate, kind of, the fill of the original home page into

13  the shopping cart page.

14      So it was just he was messing with templates and

15  headers and text.  So, I mean, it was -- like I said, it was

16  more than I could do, but he was just basically trying to get

17  the feel of the old site, combine it with the shopping cart

18  and make it one page.

19  Q.  So at this point when Mr. Hough is involved, your website

20  is no longer on the Dreamweaver -- would "platform" be a term

21  that makes sense?

22  A.  I mean, Dreamweaver is just what you use to make the site.

23  So it was no longer the site that has been created with

24  Dreamweaver, that's correct.  It was now its own entity that

25  had nothing to do with the original site that had been

Duke - Cross

1  created.

2  Q.  Okay.  When you say it was its own entity, it was a

3  website that Mr. Hough, he took the content from your old

4  website, and somehow your website now was created through a

5  Zen Cart platform?

6  A.  Correct.

7  Q.  Okay.  And then how does BluePay fit into that?

8  A.  You still need the processor.  So Zen Cart is a shopping

9  cart, but the people still need to give you money.  So they

10  get to the point where they are going to make a purchase.

11  They are still getting it through BluePay, is who they are

12  paying.  They are not paying Zen Cart.

13  Q.  Okay.  And are you required to use BluePay when you are

14  using Zen Cart?

15  A.  No.

16  Q.  So you can pick other payment processors?

17  A.  Yes.

18  Q.  And was it Mr. -- and Mr. Hough then arranged or did

19  whatever had to be done within the Zen Cart platform to make

20  BluePay the payment processor?

21  A.  No, I had already done that when I lost PayPal.  So in

22  2009, I had got BluePay and Zen Cart integrated.  It was just

23  I didn't get it integrated onto the website.  Rob did that in

24  2011.

25  Q.  Okay.  So in 2011, he basically took the existing website

Duke - Cross

1   and created that content within the Zen Cart platform?

2   A.  Yes.

3   Q.  Okay.  And the biggest benefit of that was that that

4   allowed your customers to purchase product right off the page,

5   the first page that they land on?

6   A.  Exactly.

7   Q.  Because I assume -- well, strike that.

8           You did not want your customers having to click any

9   extra times before giving you money; is that correct?

10  A.  Exactly.

11  Q.  Okay.  Back to the status report, Page 9.

12          RankPop, can you tell me what RankPop is?

13  A.  I mean, it is a company that we used to do social media

14  postings.

15  Q.  So what service did they provide you?

16  A.  Social media postings.  They were just going on, like,

17  Facebook and posting ads or posting content.  It is a content

18  provider for social media platforms.

19  Q.  Okay.  And was it content they created or content you

20  provided them?

21  A.  They created it.

22  Q.  Okay.  And then they would post it on your Facebook page?

23  A.  Yes.

24  Q.  Okay.  And I think yesterday -- or, I'm sorry -- Monday,

25  you testified that the information about RankPop is on

Duke - Cross

1   Facebook.

2          Do you recall that?

3   A.  Yes, yes.

4   Q.  What did you mean by that?

5   A.  Well, that's where they were posting all the stuff they

6   were posting.  So if you go on my Facebook page now, and you

7   figure out when they were working for me, all the stuff you

8   see posted at that time would be whoever the RankPop person

9   working was.

10  Q.  Okay.  So explain to me how -- did they ask you before

11  they posted something to your social media page?

12  A.  They might run it by me.

13  Q.  Okay.  And so, do you recall, did you access RankPop or

14  your information for the services they provided for you

15  online?  Did you go to -- did they have an account for you?

16  A.  No, they would send me an invoice.  I would pay it.  There

17  wasn't like a -- I don't recall a place where I, like, logged

18  in and did anything.

19  Q.  Okay.  So your account -- they would send you a bill, and

20  you would send them a check?

21  A.  Yes, to the best of my recollection, yes.

22  Q.  Okay.  Groupon, how did 21 Century Smoking use Groupon?

23  A.  We would give discounts at stores for products, just

24  Groupons.  We would have Groupons, and you could buy the

25  Groupon and go to our stores and utilize them.

1   Q.  Okay.  Do you recall if you could access your account

2   information online for Groupon?

3   A.  I didn't actually.  Steve Spraker handled all of that.  I

4   never did anything with Groupon.  That was kind of Steve

5   Spraker's responsibility.

6           MR. SALAM:  Could I have a moment, your Honor?

7           THE COURT:  Sure.

8           MR. SALAM:  Your Honor, I'm going to need a few

9   minutes to get organized.  I don't know if we can take -- if

10  the court is willing to take a break for ten minutes.

11          THE COURT:  So you are going to figure out how much

12  you have left, go through your notes, that kind of thing?

13          MR. SALAM:  Yes, I can give you a quick -- I would

14  think -- well, I'm hopeful that it is no more than an hour.

15          THE COURT:  Okay.

16          MR. SALAM:  Certainly, I plan on being finished by

17  today.

18          THE COURT:  Okay.  Well, I'm signing warrants at

19  5:00 o'clock, and someone is coming in in an orange jumpsuit

20  at 5:00 o'clock.  So we are going to be done by 5:00 o'clock.

21          MR. SALAM:  I meant done with my questioning of

22  Mr. Duke.

23          THE COURT:  Got you.  All right.  Let's take a break.

24     (Recess taken.)

25          THE COURT:  Whenever you are ready.

1    BY MR. SALAM:

2    Q.  Mr. Duke, with respect to 21centurysmoking.com, to the

3    best of your recollection, when did -- what did you retain

4    Ms. -- did you retain Ms. Saraswat, Kirti Saraswat, to do work

5    on 21centurysmoking.com?

6    A.  Yes.

7    Q.  Do you recall when you retained her to do work on your

8    website?

9    A.  I had been paying her since 2007 for the Sports Doctrine

10   website, so the lines kind of blur.  I can't remember exactly

11   when she started with 21 Century Smoking, but she would have

12   started from the very beginning, whenever the site went live.

13   She would have been doing a cost-savings calculator or any

14   like additional thing that was beyond my skills of just

15   entering text.  So if I needed pictures moved around the site

16   or if I needed things changed, she would have been doing that,

17   and then she was also doing SEO work.

18   Q.  Okay.  And I want to unpack that a little.

19          So before she was doing work on the

20   21centurysmoking.com website, what site was she working on?

21   A.  She built the Sports Doctrine website.

22   Q.  Okay.  And that was -- was that in 2007?

23   A.  Yes.

24   Q.  Okay.  And just briefly, what was the concept behind the

25   sportsdoctrine.com website?

Duke - Cross

1   A.  It was kind of like a social media platform for sports.

2   Q.  Okay.  And did she create that website or did you create

3   that website?

4   A.  She created that website.

5   Q.  And do you know what platform or software she used?

6   A.  I know, initially, we were trying to get her to use Ruby

7   on Rails, and that didn't end up working out.  So I don't

8   remember what she actually ended up using.

9   Q.  All right.  When you say "We were trying to get her to use

10  Ruby on Rails," who is "we"?

11  A.  Otis Chandler and myself were doing that site together, or

12  we were going to partner on that site, and he really wanted it

13  on Ruby on Rails.

14  Q.  And can you explain to me what -- or to the court what

15  "Ruby on Rails" is?

16  A.  It is a programming language.

17  Q.  Okay.  My guess is the court knows better than I do, but

18  for the record, at least.

19          And are you able to use Ruby on Rails yourself?

20  A.  No.

21  Q.  Okay.  And then at some time in the -- sometime in 2009 is

22  when Ms. Saraswat started doing work on 21centurysmoking.com?

23  A.  Yes, early 2009.

24  Q.  All right.  Early 2009?

25  A.  Yes.

Duke - Cross

1    Q.  And what work did you have her do on 21centurysmoking.com?

2    A.  As I said, I mean, anything that was more complex than

3    entering text.  So moving around images, all of the SEO, all

4    of the meta tag, anything in the back-end, and any just moving

5    things around like the cost savings calculator.  Any of that

6    type of stuff is what she either assisted me with or the SEO

7    as well.

8    Q.  And can you, for the record, explain what your

9    understanding of "SEO" is?

10   A.  Search engine optimization, so trying to get your website

11   higher up on Google rankings, essentially.

12   Q.  So when someone enters in Google search that would result

13   in your website coming up, it is designed to make your website

14   come up higher on the list than other responsive websites?

15   A.  Correct, yes.

16   Q.  Okay.  Did you ever instruct Ms. Saraswat to put 21st

17   Century Smoke in the metadata of your company's website?

18   A.  No.

19   Q.  You didn't do that by text?

20   A.  No.

21   Q.  Or by e-mail?

22   A.  No.

23   Q.  Or by Gchat?

24   A.  No.

25   Q.  Or by Yahoo! Chat?

1    A.  No.

2    Q.  Or by any other means?

3    A.  No.

4    Q.  All right.  I'm going to switch topics here.

5         What I would like to do, just so you are

6    understanding, I want to make sure I understand the timelines.

7    So I'm going to ask you a set of questions and try and

8    establish for the record a timeline of events here.

9         As I think I had mentioned, according to the Docket

10   Filing No. 1, this case was filed on September 7th, 2012, and

11   Mr. Leavens filed his appearance on October 3rd, 2012.

12        Taking those two dates, if you can accept them, does

13   that -- now I would like to ask you if you -- when you think

14   the first time you met Tom Leavens occurred?

15   A.  Before he filed an appearance, clearly.  Within a week of

16   the case being on the docket would be my best guess.

17   Q.  But certainly before October 3rd, when the

18   docket -- strike that.

19        You believe you met with him before October 3rd,

20   2012, when he filed an appearance?

21   A.  Of course, yes, September.

22   Q.  Okay.  So sometime in September, you met with him?

23   A.  Yes, mid-September would be my best guess.

24   Q.  Okay.  And that was the meeting which you had testified

25   about him telling you not to destroy anything, correct?

Duke - Cross

1   A.  Correct.

2   Q.  I think the court said we had "gilded that lilly," so I

3   will leave it alone at this point, except for one question:

4   At that meeting, did Mr. Leavens ever use the term "ESI"?

5   A.  I don't recall.

6   Q.  At the time of that meeting -- strike that.

7          You remember -- strike that.

8          You are aware that on June 16th, 2014, Judge Kapala

9   entered an order granting partial summary judgment in your

10  favor?

11  A.  Yes.

12  Q.  And that was June 16th, 2014?

13  A.  Yes, I have no reason not to believe that's the date, yes.

14  Q.  Correct.  Okay.

15         And then I would like to direct your attention to

16  Defendants' Exhibit 4.

17         Yes, Defendants' -- I'm sorry, hold on a second.  Let

18  me make sure I have got the right -- maybe I meant Plaintiff's

19  Exhibit 4.

20         Hold on a second.  Let me check.

21         Strike that.

22         I'm confusing Defendants' and Plaintiff's.

23         Defendants' Exhibit 4, which would be the exhibit I

24  provided -- yes, Defendants' Exhibit 4 -- and just for the

25  record, I'm not sure -- this is an e-mail from Brian Gaynor to

Duke - Cross

1    Heather Liberman dated November 5th, 2014.

2            Have you seen this document before?

3    A.  In preparation for today, yes.

4    Q.  Okay.  Prior to preparing for this hearing, had you ever

5    seen this document before?

6    A.  No.

7    Q.  You see in there, there is what we now understand to be 20

8    terms, correct?

9    A.  Correct.

10   Q.  You see those?

11   A.  Yes.

12   Q.  Did your lawyers ever ask you to search your e-mails for

13   these 20 terms?

14   A.  No.

15   Q.  And what do you -- if you have it, do you have an

16   understanding what these 20 search terms are?

17   A.  They are the search terms that the Plaintiffs requested be

18   searched on our ESI, I guess.

19   Q.  Okay.  And do you remember on the first day of this

20   hearing, Mr. Davis walked through -- he wanted to establish a

21   common understanding of ESI.

22            Do you remember that testimony?

23   A.  Yes.

24   Q.  And he indicated that he considered e-mails ESI, correct?

25   A.  Yes.

Duke - Cross

507

1   Q.  And he asked that you understood that when he said ESI, he

2   meant e-mails, correct?

3   A.  Correct.

4   Q.  And he stated that when he used the term ESI, he meant

5   Yahoo! chats?

6   A.  Correct.

7   Q.  And he meant -- well, he went through a list of what he

8   meant by ESI, correct?

9   A.  Yes.

10  Q.  Okay.  And my question is:  At the time of your meeting

11  with Mr. Leavens, did you understand -- did you have an

12  understanding of what ESI was?

13  A.  No, not really.

14  Q.  Well, you say, "No, not really."

15          Did you have --

16  A.  I mean, I just knew not to delete things, but I

17  didn't -- I wouldn't -- I wouldn't know what the term ESI

18  meant or anything like that.

19  Q.  Okay.  At some point, did you -- you have an understanding

20  now of what ESI means, correct?

21  A.  Definitely, yes.

22  Q.  And what is your understanding?

23  A.  Electronic stored information.

24  Q.  Okay.  Electronically stored information?

25  A.  Right.  I think that's what it is called.  I think that's

Duke - Cross

508

 1    what they said yesterday, so yes.

 2              THE COURT:  It is.

 3              MR. SALAM:  I'm only asking for what you understand.

 4              THE WITNESS:  Yes, electronically stored information.

 5    BY MR. SALAM:

 6    Q.  Okay.  And do you recall Mr. Leavens ever using that term

 7    with you?

 8              MR. SMITH:  Objection, your Honor, asked and answered

 9    just a moment ago.

10              THE COURT:  Are you saying electronically stored

11    information or ESI?  Because you did ask whether he used the

12    term ESI, and he said no.  So I don't know if your question is

13    did he use the term electronically stored information.

14              MR. SALAM:  Yes.

15    BY MR. SALAM:

16    Q.  I would like to ask did you ever -- do you recall --

17              THE COURT:  With that clarification, it will be

18    overruled.

19              THE WITNESS:  In what time frame?

20              MR. SALAM:  Well, at the first meeting.

21              THE WITNESS:  I don't recall that exact term being

22    used in the first meeting, no.

23              MR. SALAM:  Okay.

24    BY MR. SALAM:

25    Q.  All right.  Do you recall when -- well, your current

Duke - Cross

509

1  understanding is "ESI" means electronically stored

2  information?

3  A.  Correct.

4  Q.  And you -- strike that.  We are going to -- I will get

5  back to that.

6           Okay.  And, again, just trying to establish a

7  timeline here.

8           It was your testimony that you discovered the GoDaddy

9  auto-purge setting on June 29th, 2015, correct?

10 A.  Correct.

11 Q.  That was your testimony in court, correct?

12 A.  Yes.

13 Q.  Okay.  And I believe counsel had directed your attention

14 to prior statements where I think it was May 2015, you had

15 stated, approximately, May of 2015?

16 A.  Approximately, May of 2015, yes.

17 Q.  Okay.  And you are aware that -- strike that.

18           So I think you testified that you did a lot of

19 searches for e-mails at the request of your attorneys,

20 correct?

21 A.  Yes.

22 Q.  And whatever responses -- whatever you found as a result

23 of those searches, you provided to your attorneys, correct?

24 A.  Yes.

25 Q.  And that continued up and through January 15, 2018, when

Duke - Cross

510

1   Plaintiff's filed their summary judgment memorandum?

2   A.  Yes.

3   Q.  Now, you are aware that when your lawyers would produce

4   documents to Plaintiff's counsel, they would put what is

5   referred to as a "Bates number" on them?

6   A.  I am aware of that now, yes.

7   Q.  Okay.  Yes, I'm asking for your current understanding.

8         So you are aware that that --

9   A.  Yes, I have seen them now in preparation.

10  Q.  Okay.  Were you involved in numbering the documents?

11  A.  No.

12  Q.  Were you involved in the actual choice of what to give

13  Plaintiff's counsel?

14  A.  No.

15  Q.  So when you made a decision -- strike that.

16        You didn't decide what to give your

17  attorneys -- well, strike that.

18        If your attorneys asked for information, you would

19  decide where you thought that information was, correct?

20  A.  Correct.

21  Q.  And you would go look there, correct?

22  A.  Yes.

23  Q.  And you would provide whatever you found?

24  A.  Correct.

25  Q.  Okay.  And that's how you handled it until -- from the

Duke - Cross

1  first day that former defense counsel was representing you

2  until the last day, correct?

3  A.  Yep.

4  Q.  All right.  I would like to direct your attention to

5  Defendants' Exhibit No. 5.

6      For the record, this is the declaration of Travis

7  Life, originally filed as Docket No. 253-2.

8      You recall reviewing this in the course of your

9  testimony over the two days of this hearing?

10  A.  Yes.

11  Q.  And I would like to direct your attention to Paragraph 11

12  at Page 3, and, again, I'm just trying to make sure I get the

13  time right.

14      So on or about March 14th or 15th, that's when you

15  had contact from Mr. Life seeking -- asking you to search for

16  the information he identifies here, correct?

17  A.  Yes.

18  Q.  Okay.  So you were looking for information related to

19  Ms. Wood, correct?

20  A.  Yes.

21  Q.  To Kirti Saraswat?

22  A.  Yes.

23  Q.  And Webrecsol is how it is spelled here?

24  A.  Correct.

25  Q.  Okay.  And how is her company -- that's the company she

Duke - Cross

512

1    works for, correct?

2    A.  I think she owns it, yes.

3    Q.  Okay.  And is it spelled W-e-b-r-e-s-c-o-l or c-s-o-l?

4    A.  c-s-o-l.

5    Q.  Okay.  So it is misspelled here?

6    A.  Yes.

7    Q.  Okay.  And he asked you to look for correspondence with

8    respect to Frank Gu, correct?

9    A.  Correct.

10   Q.  Now, he asked you to research your brentduke@yahoo.com; do

11   you see that, in Paragraph 11?

12   A.  Yes.

13   Q.  Okay.  Did you search other e-mail accounts besides

14   brentduke@yahoo.com?

15   A.  support@21centurysmoking.com.

16   Q.  Okay.  Did you search bduke@21centurysmoking.com?

17   A.  A lot of it would be duplicative of the Yahoo! account,

18   but, yes, I searched bduke@21centurysmoking.com,

19   brentduke@yahoo.com, and the support@21centurysmoking.com.

20   Q.  And these are the three accounts you always searched when

21   you were asked to look for information?

22   A.  Exactly.

23   Q.  Because those were the three accounts you used?

24   A.  Exactly.

25   Q.  Okay.  And they didn't ask you to search other people's

Duke - Cross

513

1   accounts, correct?

2   A.  No.

3   Q.  And you didn't think to search other people's accounts?

4   A.  No, I can't think of any reason why I would have.

5   Q.  Okay.  And you then forwarded the information to Mr. Life,

6   correct?

7   A.  Correct.

8   Q.  And I believe it was your testimony that the e-mails you

9   found that you forwarded are -- were included in Plaintiff's

10  Exhibit 1?

11          Well, I will direct your attention to Plaintiff's

12  Exhibit 1.

13          And the first page -- I'm sorry.

14  A.  Yes.

15  Q.  Just a moment.  Let me let the court --

16          So the first page of that exhibit is an e-mail from

17  Mr. Stamatis to Mr. Davis and Mr. von Ohlen providing certain

18  documents.

19          Do you see that?

20  A.  Yes.

21  Q.  Okay.  And do you see in there that it says they have been

22  Bates-stamped 21C 63515 to 21C 6326?

23  A.  Yes.

24  Q.  Okay.  And I believe your testimony was that the rest of

25  the pages of this exhibit are what you would have sent to

Duke - Cross

1   Mr. Life, correct?

2   A.   Correct.

3   Q.   Okay.  I will ask you to turn to what is identified on the

4   top as Page 62 of 732 in the docket entry.  It's,

5   approximately, a half inch back.

6   A.   Okay.

7            MR. SALAM:  Your Honor, have you been able to find

8   that?

9            THE COURT:  Yep, 21 63574.

10           MR. SALAM:  Correct.  The Bates number is 21C 63574.

11  BY MR. SALAM:

12  Q.   And that's an e-mail from -- do you recognize who that

13  e-mail is from?

14  A.   kirti@webrecsol.com.

15  Q.   Okay.  And it was sent to?

16  A.   support@21centurysmoking.com.

17  Q.   And where is that e-mail hosted?

18  A.   The GoDaddy web server.

19  Q.   Okay.  And do you see at the bottom of this page, above

20  the "Confidential Restricted" line, do you see a line there in

21  small print?

22  A.   Yes.

23  Q.   Can you read that line through the .com?

24  A.   "https://email06.godaddy.com."

25  Q.   Okay.  And this is one of the documents you provided to

Duke - Cross

1  Mr. Life on or about March 17, 2019?

2  A.  Correct.

3  Q.  Okay.  I would like to direct your attention, I would say,

4  about three-eights of an inch further back to a document that

5  has the Docket No. 87 -- or Page No. 87 of 732.

6          THE COURT:  You said March 17th, 2019?

7          MR. SALAM:  I'm sorry.  March 17th, 2018.

8          THE COURT:  See, I'm paying attention.

9          MR. SALAM:  Thank you, your Honor.

10          THE COURT:  You're welcome.

11          MR. SALAM:  I actually have a timeline demonstrative

12  exhibit that I'm trying to work off of.

13          THE COURT:  Okay.

14          THE WITNESS:  Which page are we going to?

15  BY MR. SALAM:

16  Q.  We are looking for Page 87 of 732.  The Bates number is

17  63599.

18  A.  Okay.

19  Q.  And that, again, is -- and who is that e-mail from?

20  A.  kirti@webrecsol.com.

21  Q.  And who is it -- or where is it sent to?

22  A.  support@21centurysmoking.com.

23  Q.  And, again, if you can look at the bottom, the line above

24  "Confidential Restricted," and read it, for the record, up to

25  ".com"?

Duke - Cross

516

```
 1   A.   "https://email06.godaddy.com."

 2   Q.   Thank you.

 3        I would like to direct your attention five more pages

 4   back, to a page that is Docket Page 92 of 732.

 5   A.   Yes.

 6   Q.   Okay.  Did you find that?

 7   A.   Yes.

 8   Q.   Okay.  And it is Bates-numbered, for the record,

 9   21C 63604, and, again, that's an e-mail from

10   kirti@webrecsol.com?

11   A.   Correct.

12   Q.   And it is to support@21centurysmoking.com?

13   A.   Yes.

14   Q.   And if you, again, read for the record what is above

15   "Confidential Restricted"?

16   A.   "https://email06.godaddy.com."

17   Q.   Okay.  Only a couple more.

18        I would like to direct your attention to two pages

19   behind that to a page that is 94 of 732.

20   A.   Okay.

21   Q.   And that is Bates number 21C 63606.  Again, that is from

22   kirti@webrecsol.com, correct?

23   A.   Yes.

24   Q.   And to support@21centurysmoking.com?

25   A.   Correct.
```

Duke - Cross

1  Q.  And, again, can you read, for the record, what is above

2  the "Confidential Restricted"?

3  A.  "https://email06.godaddy.com."

4  Q.  And last one -- no, actually, that is the last one for

5  that exhibit.

6        And, again, these were documents that you provided to

7  your -- I believe it is to Mr. Life, on or about March 18th,

8  2018, correct?

9  A.  Correct.

10 Q.  And it's your understanding that those were turned over by

11 your attorneys to Plaintiff's counsel within a couple days

12 thereof, correct?

13 A.  Correct.

14 Q.  All right.  I would like to direct your attention to what

15 is marked as Defendants' Exhibit 53.

16        MR. SALAM:  And has this been admitted already,

17 counsel?

18        MR. DAVIS:  Yes.

19        THE WITNESS:  I don't know if I have that.

20        MR. SALAM:  Oh, I'm sorry.  It is not in the binder,

21 not in your binder.

22        Your Honor, do you have that?

23        THE COURT:  I don't know.  I was picking it up, and

24 you told me to stop looking.

25        Hold on one second.

Duke - Cross

518

```
 1              You said 53?

 2              MR. SALAM:  Yes.  It was one of the weekend --

 3              THE COURT:  If you gave it to Ms. Pedroza, it is in

 4    here somewhere, and I know I saw an e-mail.  So I will find

 5    it.

 6              53, I have it.

 7              MR. SALAM:  I'm going to hand it to you, Mr. Duke.

 8    Don't worry.  You don't have it.  I had only come up with 52

 9    exhibits.

10              I'm sorry.  Your Honor, may I approach the witness?

11              THE COURT:  Sure.

12              MR. SALAM:  Thank you.

13    BY MR. SALAM:

14    Q.  If you could take a moment and review that.

15    A.  Okay.

16    Q.  Do you recall --

17              THE COURT:  Okay.  Go ahead.

18              MR. SALAM:  I want to make sure I have the right one.

19              It is up there, actually.

20    BY MR. SALAM:

21    Q.  Actually, I would like to refer you to, and I'm going to

22    hand you, what I'm going to mark as Defendants' Exhibit 54.

23              I apologize.  I was off on the exhibit I wanted to

24    refer to.

25              MR. SALAM:  May I approach the witness, your Honor?
```

Duke - Cross

```
 1              THE COURT:  Sure.
 2   BY MR. SALAM:
 3   Q.  Could you please review Plaintiff's Exhibit 54?
 4   A.  Okay.
 5   Q.  And do you -- what's the date on this e-mail?
 6   A.  March 17th, 2018.
 7   Q.  On the first page, correct?
 8   A.  Yes.
 9   Q.  Okay.  And you have reviewed the whole exhibit, correct?
10   A.  Yes.
11   Q.  Okay.  So I'm going to direct you to Page 3 of 5, and if
12   you could read the top two lines at the top of Page 3 of 5?
13   A.  "So I searched for Kirti e-mails, and I mean there are
14   hundreds of them.  Not sure if you just want my password or
15   what?  But I don't really know what you want me to do with
16   this information."
17   Q.  And if you go to the prior page, 2 of 5, that would
18   indicate that you wrote that e-mail to Mr. Life on March 17th,
19   2018, correct?
20   A.  Yes.
21   Q.  Okay.  Do you recall if you -- you testified that you had
22   offered your e-mail password.  Was it password or passwords to
23   your attorneys previously?
24   A.  Yes, I had offered passwords previously.
25   Q.  Okay.  Do you know if you offered your password to
```

Duke - Cross

520

 1   Mr. Life on or about this date?

 2   A.  Yes, I did.

 3   Q.  And is that -- did you do it by e-mail, by phone?

 4        Do you recall?

 5   A.  Well, in this e-mail, I'm offering it.

 6   Q.  And where do you see that?

 7   A.  "Not sure if you just want my password or what?"

 8   Q.  Thank you.

 9        And that's on which page -- there we go.  I'm sorry,

10   Page 3 of 5.

11        I'm having trouble with my own notes.  I apologize.

12        And that's Defendants' Exhibit 54.

13        You wrote this, correct?

14   A.  Yes.

15        MR. SALAM:  Okay.  I would ask that that be admitted,

16   your Honor.  If it hasn't, I wasn't sure.  I can't recall.

17        MR. DAVIS:  It is already in evidence.

18        THE COURT:  I have got it already in.

19        MR. SALAM:  All right.

20   BY MR. SALAM:

21   Q.  And that was on March 17th, 2018, correct?

22   A.  Correct.

23   Q.  And that was prior to the time when your attorneys sent

24   over the documents you had found in your search on or about

25   that date, correct?

Duke - Cross

1   A.  Yes.

2   Q.  Okay.  I would like to direct your attention to, and I'm

3   going to hand it to you, Defendants' Exhibit 57.

4           MR. SALAM:  May I approach the witness, your Honor?

5           THE COURT:  Sure.

6   (Brief pause.)

7           MR. SALAM:  May approach the witness, your Honor?

8           THE COURT:  Sure.

9   BY MR. SALAM:

10  Q.  I will hand you what I have marked as Defendants'

11  Exhibit 57 and ask you to review both pages.

12          You have reviewed it?

13  A.  Yes.

14  Q.  All right.  I would like to direct your attention to the

15  second page.

16          Can you read what you wrote -- you wrote this,

17  correct?

18  A.  Correct.

19  Q.  Okay.  And can you read for the record what you are saying

20  there?

21  A.  "Would it be wise to provide you with passwords to my

22  e-mail so you can sort through it and make sure nothing you

23  need??  Issue is with me being so far away, it isn't like you

24  can easily swing by and peruse my inbox.  Brent."

25  Q.  And then if you go to the next page at the bottom, you

Duke - Cross

522

1  sent that e-mail on May 3rd to Mr. Stamatis, correct, if you

2  know?

3          Can you tell?

4  A.  Yes, I can't tell who it went to.

5  Q.  Okay.  But Mr. Stamatis responds on May 7th, correct?

6  A.  Yes.

7  Q.  And what does Mr. Stamatis say?

8  A.  "Please send over this information ASAP.  Thanks."

9  Q.  Okay.  And then the e-mail at the top of this page, that's

10 from you to Mr. Stamatis, correct?

11 A.  Yes.

12 Q.  And it's copied to Mr. Life and Mr. Leavens?

13 A.  Correct.

14 Q.  And that's on May 7th, 2018, correct?

15 A.  Correct.

16 Q.  Okay.  And that first line with the "https://", what

17 is -- if you know, what is that?

18 A.  That's where you go to log in to the GoDaddy webmail.

19 Q.  Okay.  So you -- at the top of this, it has a link to log

20 in to your GoDaddy e-mail accounts?

21 A.  Yes.

22 Q.  Okay.  And would that allow them to log in to your account

23 and see all your GoDaddy e-mails?

24 A.  Correct.

25 Q.  Okay.  So not just the support@21centurysmoking.com or

Duke - Cross

1   your bduke@21centurysmoking.com?

2   A.  No, this would have given them the ability to see, if

3   you -- this gives you the login.  So you would go to

4   bduke@21centurysmoking.com, enter the password, or you could

5   choose to go to support@21centurysmoking.com, enter the

6   password.  Technically, you can do any of those accounts from

7   there, but I only gave them the password for those two.

8   Q.  Okay.  So if they had gone there, they could only get into

9   the two accounts that you then list below, correct?

10  A.  Correct.

11  Q.  And can you read the rest of the e-mail?

12  A.  It is "To be safe" -- or "Re:  To be safe."

13          And then it is:  "That link should take you to

14  godaddy webmail login (or just google "godaddy webmail login);

15  and then my 2 e-mail addresses are bduke@21centurysmoking.com,

16  pw:  forfun; or support@21centurysmoking.com, pw: for3fun3; or

17  brentduke@yahoo.com, pw: Norvtasb33*.  (I think this is right.

18  If this doesn't work, let me know.)

19          "That is all I can think of in terms of e-mails.  If

20  you can think of any more, let me know.

21          "Thanks, Brent."

22  Q.  I would like to direct your attention now to Defendants'

23  Exhibit 58, which you don't have, but I will hand up, and it

24  is one of the weekend or Monday e-mails I sent to everybody.

25          I would ask you to review that.

Duke - Cross

524

1   A.  Okay.

2   Q.  All right.  Does this refresh -- I think your prior

3   testimony was that at some point, 4Discovery obtained or

4   downloaded all your e-mails from your brentduke@yahoo.com

5   account, correct?

6   A.  Correct.

7   Q.  Okay.  And I believe you were not able to identify

8   specifically when that occurred, correct?

9   A.  Correct.

10  Q.  Okay.  And having reviewed this e-mail, does that refresh

11  your recollection as to when that occurred?

12  A.  It looks like May 8th.

13        MR. SALAM:  Your Honor, I would ask that Defendants'

14  Exhibit 58 be admitted.

15        MR. DAVIS:  No objection.

16        THE COURT:  Okay.  58 will be admitted.

17    (Defendants' Exhibit 58 was offered and received in

18    evidence.)

19  BY MR. SALAM:

20  Q.  So I just want to make sure I get the timing right here.

21  So the day before, you had offered your attorneys the

22  passwords to brentduke@yahoo.com, correct?

23  A.  Correct.

24  Q.  Okay.  And the next day, that's when 4Discovery downloaded

25  that information, correct?

Duke - Cross

```
 1   A.  Correct.

 2   Q.  All right.  But the day before, you had also offered your

 3   attorneys, identified in the prior, I think, Defendants'

 4   Exhibit 57, you had also offered them your passwords to both

 5   bduke@21centurysmoking.com and support@21centurysmoking.com,

 6   correct?

 7   A.  Correct.

 8   Q.  And those were hosted at GoDaddy, correct?

 9   A.  Correct.

10   Q.  Okay.  Now, I would like to direct your attention to

11   May 30th, 2019, of this year.

12        You were in Chicago on that day, correct?

13   A.  Correct.

14   Q.  And I think your testimony was you were meeting with

15   Mr. Stamatis and Mr. Shonder, correct?

16   A.  Correct.

17   Q.  And I think your testimony was that was in the course of

18   helping them with the response to the motion for sanctions,

19   correct?

20   A.  Correct.

21   Q.  All right.  And when I say "motions for sanctions," I'm

22   referring to the 75-page motion that was filed by Plaintiff's

23   counsel, okay?

24        Is that your understanding?

25   A.  Yes.
```

Duke - Cross

1    Q.   Okay.  Now, at some time during that meeting, did a

2    discussion of whether or not your bduke@21centurysmoking.com

3    and support@21centurysmoking.com had been subject to the 20

4    search terms that we have discussed?

5    A.   Was that discussed?

6    Q.   Strike that.  Let me try a better question.

7         All right.  During this meeting on May 30th with

8    Mr. Shonder and Mr. Stamatis, did the topic of

9    your -- searching your accounts at 21 Century Smoking,

10   brentduke@ -- I'm sorry, bduke@21centurysmoking.com and

11   support@21centurysmoking.com, did that -- did a discussion or

12   did those issues come up?

13        Whether or not those had been searched, did that come

14   up at the meeting?

15   A.   Yes.

16   Q.   And can you tell me what you recall as to how that came

17   up?

18   A.   I was in my general GoDaddy account where you can see all

19   of the e-mails, and I believed that my lawyers had everything

20   they needed from bduke and -- bduke@21centurysmoking,

21   support@21centurysmoking, and brentduke@yahoo.com, but I was

22   asking the lawyers if they thought they needed like these -- I

23   figured there would be nothing, but rob@21.  So I said there

24   is other e-mail addresses, and that was the first time they

25   were aware, then, of these other e-mail accounts, and that's

Duke - Cross

1  what I was discussing.

2  Q.  Okay.  And when you said you were looking at the computer,

3  were they with you on the computer, or did you show them

4  something on the computer?

5  A.  I believe I eventually showed them, but they were not

6  sitting -- they were not sitting with me.  I was sitting on

7  the other side of the room.

8  Q.  And can you tell me what you showed them on the computer?

9  A.  Kind of the list of all the e-mail accounts.

10  Q.  All right.  I'm going to hand you what is -- let's call

11  this -- I'm going to call it -- hold on.

12         Just to make life easy, I'm going to call this -- I'm

13  going to call it Defendants' 63 because I know I have a 62 I

14  may use.  So let's call this Defendants' 63.

15         MR. SMITH:  This is something new?

16         MR. SALAM:  Yes.  I have got a copy for everybody.

17         THE COURT:  And we are going to take a -- we will all

18  take a look at it over a couple of minutes so that we can read

19  it.

20  (Brief pause.)

21         MR. SALAM:  All right.  I gave away all my copies.

22  BY MR. SALAM:

23  Q.  Mr. Duke, was this the screen or something similar that

24  you showed counsel on May 30th --

25  A.  You didn't give me one.

Duke - Cross

```
 1              THE COURT:  Well, Mr. Smith needs it more than I do.
 2              MR. SALAM:  Okay.  Thank you, your Honor.
 3              MR. SMITH:  Thank you, your Honor.
 4              THE COURT:  Not a problem.
 5              THE WITNESS:  Yes.
 6   BY MR. SALAM:
 7   Q.  Okay.  So just, again, for the record, so this is a
 8   copy -- this is the type of screen you showed them at the
 9   time?
10              MR. SMITH:  Objection, your Honor.  A minute ago, it
11   was "this or something similar."
12              MR. SALAM:  Okay.
13              MR. SMITH:  And that got by me because I was looking
14   for the exhibit.
15              THE COURT:  Okay.  What do you recall showing counsel
16   at this meeting?
17              Sustained.
18              MR. SMITH:  Thank you, your Honor.
19              THE COURT:  What do you recall showing counsel at
20   this meeting?
21              THE WITNESS:  A list of the e-mail accounts in my
22   GoDaddy.
23   BY MR. SALAM:
24   Q.  And is Defendants' Exhibit 63 what you showed your -- is
25   this the type of screen you showed Defendants -- I'm
```

Duke - Cross

1   sorry -- showed Mr. Shonder and Mr. Stamatis at that meeting?

2   A.  I can't remember if they specifically ran over and looked

3   at my screen, but, yes, this is what I was looking at.  This

4   is what I described to them, and I believe I showed it to

5   them, yes.

6   Q.  Okay.

7           MR. SALAM:  Your Honor, I would ask that Defendants'

8   Exhibit 63 be admitted.

9           THE COURT:  Any objection?

10          MR. DAVIS:  No objection.

11          THE COURT:  All right.  63 will be admitted.

12          THE WITNESS:  Would you like this back, your Honor?

13   (Defendants' Exhibit 63 was offered and received in

14    evidence.)

15  BY MR. SALAM:

16  Q.  And what was Mr. Stamatis's reaction when you told him

17  about these other e-mail accounts?

18  A.  They -- well, both --

19  Q.  Listen my question.  I asked about -- we are going to go

20  one by one.

21          So what was Mr. Stamatis's reaction?

22  A.  His initial reaction was -- I mean, he was in shock, and

23  then he said something about he needed to -- I can't remember

24  exactly what he said, but that's when he said he needed to let

25  the court know of findings of -- as an agent of the court or

Duke - Cross

1    something like that, he needed to let the court know of these

2    findings, something to that effect.

3    Q.   Okay.  And you testified about that yesterday, correct?

4    A.   Yes.

5    Q.   And you said he was shocked, correct?

6    A.   Yes.

7    Q.   Okay.  Did he leave the room after this?

8    A.   Yes.  At some point, he left the room.

9    Q.   Okay.  Do you know where he went?

10   A.   He testified in June that he went down by the Chicago

11   River and just was staring into the river.

12   Q.   Okay.  And how did Mr. Shonder react?

13   A.   He was in disbelief that the support and bduke hadn't been

14   put through the 20 terms because I said "I'm pretty sure you

15   guys have all looked through these e-mails, but I don't know

16   if they have been through the 20 terms the same way the Yahoo!

17   was," and he said, "No, it had to have been because we have

18   thousands of e-mails here.  There is no way it hasn't been."

19        And that's when I explained that I didn't believe

20   that it had or I didn't know.  I knew that I had never seen

21   the terms, so I don't know exactly what should have been

22   looked for, but I didn't think that they had done that.

23        So then he went into another room, and I don't know

24   what he was looking at, but he came back shortly thereafter as

25   well.

Duke - Cross

531

1  Q.  Okay.  So at some point, both Mr. Shonder and Mr. Stamatis

2  were back in the room, correct?

3  A.  Correct.

4  Q.  And then what happened?

5  A.  We continued with the meeting that we were having, the

6  preparation that we were doing for the response.

7  Q.  Okay.  And how long thereafter did the meeting end?

8  A.  Pretty abruptly.  I mean, we continued for a little bit

9  longer, but the meeting did end shortly thereafter.

10  Q.  Okay.  And I think you testified -- well, let me ask you:

11  At some point, did you learn -- well, you testified that you

12  learned your attorneys -- strike that.

13          I would like to hand you what I will mark -- and I

14  believe I have provided previously, but we will find

15  out -- Plaintiff's Exhibit 59, and if not, I have extra

16  copies.

17          THE COURT:  Did you just say --

18          MR. SALAM:  59.

19          THE COURT:  I think you said Plaintiff's.

20          MR. SALAM:  I'm sorry.  Defendants' Exhibit 59.

21          THE COURT:  I do have a Defendants' Exhibit 59.  I

22  have it.

23          MR. SALAM:  Okay.  Let me hand one to the witness.

24          THE COURT:  I think it is on the screen.

25

Duke - Cross

1   BY MR. SALAM:

2   Q.  I would ask you to review this, Defendants' Exhibit 59.

3   A.  Okay.

4   Q.  Okay.  Do you recall that you received this on or about

5   May 31st?

6   A.  Yes.

7   Q.  I'm sorry.  May 31st, 2019?

8   A.  Yes.

9   Q.  Okay.  And the first page is from Travis Life to you, and

10  it says:  "Please call me," correct?

11  A.  Correct.

12  Q.  Okay.  The second page is an e-mail from Mr. Leavens to

13  you, correct?

14  A.  Correct.

15  Q.  And it appears he sent it to all your e-mails that he was

16  aware of, correct?

17          Well, strike that.

18          He sent it to three of your e-mails, correct?

19  A.  I see two of them.

20  Q.  Strike that.

21  A.  I see two of them.  I see brentduke@yahoo.com and

22  support@21centurysmoking.com.

23  Q.  Correct.  I am correct.  I believe so.  Okay.

24          And can you read for the record what that e-mail

25  says?

Duke - Cross

1    A.   "Brent - I am forwarding an order issued by Magistrate

2    Judge Iain Johnston requiring your presence in his courtroom

3    at 10:00 a.m. on June 4.  It is absolutely essential and

4    necessary that you appear in his courtroom on this date and at

5    this time.  The motions he references were a motion for a stay

6    in the deadline for filing a response to the Plaintiff's

7    motion for sanctions that was filed yesterday and a motion by

8    Peter Stamatis and Steve Shonder to withdraw as counsel.

9    Peter and Steve will be forwarding copies of both of those

10   motions to you directly.

11         "As a result of recent events, we believe we have an

12   irreconcilable conflict of interest with respect to our

13   representation of 21 Century Smoking, Inc., and you.  We are

14   not in a position to continue to represent you or provide you

15   with legal advice, and we urge you to immediately take steps

16   to retain other counsel before Tuesday.

17         "Please promptly respond to this message and

18   acknowledge that you have received this message.

19         "Thank you, Tom Leavens."

20   Q.   And then attached to that is a copy of an order -- well,

21   attached to that, you understand what's attached to that is

22   the order that they referred to in the e-mail?

23   A.   Okay.

24   Q.   Excuse me?

25   A.   Okay.  I don't -- yes, I believe you.

Duke - Cross

534

1  Q.  Well, do you recall seeing this as part of the e-mail that

2  you received?

3  A.  Yes.

4  Q.  Okay.  And subsequent to receiving this, you did arrange

5  to be here on June 4th -- in this courtroom on June 4th, 2019,

6  correct?

7  A.  Yes.

8        MR. SALAM:  Your Honor, I would ask that Defendants'

9  Exhibit 59 be admitted.

10       THE COURT:  Any objection?

11       MR. DAVIS:  No.

12       THE COURT:  All right.  59 will be admitted.

13   (Defendants' Exhibit 59 was offered and received in

14   evidence.)

15  BY MR. SALAM:

16  Q.  And to the extent Defendants' Exhibit 59 references

17  "irreconcilable conflicts" -- do you see where it says that in

18  the second to last paragraph?

19  A.  Yes.

20  Q.  Okay.  Yesterday, you testified, I believe, in response to

21  a question from Mr. Davis, about the motions to withdraw.  He

22  referenced the fact that the motion to withdraw, I believe,

23  used the term "irreconcilable conflict" or some other term

24  that ended with "conflict."

25        Do you recall that testimony?

Duke - Cross

535

1  A.  Yes.

2  Q.  Okay.  And you explained what you understood that to mean,

3  correct?

4  A.  Correct.

5  Q.  All right.  And I believe it referred to "unintentional

6  conduct," correct?

7  A.  Correct.

8  Q.  Okay.  Now, I want to direct your attention to -- I

9  believe you testified -- at some point in 2018, you had

10  testified that Mr. Leavens came to see you in San Diego,

11  correct?

12  A.  Yes.

13  Q.  Okay.  And I believe -- I think you said it was in

14  November of 2018, correct?

15  A.  Yes.  I don't know the exact time, but yes.

16  Q.  Okay.  I'm sure we will get that information in the course

17  of the hearing.

18        But with respect to -- and that was the only time,

19  whenever it was?

20        He came to visit you in San Diego only once, correct?

21  A.  Yes.

22  Q.  Okay.  And as best you can recall, what did you understand

23  the purpose of him coming to San Diego -- or what was the

24  purpose of the meeting that you had with him when he came to

25  see you in San Diego?

Duke - Cross

536

1  A.  As I stated, there was clearly issues with discovery

2  errors of some type with e-mail.

3  Q.  Okay.  In that meeting, did he say anything that led you

4  to believe that the errors were your fault?

5  A.  No.

6  Q.  Did he say anything to you -- and by "fault" -- let me

7  rephrase that -- or let me ask another question as

8  well -- that you had done anything wrong?

9  A.  No.

10  Q.  Okay.  Did you say anything that led you to believe that

11  you had not provided to your attorneys anything that they had

12  asked for?

13  A.  No.

14  Q.  But I think you said he did offer to quit, correct?

15  A.  Correct.

16  Q.  And what was your understanding as to why he offered to

17  quit?

18  A.  Because of this same conflict of errors having been made

19  and that somehow would conflict us, I suppose.

20  Q.  Okay.  And at that time, the only error -- well, what

21  errors -- did he mention what errors at that time?

22  A.  Well, this is when they had come to the realization of the

23  Yahoo! mishap, and so all the Yahoo! stuff, I believe, had

24  been downloaded by this point, and that's what we were

25  discussing.

Duke - Cross

1  Q.  All right.  Now, you decided not to accept his offer to

2  stop representing you, correct?

3  A.  Correct.

4  Q.  Okay.  And without disclosing any communications you may

5  have had with other attorneys, besides former defense counsel,

6  can you tell me why you chose not to accept his offer?

7  A.  Because the case had been going on at this point for six

8  years.  He had probably the most knowledge of the case of

9  anyone.  I believe him to be an honest man.  I don't believe

10  him to ever -- he would never have done something

11  intentionally wrong.  So I couldn't see any reason why I would

12  not want him to just remain as my lawyer in this case.

13  Q.  Okay.  And prior to this, you were very pleased with

14  Mr. Leavens's work for you, correct?

15  A.  Yes, I have always been pleased with Mr. Leavens's work,

16  yes.

17  Q.  I mean, he succeeded in getting you partial summary

18  judgment in approximately 18 months, correct?

19  A.  Correct.

20  Q.  And after this meeting, when you did not accept his

21  resignation, and up until -- and I'm not saying afterwards, he

22  didn't, but I'm going to give a time period:  Between this

23  meeting and his withdraw that was granted by the court in June

24  of this year, you still believe Mr. Leavens did a good job for

25  you, correct?

Duke - Cross

538

```
 1   A.  Correct.

 2   Q.  Okay.  You still think Mr. Leavens is honest?

 3   A.  Yes.

 4   Q.  Okay.  Do you believe Mr. Leavens would ever intentionally

 5   do anything improper?

 6   A.  No.

 7   Q.  Okay.  And you haven't seen anything to change that

 8   opinion since June 4th, correct?

 9   A.  No.

10   Q.  Okay.  And let me ask the question with respect to

11   Ms. Liberman.  I know she was only involved briefly.

12           But do you believe Ms. Liberman did anything

13   intentionally -- or strike that.

14           Do you believe that Ms. Liberman is honest?

15   A.  Yes.

16   Q.  Do you believe that Ms. Liberman would ever do anything

17   intentionally improper?

18   A.  I do not.

19           MR. DAVIS:  Objection, foundation.

20           THE COURT:  I will sustain that.

21           Let's get some foundation.  These are opinions as to

22   people's truthfulness, and we don't have any foundation for

23   any of this.

24   BY MR. SALAM:

25   Q.  Okay.  So Ms. Liberman was involved in this case -- when
```

Duke - Cross

1  did you first meet Ms. Liberman?

2  A.  Shortly after beginning to work with their law firm.

3  Q.  Okay.  So that would have been somewhere in --

4  A.  Late 2012.

5  Q.  Late 2012.  Okay.

6       And Ms. Liberman at some point stopped working on

7  this case, correct?

8  A.  Correct.

9  Q.  And do you recall when that was?

10  A.  I believe sometime after that settlement conference that

11  we had in 2015, I believe.

12  Q.  Okay.  Well, regardless of the time, at some point, she

13  stopped working on the case, correct?

14  A.  Yes.

15  Q.  All right.  So based on the time that you interacted with

16  her while she was working on the case, do you believe, based

17  on those interactions, that she would ever intentionally do

18  anything that would not be proper in handling the case?

19       MR. DAVIS:  Same objection.

20       THE COURT:  And what was the objection?

21       MR. DAVIS:  Foundation.

22       THE COURT:  All right.  Overruled.

23       THE WITNESS:  No, I do not believe she would do

24  anything wrong.

25

Duke - Cross

540

1   BY MR. SALAM:

2   Q.  I'm sorry?  What was your answer?

3   A.  I do not believe she would do anything dishonest or wrong,

4   whatever.  I can't remember the exact --

5   Q.  Intentionally?

6   A.  I don't believe she would do anything intentionally.

7   Q.  She might make a mistake, but not intentionally -- well,

8   strike that.  That's a bad question.

9           With respect to Travis Life, do you recall when you

10  first started dealing with Travis Life?

11  A.  Shortly after Heather Liberman left the firm.

12  Q.  Okay.

13  A.  Or maybe even when she was still there.  I think there was

14  a little bit of overlap.

15  Q.  Okay.  And until he withdrew in June of this year, you had

16  lots of dealings with him, correct?

17  A.  Correct.

18  Q.  Okay.  He would often call you and ask you to search for

19  e-mails?

20  A.  Yes.

21  Q.  Okay.  He would ask you to review filings that he was

22  making, correct?

23  A.  Yes.

24  Q.  Okay.  As you sit here today, you can't remember specific

25  filings, but he would ask you to review things, correct?

Duke - Cross

1  A.  Yes.

2  Q.  And your other attorneys would, too?

3  A.  Yes.

4  Q.  Okay.  And what is your understanding as to what they

5  would send you to review?

6  A.  Just whatever we were working on at that time for the

7  case.  Whatever filing was going to be turned in, they would

8  have me review it, if there was something pertinent that I

9  could add or needed to edit or needed to research.

10  Q.  Okay.  And based on your interactions with Mr. Life, do

11  you believe he would intentionally withhold documents?

12  A.  Absolutely not.

13  Q.  Do you believe he would intentionally destroy documents?

14  A.  No.

15  Q.  With respect to -- when did Peter Stamatis -- when did you

16  first have Peter Stamatis start working on the case?

17  A.  Shortly before the depositions.

18  Q.  Okay.  And I'm aware your deposition was in June of 2015.

19  A.  Around that, yes.  Around that time.

20  Q.  Okay.  And how did you come -- how did Mr. -- as best you

21  can recall, how did Mr. Stamatis come to be involved in this

22  case?

23  A.  We came for the settlement conference.

24  Q.  And who is "we"?

25  A.  Mr. Leavens, I believe Heather Liberman was still with us

Duke - Cross

1 at that point, and myself. And after the settlement

2 conference, Mr. Leavens informed me that in 30 years, he had

3 tried like one case, so he didn't have the confidence, given

4 the strength of our position, and he didn't want to be the

5 weakness in the case, so he wanted to find a trial attorney

6 who would be able to better suit our needs at that point,

7 seeing as this case was not going to settle.

8 Q. And is he -- is that how you felt?

9      Did you know Mr. -- how did you come to retain

10 Mr. Stamatis? Was that at the suggestion of Mr. Leavens or

11 did you find Peter?

12 A. No, Mr. Leavens found Mr. Stamatis.

13 Q. Okay. And so Mr. Stamatis was involved from somewhere in

14 around June of 2015 until he withdrew, correct?

15 A. Correct.

16 Q. And based on your dealings with Mr. Stamatis, are you

17 aware of whether or not he ever intentionally withheld any

18 information from Plaintiffs?

19 A. Absolutely not.

20 Q. Okay. Strike that.

21      Well, you are aware that he may have withheld --

22      THE COURT: You want to strike the answer or your

23 question?

24      MR. SALAM: No, strike my "strike," please.

25      THE COURT: Okay.

Duke - Cross

543

```
 1          MR. SALAM:  Thank you.

 2   BY MR. SALAM:

 3   Q.  You are aware that he did withhold documents that he

 4   considered privileged, correct?

 5   A.  Well, yes, of course.

 6   Q.  Okay.  But other than documents that he withheld for

 7   privilege basis, you are not aware of him withholding any

 8   documents that otherwise -- well, you are not aware of him

 9   withholding any other documents, other than for privilege

10   purposes, correct?

11   A.  Correct.

12   Q.  Okay.  And do you think he would intentionally destroy any

13   documents?

14   A.  No.

15   Q.  Okay.  Do you consider Mr. Stamatis to be honest?

16   A.  Yes.

17   Q.  Okay.  In fact, you had indicated that when he realized

18   that the GoDaddy -- your GoDaddy accounts had not been subject

19   to the 20 search terms, it was -- as soon as he realized that,

20   that's when he informed you, or shortly thereafter, that he

21   was going to have to tell the court this, correct?

22   A.  Correct.

23   Q.  Okay.  And last, but not least, Steven Shonder, when was

24   the first time you met Steve Shonder face to face?

25   A.  At that meeting.
```

Duke - Cross

1  Q.  On May 30th?

2  A.  Correct.

3  Q.  Basically, you met him once, and he was withdrawn the next

4  day?

5  A.  Something like that, yes.

6  Q.  Okay.  Had you had phone communications with him prior to

7  May 30th?

8  A.  He may have been on calls, but I don't think I ever just

9  had a call with him.

10  Q.  Okay.  So other than May 30th, can you describe

11  what -- you said he may have been on phone calls?

12  A.  Correct.

13  Q.  Was he ever an attorney asking you to do searches for

14  anything, other than May 30th, excluding May 30th?

15         You said he may have been on phone calls.

16         Can you recall what involvement he had in

17  communicating with you in those phone calls?

18  A.  I don't recall.

19  Q.  Okay.  Do you recall if he ever asked you to search for

20  any documents?

21  A.  It's possible.  I mean, I feel like all of the attorneys

22  at some point asked me to search for things.

23  Q.  Okay.  Well, in limited interactions you had with

24  Mr. Shonder, do you think he would have intentionally

25  destroyed any documents?

Duke - Cross

1  A.  No.

2  Q.  Do you think he would have intentionally withheld

3  non-privileged documents?

4  A.  No.

5  Q.  Okay.  Based on your dealings with Mr. Shonder, you

6  believe he is an honest attorney?

7  A.  Yes.

8  Q.  Now, at some point, and I'm not sure exactly when, you

9  came to understand that there had been a problem with your

10  Yahoo! e-mail account not being searched, correct?

11  A.  Correct.

12  Q.  And I think your testimony was that was -- the first time

13  you learned about that was somewhere on or about March 18th,

14  2018, or 14th, 2018, when Mr. Life called you and asked you to

15  search for certain e-mails, correct?

16  A.  Yeah, I think it was maybe a few weeks after that, though,

17  that they kind of figured out the actual realization that the

18  Yahoo! had not been searched for the full number of terms.  I

19  don't know if the realization was made that soon.

20       I think it was after seeing these e-mails, and

21  then -- I'm not sure I was involved in these discussions, but

22  then at some point shortly thereafter, Travis called me and

23  said that they needed my password, and they were going to have

24  4Discovery do the full search of the e-mails.  And in my mind,

25  I'm thinking "If you could do that, why didn't we do this from

Duke - Cross

1    the beginning to all of my e-mails?"  I didn't understand why,

2    at that point, we were doing that to the Yahoo! e-mail, and I

3    had been wasting thousands of hours searching e-mails.  So I

4    was kind of blown away that you could even do that.  I didn't

5    realize that that was even an option.

6    Q.  Okay.  So let me unpack that a little.

7            So when Mr. Life called you on or about March 14th or

8    15th of 2018 and asked you to search for -- I think we have

9    looked at the e-mail -- search for, I think it was related to,

10   Kirti Saraswat, Frank Gu, Ms. Wood, when he called you at that

11   time and asked you to search, at that point, you weren't aware

12   that there was -- you weren't yet aware that the problem -- or

13   one problem was that your Yahoo! e-mail account had not been

14   subject to those 20 search terms, correct?

15   A.  Correct.

16   Q.  Okay.  And somewhere within a few weeks thereafter, you

17   believe that's when you first found out about it from

18   Mr. Life, correct?

19   A.  Correct.

20   Q.  And your understanding was that is about -- you would

21   have -- they would have told you as soon as they figured out

22   that that was the problem, correct?

23   A.  Correct.

24   Q.  And so when they told you that -- and when I say "they,"

25   who was it that told you, if you recall?

Duke - Cross

547

1   A.  I believe that was Travis.

2   Q.  Okay.

3   A.  I want to say all of this was happening in March.  Maybe

4   by May, they kind of figured it out, and that's when he told

5   me.  I don't remember the exact dates, but I want to say March

6   was the first searching for the terms, and sometime in May, he

7   then reached out to me and kind of explained.

8   Q.  Okay.  And you remember we looked in one of the exhibits.

9   It was the e-mail chain that included 4Discovery, where they

10  said the download was successful, and that was May 8th?

11  A.  Correct.

12  Q.  Does that refresh your recollection as to when Mr. Life

13  explained to you that the problem was that your Yahoo! e-mail

14  account had not been searched?

15  A.  Correct.

16          MR. SMITH:  Objection, your Honor, it has been asked

17  and answered.

18          THE COURT:  Well, it has been answered again.  So we

19  have covered that ground.

20          MR. SMITH:  Okay.

21          THE COURT:  It is 4:16.

22  BY MR. SALAM:

23  Q.  So on or about the time 4Discovery downloaded the e-mails,

24  somewhere near there is when you first learned that there was

25  a problem that your Yahoo! e-mail account had not previously

Duke - Cross

1  been subject to the 20 search terms, correct?

2         MR. SMITH:  Same objection, your Honor.

3         THE COURT:  Unless this is foundation for something

4  totally new --

5         MR. SALAM:  It is.  It is, your Honor.

6         THE COURT:  Okay.  All right.  He has talked about

7  this multiple times.  Why don't you get to that subject.

8         MR. SALAM:  Okay.

9  BY MR. SALAM:

10 Q.  So when Mr. Life informed you that they were going to need

11 your credentials to download the e-mails and search them, can

12 you -- what was your reaction?

13 A.  Well, as I said, I was kind of shocked that that was even

14 something 4Discovery could do because why didn't we do that

15 from the beginning instead of wasting thousands of my hours

16 searching for e-mails.  I mean, I had been searching for

17 e-mails constantly, and if that was something that could be

18 done, which I didn't realize, that would have sure made things

19 a lot easier.

20 Q.  So this term "sanctions," I believe you recall -- in your

21 prior testimony, Mr. Davis asked you about your understanding.

22        Do you recall being asked about your understanding of

23 sanctions?

24 A.  By my attorneys?

25 Q.  No, by Mr. Davis in your previous testimony.

Duke - Cross

1   A.  Oh, yes.

2   Q.  Do you recall that?

3   A.  Yes.

4   Q.  And what was your understanding of the term -- well, who

5   did you first hear the term "sanctions" from?

6   A.  Former defense counsel.  I don't recall which one.

7   Q.  Okay.  Do you recall approximately when you would have

8   heard that?

9   A.  I would venture to guess it was around the time that Tom

10  Leavens came to visit, somewhere in that range.

11  Q.  All right.  And at that time, what did you understand the

12  term "sanctions" to mean?

13  A.  I mean, I knew it was some type of penalty or -- yes, some

14  type of penalty, like sanctions against a country, penalties

15  against a country.  So I knew it was some type of penalty, and

16  I didn't know the full details of the scope of it, but I knew

17  it was not a good thing.

18  Q.  All right.  On a scale of one to ten, how serious did you

19  think the issue was about sanctions?

20  A.  Probably fairly low because I knew it couldn't -- nothing

21  intentional was done in any way.  So I probably didn't believe

22  that sanctions could be that serious if nothing intentional

23  was done.  That probably would have been what I thought at

24  that time.

25  Q.  You are aware, as you sit here today, that the issue of

Duke - Cross

1    sanctions that we are discussing here or having a hearing on

2    is very serious, correct?

3    A.  Yes, it is a ten out of ten.  I was unaware of that.

4    Q.  Okay.  And prior to that, when did you first realize the

5    seriousness of the sanctions issue we are dealing with here?

6    A.  June 4th, I believe, is when we were sitting in this

7    courtroom.

8    Q.  Okay.

9    A.  In 2019.

10   Q.  Thank you.

11         MR. SALAM:  I'm doing my best to finish up so you

12   have time to deal with the man in the orange jumpsuit.

13         THE COURT:  Okay.

14    (Brief pause.)

15         MR. SALAM:  Can we take a short break, your Honor?

16   And I should be able to figure out exactly what I need to

17   address to finish this off.

18         THE COURT:  Five minutes tops.

19         MR. SALAM:  That would be fine, your Honor.

20    (Recess taken.)

21   BY MR. SALAM:

22   Q.  Mr. Duke, I would like to direct your attention to Yahoo!

23   Chat.  Do you remember some of your testimony?

24         You testified about Yahoo! Chat?

25   A.  Yes.

Duke - Cross

1   Q.  I believe that was Monday, correct?

2   A.  Yes.

3   Q.  Okay.  On your -- to the extent you would have used Yahoo!

4   Chat in your business, 21centurysmoking.com, did you use

5   that -- how did you access the Yahoo! Chat service?

6   A.  Like through the -- when you load up your Yahoo! e-mail,

7   there was like a thing on the left for messenger or whatever.

8   So within your Yahoo! e-mail program, you could get to

9   messenger.

10  Q.  So you would be going through your web browser, correct,

11  to get to Yahoo!?

12  A.  Correct, yes.

13  Q.  On your laptop, did you have what -- do you understand, if

14  I say "Yahoo! client" or "Yahoo! application," do either of

15  those terms mean anything to you?

16  A.  I would have had those on desktops 20 years ago, but not

17  on my laptop.

18  Q.  Okay.  So at the time you provided -- 4Discovery imaged

19  your laptop, I believe it was, December 2014; is that correct?

20          Is that what you testified to?

21  A.  Correct, yes.

22  Q.  Okay.  Sorry.  I was trying to not talk over you so the

23  court reporter --

24  A.  Oh, sorry.

25  Q.  I think I'm the one who needs to apologize.

Duke - Cross

1          But in any event, so at the time, you would have been

2   communicating with Ms. Saraswat by Yahoo! Chat?  You did do

3   that at some time, correct?

4   A.  Yes.

5   Q.  Okay.  And you would have been communicating with her

6   through -- you would have accessed Yahoo! Chat through your

7   web browser, correct?

8   A.  Correct.

9   Q.  So do you have an understanding as to whether or

10  not -- well, if you wanted to save a Yahoo! Chat, whether it

11  was Ms. Saraswat or somebody else, what would you do?

12          At the time of the chat, if, for some reason, you

13  wanted to save it, what would you do?

14  A.  Like I'm saying 10 years ago, 11, 12 years ago, when I was

15  doing it on a desktop, I would need to e-mail it to myself.

16  But for the last whatever number of years that I was using it,

17  it was just within the e-mail program.  So the only

18  time -- only the really old ones would I have e-mailed to

19  myself.  The rest would have been just basically -- I wouldn't

20  have to save them.  They were there.

21  Q.  Well, did you ever e-mail chats -- even if you were

22  accessing it through the web browser, do you ever -- do you

23  recall if you ever e-mailed a chat to yourself at

24  brentduke@yahoo.com?

25  A.  I don't think when they were on the web browser because

1  they just saved.  I mean, they were automatically there.  So I

2  didn't have to -- I could see them by just loading my e-mail.

3  Q.  Are you aware of whether or not there was a Yahoo! Chat

4  with Ms. Saraswat that -- well, I believe -- let's find the

5  Plaintiff's exhibit.

6         There was a Plaintiff's exhibit that, I believe, was

7  a chat with Ms. Saraswat?

8  A.  Yes, I recall it, yes.

9  Q.  Okay.  And that showed up in your brentduke -- that showed

10  up in your brentduke@yahoo.com e-mail?

11  A.  Correct.

12  Q.  So how did that happen if you were using your web browser?

13  A.  This would have had to have been on some type of desktop

14  somewhere that I needed to e-mail it to myself to save it.

15  It's the only reason I would have e-mailed it to myself.

16  Q.  Okay.  But on your laptop, you did not have a Yahoo! Chat

17  client, right?

18  A.  No, this would have been way before my laptop existed.

19  This would be like 2009, 2008.  It would be way in the past.

20  I got my laptop in 2011.

21  Q.  Okay.  So at the time your laptop was imaged by

22  4Discovery, you did not have a Yahoo! Chat client or

23  application residing on your computer, correct?

24  A.  I never had it on my laptop, no.

25         MR. SALAM:  Can I just have one moment, your Honor?

Duke - Cross

1        THE COURT:  Sure.

2     (Brief pause.)

3   BY MR. SALAM:

4   Q.  So if you e-mailed a chat with Kirti to your Yahoo!, then

5   you must have been using a non-web-based Yahoo! Chat at some

6   point, correct?

7   A.  Yes, before they integrated it into the actual Yahoo! Mail

8   program, you had to use a Yahoo! Messenger client or whatever

9   it was.

10  Q.  So I'm trying to understand because I know the -- I think

11  it was September of 2010 was the Yahoo! Chat or the chat that

12  you e-mailed to yourself from -- to you at yahoo.com.

13        Do you remember that exhibit?

14  A.  Yes.

15  Q.  Okay.  What computer were you using in September of 2010

16  that you would have had a chat with Ms. Saraswat?

17  A.  It either would have been on my wife's old computer or my

18  work computer at -- I was at Roach Ag, so I would have been at

19  Roach Ag at work, but I think by 2010, I don't think I was

20  working there anymore.  So I think it would have been probably

21  my wife's desktop.

22  Q.  Okay.  Your wife's desktop.

23        And is that one of the computers that's -- that was

24  provided recently, the eight computers listed?

25  A.  I'm not sure that we still have that computer.  There was

Duke - Cross

555

1    eight computers that were searched.  I'm not sure if that is

2    one of them.

3    Q.  Okay.  And if we could find the -- you are not sure, as

4    you sit here today.

5         Is there anything that would allow you to determine

6    whether or not that's one of the computers that was collected,

7    as indicated in the status report?

8    A.  I don't believe it is one of the computers, but I'm not a

9    hundred percent sure.  I mean, we searched our entire house

10   for every computer we could find, but I mean this is a

11   computer that hasn't been in use for nine years, ten years.

12   Q.  Okay.  And the computer that you used at work, at Roach

13   Ag, how long -- when were you last at Roach Ag?

14   A.  2009-ish, somewhere in there.

15   Q.  Okay.  2009?

16   A.  Somewhere in there, yes.

17   Q.  Okay.  All right.  And any idea what happened to that

18   computer after you left Roach Ag?

19   A.  No.  I wasn't working there anymore.

20   Q.  But if you had had -- strike that.

21        MR. SALAM:  Let me check Plaintiff's exhibits and see

22   if I have any more questions, and if not, I will move to admit

23   a few exhibits, and we should be finished -- I should be

24   finished with this round of Mr. Duke.

25        Hold on one second here.

Duke - Cross

1    (Brief pause.)

2    BY MR. SALAM:

3    Q.  I'm going to direct your attention to Plaintiff's

4    Exhibit 17.  Just for the record here, it is an e-mail from

5    Brent Duke to Brent Duke dated September 13th, 2010.

6    A.  Yes.

7    Q.  Okay.  So that's a Yahoo -- is that -- this e-mail, does

8    that show a Yahoo! Chat?

9    A.  Yes.

10   Q.  Okay.  So you weren't currently -- you didn't have your

11   laptop at the time of this -- the laptop that was imaged, your

12   laptop that was imaged in December of 2014, you did not have

13   at the time of -- as of September 13th, 2010, correct?

14   A.  Correct.

15   Q.  All right.  And you think you would have e-mailed this to

16   yourself because you must have been using, I think you

17   testified, your wife's desktop?

18   A.  I was using some desktop, or this was super important to

19   me, and this was the web-based thing, but it was so important

20   to me, I wanted it in my e-mail so it would be easier to

21   check.  I mean, those are the only two reasons I could think

22   that I would have e-mailed it to myself.

23   Q.  All right.  So in addition to it either not being on the

24   web, you still would have -- even if it was on the web, it may

25   have been so important or interesting or you wanted to save

Duke - Cross

557

1  it, you might still e-mail it to yourself?

2  A.  Just so it would be easier to see, yes, so it doesn't get

3  lost somewhere in five messages, and it is something I can

4  just turn to really quickly in an e-mail.

5  Q.  Now, you said you stopped working at Roach Ag somewhere in

6  2010?

7  A.  Yes, 2009, 2010, somewhere in there.

8  Q.  And you indicated that you --

9  A.  Or 2009.

10  Q.  2009?

11  A.  Yes, by that time 21 Century Smoking was far along, so

12  2009 would be the latest.

13        MR. SALAM:  Could I ask that you not scroll the

14  exhibit.  I'm sorry.  It is disturbing me.

15        MS. RICH:  Yes.  Sorry.

16  BY MR. SALAM:

17  Q.  All right.  So you left Roach Ag sometime in 2009, right?

18  A.  I believe so, yes.

19  Q.  And that's the work computer you were referring to,

20  correct?

21  A.  Yes.

22  Q.  Okay.  In 2009.

23        So when you said it would have been on your work

24  computer, you meant the computer you were using at Roach Ag,

25  correct?

Duke - Cross

558

1   A.   Correct.

2   Q.   And that was a computer they provided you, correct?

3   A.   Yes.

4   Q.   Okay.  And you weren't allowed to take that with you when

5   you stopped working at Roach Ag?

6   A.   No, it was not my computer.

7   Q.   Okay.  And your wife's desktop that you think you may have

8   been using or may have also chatted with Kirti

9   Saraswat -- well, strike that.

10         Could you, again, tell me what -- you indicated maybe

11  you had used your wife's old desktop to chat with Kirti?

12  A.   Yes.

13  Q.   And do you know if her old desktop would have had the

14  Yahoo! client on it or only if -- strike that.

15         Do you know if her old desktop would have had the

16  Yahoo! client application?

17  A.   It is a pretty old computer.  Yes, I believe it would

18  have.

19  Q.   Okay.  When you say "pretty old," give me, if you can, a

20  year.

21  A.   It probably was purchased in 2003.

22  Q.   '03?

23  A.   Yes, something like that.

24  Q.   And you were still using it -- or you might have still

25  used it as late at 2010?

Duke - Cross

1   A.  Still using it in 2011, yes.

2   Q.  You were?

3   A.  Yes.

4   Q.  Okay.  And do you know what happened to that computer?

5   A.  As I said, I have no clue.  Like we searched, and the

6   computers, we found eight computers.  We didn't find that one.

7   Q.  Okay.  And you don't know when you -- so you don't know

8   what happened to it, correct?

9   A.  No.

10  Q.  Do you think you may have thrown it out sometime prior

11  to --

12  A.  It may be -- moving from here, from Chicago, to

13  California, it might have got lost in the move.  I don't even

14  have a guess.

15  Q.  Do you recall having it in Chicago before the move?

16  A.  Yes.

17   (Brief pause.)

18      MR. SALAM:  Okay.  Bear with me, your Honor.  I'm

19  just flipping through to make sure I have no other exhibits

20  from Plaintiffs that I needed to address.

21      All right.  Your Honor, just because my co-counsel

22  gave me a list here of exhibits I have referenced, but may not

23  have moved to admit, I would just like to quickly run through

24  those.

25      I believe Plaintiff's Exhibit 1 has been admitted,

Duke - Cross

1    correct?  That's Plaintiff's, not Defendants', but it is on my

2    list here.

3           THE COURT:  Here is how I have them:  I have them in

4    the order that you used.

5           So I have got you starting at 37, 74, 76.  You

6    referenced 31.

7           MR. SALAM:  Okay.  And Plaintiff's 76 has been

8    admitted, correct?

9           I would move to admit Plaintiff's Exhibit 76 if it

10   has not been.

11          THE COURT:  Let's do it this way --

12          MR. SALAM:  Sorry, your Honor.

13          THE COURT:  Tell me what -- go through your list.

14   Tell me what exhibits you are moving for admission of.

15          MR. SALAM:  Plaintiff's Exhibit No. 1.

16          THE COURT:  Okay.  What else?

17          MR. SALAM:  Which is the e-mail from Mr. Stamatis.

18   It is the cover to the, approximately, 122 pages that Mr. Duke

19   sent to --

20          THE COURT:  Just go through the list.

21          MR. SALAM:  Plaintiff's Exhibit 1.

22          THE COURT:  Yep.

23          MR. SALAM:  Plaintiff's Exhibit 66.

24          THE COURT:  66.

25          MR. SALAM:  Plaintiff's Exhibit 76.

Duke - Cross

```
1              THE COURT:  76.

2              MR. SALAM:  Defendants' Exhibit 4.

3              THE COURT:  D-4.

4              MR. SALAM:  Defendants' Exhibit 57.

5              THE COURT:  D-57.

6              MR. SALAM:  Defendants' Exhibit 62.

7              THE COURT:  Okay.

8              MR. SALAM:  Let me check.

9         Defendants' Exhibit 10, but I may need to lay a quick

10   foundation.  I don't know if I asked any questions about that.

11             Well, I have not asked questions about it, but we can

12   address it when we do the cleanup on exhibits.  It was just

13   establishing the Bates numbers of the Yahoo! production, the

14   15,000 pages --

15             THE COURT:  Okay.

16             MR. SALAM:  -- is what I wanted it for.

17             Plaintiff's Exhibit -- I'm sorry -- Defendants'

18   Exhibit 23, which was the June 29th e-mail from GoDaddy

19   support back to Mr. Duke, and the related e-mails that he was

20   questioned about by Plaintiff's counsel, but I don't believe

21   anybody ever moved to admit them.  I would seek to admit that

22   group exhibit.

23             THE COURT:  Again, just give me a list of these.

24             MR. SALAM:  Okay.  Defendants' Exhibit 23.

25             THE COURT:  Okay.
```

Duke - Cross

1          MR. SALAM:  And LS Exhibit 18.

2          THE COURT:  All right.  So you are moving for

3   admission of Plaintiff's Exhibit No. 1, Plaintiff's

4   Exhibit No. 66, Plaintiff's Exhibit 76, Defendants' Exhibit 4,

5   Defendants' Exhibit 57, Defendants' Exhibit 62, Defendants'

6   Exhibit 23, and LS Exhibit 18, correct?

7          MR. SALAM:  And Defendants' Exhibit 10.

8          THE COURT:  Okay.

9          MR. SMITH:  No objections to any of those, your

10  Honor.

11         THE COURT:  Okay.

12         MR. DAVIS:  No objections from Plaintiff, your Honor,

13  just to note that we are moving -- on Plaintiff's list, this

14  is what I raised at the beginning of my presentation -- or the

15  examination, was our motion that's pending has our Exhibits 1

16  through 61 attached, that were already filed and of record.

17  They are part of the record.  So I moved them all to be

18  formally admitted.  There has been no objection to those

19  documents at this time.

20         THE COURT:  Okay.  Let's finish what we are in the

21  middle of.

22         MR. DAVIS:  Got it.

23         THE COURT:  No objections to Plaintiff's

24  Exhibit No. 1, Plaintiff's Exhibit 66, Plaintiff's Exhibit 76,

25  Defendants' 4, Defendants' 57, Defendants' 62, Defendants' 10,

1    Defendants' 23, and LS-18.

2            MR. DAVIS:  No objection.

3            THE COURT:  Okay.

4            MR. SALAM:  For the record, I believe we have already

5    admitted 58 and 59 of Defendants'.

6            THE COURT:  I want to make sure there is no objection

7    to those exhibits I have just identified.

8            No objection, those will be admitted.

9            MR. SALAM:  Thank you.

10           THE COURT:  Okay.  Mr. Davis, your point is you have

11   got Plaintiff's Exhibit 1 through 61 that are attached, and

12   you just want to move for admission now, correct?

13           MR. DAVIS:  Yes.

14           THE COURT:  Okay.

15           MR. DAVIS:  And in addition, the balance of our

16   exhibits on our list are -- well, we can take them as we go,

17   but if we are admitting 76, we also move 77 into evidence.

18   That was the second exhibit that Mr. Salam presented his

19   witness.  I believe I used it also.

20           THE COURT:  So Plaintiff's 77?

21           MR. DAVIS:  Yes.

22           THE COURT:  Okay.  Any objection to Plaintiff's 77

23   coming in?

24           MR. SALAM:  No objection, your Honor.

25           THE COURT:  Okay.  Plaintiff's Exhibit 77 will be

Duke - Cross

1   admitted.

2    (Plaintiff's Exhibit 77 was offered and received in

3    evidence.)

4        THE COURT:  1 through 61.

5        It is now 4:52.  I'm waiting to hear the sally port

6   door open and the marshals to come in.  I also have to go sign

7   off on some search warrants.

8        Mr. Smith, I don't even know -- I mean, it is late in

9   the day.  You have just heard all the testimony.  I don't even

10  know if, right now, you could reasonably give me an estimate

11  on how much time.  If you can, tell me.  But if you don't, I

12  would understand that it would be difficult for you to give me

13  an estimate.

14       MR. SMITH:  Not really, your Honor, but I suspect it

15  is an hour or more, to be candid, and it may be less if we

16  wind up breaking and I'm able to work through it.  I

17  really -- I know you wanted to ask that question.

18       There is sort of a housekeeping matter, and I'm

19  concerned we will lose you momentarily.

20       THE COURT:  You will, but I'm going to pause you and

21  say I do a subject matter, I finish it, and then I move on to

22  the next subject.  So when people try to change, I stop you.

23       MR. SMITH:  Just put a flag up on that.

24       THE COURT:  We will come back.

25       What do you think for your examination?  Can you give

Duke - Cross

1   me an estimate now?  Again, I know it is late in the day.

2          MR. HOLEVAS:  It would be difficult, but I don't

3   anticipate it would be an hour.  I do not think it would be

4   that long, your Honor.

5          THE COURT:  Okay.

6          MR. WOLFE:  Same answer.

7          THE COURT:  Okay.  All right.  So we got the 7th,

8   part of the morning set aside.  So I think we would be able to

9   get that cross -- that exam -- we will just call it

10  "examination," that part of the examination complete.  So I

11  think we can get that done on the 7th.

12         Now, what's the other issue?

13         MR. SMITH:  My point simply, your Honor, was it is

14  very clear to me now that on the 7th that's about the most we

15  would get done.  It is extraordinarily burdensome for

16  Ms. Liberman Van Dyke to come up from Texas.  I would like to

17  ask her to be excused from that session.  We, obviously, know

18  that there will be more beyond that at some point, and I

19  mentioned this to other counsel.  I don't think she will be

20  reached that day, and I just wonder if that's possible.

21         THE COURT:  I don't -- she shouldn't have to sit here

22  if she's not going to be called.  She can come up and sit if

23  she wants, but I don't want to require her to sit here if she

24  is never going to hit the witness stand.  It seems burdensome.

25         MR. SALAM:  I have a similar issue.  It's very

Duke - Cross

1  difficult and expensive for my client to come back and forth,

2  and my concern is that --

3          THE COURT:  Did you hear the part of me where I take

4  on a subject, and then I deal with it, and then I move on to

5  the next issue?  So I resolve it.

6          MR. SALAM:  I'm sorry.

7          THE COURT:  Okay.  Anybody have a problem with

8  Ms. Liberman being excused on November 7th?

9          MR. von OHLEN:  No problem.

10          MR. DAVIS:  No, your Honor.

11          THE COURT:  All right.  Ms. Liberman will be excused

12  on November 7th.

13          MR. SMITH:  Thank you, your Honor.

14          THE COURT:  Now, let's go to your issue.

15          MR. SALAM:  So my concern is that it is highly

16  unlikely, I fear, that Mr. Duke will be done on November 7th

17  with the two hours the court has, and then we have got to pick

18  other dates and arrange for him to come back.

19          So he is going to end up spending money coming out

20  for two hours, and then going to have to come back again, and

21  I'm wondering is there a chance that we can pick, instead of

22  doing two hours, pick a day where you are available so we know

23  for sure that Mr. Duke will be done.

24          THE COURT:  Let me tell you folks this:  I have been

25  here a little over six years now, six and a half years.  There

Duke - Cross

1  is a reason why Judge Jensen is here.  The Administrative

2  Office of the U.S. Courts authorized an additional position,

3  an additional magistrate judge position for the United States

4  District Court for the Northern District of Illinois, Western

5  Division, because for six years, according to their numbers

6  and their study, I was the busiest magistrate judge in the

7  country.  In light of that, they were able to get an

8  additional magistrate judge position available, and she has

9  now taken half my caseload.

10        In addition to that, the chief judge's office was

11  kind enough to give me what all the judges in Chicago get.

12  The term is a "calendar adjustment" -- Is that what we call

13  it? -- a "calendar adjustment," also known as a sabbatical.

14  That starts November 1st, tomorrow, for three months.  So I'm

15  already dipping into my vacation time for this.

16        So whatever you think the value of your time is, kind

17  of value it with me, because I'm already coming in on the 7th.

18        So I can't put you in the afternoon because I have

19  already jammed in a bunch of other matters to try to get

20  things done on the 7th, and, also, in reasonable reliance upon

21  me being gone, my staff made the wise choice of getting out of

22  dodge.

23        MR. SALAM:  I will make -- Mr. Duke, obviously, will

24  come on the 7th if that's when we are here.  Then he will be

25  here.

Duke - Cross

```
 1              THE COURT:  Okay.  Here is what we are going to do --
 2              MR. SALAM:  Because, your Honor --
 3              THE COURT:  Hold on.
 4              MR. SALAM:  I'm sorry.
 5              THE COURT:  We will see what we can do to get
 6   Mr. Duke done on the 7th, so he doesn't have to come back,
 7   okay?
 8              MR. SALAM:  Thank you, your Honor.
 9              THE COURT:  I have some criminal matters, again, that
10   I have tried to squeeze in.
11              You should talk among yourselves about dates to have
12   additional testimony time, and I will tell you dates to avoid
13   because I will not be here.
14              November 19th through December 2nd, I'm gone.  You
15   can pretty much forget about December -- well, yes,
16   December 23rd, and that's -- we are closed.  December 23rd
17   through January 1st, I'm out.
18              So you have got a tiny window to get this done,
19   squeeze it in there.  So figure out the time frames, a couple
20   dates, within that window.  Obviously, don't do it on the days
21   I'm gone.
22              Yvonne, do you have any other dates that are on CEO
23   that I need to avoid?
24              THE CLERK:  No, your Honor.
25              THE COURT:  That's it?  You have got to leave more,
```

Duke - Cross

1  Yvonne.  Come on.

2         Are Chuck's dates on here?  Is Chuck going anywhere?

3         Chuck, are you listening?

4         THE CLERK:  He is, your Honor.

5         THE COURT:  Okay.  Yes, that's fair.

6         You are looking -- your best bet -- oh, you know

7  what?  That's what we can do.

8         Why do we have Pierre Hayes on the 3rd?  Is that like

9  a placeholder, December 3rd?

10        THE CLERK:  I believe so, your Honor.

11        THE COURT:  Here is what we are going to do:  Take a

12  look at December 18th as an option.

13        We have one pro se in December.  We will move that.

14  Who has got that case?

15        Hold on one second here.

16        I'm not doing pro se while I'm gone.

17        All right.  So how does December 18th look for folks?

18  I will come back in for that.

19        MR. SMITH:  One second, your Honor.  I need to turn

20  on my phone.

21        MR. HOLEVAS:  Judge, while I might be the least

22  important person here, Judge Kennelly has got a case that he

23  took over for Judge Kapala that we are going to try starting

24  on the 12th here, and it is going to go into that next week.

25        THE COURT:  December 12th?

Duke - Cross

1           MR. HOLEVAS:  Yes, it starts on the 12th.

2           THE COURT:  Which case is that?

3           MR. HOLEVAS:  It is a case we got summary judgment in

4  the Seventh Circuit.

5           THE COURT:  Oh, you can't say those words.  You can't

6  say that case.

7           MR. HOLEVAS:  Arctic Cat.

8           THE COURT:  Don't say it.

9           2008?

10          MR. HOLEVAS:  Yes, your Honor.

11          THE COURT:  Do you know what courtroom he is using?

12  We should have that one available.

13          MR. HOLEVAS:  And, Judge, in all fairness to all

14  counsel, I'm not going to be the lead trial counsel in the

15  case.  So if I can step away and be present on that day, and

16  if it works for everybody else, and it is good for you --

17          THE COURT:  You said Judge Kennelly has got it from

18  the 12th through when?

19          You have got one claim left in that thing.

20          MR. HOLEVAS:  Judge, I will share with you:  30 hours

21  of trial time, 15 for the plaintiff, 15 for the defendant, so

22  it is going to move pretty quickly.

23          THE COURT:  Okay.  And it is December 12th it starts?

24          MR. HOLEVAS:  The 12th.

25          THE COURT:  So December 18th --

Duke - Cross

1          MR. HOLEVAS:  I should be okay.

2          THE COURT:  You should be okay.

3          I will talk to him.  You might want to get out of

4     there.

5          Does December 18th work for everybody else?

6          MR. SALAM:  It works for Defense counsel, your Honor.

7          MR. DAVIS:  It works for Plaintiff, your Honor.

8          THE WITNESS:  Your Honor, is that in lieu of

9     November?

10         THE COURT:  No, we are going to try to finish you up

11    November 7th.

12         THE WITNESS:  Okay.  Thank you.

13         MS. RICH:  Mr. Leavens is scheduled to be in Utah

14    that day, but if he absolutely has to, he can be here for it.

15         THE COURT:  Well, I don't know who is calling who as

16    witnesses and all those kinds of things.

17         MR. SMITH:  If it has to be, it will be.

18         THE COURT:  And we will get it done with the two

19    hours on the 7th and then full day on the 18th of December.

20         MS. RICH:  I don't think anyone has suggested that we

21    thought that would be enough time.

22         THE COURT:  You thought it would be enough time.  So

23    you are going to need more time than just the 18th?

24         MR. SMITH:  No, we are not asking for any more time,

25    your Honor.  We would hope that it would get done as far as we

Duke - Cross

1 are concerned.  I don't know about the other lawyers.

2          THE COURT:  Okay.  You've got the two hours.  We are

3 going to try to get Mr. Duke done on November 7th.  If I give

4 you a full day December 18th, what are the odds of everything

5 getting wrapped up?

6          MR. von OHLEN:  Zero.

7          THE COURT:  Zero.  Okay.

8          Anybody else got a more optimistic view?

9          MR. SALAM:  I reserve my -- I'm assuming I won't

10 really need to put on anything in my case-in-chief.  I still

11 reserve the right to put Mr. Duke back on the stand depending

12 on rebuttal or what else happens.

13          THE COURT:  So maybe this is good news for

14 Mr. Leavens.  I am going to give you the 18th, and I'm going

15 to give you another day, another eight-hour day.  You figure

16 out a day that I didn't just block off, and we will give

17 you --

18          MR. SMITH:  You mean in that window between your

19 absences?

20          THE COURT:  Yes.

21          MR. SMITH:  We can discuss that between ourselves.

22          THE COURT:  Talk among yourselves and find another

23 day.  So you will get the two hours on the 7th, you will get a

24 full day on the 18th, and another full day when I will be

25 around, okay?

Duke - Cross

573

1          Does that work?

2          MR. SALAM:  I will hope -- I can see finishing up

3   with that.  Thank you, your Honor.

4          THE COURT:  Okay.  All right.  I have got to go talk

5   to the U.S. attorneys, and then we are going to have the

6   marshals come in.

7          Have a good day, everybody.

8          MR. von OHLEN:  Thank you, your Honor.

9          MR. SALAM:  Thank you, your Honor.

10         MR. DAVIS:  Thank you, your Honor.

11         MR. BISBIKIS:  Thank you, your Honor.

12  (The hearing was adjourned to November 7, 2019, at

13     9:00 o'clock a.m.)

14                          CERTIFICATE

15    I certify that the foregoing is a correct transcript from

16  the record of proceedings in the above-entitled matter.

17  */s/Heather M. Perkins-Reiva*               *November 4, 2019*

18  _____        _____
    Heather M. Perkins-Reiva                         Date
19  Official Court Reporter

20

21

22

23

24

25