```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              WESTERN DIVISION

 3   DR DISTRIBUTORS, LLC,              )Docket No. 12 CV 50324
                                        )
 4      Plaintiff-Counterdefendant,     )Rockford, Illinois
                                        )Thursday, November 7, 2019
 5                   v.                 )9:00 o'clock a.m.
                                        )
 6   21 CENTURY SMOKING, INC.           )
     and BRENT DUKE,                    )
 7                                      )
        Defendants-Counterplaintiffs,)
 8                                      )
     CB DISTRIBUTORS, INC. and          )
 9   CARLOS BENGOA,                     )
                                        )
10      Counter-Defendants.             )

11                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE IAIN D. JOHNSTON
12                   VOLUME 3 - PAGES 574 - 843

13   APPEARANCES:

14   For the Plaintiff:          NICOLL, DAVIS & SPINELLA LLP
                                  (95 Route 17 South,
15                                 Suite 316,
                                   Paramus, NJ  07652) by
16                                MR. ANTHONY J. DAVIS
                                  MR. BRIAN E. MOFFITT
17
                                  ROBERT C. von OHLEN & ASSOCIATES
18                                (1340 Deerpath Road,
                                   Lake Forest, IL  60045) by
19                                MR. ROBERT C. von OHLEN, JR.

20   For the Defendants:         THE LAW OFFICES OF KEVIN SALAM
                                  (120 N. LaSalle Street,
21                                 Suite 2000,
                                   Chicago, IL  60602) by
22                                MR. KEVIN B. SALAM

23                                LEONARD MEYER LLP
                                  (120 N. LaSalle Street,
24                                 Suite 2000,
                                   Chicago, IL  60602) by
25                                MR. JOHN G. BISBIKIS
                                  MR. MICHAEL I. LEONARD
```

```
 1   For the Leavens, Strand &   HOLLAND & KNIGHT
     Glover Attorneys:           (150 N. Riverside Plaza,
 2                                Suite 2700,
                                  Chicago, IL  60606) by
 3                               MS. TRISHA M. RICH
                                 MR. COLIN P. SMITH
 4
     For Steven S. Shonder:      TRAUB LIEBERMAN
 5                               (303 W. Madison Street,
                                  Suite 1200,
 6                                Chicago, IL  60606) by
                                 MR. MARK F. WOLFE
 7
     For Peter S. Stamatis:      WILLIAMS MCCARTHY LLP
 8                               (120 W. State Street,
                                  4th Floor,
 9                                Rockford, IL  61105) by
                                 MR. JOHN J. HOLEVAS
10
     Also Present:               MR. THOMAS R. LEAVENS
11                               MR. TRAVIS W. LIFE
                                 MR. STEVEN S. SHONDER
12                               MR. PETER S. STAMATIS

13   Court Reporter:             Heather M. Perkins-Reiva
                                 327 S. Church Street
14                               Rockford, Illinois  61101
                                 (779)772-8309
15

16

17

18

19

20

21

22

23

24

25
```

576

```
 1              THE CLERK:  Calling 12 CV 50324, DR Distributors,
 2    LLC v. 21 Century Smoking, Inc.
 3              THE COURT:  All right.  Let's get appearances.
 4              Let's start with the Plaintiff.
 5              MR. von OHLEN:  Robert von Ohlen and Anthony Davis
 6    for the Plaintiffs.
 7              THE COURT:  Good morning.
 8              MR. DAVIS:  Good morning, your Honor.
 9              MR. LEONARD:  Good morning, Judge.  Mike Leonard,
10    Kevin Salam, and John Bisbikis for the Defendants.
11              THE COURT:  Good morning.
12              MS. RICH:  Trisha Rich --
13              MR. SMITH:  -- and Colin Smith for the Leavens Strand
14    lawyers, your Honor.
15              MR. WOLFE:  Mark Wolfe on behalf of Mr. Shonder.
16              MR. HOLEVAS:  Good morning, your Honor.  John Holevas
17    on behalf of Mr. Stamatis.
18              THE COURT:  Good morning.
19              And I believe we left off with Mr. Duke.
20              And, Mr. Smith, you were going to start?
21              MR. SMITH:  I believe so, your Honor.
22              There is an issue, I think.
23              MR. SALAM:  A scheduling matter, your Honor, on
24    4Discovery.
25              THE COURT:  Okay.
```

 1          MR. SALAM:  They are not available today.  They are

 2     available on the 19th.

 3          THE COURT:  Okay.

 4          MR. SALAM:  I had spoken with the owner prior to him

 5     speaking with his lawyer.  To make a long story short, after

 6     our last hearing, I contacted -- or sent them an e-mail saying

 7     "It doesn't look like there is time for you on the 7th," and

 8     then the next e-mail I got was from their lawyer saying "Don't

 9     talk to my client."

10          Things were worked out.  I had communications with

11     them.  I have been told by their lawyer that we can represent

12     to the court they will be available on the 19th.  I will send

13     them a friendly subpoena just to make that less likely not to

14     occur.

15          THE COURT:  Okay.  All right.

16          Well, thanks for the information.  I've set aside the

17     entire day today.  We are going to go the entire day.

18          MR. SMITH:  And we understand that, your Honor.  I'm

19     just a little startled to hear about this this morning.

20     Mr. Salam has told me he has known about it for a couple of

21     days.  There is kind of a lot of late surprises.  We received

22     a number of exhibits at 5:30 and then almost 7:00 o'clock last

23     night, and I had thought that we understood the order of

24     witnesses, and from here on out, your Honor, I would at least

25     like to have a better understanding so that we are not

1  preparing for witnesses that are not going to be called on the

2  next court date.

3         THE COURT:  And that's fair, and I think -- I don't

4  know if it made its way in the order, but I certainly have a

5  very distinct recollection of saying "You should let people

6  know who your witnesses are going to be the day before."

7  That's just common courtesy and good lawyering.

8         MR. von OHLEN:  We have been advising -- and it was a

9  surprise to us, but we learned whatever yesterday, that they

10  weren't going to be here.  We can't do anything about it.  It

11  is not somebody who is within our control.

12         MR. SMITH:  Well, that's startling to me because

13  nobody told us yesterday, and we spent some significant time

14  late yesterday preparing for a witness that we did not find

15  out until this morning would not be here.  So advising some

16  counsel and not others is even more of a surprise to me.

17         THE COURT:  Yes, I think everybody has got each

18  other's e-mails, right?  So it shouldn't be too hard when you

19  get information about this to shoot out an e-mail saying "This

20  is what is occurring.  Heads up."

21         MR. WOLFE:  One final scheduling note when your Honor

22  has a minute.

23         THE COURT:  Sure.

24         MR. WOLFE:  When we received your court order about

25  the available dates, we sent around a myriad of court

1    orders -- and to your point, yes, we have each other's

2    e-mails -- I indicated that we would acquiesce to just about

3    anything, but Mr. Shonder and I are both not available next

4    Friday, and the lawyers said that's fine with them, they will

5    put him on the last day, assuming, your Honor, that was okay

6    with you that we could neither be present and have Mr. Shonder

7    go today or the last day.

8            So I'm asking your blessing to let us out those

9    days --

10           THE COURT:  I'm not going to tell you folks how to

11   put your witnesses on, what order to put them on, and how to

12   introduce your evidence.  That's not --

13           MR. SMITH:  That's not --

14           THE COURT:  Let me finish.

15           If we haven't figured this out, that interrupting me

16   is one way to set me off, there is a problem.

17           So I'm not going to tell you how to schedule your

18   witnesses, whether you should serve subpoenas, what order to

19   put them in, how to do your direct and cross-examinations.

20   That's all your job.

21           So I have given you time for this hearing, a lot of

22   time, on my vacation time, right?  We are getting this thing

23   done.  All right.

24           It could be a horrible, awful experience.  It's

25   probably not a great experience for some of you right now, but

 1    it doesn't have to be any worse.  The way to make it worse is

 2    surprises.

 3            Anybody else getting tired of getting the documents

 4    at the last minute?  Kind of surprising?  The word "irony"

 5    gets misused a lot these days, but finding documents now,

 6    that's a problem.

 7            So having said that, Mr. Duke will resume his

 8    testimony.

 9            Mr. Smith -- or Ms. Rich, go ahead.

10            MS. RICH:  Yes, I have one more thing, your Honor,

11    thank you.

12            Mr. Life has a childcare issue this afternoon, and I

13    have spoken to Plaintiff's counsel, and we have spoken to

14    defense counsel, and nobody seems to have an objection to him

15    leaving after 3:30, if it is okay with the court.

16            THE COURT:  That's fine with me.

17            MS. RICH:  Thank you, Judge.

18            MR. DAVIS:  Just to be clear, what I said was we are

19    following the order of our witnesses on our exhibit list.

20            THE COURT:  Okay.

21            MR. DAVIS:  And Ms. Liberman has already been

22    excused, so Mr. Life would be the next witness if we get to

23    that today.

24            THE COURT:  And then in light of -- you probably

25    thought that 4D was coming out today.

1          MR. von OHLEN:  We thought we had 4D.

2          So Mr. Leavens is -- it's no mystery we are going to

3   call people in the order that we gave the witness list.  We

4   told everybody that from day one.  Unless there is some real

5   surprise, that's going to be the order.  So Mr. Leavens is

6   going next, and Mr. Life is going after that, and Liberman is

7   going after that.

8          THE COURT:  Okay.  Then people can't grumble about

9   that.  There it is.  You've got it.  Okay.

10         So, look, I don't know how long it is going to take

11   with Mr. Duke.  I have got some estimates.  We will go with

12   that.  Obviously, 4D is not here.  They are not physically

13   present.  We will plow through and keep going.

14         I have got two quick criminal statuses at 11:00.

15         Mr. Holevas may know that the chili cook-off is

16   tonight.  He will probably have to take a pass on that because

17   of this case.

18         But we are going to go to 5:00, okay?

19         Everybody okay with that up in front?

20         Okay.  All right.

21         MS. RICH:  Thank you.

22         THE COURT:  Thank you.

23         All right.  Remember you are still under oath.

24

25

Duke - Cross

```
 1        BRENT DUKE, PLAINTIFF'S WITNESS, SWORN PREVIOUSLY

 2              CROSS-EXAMINATION (Continued)

 3   BY MR. SMITH:

 4   Q.  Good morning, Mr. Duke.

 5   A.  Good morning.

 6   Q.  Are you ready for some more questions?

 7   A.  Yes.

 8   Q.  Okay.  Let's start by talking a little bit about your

 9   intentions in this case, and let me start here:  Did you ever

10   intend to produce anything less than all of the documents and

11   records and ESI you had under your control that might be

12   pertinent to the issues in this litigation?

13   A.  No.

14   Q.  And let me ask it another way:  Did you ever intend to

15   produce anything less than all of the documents and records

16   and ESI that you had under your control that were called for

17   by the discovery in this case?

18   A.  No.

19   Q.  Now, my important question:  Did you ever intend for your

20   lawyers to produce less than the entire universe of records,

21   documents, and ESI, except for what might be privileged?

22              MR. DAVIS:  Objection, foundation.

23              THE COURT:  I don't know if the question was even

24   done yet.

25              Was the question finished?
```

Duke - Cross

583

```
 1              MR. SMITH:  Yes, sir.

 2              THE COURT:  Okay.  Overruled.

 3              THE WITNESS:  No.

 4  BY MR. SMITH:

 5  Q.  Did you ever ask your lawyers to do anything other than

 6  produce everything?

 7  A.  No.

 8  Q.  Did your lawyers, including Mr. Leavens, Ms. Liberman, and

 9  Mr. Life, ever suggest to you that they wanted to produce less

10  than everything that was under your control that was called

11  for in discovery?

12  A.  No.

13  Q.  And as far as you know, based on working with them and

14  speaking with them, was it always the intention of your

15  lawyers to make full disclosure?

16  A.  Yes.

17  Q.  You never saw anything contrary to that?

18  A.  Absolutely not.

19  Q.  Now, let's go back to the beginning of this matter.

20              It's correct that you engaged Mr. Leavens and his

21  firm to represent you in this case in September of 2012,

22  right?

23  A.  Correct.

24  Q.  And that was after DR filed suit?

25  A.  Yes.
```

Duke - Cross

584

 1   Q.  And based on listening to your testimony last Monday, it's

 2   my understanding that you had given some focus to these

 3   trademark issues even before that lawsuit was filed?

 4   A.  Yes.

 5   Q.  And were you already, even before DR filed suit, making an

 6   effort to retain and hang onto all of your business and

 7   company records, including electronic records and data, that

 8   were related to the trademark issues?

 9   A.  Yes.

10   Q.  And completely separate and apart from the trademark

11   dispute issues, I got the sense that it was your personal

12   practice generally not to delete e-mails?

13   A.  Correct.

14   Q.  Your personal practice was and is to be sort of a digital

15   pack rat?

16   A.  Yes.

17   Q.  Okay.  So even prior to retaining Mr. Leavens in September

18   of 2012, you were already making it a point to try to hang

19   onto all the documents, records, information, and ESI you

20   might have that related to the trademark issues?

21   A.  Yes.  It's in my nature, yes.

22   Q.  And that included all of your electronic information?

23   A.  Yes.

24   Q.  So that was your intention, and that's what you were

25   trying to do, even before you first met Mr. Leavens?

Duke - Cross

1    A.  Correct.

2    Q.  Fast forward now.  Again, back up to the fall of 2012.

3    That's when you engaged Mr. Leavens, as we said?

4    A.  Yes.

5    Q.  And did you, at that time, tell Mr. Leavens that you were

6    already making an effort to preserve and maintain all of the

7    company's information and records that might relate to the

8    trademark issues?

9    A.  Yes.

10   Q.  So you told him going in that you were already doing that?

11   A.  Yes.

12   Q.  Okay.  And you have already testified that you and

13   Mr. Leavens had discussions about preservation right at the

14   beginning, in your very first meeting, correct?

15   A.  Yes.

16   Q.  And Mr. Davis went over that very first meeting in some

17   detail and what you remembered about it several times, but to

18   summarize, Mr. Leavens told you first about what kind of data

19   you were supposed to preserve?

20   A.  I don't recall exactly.

21   Q.  Well, then, we will get to that in a minute.

22        But you understood it was every kind of data,

23   correct?

24   A.  Yes.  Everything, yes.

25   Q.  Right.

Duke - Cross

1          And, in fact, second, you were to preserve -- and I

2    wrote your words down -- every single piece of data, correct?

3    A.   Yes.

4    Q.   And, third, that you cannot delete anything, right?

5    A.   Yes.

6    Q.   And, fourth, he told you that all of your data would

7    eventually be requested and searched, right?

8    A.   Yes.

9    Q.   So you knew that from the very beginning?

10   A.   Yes.

11   Q.   And last week, I believe you said you couldn't recall

12   whether or not Mr. Leavens used the term "ESI" in that first

13   meeting, right?

14   A.   Correct.

15   Q.   But Mr. Leavens did explain to you the concept of

16   electronically stored information and what it was at a very

17   early meeting, didn't he?

18   A.   I don't recall exactly that.

19   Q.   You don't remember testifying to that last week?

20   A.   Maybe I'm not understanding your exact question.

21   Q.   Well, let me just ask you if you were asked this question

22   last Monday and if you gave this answer.  This is a question

23   from Mr. Davis:

24          "Q.   And to be clear, when I say anyone, I'm

25    including your prior attorneys.  They never explained to you

Duke - Cross

1    what electronically stored information was before August of

2    2019?

3         "A.    They did explain to me what electronically

4    stored information was."

5         Do you recall giving that answer last Monday?

6    A.  Yes.

7         Are we still talking about the first meeting with

8    him, though?  That's where I'm getting confused.

9    Q.  Well, I don't know if it was the first meeting or you also

10   talked about a very early meeting.

11   A.  Okay.

12   Q.  So if we include your very early meetings with

13   Mr. Leavens, he did provide an explanation of what

14   electronically stored information was, the concept, at least?

15   A.  Yes.

16   Q.  Okay.  And as we said, you used the words last week you

17   were told to preserve every single piece of data, correct?

18   A.  Yes.

19   Q.  And so you knew it wasn't just e-mails.  It was any kind

20   of data?

21   A.  Yes.

22   Q.  And you understood the concept was any kind of electronic

23   record along with all your paper records?

24   A.  Yes.

25   Q.  Okay.  In fact, this "any data," that is actually

Duke - Cross

1   terminology you used twice last Monday, didn't you?

2   A.  Possibly.

3   Q.  Okay.  But what you did say last Monday for sure was that

4   it was very clear to you what you were to preserve?

5   A.  Yes.

6   Q.  And you summarized it as "Don't delete anything, preserve

7   everything," right?

8   A.  Yes.

9   Q.  And you understood that's what you were supposed to do?

10  A.  Yes, I did.

11  Q.  And I think, as you put it last Monday -- and I wrote down

12  your words -- "I heard it and I understood it"?

13  A.  Correct.

14  Q.  You didn't need to get instructions in writing in order to

15  understand what you were supposed to do?

16  A.  That's fair to say, yes.

17  Q.  Okay.  And those discussions you had with Mr. Leavens

18  early in the case, they weren't the only discussions you had

19  with lawyers at Leavens, Strand & Glover about the need to

20  preserve information and records, were they?

21  A.  Was the -- can you repeat that?

22  Q.  Yes.

23       Mr. Leavens wasn't the only Leavens, Strand & Glover

24  lawyer who talked to you about your preservation obligation,

25  was he?

Duke - Cross

589

 1    A.  I assume not.  I don't recall exactly what discussions I

 2    had regarding that.

 3    Q.  All right.  Let's back up for a minute.

 4         First of all, we know that Mr. Leavens gave you

 5    instructions about preserving data on multiple occasions,

 6    right?

 7    A.  That's fair to say, yes.

 8    Q.  All right.  Now, you also talked about preservation with

 9    Ms. Heather Liberman, didn't you?

10    A.  I'm sure I did.  I don't recall exact discussions about

11    it, but it's believable to me that I did, yes.

12         MR. SMITH:  All right.  Let's put up for a minute

13    Leavens Strand Exhibit 14, if we could.

14         THE COURT:  You said 14, Mr. Smith?

15         MR. SMITH:  14, yes, sir.

16         THE COURT:  Okay.  Thank you.

17    BY MR. SMITH:

18    Q.  And you see it on the screen in front of you?

19    A.  Yes.

20    Q.  And these are notes of a May 29, 2014, conference with

21    Brent Duke?

22    A.  Yes, I remember seeing this document.  I don't, like,

23    specifically remember this meeting.

24    Q.  And you notice the first item on her list is "Confirm not

25    removing data," and there is a checkmark next to it?

Duke - Cross

1   A.  Yes.

2   Q.  All right.  Now, I know this isn't your note, but this

3   isn't inconsistent with your recollection of the way the

4   Leavens, Strand & Glover lawyers treated this issue, is it?

5   A.  No, that's fair to say.

6   Q.  Yes.

7           So it is fair to say, and you are not at all

8   surprised by the notion that you had a discussion on May 29th,

9   2014, that, again, reiterated the instructions that you were

10  not to be deleting or removing any data?

11  A.  No, that did not surprise me.

12  Q.  All right.  So this was an ongoing conversation you had

13  with the Leavens, Strand & Glover lawyers?

14  A.  I see it here.  I know we discussed it originally, and it

15  was on -- I wouldn't necessarily describe it as an "ongoing

16  discussion," but it is fair to say I understood it.  I was

17  told on multiple occasions.

18  Q.  Let me put it a different way.

19          It didn't just come up at the beginning of the case.

20  It was reiterated at times later in the case?

21  A.  Yes.

22  Q.  And not only by Heather Liberman, it was also reiterated

23  by Travis Life later in the case in conversations with you?

24  A.  I don't recall.

25  Q.  All right.

Duke - Cross

591

1   A.   I'm not going to say it didn't.  I do not recall.

2   Q.   So you are not saying it didn't happen.  You are just

3   saying you don't recall a specific conversation?

4   A.   Exactly.

5   Q.   Okay.  So the bottom line is at various times, multiple

6   times, different lawyers at Leavens, Strand & Glover talked to

7   you about your obligation to preserve all documents and

8   records that might relate to the issues in this case?

9   A.   Yes.

10  Q.   And you fully understood that?

11  A.   Yes.

12  Q.   And you were already doing it anyway?

13  A.   Absolutely.

14  Q.   And as you said last week, and these were your words

15  again, there was no confusion there about the instructions to

16  preserve?

17  A.   Correct.

18  Q.   And focusing just on e-mails, last Monday, you told us:

19  "I have never deleted an e-mail."

20           Right?

21  A.   Yes, other than spam, yes.

22  Q.   Yes.

23           You did say later that you would delete junk mails or

24  spam e-mails, but in terms of substantive e-mails, you don't

25  delete them?

Duke - Cross

1  A.  Period.  I don't delete e-mails, no.

2  Q.  Okay.  And that was something you also had testified to,

3  as Mr. Davis brought out, in your June 2015 deposition

4  testimony also?

5  A.  Yes, that would be accurate.

6  Q.  And this wasn't just limited to you.  For purposes of this

7  litigation, you extended that preservation obligation to

8  everyone with the company, didn't you?

9  A.  Yes, to the best of my ability, yes.

10  Q.  Well, your testimony last week was that you were telling

11  everyone with the company to save everything, right?

12  A.  Everyone, yes, that I spoke with, yes.

13  Q.  Yes.

14       And you said at Page 165 of your deposition, you also

15  said:  "We tell everyone to save everything."

16       Do you remember testifying to that?

17  A.  Yes.

18  Q.  So your practice was to extend this out to your employees,

19  also, to make sure that they were preserving and saving

20  records related to the litigation?

21  A.  All records, yes.

22  Q.  Right.

23       And what you said last Monday was:

24       "I made sure everyone knew this whole time not to

25  delete anything."

Duke - Cross

593

```
 1          Right?
 2   A.  Yes.
 3   Q.  So you understood that was an obligation that extended
 4   beyond you, and you were communicating it over time to the
 5   various employees of your company?
 6   A.  Yes.
 7   Q.  Okay.  But in terms of the corporate stuff, the central
 8   corporate records, that was really just you as the custodian
 9   of those records, wasn't it?
10   A.  Basically, yes.
11   Q.  And that's what you said in your deposition.  You said:
12          "In terms of the corporate stuff, it's just me, so I
13   know not to throw anything away."
14          Right?
15   A.  Yes.
16   Q.  And that's because you were pretty much the nerve center
17   of 21 Century Smoking, right?
18   A.  Yes.
19   Q.  You are the person who charted the strategy and made the
20   decisions?
21   A.  Yes.
22   Q.  And for that reason, pretty much all significant
23   information had to and has to flow through you?
24   A.  Correct.
25   Q.  And that's why when you were asked to search for
```

Duke - Cross

594

1    information related to this case, you really only searched the

2    three e-mail accounts that you personally used?

3    A.  Exactly.

4    Q.  And you testified last Wednesday that those accounts were

5    the only ones that you understood or expected to have

6    responsive information?

7    A.  Yes.

8    Q.  Okay.  And that's because any information of any

9    significance at 21 Century Smoking ultimately flows through

10   you?

11   A.  Exactly.

12   Q.  Okay.  So we have been discussing your intention and your

13   practice to preserve all e-mails and electronic information

14   since your first meeting with Mr. Leavens, and you also told

15   us that you heard and fully understood your obligation to

16   preserve that information, fair enough?

17   A.  Yes, fair enough.

18   Q.  And you would have done that regardless of whether or not

19   you got a letter or an e-mail reiterating those instructions,

20   correct?

21   A.  Yes.  I mean, yes, that was my policy, no matter what.

22   Q.  You were already doing it?

23   A.  I was doing it before.  I do it now.

24   Q.  And there would have been no change to that had you

25   received some instruction in writing.  You would have been

Duke - Cross

595

1   doing it anyway?

2   A.  I was already doing it.

3   Q.  Okay.  And you had already entered into a practice of

4   repeatedly or periodically telling your staff to do the same

5   thing?

6   A.  Yes.

7   Q.  Okay.  And let's back up for a minute so that we get a

8   little bit of an understanding about 21 Century Smoking back

9   in this 2012 time frame, and, let's say, 2013, the early time

10  in this litigation.  How many full-time managerial employees

11  did the company have at that time?

12  A.  Two or three.

13  Q.  Two or three.

14          You, correct?

15  A.  Yes.

16  Q.  Do you count your wife as one of those?

17  A.  No.

18  Q.  She's really part time also?

19  A.  She's full time, but she wasn't really managing anything.

20  Q.  Okay.  She also takes care of -- you have a special needs

21  child she takes care of, right?

22  A.  Exactly.

23  Q.  Okay.  But you were the only officer, the only director,

24  the only owner of the company, right?

25  A.  Yes.

1  Q.  Fair to say --

2  A.  "Owner" -- I mean, there were people that co-owned stores

3  with me, so I don't know if "owner" is a fair statement.

4  Q.  In terms of the company itself, you were the only owner,

5  but there were stores where some employees might have had some

6  ownership interest?

7  A.  Exactly.

8  Q.  But not of the corporate entity itself?

9  A.  No.

10  Q.  Okay.  So at that point in time, and really the same is

11  true today, 21 Century Smoking was a small company, right?

12  A.  Fair to say, yes.

13  Q.  In fact, you have called it a very small company?

14  A.  Depending on the time frame, yes.

15  Q.  Yes.

16       You certainly said that in your deposition in this

17  case, correct?

18  A.  Correct.

19  Q.  All right.  Now, if we go back to the beginning of this

20  case in 2012, what kind of assets did the company own at that

21  time?

22  A.  The company has never really owned assets.

23  Q.  Okay.  It had an office, correct?

24  A.  Rented.

25  Q.  Was that office really at the two-flat where you also

Duke - Cross

597

1    lived?

2    A.  Yes.

3    Q.  Okay.  That's 15-something North Ashland in Chicago?

4    A.  1535 North Ashland.

5    Q.  Okay.  And it's fair to say that that office, you had

6    control over all of the company's computers at that time?

7    A.  Yes.

8    Q.  And, actually, that has essentially been the case since

9    then, also, hasn't it?

10   A.  Yes, it has always been the case, yes.

11   Q.  Okay.  And in addition to the other roles you've had with

12   the company, it's fair to say you were, effectively, the head

13   of IT also, weren't you?

14   A.  Most of the time, yes.

15   Q.  Okay.  And as we said a few minutes ago, you were the

16   person in control of all of the company's corporate files and

17   records, right?

18   A.  Myself and my wife, yes.

19   Q.  Okay.  And, in fact, last Monday, you testified just about

20   your computer and your wife's computer, and you said, "That's

21   where everything from our company is, basically."

22        Did I get that right?

23   A.  Yes.

24   Q.  Okay.  And just so we are clear, back in this time frame,

25   when this litigation started, in terms of the various

Duke - Cross

598

1  functions of the company, you were in charge of strategy?

2  A.  Yes.

3  Q.  You were in charge of sales and marketing?

4  A.  Yes.

5  Q.  You were in charge of product supply?

6  A.  Yes.

7  Q.  You were in charge of determining what was in the product

8  line?

9  A.  Yes.

10  Q.  You were in charge of human resources, whether anybody got

11  hired or fired?

12  A.  For the most part.

13  Q.  Okay.  You were in charge of finance?

14  A.  Yes.

15  Q.  And you also -- I guess you shared it with your wife, but

16  you also had a role in customer support and compliance?

17  A.  Definitely, yes.

18  Q.  It ultimately, I think, flowed up to you being really in

19  charge of any decision-making there?

20  A.  Yes.

21  Q.  In fact, we saw that you were personally involved in the

22  issues with Ms. Wood in those e-mails, correct?

23  A.  I believe I'm one of the people on the replies, yes.

24  Q.  You also replied to one of her e-mails, taking some

25  umbrage at the charges she had made?

Duke - Cross

1   A.  I'm not sure if that's me, but, yes, it could be me on

2   that one, sure.

3   Q.  Okay.  Now, back in this time frame, in addition to

4   discussing preservation, you also had conversations with the

5   Leavens Strand lawyers about what e-mail accounts and what

6   electronic records were maintained by 21 Century, correct?

7   A.  Yes.

8   Q.  For example, you had some discussions about that with

9   Mr. Leavens at the beginning of the case, correct?

10  A.  Yes.

11  Q.  He made some effort to understand what was available, what

12  was under your control, correct?

13  A.  Correct.

14  Q.  Okay.  And you had other conversations as the case

15  progressed, correct?

16  A.  Yes.

17  Q.  For example, these same notes we have in front of us,

18  Exhibit 14 -- if we can scroll up just a little more -- you

19  had discussions with Ms. Liberman in May of 2014, as the case

20  was headed toward large-scale document discovery, in which she

21  was communicating with you to assess what information,

22  materials, and e-mail accounts were available and at your

23  discretion, correct?

24  A.  Yes.

25  Q.  Okay.  And you saw this last Monday, right?

Duke - Cross

600

```
 1   A.   Yes.

 2   Q.   And your recollection was that you had a conversation in

 3   which you disclosed information?

 4   A.   Yes.  I mean, I'm reading it.  I can tell that, yes.

 5   Q.   Okay.  But in any event, she inquired on those issues and

 6   you responded?

 7   A.   Yes.

 8   Q.   Okay.  Now, you have also, over the course of the case,

 9   been repeatedly asked about the e-mail accounts you used,

10   correct?

11   A.   Yes.

12   Q.   And that's come up in this hearing several times?

13   A.   Yes.

14   Q.   And you have repeatedly identified the three accounts.

15   The brentduke@yahoo.com account?

16   A.   Yes.

17   Q.   The bduke@21centurysmoking.com account?

18   A.   Yep.

19   Q.   And I guess to a lesser extent, the

20   support@21centurysmoking.com account?

21   A.   Yes.

22   Q.   And those were -- based on the discussion, it appears that

23   you identified those same e-mail accounts to Ms. Liberman back

24   in your discussion with her in May of 2014?

25   A.   Yes.
```

Duke - Cross

1   Q.  Okay.  And I asked you that question a couple minutes ago

2   about being, more or less, in charge of IT for the company.

3          Let me go on a little further and ask you a little

4   bit about your background with computers and electronic data.

5          Is it fair to say that you have a better-than-average

6   understanding of electronic communications and data?

7   A.  That's hard to say.  Better than average versus who?

8   Q.  Well, and that's a fair response to my question, but you

9   don't feel like you know more than the average Joe on the

10  street about those issues?

11  A.  Maybe more than the average Joe on the street.

12  Q.  Okay.  So let's get into that just a little bit.

13         You have actually had a little bit of formal

14  coursework in computer programming, haven't you?

15  A.  In college, I took a class, yes.

16  Q.  And you have also become familiar with some additional

17  computer programming languages or methodologies in the course

18  of some employment you have had?

19  A.  No.

20         Computer languages?

21         MR. SMITH:  Let's pull up the first session of his

22  deposition, June 16th, and Page 30.

23  BY MR. SMITH:

24  Q.  Now, you identified in your deposition testimony some

25  familiarity with .html, correct?

Duke - Cross

602

1  A.  Yes, that's the one from the class.

2  Q.  Okay.  And you identified some familiarity with

3  JavaScript, correct?

4  A.  I know they exist.

5       MR. SMITH:  Okay.  Let's keep scrolling.

6  BY MR. SMITH:

7  Q.  And in your deposition, you testified to some ability to

8  use .html, correct?

9  A.  I can recognize .html, yes.

10 Q.  Okay.  But in any event, you also listed yourself as

11 proficient in some computer programming languages on one of

12 your resumes, correct?

13 A.  Correct.

14 Q.  Okay.  And really, to get more back to where I'm going,

15 you have essentially made a career in the e-commerce field,

16 right?

17 A.  What do you mean "made a career"?

18 Q.  Well, your businesses -- your various businesses that you

19 have taken a shot at over time, a number of them have been

20 either web-based or placed a significant reliance on Internet

21 sales, correct?

22 A.  One of them, 21 Century Smoking.

23 Q.  All right.  But you also started these other websites.

24 Now, maybe they never got off the ground, but they were also

25 intended either as marketing vehicles or potentially sales

Duke - Cross

603

1  vehicles of some kind that might attract interest over the

2  Internet, right?

3  A.  If they ever become companies, yes.

4  Q.  All right.  Well, let's talk about Sports Doctrine for a

5  minute.

6         What was Sport Doctrine?

7  A.  Like a sports social media site.

8  Q.  And what was it intended to do or what service was it

9  intended to provide?

10  A.  Just a place where you could post articles for different

11  teams.

12  Q.  And was there some fashion in which you thought that that

13  website would eventually, potentially, make money for you?

14  A.  Yes.

15  Q.  Okay.  So, again, that was an attempt to operate a website

16  for profit?

17  A.  Yes.

18  Q.  Okay.  Now, you have had other websites like one called

19  "evtcigs," correct?

20  A.  Yes.

21  Q.  And what does that do?

22  A.  I mean, I have the domain.  It is not really a website.

23  Q.  Okay.  So that one never really went live?

24  A.  I don't think so, no.

25  Q.  Okay.  How about Automatic Cigarettes?

Duke - Cross

1   A.  That was a competitor that I purchased.

2   Q.  All right.  And was it ever a live website?

3   A.  Yes, I bought it as a live website, yes.

4   Q.  All right.  And did you operate it?

5   A.  Yes.

6   Q.  And did you operate it for purposes of making money?

7   A.  A small amount, yes.

8   Q.  Okay.  Again, using the Internet and a website to make

9   money, you understand that's e-commerce, right?

10  A.  Yes.

11  Q.  Okay.  Now, what was wholesaleelectronics.com?

12          I assume it is unrelated to the vaping or

13  cigarette --

14  A.  wholesaleelectroniccigarettes.com, I think.

15  Q.  Oh, that's what it was.

16          Did you operate that as a website?

17  A.  Yes.

18  Q.  And did you make sales through it?

19  A.  Maybe one.

20  Q.  Okay.  It wasn't as successful as you might have hoped,

21  but the intention was to make sales through it?

22  A.  Yes, I never really put it in --

23  Q.  Again, e-commerce?

24  A.  Correct.

25  Q.  Okay.  In any event, by the time this litigation was

Duke - Cross

605

1  underway, you had been involved in the creation of and

2  operation of multiple e-commerce websites?

3  A.  Yeah, I guess.

4  Q.  Okay.  Now, is it also true that early in this case, you

5  had conversations with Mr. Leavens, not just about what

6  records were under your control, but about where those records

7  were?

8  A.  Yes.

9  Q.  And that included electronic records, correct?

10 A.  Correct.

11 Q.  And you had those conversations, for example, in order to

12 prepare what we lawyers call "initial disclosure statements."

13        Do you remember hearing the term "initial disclosure

14 statements" in this case?

15 A.  As I have been reviewing documents for this testimony.

16 Q.  But you have seen it as you got ready for this hearing?

17 A.  Yes.

18 Q.  And do you recall that you were consulted with respect to

19 the content of the initial disclosure statements that were

20 filed on behalf of the Defendants in this litigation?

21 A.  I remember discussing it.  I don't remember the exact

22 terminologies that were used, but I remember discussing with

23 my attorneys disclosing documents.

24 Q.  Okay.  And when those were being prepared, do you recall

25 telling Mr. Leavens that the electronic records related to

Duke - Cross

1   your 21 Smoking -- 21 Century Smoking business were on three

2   or four computers located at your home office at 1535 North

3   Ashland Avenue in Chicago?

4   A.  I have read that, so I don't have any reason to doubt it.

5   Q.  So you do believe you told Mr. Leavens that?

6   A.  I don't recall.  I don't have any reason not to believe

7   it.

8   Q.  Well, in fact, you reviewed the initial disclosure

9   statement that includes that language before it was filed,

10  didn't you?

11  A.  I believe so, yes.

12  Q.  Okay.  And you ultimately approved exactly that language

13  to go in the initial disclosure statement, correct?

14  A.  I believe so.

15  Q.  Okay.  You were actually provided with drafts, and the

16  drafts were run by you, and where you wanted to make changes,

17  you actually made changes in red line, correct?

18  A.  I don't remember the specific documentation, but, yes, for

19  anything that was filed that related to me, I read it and made

20  changes, yes.

21  Q.  Right.

22          And you never suggested any changes to the language

23  about the electronic records related to 21 Century Smoking

24  business being on the three or four computers at 1535 North

25  Ashland in Chicago, correct?

1    A.  Correct.

2    Q.  And you later discussed that same issue with Ms. Liberman

3    when there was about to be a collection of electronic data

4    related to the business, correct?

5    A.  Correct.

6    Q.  And you, again, identified that data as being on four

7    computers in your possession, correct?

8    A.  Yes.

9    Q.  Okay.  And didn't you also on December 1st, 2014,

10   ultimately tell Ms. Liberman that "anything related to

11   21 Century Smoking" would be on the four computers in your

12   possession?

13   A.  I don't remember that exact quote in 2014.

14              MR. SMITH:  Could we have Leavens Strand Exhibit 13,

15   please.

16              And let's go back up to the top.

17   BY MR. SMITH:

18   Q.  This is an e-mail from you on December 1st, 2014, to

19   Ms. Liberman, correct?

20              THE COURT:  Hold on one second.

21              You said Exhibit 13, correct?

22              MR. SMITH:  Yes, sir.

23              THE COURT:  All right.  Thank you.

24              THE WITNESS:  Yes.

25

Duke - Cross

608

 1   BY MR. SMITH:

 2   Q.  And what's happening here is you know that the Leavens

 3   Strand lawyers are talking to e-discovery consultants who are

 4   going to collect the electronic data so it can be searched for

 5   purposes of this case?

 6   A.  Yes.

 7   Q.  And, ultimately, you know what they are doing is they are

 8   going to run the Plaintiff's search terms against this

 9   electronic data in order to provide the information or the

10   areas of information that the Plaintiffs believe might

11   potentially be relevant?

12           MR. DAVIS:  Objection.

13           THE COURT:  Hold on one second.

14           What's the basis?

15           MR. DAVIS:  Foundation.

16           THE COURT:  Ask the question with "did you know," and

17   then you can follow up.

18           MR. SMITH:  Now I have to remember what it was, your

19   Honor.

20           Let me take a shot at it.

21           THE COURT:  Okay.

22   BY MR. SMITH:

23   Q.  Did you know that that information that was going to be

24   collected was going to be run against the Plaintiff's search

25   terms?

Duke - Cross

1  A.  Yes, I knew they were collecting documents.

2  Q.  All right.  So you were in the loop to some degree,

3  at least, as this process was unfolding?

4  A.  Yes.

5  Q.  All right.  And you knew that the purpose of it was to

6  gather up information that might fall into categories deemed

7  appropriate for discovery in this case?

8  A.  Correct.

9  Q.  Okay.  And, in fact, you are in the loop here because it's

10  part of assessing what the cost of this search will be, right?

11  A.  Yes, exactly.

12  Q.  All right.  And what you did is you provided information

13  about what's on these four computers, the volume of data on

14  these four computers, because this is the data that would

15  potentially be served up to search?

16  A.  Yes.

17  Q.  Okay.  And what you say in the second paragraph is:

18       "Here are the total GB" -- gigabytes -- "on the four

19  computers that would have anything related to 21 Century

20  Smoking."

21       Right?

22  A.  Correct.

23  Q.  Okay.  And when the company data on those four computers

24  was actually collected to be searched for purposes of this

25  case, you personally participated in that process, right?

Duke - Cross

610

1  A.  What do you mean "personally participated"?

2  Q.  Well, you knew that, ultimately, Leavens Strand had hired

3  4Discovery to do this search, right?

4  A.  Yes.

5  Q.  And they hired this e-discovery consultant to assist them

6  with the electronic discovery issues?

7  A.  Correct.

8  Q.  And they had interviewed several companies before settling

9  on 4Discovery.

10          You were aware of that also?

11  A.  I saw that recently, yes.

12  Q.  Okay.  And the way that the collection process ultimately

13  worked was that 4Discovery sent you what they call "collection

14  drives" to your home in California, and you were personally

15  involved in connecting those to your computers in order for

16  the data on the hard drives to be downloaded?

17  A.  Oh, yes, yes.

18  Q.  All right.  So you were the only person there connecting

19  up the computers to the collection drives and making sure that

20  the data flowed into the collection drives as requested?

21  A.  My wife and myself, yes.

22          THE COURT:  Hold on one second.  Thank you.

23    (Brief pause.)

24          THE COURT:  All right.  Thank you.

25          MR. SMITH:  Thank you, your Honor.

Duke - Cross

611

1          We are going to get up another exhibit here for a

2   minute.

3   BY MR. SMITH:

4   Q.  I'm going to ask you to take a look at Plaintiff's

5   Exhibit 65, and we are going to put it on the screen so that

6   you don't have to see the one I spilled my coffee on at the

7   Belvidere Oasis this morning.

8          But if we go to the fourth page of that exhibit, this

9   is a letter from 4Discovery.

10         Have you seen this letter before, Mr. Duke?

11  A.  In preparation for this.

12  Q.  Okay.  And that's fine.

13         But the point is in the second paragraph, Mr. Gough

14  of 4Discovery describes the process by which the data on the

15  hard drives of your four computers were collected on

16  December 9th, 2014, correct?

17  A.  Okay.  Yes.

18  Q.  And in looking at that, you don't have any disagreement

19  with the description of that process, do you?

20  A.  No.

21  Q.  Okay.  So you were there, your wife was there, you

22  connected the drives, and you followed their instructions and

23  downloaded the hard drive data from those computers onto those

24  collection drives?

25  A.  Yes.

Duke - Cross

1    Q.  And you knew that that data, what we lawyers call

2    "electronically stored information" or "ESI," that was all

3    that you transferred off the hard drives of those computers.

4           There wasn't anything more but what was on the hard

5    drives?

6    A.  Yes.

7    Q.  And you knew that's what 4Discovery was going to search?

8    A.  Yes.

9    Q.  And you also understood that 4Discovery did search that

10   material using the Plaintiff's search terms?

11   A.  Yes.

12   Q.  And that as a result of that, a large volume document

13   production was made in early 2015, correct?

14   A.  Correct.

15   Q.  Something approximating 50,000 pages?

16   A.  Correct.

17   Q.  Okay.  So this might be a good time, while we are talking

18   about 4Discovery's search, to separate that a little bit from

19   the searches you have talked about in your testimony during

20   this hearing.

21          Are you with me?

22   A.  Yep.

23   Q.  Okay.  So last week, you were asked a number of questions

24   about the various searches that your former lawyers asked you

25   to make at various times in the case, correct?

Duke - Cross

613

1    A.  Yes.

2    Q.  And I want to try to get some context around the

3    circumstances under which you were being asked to make those

4    searches.

5            Are you with me?

6    A.  Okay.

7    Q.  It's fair to say that early in the case, during 2013 and

8    2014, before there was large-scale document production in

9    early 2015, you were sometimes asked to make searches of your

10   records or your e-mails in order to understand what

11   information was available to respond to specific discovery

12   requests, correct?

13   A.  Yes.

14   Q.  Okay.  You knew the Plaintiffs were propounding

15   interrogatories and production requests that each individual

16   request might address a specific issue, correct?

17   A.  Yes.

18   Q.  And at that time, before there was large-scale document

19   production, you were assisting by finding your records that

20   might be responsive to those requests?

21   A.  Yes.

22   Q.  Because the information was under your control, and you

23   had a very good knowledge of what it was and how to find

24   things, correct?

25   A.  Yes.

Duke - Cross

1  Q.  You might not have had the same level of knowledge your

2  wife had, but you also had familiarity with her foldering

3  system, right?

4  A.  Yes.

5  Q.  And that would make you a logical person to be involved in

6  collecting that information in response to specific requests?

7  A.  Correct.

8  Q.  Okay.  Now, after your documents from the computers were

9  collected and searched by the e-discovery consultant,

10 4Discovery, there was this large-scale document production in

11 early 2015, right?

12 A.  Yes.

13 Q.  And in that same time frame and at times after that

14 large-scale document production, there were also times where

15 your former lawyers asked you to make searches to find

16 specific records that might relate to strategy decisions or

17 plans your lawyers were working on, fair enough?

18 A.  Yes.

19 Q.  So they are thinking about something they might do or some

20 step they might take in the case, so they would come to you

21 and say, "Hey, Brent, what do we have on X"?

22 A.  Yes.

23 Q.  Okay.  So you knew you were getting requests like that

24 also, correct?

25 A.  Correct.

Duke - Cross

1    Q.  All right.  They weren't just for purposes of producing

2    documents in discovery, but maybe for gathering information in

3    order to address a specific issue?

4    A.  Correct.

5    Q.  Or, for example, to prepare expert witnesses?

6    A.  Yes.

7    Q.  Okay.  So that's a second area in which you did searches

8    in response to lawyer requests, both before the large-scale

9    production and after it, correct?

10   A.  Correct.

11   Q.  And, again, that's because despite the fact that the

12   lawyers might have this large collection of documents now, you

13   might be able to very quickly identify things or identify

14   things in folders that would easily provide information to

15   make a decision or chart a course of action?

16   A.  Correct.

17   Q.  Okay.  Now, after that large-scale document production in

18   early 2015, you also -- well, let me just back up.

19          You understood that that large-scale production was

20   available not just to the Plaintiffs; it was also available to

21   your lawyers?

22   A.  Yes.

23   Q.  And you knew that your lawyers, and particularly Travis

24   Life, were able to search that production and identify what

25   materials might be in it?

Duke - Cross

616

 1   A.  I don't know the searches.  I knew he had them.  I

 2   don't --

 3   Q.  All right.  You certainly --

 4   A.  -- the details of how he interacted with them.

 5   Q.  I'm sorry.  I cut you off.

 6   A.  I didn't know the details of how he interacted with them.

 7   You are saying "searches."  Like I don't know exactly what

 8   they could do with them.  I knew that there was a bunch of

 9   documents.

10   Q.  All right.  You knew he had it and had access to it?

11   A.  Yes, I believe he read through them, yes.

12   Q.  And so after that large-scale document production was

13   available, you were also asked to make searches as a backup,

14   to find out whether it turned up anything different from what

15   Mr. Life had already turned up when he had searched the

16   existing document production.  You are aware of that also?

17   A.  Yes.

18   Q.  Okay.  So some of these searches that we talked about last

19   week weren't primary searches by you.  They were actually

20   secondary searches that you made as a double-check after the

21   Leavens Strand lawyers had already searched the database?

22   A.  I suppose some were, yes.

23   Q.  All right.  That's generally your understanding?

24   A.  Yes.

25   Q.  Okay.  So it's not as if they were relying on you in the

Duke - Cross

1    first analysis.  They were relying on you to determine whether

2    there was anything they should be concerned about in terms of

3    the completeness of the search they had already done, fair

4    enough?

5    A.  Fair enough.

6    Q.  Okay.  For example, you knew that the reason Mr. Life

7    asked you in March of 2018 to search for Webrecsol -- I want

8    to say "Webrecsol" every time -- Webrecsol and Saraswat

9    materials was because he had already searched the document

10   production for those same materials and really hadn't found

11   much?

12   A.  Can you repeat that?

13   Q.  Yes.

14        You knew that the reason that you were asked in March

15   to look for Webrecsol and Saraswat materials was because there

16   was an allegation that more existed and Mr. Life had searched

17   the database and hadn't found much?

18   A.  Yes.

19   Q.  So he came to you and said, "Let's check this out.  Let's

20   find out whether the Plaintiffs are right.  We don't think

21   they are right, but let's find out," correct?

22   A.  Correct, yes.

23   Q.  All right.  So that search that you then made was a

24   secondary search for those materials, correct?

25   A.  Yes, that was my understanding.

Duke - Cross

1   Q.  Because at that time the defense team's working assumption

2   was that everything should have been available, everything

3   should have already been found, correct?

4   A.  Exactly, yes.

5   Q.  All right.  So this was a due diligence, double-check

6   search that you were asked to make, correct?

7   A.  Correct.

8   Q.  And when you made it, the materials were produced within

9   something like 48 hours?

10  A.  Yes.

11  Q.  Okay.  Now, when you turned up 112 documents in that

12  search, Mr. Life told you he was surprised, didn't he?

13  A.  I don't recall.

14  Q.  You generally got the impression he didn't expect you to

15  find anything, right?

16  A.  Yes.

17  Q.  Okay.  And by the way, let's put one issue to rest:  You

18  had an e-mail exchange with Mr. Life, and you said, "I have

19  hundreds of Saraswat e-mails," right, before you made your

20  search?

21  A.  Correct.

22  Q.  And you have described that as an exaggeration or

23  hyperbole, correct?

24  A.  Correct.

25  Q.  When you made that statement, you didn't know how many you

Duke - Cross

1  did or didn't have?

2  A.  That's fair to say.

3  Q.  All right.  Nevertheless, you searched, and everything you

4  found wound up being the 112 that you provided to Mr. Life?

5  A.  Correct.

6  Q.  Okay.  So when you were talking about hundreds of e-mails,

7  you weren't attempting to make some hard estimate that you

8  were going to be held to?

9  A.  Correct.

10  Q.  Okay.  Now, let me switch a little bit from e-mails to

11  chat or instant messaging functions.

12       You were asked some questions about that last week,

13  right?

14  A.  Yes.

15  Q.  About Yahoo! Chat and Gtalk?

16  A.  Correct.

17  Q.  And you testified last week that early in the case when

18  you were being told to preserve information that you were told

19  to preserve the chat data as well?

20  A.  I don't recall being specifically told to save anything in

21  specific.  I was told to save everything.

22       THE COURT:  While you are looking for that, let me

23  ask you a question.

24       What folder or application or database or location

25  were you searching when you found these 112 Saraswat e-mails?

Duke - Cross

1          THE WITNESS:  My Yahoo! e-mail account.

2          THE COURT:  Yahoo! e-mail account, right?

3          THE WITNESS:  Yes.

4          MR. DAVIS:  I'm sorry.  I didn't hear the answer,

5    your Honor.

6          THE WITNESS:  My Yahoo! e-mail account.

7          THE COURT:  Which at that point had not been copied,

8    correct?

9          THE WITNESS:  Correct, and I believe there were,

10   maybe, four or five in the support@21centurysmoking e-mail

11   account as well.

12         THE COURT:  Okay.  All right.  Just wanted to

13   confirm.

14         Go ahead.

15         MR. SMITH:  No problem.

16         And we are going to talk a little bit about the

17   e-mails that were on the hard drives versus the e-mails that

18   weren't.

19   BY MR. SMITH:

20   Q.  Because there were a substantial number of e-mails on the

21   hard drives, correct?

22   A.  Yes.

23   Q.  In fact, ultimately hundreds of e-mails were produced from

24   the hard drives, correct?

25   A.  Yes.

Duke - Cross

1  Q.  As part of that 57,000 -- I'm sorry -- 47,000-page

2  production?

3  A.  Yes.

4  Q.  Okay.  So I was asking you about preservation of chat

5  functions, and last week, at Page 215 on the Monday

6  transcript, do you recall being asked:

7       "Q.    Did you know back at the time when you were

8   being told to preserve the information that you were to

9   preserve the Yahoo! Chat as well?

10      "A.    Yes, and I didn't delete the Yahoo! Chat.  The

11   program just disappeared."

12      Do you recall that testimony?

13  A.  Yes.

14  Q.  Okay.  So you did understand you were to preserve the chat

15  data to the extent it was available to you?

16  A.  I understood to preserve everything, yes.

17  Q.  All right.  And you certainly understood that to include

18  the chat data?

19  A.  Of course.

20  Q.  Okay.  And I kind of want to get a sense of when you used

21  these chat or instant messaging functions and what for, okay?

22  A.  Okay.

23  Q.  Well, the reason I ask that is when you were asked about

24  these messaging or chat functions last week, you referred to

25  one of them as "something I have not used in forever."

Duke - Cross

1           Do you recall testifying to that?

2    A.  Yes.

3    Q.  And let's start with Yahoo! Chat.  When did you use that

4    for anything related to 21 Century Smoking?

5    A.  Rarely would I have used it for anything related to 21

6    Century Smoking, but mostly it would have been in 2009 when I

7    needed assistance with the initial website.

8    Q.  So it wasn't something -- after this litigation started,

9    it would have been extremely rare for you to have used it?

10   A.  Extremely rare, yes.

11   Q.  All right.  In fact, another thing you testified to last

12   week is that 99.9 percent of your Yahoo! Chats were personal?

13   A.  Fair to say, yes.

14   Q.  Do you have a specific recollection of using the Yahoo!

15   Chat for anything related to 21 Century Smoking after this

16   litigation was filed?

17   A.  No.

18   Q.  Okay.  How about Gtalk?

19           On Monday, I believe you said you didn't recall any

20   specific conversations on Gtalk.

21   A.  No.

22   Q.  You also said it was something you used very rarely,

23   correct?

24   A.  Extremely rarely, yes.

25   Q.  And I think you said all of it was 10 to 12 years ago?

Duke - Cross

623

1   A.  For the most part, yes.

2   Q.  Again, not holding you to that time period, but certainly

3   it would be before this litigation was filed?

4   A.  Yes, it would have been rare before, and then extremely

5   rare after, if at all.

6   Q.  Okay.  And let me just ask you this direct question:  Do

7   you recall ever using Gtalk for any purpose related to

8   21 Century Smoking?

9   A.  I'm not saying it's not possible.  I don't recall using

10  it, though.

11  Q.  Okay.  And more specifically, do you recall using it ever

12  in 2012 or after for 21 Century Smoking?

13  A.  No, I believe in some e-mail documentation that showed up,

14  she said she was going to send -- Kirti said she was going to

15  send files through Gtalk or something.  So that may or may not

16  have occurred, but that's the only thing that I recall at all

17  from Gtalk.

18  Q.  Now, have you ever heard of these talk or chat or

19  messaging functions referred to as "ephemeral messaging

20  communications"?

21  A.  No.

22  Q.  Well, it is a reference that the lawyers use.  There is a

23  lot of words lawyers use that don't make much sense to anybody

24  else.  But the point is that at least some of these chat

25  functions don't last very long.  They don't remain available

Duke - Cross

624

1    for very long.

2    A.  Okay.

3    Q.  And certainly some of these chat functions, I believe, you

4    testified in your deposition that the only reason you would

5    have a record of it at certain points in time is because you

6    made a screenshot and sent it to yourself.  I think we saw

7    Exhibit 37 appear to be something like that.

8    A.  Correct.

9    Q.  Okay.  And so at some time frame, the stuff didn't even

10   have its own existence for any period of time after the chat

11   ended unless you took a step to preserve it, correct?

12          THE COURT:  Well, we need some serious foundation

13   because that's directly contrary to representations that have

14   been made to me in this case.  So I need to know the basis for

15   any foundation for answering that question.

16          MR. SMITH:  Well, I'm happy to just ask him about it,

17   your Honor, because I'm actually trying to clear the air on it

18   also.

19          THE COURT:  Okay.

20   BY MR. SMITH:

21   Q.  And let me try it this way:  As I understood it, there

22   were times where Yahoo! Chat remained available to you, but

23   other times where, perhaps, it didn't.  Did I get that wrong?

24   A.  I mean, I am a digital hoarder, so I would have definitely

25   have done anything in my power to have kept it, if possible.

Duke - Cross

1 The only circumstance under which I wouldn't have kept it or

2 been able to keep it is if it was on a computer from somewhere

3 else when I was using messenger. I would have to e-mail it to

4 myself.

5 Q. Okay.

6 A. That's the only situation I can think of where it would

7 just disappear on its own.

8          I would have set all settings to save forever if that

9 setting existed.

10 Q. All right. That's what I was trying to understand.

11          And because we have this --

12          MR. SMITH: I believe it is Plaintiff's Exhibit 37.

13          THE COURT: You said Plaintiff's 37?

14          MR. SMITH: Plaintiff's 37.

15          THE COURT: Okay.

16 BY MR. SMITH:

17 Q. And it was pointed out last week, this exhibit is an

18 e-mail from you to you on the Yahoo! account, correct?

19 A. Right.

20 Q. So this apparently -- is this one of those chats on some

21 other computer where you would have had to do this in order to

22 save it?

23 A. It is a high likelihood of that, yes, or it was just

24 something that I wanted to have easy access to without

25 scrolling through all the other chats or all of -- going back

Duke - Cross

1  into Yahoo! Messenger and looking through it.  I would -- this

2  says:  "Chat with SEO examples of Kirti."  So maybe I just

3  wanted those examples, and I wanted them readily available, so

4  I would have e-mailed it to myself.

5  Q.  All right.  So as I'm understanding this now, there is two

6  possibilities.  One, this was on another computer, and you

7  needed to do this in order to save it, or this was something

8  you wanted to be more readily available to you than in the

9  chat part of the account?

10 A.  Correct.  So that would be slow, you know, to scroll

11 through a chat as opposed to just looking at an e-mail.

12 Q.  Okay.  Now, you testified last week that it was your

13 intention and your effort not to delete chats and to preserve

14 them, correct?

15 A.  Correct.

16 Q.  Okay.  And at some point, Yahoo! discontinued its chat

17 service, correct?

18 A.  Correct.

19 Q.  And I believe that 4Discovery ultimately determined that

20 that service was discontinued sometime in July of 2018,

21 correct?

22 A.  I don't know the exact date, but that sounds right.

23 Q.  Okay.  Did you get any advance notice that that function

24 was going to be discontinued?

25 A.  I never saw anything.

Duke - Cross

1  Q.  So as far as you can recall and as far as you were aware,

2  you didn't have any notice to do anything about that?

3  A.  I never saw anything, no.

4  Q.  And I believe you testified last week that you wouldn't

5  have wanted that to happen because you didn't want to lose

6  at least your personal chats?

7  A.  Exactly.

8  Q.  Okay.  And let's turn for a minute to your testimony last

9  week about Mr. Leavens being present on one occasion at your

10  home office when you accessed some e-mail accounts.

11        Do you recall that testimony?

12  A.  Yes.

13  Q.  And what you said was he was there and he saw you do it,

14  right?

15  A.  Yes, that's fair, yes.

16  Q.  And that was near the beginning of the case.  You said it

17  was late 2012 or 2013, correct?

18  A.  Correct.

19  Q.  And you said, also last Monday, this was the only time

20  that happened?

21  A.  The only time what?

22  Q.  That Mr. Leavens sat with you and looked at one of your

23  computers with you.

24  A.  It's the only time I can recall, yes.

25  Q.  Okay.  And you were using your own laptop in your office

Duke - Cross

1  at 1535 North Ashland in Chicago?

2  A.  Correct, yes.  We were sitting at a table, correct.

3  Q.  Okay.  And to be clear, you told us Monday you didn't

4  actually explain to Mr. Leavens that you were accessing your

5  e-mail account online as opposed to looking at information on

6  the hard drive of the computer, right?

7  A.  I don't recall specifically explaining it, no.

8  Q.  Well, you actually said that you didn't use any words,

9  right?

10  A.  Correct.

11  Q.  Okay.  Now, what Mr. Leavens was doing, among other

12  things, was trying to determine what folders and files and

13  electronic records you had at your disposal, correct?

14  A.  Yes.

15  Q.  Okay.  And the fact of the matter is you never explained

16  to Mr. Leavens in words that the entirety of your e-mail

17  accounts could only be accessed online?

18  A.  Correct.

19  Q.  Okay.  And obviously, you are not in any position to say

20  what he understood because you didn't actually have a

21  conversation with him about the concept of the accounts being

22  online?

23  A.  Correct.

24  Q.  And, more importantly, about the entirety of the accounts

25  being online?

Duke - Cross

629

1   A.  Correct.

2   Q.  Because certainly there were e-mails on your computers?

3   A.  Yes.

4   Q.  Okay.  And, again, we discussed this a few minutes ago.

5   When you actually did use words to discuss the location of the

6   electronic data under your control, you said that everything

7   was on four computers in your possession, correct?

8   A.  Correct.

9   Q.  Okay.  You told Mr. Leavens that when he was preparing the

10  initial disclosures, right?

11  A.  Yes.

12  Q.  And that's what he put in the initial disclosures that he

13  sent you to review, correct?

14  A.  Correct.

15  Q.  And you corrected other parts, but you didn't correct that

16  part, right?

17  A.  Correct.

18  Q.  And on December 1, 2014, in your e-mail to Ms. Liberman,

19  again discussing the electronic data to be collected and

20  searched, you specifically referred, in your words again, to

21  "the four computers that would have anything related to

22  21 Century Smoking," correct?

23  A.  Correct.

24  Q.  Again, so that's what you told her also?

25  A.  Correct.

Duke - Cross

630

1   Q.  Okay.  And you never told anybody, Ms. Liberman or

2   Mr. Leavens or anybody else:  "The data is not all on the

3   computers.  If we want to search it all, we have to find out

4   the volume of data in the cloud accounts"?

5   A.  You are asking if I specifically said that?

6   Q.  Yes.

7           You never said that?

8   A.  Correct.

9   Q.  Because what was going on in this time frame was in

10  interviewing the e-discovery consultants and assessing what it

11  was going to cost, one of the things that was going on was

12  assessing the volume of the data, correct?

13  A.  Correct.

14  Q.  That's why you provided that breakdown on December 1,

15  2014, of the various gigabytes of electronic data in each of

16  the categories on the computers that you provided to

17  Ms. Liberman?

18  A.  Yes.

19  Q.  Okay.  And you knew that was what was going to be loaded

20  and searched?

21  A.  Yes.

22  Q.  Okay.  And you didn't tell anyone then that the data was

23  incomplete and would not have all your e-mails?

24  A.  Correct.

25  Q.  Okay.  So let me jump ahead for a minute on that.

Duke - Cross

631

1      You recall last week being asked a lot of questions

2   about this period from March to May of 2018 during which a

3   determination was reached that the full extent of your Yahoo!

4   e-mails had not been searched under the Plaintiff's search

5   terms?

6   A.  Correct.

7   Q.  And do you recall testifying that it took the defense team

8   a few weeks to figure out that the full Yahoo! account had not

9   been subjected to the search terms?

10  A.  Yes, it was a number of weeks.

11  Q.  What you said was it was actually a few weeks after

12  March 18th, 2018, that the lawyers figured out the actual

13  realization that the Yahoo! account had not been searched for

14  the full extent of the e-mails?

15  A.  Correct.

16  Q.  Okay.  And you understand that up until that time, your

17  lawyers thought they had collected all of your e-mails from

18  the four computers that had been identified as having

19  everything related to 21 Century Smoking?

20  A.  Yes.

21          MR. DAVIS:  Objection, foundation.

22          THE COURT:  I will sustain.

23          If you ask it "Did you understand," and then follow

24  up that question with "How did you understand it," I will let

25  you do that.

Duke - Cross

632

 1  BY MR. SMITH:

 2  Q.  Did you understand that up until that time your lawyers

 3  thought they had collected all of your e-mails from the four

 4  computers that had been identified as having everything

 5  related to the 21 Century Smoking business?

 6  A.  Yes.

 7  Q.  And how did you understand that?

 8  A.  Because clearly it was just getting figured out right

 9  then.

10  Q.  You discussed those issues with your lawyers, also,

11  correct?

12  A.  At that point is when they seemed to have figured it out,

13  so that's clearly -- and then they searched my e-mails, so

14  that's how I knew.

15  Q.  And you were aware that the information from the hard

16  drives of those computers had, in fact, been searched by

17  4Discovery against the Plaintiff's search terms, correct?

18  A.  Yes.

19  Q.  And that search for e-mails including the designated

20  search terms, that turned up hundreds of e-mails, right?

21  A.  Yes.

22  Q.  And this nearly 50,000-page production?

23  A.  Yes.

24  Q.  And you knew, by the way, that that production was

25  significantly larger than DR's production, correct?

Duke - Cross

633

1    A.  Correct.

2    Q.  The small company produced almost ten times the records

3    that the large company produced?

4    A.  Yes.

5    Q.  And the reason for that was it was always your

6    understanding that the guiding philosophy of the defense team,

7    meaning you and your lawyers, was to overproduce and make sure

8    you gave up everything that possibly could bear on this case?

9    A.  Correct.

10   Q.  And that was always what everybody wanted to do as far as

11   you knew?

12   A.  Yes.

13   Q.  Okay.  But to get to the bottom line of this series of

14   questions, based on your own participation in that process, in

15   the spring of 2018, the fact that your production was

16   incomplete because it did not include all of the Yahoo!

17   e-mails that were on the online account was not figured out

18   until, approximately, May, correct?

19   A.  Correct.

20   Q.  Okay.  That's what you gleaned from being in the middle of

21   that process with your lawyers?

22   A.  Yes.

23   Q.  Okay.  Now, let's turn for a second to the auto-delete

24   issue.

25            And to be clear, this auto-delete issue was only

Duke - Cross

634

1  applicable to at least some -- maybe all, but some -- of the

2  GoDaddy-based accounts, correct?

3  A.  Correct.

4  Q.  That would be the @21centurysmoking.com accounts?

5  A.  Yes.

6  Q.  And to be clear, you didn't even know that this

7  auto-delete function existed, I believe you testified, until

8  late June of 2015?

9  A.  Correct.

10 Q.  You weren't aware it was happening?

11 A.  Correct.

12 Q.  It wasn't a setting that you asked for?

13 A.  Correct.

14 Q.  And it wasn't anything you intended to be in place?

15 A.  Correct.

16 Q.  And because you didn't know about it, you obviously

17 couldn't tell anybody about it before you discovered it in

18 late June of 2015?

19 A.  Correct.

20 Q.  Now, is it also true that after you discovered the

21 auto-delete setting, you also told your lawyers that e-mails

22 from the 21centurysmoking.com accounts were also

23 auto-forwarded to your Yahoo! e-mail account?

24 A.  The bduke@21centurysmoking account, yes.

25 Q.  And, in fact, you told them that "from" e-mails from that

Duke - Cross

1    account went to the Yahoo! account, correct?

2    A.  No, just inbox e-mails.

3         MR. SMITH:  Could we have Exhibit 17, Leavens Strand

4    Exhibit 17?

5    BY MR. SMITH:

6    Q.  Now, if you will take a look at this, this is an e-mail

7    chain between you and Peter Stamatis, correct?

8    A.  Correct.

9    Q.  And it copies Tom Leavens and Steve Shonder, correct?

10   A.  Correct.

11   Q.  And let's scroll down a little bit and look at the message

12   that Mr. Stamatis sent you:

13        "You had previously advised us that e-mails from

14   bduke@21centurysmoking.com and support@21centurysmoking.com

15   were auto-forwarded to your bduke@yahoo.com account at all

16   relevant times.  In examining the bduke@yahoo.com account, we

17   do not see those coming in.  Can you direct us to them?"

18        Did I read that correctly?

19   A.  Yes.

20   Q.  And if we scroll up to your response, you say:  "Only

21   bduke e-mails forward, not support e-mails."

22        Which is what you just told me a minute ago, right?

23   A.  Correct.

24   Q.  And you say:  "I don't know what you mean by 'direct.'  It

25   is every e-mail."

Duke - Cross

636

1          Right?

2     A.   Right.

3     Q.   But you didn't say:  "No, it's not 'from' e-mails, it is

4     'to' e-mails"?

5     A.   I mean, you are saying "from."

6          Like if you can scroll down, can I see that again?

7          "You advised us that e-mails from," as in from, not

8     sent.  It doesn't say:  "From the sent box of."  It says

9     "from."  So from those two accounts, not from the sent box of

10    those two accounts.  So I don't mean "from" as in sent.  I

11    mean "from" as in actually from.  They exist there.

12    Q.   Okay.  So the fact that you had previously told them that

13    e-mails from that account, you didn't mean "from" as in sent?

14    A.   "From" as in from the account forwards to this account.

15         THE COURT:  "From" as in located, not "from" as in

16    sent.

17         THE WITNESS:  Correct.

18    BY MR. SMITH:

19    Q.   But you, as you sit here today, don't know what the

20    lawyers understood that "from" to mean, correct?

21    A.   I can't understand what someone else thinks.

22    Q.   Okay.  So what you are telling us and what you are

23    clarifying now is that it is the "to" e-mails, not the "from"

24    or sent e-mails?

25    A.   The e-mails received in bduke@21centurysmoking.com,

Duke - Cross

637

1    correct.

2    Q.   Okay.  Now, you also testified last week in connection

3    with your discovery of the auto-delete issue on June 29th,

4    2015, about what you did in the wake of that, right?

5    A.   Correct.

6    Q.   Okay.  And you referred to an e-mail exchange you had with

7    Travis Life that day, right?

8    A.   Yes.

9    Q.   Okay.  And you admitted on Monday, and I wrote down your

10   words, that you were "piecing this together."

11        Do you remember saying that?

12   A.   I believe that's a fair statement.  I don't remember

13   saying that, but that sounds right.

14   Q.   Let's look at Page 165 of last Monday's transcript.

15        Do you see Line 10, Mr. Duke?

16   A.   Yes.

17   Q.   You are referring to "piecing things together" from

18   looking at e-mails, correct?

19   A.   Correct.

20   Q.   Okay.  And, in fact, you actually said it twice.  You said

21   at another time that you were piecing it together from the

22   communications you were looking at, fair enough?

23   A.   I'm trying to get the context of this statement.

24        MR. SMITH:  Go down a little further, please.

25        It doesn't matter.  I will withdraw the question.

Duke - Cross

1  BY MR. SMITH:

2  Q.  Let me ask it this way:  What you were doing was trying to

3  reconstruct a recollection based on looking at these e-mails,

4  correct?

5  A.  Correct.

6  Q.  Okay.  And that's because, as a matter of fact, you really

7  don't have a good recollection of what took place that day,

8  right?

9  A.  Fair statement, yes.

10  Q.  Okay.  And to be clear, when you did your own declaration

11  about this issue in March of 2018, you didn't get the date of

12  your discovery of this issue right?

13  A.  Correct.

14  Q.  Okay.  You didn't have the benefit of looking at these

15  documents or having called and checked in with the GoDaddy

16  people, and at that time, you said 2014, right, in your

17  declaration?

18  A.  Correct.

19  Q.  Okay.  And now you have settled on June 29th, 2015, right?

20  A.  For sure, that's the date, yes.

21  Q.  All right.  And as Mr. Davis pointed out last week, you

22  also at one point approximated that date as May of 2015?

23  A.  Correct.

24  Q.  And I'm with you on this, I think June 29th is

25  approximately May, but the fact of the matter was you didn't

Duke - Cross

639

1  have a crystal clear recollection until you pieced this

2  together, correct?

3  A.  Until I called and asked.

4  Q.  All right.  Now, you referred to -- well, you also told

5  Mr. Davis last Wednesday that you actually don't recall which

6  attorney you first told about the auto-purge issue, correct?

7  A.  Correct.

8  Q.  Still correct today?

9  A.  Correct.

10  Q.  Okay.  And the e-mail exchange you had with Mr. Life that

11  day, Defendant's Exhibit 23, that doesn't say anything about

12  the auto-delete issue, does it?

13  A.  No.

14  Q.  It's all about issues arising from the Edmiston

15  deposition, right?

16  A.  I believe so, yes.

17  Q.  And, in fact, Exhibit 23 is actually incomplete.  You had

18  a more extensive exchange with Mr. Life that day; do you

19  recall that?

20  A.  I believe that's true.

21        MR. SMITH:  Can we put up Leavens Strand Exhibit 16,

22  please?

23        And we can just scroll through these slowly, if we

24  could.

25

Duke - Cross

640

```
 1  BY MR. SMITH:
 2  Q.  But this is actually, I believe, five or six distinct
 3  exchanges you had with Mr. Life in the wake of the Edmiston
 4  deposition that day.
 5        Just let us know if we are moving too fast, Mr. Duke.
 6  A.  Okay.
 7  Q.  You agree this is all pretty much about the Edmiston
 8  deposition and the question of whether he had an equity
 9  interest in your company?
10  A.  Yes.
11  Q.  Not a word in here about the auto-delete?
12  A.  No.
13  Q.  Okay.  And the fact of the matter is you don't really
14  remember the specifics of any conversations about the
15  auto-delete with Mr. Life, do you?
16  A.  I remember discussing it with someone.  I told you I do
17  not remember -- I don't remember who I discussed it with.  I
18  remember discussing it with someone.
19  Q.  That's the point.  You are not even sure you spoke to
20  Mr. Life about it, right?
21  A.  I'm not sure who I talked to.
22  Q.  All right.  And you are not sure when you first reported
23  it to anybody, correct?
24  A.  As soon as I got off the phone with GoDaddy, I called an
25  attorney.
```

Duke - Cross

641

1   Q.  You called somebody, but you can't say who or what was

2   said or how they reacted?

3   A.  No.

4   Q.  Okay.  And until you did this reconstruction, piecing it

5   together -- by the way -- strike that question, please.

6          By the way, you actually testified last week that you

7   weren't sure whether you made the call before or after you

8   talked to GoDaddy, didn't you?

9   A.  Which call?

10   Q.  This supposed call to a Leavens Strand lawyer or one of

11   your defense team about this.

12   A.  Correct, yes, I may have called right before or right

13   after, but GoDaddy was the confirmation of the issue that I

14   was seeing.

15   Q.  So you don't recall if it was before or after, right?

16   A.  It would have been right before or right after, correct.

17   Q.  You don't recall who you talked to?

18   A.  Correct.

19   Q.  Don't recall what was said?

20   A.  Correct.

21   Q.  Okay.  Now, let's turn to a related issue that I think we

22   can agree on.

23          You were asked by Mr. Davis last Monday why

24   Mr. Life's May 14, 2018, declaration, Defendant's Exhibit 5,

25   didn't disclose the auto-delete issue.

Duke - Cross

642

1      Do you remember being asked that?

2  A.  Yes.  I do remember being asked it, yes.

3  Q.  And you said you didn't know.  You weren't involved in the

4  preparation of Mr. Life's declaration, right?

5  A.  Correct.

6  Q.  But what you do know is that the auto-delete issue had

7  already been disclosed by you two months earlier in your

8  declaration, right?

9  A.  I would have to see it.  I believe -- there is no reason

10  for me not to believe that.

11      MR. SMITH:  I just want to put this issue to rest.

12      Let's put Defendant's Exhibit 5 up first.

13  BY MR. SMITH:

14  Q.  This is Mr. Life's declaration, right?

15  A.  Okay.

16      MR. SMITH:  And let's go to the end of it, just to

17  see what it is dated.

18  BY MR. SMITH:

19  Q.  It's dated May 14, 2018, right?

20  A.  Correct.

21      MR. SMITH:  Now, let's put Leavens Strand Exhibit 9

22  up, please, and let's go to the end of that.

23      Whoops, it is an attachment.

24  BY MR. SMITH:

25  Q.  That's your declaration on March 19, 2018, correct?

Duke - Cross

643

1  A.  Correct.

2  Q.  About two months earlier?

3  A.  Yes.

4  Q.  And this was all about the auto-delete issue, right?

5  A.  Can I see that real quick?

6       MR. SMITH:  Scroll up.

7       THE WITNESS:  Correct.

8  BY MR. SMITH:

9  Q.  Okay.  And it was filed as an attachment to Docket

10 No. 234, "Defendant's Supplemental Local Rule 56.1(a)(3)

11 Statement of Material Facts."  You are probably not --

12 A.  I will take your word for that.

13 Q.  Okay.  Fair enough.

14      You may not know what it was attached to, but you

15 understand that you had created this declaration in March to

16 be filed with the court, right?

17 A.  Correct.

18 Q.  And that was way back before Mr. Life's declaration?

19 A.  Correct.

20 Q.  Okay.  And let's turn to another subject, and that's the

21 Edmiston recordings.

22      You recall we spent a lot of time on that last week?

23 A.  Yes, we did.

24 Q.  And your testimony, as I understand it, is that you always

25 understood that Mr. Edmiston had made or attempted to make two

Duke - Cross

644

1    audio recordings at the trade show he attended?

2    A.  Correct.

3    Q.  And you also understand that Mr. Edmiston testified in his

4    deposition that he attempted to make two recordings, correct?

5    A.  Correct.

6    Q.  So there was no secret about that?

7    A.  Correct.

8    Q.  And, by the way, you have read Mr. Edmiston's deposition,

9    correct?

10   A.  I believe so, yes.

11   Q.  You read it, if not for your own staying apprised of the

12   case, you also read it for purposes of making confidential

13   information designations.

14          Do you recall that?

15   A.  Yes.

16   Q.  Okay.  But anyway, there was no secret about the fact that

17   he tried to make two recordings?

18   A.  Correct.

19   Q.  And he also clearly testified in his deposition that the

20   second recording did not work and there was no recording to

21   send.

22          Do you remember that?

23   A.  Correct, yes.

24   Q.  So that was in June of 2015, right?

25   A.  I believe you.  I don't know the date.

Duke - Cross

645

1  Q.  Something like seven months after you had e-mail exchanges

2  with Mr. Edmiston about what he had done and you had e-mail

3  exchanges with the Leavens Strand lawyers about the

4  recordings?

5  A.  That sounds accurate, yes.

6  Q.  You had e-mail exchanges with the Leavens Strand lawyers

7  from about September 30th -- well, you had a number of

8  exchanges on September 30th, correct?

9  A.  Correct.

10 Q.  And I'm going to get to it in a minute, but we know you

11 had some e-mail exchanges with Mr. Edmiston on October 2 and

12 October 4, correct?

13 A.  That sounds right.

14 Q.  But seven months later, Mr. Edmiston testified the second

15 recording did not work and there was no recording to send,

16 right?

17 A.  Correct.

18       MR. SMITH:  Let's put up Exhibit 20.

19       Keep going.

20       Stop there.

21 BY MR. SMITH:

22 Q.  And he's being asked about a second recording, and he

23 said:

24       "I stopped and tried to record again, and it wouldn't

25 work."

Duke - Cross

646

```
 1          Right?

 2   A.  Correct.

 3   Q.  That's what you read when you read his deposition?

 4   A.  Yes.

 5   Q.  Okay.  Now --

 6          THE COURT:  When did you read his deposition?

 7          MR. SMITH:  Pardon me?

 8          THE COURT:  When did you read his deposition?

 9          THE WITNESS:  I do not recall.

10          THE COURT:  Can you give me a year?

11          THE WITNESS:  After it was done because part of it --

12          THE COURT:  I figured that one out myself.

13          THE WITNESS:  Part of it was that he had thought he

14   had equity ownership.  So I was curious where exactly that

15   came from.  And I guess he is saying something about

16   confidentiality.  I don't know -- I don't recall that.  I know

17   that -- I remember looking at it, and out of curiosity, why he

18   would have said what he said about the equity part of it.

19          THE COURT:  Okay.

20          MR. SMITH:  Let's scroll down a little further, if we

21   can.

22   BY MR. SMITH:

23   Q.  And at Lines 12 and 13, he says -- he is being asked about

24   both of the recordings on Line 5, and then he says:

25          "No, I think it was just the first one because the
```

Duke - Cross

647

1   second one, there wasn't anything."

2          Right?

3   A.  Correct.

4   Q.  Now, to get to the point here, as you testified last

5   Monday, you only sent the one recording, the first recording,

6   to your lawyers at the Leavens Strand firm; is that correct?

7   A.  Yes, exactly.

8   Q.  I believe you testified that was your decision alone, fair

9   enough?

10  A.  Absolutely, yes.

11  Q.  And we also know that you received e-mails from

12  Mr. Edmiston dated October 2 and October 4, 2014, and I

13  believe those were marked as Plaintiff's Exhibit 23 and 24.

14         Do you recall that?

15  A.  I don't recall exactly.

16  Q.  Not the exhibit numbers.  I apologize for that.

17         Do you remember having e-mail exchanges with

18  Mr. Edmiston on October 2 and October 4?

19  A.  Yes, yes.

20         MR. SMITH:  Let's put up Plaintiff's 24 first.

21         MS. RICH:  Plaintiff's 24?

22         MR. SMITH:  Yes.

23  BY MR. SMITH:

24  Q.  So this is the October 4 e-mail that you were asked about

25  last week, correct?

Duke - Cross

1    A.  Yes.

2    Q.  Referring to the second recording, okay?

3    A.  Correct.

4         MR. SMITH:  And let's look at 23 for a minute.

5         My mistake.  I intended to do this chronologically,

6    and I got it backwards.

7    BY MR. SMITH:

8    Q.  And this is the one that says:  "Video too long to send,

9    but I have it," right?

10   A.  Correct.

11   Q.  So both of those refer to another recording.  I'm not

12   going to get into whether there is two versus three, but they

13   refer to another recording, in any event, correct?

14   A.  Correct.

15   Q.  Okay.  And you testified that you did not send either of

16   those e-mails to your lawyers at Leavens Strand, also correct?

17   A.  Correct.

18   Q.  Okay.  In fact, you testified that it was your decision

19   not to send those e-mails to your lawyers, correct?

20   A.  Correct.

21   Q.  And let's back up.

22        It's true, isn't it, that on September 30th, 2014,

23   just a few days before you got those e-mails from

24   Mr. Edmiston, you unequivocally told your lawyers at Leavens

25   Strand that there was only one recording?

Duke - Cross

649

 1   A.  Correct, yes.  That was to the best of my knowledge, yes.

 2          MR. SMITH:  All right.  Let's look for a minute at

 3   Leavens Strand Exhibit 18, please.

 4   BY MR. SMITH:

 5   Q.  And this is an e-mail chain --

 6          MR. SMITH:  Scroll down a little bit, if you would,

 7   please.

 8   BY MR. SMITH:

 9   Q.  -- an e-mail chain between you and Heather Liberman.  And

10   ultimately, she winds up communicating with Tom Leavens,

11   right?

12   A.  Correct.

13   Q.  And she is asking you at 11:32 a.m.:  "Find out whether

14   there is a second recording."

15          No. 1, right?

16   A.  Uh-huh.

17   Q.  No. 2:  "Whether Bill" -- Bill Edmiston -- "still has the

18   recording."

19          Right?

20   A.  Yes.

21   Q.  No. 3:  "If Bill has the recording, ask him to send it to

22   you."

23          Right?

24   A.  Correct.

25          MR. SMITH:  Now, if we scroll down a little bit -- or

Duke - Cross

1  scroll up a little bit to the next message -- oops, I missed

2  one.

3          Scroll back down.

4  BY MR. SMITH:

5  Q.  I'm looking at yours, your September 30th at 2:37 p.m.

6          You say to Heather Liberman:  "Said recording did not

7  work, so there isn't another recording"?

8  A.  Correct.

9  Q.  Okay.  And then if we go to the top e-mail in the chain,

10  she advises Mr. Leavens one minute later at 2:38 p.m.:  "See

11  Brent's response below.  There is no second recording."

12          Right?

13  A.  Correct.

14  Q.  Okay.  And that's what you said in your written

15  communication, "There is no second recording," right?

16  A.  Correct.

17  Q.  And as I understand your testimony last week, you say that

18  sometime later, after receiving Mr. Edmiston's October 4

19  e-mail, you orally told your counsel there was a second

20  recording; is that your testimony?

21  A.  I remember orally saying it when I first found out about

22  the whole situation.  I don't remember orally saying it weeks

23  later.  I'm getting confused as to the time frame right now.

24  Q.  Regardless of when you made this oral communication, you

25  did testify last week that you didn't recall which of your

Duke - Cross

1    attorneys you told, right?

2    A.  Correct.

3    Q.  And what we know is you didn't send another e-mail to

4    Leavens Strand on this issue like you had done multiple times

5    in this chain before, right?

6    A.  Correct.

7    Q.  And you didn't forward Mr. Edmiston's e-mails, right?

8    A.  Correct.

9    Q.  And you also know that some months later, Bill Edmiston

10   gave his deposition in late June of 2015 and unequivocally

11   testified there wasn't a second recording, right?

12   A.  Correct.

13   Q.  And you reviewed Mr. Edmiston's deposition, as we said?

14   A.  Correct.

15   Q.  And in August of 2015 -- I think it's a late June

16   deposition, so this is about a month later, after the

17   transcript is available -- Mr. Life asked you to review the

18   Edmiston deposition for designations of sensitive corporate

19   information.

20           Do you recall that?

21   A.  I didn't recall the time, but, yes, that sounds right.

22           MR. SMITH:  Could we put up Leavens Strand

23   Exhibit 20?

24           Hang on.

25           I apologize, your Honor.

Duke - Cross

652

1          THE COURT:  That's okay.

2          MR. SMITH:  My outline has an incorrect number in it.

3    It's 19.

4    BY MR. SMITH:

5    Q.  Now, this is an e-mail exchange between you and Travis

6    Life on August 7th, 2015, correct?

7    A.  Correct.

8    Q.  And the re line is "Designations for Edmiston's

9    deposition," right?

10   A.  Correct.

11   Q.  And you understand that that was the confidential

12   corporate information designations or sensitive corporate

13   information designations?

14   A.  Correct.

15   Q.  And you had read the deposition and you suggested some

16   errors Mr. Edmiston made or statements that you didn't think

17   were entirely accurate, correct?

18   A.  It appears so.

19   Q.  You didn't flag, "Oh, he said there wasn't a second

20   recording," and we all know there is a second recording,

21   right?

22   A.  Correct, yes.  At this time, I believed there not to be a

23   second recording, correct.

24   Q.  So in August of 2015, you believed there was not a second

25   recording?

Duke - Cross

653

1  A.  Correct.

2  Q.  Even though you say that back in October of 2014, you

3  advised your counsel that there was a second recording?

4  A.  And then was told by Bill Edmiston there was no second

5  recording, correct.

6  Q.  So you had changed your position from what you claim you

7  told your counsel.  You changed your position.

8        You first told counsel on September 30th, 2014, there

9  is no second recording.  Then you say in your testimony last

10  week that "I told them sometime around October 4 that there

11  was a second recording."  And now eight months later, you are

12  back to no second recording, and you are not correcting this

13  erroneous deposition testimony?

14  A.  This time frame is where I'm getting confused.  I talked

15  to Bill Edmiston.  He said there was two recordings.  I told

16  my lawyers there was two recordings.  He then told me there is

17  only one recording.  I told my lawyers there is only one

18  recording.  So in that order is how it happened.  I don't know

19  about these dates that are being brought up, but I was told

20  that there was two recordings.  Then I was told there was one

21  recording.  So I believed there to be one recording.  Until

22  very recently, I believed there was one recording.

23  Q.  I don't mean to be cute, but your final answer is that you

24  believed, until very recently, there to be only one recording,

25  and you believe that your lawyers appropriately understood

Duke - Cross

654

1   there was only one recording?

2   A.  Correct, yes.

3   Q.  Okay.  So you are not here suggesting that you flagged a

4   second recording for your lawyers and that they should have

5   produced that.  You are not saying that at all?

6   A.  No.

7   Q.  Okay.  You are saying your lawyers legitimately believed

8   there was only one recording and there would only be one

9   recording to produce?

10   A.  Correct.

11   Q.  Okay.  Now, I want to go a little farther forward to the

12   meeting in San Diego that you had at least face-to-face with

13   Mr. Leavens, correct?

14   A.  Yes.

15   Q.  Now, you placed that meeting, and I think you approximated

16   it, but you placed that meeting as being in, approximately,

17   November, correct?

18   A.  I don't -- yes, sometime in 2018.

19   Q.  You wouldn't be surprised to find out it was actually in

20   September?

21   A.  Not at all.

22   Q.  Okay.  And you said Mr. Stamatis was on the phone,

23   correct?

24   A.  Correct.

25   Q.  And he wasn't the only lawyer that was attending that

Duke - Cross

655

1  meeting by phone, was he?

2  A.  I don't recall everyone who was on the call.

3  Q.  Well, you know that Mr. Salam was on the phone for that

4  meeting.

5       You recall that, don't you?

6  A.  I do not recall.  I know he may have been on the meeting

7  for part of the meeting, but I don't recall him being on for

8  the entirety of the meeting.

9  Q.  Well, that meeting, Mr. Salam was on the phone because he

10  sort of functioned as your separate personal counsel in that

11  time frame, right?

12  A.  Correct.

13  Q.  He had handled some of the insurance dispute for you,

14  correct?

15  A.  Yes.

16  Q.  And you had continued to use him as sort of like an extra

17  sounding board, right?

18  A.  Correct.

19  Q.  And that's why he was at that meeting by telephone,

20  correct?

21  A.  If you are saying he was at the meeting, then, yes, that

22  would have been why he would have been there.

23  Q.  I guess you are telling me you don't recall that?

24  A.  I do not recall him specifically being on that call, no.

25  Q.  You recall Mr. Shonder was also on the phone?

Duke - Cross

656

1   A.  I do not.

2   Q.  But you did know that this was effectively an

3   all-hands-on-deck meeting, didn't you?

4   A.  Yes.

5   Q.  Okay.  So there was no question in your mind about the

6   seriousness of this meeting, right?

7   A.  No.

8   Q.  Because it was in the wake of the Plaintiffs laying out

9   their plan for a sanctions motion, right?

10  A.  Correct.

11  Q.  And, in fact, you testified last week that the concept of

12  sanctions was discussed at this meeting, correct?

13  A.  Correct.

14  Q.  Okay.  So you knew the meeting was being held because of

15  the threat of sanctions, right?

16  A.  Correct.

17  Q.  Okay.  And the discussion wasn't just about e-mails, was

18  it?

19  A.  As I said, I do not recall a lot of the details of the

20  meeting.

21  Q.  You don't remember there being discussion of your

22  deposition testimony?

23  A.  I do not recall the subject that we talked about in the

24  meeting.

25  Q.  Well, did your lawyers at that meeting discuss with you

1    the fact that they were concerned that events in the case had

2    potentially affected your credibility?

3            MR. LEONARD:  Objection, attorney-client privilege.

4            MR. SMITH:  Well, we will excuse Mr. Salam from that,

5    although I'm not sure I have to.

6    BY MR. SMITH:

7    Q.  But I will say did your Leavens Strand lawyers or

8    Mr. Stamatis or Mr. Shonder suggest to you that there were

9    issues about your credibility?

10           MR. LEONARD:  Same objection, attorney-client

11   privilege.

12           THE COURT:  Overruled.

13           THE WITNESS:  I do not recall that, no.

14   BY MR. SMITH:

15   Q.  You don't recall that they wanted to make sure you

16   understood that there was the potential for sanctions arising

17   from deposition testimony?

18           MR. LEONARD:  Same objection, your Honor.

19           Can I just have a continuing objection?

20           MR. SMITH:  And to be clear --

21           THE COURT:  Let him finish the objection.

22           We've played this game a couple of times, right?

23           Again, question, objection.  Let the question finish,

24   let the objection finish, don't answer, I will rule.

25           Go ahead.

Duke - Cross

658

1          MR. LEONARD:  Judge, just to be a non-obstructionist,
2  can I have a continuing objection to all parts of this
3  conversation on attorney-client privilege, or would you like
4  me to make an individual objection to each question?
5          THE COURT:  Do whatever you think you need to do to
6  preserve your record.
7          MR. LEONARD:  Okay.  Objection, attorney-client
8  privilege.
9          THE COURT:  All right.  Overruled.
10          MR. SMITH:  And I apologize for the interruption.  I
11  think that's my first black mark, your Honor, but I will
12  probably get more, so I apologize.
13          THE COURT:  That's okay.
14  BY MR. SMITH:
15  Q.  And, again, from these questions, I'm going to exclude
16  Mr. Salam for purposes of convenience.
17          But my question is:  Did the other lawyers at the
18  meeting suggest to you that there were issues raised about
19  your credibility as a result of deposition testimony?
20          MR. LEONARD:  Objection, attorney-client.
21          THE COURT:  Overruled.
22          And the question as to Mr. Duke's credibility and
23  statements under oath are fully encompassed in the motion for
24  sanctions, and it was all agreed that the attorney-client
25  privilege was not going to be asserted on issues encompassed

Duke - Cross

659

1    in the motion.

2              So overruled.

3              Go ahead and answer.

4        THE WITNESS:  As I said previously, I really do not

5    recall a lot of details from that meeting.

6    BY MR. SMITH:

7    Q.  Did you feel put on the spot at all at that meeting?

8    A.  No.

9    Q.  Okay.  But you knew at least that the lawyers were very

10   concerned about where the case went from there, fair enough?

11             MR. LEONARD:  Objection to foundation and

12   attorney-client privilege.

13             THE COURT:  What was your understanding?

14             THE WITNESS:  I did not --

15             THE COURT:  Sustained.

16             What was your understanding?

17             THE WITNESS:  I did not have an understanding that

18   they were concerned about the case, no.

19   BY MR. SMITH:

20   Q.  So you thought this was just another strategy meeting?

21   A.  I thought that this was discussing the fact that the

22   Yahoo! e-mails, there was a mess up in discovery, but it was

23   something that we would be able to get over, essentially, and

24   given the strength of our case, that it was something that

25   wasn't good, but wasn't whatever word you just used.  I did

Duke - Cross

1    not feel that way, no.

2    Q.  Let me ask you about one more subject.

3            THE COURT:  Is this a different subject matter or

4    subject about this meeting?

5            MR. SMITH:  It is a different subject matter.

6            Do you want a break, your Honor?

7            THE COURT:  Hold on one second.

8            We have said that -- let me just interrupt for a

9    second.

10           You said the meeting, you were in San Diego, and

11   Mr. Leavens was in San Diego, correct?

12           THE WITNESS:  Correct.

13           THE COURT:  Where in the city of San Diego did this

14   meeting occur?

15           THE WITNESS:  I want to say at like the Sheraton by

16   the airport.

17           THE COURT:  Okay.  You did tell us about that before.

18           And how was this meeting set up?  How was it

19   arranged?

20           THE WITNESS:  We sat in a conference room, just he

21   and I in a conference room.

22           THE COURT:  I assume there were e-mails or

23   conversations saying:  "Meet at the Sheraton"?

24           THE WITNESS:  Yes.

25           THE COURT:  People -- you don't remember who, but you

1    think somebody called in, right?

2         THE WITNESS:  There were definitely lawyers on the

3    phone.

4         THE COURT:  So were there e-mail exchanges or

5    telephone calls about a conference call number to call in, how

6    people were going to participate in this meeting?

7         THE WITNESS:  I wouldn't have been involved in that

8    type of thing.  I had an e-mail from Mr. Leavens telling me

9    what time to meet him.

10        THE COURT:  Okay.  So that was it, just an e-mail

11   from Mr. Leavens saying show up at the Sheraton this date, at

12   this time?

13        THE WITNESS:  And I believe he gave me documents to

14   review and said:  "Meet at this time."

15        THE COURT:  Okay.  Did he say what the purpose and

16   nature of that meeting was going to be when he gave you those

17   documents and told you the date and time to appear?

18        THE WITNESS:  I can't recall if he told me before or

19   after, but to the best of my knowledge and recollection of

20   that meeting, it was him basically offering to step aside from

21   the case, and that's what really struck home with me from that

22   meeting.

23        THE COURT:  Did he say he was out there solely for

24   the purpose of this meeting, or was he going to Sea World, or

25   what?

Duke - Cross

662

1      THE WITNESS:  It was only for that meeting is what I
2   understood, and that's why he wanted to meet at the airport,
3   because he was just coming in, and he was going somewhere else
4   afterward.
5      THE COURT:  Had you ever met with Mr. Leavens in
6   San Diego previously?
7      THE WITNESS:  No.
8      THE COURT:  Have you ever met with Mr. Leavens in
9   San Diego since this meeting?
10      THE WITNESS:  No.
11      THE COURT:  Okay.  All right.  Go ahead.
12      MR. SMITH:  All right.  Thank you, your Honor.
13   BY MR. SMITH:
14   Q.  I want to understand a couple of things about the
15   discoveries that the e-mails were not entirely --
16      THE COURT:  I'm sorry.  How much time on this subject
17   matter?  Because we have got a couple criminal matters for
18   status.
19      MR. SMITH:  I really don't know, your Honor.  It
20   might be brief.
21      THE COURT:  Okay.  Then let's see where -- go ahead,
22   go ahead.
23      MR. SMITH:  Maybe I can cover these, and if we break,
24   I may have something more.  I may not.
25      THE COURT:  And that's fine.  You know, I don't want

Duke - Cross

1    to have sort of an awkward break in the middle.  So I just

2    wanted to give you a heads up.

3              So, go ahead.  Do what you need to do.

4              MR. SMITH:  And I just interrupted you about three

5    times in that exchange.

6              THE COURT:  Go ahead.

7              MR. SMITH:  I apologize.

8              Yes, I can probably do what I need to do in about

9    five minutes here.

10             THE COURT:  Okay.

11   BY MR. SMITH:

12   Q.  Last week, you were asked about your May 29, 2019, meeting

13   with Mr. Stamatis and Mr. Shonder.

14             Do you recall that?

15   A.  Yes.

16   Q.  And that's the meeting at which you told them that you had

17   a realization that the @21centurysmoking.com GoDaddy e-mail

18   accounts had likely not been fully searched?

19   A.  I had a realization that the other, like -- so the Rob,

20   the Robert, all those additional accounts had not been

21   searched, correct.

22   Q.  Well, you seem to be saying two things.  You seem to be

23   saying there were other e-mail accounts that had, perhaps, not

24   been searched?

25   A.  Correct.  That is what I was first asking them about,

1    correct.

2    Q.  But you seem to also be saying that you had determined

3    that there was potentially additional data on the cloud that

4    hadn't been on the hard drives, right?

5    A.  Could you repeat that real quick?

6    Q.  Yes.

7         I'm asking now about the support@21centurysmoking.com

8    and bduke@21centurysmoking.com.

9    A.  Yes.

10   Q.  You also felt they had, perhaps, not been fully searched?

11   A.  I thought that they had not been given the same scrutiny

12   as the Yahoo! e-mails, correct.

13   Q.  And had you had that understanding for a while before that

14   meeting?

15   A.  Whenever I sent over the e-mail accounts to the lawyers,

16   so that would have been like a year before that, when I sent

17   over the passwords for the support and the bduke is when I

18   would have known that, yeah, they weren't searched in the same

19   way that the yahoo.com was.

20   Q.  But what I'm asking you now specifically is about the

21   @21centurysmoking.com GoDaddy-based accounts.

22        When did you come to the realization that -- or when

23   did you tell the lawyers for the first time, "Hey, these

24   haven't been searched"; at that May 29th meeting?

25   A.  No, when I sent over the e-mail saying, "Hey, you guys, we

Duke - Cross

665

 1    probably should search these as well," which was in May of

 2    2018, I believe, or something like that.

 3    Q.  Of course the e-mail doesn't say that, your e-mail sending

 4    over those passwords, right?

 5            You sent over your passwords, you sent over your

 6    credentials, correct?

 7    A.  Titled something like "Just to be safe," correct.

 8    Q.  And the focus at that time was on the Yahoo! account,

 9    correct?

10    A.  Yes, correct.

11    Q.  Okay.  So are you saying that when you had this

12    conversation at the May 29th meeting that you had known for

13    some time and not had a further conversation with the lawyers,

14    or what are you saying about that meeting?

15    A.  I'm saying that I just, at that meeting, realized that

16    these other 21centurysmoking.com accounts had never been

17    searched, and I didn't know if that mattered, and then I also

18    questioned them as to whether the bduke and the support needed

19    to be searched in a more substantial way, in the way that the

20    Yahoo! e-mail was.

21    Q.  So you are saying you really had -- there really was a

22    eureka moment, a sudden realization at the meeting that caused

23    you to further raise that?

24    A.  Correct, yes.

25    Q.  Okay.  It wasn't something you had been sitting on?

Duke - Cross

666

```
 1   A.   No.
 2   Q.   Okay.  And, of course, you described last week the
 3   reaction that Mr. Stamatis and Mr. Shonder had, correct?
 4   A.   Yes.
 5   Q.   And you referred -- I think you used the words both
 6   "shock" and "surprise," correct?
 7   A.   Fair to say, yes.
 8   Q.   It was clear that they were not aware that that was the
 9   case?
10   A.   Correct.
11   Q.   And it was also clear to you that there was never any
12   intention that that would be the case?
13   A.   Correct.
14   Q.   So with that, let me back up for a minute and just ask a
15   question about this May of 2018 realization that the full
16   extent of the Yahoo! account had not been searched.
17          Are you with me?
18   A.   Yes, yes.
19   Q.   Is it fair to say that you also weren't fully aware of
20   that until May of 2018?
21   A.   Correct.
22   Q.   So that was when you fully realized that also, correct?
23   A.   Yes.
24   Q.   You had not intended for that to be the case?
25   A.   Correct.
```

Duke - Cross

1  Q.  You had not intended for your lawyers to be involved in

2  that being the case, correct?

3  A.  Correct.

4  Q.  You had up until that point operated in good faith under

5  the belief that there had been a complete search?

6  A.  Correct.

7  Q.  Based on what had already been done, correct?

8  A.  Exactly.

9          MR. SMITH:  Okay.  Your Honor, this would be a good

10  place for me to break and determine whether I have got any

11  more that I need to do.

12          THE COURT:  Okay.  All right.  Let's take a break.

13    (Recess taken.)

14          THE CLERK:  Recalling 12 CV 50324, DR Distributors,

15  LLC v. 21 Century Smoking, Inc.

16          THE COURT:  We will show the same appearances.

17          Mr. Smith, what's your estimate?

18          MR. SMITH:  Pardon me?

19          THE COURT:  What's your estimate?  What do you think?

20          MR. SMITH:  Even better than that, Judge, I have no

21  further questions at this time.

22          THE COURT:  Okay.  Who would be doing the next exam?

23          Mr. Holevas, you are standing up.  Would you be going

24  next?

25          MR. HOLEVAS:  Yes.

Duke - Cross

668

1          THE COURT:  Okay.  We will take a quick break.  You

2   get ready.  We will get Mr. Duke up.  And we will start up

3   again, okay?

4     (Recess taken.)

5          THE COURT:  All right.  Mr. Duke, remember, you are

6   still under oath.

7          THE WITNESS:  Yes, your Honor.

8          THE COURT:  Go ahead, Mr. Holevas.

9          MR. HOLEVAS:  Thank you, your Honor.

10                      CROSS-EXAMINATION

11  BY MR. HOLEVAS:

12  Q.  Mr. Duke, I don't believe we have ever had the pleasure of

13  being introduced.  My name is John Holevas, and I represent

14  Mr. Stamatis in this case.

15          I'm going to ask you some questions regarding some

16  things that I hope will be helpful to Judge Johnston as he

17  reviews this motion, and those will kind of center on who knew

18  what, when, and what did they do with that information, okay?

19  A.  Okay.

20  Q.  In your prior testimony last week and today, there has

21  been some discussion about what your former lawyers told you

22  or what you told your former lawyers.

23          I want to unpack that a little bit because

24  notwithstanding the fact that your former lawyers all withdrew

25  on the same day, they came into this case at different times,

Duke - Cross

669

1   correct?

2   A.  Correct.

3   Q.  Okay.  So what I might try to refer to, and with your

4   permission, your first group of lawyers, Mr. Leavens and

5   Mr. Life, Ms. Liberman, I may refer to them as "group number

6   one" or "Mr. Leavens and his team."

7           Is that okay?

8   A.  Yes.

9   Q.  And then later on, Mr. Stamatis and Mr. Shonder came into

10  this case, correct?

11  A.  Correct.

12  Q.  I may refer to them as "Mr. Stamatis," "Mr. Shonder," or

13  "group number two," okay?

14  A.  That's fine, sir.

15  Q.  All right.  Now, I think it has been established that the

16  complaint in this case that the Plaintiffs filed was filed on

17  September 7th of 2012.

18          Do you recall that being the date?

19  A.  It sounds right.

20  Q.  Okay.  And I think you said that Mr. Leavens, you

21  contacted him, and he was your first lawyer.  In or around

22  September of that year, he came into this case, correct?

23  A.  Correct.

24  Q.  And I believe it indicates that he entered an appearance

25  on October 3rd of 2012.

Duke - Cross

1          Does that sound about right to you?

2     A.  It sounds right.

3     Q.  Do you know when Mr. Stamatis entered his appearance in

4     this case?

5     A.  Sometime before my deposition.

6     Q.  Okay.  If I were to tell you, sir, that Docket No. 122,

7     that was filed on June the 8th of 2015, and that's when

8     Mr. Stamatis entered his appearance, would you have any reason

9     to disagree with that?

10    A.  No.

11    Q.  Okay.  So that would be, approximately, almost three years

12    that this case had been pending before Mr. Stamatis entered

13    his appearance, correct?

14    A.  Correct.

15    Q.  And just for the record, I think Mr. Shonder maybe entered

16    his appearance at or about that same time.

17          Is that your recollection?

18    A.  I do not recall.

19    Q.  Okay.  Fair enough.

20          And I think you told us earlier that Mr. Leavens

21    brought Mr. Stamatis into this case as trial counsel because

22    Mr. Leavens hadn't really tried a case for quite a few years.

23          Was I correct about that?

24    A.  Correct.

25    Q.  Okay.  Now, we had a lot of discussion so far about what

Duke - Cross

1    Mr. Leavens and your group one lawyers told you about

2    preservation of documents and electronically stored

3    information, correct?

4    A.  Correct.

5    Q.  And I'm not going to belabor that because I think we have

6    had a lot of testimony about that, but it was clear to you, in

7    no uncertain terms, what your obligation was about maintaining

8    and preserving evidence, correct?

9    A.  Correct.

10   Q.  Would it be fair to say that when Mr. Stamatis and

11   Mr. Shonder came into this case three years after those

12   discussions that you had with Mr. Leavens and his firm that

13   Mr. Stamatis didn't need to read you that riot act again

14   because you knew what your obligation was, right?

15   A.  Fair to say, yes.

16   Q.  Mr. Shonder and Mr. Stamatis didn't have to repeat

17   everything that Mr. Leavens told you about your duties and

18   responsibilities because they were crystal clear in your mind,

19   correct, sir?

20   A.  Correct.

21   Q.  Some discussion about a litigation hold letter, I think

22   Mr. Davis had asked you that on your first day of testimony,

23   and Mr. Smith had reiterated it again today.  I will represent

24   to you, sir, that's kind of a letter where the lawyer will

25   tell the client exactly what Mr. Leavens told you about

Duke - Cross

1    preserving documents and information.

2          Would it be fair to say that Mr. Stamatis and

3    Mr. Shonder didn't need to send you any such litigation hold

4    letter because, once again, your obligation was crystal clear

5    in your mind?

6    A.  Yes.

7    Q.  Okay.  Now, is it my understanding, am I correct, sir,

8    that before this litigation began, either your first group of

9    lawyers, Mr. Leavens and his firm, and/or Mr. Stamatis and

10   Mr. Shonder, had never represented you before, correct?

11   A.  Correct.

12   Q.  They had never represented 21 Century Smoking, Inc.,

13   correct?

14   A.  Correct.

15   Q.  Never served as a corporate counsel for that entity,

16   correct?

17   A.  Correct.

18   Q.  Never served as a personal counsel for Brent Duke,

19   correct?

20   A.  Correct.

21   Q.  Okay.  So would it be fair to say, sir, that between you,

22   on the one hand, and Mr. Leavens and his firm and Mr. Stamatis

23   and Mr. Shonder, that you would be in the best position to

24   know where your corporate records and documents germane to

25   this litigation would be maintained and housed?

Duke - Cross

673

1          Would that be fair?

2   A.  Correct.

3   Q.  Okay.  And would it be fair to say that when you provided

4   them information about where documents germane to this case

5   and were relevant to this case and that should be produced in

6   this case, that you reasonably relied upon them taking what

7   you said at face value, correct?

8   A.  Correct.

9   Q.  Now, I believe you have testified consistently that you

10  believe that the documents that should be searched in

11  this -- or the data that was called for to be produced in this

12  case were probably housed on those four computers that you

13  have testified about?

14  A.  Yes.

15  Q.  Okay.  And I believe Mr. Salam went through on, I think,

16  either your first or your second day of testimony a very

17  extensive laundry list of a number of electronic devices that

18  you had.

19          Do you remember that sheet that you went through with

20  Mr. Salam?

21  A.  Yes.

22  Q.  I think some of them you even talked about a computer that

23  may have been in your garage for 20 years, correct?

24  A.  Correct.

25  Q.  In your wildest dreams, did you ever think that that

Duke - Cross

674

1  computer needed to be searched in this case to produce

2  documents that were relevant to this case?

3  A.  Of course not.

4  Q.  You did your utmost and your reasonable best to identify

5  what devices needed to be searched, and you told your lawyers,

6  both your first set and your second set, what those computers

7  were, correct?

8  A.  Correct.

9  Q.  All right.  Now, I understand, and Mr. Smith had

10  questioned you a little bit about this, that those four

11  computers were imaged by you remotely in some fashion,

12  correct?

13  A.  Yes.

14  Q.  Okay.  And Mr. Smith had said something about whether you

15  are more attune than the average Joe about computer things.

16        Do you remember that exchange?

17  A.  Correct.

18  Q.  Well, I can represent to you, sir, and I think Judge

19  Johnston can take judicial notice of this, I'm less than the

20  average Joe.

21        So let me just ask you in this sense:  You went

22  through those devices, and you referenced a Pinterest account.

23        Do you remember that exchange?

24  A.  Yes.

25  Q.  Did you ever think you needed to search your Pinterest

Duke - Cross

1  account to find documents relevant and germane to this case?

2  A.  I have never even logged into it, so no.

3  Q.  Okay.  So notwithstanding the fact you may have a lot of

4  devices, you made the best and reasonable efforts to determine

5  where documents that should be searched and should be produced

6  in this case were located, correct?

7  A.  Yes.

8  Q.  All right.  And that initial searching that was done, and

9  I think it has been alluded to, maybe 40,000, 50,000 documents

10  that were produced, all those searches were completed and

11  those documents turned over before Mr. Stamatis and

12  Mr. Shonder ever arrived on the scene; is that correct?

13  A.  Correct.

14  Q.  Now, I understand that there may be some issue pertaining

15  to whether those forensic images of your hard drives have now

16  somehow maybe been corrupted or lost or destroyed.

17           Am I correct on that?

18  A.  Yes.

19  Q.  Okay.  But is it also true that those computers still

20  exist today?

21  A.  Yes.

22  Q.  And you have told us repeatedly that you have never

23  deleted anything off of those computers, correct?

24  A.  Correct.

25  Q.  And if I use the example that Mr. Davis used when he

Duke - Cross

1  questioned you about copying things, and I think what he said

2  is if he takes his notes, his outline, and he put it on a

3  Xerox machine and he made a copy, he would have a copy of

4  those notes, correct?

5  A.  Correct.

6  Q.  And if, for whatever reason, he lost the copy, as long as

7  the original notes existed, he could make another copy,

8  correct?

9  A.  Correct.

10 Q.  So is it fair to say, sir, that the hard drives that you

11 still have in those computers could be searched once again?

12 A.  Correct.

13 Q.  And all the information would still be there because you

14 haven't deleted anything, correct?

15 A.  Yes.

16 Q.  Okay.  And I understand there is an issue about that

17 auto-delete, but, notwithstanding that fact, we could copy

18 those computers once again, correct?

19 A.  Correct.

20 Q.  All right.  And I know you have told us, and I'm not going

21 to belabor it, that you never intentionally or willfully

22 either deleted or destroyed or withheld documents, correct?

23 A.  Correct.

24 Q.  I just want to ask you about that about Mr. Stamatis and

25 Mr. Shonder.

Duke - Cross

677

```
 1            Did Mr. Shonder or Mr. Stamatis ever ask you or
 2   direct you to delete or withhold any documents?
 3   A.  No.
 4   Q.  To your knowledge, any documents that you would have
 5   provided to Mr. Shonder or Mr. Stamatis, did they ever not
 6   produce those documents or told you "We are not producing
 7   these"?
 8   A.  No.
 9   Q.  Now, I believe you told us about a conference that you
10   participated early on in the litigation with Mr. Leavens and
11   his team to try to identify and make that initial Rule 26
12   disclosure.
13            Do you recall that exchange?
14   A.  Yes.
15   Q.  That was way before Mr. Stamatis and Mr. Shonder arrived
16   on the scene, correct?
17   A.  Correct.
18   Q.  So whatever discussion was had about what was to be
19   produced, what was going to be searched, that was before
20   Mr. Shonder and Mr. Stamatis were involved in the case, fair?
21   A.  Fair.
22   Q.  Okay.  And once Mr. Stamatis and Mr. Shonder came into the
23   case, you did not reasonably believe that it would be their
24   obligation to go back and voluntarily audit three years of
25   litigation that had transpired before they got in the case,
```

Duke - Cross

678

1  did you?

2  A.  No, I did not.

3  Q.  It would have cost a lot of time, money, and effort for

4  them to do that, and you had very capable counsel through

5  Mr. Leavens and his firm that had already done all that work,

6  correct?

7  A.  Correct.

8  Q.  Okay.  Now, Mr. Duke, do you remember, I think it was

9  Monday, your first day of testimony, that Judge Johnston

10  alluded to a particular order in this case, and it was Docket

11  No. 116?

12        Do you remember him making reference to that?

13  A.  Can you remind me what it is about?

14  Q.  Okay.  And I will remind you a little bit about it.  And

15  to be honest with you, sir, I was not aware of this document

16  until Judge Johnston alluded to it, and I tend to take

17  particular notice when a judge takes notice of something, so I

18  did have an opportunity to read it.

19        Have you looked at it since Monday of last week?

20  A.  I still don't know what it is.

21  Q.  Okay.  Well, let me just tell you what it is.  It is an

22  order that the Judge entered in this case, and it had to do

23  with the discovery in this matter, and let me just read a

24  portion of it to you, and then I will ask you a question, and

25  it had to do with a motion for extension.  The lawyers on both

Duke - Cross

1    sides wanted to have some additional time to complete some of

2    this discovery.

3             MR. von OHLEN:  Can we get a docket number on that?

4             THE COURT:  116.

5             MR. HOLEVAS:  Oh, I'm sorry.  Yes, it is Docket

6    No. 116.  It was filed on 3/4 of '15.

7             MR. DAVIS:  And just to be clear, it is not the

8    minute order; it is the actual order?

9             MR. HOLEVAS:  Yes, your Honor.

10            And, I'm sorry, your Honor.  I don't have copies.

11            Would you like to look at it, Mr. Davis?

12            MR. DAVIS:  No.

13   BY MR. HOLEVAS:

14   Q.  And let me read in the pertinent parts that I believe

15   here.  It says:

16            "The court will grant the motion and even give an

17   additional 30 days beyond that which is asked.  However, the

18   parties are on notice that these revised dates will not be

19   moved.  The parties were on notice when they first appeared

20   before the court and now they have received a warning shot.

21   Additional extensions will not be allowed.  Accordingly, the

22   date for Rule 26(e) supplementations is now June 1st, 2015."

23            And I will just add that that's seven days before

24   Mr. Stamatis entered an appearance in this case.

25            It says:  "Accordingly, the new date is," as I have

Duke - Cross

680

1  indicated, "June 1st, 2015.  The close of fact discovery is

2  now July 1st, 2015."

3           Now, Mr. Duke, I will represent to you that a

4  Rule 26(e) supplementation is something that the lawyers file,

5  and kind of pardon my language here, it is kind of a

6  put-up-or-shut-up moment.  You have to provide all your

7  information, supplement what your witnesses are, what your

8  documents are, and things of that nature.  That order was

9  entered and that cutoff date was seven days before

10 Mr. Stamatis and Mr. Shonder became involved in this case.

11          I ask you the same question as I asked you before:  I

12 take it you didn't believe that they were supposed to go back

13 and revisit and look at all the documents and within seven

14 days of their entry of appearance provide you with any counsel

15 or guidance as to what or what did not need to be additionally

16 produced; is that fair?

17 A.  Fair.

18 Q.  I believe you talked about early on sitting down at one

19 point with Mr. Leavens and looking through some of your

20 electronic documents or sitting side-by-side with him.

21          Do you recall that discussion?

22 A.  Yes.

23 Q.  At any time in this litigation, did you ever undertake

24 that type of review with Mr. Stamatis or Mr. Shonder?

25 A.  Not prior to that meeting in 2019.

Duke - Cross

681

1  Q.  Yes, exactly.

2       Okay.  And we will get to that.  That's the very last

3  meeting that ultimately led to the withdraw, correct?

4  A.  Correct.

5  Q.  I'm talking about at any time up until that point, did you

6  ever sit down with Mr. Stamatis, did you ever sit down with

7  Mr. Shonder and go through the same kind of review and

8  analysis that you did with Mr. Leavens?

9  A.  No.

10  Q.  Okay.  But I take it you didn't believe that you needed to

11  because you had good, competent counsel representing you

12  through Mr. Leavens and his firm, correct?

13  A.  Correct.

14  Q.  And I believe you may have testified that at that early

15  meeting that you had when you and Mr. Leavens and his firm

16  were going through to analyze the discovery, you realized you

17  didn't have a backup system, and you put into place a

18  Carbonite system?

19  A.  Yes.

20  Q.  Okay.  Once again, that was way before Mr. Stamatis or

21  Mr. Shonder ever got involved in this case, correct?

22  A.  Correct.

23  Q.  Okay.  And then your first vendor that undertook the

24  searches once you had done that external download was

25  4Discovery, correct?

Duke - Cross

1   A.  Correct.

2   Q.  And, again, 4Discovery -- and they were provided the

3   search terms that were agreed upon by the parties?

4   A.  Yes.

5   Q.  Okay.  Once again, 4Discovery did their work, and those

6   search terms were agreed to by the respective parties, long

7   before Mr. Stamatis or Mr. Shonder ever arrived on the scene,

8   correct?

9   A.  Yes.

10  Q.  And now I understand that there is a new forensic search

11  company that's undertaking I think what you have described

12  earlier as a more rigorous search of all your computer

13  information; is that correct?

14  A.  Yes.

15  Q.  And that's ongoing right now?

16  A.  Yes.

17  Q.  And that search has yet to be complete,

18  correct -- completed?

19  A.  I don't know where they are at with that, no.

20  Q.  Okay.  Is it fair to say that right now, as we sit here

21  today, at this moment, we don't know whether there are going

22  to be any additional documents that may or may not be

23  uncovered through that search because it is not complete yet,

24  correct?

25  A.  Correct.

Duke - Cross

1   Q.  Okay.  So whether there has been, as the Plaintiff

2   suggests in their papers and their motion for sanctions, a

3   willful refusal, an intentional refusal to produce documents,

4   we don't know if there are going to be any additional

5   documents, at least as we sit here today, correct?

6           MR. DAVIS:  Objection.

7           THE COURT:  Sustained.

8   BY MR. HOLEVAS:

9   Q.  The discovery that was done before Mr. Stamatis and

10  Mr. Shonder came on the scene, there was about, I think,

11  maybe, was it, 50,000 or so documents that had been produced?

12  A.  Correct.

13  Q.  Okay.  And then let's fast forward a little bit.

14          Then there became that issue that Mr. Smith had asked

15  you a bunch of questions about concerning the Yahoo! and some

16  other information that may have been in the cloud that you

17  believe, perhaps, had not been searched?

18  A.  Correct.

19  Q.  Okay.  Those searches and those requests for you to search

20  the Yahoo! information, was that handled predominately through

21  Mr. Leavens and his firm and his team?

22  A.  I don't know who handled -- I don't know what you mean by

23  that.

24  Q.  Okay.  So there was an issue, then, with the -- in your

25  mind whether there was an adequate search performed of the

Duke - Cross

684

1    Yahoo!, of the cloud accounts, correct?

2    A.  I was made aware of that in that May time frame, in 2018,

3    yes.

4    Q.  Okay.  And then you brought that information forward to

5    your attorneys, both set one and set two, correct?

6    A.  They told me.  I don't remember which set told me, but I

7    was told by my attorneys.

8    Q.  Okay.  And then I want to get to the point where you

9    talked about a meeting that you had with Mr. Stamatis and

10   Mr. Shonder at -- I believe you couldn't recall if it was

11   Mr. Stamatis's office or Mr. Shonder's office, correct?

12   A.  I don't know which of their offices it was at.

13   Q.  Okay.  And that's when this GoDaddy issue kind of came to

14   light, correct?

15   A.  Correct.

16   Q.  And that was the first time that had come to light,

17   correct?

18   A.  Correct.

19   Q.  And I think you have testified earlier -- and, again,

20   testified today -- that Mr. Stamatis and Mr. Shonder were very

21   surprised or shocked about that, correct?

22   A.  Yes.

23   Q.  And I think you told us that you recall Mr. Stamatis

24   actually leaving the office, going down and standing in front

25   of the Chicago River, correct?

Duke - Cross

685

1    A.  That's what he had said, yes.

2    Q.  Well, do you recall him leaving the office or wherever you

3    and Mr. Shonder and Mr. Stamatis were?

4    A.  Yes.

5    Q.  Okay.  And if he was to testify in this case that that

6    happened, would you have any reason to doubt that that's where

7    he went?

8    A.  No, he has already said in court that that's where he

9    went.

10   Q.  And then he came back, and I think you told us that he

11   told you immediately that, I think your words were, as an

12   agent of the court -- or maybe it was officer of the

13   court -- agent of the court, he had to immediately disclose

14   what he learned to the court and to the Plaintiffs, correct?

15   A.  Correct.

16   Q.  Mr. Duke, does that sound to you to be a man that wanted

17   to intentionally withhold documents or information?

18   A.  No.

19   Q.  Doesn't it sound to you like that's a man that wanted to

20   immediately inform the court and the lawyers in this case of

21   what was going on?

22   A.  Yes.

23   Q.  Okay.  And this issue about the auto-delete, that was

24   something that was discovered and cured, meaning "cured" that

25   the auto-delete was taken -- or shut off before Mr. Stamatis

Duke - Cross

1   and Mr. Shonder got involved in the case, correct?

2   A.  I believe so, yes.

3          MR. HOLEVAS:  Your Honor, if I may have one moment to

4   confer with Mr. Stamatis?

5          THE COURT:  No problem.

6          MR. HOLEVAS:  Thank you.

7   (Brief pause.)

8          MR. HOLEVAS:  Thank you, your Honor.

9   BY MR. HOLEVAS:

10  Q.  Mr. Duke, Mr. Stamatis just pointed out to me that perhaps

11  Mr. Shonder did not enter his appearance until a little after

12  him, closer to early '18.

13         Do you have a recollection one way or another on

14  that?

15  A.  That sounds more like it to me, yes.

16  Q.  Okay.  Would your answer, though, to the questions that I

17  asked you about his involvement, similar to Mr. Stamatis, be

18  the same, regardless of whether I was off a little bit by the

19  time he entered his appearance?

20  A.  Correct.

21  Q.  Okay.  And the searching that you were asked to do in this

22  case, and I think you have testified Mr. Leavens and his team

23  asked you to undertake those searches, and I think even later,

24  Mr. Smith asked you some questions here this morning about

25  Mr. Life asking you to go back and double-check some things;

Duke - Cross

1  do you remember that exchange?

2  A.  Yes.

3  Q.  Do you ever recall Mr. Stamatis ever asking you to perform

4  any searches, or was that something left to team number one?

5  A.  I don't recall specifically where the e-mails would come

6  from.  I mean, usually everyone would be Cc'd, and I would

7  just see directions and follow them.

8          MR. HOLEVAS:  Okay.  That's all I have.

9          Thank you very much, Mr. Duke.

10         Thank you, your Honor.

11         THE WITNESS:  Thank you, sir.

12         MR. WOLFE:  May I, your Honor?

13         THE COURT:  Sure.

14                      CROSS-EXAMINATION

15 BY MR. WOLFE:

16 Q.  Good morning, Mr. Duke.

17 A.  Good morning.

18 Q.  We also have not met before these proceedings.  My name is

19 Mark Wolfe, and I represent Steven Shonder.

20         The beautiful thing about being last is that there

21 are very few topics left to discuss.  So I will be blissfully

22 short.

23         And I want to talk specifically about Mr. Shonder for

24 a moment.  He was not one of the original attorneys you

25 retained in this case to assist you in this matter, correct?

Duke - Cross

1  A.  Correct.

2  Q.  All right.  As I understand it, the universe of

3  Mr. Shonder's dealings in this case is sitting in on some

4  phone calls, never by himself, but always amongst the various

5  sets of attorneys that you have had, correct?

6  A.  Correct.

7  Q.  And the other -- then the one and only meeting that you

8  ever have had with him was this May meeting that has been

9  discussed at some length over the last couple days, fair?

10  A.  Fair.

11  Q.  He was not involved in any of the 50,000 documents that

12  have been produced in this case, fair?

13  A.  Correct.

14  Q.  He wasn't involved in the federal rule -- the mandatory

15  federal rule disclosures that have been talked about in this

16  case, correct?

17  A.  Correct.

18  Q.  He had nothing to do with obtaining the answers to the

19  questions -- the interrogatory questions and answers in this

20  case that you supplied, right?

21  A.  Correct.

22  Q.  He was not involved in determining the 20-or-so search

23  terms that have been discussed at length in these proceedings,

24  right?

25  A.  Correct.

Duke - Cross

689

1   Q.  He wasn't involved in hiring 4Discovery or any other

2   e-vendor with regard to searching computers or looking for any

3   sort of e-mails or anything of that sort, right?

4   A.  I don't know about the -- we searched the Yahoo! e-mails.

5   I don't know if he was --

6   Q.  Let me withdraw the question and do it better.

7        He was not involved in the selection of 4Discovery,

8   correct?

9   A.  Correct.

10  Q.  All right.  The one and only discussion you have had

11  face-to-face with him was this May 2019 meeting that we have

12  discussed, correct?

13  A.  Correct.

14  Q.  And at that time, there was a revelation, if you will,

15  that there were some documents that perhaps have not been

16  reviewed or discovered in this case, fair?

17  A.  Fair.

18  Q.  And immediately upon him understanding that there was,

19  perhaps, an issue of additional documents, both Mr. Stamatis

20  and Mr. Shonder indicated that that information had to

21  immediately be provided to the court and to the other side,

22  fair?

23  A.  Yes.

24  Q.  All right.  And after they got over their surprise and

25  their shock, as you have testified to, it was your

Duke - Cross

690

1    understanding that, in fact, efforts were then made to attempt

2    to get to the bottom of these documents that may need to be

3    disclosed to the other side, right?

4    A.  Correct.

5    Q.  And shortly after that, there was a determination that it

6    might be in everyone's best interest to -- for the attorneys

7    to withdraw from the case, fair?

8    A.  Correct.

9    Q.  And just to dot the "i" on this, you do not believe in any

10   way, shape, or form that Mr. Stamatis or Mr. Shonder had any

11   intent to hide documents, to delete documents, to not do

12   anything but fully support the production of documents that

13   you had in this case, fair?

14   A.  Fair.

15           MR. WOLFE:  All right.  Thank you.

16           I have nothing else.

17           THE COURT:  What's your estimate?

18           MR. DAVIS:  20 minutes -- 20, 30 minutes.

19           THE COURT:  All right.  We will take a break.  We

20   will come back at 1:00 o'clock sharp.

21           Remember, you are under oath.  Don't talk to anybody

22   about your testimony.

23           THE WITNESS:  Yes, your Honor.

24     (Recess taken.)

25           THE CLERK:  Recalling 12 CV 50324, DR Distributors,

1    LLC v. 21 Century Smoking, Inc.

2           THE COURT:  Before we start, I apologize for being

3    late, but the federal courts are a hierarchal system.  At the

4    apex is, at least here, is Chief Judge Pallmeyer.  She is the

5    apex predator.  I'm like a minnow.  So that's why I'm running

6    late.

7           All right.  Mr. Davis, are you ready?

8           MR. DAVIS:  Yes, I am, your Honor.

9                        REDIRECT EXAMINATION

10   BY MR. DAVIS:

11   Q.  Mr. Duke, good afternoon.

12   A.  Good afternoon.

13   Q.  I have got a few follow-up questions to discuss with you,

14   some of the things that you spoke about today with some of the

15   other attorneys.

16          Do you understand that?

17   A.  Yes.

18   Q.  Okay.  And you recall there has been a lot of questions

19   about chat, chat applications that you used?

20   A.  Yes.

21   Q.  And you used Gtalk?

22   A.  Yes.

23   Q.  And Yahoo! Messenger?

24   A.  Yes.

25   Q.  And Skype?

Duke - Redirect

1   A.  Yes.

2   Q.  Okay.  And earlier, you were asked about a chat you had

3   with Ms. Saraswat.  I believe it was Plaintiff's Exhibit 37.

4   And that was one of the e-mails where you copied -- and

5   correct me if I'm wrong -- copied your chat communication on

6   Yahoo! Messenger into an e-mail and sent it to yourself.

7         Do you recall that?

8   A.  Correct, yes.

9   Q.  Okay.  And now I want to direct your attention to another

10  chat session that you copied into an e-mail.  Your attorney,

11  Mr. Salam, reviewed that with you the other day.  It is

12  Plaintiff's Exhibit 17.

13        MR. DAVIS:  If I can have that brought up again,

14  please.

15  BY MR. DAVIS:

16  Q.  I ask you if you can take a look at that and tell me if

17  you recognize it.

18  A.  Yes.

19  Q.  And what is it?

20  A.  Some type of a chat conversation that I copied over and

21  e-mailed to myself.

22  Q.  And when you say "some type of a chat session," is there

23  anything in here that would tell you whether that was Gtalk or

24  Yahoo! or Skype or any one of your other chat messaging

25  programs you used?

Duke - Redirect

693

```
 1   A.  I mean, I basically just used Yahoo! Messenger, so I would

 2   assume it would be Yahoo! Messenger.

 3   Q.  Okay.  And --

 4           THE COURT:  So there is no confusion, Yahoo!

 5   Messenger is the same as Yahoo! Chat, correct?

 6           THE WITNESS:  Yes.

 7           THE COURT:  We all have that understanding.

 8           MR. DAVIS:  Thank you, your Honor.

 9           THE COURT:  Go ahead.  We don't need any more

10   confusion.  Thank you.

11   BY MR. DAVIS:

12   Q.  And who were you chatting with?

13   A.  Kirti Saraswat.

14   Q.  And when did you chat with her?

15   A.  It appears September 13th, 2010.

16   Q.  And your company, 21 Century, existed in September of

17   2010, right?

18   A.  Yes.

19   Q.  Okay.  And how long did this chat session last?

20   A.  Is this the whole thing?

21   Q.  There is three pages.

22   A.  It looks like about an hour and 20 minutes.

23           MR. DAVIS:  Okay.  We move P-17 into evidence.

24           THE COURT:  Any objection?

25           MR. SALAM:  No objection.
```

Duke - Redirect

694

```
 1              THE COURT:  It will be admitted.  17 is admitted.
 2              Plaintiff's Exhibit 17 -- sorry -- Plaintiff's
 3    Exhibit 17 is admitted.
 4              I'm adding to the confusion.  I apologize.
 5     (Plaintiff's Exhibit 17 was offered and received in
 6      evidence.)
 7    BY MR. DAVIS:
 8    Q.  And in the body of this, I would ask you to review it and
 9    tell me what you are discussing with Kirti Saraswat.
10              Take your time, and we can move the pages whenever
11    you would like.
12    A.  It looks like SEO stuff for electronic cigarettes.
13    Q.  All right.  And you are talking about keywords?
14    A.  Yes.
15    Q.  And you are talking with her about SEO ranking; is that
16    right?
17    A.  It appears so, yes.
18    Q.  All right.  And based on this chat, you are talking with
19    her about her buying keywords for your company, right?
20    A.  Buying keywords?
21    Q.  Yes.
22              I'm looking at the language on the third page, at the
23    top.  This is 21C 1001953.
24              Maybe you can explain to me what she is saying there
25    at the top three lines.
```

Duke - Redirect

1  A.  That is the keyword, "buy electronic cigarette."

2  Q.  "Buy electronic cigarette"?

3  A.  Yes.

4  Q.  So she is not buying them for you.  She is telling you

5  what the keyword is?

6  A.  That is the keyword, yes.

7  Q.  And what will she -- will she take that and buy those

8  keywords for SEO marketing purposes or just use them in

9  connection with your website?

10  A.  No, that's the keyword that she is using in connection

11  with the website.

12  Q.  And where does she use it?

13  A.  I don't know exactly what she is doing when she is doing

14  SEO.  On articles outside the website, somewhere on the

15  website, I don't know exactly how to do that.

16  Q.  I got you.

17        So she is doing SEO work for you at this time, right?

18        This is September of 2010?

19  A.  It looks like it, yes.

20  Q.  Okay.  And she is working for you and your company, right?

21  A.  Yes, she is definitely doing work.

22  Q.  And the SEO work, that's like an active, ongoing process,

23  right, when you are doing SEO work, optimization?

24        Would you agree with that?

25  A.  To be successful, yes.

1    Q.  Right.

2          And in this chat, you guys are talking about articles

3    that she wants you to write and send to her; is that fair?

4    A.  Yes.

5    Q.  All right.  And that's part of that process where you are

6    always changing what you are doing online and with keywords to

7    optimize your search engine rankings, right?

8    A.  It sounds about right, yes.

9    Q.  Okay.  And did you monitor your results for your website,

10   21centurysmoking.com?

11   A.  To the best of my ability, yes.

12   Q.  And let me turn your attention now to a process you

13   described when we were talking about -- do you remember when

14   we were talking about inhaleinside.com, one of your websites?

15   A.  Yes.

16   Q.  All right.  And you talked about a process of how you

17   created the websites; do you recall that?

18   A.  Yes.

19   Q.  Okay.  And we focused on inhaleinside.com because we had,

20   and now in evidence, PX-74 and PX-75.

21          Do you remember I showed you --

22   A.  Yes.

23   Q.  Right.

24          That was your website and the source code, right?

25   A.  Yes.

Duke - Redirect

1    Q.  And you described how you were -- some process where you

2    are copying other site source code and creating other

3    websites; is that correct?

4    A.  Yes.

5    Q.  And to do that, you used, and I wrote, Dreamweaver and

6    another application called "Notepad"; is that correct?

7    A.  Yes.

8    Q.  Did you use any other programs?

9    A.  Not that I can recall at this time.

10   Q.  All right.  And referring to the Dreamweaver, it is a

11   program, right?

12   A.  Yes.

13   Q.  It is on your laptop?

14   A.  Yes.

15   Q.  And that's your main computer you use?

16   A.  Yes.

17   Q.  Okay.  And you used Dreamweaver to create hypertext markup

18   pages for your website; is that right?

19   A.  Hypertext -- http is -- hypertext markup is what?

20   Q.  Yes.

21        Well, you described -- let me clarify.

22        You described, when you look at your computer and

23   Dreamweaver is open, you described a split screen?

24        Did I get that right?

25   A.  Yeah, yeah, yeah.

Duke - Redirect

1    Q.  And one side is what?

2    A.  One side is like the code, and one side is like what the

3    site actually looks like.

4    Q.  When you say "what it actually looks like," that is what

5    like a human being looking at their monitor would see on your

6    website, right?

7    A.  Exactly, yes.

8    Q.  And the other side is the hypertext markup language, the

9    source code, right?

10   A.  Okay.  Yes.

11   Q.  You say "Okay."  Do you know that to be true?

12   A.  I just didn't know the term "hypertext markup," but source

13   code, yes.

14   Q.  The source code?

15   A.  Yes, yes.

16   Q.  Okay.  And all those Dreamweaver website files, those are

17   saved on your laptop; is that right?

18   A.  Yes.

19   Q.  So when you are working on something on your laptop in

20   Dreamweaver, it is a file that you have saved on your laptop,

21   right?

22   A.  Yes.

23   Q.  And at some other date or time, once you are done or you

24   finished the file or the website, then you somehow load it up

25   into the Internet; is that right?

Duke - Redirect

1   A.  Yes.

2   Q.  And you do that yourself?

3   A.  Yes.

4   Q.  Okay.  Let me turn you back now to something you talked

5   about a few times, this company called "Automatic Cigarettes."

6   A.  Okay.

7   Q.  Okay.  That's an e-cigarette company, right?

8   A.  Yes.

9   Q.  Okay.  And you mentioned a few times -- actually, your

10  attorney specifically asked you about it when he was reviewing

11  all the -- remember that big list of e-mail accounts that is

12  in the new ESI report?

13  A.  Yes.

14  Q.  And one of the ones he asked you about is

15  info@automaticcigarettes.com; do you remember that?

16  A.  Yes.

17  Q.  And Mr. Salam asked you, he said, "Does that website have

18  anything to do with 21 Century Smoking, your company?"

19          Do you recall that question?

20  A.  Does that e-mail address have anything to do with it --

21  Q.  Uh-huh.

22  A.  -- or does the website?

23  Q.  No.  He said does that website, automaticcigarettes, have

24  anything to do with 21 Century Smoking?

25  A.  Okay.

1  Q.  Do you remember that question?

2  A.  Yes.

3  Q.  And your answer was?

4  A.  No.

5  Q.  No, right?

6       But isn't it true that your company bought Automatic

7  Cigarettes, the company?  You and your company purchased it

8  and integrated that company into 21 Century Smoking, your

9  current company; isn't that correct?

10 A.  I would say, no, I didn't integrate it.

11 Q.  All right.  You are saying you didn't say that in your

12 deposition?

13      MR. DAVIS:  Let's bring up Mr. Duke's June 16th,

14 2015, deposition, Page 93, please.

15 BY MR. DAVIS:

16 Q.  Because you produced some documents in this case that said

17 Automatic Cigarettes, and if we look at page -- I'm

18 sorry -- starting at the bottom of 92, Page 92, Brent Duke

19 deposition, June 16, 2015, Line 19 on Page 93 -- sorry -- 92.

20      I can't even keep my own numbers right.

21      Do you see the question at the bottom that starts at

22 Line 19?

23 A.  Yes.

24 Q.  All right.  So why don't you read that to the court.

25 A.      "Q.   It says in the second paragraph:  'Duke was

Duke - Redirect

1    integral in the purchase and integration of a

2    competitor, Automatic Cigarettes.'  What is that?"

3    Q.  And your answer?

4    A.      "A.   It is a brand that we -- that 21 Century

5    Smoking purchased."

6    Q.  And the next question?

7    A.      "Q.   And when you say '21 Century Smoking,' you mean

8    your corporation?

9            "A.   Yes.

10           "Q.   Do you remember when your company purchased

11   the Automatic Cigarette business?

12           "A.   No."

13   Q.  All right.  So isn't it true that that company has

14   everything to do with your current company, right?

15           You bought it.  You own it.  You integrated it

16   yourself.  Isn't that right?

17   A.  We own it, but, no, no part of it has ever -- it is two

18   separate companies.  The money from that one goes to the same

19   place as the money from 21 Century Smoking.

20   Q.  Okay.  So your testimony on June 16th of 2015 is false,

21   right?

22           You said that your company bought it.  What you just

23   described, you didn't testify to, right?

24   A.  You said -- you're quoting something that says:  "Duke was

25   integral in the purchase and integration."  I don't know where

1    that is coming from.

2    Q.  That is coming from a document you created and produced in

3    this case talking about what you were doing with your

4    business.  I believe it was like a business plan or pro forma.

5    These are documents you produced.

6         I'm trying to confirm you said the other day, when

7    your counsel asked you did that website have anything to do

8    with 21CS, you said "No," without qualification.

9         But at your deposition four years ago, you said you

10   bought it, you integrated it, it's owned by your company, and

11   now you have another story; is that right?

12        So what's the final answer?  To use Mr. Smith's

13   question before, what's your final answer today?

14   A.  My final answer would be I don't see me saying here that I

15   integrated it.  I see that I'm reading from something that I

16   wrote.  So I'm just curious where that came from.  That's all.

17        MR. DAVIS:  Okay.  All right.

18        THE COURT:  Can you go to the next page for me, 93,

19   for a second?

20        MR. DAVIS:  Certainly.

21        THE COURT:  All right.  Thank you.

22   BY MR. DAVIS:

23   Q.  I want to turn your attention now to something that

24   Mr. Smith questioned you about.  He talked about something the

25   Leavens Strand attorneys were doing with what he characterized

Duke - Redirect

1  as a -- and I wrote -- "secondary review."

2        Do you remember those questions he asked you?

3  A.  Yes.

4  Q.  And had you ever heard that before today, that your

5  attorneys were doing secondary reviews in your case?

6  A.  I don't know if I have heard that exact term, no.

7  Q.  Were you aware that your attorneys were doing anything in

8  terms of contacting you to check their work or do a

9  double-check against their work, searching the data in this

10  case and producing documents?

11        Did you ever hear that before today?

12  A.  That's hard for me to answer.  I don't fully understand

13  the question.

14  Q.  Okay.  Let me try and rephrase it.

15        So Mr. Smith asked you today about the secondary

16  reviews that he said his clients, the Leavens Strand

17  attorneys, were doing throughout this case, right?

18  A.  Correct.

19  Q.  And I understood from his questions that it's some sort of

20  double-check they were doing, that they would search the

21  records to provide discovery in this case, and they would look

22  at it, and then they would call you and ask you to run the

23  searches again in some way to see what you obtained, to do a

24  check, to see if that data matched.

25        Do you recall that today?

Duke - Redirect

1    A.  I recall discussing it today, yes.

2    Q.  Is this the first time you have ever heard that this was

3    happening in your case?

4    A.  It is hard for me to say because you are asking what they

5    were doing.  They have never really discussed with me what

6    they were doing ahead of time.  I just know they were reaching

7    out to me and asking for documents.  I don't have any clue

8    what's going on outside of me.

9    Q.  Right.  Fair enough.

10          So none of your prior attorneys ever said to you,

11   "Hey, we are doing a secondary check.  We are doing a

12   double-check.  We are auditing our work to see if your search

13   matches our search."  You never heard that before, right?

14   A.  I don't recall hearing that, no.

15   Q.  Okay.  And do you ever recall your prior attorneys telling

16   you there was a problem when they did any of their secondary

17   research or double-checks or any kind of -- any time they had

18   a conversation with you, did they ever tell you they were

19   having a problem or they discovered a problem when they were

20   doing the secondary checks?

21   A.  Well, yes, the Saraswat e-mails that were discussed

22   recently, they reached out to me and said that they were

23   having a problem finding the e-mails, yes.

24   Q.  And was that the first time that they raised a problem

25   with you when they were doing these secondary checks as far as

1  you are aware?

2  A.  I would have to look through all my records.  I'm not

3  sure.

4  Q.  And the records you would look at would be what?

5  A.  E-mails.

6  Q.  You would look at your e-mails to determine what people

7  told you, what was said, and when things happened, right?

8  A.  Exactly.

9  Q.  Okay.  Now, I want to turn to the time that you were just

10  referring to when the issue or the problem arose with the

11  Yahoo! e-mail, right?

12  A.  Okay.

13  Q.  That's March of 2018?

14  A.  Yes.

15  Q.  Does that sound right?

16  A.  Yes.

17  Q.  And we know from the e-mails that your prior attorney,

18  Travis Life, e-mailed you, right, asking you to run some

19  searches?

20  A.  Yes.

21  Q.  Is that right?

22      And your testimony is that you sent him an e-mail

23  with a file attached, and that file collected the results of

24  your search; is that accurate?

25  A.  Yes.

Duke - Redirect

1   Q.  And do you still have that e-mail?

2   A.  Yes.

3   Q.  And that has the file still attached?

4   A.  Yes.

5   Q.  And the file that's attached are the documents that you

6   found running the searches that Mr. Life asked you to search

7   on or about March 17th of 2018?

8   A.  Yes.  So the saved e-mails that are then put into a

9   folder, and then the folder is sent.  So if that's what you

10  are asking, yes.

11  Q.  Yes.  Got it.

12          So it is not like a .pdf with multiple pages.  It is

13  a folder with e-mail files within it?

14  A.  Correct.

15  Q.  Got it.

16          All right.  And you still have that e-mail with that

17  folder attached to it?

18  A.  Yes.

19  Q.  And why haven't you produced it?

20  A.  I don't know what you are asking.

21  Q.  Have you given it to your new attorneys?

22  A.  I gave it to my previous attorneys.

23  Q.  But I'm saying did you give it to your new attorneys, the

24  e-mail that you sent to Mr. Life on or about March 17th, 2018?

25  A.  I don't know.

Duke - Redirect

707

```
 1   Q.  Have you reviewed it yourself recently after the motion

 2   for sanctions was filed?

 3             Did you look at that file?

 4   A.  No.

 5   Q.  Did you look at it to see if the documents that were

 6   produced by your attorneys to our firm on the evening of

 7   March 19th matched with what you gave them on March 17th?

 8             Have you done that?

 9   A.  No.

10   Q.  Okay.  Now, I want to turn your attention to some

11   questions, something that Mr. Smith and Mr. Holevas both

12   talked about.

13             In the early stage of this case, right, there was a

14   document production from your company to my client, right?

15   A.  Yes.

16   Q.  And I wrote down how it was described.  Mr. Smith said

17   50,000 records were produced, and Mr. Holevas said that there

18   was 50,000 documents produced.

19             Do you recall their statements about that in court

20   earlier today?

21             THE COURT:  All right.  Hold on a second.

22             Is there an objection?

23             MR. SMITH:  Objection.  I believe my statement was

24   "pages," your Honor.

25             MR. DAVIS:  I wrote and put quotes around the word
```

Duke - Redirect

1    "records."

2         THE COURT:  Okay.  I will overrule.  If he thinks it

3    is records or pages, he will tell us.

4    BY MR. DAVIS:

5    Q.  Do you have a recollection of the way Mr. Smith

6    characterized your production?

7    A.  I don't have a recollection of the exact characterization.

8    I know what you are talking about.

9    Q.  You know what I'm talking about, right?

10   A.  Yes.

11   Q.  Do you know if it was 50,000 documents or was it 50,000

12   pages?

13   A.  I never actually saw the discovery, so I have no clue.

14   Q.  You have no clue.

15        But if they are talking about this in terms of 50,000

16   pages, and Mr. Smith just stood up to correct that, let's talk

17   about that for a second, and I want to clean it up so there is

18   no misunderstanding with the court about this.

19        You understand a document can be multiple pages,

20   right?

21   A.  Of course.

22   Q.  Right.

23        So if I give you a deposition transcript, it can be

24   500-pages long, right?

25   A.  Correct.

Duke - Redirect

1   Q.  That's one document that's 500 pages?

2   A.  Yes.

3   Q.  All right.  And your company produced about 50,000 pages

4   of documents in the early stages of this case -- I will

5   represent that to you -- right?

6   A.  I believe you.

7   Q.  Okay.  Now, in that production, there were documents, for

8   example, like you produced a document, one document, that was

9   mailing labels, and it was Bates-stamped 21C 17114 to -- Are

10  you ready? -- 24113.  So we got a 7,000-page printout of

11  mailing labels.

12          Do you recall that being produced in this case?

13  A.  Again, I never looked at the production.

14  Q.  All right.  You don't dispute it in any way, though,

15  right?  I'm telling you that's what was produced.

16  A.  No, no reason to dispute it.

17  Q.  Now, interestingly, how many times do you think you

18  produced that mailing label document to us in your initial

19  production?

20          MR. LEONARD:  Objection, lacks foundation and calls

21  for speculation.

22          THE COURT:  Overruled.

23  BY MR. DAVIS:

24  Q.  Do you know how many times you produced it?

25  A.  Probably however many times it came against the search

Duke - Redirect

1    terms.

2    Q.  Okay.  So within that 50,000 pages of documents that

3    Mr. Holevas and Mr. Smith talked about --

4           THE COURT:  It is "Holevas," by the way.

5           MR. DAVIS:  Excuse me?

6           THE COURT:  Holevas.

7           MR. DAVIS:  Holevas.

8           I apologize, your Honor.

9           THE COURT:  That's all right.

10   BY MR. DAVIS:

11   Q.  You have over 20,000 pages of that production are three

12   documents that are mailing labels.  The first one I have

13   already denoted.  The second one was 21C 24114 through 31113,

14   and that was about 6,100 pages.  The third one was

15   Bates-stamped 21C 31114 through 21C 38113.  That was a little

16   over 7,000 pages.

17          All right.  You understand the difference, right,

18   between documents and pages, right?

19   A.  Yes, I do.

20   Q.  Okay.  Now, how many e-mails, if you know -- of those

21   50,000 pages, how many e-mails did your company produce in the

22   initial production; do you know?

23   A.  No.

24          MR. DAVIS:  I have nothing further, your Honor.

25          MR. LEONARD:  May I proceed, your Honor?

```
 1              THE COURT:  Why?

 2              MR. LEONARD:  Follow-up questions.

 3              THE COURT:  No.

 4              MR. LEONARD:  Do you want us to wait until our

 5    case-in-chief to do that?

 6              THE COURT:  Yes.

 7              MR. LEONARD:  All right.  Thank you, Judge.

 8              THE COURT:  If anybody is asking questions, it is

 9    going to be me right now.

10              MR. SMITH:  Your Honor, if I could, could I move some

11    exhibits into evidence?

12              THE COURT:  As soon as I'm done.  You might have more

13    documents based upon my questioning.

14              But remind me, so we do that.

15              MR. SMITH:  I will, your Honor.

16              THE COURT:  Okay.  Thank you.

17     (Brief pause.)

18              THE COURT:  I think we have got this covered:  "SEO"

19    stands for "search engine optimization," correct?

20              THE WITNESS:  Are you asking me, your Honor?

21              THE COURT:  Yes.

22              THE WITNESS:  Yes, your Honor.

23              THE COURT:  Just to make sure we all have the same

24    nomenclature.

25              I'm going to ask you this question, and I'm going to
```

1    tell you why I'm asking it:  Do you have the financial ability

2    to pay $750,000 or more in monetary sanctions?

3              THE WITNESS:  No, I do not, your Honor.

4              THE COURT:  Okay.  I'm asking the question because

5    there is a motion for sanctions pending, as you know, and I

6    need to first determine was there a violation; second, if I do

7    determine a violation, I need to determine what, if any,

8    sanctions I need to impose.

9              Obviously, I'm not going to impose a sanction that is

10   a Pyrrhic victory.  I'm not going to require you to pay -- or

11   order you pay $750,000 or more if you can't pay it because

12   that's not much of a sanction.

13             So that's why I'm asking the question.  I'm not

14   delving into your personal finances, okay?

15             THE WITNESS:  Okay, your Honor.

16             THE COURT:  All right.  That's the only question I

17   have.  Thank you very much.

18             You can step down.

19             We are going to go through the exhibits now and see

20   what's admitted, okay?

21             THE WITNESS:  Thank you, your Honor.

22     (Witness excused.)

23             MR. SMITH:  Yes, your Honor.  We would -- I admit I'm

24   not as organized I should be, so I may be offering some

25   exhibits that have previously been offered, your Honor.

1          THE COURT:  Okay.

2          MR. SMITH:  Just to be clear, we would like to offer

3  the Leavens Strand Exhibits 9, 13, 14, 18, 19, and 20.

4          THE COURT:  18, 19, and 20.

5          Okay.  My notes show that 18 is already admitted.

6          So the motion is to admit Leavens Strand Exhibits 9,

7  13, 14, 18, which my records show is already admitted, 19, and

8  20.

9          Mr. Salam, Mr. Leonard, any objections to any of

10  those?

11          MR. LEONARD:  I think they will probably prove up 14,

12  Judge.  So at this time, there is not a foundation for 14.

13  It's another attorney's notes --

14          THE REPORTER:  I'm sorry.  I can't hear you.

15          THE COURT:  Just tell me which ones you have an

16  objection to.

17          MR. LEONARD:  No. 14, foundation.

18          THE COURT:  Okay.  And all the others, no objection?

19          MR. LEONARD:  No objection.

20          THE COURT:  So 9, 13, 18, which I already have as

21  admitted, 19, and 20.

22          Mr. Davis, did you have any objection to any of

23  those?

24          MR. DAVIS:  No objection.

25          THE COURT:  Okay.  Let me take a look at 14 right

1  now.

2           Can you put it up on the screen?

3           Thank you.  Thank you very much.

4           Oh, these are Ms. Liberman's notes.

5           MR. SMITH:  Yes, that's correct.

6           THE COURT:  Okay.  Mr. Duke referred to them, but he,

7  obviously, didn't write them up.

8           I assume we are going to have Ms. Liberman testify at

9  some point?

10          MR. SMITH:  I'm told that opposing counsel are going

11  to call her.

12          THE COURT:  Okay.  All right.  So at this point, not

13  admitted, without prejudice.  So let's remember to come back

14  to 14 if you want to get it admitted.

15   (Leavens Strand Exhibits 9, 13, 18, 19, and 20 were offered

16    and received in evidence.)

17          MR. SMITH:  Understood.

18          And can I just verify:  I think these are all already

19  in, but otherwise I would offer them.

20          THE COURT:  Sure.  Go ahead.

21          MR. SMITH:  They are Plaintiff's 23, 24, 37, and 65.

22          THE COURT:  Plaintiff's 23, 24, 37, and 65.

23          All right.  I will say those slower.  I apologize.

24          All right.  Plaintiff's 23, 24, 37, 65.

25          Mr. Leonard?

```
 1              Mr. Salam, any objection to those?

 2              Do you still need to dig your way through the

 3  documents?

 4              MR. LEONARD:  I was checking one last one.

 5              No objection.

 6              THE COURT:  Mr. Davis, any objection to Plaintiff's

 7  23, 24, 37, and 65?  Seeing as they are your exhibits, I'm

 8  thinking you are okay with them.

 9              MR. DAVIS:  Yes, then they are already in evidence,

10  so I'm fine with it.

11              THE COURT:  So we will make sure those are admitted

12  just in case they are not.

13   (Plaintiff's Exhibits 23, 24, 37, and 65 were offered and

14    received in evidence.)

15              MR. SMITH:  And my last one, your Honor -- I'm sorry.

16  I'm jumping the gun.

17              The last one is Defendant's 5, which I'm virtually

18  certain is in, but in an abundance of caution.

19              THE COURT:  Okay.  Any objection to Defendant's 5?

20              MR. LEONARD:  No objection, Judge.

21              MR. DAVIS:  No objection.  It is in already.

22              THE COURT:  Defendant's 5, that's what my notes show,

23  too.

24              Okay.  Anything else?

25              MR. SMITH:  That's it.  Thank you, your Honor.
```

1          MR. DAVIS:  Your Honor, we would like to move some
2    further exhibits in also.
3          THE COURT:  Okay.
4          MR. DAVIS:  I have raised this a few times:  1
5    through 61 of our list were all exhibits that were attached to
6    our motion for sanctions.
7          THE COURT:  1 through 61.  Okay.
8          MR. DAVIS:  1 is in.  2 through 10 are all the
9    e-mails that are part of Exhibit 1.
10         THE COURT:  Okay.
11         MR. DAVIS:  They are contained within Exhibit 1.  We
12   just broke them out separately.
13         THE COURT:  All right.  Plaintiff's 1 through 61, and
14   you mentioned that the first -- what was it?
15         1 is in.
16         2 through 10 are all e-mails.  Okay.
17         MR. DAVIS:  And 2 through 10 are all included in
18   PX-1.  They are just separated out --
19         THE COURT:  Oh, I got you.  So they have just been
20   separated out so they are standing alone?
21         MR. DAVIS:  That is right.
22         THE COURT:  I understand.
23         MR. DAVIS:  I don't want there to be any confusion
24   later when we refer to 1.  They are in evidence already.  I
25   just wanted to get that on the record.

1        THE COURT:  Okay.  I understand what you are doing.

2        MR. SALAM:  I'm just trying to confirm that, your

3    Honor.  I'm just checking the Bates numbers.

4        THE COURT:  Okay.  Tell me when you have completed

5    your review.

6        MR. SALAM:  I'm sorry.  Exhibit 10, I don't see a

7    Bates number or --

8        THE COURT:  There is a Bates number 21C 63530.

9        MR. SALAM:  For No. 10?

10       THE COURT:  For Plaintiff's No. 10.

11       MR. SALAM:  I must have a missing page.

12       Hold on a second.  I apologize.  I stuck something on

13   top of that in the binder.  I apologize.

14       63530.

15       All right.  With that representation, we have no

16   objection, your Honor.

17       THE COURT:  Okay.  That's going to be 1 through 10.

18    (Plaintiff's Exhibits 1 through 10 were offered and received

19    in evidence.)

20       THE COURT:  Okay.  Go ahead, Mr. Davis.

21       MR. DAVIS:  The next set, 11 through 16, are more of

22   the same.  They are e-mails between Mr. Duke and Ms. Saraswat.

23   They are business records.  They are a part of our motion.

24   There has been no -- we couldn't go through, with the time,

25   through every e-mail.

```
 1              THE COURT:  Sure.  I understand.
 2              MR. DAVIS:  But they are part of the motion for
 3      sanctions.  I don't recall anything in the reply brief that
 4      objected to any particular document in 1 through 61, but we
 5      would seek to move 11 through 16 into evidence.
 6              THE COURT:  Okay.  11 through 16, any objection,
 7      Mr. Leonard?
 8              Mr. Salam?
 9              MR. LEONARD:  No objection.
10              THE COURT:  All right.  Those will be admitted.
11       (Plaintiff's Exhibits 11 through 16 were offered and
12        received in evidence.)
13              THE COURT:  All right.  Go ahead, Mr. Davis.
14              MR. DAVIS:  So we have 17 is in evidence.
15              THE COURT:  Yes.
16              MR. DAVIS:  19, those were the deps.  That's fine.
17              23, 24, 25, 26, 27 are in evidence.
18              31, 32 are in evidence.
19              We also move PX-34 on the same basis.  Again, it's
20      another business record.  It is an e-mail between Duke and
21      someone named Otis Chandler.  Same basis as before.
22              THE COURT:  All right.  So that's Plaintiff's 34.
23              Any objection to Plaintiff's 34?
24              MR. LEONARD:  No objection.
25              THE COURT:  All right.  34 will be admitted.
```

```
 1      (Plaintiff's Exhibit 34 was offered and received in
 2     evidence.)
 3              MR. DAVIS:  35 is in evidence.
 4              36 is in evidence.
 5              38 through 46, again, same offer, part of our motion
 6     for sanctions, business records, e-mails between Mr. Duke and
 7     Mr. K-o-s, Kos.  We move all those in.
 8              THE COURT:  You said 38 through?
 9              MR. DAVIS:  49.
10              THE COURT:  Oh, I thought you said 46.
11              So it is 38 through 49?
12              MR. DAVIS:  Correct.
13              THE COURT:  All right.  Hold on.
14              MR. LEONARD:  Going through 49?
15              THE COURT:  38 through 49.  Any objection,
16     Mr. Leonard?
17              Mr. Salam?
18              MR. LEONARD:  No objection.
19              THE COURT:  Okay.  Those will be admitted.
20      (Plaintiff's Exhibits 38 through 49 were offered and
21     received in evidence.)
22              MR. DAVIS:  53, it is another Kos e-mail to Duke.
23     The same -- move on the same basis.
24              THE COURT:  53.
25              Any objection to 53?
```

```
 1            MR. LEONARD:  Just a second, your Honor.

 2            THE COURT:  Take your time.

 3            MR. LEONARD:  No, no objection.

 4            THE COURT:  53 is admitted.

 5      (Plaintiff's Exhibit 53 was offered and received in

 6       evidence.)

 7            MR. DAVIS:  We move 56.  It is e-mails from

 8   Defendants' 3/19/2018 production.  It references the online

 9   chat communications between Mr. Duke and Ms. Saraswat,

10   business records.

11            MR. LEONARD:  No objection, your Honor.

12            THE COURT:  56 will be admitted.

13      (Plaintiff's Exhibit 56 was offered and received in

14       evidence.)

15            MR. DAVIS:  59, it's an e-mail between Mr. Duke and

16   his mother.  It was in the native data.  It's a business

17   record.  It was redacted by Plaintiff's counsel.  We also seek

18   the admission of that document.

19            MR. LEONARD:  No objection.

20            THE COURT:  Plaintiff's 59 is admitted.

21      (Plaintiff's Exhibit 59 was offered and received in

22       evidence.)

23            THE COURT:  Anything else, Mr. Davis?

24            MR. DAVIS:  60 and 61 on the same basis.  61 is --

25            MR. LEONARD:  No objection.
```

1      THE COURT:  No objection, 60 and 61 will be admitted.

2   (Plaintiff's Exhibits 60 and 61 were offered and received in

3    evidence.)

4      MR. DAVIS:  PX-72, we offer into evidence.  It's an

5   e-mail between our firm and the Leavens Strand firm with the

6   ESI search terms.  We have talked about it, but I don't think

7   it's in evidence.  PX-72.

8      THE COURT:  Hold on one second.  Let me get there.

9      MR. SALAM:  No objection, your Honor.  I believe it

10   may be admitted as another exhibit as well, but we have no

11   objection.

12      THE COURT:  72 will be admitted.

13   (Plaintiff's Exhibit 72 was offered and received in

14    evidence.)

15      MR. DAVIS:  I think that's all I have, your Honor.

16      THE COURT:  Okay.  Who would be the next witness,

17   Mr. Davis?

18      MR. DAVIS:  The next witness on Plaintiff's case,

19   your Honor, is Thomas R. Leavens.

20   (Witness duly sworn.)

21      MR. von OHLEN:  Your Honor, just for clarity sake, we

22   are calling Mr. Leavens as an adverse witness pursuant to

23   Rule 611(c)(2).

24      THE COURT:  Okay.

25

1          THOMAS R. LEAVENS, PLAINTIFF'S WITNESS, SWORN

2               DIRECT EXAMINATION (Adversely)

3  BY MR. von OHLEN:

4  Q.  Good afternoon, Mr. Leavens.

5  A.  Good afternoon.

6  Q.  You first filed your appearance in this case on

7  October 3rd, 2012, correct?

8  A.  Whatever the record shows, yes.

9  Q.  And the record is right in front of you.  It should be.

10  If you look down, you will see your appearance form.

11          Is that your appearance form that you filed on

12  October 3rd, 2012?

13  A.  Yes.

14  Q.  Okay.  And that's your electronic signature that's

15  attached to that appearance form, the second box?

16  A.  Yes.

17  Q.  Okay.  And you stated in that appearance form that you

18  were the lead counsel in this case, a member of the trial bar,

19  and that you would be the trial attorney in the event that the

20  case reached trial; is that all correct?

21  A.  It was correct at the time, yes.

22  Q.  Okay.  And when you say "It was correct at the time," you

23  haven't amended that appearance form in any way, have you?

24  A.  I don't know.  I'm not conducting the trial, of course.

25  Q.  Well, I will make a representation to you that I have

Leavens - Direct

1   looked over the entire document, and I have never seen an

2   amended appearance form where you indicated that these were

3   not your roles in the case.

4           Do you have any reason to doubt that?

5   A.  I don't think I filed an amended appearance.

6   Q.  Okay.  And let's turn to your appearance.

7           MR. von OHLEN:  Let's put up 63.

8   BY MR. von OHLEN:

9   Q.  Take a look at that as well, Plaintiff's 63.

10          And you reiterated all those representations on

11  July 16th, 2013, when Brent Duke was added as an individual

12  Defendant, and you filed an appearance on his behalf then; is

13  that correct, sir?

14  A.  Yes.

15  Q.  Okay.  Thus it would be accurate to state that, at least

16  according to the court's records and docket, that you have

17  been the lead counsel in this case from the time of your first

18  appearance on October 3rd, 2012, until the date that your

19  motion to withdraw was granted in early June 2019; isn't that

20  all correct, sir?

21  A.  Well, as I explained, the circumstances are different than

22  what is reflected.  I did not file an amendment to that

23  appearance, but I have not been the lead counsel for some

24  time.

25  Q.  Okay.  But you made these representations, and they were

Leavens - Direct

724

1   never amended.  You never advised the court that you were not

2   lead counsel, correct?

3   A.  That's correct.

4   Q.  Are you saying somebody else is lead counsel other than

5   you in this case?

6   A.  At the time of the withdraw, yes.

7   Q.  Okay.  Fair enough.

8        So before you withdrew in early June of 2019, at all

9   times up until then, you were the lead counsel in this case,

10  correct?

11  A.  No.

12  Q.  You were not?

13  A.  I was not.

14  Q.  So who else was lead counsel?

15  A.  Mr. Peter Stamatis assumed that responsibility at some

16  point after his appearance, up to the withdraw.

17  Q.  Okay.  So if we looked at Mr. Stamatis's form, appearance

18  form, it would indicate he was lead counsel in this case; is

19  that your understanding?

20  A.  He was not lead counsel when he filed his appearance.

21  Q.  Okay.  Did Mr. Stamatis ever file a document with this

22  court or advise this court that he was the lead counsel in

23  this case?

24  A.  I don't know.

25  Q.  Okay.  And before we go on, we will get Mr. Stamatis's

Leavens - Direct

1    appearance, but I will represent to you that he indicated that

2    he wasn't lead counsel in this case.

3            Do you have any reason to dispute that?

4    A.  That he --

5    Q.  Let me clarify.

6            When he filed his appearance form in this case, there

7    is a box that he can check.  You can be lead counsel or not

8    lead counsel.  I will represent to you that he filed that he

9    is not lead counsel.

10   A.  Well, that may have been true at the time he filed his

11   appearance.

12   Q.  Okay.  And did he ever file an amended appearance to

13   indicate that he was lead counsel?

14   A.  I don't know.

15   Q.  Okay.  But in any event, the docket of the court would

16   reflect the accuracy on those things; would you agree with me

17   on that?

18   A.  I would disagree.

19   Q.  Oh, okay.  So that the court records are inaccurate, and

20   some agreement between you and Mr. Stamatis is more accurate

21   as to who was lead counsel?

22   A.  I think that's correct.

23   Q.  So when did you step away and not be lead counsel anymore?

24   A.  I don't think that there is an exact date, but

25   Mr. Stamatis was assuming more and more responsibilities.  I

Leavens - Direct

726

1    would put it at some time maybe in 2017 or so.

2    Q.  Okay.  So did you ever have a conversation with

3    Mr. Stamatis and say, "Hey, you are lead counsel now; I'm

4    not"?

5    A.  Yes, I did.

6    Q.  Okay.  And I will represent to you that there were, I

7    believe, 22 depositions taken in this case.  It's hard to

8    count them because Mr. Haas was taken several times.  But

9    about 22 depositions depending on if you double count some.

10        Do you know how many depositions you showed up at?

11   A.  I think I was at all but the ones that were done by

12   Mr. Life.

13   Q.  Which would have been one, right?

14   A.  I was not at Edmiston's.  I don't think I was --

15   Q.  At Edmiston's, correct, Mr. Life was.

16   A.  I don't think I was at the one with Mr. Hough.  Perhaps I

17   was, but that's what my recollection is.

18   Q.  So would it be fair to say, if there was 22, that you were

19   at somewhere between 19 and 20 of the depositions that were

20   taken in this case?

21   A.  That I attended, yes.

22   Q.  Yes.

23        Attended, was of record?

24   A.  Correct.

25        MR. von OHLEN:  Okay.  We would move Exhibit 62 and

Leavens - Direct

1    63 into evidence, please.

2            THE COURT:  Any objection?

3            MR. LEONARD:  No objection.

4            THE COURT:  I will take judicial notice of it, too.

5            Okay.  Plaintiff's Exhibit 62 and 63 will be

6    admitted.

7        (Plaintiff's Exhibits 62 and 63 were offered and received in

8        evidence.)

9    BY MR. von OHLEN:

10   Q.  Can you please describe the circumstances by which you

11   were originally retained by Mr. Duke or his company in this

12   case?

13   A.  I was contacted by him at the recommendation of his prior

14   counsel, I believe.  I don't recollect necessarily.  But he

15   contacted me by telephone and introduced himself and described

16   the circumstances of his being sued, and he needed defense of

17   the lawsuit.  And I'm trying to remember how much of an

18   exchange that we had before he came into my office, but very

19   soon after his first call, he came into the office, and we

20   were engaged as his counsel.

21   Q.  Okay.  So if I understand the timing correct, it sounds

22   like he had been served with a complaint, and in between that

23   time and when some responsive pleading was due, he called you,

24   interviewed you, and eventually retained you; is that correct?

25   A.  Correct.

Leavens - Direct

1  Q.  And did there come a time between that first phone call

2  when you actually met him?

3  A.  Yes.

4  Q.  Okay.  And --

5  A.  Very soon after the first phone call.

6  Q.  Okay.  So within days?

7  A.  Correct.

8  Q.  Okay.  And where was that meeting?

9  A.  At our office at 203 North LaSalle in Chicago.

10  Q.  Who else was there, other than you and Mr. Duke?

11  A.  I don't recall that anybody else was at that meeting.

12  Q.  So just the two of you?

13  A.  That's what I recall.

14  Q.  Okay.  Were there other initial meetings before you filed

15  your appearance in this case or was that the only one?

16  A.  You are talking about face-to-face meetings?

17  Q.  Face-to-face, yes.

18  A.  It wasn't -- that was not the only one.

19  Q.  Okay.  Tell us what the next one was, who was there, when

20  it was.

21  A.  I don't know what the next one was.  The one I remember is

22  going to his apartment, which is in Chicago on Ashland, and I

23  met with him there.

24  Q.  Okay.

25  A.  And I believe I was by myself when I did.

1    Q.   And could you put a month on that?

2    A.   It probably was September given what you have told me

3    about the appearance form.

4         October 2nd, is that what you said?

5    Q.   It was October 3rd, I believe.

6    A.   Right.

7    Q.   Yes, October 3, 2012.

8    A.   So it was probably sometime in September.

9    Q.   In September.  Okay.

10        And was there any other initial meetings before a

11   responsive pleading was filed?

12   A.   Those are the two that I remember face-to-face.

13   Q.   Okay.  And you had some telephone calls or e-mail

14   exchanges or written exchanges with him as well?

15   A.   Correct.

16   Q.   Okay.  Another name was mentioned very early on in this

17   case, a Matt Rieger.  Was that the attorney who you just

18   mentioned that referred Mr. Duke to you, Matt Rieger?

19   A.   That's only received information.  I don't know for sure.

20   Q.   Okay.  Do you know who Matt Rieger is?

21   A.   I do not.

22   Q.   Okay.  So you have never had any correspondence or contact

23   with him in connection with this case?

24   A.   Nothing that I can recollect, no.

25   Q.   You never got a copy of Mr. Rieger's file that he had as a

Leavens - Direct

1    result of his discussions with Mr. Duke about trademark

2    issues; is that correct?

3    A.  I did get some documents.  I got a draft complaint.  I

4    received a cease-and-desist letter that had been sent.  I

5    don't remember anything else besides those two documents.

6    Q.  Do you remember if you received them from Mr. Rieger or

7    Mr. Duke or somebody else?

8    A.  I think I got them from Mr. Duke.

9    Q.  Okay.  What was the nature of your relationship to

10   Mr. Salam, Kevin Salam, in this case before he became an

11   attorney of record in August of 2019?

12           MR. LEONARD:  Objection to relevance.

13           MR. von OHLEN:  There is a lot of things stated that

14   he has been involved, as well as --

15           THE COURT:  There was that meeting, so overruled, but

16   tie it up and then show me relatively quickly.

17           MR. von OHLEN:  I will tie it up in about two

18   minutes.

19           THE COURT:  Okay.

20   BY MR. von OHLEN:

21   Q.  Do you recall the question?

22   A.  I don't.

23   Q.  Okay.  It's just what was the nature of your relationship

24   with Mr. Salam before he became attorney of record in this

25   case?

Leavens - Direct

731

1    A.  I knew him through his representation of Mr. Duke in

2    the -- initially, in the insurance defense litigation, the

3    declaratory judgment action that was filed by the insurance

4    company.

5    Q.  And how did you come to know him?

6    A.  He knew Mr. Stamatis, and Mr. Stamatis recommended him as

7    being somebody who had expertise in that area.

8    Q.  So Mr. Stamatis recommended -- I'm sorry -- I'm going to

9    have to follow that again.

10          Mr. Stamatis recommended you?

11   A.  No, Mr. Stamatis recommended Mr. Salam.

12   Q.  Mr. Salam for the insurance coverage issue?

13   A.  Correct.

14   Q.  Okay.  How does Mr. Stamatis get involved that he is the

15   one recommending?  Because we don't see Mr. Stamatis on the

16   scene until June of 2015.

17          So what was his involvement prior to June 2015?

18   A.  Well, I met Mr. Stamatis in, I think, 2014.  I might have

19   met him late in 2013.  But we had a mutual client, and I

20   remember having a conversation with him about a particular

21   matter for that client.  I can't remember how long after that

22   that we connected again on another matter that he had, but he

23   had a trademark, some litigation that he needed some

24   consulting about, and I helped him with that matter.

25   Q.  Okay.  So you meet Mr. Stamatis and somehow through -- you

Leavens - Direct

1   correct me if I'm wrong -- somehow through his conversation

2   with you and his relationship with you, you come to ask him

3   for a recommendation for a coverage lawyer and that results in

4   the recommendation of Mr. Salam to Mr. Duke?

5         I'm sorry.  That's a long question, but I'm trying to

6   get the labyrinth here.

7   A.  Well, the sequence is I knew Mr. Stamatis, and

8   Mr. Stamatis was involved at that point in this lawsuit, and

9   the declaratory judgment action was filed by the insurance

10  company, and Mr. Duke and 21 Century needed defense of that

11  lawsuit, and Mr. Stamatis made the recommendation of

12  Mr. Salam.  That's how I remember that it happened.

13  Q.  I hear that, and thank you for that answer.

14        But in that answer, I heard that Mr. Stamatis was

15  involved in this case, and it sounded to me like it was prior

16  to when he filed his appearance in this case, which, as we

17  have heard, is June 2015.

18        Was that what you meant to say?

19  A.  Well, he was involved with the case.

20  Q.  Okay.  And tell me --

21        THE COURT:  Before June of 2015?

22        THE WITNESS:  Yes.  Well, he -- well -- I will let

23  you ask the question.

24  BY MR. von OHLEN:

25  Q.  Here is the great open-ended question:  What did he do?

Leavens - Direct

733

1    What was his involvement?

2         THE COURT:  And when did he do it?

3         THE WITNESS:  I first spoke to Mr. Stamatis about

4    this case after the settlement conference that we had here

5    that was unsuccessful.

6         MR. von OHLEN:  Okay.

7         THE WITNESS:  And it appeared as if this case was

8    going to actually go to trial because of the failed

9    settlement.  So I called Mr. Stamatis, and I don't know that I

10   talked to him about the case before that or not.  I don't

11   recollect.  But what I do recollect the first time was that I

12   spoke to him about the case and wanted to see whether he would

13   be interested in assisting.

14        His role initially was with respect to just some

15   general consulting.  We consulted with him with respect to the

16   defamation action that we were adding to the complaint, and we

17   asked for his recommendation for an e-discovery consultant.

18   He did not become active in the case in the sense of making

19   appearances at depositions or anything like that until later

20   in 2015.

21        I don't recall which deposition he appeared at

22   initially, but he did finally enter his appearance and was

23   active in the case after that.

24        THE COURT:  I'm going to pause you right there.

25        So is it your testimony that after the settlement

Leavens - Direct

734

conference, you contacted Mr. Stamatis or you were talking to

Mr. Stamatis and Mr. Stamatis recommended Mr. Salam?

        Is that what you are saying?

        THE WITNESS:  I believe the recommendation -- I

didn't know Mr. Salam independently.

        THE COURT:  And I'm not saying you did.

        I'm just going through the chronology, and this

is -- correct me if I'm wrong, but is it your testimony that

after the settlement conference, you spoke to Mr. Stamatis,

and Mr. Stamatis recommended Mr. Salam to --

        THE WITNESS:  I believe that that's the way that that

worked because at the settlement conference, I don't believe

the declaratory judgment action had been filed yet, and we

could look at the record and get that clarified.  I just don't

remember off the top of my head.

        THE COURT:  You know we had the attorney for the

insurance company here at that settlement conference.

Remember?

        THE WITNESS:  That's right.

        THE COURT:  Okay.  So would that help you remember

whether or not there was a dec action pending?

        THE WITNESS:  I don't believe that there was a dec

action pending at that time.

        THE COURT:  Okay.

        THE WITNESS:  I mean, I don't remember that it was

Leavens - Direct

735

1    pending at the time.

2              I do know that I did not know Mr. Salam.

3              THE COURT:  Okay.

4              THE WITNESS:  And my recollection is that I met him

5    through Mr. Stamatis.

6              THE COURT:  Okay.

7    BY MR. von OHLEN:

8    Q.  And I'm advised by co-counsel that that settlement

9    conference was in August of 2014.

10             Does that help reset the timeline in your mind?

11   A.  As to?

12   Q.  As to Mr. Stamatis's involvement in this case.

13   A.  I did not contact him about the case until after that

14   settlement conference.

15   Q.  Okay.  And ballpark me:  Is this days after that you come

16   to this realization that you need somebody else --

17   A.  Yes.

18   Q.  -- or is it months later?

19   A.  Days.

20   Q.  Days.  Okay.

21             And you did say that you consulted with him on, I

22   believe, a potential lawyer in the DJ action; is that correct?

23   A.  I asked -- I'm trying to think how it came up.  I don't

24   recall necessarily about how it came up, whether I reached out

25   to him to get his recommendation or whether this was something

Leavens - Direct

736

1    that occurred just in the course of us already working on the

2    case.  As I said, it would be clarified if there was some

3    indication about when that dec action was actually filed.

4    Q.  Okay.  That will speak for itself, and that's in the

5    record.

6            And I think you also said that you solicited some

7    recommendations or information from Mr. Stamatis regarding

8    e-discovery issues; is that correct?

9    A.  No.

10   Q.  Okay.  Tell me what -- I heard the word "e-discovery."

11   A.  Correct.

12   Q.  Okay.  What about e-discovery did you solicit

13   Mr. Stamatis's input in?

14   A.  If he had a recommendation for an e-discovery consultant.

15   Q.  Oh, okay.  And did he give you an answer?

16   A.  Yes.

17   Q.  Okay.  Who was it?

18   A.  Elijah.

19   Q.  And Elijah, who became 4Discovery, correct?

20   A.  Elijah was one company.  I don't think of them as the

21   same.  I didn't realize that they were --

22   Q.  Related?

23   A.  Are they related?

24   Q.  That's my understanding, but you tell me.

25   A.  I didn't understand that they were related.

1  Q.  Okay.

2  A.  I thought 4Discovery was different from Elijah.

3  Q.  In any event, he recommended Elijah to you?

4  A.  That's what I understand.  The conversation was not

5  directly with me.  It was with Ms. Liberman.

6  Q.  Okay.  So were you present when that conversation took

7  place?

8  A.  No.

9  Q.  Okay.  So how do you know about the substance of that

10  communication between Ms. Liberman and Mr. Stamatis and what

11  they talked about?

12  A.  I don't recollect how I know that.

13  Q.  Okay.  It is just in your head?

14  A.  In my head, yes.

15  Q.  Okay.  Anything else that's in your head with regard to

16  what they might have talked about?

17  A.  Who is "they"?  I'm sorry.

18        MR. SMITH:  Objection, your Honor.

19        THE COURT:  Okay.  What was the objection?

20        MR. SMITH:  The objection is to the form and to the

21  foundation:  "Anything else that's in your head that they

22  might have talked about."

23        THE COURT:  I will sustain.

24        You can break that up.

25        And for the record, the settlement conference was on

Leavens - Direct

738

1    August 25th.  The dec action was filed on October 6th, 2014.

2            So if you could break that up, Mr. von Ohlen.

3            MR. von OHLEN:  Okay.

4    BY MR. von OHLEN:

5    Q.  You said that you have this knowledge about what

6    Mr. Stamatis and Ms. Liberman spoke about, that it's in your

7    head, but you don't know where it came from; is that correct?

8    A.  I don't recollect how I came to that knowledge, no, but I

9    understand that it was her that contacted him for a

10   recommendation.

11   Q.  Okay.  And you don't know whether you heard that from

12   Ms. Liberman or Mr. Stamatis or somebody else; is that what

13   I'm getting?

14   A.  I would be guessing if I told you who I --

15   Q.  And I don't want you to guess, so just whatever your

16   answer is.

17           So do you know what else they might have talked

18   about, other than a recommendation on an e-discovery vendor?

19           MR. SMITH:  Again, your Honor, just objection because

20   there is not even a time frame for this question.

21           THE COURT:  Well, because the witness can't answer

22   it, so I will overrule.

23           So the question is "So do you know?"  So it is a

24   foundational question.  If he knows, then we can try to pin

25   down more foundation.

Leavens - Direct

739

```
 1          THE WITNESS:  I don't know what they might have

 2    talked about.

 3    BY MR. von OHLEN:

 4    Q.  Okay.  Getting back to Mr. Salam, did you keep him

 5    apprised of developments in this case such as sending him

 6    pleadings or phone call updates on status?

 7          MR. LEONARD:  Objection to relevance.

 8          THE WITNESS:  Do you have a time frame?

 9    BY MR. von OHLEN:

10    Q.  Yes, the time --

11          THE COURT:  Hold on a second.

12          Objection to what?

13          MR. LEONARD:  Relevance.

14          THE COURT:  Overruled.

15    BY MR. von OHLEN:

16    Q.  -- before he became counsel in this case?

17    A.  Before he entered his appearance?

18    Q.  Yes.

19    A.  Okay.  Ask me the question again.  I'm sorry.  I just

20    needed to understand the time frame.

21    Q.  You knew that Mr. Salam was involved in the DJ, correct?

22    A.  He was involved in the what?

23    Q.  The declaratory judgment action.

24    A.  I did not understand that, that he was -- that

25    Mr. Salam -- I'm sorry -- Mr. Stamatis or Mr. Salam?
```

Leavens - Direct

740

1   Q.  Mr. Salam.

2   A.  Okay.  Sorry, I was confused.

3   Q.  Okay.  And I'm trying to lay the foundation.

4        You knew that Mr. Salam was involved as counsel for

5   Brent Duke, your mutual client, in the declaratory judgment

6   action that actually involved the coverage for this case,

7   correct?

8   A.  Correct.

9   Q.  Okay.  And so my question is, in the course of that, did

10  you keep Mr. Salam apprised of pleadings or the status of

11  discovery or in any way?

12  A.  I thought that we did.

13  Q.  And how did you do it?

14  A.  Well, we would respond to any requests that he would have

15  for the needs of the defense of that lawsuit, and I think that

16  was principally the way that we would apprise him.  I can't

17  describe that there was like a regular meeting or a regular

18  call or anything, but he did receive updates.

19  Q.  And that's what I'm really getting at.

20        Did you copy -- let's take them one by one.

21        Did you copy him on pleadings?

22  A.  I don't know that we copied him on every pleading, no.

23  Q.  No, I'm not saying every pleading.

24        On any pleadings?

25  A.  On any pleadings?

Leavens - Direct

1 Q. Yes.

2 A. I'm sure we gave him some pleadings, yes.

3 Q. Okay. But you are not sure of the amount of the

4 pleadings?

5 A. I couldn't qualify that, no.

6 Q. Who would have made this decision to keep him in the loop

7 on what's going on in this case?

8 A. I don't know that it belonged to any particular person to

9 do that. As I said, my sense, as I sit here, was that we were

10 responding to what it is that he needed. He was updating us

11 on the developments in the case from his perspective, and we

12 would update him in a like manner.

13 Q. Okay. So it was a mutual exchange; is that what your

14 testimony is?

15 A. I think so, yes.

16      MR. von OHLEN:  Okay.  Can we please put up

17 Exhibit No. 54, please?

18 BY MR. von OHLEN:

19 Q. Now, I will represent to you that this is a privilege log

20 that your firm produced to us on June 6, 2018.

21      Do you recognize that privilege log?

22 A. I did not until I saw it as an exhibit.

23 Q. Okay. Well, do you have any reason to dispute that this

24 is a privilege log produced by your firm in this case?

25 A. I don't have any reason to dispute that.

Leavens - Direct

742

```
 1   Q.  Okay.  But have you ever seen this before?

 2   A.  As I said, I don't know that I saw it before.  I saw it as

 3   an exhibit.

 4   Q.  Who would have been in charge of putting together and

 5   tendering a privilege log to opposing counsel in this case?

 6   A.  Mr. Life.

 7   Q.  Mr. Life.

 8       So I will just ask you to -- let's scroll down to the

 9   October 31st, 2014, and the November 10th, 2014, entries.

10   Let's see if we can find those.

11       I think one is at the bottom of this page.

12       Do you see that?

13   A.  Yes.

14   Q.  And it says --

15       MR. von OHLEN:  Hold it.  It is moving a lot here.

16   BY MR. von OHLEN:

17   Q.  It says the Bates number of a document in the first

18   column.

19       The second number is the date:  10/31/2014.

20       The next column, it says "Receipt?"

21       Do you see that, where I'm talking about?

22   A.  Yes, uh-huh.

23   Q.  Okay.  And the next column, it says the "to" and "from" is

24   from Kevin Salam, Esq., to Brent Duke.

25       And the next column describes the nature of the
```

Leavens - Direct

1    communication, and that says:  "Wire report regarding payment

2    for legal services."

3         And then the final column identifies the nature of

4    the privilege that's being asserted.

5         Are you with me on all of that, and did I state that

6    all correctly?

7    A.  I see that, yes.

8    Q.  Okay.  Did I state anything incorrectly there?

9    A.  No.

10   Q.  Okay.  So my question is:  What are you referring to here

11   with regard to a wire report regarding payment for legal

12   services?

13        Did you have some type of financial arrangement with

14   Mr. Salam with regard to legal fees or payment for services in

15   this case?

16        MR. LEONARD:  Objection, attorney-client, for the

17   reasons stated in the privilege log.

18        THE COURT:  Overruled.

19        But I'm going to go back to your relevance objection.

20   I thought I knew where you were going, and I clearly was

21   wrong.  So I'm not sure where all of this is going.

22        So go ahead and answer the question.

23        But help me get to wherever it is you are trying to

24   get to.

25        MR. von OHLEN:  Okay.

Leavens - Direct

744

1          THE WITNESS:  The question again, please?

2   BY MR. von OHLEN:

3   Q.  The last part of the question was simply framing this

4   particular receipt.

5          Did you have any arrangement with Mr. Salam regarding

6   any -- let me rephrase.

7          Did you have any financial arrangement with Mr. Salam

8   regarding legal fees with regard to this case?

9   A.  No.

10  Q.  Do you know during the course of Mr. Salam's

11  representation in the declaratory judgment action with Diamond

12  State whether he ever issued any instructions to Brent Duke

13  about retaining and preserving documents in connection with

14  this case?

15         MR. LEONARD:  Objection to foundation and

16  attorney-client privilege, joint defense privilege.

17         THE COURT:  Overruled.

18         He said, "Do you know?"  It is a foundational

19  question, and it is clearly the subject matter of the motion.

20         Go ahead and answer.

21         THE WITNESS:  I'm sorry.  Restate it.

22         MR. von OHLEN:  Did you not understand the question

23  or you just forgot it?

24         THE WITNESS:  I forgot in the course of the

25  objections, so I want to make sure I'm answering it correctly.

Leavens - Direct

745

1    BY MR. von OHLEN:

2    Q.   Okay.  So the question is:  Do you know, as a result of

3    Mr. Salam being involved in what I will call a "sister case,"

4    a related case, do you know if he ever issued any instructions

5    of any kind to Mr. Duke, your mutual client, regarding

6    preserving data?

7    A.   I do not know that.

8    Q.   Okay.  Do you know what the term "Peppers counsel" means

9    under Illinois law?

10   A.   I have a general understanding of what it means, yes.

11   Q.   Just give me your general understanding.

12          MR. LEONARD:  Objection to the relevance and calls

13   for a legal conclusion.

14          THE COURT:  Well, I'm getting a little confused on

15   the relevance.

16          So I will overrule it for now.

17          Legal conclusion, he is a lawyer.  He is telling us

18   what his understanding of Peppers counsel is.

19          So overruled to that extent.

20          THE WITNESS:  My understanding is that under

21   circumstances where an insurance company agrees to defend

22   under a reservation of rights that the insured is entitled to

23   engage counsel of their selection rather than under

24   circumstances where there is an agreement to defend when the

25   insurance company then selects the counsel.

Leavens - Direct

1   BY MR. von OHLEN:

2   Q.  Okay.  And is your firm Peppers counsel in this case?

3   A.  It was, yes.

4   Q.  Okay.  I mean, until you withdrew?

5   A.  Correct.

6   Q.  Okay.  So at all times prior to that, was your firm

7   Peppers counsel in this case?

8   A.  I don't know -- well, I believe so, yes, yes.

9   Q.  And then as a result of that, Diamond State would have

10  paid your fees, correct?

11  A.  Yes.

12  Q.  Okay.  Now, in May of 2013, you filed a counterclaim on

13  behalf of your clients, Brent Duke and 21 Century Smoking,

14  correct?

15  A.  Whatever the record reflects.  I don't have an independent

16  recollection.

17  Q.  I will represent to you that that's in the docket.

18  A.  Okay.

19  Q.  That that's the date which -- you recall filing a

20  counterclaim, right?

21  A.  Yes.

22  Q.  Okay.  And that was in May of 2013.

23          And in that counterclaim, you sought, you know,

24  various damages against DR, including trademark infringement

25  and whatever else, Illinois Deceptive Trade Practices Act.

Leavens - Direct

747

1        Do you remember all that?

2   A.  Yes.

3   Q.  Okay.  Did there ever come a time where Diamond State

4   asked you to allocate or separate the billing for prosecuting

5   the counterclaim versus defending Mr. Duke or 21 Century

6   Smoking in this matter?

7        MR. SMITH:  Objection, your Honor.

8        MR. LEONARD:  Objection to relevance.

9        MR. SMITH:  Same objection.

10       THE COURT:  Yes, I don't know the relevance.  If you

11  want to make a proffer?

12       MR. von OHLEN:  Can I make a proffer on the

13  relevance?

14       THE COURT:  You can make a proffer.

15       MR. von OHLEN:  The issue in this case -- and we have

16  had literally hours of testimony on the intent:  "My intent

17  was not to do this; my intent to do that."  As your Honor

18  knows, intent is done by connecting dots.  No one is going to

19  stand up here and have a Perry Mason moment and say, "Yeah, I

20  intended to do that."  One of the things that you can

21  establish intent with is -- the oldest one in the book is

22  money, and this goes exactly to that.

23       MR. SMITH:  Your Honor, if I may respond, there is a

24  much more direct way to get at that, I think.

25       THE COURT:  Yes, but it is his case to try.

Leavens - Direct

748

```
 1          But I'm still not -- you lost me on that.
 2          MR. von OHLEN:  I guess I would sum it up by the
 3  financial incentives that a Peppers counsel has to --
 4          THE COURT:  Drag a case on forever.  Got it.  I
 5  understand that.  I'm with you there.  But tie that into the
 6  motion.
 7          MR. von OHLEN:  Then, your Honor, I have made the
 8  point, and I will move on.
 9          THE COURT:  All right.  I got that.  It's in my head.
10  I just didn't understand how it worked into the motion.  Okay.
11          MR. von OHLEN:  Sorry.
12  BY MR. von OHLEN:
13  Q.  Did you have occasion to represent other clients in
14  federal court between 2006 and 2012?
15  A.  Between 2006, you said?
16  Q.  2006 and 2012, in federal court litigation.
17  A.  Yes.
18  Q.  Okay.  And did you have experience, prior to your
19  retention in this case, regarding the rules and procedures
20  regarding the preservation of electronically stored
21  information?
22  A.  Yes.
23  Q.  And we have heard a lot about the phrase "litigation hold
24  letter" before.  What is your understanding of what a
25  litigation hold letter is?
```

Leavens - Direct

749

1   A.   A litigation hold letter is, essentially, a -- not a

2   demand, but a notice given to the client to ensure

3   preservation of their evidence, of their data.

4   Q.   To inform them of their obligations under the rules and

5   what they need to do, correct?

6   A.   Yes.

7   Q.   Okay.  And have you ever issued a litigation hold letter

8   to any other client before this case?

9   A.   I don't believe so.

10  Q.   And we can now agree that you didn't issue a litigation

11  hold letter in this case at any time, correct?

12  A.   There was nothing put in writing.

13  Q.   Well, that's what I mean.

14  A.   There was a litigation hold issued, yes.

15  Q.   That's not my question.  Let's just stick with the exact

16  question, all right?

17       You never issued a litigation hold letter, not an

18  oral instruction, a letter in this case, correct?

19  A.   Correct.

20  Q.   And you never issued one ever before in your practice; is

21  that correct?

22  A.   I don't recollect that I have.

23  Q.   Okay.  To your knowledge, did anyone at either

24  Mr. Stamatis's firm or Mr. Shonder's firm ever issue a

25  litigation hold letter in this case?

Leavens - Direct

750

```
 1   A.  I have to take a step back.
 2         I did send a letter, maybe a year ago, to -- not to a
 3   client, but to Facebook to preserve some evidence, but --
 4   Q.  Okay.  So other than that, your testimony is accurate?
 5   A.  Yes, I don't know that I had issued a letter to a client.
 6   I mean, I may have.  I'm just telling you I don't recollect
 7   it.
 8   Q.  All you can give me is your best recollection.  That's
 9   fine.
10   A.  That's right.
11   Q.  Okay.  Do you have a file at your firm where you keep the
12   correspondence related to this case before you withdrew?
13   A.  Well, it's not in one file necessarily.  We have
14   correspondence.  We keep that, but we don't keep it
15   necessarily in a single file.
16   Q.  Okay.
17   A.  All correspondence doesn't go into one file.
18   Q.  It might be spread out across the office?
19   A.  Yes.
20   Q.  Okay.  But there is an organizational concept behind
21   retaining correspondence for this case; is that a fair
22   statement?
23   A.  Yes.
24   Q.  Okay.  When you brought Mr. Stamatis on board as a member
25   of the defense team, whenever that might be, and whatever you
```

1  might consider, but certainly he filed his appearance in June

2  of 2015, and fact discovery was still open in June of 2015.

3          Did you give Mr. Stamatis access to the entire file?

4  A.  I'm not sure how to answer that.

5  Q.  I don't want to tell you how to answer it, but, generally

6  speaking, what we tell witnesses is it is a yes, no, or I

7  don't know.

8  A.  Well, the reason why I don't know how to answer it is

9  because he was not prevented from seeing anything.

10         THE COURT:  But the question is did you give him

11  access?  Did you say "Here's the file"?

12         THE WITNESS:  Yes, he had access, if he wanted to, to

13  see the file.  He did ask for documents from us, and we did

14  provide them when he would ask for them.  So that's my best

15  answer.

16  BY MR. von OHLEN:

17  Q.  Okay.  And just so that I understand it, he had -- you

18  know, obviously, during regular business hours, he had

19  complete access to the file, correct?

20  A.  We didn't deny him access.

21  Q.  Okay.  Do you know whether or not he read the file?

22  A.  Oh, he did.  I don't know if he read the entire file, but

23  he read the material that we did provide.

24  Q.  Okay.  Did you choose the material that you provided, or

25  did you give him access and he decided what to read?

Leavens - Direct

752

1    A.  I don't remember that kind of distinction.

2    Q.  Okay.  Do you remember any kind of time when Mr. Stamatis

3    showed up at your office to read the file?

4    A.  He may have.  I don't know for sure.

5    Q.  Who would know?

6    A.  Well, maybe myself, maybe Mr. Life, maybe

7    Ms. Liberman -- actually, no, not Ms. Liberman because she was

8    gone by then.

9         But I can't say -- it strikes me that it could have

10   happened that he came by the office out of convenience to be

11   able to take a look.  He certainly came by to see what kind of

12   documentation that we had for purposes of getting some sense

13   of the status on the case.

14   Q.  Okay.  And let's put a time on that.

15        So he files his appearance in June of 2015.  Did he

16   look at the file before he filed his appearance or after he

17   filed his appearance?

18   A.  He looked at -- he certainly looked at file material prior

19   to his appearance.  I can't tell you that I know the extent of

20   what he looked at.

21   Q.  Okay.  And can you put any kind of time frame on when he

22   would have been looking at the file, other than it was after

23   the settlement conference and before he filed his appearance?

24        Let's start with can we agree that it was in that

25   time frame?

1   A.  Within that time frame what?

2   Q.  Starting with the settlement conference, when you decided

3   you needed to bring somebody else on board, and when we know

4   that he filed his appearance in the middle of June 2015.

5          So between those two things, can you put a time frame

6   on when Mr. Stamatis -- when you gave him access to the file?

7   A.  It probably would have been starting in 2015 because, as I

8   said, he was more in the role of just consulting with us prior

9   to that time.  We did provide pleadings to him so that he was

10  familiar with the case, but as far as his actually coming over

11  and reviewing the file, I don't know that that would have

12  happened prior to, say, January of 2015.

13  Q.  January of 2015?

14  A.  Again, you are asking me to put a date on it, and that's

15  the best that I can do.  I don't know whether that's correct

16  or not.

17  Q.  Okay.  Well, fair enough.

18          So if I understand your testimony earlier, at some

19  point, at least, it is your position that you were no longer

20  lead counsel; is that correct?

21  A.  Yes.

22  Q.  Okay.  And who was it that became lead counsel?

23  A.  Mr. Stamatis.

24  Q.  And when would that have been, as of what date?

25  A.  I can't put a precise date on it, but I know that we had

1    the conversation a couple times.

2    Q.  And you can't put any date on it?

3         I'm not asking for precision here.  I'm asking your

4    best estimate as to the date when you say you were no longer

5    lead counsel and you were handing over the reigns to

6    Mr. Stamatis.

7    A.  I would say it would be sometime in 2017.  It wasn't 2015

8    because that's when he first became involved.  He took the

9    principal role of dealing with our experts, which involved

10   2015 and into 2016, I know.  But I remember conversations with

11   him saying, "You need to be the lead on this, and I don't want

12   to have a circumstance where there is something where there is

13   a misunderstanding as far as something being done as between

14   us," and he acknowledged that, but I don't have an exact date

15   on when that occurred.

16   Q.  Okay.  But it sounds like we are moving.  It was

17   certainly -- I'm not going to say "certainly."

18        It was after he filed his appearance, and you believe

19   sometime in 2017.

20        Was that your testimony?

21   A.  Yes, just, you know, trying to give as best a time.  There

22   wasn't a precise moment, the responsibilities between the two

23   of us as counsel on the case, but at a certain -- he was

24   brought in because he was going to be doing the trial, and

25   there were things that he needed to be -- that I needed to

Leavens - Direct

755

1  make sure were being handled with respect to the experts and

2  others, with having to try this in mind.

3  Q.  Okay.

4  A.  So --

5  Q.  I'm sorry.  I didn't mean to interrupt you.

6  A.  No, I'm done.

7  Q.  Okay.  Now, you remember expert discovery because I was

8  involved with expert discovery, and we sat across from each

9  other at all the expert depositions.

10        Do you recollect that?

11  A.  I do.

12  Q.  Okay.  And all those dates will speak for themselves.

13        So when we were across from each other, and I was

14  asking questions of your expert, and you or Mr. Stamatis was

15  asking questions of our expert, who was lead counsel in your

16  mind at that point?

17        MR. SMITH:  Objection.  There is a lack of time

18  frame, again, in the question.

19        THE COURT:  He just said during expert discovery, so

20  overruled.

21        THE WITNESS:  I don't know that I could say that one

22  of us was lead counsel.  Mr. Stamatis, though, I interpreted

23  his role as being principally the attorney that was dealing

24  with our experts in terms of getting their opinions and

25  handling the depositions.

Leavens - Direct

756

1          I don't recall on all the defense of those

2     depositions.  I think we can look and see who it was that was

3     defending those.  But I saw him as playing the lead role with

4     respect to those defendants.  I wouldn't say necessarily that

5     as between the two of us, who was the lead attorney in the

6     case overall, but that did become the case, I would say, if I

7     have to put a time on it, sometime maybe in '17, 2017.

8     Q.  As we are sitting here today, are you aware of whether

9     Mr. Stamatis had an understanding that he was lead counsel in

10    this case at any time?

11    A.  He acknowledged it when we had the conversation.  We had

12    the conversation, I know, a couple times.

13    Q.  Okay.  And I hate to keep on coming back to when those

14    conversations occurred, but is that, again, sometime in 2017?

15    A.  It's as best I can put some kind of date on it, yes.

16    Q.  Okay.  And was there ever any writing where you said,

17    "Hey, you are now lead counsel," or "We are co-lead counsel,"

18    or "We are switching roles"?

19          Is there anything to that effect in your file?

20    A.  I don't think so.

21    Q.  Okay.  Did you ever restrict Mr. Stamatis's access to

22    Mr. Duke or any 21 Century people in any way?

23    A.  To any 21 Century people?  No.

24    Q.  No?

25    A.  Or Mr. Duke?  No.

Leavens - Direct

1   Q.  Okay.  Who decided to bring Mr. Shonder on board?

2   A.  Mr. Shonder works with Mr. Stamatis.

3   Q.  All I can note is they seem to have different law firms.

4        Is it your understanding that they have some kind of

5   arrangement where they work together?

6   A.  Yes.

7   Q.  Okay.  So, again, my question is:  Who decided to bring

8   Mr. Shonder on board?

9   A.  I think that it was probably a mutual decision.  I don't

10  remember that there was much discussion about it.  It was

11  somebody that works with Mr. Stamatis on his matters.

12       I met Mr. Shonder at the time that I met face-to-face

13  with Mr. Stamatis about his trademark action.  They were

14  handling that together, and that's how I met the two of them.

15  Q.  Okay.  When you say it was a mutual decision, is it my

16  understanding that it was a mutual decision between you and

17  Mr. Stamatis to bring Mr. Shonder on board as additional

18  counsel?

19  A.  I don't remember that there was any particular decision,

20  other than Mr. Shonder is there, this is what Mr. Shonder

21  does, and he works with Mr. Stamatis.  So that's -- it's like

22  although they are not a firm or a partnership, as I understand

23  it, they operate very much that way, and that's how I

24  perceived it.  I'm getting Mr. Stamatis, and I'm getting

25  Mr. Shonder along with it.

Leavens - Direct

758

1  Q.  Okay.  So did you have any involvement on making the

2  decision to bring him on board?

3  A.  I guess, yes.

4  Q.  You were told, and you said, "It is okay with me,"

5  something like that?

6  A.  Yes, that's fine.  Yes, he is somebody who works with

7  Mr. Stamatis and has very good skills in terms of briefing and

8  trial work.

9  Q.  Okay.  We are going to switch topics here.  So take a

10  breath, take a drink.

11      All right.  As you know, this case was filed in

12  September 2012, and fact discovery closed on July 1st, 2015.

13      You would agree with that, right?

14  A.  Yes.

15  Q.  Okay.  And during that whole time frame, from September

16  2012, your first meeting with Brent Duke, until the time when

17  discovery closed, did you ever personally inquire of Brent

18  Duke of the identity of all of his e-mail accounts?

19  A.  I think we discussed that initially, yes.

20  Q.  Okay.  When you say "we," I want to be real careful.

21      Did you -- I'm just asking you, not anybody else in

22  your firm -- did you have discussions with Mr. Duke regarding

23  the identity of all his e-mail accounts?

24  A.  Yes, that was something that occurred in the beginning.

25  Q.  Okay.  And when would that have been?

Leavens - Direct

759

 1    A.  It would have been in the fall of 2012.

 2    Q.  Did you take any notes or memoranda that memorializes the

 3    information that Mr. Duke gave you at those meetings regarding

 4    his e-mail accounts?

 5    A.  I don't think that I have any notes.

 6    Q.  Well, you know, as a lawyer, what my next question is

 7    going to be, right?

 8         You don't think you have any notes.  Have you gone

 9    back and looked to see if you had any notes regarding e-mail

10    accounts?

11    A.  I haven't seen any notes.

12    Q.  Okay.  And if you did have notes, presumably, they would

13    be in your file, correct?

14    A.  Yes.

15    Q.  And have you retained a copy of your file after

16    withdrawing in this case?

17    A.  You mean -- do you mean files, plural?

18    Q.  I didn't think I needed to define this, but, I mean,

19    lawyers have case files where they keep everything related to

20    the case.  You have an understanding about that, right?

21    A.  Yes.  So my question was I heard you to say a singular

22    file.

23    Q.  No, your whole file, your Brent Duke, DR v. 21 Century,

24    your whole file.

25         Did you keep a copy of your file after withdrawing in

1   the beginning of June 2019?

2   A.  Yes.

3   Q.  Okay.  So if you had any notes, they would be in that

4   file, right?

5   A.  Yes.

6   Q.  Okay.  And, again, these questions, when I say "you," I am

7   only meaning you.  So I'm giving you a heads up here, okay?

8           Did you obtain the login information associated with

9   those e-mail accounts at any time between 2012, when the case

10  was filed, and the close of discovery on July 1st, 2015?

11  A.  I don't think I ever did, no.

12  Q.  Okay.  Do you know if anyone else at your firm obtained

13  the login information from Mr. Duke regarding his e-mail

14  accounts during that time frame?

15  A.  I don't know.

16  Q.  Okay.  Do you recall Mr. Duke's testimony from last week

17  where he said that he offered his login information to his

18  attorneys on many occasions?

19          Do you recall that testimony?

20  A.  I do.

21  Q.  Okay.  Is that truthful testimony?

22  A.  I don't understand it that way.

23  Q.  I'm not even sure I understand the answer.

24          Is it truthful testimony to the best of your

25  knowledge?

1   A.  I only recall seeing an offer sometime in May of last

2  year, perhaps.  I don't recall ever seeing anything before

3  that time.

4   Q.  Okay.  And that would be outside the time frame.

5  Remember, I'm bringing you back just to that time frame.

6         So within that time frame, you are saying that he did

7  not offer his login information to the best of your knowledge?

8   A.  To the best of my knowledge, he did not.

9         THE COURT:  And the time frame is 2012 through

10  July 1st of 2015, correct?

11         MR. von OHLEN:  Correct.

12         THE COURT:  That's what I thought.  Okay.  I just

13  wanted to confirm.  Thank you.

14         MR. von OHLEN:  Okay.

15  BY MR. von OHLEN:

16   Q.  So your understanding is that if Mr. Duke testified to

17  that, that's not correct?

18         MR. SMITH:  Objection.  Objection, misstates

19  Mr. Duke's testimony.

20         THE COURT:  Well, it's overruled.

21         The question is:  "So your understanding is that if

22  Mr. Duke testified to that, that's not correct?"

23         So you can go ahead and answer that.

24         Objection overruled.

25         THE WITNESS:  If his testimony is that he offered me

Leavens - Direct

1    his login information during that period of time?

2         MR. von OHLEN:  Well, actually, the initial question

3    was whether or not he offered -- let's start again because I

4    really do want to get this right.  I don't want to waste the

5    court's time, but I want to get it right.

6    BY MR. von OHLEN:

7    Q.  Do you recall Mr. Duke's testimony that he said here in

8    open court that he offered his lawyers login information on

9    many occasions?

10        Do you recall that testimony?

11   A.  Yes.

12   Q.  Okay.  So now my question is:  Within the time frame of

13   September 2012, when you first met him, and when discovery

14   closed in this matter on July 1st, 2015, do you have any

15   knowledge that Mr. Duke actually tendered that login

16   information on his e-mail accounts to any lawyer at your firm?

17   A.  I don't have any of that knowledge, no.

18   Q.  Okay.  And I think you did state that Mr. Duke did offer

19   his login information to Travis Life, and I believe it's in an

20   e-mail dated May 7th, 2018.

21        Do you remember that testimony?

22   A.  Yes.

23   Q.  Okay.  And do you know whether or not that was the first

24   time that Mr. Duke offered his login information for his

25   e-mail accounts?

Leavens - Direct

763

1   A.  I don't know if the -- if he ever did.

2   Q.  If you don't know, who else would know at your firm or

3   anybody on the defense team?

4   A.  Well, I mean, it would be anybody else on the defense

5   team, if he did.  I'm only speculating.

6   Q.  Okay.  All right.  So you can only speak to yourself and

7   the knowledge that you have attained as a result of being the

8   guy with gray hair on the file?

9   A.  I guess, yes.

10  Q.  Okay.  Did Mr. Duke ever advise you that he had -- well,

11  let's go back foundationally.

12        What e-mail accounts did Mr. Duke advise you that he

13  had during that time frame?

14        I don't want to repeat it 10,000 times.  You know the

15  time frame I'm talking about, right, from filing to fact

16  discovery closure?

17  A.  Correct, right.

18  Q.  What e-mail accounts did he tell you he had?

19  A.  He had the Yahoo! account, and he had the bduke@21century,

20  and the support@21century.

21  Q.  Okay.  Just for ease of us going back and forth, can we

22  agree that we are going to call one the Yahoo! account and the

23  other the GoDaddy accounts?

24        Is that okay with you?

25  A.  Yes.

Leavens - Direct

764

1 Q. Okay. Did Mr. Duke ever advise you that he had a Gmail

2 account?

3 A. No.

4         MR. von OHLEN: If you can put up LS Exhibits 14 and

5 15 for Mr. Leavens.

6         There we go.

7         We will start with 14.

8 BY MR. von OHLEN:

9 Q. Okay. I will represent to you that these were produced by

10 your lawyers to us in this case. So I'm just trying to lay a

11 foundation here. Your lawyers produced these documents.

12         Can you tell me what this document is?

13 A. They appear to be notes that were taken by Ms. Liberman

14 based on a conversation that she had with Mr. Duke.

15 Q. And how do you know that?

16 A. Well, it says, "Conference with Brent Duke," and I believe

17 that Ms. Liberman has identified that as her handwriting.

18 Q. Okay. And you worked with Ms. Liberman, presumably, for a

19 period of years, correct?

20 A. Yes.

21 Q. And you had occasion to see her handwriting, correct?

22 A. I did.

23 Q. Okay. And you believe these to be her notes from that

24 meeting?

25 A. I wouldn't have been able to tell you on that basis, no.

Leavens - Direct

765

1   Q.  So you are a trial lawyer.  Can you lay a foundation for

2   these documents?  They are produced by your lawyers in this

3   case.  They came out of your file, correct?

4   A.  Correct.

5   Q.  Okay.  And you believe these to be Ms. Liberman's notes;

6   is that correct?

7   A.  I do.

8   Q.  Okay.  And what about the next page, which is LS-15, can

9   you tell the court what that is?

10  A.  Well, it's a list of questions with some comment, and it's

11  on a notepad that says:  "From the Desk of Heather Liberman."

12  It appears to be the same handwriting.

13  Q.  Okay.  And those came out of your firm's file in this

14  case, correct?

15  A.  Yes.

16  Q.  Okay.  Let's go back to 14.

17       Now, you would agree with me that at the top of this

18  document, it is dated May 29, 2014, and it's titled:

19  "Conference with Brent Duke"; is that correct?

20  A.  Yes.

21  Q.  Okay.  Were you present at that conference?

22  A.  No.

23  Q.  Okay.  Do you know who else was present at that

24  conference?

25  A.  I have no idea who, other than Mr. Duke and Ms. Liberman.

Leavens - Direct

766

```
1   Q.  Okay.  Do you know where that conference took place?
2   A.  No.
3   Q.  Do you know who arranged the meeting or what the purpose
4   of the meeting was?
5   A.  No.
6   Q.  Who would have the answers to those questions?
7   A.  Mr. Duke and Ms. Liberman --
8   Q.  Okay.
9   A.  -- I would assume.
10  Q.  Do you know if there are any other notes that evolved from
11  this particular conference with Brent Duke other than LS-14
12  and LS-15?
13  A.  Not that I know of.
14  Q.  Okay.  Did Ms. -- well, let's lay some foundation.
15          Didn't Ms. Liberman work for you?
16  A.  She worked for our firm, yes.
17  Q.  She was an associate at your firm, right?
18  A.  Yes.
19  Q.  And you were the first named partner on the door, correct?
20  A.  Correct.
21  Q.  Okay.  How long did she work for you before she left?
22  A.  She started as a clerk and then became an associate.  She
23  was with us maybe four years.
24  Q.  And she would have left at the end of 2014?
25  A.  Correct.
```

 1   Q.  Okay.  So was she a four-year attorney or did you hire her

 2   as a lateral?

 3          THE COURT:  Or did she go from a law clerk into an

 4   associate role?

 5          THE WITNESS:  She started as a law clerk and then we

 6   elevated her.

 7   BY MR. von OHLEN:

 8   Q.  Okay.  So she transitioned right from law clerk?

 9   A.  Yes.

10   Q.  So she was -- essentially, by the time she left, she was a

11   four-year lawyer, correct?

12   A.  By the time she left what?

13   Q.  By the time she left your firm, she had been a lawyer for

14   four years?

15   A.  Three, maybe.

16   Q.  Okay.  Three or four?

17   A.  She was still in law school when she started with us, I

18   believe.

19   Q.  Okay.  Did Ms. Liberman communicate with you in any manner

20   with regard to what transpired at this conference with Brent

21   Duke on May 29th, 2014?

22   A.  I'm sorry.  Do that again.

23   Q.  Sure.

24          Did Ms. Liberman communicate with you in any manner

25   about what transpired at this conference with Brent Duke on

Leavens - Direct

1   May 29th, 2014?

2   A.  You mean did she report after?  Is that what you are

3   asking?

4   Q.  Yes, I mean, come back and tell you what happened.

5   A.  I don't have a specific recollection of it.  It would be

6   her practice to do that, but I don't have a specific

7   recollection.

8   Q.  Okay.  To report back what happened.  You are the senior

9   guy, presumably, on the case, and she's the junior associate,

10  correct?

11  A.  Yes.

12  Q.  Okay.  But you don't have any recollection of what she

13  said?

14  A.  I don't have a specific recollection of a discussion about

15  this afterwards.  As I said, it would be her practice, but I

16  don't remember the specifics of it.

17  Q.  Well, let's take a wide view.  If you don't have any

18  recollection of the specifics, do you have any recollection at

19  all with regard to what she said?

20  A.  About the conference that she had with Mr. Duke?

21  Q.  Exactly.

22  A.  No, I don't.

23  Q.  Okay.  So as we are sitting here today, are you even sure

24  that she came back and talked to you, other than it's her

25  regular practice?

Leavens - Direct

769

1   A.  I assume that's what she did, yes, because that is how she

2   operated.  She was very good at communication.

3   Q.  Okay.  Do you recall what direction, if any, that you gave

4   her as a result of her communicating about what occurred at

5   the conference with Brent Duke?

6   A.  No.

7   Q.  Would it be your practice to give somebody some direction

8   after they come back from a conference with a client like

9   this?

10  A.  If there was some action necessary, I would have indicated

11  that, yes.

12  Q.  Okay.  And I'm doing this to try to refresh your

13  recollection.

14          Let's assume that Ms. Liberman did come to you,

15  consistent with her practice, and let's assume that she spoke

16  to you about what's exactly in her notes.

17          Does that refresh your recollection about what you

18  might have -- what kind of guidance you might have given her?

19          MR. LEONARD:  Objection to the hypothetical and

20  objection to improper refreshing of recollection.

21          THE COURT:  Well, it is a hypothetical.  I will allow

22  it.

23          If you can answer that.

24          There is two parts to that hypo.  You don't recall

25  her coming back, you don't recall a conversation, but you said

Leavens - Direct

1  that's her practice, and if that was her practice, what would

2  you have done?

3          THE WITNESS:  Hypothetically, what would I have

4  advised her to do?  That's what you are asking?

5          MR. von OHLEN:  Yes.

6  BY MR. von OHLEN:

7  Q.  I'm saying this is the best piece of evidence we have at

8  the moment.

9          THE COURT:  Let's do this:  What's your practice?

10          Heather Liberman comes up to you after she meets with

11  clients, right?  That's her practice; is that true?

12          THE WITNESS:  Yes.

13          THE COURT:  And then you have a conference with her,

14  right?

15          THE WITNESS:  Yes.

16          THE COURT:  And what's your practice after you have a

17  conference with an associate who talks with one of your

18  clients?

19          THE WITNESS:  It would depend upon what the

20  circumstances were, what the conference was about, and if

21  there was any action that was going to be necessary for

22  follow-up.  So it's really impossible for me to say in a

23  hypothetical that this is like the routine way in which

24  something might be handled.

25

 1   BY MR. von OHLEN:

 2   Q.  And I'm trying to take it out of the hypothetical by

 3   saying you have here her notes.  The assumption is that she

 4   came to you and talked about these topics.  I'm not saying she

 5   did.  But I'm saying if she talked to you about these very

 6   topics, and I don't want to have to go through them line by

 7   line, but you have them right in front of you --

 8          MR. LEONARD:  Objection.

 9          THE COURT:  Let him finish the question.

10          We are going to take a break.

11          If you can't figure that one out after 15 times, I

12   don't know what.

13    (Recess taken.)

14          THE COURT:  There is two people sitting in the jury

15   box.  They are both my clerks.  They are not jurors.  We don't

16   have a jury here.  There is not going to be a juror unschooled

17   in law that is going to hear horrifically prejudicial

18   testimony that will be unable to be removed from their head

19   absent a lobotomy.

20          So, again, I'm pretty sure I have said this every

21   day, and this is also for the benefit of my court reporter,

22   who has trouble taking down two people talking at once, let

23   alone three people talking at once.

24          Let the question come through.  Stand up, make an

25   objection.  The witness will hold off.  All the witnesses are

1   here.  The witness will hold off when there is an objection.

2   I will make a ruling.  And then we will get an answer.

3          I don't think I have jammed somebody up by saying,

4   "Well, the witness has answered.  Too late, I'm not going to

5   listen to your objection."  I have heard the objections.

6          So, once again, let the question come through.  Stand

7   up, make an objection.  The witness will hold off.  I will

8   rule on the objection.  And we will have a nice, clean

9   transcript, okay?

10          Is there any confusion as to that?

11          I didn't think so.  Okay.

12          Do you need your question read back, or do you want

13  to start with another one, Mr. von Ohlen?

14          MR. von OHLEN:  I can't remember the last question.

15          THE COURT:  Okay.  Why don't you read it back,

16  Heather.

17          THE REPORTER:  Sure.

18   (Record read.)

19          THE COURT:  All right.  So, again, Mr. Leavens, we

20  are trying to figure out what these notes are.

21          Theoretically, we can get Ms. Liberman in here, and

22  then call you back to testify about these notes.  If you

23  don't -- you know, if you can't answer a question, you can't

24  answer a question.

25          We are trying to figure out what happened after this

Leavens - Direct

773

1    meeting.  If you can recall, you can testify to it.  Go ahead.

2    If you can't, you can't, and then we will see what

3    Ms. Liberman says.

4         But you have testified that her general practice was

5    to talk to you after meeting with a client.  I tried to follow

6    up with what's your practice after your associate talks to one

7    of your clients.  You said it would depend on the

8    circumstances.  Mr. von Ohlen says, "Well, you have the

9    circumstances sitting right in front of you.  What would be

10   your practice?"

11        So having had the opportunity to review a document

12   that's in front of you, that's been produced in this case,

13   that's a document from your own firm, subject matter relating

14   to this case, do you know what, if anything, you said to

15   Ms. Liberman after she met with you, if she did meet with you;

16   and if so, what was it?

17        THE WITNESS:  I don't have any recollection of a

18   conversation with her, giving her instructions to do anything

19   based upon what's set out here.

20        MR. von OHLEN:  Okay.  Thank you.

21   BY MR. von OHLEN:

22   Q.  Did you ever inquire of Mr. Duke the identity of his

23   employees, either current or former, spanning the arc of the

24   allegations in this case, meaning from 2009 to the close of

25   discovery in 2015?

1    Did you ever inquire of Mr. Duke of the identity of

2    those people and obtain their login information for their

3    e-mail accounts?

4    A.  No.

5    Q.  Okay.  Do you know if anyone at your firm or on the

6    defense team did that?

7    A.  No, I don't know.

8    Q.  Okay.  Now, I'm going to give you some names, and these

9    names are from your disclosures -- your Rule 26 disclosures in

10   this case.  So that's where I sourced these names.

11   Are you with me on that?

12   A.  Yes.

13   Q.  Okay.  So it is Robert Hough, H-o-u-g-h; Bryan Kos, K-o-s;

14   Steve Spraker; Rob Link; Brandon Duke; and Laurie Duke.

15   Okay.  You made several disclosures in this case, and

16   one or many of them, all of those names, I'm making that

17   representation to you.

18   Okay?  Are you with me?

19   A.  Yes.

20   Q.  Okay.  Did you ever attempt to contact these potential

21   custodians to inquire whether there were any potential sources

22   of ESI such as personal e-mail accounts, cell phone texting

23   accounts, or any other kind of accounts that they used for

24   business purposes while associated with 21 Century Smoking?

25   A.  I don't recall that we were told that everything was on X

1  number of computers.  Three or four computers initially became

2  four.

3  Q.  I hear your answer, but that wasn't my question.

4       My question -- it was a long question, so I'm just

5  going to do the front part of the question again.

6       Did you ever attempt to contact those potential

7  custodians to inquire of them regarding potential sources of

8  ESI?

9  A.  We contacted some of those people who were going to be

10 deponents about documents that they might have.

11      But your question with respect to when you say "ESI,"

12 what are you referring to?

13 Q.  Let me help you out, and I apologize for that.

14      You are not familiar with the term "ESI"?

15 A.  Well, I am, but are you referring to -- what, to e-mail?

16 Are you talking about documents stored?

17 Q.  Go ahead, sir, finish your --

18 A.  I was trying to get some clarification about what kind of

19 ESI that you were talking about.

20 Q.  Fair enough.  I had it in my initial question.  So let me

21 bring it all back to you.

22      Do you want me to put it all together again so you

23 have it?

24      THE COURT:  I think you are going to have to break

25 this out.

Leavens - Direct

776

```
 1        Did you talk about -- did you contact Bob Hough about
 2  these potential documents?
 3        MR. von OHLEN:  Let's start with ESI.
 4  BY MR. von OHLEN:
 5  Q.  Do you understand that "ESI" means electronically stored
 6  information?
 7        You understand that, right?
 8  A.  I do, and there are various kinds of ESI.
 9  Q.  Correct.
10        There is e-mail, there is cell phone that has got
11  texts on it, there is social media that people write stuff
12  back and forth with each other, there is chat, right?
13        All those things are ESI?  You have that
14  understanding, right?
15  A.  Yes.
16  Q.  Okay.  And you have an understanding of all the people who
17  you disclosed in your Rule 26 disclosures and supplemental
18  disclosures.  I'm not going to go over their names again.
19  A.  Yes.
20  Q.  We just talked about them, right?
21  A.  Right.
22  Q.  Okay.  So keeping in mind those names and electronically
23  stored information, which we just discussed, those topics,
24  e-mails, phone texting, social media accounts, did you ever
25  attempt to contact those potential custodians, the people that
```

1   you put on your Rule 26 disclosures, in order to determine

2   whether or not that they had any kind of ESI, any kind of

3   device, any kind of service that they may have used for

4   business purposes with 21 Century Smoking?

5   A.  I think Mr. Hough.  I can't say as to the others.

6   Q.  Okay.  And when you say you think Mr. Hough, did you do

7   it, or did somebody else do it?

8   A.  I remember meeting with Mr. Hough.  So I'm sure that came

9   up in conversation with my meeting with him.

10  Q.  Are you assuming or do you know?

11  A.  I'm assuming based upon the fact that this was -- he was a

12  deponent, and I wanted to understand what it is that he had in

13  terms of data, documentation.

14  Q.  Okay.  So I don't want to put words in your mouth, but

15  your testimony is you did inquire of Mr. Hough regarding

16  potential sources of ESI that might relate to this case; is

17  that your testimony?

18  A.  My testimony is I believe I did, yes, in connection with

19  his being a deponent in this case.

20  Q.  Okay.  And when would that have been?

21  A.  Prior to his deposition.  I don't remember a specific

22  date.

23  Q.  What did he tell you?

24  A.  I don't recall.

25  Q.  Did you take any notes?

1  A.  I don't believe so.

2  Q.  Other than Mr. Hough, all the other names that I

3  mentioned, did you contact any of them regarding potential

4  sources of ESI?

5  A.  No.

6       THE COURT:  When you talked to Hough, did he tell you

7  that he did not use his 21 Century Smoking e-mail account?

8       THE WITNESS:  I don't remember.  As I said, I have a

9  general understanding that would have been something that I

10  would have talked to him about, but I don't remember the

11  specifics.

12  BY MR. von OHLEN:

13  Q.  Well, that was the next question in my outline that the

14  Judge just asked.

15       So we heard Mr. Duke testify that Mr. Hough used his

16  @live.com account for business e-mails with Mr. Duke.

17       Do you remember that testimony?

18  A.  I believe so, yes.

19  Q.  Okay.  So did you ever inquire of either

20  Mr. Hough -- let's start with Mr. Hough.

21       Did you ever inquire of Mr. Hough regarding how he

22  communicated with Brent Duke for business purposes?

23  A.  I don't remember that -- I don't remember the specifics of

24  my conversation with him.

25  Q.  Okay.  So let's switch it around.

Leavens - Direct

779

1        Did you ever speak with Brent Duke about how he
2   communicated with Mr. Hough regarding business purposes, other
3   than orally?
4   A.  I don't remember that specific topic.
5   Q.  Do you know whether you have any notes about any of those
6   topics?
7   A.  Which topics?  I'm sorry.
8   Q.  The topics about Mr. Hough and how you may have reached
9   out to him, but you are not sure.
10  A.  Well, I know I met with him.
11  Q.  Okay.  About the @live.com, do you have any notes
12  regarding that?
13  A.  @live?
14  Q.  Yes, that's what we just talked about a minute ago,
15  that -- do you recall that, the testimony from Brent Duke
16  where he said, "Robert Hough communicated with me through
17  @live.com because he didn't want to use" --
18  A.  I'm not familiar with that, no.
19  Q.  Okay.  You weren't here when Mr. Duke testified --
20  A.  No, I'm not familiar with @live.
21  Q.  Oh, okay.  All right.  Thank you.
22        All right.  Let's just put up two other exhibits that
23  were provided by your counsel, LS Exhibit 4 and LS Exhibit 6,
24  which I will represent to you are the Rule 26 disclosures your
25  firm compiled and served on Plaintiff's counsel in this case.

Leavens - Direct

780

1        Can you take a quick look at them and with the idea

2   that my question is going to be whether you recognize them and

3   whether they are true and correct so that I can move them into

4   evidence?

5        And my question simply is:  These are your firm's

6   Rule 26 disclosures in this case; is that correct?

7   A.  I think that's correct, yes.

8        MR. von OHLEN:  Okay.  I would move them into

9   evidence.

10       THE COURT:  Any objection to LS No. 4 and LS No. 6?

11       MR. LEONARD:  None.

12       THE COURT:  Okay.  Those will be admitted.

13       Thank you.

14    (Leavens Strand Exhibits 4 and 6 were offered and received

15     in evidence.)

16  BY MR. von OHLEN:

17  Q.  Two of the other names, and specifically they are on LS-6,

18  I believe, are Chris Ligutan -- I will spell that for the

19  court reporter, L-i-g-u-t-a-n -- and Kai Sibley, K-a-i,

20  S-i-b-l-e-y.  And those names are in your supplemental

21  disclosures.  I believe that is LS Exhibit No. 6.

22       Did you ever contact either one of those people to

23  determine whether they had potential sources of ESI that might

24  relate to this case?

25  A.  No, I did not.

Leavens - Direct

781

```
 1   Q.   Okay.  Did you ever talk to Kai Sibley at all?

 2   A.   No.

 3   Q.   Do you know who she is?

 4   A.   I understand who she is.  I have been told who she is.

 5   Q.   What's your understanding?

 6   A.   That she is the wife of Bill Edmiston.

 7   Q.   Okay.  And one that was at the Las Vegas gaming

 8   convention, correct?

 9   A.   Yes, correct.

10   Q.   Okay.  Do you know whether anybody at your firm ever

11   contacted her?

12   A.   I don't know.

13   Q.   Whose responsibility was it to put together these Rule 26

14   disclosures?

15   A.   Which one?

16   Q.   Either one, Exhibit No. 4 or 6.

17   A.   Well, one of them is signed by me and one of them is

18   signed by Mr. Life, so I assume that that reflects who did it.

19   Q.   Okay.  And I don't want to assume because a lot of times

20   associates prepare things and partners sign them.  So let's

21   just take them one at a time.

22        LS-4, were you responsible for compiling that?

23   A.   Is that the one I signed?

24   Q.   Let's get to the last page.

25        Yep.
```

Leavens - Direct

782

```
 1   A.  Yes, because they are not identified by number as I'm

 2   looking at them here.

 3             So, yes, that's -- oh, yes, at the bottom, yes.

 4             Yes, I prepared that.

 5   Q.  Okay.  So you are responsible for putting together LS-4,

 6   correct?

 7   A.  Yes.

 8   Q.  And then LS-6, because it is signed by Mr. Life, that's

 9   his responsibility, correct?

10   A.  I assume, yes, uh-huh.

11   Q.  Do you know whether you looked at LS-6 before it was

12   transmitted to Plaintiff's counsel?

13   A.  I don't know.

14   Q.  Okay.  So we are going back to that time frame, which is,

15   again, the filing of the complaint in September 2012 to the

16   end of fact discovery, July 1st, 2015.

17             During that period of time, did you inquire of Brent

18   Duke the identity of his cell phone or texting accounts and

19   related login information?

20   A.  No.

21   Q.  Do you know if anybody at your firm did?

22   A.  I do not know.

23   Q.  Did you or anyone at your firm inquire of Mr. Duke

24   regarding the cell phone or texting accounts for his employees

25   Laurie Duke, Robert Hough, Bryan Kos or -- let's just leave it
```

Leavens - Direct

783

1   at those -- in order to obtain their service provider or login

2   information?

3   A.  I don't believe we did.

4   Q.  During that same period of time, did you or anyone at your

5   firm inquire of Brent Duke regarding the identity of any

6   online messenger accounts such as Yahoo! Chat, Gtalk, Skype,

7   or any other messaging account and obtain login information

8   for those accounts?

9   A.  No.  The answer is all based -- you know, you are asking

10  about login information.  We did not get login information.

11  Q.  Okay.  So let's separate it out, then.

12          Did you, during that same period of time, inquire of

13  Mr. Duke regarding just the identity of any online messenger

14  account such as chat, Gtalk, et cetera?

15  A.  We talked about the fact that he had used chat, I believe,

16  in the past, and his methods of preserving it.  I do recall

17  that.

18  Q.  Okay.  And when you say "chat," I want to make sure we are

19  talking about the same thing.  That's the Yahoo! Messenger

20  chat or just chat in general?

21  A.  Chat as a category.

22  Q.  Chat as a category.  Okay.

23          Was it you who spoke to Mr. Duke about that?

24  A.  Yes.

25  Q.  Okay.  And when was that?

Leavens - Direct

1   A.  That was very early 2012, talking to him generally about

2   his electronic records, electronically stored information.

3   Q.  Now, when you say "very early in 2012," the case wasn't

4   filed until September 2012.

5       Was it after that?

6   A.  Right.  I didn't mean to give the wrong impression.  Yes,

7   it was certainly after the case had been filed.

8   Q.  Okay.  And you have a specific recollection of telling

9   Mr. Duke to retain and preserve and maintain any chat

10  information or ESI that he might have?

11  A.  The discussion was more along the lines of making sure I

12  understood how he preserved it, and he said anything that was

13  material, that he would copy it, and I don't recall how he

14  would retain it, whether it was a document or whether he would

15  send it to himself by e-mail, or maybe he did both methods,

16  but anything that was material and any chat, he had preserved

17  it in that way.

18  Q.  Okay.  So let's break that down a little.

19      So we are talking about chat as a category, not any

20  specific chats when you are giving these instructions; is that

21  correct?

22  A.  Correct.

23  Q.  Okay.  And you said anything that was material, he would

24  copy it, correct?

25  A.  That was his -- he was telling me what his practice had

Leavens - Direct

1   been.

2   Q.  Okay.  So you didn't tell him to do that.  He just

3   said -- you were having a conversation, and he said, "Hey,

4   anything that's material, I'm going to copy it"?

5   A.  Well, I think --

6   Q.  This is important.  That's why I want to get --

7           MR. SMITH:  Your Honor --

8           THE COURT:  Go ahead and let him finish.

9           Go ahead and finish.  You are answering a question.

10  Go ahead and answer that question, unless there is an

11  objection.

12          MR. SMITH:  That was about letting the witness

13  finish, your Honor.

14          THE COURT:  Okay.  Go ahead and finish your answer.

15          THE WITNESS:  This was part of the discussion about

16  his preservation, which is "How do you preserve chat?"

17          "Well, the way I preserve chat is this way."

18          So that's the nature of the conversation.

19  BY MR. von OHLEN:

20  Q.  Okay.  And he said anything that is material.  He used

21  that word, "material"?

22  A.  It was -- I believe it was "material," but it was

23  certainly anything that related to his business that had any

24  kind of importance.

25  Q.  Okay.  And did you give him any instructions on who gets

Leavens - Direct

1   to decide what is material?

2   A.  I don't recall.  I don't remember whether I gave him any

3   instructions along those lines.

4   Q.  Did you ever memorialize anything regarding that

5   conversation in writing with Mr. Duke?

6   A.  I don't recall that I did.

7   Q.  Did you ever take any notes from that conversation about

8   what we just talked about, that anything that was material, he

9   would copy it?

10  A.  I don't think so.

11  Q.  Okay.  So we are relying on your recollection here today;

12  that's correct?

13  A.  You should, yes.

14  Q.  Okay.  All right.  Now, again, during that same period of

15  time, did you inquire of Brent Duke regarding the identity of

16  any social media accounts such as Facebook, Instagram,

17  LinkedIn, or Twitter?

18  A.  Did we discuss those?

19  Q.  Yes.

20  A.  I believe we did.  I don't recall anything about Twitter.

21  What I understood about Facebook is that he had files relating

22  to things that had been posted there.  I don't recall that we

23  had a specific conversation about his accounts per se.

24  Q.  So is it your testimony that you did discuss the identity

25  of the social media accounts as they might relate to his

Leavens - Direct

1    obligations to preserve data in this case?

2            Is that your testimony?

3    A.  It's less clear in my mind how it is that he saved

4    anything that might be posted on a social media account.  It

5    wasn't -- I don't know that we had this discussion about

6    getting into the -- like logging in to get the data out of it.

7    I was of the impression more that if there are things that

8    were posted, there was ways in which there were copies of that

9    material.

10   Q.  At that time, did you -- or at any time, did you obtain

11   his login information for any social media accounts?

12   A.  I don't think so.

13   Q.  When you gave him -- strike that.

14           When you had this interaction with him about social

15   media accounts, was that at the same time that you had the

16   conversation about the chat accounts?

17   A.  Yeah, it was all pretty much -- well, we had more than one

18   conversation, first of all, about this, but I can't say what

19   was discussed at any particular one, but I know we had more

20   than one conversation.

21   Q.  And just so that I don't have to ask it over and over

22   again, do you have any notes regarding any of these

23   conversations about his social media accounts and what you

24   discussed with him about those accounts?

25   A.  No.

Leavens - Direct

788

1  Q.  Any e-mail accounts, any notes regarding what you

2  discussed with them about those?

3  A.  I don't think that there is any e-mail that talks about

4  social media accounts.

5  Q.  I'm sorry.  I may have mis-phrased that.

6        So do you have any notes regarding your discussions

7  with Mr. Duke that memorialize these discussions about either

8  his e-mail accounts, his cell phone accounts, his texting

9  accounts, his social media accounts?

10       Do you have any notes?

11       You had these conversations.  Did you take any notes

12  and are they in your file?

13  A.  No, I don't believe so.

14  Q.  Okay.  During that same period of time, did you inquire of

15  Mr. Duke regarding any document storage accounts, such as

16  Dropbox, and advise him of his obligations to preserve ESI?

17  A.  I don't recall any discussion about Dropbox specifically,

18  no.  It was a general -- starting from the general "Don't

19  delete anything, preserve all your data," but I don't remember

20  specifically conversation about Dropbox.

21  Q.  Okay.  And during this same period of time, did you

22  inquire of Mr. Duke regarding his Amazon account, his eBay

23  account, his PayPal account, his BluePay account, and tell him

24  his obligations with regard to preserving ESI with regard to

25  those accounts?

Leavens - Direct

1   A.  Well, what I understood about Amazon -- well, yes, I guess

2   the answer is, yes, I did, because these were payment

3   processes that he had.  So he needed to preserve the

4   documentation, what would show whatever advertising he may

5   have been doing.  He needed to show anything having to do with

6   sales.  He needed to preserve anything having to do with

7   payments that he received, yes.

8         I don't recall necessarily a discussion about

9   preserving Amazon specifically or PayPal or whatever, but we

10  did discuss those as ways in which he received revenue during

11  various times.

12  Q.  And that they might be relevant to his case, correct?

13  A.  Yes.

14  Q.  And did you memorialize anything with regard to those

15  payment accounts?

16  A.  No.

17  Q.  Neither in your file nor confirming with Mr. Duke?

18  A.  Nothing that I remember.

19  Q.  Okay.  So I want to make sure I have captured the universe

20  here.  We have what we believe to be Heather Liberman's notes,

21  which are marked as LS-14 and LS-15.

22        Are you aware of any other notes, any other memoranda

23  in your file, anything that would memorialize what was

24  communicated between you or anybody at your firm with Mr. Duke

25  regarding his obligations to preserve documents or ESI in this

Leavens - Direct

1   case?

2   A.  I mean, there may be something.  I don't know.

3   Q.  You haven't looked for it?

4   A.  Well, that would be privileged, wouldn't it?

5            THE COURT:  Why do you think we are here?

6            Have you looked for documents, notes, your own notes,

7   on whether you told Mr. Duke to preserve ESI?

8            THE WITNESS:  I don't have any documents like that.

9            THE COURT:  Okay.  But the question is did you look

10  for them?

11           THE WITNESS:  Yes.

12           THE COURT:  There is the answer.

13  BY MR. von OHLEN:

14  Q.  And you didn't find any, right?

15  A.  That's right.

16  Q.  So what we have here is LS-14 and LS-15.  That's the

17  universe, correct, as far as you know?

18  A.  As far as I know, that's right.

19  Q.  Okay.  So now we have nibbled at all of these topics, but

20  here's the big question:  So did you ever advise Mr. Duke

21  regarding his legal responsibilities to preserve ESI, and how

22  many times did you do it, and to the best of your

23  recollection, when?

24  A.  I gave him those instructions.  I don't know if I used the

25  word "ESI," but electronic records, and I mentioned that the

1   very first time we met, that he had that obligation.

2          And I don't know how many more times I would have

3   said anything about that.  Like I know that there were more,

4   but it would have been early in the case when we are talking

5   about what the universe of his electronic information is and

6   what his paper -- his documentation is.

7   Q.  And prior to this case, were you familiar with e-mail

8   providers such as Gmail or Yahoo! or AOL or anything like

9   that?

10  A.  Yes.

11  Q.  Okay.  Did you have an account with any of those folks?

12  A.  I had a Gmail account and an AOL account.

13  Q.  Okay.  And is that going back even before this case

14  started in 2012?

15  A.  I believe so, yes.

16  Q.  Okay.  And presumably, like the rest of us, you have a

17  username, and you have a password in conjunction with those

18  accounts, correct?

19  A.  Correct.

20  Q.  Okay.  Going back again to the word "material" that you

21  used in response to one of my questions, when Mr. Duke said

22  that he would keep anything that was material, is that the

23  same conversation where he said, "I keep everything, and I

24  won't delete anything"?

25          Is that the same conversation, or are those different

Leavens - Direct

1  conversations?

2  A.  Well, he mentioned that he didn't delete anything multiple

3  times.  We did not have multiple -- the same number of

4  conversations about how he preserved chat.

5  Q.  Okay.  And with regard to these conversations, and I'm

6  sure you are aware, that there is a difference between saying

7  "I'm not going to delete anything" and "I'm going to copy

8  something and protect it in some fashion from either age or

9  corruption or deletion or anything like that."

10        You understand there is a difference between

11  preserving something and copying something, correct?

12  A.  Yes.

13  Q.  Okay.  Did you give him any instructions about copying

14  either his e-mails or his -- any of his electronically stored

15  information as opposed to "I will just keep what is material

16  to this case"?

17  A.  Well, he was to preserve everything.  The issue about chat

18  is because it is ephemeral, and it goes away.  So how do you

19  preserve something under those circumstances?  And he

20  explained to me this is what his practice was.

21  Q.  Okay.  And I guess my question is, and let me make it a

22  little simpler, did you tell him to make copies of these

23  databases so that we would have a snapshot in time as to what

24  existed whenever you gave him these instructions?

25  A.  I don't think I did.

1          MR. von OHLEN:  Could you put up Exhibit No. 64,

2     please?

3          I'm getting into a new area here as well.

4     BY MR. von OHLEN:

5     Q.  Can you see that, Mr. Leavens?

6     A.  Yes.

7     Q.  So let's start with the foundation.

8          Is this your sworn declaration in this case?  And it

9     is dated May 14, 2018.

10    A.  Yes.

11    Q.  And is that your signature at the end?

12    A.  Well, I believe so, without seeing it.

13    Q.  All right.  Well, we can scroll to the end if you want.

14         Do you want us to scroll to the end?

15    A.  No, you don't need to.  I have seen the document before.

16    Q.  All right.  Did you write this declaration?

17    A.  I contributed to the writing of it, yes.

18    Q.  Explain what that means.

19    A.  Well, I think that there are others who were involved.  I

20    can't tell you who, or who did what, but it was something that

21    was certainly reviewed by others on the defense team.

22    Q.  Okay.  Well, I have got to say I don't understand that

23    answer.

24         So this is your sworn declaration --

25    A.  Yes.

Leavens - Direct

794

1    Q.  -- right?

2    A.  Yes.

3    Q.  And you realize that you are under the pains and penalties

4    of perjury with regard to signing?

5    A.  I didn't mean to detract from that at all.

6    Q.  Okay.  And so now my question is, and it is real simple:

7    Did you write this declaration?

8    A.  It's my declaration.

9    Q.  Not my question.

10          Did you write -- I know you signed it.

11          Did you write it, or did somebody else write it?

12   A.  I am trying to answer you honestly, and any kind of

13   document, it gets edited by others making contributions.

14          So this is my declaration.  I stand by it.

15   Q.  And I understand that, but -- and I don't mean to be

16   difficult, but if you didn't write it, and other people had

17   input, who are those people who helped you write it and who

18   are those people who had input?

19   A.  I don't remember who.  It would be the defense team, but I

20   don't remember any specific individual.  I'm giving you the

21   best answer as I can with respect to what the process is of

22   creating a document like this.

23   Q.  Okay.  Well, let's define the universe of who it could

24   have been, then.

25          Who could it have been who helped you write your

1    sworn declaration in this case?

2    A.  This is speculation, but the defense would be

3    Mr. Stamatis, Mr. Shonder, and Mr. Life.

4    Q.  You understand that sworn declarations have to be based

5    upon personal knowledge, correct?

6    A.  Yes.

7    Q.  Okay.  Is everything in this declaration that you swore to

8    being true, is it based upon your personal knowledge?

9    A.  Yes.

10   Q.  Okay.  How did you communicate that personal knowledge to

11   somebody who wrote or helped you write this sworn declaration?

12   A.  I am simply speculating that there was contributions made

13   by others.  You asked me if I wrote this, as if I wrote a

14   hundred percent of it, and I'm just giving you what I think is

15   the best answer, which is this is all my personal knowledge,

16   this is my declaration, I stand by it, but there may have been

17   edits that people had proposed.

18          THE COURT:  And, look, you have said that a couple

19   times.  You have clearly adopted the document.  You have

20   signed the document, even though it is not your signature, but

21   you have signed it.

22          But it is a fair question to know who added things to

23   this document, what they added, who removed things from this

24   document, and what did they remove.  I assume that is where

25   this line of questioning is going, and it is all fair.

1      So if you want to go through -- I don't know if there

2  is drafts of this with a red line somewhere, that would be

3  helpful, but go ahead and follow up.  That's where this is

4  going.

5  BY MR. von OHLEN:

6  Q.  Well, those are all great questions.

7      So let's just start with were there drafts of this

8  that were presented to you?

9  A.  I don't think so.  I don't think that's the way the

10  process worked.

11  Q.  Why don't you tell me how the process worked.

12  A.  The process that worked for me was to prepare this, as I

13  remember, anyway, and it would be reviewed by -- and, again, I

14  don't remember who, but there would certainly be contributions

15  that people might make.

16  Q.  So if there weren't drafts that were presented to you, was

17  something just presented to you, you read it, and you signed

18  it?

19  A.  No.

20  Q.  Well, if that's wrong, tell me where it's wrong.

21  A.  I wrote it, wanting to make sure that it was correct, and

22  with respect to any contributions by anybody else, did I miss

23  something, is this clear.  You know, those kinds of things.

24  Q.  Okay.  Well, I heard you say you wrote it.  So are you

25  saying now that you personally wrote this declaration?

 1   A.  Well, I did.  I did.  But, again, I was trying to be as

 2   careful in my answer to you as I could be.

 3   Q.  And I just have to ask this question again.  You know, did

 4   you write this, or is this a compilation of some other people

 5   who wrote it and then presented it to you?

 6   A.  It's the former.

 7   Q.  You wrote it?

 8   A.  I wrote it, given everything else we have just discussed,

 9   yes.

10   Q.  So everything in here is based upon your personal

11   knowledge?

12   A.  I believe so, yes.

13   Q.  Well, I mean, it is either a yes or a no.

14            THE COURT:  What don't you think is based upon your

15   personal knowledge?

16            THE WITNESS:  I'm sorry.  What?

17            THE COURT:  What don't you think is based upon your

18   personal knowledge?

19            THE WITNESS:  Let me read it through and see if there

20   is anything.

21            THE COURT:  Yeah.

22            MR. von OHLEN:  Sure.  Go ahead.

23     (Brief pause.)

24   BY MR. von OHLEN:

25   Q.  Are you ready, Mr. Leavens?

1   A.  I am.  There is the section, Section 7, that is based

2   principally upon my review of e-mail correspondence, having to

3   do with correspondence between Ms. Liberman and Brian Gaynor.

4   Q.  Okay.  So you are saying that Paragraph 7 is not based on

5   your personal knowledge?

6   A.  It's personal knowledge of my review of the e-mails, but I

7   was not engaged in those communications.

8   Q.  Anything else?

9   A.  Can you flip to the next page again?

10          No, I think that's the qualification that I would

11  make.

12          MR. von OHLEN:  We move Plaintiff's 64 into evidence.

13          THE COURT:  Any objection?

14          MR. LEONARD:  None.

15          THE COURT:  Okay.  64 is admitted.

16    (Plaintiff's Exhibit 64 was offered and received in

17     evidence.)

18  BY MR. von OHLEN:

19  Q.  Who selected the e-discovery vendor 4Discovery that

20  Defendants retained in this case?

21  A.  We got bids from two, maybe three consultants, and we

22  offered Mr. Duke the opportunity to express his preference,

23  and he preferred the 4Discovery.

24  Q.  So in terms of selection, Mr. Duke selected them based

25  upon a universe that you provided to him; is that correct?

Leavens - Direct

1  A.  Based upon a universe, you said?

2  Q.  That you provided to him?

3  A.  Yes, yes.

4  Q.  Okay.  Did you personally interview 4Discovery in order to

5  narrow that universe?

6  A.  No.

7  Q.  Did Ms. Liberman interview them?

8  A.  Did Ms. Liberman what?

9  Q.  Interview 4Discovery and the other ones that you were

10  considering?

11  A.  Yes.

12  Q.  Okay.  Did she report back to you on the basis of those

13  interviews?

14  A.  Yes.

15  Q.  Okay.  And did you approve the selection of 4Discovery?

16  A.  Yes.

17  Q.  Okay.  And did you tell Heather Liberman to run it by

18  Brent Duke?

19  A.  Yes.

20  Q.  Okay.  And Mr. Duke approved it?

21  A.  Yes.

22  Q.  Okay.  And 4Discovery was retained on or about

23  December 9th, 2014, and that's according to the 4Discovery

24  statement of work referenced in Exhibit 65; is that correct?

25  A.  What was the date again?

Leavens - Direct

800

1   Q.   December 9th, 2014.

2   A.   Okay.

3   Q.   Does that ring a bell with you?

4   A.   Yes.

5   Q.   Okay.  What instructions did your firm give 4Discovery

6   with regard to this case and who gave those instructions to

7   them?

8   A.   The instructions would have been communicated by

9   Ms. Liberman.

10  Q.   Okay.  Did you have any involvement in communicating those

11  instructions?

12  A.   I don't recall that I had direct communication with

13  4Discovery.

14  Q.   How about giving Ms. Liberman some instructions on what

15  kind of instructions she should give to 4Discovery?

16  A.   To proceed with the search of the ESI for 21 Century

17  Smoking with the search terms that had been provided by the

18  Plaintiffs.

19  Q.   To proceed with applying the search terms to what?

20  A.   Well, to the four computers that Mr. Duke had indicated

21  were, essentially, the universe of his ESI.

22  Q.   And those instructions were memorialized in an engagement

23  agreement, correct?

24  A.   There was an agreement that was signed; is that what you

25  mean, with the 4Discovery?

Leavens - Direct

1  Q.  I'm reading from your sworn declaration, Paragraph 8:  "I

2  approved the selection of the vendor, and Ms. Liberman

3  coordinated the completion of the engagement agreement with

4  the vendor."

5          Do you remember that?

6  A.  Okay.  I see that.

7  Q.  Okay.  So my question:  Your instructions were

8  memorialized in some type of engagement agreement.

9          You described that in your sworn declaration, right?

10 A.  Yes.

11 Q.  And that happened, right?

12 A.  Yes.

13         MR. von OHLEN:  Okay.  Okay.  Let's put up LS

14 Exhibit 21.

15 BY MR. von OHLEN:

16 Q.  And I will represent to you that this is a document that

17 was turned over by your lawyers in the last ten days in this

18 case, I can't remember exactly, and marked as LS-21.

19         Have you seen this before?

20 A.  Yes.

21 Q.  Do you want to take a look at it just to refresh your

22 recollection?

23 A.  Sure.

24 Q.  Okay.  I think it is four or five pages.

25         Tell Mr. Moffitt when you want to turn pages.

Leavens - Direct

802

1   A.   Okay.  Good.  I was looking at the other table.

2            Is there a signature page?

3            Okay.  Thank you.

4   Q.   So my question to you:  Is this the engagement agreement

5   that you referred to in Paragraph 8 of your declaration?

6   A.   Yes.

7   Q.   So there is no other engagement agreement.

8            This is it, correct, as far as you know?

9   A.   As far as I know, yes.

10  Q.   Okay.  And if we look on the first page, it has some

11  handwriting.  There is a cross-out of "Heather Liberman," and

12  it says "Brent Duke, 21C."

13           Do you see that?

14  A.   Yes.

15  Q.   Do you know who put that handwriting?

16  A.   I don't.  It looks like it might be Heather's, but I don't

17  know for sure whether it was.

18  Q.   Okay.  And do you know -- do you have any understanding

19  why there is that handwriting on this document?

20  A.   I don't unless there was some discussion about who was

21  going to be the contracting party.

22  Q.   Okay.  Now, you did ask about the last page, and the

23  signature page.

24           MR. von OHLEN:  And I would ask us to flip to that.

25

Leavens - Direct

803

```
 1   BY MR. von OHLEN:

 2   Q.  Do you see that?

 3   A.  Yes.

 4   Q.  Okay.  So this one appears to be unsigned.  Did you

 5   ultimately sign this -- I'm going to call it "statement of

 6   work" simply because it says that on the front.

 7           Could we agree to call it "statement of work"?

 8   A.  Yes.

 9   Q.  Okay.  Did you sign this document?

10   A.  I don't remember.

11   Q.  Well, I will represent that this came from your lawyers,

12   and I assume they got it somehow.

13           Did they ask you to go back into your file and look

14   for the statement of work or the engagement letter?

15   A.  I haven't seen one that is signed.  Maybe 4Discovery has

16   it, but I --

17   Q.  Okay.  So you don't know whether or not you signed it; is

18   that fair?

19   A.  I don't know for sure.  I assume I did, but I don't know

20   for sure.

21   Q.  Okay.  And you don't have one in your file, and you have

22   looked for it?

23   A.  I didn't see one.  That's right.

24   Q.  Okay.  Now, as you were engaging 4Discovery in this case

25   to perform certain tasks, did you send a copy of the statement
```

 1   of work to Mr. Duke for his review and approval?

 2   A.  I don't remember if we did or not.

 3   Q.  When you went back to look in the file, did you find

 4   anything like that, some communication with Mr. Duke regarding

 5   this statement of work?

 6   A.  I don't remember.

 7   Q.  Well, you would have done that recently, I assume,

 8   correct?

 9   A.  I don't remember seeing it.  Maybe I did, and I didn't --

10   Q.  Okay.  So as we are sitting here today, you have no

11   recollection whether or not you signed it and whether or not

12   that you sent it to Mr. Duke for his review; is that fair?

13   A.  I assume I signed it because they went ahead and did the

14   work.  So I would have been the one to sign it.

15   Q.  Well, the reason I ask is because there is a cross-out on

16   the first page, and it says "Prepared for," and Heather

17   Liberman's name is crossed out, and they put in "Brent Duke,

18   21C"?

19           You see that on the first page, right?

20   A.  Uh-huh.

21   Q.  So I don't want to put words in your mouth, but that would

22   suggest to me that it is being prepared for somebody next to

23   the cross -out, Brent Duke, 21C.

24           I mean, does that help refresh your recollection of

25   who the client was, at least with regard to this statement of

1  work?

2  A.  Well, you make a good point, but I don't remember.  Maybe

3  4Discovery would have the actual document with the signature.

4  Q.  Okay.  Well, fair enough, if you don't remember, you don't

5  remember.

6         On the last page, of course, it says:  "Client:

7  Leavens, Strand & Glover."

8         Did you consider yourself the client with regard to

9  this engagement?

10  A.  I think we did.

11  Q.  Okay.  Did Mr. Duke ever communicate with you at any time

12  regarding the scope of the 4Discovery engagement in this

13  matter?

14  A.  I'm sorry, one of the words dropped out.

15         Did he ever?

16  Q.  Let me go back.

17         Did Mr. Duke ever communicate with you at any time

18  regarding the scope of work that you asked 4Discovery to do in

19  connection with this case?

20  A.  I know there was communication with Mr. Duke about what it

21  was that was being searched, if that's what you mean, and it

22  was these four computer hard drives.

23  Q.  Okay.  Well, I'm just asking the specific question

24  of -- let me give you some foundation.

25         You gave 4Discovery a mission in this case, correct?

Leavens - Direct

806

1          You communicated to them, correct?

2     A.  Me personally, no.

3     Q.  Well, you or Heather Liberman under your direction,

4     correct?

5     A.  Yes.

6     Q.  Okay.  And that mission was defined, and we will get to it

7     in a minute, in the statement of work, correct?

8     A.  Correct.

9     Q.  Okay.  Did you ever communicate with Mr. Duke regarding

10    the mission that you were assigning to 4Discovery?

11    A.  He understood, yes.

12    Q.  Okay.  That's different than whether you communicated.

13         Did you communicate with him and say, "We are having

14    4Discovery do what's exactly on Page 2 of this document"?

15    A.  Yes, this document was the end result of a process where

16    Mr. Duke understood what it is that we were doing as far as

17    the search of his ESI with the search terms.  He was involved

18    with the process of selecting this company.  So that's why I'm

19    pausing on your questions here.

20    Q.  Well, really, my question just goes to did you

21    communicate.

22         They have a mission, and you said -- I think your

23    testimony was you weren't sure whether or not he saw the

24    statement of work or whether he signed it; is that correct?

25    A.  Right.  I don't know whether Mr. Duke signed that, that's

Leavens - Direct

1  right.

2  Q.  Okay.  And you don't know whether or not you sent it to

3  him, correct?

4  A.  I don't know off the top of my head whether we sent it to

5  him.

6  Q.  Okay.  So I have gone beyond signing and whether you sent

7  it, and now I'm talking about did you ever communicate with

8  him, orally or in an e-mail or in any possible other way,

9  about what the scope of the mission is, which is -- I mean, it

10  is clearly defined here.  I'm not going to read the whole

11  document, but it is on Page 2.

12        Did you communicate with him specifically that that

13  was the mission?

14  A.  He saw that, yes, that was part of the bid.  There is also

15  the objective there to provide consulting and expert services.

16  Q.  Okay.  Well, fair enough.

17        So you did communicate to him that their mission was

18  only to create -- and I'm going to read right from this

19  document, so read along with me.

20        Phase 1; do you see that?

21  A.  Yes.

22  Q.  "Phase 1:  Remote Forensic Imaging"; do you see that?

23  A.  Yes.

24  Q.  Okay.  The next step is three bullet points in an adjacent

25  box; do you see that?

Leavens - Direct

808

1   A.  Yes.

2   Q.  And it says -- the first bullet point is:  "Create a

3   remote forensic image of four computers:  Cost:  $500 per

4   computer," right?

5   A.  Yes.

6   Q.  The second one is:  "Maintain a sound chain of custody

7   documentation and perform image authentication."

8           Do you see that?

9   A.  Yes.

10  Q.  Okay.  And the third one is:  "Maintain a copy of data."

11          Correct?

12  A.  Correct.

13  Q.  Okay.  And Phase 2 says:  "Analysis."

14          Right?

15  A.  Correct.

16  Q.  And the first bullet point says:  "Perform search against

17  collected data using client-supplied search terms."

18          Have I read that correctly?

19  A.  Yes.

20  Q.  And the second bullet point says:  "Produce resultant data

21  to client."

22          Correct?

23  A.  Yes.

24  Q.  And the third and fourth bullet point just give estimates

25  of the amount of time to do it and the cost to do it; is that

1    correct?

2    A.  Correct.

3    Q.  All right.  So this is -- we can agree that this is the

4    scope of the 4Discovery mission, right?

5    A.  Well, if you add the consulting in there, yes.

6    Q.  Okay.  For whatever additional -- fair enough.

7           I mean, whatever is in the third box, "Additional

8    Consulting"?

9    A.  Yes.

10   Q.  Which says the amount of money that they are going to

11   charge you "for expert testimony as may be required and

12   mutually agreed in support of this project," correct?

13          MR. SMITH:  Well, objection, your Honor.  It is not

14   just expert testimony.  It says more than that.

15          THE COURT:  It does say more than expert testimony.

16   It says --

17          MR. SMITH:  It says "additional e-discovery

18   consulting."  That's my objection, your Honor.

19          THE COURT:  It says "Additional Consulting" in the

20   blue box, on the left side, and it says:

21          "4Discovery charges 295/hour for additional

22   e-discovery consulting and 395/hour for expert testimony as

23   may be required and mutually agreed upon in support of this

24   project."

25          I got it.  All right.  So that's what it says.  We

Leavens - Direct

```
 1   all agree to that.  We are good.
 2          MR. von OHLEN:  Okay.  All right.
 3   BY MR. von OHLEN:
 4   Q.  So that's the sum total of what the mission was here,
 5   correct, in those three boxes?
 6   A.  Yes.
 7   Q.  Okay.  So did you ever engage 4Discovery after February of
 8   2015 for any additional consulting services?
 9   A.  Yes.
10   Q.  When?
11   A.  Well, not me personally, but that was in, I think,
12   sometime in -- sometime in May of 2018.
13   Q.  Okay.  So fair enough.
14          So my point would be did you ever engage them again
15   before discovery closed in this case on July 1st, 2015?
16   A.  I don't believe so, no.
17   Q.  I want to make sure that this is the universe of what you
18   engaged them for.  It's in the first two boxes, and there was
19   nothing in the third box in terms of additional consulting
20   until after discovery was closed; is that a fair statement?
21   A.  Well, we certainly would have expected them to give
22   us -- provide us the consulting services, if it was necessary.
23   Q.  Of course, if you asked, but you just said you didn't ask
24   them.
25   A.  Or for them to point that out.  That's why we engaged
```

1   them.  They were experts.

2   Q.  Okay.  Well, we will get to what they should have pointed

3   out in a minute, but I'm just getting to what you engaged them

4   to do, and this is what they did and nothing else?

5   A.  That's right.

6          MR. von OHLEN:  Before I forget, let me move LS-21

7   into evidence.

8          THE COURT:  Any objection?

9          MR. LEONARD:  No.

10         THE COURT:  All right.  LS-21 will be admitted.

11     (Leavens Strand Exhibit 21 was offered and received in

12     evidence.)

13         MR. von OHLEN:  I'm sorry.  Did the Judge ask a

14  question?

15         THE COURT:  No, I said LS-21 is admitted.

16         MR. von OHLEN:  Okay.  All right.

17  BY MR. von OHLEN:

18  Q.  All right.  With regard to LS-21 in the first box where it

19  says:  "Create a remote forensic image of four computers"; do

20  you see that?

21  A.  Yes.

22  Q.  Were those four computers the laptops of Brent Duke,

23  Laurie Duke, Robert Hough, and Bryan Kos?

24  A.  Yes.

25  Q.  Okay.  Who made the decision to limit the scope of the

Leavens - Direct

812

1    inquiry to those four laptop computers?

2    A.  That was the universe as it was presented to us.

3    Q.  Well, you engaged them, correct?

4    A.  I'm sorry.  What?

5    Q.  You engaged 4Discovery, correct?

6    A.  Yes.

7    Q.  And you gave them the instructions -- or you or

8    Ms. Liberman gave them the instructions, correct?

9    A.  Yes.

10   Q.  Nobody else did, correct?

11   A.  No, there was nobody else who was instructing them on

12   this, right.

13   Q.  Did you or, to your knowledge, Ms. Liberman or anyone at

14   your firm advise 4Discovery of Mr. Duke's e-mail accounts with

15   GoDaddy and Yahoo! in 2014, when they were retained?

16   A.  When they were what?  I'm sorry.

17   Q.  When they were retained.

18   A.  I don't know.

19   Q.  Well, who would know?

20   A.  Well, I would know if -- well, I don't know that we did.

21   Thinking it through, it would have been Ms. Liberman who was

22   directly in touch with them, but she would have instructed me

23   about what her conversations would have been with them.

24   Q.  Okay.  Well, do you know if anyone provided 4Discovery

25   with the login and password information for those GoDaddy and

Leavens - Direct

813

1    Yahoo! accounts?

2    A.  I do not.

3    Q.  Did you or anyone at your firm advise 4Discovery of any of

4    Mr. Duke's cell phone or texting accounts and provide them

5    with login information for those accounts?

6    A.  No.

7    Q.  Same question:  Did you or anyone at your firm advise

8    4Discovery of Mr. Duke's chat accounts or any kind of

9    messenger account and provide them with login information for

10   those accounts?

11   A.  No -- well, I have to -- there was a later time that login

12   information was provided, but that has to do with the Yahoo!

13   search in 2018.

14   Q.  Fair enough, and I didn't give you a time frame for that.

15        So the time frame that I was asking about was, you

16   know, from the time that you retained 4Discovery until the

17   time fact discovery was closed.

18        Just within that time frame, did you give them any

19   login information on any of those accounts?

20   A.  No, no.

21   Q.  In fact, you didn't even identify those accounts for them,

22   correct?

23   A.  I don't think we did.

24   Q.  To your knowledge -- well, let's start with you.

25        Did you or anyone at your firm advise 4Discovery that

Leavens - Direct

814

```
 1  you sat with Mr. Duke in front of his computer in 2013 and
 2  printed e-mails and printed screenshots from Mr. Duke's Yahoo!
 3  account?
 4         Did you advise anybody at 4Discovery of that fact?
 5  A.  I didn't catch the first part of what you are saying.
 6  Q.  Okay.  Let's break it down.
 7         There came a time where you sat with Mr. Duke in
 8  front of his computer, correct?
 9  A.  Yes.
10  Q.  Okay.  And you saw -- and he brought up various
11  information on that computer, correct?
12  A.  Yes.
13  Q.  And you were looking at it, right?
14  A.  Yes.
15  Q.  You were with him.  You were sitting right next to him,
16  right?
17  A.  Yes.
18  Q.  And at that time, you saw some information related to
19  Yahoo!, correct?
20  A.  I don't remember anything being identified as Yahoo!.
21  Q.  Okay.  You don't remember -- I'm going to come back to
22  that, sir, because I need to look at some documents.
23         Do you know whether or not 4Discovery conducted an
24  in-person interview with Mr. Duke regarding potential sources
25  of ESI in this case?
```

Leavens - Direct

1  A.  I don't have any knowledge of anything like that.

2  Q.  You don't think that they did.  You didn't instruct them

3  to do an interview of Mr. Duke regarding ESI, correct?

4  A.  That's right.

5  Q.  Do you know whether or not 4Discovery did any kind of

6  remote interview with Mr. Duke regarding sources of ESI by

7  chat or phone or anything else?

8  A.  They were directly in touch with him about the duplication

9  of his computers, yes.

10 Q.  The four laptop computers that we talked about, right?

11 A.  That's right.

12 Q.  Okay.  So is it fair to say that you didn't instruct

13 4Discovery to contact Mr. Duke and perform an interview with

14 him regarding all the sources of ESI?

15         Is that a fair statement?

16 A.  Yes.

17 Q.  Do you know whether 4Discovery ever personally handled or

18 touched Mr. Duke's computers in order to copy their hard

19 drives?

20 A.  I don't know that they did.  I think the process was

21 equipment was sent to Mr. Duke, and he -- there were copies of

22 those computers that were made onto those devices, and then

23 those were sent out for searching.

24 Q.  So did they call -- I think they referred to that as a

25 "remote collection," to remotely image the four computers.

Leavens - Direct

816

```
 1              Does that phrase ring a bell?
 2   A.  Yes.
 3              MR. von OHLEN:  Can you put up Plaintiff's 65,
 4   please?
 5              And could you scroll through so the witness can see
 6   what's attached?
 7   BY MR. von OHLEN:
 8   Q.  My question is:  Do you recognize this document?
 9   A.  Yes.
10   Q.  Okay.  And tell the court what it is.
11   A.  Well, it is a report from 4Discovery that includes -- if
12   you will go back, it includes information about the first
13   search that was done in 2015 and then information about
14   subsequent work that they did in 2018.
15   Q.  Okay.  And I'm going to refer to this as the -- and I'm
16   going to get his name wrong, probably, but the Gough letter,
17   unless you have a better pronunciation of his last name,
18   G-o-u-g-h.
19   A.  I don't.
20   Q.  Okay.  So as we go through this -- and this report was
21   filed with the court, correct?
22              We know from the first page, right?
23   A.  Yes, yes.
24   Q.  Okay.  And let's go back to the first page.
25              All right.  So let's just start with the second
```

Leavens - Direct

1   paragraph, and I think we already talked about this, that this

2   is when they talked about on or about December 9th, 2014, he

3   goes through a whole paragraph of how he was instructed by you

4   to examine digital media related to this matter, correct?

5   A.  Correct.

6   Q.  Correct?

7   A.  Correct.

8   Q.  Okay.  And then he talks about that remote collection

9   process where he sends boxes out to Brent Duke, with

10   apparently some instructions, and it is up to Mr. Duke to,

11   apparently, connect all the data together, put it on a hard

12   drive, and send it back to 4Discovery.

13        Is that your understanding of the process?

14   A.  Yes.

15   Q.  Okay.  And then Mr. Gough says:  "A forensic analysis was

16   then performed by 4Discovery on the forensic images stored on

17   this hard drive."

18        Right?

19   A.  Yes.

20   Q.  So it would be fair to state, then, that 4Discovery never

21   performed -- before discovery was closed in this matter, they

22   never performed a forensic analysis with Plaintiff's ESI terms

23   on any of Brent Duke's online e-mail, texts, chat, or social

24   media accounts; is that correct?

25   A.  Well, I don't know the extent to which that was on those

 1    four hard drives.

 2    Q.  Okay.  But with regard to anything -- well, fair enough.

 3            So you don't know what was on those four drives.  You

 4    don't know the complete data on his -- on all those things

 5    that were on his hard drives?

 6    A.  No, I was referring to some of the categories of things

 7    that you had described, I assume are on the hard drive.  We

 8    know e-mail was on there.  We know things related to the

 9    social media.  My understanding is that some of that was on

10    there.  We just did not have login to other accounts.

11    Q.  Well, you know now that the universe of his ESI wasn't on

12    those laptops, correct?

13    A.  We know that now.

14    Q.  Yeah.

15    A.  We didn't know that then.

16            THE COURT:  Who is "we"?

17            THE WITNESS:  Pardon?

18            THE COURT:  Who is "we"?

19            THE WITNESS:  We as a firm, and based on the

20    testimony of Mr. Duke, I think he understood that that was

21    there, too.  But I mean -- well --

22    BY MR. von OHLEN:

23    Q.  You think that Mr. Duke understood that the totality of

24    his Yahoo! and GoDaddy e-mails were on his hard drives?

25            Is that your testimony?

1   A.  He had made those representations.

2   Q.  Okay.  When did he make those representations to you?

3   A.  Those were in the documents that -- one of the documents

4   that we had, that everything having to do with 21 Century was

5   on those four computers.

6   Q.  Well, and I may be putting a finer point on it.

7           Did Mr. Duke represent to you that the universe of

8   all his GoDaddy e-mails was on his four computers?

9   A.  His statement was to that effect.

10  Q.  Well, I mean, to that effect, and did he use the

11  words -- did you ask him about the GoDaddy, and did he say,

12  "Yes, all my GoDaddy e-mails are on" -- I'm trying to figure

13  out what he said to you.

14          "They are all on there, Mr. Leavens, all my GoDaddy

15  e-mails, the whole universe is on my computer"?

16  A.  No, no, he didn't say it in that way.  I'm just going on

17  the basis of the document that I saw this morning.

18  Q.  Okay.  So other than that document, you don't have any

19  understanding about what Mr. Duke told you about where his

20  e-mails reside?

21  A.  There is more.  There is the initial disclosures from 2012

22  going forward and his communications with Mr. Life in

23  connection with searches.

24  Q.  And I'm trying to just sort through that.

25          Is it your position that Mr. Duke advised you that

Leavens - Direct

1    all his e-mails, the universe of his e-mails, meaning the

2    Yahoo! and the GoDaddy e-mails, were on his hard drive?

3            Did he ever advise -- let's start with you.

4            Did he ever advise you specifically of that?

5    A.   What happened is that I did meet with him, and we had the

6    conversations about his electronically stored information, and

7    what I drew from the conversation that we had was that

8    everything existed on these computer hard drives, and that is

9    the way that I presented that in those initial disclosures.

10           They were given to him to review, and through

11   at least a couple versions, those things that were not

12   corrected, were not changed.  And he later on -- you saw the

13   document later on -- today -- that showed his confirming to us

14   that everything with respect to 21 Century was on those four

15   computers.  That's what we relied upon.  That was wrong

16   information, but that was information that we relied upon.

17   Q.   Okay.  So is it fair to say that you drew an inference

18   from that conversation that the GoDaddy and Yahoo! e-mails

19   were all on the hard drives, but he never actually said those

20   words?

21   A.   I can't remember.  I can't remember, but that is

22   definitely where I was left after my conversations with him,

23   that those four hard drives were where that ESI was.

24   Q.   And that e-mail that you referred to where he described

25   that "That's where all my information is," when is the first

1   time you saw that e-mail?

2   A.  I saw that this year.  That's what I remember.

3   Q.  Did 4Discovery ever issue a written report as a result of

4   the work it did on behalf of your firm in this case?

5   A.  I believe they did, yes.

6   Q.  Where is that report?

7   A.  I don't know.  If they did issue something, it's probably

8   in our files.

9   Q.  Okay.  We would request that that be produced since it

10   seems to be pretty much on point.

11       Could you go back in your file and look for it if the

12   court directs you to produce it?

13   A.  Yes.

14       MR. SMITH:  My only concern, your Honor, is that if

15   we are in a discovery process, there were requests we would

16   have made a while back.

17       THE COURT:  I'm sorry.  What did you say?

18       MR. SMITH:  I said if we are in a discovery process

19   here, there are requests we would have made a while back.

20       THE COURT:  Well, it is November 7th, 2019.  The

21   motion for sanctions was filed a long time ago.  We knew about

22   these hearing dates.  We knew 4Discovery was involved.  We

23   have a contract with 4Discovery.  We have a letter from

24   4Discovery.  I'm -- I think the legal word

25   is -- "flabbergasted" that if 4Discovery completed a report

1   pursuant to the statement of work that that document hasn't

2   been produced to counsel, all counsel, and to me, quite

3   honestly, at this point.

4           MR. SMITH:  I don't want anybody to get -- and I'm

5   not sure what the state of my knowledge is, but I think what

6   it is is a hit report.  It is not a written report.

7           THE COURT:  And I understand that, and I assume you

8   and I are on the same wavelength that their "report" would

9   have been, and their "analysis," produce resultant data to

10  client, which shows the documents where the search terms were

11  hit.  If there is that document, I still think it would have

12  been produced somewhere in this litigation.  If there is

13  something beyond that, I would think it is relevant to what we

14  are talking about here.

15          The statement of work is informative not only in what

16  it says, but also in what it doesn't say.  There are fancy

17  little arrows here.  It says:  "Identify, Collect, Analyze,

18  Report."

19          "Phase 1:  Remote Forensic of Imaging."  That's just

20  collection.  There is no identify.  That's where this whole

21  thing goes sideways.

22          So if there is a report that talks about what we have

23  just -- what the testimony is, it would behoove everybody to

24  see that report.

25          Now, if it is a hit report, that shouldn't be hard to

Leavens - Direct

1   find.

2          MR. SMITH:  Your Honor, we will take a look and see

3   what they are asking.

4          THE COURT:  And I don't know if it exists.

5          MR. SMITH:  I don't want to be wrong about this, but

6   my recollection is that that's all there is, and we will look,

7   and we will be happy to --

8          THE COURT:  That's fine.

9          And I understand your thought that a report would

10  just be a hit report, but if there is something else out

11  there, it would probably be helpful to know.

12         MR. SMITH:  And I understand completely, your Honor,

13  and we will determine with certainty what the answer to that

14  question is.

15         THE COURT:  Okay.

16  BY MR. von OHLEN:

17  Q.  Regardless of the type of report or the lack of report,

18  did you advise Mr. Duke regarding the results of this forensic

19  examination?

20  A.  I don't remember anything specific about that.  I'm sure

21  we did in some way.  We had communication with him, but I

22  don't remember anything specific.

23  Q.  Okay.  I don't want you to guess.

24         Do you have any knowledge whether it was or -- if you

25  did or you didn't report to Mr. Duke what the results of

Leavens - Direct

824

1  4Discovery's forensic investigation was?

2  A.  I believe we did, but I don't have any specific knowledge.

3  Q.  And when you say you believe you did, did you do it by way

4  of writing or on the phone?

5  A.  I think Mr. Life would probably be the best person to be

6  able to give the answer to that.

7  Q.  Okay.  So you don't have any personal knowledge on that

8  topic; is that fair?

9  A.  I'm not recollecting anything, no.

10  Q.  Did 4Discovery issue invoices and transmit them to your

11  firm?

12  A.  I don't remember.

13  Q.  Okay.  You don't remember reviewing and approving them for

14  payment?

15  A.  I don't.

16  Q.  Do you know who paid them?

17  A.  We would have paid.  If we did pay -- I assume that we

18  did -- we would have paid and put it on the bill.

19  Q.  The bill to the insurance company, right?

20  A.  Well, the bill to 21 Century, which is also submitted to

21  the insurance company, but the bill is to 21 Century.

22  Q.  Okay.  So the bill -- let me see if I understand the

23  process.

24        The bill would have been sent to you.  You would look

25  it over.  You would send it to Brent Duke, and Brent Duke

Leavens - Direct

825

1  would turn it over to the insurance company?

2        Do I got that right?

3  A.  No.

4  Q.  Okay.  Tell me.

5  A.  The bill would come to us.  We would pay for it, and it

6  would go on the bill that would be submitted to 21 Century,

7  with copies going to the insurance company, and the insurance

8  company would make the payment.

9  Q.  Okay.  So let me go about it another way.

10        Did you ever refuse to pay 4Discovery for anything

11  they did?

12  A.  I don't remember doing that, no.

13  Q.  During the fact discovery phase in this case, did you ever

14  complain to 4Discovery regarding their performance of their

15  duties in connection with this case?

16  A.  I don't personally remember that I did.  I don't know

17  whether there was anything later in 2018.

18  Q.  And that's why I limited it up to the end of fact

19  discovery, July 1st, 2015.

20        Did you ever complain "You didn't do your job right,"

21  any kind of complaint whatsoever?

22  A.  No, not that I remember.

23  Q.  Let's go back to Exhibit No. 65, specifically Mr. Gough's

24  letter of January 19th, 2019, Page 2, first paragraph.

25        Tell me when you are with me.

Leavens - Direct

826

1   A.  I'm sorry.  What?

2   Q.  So, again, we are in Mr. Gough's letter, all right?  It is

3   on the screen in front of you.  And that's Page 2.  And I'm

4   going to -- I want you to look at the first paragraph.

5          In fact, I'm going to read it, so we can read it

6   together, all right?

7   A.  Okay.

8   Q.  Are you with me?

9          So it says:  "After the analysis was complete, this

10  hard drive was stored in 4Discovery's long-term evidence

11  storage.  When a case is moved to long-term evidence storage,

12  it is stored on a single, nonredundant hard drive.  Under the

13  2014 statement of work, 4Discovery was not required to

14  maintain any electronically stored information beyond one year

15  from the last invoice date.  The last invoice date on this

16  matter was February 10th, 2015.  4Discovery was not requested

17  to do any further work at that time."

18         Did I read that correctly?

19  A.  You did.

20  Q.  Okay.  So we can agree that the fact discovery stage was

21  still open in February 2015, correct?

22  A.  Yes.

23  Q.  Okay.  Why didn't you instruct 4Discovery to maintain the

24  electronically stored data in this case beyond the one year it

25  committed to in its statement of work?

1   A.  I don't know.  Just there was a reference in the letter

2   that they would not destroy anything, and that if there was

3   going to be any effort to destroy something on their part,

4   they would give advance notice.  So I don't recollect why we

5   didn't go and make arrangements for it to be kept more than

6   one year.

7   Q.  Okay.  So we can agree you didn't tell them to store it

8   for more than one year; is that correct?

9   A.  That's correct.

10  Q.  And we can agree that you were on notice that you had to

11  tell them, correct?

12  A.  We had to tell them if there was going to be an agreement,

13  that's right, but they had to tell us if they were going to do

14  anything with it that was going to be destructive to it.  This

15  was just a question of their commitment as far as one year.

16          MR. von OHLEN:  Okay.  Let's go back, then, to LS-21,

17  please, which is the statement of work by 4Discovery,

18  specifically to Page 4.

19  BY MR. von OHLEN:

20  Q.  I want you to look at the paragraph with the heading "Data

21  Storage and Retention."

22          Do you see that?

23  A.  Yes.

24  Q.  Okay.  Let's just start with the first line:

25          "4Discovery retains and securely stores all

Leavens - Direct

1  electronically stored information (ESI) related to this

2  agreement for a period of one year from the last invoice date

3  at no charge to the client."

4          You see that, right?

5  A.  Yes.

6  Q.  And "one year" is circled.

7          Do you know who circled that?

8  A.  I do not.

9  Q.  Was that you?

10  A.  I don't remember.

11  Q.  Okay.  So, fair enough, they put you on notice that they

12  are going to keep it for one year, right?

13  A.  That's right, without charge.

14  Q.  Without charge, right.

15          And in the interest of moving this along, I'm going

16  to skip down one sentence to:

17          "4Discovery is not responsible for any ESI beyond one

18  year from the last invoice date unless the client and

19  4Discovery have executed a supplemental agreement for the

20  archival and secure storage of any ESI related to this

21  agreement."

22          Do you see that?

23  A.  Yes.

24  Q.  Okay.  Did you ever execute a supplemental agreement for

25  storage?

Leavens - Direct

829

1    A.  I don't think we did.

2    Q.  Okay.  Let's stay with Exhibit 65.

3         Now, let's fast forward a few years to May 2018, and

4    this is after the Plaintiff's would have filed their original

5    motion for sanctions, and it was only then, correct, that

6    Travis Life, an attorney for your firm, contacted 4Discovery

7    and reactivated this case; is that correct?

8    A.  Yes.

9    Q.  Okay.  And that's in Mr. Gough's report at Page 2,

10   Paragraph 2, right?

11   A.  Right.

12   Q.  He actually uses the word "reactivated," right?

13   A.  Yes.

14   Q.  Okay.  And now staying with Exhibit 65, and, again, with

15   reference to the Gough letter, Page 2, Paragraph 4 -- one,

16   two, three, four -- move down towards the bottom.

17        Do you see that --

18   A.  Yes.

19   Q.  -- Paragraph 4?  Okay.

20        And isn't it true that 4Discovery took the single

21   nonredundant hard drive from long-term storage and "The hard

22   drive was connected to a forensic workstation, but it was

23   nonresponsive and appeared to have failed.  4Discovery did

24   everything within its ability to recover as much data as

25   possible from the failed hard drive, but was unsuccessful in

Leavens - Direct

830

1    recovering the forensic image of Brent Duke's laptop."

2            Did I read that correctly?

3    A.  I believe so.

4    Q.  Thus the net effect of the loss of these hard drives

5    that 4 -- or the single nonredundant hard drive that was in

6    4Discovery's possession is that there is no longer a mirror

7    image of what was on Brent Duke, Laurie Duke, Robert Hough,

8    and Bryan Kos's hard drives as of December 2014, correct?

9    A.  It appears that way, yes.

10   Q.  Now, this case, as we have gone over ad nauseum, was filed

11   in September of 2012, and you were retained during that same

12   month, correct?

13   A.  Yes.

14   Q.  Okay.  Why did you wait over two years from September 2012

15   to even attempt to make a copy of the hard drives of your

16   client's computers?

17   A.  We weren't involved with the process that occurred in

18   2014.  We weren't involved with that process in 2012.

19   Q.  I'm not sure I understand your answer.

20           You were directing this case as lead counsel, we can

21   agree with that, right, in September of 2012, right?

22   A.  Yes.

23   Q.  Okay.  And you gave Mr. Duke instructions about

24   preservation of information and ESI, right?

25   A.  Yes.

Leavens - Direct

1   Q.  And my question is that was in September of 2012.  Why did

2   you wait to December 2014 -- that's about 26 months -- before

3   you retained somebody to make an image of those computers?

4   A.  I don't understand that there is an obligation to make an

5   image, as you are suggesting.

6   Q.  Okay.  That there is no obligation, that people can

7   continue to use their computers, and you have no obligation to

8   ask them to make copies, is that your understanding of what

9   the obligations are?

10  A.  There is an obligation to preserve, but I did not

11  understand that there was an obligation to create a copy.

12  Q.  Why didn't you make the decision to create --

13          THE COURT:  Do you understand that there is more than

14  just the documents, that the image captures all the metadata

15  related to the documents?  Do you understand that?

16          And that documents that are entered into and edited

17  or reviewed, the metadata relating to that, all that changes?

18          Do you understand that?

19          THE WITNESS:  Am I aware that copying would capture

20  that?

21          THE COURT:  That if you don't image at the time, and

22  people use the devices, that it changes the information

23  relating to the documents itself; do you understand that?

24          THE WITNESS:  I understand things can be overwritten.

25  Is that what you mean?

1          THE COURT:  Okay.  Go ahead.

2   BY MR. von OHLEN:

3   Q.  Well, at least you understood that your client continued

4   to use those computers in his business in the intervening two

5   years between September 2012 and December 2014; is that a fair

6   statement?

7   A.  Yes, I did.

8   Q.  Okay.  And as a result of using them, he is adding things

9   and perhaps subtracting things; is that a fair statement?

10  A.  Well, they are not deleting.  They are preserving.

11  Q.  They are not supposed to, right?

12  A.  They are not supposed to delete?

13  Q.  Delete.

14  A.  That's correct.

15  Q.  Okay.  And the way that we can, as lawyers, figure out

16  whether somebody is telling the truth about that is that you

17  actually obtain a copy, right?

18  A.  You could.

19  Q.  Or you can just rely upon their veracity, I guess; is that

20  what you are saying?

21  A.  Well, my understanding is that he understood, Mr. Duke

22  understood, what the responsibility was, and he observed that.

23  He has given that commitment to us many, many times.

24  Q.  Okay.  And I just want to make sure that -- and maybe I

25  have asked this question, but you didn't tell him to make a

Leavens - Direct

833

1  copy, and you believe it wasn't your obligation to tell him to

2  make a copy of what's on your hard drives or any other ESI.

3  It is just good enough that he says, "I will retain anything

4  that's material to this case."  That's good enough according

5  to what you understand your obligations?

6  A.  I believe I fulfilled my obligation.

7       MR. von OHLEN:  Please put up Exhibit No. 66, please.

8  BY MR. von OHLEN:

9  Q.  Okay.  So Exhibit 66 is Defendant's status report to this

10 court's June 6, 2019, order, and the report references the

11 preliminary work done by new e-discovery vendor QDiscovery,

12 which, as you may know, was retained by the Defendants through

13 Mr. Salam after your withdraw in this case.

14      So this document was filed with the court, and it is

15 contained at Docket No. 318.

16      So before I put this up on the screen, have you had

17 an opportunity to review, take a look at this report before

18 today?

19 A.  I have seen it before, yes.

20 Q.  Okay.  And in conjunction with preparing for this hearing,

21 right?

22 A.  Yes.

23 Q.  And the report is very long.  Unfortunately, it speaks for

24 itself, and I just have a couple of questions regarding it.

25      And if you would like to page through it, but I think

Leavens - Direct

834

1    you know what it contains, right?

2           It is a report of various sources of ESI that

3    QDiscovery got as a result of interviews with Mr. Duke and his

4    employees.

5           We can agree on that, right?

6    A.  Yes.

7    Q.  Okay.  And we can agree that neither you and your firm or

8    anybody on the defense team uncovered all the sources

9    of -- potential sources, let me say, of ESI that are

10   referenced in the QDiscovery report while fact discovery was

11   open, correct?

12   A.  Start again.  I'm sorry.  I missed the first part.

13   Q.  Sure, sure.

14          They list a whole bunch of things in those reports?

15   A.  Yes.

16   Q.  Twitter accounts, Instagram, Yahoo!, GoDaddy, people's

17   cell phones, computers in the garage, whatever.  They list a

18   lot of things.

19          You remember all of that, right?

20   A.  Yes.

21   Q.  And we can agree that you didn't discover that universe of

22   things while it was on your watch, before you withdrew from

23   the case, correct?

24   A.  We did not search all of that; that's correct.

25   Q.  Okay.  Nor did you discover the existence of some of those

Leavens - Direct

835

 1  things, correct?

 2  A.  Some of the things, that's right.

 3  Q.  Okay.  Now, I want to direct your attention to Page 39 of

 4  the QDiscovery report.

 5          39, I think it is.

 6          THE COURT:  Is it the going to be the Docket 39, at

 7  the top?

 8          MR. von OHLEN:  It is so hard when I don't have the

 9  paper document in front of me.

10          THE COURT:  Because it is 39 pages, and the last

11  page, 39 -- well --

12          The hit report?

13          MR. von OHLEN:  13 of 39.

14          MR. DAVIS:  13 of 39.

15          THE COURT:  So we are looking at Page 13 of 39?

16          MR. von OHLEN:  Yes, sorry.

17          THE COURT:  That's okay.

18          MR. von OHLEN:  Scrivener's error, your Honor.

19          THE COURT:  That's all right.

20  BY MR. von OHLEN:

21  Q.  Okay.  So I'm just looking at this, and, as you know, we

22  haven't had any -- well, maybe you don't know.

23          There has been no production of any of these

24  documents yet to date that are referenced in this report.

25          But take a look at the middle column where it

Leavens - Direct

836

1    says -- at the top, it says:  "Search Terms Report," and it

2    says:  "Report Name:  Keyterms - GoDaddy E-mails."

3           Do you see that at the top?

4    A.  Yes.

5    Q.  And "Searchable Set" next to it says "SS," which I'm

6    assuming means "searchable set," and then it says "GoDaddy

7    Accounts."

8           Do you see that?

9    A.  Yes.

10   Q.  Okay.  And then down, we have various columns, and you see

11   one is "Total documents with hits," and it is "23,609," right?

12   A.  I can't see those numbers on my screen.

13   Q.  Okay.  Let's make it a little bigger for you.

14   A.  Okay.

15   Q.  Do you see those numbers now, "Total documents with hits"?

16   A.  Uh-huh.

17   Q.  And then the next one says:  "Total documents with hits,

18   including family."

19           I'm not sure what "family" means, whether it is

20   Mr. Duke's family or his business family.

21           But in any event it is "42,592."

22           And then "Total documents without hits," which is

23   "179,735."

24           Do you see all that?

25   A.  Yes.

1  Q.  So is it your understanding that those are the amount of

2  documents?

3           And it look like either 23,000 or 42,000 that

4  Plaintiff's search terms hit on the GoDaddy accounts?

5  A.  I have no understanding of this report.

6  Q.  Okay.  Fair enough.

7           This was after your time on the case, right?

8  A.  Yes.

9  Q.  Correct?

10 A.  Yes.

11 Q.  But we already know that there were 15,866 pages of

12 documents that Defendants late produced on May 31st, 2018,

13 from the Yahoo! account, correct?

14 A.  I think that's the right number, yes.

15 Q.  Yes, I will represent to you that that's the number.  I

16 don't want to go through all the Bates ranges, but 15,866.

17           And I may say "15,000" from now on, but you and I

18 know what we are talking about, what set of documents, right?

19 A.  Yes.

20 Q.  Okay.  So my question is:  When did you first learn that

21 there were even more documents than this 15,866 that were not

22 produced in discovery that were responsive to Plaintiff's ESI

23 terms?

24 A.  I think that was May 29th of this year.

25 Q.  2019, correct?

Leavens - Direct

838

1   A.  Correct.

2   Q.  So when you discovered that the search terms hadn't been

3   run against the Yahoo! e-mails in -- and that would have been

4   around May of 2018, correct?

5   A.  Correct.

6   Q.  Okay.  It didn't occur to you at that time to say, "Hey,

7   let's check and see if they were run against the GoDaddy

8   e-mails"?

9   A.  It did not.

10  Q.  Did you talk to anybody on your team about whether that's

11  something we might investigate?

12  A.  We did not have that conversation.

13          MR. von OHLEN:  Okay.  Your Honor, I'm about to -- it

14  is three minutes to 5:00.  I'm about to change gears here.

15          What do you want me to do?

16          THE COURT:  Once you change gears, how much longer

17  are you going to take?

18          MR. von OHLEN:  A lot.

19          THE COURT:  Well, my HP is showing 4:59.  So, okay,

20  we will wrap it up for today.

21          The subpoena on 4Discovery doesn't need to be a

22  "friendly subpoena."  It just needs to be a regular old

23  subpoena, and if they don't respond or if they object, file a

24  motion, get it in front of me ASAP.  Give them a copy of the

25  motion.  And then we will see where things go.

1          All right.  So we have got Mr. Leavens's testimony.

2   You have already given notice of the order of the witnesses.

3          MR. von OHLEN:  Leavens, Life, Liberman.

4          MR. SMITH:  Your witness list was the other order, so

5   I thought I would ask.

6          MR. DAVIS:  It is Liberman and then Life.  Sorry.  We

7   switched it when we released her from today.

8          THE COURT:  Okay.

9          MR. von OHLEN:  But Life is going next.

10          THE COURT:  Okay.  I just want to make sure.

11          So what's our understanding of these people?

12          MR. SMITH:  And that's what I want to know.  Can you

13   just give us the order?

14          THE COURT:  Sure, yes, so he knows which one of his

15   clients to talk to, to get teed up.

16          MR. von OHLEN:  So we will take Ms. Liberman next,

17   but I know that she's from out of town, and I know that she

18   probably doesn't want to come back twice.

19          MR. SMITH:  She can be here for both days.  We have

20   ascertained that already, your Honor.

21          THE COURT:  Okay.

22          MR. von OHLEN:  So it goes L, L, and then L.

23          THE COURT:  Okay.  Is Life before Liberman?

24          MR. von OHLEN:  No, there isn't.  There is Liberman

25   before Life.

1          THE COURT:  Because I'm eyeballing this, and if

2    that's the end of you, and the end of your case, then we are

3    talking --

4          MR. von OHLEN:  No, we still have Mr. Stamatis.

5          THE COURT:  Right, but we are going to go through all

6    that.

7          I'm looking at the 15th, and Ms. Liberman is

8    somewhere in the mix between the 15th and the 19th.

9          We are closing shop on the 19th, right?

10         MR. von OHLEN:  Well, presumably, the other

11   examinations are going to be much shorter than Mr. Duke, and

12   Mr. Leavens, who spans the whole arc, and Ms. Liberman is --

13         THE COURT:  Should be relatively --

14         MR. von OHLEN:  -- a smaller arc.  And Mr. Life kind

15   of picks up, at least in time, after Ms. Liberman.

16         THE COURT:  All right.  Okay.  And here is my

17   point -- true, at least that makes sense to me, and then you

18   have Mr. Stamatis, and you have Mr. Shonder, 4D, and I don't

19   know what cleanup they are doing.  I don't know if Mr. Duke is

20   coming back or not.

21         My point being we are finishing up at 5:00 today.  We

22   have got two days left.

23         MR. von OHLEN:  Two.

24         THE COURT:  Two days left, and I'm seeing at least

25   four, okay?

841

1        That dovetails into my point:  Look, I apologize if

2   at times I seem a little short-tempered.  I give plenty of

3   warnings.  I probably give too many warnings, because people

4   know I give too many warnings, and then they screw around and

5   they don't listen to the first warnings.  I bark before I

6   bite.  So if I have to say things multiple times, it tells me

7   one of two things:  One, you are not listening to what I'm

8   saying; two, you are listening to what I'm saying, you just

9   don't care.

10        And in the context of this case, with violations,

11   multiple violations of rules and court orders, look, we are

12   dancing around some issues here.  Things were lost.  Things

13   were lost and are not retrievable.  They are gone.  They don't

14   exist.  I think we can all stipulate to that.

15        So in the context of all that, supplementation dates

16   being blown, fact discovery dates being blown -- you know

17   what?  I forgot about that whole Haas thing, and then I had a

18   flashback of that fiasco.

19        So in the context of this case, when I say something

20   one day, repeat it that day, say something the next day,

21   repeat it that day, say it two times today, at some point, I'm

22   going to go off, all right?

23        Long fuse, but when I go off, it is big, okay?

24        So, please, when I say something, I kind of mean it,

25   okay?  Just comply with those things.

1    And orders are there for a reason, my directions are

2    there for a reason, so that we can get things done, so that

3    Ms. Perkins-Reiva can get a clean transcript, so that the case

4    can move forward, and we can be done, and that this won't be

5    an awful -- a more awful situation than it needs to be, okay?

6    I will see everybody on November 15th at

7    9:00 o'clock.

8    We have currently two CVB cases scheduled.  I don't

9    know if they are going to occur.  If they do occur, I will

10   make short work of them.

11   I also have a pro se case that was pushed back to me

12   from one of the helpful district judges, who is taking cases

13   now, and so I need to address that.  I will do that quickly

14   and get that done so that we can get through as much as we can

15   get through on Friday, November 15th, okay?

16   You are under oath.  Don't talk to anybody about your

17   testimony.

18   Before we wrap up, Mr. von Ohlen, anything you want

19   to talk about?

20   MR. von OHLEN:  No, other than if they can find that

21   report, and if they would tender it to us before the next time

22   I see the witness.

23   THE COURT:  Okay.  Mr. Smith, anything?

24   MR. SMITH:  No, your Honor.

25   THE COURT:  Okay.  Mr. Salam, anything?

843

1          MR. SALAM:  No, your Honor.

2          THE COURT:  All right.  We will see you on Friday,

3    the 15th.

4     (The hearing was adjourned to November 15, 2019, at

5     9:00 o'clock a.m.)

6                          CERTIFICATE

7     I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.

9    */s/Heather M. Perkins-Reiva*          *November 11, 2019*

10   _____          _____
     *Heather M. Perkins-Reiva*                    *Date*
11   *Official Court Reporter*

12

13

14

15

16

17

18

19

20

21

22

23

24

25