**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC, | ) |
| | ) |
| Plaintiff-Counterdefendant, | ) |
| | ) Case No. 3:12-cv-50324 |
| v. | ) |
| | ) Judge Thomas M. Durkin |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | ) |
| | ) |
| | ) Magistrate Judge Iain D. Johnston |
| | ) |
| Defendants-Counterclaimants, | ) |
| | ) |
| v. | ) |
| | ) |
| CB DISTRIBUTORS, INC., and CARLOS BENGOA, | ) |
| | ) |
| | ) |
| Counter-Defendants-Counterclaimants, | ) |

**POST-HEARING MEMORANDUM OF THE LEAVENS, STRAND LAWYERS**

Thomas Leavens, Peter Strand, Heather Liberman VanDyke, and Travis Life (the "LSG lawyers") provide this memorandum addressing the issues raised by Plaintiffs' Renewed Motion for Sanctions and the information presented at the recent evidentiary hearing in this matter.

**INTRODUCTION**

While the benefit of hindsight now allows nearly omniscient examination of how discovery unfolded in this case, the actions of the LSG lawyers must be evaluated not with the advantage of that perspective, but rather in light of their decisions and actions made and taken in real time with the information then available. When evaluated in that light, it is clear that the LSG lawyers at all times acted in good faith and in reliance on representations made repeatedly by their client.

With that benefit of hindsight, the LSG lawyers recognize that there were certain deficiencies in the discovery process. First, there was a late identification and production of some

of the available ESI. While the full scope, breadth, and importance of any late-produced ESI remains undetermined, it is true that this material should have been produced earlier and that the late production may have impacted the Plaintiffs' discovery and trial preparation. It also appears likely that some ESI was not fully preserved, likely cannot now be retrieved, and will not be produced. The scope, breadth, and importance of this material and any resulting potential prejudice is, however, far from clear. Despite these facts, it does not follow that a monetary or other sanction is an appropriate remedy in this dispute, particularly as against the LSG lawyers. Indeed, the evidence consistently demonstrated that the LSG lawyers acted in good faith and that they reasonably relied on the representations made by their client, Brent Duke.

The LSG lawyers properly communicated to Duke his obligations to preserve discoverable ESI, and Duke testified that he understood and observed those obligations. Following that, the LSG lawyers undertook a good faith effort to assess the universe of the discoverable ESI and, based on repeated representations from Duke, reasonably believed that the pertinent electronic records were contained on the four hard drives from which their initial ESI production was made. Given those facts, coupled with the Plaintiffs' failure to establish any irremediable prejudice, any significant sanction would be unwarranted. Finally, even if any sanction could attach to a good faith effort by counsel to identify, collect, and preserve ESI, that sanction must necessarily be limited by a number of factors. For these reasons, any sanction against the LSG lawyers would be inappropriate in this case.

1.     **The LSG Lawyers Appropriately Communicated the Obligation to Preserve Records and ESI.**

There cannot be any serious dispute that the LSG lawyers fully communicated to Duke his obligation to preserve all relevant evidence, including all forms of ESI. Thomas Leavens testified that at the outset of the case he advised Mr. Duke about the need to preserve records and electronic

2

information that might be related to the litigation. Tr3 790-92.[1] He testified that "the message had been delivered and understood" and that Duke acknowledged his obligation to preserve evidence, including electronic data and information. Tr4 1028. Leavens stated that in his subsequent communications with Duke, Duke reiterated his ongoing understanding and compliance with his preservation obligations. *Id*. Heather Liberman also repeated the importance of preservation during her May 2014 conversation with Duke. Tr4 1127. During that conversation, she checked and verified that Duke was not removing or disposing of any records. As Ms. Liberman put it, she "wanted to confirm that Mr. Duke wasn't deleting anything." Tr4 1130. Her contemporaneous notes of that conversation, LS Ex. 14, corroborate her testimony. Those notes include the statement, "confirm not removing data" marked with her check mark to indicate the subject was covered with Mr. Duke. *Id*. After joining the defense team, Travis Life again reconfirmed with Duke the understanding that he was preserving documents as requested, including that he was backing up his computers. Tr4 1209.

Duke agreed that he had received these various preservation warnings. He testified that the LSG lawyers explained to him what electronically stored information was and that he was to preserve "every kind of data." Tr3 585-87. He further confirmed that he was told that he could not delete anything and that all of his data would eventually be requested and searched. Tr3 586. Duke agreed that his obligations were hammered home to him by multiple LSG lawyers on multiple occasions. Tr3 588-90. He also agreed that his duties and responsibilities with respect to preservation of documents and ESI were "crystal clear" in his mind. Tr3 671-72. He similarly confirmed that he "fully understood" his obligation to preserve documents and records that might

---

[1] Citations to the transcripts from the five-day evidentiary hearing are abbreviated herein as Tr1, Tr2, Tr3, Tr4, and Tr5, each corresponding to the respective hearing day.

#72323560_v4

relate to the issues in this case and "there was no confusion" about preservation instructions he received from the LSG lawyers. Tr3 591.

The evidence, in fact, indicated that the LSG preservation advice was arguably not even necessary given that Duke was already taking steps to preserve all evidence and records, and especially emails, even before he retained LSG. Tr1 65-66, 225, Tr3 591, 594-95. Duke testified that his practice even before the case started was to never delete any emails except spam. Tr3 591-92. Duke ultimately agreed he was "sort of a digital pack rat" and later flatly stated, "I am a digital hoarder." Tr3 584, 624.

Seventh Circuit Electronic Discovery Committee Principle 2.04(a)[2] makes parties responsible for taking only "reasonable and proportionate steps to preserve relevant and discoverable ESI…." That principle goes on to state, "[t]he parties and counsel should address preservation issues at the outset of a case, and should continue to address them as the case progresses and their understanding of the issues and the facts improves." The hearing testimony demonstrated that the LSG lawyers communicated the preservation obligation at the outset of the case and continued to reiterate, address, and monitor preservation as the case progressed. As such, LSG lawyers' actions were objectively reasonable and appropriate.

## 2.      A Litigation Hold was Issued and Implemented.

It is similarly clear that as a result of the LSG preservation advice a litigation hold directive was issued within 21 Century Smoking ("21CS") and implemented. Duke testified that he communicated the preservation obligation to everyone with 21CS to the best of his ability. Tr3

---

[2]  This refers to the August 1, 2010 Revision of 7th Circuit Electronic Discovery Committee's Principles Relating to the Discovery of Electronically Stored Information, which was the operative version of those principals during the phases of this case when the initial eDiscovery issues were addressed.  These principles are hereinafter cited as "7th Cir. Principle __."

#72323560_v4

592.  He testified that he told all employees to save "everything," and that he took steps to make sure they were preserving and saving records related to the litigation. Tr3 592-93.

It is true that the LSG lawyers did not send a formal written hold communication to Duke or 21CS.  That fact, however, does not mean that a hold was not issued.  Case law from the time period when this litigation started indicates that formal hold letters are not necessary in all circumstances.  *See Haynes v. Dart*, No. 08 C 4834, 2010 WL 140387, at *4 (N.D. Ill. Jan. 11, 2010); *see also Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522-23 (D. Md. 2010) (litigation hold not required in all circumstances because of reasonableness standard); *Kinnally v. Rogers Corp.*, No. CV-06-2704-PHX-JAT, 2008 WL 4850116, at *6 (D. Ariz. Nov. 7, 2008) ("While a party must put in place a litigation hold to ensure the preservation of relevant documents, ... there is no requirement that it must be *written*." (emphasis original; internal citations and quotation marks omitted)).  Moreover, the manner in which the preservation advice was communicated and the hold issued here should be evaluated in light of the nature of 21CS and Duke's role in it.  As Duke stated, 21CS was "a very small company" and he was the key and sole managerial and IT employee in most respects. Tr3 596-98. While formal hold letters may provide benefits in large corporate or governmental organizations, in which such letters can be disseminated amongst numerous relevant employees to advise them of their obligations, it is hard to see any practical advantage (except in terms of providing protection to the lawyers) in very small organizations like 21CS where the key record-keepers are in direct and regular communication with counsel.[3]

---

[3] There has been some mention in the proceedings suggesting the failure to issue a written hold letter may constitute "gross negligence."  This concept arguably arises from Judge Scheindlin's comment in *Pension Committee of Univ. of Montreal v. Banc of America*, 685 F. Supp. 2d 456, 464-65 (S.D.N.Y. 2010), that after *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004), the failure to issue a written litigation hold would constitute gross negligence.  However, even Scheindlin's governing Second Circuit later expressly rejected that concept in *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135,

Finally, it bears noting that there is no evidence that a written litigation hold, as contrasted with the repeated direct oral communications employed in this case, would have caused any different result with respect to the preservation of evidence. Duke, a self-admitted digital hoarder, flatly testified that he already had a practice of not deleting any substantive information and preserving everything. Tr1 225, Tr3 594-95. His testimony further indicated he actually took steps to disseminate the hold requirement throughout the company and follow up on it. Duke also conceded that he did not need any instructions in writing in order to understand what he was supposed to do and testified that he would not have done anything differently if he had received written instructions. Tr3 588, 594-95. Accordingly, issuance of the verbal litigation hold was reasonable under the circumstances of this case and cannot constitute sanctionable behavior. *See, e.g., Haynes* 2010 WL 140387, at *4; *see also Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010) ("For instance, in a small enterprise, issuing a written litigation hold may not only be unnecessary, but it could be counterproductive, since such a hold would likely be more general and less tailored to individual records custodians than oral directives could be. Indeed, under some circumstances, a formal litigation hold may not be necessary at all."). This Court recognized the importance of proximate cause in its opinion in *Snider v. Danfoss, LLC*, No. 15 CV 4748, 2017 WL 2973464, at *4 (N.D. Ill. Jul. 12, 2017), when it held that in order to impose

---

162 (2d Cir. 2012) ("We reject the notion that a failure to institute a "litigation hold" constitutes gross negligence per se."). The rulings of other district judges, such as Judge Conlon's ruling in *Haynes v. Dart* and the *Victor Stanley* and *Kinally* cases, *supra*, similarly reject any such absolute requirement. Moreover, LSG's research has not identified any cases purporting to require the issuance of a written litigation hold for entities as small and intimately managed as 21CS. As an Editor of the Sedona Principles put it, "Elevating a written litigation hold to a pre-condition of compliance is inconsistent with the reasonableness standard. A litigation hold is a useful, but not exclusive, method of compliance." Thomas Y. Allman, *Amending the Federal Rules (Again): Finding the Best Path to a Duty to Preserve*, 11 Engage 2, 93 (2010).

#72323560_v4

sanctions under Rule 37(e) "[t]he ESI must have been (a) lost *because* (b) a party failed to take (c) reasonable steps to preserve it." (*emphasis added*).

### 3.    The LSG Lawyers Took Appropriate and Good Faith Actions to Assess the Universe of Discoverable Records and ESI.

Leavens testified that early in the case he met with Duke not only to discuss evidence preservation but also to identify where relevant records and electronic information were stored. Tr4 896. 21CS was and plainly is a small company. Tr3 596. It has always operated out of Duke's home and has never really had any physical assets. Tr3 596-97. Duke was the key employee and nerve center of the company. He was in charge of strategy, finance, HR, sales and marketing, the product line, product supply, and customer support and compliance. Tr3 597-98. The result, he agreed, was that issues "flowed up" to him "being really in charge of any decision-making" at 21CS. Tr3 598. Perhaps even more important, Duke had control over all of the company's files and records. Tr3 597. This included control of all of the company's computers. *Id.* Duke, in fact, admitted that he was effectively the head of IT for the company with respect to those devices. *Id.*

It was thus more than reasonable that the LSG lawyers concluded that all relevant ESI in this case could be found within Duke's control.[4] Indeed, Duke has repeatedly said exactly that. As is discussed in more detail below, he made such representations to the LSG lawyers in direct

---

[4]    During the evidentiary hearing, Plaintiffs' counsel asked Duke and the LSG lawyers about the preservation of various potential electronic communication media and records that might have been outside the scope of Defendants' production. This included cellular telephones, social media accounts, and various employee personal email accounts. In almost none of these instances, however, did Plaintiffs' counsel go on and ask questions to establish that the content of such materials included anything significant to the issues in this case. Such further inquiries – much less answers to them – were conspicuously absent. In the rare instances where substance was addressed, there was no indication that any material ESI was involved. Cellular telephones were a good example; Mr. Duke testified that he did not save files on his phone and could not conceive of anything that would have been on any of his phone that would relate to information sought in the litigation. Tr2 481. The fact is that these issues were apparently injected into the hearing as part of the Plaintiffs' strategy to magnify the ESI issues by throwing additional claims at the wall in the hope that something more might stick.

#72323560_v4

oral communications and in writing, and confirmed those representations by his conduct in multiple ways. Significantly, Duke has continued to make similar statements through his hearing testimony in late October of 2019. Referring to his computer and his wife's computer on direct examination, he stated: "That's where everything from our company is, basically." Tr1 151.

Lawyers have to, and are plainly entitled to, rely on the information provided by their clients in locating and collecting discoverable records, including ESI. Magistrate Judge Mason, relying on *Zubulake*, noted that "the lawyer must act reasonably, but 'cannot be obliged to monitor her client like a parent watching a child. At some point, the client must bear responsibility for a failure to preserve.'" *United Cent. Bank v. Kanan Fashions, Inc.*, No. 10 CV 331, 2011 WL 4396912, at *2 (N.D. Ill. March 31, 2011).

The fact that the LSG lawyers considered Duke himself to be the central custodian of records for himself and for 21CS was also fully disclosed to Plaintiffs and their counsel early in the case. This was clearly reflected in Defendants' initial Rule 26 disclosures served in November of 2012. Pl. Ex. 50. And at the May 15, 2014 status hearing in this case, in response to a question from the Court, Leavens stated that Duke was the only custodian of electronic materials for the Defendants (indeed, Plaintiffs' counsel also represented there was only one custodian of electronic materials for DR). Ex. A, Transcript of May, 15, 2014 Status Hearing, at 6-7. Plaintiffs took no issue with that disclosure. In fact, at no time prior to filing of their renewed motion for sanctions – – and indeed arguably not until the evidentiary sanctions hearing itself – – did the Plaintiffs seriously contend that there were any other persons affiliated with 21CS who might be custodians of ESI pertinent to the real issues in this litigation. *Cf.* 7th Cir. Principle 2.04(a), (c), (e) (suggesting parties address, confer, and resolve issues about preservation at the outset of the case and as it progresses).

### 4. The LSG Lawyers Reasonably Believed all Discoverable ESI was Stored on the Four Hard Drives Identified by Duke.

Mr. Duke, despite his evasions on multiple other subjects, did not seriously contest that he took a series of actions over a period of years that led his former lawyers to believe that all electronic records — including emails — were on the hard drives of four computers located at his home office. Tr3 629. Leavens testified that in his conversations with Duke early in the litigation, Duke generally indicated that "everything existed on these computer hard drives...." referring to the four computers located at his home office. Tr3 820, Tr4 896. More important, Leavens specifically testified that Duke indicated that all of his emails were on those hard drives. Tr3 818-19; *see* Tr4 894, 1142. Liberman testified that she arrived at the same understanding. Tr4 1124-27. Duke confirmed to her that all electronic information was on the four hard drives. Tr4 1125.

Obviously, from the outset of the case, the LSG lawyers believed that all electronic records — including all emails — were on the four hard drives.[5] It is significant that Duke admits that he never suggested to any of his lawyers that his email accounts had a separate existence online from what he maintained on his computer hard drives. He flatly testified that he never explained that distinction to them. Tr1 238-39. Thereafter, Duke repeatedly reaffirmed and reinforced the conclusion that all electronic materials were on the four hard drives in a series of communications and actions:

---

[5] In assessing the reasonableness of the LSG lawyers' conclusion that all emails were on the four hard drives, it is notable that Plaintiffs' counsel never raised a question about the issue despite being advised from the beginning in Defendants' Rule 26 disclosure statement (LS Ex. 4) that all electronic records resided on "three or four computers" located at 21CS's office. The LSG lawyers do not suggest that Plaintiffs' counsel share any responsibility for the failure to identify the location and scope of Defendant's ESI, but only note that this distinction apparently did not jump off the page at them either. Plaintiffs obviously had emails from multiple 21CS and Duke accounts, and knew that the electronic records had been identified as coming from the computers, but never suggested that Defendants' collection and search was improper because it was limited to the computer hard drives.

#72323560_v4

- When the LSG lawyers prepared the draft of Defendants' initial Rule 26 disclosures, Leavens discussed that draft with Duke and provided him a copy for review and comment. Tr5 1541-42, LS. Ex. 7. That draft included the statement: "Electronic records are located at 1535 N. Ashland Ave., Chicago, Illinois and reside on three or four computers located there." LS Ex. 7, p. 5. Duke approved that language while making changes to other aspects of the draft. *Id*., p.4. Duke also testified that he told Leavens the same thing. Tr3 629.

- After the injunctive and summary judgment aspects of the case, when it moved toward full-scale discovery in 2014, Liberman again discussed the location of electronic records with Duke, as evidenced by LS Ex. 15, which again referenced the four computers. As Liberman testified, the list and reference to four computers in that exhibit was "the scope of where we understood electronic information was stored." Tr4 1139.

- In late 2014, as Defendants prepared to collect ESI for search and review, Duke expressly described the four computers as having all records. Recognizing the scope of the plan for collection, Duke emailed Liberman on December 1, 2014 referring to "the 4 computers that would have anything related to 21 Century." LS Ex. 13.

- Shortly thereafter, on December 14, 2014, Duke personally and physically participated in the 4Discovery remote collection process by which the four hard drives were copied for search. Tr3 610-611. Despite knowing that all 4Discovery was collecting and was going to search was the content of those hard drives, Duke never made any objection to the completeness of that collection. Tr3 608-612, Tr4 1164.

- In June of 2015, when Defendants filed their Second Supplemental Rule 26 disclosures, the language about electronic records residing on three or four computers in 21CS's office again appeared and was again approved by Duke. LS Ex. 6.

- As the litigation proceeded, Duke's participation in the discovery process further confirmed to the LSG lawyers the completeness of the collection and production. In response to Plaintiffs' counsel's question, Travis Life described how his communications with Duke about the numerous backup searches Duke made to confirm the completeness of Life's own discovery searches reinforced this conclusion:

  > …we had an understanding that we had the universe of documents. Whenever I asked Mr. Duke to do a different search, it was already after I searched the universe of documents, to be a secondary search. I wanted to make sure that I had an absolute complete response to your discovery requests, and every time I asked Mr. Duke to supplement, I never got any additional documents or anything I didn't already have. I had no reason to believe that there was anything else out there.

Tr4 1202. Life stated that until early 2018, Duke's common response was, "You have all the data.

You have everything." Tr4 1242, *see* Tr4 1207 ("You already have it. You already have it. You

have searched it. You have it.") These statements reinforced Life's belief that everything available to Duke had been searched and produced. Tr4 1242.

In addition to Duke's representations and behavior, the conclusion that all of the emails were on the four hard drives was consistent with a common practice and Duke's digital character. 4Discovery principal Chad Gough, an eDiscovery consultant, confirmed that computer systems can be configured so that all emails are downloaded onto the hard drive. Tr5 1483. (Significantly, Liberman testified this was consistent with her own email experience: "... I thought that all of that information was on the hard drive because, I can say from experience, that the e-mail that I had using Outlook at the law firm was on my hard drive. So there wasn't a question for me." Tr4 1151.) Such an arrangement would also have been entirely consistent with Duke's practices as a digital pack rat and digital hoarder. Put simply, these factors also underline the reasonableness of the LSG lawyers' conclusion that all emails were on the hard drives. Further, courts across the country have recognized that a lawyer may reasonably rely upon the assertions made by his or her client. *E.g.*, *Goines v. Lee Mem. Health Sys.*, No. 2:17-cv-656-FtM-29NPM, 2019 WL 4016147, at *5 (M.D. Fla. Aug. 26, 2019); *McFadden v. Meeker Housing Auth.*, No. 16-cv-2304-WJM-GPG, 2019 WL 2189493, at *1 (D. Colo. May 21, 2019); *Lawrence v. City of New York*, No. 15cv8947, 2018 WL 3611963, at *3 (S.D.N.Y. July 27, 2018).

The reasonableness of that conclusion was also ultimately reinforced by the results of the search process. The fact is that the hard drive search generated hundreds of emails within the scope of the search terms. Tr3 620-21. This was yet another indication to the LSG lawyers that the collection was appropriate. Tr4 1038.

The perception of the LSG lawyers was that the hard drives, in addition to having all emails, also had all other forms of 21CS computerized records and electronic materials. Having concluded

that, it was also reasonable for the LSG lawyers not to even consider an expensive and time consuming additional search of the Duke/21CS online email accounts. Those accounts would potentially have been a secondary source of the same emails, but a smaller and less complete collection of all potentially discoverable electronic records. As Leavens put it, they were "a subset of what was on the hard drives." Tr4 893. Their search was instead logically of what was understood to be the larger and more complete collection. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (the court "must limit the frequency or extent of discovery… if it determines that the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."). As the Advisory Committee Notes to Rule 37(e) indicate, the rule calls for reasonable steps but "does not call for perfection." Fed. R. Civ. P. 37(e) Adv. Comm. Notes to 2015 Amendment. The Advisory Committee Notes and other authorities have also recognized the potential expense of e-discovery and the propriety of reasonably controlling those expenses. *Id.* Similarly, the 7th Circuit Electronic Discovery Principles note an intention to promote the "inexpensive" resolution of litigation. 7th Cir. Principle 1.01. Those same provisions suggest a goal to craft discovery to "eliminate duplicative ESI." 7th Cir. Principle 2.05(b)(1). Case law also suggests an appropriate focus on cost issues. *See, e.g., U.S. ex rel. Oughatiyan v. IPC The Hospitalist Co.*, No. 09 C 5418, 2015 WL 4249195, at *2 (N.D. Ill. Jul. 14, 2015) *citing U.S. ex rel. Spay v. CYS Caremark Corp.*, No. 09-4672, 2013 WL 4525226, at *7 (E.D. Pa. Aug. 27, 2013); *see also Danis v. USN Communications, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *5 (N.D. Ill. Oct. 23, 2000) )*; see also Archer Daniels Midland Co. v. Chemoil Corp.*, No. 15-2199, 2016 WL 9051173, at *3 (N.D. Ill. Oct. 19, 2016) (finding that the burdens and costs of production outweighed the need for discovery where the additional discovery would likely only lead to few additional emails that would be expensive and difficult to obtain).

Surprisingly, late in the evidentiary hearing when his counsel tried to rehabilitate him, Duke contradicted his prior testimony that Leavens' explanations to him were "crystal clear" and claimed that he had misperceived what materials constituted "electronic records." Tr5 1526-30. His testimony was that he did not understand "electronic records" to include his emails. *Id*. However, Duke then promptly undercut this contention on examination by both LSG's counsel and the Court. He agreed that "an email is a type of electronic record." Tr5 1540. When directed to the language of Judge Mahoney's initial disclosure template and asked if emails are "electronic records," he responded that "... it seems pretty clear if this states that...." *Id*. In response to the Court's questions, Duke then went on to admit "... that's kind of ridiculous to not understand that 'electronic' is electronic." Tr5 1545. The LSG lawyers reasonably assumed that Duke would not have interpreted this language in a way that he himself now concedes is ridiculous.

**5.      The LSG Lawyers Took Reasonable and Appropriate Actions to Collect, Process, and Produce Relevant ESI.**

After having determined what appeared to be the reasonable universe of ESI that would contain discoverable materials relevant to the issues in this litigation, the LSG lawyers acted in good faith to make an appropriate document production. Significantly, the first step in that process was to propose to Plaintiffs' counsel that the parties share a single eDiscovery consultant to marshal the ESI of both parties for production. Tr5 1352-53. Plaintiffs' counsel rejected that proposal. *Id*. The LSG lawyers then retained 4Discovery as the eDiscovery consultant for the Defendants and engaged with Plaintiffs in the process of determination of search terms. In another example of their express intention to make broad discovery (*see* Tr3 633, Tr4 1027, 1164, 1245), the LSG lawyers accepted all of the Plaintiffs' proposed search terms despite the fact that many were plainly overbroad. Tr4 866.

13

4Discovery then arranged for the actual collection of the ESI from the hard drives of the Duke and 21CS computers.[6,7] This process was conducted remotely, and involved Duke and his wife physically connecting the remote collection drives to their computers to accomplish the download process.  Tr3 610-12.

4Discovery thereafter processed those materials in a series of steps, including various filtering procedures, to assemble materials potentially including the agreed search terms. Those materials were then provided to LSG, and Life conducted a document-by-document review, and in February of 2015 produced all documents with search term hits that were not privileged.[8]  Tr5 1243-44.

---

[6]  The 4Discovery collection process obviously resulted in the copying of the 21CS hard drives.  During the evidentiary hearing, Plaintiffs' counsel asked questions about whether Defendants had copied all potentially discoverable ESI at the time they were initially asked to preserve records, suggesting the existence of an obligation under the discovery rules to make such copies.  Tr1 67-73, Tr3 792.  That suggestion confuses practices recommended by some commentators with legal obligations.  Copying as part of the preservation process is not mandatory and the LSG lawyers have found no case law supporting such a suggestion.  The duty is only to take "reasonable and proportionate steps to preserve ESI . . .".  7th Cir. Principle 2.04(a).

[7]  Plaintiffs also attempt to attribute fault to the LSG for lawyers for the unanticipated and apparently random failure of 4Discovery's stored drive of the collected materials long after the initial search process was completed and materials produced. This contention runs upstream against a host of facts: (1) the agreement called for 4Discovery to maintain the materials for at least a year and to notify LSG if the materials were to be destroyed (LS Ex. 21 at 4); (2) there was no reason anyone would reasonably anticipate there would be any need for the materials after a year, as the discoverable documents would have long since been produced; (3) the database of 4Discovery's search results remain available today; (4) there was never any notification to the LSG lawyers that the material would be destroyed or cease to be available (Tr5 1470); (5) the "destruction" was unintentional and a remarkably rare event (Tr5 1489, 1492-93); and (6) in fact, 4Discovery doesn't even warn its clients, and did not warn the LSG lawyers, of the risk of hard drive failure (Tr5 1493).

[8]  The specific issues raised by Plaintiffs' Exhibit 91, the 4Discovery "hit" report, are the subject of distinct ongoing proceedings. It bears noting that that issue was not raised in Plaintiffs' motion for sanctions, but only developed late in the course of the evidentiary hearing. It has already been established that the exhibit was actually an interim report and that Chad Gough's testimony that 4Discovery's collection search resulted in over 84,000 distinct documents that exhibited search term hits was incorrect. Defendants' Third Status Report, Doc. 368.  The actual number of documents generated and assembled at the conclusion of 4Discovery's process was actually much smaller and, as will be demonstrated, still included a substantial volume of irrelevant "spam" pages.

14

6.    **The Chat/Instant Message Issue**

The issue of instant messages, or "chats," received substantial focus during the evidentiary hearing. The evidence established that the LSG lawyers appropriately instructed Duke regarding the preservation and importance of such materials. To the extent any such materials have become unavailable, that was caused by other actors and was without any intention of the LSG lawyers. Perhaps more important, there was no direct evidence that any specific chat communications material to the issues in this case have been lost and cannot now be produced.

At the outset, it is clear that the instructions of the LSG lawyers were broad enough to require the preservation of any chats with relevance to the litigation. Leavens testified that early in the case he specifically discussed chat communications and methods of preserving them with Duke. Tr3 783-84. At that time, Duke told Leavens that he already had and was using a process for preserving any material chats. Tr3 784-85. Duke similarly testified, in response to a direct question from the Court among others, that he knew and understood from the initial preservation discussions that he was to preserve chat data. Tr1 215, Tr3 621.

There was, however, little evidence of the existence of any significant number of chat communications related to the 21CS business. Duke testified that his use of those functions was overwhelmingly for personal reasons and that business usage was rare. Tr3 622. While Duke testified he had some Yahoo chat communications (at least some of which he plainly preserved by copying and emailing them to himself, as in Pl. Ex. 37) when he needed assistance in the early phases of the 21CS website, such communications were generally "rare" and "extremely rare" after this litigation started. *Id.* He similarly testified that the other chat function he had access to, Gtalk, was used rarely or extremely rarely and that he actually did not have a specific recollection of ever using it for any purpose related to 21CS. Tr3 622-23, 692-93.

The fact of the matter is that Plaintiffs never established that Duke engaged in any specific chat conversations relating to material issues in this case that have not been produced. Notably, Plaintiffs' counsel carefully avoided asking Duke direct questions about whether he had such communications beyond those copied and produced. The suggestion that such communications must have occurred — intimated many times during the course of the hearing — was never corroborated by any evidence. It is also significant that while the Plaintiffs specifically attempted to engender speculation regarding the possibility of instant messaging communications between Duke and Saraswat about the website metadata issue, they have never made any attempt to corroborate that contention. They made no effort to even communicate with Saraswat, much less take her deposition, in order to confirm the existence of such communications. The substance of the Saraswat declaration (Def. Ex. 28), arising from defense counsel's interview of her (Tr5 1393-94), stands undisputed. The result is that the suggestion that the communications that Plaintiffs hypothesize ever occurred, or have any materiality to the issues in the case, remains pure speculation.

Finally, and perhaps most important, it is clear that to the extent any instant message/chat materials that once existed are no longer available, that happened through events the LSG lawyers were not aware of and had no control over. Duke flatly testified that he never deleted his chats. Tr5 1519. Instead, he claimed that the loss of those materials occurred as a result of an unannounced action of his service provider, Yahoo. Tr1 215, Tr3 626-27; *see also* Defendants' Fifth Status Report, Doc. 373. Regardless of the credibility of these contentions, there is no suggestion that any of the LSG lawyers intended or caused these materials, apparently at one time preserved in the service providers systems, to be purged or lost.

16

7.      **The Email Issues**

A.      *The Yahoo Online Account*

The fact that the defense lawyers did not understand until approximately April of 2018 that there were responsive Yahoo emails that were not included in Defendants' February 2015 ESI production is explained in the preceding sections. Put simply, the LSG lawyers believed, based on Duke's representations and conduct, that the entirety of the Yahoo account was on the hard drives from which production was made. Subsequent events, including Duke's repeated affirmations that LSG had "everything," and the fact that nothing more came forward in Duke's multiple backup searches on discrete discovery issues, only reinforced that belief. It was only after Duke advised Life that he had numerous emails with Saraswat that the incompleteness of the Yahoo materials in the original ESI production eventually became apparent to defense counsel.

Duke admitted that at the outset he did not explain to LSG counsel the distinction between the hard drive emails and his online email accounts. Tr1 238-39. And while Duke contended in his hearing testimony that he had offered defense counsel the login credentials from the online email accounts (Tr1 124, 129-30, 200), he never identified any specific communication corroborating that claim and could not state any specific time it occurred. In fact, the first record of Duke actually offering or providing credentials was in May of 2018. Def. Ex. 57. The LSG lawyers, by contrast, testified that they never communicated with Duke about obtaining or were offered those credentials before that time. Tr4 1141-42, 1237.

Finally, it remains the fact that once the defense counsel team fully understood that the original ESI production did not include all of Duke's Yahoo emails, they immediately took steps to have his online account searched and made a supplemental production of email materials. Tr4 1052.

B.    *The Auto-Delete Issue*

It is not disputed that the content of at least some of the 21CS email accounts were for a time affected by what has been termed an "auto-delete" or "auto-purge" function. Although there had earlier been a different understanding about what effect this account feature had, by the time of the evidentiary hearing it was understood that certain of the GoDaddy accounts automatically deleted sent emails after six months. Tr1 162-63. Duke's unrefuted testimony was that it was an automatic account setting that he did not intend to implement and was not aware of until mid-2015. Tr1 163-64, 168, Tr3 634. Duke's testimony in this respect is logical; the feature would run afoul of his professed intention to preserve all business materials and would be contrary to his digital hoarding practices. Duke also testified that immediately upon discovering the setting he contacted GoDaddy and was able to correct the setting to end the auto-deletion. Tr1 168.

There is no suggestion that any of the LSG lawyers had any awareness of the auto-delete issue before Duke discovered and corrected it. Although Duke gave uncertain and contradictory testimony, based upon a limited recollection and what he termed "piecing it together," about how and when he advised his lawyers about the issue (*see* Tr1 164-169, Tr3 637-641), it is the case that at some point Leavens became aware of the issue. Leavens initially understood, however, that the impact of the auto-delete function was offset by an auto-forwarding feature Duke had enabled on the primary GoDaddy accounts by which sent emails were forwarded to Duke's personal Yahoo email account. Tr4 1040-43. The fact that this had been the understanding of defense counsel is confirmed by two hearing exhibits, LS Ex. 11 (Paragraph 15: "I have come to learn that at all relevant times, emails from 'support@21CenturySmoking.com' and 'bduke@21CenturySmoking.com' were automatically forwarded to the Yahoo Email."); and LS Ex. 17. The latter exhibit is an email exchange in which Peter Stamatis asked Duke to confirm

what Duke "had previously advised" about emails *from* the two 21CenturySmoking.com accounts being auto forwarded to the bduke@yahoo.com account. Duke responded noting that only the bduke account (the more substantively significant account) forwarded, but did not take issue with the "from" characterization. *See* Tr3 634-36.

While it has ultimately been determined that it was not "from" emails but instead "to" emails that were actually auto-forwarded to Duke's Yahoo account, it remains the case that there is little evidence that the auto-delete issue caused a material loss of significant emails. In the first place, as Duke repeatedly explained in his testimony, any sent email that got a reply was preserved as part of the email chain in inbox materials. *E.g.*, Tr1 67, 103-104. As sent emails are generally intended to get responses, and to serve as part of ongoing email communications, this undoubtedly resulted in the preservation of most of the sent emails. This is demonstrated by the Plaintiffs' failure to provide much indication of specific communications they contend are lost.

C.   *The GoDaddy Email Online Accounts*

More than once during the evidentiary hearing, the Court raised the legitimate question about how defense counsel failed to search the online GoDaddy accounts in 2018 when the issues with the Duke online Yahoo account were discovered and remedied. The answers to those questions were perhaps unsatisfactory in the harsh glare of hindsight, but nevertheless illustrated the fact that the lawyers were operating in good faith.

The backdrop to former defense counsel's understanding of the email issues goes back to Duke's original assurances that all electronic records related to 21CS were on the four hard drives from which Defendants' original ESI production was derived. Although the lawyers discovered that Duke's personal Yahoo account was not completely on the hard drives, they did not understand that the same issue applied to the GoDaddy accounts that were 21CS business accounts. As

19

Stamatis explained it, the understanding was "that the only account that been searched was the Yahoo! account because -- let me say it this way-- the personal e-mail account that was at Yahoo! and that all the corporate e-mails or all the corporate data was on those hard drives."  Tr5 1296-96.  The Yahoo email "was the outlier because it was the personal e-mail ... and everything was in the corporate computers." Tr5 1357.

The May 2019 discovery that the GoDaddy accounts had not been fully searched came, to put it mildly, as a complete surprise to counsel.  Leavens explained that after the discovery of the Yahoo online issue, he believed he and the other defense counsel had received assurances from Duke that "there were not going to be any more surprises" and "we were getting to the bottom of the full story on the matters that had arisen when we did the Yahoo! search."  Tr4 908. Stamatis and Steven Shonder, the initial recipients of the disclosure, provided compelling testimony about their shock and emotional reaction. Stamatis described how upset he was, even referring to his immediate need to go walk by the Chicago River and "looking at the water, waiting for Clarence to jump in before I jumped in ...." Tr5 1330, 1358.  Shonder described himself as "crestfallen," and felt the blood rush out of his head. Tr5 1402.  This obviously was what led to the withdrawal of defense counsel.

There was plainly no intention of the former defense lawyers to deprive the Plaintiffs of any discoverable materials. Obviously, it would not make any logical sense for the lawyers to have remedied the Yahoo issue in 2018 and not addressed other online accounts had they fully understood it.  The fact is that all four defense lawyers had essentially the same information and none made the connection to the GoDaddy accounts.

Upon realizing what had occurred, former defense counsel blew the whistle and reported the issue to the Court.  They then immediately initiated the process of having the GoDaddy

accounts searched so that discoverable materials could be produced. It bears noting that it has not yet been determined what materials may exist in the online GoDaddy accounts that were not included in Defendants' original ESI production, making the extent of any late production undetermined.

## REMEDIES IN THIS CASE

Any issues that can reasonably be attributed to the conduct of former defense counsel ultimately relate to ESI.[9] As such, those issues fall under the rubric of Rule 37(e).[10] The essential dictates of Rule 37(e) are clear: first, the Court must decide if ESI that should have been preserved was lost because a party failed to take reasonable actions and that the information cannot be restored or replaced through additional discovery. Indeed, the 2015 amendments to Rule 37(e) provide that it is the specific and sole basis to issue a sanction for failing to preserve electronically stored information. *Snider*, at *3; *see also, Worldpay, US, Inc. v. Haydon,* 17-CV-4179, 2018 WL 5977926 (N.D. Ill. Nov. 14, 2018). Only when each of the prerequisites is met is the court to assess any prejudice suffered by the opposing party. *Id*. at 5. Where each prerequisite is met *and* prejudice has resulted, the Court may only order measures no greater than are necessary to cure the prejudice unless there was intent to deprive another party of the use of the ESI. Prejudice

---

[9] Although Plaintiffs' Renewed Motion for Sanctions also relies on Rules 26, 56, 28 USC § 1927 and the Court's inherent authority as bases for requested sanctions, the hearing evidence indicated that any lack of knowledge or information on the part of the defense lawyers was not intentional and was ultimately the result of ESI that had not been produced in the discovery process. As such, there was a total absence of intentional conduct by the defense counsel and these are at bottom Rule 37(e) issues.

[10] The LSG lawyers recognize that Plaintiffs' contentions include issues that do not involve ESI, and which would fall outside Rule 37(e). Those other issues, however, involve Mr. Duke's independent conduct, such as the issue of the website metadata, and his testimonial representations about his involvement with Edmiston and the Edmiston recordings, his contacts with Saraswat, and his failure to candidly identify Brian Kos. It cannot be seriously claimed that defense counsel permitted or encouraged Duke's conduct or representations on these issues. The record is, in fact, replete with evidence of the efforts of defense counsel to react to, investigate, cure, and clear up these issues.

cannot be presumed, but must be shown. *Worldpay,* at *6 ("The problem, however, is that while Worldpay has articulated what it hopes that it might have found among the deleted information, it has provided little reason to be confident that this information actually would have been found had the domain not been shut down. It has at best an educated guess about what might have been on the domain."). "A document is destroyed in bad faith if it is destroyed for the purpose of hiding adverse information." *Id*, at *5 (citation omitted).

The record is devoid of any indication that any of the defense lawyers ever intended to deprive the Plaintiffs of any discoverable information. First, such an intention would just not make sense. Former defense counsel, including the LSG lawyers, were representing the adjudicated senior user and were being paid by the hour. There is simply no reason to engage in deliberate discovery misconduct. Second, the intention of the LSG lawyers to make full disclosure (Tr4 1027, 1164, 1245) was corroborated by their conduct on numerous occasions, such as their rejected proposal that the parties share a single eDiscovery consultant and their acceptance without objection of Plaintiffs' broad search terms. Third, each of the LSG lawyers, along with Brent Duke himself, testified that the LSG lawyers were always acting in good faith. That testimony remains uncontroverted.

If, despite the LSG lawyers' good faith, this Court deems that some type of sanction is appropriate, that sanction should be limited by a number of factors, including that the Plaintiffs have provided very little, if any, clear proof of actual prejudice. Plaintiffs have, at best, articulated only that the missing ESI has impacted their discovery process. While 37(e) does not identify which party bears the burden of showing prejudice, Plaintiffs have not been able to demonstrate that any material document once existed, is now gone, resulting in harm, and any claimed prejudice

remains speculative and amorphous. Without a showing of prejudice, Rule 37(e) sanctions are not available. *Worldpay,* at *6.

To the extent this court finds that any sanction is appropriate, relevant precedent favors narrowly tailoring such a sanction. For example, in *Bankdirect Capital v. Capital Premium Financing,* the defendant brought a sanctions motion against the plaintiff on the basis that the plaintiff intentionally destroyed or allowed to be destroyed several years' worth of emails that were sought in discovery. *Bankdirect Capital Finance, LLC v. Capital Premium Financing, Inc.,* 15 C 10340, 2018 WL 1616725, *1 (N.D. Ill. April 4, 2018). The plaintiff argued that the loss was attributable to errors, and was not the result of any intent to effect the litigation. *Id.* Magistrate Judge Cole, "guided by the principle that a combination of events, each of which seems mundane when viewed in isolation, may present a very different picture when considered together," ruled that the actions should be considered by the jury to "determine the reasons for the non-production and the impact, if any, the non-production of the challenged emails has on the merits of the parties' claims." *Id.* at 12. Likewise, in *Schmalz v. North Riverside,* Magistrate Judge Rowland also found that the defendant's failure to produce ESI and any resulting prejudice was a question for the jury. *Schmalz v. Village of North Riverside,* 13 C 8012, 2018 WL 1704109, at *8 (N.D. Ill. March 23, 2018). In that case, the defendant was alleged to have failed to preserve text messages, which were purported to be relevant and no longer available. As in *Bankdirect* and *Schmalz,* an appropriate remedy here, if any, could be assessed by the trier of fact, who will have an opportunity to review these issues in light of the broader issues in the case.

An award of attorneys' fees in favor of the Plaintiffs and against the LSG lawyers would be inappropriate in this case as well. As this court has noted, "the mention of attorneys' fees as a sanction" is "notably absent from Rule 37(e)," and even the Advisory Committee Notes are

"shockingly silent" on the issue. *Snider,* at \*5. While courts have, from time to time, imposed an award of attorneys' fees as a sanction under Rule 37(e), those cases are rare and tend to include particularly egregious conduct, unlike what the evidence supports against the LSG lawyers. *See, e.g., Williams v. Am. Coll. Of Educ., Inc.,* 16 C 11746, 2019 WL 4412801, at \*16 (N.D. Ill. Sept. 16, 2019) (awarding, among other things, attorneys' fees and costs where the respondent intentionally overwrote a hard drive and repeatedly committed perjury regarding his conduct).

No other basis for sanctions should be considered against the LSG lawyers, based on the fact that there is no evidence that any of them engaged in any intentional or deliberate misconduct. While this court of course possesses inherent authority to sanction conduct that is abusive to the judicial process, "inherent powers must be exercised with restraint and discretion." *Chambers v NASCO, Inc.*, 501 US 32, 44 (1991) (citation omitted). When invoking inherent authority to impose sanctions, any such sanctions are appropriate only where there is willful abuse of the judicial process or there is evidence that the litigation has been conducted in bad faith. *Tucker v. Williams,* 682 F.3d 654, 662 (7th Cir. 2012). In those cases, the inherent powers are to be used "not merely to remedy the prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (citation omitted). Inherent powers should be used sparingly, and to punish *misconduct* that occurs within the litigation and that cannot be adequately disposed of pursuant to other rules. *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir. 2002) (emphasis added). In this case, there is no basis to believe that the LSG lawyers engaged in intentional or deliberate misconduct. As a result, any sanctions that are issued under the court's inherent powers would be unsound.

24

Likewise, the LSG lawyers' reasonable reliance and good faith prevent sanctions from being entered under Rule 26(g) or 56(h). Rule 26(g) allows sanctions when a party or counsel makes false certifications based upon reasonable inquiries, and Rule 56(h) requires bad faith or that the action is solely an attempt to delay court proceedings. There is no evidence here that the LSG lawyers engaged in this type of conduct; the repeated and unsupported suggestions to the contrary are merely indicative of the hyperbolic rhetoric that this litigation has come to include.

## **CONCLUSION**

Sanctions against lawyers are appropriate only where there is intentional or deliberate misconduct, and in this case, there is no evidence that any of the LSG lawyers acted in such a way. At all times, the LSG lawyers reasonably relied on the repeated and consistent representations made by their client, and moreover, they consistently acted in good faith. It would be unfair and inequitable to issue any sanction against the LSG lawyers based on either the benefit hindsight now provides, or based on current versions of the evolving standards of how lawyers are charged with conducting e-discovery. For the foregoing reasons, any sanction against the LSG lawyers would be inappropriate, and the Renewed Motion for Sanctions against the LSG lawyers should be denied in its entirety.

Respectfully submitted,

By: /s/ *Trisha M. Rich*
    One of Their Attorneys

Colin P. Smith (ARDC No. 3127693)
Trisha M. Rich (ARDC No. 6288544)
HOLLAND & KNIGHT LLP
150 North Riverside Plaza, Suite 2700
Chicago, Illinois 60606
Tel.: (312) 263-3600
Fax: (312) 578-6666
colin.smith@hklaw.com
trisha.rich@hklaw.com

#72323560_v4