**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC, <br><br>       Plaintiff/Counter-Defendant, <br><br> v. <br><br> 21 CENTURY SMOKING, INC., and BRENT DUKE, <br><br>       Defendants/Counterclaimant, <br><br> v. <br><br> CB DISTRIBUTORS, INC., and CARLOS BENGOA, <br><br>       Counter-Defendants/Counterclaimants. | **Case Number: 3:12 – cv – 50324** <br><br> Judge Thomas M. Durkin <br><br> Magistrate Judge Iain D. Johnston |

**PLAINTIFFS' POST-HEARING MEMORANDUM IN FURTHER**
**SUPPORT OF THEIR RENEWED MOTION FOR SANCTIONS (DKT. 294)**

Plaintiff/Counter-Defendant DR Distributors, LLC ("DR"), and Counter-Defendants/Counterclaimants CB Distributors, Inc. ("CB") and Carlos Bengoa ("Bengoa")(collectively the "Plaintiffs") respectfully submit the following Post-Hearing Memorandum in further support of their Renewed Motion for Sanctions against Defendant/Counterclaimant 21 Century Smoking, Inc. and Defendant Brent Duke ("Duke") (collectively, the "Defendants") and Defendants' former counsel Thomas R. Leavens, Peter S. Stamatis, Travis W. Life, Steven Shonder, and Heather Liberman VanDyke. [Dkt. 294].

## I.    __PRELIMINARY STATEMENT.__

After having over a year to prepare a response, and after five days of testimony at the evidentiary hearing, the best Duke and his phalanx of former attorneys can come up with by way of explanation for the multi-tiered mess that they collectively created as detailed in Plaintiffs' Motion for Sanctions ("MFS") is: we are "honest" people who did not "intend" to do anything in contravention of our Oaths or Rules, and we are, philosophically, "over producers" of documents. The problem with this approach is that this "defense" is based upon **conclusions** rather than actual evidence or cogent explanations that back up these lofty self-perceptions.   Their unsupported generalities miss the boat that: "Facts, not 'general propositions...decide concrete cases.'" *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.,* 2018 WL 1616725, at *1 (N.D. Ill. Apr. 4, 2018)(quoting *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting)).

In fact, very little was offered by either Duke or his attorneys to counter anything in Plaintiffs' MFS as the testimony demonstrated: a wide ranging and serial disregard for the Court's Rules and Orders; a lack of candor during discovery and at the hearing; and in the end, an incredible exercise in blame assessment by Duke and his former lawyers, pointing their fingers at each other, their e-discovery vendor, Judge Mahoney's Pre-trial Order form, and even at Plaintiffs' attorneys.

The long and winding road that collectively deposits us on the doorstep of this "monumental mess" is brought to us by a confluence of individuals in the form of Duke, who lied and dissembled his way through his deposition, declarations and hearing testimony, and his various teams of former lawyers who consciously and intentionally disregarded the Rules in the representations that they made in pleadings, to opposing counsel, and to this Court.  How is the responsibility to be allocated for a mess that is so multi-faceted in its obfuscation of the truth, its prejudice to Plaintiffs' case, and its usurping of this Court's resources?  Plaintiffs cannot possibly

recount all the damning, contradictory or incredible evidence that was illuminated during the evidentiary hearing in our closing brief, but they will offer the motive for the intentional misconduct as well as provide connections, disparities and holes in the evidence that lead to the inescapable conclusion that this case can never be tried on the merits because the "merits" are intentionally unknowable due to the collective litigation misconduct of Duke and his attorneys.

Before addressing the litany of transgressions outlined in the MFS and how that misconduct was further informed by the examinations at the evidentiary hearing, Plaintiffs note that what Duke and his former counsel **didn't do** in the Response Brief and at the evidentiary hearing speaks volumes. Where were the witnesses and documents that could substantiate their bare assertions? Why was there no GoDaddy witness to support Duke's auto-deletion story? Where were Bill Edmiston and Kai Sibley on the issue of the planned clandestine recording (aka the "big joke" according to Duke) at the trade show? Where was Laurie Duke to explain what she compiled in Plaintiffs' Exhibit 32 about Defendants' online sales created for the "Lawsuit"? Where was the Yahoo witness to answer the Court's questions regarding "Chat"? Why was there no testimony from Duke's new discovery vendor as to the possibility of data recovery or the reasonableness of the assumption that Yahoo and GoDaddy email accounts are stored on hard drives? Where was Kirti Saraswat from Webrecsol ("Saraswat") to explain her communications with Duke and the contradictions suggested by her Declarations in contrast to the newly discovered documents?

As already detailed in Plaintiffs' submissions in this case, it is often the absence of things that provides illumination of the truth when the intent is to deceive. As to the actual witnesses who did testify, they appeared casually unprepared to testify about the serious issues raised in the MFS or to even substantiate the details of what occurred at critical junctures that were the focus of this inquiry. The sheer number of times that the lawyers could not recall, or had no

memorialization of key events, or deferred to other members of the team for the responsibility/failure of performing a particular task was numbing.

It seems almost a quaint notion that only a year ago in this seven-year odyssey that Defendants' counsel was taking the position that "no documents were withheld." After that was debunked to the tune of tens of thousands of documents (Yahoo, Chat documents, and then the GoDaddy), the next line of the fabrication was that there was nothing "helpful" in the Yahoo documents to Plaintiffs' case and therefore, "no harm, no foul." These statements were made by attorney Stamatis in a signed pleading after he and his team purportedly read all 15,866 pages of paper documents from the Yahoo production in May 2018. (See Dkt. 253) That this was a misrepresentation is now without doubt. The fact that Plaintiffs have suffered prejudice in the manner laid out in their MFS is, at this point, virtually uncontested. It is incalculable how the documents that we know now have been destroyed, deleted, or corrupted would have impacted this case. And this result was, at every turn, avoidable if Duke and his prior attorneys had given more than lip service to their obligations, oaths, the Rules, and this Court's Orders.

The testimony offered at the evidentiary hearing demonstrated both the genesis and the spread of the infection that killed this case from a truth-finding perspective. The failure of the Defendants' "lead counsel" to provide comprehensive written instructions to his client regarding document retention and preservation, followed by a complete lack of diligence, follow-up or coordination to ensure that such procedures were enacted was the initial seed of contamination. Plaintiffs believe that the seminal moment when Defendants' intent to deceive was conceived was in the aftermath of Judge Frederick J. Kapala's Order on Partial Summary Judgment Motion entered on June 16, 2014 ("JKO" or the "Order") (Defendants' Exhibit 1 (Dkt. 80)). While Judge Kapala found that Defendants had first use of the mark (and was the senior user at common law,

not by registration), he also opined at length on his concerns of Defendants' "unclean hands." Among other things, Judge Kapala addressed Defendants very early knowledge of Plaintiffs and their trademark, evidence that Plaintiffs' trademark was in the metadata of Defendants' website and other evidence that a fact finder could find showed that Defendants' were attempting to appropriate the goodwill and reputation generated by the trademark of their competitor for their own profit. He concluded that: "Based on that delay and the other evidence in the record, a jury could reasonably conclude that 21 Century Smoking was content to profit from the success of DR Distributors' junior use until 21 Century Smoking found itself sued for infringement, and only then moved to cancel the junior mark in an effort to fend off liability." *Id.* at 8. He further held that "a reasonable factfinder could determine that cancellation is inappropriate, notwithstanding 21 Century Smoking's senior use, on account of unclean hands." *Id.*

Duke and all attorneys confirmed their awareness of the JKO which became their roadmap for litigation misconduct. (Tr. 266, 1225, 1281). Since Lanham Act cases are primarily equitable in nature and a finding of "unclean hands" deadly to their case, Duke and his attorneys focused only upon the mantra of "senior user" and evaded, at every turn, all efforts directed at the truth finding process related to any evidence of their unclean hands. Their strategic decision to evade expanded beyond the metadata/keyword issue and into another case critical areas in their attempt to prove "market penetration," an absolutely essential component to a common law trademark case. Hence, the withheld documents regarding online sales (PX-31 compared to PX-32), which when eventually produced after discovery closed yielded Duke's tortured explanation as to what his wife "really" meant when she composed the online sales chart for the "lawsuit."

Motivated to avoid unclean hands and to obtain a potential multi-million dollar award, the testimony of lead attorneys Leavens and Stamatis was illuminating in it demonstrated the thought

process that boiled down to: by Defendant having the first sale, the case was essentially won, and everything else, including Judge Kapala's Order regarding unclean hands, was just a nuisance. Stamatis testified that the metatag issue was "tiny" in his mind in compared to the gravity of Defendant's claims (Tr. 1354-55). These notions, that Plaintiffs' discovery requests aimed at the metadata, market penetration and consumer confusion issues were just "tiny" nuisances led to a cavalier and intentional attitude that infected virtually every maneuver around the truth finding process undertaken by Duke and his former lawyers. This led to lie after lie in discovery responses, declarations, deposition testimony, representations to the Court, and at the evidentiary hearing.

It is an age old and proven cross-examination strategy to demonstrate that by one lie, a witness is, by extrapolation, a likely liar on other material aspects of his testimony. The Seventh Circuit stated that the "trier of fact must consider whether particular falsehoods in a witness' testimony so undermine his credibility as to warrant disbelieving the rest of his testimony. *United States v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009). Here, the Court experienced so many lies, exaggerations, convenient memory lapses and other assorted dissembling behaviors, especially by Duke, that there is no need to extrapolate in order to reach the conclusion that he is not a credible witness. That his own various teams of lawyers found his credibility impugned, as stated on the witness stand or by their collective "loud" withdrawals is not surprising, although, quite frankly, they were often co-conspirators in the same credibility-challenged dissembling boat.

With full awareness that they had to avoid all evidence of unclean hands in order to get the millions they sought, Defendants engaged in the misconduct outlined in the MFS and documented and confirmed through the testimony at the hearing. Duke and his former counsel created a false, selective and incomplete record upon which they asked this Court to make dispositive rulings with the knowledge that the record was fabricated. Duke and his former counsel were given the

opportunity to explain their conduct and how it led to the path of mistrust and withdrawal. With their paucity of documents and explanations at the hearing, the Court can only conclude that it will never get the truth. Duke and his attorneys were obligated to provide a meaningful response to the MFS. The Court can also conclude that the actual truth, only known to Duke and his former attorneys, is so bad that it was better for them to collectively evade the truth and not provide any clarity or illuminating documents. The record now confirms the allegations in the MFS, and that the prejudice visited upon Mr. Bengoa (the owner of DR and CB), and the insults Defendants perpetrated on this Court and its Rules, are so broad and gross that justice can only be served by the dismissal of Defendants' counterclaims and the award of monetary sanctions.

## II.  ARGUMENT.

### A.  Defendants' Exhibit 76 (DX-76) Establishes Intentional And Bad Faith Misrepresentations to Hide the Truth, Suborn Perjury and Violate Court Rules.

The Court need only read the five-page email exchange in DX-76 between Duke and his counsel to understand the extent of the misconduct revealed and established by Defendants' own exhibits at the hearing. Once Duke and his attorneys read the JKO, they began to engage in intentional litigation misconduct to avoid dismissal. Duke's early knowledge of Plaintiffs' trademark in 2010 was a critical factor emphasized by Judge Kapala. At his deposition on June 16, 2015, (See LSX-1: Dep. Tr. Pages 346 to 363), Duke testified that he did not see the "TM" marking on the photo of Plaintiffs' product provided to him in an email from his Chinese manufacturing representative Mr. Frank Gu, or that he even knew that a "TM" was a trademark, never gave the image any thought and had no recall of seeing it or discussing it. (See PX 68 -- Gu Email to Duke in 2010 is attached to the end of PX-68 with picture of Plaintiffs' product with the trademark and the "TM" symbol clearly visible – Bates No. 21C-0769 to 0784).

Defendants' Exhibit 76 is an email exchange between Duke and attorney Liberman on April 8 to 10, 2013. In the emails, Liberman asked Duke specifically when he became aware of Plaintiffs' trademark and Duke responded with clarity as to his awareness and understanding of Plaintiffs' Trademark in 2010. In the email, Duke specifically identifies the email with Frank Gu in 2010 (PX-68) and confirmed he was aware at that time that Plaintiffs had a trademark registration when he saw the "TM" symbol on the picture next to product name. He also states that he spoke to his attorney about this and confirmed Plaintiffs had a trademark. (DX-76). This 2013 email exchange confirms that Duke committed perjury during his deposition in 2015. With the knowledge of his awareness of Plaintiffs' trademark disclosed to counsel in 2010, it also confirms that his attorneys, Leavens and Stamatis, allowed him to commit perjury. Contrary to his statements in his email, Duke failed to reveal that he noticed the TM symbol and was aware of Plaintiffs' trademark when he first saw that picture in 2010 – years before his deposition.

Further, Defendants and his legal counsel made a knowingly false statement of fact in their March 19, 2018 Supplemental Local Rule 56.1(a)(3) Statement of Undisputed Material Facts (Dkt. 234)(See PX-89). Despite knowing the scope of Duke's knowledge of Plaintiffs' trademark and having written confirmation of it in their possession since 2013, Defendants stated at Paragraph 163 of their pleading: "Duke did not notice the TM marking on the photo produced by Frank Gu." *Id.* There are many other misrepresentations made in this pleading seeking to obtain a multi-million-dollar judgment. This is but one example in this case where excuses have been given by Duke and his attorneys that have later been disproven. When this occurs, Courts have found intentional conduct holding that "[f]alse exculpatory statements are often evidence of consciousness of guilt." *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc*., 2018 WL 1616725, at *11 (N.D. Ill. Apr. 4, 2018)(citing *U.S. v. Shorter*, 54 F.3d 1248, 1260 (7th Cir. 1995)).

**B.  Defendants And Their Lawyers Intentionally Withheld Responsive Documents.**

The Court learned that in January of 2015 the application of Plaintiffs' ESI search terms, after de-duplication, resulted in 84,522 distinct document hits from Defendants' hard drives, which increased to 93,365 when family members are included. (See PX-91).  From that universe of documents, all of which should have been produced, Plaintiffs only received 46,118 **pages.** Defendants had ample opportunity to explain this discrepancy -- but couldn't. Not surprisingly, Defendants have subsequently filed unsolicited Status Reports and a Motion to Re-open to "correct" the misrepresentations by attorney Life that all documents that hit the search terms except for privileged documents were produced.  Life's explanations make no sense.  We will never know what was withheld as Defendants' hard drive ESI as it existed at the time of collection was lost.

**C.  Duke And His Attorneys Were Not Credible And Their Explanations Were Misrepresentations, Outright Fabrications And Proven False.**

**1.     The Invited Defamation Set-up and Cover-up.**  This was all a big "joke" according to Duke that was planned, hatched, and followed through upon, at length, via numerous (undisclosed until May 2018) emails between Duke and business associate Edmiston. This involved: bringing in Edmiston's wife to help with the set-up; and a still undetermined number of clandestine recordings which Duke admittedly had in his possession since October 2013 (PX-23).  Duke's tortured explanation regarding why he did not produce the second recording (PX-71) because he did not typically pay attention to Edmiston's email attachments lacked credibility as the first recording "117MOV" looked no different in format from the second "118MOV."  Duke knew the defamation claim was a set-up (the tapes contained nothing defamatory), and his lawyers filed the defamation claim without any reasonable investigation.  But it is Duke's perjury at his deposition that is one of the grandest floutings of his Oath in this case: he denied that he gave Edmiston "any direction to record any of the events taking place at the trade show." (MFS at PageID#12937-38).

Given what we now know from the Yahoo email cache produced in May 2018, it is clear that Duke planned this and intentionally lied to a direct question under oath regarding it during his deposition.

2.      **The Saraswat Lies.**  Duke and his attorneys misrepresented and concealed the scope and extent of Duke's relationship with his SEO consultant Saraswat to avoid a key issue in JKO.  Duke never reveals how he communicated with Saraswat or worked for Webrecsol. (PX 36-37).  Despite documents to the contrary, Defendants and their lawyers lied about the timing of their work together to avoid the time period when Plaintiffs' trademark was in Defendants' website. They cobble together an explanation for their timing lies through a new and tortured "free work" story. The withheld documents tell a different story. And when they do, Duke comes up with uncorroborated explanations.  He knew he communicated with Saraswat using Chat and worked with her well before and after the dates he certified to and that his lawyers inserted in the Saraswat Declaration.  None of Duke's Yahoo Chats were ever disclosed, preserved or searched and are now spoliated as a result of their intentional conduct.  (See Tr. 1458, 1468-69, 1499-1500).

3.      **The GoDaddy Auto-Deletion Story.** There are six years of potentially relevant business emails that are gone forever. Duke's sent GoDaddy emails are forever lost, as are all of his employees' sent emails on the GoDaddy platform.  This impacts virtually every contested issue in this case.  The "story" that is concocted to explain away this spoliation is nonsensical and conveniently uncorroborated. Duke admitted that he was obligated to save his emails, but took no steps to ensure it happened.  When he "discovered" this GoDaddy nefarious secret setting, he should have documented it.  Instead, Duke articulated three different dates at which time he "discovers" and corrects this setting.  His latest version of his "AHA" moment of discovery of June 29, 2015 is not credible. There is no corroboration for this date, no screenshot of his settings; no email to his lawyers; and no recollection of who he spoke with on the defense team.

4.     **The Auto Forwarding Sham is a Lie on top of the Auto Delete Lie.** Both Duke and his lawyers (at least Leavens) knew about the deletion of Duke's emails from sometime in 2015. They did not disclose it until March 2018, years after fact discovery closed. The "theory" why they chose to not disclose the spoliation of evidence is the "auto forwarding" of Duke's GoDaddy emails to his Yahoo account. It is now uncontested, by way of Defendants' Response Brief (see p. 11), that this auto forwarding story is false. They made representations to the Court in Declarations, briefs and open court that were untrue on a material issue regarding spoliation of evidence.

5.     **Duke Lies about the Confused Customer Emails**. Duke now admits that he selectively produced the confused customer emails, specifically redacting the Wood emails out of an altruistic motive of not wanting to "mislead" in showing multiple consumer complaints where only one existed. (Tr. 291). This is an intentional decision not to comply with a Request to Produce so as to withhold the rest of the email string which contains damning evidence. (See PX-69) This is not a coincidence, it is an intentional act to hide documents and avoid the import of JKO. Duke's excuse makes no sense because he produced other confused customer email strings that contained multiple emails, just not ones that were not critical of him. Finally, Duke would never have been caught but for Wood forwarding the emails to Plaintiffs. The final nail in the coffin is Duke's testimony that a more "robust" search might still unearth all the Wood emails. (See Tr. 200-201).

6.     **Contorted Explanation of the Critical Online Sales Data – PX 32.** The data on this chart destroys Duke's argument that his company's online sales were on the rise and that he was in the process of achieving the required market penetration. It is **uncontested**: 1) that this document, PX-32, was withheld during discovery, 2) that the online sales data on this chart undermines Duke's market penetration argument, 3) that this document was compiled by Laurie Duke and she would have no reason to lie about the data, 4) that the document "RE" line suggests it was compiled

in connection with the "lawsuit," and 5) that Defendants' expert David Haas did not have this chart/data when formulating his opinions. Haas used "estimates" in order to come up with the online sales for the timeframe referenced in the chart. (See PX-88 at Ex. 8.2 fn. 4). When confronted with this withheld document, Duke testified that his wife got it all wrong, and that the numbers on PX-32 leave out 80-90 percent of his on-line sales. (Tr. 444). The magnitude by which Duke testified that his wife got it wrong is inconsistent with the numbers articulated in Haas' expert report and his filed tax returns. It is telling that Duke did not call his wife as a witness.

7. **Duke's Feigned Ignorance Regarding Computers.** Duke, a Stanford educated e-commerce entrepreneur, concocts an alternative self-narrative asking the Court to believe that he is clueless as to the workings of computers. He has maintained a lack of ability to "code" in order to maintain that he was incapable of putting Plaintiffs' trademark in the metadata of his company website to avoid the clear mandate in JKO. There are too many inconsistencies between his story and the record for it to have any credibility. His education and work experience and detailed resume showing his coding skills. (See LS-1 at pp. 32-54, 130-132). The record now reveals that contrary to his deposition testimony and answers to written discovery: Duke is the "author" of "keywords" to other websites he never disclosed (PX-74 to 78, and Tr. 395-399). He was associated with Webrecsol. (PX-36 through PX-46). And his stunning acknowledgement that he was fully capable of modifying websites and was able to personally insert keywords into websites by using programs that did not require any "coding" ability. (See Tr. 489-91).

8. **Duke Is Fully Capable Of Computer Chicanery – PX-35.** Defendants' withheld an email between Duke and Hough that details how they planned to code their website to use certain misleading SEO techniques to trick customers by using a broken link to competitors' websites. (PX-35). This shows Duke is capable of articulating deceptive strategies like putting Plaintiffs'

trademark in his website, taking advantage of confused customers (Wood and likely others), and making his product compatible with Plaintiffs' as stated in his email with Gu (See PX-29).

9.     **The San Diego Meeting: Someone Is Lying**. There are two disparate accounts about what occurred at the September 2018 San Diego meeting. Since none of the lawyers who participated memorialized the substance of this paramount meeting, we are left with Duke's testimony that Leavens acknowledged "errors," and offered to withdraw.  Leavens says he confronted Duke about "credibility" issues and that they spent time going through Plaintiffs' sanctions presentation from the August 14, 2018 court conference, and that at no time did Leavens acknowledge he made any errors or offer to withdraw. What makes sense given the context of the meeting?  The examples of withheld documents that Plaintiffs' counsel articulated at that August 2018 hearing were: 1) the invited defamation and withheld recordings showing Duke's perjury; 2) the damning online sales/market penetration document; 3) the Wood/consumer confusion email and clandestine redaction; and 4) auto delete/auto forward fallacy. (See Dkt. 267 Tr. of Aug. 14, 2018 Hearing at pp. 10-43). All of these issues involve events, information and documents that were unquestionably known to Duke.  Some were known to defense counsel over time, but they all originated with Duke.  Thus, it makes sense that Leavens questioned the credibility of his own client.  He called the meeting, selected the documents, set the agenda and involved all defense counsel, including Mr. Dukes' personal attorney Salam, via telephone. Why do all that if you are going to admit personal errors and fall on your sword?  It makes no sense. And if it were true, why wouldn't Salam get up and testify so at the evidentiary hearing?  Here is what we do know: Duke did not fire his lawyers and they all withdrew.  The best explanation is the simplest one:  Duke was making misrepresentations throughout the litigation and his attorneys confronted him.

10.    **The "All my electronic data is on my hard drives" Story is Not Credible**.  Defendants
and their lawyers have repeatedly relied on a fundamental misunderstanding to explain all of their
misconduct: that all of Defendants' company electronic data was on the hard drives of the
computers at his office.  They have asserted this at every turn and it is simply not credible. This
explanation defies common sense.  The attorneys all have personal and professional experience
using online email accounts, over 100 years of legal experience and were assisted by experienced
ESI vendors.  It is too convenient that none of them asked anyone or investigated this assumption.
It defies common sense and is simply ridiculous to ask anyone to believe their story that is so
obviously false and easily debunked.  The Court faced a similar challenge in trying to understand
Duke's equally ridiculous and incredible testimony that he did not know "e-mails" were electronic.
These are outright fabrications made in an effort to avoid the consequences of their misconduct.

**D.    The Attorneys – Lead Counsel Leavens – Lied And Covered Up Intentional Conduct
And Allowed Duke To Commit Perjury.**

Making an allocation of the misconduct that begat this mess is challenging because, in
addition to Duke' demonstrated lies, there were myriad mistakes, misrepresentations and
misconduct, which are now augmented by conveniently poor memories and a telling refusal by
Duke's former lawyers to produce corroborating documentation.   Leavens testimony was
especially illuminating as to how Defendants and counsel concealed and misrepresented their
misconduct throughout this case.  He was the "lead counsel" (although even on this he could not
give a straight answer) who led the actions, or purposeful inactions, over a period of years, that
demonstrated a pattern of intentional disregard for the Court's Rules and Orders. Leavens
demeanor on the witness stand alone, with his countless failures to recall, and his failure to produce
any tangible evidence (memos, confirming emails, supporting witnesses, etc.) to support his bare
assertions spoke to the (in)credibility of what amounts to, at best, an "empty head, white heart"

defense.[1] But no one was fooled. Leavens sparse recollection and lack of preparation was a strategic decision, because telling the truth would be even more devastating to his credibility. Better to "forget" than to get caught in another lie. And yet, there were many watershed moments in Leavens testimony that support the MFS. Here are just a few.

There was no Litigation Hold or written instructions from Leavens to Duke regarding the preservation of evidence in this case. (Tr. 749) Leavens knew the difference between "I am not going to delete anything" and "I am going to copy something and protect it in some fashion from either age, or corruption or deletion or anything like that." (Tr. 792) But when asked whether he asked Duke to make a copy of his databases so that there would be a "snapshot in time as to what existed" he stated: "I don't think I did." (Tr. 792). Leavens admitted that in Fall 2012 he knew Duke had Yahoo and GoDaddy email accounts, and a Yahoo Chat account but never got login information during fact discovery. (Tr. 759-760). Leavens testified that Duke was lying when Duke testified that he offered the login information to Leavens (Tr. 760-763). It doesn't matter who is lying as Leavens had an obligation to secure the login information and make "reasonable inquiry" to comply with Rule 26(g). Leavens was asked during the hearing: "And you have a specific recollection of telling Mr. Duke to retain and preserve and maintain any Chat information or ESI that he might have? Answer: "The discussion was more along the lines of making sure I understood how he preserved it, and he said anything that was material, that he would copy it, and I don't recall how he would retain it, whether it was a document or whether he would send it to himself by email, or maybe he did both methods, but anything that was material and any Chat he had preserved it in that way." (Tr. 784). A few questions later Leavens was asked about whether

---

[1] This "empty head, pure heart defense" is not a basis to deny sanctions. See *Fox Valley Laborers Fringe Ben. Funds v. Pride of the Fox Masonry*, 1996 WL 137654 at * 9 (N.D. Ill., March 25, 1996)(indifference to rules and orders amount to objective bad faith, which is also sanctionable); and MFS at PageID #12967-68.

he was certain that Duke's understanding was that he was to retain anything that was "material" and Leavens answered: "I believe it was "material" but it was certainly anything that was related to his business and that had any kind of importance." (Tr. 785). And when Leavens was asked the follow-up question: "And did you give him any instructions on who gets to decide what is material," Leavens' answer was: "I don't recall. I don't remember whether I gave him any instructions along those lines." (Tr. 784-786). This is certainly a reworking of the Federal Rules by Leavens where the Defendant gets to decide what potential evidence he has in his possession is both "material" and/or "important" to preserve.

Further, the Leavens-led team never conducted a Custodian Interview, nor did they ask their e-discovery vendor to do one. We now know that such interview would have resulted in tens of thousands of responsive documents. (See PX-66). Leavens signed the Rule 26 Disclosures on key witnesses, but made ZERO effort to identify, preserve and maintain ESI related to ANY 21 Century Smoking employees (such as Robert Hough) or key witnesses (Saraswat). (Tr. 773-83, 1210-11, 1235-37). Incredibly, Leavens testified that he talked to Hough about ESI before his deposition (Tr. 777), but never inquired about how he communicated with Duke. Duke confirmed that Hough did not use the company GoDaddy account, but communicated with Duke through his @live.com email account. (Tr. 96-97). This @live.com account, on a key Rule 26 witness, was never disclosed, preserved, or searched.

With regard to the Leavens-led failures as to Saraswat related ESI, there simply is not enough space in this brief to catalog the defense's misrepresentations and willful ignorance on this topic, but this can be summarily and definitively stated: Leavens knew about Saraswat (she was listed in the Rule 26 Disclosures signed by him) and he did nothing to inquire of her or Duke how they communicated. (Tr. 944-45). It was only when Plaintiffs' counsel finally got Duke's Yahoo

emails on May 31, 2018, that they uncovered "Chats" had been cut and pasted into emails that revealed this form of communication. The Chats are gone (Tr. 927) and we will never know what they said on a key issue identified by Judge Kapala regarding Defendants' unclean hands.

Leavens also acknowledged that his team read the Yahoo email documents which contained Yahoo Chats before they were produced on May 31, 2018. He was asked: "If you knew this was Chat, why didn't you investigate it then rather than wait until after I pointed it out at an August 14th, 2018 status conference before His Honor?" Leavens response: "I don't know." (Tr. 926) Of course, even a rudimentary Google search would have revealed that time was of the essence as Yahoo was shutting down the Chat service, but neither Leavens nor anyone on the "Team" that read those Chat documents thought it was sufficiently "material" or "important" to inquire further. Stamatis was so bold as to state to this Court: "Plaintiffs, if given the opportunity to review this newly realized material, could not truthfully or objectively say that any of it supports Plaintiff's claims or supports its claims of unclean hands." (Dkt. 253 at PageID#12322; Tr. 1293). The Chat fiasco is but one definitive example of the spoliation of relevant ESI that occurred on Leavens watch which he attempted to excuse at the hearing with a feeble exhortation that Chat was "ephemeral" (Tr. 792) when all the evidence was to the contrary.

The "big excuse" why the email accounts were not produced was that: we assumed (wrongly) the emails were all on the hard drives! But when pressed, Leavens acknowledged that he never asked Duke if all his Yahoo and GoDaddy emails are on the hard drives (Tr. 894-95), and that he just assumed so because Duke purportedly stated that "everything" is on the four hard drives. (Tr. 898). Leavens also acknowledged that he never asked his e-discovery vendor, 4Discovery ("4D"), whether Yahoo and GoDaddy account emails would typically be preserved to a computer hard drive. (Tr. 896-97). In fact, Leavens could not even recall if he told 4D that Duke

had a Yahoo or GoDaddy accounts (Tr. 897), but he did to blame 4D for not providing "consulting" services to identify his own misunderstanding of Duke's ESI. (Tr. 1035-37, 1061-62, 1087-89)

The Leavens mantra is: Everyone else is to blame! Not me for not reading the 4D Statement of Work that only obligated 4D to maintain hard drives for one year, resulting in its loss forever (Tr. 1446-50). Not me for failing to advise Duke to adjust his ESI settings to preserve emails or for waiting 26 months from the beginning of his engagement in Sept. 2012 to Dec. 2014 to even bother imaging the hard drives which were in daily use (Tr. 831). Not me for failing to provide instruction to Liberman regarding ESI. (Tr. 767-73). Not me for not preserving Chat documents before they spoliated. Not me for "misunderstanding" the auto-forward/auto delete excuse, and not disclosing spoliation of years-worth of GoDaddy emails. Not me for failing to take a single note or compose a memo when he confronting Duke about numerous "credibility" issues (Tr. 859). Not me for having no explanation why it took over a year after "discovering" the Yahoo email debacle to figure out that the same failures occurred with the GoDaddy accounts. Not me for not following up with GoDaddy to confirm the timing of the "discovery" of the "auto-delete" setting. In sum, Leavens stuck to the script and testified to the end that he and the defense team he led made no "errors" whatsoever in their representations, strategic silences, inactions and willful indifferences to the Rules. (Tr. 983-84)

Leavens was assisted by the efforts of attorneys Liberman or Life in the serial misconduct of this case. Liberman's testimony was a painful exercise in purposeful evasion and comprehensive memory loss. While Liberman was the only attorney that took even a few sparse notes regarding Duke's ESI (LS-14 & 15), in one of the seminal moments of her testimony, she could not even recall if she ever met with Duke in person or otherwise regarding those notes, and otherwise recalled nothing other than what was written on the page. (Tr. 1127-28). But those notes

confirm that she, along with Leavens, were aware of Duke's Yahoo and GoDaddy email accounts and gave no instructions or made no provision for their preservation and production.

**E.** **Stamatis Did Not Act with Reasonable Diligence, Cannot Be Believed and the Record Shows He Knew the Scope of Spoliated Documents And Failed to Promptly Disclose.**

Stamatis' defense proffers two conflicting notions: 1) the defense lawyers did nothing wrong as these discovery issues are "tiny" and blown out of portion by overly aggressive plaintiff lawyering, or 2) my date of Appearance is June 8, 2015 and I am "current counsel" and therefore off the hook for failures that preceded my Appearance. However, the testimony revealed that Stamatis: 1) was involved behind the scenes before his Appearance, 2) had complete access to, and did in fact review the file, 3) signed pleadings, and 4) made numerous representations to the Court at hearings regarding discovery issues, and 5) became lead counsel.

Stamatis led the charge in briefs and hearings to resist an amendment to the Motion for Summary Judgment and is the author of the "manufactured, insignificant and untrue" trinity of observations about Plaintiffs (now) substantiated claims regarding document withholding. He made clear his view that it was not his job to conduct a diligent investigation into any of the matters raised concerning Defendants failure to comply with Rules, Orders or even to confirm that preservation, searching and production was proper. In his view, this was not "current counsel's" responsibility, and regardless of the allegation, he did not have to speak with Duke (Tr. 1284) and was entitled to uncritically rely upon the team that preceded him for everything (Tr. 1285).

The record is filled with Stamatis' misrepresentations, including: 1) no documents were withheld, 2) no stone was left unturned, 3) Plaintiffs' document concerns were a "road to nowhere", 4) there was nothing relevant in the 112 Saraswat emails, and yet he included them in his brief, 5) there was nothing in the Yahoo emails production that in good faith could be said to be helpful to Plaintiffs, 6) his "understanding" that the Yahoo emails and Chat were on the same

account and therefore Chat had been searched, and 7) his resulting failure to track down the Chat documents in May/June 2018 when time was of the essence to prevent their spoliation.

On March 19, 2018 when the first 112 Saraswat withheld pages were produced, Stamatis knew there was a problem. The mere existence of these 112 pages and their unholy genesis should have set off alarm bells for Stamatis, then lead counsel, to diligently investigate. The 112 pages contained previously undisclosed emails from **both** the Yahoo and GoDaddy accounts which should have compelled him to investigate **both** accounts. (PX-1) Instead, he did nothing other than represent to the Court that nothing was amiss and opposed Plaintiffs' Motion to Amend its summary judgment motion. (See Dkt. 253).

The record also points to the fact that Stamatis knew that there was a GoDaddy email problem in early 2018 rather than the late May 2019 revelation that he now professes. On May 7, 2018, Stamatis exchanged emails with Duke asking for and receiving Duke's GoDaddy account login information. (See DX-57). The only plausible explanation as to why he asked for access to Duke's GoDaddy account was to investigate what Leavens told him about the loss of data in the context of the auto delete/auto forward fictions. Why else would Stamatis be asking to see the GoDaddy email accounts in May 2018 if the only issue was only with failure to produce the Yahoo emails and everything else was on the company hard drives? It confirms Stamatis knew there was a GoDaddy email problem long before he disclosed it and long before his moment of epiphany the day before he filed his Motion to Withdraw. He hoped that by explaining away the GoDaddy problem with a made-up auto-delete/auto-forward story, the Court would accept same and return to the MSJs without looking into the full scope of the misconduct. Stamatis' fingers are all over this mess since at least the beginning of 2015, and his reliance on his date of Appearance does not preclude his responsibility for the misrepresentations that he offered to the Court as gospel.

**F. Multiple Violations of Rules 26(g)(3) and 37(b).**

As detailed in the MFS, a court is required to impose sanctions against a party and/or its counsel, pursuant to Rule 26(g)(3), when they falsely certify that "to the best of that person's knowledge, information, and belief formed after *reasonable inquiry*," discovery responses are complete, accurate and such disclosures have not been made for an improper purpose. Duke and his prior attorneys failed to comply with Rule 26(g)(3) by failing to produce any email or Chat communications with Saraswat until March 19, 2018, despite discovery requests, deficiency letters and an Order compelling their production. (See PX 81-87, and Dkt. 132). Each time, Duke and/or his prior attorneys responded in signed discovery responses, falsely representing that no such documents existed. The testimony confirmed that, in each instance, they failed to make a reasonable inquiry or made no inquiry at all. If Duke is to be believed, his attorneys are lying, and never asked him to search for those communications until March 2018. (Tr. 205). If the prior attorneys are to be believed, Duke is lying, as they claim they repeatedly asked him to search for all such communications during discovery, and Duke told them he did not have any. (Tr. 1203-09, 1229) Either way, none of these responses were formed after a reasonable inquiry, as evidenced by the late production of emails and the spoliation of Chats with Saraswat.

Leavens admits that, when he executed PX-81, Defendants' Feb. 15, 2013 Responses to Plaintiff's Interrogatories, Rule 26(g) required him to make a reasonable investigation before executing same. (Tr. 943-944). Although he had identified Saraswat as a person with knowledge, Leavens was unable say what he did to identify and preserve any communications with her. (Tr. 944-946). Leavens was unable to recall any actions taken in response to PX-82, a July 23, 2013 deficiency letter documenting Defendant's failure to produce documents regarding Webrecsol. (Tr. 946-947). He had no explanation for why the Saraswat emails produced in 2018 were not

produced in response to these requests. (Tr. 947-948). The same was true regarding PX-83, Defendants' March 27, 2015 Responses to Interrogatories signed by Life, which requested production of Webrecsol documents. (Tr. 948-949). While Leavens testified it was his "understanding" that Life would have asked Duke for those documents, he could not disagree that the Bates range cited by Defendants did not contain communications with Saraswat. (Tr. 949-950).

Leavens gave similar responses when confronted with additional discovery responses marked as PX-85 and 86, as well as Plaintiffs' Motion to Compel, PX-87. (Tr. 950-955). He could not recall if he consulted with Duke in preparing the supplemental discovery responses in PX-85, and repeatedly deferred to his associate. (Tr. 950-951). Duke executed a verification as to these Responses, which included a Response to Request No. 16 which cited a Bates range that does not include any communications with Saraswat, yet Duke unquestionably knew that such communications existed. (Tr. 951-952). As for Plaintiffs' Motion to Compel, Leavens could not recall if he told Duke that such a motion was pending, and does not recall speaking with Duke about obtaining the documents called for in the motion. (Tr. 955-956). Nor could he recall what Defendants did to comply with the June 11, 2015 Court Order compelling production. (Dkt. 132). He did not know if Life did anything in terms of due diligence before sending PX-55 the next day, an email that again falsely stated that no such Saraswat documents existed. (Tr. 959-960). The resultant failure to produce hundreds of Saraswat emails, as well as tens of thousands of other responsive documents until three years after the "FINAL" June 1, 2015 deadline for supplementation (Dkt. 116), is a blatant inexcusable violation of this Court's Order.

### G. Sanctions Should Be Ordered And Defendants' Suggestion That Everything Should Be For Impeachment Before A Jury Is Misguided And Contrary To Law.

Defendants argue that the issues presented in the MFS go to impeachment and should be presented to a jury. (See Dkt. No. 347 at pp. 15-16, 20). Notwithstanding the many arguments in

the MFS that this ignores regarding this Court's authority to issue sanctions, it also overlooks: (1) that this case turns primarily upon claims arising under the Lanham Act, which does not create a right to jury trial; and (2) that they are only seeking equitable damages (disgorgement of profits), which fall within the Court's authority. See *Continental Vineyard LLC v. Dzierzawski*, 2019 WL 2076248, (N.D. Ill. May 10, 2019)(Durkin, J). Defendants stated that they are abandoning the defamation claims. (Dkt. 347 at p. 21). There is nothing on Defendants case for a jury to decide, and this Court has the power to issue case ending sanctions in light of the extensive misconduct.

## H. **Defendants' Misconduct Has Infected The Entire Case And Dismissal Is Appropriate.**

While severe, a court has broad authority to issue case ending sanctions when bad faith conduct has infected the entirety of the proceedings, occurs within the presence of the court, or threatens the court's ability to control and maintain the integrity of the litigation process. *Furey v. City of Chicago*, 900 F.3d 450, 463-464, 469 (7th Cir. 2018). As stated in the MFS and proven at the hearing, what we have here is "misconduct that places too high a burden on allowing the case to continue." (MFS at PageID#12983). Defendants and their lawyers were provided ample opportunity to explain themselves during the evidentiary hearings, but fell far short of demonstrating: (1) that their conduct was substantially justified; or (2) why any particular sanctions that this court might issue against them would be unjust.

## I. **Loss Of Memory Is Part Of The Prejudice.**

Defendants failed to produce responsive documents during discovery that prejudiced Plaintiffs. (See Dkt. 294 at PageID# 12938, 12945-46, 12968, 12972-73). Plaintiffs incurred increased litigation costs over the past two years solely due to Defendants' and counsels' continued resistance to their discovery obligations, which compelled Plaintiffs to press forward with summary judgment filings based upon a false record, and then shifted the burden to Plaintiffs to

expose their litigation misconduct. Plaintiffs' efforts were further complicated by the shifting excuses and explanations offered by the defense, which had to be painstakingly unraveled, prompting additional work, delayed and supplemental filings, and eventually the withdrawal of all former defense counsel, all of which unnecessarily protracted this litigation by several years.

As revealed during the evidentiary hearing, these delays have led to the loss of material evidence and faded memories, which supports a finding of prejudice to Plaintiffs. See *Prien v. Trask*, 677 F. App'x 375, 375–76 (9th Cir. 2017)(affirming dismissal as a sanction where delay and prejudice, resulting from faded memories and stale evidence, outweighed interest in resolution on the merits). It is simply not enough that, after obfuscating, lying and relying on false assumptions that Defendants eventually produced additional documents. This does not cure the prejudice that Defendants have inflicted on Plaintiffs and this Court, nor does it mean that sanctions are no longer warranted. See, *e.g.*, *Shott v. Rush Univ. Med. Ctr.*, 2015 U.S. Dist. LEXIS 1322, at *13 (N.D. Ill., Jan. 7, 2015)(Kapala J.); *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559 (7th Cir. 2007).

**J.** **Attorneys Are Culpable As They Violated Rules And Allowed Duke To Control All "Preservation" And Searches For Documents.**

Former defense counsel ignored their discovery obligations, which required that they implement a litigation hold, communicate with their client regarding document/ESI discovery, and supervise the process of document collection. See Dkt. No. 294 at PageID#12975-77; see also *Northington v. H & M Int'l*, 2011 WL 663055, at *17 (N.D. Ill. Jan. 12, 2011). This empowered Duke to not only create a false record through perjured testimony and selective production, but also conceal the very types of evidence that Judge Kapala instructed would prove fatal to his case.

But former counsel was not merely at fault for yielding control of their document production, they also suborned perjury, disobeyed multiple court orders, and vexatiously protracted this litigation, all independent categories of misconduct that warrant sanctions. When

viewed together the collective facts demonstrate that Duke and counsel acted with the necessary intent, bad faith, and fault deserving of severe sanctions. See, *e.g.*, *Furey v. City of Chicago*, 900 F. 3d 450, 464 (7th Cir. 2018) and *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.,* No. 15 C 10340, 2018 WL 1616725, *1-2, 6-7, 11-12 (N.D. Ill. Apr. 4, 2018).

Duke's intent to deceive has been amply demonstrated. He confirmed that he knew about Judge Kapala's decision. (Tr. 265-66). Duke also knew that the "E" in E-discovery included emails, because he was ordered to, and did, participate in a Rule 26(f) conference, for the specific purpose of determining how the parties would fulfill their respective e-discovery obligations. (Tr. 231-32, 1544-46). Duke himself collected web-based emails to support his claims and defenses and then personally moved those emails to folders on his hard drives. (Tr. 230-31). It was then Duke who worked with the e-discovery vendor to copy only those documents from his computer hard drives (which included the foldered but not other web-based emails) for use in running ESI searches. (Tr. 116-188). Duke also knew that his former counsel had not run web-based e-mail searches and, when it later benefited him, Duke knew where and how to search his web-based emails (in Yahoo and GoDaddy) – not his hard drives – for additional documents. (Tr. 238-39).

Even if former counsel did not "fully realize" how Duke had been manipulating the document production, both they and Duke knew that Plaintiffs had questioned their discovery responses. The issue of "missing documents" was specifically raised in 2015 during Duke's depositions and motion to compel; and again raised multiple times in motions and conferences spanning from early 2018 through 2019. Duke worked with his former counsel to formulate objections, offer shifting excuses and assurances, and ostensibly provide curative productions to stave off further inquiry and nullify Plaintiffs' arguments regarding discovery deficiencies. Time

and again former counsel employed very deliberate tactics and careful phrasing in briefs and in court to conceal this misconduct.

What makes this conduct even more egregious is that it contravened multiple court orders, including: Dkt. 78 (E-discovery); Dkt. No. 132 (Order granting Plaintiffs' motion to compel); Dkt. No. 249 at 23:17-19 (Order Defendants' to explain and defend their discovery deficiencies be "really good and supported by affidavit"); and Dkt. No. 254 (Order Defendants produce documents by no later than May 31, 2018, in both paper and native format). Despite Defendants' arguments to the contrary, those orders cannot be construed as to avoid sanctions. See *Tamari v. Bache & Co.,* 729 F.2d 469, 472 (7th Cir.1984); *Brandt v. Vulcan, Inc*., 30 F.3d 752, 756 (7th Cir. 1994); *Metropolitan Life Insurance. Co. v. Cammon,* 1989 WL 153558 (N.D. Ill. Nov. 7, 1989).

Only Duke and his counsel knew where to locate the responsive documents, and it was not Plaintiffs or the Court's responsibility to order them not to engage in misconduct or tell them what they needed to do to meet their discovery obligations. *United States v. Golden Elevator, Inc .,* 27 F.3d 301, 302 (7th Cir. 1994)("Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won."); *Hal Commodity Cycles Management v. Kirsh,* 825 F.2d 1136, 1139 (7th Cir. 1987). Overall, there were far too many errors, and far too many contrived explanations, to dismiss the conduct as negligence or even gross negligence.

**III.**     **CONCLUSION.**  Plaintiffs ask the Court to sanction Defendants and their prior counsel by dismissing their counterclaims, and entering a default judgment on Plaintiffs' Complaint, as well as award Plaintiffs their attorneys' fees and costs necessitated by Defendants' and their counsels' misconduct and deceit. Defendants and their prior counsel should be jointly and severally obligated to satisfy any monetary sanction or award ordered by the Court.

Respectfully submitted,                          Dated:  January 27, 2020
Attorneys for Plaintiffs

By:     /s/  *Anthony J. Davis*

ANTHONY J. DAVIS                                 ROBERT C. VON OHLEN
SANTOMASSIMO DAVIS LLP                           VON OHLEN & ASSOCIATES
adavis@ogcsolutions.com                          rvo@vonohlenlaw.com
1 Gatehall Drive, Suite 100                      1340 W. Deerpath Road
Parsippany, New Jersey 07054                     Lake Forest, Illinois 60045
201-712-1616                                     888-376-7475
201-712-9444 (fax)                               888-354-4244 (fax)