UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| DR Distributors, LLC, | ) |
|     Plaintiff-Counterdefendant, | ) ) ) |
| v. | ) No. 12 CV 50324 |
| 21 Century Smoking, Inc, and Brent Duke, | ) ) ) ) |
|     Defendants-Counterclaimants, | ) ) |
| v. | ) ) |
| CB Distributors, Inc., and Carlos Bengoa, | ) ) ) |
|     Counterdefendants. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' first motion to reopen the evidentiary hearing ("Motion") [370] on Plaintiff's motion for sanctions [294], [395]. For the following reasons, the Motion is denied.

## BACKGROUND

Plaintiff filed a motion for sanctions on March 25, 2019. Dkts. 294, 395.[1] In the 75-page motion, plaintiff accused defendants and their former counsel of various discovery abuses. Between October 28, 2019 and November 19, 2019, the Court held five days of evidentiary hearings on the motion for sanctions.[2]

During the third day of testimony on November 7, 2019, former defense counsel Thomas Leavens testified regarding his firm's statement of work agreement with his firm's e-discovery vendor in the case, 4Discovery ("4D"), as well as his conversations with defendant Brent Duke regarding the extent of his electronic data. *See* Evid. Hr'g Tr. at 790-833. Mr. Leavens confirmed that 4D provided his firm with a written report for the work it did for his firm for the case in late 2014 and that it probably existed in his firm's files. *Id*. at 821. Plaintiff's counsel asked that that document be produced because it was never produced to them and was relevant to the questions

---

[1] The motion for sanctions was refiled for administrative purposes on March 10, 2020. Dkts. 394, 395.
[2] The Court originally allotted two days for the hearing, but at the parties' request allowed for a total of five days of testimony. Dkts. 334, 358.

raised by the motion for sanctions (specifically that electronically stored information ("ESI") was spoliated or withheld in the case). Mr. Leavens agreed to look for it. *Id*. Mr. Leavens' counsel, Colin Smith, suggested that he would have sent discovery requests earlier if he had known that discovery was permitted. *Id*. The following exchange occurred between the Court and Mr. Smith:

> THE COURT: Well, it is November 7th, 2019. The motion for sanctions was filed a long time ago. We knew about these hearing dates. We knew 4Discovery was involved. We have a contract with 4Discovery. We have a letter from 4Discovery. I'm -- I think the legal word is -- "flabbergasted" that if 4Discovery completed a report pursuant to the statement of work that that document hasn't been produced to counsel, all counsel, and to me, quite honestly, at this point.
>
> MR. SMITH: I don't want anybody to get -- and I'm not sure what the state of my knowledge is, but I think what it is is a hit report. It is not a written report.
>
> THE COURT: And I understand that, and I assume you and I are on the same wavelength that their "report" would have been, and their "analysis," produce resultant data to client, which shows the documents where the search terms were hit. If there is that document, I still think it would have been produced somewhere in this litigation. If there is something beyond that, I would think it is relevant to what we are talking about here. The statement of work is informative not only in what it says, but also in what it doesn't say. There are fancy little arrows here. It says: "Identify, Collect, Analyze, Report." "Phase 1: Remote Forensic of Imaging." That's just collection. There is no identify. That's where this whole thing goes sideways. So if there is a report that talks about what we have just -- what the testimony is, it would behoove everybody to see that report. Now, if it is a hit report, that shouldn't be hard to find.
>
> MR. SMITH: Your Honor, we will take a look and see what they are asking.
>
> THE COURT: And I don't know if it exists.
>
> MR. SMITH: I don't want to be wrong about this, but my recollection is that that's all there is, and we will look, and we will be happy to –
>
> THE COURT: That's fine. And I understand your thought that a report would just be a hit report, but if there is something else out there, it would probably be helpful to know.

*Id*. at 822-23. Mr. Smith produced 4D's 2015 hit report to plaintiff's counsel on November 11, 2019. *Id*. at 861-62. This was the first time plaintiff's counsel had seen this document. *Id*. Plaintiff's counsel continued questioning Mr. Leavens on November 15, 2019 and briefly focused on the newly tendered 4D hit report. *Id*. at 862-66. The hit report is a spreadsheet detailing the hits from running the parties' 20 agreed search terms against the documents on Mr. Duke's four hard drives during the discovery process in late 2014 and early 2015. *See* Pl. Ex. 91. According to the report, the 20 agreed search terms hit 84,522 unique documents within the

2

subset of electronic data on Mr. Duke's four hard drives after the files were deduplicated[3] and de-nisted.[4] Plaintiff's counsel asked Mr. Leavens why, despite the search terms hitting 84,522 discrete *documents*, former defense counsel tendered a total of approximately 50,000 *pages* of discovery materials to plaintiff in February 2015. Evid. Hr'g Tr. at 863-64. Plaintiff's counsel also asked if Mr. Leavens knew whether anyone on the defense team "culled" the approximately 34,000 apparently missing documents from the production before tendering the materials to plaintiff. Mr. Leavens did not know whether there was a technical explanation or if there was some other discrepancy and then played hot potato by suggesting former counsel Travis Life might know more. *Id*. at 865-66.

Mr. Life also testified on November 15, 2019 regarding his part in the ESI discovery process. Specifically, he testified that when 4D gave him the documents from its ESI search, he only reviewed them for privilege before tendering the production to plaintiff. *Id*. at 1213, 1243-46. That same day, 4D's owner Chad Gough testified that based on the hit report, the total number of hits including "family member"[5] documents was 93,335, but that this total would likely include privileged documents and other unresponsive spam documents that happen to also contain one of the 20 search terms. *Id*. at 1438-43. However, contrary to Mr. Life's testimony, defendants' privilege log reveals that former defense counsel withheld only 838 *pages* of privileged material. *See* Pl. Ex. 56. Therefore, assuming each document represents at least one page and that the hit report is accurate, former defense counsel received tens of thousands more pages of responsive documents than the approximately 50,000 pages they eventually turned over to plaintiff's counsel in 2015. The hearing concluded on November 19, 2019. Dkt. 363. Before concluding the hearing, the Court asked all parties if there was additional evidence to present. All parties, including defendants, said there was no further evidence to add. Tr. 1554.

As is endemic in this litigation, after being on notice of the Court's desire to hold an evidentiary hearing on the motion for sanctions for months, the Court extending the length of the hearing from two to five days of testimony at the parties' request, and ultimately closing the hearing without objection from any participant, defendants filed the instant Motion on January 16, 2019 asking to reopen the hearing for an opportunity to explain away this evidence and the document discrepancy it seemingly revealed.[6] Dkts. 368, 370.

---

[3] Deduplication is "[a] method of replacing multiple identical copies of a Document by a single instance of that document." Maura R. Grossman & Gordon V. Cormack, *The Grossman-Cormack Glossary of Technology-Assisted Review*, 7 FED. CTS. L. REV. 85, 92 (2014).

[4] De-nisting is "[t]he use of an automated filter program that screens files against the NIST list [ ] to remove files that are generally accepted to be system generated and have no substantive value in most instances." Maura R. Grossman & Gordon V. Cormack, *Comments on "The Implications of Rule 26(g) on the Use of Technology-Assisted Review,"* 7 FED. CTS. L. REV. 285, 288 n. 12 (2014) (internal citation and quotation omitted).

[5] As Mr. Gough explained at the hearing, a family document is one that is related to a document with a search term but that may not itself contain a search term. He gave the example of an email containing a search term that also had two attachments. The email with the search term is considered the "parent," the attachments "children," and taken together they are considered a "family." Evid. Hr'g Tr. 1441-42.

[6] Defendants later filed a *second* motion to reopen to explain away other evidence elicited during the evidentiary hearing. *See* Dkt. 384.

## **MOTION TO REOPEN**

According to the Motion and associated status report to the Court, current defense counsel reviewed the evidentiary hearing transcript, 4D's hit report, and other associated documents. This review established the following: 84,522 documents hit at least one of plaintiff's 20 search terms. After it analyzed the data on Mr. Duke's four hard drives, 4D eventually provided 11,540 documents totaling 55,601 pages of material to former defense counsel. However, former defense counsel only produced 45,280 pages of documents to plaintiff on February 25, 2015. Mr. Life's testimony that he produced all nonprivileged documents to plaintiff does not explain this page discrepancy because he only withheld 838 pages on privilege grounds. *See* Dkts. 368 (January 15, 2020 status report), 370 (Motion). To summarize, there are two page discrepancies: first, between the 84,522 ***documents*** that hit the parties' search terms according to the 2015 hit report and the 55,601 ***pages*** 4D turned over to former defense counsel; second, between the 55,601 pages former defense counsel received from 4D and the 45,280 pages they ultimately disclosed to plaintiff's counsel. Even after accounting for the 838 pages Mr. Life withheld from the production on privilege grounds, there are 9,438 "missing" pages from former defense counsels' production to plaintiff.

These facts "caused Defendants' [new] counsel to investigate these matters even further" after the hearing concluded, despite agreeing the proofs were closed. Dkt. 370 at 2; Tr. 1554.. As part of this new investigation, defendants reviewed 4D's response to their evidentiary hearing subpoena, which included emails between 4D employees Phil Knox and Jarred Sikorski. According to an email chain from January 2015, Mr. Sikorski told Mr. Knox that "we" removed "irrelevant"[7] documents from the production they tendered to former defense counsel. Dkt. 368 Ex. 4. Current defense counsel also conducted more interviews with Mr. Life and Mr. Gough after the evidentiary hearings concluded. Mr. Gough stated in these interviews that the 2015 "hit report" was a snapshot of the document production during the middle of the ESI evaluation process and was not a final report, he was only peripherally involved in this process, that Mr. Sikorski performed the document filtering by adding industry standard automated filters after the 2015 hit report was generated and before documents were given to former defense counsel, but that he did not know which specific filters Mr. Sikorski applied. Mr. Gough also confirmed that 4D ultimately tendered 11,540 documents totaling 55,601 pages of material to former defense counsel.[8] Dkt. 370 at 3-5. Mr. Life also provided new information to defendants that contradicts his prior hearing testimony. Specifically, for the first time, Mr. Life explained that in addition to privileged materials, he removed documents that did not contain any of plaintiff's search terms from the document set he received from 4D. *Id*. at 5-6. How documents produced by applying search terms to the data produced documents not containing any search terms was not fully and clearly explained. And no "final report" (a reasonable inference is that a "final report" exists) was provided. So, once again, despite a court order to produce the report for the hearing, the

---

[7] There were references that one of the search terms in this trademark case was "trademark." That might explain why "irrelevant" documents were captured and then removed. But again, the testimony on this point was hazy.

[8] To support their theory, defendants later filed an unrequested status report containing an expert opinion from their new e-discovery expert Yaniv Schiff on January 21, 2020. In his attached opinion, Schiff opined that Sikorski used filters to remove "non-user generated" files as is industry practice, and that a drop from 55,601 to 11,540 file counts thereafter is "reasonable." Dkt. 372 at 3-7.

"final report" was not produced. It must be said that counsel for the former defense counsel should be given substantial slack in this regard. But they may now have a better appreciation for what the Court and plaintiff's counsel have been subjected to in this case.

Notably, defendants cite no authority to support their Motion. Instead, defendants simply conclude the Motion by reiterating that this new information from Mr. Gough and Mr. Life "is directly relevant to the issues before this Court," and that the hearing "should be reopened" to allow the parties to further question Mr. Gough and Mr. Life. Dkt. 370 at 5-6. The Court ordered defendants to file offers of proof if the parties could not agree to stipulate to any of these new facts in lieu of reopening an evidentiary hearing that had already eaten up an inordinate share of the Court's time. Dkt. 377.

As is also endemic in this litigation, the parties could not agree to a stipulation and defendants filed an offer of proof as to Mr. Gough's and Mr. Life's proposed testimony on March 6, 2020. Dkts. 391, 392. Former defense counsel's counsel also filed an offer of proof, but only as to Mr. Life's proposed testimony, and it is identical to defendants' offer of Mr. Life's proposed testimony. *See* Dkts. 392, 393 at 3-8. Mr. Gough's and Mr. Life's testimony relating to the page discrepancy in the offers of proof is nearly identical to the representations made in the motion to reopen as discussed above. *See* Dkts. 370, 393. In sum, according to the offers of proof, Mr. Gough would testify that as is standard in his industry, his then-employee Mr. Sikorksi filtered documents from the 84,522 documents mentioned in the 2015 hit report before 4D handed over documents to former defense counsel in 2015, but that he doesn't know which filters were applied. Dkt. 393 at 1-3. Mr. Life would testify that he did not focus on the hit report before his testimony, but after the evidentiary hearing and upon further reflection he realized he removed privileged documents *and* documents that did not hit any search terms and were otherwise "irrelevant" from the document set defendants received from 4D in 2015 before disclosing the production to plaintiff. *Id.* at 3-8. Plaintiff characteristically and vigorously objects to the offers of proof. Dkts. 397, 398.

## **ANALYSIS**

The Court's decision to limit the evidentiary hearing to five days of testimony is an interlocutory order because the Court is not dismissing this case as a sanction. However, the Court may in its discretion re-visit non-final rulings at any time before final judgment. *Mintz v. Caterpillar, Inc.*, 788 F.3d 673, 679 (7th Cir. 2015).

In an exercise of that discretion, the Court denies the Motion for one main reason: The Court is not currently imposing sanctions based on this page discrepancy. As detailed in this Court's order on the sanctions motion, the Court finds sanctions warranted for the conduct described therein, none of which is based on this discrepancy. As things stand, there is plenty of other conduct that is sanctionable. The page discrepancy has no bearing on those sanctions. Therefore, the Court need not reopen the evidentiary hearing to hear more testimony from Mr. Gough or Mr. Life, or to allow defendants to subpoena Mr. Sikorski.

But there are many other reasons to deny to the Motion. For months, defendants were aware of an impending evidentiary hearing focused on their ESI production in this case. *See* Dkt.

267 at 63-64 (August 18, 2018 hearing transcript where the Court warned that it would likely "have an evidentiary hearing" to "get to the bottom of this stuff," and that "facts going to intent are key . . . ."). Current defense counsel appeared in this case for defendants over two months before the evidentiary hearing was held, though at least one current defense counsel was aware of the morass of discovery issues in the case before filing an appearance. *See* Dkts. 315, 316, 317, 334. 4D's 2015 hit report is relevant to the scope and nature of defendants' electronic discovery in the case, which was the focus of plaintiff's motion for sanctions and the evidentiary hearing. Defendants agree in both their Motion and offer of proof that this document and possible testimony related to it is (and presumably *always was*) relevant to sanctions issues. *See* Dkts. 386 at 7, 371 at 5-6. When plaintiff first learned of and questioned Mr. Leavens about the 2015 hit report during the hearing testimony on November 7, 2019, prior defense counsel's counsel Mr. Smith seemed to recognize what Mr. Leavens was referring to, indicating that at least prior counsel was aware of the report's existence. Evid. Hr'g Tr. at 822-23. The hit report is defendants' document and was produced by their own e-discovery vendor. For some reason, the document was never tendered to plaintiff or to the Court before the evidentiary hearing. How defendants might be surprised by their own discovery vendor's document given the time these issues have been percolating before the Court, and their suggestion that this issue "unexpectedly arose" at the evidentiary hearing, is mind-boggling. If anything, that this document (or some other report from 4D detailing the electronic discovery process) was not provided to the Court and all participants well before the evidentiary hearing further evidences a general disregard of the serious nature of the discovery issues in this case. The same can be said of Mr. Life's sudden recall. Plaintiff is the only hearing participant that may credibly or reasonably claim to have been surprised by the hit report because it is not plaintiff's document and plaintiff first became aware of its existence during the third day of hearing testimony.

Assuming defendants were surprised by the contents of their own e-discovery vendor's hit report that existed in former counsel's files from early 2015 onward, regardless of whether it is a final or preliminary hit report, defendants had ample occasion and opportunity to question Mr. Gough and Mr. Life at the hearing on these issues. Both witnesses gave testimony describing their understanding of the hit report and their relative roles in the discovery process as discussed above. If the Court accepted Mr. Gough's and Mr. Life's proposed testimony at face value, a discrepancy between what 4D provided to former defense counsel and what former defense counsel tendered to plaintiff would still exist, and the Court would be forced to choose between two directly conflicting explanations from Mr. Life as to why there is a discrepancy. Defendants cite no authority to support their Motion, aside from stating that Mr. Life's and Mr. Gough's proposed testimony is "relevant." That the testimony from the hearing raised more questions and the specter of yet another discovery problem in this case, or that current defense counsel thought of more or different questions to ask these witnesses upon further reflection after the fact, is not cause to again seek more time and testimony to explain discrepancies in their own documents. The Court closed the evidentiary hearing without objection from any party. Former and current defense counsel have had repeated opportunities to explain defendants' discovery procedures in this case. The Court will not humor yet another request for another opportunity to do so.

## **CONCLUSION**

For those reasons, the Motion [370] is denied.

Entered: January 19, 2021        By:  _____
                                      Iain D. Johnston
                                      U.S. District Judge