## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| DR Distributors, LLC, | ) |
| | ) |
| Plaintiff-Counterdefendant, | ) |
| | ) |
| v. | ) No. 12 CV 50324 |
| | ) Honorable Iain D. Johnston |
| 21 Century Smoking, Inc, and Brent Duke, | ) |
| | ) |
| | ) |
| Defendants-Counterclaimants, | ) |
| | ) |
| v. | ) |
| | ) |
| CB Distributors, Inc., and Carlos Bengoa, | ) |
| | ) |
| | ) |
| Counterdefendants. | ) |

## MEMORANDUM OPINION AND ORDER

I. INTRODUCTION AND CONCLUSION
    A. Ominous Foreshadowing
    B. Issue Before the Court
    C. Sanctions Imposed
II. EXPLANATION FOR CONCLUSION
    A. Background
    B. Evidence Produced at Hearing and Contained in the Record
        1. Court's Reaction to the Evidentiary Hearing
        2. Witnesses
            a. Brent Duke
            b. Thomas Leavens
            c. Heather Liberman
            d. Travis Life
            e. Peter Stamatis
            f. Steven Shonder
            g. Chad Gough
        3. Findings of Fact: What Happened

a. Pre-Litigation: 2009—2012
  i. Duke's E-Commerce Businesses and IT Systems
  ii. "Personal" v. "Corporate" Email Accounts & Auto-forwarding
  iii. Duke's Communication and Relationship with SEO Consultant Saraswat
  iv. Duke Learns of Plaintiff's Trademark
b. 2012
  i. Initiation of Litigation and Pleadings
  ii. Leavens' Meeting with Duke About Disclosures
c. 2013
  i. Online Sales ESI
  ii. Preliminary Injunction
  iii. Amended Pleadings Because of Preliminary Injunction Hearing
  iv. Las Vegas Tradeshow
  v. Defendants Move for Partial Summary Judgment
d. 2014
  i. The Undersigned's Entry into the Case
  ii. Liberman Meets with Duke About ESI
  iii. Judge Kapala's Partial Summary Judgement Ruling
  iv. First Failed Settlement Conference
  v. Defendants Added Defamation Counterclaim
  vi. Defendants Contract with ESI Vendor
  vii. ESI Vendor Copies Computers Hard Drives But Not Web-based Emails
  viii. Unreasonable Reaction to Volume of ESI Recovered
e. 2015
  i. Court's Discovery Orders
  ii. Plaintiff's Motion to Compel and Court's Order
  iii. Stamatis Appears and Duke is Deposed
  iv. Court's Concerns About Duke's Deposition Testimony
  v. Duke Allegedly First Learns of Spoliation by Autodeletion
  vi. Court's Concerns About Autodeletion
  vii. Plaintiff Seeks to Add Invited Defamation Defense
f. 2016
  i. Expert Discovery
g. 2017
h. 2018
  i. Cross-Motions for Summary Judgment
  ii. Former Defense Counsel's Scramble to "Figure It Out"
  iii. What the Former Defense Counsel Don't "Figure Out"

           iv. Responses to Summary Judgment Motions and ESI Issues Emerge
           v. Court Attempts to Understand ESI Problems
           vi. Defendants Identify 15,000 Pages of Responsive Documents Not Produced
           vii. Court's Warning Shots and Attempts to Resolve ESI Problems
           viii. More ESI Concerns Emerge: Yahoo! Chat and Self-Collection
           ix. Defendants and Former Defense Counsel Finally Investigate Yahoo! Chat
           x. GoDaddy Accounts Remain Unsearched
           xi. San Diego Meeting
           xii. Defendants and Former Defense Counsel's Failed Escape from ESI Blunders: The Motion to Dismiss the Defamation Counterclaim
        i. 2019
           i. Sanctions Motion Schedule
           ii. Former Defense Counsel Finally "Figure It Out" About GoDaddy Accounts Because Duke Finally Tells Them
           iii. New Defense Counsel Appear and Court Attempts to Resolve the Case
           iv. Evidentiary Hearing Held
           v. Post-Hearing Briefs Filed
               (a) Plaintiff's Brief
               (b) Defendants' Brief
               (c) Leavens, Strand & Glover Brief
               (d) Stamatis' Brief
               (e) Shonder's Brief
           vi. Post-Hearing Activity Included Mediation
C. The E-Discovery Process: Same As It Ever Was
    1. Identification of ESI: The Whole Process Starts Here
    2. Preservation of ESI: The Litigation Hold
    3. Collection of ESI
    4. Review of ESI
    5. Disclosure/Production of ESI
    6. Three Assumptions Underlying the ESI Discovery Process
        a. Competence of Counsel
        b. Honesty and Candor of Client
D. Legal Authority to Impose Sanctions
    1. Bases the Court Will Not Use
        a. Inherent Authority and Civil Contempt
        b. Rule 11
        c. Rule 56(h)

d. 28 U.S.C. § 1927
2. Bases for Sanctions
    a. Rule 26(g)
    b. Rule 37
        i. Rule 37(a)
        ii. Rule 37(b)
        iii. Rule 37(c)
        iv. Rule 37(e)
        v. Rule 37's Exceptions for Sanctions
E. Application of Findings to Relevant Law
1. Sanctions are Warranted under Rules 26(g), 37(a), (b), (c)
    a. Rule 26(g)
    b. Rule 37(a)
    c. Rule 37(b)
    d. Rule 37(c)
2. Defendants' Failures were Not Substantially Justified or Harmless, and Sanctions would not be Unjust
3. Curative Measures are Necessary under Rule 37(e)
    a. Evidentiary Issues
    b. Background of Yahoo! Chats and GoDaddy Emails
        i. Yahoo! Chats
        ii. GoDaddy Emails
    c. Rule 37(e) Decision Tree Analysis
        i. Was the Information ESI?
        ii. Was There a Duty to Preserve the ESI?
        iii. Was the ESI Relevant?
        iv. Was the ESI Lost Because a Party Failed to Take Reasonable Steps?
        v. Was the Lost ESI Unable to be Restored or Replaced?
        vi. Was There Intent to Deprive/Was There Prejudice?
    d. Curative Measures Imposed
4. Default and Dismissal Are Not Warranted

# I. INTRODUCTION <u>AND</u> CONCLUSION

## A. Ominous Foreshadowing

"Snakebit"—That's how a former defense counsel described this case. But

"snakebit" connotes the unfortunate circumstances that befall unsuspecting victims.

That didn't happen here. Instead, through a series of missteps, misdeeds, and

misrepresentations, Defendants and the former defense counsel find themselves looking down the barrel of a sanctions motion Howitzer. If any entity has been snakebit, it's this Court.

This case has taught this Court that—like Boxer the Horse in *Animal Farm*—it cannot solve all problems by just working harder. No matter how hard this Court tried to move this case to a just, speedy, and inexpensive determination, it was thwarted. This case is evidence that early and constant case management does not necessarily result in a prompt resolution or avoidance of problems.

This case was filed eight years ago in 2012. There are over 400 docket entries now. And no end is in sight. The case was assigned to the undersigned in 2014, while a summary judgment motion was pending before the then District Judge. In keeping with this Court's practice of active (perhaps hyperactive) case management, immediately upon the transfer of the case, this Court held an in-person status conference.[1] At this conference, this Court specifically addressed electronic discovery issues. The Court asked counsel if litigation holds were issued. Dkt. 367, at 6. No one informed the Court that they had not been issued. It turns out, defense counsel issued no written litigation hold to Defendants. The Court warned that it did not want to have a problem because of the lack of litigation holds. *Id.*

---

[1] Despite its experience with this case, the Court has been a strong believer in the importance of active case management. Much excellent commentary supports this belief. *See, e.g.*, Steven S. Gensler & Hon. Lee H. Rosenthal, *Four Years After Duke: Where Do We Stand on Calibrating the Pretrial Process*, 18 Lewis & Clark L. Rev. 643 (2014); Steven S. Gensler, *Judicial Case Management: Caught in the Crossfire*, 60 Duke L.J. 669 (2010); Rebecca Love Kourlis & Jordan M. Singer, *Managing Toward the Goals of Rule* 1, 4 Fed. Cts. L. Rev. 1 (2009).

The Court then asked each side if the record custodians had been identified. Defense counsel said they were and identified Brent Duke as the custodian. The Court asked defense counsel if Duke was sufficiently knowledgeable with electronically stored information (ESI). *Id.* at 7. Defense counsel said that Duke was generally knowledgeable. To drill down, the Court specifically asked if Duke were asked about metadata and native applications, would Duke understand those terms. Defense counsel said generally he would. *Id.* As will be shown below, Duke's purported knowledge of ESI is now hotly debated. The Court then asked the parties how they intended to search for ESI, whether through search terms or predictive coding/technology assisted review. The parties said that they had not yet discussed that issue. The Court then specifically ordered the parties to "reconvene a 26(f) conference to discuss e-discovery issues *in detail* with custodians for each side." Dkt. 78 (emphasis added). In ordering the parties to engage in this process— one mandated by the Federal Rules of Civil Procedure—the Court said that it did not want to have "an e-discovery snag . . . [that] throws the entire schedule out the window." Dkt. 367 at 9. If that initial status hearing and court order did not place all counsel, and specifically the former defense counsel, on notice that ESI was an important issue to this case and to this Court and that e-discovery should be taken seriously, the Court is at a loss as to what else it could do to notify them.

## B. Issue Before the Court

As anticipated in a previous order, *DR Distribs., LLC v. 21 Century Smoking, Inc.*, No. 12 CV 50324, 2019 U.S. Dist. LEXIS 22404 (N.D. Ill. Feb. 12, 2019),

currently pending before the Court is Plaintiff's motion for sanctions relating to the failure to timely produce ESI and for the spoliation of ESI as well as other alleged misdeeds. Plaintiff has requested a full arsenal of sanctions weapons, including civil contempt, inherent authority, 28 U.S.C. § 1927, and Federal Rules of Civil Procedure 11, 26(g), 37, and 56(h). Dkt. 294. According to Plaintiff, because of Defendants' and the former defense counsel's actions and inactions, the only reasonable sanction is defaulting Defendants and dismissing their counterclaims. (Occasionally, these sanctions are referred to as the "nuclear option[s]." *Gerace v. Andrews*, No. 16 C 721, 2017 U.S. Dist. LEXIS 68790, at *1 (N.D. Ill. May 5, 2017). Defendants and the former defense counsel now unreasonably assert that modest sanctions, at most, should be imposed. This assertion is contrary to one of the former defense counsel's confession that he "would be hard pressed to say there shouldn't be sanction on this." Dkt. 315, at 9. Apparently, once the lawyers lawyered up, they changed their tune.

The issue for this Court is to determine in its discretion what, if any, sanctions should be imposed, against whom, and under what authority. In deciding this issue, the Court held five days of evidentiary hearings, admitted voluminous documents into evidence, and carefully listened to the testimony of witnesses and evaluated their demeanor to help gauge their credibility. And the parties filed hundreds of pages of briefs. The Court has devoted a tremendous amount of time to its decision. The Court is fully aware of the consequences of the decision not only as to this case, but also as to the former defense counsel and Duke. Over thirty years

ago, another judge aptly observed a court's responsibility in determining sanctions motions:

> The imposition of sanctions is a serious matter and should be approached with circumspection. An attorney's name and reputation are his [or her] stock in trade and thus any unfair or hasty sullying of that name strikes at the sanctioned attorney's livelihood. These considerations suggest that, whenever possible, doubts should be resolved in counsel's favor. The Court has taken considerable time to review the full record of these proceedings, the papers, and the transcript[s] of the oral argument [and the evidentiary hearing]. The passage of time may have restored some welcomed objectivity to the Court's analysis of the issues presented, leaving the Court nevertheless committed to the regrettable conclusion that . . . sanctions must be imposed.

*Hart v. Blanchette*, No. 13 CV 6458, 2019 U.S. Dist. LEXIS 55061, *135-36 (W.D.N.Y. Mar. 29, 2019) (quoting *Veliz v. Crown Lift Trucks*, 714 F. Supp. 49, 56 (E.D.N.Y. 1989)). Courts, including this Court, are reluctant to sanction counsel and parties. *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 488 (N.D. Ohio 2013). But when they abuse the system, which happened here, it is unfair to complying parties not to sanction the violators. *Watchel v. Health Net, Inc.*, 239 F.R.D. 81, 84 (D.N.J. 2006).

### C. Sanctions Imposed

In the exercise of its discretion—to the extent certain rules allow for discretion—the Court imposes the following sanctions to cure the harm Defendants and the former defense counsel have inflicted on Plaintiff:

- At their own expense, within 30 days of this order, Defendants must conduct a reasonable search for all responsive ESI and produce the responsive material to Plaintiff, which Plaintiff can use if it chooses. Fed. R. Civ. P. 37.

- Defendants are barred from using any information not disclosed to Plaintiff by June 1, 2015, which is the date discovery supplements were due, Dkt. 116; Fed. R. Civ. P. 37(c), and are barred from using any documents not produced under this Court's June 11, 2015, order, Dkt. 132; Fed. R. Civ. P. 37(b)(2). This bar also precludes Defendants' expert witnesses from testifying that their opinions would not change had they considered the documents and information not disclosed before June 1, 2015. Fed. Rs. Civ. P. 37(b)(2), 37(c).

- Defendants are barred from contesting that Kirti Saraswat and Webrecsol were performing work for Defendants through the date the metatag was removed from Defendants' website, including work related to Defendants' search engine optimization. Fed. Rs. Civ. P. 37(b)(2)(A), 37(e)(1).

- The jury hearing any of Defendants' counterclaims will be informed of Defendants' failure to provide the Counterdefendants with the documents they requested. Fed. R. Civ. P. 37(c)(1)(B).

- Evidence relating to Defendants' failure to preserve ESI may be presented to the jury hearing Defendants' counterclaims and the jury will be instructed that "it may consider that evidence, along with all the other evidence in the case, in making its decision." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; Thomas Y. Allman, *Dealing with Prejudice: How Amended Rule 37(e) Has Refocused ESI Spoliation Measures*, 26 Rich. J. L. & Tech. 1 (2020) (appendix collecting decisions). The jury will also be instructed that Defendants had a duty to preserve the spoliated Yahoo! chats

and GoDaddy emails, that the spoliated Yahoo! chats and GoDaddy emails were relevant to the claims in the case, that Defendants failed to take reasonable steps to preserve the spoliated Yahoo! chats and GoDaddy emails, and that the spoliated Yahoo! chats and GoDaddy emails cannot be recovered. Fed. R. Civ. P. 37(e)(1).

- The trial judge hearing[2] Plaintiff's Lanham Act claims can consider Defendants' failure to preserve ESI in reaching the judgment on those claims.[3] Fed. R. Civ. P. 37(e).

- Defendants and the former defense counsel must pay Plaintiff's reasonable attorneys' fees and costs incurred in creating and litigating docket entries 209, 216, 227, 232, 238, 239, 241, 244, 246, 247, 270, 294, 343, 370, 381, 384, and 388—all filings related to Plaintiff's motion for sanctions and summary judgment motion that was derailed because of Defendants' and the former defense counsel's discovery failures. Defendants and the former defense counsel must also pay Plaintiff's reasonable attorneys' fees and costs for time reasonably spent preparing for and participating in the evidentiary hearing and the pre-hearing and post-hearing briefs. The fees and costs will be paid

---

[2] If a party moves for summary judgment on the Lanham Act claims, the judge can consider this evidence too. But this case should be tried without enduring any Pavlovian summary judgment motions. Too many genuine issues of material fact exist.

[3] Jury trials are not available for Lanham Act claims that are equitable. *See Daisy Grp., Ltd. v. Newport News, Inc.*, 999 F. Supp. 548, 550-51 (S.D.N.Y. 1998). But a judge presiding over a bench trial may draw a rebuttable inference because of alleged spoliation. *In re Hornblower Fleet*, No. 16 CV 2468, 2019 U.S. Dist. LEXIS 59314, at *8 (S.D. Cal. Apr. 5, 2019); *Thompson v. U.S. HUD*, 219 F.R.D. 93, 105 (D. Md. 2003) (district judge in bench trial allowed to draw inference from failure to preserve and produce emails); *see also, e.g.*, *Bistrian v. Levi*, 448 F. Supp. 3d 454, 477-78 (E.D. Pa. 2020).

in the following proportions: Duke to pay 50% and the former defense counsel to pay 50%, with former defense counsel Thomas Leavens paying 80% and former defense counsel Peter Stamatis paying 20% of that 50%. Fed. Rs. Civ. P. 26(e)(1)(B), 26(g)(3), 37(a)(5), 37(b)(2), 37(c)(1)(A).

- The former defense counsel, except for Steven Shonder, must complete by December 31, 2021 at least eight hours of continuing legal education (CLE) on ESI, and by March 3, 2021, certify they have read this entire order. Fed. R. Civ. P. 37(b)(2).

These sanctions are designed to make Plaintiff whole for the injury Defendants and the former defense counsel caused and are proportionally tailored to Defendants' and the former defense counsel's actions and inactions. The sanctions are likewise designed to deter the type of misconduct found in this order. *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976). In imposing these sanctions, the Court is fully aware that Plaintiff's request for attorneys' fees and costs will likely exceed seven figures as Plaintiff has already paid its counsel for this work.[4]

The Court believes that it rightfully could also impose a monetary sanction on both Defendants and the former defense counsel under Rule 37. *See Maynard v.*

---

[4] Plaintiff has presented information that even before the evidentiary hearing, it had paid its counsel over $800,000 relating to these issues. The Court obviously maintains an open mind as to the reasonableness of the fees and looks forward to extensive and excellent briefing on that issue, but it is no surprise that authority exists to support the reasonableness of such a request. *Lavatec Laundry Tech. GMBH v. Voss Laundry Sols.*, No. 13 CV 56, 2018 U.S. Dist. LEXIS 144487, *44 (D. Conn. Jan. 9, 2018) (when a sophisticated client pays attorneys' fees that it does not know it will recover, the amount is presumptively reasonable); *Stonebrae, L.P. v. Toll Bros.*, No. C-08-0221, 2011 U.S. Dist. LEXIS 39832, *19-20 (N.D. Cal. Apr. 7, 2011) (attorneys' fees are presumptively reasonable when already paid by client).

*Nygren*, 332 F.3d 462, 470 (7th Cir. 2003) (holding that remedial fine of $500 per hour for the district court's time was permissible), *overruled on other grounds by Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 781 (7th Cir. 2016); *Danis v. USN Commc'ns., Inc.* No. 98 C 7482, 2000 U.S. Dist. LEXIS 16900, at *158-59 (N.D. Ill. Oct. 23, 2000). That fine would be to compensate and remediate to a small extent the unnecessary prejudice Defendants and the former defense counsel have inflicted on this Court and the thousands of other litigants whose cases could not be addressed because of the diversion of its resources caused by Defendants and the former defense counsel. *See Bankdirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 U.S. Dist. LEXIS 224705, at *23 (N.D. Ill. Nov. 8, 2018) ("Prejudice here is clear . . . to those litigants and their attorneys in other cases who require the court's attention. Every hour consumed administering needless or unnecessary discovery disputes is an hour taken from other litigants, who must wait in a longer queue for judicial attention."); *see also Travel Sentry, Inc. v. Tropp*, 669 F. Supp. 2d 279, 286-87 (E.D.N.Y. 2009) (imposing monetary fine); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 558 (N.D. Cal. 1987) (imposing fine because of burden on court). Defendants and the former defense counsel's attitude toward their ESI responsibilities—even after a major ESI snafu—was wholly unreasonable and the damage they inflicted was easily avoidable. Reasonable action—if any—was not taken until significant damage was already done. But the Court will not impose monetary sanctions because it would likely result in frivolous motion practice, based on claims that the monetary sanction was punitive rather

than compensatory. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186-87 (2017). Despite the frivolousness of that type of argument, the Court's experience with this case leaves it with the firm belief that counsel simply cannot help themselves. So, to prevent even more waste of the Court's time, the Court chooses not to impose it. *Nat'l Hockey League*, 427 U.S. at 642 (reviewing imposition of discovery sanctions under an abuse of discretion standard); *Qualcomm Inc. v. Broadcom Corp.*, No. 05 CV 1958-B, 2008 U.S. Dist. LEXIS 911, at *64 n.18 (S.D. Cal. Jan. 7, 2008) (declining to impose monetary fine).

The Court is mindful that different judges facing the same facts could impose different sanctions. *United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996) (different judges faced with same facts exercising discretion can reach different conclusions). In exercising discretion, different judges evaluating the evidence here could reasonably use the nuclear options available. The Court is also mindful that this result is not what either side requested. But, in balancing the facts, law, and equities, the Court determines that neither Plaintiff's request for the nuclear options nor Defendants' and the former defense counsel's suggestion for a pass is appropriate. The sanctions imposed are tailored to Defendants' and the former defense counsel's misconduct, while remedying the prejudice inflicted upon Plaintiff. *See Nelson v. Schultz*, 878 F.3d 236, 238-39 (7th Cir. 2017) (judges must tailor sanctions to the severity of the misconduct); *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (sanctions should remedy prejudice). The sanctions also allow the case to proceed on the merits, allowing Plaintiff to use any

withheld documents it deems appropriate and preventing Defendants from using those same improperly withheld documents, as well as informing the ultimate fact finders that they can consider the evidence of Defendants' discovery failures in reaching their conclusions on the merits.

In determining the appropriate sanctions, the Court has not required Defendants and the former defense counsel to reach a level of perfection in identifying, preserving, collecting, and producing ESI. Perfection is not the standard. *City of Rockford v. Mallinckrodt ARD, Inc.*, 326 F.R.D. 489, 492 (N.D. Ill. 2018). Instead, the Court is requiring reasonableness and good faith as measured back in 2012 through 2015. This is a two-pronged standard, addressing both time frame and competence. First, as to the time frame, this case was filed in 2012. Discovery supplements were due on June 1, 2015. Dkt. 116. Fact discovery closed on July 1, 2015. Dkt. 116. As shown later in detail, the law and corresponding duties of parties and counsel to identify, preserve, collect, and produce ESI were not nascent then. Second, as to the competence level, the Court is not holding the former defense counsel to an expert level. The Court is fully aware that parties occasionally allege that judges holding expertise in particular areas "misuse" that expertise. *See, e.g., United States v. Modjewski,* 783 F. 3d 645, 652 (7th Cir. 2015). Being an expert should be commended, not condemned. *Id.* Although the Court does not necessarily hold itself out to be an expert on ESI,[5] it has a working familiarity with the subject. It has published decisions on ESI generally and ESI

---

[5] Some of the true ESI experts are cited throughout this decision.

14

spoliation specifically. *See Mallinckrodt ARD, Inc.*, 326 F.R.D. at 492; *Snider v. Danfoss, LLC*, No 15 CV 4748, 2017 U.S. Dist. LEXIS 107591 (N.D. Ill. July 12, 2017). The undersigned has published articles on ESI and sanctions relating to the failure to identify, preserve, collect, and produce ESI. *See, e.g.,* Iain D. Johnston & Thomas Y. Allman, *What Are the Consequences for Failing to Preserve ESI? My Friend Wants to Know*, Circuit Rider 57 (2019). The undersigned has presented continuing legal education programs on ESI. *See, e.g., Sanctions Under Amended Rule 37(e): Is the Law Fulfilling the Amendments' Intent?*, Seventh Circuit Council on eDiscovery and Digital Information, https://www.ediscoverycouncil.com/content/sanctions-under-amended-frcp-37e-law-fulfilling-amendments-intent (last visited Aug. 24, 2020). And the undersigned has been thinking and writing about discovery spoliation issues for over twenty-five years. *See, e.g.*, Iain D. Johnston, *Federal Courts' Authority to Impose Sanctions for Prelitigation or Pre-Order Spoliation of Evidence*, 156 F.R.D. 313 (1994).

The Court does not demand that level of expertise, but it certainly expects—and the rules require—a reasonable understanding of ESI and the law relating to identifying, preserving, collecting, and producing ESI, in addition to good faith compliance by the parties and counsel.[6] Those expectations and requirements

---

[6] Jonathan Redgrave, Victoria Redgrave, Karen Hourigan, Monica McCarroll & France Jaffe, *Expectations of Conduct by Counsel*, The Federal Judges' Guide to Discovery 25 (2d ed. 2015) ("Courts can and should expect attorneys appearing before them on e-discovery matters to demonstrate that they are prepared and competent, are behaving reasonably and are willing to cooperate with opposing counsel."); Ronni Solomon & Andrew Walcoff, *The Role of Rules 26(f) and 16(b) in Active Judicial Management of Discovery Challenges, in* The Federal Judges' Guide to Discovery 55 (2d ed. 2015) ("It is entirely appropriate for

demand that counsel reasonably care and think about ESI issues—and some semblance of intellectual curiosity would go a long way in this regard. For example, in 2018, when the former defense counsel were confronted with the failure to identify, preserve, collect, and produce responsive Yahoo! emails and Yahoo! chats, they stood before the Court and represented that Yahoo! emails and chats were the same communication program. Dkt. 267, at 32-33. But as the Court demonstrated to counsel at the hearing, by simply going onto the Yahoo! homepage, one would realize that this representation was not true. Dkt. 267, at 57-58; *see also* Tr. 1498.[7] The undisputed testimony at the sanctions hearing supported the Court's demonstration that the former defense counsel's representation was wrong. Tr. 1436. Later, during the sanctions hearing, former defense counsel was still operating under the erroneous belief that Duke's Yahoo! web-based chats were ethereal. Tr. 792, 1068, 1320. They weren't. Tr. 1497-98.[8] Indeed, before July

---

judges to expect attorneys appearing before them to be educated and prepared to address a variety of subjects related to e-discovery at the Rule 26(f) conference.").

[7] References to "Tr." are to the transcript of the evidentiary hearing held from October 28, 2019, to November 19, 2019.

[8] Duke testified that he used a web-based version of Yahoo! chat. Tr. 89. This testimony is supported by judicial admissions made to the Court. Dkt. 373, at 10. The web-based version of Yahoo! chat at the time defaulted to saving chat history. *Yahoo Messenger Safety Guide*, Yahoo!, https://safety.yahoo.com/SafetyGuides/Messenger/index.htm (last visited Aug. 17, 2020) ("With Yahoo Messenger, you can save conversations with friends. By default, your Yahoo Messenger and Yahoo Mail IM conversations are saved in your conversation history. You can turn this setting on or off in Yahoo Mail."); *Yahoo! Messenger for the Web*, Yahoo! https://policies.yahoo.com/ie/en/yahoo/privacy/products/messenger/web/index.htm (last visited Aug. 17, 2020) ("By default, Yahoo! Messenger for the Web will archive your message history in your account on Yahoo! servers, just like email."); *Yahoo! Messenger for the Web Tutorials,* Yahoo!, http://help.yahoo.com/tutorials/msweb/msw/msw_history1.html [https://web.archive.org/web/20090818070554/http://help.yahoo.com/tutorials/msweb/msw/m

2018 when counsel made that representation, Yahoo! chats were not difficult to

obtain. Tr. 1498; *see* The Sedona Conference, *Commentary on Legal Holds, Second*

*Edition: The Trigger & The Process*, 20 Sedona Conf. J. 341, 396 (2019) ("More

modern chat and messaging applications store their conversations in a form that

can be maintained and more easily recovered."). If Yahoo! chats were used, then

searched for but not found, the reasonable inference is that they were deleted. Tr.

1499-1500. But Duke claims he never deleted any chats. Tr. 1519.

The Court is not necessarily even imposing a duty to Google, although good

arguments exist to do so. *See, e.g. Davis v. Dep't of Justice*, 460 F.3d 92, 95 (D.C.

Cir. 2006); Carole Levitt & Mark Rosch, *Computer Counselor: Making Internet*

---

sw_history1.html] ("You choose whether or not to archive your Messenger conversations by enabling or disabling the history feature *(history is enabled by default)*. After you enable the feature, Messenger creates a container for each contact that you instant message and begins archiving your conversations. Each time you converse with a particular contact on the same day, Messenger adds the conversation to the same archive. If you converse with the same contact on a different day, Messenger begins a new archive in the same container.") (emphasis added); Ashish Mohta, *Yahoo Messenger for Web is Avail[a]ble Now*, TechnoSpot, https://www.technospot.net/blogs/yahoo-messenger-for-web-is-availble-now/ [https://web.archive.org/web/20071218205829/https://www.technospot.net/blogs/yahoo-messenger-for-web-is-availble-now/] ("Conversations are archived online, [s]o you can access the past chat anywhere anytime"). Again, this is consistent with Duke's testimony that his Yahoo! chats were saved, until they were somehow deleted. Tr. 99-100. Indeed, Duke specifically testified that the Yahoo! chats were not autodeleted. Tr. 1519. Moreover, even setting this evidence aside, Stamatis' and Leavens' belief is bizarre. Nobody ever told them that Duke's web-based chats were ethereal; in fact, Yahoo! told him that they were recoverable. Dkt. 273. Stamatis and Leavens provided no bases to support this belief. And they demonstrated that they had no personal knowledge of the Yahoo! chat program. Dkt. 267, at 32-33, 57-58. Leavens' assertion is even more bizarre. His assertion that Duke's web-based chats were ethereal came in testimony *after* he had already testified that the chats were saved. Tr. 783, 792. This bizarre belief and testimony is just more evidence of their lack of understanding of the technology Duke used in his business that related to this litigation.

*Research Part of Due Diligence*, 29 L.A. Lawyer 46 (2007); Ellie Margolis, *Surfin'*
*Safari—Why Competent Lawyers Should Research on the Web*, 10 Yale J. L. & Tech.
82, 115 (2007).[9]  But the Court understandably requires—because the rules
mandate—reasonable investigation and good faith compliance with the Federal
Rules of Civil Procedure and the corresponding duties. Indeed, a simple internet
search[10] from an iPhone of "Yahoo! chat" offers "Yahoo! chat history" as an optional
search.  On the first page of the search, under "People Also Ask," there exists "How
can I recover Yahoo! chat history?"  With the tap of a screen, the following
information is conveyed: "Yahoo! stores your messenger logs on its server, not your
hard drive."  Had these simple and reasonable actions been taken by any one of the
five former defense counsel at any time before June 1, 2015, counsel would have
known, among other things, that Yahoo! chats and Yahoo! emails were not stored on
Duke's hard drive, and that Duke's representations that "the four computers would
have anything related to 21 Century Smoking" was extremely suspect and likely

---

[9] Using the internet, particularly Google, to obtain information for litigation is not a
stunning revelation.  This was basic investigation before Barack Obama became the forty-
fourth president of the United States. *See, e.g.*, Thomas A. Mauet, *Pretrial* 40 (7th ed. 2008)
("Never overlook information available that may be available on the Internet.  You can . . .
acquire information about products. . .");  Roger S. Haydock, David F. Hess & Jeffrey W.
Stempel, *Fundamentals of Pretrial Litigation* 57, 59 (7th ed. 2008) ("The development of the
internet has made information dramatically more available at relatively low cost.  Counsel .
. . should routinely use internet searches as a 'first pass' looking for information simply
because there is so much more available that can be accessed without leaving the office. . .
Several search engines can be used to locate information.  Google is the best known. . . * * *
Investigating counsel should also remember that general information searches through
basic search engines . . . also often yield valuable information about parties, persons,
organizations, or the subject matter of the case.").
[10] The Court is not taking judicial notice of these facts resulting from a simple Google
search.  Instead, the Court is taking judicial notice that internet research can quickly and
easily provide counsel with useful information about issues in a case.

untrue.  Presumably, that realization would have prompted a reasonable attorney to conduct the same simple and quick investigation into the GoDaddy emails, which would have informed counsel that the GoDaddy emails were similarly web-based. Tr. 1459.  In fact, the internet search "Are GoDaddy emails stored on your hard drive?" answers this question as well.  Of course, none of this would have even been necessary if Duke had simply informed his own former defense counsel of this fact, a fact he knew.  Tr. 238-39 ("Q: And did you explain to your attorney at that time the difference between stuff being online and stuff being on your computer? A: No. *** Q: And why didn't you explain the difference to him, if you know? A: I mean, in my mind, it kind of is common sense that Yahoo! mail is online.  I guess everyone didn't know that or doesn't know that, but in my mind, that just goes without saying.  So I wouldn't be just walking around describing that Yahoo! email is in the cloud.").  Instead, at best, this Stanford University graduate and e-commerce businessman sat mum, failing to volunteer this and other information until Plaintiff had already expended hundreds of thousands of dollars attempting to obtain relevant ESI, which it was entitled to receive years ago.  Tr. 249.  At worst, Duke deceived his attorneys into believing all the relevant electronic records were stored on his hard drives.  Tr. 604-05, 609 ("Here are the total GB on the four computers that would have anything related to 21 Century Smoking."), 1160, 1224 ("The information that we received was inaccurate."), 1242 (Duke would repeatedly and erroneously tell counsel "You have all the data.  You have everything.").

## II. EXPLANATION FOR CONCLUSION

To explain how the Court arrived at the conclusion as to the appropriate sanctions, what follows is (a) background of this case to provide context, (b) the evidence produced at the hearing and contained in the record, (c) a lengthy discussion of the e-discovery process, (d) the applicable legal authority to impose sanctions, and (e) an application of the Court's factual findings (including credibility determinations) to the legal authority as to the specific e-discovery violations.[11]

## A. Background

This is a trademark case, with supplemental state-law claims and counterclaims, including a counterclaim based on defamation. Plaintiff is DR Distributors, LLC, which owns the registered trademark "21st CENTURY SMOKE." Carlos Bengoa is its president. Dkt. 80, at 1. Defendants are 21 Century Smoking, Inc. and Brent Duke. Duke owns and operates 21 Century Smoking. *Id.* Both companies sell electronic cigarettes, and their marks are used in their respective businesses. *Id.* The parties rightfully agreed that the marks are confusingly similar. *Id.* at 3. According to the parties, this is an "eight-figure case". Dkt. 267, at 64.

## B. Evidence Produced at Hearing and Contained in the Record

### 1. Court's Reaction to the Evidentiary Hearing

Between October 28, 2019, and November 19, 2019, the Court held five days of evidentiary hearings, sometimes going well into the night. At the hearing, the

---

[11] The Court's factual findings are based upon the testimony and exhibits admitted at the hearing as well as facts subject to judicial notice, including representations Duke and the former defense counsel made in open court and in documents in the Court's docket. *See Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983).

Court heard testimony from Duke, the former defense counsel, and Chad Gough. Gough is the owner and founder of 4Discovery, the ESI company which copied and stored the four hard drives Duke earlier claimed possessed all the relevant electronic records. Tr. 1427-28. Additionally, dozens of exhibits were admitted into evidence.[12] The proofs were closed without objection. No party requested that the proofs remain open. The Court asked repeatedly if the parties and the former defense counsel if there was any additional evidence to present and was told there was none. *See, e.g.*, Tr. 1554. In fact, when documents were produced immediately before a witness's testimony, the Court provided counsel with the opportunity to later object if necessary. Tr. 1462-64. So, the parties were on notice that if appropriate, the Court would keep the proofs open. Although there was certainly some clock running and definitely some dead-horse beating, all counsel generally performed well. Particularly, counsel's handling of the exhibits was extraordinary. The Court commends counsel in this regard.[13] The Court's credibility findings as to the various witnesses is described throughout this order. Some witnesses were far more credible than others. In making its various credibility determinations and findings of fact, the Court used common sense and ordinary life experiences. *United States v. Blagojevich*, 614 F.3d 287, 290 (7th Cir. 2010). For example, common

---

[12] This Court's experience is not unique, unfortunately. *See* Hon. William Matthewman*, Towards a New Paradigm for E-Discovery in Civil Litigation: A Judicial Perspective*, 71 Fla. L. Rev. 1261, 1267 (2019) ("Spoliation motions are virtually always time consuming for the court to resolve, and they often require lengthy evidentiary hearings.").

[13] Trial presentation is about credibility. One of the quickest and surest ways counsel can lose credibility is not knowing the substance of exhibits or fumbling around with the exhibits. Hon. Amy St. Eve & Gretchen Scavo, *What Juries Really Think: Practical Guidance for Trial Lawyers*, 103 Cornell L. Rev. Online 149 (2018).

sense and ordinary life experiences do not support Duke's claim that Yahoo! terminated its chat program without notice to its subscribers. Tr. 626. The Court carefully listened to the witnesses and observed their demeanor. *See, e.g.*, *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). Indeed, at times, the Court even corrected witnesses' testimony as to important dates. Tr. 515. The Court also used the same basic tools juries are instructed that they can use to reach these conclusions. *See, e.g.,* Federal Civil Jury Instructions of the Seventh Circuit §§ 1.11, 1.12, 1.13, 1.14 (2017). In this regard, the Court explained that it was not making any legal, factual, or credibility findings until the proofs were closed and it had read the post-hearing briefs. Tr. 847-48, 1556. Apparently, this practice is followed by good judges. Hon. Wayne Brazil (ret.), *Credibility Concerns About Virtual Arbitration Are Unfounded*, Law360 (May 26, 2020, 5:23 PM EDT), https://www.law360.com/articles/1274230.[14] As with all evidentiary hearings—

---

[14] At the November 15, 2019, hearing, the Court described its process for making credibility determinations:

> I will make credibility determinations. I wait until the end. I instruct jurors on that all the time, wait until the end, wait until you hear all the evidence, because I don't know if a document, exhibit, testimony is going to come in that explains how something works and the circumstantial evidence gibes with something else that either shows that somebody is credible or not credible. So I wait until the end to get all the proofs before I do that.

Tr. 848. On November 30, 2019, at the conclusion of the hearing, the Court informed the parties that it wanted to read the post-hearing briefs and explained that it was not making any findings until then. Tr. 1556 ("If anybody thinks they know exactly what I'm going to do, they are fooling themselves because I don't know what I'm going to do, okay?"). On May

trials included—there was significant testimony that did not make much sense and was simply not credible.  As to credibility determinations, Plaintiff requests this Court to follow the principle of "false in one, false in all".  Dkt. 381, at 6. But this Court does not subscribe to that principle and neither does the Seventh Circuit. *United States v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009).

Despite all the evidence, the Court is not entirely convinced that it has been given the full story.[15]  At times, the gaps in the testimony were stunning, especially because the Court allowed all the witnesses to attend the entire hearing and listen to all the other witnesses' testimony.  Tr. 6.

For example, the testimony of Duke and the former defense counsel about the San Diego meeting left a lot to be desired and was emblematic of the hearing.  The lack of recall about not only the details of this critical event, but also the general purpose of the meeting was incredible, particularly because it was described as an "all hands on deck" meeting.  Tr. 1324.  For example, there was conflicting and vague testimony regarding whether the former defense counsel sought to withdraw

---

26, 2020, in part, here is how Judge Brazil described how he makes credibility determinations:

> Good arbitrators do not begin the process of making findings of fact until everything is over—until all the witnesses have been examined and cross-examined, all the documents have been admitted and studied, all the arguments have been heard and recorded, all the post-hearing briefings have been completed and digested.

Brazil, *Credibility Concerns About Virtual Arbitration*, *supra*. It is comforting to know that this Court uses the same process as good arbitrators.

[15] As Big Audio Dynamite asked in *The Bottom Line*:  "Nagging questions always remain, why did it happen and who was to blame?" https://www.youtube.com/watch?v=4V5Zoe84BjE

and whether the former defense counsel expressed concern as to Duke's credibility. *See, e.g.*, Tr. 296, 859, 1184, 1328 (regarding whether counsel sought to withdraw); 303-04, 857, 1007, 1327-28, 1339 (regarding whether issue of Duke's credibility was discussed). Indeed, despite his former attorneys' testimony that Duke's credibility was a central purpose of the meeting, Duke testified that he did not recall if anybody questioned his credibility at the San Diego meeting. Tr. 657-59, 854, 1191. But, frankly, a client not recalling if his attorneys essentially called him a liar is not credible. If it happened, it would be vividly recalled; and if it did not happen, that would be recalled as well. Leavens, who personally attended the meeting to get answers from Duke, did not remember if Duke acknowledged that he made any errors. Tr. 854, 858. Purportedly, everybody spoke at this meeting, but the recall of what was said was spotty. Tr. 861. Duke's and the former defense counsel's incantation of "I don't recall" did not sit well. *See Laukus*, 292 F.R.D. at 504-05. Compounding the problems of the questionable testimony was that no notes were taken at the meeting nor a follow up memorandum to the file written.[16] The lack of

---

[16] Leavens repeatedly testified that he had concerns about Duke's credibility. Tr. 860, 950, 1020-21, 1071. But he never documented those alleged credibility concerns. Tr. 1005-06. Instead, Leavens testified that he preferred to address those issues verbally. Tr. 1019. Certainly, an attorney can verbally raise concerns with a client, but that does not preclude writing a memorandum to the file documenting and memorializing those concerns. At the hearing, counsel for the former defense counsel, and the former defense counsel themselves, seemed perplexed when the Court, Plaintiff's counsel, and current defense counsel suggested that some kind of documentation or even a memo to the file would have been called for in this case, particularly with respect to the San Diego meeting. Tr. 1019, 1080-82. The Court is confused at this reaction. A memo to the file is not some novel practice, particularly in the legal profession and even more so when a client's actions and credibility are at issue. Tricia Goss, *How to Write a Memo to File*, Bizfluent (Sept. 26, 2017), https://bizfluent.com/how-4678025-write-memo-file.html ("For example. . . write a memo to file in case another party later questions your actions. Memos to file are imperative for

documentation permeates this entire case.  The San Diego meeting occurred in September or November of 2018.  Tr. 297, 854.  Leavens flew to San Diego for this meeting with Duke.  Tr. 1019. This was unique.  This trip was purportedly to speak to Duke about the discovery issues, and it was the only time Leavens had done this.  Tr. 300, 535, 662, 855-56.  At least four other attorneys participated by conference call.  Tr. 855.  Collectively, all these attorneys possessed decades of combined legal experience.  But after this critical meeting to address a colossal problem with the case, not a single one stopped and decided that it would be reasonable to conduct an

---

legal, medical or other highly sensitive files that might later be used in court as well.").  Indeed, writing a memo to the file is common in a variety of settings.  Eric Felten, *A Brief History of the 'Memo to the File'*, Washington Examiner (May 17, 2017, 01:20 PM), www.washingtonexaminer.com/weekly-standard/a-brief-history-of-the-memo-to-the-file ("The Memo to the File becomes second nature to anyone who has worked as even just a midlevel manager in the federal government. * * * [T]he first thing such an employee does if his boss is stupid enough to ask him to do something sketchy, is to write it down, to document in detail the what, the when, and the where.  Time spent managing, or even just working, in the federal government, teaches the habit of writing memos to the file.").  Moreover, lawyers representing attorneys in legal malpractice advise that memos to the file are critical.  Mark E. Ellis & Steven B. Vinick, *How to Avoid Legal Malpractice: Ethics for Every Attorney* (last visited Aug. 8, 2020), www.ellislawgrp.com/article17malpractice.html ("All discussions, recommendations and actions should be documented."); Greg Fayard, *Avoiding Legal Malpractice Tip: Document, Document, Document*, FMG BlogLine (May 24, 2018), www.fmglaw.com/FMGBlogLine/professional-liability/avoiding-legal-malpractice-tip-document-document-document/ ("Having defended scores of attorneys over the years, more often than not, I wish my lawyer-client had either better documented his or her file, or memorialized a key conversation. . . For a key strategy decision in a case, a quick 'memo to file' in e-mail form works as well as something more formal."); Edward X. Clinton, Jr., *When Should You Make a Memo to the File?* (May 17, 2017), www.chicagolegalmalpracticelawyerblog.com/make-memo-file/ ("A memo to the file should be made . . . whenever the client . . . does not appear to be telling the truth. * * * In sum, the memo to file is used to protect the lawyer where the client may be heading off the rails in some form or fashion or where the client will later blame the lawyer for some event that took place.").  Not surprisingly, law students are taught to write memos to the file.  *See, e.g.*, Ira Steven Natheson, *Best Practices for the Law of the Horse: Teaching Cyberlaw and Illuminating Law Through Online Simulations*, 28 Santa Clara Computer & High Tech. L.J. 657, 697, 704, 715 (2011-2012).  During practice, the undersigned occasionally wrote memos to the file, and as an instructor, taught law students when and how to write memos to the file.

investigation to determine the basis, scope, and nature of the fundamental breakdown in the identification, preservation, collection, and production of ESI or even to simply go back and perform, in late 2018, a reasonable custodian interview. Moreover, despite alleged credibility concerns about Duke—concerns that would be very reasonable given that Duke knew he possessed relevant Yahoo! emails and chats but failed to provide them to the former defense counsel—none of these attorneys documented what occurred or was said at this meeting. Tr. 1184-85, 1326, 1400. A reasonable person would be very suspicious of the absence of evidence and the hazy recollections of such an important moment in this case— indeed, such an important moment in the careers of the former defense counsel.

In fact, to the Court, it seems as though Duke and the former defense counsel engaged in their own version of mutually assured destruction ("MAD") in which they each knew that if it launched a broadside, it would be met with a return salvo in kind. As the United States and the Soviet Union learned throughout the Cold War, neither side wins in such an engagement. Here, a full-scale attack by Duke against the former defense counsel or vice versa would only benefit Plaintiff. To be sure, there were some assaults. For example, Leavens asserted that he felt Duke was not always credible. Tr. 854-59. This attack begot a brutal evisceration by Duke's current counsel of Leavens' knowledge (or, more accurately, the lack thereof) of ESI identification, preservation, and collection. Tr. 987-91. But mostly the vague testimony was a tacit recognition that "mistakes were made" (passive voice noted by the Court), but that those mistakes—to the extent the witnesses were even able to

26

identify them—were unintentional. *See, e.g.*, Tr. 301, 1181, 1288. Shockingly, one of the most culpable actors—Leavens—claims he made no errors. Tr. 984. Additionally, there were painfully obvious inferences from the facts that led to a single conclusion that former defense counsel refused to admit. For example, for at least a year, Duke did not inform the former defense counsel that his GoDaddy email had not been subjected to the search terms and that responsive documents existed in that account. Tr. 1402 (former defense counsel Shonder testifying that Duke "said or he revealed to me that there were the corporate e-mails [that] had been housed on GoDaddy and had not been part of the—they weren't stored on the computer, and therefore were not searched, okay?"). When Duke finally disclosed this critical fact to the former defense counsel in May 2019, counsel said that he was disappointed because he had been misled. Tr. 1403. But rather than testify that he was misled by Duke, he said that he was misled "by the circumstances of the case." Tr. 1403. Instead of stating the obvious, the former defense counsel hid behind the "circumstances of the case." The Court fully understands why this MAD strategy— whether explicitly or implicitly—was taken. Counsel may have thought it was good litigation strategy; however, it was maddening to this fact finder. Indeed, the Court can confidently say that it was not good strategy for this hearing. The Court was left unsatisfied and very suspicious by the testimony. Witness amnesia is not persuasive. Witnesses were either intentionally obtuse and vague or they were "casually unprepared." Dkt. 381, at p. 3. None of these possibilities are good. *Laukus*, 292 F.R.D. at 504-05. A reasonable person would have expected the

27

witnesses to have locked themselves in a conference room for a week with the relevant documents to prepare for this critical hearing. Of course, the former defense counsel's intentional decision not to document fundamental actions and events in this case would hamper their ability to do so. Likewise, Duke did absolutely nothing to investigate the allegations in the sanctions motion. Tr. 62, 64. Moreover, it is important to remember that these were no ordinary witnesses. Except for Gough, they were all very "interested" in the sanctions motion, and other than Duke, they were all attorneys.

Indeed, the failure to flesh out critical areas of inquiry caused the Court to independently question witnesses, which the Court warned counsel it would do and is the Court's right and duty. Dkt. 315, at 24; *Glasser v. United States*, 315 U.S. 60, 82 (1942); *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988); *United States ex rel. Kurena v. Thieret*, 659 F. Supp. 1165, 1172-73 (N.D. Ill. 1987). The Court's questioning of the witnesses was illuminating, particularly with respect to the missing Yahoo! chats.

The testimony about actions that were taken and importantly not taken did not comport with common sense or everyday life experiences. The "this-is-just-a-big-misunderstanding" portrayal didn't fly. *Laukus*, 292 F.R.D. at 489. Following the hearing and after analyzing and drawing reasonable inferences from the exhibits, testimony, prehearing and post-hearing briefs (as well as the cases cited in those briefs), the Court was left with the firm conviction that Duke took advantage

28

of the ineptitude, carelessness, or disinterest of his attorneys. They were equally culpable.

### 2. Witnesses

**a. Brent Duke**: Duke is a Stanford University graduate. Dkt. 24-2, at 1. He was engaged in multiple e-commerce businesses. Tr. 489, 501-02. 21 Century Smoking was his company. Tr. 593. He directed its functions and operations. Tr. 593-97.

Depending on any given moment, Duke has portrayed himself to be a luddite, unknowledgeable in the ways of information technology. For example, at one point, he testified that he never thought that "electronic records" included web-based emails, testimony from which he quickly retreated. Tr. 1529-30, 1540, 1543-45. He also claims that he would not know how to search email folders for emails that had been stored in the incorrect folder, even though an exhibit was admitted showing that the search function for emails was used. Tr. 292, 872.

But, at other times, the evidence contradicted that portrayal. For example, Duke took computer programming classes at Stanford and, on his resume, stated he was proficient in some computer programming languages. Tr. 601-02. He was also knowledgeable enough to know that photographs were not searchable as text. Tr. 1139. He knew enough not to email passwords; he was described as the "head of the IT department;" and he knew more than "the average Joe on the street." Tr. 224, 595-97, 601. Duke knew what web-based emails were and that they were part of web data. Tr. 69, 72. In an exchange with his search engine optimization (SEO)

29

consultant, he wrote "script put in PHP files. Try opening in Firefox. So I need clean files I can keep on my PC as a backup." Tr. 159; Pls. Ex. 57. Duke knew how to download emails, put them into a zip file, and email the file to his counsel. Tr. 231. Moreover, Duke was surprised that a person would not know that Yahoo! and GoDaddy emails were web-based emails. Tr. 239. Indeed, he was even so confident in his information technology knowledge that he expressed his own theory as to how metadata ended up in a website. D. Ex. 72, Tr. 1531. In a strange race to the bottom of technical ignorance, one of the former defense counsel was quick to note that Duke seemed very competent in using computer systems and more "tech savvy" than him. Tr. 1030.

Duke's knowledge of and abilities with information technology is important in this case because Plaintiff's theory is that Duke or his SEO consultant placed the metatag in a website to drive searches to the website. Dkt. 216, at 6, 25. (Unsurprisingly, both have denied that they did. Tr. 503, 1359.)

There are multiple examples of Duke's sworn statements—whether in a declaration or a deposition—being factually incorrect. For example, despite his sworn deposition testimony claiming that he only created two websites, a late production of documents showed that he created about fifty. Tr. 386-87. Another example is Duke's testimony regarding his knowledge of Plaintiff's trademark. Duke's deposition testimony regarding when he first saw Plaintiff's trademark and his understanding that "TM" was the trademark symbol was demonstrably false. *Compare* Dkt. 404, LS Ex. 1 at 351-62 (Duke testified that he did not know that the

"TM" symbol meant "trademark" and did not see the "TM" symbol, which was clearly displayed on Plaintiff's packaging) *with* Dkt. 407, at 116-17 (proving that Duke saw the "TM" symbol and knew that the symbol meant "trademark").

His memory was lacking at critical points in his testimony, including the San Diego meeting. Tr. 302. Moreover, Duke's recall of important dates, some of which he had previously sworn to, was spotty, including his last contact with his SEO consultant and when he learned of the autodeletion of the GoDaddy emails. Dkt. 234-2, Defs.' Ex. 64; Pl. Ex. 17; Tr. 1523-24, 1555; Dkt. 234-2; Tr. 637-43. Indeed, even when testifying under oath, he was cavalier with dates. Tr. 318 ("approximately May" was equivalent to June 29, 2015). Tellingly, each time that Duke needed to revise a date of an event, the revised date always benefited him. For example, the alleged last date his SEO consultant worked for him was changed at least twice when he was confronted with documents showing his prior representations were false. But despite moving the date twice, he claimed he was absolutely confident that she stopped working for him no later than 2010, which not surprisingly would have been before the metatag was included in Defendants' website. Tr. 1553; Dkt. 26, at 2; Dkt. 232, at 13.

Duke's testimony was problematic in other ways. Some of his testimony was inconsistent with his own documents. *Id.* And some of his testimony did not square with common sense and ordinary life experiences, such as when he testified that Yahoo! did not provide notice that it was ending its Yahoo! chat function. Tr. 273. Duke also used euphemistic (to be charitable) language during his testimony. For

example, when confronted with the uncontested fact that neither he nor the former defense counsel searched the GoDaddy accounts, he claimed that the GoDaddy accounts "had not been given the same scrutiny as the Yahoo! emails . . . ." Tr. 664.

Significantly, many of his explanations were simply not credible. American treasure, Tina Fey, authored the best seller *Yes, And*. If Duke were to write a book, it would be entitled *Yeah, But*. Duke had an explanation for every problem. (Although his GoDaddy emails were autodeleted, they were auto-forwarded to the Yahoo! account. Tr. 634.) But for nearly every explanation he provided, there was an undisputable fact that conflicted with the explanation. (The GoDaddy emails that should have been "showing up" in the Yahoo! account had they been auto-forwarded were not, in fact, "showing up." Tr. 1390-92.) Then when confronted with that fact, he would produce another explanation. (If the GoDaddy emails were not "showing up" in the Yahoo! account, it was because they were simply misfiled. Tr. 292.)

**b. Thomas Leavens**: Leavens is an experienced attorney. Tr. 1018-19. He was a named and founding partner with the firm of Leavens, Strand & Glover. Leavens was the supervising partner on the case. Tr. 1024. He has represented clients in trademark cases previously. Tr. 1026-27.

But Leavens was a difficult witness. At times, extracting information from him was painful, and he often asked that questions be repeated. *See, e.g.*, Tr. 775, 854, 937-38. Oddly, Leavens came across as uninterested not only in his testimony, but in his actions in this litigation. For example, even when he testified that his

32

curiosity was piqued, he still could not remember what, if anything, he did to satisfy that curiosity. Tr. 916. Similarly, despite being an important issue in this case, he did nothing to attempt to determine the difference between Yahoo! chat and Yahoo! email. Tr. 922. Critically, after learning that Duke's Yahoo! account was not searched because it was a web-based account, it never occurred to him to search Duke's GoDaddy account, which is also a web-based account. Tr. 838, 908.

Although Leavens listed himself as lead counsel on his appearance form and designated himself as trial counsel in this case, he has not litigated a federal case for fifteen years. Tr. 722, 983; Dkt. 6. His understanding of ESI identification, preservation, collection, and productions is inadequate. Tr. 989-90, 1087. He does not possess a single continuing legal education certificate establishing credit for attending a class on ESI. Tr. 1087. No doubt, Leavens understands that ESI should not be affirmatively destroyed and knows to some extent that it must be preserved. Tr. 791-92. But beyond that, he has neither practical experience or understanding of ESI identification, preservation, collection, and production nor any academic training. Tr. 987-90. Indeed, he issued no written litigation hold to Duke. Tr. 749. There is no evidence that Leavens made a conscious and intentional decision not to do so. Instead, he had limited knowledge as to what a litigation hold was, even after being specifically asked about it by the Court. Tr. 749; Dkt. 367, at 6. Leavens did not instruct—verbally or in writing—Duke to disable any autodelete functions. Tr. 127, 209, 221-22, 749, 936. And he presented no evidence that he or any of his associates conducted a custodian interview. Tr. 773-75, 783. Instead, he

delegated the identification and collection of the ESI to a third-year associate with very little practical litigation experience. Tr. 1148-49. The guidance and supervision he provided to this associate was minimal. For example, he does not recall if he met with the associate before she met with Duke or talked to her about the meeting with Duke. Tr. 768-69. Critically, Leavens gave no instructions to the associate about ESI. Tr. 992-93. Leavens did not know or understand that Yahoo! and GoDaddy emails were web-based email systems. Tr. 838, 908; Dkt. 256, at 13-14. In fact, he did not even seem to know what he did not know about web-based emails. *Id.* Leavens allowed Duke to self-collect ESI with no supervision and without knowing the methodology Duke used to collect ESI. Tr. 786, 891, 1201-02.

The lack of knowledge of these topics or even the understanding that he should have educated himself on this topic is exemplified by a May 17, 2018, status hearing. When the Court questioned Leavens about the fact that Yahoo! emails—a main way Duke communicated on behalf of his company—had not been identified, preserved, collected, searched, or produced, Leavens confessed his ignorance: "I just don't have the technological background necessary to make the technical distinction that escaped us here, which is that those emails would not be revealed by the search that was done on those four computers." Dkt. 256, at 13-14. Leavens also did not know that Yahoo! chat—an instant messaging system—was separate and distinct from emails sent by Yahoo!'s web-based email system. Tr. 921.

Nevertheless, Leavens was able to prevail on an early summary judgment motion in this case. Dkt. 80. But even he knew that as the case progressed, he was

in over his head, which is why he recruited Peter Stamatis to work on the case. Tr. 733. As the litigation progressed, Leavens allegedly told Stamatis that Stamatis needed to be lead counsel so there would not be a "misunderstanding." Tr. 754, 1063. Although Leavens thought the litigation would not be a "big discovery case" and anticipated a quick resolution with limited discovery, he misjudged. Tr. 1026.

Leavens' actions and inactions are stunning given that he was in attendance at the initial status hearing before the Court, during which the Court asked counsel—including him—about various ESI issues and then specifically required counsel to conduct a Rule 26(f) conference to discuss ESI issues "in detail". Dkt. 367, at 9. The Court specifically warned Leavens that it did not want an ESI discovery snag to delay this case. *Id.* He was on notice about the importance of ESI from the first moment he stepped before the Court. Leavens did a lot of finger-pointing—at Duke for his lack of uncandid, at Stamatis for not taking the lead, at 4Discovery for not engaging in work they were not contracted to do—but never took any blame upon himself or his firm. Tr. 810-11, 984, 1031, 1087-88. Courts do not look favorably on a lead counsel's refusal to accept any responsibility in the face of clear errors. *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 508 (N.D. Ohio 2013).

**c. Heather Liberman**: Liberman was an associate working directly for Leavens at Leavens, Strand & Glover. Tr. 1095. She currently holds a job many law students dream of: General Counsel of SXSW. Tr. 1095.

Liberman was involved in this case from the outset. Tr. 1095-96, 1159. Liberman helped with discovery, but she did not recall specifically what she did.

35

Tr. 1101. Liberman's understanding of the identification, preservation, collection, and production of ESI was obtained by on-the-job training, which was poor. Tr. 995, 1097.[17] Apparently, this training was from Leavens who knew very little about e-discovery. She did attend one CLE addressing ESI, but it did not seem to have a lasting impact on her memory; she could not remember if there were others. Tr. 1098, 1149, 1150 ("I don't remember the specifics . . . I can't remember with certainty what they covered"). Liberman did not know there was difference between email client and web-based email. *See* Tr. 1151 (failing to draw distinction between Outlook compared to Yahoo! and GoDaddy email). Like Leavens, she did not issue a written litigation hold to Duke. Tr. 1106.

Liberman testified that she was not the principal attorney in contact with Duke. Tr. 1097. Liberman did, however, interview Duke about the sources of his ESI. LS Ex. 14; Tr. 1129. But this interview cannot be characterized as a custodian interview. Tr. 1127-28. She created a hand-written note of the interaction between

---

[17] Here is the colloquy on this topic:

> Q. Okay. While you were at the firm, did you ever receive any training regarding ESI discovery from anyone at the firm?
>
> A. I would have certainly been taught how to do the tasks I was asked to do. So if that meant for me to collect certain documents – for example, at one stage, I was asked to go to Brent [Duke]'s apartment to pick up a number of physical files. So, someone, likely Tom [Leavens], would have asked me to go do that and bring the files back to the office and then asked me to copy the files. So I think that on-the-job kind of training that was discussed earlier made sense.

Tr. 1097. The question asked about "training regarding ESI discovery" and the response was that she was told to go to a client's apartment, pick up physical documents, bring them back to the office, and then copy those documents. Put simply, that is not training on e-discovery. Instead, that is why associates leave law firms and sometimes leave the practice of law altogether.

her and Duke.  LS Ex. 14.  But she had no independent recollection of creating the document.  Tr. 1128.  Liberman did not remember if the conference was in person, where it occurred, who else was present, or how long it lasted.  Tr. 1128-29.  This note memorialized that she spoke to Duke about not deleting information, asking about other custodians, discussing the identity and use of search terms, discussing expert witnesses, and addressing the need to be prepared for a deposition.  Tr. 1130-37.  Critically, another note confirms that Duke told her that his company's electronic information was contained on the hard drives of his four computers, which Duke later confirmed by an email. LS Ex. 15 (identifying four computers); LS Ex. 13 ("Here are the total gb on the 4 computers that would have anything related to 21 Century Smoking."); Tr. 1107, 1124-25, 1160-61.  No other documentation was created of this interview.  Tr. 1137-38.  Liberman operated under the assumption that all the ESI was on the four hard drives so she never followed up to obtain any other ESI—including Yahoo! and GoDaddy emails—or attempted to obtain ESI from others at 21 Century Smoking.  Tr. 1132-33.  And, obviously, there was no testimony that before the close of fact discovery, Duke's email accounts were copied, searched, and produced to Plaintiff.  They weren't.  The evidence at the hearing also established that multiple devices and email accounts used by Duke and Defendants were not captured and preserved, including at least one cell phone and multiple email accounts used by Duke's employees.  Tr. 81, 97-101.  Additionally, Liberman's conversation with Duke never uncovered Duke's use of Yahoo! chat to communicate

with Kirti Saraswat, Duke's SEO consultant.  Tr. 1128-37.  Like Leavens, Liberman left Duke to preserve and collect his own ESI.  Tr. 1104-06.

Liberman was also involved in coordinating the contract between Duke and the ESI vendor Defendants used, 4Discovery.  Tr. 1116.  Before the close of fact discovery, nobody asked 4Discovery or any other ESI vendor to make a copy of Duke's email accounts.  Tr. 1122.  Liberman left Leavens, Strand & Glover in about December 2014.  Tr. 1111.  Toward the end of her tenure, she transitioned the work on the case to Travis Life.  Tr. 876.

Liberman's testimony at the hearing was unexpectedly evasive and defensive.  *See, e.g.*, Tr. 1119-20, 1134.  She also jousted with counsel during her testimony over relatively unimportant matters.  *See, e.g.*, Tr. 1106.  And Liberman's recollection of critical matters was hazy at best.  For example, she could not specifically recall what she did relating to discovery, if she was involved in preparing the initial disclosures or providing written guidance on preserving evidence, and what she did to transition the file.  Tr. 1101, 1109, 1111.  But there was one fact that Liberman could recall very clearly; namely, that she was an associate "operating under the direction of a partner."  Tr. 112, 1158-59.  Her demeanor and affect were also puzzling at times.  Often, between questions and answers, there would be unusually long pauses before she answered.  Tr. 1107, 1120, 1135 (Court noting Liberman was not quick to answer questions).  Pauses are certainly understandable when trying to recollect facts from years ago and when being careful in testimony, but these pauses often occurred even when fairly benign

38

questions were posed. Moreover, like all the witnesses, she was present during the testimony of previous witnesses; so, she was able to hear the prior witnesses' testimony. Presumably and hopefully, she was also prepared for her testimony, although Plaintiff contends that the witnesses were "casually unprepared". Dkt. 381, at 3.

Because of the substance and presentation of her testimony, the Court was left to struggle in weighing her credibility, unsure whether she was being less than credible or just presenting a certain demeanor. A reasonable person would think that Liberman, who formerly worked at the direction of a named partner as an associate and who now holds an excellent job in another state, would have no motive to be defensive or evasive. Yet that is this Court's impression of her testimony.

**d. Travis Life**: Life was hired as an associate by Leavens, Strand & Glover in about December 2014. Tr. 1167. He took over the associate duties of this case from Liberman. Tr. 214. He previously worked on ESI matters when he worked for an ESI company. Tr. 1241. According to Leavens, Life was hired because of his e-discovery competence. Tr. 1027. However, the testimony about Life's experience with e-discovery was conclusory. Tr. 1240. No specifics were given. Tr. 1240-41. He certainly did not come across as holding any particular expertise in ESI. Life never instructed Duke to check or disable autodeletion functions, was unfamiliar with the ESI relating to the web-based chat, did not document anything relating to the e-discovery preservation and collection, and

Duke's self-collection of ESI was of no concern to him. Tr. 1181, 1201-02, 1208. As with Leavens and Liberman, there is no evidence that Life provided Duke with a written litigation hold.

Throughout the case, Life was constantly and repeatedly involved in the search for and untimely discovery and production of ESI. Tr. 1194-98, 1201-07. As with the other former defense counsel, Life did not undertake any investigation to confirm Duke's representations about the ESI. For example, he did not investigate Duke's assertions regarding the autodeletion of emails or Duke's assertions that all relevant ESI was on the four hard drives and that the former defense counsel possessed all the ESI. Tr. 1186-87. Life solely relied upon Duke's alleged representation that all the ESI was contained on the four hard drives Duke and his companies used. Tr. 1201-07, 1243. As did Leavens and Liberman, Life left Duke to preserve and collect his own ESI. Tr. 1200-02.

At the hearing, Life generally appeared to be a credible witness.[18] However, after the hearing, Duke's new defense counsel filed a motion detailing an interview

---

[18] Life's attempt to continue to represent Duke after the May 2019 ESI snafu was clearly an error in judgment. Luckily, he received sage advice from Stamatis and perhaps a wise warning from Kevin Salam (Duke's coverage attorney) not to do so. Tr. 1239-40, 1538. The Court views this judgment lapse as an attempt by a young senior associate/junior partner moving to a new firm to develop a book of business. Indeed, bubbling underneath many other layers of this case is that fact that Duke's counsel are *Peppers* counsel because Duke's insurance carrier is defending under a reservation of rights. *See Maryland Cas. Co. v. Peppers*, 355 N.E.2d 24 (Ill. 1976). So, the argument goes, this case is an annuity or sinecure for any counsel representing Duke. If true, this case would be a fine addition to a book of business for a lateral attorney. Although not completely discounting the sometimes perverse incentives of *Peppers* counsel, the Court is not now willing to impugn the motives of any of Duke's counsel in this way. In fact, if the former defense counsel wanted to run up the tab, then they would have spent time conducting lengthy client interviews, custodian interviews, and researching the law and procedure related to ESI. Unfortunately, they didn't.

they conducted of Life after the hearing. Dkt. 386. In that filing, it was represented that Life remembered and was able to explain various discrepancies in the ESI production. Dkt. 386, at 6-7. The Court is simply dumbfounded that after the history of this case, all its ESI blunders, and five days of evidentiary hearings, Life suddenly remembers certain matters he had forgotten at the hearing.

> **e. Peter Stamatis**: Stamatis is an experienced and successful litigator with a good reputation. Tr. 1359-60. He had previously worked with Leavens on a different trademark case. Tr. 1274-75. Stamatis filed his appearance in this case on June 8, 2015, just before the close of fact discovery. Tr. 1273-74. He was involved in some fact depositions and expert discovery. Tr. 1276, 1280.

Leavens believed that Stamatis became the principal attorney on the case in about 2017. Tr. 755. But Stamatis balks at being considered the "lead counsel" on this case. Tr. 1274, 1276, 1295. Although his appearance form does not indicate that he was lead counsel, it does indicate that he was planning on trying the case. Dkt. 129. Moreover, Stamatis repeatedly appeared before the Court for statuses and argued contested motions. In fact, between July 28, 2015, and January 29, 2019, Stamatis appeared before the Court around a dozen times. *See, e.g.,* Dkts. 150, 195, 243, 249, 256, 267, 293. During the same time frame, he also signed about a dozen filings with the Court on a range of contested matters. *See, e.g.*, Dkts. 155, 171, 187, 191, 196, 199, 202, 235, 257, 275, 280. Moreover, Stamatis was the point man on the sanctions motion response. Dkt. 315, at 5, 9; Tr. 1401. He was an integral part of the trial team. *Laukus*, 292 F.R.D. at 506. From the Court's

41

perspective, Stamatis was acting as a lead counsel. *Lead Counsel*, Black's Law Dictionary (9th ed. 2009); *Barcia v. Sitkin*, 683 F. Supp. 353, 356 (S.D.N.Y. 1988) (lead counsel develop trial strategy). Leavens had the same perspective. Tr. 726.

Regarding his other activities in the case, Stamatis never reviewed the boxes of discovery materials; instead, if he needed a document, he obtained it from Life. Tr. 1282. His only involvement with e-discovery concerned a discussion with Liberman about a possible e-discovery vendor. Tr. 1283, 1352. Otherwise, Stamatis was not involved in electronic discovery. Tr. 1282.

Stamatis' testimony at the hearing came across as embarrassed and frustrated, but still defiant and combative. Tr. 1278-79, 1287, 1292, 1297 ("We did not have a lead counsel ceremony where the baton . . . was handed over to me . . . ."), 1309 ("Okay. Whatever."). In this Court's view, his professional judgment appeared clouded by his perceived strength of Duke's case. Stamatis did not—and still does not—seem to have taken Plaintiff's ESI concerns seriously. Tr. 1293-95, 1299 ("There they go again."). Under adverse examination, he spared with Plaintiff's counsel, taking the position that Plaintiff only litigated the ESI issue because the merits of its case were weak. Tr. 1298-99. Stamatis took the same position when questioned by the Court. Tr. 1354-55. And he took the same position in his post-hearing brief. Dkt. 378, at 26.

Stamatis essentially asserted that because this is a trademark case, ESI was unimportant. Tr. 1354. There are several flaws with that position, including, but not limited to, the fact that customer confusion is the critical element in a

42

trademark case and the customer confusion documents—some of which were not timely produced, *see, e.g.,* Tr. 197-98, 260, 942-43, 1217-18— were ESI. *See Ziebart Int'l Corp. v. After Mkt. Assocs.*, 802 F.2d 220, 225 (7th Cir. 1986) ("The 'key question' in determining whether there has been infringement under the federal trademark law (the Lanham Act, specifically 15 U.S.C. § 114(1)) is whether there is likelihood of confusion by the consuming public."); *see also Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 419 (7th Cir. 2019); Dkt. 80, at 3-4 (Judge Kapala noting that the parties agreed that the marks were causing customer confusion). Further, in this trademark case, market penetration has also been hotly contested. Dkt. 232, at 22-23, Dkt. 233, at 14-18; *Zazu Designs v. L'Oreal S.A.*, 979 F.2d 499, 505 (7th Cir. 1992); *Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1394-99 (3d Cir. 1985); 15 U.S.C. § 1115(b)(5). And ESI relevant to market penetration was not timely produced. Pl.'s Ex. 32 (documents attached to email entitled "lawsuit—monthly sales including online"). Similarly, the extremely weak defamation counterclaim was based upon an alleged conversation that occurred at a trade show in Las Vegas that was captured on a digital video recording. Pl. Ex. 71 (containing IMG___0018.mov). The key digital recording, which is ESI,[19] contains no defamatory statements and was not produced before the discovery supplement

---

[19] *ML Healthcare Servs., LLC v. Publix Super Mkts, Inc.,* 881 F.3d 1293, 1307 (11th Cir. 2018); *Bistrian*, 448 F. Supp. 3d at 467; *Ball v. George Wash. Univ.*, No. 17-cv-0507, 2018 U.S. Dist. LEXIS 165983, at *2 (D.D.C., Sept. 27, 2018); *Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2018 U.S. Dist. LEXIS 204933, at *35-42 (S.D. Fla., Dec. 4, 2018). Wisely, Defendants and the former defense counsel do not argue that this video was not ESI. The digitized video was attached as a .mov file to an email. It was ESI.

date or the close of fact discovery.[20] Critically, the Plaintiffs' position throughout this case is that Defendants placed the metatag in the website to increase SEO and Duke communicated with his SEO consultant via Yahoo! chat, which is classic ESI. And highly relevant ESI going to this key issue was not timely produced. Pl.'s Ex. 17; Dkt. 294-2. Indeed, some of this ESI was spoliated. Tr. 938. ESI was always and remains a critical part of this case, despite Stamatis' self-serving opinion to the contrary.

Moreover, Stamatis did himself no favors with his steadfast refusal to agree to established facts. *Laukus*, 292 F.R.D. at 499. For example, Stamatis refused to stipulate that all of Duke's GoDaddy emails (specifically those sent from the "account" address) were not, in fact, auto-forwarded to Duke's Yahoo! account, which is contrary to his previous representations to the Court that they were forwarded. Tr. 173, 1302, 1309,1391-92, 1396, 1534-36.[21] Stamatis stood his

---

[20] Defendants' current counsel take the position that because there was nothing defamatory on the recording, the recording is not relevant. But counsel appears to misapprehend the distinction between relevance under Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 401. The definition of the former is much broader than the latter. *Laudicina v. City of Crystal Lake*, 328 F.R.D. 510, 519-20 (N.D. Ill. 2018). Further, this is an odd argument. Even under a Rule 401 standard, this evidence is relevant. Defendants' defamation claim is based upon alleged defamatory statements made at a trade show in Las Vegas. The key witness claimed the defamatory statements were on the video recordings. Dkt. 294-2, at 231 (the recording "[c]an prove that they were there to some degree. And the two claims he made as I mentioned"). But those two statements were not, in fact, captured on the recording. Indeed, the recordings of the statements made at the trade show are not defamatory. Tr. 973. The lack of the defamatory statements in the recordings is relevant, not irrelevant.

[21] Stamatis made this representation to the Court: "When we talked to Mr. Duke, Mr. Duke was clear: At the time, those emails were auto-forwarding. That's how he had it set up." Tr. 1309. Duke unequivocally testified that he never told counsel this. Tr. 1536. Shonder's testimony answers the critical question as to whether the emails were auto-forwarded; they weren't. Tr. 1392 (emails that should have been auto-forwarded were not showing up in

44

ground despite having heard repeated testimony clearly establishing only one of the GoDaddy email accounts auto-forwarded to the Yahoo! account.

However, the Court does not believe that Stamatis intentionally destroyed or hid ESI. The fact that he immediately knew of the monumental problem caused by the sudden realization of the trove of GoDaddy emails and saw the need to inform the Court goes a long way to supporting this finding. Instead, Stamatis' error was blindly relying upon all previous representations by Duke, as well as Leavens and Life, who blindly relied upon Duke's representations. And he did so even after learning that Duke's previous representations were incomplete, at best, or false, at worst. Other than directing the team of attorneys to address the problems, he did no independent inquiry or directed any specific inquiry to determine the reasons for the various and multiple ESI failures. Tr. 1290, 1310 ("Well, we looked at it. I don't know what the results of that were. I still don't know."), 1357 ("I took [Duke's representations] as face value, and we moved on from there."), 1390-91, 1399-1400.

**f. Steven Shonder**: Shonder is an experienced attorney who had worked on cases with Stamatis previously. Tr. 1406. He is not associated with Stamatis, however. Tr. 1406. For this case, he can fairly be categorized as a contract attorney. (The moniker "contract attorney" is not meant to be pejorative, nor should it be interpreted that way.) Shonder worked on projects as needed. Tr. 1366. Although Shonder worked on the case occasionally as early as July 2015, he entered his appearance on the record on August 13, 2018. Tr. 1364-66. There is no

Yahoo! production). But nobody's testimony unequivocally answers the critical question whether Duke told the former defense counsel this.

evidence that he was tasked with the identification, preservation, and collection of discovery materials, including ESI. Indeed, Shonder was not involved in discovery. Tr. 1365-66, 1408.

Shonder's testimony at the hearing was credible and sincere, albeit at times a bit combative. His answers were generally direct and factual. Like the other former defense counsel in this case, he relied upon representations from other counsel that all email accounts had been searched and responsive documents produced. Tr. 1398-99. When Shonder learned that responsive documents had not been produced, he repeatedly, emphatically, and unequivocally directed that they be produced. Tr. 1370-72. The lack of production concerned him. Tr. 1383-84. But like the other former defense counsel, he did not conduct any investigation or inquiry to confirm Duke's representations, even after the previous representations turned out to be false. Tr. 1389-99. And like other counsel, Shonder did not provide Duke with a written litigation hold. Tr. 221-22. But, given his role in the case, it would be unreasonable to expect that he would.

In 2019, when Shonder learned of the failure to collect and produce the GoDaddy emails, he was "crestfallen." Tr. 1402. He immediately knew the gravity of the revelation that Duke's GoDaddy emails had not been searched with the search terms and produced. Shonder just happened to be in the wrong place at the wrong time.

      **g. Chad Gough**: Gough is the owner and founder of 4Discovery, an e-discovery vendor hired by Duke and the former defense counsel to image the

46

four hard drives that Duke represented contained all the electronic records. Tr. 1417, 1472. Gough is an expert in this field. Tr. 1472, 1473. Previously, he worked for six years at Allstate Insurance performing information security and investigation. Tr. 1416. For more than 15 years, he has worked with law firms on computer forensics and e-discovery. Tr. 1416. He teaches computer forensics and incident response at DePaul University, and has previously testified about a dozen times. Tr. 1416-17.

Gough was a credible witness. He was subpoenaed to testify and was not woodshedded by counsel for the former defense counsel, Duke, or Plaintiff.

The Court sensed Gough was frustrated because he seemed to know that had 4Discovery been contracted to perform its full services, none of this ESI fiasco would have occurred. Tr. 1433. Instead, as Gough credibly testified, 4Discovery was hired for a limited purpose—namely, to copy the four hard drives, run the agreed upon search terms against the imaged drives, and produce a report. Tr. 1426, 1432, 1494. 4Discovery was not asked or hired to perform a custodian interview. Tr. 1426. 4Discovery was operating in the dark; it was not provided with pleadings, discovery requests, ESI production protocols, or even told which email accounts were at issue. Tr.1432-33, 1481, 1495.

Gough clearly indicated that he knew that imaging the four hard drives would not capture ESI stored in the cloud. Tr. 1432-33; 1452. In fact, if he had been told that the email accounts included Yahoo! emails, he would have followed up by questioning counsel about "cloud-based accounts being stored on a local

computer." Tr. 1433. None of the former defense counsel asked whether a search of the four computers would capture the web-based emails from Yahoo! or GoDaddy. Tr. 1435-36. Unlike the former defense counsel, he knew that email client, such as Outlook emails, are stored on the hard drive. Tr. 1436. Gough also never would have represented that a search of the four computers would capture Duke's Yahoo! and GoDaddy emails, because those are web-based email systems. Tr. 1437, 1459. And we now know that this is where a trove of responsive ESI was stored but not timely produced.

Counsel for Leavens made several valiant attempts to shift the blame onto 4Discovery for the ESI snafus in this case. Tr. 1473-81. But none of those attempts were successful. For example, she tried to establish that 4Discovery offers expert services in identifying the location of ESI. *Id.* But as Gough and others testified and as the documentary evidence showed, 4Discovery was not hired for that purpose. Tr. 1426, 1432, 1494. Its work was limited. Tr. 1494. Indeed, Liberman testified that the instructions given to 4Discovery were straight-forward: "Here are the four hard drives. Please image them." Tr. 1121. But more fundamentally, counsel cannot just lay the blame on an ESI vendor. *HM Elecs., Inc. v. R.F. Techs., Inc.*, Case No. 12cv2884, 2015 U.S. Dist. LEXIS 104100, at *72 (S.D. Cal. Aug. 7, 2015). Similarly, she tried to establish that it would be reasonable for Leavens to believe that Duke stored all of his emails locally on the four hard drives, rather than in the cloud, as web-based emails usually are stored. Tr. 1473-81. There are two fundamental problems with that. First, Leavens never testified that he

48

assumed no web-based emails were stored in the cloud. Second, and fundamentally, he could never testify to that because he never knew that. As he stated in open court in 2018, he did not have the technological knowledge to make that representation.[22] Dkt. 256, at 13-14. So Leavens couldn't have relied upon something he simply did not know or even understand.

*　　　*　　　*

In finding facts involving spoliated, suppressed, or untimely produced ESI, courts sometimes list out the possible options as to how these events occurred. First, maybe the client intentionally destroyed, withheld, or hid the documents from its attorneys, and they were so effective that the attorneys did not know or suspect that the documents even existed. Second, the attorneys failed to discover the intentionally destroyed, withheld, or hidden documents or even suspect these actions took place because of their complete ineptitude and disorganization. Third, the client shared the documents with its attorneys (or at least some of the attorneys) and the knowledgeable attorneys worked with the client to destroy, withhold, or hide the documents. Fourth, the client did not tell the attorneys about the documents, but the attorneys suspected there was additional evidence or information and chose to ignore the evidence and warning signs and accepted the client's incredible assertions about the adequacy of the document search and investigation. *See Qualcomm Inc. v. Broadcom Corp.*, No. 05cv1958-B, 2008 U.S.

---

[22] This would have been an unusual assumption: It would be based on the belief that a subscriber would copy and store all web-based emails locally on a hard drive rather than or in addition to in the cloud. Tr. 1436. Frankly, Leavens does not possess the level of sophistication to even make this assumption.

Dist. LEXIS 911, at *31 (S.D. Cal. Jan. 7, 2008), *vacated in part*, 2008 U.S. Dist. LEXIS 16897 (S.D. Cal. Mar. 5, 2008). Other options exist. For example, there is Defendants' narrative that everything was just a communication breakdown, like a John Cleese farce, just not funny. Another option is a combination of all of these options. That option would recognize that life is rarely cabined neatly into distinct options. Regardless, each case must be determined on its own specific facts.

This Court does not believe that any of the former defense counsel intentionally destroyed, withheld, or hid ESI. The Court is not as confident about the innocence of Duke's actions and inactions. The Court finds that the facts here are closer to the fourth option: the former defense counsel suspected there was additional information but did next to nothing to investigate—let alone remedy— the problems. There is no doubt documents were spoliated and not timely produced. Those events occurred as a result of the actions and inactions of both Duke and the former defense counsel. There is much blame to be shared by both.

As to Defendants, which essentially means Duke, he repeatedly told the former defense counsel that all ESI was on the four computer hard drives and that they "had all the data" and "had everything," which was false—and he knew it was false. Tr. 1242. And he did absolutely nothing to educate them otherwise, even when it was abundantly apparent that the former defense counsel were under a distinct misunderstanding. Duke failed to reasonably search for and produce ESI even after at least one court order specifically requiring the production of ESI. And most importantly, even if the Court were charitable and gave Duke the benefit of *all*

inferences and doubts—not just reasonable ones—he still failed to inform the former defense counsel that the GoDaddy accounts had not been searched until a year later. By this time, Plaintiff had suffered substantial prejudice. Duke's testimony that is contrary to these findings is unreasonable. Although some of his testimony was credible and reasonable, on the key issues in this case, he was not a credible witness. Stamatis' "high concern" about Duke's credibility was eminently reasonable. Tr. 1191. The retreat from that concern at evidentiary hearing rang hollow. That finding is bolstered by the clear examples of not only mistaken prior sworn testimony, but patently obvious false testimony.

The former defense counsel shoulder much of the blame as well, particularly Leavens. His errors were fundamental. And because those fundamental errors occurred at the outset of the case, they permeated the entire case from then on. The former defense counsel conducted no custodian interview. They failed to understand the most basic elements of Defendants' ESI. And, other than relying on Duke, they then failed to attempt to understand the ESI issues even when it became obvious that they did not understand it. They issued no written litigation hold, let alone one that specifically instructed Duke to disable autodeletion functions. They left Duke to engage in self-collection of ESI without any instruction, monitoring, or documentation. They failed to timely disclose relevant ESI. They minimized their failures and the failures of the client. They neglected to address false sworn testimony of Duke and failed to inform the Court when they learned of the spoliation of ESI. Critically, the former defense counsel did

nothing—other than to rely on Duke's say-so, even after they rightfully questioned his credibility—to investigate any of the repeated ESI failures. Indeed, they simply repeated all the same failures even after they were on notice of the fundamental ESI mistakes. It is the failure to take reasonable steps—indeed, almost any steps—after the Yahoo! ESI disclosure problems that is the primary basis for the sanctions against Stamatis, who at that point was acting as a lead counsel. The actions and inactions were because of carelessness and the failure to make a reasonable inquiry on multiple occasions.

### 3. Findings of Fact: What Happened

#### a. Pre-Litigation: 2009—2012

##### i. Duke's E-Commerce Businesses and IT Systems

Duke is a graduate of Stanford University. Tr. 1262, 1278. While attending Stanford, he studied computer science and became proficient in computer programming languages. Tr. 601-02.

After graduation, Duke started several e-commerce businesses. Tr. 602-03, 1278. In doing so, he purchased domains and created websites. Tr. 603-05. Although Duke testified in his deposition that he only owned two websites, it was later established that, in fact, he owned "many, many, many websites." Tr. 384-85.

One of Duke's e-commerce companies is 21 Century Smoking, Inc., a defendant in this litigation. Dkt. 80, at 1. This business is engaged in the sale and distribution of electronic cigarettes. *Id.*

For 21 Century Smoking, Inc., Duke used at least two electronic communication accounts. Specifically, he had a GoDaddy email account. Pl.'s Ex. 66; Tr. 90. The two primary email addresses he used for the GoDaddy account were support@21centurysmoking.com and bduke@21centurysmoking.com. Tr. 90.

GoDaddy accounts are web-based. Tr. 129-30, 131, 1234-35,1459; Dkt. 315, at 6-7. Duke knew that GoDaddy emails were web-based, not accessed through an email client. Tr. 129-30, 131, 281-82. Unfortunately, Duke's attorneys (the former defense counsel) did not know GoDaddy was a web-based email system. Tr. 896-97, 1401; Dkt. 315, at 6-7. In fact, it seems that some of the former defense counsel did not even know there was a difference between an email client and web-based emails. Tr. 1151; Dkt. 256, at 13-14. Apparently, it was not until May of 2019 that they first learned that GoDaddy accounts are web-based. Tr. 281-82, 911, 1328-29, 1401, 1402; Dkt. 315, at 16. Duke never revealed this fact to the former defense counsel until then. Tr. 281-82, 911, 1328-29, 1401, 1402.

In addition to the GoDaddy account, Duke also had a Yahoo! account. Tr. 68, 89-90. The Yahoo! account possessed both email and instant message capabilities. Tr. 89. The Yahoo! email account Duke used was brentduke@yahoo.com. Tr. 90. Additionally, at all relevant times, Duke's Yahoo! account also had an instant messaging function, Yahoo! chat. Tr. 89.

Like GoDaddy, Yahoo! is a web-based system. Tr. 89. So, just like GoDaddy emails, generally, Yahoo! emails and chats are stored in the cloud, not locally. Tr. 89. Yahoo! email and Yahoo! chat are different communication programs. Tr. 1436,

1498; Dkt. 267, at 57-58.  Again, Duke knew Yahoo! was a web-based system and that emails were not stored on his hard drive.  Tr. 238-39, 838, 908.  And again, as with the GoDaddy emails, the former defense counsel did not know that Yahoo! emails and chats were web-based and stored in the cloud.  Tr. 238-39; 1396; Dkt. 256, at 13-14 ("[B]ut essentially it did not occur to us that the Yahoo account needed to be dealt with as a separate matter in the e-discovery that was done.  I just don't have the technological background necessarily to make the technical distinction that escapes us here, which is that those emails would not be revealed in the search that was done of those four computers").[23]  Once again, as with the GoDaddy emails, Duke never told them this fact.  Tr. 238-39.  The former defense counsel apparently did not learn of this fact until sometime in the spring of 2018.  Tr. 246-47; Dkt. 253-1, at 4.

Duke claims that both the Yahoo! email and chat accounts were for personal use.  Tr. 68.  But it is undisputed that he used both for business purposes of 21 Century Smoking, Inc.  Tr. 68, 90, 236, 238, 763, 783.

### ii. "Personal" v. "Corporate" Email Accounts & Auto-forwarding

In an apparent attempt to excuse their failure to timely produce a trove of relevant and responsive Yahoo! emails or preserve relevant and responsive Yahoo! chats, the former defense counsel repeatedly referred to Duke's Yahoo! account as his "personal account" and the GoDaddy account as the "corporate account."  Tr.

---

[23] At one point, one of the former defense counsel seemed to indicate that he believed that Yahoo! emails would co-exist on Duke's hard drives.  Tr. 892-93.  He never explained the basis for that inaccurate belief.

873, 891, 1286, 1289, 1297, 1357, 1399; Dkt. 378, at 7. Stamatis was the biggest proponent of this theory. Dkt. 378, at 7. But he personally knew that Duke communicated with Saraswat, whom he hired to perform SEO on the website for his business, through Yahoo! emails because he produced these emails to Plaintiff. Dkt. 294-2, at 2. Simply attaching these convenient, self-serving labels to these accounts does not make them so easily categorized. Calling the Yahoo! account a "personal account" does not make it so. As Abraham Lincoln famously noted, calling a tail a leg does not make a tail a leg. The evidence at the hearing overwhelmingly established that Duke used both the Yahoo! email and chat accounts for business purposes. Tr. 68, 90, 138, 157, 236, 273, 763, 783; Dkt. 294-2, at 3-61. Indeed, as discussed in more detail elsewhere, Duke enabled an auto-forwarding function, sending certain GoDaddy emails to the Yahoo! email account. Tr. 634-36. This fact establishes that the Yahoo! account served both a personal and business function. Further, Duke showed one of the former defense counsel that he used both the Yahoo! email and chat accounts for work. Tr. 236, 238, 763, 783. Additionally, most of the late-produced emails between Duke and Saraswat were from Duke's Yahoo! account. Dkt. 294-2, at 64-113. Duke even communicated with the former defense counsel about this very litigation through his Yahoo! email account. Tr. 184, 277. And Duke was not the only one who engaged in this practice at 21 Century Smoking, Inc.; some of his own employees did so, too, and used their own personal email accounts for work. Tr. 97-99, 102, 197. These accounts were not searched until immediately before the sanctions hearing. Dkt. 318.

The practice of employees forwarding business emails to non-business email accounts is well-known not only in the legal arena, but in society at large. For example, numerous cases have recognized this practice. *See, e.g.*, *Prairie Field Servs., LLC v. Welsh*, No. 20-cv-2160, 2020 U.S. Dist. LEXIS 201813, at *10 (D. Minn. Oct. 29, 2020) ("Drefke says that he would sometimes forward work emails to his personal account. . ."); *Miller v. Native Link Constr., LLC*, No. 2:15-cv-01605, 2019 U.S. Dist. LEXIS 49592, at *6 (W.D. Pa. Jan. 22, 2019); *Pipeline Prods. v. Madison Cos., LLC*, No. 15-4890, 2018 U.S. Dist. LEXIS 171694, at *5-6 (D. Kan. Oct. 4, 2018); *Priority Payment Sys., LLC v. SignalPay, Ltd.*, 161 F. Supp. 3d 1294, 1301 (N.D. Ga. 2016); *Ezenia! Inc. v. Nguyen (In re Ezenia! Inc)*, 536 B.R. 485, 520 (D.N.H. 2015) ("the evidence showed that Nguyen often forwarded emails to his personal Gmail account relating to Ezenial's business"); *Small v. Univ. Med. Ctr. of S. Nev.*, No. 2:13-cv-00298, 2014 U.S. Dist. Lexis 114406, at *43-44 (D. Nev. Aug. 18, 2014). Additionally, court protocols recommend that parties discuss the use of personal email accounts at Rule 26(f) conferences. *See, e.g.*, U.S. District Court for the District of Maryland, Principles for Discovery of Electronically Stored Information in Civil Cases, Principle 1.02, https://www.mdd.uscourts.gov/sites/mdd/files/ESI-Principles.pdf (last visited Nov. 17, 2020).

Because the law reflects societal activities, it is not surprising that the practice of forwarding business emails to personal accounts was a common occurrence. For example, during the lengthy life of this litigation, it was well-

known and the subject of continual public discussion that multiple Secretaries of State, including Condeleeza Rice, Colin Powell, and Hillary Clinton, used personal email accounts for work purposes. *Hillary Clinton Email Controversy*, Wikipeda.org https://en.wikipedia.org/wiki/Hillary_Clinton_email_controversy (last visited Nov. 16, 2020). The practice of forwarding work emails to personal email accounts is particularly common with small businesses. Yahoo! Small Business even explains how to engage this function. *Help,* Yahoo! small business, https://help.smallbusiness.yahoo.net/s/article/SLN22028 (last visited Nov. 16, 2020). Gmail does the same. Wolfram Donat, *How to Get My Work Email Delivered to My Gmail Account*, Chron, https://smallbusiness.chron.com/work-email-delivered-gmail-account-27774.html (last visited Nov. 16, 2020). Saying that the relevant, responsive, unproduced and spoliated ESI was located on Duke's "personal" Yahoo! account offers no quarter to the former defense counsel. Competent counsel have known this practice for years and would have investigated it at the outset of the case. This is ESI 101.

### iii. Duke's Communication and Relationship with SEO Consultant Saraswat

With regard to Yahoo! chat, Duke specifically used that function to communicate with his search engine optimization consultant, Kirti Saraswat of Webrecsol. Tr. 68, 138, 157, 273, 512. Saraswat also input metatags into Defendants' website. Tr. 503. Saraswat was based overseas and used Yahoo! too, so Duke was able to use the chat function to instant message her and have a contemporaneous electronic conversation. Tr. 138-39. Despite her important

57

involvement in this case as Duke's search engine optimization contractor, none of the former defense counsel instructed her to preserve her communications with Duke. Tr. 1079-80.

Saraswat's work for Duke lasted for two years, at least. Tr. 502 (started beginning 2009); 1553 (allegedly terminated at end of 2010). But when her work for Defendants ended is open to serious question. Saraswat swore under penalty of perjury that she stopped working for Duke in February of 2010. Dkt. 267, at 2. But Duke initially testified that Saraswat stopped working for him two months later. Tr. 1521-23. In fact, Duke swore under penalty of perjury that "After April 2010, [he] had no further communications with Webrescol [sic] or Kirti Saraswat regarding 21 Century Smoking's web site and, in particular, no communications about metadata on the site." Dkt. 234-2, at 1. Nearly every aspect of that testimony is demonstrably false.

An untimely produced document established that Duke and Saraswat were, in fact, communicating with each other about 21 Century Smoking Inc.'s website as late as September 13, 2010. Pl.'s Ex. 17. Critically, this correspondence between Duke and Saraswat repeatedly referenced and discussed future, continued work by Saraswat for Duke on the website. Pl.'s Ex. 17 (Saraswat: "i will updated keyword lists"), (Duke: "i want to see results for e-cig or electronic cigarette or even buy electronic cigarette . . . stuff that will get new customers"), (Saraswat: "okay brent from now onwards i will target only specific keywords"), (Saraswat: "well we will use existing keywords n i will give more n more focus"). Indeed, the former defense

counsel admitted that previous representations about the work and communications were false. Dkt. 234-1, at 2.

At the evidentiary hearing, Duke finally and adamantly settled on some unspecified date in 2010 as the last date that Saraswat worked for him. Tr. 1552-53. He also claimed for the first time that Saraswat was working for free between February and September 2010. Tr. 1552-53.

Duke's sudden claim that Saraswat was working for free is based on a single document he seized on for the first time in rebuttal at the end of the evidentiary hearing. Defs.' Ex. 64; Tr. 1552-53. The document, which was relevant and responsive to a production request, was not timely produced even after the Court ordered it to be produced. *Compare* Tr. 924; Def's Ex. 64 (showing production date of March 17, 2018) *with* Dkt. 269, at 17-18; Dkt. 132 (court order requiring Saraswat communications to be produced by June 15, 2015).

The date Saraswat ceased working for Duke—whether for free or not—is critical in this case. As discussed in more detail elsewhere, Defendants' webpage contained a metatag that used Plaintiff's mark. Dkt. 26, at 2. Indeed, Defendants do not dispute that Plaintiff's mark was in Defendants' webpage. Dkt. 278, at 41. Plaintiff's main theory is that the metatag drove internet customers to Defendants' webpage. Dkt. 29, at 10-11. And because Duke and Saraswat continually tried to increase 21 Century Smoking Inc.'s search engine optimization, Plaintiff contends that Saraswat or Duke—or both—inserted Plaintiff's mark into the metatag on Defendants' website. Dkt. 29, at 10-11; Tr. 503. Both Duke and Saraswat deny

they did this. Tr. 1359; Dkt. 267, at 2. But Plaintiff entered the electronic cigarette market in 2010 and Plaintiff's mark existed in a metatag on Defendants' website as early as October 2011. Dkt. 26, at 2; Dkt. 29, at 4, 10-11; Dkt. 37, at 4-5; Dkt. 234-1, at 2. So, Plaintiff's argument would be buttressed if Saraswat was working (regardless of whether she was paid) for Duke at that time. Conversely, Defendants' argument would be buttressed if Saraswat were not working for Duke at that time. Duke and the former defense counsel have desperately offered at least three different dates for the end of the relationship, which—not surprisingly—precede the date that the metatag was placed in Defendants' webpage. But as withheld evidence has been finally produced by Duke, even after court ordered production dates, the end date of Saraswat's employment creeps closer to the date of the inclusion of the metatag and Plaintiff's entry into the electronic cigarette market.

### iv. Duke Learns of Plaintiff's Trademark

On July 21, 2010, Duke first learned of Plaintiff's trademark registration. Dkt. 407, at 117 ("3. When did you first learn that Plaintiff had a trademark registration?"); *Id.* at 116 ("3. On 7.21.10 I got the email from my supplier with their packaging and it had a TM by their name. I wasn't 100% sure what that meant, but was fairly surprised to see it."). This information is confirmed by email communications between Duke and one of the former defense counsel in April 2013. *Id.*; Defs.' Ex. 76. Besides the date that Duke learned of Plaintiff's trademark, at least two other critical facts are established on this date: (1) Duke saw the "TM",

and (2) he obviously knew that "TM" meant "trademark" because the trademark symbol was his basis for answering the specific question as to when he first learned of the trademark registration. As will be shown later, in his deposition testimony in 2015, Duke misrepresented both of these facts.

### b. 2012

### i. Initiation of Litigation and Pleadings

On September 7, 2012, DR Distributors, LLC (Plaintiff) filed a complaint, alleging violations under the Lanham Act for counterfeiting and infringement, unfair competition and false designation and supplemental state-law claims for unfair competition and deceptive trade practices. Dkt. 1.

On September 10, 2012, the case was initially assigned to then Magistrate Judge P. Michael Mahoney and District Judge Frederick J. Kapala.

On October 3, 2012, Thomas Leavens filed his appearance for 21 Century Smoking, Inc and Duke. Dkt. 6. Later, Heather Liberman filed here appearance for Defendants. Dkt. 41. Liberman was an associate at Leavens' law firm.

On the same day the former defense counsel filed their appearances, Defendants answered, denying the operative allegations and raising six affirmative defenses. Dkt. 8. 21 Century Smoking, Inc. also filed a counterclaim against DR Distributors, alleging federal unfair competition, trademark and service mark infringement, and supplemental state-law claims for unfair competition and deceptive trade practices, as well as seeking cancellation of Plaintiff's trademark application and registration. *Id.*

61

On October 23, 2012, DR Distributors answered the counterclaims, denying the operative allegations and asserting eleven affirmative defenses, including unclean hands. Dkt. 13.

On October 24, 2012, Magistrate Judge Mahoney held a status hearing and ordered counsel to hold a Rule 26(f) conference and submit a proposed case management order (CMO). Dkt. 14. He also set an initial pretrial conference for November 14, 2012. *Id.*

On November 14, 2012, Magistrate Judge Mahoney approved the proposed CMO, required Rule 26(a)(1) disclosures to be served by November 26, 2012, and ordered that fact discovery be completed by October 1, 2013. Dkt. 16.

### ii. Leavens' Meeting with Duke About Disclosures

At some time in late 2012, Leavens and Duke met at Duke's "warehouse" on North Ashland Avenue in Chicago, Illinois. Tr. 126-27, 211, 502, 236-37, 627, 759. The Court draws the reasonable inference that this meeting was to provide Rule 26(a)(1) initial disclosures that were due on November 26, 2012. Tr. 868-69; Dkt. 16. No notes were taken of this meeting and no documentation exists regarding this meeting. Tr. 127, 212, 215, 759, 995-96. Duke showed Leavens how he would access his online email accounts. Tr. 236-37, 605, 759. At this time, Duke knew that his GoDaddy and Yahoo! accounts, including Yahoo! chat, were web-based. Tr. 69-70, 89. But Duke never told Leavens this fact. Tr. 238-39. Duke also showed Leavens how the emails were saved online. Tr. 238. According to Leavens, although Duke was showing him these emails and accounts, Duke did not explain to

62

Leavens what he was doing. Tr. 628. More precisely, Duke never told Leavens that the entirety of all email accounts could only be accessed online. Tr. 628. In other words, Duke never told Leavens that to obtain all of the emails, they needed to be downloaded from the internet. Tr. 1029. And Duke did not explain to Leavens that the emails were online, not on the computers. Tr. 238-39, 628-29. During this meeting, Leavens verbally told Duke to save the information, including Yahoo! chats, and not to delete the data. Tr. 126, 783-85, 790-91. Duke was verbally reminded of this repeatedly. Tr. 590-91. As a result of this meeting, Leavens knew that Duke used Yahoo! (both email and chat) and GoDaddy for 21 Century Smoking, Inc.'s communications. Tr. 763, 926. But Leavens never searched the Yahoo! or GoDaddy accounts. Tr. 132. This meeting between Leavens and Duke was not a custodian interview. Tr. 243, 995-96, 1127-28. No written litigation hold was provided as a result of this meeting nor was Duke instructed to disable any autodeletion functions. Tr. 127, 209, 215, 221-22, 749, 936, 1208.

In November 2012, Leavens and Duke communicated about Defendants' Rule 26(a)(1) disclosures. Tr. 605-06; LS Ex. 7. Leavens provided drafts of the document to Duke, which Duke amended, and then Leavens incorporated those amendments. LS Ex. 7. Critically, the draft disclosure, which Duke reviewed, stated the following about electronic records: "Electronic records are located at 1535 North Ashland Avenue, Chicago, Illinois and reside on three or four computers located there." Tr. 629, 1029; LS Ex. 7. Duke knew that "electronic records" included emails but claimed he did not think of emails in that context then. Tr. 1540, 1544-45. Duke

63

reviewed, approved, and did not suggest changing this language in the initial disclosures. Tr. 606-07. Duke told Leavens that all of the electronic data ("everything") under his control was on the four computers in his possession. Tr. 605, 629, 896. Therefore, based upon this representation by Duke, Leavens claimed he was under the impression that everything related to 21 Century Smoking, Inc. was on the hard drives of these computers. Tr. 1021. The Rule 26(a)(1) initial disclosures Defendants served on Plaintiff specifically stated "Electronic records are located at 1535 North Ashland Avenue, Chicago, Illinois and reside on three or four computers located there." Dkt. 294-2, at 621; Pl.'s Ex. 50 at 5. This representation was repeated in subsequent disclosures. LS Ex. 4 at 5 (dated August 27, 2103). Leavens signed these disclosures under Rule 26(g). Dkt. 294-2, at 622; Tr. 782; LS Ex. 4 at 5.

Duke claimed that at some time in 2012 or 2013, he offered the former defense counsel his log-in and password information so that they could search the accounts online. Tr. 129-30. There is no documentation to support this claim. Tr. 224. Leavens denied that Duke made this offer at this time. Tr. 760-61. Liberman likewise denied Duke offered his log-in or password information. Tr. 1141-42. And Life, who was not with the law firm during this time, testified that he did not have this information until 2018. Tr. 1237. But it is undisputed that Duke did offer this information to the former defense counsel in the spring of 2018. Tr. 224, 519, 762. Stamatis finally took Duke up on that offer on May 7, 2018. Tr. 522.

### c. 2013

64

### i. Online Sales ESI

On February 10, 2013, Laurie Duke, Brent Duke's wife, created an email entitled "lawsuit – monthly sales including online". Dkt. 294-2, at 276-300; Pl.'s Ex. 32. She sent the email to Duke. Tr. 372. The email attached documents showing 21 Century Smoking's sales by location as well as online sales. Dkt. 294-2, at 276-77. (This is referred to as the "withheld online sales document.")

The withheld online sales document contained the agreed search terms and should have been produced during discovery. Tr. 382. It was not. It was not produced until June 1, 2018, long after the close of both fact and expert discovery. Tr. 374, 378, 380; Dkt. 116. Furthermore, Duke never provided the withheld online sales document to the former defense counsel. Tr. 378, 447. So, the withheld online sales document was never provided to Defendants' market penetration expert. Tr. 378, 380, 450. It was Duke's decision not to provide this document. Tr. 380-81.

But Duke did provide another document containing sales information to both the former defense counsel and expert. Tr. 370, 379, 965; Dkt. 294-2, at 251-274.; Pl.'s Ex. 31. (This is referred to as the "produced online sales document.") The market penetration expert's opinion was material to the litigation, and his opinion was used in support of the summary judgment motion. Tr. 966-67. The produced online sales document was provided to Plaintiff's counsel. Tr. 370. The produced online sales document is identical to the withheld online sales document, except that it does not capture online sales figures in the document created by Laurie Duke. The withheld online sales document specifically identifies 21 Century

Smoking's online sales from August 2009 through January 2013. Dkt. 294-2, at 277. According to Plaintiff, these online sales figures are substantially lower than the online sales figures upon which Defendants' market penetration expert relied. Plaintiff also argued that this information shows that online sales decreased over time. Dkt. 267, at 33-36.

At the evidentiary hearing, Duke testified that the withheld online sales document figures were incomplete and were partial calculations, even though all the other figures in the document were accurate. Tr. 374, 376, 448. According to Duke, his wife created the withheld online sales document and then he supplemented the numbers with other online sales information to create an accurate total. Tr. 444. It was represented that the purportedly correct online sales figures were the same figures reported to the Internal Revenue Service for tax purposes. Tr. 1325.

But at the evidentiary hearing, the tax returns were not introduced or even listed as exhibits. And Laurie Duke did not testify. Stamatis testified that he asked Duke about the discrepancy between the two documents and Duke provided the same answers. Tr. 1325-26. But Stamatis never confirmed the explanation with Laurie Duke and there is no evidence he compared the online sales figures to the information reported to the IRS. Tr. 1326. Stamatis took Duke's word and moved on. Tr. 1357. There is no indication on the document that the sales figures were partial or incomplete. Tr. 378. According to Duke, the document's incompleteness would be implicit. Tr. 378-79.

The Court asked Duke whether there was a way to compile all the online sales through a single process or program and in a single document. Tr. 448. Duke answered that a software program could compile all the online sales. Tr. 448. It is not surprising that any decent online sales program could perform this function. If that program could perform that function, then it begs the question why it wasn't used to compile the online sales data instead of Laurie Duke compiling "partial" and "incomplete" data and then Brent Duke supplementing the data to generate a document to provide to the former defense counsel and the market penetration expert.

At the end, however, it does not really matter if the online sales data in the withheld online sales document was partial or incomplete. The issue is that it was relevant and responsive—the ESI contained the agreed search terms—and should have been produced years earlier. It was not. Had it been produced, Plaintiff could have investigated these issues in discovery and examined Duke and his market penetration expert about the online sales figures created by Laurie Duke.

## ii. Preliminary Injunction

On March 7, 2013, Plaintiff filed a motion for preliminary injunction and requested that the hearing be expedited. Dkts. 20, 21, 22. Among other things, the preliminary injunction sought to enjoin Defendants from using Plaintiff's trademark in connection with the sale of e-cigarettes, including in metatags, and attending an industry trade show in Las Vegas, Nevada from March 17, 2013, through March 20,

2013.[24]  Dkt. 22.  Plaintiff apparently also had just learned that from October 2011 to August 2012 Defendants misused Plaintiff's trademark as a keyword in the metadata of Defendants' website.  Dkt. 26 at 2. (There is no dispute that the metatag containing Plaintiff's mark was in Defendants' website; Defendants admit as much.  Dkt. 278 at 49; Dkt. 347 at 16.  The critical issues in this case are how it got there and what are the consequences of this fact.)[25]

On March 14, 2013, Judge Kapala granted Plaintiff's motion for preliminary injunction, in part, and denied the motion, in part.  Dkt. 26.  Judge Kapala ordered that neither party would use the other's trademark or make any statement that implied the products were affiliated with each other.  *Id.* at 2.  Further, based on Defendants' representation that they would not be attending the Las Vegas tradeshow, Judge Kapala granted that relief.  *Id.*

As far as the Court knows, Defendants did not attend the March 2013 Las Vegas trade show.  But as will be discussed later, there was another trade show in Las Vegas in September of 2013.  The Court assumes the September trade show was not the August trade show referenced in a different filing.

On April 8, 2013, one of the former defense counsel sent an email to Duke asking a series of questions.  One of the questions was "3. When did you first learn that Plaintiff had a trademark registration?"  Dkt. 407, at 117. The next day, Duke responded and stated "3. On 7.21.10 I got the email from my supplier with their

---

[24] In a later filing, Plaintiff asserts that the trade show was in August 2013.  Dkt. 232, at 13.
[25] Again, in a later filing, it appears that Plaintiff may be asserting that the metatag existed at the time of the preliminary injunction hearing, which was seven months after the August 2012 date.  Dkt. 232, at 13.

packaging and it had a TM by their name.  I wasn't 100% sure what that meant, but was fairly surprised to see it."  *Id.* at 116.  As shown later, Duke falsely testified about these issues in his deposition, and counsel failed to correct the false testimony at any time.

### iii. Amended Pleadings Because of Preliminary Injunction Hearing

On May 1, 2013, Plaintiff filed a motion for leave to file a first amended complaint.  Dkt. 29.  The same day, Defendants filed a motion for leave to file an amended counterclaim.  Dkt. 32.  Magistrate Judge Mahoney granted both motions. Dkt. 33.

The Plaintiff's first amended complaint contained the same legal claims, but added factual allegations relating to customer confusion and the insertion of the metadata in the keyword section of Defendants' website.  Dkt. 29.  Defendants' amended counterclaim alleged the same claims; it also contained a jury demand. Dkt. 32.

Both sides filed answers to these amended pleadings.  Dkts. 35, 36, 37, 42, 43, 44.

On July 29, 2013, Magistrate Judge Mahoney extended fact discovery to June 2, 2014.  Dkt. 45.

### iv. Las Vegas Tradeshow

On September 10, 2013, Duke exchanged emails with Bill Edmiston about the upcoming trade show in Las Vegas.  Pl.'s Ex. 22; Dkt. 294-2, at 221.  Edmiston has some amorphous relationship with Duke.  Edmiston testified that he had an

ownership interest in 21 Century Smoking. Tr. 646. Defendants deny that. At the very least, Edmiston was a volunteer agent for Defendants. *Restatement (Second) of Agency*, § 225. So, Edmiston's documents are in the possession, custody, or control of Defendants. *See McBryar v. Int'l Union of Auto. Aerospace & Agric. Implement Workers*, 160 F.R.D. 691, 695 (S.D. Ind. 1993) (documents held by agent are within party's possession, custody, or control). Defendants do not dispute this.

Regardless of Edmiston's status, Duke told Edmiston that "21st Century Smoke is going to have a booth there. Maybe you can record them saying something libelous about me, lol." Edmiston responded by stating "That sounds fine to me. I will go to there [sic] booth and play dumb about the two names. Will record. And take pics. :)". Duke did not respond to Edmiston's email telling him that he was joking or not to record the interaction. There were no attachments to the email from Edmiston to Duke.

As discussed in more detail later, despite being responsive to discovery requests, this email exchange was not produced until years after it was requested and after the Court ordered fact discovery deadline passed. Dkt. 116; Dkt. 267, at 19-24. And as discussed later, this untimely email exchange flatly contradicted the deposition testimony of both Duke and Edmiston. *Compare* Dkt. 294-2, at 221, *with* Dkt. 294-2, at 199, 215. A former defense counsel later acknowledged that the email exchange was at least good impeaching material. Dkt. 267, at 50. Additionally, the email exchange would have supported Plaintiff's defense of invited defamation.

The Las Vegas tradeshow occurred at the end of September 2013. Edmiston attended and Plaintiff had a booth at the trade show.

After the trade show, on October 2, 2013, another email exchange occurred between Edmiston and Duke. Pl.'s Ex. 23, 28; Dkt. 294-2, at 224, 236-37. This email exchange was also not timely produced. Like the other email exchange, it was produced years after the close of all discovery and after motion practice on the defamation counterclaim. In this email exchange, Edmiston sent an email to Duke with no subject but with an attachment, a video labeled IMG_0117.mov. Edmiston wrote, "Brent here is one of the two recordings. Not great with all the noise. Tell you more tomorrow. Kai and I could Both [sic] testify he slammed you. Stated you are just a web site. Buy product all over the place. Stated You [sic] took their brand name. Tell you more tomorrow." Pl.'s Ex. 28; Dkt. 294-2, at 236-37.

This recording ("the first recording") was played at the evidentiary hearing. The first recording does not contain any of the statements Edmiston describes. Tr. 347. Further, the first recording contains no defamatory statements. Tr. 973.

Two minutes after Edmiston sent Duke the email with the first recording, Edmiston sent Duke a second email. Pl.'s Ex. 23; Dkt. 294-2, at 224; Tr. 336. This email's subject was "Part two". This email had an attachment: IMG_0118.mov. (This is the "second recording.") An ".mov" file is a multimedia container file that can contain videos. There's no question Duke received this email with the video attachment. Tr. 184. Obviously, this is the next video in the sequence. No business card was attached. The text of the email stated, "Video too long to send but I have

it." But again, the attachment indicates a video file was attached. Plaintiff requested this ESI in discovery. Pl.'s Ex. 83 at ¶¶ 23, 24. But Defendants failed to produce the document in response to the request, and only produced it years after the close of fact discovery.

The second recording was played at the evidentiary hearing. The Court finds that it contains no defamatory statements. Additionally, the second recording contained no statements about Defendants being "just a website", that 21 Century Smoking "Buys [sic] product all over the place," or Defendants taking Plaintiff's "brand name." There was also no discussion of a lobbyist or a person testing the product on the factory floor. The second recording mentioned the "FDA" but only in the context that the FDA allegedly won't let e-cigarette companies make certain claims about the product.

Duke acknowledged that it was his decision not to provide this email with the second recording to the former defense counsel. Tr. 185, 190-91, 203, 334, 339. Duke claimed that he did not believe there was an attachment to the email. Tr. 185-86. When confronted with the fact that the email specifically showed a file was attached, he testified that all of Edmiston's emails had a business card attached so he just disregarded it. Tr. 186. But there's an evidentiary problem with this assertion. The email exchanges between Duke and Edmiston do not always have Edmiston's business card attached. Indeed, neither the September 10, 2013, nor the October 2, 2013, exchanges have Edmiston's business card attached. Tr. 340; Pl.'s Ex. 22, 23, 28. (A later exchange does contain a business card. Pl.'s Ex. 25;

Dkt. 294-2, at 229.)  Duke's assertion is suspicious.  Despite the text, the second email with the second recording arrived two minutes after the first and Edmiston said there were two videos.  The email clearly indicates that a .mov file was attached.  A reasonable inference is that this was the second video that was supposed to support the defamation claim, but it did not; so, Duke simply decided not to provide it.  This is an issue best left for a jury to decide.

### v. Defendants Move for Partial Summary Judgment

On October 11, 2013, Defendants moved for partial summary judgment on their amended counterclaim as to the claims seeking to cancel Plaintiff's registration of its trademarks.  Dkt. 49.

On November 20, 2013, Plaintiff filed its opposition to the Defendants' motion for partial summary judgment.  Dkt. 61.  In its opposition brief, Plaintiff argued that the doctrine of unclean hands prevented summary judgment in Defendants' favor to cancel the registration of the marks.  *Id.*  Plaintiff had already pleaded unclean hands as an affirmative defense to the counterclaims.

Defendants replied on December 12, 2013.  Dkt. 71.

### d. 2014

### i. The Undersigned's Entry into the Case

During the pendency of the partial summary judgment motion, due to the retirement of Magistrate Judge Mahoney, on April 30, 2014, the case was reassigned to the undersigned as the then magistrate judge on the case.  Dkt. 76.  Judge Kapala remained the district judge on the case.

73

On May 15, 2014, the undersigned held a status hearing with the parties. Dkt. 78.  Thomas Leavens appeared as counsel for Defendants.  Dkt. 367.  The Court addressed a variety of issues at the status hearing.  *Id.* at 5-9.  In particular, the Court discussed ESI issues.  *Id.*  The Court was concerned with the status of ESI discovery and voiced its warning that it did not want "an e-discovery snag . . . [that] throws the entire schedule out the window."  *Id.* at 9.  The Court then directed that the parties "to reconvene a 26(f) conference to discuss e-discovery issues in detail with the e-discovery custodians for each side and the document issues raised during the status hearing."  Dkt. 78.

### ii. Liberman Meets with Duke About ESI

On May 29, 2014, Liberman had a conference with Duke.  Tr. 1127; LS Ex. 14.  Although she was the associate working at the direction of the Leavens, he was not present at this conference.  Tr. 765, 1126, 1144, 1159.  Before this conference, Leavens—the lead counsel and named partner—gave Liberman—the third-year associate—very little, if any, direction.  Tr. 765, 767, 769, 773.  Indeed, Leavens provided Liberman with no instructions about ESI for this conference.  Tr. 992-93.  During that conference, Liberman confirmed with Duke that he was not to remove data, identified other custodians, and noted that Duke used a Yahoo! and GoDaddy email account, with the GoDaddy emails being the bduke@21centurysmoking.com and support@21centurysmoking.com addresses.  Tr. 1129-30; LS Ex. 14.  These were the only accounts Duke identified.  Tr. 600-01.  It turns out that communications on behalf of 21 Century Smoking, Inc. occurred on other email

accounts, including employees' private email accounts. Tr. 97-99. Liberman did not give Duke any written guidance regarding the preservation of ESI. Tr. 1106. And she did not instruct Duke to disable any autodeletion settings. Tr. 1106. Sometime later in 2014, Liberman confirmed with Duke that he used four computers. LS Ex. 15. Nobody contends that these conferences constituted a custodian interview; in fact, they were not. Tr. 243, 1127-28. There is no evidence that the other custodians' accounts were searched for relevant ESI or that ESI was produced from these other custodians (other than perhaps Duke's wife who would occasionally use the support@21centurysmoking.com account). In fact, evidence at the hearing established that these accounts were not searched until 2019. Tr. 81, 97-101, 1132; Dkt. 318. Liberman believed that all relevant ESI was contained on the four hard drives Duke identified. Tr. 1107, 1121-22. This belief was based on communications from both Leavens and Duke. Tr. 1124-25. Indeed, Duke directly reiterated his previous representations to Leavens with Liberman when Duke specifically informed her that all the electronic information was on the four hard drives. Tr. 1160-61. But she did not confirm all relevant emails were on the four hard drives, which was what she believed Leavens had already established with Duke. Tr. 1126, 1133.

### iii. Judge Kapala's Partial Summary Judgement Ruling

A month later, on June 16, 2014, Judge Kapala granted Defendants' motion for partial summary judgment, in part, and denied it, in part. Dkt. 81. In the order, Judge Kapala framed the issues before him on the summary judgment

75