filings: "(1) whether the uncontested facts show that 21 Century Smoking [Defendant] was the senior user of its mark, thus subjecting DR Distributors' [Plaintiff's] mark to cancellation; and (2) whether any such cancellation would be blocked by the doctrine of unclean hands." Dkt. 80, at 3. Initially, Judge Kapala held that it was "undisputed that [Defendant] used its. . . mark in commerce as a trademark prior to [Plaintiff's] use of its confusingly similar mark." *Id.* at 4. Judge Kapala then found that Defendant was the senior user of the mark and that Plaintiff's mark was subject to cancellation. *Id.* at 5. Judge Kapala also found two alternative bases that subjected Plaintiff's mark to cancellation. *Id.* at 5-6. Judge Kapala ultimately granted summary judgment to Defendants on the issue that it was the senior user of the mark. *Id.* at 6. Judge Kapala then addressed the defense of unclean hands, finding as a matter of law that the unclean hands doctrine applies to cancelation proceedings so long as the inequitable conduct related directly to the trademark that the party seeks to cancel and the party's conduct was in bad faith. *Id.* at 7. Addressing the undisputed facts relating to the unclean hands defense, Judge Kapala focused on the inclusion of the metatags in Defendants' website for nine months, which would allow a reasonable fact finder to conclude that Defendants engaged in inequitable conduct by drawing customers to its website by appropriating a mark it knew to be registered to a more popular competitor. *Id.* at 7. Judge Kapala also noted other facts that supported Plaintiff's unclean hands defense, finding that "a jury could reasonably conclude that [Defendant] was content to profit from the success of [Plaintiff's] junior use until [it] found itself sued

for infringement, and only then moved to cancel the junior mark in an effort to fend off liability." *Id.* at 8. In conclusion, Judge Kapala found that it would "not grant summary judgment as to the entirety of Counts V and VI of the counterclaim, as a reasonable factfinder could determine that cancellation is inappropriate, notwithstanding [Defendants'] senior use, on account of unclean hands." *Id.* There is no doubt that Defendants knew the import of the unclean hands defense for Plaintiff in this case; in fact, they said they knew it was Plaintiff's main argument. Dkt. 269, at 13-14.

### iv. First Failed Settlement Conference

About two weeks later, on July 1, 2014, the parties participated in a status hearing, during which they requested that the undersigned hold a settlement conference as the magistrate judge. Dkt. 83. Unfortunately and obviously, the case did not settle. *Id.* So, the Court ordered the parties to submit a revised CMO. *Id.*

The parties submitted a revised CMO, in which they indicated that Rule 26(a)(1) disclosures had already been completed. The Court adopted the proposed CMO and ordered fact discovery completed by April 1, 2015. Dkt. 86.

### v. Defendants Added Defamation Counterclaim

On September 24, 2014, Defendants filed a motion to amend the counterclaims to add a defamation claim. Dkts. 88, 89. The Court takes judicial notice that the motion to file the counterclaim was filed on the eve of the expiration of the statute of limitations. 735 Ill Comp. Stat. 5/13-201. The proposed defamation counterclaim related to events occurring at a September 2013 trade show in Las

Vegas, Nevada. Dkt. 99, at 7-9. This appears to be a different trade show than was the subject of the motion for preliminary injunction. The proposed defamation counterclaim was based on the following allegations. On September 25, 2013, Bill Edmiston attended a trade show in Las Vegas. Dkt. 294-2, at 215. According to the counterclaim, Bill Edmiston "was familiar with the electronic cigarette products bearing the [Defendants'] mark, and wanted to learn about the [Plaintiff's] electronic cigarette products." Dkt. 99, at 7. At the trade show, Plaintiff exhibited its products, which bore Plaintiff's mark. *Id.* Edmiston approached two of Plaintiff's representatives and engaged in a conversation, specifically asking them if the products were the same, but was informed that the products were different. *Id.* According to the amended counterclaim, a representative told Edmiston that Plaintiff began using its mark "in an effort to trade off of the goodwill associated with" Defendants' mark. *Id.* The representative allegedly further elaborated that Defendant purchased its products from a third party and merely relabeled the products and that the products were inferior. *Id.* According to the pleading, these allegations were false and made with the intent to disparage and defame Defendants and their products. Dkt. 99, at 8-9. Over Plaintiff's objection, the Court allowed Defendants' second amended counterclaim to be filed. Dkt. 98. The counterclaim was filed, and Plaintiff answered it and filed 17 affirmative defenses. Dkts. 99, 102, 103, 104.

*After* the defamation counterclaim was filed, Duke and the former defense counsel attempted to obtain the second recording, which was the IMG_0118.mov

file.  Despite having already filed the counterclaim, which could only be filed after a
reasonable factual inquiry under Rule 11, one of the former defense counsel
contacted Duke and asked Duke to obtain the second recording.  And remember
that the first recording contained none of the statements that were alleged to have
been made.  Indeed, there was nothing defamatory in the first recording.  Tr. 973.
The email from the former defense counsel to Duke, dated September 30, 2014—
which is after the statute of limitations expired—is a classic example of self-
collection.[26]  Pl.'s Ex. 25; Dkt. 294-2, at 229.  Duke then emailed Edmiston and
asked about the second recording.  *Id.*  Edmiston replied to Duke by stating that the
"recordings did not work – could not hear any part of the important stuff – I am not
a good 'spy.'  :(."  Pl.'s Ex. 25; Dkt. 294-2, at 229.

Like the other emails, despite being requested, this ESI was not timely
produced.  Tr. 353.  Duke failed to produce this document to the former defense
counsel.  Tr. 648.  Additionally, Edmiston's description of what was captured in the
recording is very different than his description a year earlier.

In response to the former defense counsel's request for the second recording,
on September 30, 2014, Duke unequivocally told them there was only one recording.
Tr. 648.

A few days later, on October 4, 2014, Edmiston emailed Duke.  Pl.'s Ex. 26;
Dkt. 294-2, at 231.  The subject of the email was "Here is the recording."  Duke

---

[26] Custodian self-collection occurs when counsel direct their clients to identify, preserve,
collect, and produce documents and electronic information in response to discovery
requests.  Jack Halprin, *Custodian Self-Collection – The Challenges & Consequences*, PEER
TO PEER (May 2008).

responded by stating that he thought the former defense counsel already had this particular recording, i.e., the first recording. Duke then lamented that the recording did not support the claim. Dkt. 294-2, at 231 ("sucks that it cut off right there, lol."). Edmiston then wrote that the first recording could prove that Plaintiff was at the trade show and could prove Edmiston's two claims, presumably meaning the defamatory statements. This is factually and legally false. The recordings contained none of the content Edmiston previously claimed, and there were no defamatory statements in the recording. Tr. 973.

Like the other emails, this was not timely produced despite being requested. Duke failed to provide this document to the former defense counsel. Tr. 648. This email also did not attach Edmiston's business card.

Fast on the heels of that email, Edmiston sent Duke another email. Pl.'s Ex. 24; Dkt. 294-2, at 227. This email had the same subject matter because it was a continuation of the chain. But it contained no attachments. This email was also not timely produced despite being requested.

In this email, Edmiston told Duke that he found a longer recording that he could not forward, but that he possessed it: "So there is a second one." Pl.'s Ex. 24; Dkt. 294-2, at 227. Edmiston stated that this recording is "mostly just general talking," but he did represent that in this recording Plaintiff stated, "they have gone to the FDA and they have a lobbyist". Edmiston then stated, "Also states this guy is the One [sic] that goes to the factory and tests the vaporing for the units. Long recording and we did not get much good info in this one that much clearer we are

80

bad spies :) :)  But this proves they were there and maybe his voice can be identified."  Pl.'s Ex. 24; Dkt. 294-2, at 227.

Whatever the recording was that Edmiston referenced in the October 4, 2014, follow-up email, it has not been produced.  Moreover, none of what Edmiston described being contained in that recording is contained in either the first recording (IMG_0117.mov) or second recording (IMG_0118.mov).  The reasonable inference to be drawn is that there is a "third recording" that has never been produced.

At the evidentiary hearing, Duke initially testified that around October 4, 2014, he told the former defense counsel that there was a second recording.  Tr. 653. Purportedly, Duke verbally told one of the former defense counsel, whom he could not remember, there was a second recording despite this whole conversation occurring via email.  Tr. 650-51.  Duke later retreated from that testimony, finally admitting that he told them there was only one recording.  Tr. 654.  As established above, it is beyond dispute that there was a second recording and likely a third recording.  Neither was produced to Plaintiff despite being requested.  All of these emails and recordings also should have been disclosed in Defendants' initial disclosures under Rule 26(a)(1) without even the need for a document request.

Duke adamantly testified that he told the former defense counsel that there was only one recording because he believed there was only one recording.  Tr. 452, 653-54.  Duke's testimony that he believed there was only one recording is not credible.  For a moment, the Court sets aside the fact that at the evidentiary hearing Duke couldn't even keep his story straight.  Tr. 653-54.  Instead, the Court

81

will review the undisputed facts. And these established facts simply cannot be reconciled with this Duke's unbelievable assertion.

In 2013, Duke received an email with the first recording attached. Pl.'s Ex. 28; Dkt. 294-2, at 236-37. This email stated, "Brent here is one of two recordings." *Id.* Moments later, he received another email with a subject line "Part two" that stated, "Video is too long to send but I have it." Tr. 336; Pl.'s Ex. 23; Dkt. 294-2, at 224. At that very moment, Duke knew there was another recording. Whether that recording was attached to the email is immaterial to the fact that there existed another recording. The email clearly refers to another recording. Tr. 648.

If that's not enough evidence to refute Duke's testimony that he believed that there was only one recording, consider the follow-up emails. In 2014, Duke requested the second recording from Edmiston. Pl.'s Ex. 25; Dkt. 294-2, at 229. Edmiston responded by sending Duke a recording. Pl.'s Ex. 26; Dkt. 294-2, at 231. But Duke stated that the former defense counsel already had that recording. *Id.* The point here is that Duke knew the content of the recording he forwarded to the former defense counsel (the first recording); otherwise, he could not have known these were the same recordings. Edmiston then immediately responded by stating that there is a longer recording and stated, "So there is a second one." Pl.'s Ex. 24; Dkt. 294-2, at 227. Again, at this point, Duke knew there was another recording. To remove any doubt that he knew there was more than one recording, Edmiston described the content of this other recording, which was different than the content

of the first recording. And because Duke knew the content of the first recording, he had to know that the recording that Edmiston described was a different recording.

Duke's testimony in 2019 that he believed there was only one recording was false.

### vi. Defendants Contract with ESI Vendor

In about November and December of 2014, the former defense counsel began the process to identify and hire an ESI vendor. LS Ex. 13. Leavens and Liberman were involved in the process. Tr. 805, 1118-19. Liberman had never worked with an ESI vendor before. Tr. 1154. Stamatis' only involvement was to suggest a possible vendor that was ultimately not retained. Tr. 1156. None of the other former defense counsel were involved in the process.

On December 1, 2014, in response to an email about the price a possible ESI vendor would charge for the work, Duke represented the following to the former defense counsel: "Here are total gb [gigabytes] on the 4 computers that would have anything related to 21 Century Smoking." Tr. 609; LS Ex. 13. Duke did not inform the former defense counsel that a search of the four computers would not result in a complete production because the computers did not contain online emails. Tr. 630. There is no evidence that at any time during the ESI vendor hiring process Duke informed any of the former defense counsel that online emails (i.e., emails not on the four computers) needed to be searched. Tr. 630, 1029, 1126, 1160, 1164. There is also no evidence that any of the former defense counsel specifically asked Duke if all of his emails were located on the four hard drives to be searched by the ESI

vendor. Tr. 1125. Neither Leavens nor Liberman believed that the ESI vendor would be obtaining Duke's emails from the internet when it copied Duke's hard drives. Tr. 812, 813, 1152. So, both Liberman and Leavens assumed that all of Duke's ESI, including emails, were on the four computers. Tr. 818-19, 820, 895, 896, 898, 1021, 1124-25, 1133.

On December 9, 2014, the former defense counsel contracted with 4Discovery to image Duke's four computer hard drives. Tr. 611, 1417, 1421, 1426-27; Defs.' Ex. 67. Leavens informed Duke that 4Discovery would conduct the search and Duke approved of hiring 4Discovery. Tr. 805, 1057. 4Discovery was not contracted to perform a custodian interview—despite its ability to perform this service—and never performed a custodian interview in this case. Tr. 243, 1426-27, 1496. A custodian interview was not conducted until August 13, 2019. Tr. 100-01; Dkt. 318. The scope of 4Discovery's work was limited to creating a mirror image of the four hard drives and running the search terms against the images. Tr. 1118, 1119, 1432-33. The mission Liberman gave 4Discovery was this: "Here are the four hard drives. Please image them." Tr. 1121. 4Discovery was not asked or contracted at that time to search Duke's GoDaddy or Yahoo! email accounts, which were web-based and stored in the cloud. Tr. 1121-22, 1436-37, 1459. Indeed, the former defense counsel did not anticipate 4Discovery would collect online emails. Tr. 1092. Moreover, 4Discovery was neither told of these email accounts at that time nor provided with log-in or password information for these accounts. Tr. 813. Duke did

not tell 4Discovery about his web-based email accounts, and it never asked him about those accounts. Tr. 245.

### vii. ESI Vendor Copies Computers Hard Drives But Not Web-based Emails

4Discovery sent Duke a hard drive to attach to his computers and software to image the four hard drives. Tr. 1428; Dkt. 288, at 4. 4Discovery was to then run the search terms against these hard drive images. Tr. 1430-31.

Duke claimed that he did not know that this process would not capture his online emails. Tr. 545. That claim is simply unreasonable and not credible. *See Bankdirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 U.S. Dist. LEXIS 57254, at *5 (N.D. Ill. Apr. 4, 2018) ("We are guided by the overarching principle that common sense and experience always have a role to play in drawing inferences and must not be ignored.").

The most—and truly only—reasonable inference from the facts is that Duke knew this process would *not* capture all his online Yahoo! and GoDaddy emails. First, Duke was personally involved in collecting the ESI off of the four hard drives. Tr. 118, 611, 1037. Duke knew that it was these specific hard drives that were being copied. Tr. 611, 1037. Second, Duke knew that only data from his hard drives was being copied. Tr. 632. Third, Duke knew that his GoDaddy and Yahoo! accounts were web-based and not on the four hard drives. Tr. 129-30, 131, 238-39, 281-82, 838, 908. Fourth, Duke knew that his log-in and password were needed to access the online information, which is why he claims he offered this information to the former defense counsel so that they could obtain the online emails. Tr. 129-30.

85

Fifth, Duke knew he had not provided his log-in or password information to 4Discovey at this time. Tr. 249. In light of these facts, Duke must have known that 4Discovery was *not* copying his online emails. The incredible and unreasonable contrary testimony by a witness who repeatedly gave demonstrably false testimony does not compel a different conclusion, particularly when that witness has at the very least a working knowledge of computer science.

In late 2014 or early 2015, 4Discovery then ran the search terms provided by the former defense counsel against the imaged hard drives and produced a hit report. Tr. 1430-31; Pl.'s Ex. 91. As a result, Defendants produced about 47,000 pages to Plaintiff. Tr. 1038. Because only the hard drives were imaged and the search terms were only run against those images of the hard drives, this data collection process did *not* search Defendants' web-based emails in either the Yahoo! account (both the email and chat) or the GoDaddy account. Tr. 69, 72, 632, 633, 1287, 1402-03, 1459; Dkt. 253-1, at 4. To reiterate, although the former defense counsel erroneously believed that all of the emails were copied, Tr. 632, the ESI search process did not search Defendants' two main email accounts, which were web-based. Tr. 631-32, 1287, 1332, 1401, 1459; Dkt. 253-1, at 4. So, thousands of documents that contained the search terms, including critical communications between Duke and Saraswat, were not collected or produced at that time. Tr. 904, 1181-82, 1283, 1401; Pl.'s Ex. 17; Dkt. 253-1, at 4-5. As one of the former defense counsel put it, this was "an error in discovery." Tr. 1181. "In hindsight . . . things could have been done differently." Tr. 1289. The former defense counsel never

86

"figured it out" until the spring of 2018. Tr. 545-47, 916, 1287; Dkt. 253-1, at 4. And when they "figured it out," they only did so with respect to the Yahoo! account. Tr. 1287, 1297. They did not "figure it out" with respect to the GoDaddy emails until May of 2019, when Duke finally informed them that the account had not been searched. Tr. 1297, 1402-03, 1410-11. As already established, Duke knew these email accounts were not copied and should have been. But he did not tell the former defense counsel this fact, despite being involved in the process.

### viii. Unreasonable Reaction to Volume of ESI Recovered

Nevertheless, because of the volume of discovery produced by this process, the former defense counsel have taken the position that it was reasonable for them to assume that the production was complete and correct. Tr. 612, 632, 1038, 1398; Dkt. 383, at 2. Not surprisingly, the former defense counsel offer no support for this proposition. Rule 26(g)'s reasonable inquiry requirement is not met by merely eyeballing the volume of documents produced. Indeed, this contention is insufficient to ward off sanctions. *See, e.g.*, *See Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 223 (S.D.N.Y. 2003); *HM Elecs., Inv. v. R.F. Techs., Inc.*, No 12-cv-2884, 2015 U.S. Dist. LEXIS 104100, at *60 (S.D. Cal. Aug. 7, 2015), *vacated as moot*, 171 F. Supp. 3d 1020, 1033 (S.D. Cal. 2016); *Qualcomm Inc. v. Broadcom Corp.*, No. 05cv1958-B, 2008 U.S. Dist. LEXIS 911, at *31 (S.D. Cal. Jan. 7, 2008), *vacated in part*, 2008 U.S. Dist. LEXIS 16897 (S.D. Cal. Mar. 5, 2008). The former defense counsel have even gone so far as to argue that because Defendants produced more documents than Plaintiff, it was

reasonable to assume production was complete and correct. Tr. 632-33. Again, not surprisingly, no authority has been cited to support this position, nor is Rule 26(g)'s reasonable inquiry requirement met by claiming one party produced more than another party. These arguments fundamentally misunderstand electronic discovery.

### e. 2015

#### i. Court's Discovery Orders

On March 3, 2015, the Court granted Plaintiff's uncontested motion to extend discovery. Dkts. 110, 115, 116. In this order, the Court set the Rule 26(e) discovery supplement date for June 1, 2015, and the fact discovery cut-off date for July 1, 2015. Dkt. 116. The Court noted that this was "a FINAL extension." *Id.* (As a word of caution, when a court uses capitalization in an order, it is shouting. *Bentrud v. Bowman*, 794 F. 3d 871, 875 (7th Cir. 2015).)

On June 1, 2015, all fact discovery supplementation was due under Rule 26(e). Dkt. 116.

#### ii. Plaintiff's Motion to Compel and Court's Order

On June 5, 2015, Plaintiff filed a motion to compel, seeking documents including communications between Defendants and their search engine optimization consultant, Kirti Saraswat, and her company, Webrecsol. Dkt. 126. Plaintiff had previously requested documents relating to these issues, but the documents produced in response to the request did not include any Yahoo! chats or

emails between Duke and Saraswat. Pl.'s 83, Tr. 1221-22. It is undisputed that Duke communicated with Saraswat via Yahoo! chat. Tr. 138, 139; Dkt. 294-2.

On June 11, 2015, the Court granted the motion, in part, and denied it, in part. Dkt. 132. The Court ordered that Defendants answer certain contested interrogatories and produce the documents relating to communications between Defendants and Saraswat and Webrecsol. Dkt. 132. In granting the motion to compel and ordering the documents be produced, the Court stated that it was going to give counsel "to June 15th, Monday, to get those documents to your opponents. So that will give you a couple extra days and a weekend to *make sure there are no snafus . . .* and *that [it] is a complete production, so they are not getting them piecemeal and then something else happens, so that they get all the documents that are responsive*." Dkt. 269, at 17-18 (emphasis added); Dkt. 132 (documents to be produced by June 15, 2015).

As a result of this order, Travis Life, the associate who took over for Liberman, contacted Duke and asked him to search for and produce the requested documents. Tr. 1227-28. Duke informed Life that he did not have the documents,[27] so on June 12, 2015, based solely on this single conversation, with no independent investigation, Life informed Plaintiff's counsel that Defendants possessed no

---

[27] Duke claims that the first time any of the former defense counsel asked for Saraswat and Webrecsol emails was in March of 2018. Tr. 205. This is difficult to believe. Indeed, it is contradicted by his own deposition testimony in June of 2015 when he stated that he believed he had provided all of his emails with Saraswat to the former defense counsel. LS Ex. 1 at 141, 1490-50. Of course, the record establishes that this testimony is false. too. Dkt. 294-2, at 2-114. Life's testimony is far more credible on this point. Life argued the motion in court and heard emphatic directions from the Court to produce the documents if they existed. Dkt. 269, at 17-18. Again, there is no documentation about any of this.

responsive documents. Tr. 1227-28, Pl.'s 55. This was untrue. Tr. 1224, 1228 ("The information we received was inaccurate."). Defendants did, in fact, have responsive documents. Tr. 1228. Moreover, although Duke communicated with Saraswat and Webrecsol through Yahoo! chat, he never even searched Yahoo! chat for responsive documents. Tr. 138, 139, 272. Indeed, Duke took no actions to preserve all Yahoo! chats. Tr. 139, 216, 272. Of course, Leavens knew that Duke used Yahoo! chat to communicate for business purposes. Tr. 783-84. So, despite the former defense counsel's knowledge that Duke used Yahoo! chat to communicate for business, when the motion to compel was granted, none of the former defense counsel asked Duke whether he searched Yahoo! chat for these relevant and responsive documents that were ordered to be produced. As explained in more detail below, some of the responsive documents were produced in 2018, years after the fact discovery cut off and the supplementation date, and after Plaintiff had expended significant time and money seeking these documents and filing a summary judgment motion. Tr. 1228; Dkt. 116; Dkt. 294-2.

### iii. Stamatis Appears and Duke is Deposed

In the meantime, attorney Peter Stamatis entered his appearance for Defendants. Dkt. 129. The appearance form indicated that Stamatis was not acting as lead counsel but would be trial counsel. Dkt. 129.

On June 16-17, 2015, Duke was deposed. Pl.'s Exs. 19, 20. Among other things, Duke testified that he only deleted junk emails, searched all email accounts to find any documents that were requested, and turned over all his records to the

former defense counsel.  Tr. 225-26.  Much of this is false. By this date, he had not produced all responsive Yahoo! and GoDaddy emails to the former defense counsel; he had not produced hundreds, if not thousands of responsive ESI documents (including ESI the Court had just days before ordered be produced); and he allowed emails to be autodeleted.  Like his testimony before the Court during the evidentiary hearing, Duke's testimony was slippery.  For example, Duke was specifically asked if he had produced all his email communications with his overseas SEO consultant Kirti Saraswat to the former defense counsel, and he answered, "I believe so." and "I think so."  LS Ex. 1, at 141-42, 149-50.

During his deposition, Duke also falsely testified to other critical matters in this case.  First, as noted previously, Duke falsely testified in his deposition that he only owned two websites when he truly owned "many, many, many websites."  Tr. 384-85.

Second, as to the September 2013 Las Vegas trade show in which Edmiston recorded various conversations, Duke was specifically asked "Did you give him any direction to record any of the events taking place at the trade show?"  Duke unequivocally answered "No."  Dkt. 294-2, at 199.  But in an email between Duke and Edmiston that had been withheld for years and was not provided to Plaintiff's counsel before the deposition, Duke states, "maybe you can record them saying something libelous about me, lol."  Tr. 348.  Edmiston replied by stating, "That sounds fine to me.  I will go to there [sic] booth and play dumb about the two names. Will record.  And take pics. :)".  Dkt. 294-2, at 221.  Recall that after this tradeshow,

Defendants filed an amended counterclaim alleging defamation based on statements Plaintiff's representatives purportedly made to Edmiston. Dkt. 99, at 7-9. Further recall that the recordings contained no defamatory statements. Tr. 973.

Third, as stated previously, in April 2013, Duke exchanged the following email communication with one of the former defense counsel: "3. When did you first learn that Plaintiff had a trademark registration?; 3. On 7.21.10 I got the email from my supplier with their packaging and it had a TM by their name. I wasn't 100% sure what that meant, but was fairly surprised to see it." Dkt. 407, at 116-17. But, in his deposition, Duke repeatedly testified under oath that he did *not* see the "TM" on July 21, 2010, and that he did *not* know what the "TM" symbol meant. Dkt. 404, LS Ex. 1, at 351-62; Dkt. 404, LS Ex. 1 at 359 ("I don't recall ever seeing the TM. . ."); Dkt. 404, LS Ex. 1 at 362 ("Q: And before I told you that today [that the TM symbol means "trademark"], you had no understanding of what the TM symbol stood for? A: I do not have a very clear understanding of trademarks, no.").

### iv. Court's Concerns About Duke's Deposition Testimony

The Court pauses here to note several concerns. First, being a Stanford graduate who had multiple e-commerce businesses, Duke's testimony that he did not know that "TM" meant "trademark" is simply not credible. Second, the trademark symbol is glaringly obvious on the photograph that Duke received and saw. Dkt. 406-3, at 97. The photograph clearly shows "21st Century Smoke™." *Id*. Indeed, despite testifying that he did not see the trademark symbol in 2010, Duke admitted the symbol was clearly displayed. Dkt. 404, LS Ex. 1, at 350. These two

concerns go to Duke's propensity to testify falsely. The next concern goes to counsel's ethical duty to the Court and opposing counsel. Because the issue of Duke's first knowledge of the Plaintiff's trademark is critical to the case and was specifically addressed by counsel previously, the Court believes that the former defense counsel must have prepared Duke for his deposition and certainly reviewed this issue if not this specific document and the correspondence related to it. And because the Court believes that this issue must have been discussed in deposition preparation, the former defense counsel must have known that Duke not only saw the trademark symbol back in 2010, but also that he knew that "TM" meant "trademark." Therefore, because of this, the former defense counsel had a duty at the deposition to prevent and correct what was clearly false testimony but failed to do so. This whole event is a stain on the credibility of Duke and some of the former defense counsel. A.B.A. Model Rule 3.3(a)(3), (c).

### v. Duke Allegedly First Learns of Spoliation by Autodeletion

Duke claimed that on June 29, 2015, he learned for the first time that his GoDaddy accounts (both bduke@21centurysmoking.com and support@21centurysmoking.com) were set to autodelete after 60 days. Tr. 167-69, 310, 316, 318. The Court refers to this as the "autodeletion problem," which is the Court's term. (Recall that none of the former defense counsel instructed Duke to disable autodeletion functions at the beginning of the litigation. Tr. 936, 1208.) Duke claims that as soon as he learned of this autodeletion he took three actions: (1) he contacted GoDaddy about the autodeletion; (2) he called an attorney at

93

Leavens, Strand & Glover, but cannot remember which one, and verbally notified that attorney of the autodeletion; and (3) he disabled the autodeletion function. Tr. 167-69. There are at least three evidentiary problems with this representation. First, no contemporaneous documentation has been presented to support any of it. Second, Duke previously swore under penalty of perjury that he learned of the autodeletion problem sometime in 2014, LS Ex. 9, at 2, then swore that he learned about it in "approximately May 2015," and then finally testified that he learned about it on the very specific date of June 29, 2015. Tr. 179, 310, 316, 318, 509, 936, 1173. Third, none of the attorneys at Leavens, Strand & Glover corroborate this specific testimony. If the call occurred on June 29, 2015, then Liberman was no longer employed at the firm and could not have received the call. Tr. 1110. Life specifically denied receiving the call and claimed that he did not know about the autodeletion problem until March of 2018. Tr. 1168. And Leavens did not remember receiving the call. Tr. 937.

The autodeletion problem cannot be fully and properly addressed without analyzing the claim of the "auto-forwarding solution." (Again, this is the Court's term.) According to Duke, emails in one of his GoDaddy accounts—specifically, the bduke@21centurysmoking.com account—auto-forwarded to his Yahoo! email account. Tr. 634. These would only be emails physically located in that email's inbox; emails sent from this account were not auto-forwarded to the Yahoo! account. Tr. 635, 636. Moreover, emails in his other GoDaddy account—specifically, the support@21centurysmoking.com account—were never auto-forwarded to the Yahoo!

94

account, and were, therefore, deleted and are not recoverable. Tr. 173, 938-39. But again, like the autodeletion problem that the auto-forwarding solution allegedly "mitigated," there is a discrepancy between Duke's testimony and the former defense counsel's testimony. According to the former defense counsel, Duke informed them that *all* of the GoDaddy accounts auto-forwarded to the Yahoo! accounts. Tr. 1042; LS Ex. 17. But there are problems with the former defense counsel's testimony too. Initially, there is predictably no contemporaneous documentation to support the former defense counsel's assertion. Instead, there exists only an after-the-fact email dated May 19, 2019, from Stamatis, who had no personal knowledge of the conversation or representation, to Duke. Tr. 1042; LS Ex. 17. Moreover, Leavens' hazy recollection infects his testimony on this front as well. Tr. 1039. He cannot recall the details of what he was told, by whom, or when. Tr. 1039. Furthermore, Duke testified that he never told the former defense counsel that *all* the GoDaddy emails auto-forwarded to his Yahoo! account. Tr. 1536.

Regardless of who is to be believed about the auto-forwarding solution, there are undisputed facts relating to it and the autodeletion problem. First, it is undisputed that certain relevant, responsive GoDaddy emails that existed at and during the time of litigation have been spoliated and cannot be recovered. Tr. 67, 164, 168, 180, 936, 938-39. Second, none of the former defense counsel conducted any investigation into either the autodeletion problem or the auto-forwarding solution. Tr. 942, 1170-71, 1300, 1380. Third, no evidence was presented at the hearing corroborating either the autodeletion problem or the auto-forwarding

solution. Fourth, the auto-forwarding solution was shown to be erroneous at the evidentiary hearing: It was, in fact, not a solution at all. If the auto-forwarding solution is to be believed, then all of the emails in the bduke@21centurysmoking.com inbox should have all auto-forwarded to Duke's Yahoo! email account. That did not happen with critical customer confusion emails and other relevant and responsive emails. Tr. 286-90, 322, 1390-92 (emails that should have been forwarded were not showing up in Yahoo! production). And again, it was not a solution because even accepting the autodeletion problem and auto-forwarding solution in the best light (which is a very difficult proposition), the fact remains that GoDaddy emails from before about November of 2014 were spoliated. Tr. 67, 164-65, 936-39.

### vi. Court's Concerns About Autodeletion

Once again, the Court is compelled to pause and comment on a concerning fact. It is undisputed that Duke and Leavens never disclosed the autodeletion problem to Plaintiff or the Court until March 19, 2018. Tr. 936, 1305, 1312. Leavens silently sat on this information for years. Tr. 1312. None of the other former defense counsel knew of the autodeletion until the spring of 2018. Tr. 1168-69, 1297, 1378-79. Liberman was long gone by that time; so, she was unaware of the issue. Tr. 1110. Even if the Court were to credit Duke's and Leavens' versions of the events surrounding the autodeletion problem and auto-forwarding solution

96

and consider this "mitigation,"[28] Tr. 1039, there is no question that GoDaddy emails existing before about November 2014 were spoliated. Tr. 67, 164, 168, 180, 936, 938-39. Much of the spoliation would have likely been prevented by simply informing Duke to disable the autodeletion function, which any competent counsel should have done. This never happened. Tr. 936, 1208. Courts don't cotton to attorneys failing to promptly notify the court of spoliation issues. *See, e.g.*, *Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*, 18-CV-4437, 2020 U.S. Dist. LEXIS 180982, at *51 (S.D.N.Y. Sep. 30, 2020) ("[C]ounsel conceal[ed] the fact of the spoliation for months. . ."); *Jackson Family Wines, Inc. v. Diageo N. Am., Inc.*, No: 11-5639, 2014 U.S. Dist. LEXIS 19420, at *25-26 (N.D. Cal. Feb. 14, 2014) ("If Defendants had nothing to hide, then why did they willfully conceal the spoliation from the Plaintiff and the Court? Because Defendants have not provided an answer to that question, they cannot defeat the presumption of prejudice.").

The Rules of Professional Conduct require counsel to be candid with the court and act fairly to opposing counsel and parties. Rules of Professional Conduct 3.3 and 3.4. Rule 3.3(a)(1) bars attorneys from knowingly making a false statement of fact or failing to correct a false statement of material fact previously made by the attorney. Rule 3.3(a)(1). Rule 3.3(a)(3) prohibits attorneys from offering evidence that attorneys know to be false. Rule 3.3(a)(3). "There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."

---

[28] "Mitigation" is counsel's term. Tr. 1039. "Mitigation" and "cure" are not synonymous. "Mitigate" is "[t]o make less severe or intense." *Mitigate*, Black's Law Dictionary (9th ed. 2009). "Cure" is "[t]o remove legal defects or correct legal error." *Cure*, Black's Law Dictionary (9th ed. 2009) The auto-forwarding was not a cure.

97

Rule 3.3, cmt. 3.  The duty of candor toward the court is premised on the attorney's obligation as an officer of the court to prevent the fact finder from being misled by false evidence.  Rule 3.3, cmt. 5.  Rule 3.4 prohibits attorneys from obstructing another party's access to evidence or unlawfully destroying or concealing a document, and likewise prohibits attorneys from counseling or assisting another person to engage in these actions.  Rule 3.4(a).  The Rule 3.4 recognizes that the right of an opposing party to obtain evidence through discovery is an important procedural right.  Rule 3.4, cmt. 2.  Fairness in our adversarial system is achieved by preventing the destruction or concealment of evidence.  Rule 3.4, cmt. 1.  Moreover, Rule 3.4 also requires attorneys in pretrial procedures to make reasonably diligent efforts to comply with a legally proper discovery request by an opposing party.  Rule 3.4(d).  Rule 8.4 contains a catch-all provision that states that it is misconduct for attorneys to violate or attempt to violate the rules or to knowingly assist another to do so.  Rule 8.4(a).  Further, Rule 8.4(c) makes conduct involving dishonesty, fraud, deceit or misrepresentation professional misconduct.  Rule 8.4(c).  Finally, Rule 8.4(d) states that it is professional misconduct to engage in conduct that is prejudicial to the administration of justice.  Rule 8.4(d).

The failure to timely disclose the destruction of evidence violates the rules requiring candor to the court and fairness to the opposing party and counsel.  *Cobell v. Babbitt*, No. 1-96CV01285, 1999 U.S. Dist. LEXIS 20918, at *196 (D.D.C. Dec. 3, 1999) ("At a minimum, those attorneys who were aware of the Hyattsville document destruction from its inception and yet chose to take no action to ensure timely

98

notification are guilty, in my view, of violating the Rules of Professional Conduct which demand candor to the Court and fairness to the plaintiffs and plaintiffs' counsel."). The same holds true for the destruction or loss of ESI. Dalila Hoover, *Spoliation Sanctions and How to Avoid Them*, AmericanBar.org (June 18, 2020), https://www.americanbar.org/groups/litigation/committees/pretrial-practice-discovery/articles/2020/spring2020-spoliation-sanctions-and-how-to-avoid-them ("If your client has deleted some information or data, be transparent and let the court and adverse counsel know."). Indeed, counsel must immediately inform the court and opposing counsel when they learn that ESI has been destroyed. *Cruz v. G-Star Inc.*, 17 Civ. 7685, 2019 U.S. Dist. LEXIS 169445, at *40 n.7 (S.D.N.Y. Sep. 30, 2019) ("To be clear, once counsel discovered that relevant information had been destroyed, disclosure should have been made immediately.").

In fact, Leavens specifically testified that he understood that a duty exists to notify opposing counsel and the Court if evidence has been destroyed. Tr. 937. Why Leavens failed to notify the Court of the spoliation of some of the GoDaddy emails is a mystery. Leavens sat on this information for over a year. Tr. 1305. Other than asserting that the auto-forwarding solution was "mitigation," he never explained why he failed to disclose the undisputed spoliation of the GoDaddy emails to the Court. Tr. 1039. But again, the "mitigation" did not solve the spoliation issue. Emails were destroyed. Tr. 67, 169. And again, Leavens conducted no investigation as to any of this. Tr. 942. A failure to comply with ethical obligations to opposing counsel and the Court does not further a witness' credibility.

99

### vii. Plaintiff Seeks to Add Invited Defamation Defense

On July 1, 2015, fact discovery closed. Dkt. 116.

In the fall of 2015, Plaintiff sought to add the additional affirmative defense of invited defamation in response to Defendants' defamation counterclaim, which was based on statements Plaintiff's representatives allegedly made to Edmiston. Dkt. 146. At the time Plaintiff moved to add this affirmative defense, despite having requested email communications on this topic, Plaintiff did not possess the email communication between Duke and Edmiston, which showed that their deposition testimony was false, because Defendants failed to timely produce these relevant and responsive documents. Pl.'s Exs. 22, 83, at ¶¶ 23, 24; Dkt. 294-2, at 199, 215. Defendants objected to the addition of this affirmative defense, relying in part on Edmiston's false deposition testimony. Dkt. 151, at 6. In partial reliance on the former defense counsel's false representation that Edmiston's deposition testimony was accurate and unrebutted, the Court denied Plaintiff's motion to add the affirmative defense. Dkt. 154, at 7.

With the passage of the supplementation date and the close of fact discovery, the Court held a status to discuss retained expert witnesses. Dkt. 145. The Court then set a schedule for the completion of expert discovery. *Id.*

### f. 2016

### i. Expert Discovery

From the fall of 2015 through the spring of 2017, the parties engaged in expert discovery. This process had its own series of misfires, including one of

100

Defendants' experts having to supplement his opinion after he was confronted with the fact that a critical representation in his report was erroneous, dkt. 181, and Defendants' withdrawal of another expert's report, dkts. 189, 192. So, like many of the cut-off dates in this case, the expert discovery schedule had to be modified.

All of this expert discovery occurred without the benefit of Defendants' complete and correct disclosure of ESI on critical issues concerning experts' opinions. For example, Plaintiff did not have the withheld online sales document created by Laurie Duke that contained different and lower online sales figures than the figures relied upon by Defendants' market penetration expert.

### g. 2017

On January 23, 2017, expert discovery closed. Dkt. 182.

On March 8, 2017, the undersigned established the briefing schedule on the issue as to whether Defendants could file a successive motion for summary judgment. Dkt. 190.

On August 2, 2017, Judge Kapala allowed Defendants leave to file a second motion for summary judgment. Dkt. 197.[29]

On October 19, 2017, the Court set a briefing schedule for cross-motions for summary judgment. Dkt. 208. The cross motions were due on January 18, 2018. *Id.*

### h. 2018

---

[29] Like most judges, Judge Kapala frowned on successive summary judgment motions. *See generally* 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.121[1][a] (3d ed. 2019). But district courts retain discretion to allow them, which Judge Kapala did in this case. *Id.*; Dkt. 197.

### i. Cross-Motions for Summary Judgment

On January 18, 2018, the parties filed their simultaneous cross-motions for summary judgment. Dkts. 213, 214, 215, 216.

Plaintiff's memorandum in support of its summary judgment motion alleged, among other things, that Defendants withheld critical email communications concerning not only the metadata in Defendants' website but also diversion of Plaintiff's customers and disparagement of Plaintiff's products and business. Dkt. 216, at 33. According to Plaintiff, these actions in conjunction with other actions established its unclean hands defense. *Id.*

### ii. Former Defense Counsel's Scramble to "Figure It Out"

After Plaintiff filed this scathing memorandum, the former defense counsel began to "figure it out." Tr. 1177, 1181, 1243, 1283 ("They are accusing these guys of hiding documents."). Initially, Life contacted Duke and asked him to "re-search" for relevant and responsive documents. Tr. 260. About 112 documents were found and produced. Tr. 250, 254; Dkt. 294-2. Thousands of others were not. Tr. 227, 250. Ultimately, Life contacted 4Discovery, which informed him that the search of the four computers would not have captured the Yahoo! emails stored online. Tr. 1286-87; LS Ex. 11 at 3. Beyond this, how the former defense counsel specifically came to this conclusion is still a bit of a mystery. Tr. 1285-87. The evidentiary hearing produced coy, vague testimony, with no witness willing to state exactly who said what to whom and how the conclusion was reached. And as standard operating

102

procedure in this case, there was no documentation, contemporaneous or otherwise, to shed any light on the process.

On March 19, 2018, in response to Plaintiff's unclean hands argument asserting Defendants destroyed and failed to produce ESI, Defendants produced hundreds of Yahoo! emails (but not Yahoo! chats) and then used some of these previously unproduced documents in support of their summary judgment motion. *See, e.g.*, Tr. 1283; Dkt. 233, at 24-25; Dkt. 234-1. To state the painfully obvious, by producing and using undisclosed ESI, Defendants proved Plaintiff's point that ESI had been withheld. As far as the Court knows, this production was done without apologies. Indeed, despite possessing the documents for 48 hours, the former defense counsel only produced them to Plaintiff at 8:26 p.m., after Plaintiff had already filed its response brief. Dkt. 239, Ex. A. And, for the first time, Defendants also disclosed to the Court and Plaintiff the autodeletion problem (i.e., the spoliation of ESI). Dkt. 234-2, at 2; Pl.'s Ex. 73, at 2. This disclosure was done without any fanfare; the disclosure was slipped into a declaration attached to exhibits responding to Plaintiff's summary judgment motion. Dkt. 234-2, at 2. Although the withheld documents Defendants used in the response brief were only recently produced, long after the Rule 26(e) supplementation date and the fact discovery cut-off date, Defendants did not flag this or otherwise point this out to the Court or opposing counsel.

### iii. What the Former Defense Counsel Don't "Figure Out"

And, critically, the former defense counsel failed to "figure it out" with respect to the GoDaddy emails. Tr. 838, 908, 911, 1296-97, 1404. So, even then, there was another tranche of ESI that the former defense counsel did not even know they had failed to produce. The former defense counsel's failure to even consider, let alone investigate, whether the GoDaddy account had likewise not been searched is perplexing and troubling. At that time, the former defense counsel knew the following:

- Duke used both Yahoo! and GoDaddy. Tr. 763, 926;

- Plaintiff's main argument of unclean hands was based on Defendants' failure to produce electronic communications. Dkt. 216, at 33; Tr. 1283

- The Yahoo! email account had not been searched and the Yahoo! emails had not been produced because the emails were web-based. Dkt. 253-1, at 4; LS Ex. 11, at 3;

- Plaintiff was contending that GoDaddy emails had not been produced. Dkt. 232, at 11 n.1;

- Emails that, according to Duke's representation, should have been forwarded from the GoDaddy account to the Yahoo! account were not forwarded. Tr. 1390-92; and

- The late-produced emails contained emails from the GoDaddy accounts, in addition to the Yahoo! accounts. *See, e.g.*, Dkt. 294-2, at 62.

But not a single one of the former defense counsel working on the case at that time thought to investigate or even ask about the GoDaddy email account. Despite five

days of evidentiary hearings, they never explained why they did not "figure it out;" it just never occurred to them.  Tr. 838, 908, 911, 1296-97, 1404.

Of course, the former defense counsel would have been able to "figure it out" had Duke simply told them that the GoDaddy emails had not been searched either, which Duke clearly knew.  Tr. 281-82.  By the spring of 2018, Duke knew that the former defense counsel did not know the distinction between emails stored locally on the hard drives and emails stored in the cloud online.  Tr. 249.  Instead of informing the former defense counsel that the GoDaddy emails had not been subjected to the search terms, he failed to disclose that information to them for years.  Tr. 281-82, 1328-30 ("Mr. Shonder is talking to Mr. Duke at the little table in my office.  And we learn about the GoDaddy . . . that the corporate emails were not on the hard drives, but they were in the cloud, too, at GoDaddy."), 1402-03 ("[W]e were having a discussion about your Bryan Scott Kos . . . and he said or he revealed to me that there were the corporate emails had been housed on GoDaddy and had not been part of the – they weren't stored on the computer, and therefore were not searched, okay?"), 1410-11 ("Well, I think Plaintiff had attached some documents to their sanctions brief, and so we were talking about those e-mails, and Mr. Duke just said, well, he has got another account that is GoDaddy and that also wasn't subject to the search or words to that effect.").  If Duke's admissions and plain statements to Shonder and Stamatis are not enough direct evidence on this point, there's plenty of circumstantial evidence establishing that Duke knew the GoDaddy accounts had

not been searched and failed to disclose this. At that time, Duke knew the following:

- He used both Yahoo! and GoDaddy email accounts for 21 Century Smoking Inc.'s business. Tr. 68, 89-90;

- Plaintiff was seeking emails related to the claims in the lawsuit. Tr. 139, 222-24, 229-30, 614;

- Yahoo! emails had not been searched and produced because they were web-based, which Duke knew by the spring of 2018. Tr. 298-99, 545;

- Duke knew GoDaddy emails were also web-based. Tr. 129-31;

- The ESI vendor would need Duke's log-in and password information, which he had not provided, to access the GoDaddy accounts. LS Ex. 1 at 143; and

- The former defense counsel did not have all the relevant GoDaddy emails. Tr. 1328-30, 1402-03, 1410-11.

On this important issue of the failure to realize that the GoDaddy emails had not been searched because they were web-based just like the Yahoo! emails, a reasonable inference is that some of the former defense counsel were too obtuse, uninterested, or careless to ask the question, and Duke was too coy, veiled, or duplicitous to volunteer the information.

Adding to the calamity, for some inexplicable reason, the former defense counsel also still failed to "figure it out" with respect to the Yahoo! chats. Dkt. 267, at 57-58. Those had not been preserved, searched, and produced either.

### iv. Responses to Summary Judgment Motions and ESI Issues Emerge

On March 19, 2018, Plaintiff contemporaneously filed its response in opposition to Defendants' motion for partial summary judgment. Dkt. 232. In the filing, Plaintiff continued to assert that Defendants engaged in litigation misconduct that supported its unclean hands defense. Dkt. 232, at 14, 24, 27. With premonition of larger ESI problems, Plaintiff also noted that there was a lack of email responses to customer confusion complaints. Dkt. 232, at 11 n.1.[30] Because the briefing schedule established simultaneous filings, at the time it filed its response, Plaintiff was still in the dark about a number of ESI matters. For example, Plaintiff had not yet received the newly produced 112 pages of emails. Dkt. 239, Ex. A; Dkt. 294-2. Moreover, Plaintiff was unaware of Defendants' forthcoming ESI document dump of thousands of pages of responsive documents, the extent of the Yahoo! email withholding, the failure to preserve Yahoo! chats, and the GoDaddy email autodeletion. And Plaintiff certainly did not know that there were two GoDaddy email accounts that had not even been searched.

After receiving the 112 pages of responsive documents and learning of the autodeletion problem for the first time, on April 6, 2018, Plaintiff sought to amend its summary judgment filings. Dkt. 239. Unsurprisingly, Plaintiff argued that the

---

[30] This footnote should have been a huge tip-off to the former defense counsel that there were production or spoliation issues with respect to the Duke's GoDaddy accounts. The allegation, which turned out to be true, is evidence that the GoDaddy emails were not all forwarded to the Yahoo! account. As noted above, Duke's GoDaddy emails autodeleted for years during the pendency of this litigation. Unfortunately, the former defense counsel ignored this warning, failed to confront Duke, or investigate the issue at that time, and did not take this allegation seriously. As discussed below, they did not learn of the failure to produce responsive GoDaddy emails until they blindly stumbled across it over a year later, causing their withdrawal from this case.

tardy disclosure of the documents prejudiced it, evidenced its repeated concerns and allegations that Defendants had failed "to properly preserve and produce all relevant documents" sought by Plaintiff, and "fully support[ed] a finding of 'unclean hands.'" Dkt. 239, at 2-3. Plaintiff reasonably requested that it be granted leave to amend its summary judgment filings to address these recently produced documents that were required to be produced years earlier. Dkt. 239, at 5.

### v. Court Attempts to Understand ESI Problems

Two weeks later, on April 17, 2018, the Court held a status hearing on the Plaintiff's motion to amend the summary judgment filings. Dkt. 249. At the hearing, Plaintiff highlighted that it had serious concerns about the recently disclosed ESI issues and argued that it had been prejudiced because it relied on the discovery responses in formulating its litigation strategy. Dkt. 249, at 17. After being forced to admit that the 112 pages of recently produced documents were responsive to Plaintiff's discovery requests, Defendants repeatedly requested time to "go back and figure it all out." Dkt. 249, at 8, 9, 22. The Court had its own concerns. Initially, the Court repeatedly raised the issue of a written litigation hold. *Id.* at 11, 12. This was not the first time the Court drew the former defense counsel's attention to the need to have a proper written litigation hold. Dkt. 367, at 6. Then the Court asked the following very direct and precise question and received the following direct answer: "THE COURT: Were you relying upon those documents [i.e., the recently produced 112 pages] in any way . . . in your filings? MR. STAMATIS: No, your Honor." Dkt. 249, at 8. This was untrue. Defendants

did rely on those documents.  Tr. 1283; Dkt. 233, at 24-25; Dkt. 234-1.  Additionally, the Court specifically asked if data had been lost.  Dkt. 249, at 12.  Stamatis responded, "Not to our knowledge, your Honor."  *Id*.  But there is no dispute that data had been lost, specifically certain GoDaddy emails and Yahoo! chats, at the least.  Finally, the Court fired a series of warning shots.  After allowing Defendants time to investigate and file a response, the Court stated the response "better be really good and supported by an affidavit."  *Id.* at 23.  The Court further predicted where these ESI issues were going:  "I see this whole thing blowing up, and then we jump down the ESI rabbit hole, and it is going to be a problem, and there will be sanctions motions and motions to exclude, motions for adverse instructions."  *Id*.  In conclusion, the Court gave its final warning to the former defense counsel:  "I would spend a lot of time talking to Mr. Duke about what happened with the ESI.  Maybe there is no 'there' there, but that's a problem currently, as it is currently framed."  *Id.* at 25-26.

### vi. Defendants Identify 15,000 Pages of Responsive Documents Not Produced

In May of 2018, the former defense counsel reactivated the contract with 4Discovery, the e-discovery vendor, to search Duke's Yahoo! account.  Tr. 1451.  Only then did 4Discovery finally perform the search of Duke's Yahoo! email account.  Tr. 1452, 1455.  4Discovery was provided with Duke's log-in and password information and searched the Yahoo! email account with the search terms, resulting in another hit report identifying the documents.  Tr. 1452-53.  This ESI was stored in the cloud, as Yahoo! is a web-based email system.  Tr. 1452.  Thousands of

documents were identified on this hit report.  Pl.'s Ex. 91.  (There may have been
fewer documents, but there were over one thousand pages of responsive documents
that should have been produced in a best-case scenario for Defendants.  Dkt. 370, at
3-5.  Plaintiff represented that it received about 15,000 pages.  Tr. 912.)

    At this time, 4Discovery was not instructed to search for Yahoo! chats.  Tr.
1455.  No instruction was given to 4Discovery to search this function even though,
by then, the former defense counsel knew that Duke communicated with Saraswat
by Yahoo! chat and that Plaintiff had requested those documents.  Tr. 783-84; Dkt.
126; Dkt. 132.  In fact, a cut-and-pasted email of a Yahoo! chat between Duke and
Saraswat about SEO was produced by the former defense counsel in March of 2018.
Tr. 924; Dkt. 294-2, at 171; Defs.' Ex. 64.  In litigation, this document is called a
"hot doc."  As discussed in detail previously, this ESI substantially undermined
Duke's and Saraswat's credibility by proving their prior sworn statements to be
false on multiple levels. And this ESI bolstered Plaintiff's unclean hands assertion,
by proving that the person inserting metatags into 21 Century Smoking's website
expressed how she would continue to attempt to increase the SEO.

    After 4Discovery conducted its search, on May 14, 2018, Defendants filed
their response in opposition to Plaintiff's motion to amend its summary judgment
filings.  Dkt. 253.  The filing was supported by declarations of Life and Leavens but
not Duke, which had to be an intentional but very strange decision.  Likewise, the
document was certainly not reviewed by Duke before it was filed because it is larded
with assertions that Duke now claims are false.  The filing is troublesome,

containing a dismissive attitude, misrepresentations of fact, and meritless legal arguments. Initially, the theme of the document was "There's-nothing-to-see-here." This was the theme despite their admission that 4Discovery's recent search for responsive ESI had identified four banker's boxes of previously undisclosed and responsive documents. *Id.* at 9. Next, the filing also misrepresented that Liberman reviewed Duke's email systems with Leavens. *Id.* at 3. Liberman testified she was not present when this occurred. Tr. 1126. The filing also represented that both GoDaddy accounts auto-forwarded to the Yahoo! account. Dkt. 253, at 3-4, 12, 14. That is untrue. Tr. 173, 634, 938-39. Finally, the response made several legally meritless arguments. For example, the response asserted that the failure to disable the autodeletion functions was reasonable. Dkt. 253, at 13-14. Further, the response asserted that sanctions were not warranted because there was no bad faith, ignoring that only negligence is required to impose sanctions under Rule 37(b), (c). Dkt. 253, at 9; *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642-43 (7th Cir. 2011). Additionally, the response completely ignored that the 112 pages were documents that the Court had ordered Defendants to produce by June 15, 2015, which meant that Rule 37(d) was violated. Moreover, the response repeatedly attempted to cast blame on 4Discovery for Defendants' and the former defense counsel's errors. Dkt. 253, at 6, 8. Strangely, after attempting to blame 4Discovery, Defendants represented that they had retained 4Discovery again to search the Yahoo! email account. *Id.* at 9. Hiring a contractor to do important ESI searching after accusing it of incompetence is very odd.

### vii. Court's Warning Shots and Attempts to Resolve ESI Problems

On May 17, 2018, the Court held another status hearing on the ESI issues. Dkt. 256. At the hearing, the former defense counsel stated that they "took a hard look to get to the bottom of what happened." *Id.* at 5. Of course, as is now abundantly clear, the look was not hard and the bottom was not reached. They suggested that all the documents 4Discovery identified should be produced and then the parties should discuss next steps. *Id.* at 7. Unsurprisingly, Plaintiff was skeptical of this suggestion, noting that now thousands of additional documents were going to be produced long after discovery was closed. Importantly, Plaintiff once again emphasized that it had been prejudiced because its litigations strategy had been developed on the discovery that had been produced. *Id.* at 13. During the status, Leavens admitted that the ESI process was "just informed by [his] own personal experience in emails being maintained on the computer." *Id.* at 14.

The Court then struck without prejudice all the summary judgment filings while the ESI issues were resolved. *Id.* at 30. The Court then continued to hammer on the issue of the lack of litigation hold letters. *Id.* at 19. In exasperation, the Court fired yet another warning shot and explained the state of the law relating to ESI:

> [I]t is not 2004 anymore, it is not even 2009. It is not 2004 with *Zubalake*
> [sic]. We are at 2018 . . . The Rules of Professional Conduct require counsel
> to be reasonably competent in ESI and in electronic information. I'm baffled

112

as to what I'm being told, how it occurred, because it doesn't make a whole lot

of sense to me, but I don't have all the facts again.

*     *     *

Rule 37(e) was amended and amended in large part to streamline the process

and to focus on the key issues relating to ESI so that the ESI tail does not

wag the litigation dog . . .

*Id.* at 16.

The Court then required all the ESI be produced in native format and that because
hard copies existed already, those be provided as well. *Id.* at 21. Following this
Court's "no harm, no foul" ESI mantra, the Court then gave Plaintiff a reasonable
time to review this ESI to determine if there was anything of value in the
production. *Id.* at 24. In striking all the filings, the Court concluded by stating,
"You have a mess before Judge Kapala. The mess is probably going to get worse
before it gets better. We have to figure out the ESI issues, okay?" *Id.* at 30.

On August 14, 2018, the Court held a hearing on discovery matters, after
Defendants had produced another 15,000 pages of documents to Plaintiff long after
the close of discovery. Dkt. 266. The Court wanted to know if the documents were
relevant and important. Dkt. 267, at 17.

In detail, Plaintiff highlighted four keys from the recently produced ESI.
First, Plaintiff addressed the withheld ESI going to the defamation counterclaim.
Specifically, Plaintiff noted the discrepancies between Duke's and Edmiston's
deposition testimony and what the documents established. Further, Plaintiff

113

established that a video recording showed that no defamatory statements were made during the conversation that was the basis of the claim. (One of the former defense counsel later admitted as much. Tr. 973.) Plaintiff also emphasized that it would have been able to not only impeach the witnesses in their depositions but also establish an invited defamation affirmative defense. Dkt. 267, at 19-24. Even one of the former defense counsel admitted that the withheld emails were impeaching. *Id.* at 50. Second, Plaintiff highlighted the ESI communications between Duke and Saraswat. This ESI contained the September 13, 2010, communication that contradicted Duke's prior sworn testimony as to when Saraswat stopped working for him. *Id.* at 24-33. Third, Plaintiff emphasized that the ESI showed that online sales were different than had been previously represented and different than Defendants' market penetration expert assumed. According to this recently produced ESI, online sales were decreasing, not increasing. *Id.* at 33-36. Fourth, Plaintiff addressed the "autodeletion problem" and "auto-forwarding solution." As an example, Plaintiff used the Debra Wood email exchange to show the flaws in Defendants' explanation. *Id.* at 37-44.

In response, Defendants asserted that none of these examples were "the smoking gun." *Id.* at 47. Defendants took that position even though they admitted that some of the ESI was "really good impeaching material." *Id.* at 50. As to the "autodeletion problem" and "auto-forwarding solution," Stamatis stated the following: "When we talked to Mr. Duke, Mr. Duke was clear: At that time, these emails were forwarding. That's how he had it set up." *Id.* at 58. Duke adamantly

denied ever telling Stamatis this. Tr. 1536. Obviously, both cannot be truthful

statements. And even though all the issues arose from Defendants' own documents

that were purportedly reviewed by the former defense counsel, Defendants

requested more time to investigate the issues raised. *Id.* at 58. As shown later, the

"investigation" was simply to speak with Duke about these problems and then just

continue to accept all his representations at face value. Tr. 1309-10, 1357 ("I took it

[Duke's representations] as face value, and we moved on from there."). They did so

despite their skepticism about Duke's representations. Tr. 859.

### viii. More ESI Concerns Emerge: Yahoo! Chat and Self-Collection

Two other important issues emerged at this hearing. First, Leavens revealed

that Defendants were engaged in self-collection of ESI. Dkt. 267, at 29. Adding to

that revelation, the former defense counsel acknowledged that they were not

monitoring or reviewing Defendants' self-collection. Dkt. 267, at 30 ("THE COURT:

My question was did anybody follow up, do a re-search – re-search – of the computer

to make sure that Mr. Duke's personal search, a party-to-the-lawsuit's search, of his

ESI was complete and accurate? MR. LEAVENS: There was not a search of his

Yahoo! account by the ESI provider, we have acknowledged that, and that was

something that was our error for not including. And as far as following up and

doing a search ourselves, his attorneys, of his Yahoo! account, I don't recall whether

we did that or not. I'm sorry, your Honor."). In response to hearing this, the Court

fired another warning shot: "I guess one of the lessons, one of the takeaways is

don't have your client who is a party do the document search." *Id.* at 65. This

warning shot, like all the Court's warning shots in this case to Defendants, went unheeded. Second, and relatedly, the Court questioned the former defense counsel about the search conducted of the Yahoo! account. Specifically, the Court asked the former defense counsel if they understood that emails and chats were different communication methods. *Id.* at 31-33. The former defense counsel assumed that they were the same so that 4Discovery's search of the Yahoo! email would also capture the chats. *Id.* at 32. This assumption was wrong. Tr. 1436, 1498. In front of the former defense counsel, the Court went online from its own computer in the courtroom to the Yahoo! home page to show the former defense counsel that Yahoo! email and Yahoo! chat were different and ordered them to determine if both were searched. *Id.* at 57-58.

At the end of the August 14, 2018, hearing, the Court allowed Plaintiff the opportunity to refile or supplement its motion for sanctions. The Court also set a briefing schedule on the motion. *Id.* at 61-62.

### ix. Defendants and Former Defense Counsel Finally Investigate Yahoo! Chat

After the Court raised the issue about the Yahoo! chats still not being searched, on September 13, 2018, Defendants filed a status report with the Court. Dkt. 268. This status report made two important points. First, the status report confirmed that the Yahoo! chats had *not*, in fact, been searched, as the Court feared. *Id.* at 2. Second, the status report represented that the Yahoo! chats could be searched and responsive chats would be produced. *Id.*

116

In September of 2018, five months after 4Discovery was contracted to search for Yahoo! emails, and after the Court had disabused the former defense counsel of their erroneous assumption that Yahoo! email and chat were the same, 4Discovery finally searched for Duke's Yahoo! chats. Tr. 1455-57. (This would have been the second time the former defense counsel used 4Discovery to obtain ESI despite previously accusing it of incompetence. Again, that is strange.) Yahoo! chats are also stored in the cloud. Tr. 1457. Yahoo! chats are easy to obtain and doing so is basic work for an e-discovery vendor. *Id.* But 4Discovery was unable to locate any Yahoo! chats; none were found. Tr. 1458. And remember, it is undisputed that Duke communicated with Saraswat about metatags and SEO via Yahoo! chat. *See, e.g.,* Dkt. 294-2, at 171. If Yahoo! chat were used and then a search for those chats was performed but none were found, then the reasonable inference is that those chats were deleted. Tr. 1499-1500. Not surprisingly, Duke claimed he never deleted any chats. Tr. 1519.

On October 10, 2018, despite previously informing the Court that the Yahoo! chats could be searched and would be produced, Defendants informed the Court that 4Discovery could not recover the Yahoo! chats. Dkt. 273. The Court responded that this development was troubling and disturbing, noting that it would not "instruct counsel how to preserve evidence." Dkt. 274.

### x. GoDaddy Accounts Remain Unsearched

Importantly, even at this late date, 4Discovery was never asked to search Duke's GoDaddy account. Tr. 1459. The search of the GoDaddy account did not

occur until August of 2019 by a different vendor on the eve of the evidentiary hearing after the Court demanded a report on the status of the search of the account.  Dkt. 318, at 6, 10; Dkt. 318-1, at 14-15.  A custodian interview was not performed until that time as well.  Tr. 100-01.

### xi. San Diego Meeting

In the fall of 2018,[31] after the discovery of the failure to produce thousands of pages of responsive documents, a meeting occurred in San Diego between the former defense counsel and Duke, along with one of Duke's current defense counsel.  Tr. 855.  The meeting lasted at least two hours.  Tr. 857, 1326.  Leavens even flew to San Diego for this meeting.  Tr. 1019.  Although the testimony on this point was somewhat vague, the purpose of the meeting was to address discovery problems and get answers to questions relating to the ESI blunders.  Tr. 854-55, 1177.  The Yahoo! email fiasco was one "bomb," but there were other "bombs" too.  Tr. 1178.[32]

---

[31] The Court pauses to discuss the lack of the ability by any witness to nail down the date of this meeting because it is emblematic of a larger issue in this case.  Allegedly, the meeting occurred in either September or November of 2018.  Tr. 297, 854.  Based on the chronology of the case, the most reasonable inference is that this meeting occurred in September.  The fact that nobody could pin down a date for this meeting shows how cavalierly Duke and the former defense counsel have taken these issues.  Nobody even bothered to look at flight itineraries or checked their phone or time records to determine when this important meeting occurred.  Indeed, minimally descriptive and professional billing records would have contained this information.  A simple "investigation" consisting of popping open a calendar would have only taken a few minutes.  This minimal effort by Duke or any of the former defense counsel would have uncovered the date and time of this meeting.  Their alleged inability to recall the date of the meeting also created credibility problems for all the witnesses, especially relating to their recollection of dates.  In fact, Duke's erroneous recall of critical dates was troublesome.  Duke was described as a "digital pack rat."  Tr. 584.  A "digital pack rat" would have all the electronic data he needed to review to identify dates.

[32] "Bomb" and "bombs" were terms used by one of the former defense counsel.  Tr. 1178.  The Court agrees with that description.

118

Despite the participation of Duke and five attorneys in this meeting, the testimony about what occurred was vague and muddled. The witnesses' recollections about the meeting were hazy and contradictory including on the topics of whether counsel sought to withdraw or whether Duke's credibility was questioned. Tr. 296, 859, 1184, 1328 (withdraw issue), 303-04, 857, 1007, 1327-28 (Duke's credibility issue). All the witnesses' fuzzy memory about this meeting is stunning. Tellingly and strangely, nobody recalled the "autodeletion problem" and the concomitant "auto-forwarding solution" being discussed at this meeting. Tr. 1311. Allegedly and unbelievably, no conclusions were reached as to what occurred or how it happened. Tr. 1181 ("So I don't recall having conversations about any conclusions."). Per standard operation procedure for this case, nobody took notes and no document was created memorializing what occurred at this meeting. Tr. 1184-85, 1400. Certainly, no written action plan to investigate, remedy, and prevent ESI problems was created. According to Leavens, Duke assured the former defense counsel that there would be no more surprises. Tr. 908. Despite everything that had occurred up to that point—including the concerns about Duke's credibility, Tr. 854-56—the former defense counsel just took these assurances at face value and moved on. Tr. 1357 ("I took it [Duke's representations] as face value, and we moved on from there."). And they did so even though not all of them accepted Duke's explanations. Tr. 859.

### xii. Defendants and Former Defense Counsel's Failed Escape from ESI Blunders: The Motion to Dismiss the Defamation Counterclaim

Although no witness testified to this, based on the evidence and the reasonable inferences drawn from that evidence, the Court finds that as a result of the San Diego meeting, Defendants and the former defense counsel engaged in a half-cocked scheme to extricate themselves from the sanctions corner. Instead of addressing the ESI spoliation issue head on, they tried to procedurally outmaneuver Plaintiff.

On October 15, 2018, in what can only be reasonably interpreted as an attempt to avoid sanctions relating to the undisclosed ESI going to the defamation counterclaim, Defendants attempted to drop that claim. Dkt. 275. As noted throughout this order, this counterclaim was the subject of substantial litigation, including the motion to amend the affirmative defenses to add the invited defamation affirmative defense. Dkt. 146. Plaintiff opposed the motion. Dkt. 279. Defendants strangely still contended there was merit to the claim. Dkt. 280, at 2. According to Defendants, they were willing to let this claim go "to simplify matters before the Court" and "in the interest of streamlining the case." *Id.* This posturing was too much to take. Defendants also took the opportunity to minimize Plaintiff's assertions of Defendants' ESI failures and to argue that Plaintiff was blowing everything out of proportion. *Id.* at 10. Defendants were wrong when they took that position then. And even as the additional ESI failures have come to light, Stamatis still takes that position. That position is even more erroneous now. The Court denied the motion because, in part, Defendants claimed that at that time they were still willing to proceed with the counterclaim. Had Defendants simply

120

stated that they were willing to forego the claim and not pursue it, the Court would have likely granted a Rule 41(b) motion or *sua sponte* dismissed the counterclaim. Dkt. 292, at 6 n.7. Indeed, the Court explained this at the status hearing before ruling on the motion. Dkt. 293, at 31-33. There are two important aspects of this Court's ruling on the motion to dismiss the defamation counterclaim. First, no attorneys' fees are being awarded to Plaintiff for work related to this motion. Second, Defendants did not file any objections to the district judge on this ruling, the reasonable inference being that any objection would have been overruled. Consequently, this ruling cannot now be appealed. Fed. R. Civ. P. 72; 28 U.S.C. § 636.

### i. 2019

### i. Sanctions Motion Schedule

On January 29, 2019, the Court held yet another status to attempt to "get to the bottom" of the ESI issues. Dkts. 290, 293. At the hearing, Plaintiff explained how Defendants' ESI failures had prejudiced it. Dkt. 293, at 5, 7. According to Plaintiff, its entire litigation strategy had been affected, including expert discovery. *Id.* at 5. Plaintiff also asserted that its examinations of witnesses at depositions were hindered by Defendants' failure to preserve and produce the ESI. *Id.* at 7. In mixing metaphors, Defendants responded that Plaintiff was on "a fishing expedition for a smoking gun." *Id.* at 14. The Court confirmed that the ESI issues went beyond Rule 37(e) and that a dismissal on the counterclaim would not resolve all of the ESI issues. *Id.* at 16-18. Because the parties agreed that the issues should be

121

briefed and followed with an evidentiary hearing if necessary, the Court entered a lengthy briefing schedule, allowing the parties to file 75-page memoranda. *Id.* at 25-27.

On March 25, 2019, Plaintiff filed a 75-page memorandum in support of its motion for sanctions. Dkt. 294. The memorandum asserted that sanctions should be imposed under numerous bases, including the Court's inherent authority and an arsenal of rules, such as Rule 26(g), Rule 37(a),(b),(c) and (e) and Rule 56(h) as well as 28 U.S.C. § 1927. Dkt. 294, at 60, 63, 66, 79, 81. As remedies for the alleged violations, Plaintiff sought evidentiary sanctions, attorneys' fees and dismissal of Defendants' counterclaims, and entry of default on Plaintiff's complaint. Dkt. 294 at 83.

In May of 2019, Judge Kapala retired as district judge, and Judge Thomas M. Durkin was assigned as the district judge on the case. Dkt. 297.

### ii. Former Defense Counsel Finally "Figure It Out" About GoDaddy Accounts Because Duke Finally Tells Them

On May 29, 2019, just a few days before the response brief was due to Plaintiff's 75-page memorandum, Duke met with Shonder and Stamatis in Stamatis' office. TR. 1328-29, 1400-01. During a discussion about emails, Duke told Shonder that he has "another account that is GoDaddy and that also wasn't subject to the search." Tr. 282, 528-30, 1410-11. According to Shonder, Duke said, "Well, I have his emails, too. Those also were on the cloud." Tr. 1401. Duke then told Shonder that because the GoDaddy emails were stored in the cloud and not on

the computers they had not been searched.  Tr. 281-82, 1401-02.  This was how the former defense counsel learned that the GoDaddy emails had not been searched. Tr. 1332.  When Shonder heard this information, he was "crestfallen" and the blood rushed out of his head.  Tr. 1402.  Shonder stated "Okay, well, we have got a big problem now, and we have got to address it."  Tr. 1402.  Shonder told Duke "Well, this is big.  We are going to have to tell the court about it."  Tr. 1403.  When Stamatis heard Duke provide this information, he said that it was "Groundhog's Day all over again."  Tr. 1357.  He then said, "You have got to be kidding me." Tr. 1357.  Stamatis also said, "I need to let everyone know."  Tr. 284.  Both Shonder and Stamatis were shocked and surprised.  Tr. 684.

Two days later, on May 31, 2019, Peter Stamatis and Steven Shonder moved to withdraw from representing Defendants.  Dkt. 300.  Fast on the heels of that motion was Thomas Leavens and Peter Strand's motion to withdraw.  Dkt. 303.[33]  A few days later, Travis Life and Heather Liberman moved to withdraw as well. Dkts. 305, 307.  In typical fashion, like most motions to withdraw as counsel, the motions were scant on details other than referencing an "irrevocably impaired" relationship and a conflict of interest relating to the recent discovery of yet more potentially relevant and undisclosed ESI.  But because of the history of the case and the timing of these motions, it was fairly obvious that these were "noisy withdraws." *Fort v. Colvin*, No. 15 CV 50189, 2016 U.S. Dist. LEXIS 177011, at *2-3 (N.D. Ill. Dec. 22, 2016).  Plaintiff takes the position that these noisy withdraws allow the

---

[33] Peter Strand filed an appearance in this case but had no substantive involvement.  He is not the subject of either the sanctions motion or this order.

Court to reasonably infer that the former defense counsel believed that Duke was untrustworthy. Dkt. 381, at 6. Along with the motions to withdraw, a motion to stay the response to the motion for sanctions was filed. Dkt. 298.

On June 4, 2019, the Court granted the motion to stay the response and the various motions to withdraw. Dkt. 313. During this hearing, former defense counsel gave a convoluted explanation of how they learned of the failure to produce the GoDaddy emails. But they did say that they were still operating under the belief that all the GoDaddy emails were on the four hard drives. Dkt. 315, at 6-7. Stamatis continued to push his position that Defendants had an excellent case on the merits and that Plaintiff was fighting over the ESI issue to avoid the merits. *Id.* at 8. But, in a moment of candor, Stamatis confessed that he "would be hard pressed to say there shouldn't be sanctions on this." *Id.* at 9. Upon reflection and representation, he has apparently changed his mind on this point. The Court required a status report regarding the GoDaddy emails by August 13, 2019, and set a status hearing for August 20, 2019. Dkt. 313. The Court also noted that it intended to discuss with a possible resolution to the case. *Id.* at 3.

### iii. New Defense Counsel Appear and Court Attempts to Resolve the Case

On August 8, 2019, new counsel for Defendants appeared. Dkts. 316, 317.

The August 13, 2019, status report essentially described the beginnings of a proper custodian interview. Dkt. 318. This was the first and only time a custodian interview was performed in this 2012 case in which fact discovery closed on July 1,

2015.  Tr. 100-01, 243.  It also turns out that there were more sources of ESI that had not been searched.  Tr. 243; Dkt. 318.

On August 20, 2019, the Court held a hearing to review the status report and to discuss the possibility of resolving the case.  Again, unfortunately and obviously, the case did not settle.  Dkt. 320.

On September 30, 2019, the Court scheduled the dates for the evidentiary hearing.  Dkt. 328.

On October 1, 2019, counsel appeared for the former defense counsel.  Dkts. 331, 332, 333.

On October 18, 2019, counsel for Stamatis moved to allow the former defense counsel to be present and participate during the evidentiary hearing.  Dkt. 339. That motion was joined by the other former defense counsel.  Dkt. 342.  The Court granted those motions.  Tr. 6.

On October 24, 2019, Defendants finally filed their response to Plaintiff's renewed motion for sanctions.  Dkt. 347.  Despite Plaintiff's reliance on a slew of bases for sanctions, this response focused solely on Federal Rule of Civil Procedure 37(e).  *Id.* at 4-6, 32-35.

### iv. Evidentiary Hearing Held

From October 28, 2019, through November 19, 2019, the Court held five days of evidentiary hearings.  Dkts. 350, 353, 359, 362, 363.

On November 20, 2019, the Court gave all the participants of the evidentiary hearing the opportunity to file post-hearing briefs.  Dkt. 363.  The Court once again

gave the parties the opportunity to participate in a settlement conference. *Id.* But the parties eschewed that opportunity. Dkt. 366.

### v. Post-Hearing Briefs Filed

On January 27, 2020, the parties filed their post-hearing briefs. Dkts. 378, 379, 380, 381, 382, 383.

### (a) Plaintiff's Brief

Plaintiff's post-hearing brief, factually, focused on the following matters: (a) the credibility of the witnesses, including Duke's alleged perjury; (b) the late disclosure of ESI, including the emails and videos related to the defamation counterclaim, the Saraswat documents, and the online sales data document, Dkt. 381, at 8-11; (c) the loss of ESI, including the GoDaddy emails and Yahoo! chats, *id.* at 9-10, 16; and (d) the still unproduced ESI, including the GoDaddy emails, *id.* at 15. Legally, the brief highlighted Federal Rules of Civil Procedure 26(g) and 37(b), (d) and (e). *Id.* at 20, 25.

### (b) Defendants' Brief

In a well-written and well-organized brief that was persuasive in parts Defendants addressed all but one of the bases Plaintiff had used to seek sanctions. Dkt. 382, at 3. This is in contrast to their memorandum in response to the motion for sanctions that only addressed Rule 37(e). Dkt. 347, at 4-6, 32-35. Defendants made no mention of Rule 26(g), which allows a court to sanction parties as well as counsel. Fed. R. Civ. P. 26(g). As to the lost ESI and Rule 37(e), Defendants argued that there was no intent so the nuclear options could not be used, and that because

there was no prejudice, no other curative measures were necessary. Dkt. 382, at 5-8. Alternatively, Defendants argued that if prejudice were found, then the matter should be left for the jury to decide how to consider the evidence relating to the spoliation. As to possible sanctions under Rule 37(b) because of Defendants' failure to comply with this Court's discovery orders, Defendants argued that they had no intent. *Id.* at 17-19. But only negligence, not intent, is required for sanctions under this rule. *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642-43 (7th Cir. 2011). Regarding the late produced ESI, Defendants asserted it was harmless under Rule 37(c). Dkt. 382, at 9-13. Defendants further stated that if the Court were inclined to impose monetary sanctions, the former defense counsel should pay. *Id.* at 26.

### (c) Leavens, Strand & Glover Brief

The Leavens, Strand & Glover attorneys' brief rightfully recognizes that ESI should have been produced earlier and that the late production impacted the litigation. Dkt. 379, at 2. But they asserted that their actions were appropriate and made in good faith. Understandably, their main argument was that they could reasonably rely on Duke's incorrect representations. Legally, the brief primarily focused on Rule 37(e), *id.* at 21-25, except for a single line about Rule 26(g), *id.* at 25. Additionally, good faith is not a defense for a Rule 37(b) violation, which unquestionably happened. *e360 Insight*, 658 F.3d at 642-43. But the brief failed to address many issues. For example, it failed to address their lack of a custodian interview, their lack of any instructions to disable autodeletion functions, and their

127

complete reliance on self-collection without any oversight. The brief also neglected to address that because of their failures thousands of GoDaddy emails have still not been produced. Dkt. 318. But most importantly, these attorneys failed to address that solely relying on Duke's representations was not a reasonable inquiry, especially after they possessed not only suspicions that he was being less than candid with them but proof that he was not fully forthright with them. Tr. 854-56, 1071, 1224 ("The information we received was inaccurate."). Indeed, Leavens testified that after Duke provided certain explanations, Leavens was "not sure that [he] acceptable all of them." Tr. 859. Substantial case law establishes that the reliance was not reasonable.[34] Courts recognize the common-sense proposition that attorneys should be skeptical of their clients after they have learned that their clients have been less than candid and cannot just blindly rely on clients' say so. *A PDX Pro Co. v. Dish Network Serv., LLC*, 311 F.R.D. 642, 657 (D. Colo. 2015); *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1327 (S.D. Fla. 2007). Blindly relying on a client about the identification, preservation, and collection of ESI is also not reasonable.[35] This filing also did *not* argue that Life and Liberman should be spared from sanctions because they were associates working under the

---

[34] *See S. Leasing Partners v. McMullan*, 801 F. 2d 783, 788 (5th Cir. 1986) (explaining that blind reliance on a client is seldom a sufficient inquiry under Rule 11); *see also Fin. Inv. Co. (Bermuda) v. Geberit AG*, 165 F.3d 526, 533 (7th Cir. 1998) (taking client's word was "wholly inadequate pre-filing investigation" under facts).
[35] *HM Elecs., Inc. v. R.F. Techs., Inc.*, Case No. 12cv2884, 2015 U.S. Dist. LEXIS 104100, at *40 (S.D. Cal. Aug. 7, 2015); *Phoenix Four Inc. v. Strategic Res. Corp.*, 05 CV 4837, 2006 U.S. Dist. LEXIS 32211, at *17-18 (S.D.N.Y. May 23, 2006); *see also* Hon. Shira A. Scheindlin & Daniel J. Capra, *Electronic Discovery and Digital Evidence* 209 (2009); Kenneth J. Withers, *Computer-Based Discovery in Federal Civil Litigation*, 2000 Fed. Cts. L. Rev. 2, 3-4 (2000).

128

direction of a partner.  This argument could not be made because it would raise a conflict in the representation, at least that is the Court's best guess.  Nevertheless, the Court will make this argument for Liberman and Life and ultimately does not impose any monetary sanctions on them primarily for that reason.  As the senior partner on the case and as a lead counsel, Leavens had a duty to reasonably supervise those who had been delegated the e-discovery responsibilities.  *HM Elecs., Inc. v. R.F. Techs., Inc.*, Case No. 12cv2884, 2015 U.S. Dist. LEXIS 104100, at *58 (S.D. Cal. Aug. 7, 2015); *Qualcomm*, 2008 U.S. Dist. LEXIS 911, at *54-55.  But the Court is requiring Life and Liberman to attend ESI training.  Hopefully, Liberman's recollection of this training will be better than her recall of her previous CLE program.  Tr. 1149-50.

### (d) Stamatis' Brief

The theme of Stamatis' brief was his limited role in, and particularly his lack of involvement in, the discovery process.  Dkt. 378, at 1-5.  On the legal front, the brief made several technical and valid points.  For example, Stamatis signed no discovery documents so he could not be sanctioned under Rule 26(g).  *Id.* at 23-24.  Additionally, the clear violations of Rule 37(b) occurred before he was involved with the case.  *Id.* at 14, 22.  As a result, Stamatis asserted that only minimal—if any—sanctions should be imposed.  *Id.* at 13.  But, just like Leavens, he was a lead counsel, so the duty to supervise and monitor the associates rests with him, too. *HM Elecs., Inc.*, 2015 U.S. Dist. LEXIS 104100, at *58; *Qualcomm*, 2008 U.S. Dist. LEXIS 911, at *54-55.  Additionally, the brief did not address, among other things,

129

any of the following: His lack of reasonable follow up when discovery problems arose; his sole reliance upon representations from Duke, whose credibility was rightfully questioned, as well as from the other former defense counsel who similarly blinded relied on Duke's representations; and the failure to timely produce GoDaddy emails when a reasonable inquiry would have revealed the fundamental flaw with the entire production process. Tr. 1290, 1309-10, 1325-26, 1357. The brief also did not address the continued ESI issues and the need to produce responsive documents at this late date, which implicates Rule 37(a). Additionally, the brief did not address the misrepresentations made to the Court that hindered the fact-finding process as well as the efforts to remedy the ESI failures at an early stage. It is clear that Stamatis believed that the ESI issue was just distraction, which may explain why he merely barked orders to the other former defense counsel, Tr. 1288-89, instead of taking the issues seriously and conducting a reasonable investigation himself or supervising a reasonable investigation. Tr. 1300, 1357. That was an error in judgment, but not evidence of intent to hide or destroy ESI.

Indeed, Stamatis' position throughout this entire ESI catastrophe is that it is all a distraction from the substance of Duke's meritorious trademark claim. But, as the Court noted throughout this order, that position is flawed for several reasons. The position is also fundamentally flawed for a much larger reason. The position fails to address that Defendants' and the former defense counsel's actions and inactions struck at the core of how this Court administers justice by relying on

sworn testimony of witnesses, complete and accurate discovery responses, and meritorious legal representations by attorneys.

The following facts have been established. Although they are discussed elsewhere, these facts bear repeating. Defendants filed a counterclaim alleging defamation. Dkt. 88. This claim was part of the pleadings and at issue when Stamatis filed his appearance. The counterclaim was based on statements allegedly made by Plaintiff's representative at the Las Vegas trade show. (The Court sets aside for a moment the extraordinary fact that none of the recordings of the statements support the allegations.) In discovery, Plaintiff then specifically requested "[a]ny and all documents which refer or relate to any requests or instructions given or made to Bill Edmiston . . . with regard to the Global Gaming Expo in Las Vegas in 2013" and "[a]ny and all documents which refer or relate to any audio or video recordings of any interactions, conversations, or statements between Bill Edmiston and any parties or individuals concerning 21ST CENTURY SMOKE electronic products at the Global Gaming Expo in Las Vegas in 2013." Pl.'s Ex. 83 at ¶¶ 23, 24. In responding to these discovery requests, Defendants failed to produce the email chain between Duke and Edmiston containing the following colloquy: Duke: "maybe you can record them saying something libelous about me, lol;" Edmiston: "that sounds fine to me. I will go to there [sic] booth and play dumb about the two names. Will record. And take pics. :)." Pl.'s Ex. 22.[36] These emails

---

[36] The Court rejects any assertion that Duke believed this was all a joke. Tr. 343. The inclusion of "lol" does not require a different result. The interactions between Duke and Edmiston, as well as between Duke and the former defense counsel, negate this assertion.

were not produced until June 1, 2018, years after the close of fact discovery and several motions by Plaintiff.  Dkt. 116.

During his own deposition, Duke denied providing Edmiston with any instruction about recording the interaction.  Dkt. 294-2, at 199 (Q: "Did you give [Edmiston] any direction to record any of the events taking place at the trade show?"  A: "No.").  Stamatis defended Duke at this deposition.  *Id.* at 180.  Edmiston likewise denied receiving any instructions from Defendants to have a conversation with Plaintiff's representative.  *Id.* at 215.  The withheld emails show that both Duke and Edmiston falsely testified under oath.  And Duke did so in the presence of Stamatis.

Plaintiff eventually filed a motion to add the affirmative defense of invited defamation.  Dkt. 146.  Invited defamation is an affirmative defense that bars defamation claims if the publication is procured by the plaintiff.  *Leyshon v. Diehl Controls N. Am., Inc.*, 946 N.E.2d 864, 873 (Ill. App. Ct. 2010).  Plaintiff asserted that this was a meritorious affirmative defense to the defamation counterclaim.  Dkt. 146-1, at 14.  Defendants objected to allowing this affirmative defense because, in part, there was no evidence that Duke instructed Edmiston.  Dkt. 151, at 6.  Specifically, the response stated that Edmiston spoke with Plaintiff's representative

---

When Duke received the emails with the audio and video recordings, Duke was not surprised or concerned with Edmiston's actions.  If Duke's instructions to Edmiston were all just a big joke, his response would have been something along the lines of "Bill, what were you doing?  I was just joking.  I didn't mean for you to record them."  Nothing remotely like that was conveyed.  Tr. 347; Dkt. 294-2, at 224-31.  Of course, the fact that Edmiston recorded the conversations is strong evidence that the Edmiston did not believe Duke was joking.  Tr. 343.

"on [his] own volition." *Id.* The response then quoted Edmiston's deposition testimony where he denied any instruction by Defendants. *Id.* Stamatis signed this response brief under Federal Rule of Civil Procedure 11. *Id.* at 13.

In a thorough order, the Court denied Plaintiff's motion to add the affirmative defense. Dkt. 154. The Court denied the motion, in part, because Edmiston's deposition testimony that Duke did not instruct him was unrebutted. Dkt. 154, at 7. Indeed, because of Edmiston's unrebutted testimony, the Court stated that the affirmative defense of invited defamation was not strong. *Id.* So, the Court's ruling was based, in part, upon false deposition testimony, withheld ESI, and erroneous legal representations. The Court's ruling was infected by the misconduct.

In hindsight, with the benefit of the withheld emails, the Court believes its ruling may have been erroneous. The Court does not possess a way-back machine but is firmly convinced its decision may have been different had it been provided an accurate factual record. *Cf. United States v. Bagley*, 473 U.S. 667, 682 (1985). Stamatis should recognize that a mere distraction has not occurred when courts make erroneous decisions based on false testimony, withheld ESI, and counsel's misrepresentations. Instead, a miscarriage of justice has occurred.

### (e) Shonder's Brief

Factually, Shonder's brief focused on his limited involvement with the case, in particular with discovery, and consequently, no sanctions should be imposed on him. Dkt. 383, at 11-13. The brief also highlighted that when he learned of the two

133

major ESI explosions, the first time, he made every effort to produce the documents and notify the Court, and the second time, he moved to withdraw. Legally, Shonder's brief focused on Rule 37(e). Because of his lack of involvement and supervisory responsibility, the Court finds that Shonder should not be sanctioned in any way. He does not wear the jacket for any of the ESI problems in this case.

### vi. Post-Hearing Activity Included Mediation

In 2020, Duke also filed two post-hearing briefs to reopen the hearing. Dkts. 370, 384. Because of various Court orders relating to COVID that stayed briefing on motions, those motions were not fully briefed until June 23, 2020. Dkt. 414. Those motions were taken with the sanctions motion and are ruled on by separate order. Dkt. 414. They are both denied.

On September 29, 2020, after the undersigned was sworn in as a district judge, Judge Durkin was removed from the case, and the undersigned was reassigned the case as the district judge. Dkt. 417.

On October 23, 2020, the Court held a status conference that was also another attempt to convince the parties to discuss settling the case. Dkt. 420. The Court explained the sanctions it intended to impose but wanted to give the parties the opportunity to resolve the case before those sanctions were imposed and made public. The Court explained that it understood the consequences that were about to befall the parties and the former defense counsel. The Court then gave the parties time to find a mediator and mediate the case. The parties selected former Magistrate Judge P. Michael Mahoney as the mediator. Dkt. 428. Despite the

mediation, obviously, the case did not settle. Dkt. 430. At the request of the former defense counsel, the Court held fire until after January 4, 2021, and then after another request, until January 19, 2021. Dkts. 431, 432, 436. The case was not settled by that date. In fact, the parties have eschewed every opportunity to resolve this case. Consequently, the Court has entered this order.

### C. The E-Discovery Process: Same As It Ever Was

E-discovery is still discovery. Unquestionably, at times, ESI discovery can be complex. But complex issues were not at play here. The same basic discovery principles that worked for the Flintstones still work for the Jetsons. *See Brown v. Tellermate Holdings Ltd.,* No. 2:11-cv-1122, 2014 U.S. Dist. LEXIS 90123, at *4 (S.D. Ohio July 1, 2014) ("[T]he underlying principles of discovery do not change just because ESI is involved."). Indeed, just like in the good old days, ESI document disclosure and discovery involve five fundamental steps: (1) identification, (2) preservation, (3) collection, (4) review, and (5) production. *The Sedona Principles, Second Edition: Best Practices Recommendations & Principles for Addressing Electronic Document Production*, 35 (Jonathan M. Redgrave ed., 2007).

### 1. Identification of ESI: The Whole Process Starts Here

For ages, reasonable attorneys have known that the initial client interview is crucial to litigation success. R. Lawrence Dessem, *Pretrial Litigation in a Nutshell* 10 (4th ed. 2008). Everything that counsel does during the pretrial process builds upon the initial client interview. *Id.* at 9. Counsel must interview the client to obtain all relevant available information. Mauet, *supra* note 9, at 29. While

attempting to engender client confidence, counsel should maintain a healthy skepticism concerning a client's initial explanation of a case. Dessem, *supra*, at 17. The client must be pushed, probed, even cross-examined to test the facts provided to counsel. Mauet, *supra* note 9, at 32. Counsel should elicit detailed, specific facts rather than being content with generalities and conclusions that the client may initially offer. Dessem, *supra*, at 17. And counsel should be cognizant of not only what the client says, but also what the client doesn't say. *Id*.; Mauet, *supra* note 9, at 31. Reasonable counsel conduct proper and thorough initial client interviews not simply because it is best practices; rather, these interviews are required by the Federal Rules of Civil Procedure and the Rules of Professional Conduct. Fed. Rs. Civ. P. 11, 26(g), 37(e); Model Rules of Prof'l Conduct r. 1.1 cmt. 5 (Am. Bar Ass'n 2020) ("Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation."); *see S. Leasing Partners v. McMullan*, 801 F. 2d 783, 788 (5th Cir. 1986) (blind reliance on a client is seldom a sufficient inquiry under Rule 11); *see also Fin. Inv. Co. (Bermuda) v. Geberit AG*, 165 F.3d 526, 533 (7th Cir. 1998) (taking client's word was "wholly inadequate pre-filing investigation" under facts). Of course, a client interview is not just a one-and-done process; follow up can be just a critical. Dessem, *supra*, at 10.

    After 2004 and the *Zubulake* decisions, counsel who did not understand or take seriously ESI issues were playing Russian roulette. For sure, each litigation

136

chamber does not contain a bullet but when one does, the consequences can be tragic. The *Zubulake* decisions—culminating with *Zubulake V* in 2004—were highly publicized not only in legal publications,[37] but also in mainstream media.[38]  In 2004, Judge Scheindlin issued a warning to counsel:

> Now that the key issues have been addressed and national standards are developing, *parties and their counsel are fully on notice of their responsibility to preserve and produce electronically stored information.* * * * It is hoped that counsel will heed the guidance provided by these resources and will work to ensure that preservation, production and spoliation issues are limited, if not eliminated.

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 440-41 (S.D.N.Y. 2004) (emphasis added).  The fourth edition of the Manual for Complex Litigation, published in 2004, highlighted the importance of ESI.  The Manual addressed the prevalence of ESI and the courts' and the parties' responsibilities relating to this information. Manual for Complex Litigation § 11.446, at 77-78 (4th ed. 2004) ("Discovery of Computerized Data").  Tellingly, the Manual identified the various locations in which ESI might

---

[37] Michael Newman & Shane Crase, *Avoiding the Pitfalls of Electronic Discovery in Employment Litigation*, Federal Lawyer 20 (June 2007); Scott A. Carlson & Ronald L. Lipinski, *eDiscovery: A New Approach to Discovery in Federal and State Courts*, 95 Ill. B.J. 184 (2007); Todd D. Robichaud, *Old Wine in New Bottles: Discovery Disputes and Cost-Shifting in the Digital Age*, 33 The Brief 56 (2004); Ryan A. Horning, Kelly Smith-Haley & Bradley A. Klein, *Electronic Discovery: The New Rules*, 20 Chic. Bar. Ass'n Rec. 51 (Apr. 2006); Jason Krause, *Don't Try This at Home*, 91 A.B.A. J. 59 (Mar. 2005); Wendy Davis, *The Zubulake Road Show*, 91 A.B.A. J. 22 (Feb. 2005); Jonathan M. Redgrave & Erica J. Bachmann, *Ripples on the Shores of Zubulake:  Practice Considerations from Recent Electronic Discovery Decisions*, 50 Fed. Law. 31 (2003).

[38] Ameet Sachdev, *E-Mails Become Trial For Courts*, Chi. Trib. (Apr. 10, 2005), https://www.chicagotribune.com/news/ct-xpm-2005-04-10-0504090326-story.html; Susanne Craig & Ann Davis, *UBS Warburg Is Ordered to Pay For Retrieval of E-Mails in Case*, Wall St. J. (May 19, 2003, 12:01 AM), https://www.wsj.com/articles/SB105329801953669300; Landon Thomas Jr., *A Ruling Makes E-Mail Evidence More Accessible*, N.Y. Times (May 17, 2003), https://www.nytimes.com/2003/05/17/business/a-ruling-makes-e-mail-evidence-more-accessible.html.

be stored, including personal computers as well as information that "can be accessible via the Internet." *Id.* at 78.

In 2006, the Federal Rules of Civil Procedure were amended to specifically address ESI concerns. Rule 16(b) was amended to alert the court of the possible need to address ESI discovery early in the litigation. Fed. R. Civ. P. 16(b) advisory committee's note to 2006 amendment. Both Rule 26(a) and Rule 34 were amended to recognize that a party must disclose ESI. Fed. R. Civ. P. 26(a), 34 advisory committee's notes to 2006 amendment. In reality, the rules were catching up with case law that already held that producing parties were obligated to search electronic systems for information requested. *McPeek v. Ashcroft*, 202 F.R.D. 31, 32 (D.D.C. 2001). And Rule 26(f) was amended to direct the parties to discuss ESI during their discovery-planning conference. Fed. R. Civ. P. 26(f) advisory committee's notes to 2006 amendment. The practical purpose of this amendment was to facilitate early identification of electronic discovery issues to prevent expensive and time-consuming discovery disputes. Hon. Shira A. Scheindlin & Daniel J. Capra, *Electronic Discovery and Digital Evidence* 199 (2009). By 2006, it was generally understood that attorneys could not "get away with 'I don't understand these computers' anymore." Helen W. Gunnarsson, *Coming Soon: New Federal E-Discovery Rules*, 94 Ill. B.J. 578, 580 (2006) (quoting Chicago attorney Todd Flaming).

In 2007, the Sedona Conference published an annotated version of *The Sedona Principles, Second Edition: Best Practices Recommendations & Principles*

*for Addressing Electronic Document Production* (Jonathan M. Redgrave ed., 2007).

This book was nearly 300 pages packed full of practical, user-friendly information

regarding ESI.

By 2008, among other entities, the RAND Institute for Civil Justice noted the

obvious, even back then, that virtually all information was available in electronic

form. James N. Dertouzos, RAND Institute for Civil Justice, *The Legal and*

*Economic Implications of E-Discovery: Options for Future Research* 1-2 (2008). In

that same year, courts assumed counsel had learned the sophisticated ways to work

with information technology professionals and how to ask them the correct

questions to obtain the information needed. *See Alexander v. FBI*, 541 F. Supp. 2d

274, 277 (D.D.C. 2008). The obligation of counsel to effectively communicate with

the client about information technology and receive truthful responses was a

commonly discussed topic. *See, e.g.*, Karl R. Wetzel, *Communication Between*

*Counsel and Corporate IT*, 17 Bus. L. Today 37, 41 (2007) ("The importance of

communication between the business lawyer and corporate IT cannot be overstated.

The days of contacting in-house counsel or a corporate executive regarding the

discovery mandates of a pending litigation and receiving a number of banker's boxes

in return are a thing of the past. Business lawyers must now rely upon and trust

the corporate IT representative to assist them in the identification, preservation,

and collection of relevant ESI to comply with the newly amended FRCP and the

obligations set forth by recent case law."). And courts were reiterating warnings

similar to the warnings announced in *Zubulake* years earlier. *See, e.g., Qualcomm*,

139

2008 U.S. Dist. LEXIS 911, at *71 ("While no none can undo the misconduct in this case, this process, hopefully, will establish a baseline for other cases. * * * If nothing else, it will provide a road map to assist counsel and corporate clients in complying with their ethical and discovery obligations and conducting the requisite 'reasonable inquiry.'").

By 2009, courts were issuing wake up calls to counsel about electronic discovery. *William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 134 (S.D.N.Y. 2009). In addition to *The Sedona Principles*, other excellent ESI treatises were readily available. *See, e.g.*, Scheindlin & Capra, *supra*. Bar associations had jumped into the ESI field too. The American Bar Association had published multiple articles and two books on ESI issues in this time frame. Michael D. Berman, Courtney Ingraffia Barton & Paul W. Grimm, *Managing E-Discovery and ESI From Pre-Litigation Through Trial* (2011); Kristin M. Nimsger & Michele C.S. Lange, *Electronic Evidence and Discovery: What Every Lawyer Should Know Now* (2d ed. 2009). The continuing legal education industry was awash in ESI seminars, with advertisements littered through publications. *See, e.g.,* Jason Krause, *E-Discovery Gets Real*, 93 A.B.A. J. 44, 49 (2007) (advertising a CLE entitled "new Rules for Electronic Discovery"); Scott A. Carlson & Ronald L. Lipinski, *eDiscovery: A New Approach to Discovery in Federal and State Courts*, 95 Ill. B.J. 184-87 (2007) (advertising a CLE on e-discovery); 20 Chic. B. Ass'n Rec. 1-2 (Jan. 2006) (advertising 6.5 hours of CLE on e-discovery at the Midwest law and technology conference); 18 Chi. B. Ass'n Rec. [i]-[iv] (Oct. 2004) (advertising e-

discovery CLEs). And, under the leadership of then Chief Judge James Holderman and Magistrate Judge Nan Nolan, the United States Court of Appeals for the Seventh Circuit created the Seventh Circuit Electronic Discovery Pilot Program. Beginning in 2010, the Program provided free webinars on various ESI topics, including "You and Your Clients: Communicating About E-Discovery," "The 4 P's of eDiscovery," "What Everyone Should Know About the Mechanics of E-Discovery," "Ethics of E-Discovery," and "ESI 101: A Brief Survey of the Technology and Its Application for Beginners." *See* Seventh Circuit Council on eDiscovery and Dig. Info., *Library of On-Demand Webinars*, www.ediscoverycouncil.com/webinars. These free webinars provided basic, but important, information regarding fundamental legal principles for the identification, preservation, collection, review, and production of ESI.

The growth of ESI and its impact on litigation has continued unabated. The impact of ESI "on discovery cannot be overstated." 6 James Wm. Moore et al., *Moore's Federal Practice*, § 26.09 at 26-68.8(2) (3d ed. 2019). Indeed, it is almost quaint now to say that all litigation involves ESI. Nevertheless, counsel are still rightfully reminded that "[e]ven in the smallest of cases these days, electronic data—especially email—play a role." George Socha & Margaret Wolf, *Why Can't I Just Review it in Outlook?*, 102 Judicature 9 (2018).

With the expansion of ESI, the amendments to the Federal Rules of Civil Procedure, and the possible consequence of serious (and sometimes case-dispositive) sanctions, a new aspect of client interviews emerged: the custodian interview.

Whether viewed as a different type of client interview or merely an outgrowth of a client interview, they are similar and just as important. Like the initial client interview, the custodian interview is not merely a theoretical best practice. Instead, like the initial client interview, a proper and thorough custodian interview is mandated by the Federal Rules of Civil Procedure and the Rules of Professional Conduct. Fed. Rs. Civ. P. 26(f), 26(g), 37(e); Model Rules of Prof'l Conduct r. 1.1 cmt. 8 (Am. Bar Ass'n 2020). Since at least 2006, counsel have been required to take an active, affirmative role in advising their clients about the identification, preservation, collection, and production of ESI. Scheindlin & Capra, *supra*, at 470-71. Indeed, twenty years ago, an attorney's duty in this regard was clear:

> The attorneys have an obligation to investigate their clients' information management system thoroughly to locate potentially relevant and discoverable material, no matter how technically opaque that information system may appear. *Such an investigation goes well beyond simply asking the client for the relevant files and trusting that the client itself has a complete understanding of its own information technology structure.*

Kenneth J. Whithers, *Computer-Based Discovery in Federal Civil Litigation*, 2000 Fed. Cts. L. Rev. 2, 3-4 (2000) (emphasis added).

As with an initial client interview, a reasonable custodian interview can require counsel to cross-examine the client and test the accuracy of the client's response to document requests to ensure that all appropriate sources of data have been searched and that responsive ESI has been collected—and eventually reviewed and produced. Scheindlin & Capra, *supra*, at 209. Simply relying on a client's say so may not be reasonable. *HM Elecs., Inc. v. R.F. Techs., Inc.*, Case No. 12cv2884,

2015 U.S. Dist. LEXIS 104100, at *40 (S.D. Cal. Aug. 7, 2015); *Phoenix Four Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837, 2006 U.S. Dist. LEXIS 32211, at *17-18 (S.D.N.Y. May 23, 2006). And like an initial client interview, the custodian interview can be an iterative process, requiring follow up. Sedona Conference, *The Sedona Conference "Jumpstart Outline:" Questions to Ask Your Client & Your Adversary to Prepare for Preservation, Rule 26 Obligations, Court Conferences & Requests for Production* (2011).

At the least, a reasonable custodian interview consists of locating the relevant people and the locations and types of ESI. 1 Arkfeld's Best Practices: Electronic Discovery § 4.7; Tr. 1494-96. Counsel have a duty to know and understand their clients' ESI systems and storage. *HM Elecs., Inc.*, 2015 U.S. Dist. LEXIS 104100, at *57-58. The relevant people are the individuals who have custody of the relevant ESI or the ability to obtain the ESI. Counsel must interview them to learn the relevant facts regarding ESI and to identify, preserve, collect, and produce the relevant ESI. 1 LN Practice Guide: MA e-Discovery and Evidence § 3.07[1]. The failure to adequately interview key custodians that results in the failure to identify, preserve, collect, and produce ESI can result in sanctions. *Small v. Univ. Med. Ctr.*, No. 13-cv-0298, 2018 U.S. Dist. LEXIS 134716, at *149-50 (D. Nev. Aug. 8, 2018); *HM Elecs., Inc.*, 2015 U.S. Dist. LEXIS 104100, at *46 ("it was unreasonable to ask one person").

The relevant locations are those places where the ESI can be found so that it can be both (a) preserved and (b) collected and produced. Although both are

143

necessary, preserving ESI is distinct from collecting and producing ESI. Scheindlin & Capra, *supra*, at 208. Relevant locations can include a myriad of places, including hard drives, laptops, and internet-based applications. Martin T. Tully & Lauren H. Cooper, *Introduction to Information Systems at Organizations—It's Not a "Just Push a Button World," in* The Federal Judges' Guide to Discovery 6, 9-10 (2d ed. 2015); Scheindlin & Capra, *supra*, at 211. An internet-based application is one in which an internet user goes to a third-party's website and logs onto an application program provided by a third party. The user then uses the application as if it resided on the user's device. When using an internet-based application, the data usually remains with the third-party provider. Scheindlin & Capra, *supra*, at 64.

The types of ESI can include emails and chats/instant messages. Tully & Cooper, *supra*, at 6, 9-10; Scheindlin & Capra, *supra*, at 211. Emails differ from chats/instant messages. *The Sedona Conference Glossary: E-Discovery & Digital Information Management (Fourth Edition)*, 15 Sedona Conf. J. 305, 324, 333 (Sherry B. Harris & Paul H. McVoy, eds., Fall 2014). Email may or may not be an internet-based application. "Email" is "[a]n electronic means of sending, receiving and managing communications via a multitude of different structured data applications (email client software), such as Outlook or Lotus Notes or those often known as 'webmail,' such as Gmail or Yahoo! Mail." *Id*. at 324. Webmail is an example of an internet-based application. In addition to Yahoo! mail, GoDaddy emails are webmail. Tr. 522-23.

144

Before 2012, even counsel with only rudimentary knowledge of ESI had access to sources to guide them in custodian interviews. For example, back in 2011, the Sedona Conference published a free questionnaire that notified counsel about identifying, preserving, collecting, and producing ESI—including email, third-party email sources, and instant messaging. Sedona Conference, *Jumpstart Outline*, *supra*, at 1. This free publication specifically addressed email servers and instructed counsel to ask the client to identify the systems (client and server-side applications) used for emails and the time period for the use of each system, whether end-user emails are stored in the end-user's hard drive, email server, or a server of a third party application service provider; whether backup email servers exist; and whether the client's email servers overwrite, reformat, erase, or otherwise destroy the content of email on a periodic basis. *Id.* at 3-5. Other checklists existed as well. Scheindlin & Capra, *supra*, at 210-11; *see also* Hon. Shira A. Scheindlin & Jonathan M. Redgrave, *Discovery of Electronic Information in Business and Commercial Litigation in Federal Courts* ch. 22 (2d ed. 2008). These checklists likewise instructed counsel to question clients about applications used including email, instant messaging, internet email, and shared email systems with a service provider. The Sedona Conference, *Jumpstart Outline*, *supra*, at 3-5; Scheindlin & Capra, *supra*, at 210-11. Handy glossaries were published for the technology impaired. *See, e.g.,* Maura R. Grossman & Gordon V. Cormack, *The Grossman-Cormack Glossary of Technology-Assisted Review*, 7 Fed. Cts. L. Rev. 1 (2013).

145

These issues were not merely academic concerns, discussed by commentators and ESI wonks. Federal judges across the nation were making the same points.[39]

## 2. Preservation of ESI: The Litigation Hold

Once a party reasonably anticipates litigation, it is duty-bound to take good faith steps to preserve documents and data that may be relevant to the litigation. *Zubulake v. UBS Warburg* LLC, 220 F.R.D. 212, 216-17 (S.D.N.Y. 2003); Fed. R. Civ. P. 37(e); *The Sedona Principles*, Principle 5. Though a party need not preserve all documents in its possession—again, perfection is not the standard—it must preserve what it knows and reasonably ought to know is relevant to possible litigation and is in its possession, custody, or control. *See, e.g.*, *Doe v. City of Chicago*, Case No. 18-cv-03054, 2019 U.S. Dist. LEXIS 113395, at *14-15 (N.D. Ill. July 9, 2019); *Mintel Int'l Grp., Ltd. v. Neerghen*, Case No. 08 CV 3939, 2009 U.S. Dist. LEXIS 131224, at *4-5 (N.D. Ill. Jan. 22, 2009). Of course, as discussed above, litigants and attorneys must familiarize themselves with their data retention

---

[39] *See, e.g.*, *Brown*, 2014 U.S. Dist. LEXIS 90123 at *4; *Moore v. City of Chi. Heights*, No. 09 C 3452, 2011 U.S. Dist. LEXIS 126738, at *27-28 (N.D. Ill. Feb. 15, 2011) (Gilbert, J.) ("A lawyer needs to communicate with is or her client about the information that is or may be available to support a claim or defense especially at an early stage of the litigation. If no communication or inquiry takes place between the lawyer and client at the earliest stages of litigation, then it is impossible to assure information that may be used for these purposes is discovered and disclosed. This is particularly critical with respect to ESI. Technology changes so rapidly today, and the archiving of ESI has become so ubiquitous that policies and practices of just a few years ago are now obsolete. It is, therefore, imperative that parties and their counsel not only assume that what they understood to be the typical way of doing things remains the case over time."); *Qualcomm*, 2008 U.S. Dist. LEXIS 911, at *31 ("For the current 'good faith' discovery system to function in the electronic age, attorneys and clients must work together to ensure that both understand how and where electronic documents, records and emails are maintained and to determine how best to locate, review, and produce responsive documents. Attorneys must take responsibility for ensuring that their clients conduct a comprehensive and appropriate document search.").

systems, both local and web-based, to determine whether potentially relevant information is, in fact, being preserved. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("It is important that counsel become familiar with their clients' information systems and digital data—including social media—to address these issues.") What programs does the client use that creates ESI that could relate to the litigation? How is the information stored? Who can access the data and what can they do with it? Are there copies? Will the data be stored indefinitely?

Attorneys and litigants must ask these and other questions to identify what they are required to preserve for litigation purposes and, once a party reasonably anticipates litigation, it must take affirmative action to satisfy its preservation duties. *See, e.g.*, *Hohider v. UPS*, 257 F.R.D. 80, 82 (W.D. Pa. 2009). Additionally, attorneys must inform their clients of these preservation duties. Indeed, "[t]he preservation obligation runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction. Moreover, this responsibility is heightened in the age of electronic discovery." *Orbit One Commc'ns. v. Numerex Corp.*, 271 F.R.D. 429, 437 (S.D.N.Y. 2010) (internal citations and quotations omitted). The efforts a party takes to satisfy its preservation duties are known as the "litigation hold." *See, e.g.*, Nathan M. Crystal, *Ethical Responsibility and Legal Liability of Lawyers for Failure to Institute or Monitor Litigation Holds*, 43 Akron L. Rev. 715, 717 (2010). To ensure their clients institute litigation hold procedures sufficient to satisfy their preservation duties, and to ensure they fulfill their own discovery obligations,

attorneys utilize a tool well-known to all competent litigators: the litigation hold notice. *See, e.g.*, *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 45-46 (D.D.C. July 18, 2019). A litigation hold notice is a communication, either written or oral, that puts clients on notice of their duties to preserve documents within their possession, custody, or control that are relevant to the litigation and further directs the clients how to fulfill those obligations. Since well before 2012, litigation hold notices have been and continue to be a crucial and necessary tool for ensuring that clients preserve ESI consistent with their discovery obligations. *See, e.g.*, Mark S. Sidoti & Reneé L. Monteyne, *The Effective Internal Litigation Hold Letter*, In-House Def. Q., Winter 2007, at 9.

The standard and recognized method to ensure clients have been adequately informed of their preservation duties is through a written litigation hold letter. *See, e.g.*, *Pope v. Cty. of Albany*, No. 11-CV-736, 2012 U.S. Dist. LEXIS 192394, at *9-10 (N.D.N.Y. July 31, 2012). Best practices dictate that a written letter is the superior form of the litigation hold notice for various practical reasons, primarily because it documents when the hold issues and what it directs a litigant to do to meet its discovery obligations. *Borum*, 332 F.R.D. at 45 ("A litigation hold typically takes the form of a written hold.") (The importance of documentation is discussed below.) Even so, under certain circumstances, reasonable, good-faith verbal communications to a client—typically a small business or individual litigant—*may* suffice to convey that party's discovery obligations and ensure discovery is preserved, even in lieu of a formal litigation hold letter or policy. *See, e.g.*, *id.* at 45-

46; *Steuben Foods, Inc. v. Country Gourmet Foods*, LLC, 08-CV-561S(F), 2011 U.S.
Dist. LEXIS 43145, at *17-19 (W.D.N.Y. April 21, 2011); *Jones v. Bremen High Sch.
Dist. 228*, No. 08 C 3548, 2010 U.S. Dist. LEXIS 51312, at *15-18 (N.D. Ill. May 25,
2010); *Haynes v. Dart*, No. 08 C 4834, 2010 U.S. Dist. LEXIS 1901, at *10-14 (N.D.
Ill. Jan. 11, 2010). But, of course, any litigation hold notice, either written or verbal,
must contain enough information to adequately inform its intended recipient of its
discovery obligations under the circumstances. As these and many other cases
demonstrate, regardless of the *form* the litigation hold notice takes, its *content* is
critical. At minimum, parties have a duty to preserve discovery materials in a
reasonable manner and a sufficient hold notice should explain how to satisfy that
duty. *Cf. Pope*, 2012 U.S. Dist. LEXIS 192394 at *8-9; *Zimmerman v. Poly Prep
Country Day Sch.*, 09 CV 4586 (FB), 2011 U.S. Dist. LEXIS 40704, at *81 (E.D.N.Y.
Apr. 13, 2011); *Point Blank Sols. Inc. v. Toyobo Am. Inc.*, No. 09-61166-CIV, 2011
U.S. Dist. LEXIS 42239, at *92-95 (S.D. Fla. Apr. 5, 2011); *Keithley v. Home
Store.com, Inc.*, No. C-03-04447 SI, 2008 U.S. Dist. LEXIS 61741, at *18-19, 47-48
(N.D. Cal. Aug. 12, 2008). For example, one oft-cited litigation pamphlet outlining
ten tips for crafting a sufficient litigation hold warns that simply directing a client
to "save everything" is insufficient. Stephanie F. Stacy, *Litigation Holds: Ten Tips
in Ten Minutes*, https://www.ned.uscourts.gov/internetDocs/cle/2010-
07/LitigationHoldTopTen.pdf ("Don't leave a voice-mail or send an e-mail
communicating the litigation hold, and don't walk down the hallway and instruct
the custodian to 'save everything.' Put the Litigation Hold Notice in writing, with

*clear instructions to suspend automatic deletion* and [] on what should be preserved.") (emphasis added); *Brown*, 2014 U.S. Dist. LEXIS 90123 at *56 ("[Defendants'] counsel had an obligation to do more than issue a general directive to their client to preserve documents which may be relevant to the case.").[40] This is sage advice, as the quagmire of discovery issues in this case illustrates. Rather than providing general statements directing clients not to delete anything relevant, attorneys must give reasonable and specific instructions detailing where ESI might be stored and what steps the client may need to take to preserve it.

Among other things, critically, an adequate hold notice must include a warning to disable autodelete functions. Autodelete settings (as the name implies) automatically delete regularly created electronic data at regular time intervals. These settings are widely used in many applications for various practical or business purposes unrelated to litigation. For instance, electronic records become outdated, electronic storage space may be limited, and storing ESI for extended periods can be costly absent any specific reason to retain the data. Regularly and automatically deleting old data is an easy way to efficiently address these issues. So, autodelete functionality is and has been a near ubiquitous feature in programs and email services that produce ESI, leading to a phalanx of publications warning litigators of the need to clearly and adequately inform their clients to investigate and turn off autodelete functions as part of their litigation hold processes.[41]

---

[40] That is precisely all that was done here. Tr. 127, 28, 216-18, 588, 788.

[41] *See, e.g.*, Syed Ahmad & Corey Lee, *Practical Advice for a Successful Legal Hold Program*, 8 Tech. Litig. 7, 8-9 (2014) ("It is also critical to record efforts that were made to