It follows that in cases involving ESI, to satisfy their preservation duties, parties must investigate and disable autodelete functions on email accounts (client and web-based) at the onset of litigation if those accounts reasonably contain relevant information and it is reasonable under the circumstances of the case to do so. This was the standard articulated in the *Zubulake* decisions and incorporated into the 2006 version of Fed. R. Civ. P. 37(f). The 2006 committee notes to Rule 37(f) explained the impact of autodeletion functions:

> [Rule 37(f)] applie[d] to information lost due to the routine operation of an information system only if the operation was in good faith. Good faith in the routine operation of an information system may involve a party's intervention to modify or suspend certain features of that routine operation to prevent the loss of information, if that information is subject to a preservation obligation.

Fed. R. Civ. P. 37(e) advisory committee's note to 2006 amendment. Well before this case was filed in 2012, attorneys were on notice to instruct their clients to disable

---

set aside the regular document retention policy, such as turning off auto-delete in email, and the date those steps were taken."); Matthew Ralph & Caroline D. Sweeney, *E-Discovery and Antitrust Litigation*, 26 Antitrust 58, 59 (2011-2012) (stating that "suspension of email auto-delete functions is now a fairly well recognized standard of conduct" in e-discovery context); Richard L. Miller & Kristen Werries Collier, *Avoiding the Innocent Spoliation of Evidence*, 24 Chi. B. Ass'n Rec. 40, 43 (2010) (advising in state law context that once a business expects litigation, it "should suspend all electronic auto-delete policies and programs with respect to the individuals that were involved with the matter at issue") (emphasis removed); Joshua C. Gilliland & Thomas J. Kelley, *Modern Issues in E-Discovery*, 42 Creighton L. Rev. 505, 513 (2009) ("If you get sued and your client has not suspended their document destruction policies or turned off its auto-delete procedure, a court will not find that the client acted in good faith. For instance, there is ample bodies of case law where people still get sanctioned by trying to claim [2006 safe harbor] Federal Rule 37(e) protection, which fails, because they did not suspend their e-mail archiving systems."); Helen L. Marsh, *Here Comes the Judge: The New Federal Rules on E-Discovery*, 18 Prac. Litig. 7, 16 (2006) (advising attorneys to "[i]dentify auto-delete or auto-archive policies, employee compliance with those policies, and determine modification, if necessary, to meet requirements of [the] litigation hold.").

autodelete functions. *The Sedona Principles: Best Practices Recommendations and Principles for Addressing Electronic Document Production*, 29, 247 (2d ed. 2007). Indeed, long before the litigation started and during its long and convoluted existence, courts regularly warned parties to suspend their automatic deletion policies when litigation was reasonably anticipated.[42] *See, e.g.*, *Weitzman v. Maywood*, No. 13 C 1228, 2014 U.S. Dist. LEXIS 120686, at *4 (N.D. Ill. Aug. 29, 2014) ("When a party first reasonably foresees that litigation is on the horizon, it must suspend its ordinary policies governing how information is retained or destroyed and put into place a litigation hold to preserve relevant material."); *YCB Int'l, Inc. v. UCF Trading Co.*, No. 09-CV-7221, 2012 U.S. Dist. LEXIS 104887, at *25 (N.D. Ill. June 12, 2012) (citing *Zubulake*, 220 F.R.D. at 218); *Krumwiede v. Brighton Assocs., L.L.C.*, No. 05 C 3003, 2006 U.S. Dist. LEXIS 31669, at *23-24 (N.D. Ill. May 8, 2006) (same); *see also* Jonathan Redgrave, *An Examination of "Litigation Holds" and the Preservation of Electronic Documents in the Context of* Zubulake, Jones Day Commentaries, Nov. 2004, at 4,

https://www.jonesday.com/files/Publication/8b2f8bf5-d077-4b02-80e5-

---

[42] *See also* Nicholas O'Donnell, *10 Essentials for a Well-Drafted Litigation Hold Notice*, Sullivan Law (Jan. 7, 2016, 5:38 PM) (explaining that a litigation hold should direct IT personnel to suspend normal deletion policies and suggesting the following language: "To comply with our legal obligations, the Company must make all reasonable efforts to preserve, or suspend from deletion, overwriting, modification, or other destruction of all relevant paper or electronic data in your possession, custody, or control that is relevant to this litigation matter.") (emphasis removed); The Sedona Principles, at 29 ("As part of a legal hold process, a party should be prepared to take good faith measures to suspend or modify *any feature of information systems* which *might impede* the ability to preserve discoverable information.") (emphasis added); Sidoti & Monteyne, *supra* p. 28, at 12 (example hold letter directing client to suspend deletion and overwriting practices to comply with discovery obligations).

f69db0d75372/Presentation/PublicationAttachment/05cfba3e-a8d6-471f-9eaf-fab096b23b82/RedgraveJDcommentary.pdf.  Even state courts warned counsel of the failure to disable autodelete functions and affirmed sanctions for failing to do so. *VOOM HD Holdings, LLC v. Echo Star Satellite, LLC*, 939 N.Y.S.2d 321, 332-33 (N.Y. App. Div. 2012).  The comments to the 2015 amendments to Rule 37, which replaced Rule 37(f) with the current version of 37(e), again warned of the consequences of failing to disable autodeletion functions:

> [A]s under [the 2006 version of 37(f)], the routine, good-faith operation of an electronic information system would be a relevant factor for the court to consider in evaluating whether a party failed to take reasonable steps to preserve lost information, although the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation.

Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Thus, even after the 2015 amendments, courts continue to expect litigants to reasonably investigate and alter routine data destruction once litigation is reasonably anticipated to satisfy their preservation duties. *See, e.g.*, *Charlestown Capital Advisers, LLC. v. Acero Junction, Inc.*, 18-CV-4437, 2020 U.S. Dist. LEXIS 180982, at *34 (S.D.N.Y. Sep. 30, 2020); *Hernandez v. Helm*, No. 18 C 7647, 2019 U.S. Dist. LEXIS 195947, at *11-12 (N.D. Ill. Nov. 12, 2019); *Hunting Energy Servs. v. Kavadas*, No. 3:15-CV-228 JD, 2018 U.S. Dist. LEXIS 161416, at *13-14 (N.D. Ind. Sept. 20, 2018). These are not novel concepts.  Instead, this is what a typical litigation hold should do.  The Sedona Conference, *Commentary on Legal Holds, Second Edition:  The Trigger & The Process*, 20 Sedona Conf. J. 341, 357 (2019).

 The rationale behind directing litigants to investigate and disable autodelete

functions is obvious: if ESI is relevant to litigation that may or has commenced, the Rules of Civil Procedure require that that data be preserved, which cannot be done if the data is set to autodelete and is ultimately deleted. As this case demonstrates, attorneys and parties that ignore their obligations to reasonably investigate the possibility of or disregard autodelete functions run the risk of destroying relevant evidence and visiting prejudice upon their litigation adversaries, thereby earning sanctions. A litigation hold—whether verbal or written—that fails to instruct a party to disable autodeletion functions is not much of a litigation hold. *Brown*, 2014 U.S. Dist. LEXIS 90123 at *56; *MOSAID Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 339 (D.N.J. 2004) ("When the duty to preserve is triggered, it cannot be a defense to a spoliation claim that the party inadvertently failed to place a 'litigation hold' or 'off switch' on its document retention policy to stop the destruction of that evidence.").

The issuance of a litigation hold does not end counsel's duty in preserving ESI. Lisa C. Wood & Matthew E. Miller, *What You and Your Client Can and Should Do to Avoid Spoliation of Electronic Evidence*, 27 Antitrust ABA 85, 86 (Summer 2013) ("In addition, it is not enough to notify the client of preservation obligations: 'Counsel must take affirmative steps to monitor compliance [with the litigation hold] so that all sources of discoverable information are identified and searched.'"). Counsel cannot simply issue a litigation hold and assume they are done with their role in preserving ESI. Scheindlin & Capra, *supra*, at 85. They must continue to monitor and supervise or participate in a party's efforts to comply

154

with the duty to preserve. The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. 341, 358 (2019) (collecting cases and other authority dating back to 2004); *see, e.g., Charlestown Capital Advisors, LLC*, 2020 U.S. Dist. LEXIS 180982, at *34.

Here, certain GoDaddy emails and all Yahoo! chats (except for two, one of which is particularly damning, chats that were disclosed years after the close of fact discovery, Pl.'s Exs. 17, 37) were deleted and are gone forever. *See, e.g.*, Tr. 219, 927 (Yahoo! chats gone forever), 938 (some GoDaddy emails not recoverable). And none of the former defense counsel instructed Duke to disable any autodelete functions. Tr. 936. But, strangely, Duke and the former defense counsel still take the position that a written litigation hold was not necessary for Duke to understand his preservation duties. Tr. 588. This is patently wrong. Had Duke understood his duties, those documents would not have been spoliated. Again, ESI was deleted and is lost, so obviously Duke did not understand his preservation duties. Tr. 927, 938. Or, if Duke did understand his duties, then he intentionally spoliated ESI. Had reasonable steps—including a litigation hold communication stating to cease all autodelete functions—been taken when the duty to preserve arose, this ESI would more likely not have been deleted. Moreover, counsel did nothing to follow up on their supposedly reasonable verbal litigation hold, even after learning of the autodeletion of GoDaddy emails and the failure to collect the Yahoo! emails. And, even after those colossal failures, they dawdled for months after learning about the need to obtain and preserve the Yahoo! chats and did so only after the Court

155

ordered them to investigate the issue. *Compare* Tr. 926 (Leavens testifies that he knew Yahoo! chats were not produced, does nothing to investigate whether chats were recovered before May 2018 and does not know why he did nothing), *with* Dkt. 268, at 1 (showing that counsel did not investigate issue until after August 14, 2018, hearing); *J.S.T. Corp. v. Robert Bosch LLC*, No. 15-13842, 2019 U.S. Dist. LEXIS 90431, at *31 (E.D. Mich. 2019) ("Bosch then did not take any proactive efforts to restore or replace the lost email until many months later."). They dawdled even though Leavens knew—all the way back in 2012—that Duke communicated on Yahoo! chat. Tr. 926. And if more evidence that the verbal litigation hold was insufficient is necessary, it bears repeating that even though Duke communicated with Saraswat via Yahoo! chat, he never searched for responsive Yahoo! chat documents or attempted to preserve this ESI and it is now gone forever. Tr. 138, 139, 216, 272. Whether the remaining requirements necessary to impose sanctions under Rule 37(e) are established is addressed below.

### 3. Collection of ESI

The collection of ESI overlaps with many other areas of the discovery process. ESI that is not identified or preserved cannot be produced. And even ESI that is identified and preserved may not be collected if clients are not properly counseled and supervised—by using, among other things, appropriate documentation—during the identification and preservation process. And even when attorneys properly counsel and supervise clients, allowing clients to self-collect ESI leaves them subject

to allegations of incomplete production.  In this case, Defendants and the former defense counsel engaged in unsupervised and undocumented self-collection.

Custodian self-collection occurs when counsel direct their clients to identify, preserve, collect, and produce documents and electronic information in response to discovery requests.  Jack Halprin, *Custodian Self-Collection – The Challenges & Consequences*, PEER TO PEER (May 2008).  Reasons counsel give for relying on custodian self-collection include that the case is small, to save on costs, or that their client has its own know-how for preserving and finding responsive information on its own.  *See* Alex Khoury, *Self-Collection in E-Discovery – Risks vs. Rewards,* Law 360 (Aug. 28, 2017, 10:43 AM EDT), https://www.law360.com/articles/957202/self-collection-in-e-discovery-risks-vs-rewards.[43]  However, parties and counsel that embark on self-collection can soon encounter multiple pitfalls that can sidetrack the litigation and lead to motions to compel, spoliated evidence, and even sanctions.  *Id.* Without proper guidance and oversight from counsel, custodian self-collection can be a risky move, as this case establishes.  The former defense counsel appeared oblivious to any of these concerns.  Tr. 1201-02.

The first pitfall counsel may encounter is the client's failure to identify all sources of responsive information.  Clients may not have the technical or legal understanding to identify all possible sources of information, especially ESI.  *See*

---

[43] None of these reasons exist here.  First, this is not a small case.  Duke's former counsel claims it is an eight-figure case.  Dkt. 367, at 64.  Second, the case is being defended under a reservations of rights, so costs are far less of a concern.  Third, the mere existence of the sanctions motion and this order shows that Duke's preservation and collection efforts were monumentally lacking.

Halprin, *Custodian Self-Collection, supra* ("Technical limitations, lack of legal understanding and improper preservation techniques such as "drag-and-drop" are all grounds for potential errors in self-collection efforts. . . . [S]ome employees may not understand or remember that relevant ESI may be stored as sent e-mail messages or drafts of documents."). Although some sources of information are obvious such as documents or e-mails, other potential sources of electronic information are less obvious, including social media, messaging apps, thumb drives, and cloud storage. 1 LexisNexis Practice Guide: MA e-Discovery & Evidence § 3.08. Based on the evidence at the hearing, this type of ESI was not preserved, searched, collected, or produced in this case before Plaintiff filed the motion for sanctions.

Relying solely on the client to identify the universe of relevant information, without reasonable inquiry to verify that the client accurately captured that universe, can lead to sources of information being overlooked. For instance, in *Bd. of Regents of the Univ. of Neb. v. BASF Corp.*, No. 04 CV 3356, 2007 U.S. Dist. LEXIS 82492, at *6-7 (D. Neb. Nov. 5, 2007), plaintiff's counsel "gained an 'understanding'" after talking to his client's employees that all relevant information could be found in a professor's lab except for a few other documents, though counsel knew where those were, too. But after opposing counsel questioned whether all responsive documents had been found and produced on multiple occasions, each occasion led plaintiff's counsel to inquire further, which led to the discovery of more previously-unknown relevant information, including ESI contained on floppy discs

(remember those?) that required a computer forensics expert to retrieve. *Id.* at *7-12. This trickling production of documents eventually led the court to conclude that plaintiff's counsel had failed to conduct the thorough search for documents required by Fed. R. Civ. P. 34 and awarded sanctions. *Id.* at *17-20; *see also Tarlton v. Cumberland Cty. Corr. Facility*, 192 F.R.D. 165, 170 (D.N.J. 2000) ("[Defense c]ounsel had a duty to explain to their client what types of information would be relevant and responsive to discovery requests and ask how and where relevant documents may be maintained. . . . It was not their option to simply react to plaintiff's fortuitous discovery of the existence of relevant documents by making disjointed searches, each time coming up with a few more documents, and each time representing that that was all they had.").

The second pitfall counsel may fall into after embarking on self-collection is the client's failure to preserve evidence, as discussed throughout this order. As was done here, "[i]t is not sufficient to notify all employees of a legal hold and expect that the party will then retain and produce all relevant information." *Samsung Elecs. Co. v. Rambus, Inc.*, 439 F. Supp. 2d 524, 565 (E.D. Va. 2006); *see also Procaps, S.A. v. Patheon, Inc.*, No. 12-24356-CIV, 2014 U.S. Dist. LEXIS 28263, at *5 (S.D. Fla. Feb. 28, 2014) (awarding attorneys' fees, in part, because counsel "failed to realize that its client never actually implemented the litigation hold"). Instead, counsel must take affirmative steps to monitor compliance. *Samsung Elecs.*, 439 F. Supp. 2d at 565. One particular risk that can result from failing to fully instruct the client on its obligations to preserve evidence or to monitor its

compliance is the autodeletion of electronic information. Here, as discussed in detail, counsel ran headlong into this risk despite nearly a decade of case law and secondary authority flagging this critical issue for them. For example, back in 2004, the court in *Convolve, Inc. v. Compaq Comput. Corp.*, 223 F.R.D. 162, 175-76 (S.D.N.Y. 2004), noted that in "the world of electronic data, the preservation obligation is not limited simply to avoiding affirmative acts of destruction. Since computer systems generally have automatic deletion features that periodically purge electronic documents such as e-mail, it is necessary for a party facing litigation to take active steps to halt that process."

Even when the client has identified all possible sources of relevant information, a third pitfall may arise when the client may not find or provide to counsel all responsive documents and ESI from those sources. Crafting effective searches of ESI can be challenging, even for counsel. *See Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 877 F. Supp. 2d 87, 108-09 (S.D.N.Y. 2012). Therefore, "effective custodian-conducted searches must give specific directions as to search terms and techniques." *Brown v. West Corp.*, 287 F.R.D. 494, 499 (D. Neb. 2012). In *Procaps S.A.*, plaintiff's counsel left the collection of relevant documents to the client, who looked for responsive documents using a single search term and searched only e-mails between the plaintiff and defendant, neglecting to search internal e-mails or e-mails on which he was copied, which led the court to order a comprehensive forensic search of the plaintiff's ESI and to award fees. *Procaps*, 2014 U.S. Dist. LEXIS 28263, at *7-8.

160

Similarly, in *Cache La Poudre Feeds, LLC v. Land O'Lakes Farmland Feeds, LLC*, 244 F.R.D. 614, 625, 630 (D. Colo. 2007), counsel merely directed the client to "identify documents that 'related to the litigation,'" "simply accepted whatever materials employees provided," and then assured opposing counsel that they had made the necessary efforts to provide all relevant documents and information. That is precisely what happened in this case. And, as in this case, that representation turned out to be untrue. The court found that counsel could not legitimately claim that they made every effort to provide all relevant information when they had undertaken no independent action to verify the completeness of what employees found. *Id.* at 629-30.

Clients may fail to find or provide all responsive information for the additional reason of self-interest. As one author has warned, "[d]ocument collection by custodians who have a stake in the outcome of the litigation or whose conduct might have been embarrassing or compromising will draw heightened scrutiny and skepticism." Khoury, *Self-Collection in E-Discovery, supra*; *see also* 1 LexisNexis Practice Guide: MA e-Discovery & Evidence § 3.08. ("Permitting self-collection, particularly where the custodians are fact witnesses to a litigation, has some obvious downsides such as the fact witnesses' self-interest and likely lack of forensic training in locating and securing relevant documents.").

This type of skepticism was warranted in *Wachtel*, when the court imposed sanctions after the defendant relied on employees to search for and turn over whatever the employees determined was relevant: "[m]any of these specific

161

employee-conducted searches managed to exclude inculpatory documents that were highly germane to Plaintiffs' requests." *Wachtel*, 239 F.R.D. at 92. As in this case, some of these documents were first revealed to the plaintiff when attached as exhibits to the defendants' summary judgment motions. *Id.* at 91. Moreover, as in *Wachtel*, Duke was left to determine relevance. Tr. 785-86.

A fourth pitfall is that clients who self-collect may not fully document how they conducted their searches. As articulated in *The Sedona Principles*, "[h]aving documentation can help respond to legitimate challenges . . . – even those made years later – to the processes employed, avoid overlooking ESI that should be collected, and avoid collecting ESI that is neither relevant nor responsive to the matter at issue." *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 SEDONA CONF. J. 1, cmt. 6.c (2018). Counsel who do not closely monitor a client's search criteria and techniques may discover too late that the client did not document the sources of information it searched or the tools or terms it employed.

As established in this case, if opposing counsel challenges the completeness of discovery responses, the lack of documentation from the client will leave counsel hamstrung when attempting to defend the production. And more fundamentally, the revelation that the client's search was never systemized and documented will leave counsel vulnerable to the argument that counsel had never met its duty to conduct a reasonable inquiry into the thoroughness of the client's search and the completeness of the production before the production was made. *See Metro. Opera*

162

*Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 221-22 (S.D.N.Y. 2003); *see also* Halprin, *Custodian Self-Collection, supra* ("self-collection is inherently risky because it is not defensible; counsel who rely on self-collection cannot have confidence in the accuracy and thoroughness of the process or determine how much relevant information custodians may have failed to produce or even intentionally delete as the case law has shown."). Though an added cost at the front-end, "[r]etaining an experienced e-discovery consultant and relying on that consultant to plan and supervise a collection provides a 'buffer' between the client and the appearance of intentionality if any documents missed during collection become the focus of a spoliation motion." Khoury, *Self-Collection in E-Discovery, supra*. That was not done here. The ESI vendor was only charged with copying the four hard drives and running the search terms against the images. Tr. 1426, 1432-33, 1481, 1494-95. An ESI consultant was not engaged to plan and supervise the production of ESI until well after the motion for sanctions was filed. Dkt. 318.

Not every effort to self-collect is doomed to failure. When counsel issue a detailed written litigation hold (including an instruction to disable autodelete functions) that is fully disseminated to all the relevant custodians, properly instruct the client on thorough searches, conduct a reasonable inquiry to ensure that the client's efforts resulted in a responsive production of information, and document their efforts, courts have concluded that counsel and the party have met their obligations. *See Mirmina v. Genpact LLC,* No. 3:16-cv-00614, 2017 U.S. Dist. LEXIS 117412, *4-5 (D. Conn. July 27, 2017). But none of that happened here.

163

Indeed, the former defense counsel were never concerned about issues related to self-collection. Tr. 1201-02. There was no attorney supervision of the ESI collection in this case. They had no idea of the methodology Duke used to collect the ESI in response to discovery requests. Tr. 891. In fact, the former defense counsel allowed Duke to determine what ESI was material to the case. Tr. 786. As has been demonstrated in this case, nothing is to be gained and much is to be lost when counsel blindly rely on a client to self-collect after an inadequate litigation hold and insufficient inquiry into the adequacy of the client's search.

### 4. Review of ESI

The review of the collected ESI can raise thorny problems, particularly as it relates to the identification, culling, and logging of documents protected from disclosure by a privilege or the work-product doctrine. The Federal Rules of Civil Procedure have attempted to address those problems in various ways. *See, e.g.,* Fed. R. Civ. P. 26(b)(5)(B). Likewise, Federal Rule of Evidence 502(b) provides a valuable safeguard, provided counsel or the court uses it. Panel Transcript, *Electronic Evidence and Digital Evidence: E-Discovery: Where We've Been, Where We Are, Where We're Going*, 12 Ave Maria L. Rev. 1, 31 (2014) ("[T]he number of lawyers who do not know about Federal Rule of Evidence 502 is mind-boggling."— Judge Andy Peck (ret.)). Thankfully, the sanctions motion here generally does not raise issues relating to the review of the materials. There was some noise made about a discrepancy about the number of hard copy documents produced after the Yahoo! snafu. This issue was touched upon during the hearing, but in the scheme of

164

things and other clear discovery violations, it does not affect this Court's ultimate determination of the sanctions to be imposed for at least two reasons. First, electronic documents were produced in native format, per court order, ameliorating this concern. Second, because of the imposition of all of the sanctions this Court is already imposing (which cure Plaintiff's prejudice), in its discretion, this Court chooses not to impose any sanctions relating to the discrepancy. Consequently, for this and other reasons stated in the order addressing this issue, the Court denies Duke's motion to reopen the evidentiary hearing. Dkt. 370.

### 5. Disclosure/Production of ESI

Production of ESI involves several issues, including, but not limited to, the nature of the disclosure/production and the timing of the disclosure/production.

The nature of the production is addressed in Rule 34(b)(2)(D), (E). Luckily, the nature of the production of ESI is not a major issue in the sanctions motion, in part, because, when first notified of the initial Yahoo! snafu, the Court ordered production of the available responsive ESI in both native format and hard copy.[44] As noted previously, this production method raised some concerns by Plaintiff because of a discrepancy in these two forms of production. But again, this Court is not imposing sanctions because of this discrepancy.

Unluckily, the timing of the ESI disclosure/production is a major issue in the sanctions motion. Just like physical documents, ESI must be timely disclosed. So,

---

[44] This decision should not be read as authority for requiring all native production all the time. The facts of this case are hopefully unique. The Court's order requiring this production to be both in hard copy and all native was the result of frustration with Defendants' ESI processes.

some ESI must be disclosed automatically, without even a production request. Those Rule 26(a)(1)(A)(ii) disclosures of ESI must be made either at the date ordered by the court or under Rule 26(a)(1)(C). These disclosures include ESI a party may use to support its claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(ii). It is critical that the ESI be provided in initial disclosures or as early as possible in the litigation. *Moore*, 2011 U.S. Dist. LEXIS 126738, at \*27-28. If ESI does not fall within the scope of the required initial disclosures but is responsive to Rule 34 production requests, it must be produced within 30 days. Fed. R. Civ. P. 34(b)(2)(A). And as a failsafe, just like paper documents, ESI that falls under the scope of required initial disclosures or a production request must be made as supplemental disclosures or productions under Rule 26(e). Like many courts, this Court's standard practice is to include a specific date in its case management order to make supplemental disclosures and productions. Fed. Rs. Civ. P. 16(a)(3)(B)(i), 26(e)(1)(B). In this case, that date was June 1, 2015. Dkt. 116.

Case management orders, which are sometimes referred to as scheduling orders under Rule 16, are critical in federal civil litigation. *Kassim v. City of Schenectady*, 221 F.R.D. 363, 365 (N.D.N.Y. 2003) (importance of a case management order "cannot be overstated"). These orders should not be taken lightly. *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001); *see also Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 610 (9th Cir. 1992) ("A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded without peril.") (internal citation and quotation omitted).

Long ago, our system rejected trial by ambush, and instead, instituted the discovery process. *Bankdirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 U.S. Dist. LEXIS 224705, at *11 n.5 (N.D. Ill. Nov. 8, 2018). The disclosure and discovery rules exist to ensure that cases are not litigated in the dark. *Hickman v. Taylor*, 329 U.S. 495, 501 (1947). For that process to work, courts must impose and enforce deadlines. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (adhering to case management order dates is critical to achieving the goal of Rule 1); *Anthony v. City & Cty. of Denver*, 16-cv-01223, 2018 U.S. Dist. LEXIS 150096, at *10 (D. Colo. Sept. 4, 2018) (scheduling order is an important tool to avoid surprises to the parties and court). Indeed, Rule 16 *requires* case management orders to include specific benchmark dates in the order. Fed. R. Civ. P. 16(b)(3)(A). Without these orders and the dates contained in those orders, federal civil litigation would be chaotic. *Fuller v. Winn-Dixie Montgomery, LLC*, No. 16-00363, 2017 U.S. Dist. LEXIS 112777, at *4-5 (S.D. Ala. July 19, 2017) (without adherence to the dates in a scheduling order an *ad hoc*, chaotic, "anything-goes" approach would result); *Brandt v. City of Westminster*, No. 16-cv-01356, 2017 U.S. Dist. LEXIS 113171, at *10 (D. Colo. May 1, 2017) (scheduling order is an important tool necessary for the orderly preparation of a case).

Indeed, there is a method to this Court's madness in its case management orders. This Court specifically schedules supplement dates at least 30 days before the close of fact discovery for at least three reasons. First, this date acts as a warning shot. The date is a reminder to the parties to take a final pass through the

file to ensure that if there are documents, witnesses, or information that have not been disclosed, they must be disclosed immediately. Second, in theory, this practice prevents last minute disclosures or productions that would derail the case management. By requiring supplemental disclosures 30 days before the close of fact discovery, if there are last minute disclosures of documents, witnesses, or information, the parties have 30 days to complete discovery on those matters. This process ensures that the remaining dates in the case management order, such as the dispositive motion date, remain intact. When parties blow the supplemental disclosure date—as Defendants did here—the damage cascades downstream through the remaining deadlines. Third, a firm and specific date forecloses motions and responses as to whether the supplemental disclosures or productions were made "in a timely manner." Fed. R. Civ. P. 26(e)(1)(A).

The supplemental disclosure date and the close of fact discovery date are even more paramount when expert witnesses are used, as in this case, for multiple reasons. First, a party cannot withhold or fail to produce information or documents and then feed those documents to its expert as a backdoor attempt to later introduce the evidence. Second, and maybe even worse, parties cannot withhold documents or information from the other side as well as their expert and then after the expert issues a report and is deposed, produce the documents or information to the other side. Even if the expert claims—as one of the experts unsurprisingly

claims here, Dkt. 348, at 329-30[45]—that the new documents or information would not change the opinions, the other side is entitled to that information to challenge the opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii); Tr. 1265.  This is precisely why parties are entitled to know and receive the documents and information which an expert considers.  *In re Google AdWords Litig.*, C08-03369, 2010 U.S. Dist. LEXIS 136757, at *10 (N.D. Cal. Dec. 8, 2010); *JPMorgan Chase Bank, N.A. v. Mal Corp.*, 07 C 2034, 2009 U.S. Dist. LEXIS 153240, at *14 (N.D. Ill. Oct. 30, 2009) (disclosure of facts and data is to allow party to prepare effective cross-examination of expert witness).

        As established at the hearing, and as shown in this order, Defendants failed to timely disclose ESI under the requirements of Rule 26(a)(1), Rule 26(e), and Rule 34.  There can be no reasonable dispute that critical necessary and responsive ESI was not timely disclosed or produced under Rule 26(a)(1) and Rule 26(e) because these documents were not disclosed until well after June 1, 2015, when Defendants disclosed them for the first time in response to Plaintiff's motion for summary judgment and in support of their own summary judgment motion.  *See, e.g.,* Dkt. 233, at 24-25; Tr. 1284; Pl.'s Ex. 1.  Obviously, if ESI is used to fend off summary judgment, that ESI is electronically stored information the party is using to support its claims and defenses.  Fed. R. Civ. P. 26(a)(1)(A)(ii).  And the ESI produced in

---

[45] Defendants' experts have been problematic throughout the life of the case.  One expert, David A. Haas, made an "unquestionably embarrassing gaffe" in his original opinion that required him to supplement his opinion, which like the other expert witness, still did not require him to change his ultimate opinion.  Dkt. 181, at 5.  And yet another expert witness's opinion was withdrawn on the eve of his deposition.  Dkt. 189.  One can only speculate as to the reasons.

2018 was responsive to various production requests served years earlier. More importantly, because Duke's GoDaddy email accounts were not searched before May of 2019, there is likely a cache of additional ESI that has ***still*** not been produced. Dkt. 318.[46]

One final layer on the timing of production of ESI exists in this case. On June 11, 2015, the Court granted, in part, Plaintiff's motion to compel. Dkt. 132. In that order, the Court required Defendants to produce responsive documents by June

[46] Even at the hearing, Stamatis continued to protest that none of the untimely produced documents was important. Tr. 1293-94. This protestation is meritless and, frankly, beneath an attorney of his stature. Stamatis lost substantial credibility arguing otherwise. Besides being contrary to Leavens' admission that the Plaintiff's arguments were not frivolous, Tr. 918-19, Stamatis' position fails for at least three reasons. First, opposing counsel does not get to decide what is important to an adversary. Non-privileged ESI that may support a claim or defense must be disclosed under Rule 26(a)(1)(A)(ii) and non-privileged, proportional, relevant and responsive ESI must be produced under Rule 34. There is no rule that allows opposing counsel to determine disclosures and productions based upon what he thinks is important. Second, Plaintiff litigated the case up until that point based on the incomplete disclosures and discovery. Unquestionably, Plaintiff's litigation tactics and actions would have been different had it possessed this ESI. *Laukus*, 292 F.R.D. at 511; Tr. 356 ("And if we would have had these not dumped on us in June of 2018, we might have been able to understand this much more clearly and taken depositions timely and done other things in this case."). Third, the assertion is hollow under the specific facts of this case. Plaintiff had repeatedly and unequivocally asserted the unclean hands defense based upon the undisputed fact that the metatag was in the website. Indeed, Defendants knew the import of this defense. Dkt. 269, at 13-14. And, so, the SEO ESI that was not timely produced went to the heart of Plaintiff's case. Notably, Pl.'s Ex. 17 inflicts significant damage to Defendants' arguments regarding unclean hands. Likewise, the ESI relating to the defamation claim are important. Initially, it is critical to remember that Defendants were so flummoxed by this ESI that they sought to dismiss the defamation counterclaim to avoid being sanctioned for their late production. Dkt. 292, at 1. Moreover, this ESI supports Plaintiff's argument that no defamatory statements were made, were inconsistent with Duke's deposition testimony and, therefore, could be used to impeach Duke (compare Dkt. 294-2, at 199 (Pl.'s Ex. 20) ("Q: Did you give him any direction to record any of the events taking place at the trade show? A: No.") *with* Tr. 348 ("maybe you can record them saying something libelous about me, lol.")), and would have provided Plaintiff's with the ability to timely raise "invited defamation" as an affirmative defense, Dkts. 147, 154. The untimely disclosure of this ESI prejudiced Plaintiff in these ways, among many others.

170

15, 2015.  *Id.*  On June 12, 2015—one day later—after merely asking Duke if responsive documents existed and conducting no other investigation, the former defense counsel informed Plaintiff that no responsive documents existed.  Tr. 1227, 1228.  That was false.  Tr. 1228.  Responsive documents existed.  Tr. 1181, 1228.  And those documents were later produced in the spring of 2018, years after the court ordered date of June 15, 2015.  Tr. 1220, 1223, 1228.  It really should go without saying, but ESI must be produced by the date a court orders its production by either a case management order or an order granting a motion to compel—not years later in the middle of summary judgment briefing.  *Hart v. Blanchette*, No. 13-CV-6458, 2019 U.S. Dist. LEXIS 55061, at *110-12 (W.D.N.Y. Mar. 29, 2019) (attorneys and parties must follow court orders) (collecting cases), *see also Frazier v. Layne Christensen, Co.,* 486 F. Supp. 2d 831, 845-46 (W.D. Wis. 2006) (granting motion for sanctions for, among other things, producing thousands of documents during summary judgment briefing); *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 105-06 (D. N.J. 2006) (granting motion for sanctions for, among other things, producing thousands of documents during summary judgment briefing and relying on undisclosed documents in summary judgment briefs).

### 6. Three Assumptions Underlying the ESI Discovery Process

The five basic steps of e-discovery assumes three interrelated propositions: (a) that counsel is competent, (b) that the client is honest and candid with counsel, and (c) that counsel documents the processes that were used so that they can reasonably defend the processes if the production is challenged.

### a. Competence of Counsel

Counsel must be competent in their knowledge and ability to identify, preserve, collect, review, and produce ESI. Competence pervades every aspect of the ESI discovery process. This is not a new requirement. Donald R. Lundberg, *Electronically Stored Information and Spoliation of Evidence*, 53 Res Gestae 131, 133 (2010) ("It is no longer amateur hour. It is way too late in the day for lawyers to expect to catch a break on e-discovery compliance because it is technically complex and resource-demanding."). Giving credit where it is due, the Court freely quotes from the excellent discussion of this topic by Redgrave, et al., *Expectations of Conduct by Counsel*, *supra* note 6, at 16. Courts can and should expect attorneys appearing before them on e-discovery matters to demonstrate that they are prepared and competent. *Id.* at 25.

> Attorneys have a professional and ethical obligation to understand all phases of discovery, including the identification, preservation, collection, processing, review, and production of relevant electronically stored information (ESI). . . If attorneys are not competent in these areas, they have an ethical duty to become competent, associate themselves with attorneys who are, or to decline the representation. * * * Courts are showing less patience with counsel who plead ignorance regarding ESI or technology in general. Competence in discovery includes having a general understanding of discovery rules, how they apply to the various types of ESI a client may have that could be relevant to the matter, and a more specific understanding of how a client's information technology systems and ESI are structured. Counsel must investigate how to locate, preserve, and collect relevant ESI from those systems, and should seek to do so in the most efficient and cost-effective manner.

*Id.* at 16-17. "Establishing basic facts about a client's ESI, Information Governance/record retention program, and legal hold process is fundamental to

meeting discovery obligations [ ] and should be accomplished as early as practicable under the circumstances." *Id.* at 19.

Critical to this case is counsel's competence when working with an ESI vendor. As established at the evidentiary hearing and as discussed in this order, the former defense counsel gave a very limited scope of work to the ESI vendor and then sought to blame the vendor when it performed under the contract as directed. Tr. 810-11, 893.[47] That's a nonstarter.

> Parties are expected to select competent partners, such as service providers or vendors. . . Hiring a competent vendor is only the first step; counsel must appropriately supervise that vendor throughout all phases of discovery. Counsel should not assume that the vendor is proceeding as counsel thinks the vendor should proceed. Rather, counsel should confirm that the vendor is actually following counsel's instructions. Disconnects can happen at all stages [including] [w]hat sources are searched; [and] what data . . . is collected . . . .

Redgrave, et al., *Expectations of Conduct by Counsel*, *supra* note 6, at 18; *see also*

*The Sedona Principles, Second Edition, supra,* at 122 ("Ultimate responsibility for

---

[47] A more egregious attempt to shift blame was Defendants' and the former defense counsel's attempt to blame Plaintiff for failing to notify them that Defendants' representations were incorrect. Dkt. 253-1, at 4. This is another legal nonstarter. *MOSAID Techs. Inc.*, 348 F. Supp. 2d at 337. And this is an astounding assertion, particularly when Defendants and the former defense counsel's view were that Plaintiff's assertions of discovery chicanery was an erroneous blunderbuss. Dkt. 233, at 22; Tr. 1291-93. This defense was emblematic of Defendants' and the former defense counsel's position: Blame everyone and everything else. Blame the vendor; blame opposing counsel; blame the "circumstances." Dkt. 253-1, at 4; Tr. 1403. It wasn't until the post-hearing briefs when Leavens' counsel—and only Leavens' counsel—wisely abandoned that position. Dkt. 379, at 1-2. But, still, the recognition of errors was made with passive voice. *See, e,g.*, Dkt. 379 at 1 ("there were certain deficiencies in the discovery process"). Stamatis previously recognized that sanctions were warranted. Dkt. 315, at 9. But he has since crawfished that admission. Dkt. 378, at 2, 25. A wiser, more reasonable and honest strategy is that when you mess up, 'fess up. Doubling down in the face of overwhelming facts was foolish. Litigation is not a game. "As officers of the court, all attorneys conducting discovery owe the court a heightened duty of candor." *A PDX Pro Co.*, 311 F.R.D. at 653.

ensuring the preservation, collection, processing, and production of electronically stored information rests with the party and its counsel, not with the non-party consultant or vendor."). Here, there was no disconnect in the vendor following counsel's instructions. The vendor did precisely what counsel instructed it to do. The disconnect was that the initial collection—per counsel's direction, based upon Duke's unverified and repeatedly inaccurate representations that everything was on the hard drives, Tr. 609, 629, 1029, 1160-61; LS Ex. 7; LS Ex. 13—was woefully deficient.

> In 2012, the ABA's Commission on Ethics 20/20 . . . wrote that "technology has irrevocably changed and continues to alter the practice of law in fundamental ways" and that "[l]awyers must understand technology in order to provide clients with competent and cost effective services they expect and deserve." * * * The 20/20 Commission noted that practicing law in today's digital age "now require(s) lawyers to have a firm grasp on how electronic information is created, stored, and retrieved" and stated that "lawyers need to know how to make and respond to electronic discovery requests and to advise their clients regarding electronic discovery obligations." Unsurprisingly, this Comment has been widely interpreted as imposing a duty relating to competence when practicing e-discovery.

Redgrave, et al., *Expectations of Conduct by Counsel*, *supra* note 6, at 22-23. Again, the recognition of the duty of competence with respect to ESI is not new and existed years before this case was filed. Back in 2009, a leading treatise noted counsel's duties:

> Lawyers have a responsibility to educate themselves and their clients about the new and pertinent legal and technical issues regarding electronic discovery. This is especially true when it comes to counsel's affirmative obligation to actively engage with his or her client in the process of identifying, preserving, reviewing, and producing electronic information. This includes the obligation to seek, as part of the lawyer's

174

due diligence, all relevant information, positive or otherwise, which may relate to the claims at issue. To do otherwise is an ethical violation.

Scheindlin & Capra, *supra*, at 473.

### b. Honesty and Candor of Client

Axiomatically, a client has a duty to be honest with its counsel and to affirmatively notify its counsel to correct mistakes, misrepresentations, and misapprehensions. *See Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("The client has a duty to be candid and forthcoming with the lawyer. . ."); *Petrie v. Gen. Contracting Co.*, 413 P.2d 600, 601 (1966) ("We are constantly hearing talk about the obligations of lawyers to be honest with their clients, which is correct and salutary. But it is also true that a client has a duty to be honest with his lawyers and that the latter's rights are equally entitled to be safeguarded by the courts."). Attorneys and clients must be able to rely on the truthfulness of the statements they make to each other. 7A C.J.S. *Attorney & Client* § 344 (2020). Indeed, the attorney-client privilege exists to foster candid communications between the attorney and the client. 81 Am. Jur. 2d, *Witnesses*, §§ 319, 320 (2020). Certainly, the law cannot countenance clients lying to their counsel or failing to timely correct errors they are aware of.

The attorney-client relationship is a principal-agent relationship. *Royal Maccabees Life Ins. Co. v. Malachinski*, No. 96 C 6135, 2001 U.S. Dist. LEXIS 3362, at *61 (N.D. Il. Mar. 20, 2001). The client is the principal, and the attorney is the agent. *Id.* A client's duty of honesty and candor exists from this general relationship. The principal has a duty to deal with the agent fairly and in good faith. Restatement (Third) of Agency § 8.15 (Am. Law Inst. 2006). This duty

175

requires principals to furnish information to agents. *Id*. at cmt c. In the specific agency context of the attorney-client relationship, clients owe lawyers the same duties they owe third parties, including the duty not to misrepresent facts. Restatement (Third) of the Law of Governing Lawyers § 7 cmt. a (Am. Law Inst. 2000).

Even outside the context of a principal-agent relationship, misrepresentations can occur when a party has a duty to speak but remains silent. Restatement (Third) of Torts: Liability for Economic Harm § 13 (Am. Law Inst. 2020). A duty to speak to correct a misrepresentation exists in at least three circumstances. First, a duty to speak exists when the actor has made a prior statement and knows that it will likely mislead another if not amended, even if it was not misleading when made. *Id*. at § 13(a). In this context, nondisclosure can amount to deceit if the actor has spoken other words, or performed other acts, that may not have been culpable at the time but will become so if the actor remains silent. Thus, an actor may make a false statement and believe it to be true but later discover that it is false or misleading, or an actor may make a false statement in the reasonable belief that it will not elicit reliance but later discover that it has. Under these circumstances, the actor is obliged to update the earlier statement to prevent those statements from having a fraudulent effect. *Id*. at cmt. b. Second, a duty to speak exists when the actor is in a fiduciary or confidential relationship with another that obliges the actor to make disclosures. *Id*. at § 13(b). So, silence can amount to deceit if it occurs against the backdrop of a special relationship between

176

the parties that causes one of them to rely on the other to be forthcoming. *Id.* at

cmt. c. Confidential relationships occur when a party is required to act in good faith

because they have a relationship of trust. *Id.* The principal-agent relationship, in

particular the attorney-client relationship, is a fiduciary one. *Bank One v.*

*Trammell Crow Servs.*, No. 03 C 3624, 2003 U.S. Dist. LEXIS 23120, at *17-18

(N.D. Ill. Dec. 23, 2003). Third, a duty to speak exists when the actor knows that

the other party to a transaction is mistaken about a basic assumption behind it, and

that the other party, because of the relationship between them, the customs of the

trade, or other circumstances would reasonable expect disclosure of what the actor

knows. Restatement (Third) Torts § 13(c). As a result, when the fact is basic to the

transaction and the other party has a legitimate reason to rely on the actor to

supply the information, this imbalance of knowledge creates a duty on the better-

informed party to disclose it. *Id.* at cmt. d.

Case law likewise places a duty upon clients to be honest with counsel and to

correct factual errors, in part, to ensure that the same errors and mistakes are not

repeated in the future. *Moser v. Bret Harte Union High Sch. Dist.*, 366 F. Supp. 2d

944, 986 (E.D. Cal. 2005). Parties have a duty to provide true, explicit, responsive,

complete, and candid answers to discovery. *Carlson v. Freightliner LLC*, 226 F.R.D.

343, 372 (D. Neb. 2004); *Wagner v. Dryvit Sys.*, 208 F.R.D. 606, 609 (D. Neb. 2001).

Finally, the Federal Rules of Civil Procedure place a duty of candor on

parties. That duty is enforced on pain of sanctions. Fed. R. Civ. P. 11(b), (c)

advisory committee's note to 1983 amendment. In discovery, the parties have an

obligation to conduct themselves in good faith.  Hon. Paul Grimm, *Good Faith in Discovery,* 46 Litig. 23 (2020) (Rule 26(g) requires parties to act in good faith in discovery).

Duke was at a legal and factual advantage over the former defense counsel. Legally, he was in a fiduciary relationship with them.  In this relationship, Duke was the principal and they were the agents.  Factually, Duke had a knowledge advantage over the former defense counsel.  As a general matter, he knew more about computer usage, systems, and storage than the former defense counsel.  Tr. 1027, 1029, 1030.  Even if one were to believe Duke's recent self-professed claim to be a Luddite—and this Court does not—he still knew more than the former defense counsel, save perhaps Shonder.[48]  Specifically, as to his knowledge of his own computer usage, systems, and storage, Duke knew far more than the former defense counsel.  This was his data after all; and none of them conducted a custodian interview.  Tr. 243, 773-75, 783, 1127-28.  Consequently, Duke was duty bound to be honest and candid with the former defense counsel.  He was not.

Duke was not honest and candid about the location of his emails, both the Yahoo! and GoDaddy emails.  Without doubt, Duke notified them of the existence of these email accounts, and he even showed Leavens these accounts.  Tr. 236-37, 605, 759.  (Whether Leavens understood what he was observed is doubtful.  Tr. 628; Dkt.

---

[48] For example, Shonder understood the distinction between email client and web-based emails and recognized that the auto-forwarding "solution" was not accurate.  Tr. 1390-92,136.  In contrast, Liberman was unaware of any difference between email client and web-based email, Tr. 1151; Stamatis just assumed for some reason that all chats were ethereal, Tr. 1320; and Leavens didn't know much about anything related to this topic.  Tr. 838, 908, 1030; Dkt. 256, at 13-14.

178

256, at 13-14.)  But Duke was not honest and candid with the former defense counsel about the location of the emails or the searching, copying and producing of the emails.

As to the location, Duke informed the former defense counsel both verbally and in writing that his electronic data ("everything") was on the four computers. Tr. 605, 629, 896, 1029; Dkt. 294-2, at 621; LS Ex. 7.  He reiterated that they "had everything."  Tr. 1242.  This was not true.  The late production of the Yahoo! emails, the spoliation of the Yahoo! chats, and the still-to-be produced GoDaddy emails prove that point.  Tr. 1224 ("The information that we received was inaccurate."); Dkt. 318, at 4-5.  And Duke knew that all his electronic data, including emails, were not on the four hard drives.  Tr. 238-39, 1402-03, 1410-12.  Duke knew that both the Yahoo! and GoDaddy emails were web-based and did not reside on his computers. Tr. 238-39.  But Duke did not tell the former defense counsel this.  Tr. 238-39. Moreover, he failed to correct this information, despite having a duty to do so.

As to the searching, copying, and producing of the emails, he knew that neither the Yahoo! or GoDaddy online emails would be copied, searched and produced by just copying the hard drives.  Tr. 118, 129-31, 238-39, 281-82, 611, 632. He did not notify the former defense counsel of this fact until years later.  The undisputed evidence establishes that he did not tell the former defense counsel that the GoDaddy emails had not been copied, searched, and produced until May of 2019. Tr. 1328-30, 1402-03, 1410-12.  Despite five days of testimony, there was no evidence that Duke ever told them that the Yahoo! emails were not produced

179

because they were stored online rather than on his four computers. Indeed, the best inference from the evidence is that 4Discovery told the former defense counsel that the Yahoo! emails were not produced because they were web-based. LS Ex. 11, at 3. Critically, after the disclosure that the Yahoo! emails had not been produced because they were online and not stored on the four hard drives, Duke only notified the former defense counsel a year later that GoDaddy emails were stored in the cloud and not on the four computers when he thought it would help him respond to the motion for sanctions. Tr. 1402-03, 1410-12.

Duke also told the former defense counsel, specifically Life, that no documents existed regarding Duke's communications with Saraswat. Tr. 1222-24. As the tardy Yahoo! document production showed, this was false too. Tr. 1181, 1222-24.

Duke also told the former defense counsel that only one recording of the Las Vegas trade show existed. Tr. 654. This was false. As shown previously, he knew there were at least two, and more likely three. Dkt. 294-2, at 221-31.

These findings of lack of honesty and candor are buttressed by Duke's false testimony documented throughout this order. In particular, Duke's deposition testimony contains at least three notable falsehoods.

These finding do not absolve the former defense counsel. They possessed their own duties, which they breached. They fundamentally failed to implement reasonable and established processes to identify, preserve, collect, and produce ESI. They failed to identify ESI by not conducting a custodian interview. Tr. 100-01,

243, 773-75, 783, 995-96, 1127-28.  They failed to preserve ESI by not issuing a litigation hold that, among other things, informed Duke to disable autodeletion functions, and failed to monitor the litigation hold, to the extent there was one.  Tr. 127, 209, 215, 221-22, 749, 936, 1208.  They failed to collect ESI by leaving Duke to self-collect without any oversight or confirmation of his efforts.  Tr. 1170-72, 1186-87, 1201-02, 1120-24.  And all of these failures were part of the reason—in addition to Duke's lack of honesty and candor—that lead to the untimely production of ESI as well as the spoliation of ESI.  And even after they were on notice of repeated ESI failures, they conducted no investigation or monitoring, but instead simply continued to rely on Duke—the very person whom they knew made misrepresentations to them previously.  Tr. 1224 ("The information that we received was inaccurate."), 1357 ("In hindsight, you know, I would have done things differently, but I took that as face value, and we moved on from there.").

### c. Documentation

Documentation, including documenting communications with clients, is not a new phenomenon that arose with the advent of ESI.  Documentation has always been a fundamental aspect of an attorney's trade.  This includes documenting correspondence with clients, which traditionally are kept in a correspondence file.  Mauet, *supra* note 9, at 17.  Here, however, the former defense counsel did not even have a correspondence file.  Tr. 749-50.  Perhaps that is unsurprising because counsel had almost no correspondence to file.

Documenting the process used to identify, preserve, collect, review, and produce ESI is critical:

> Documenting discovery efforts can greatly benefit attorneys in the short and long term. The sheer volume and complexity of electronic discovery requires meticulous organization. Documenting discovery will help attorneys focus on what questions must be asked and what documents will be needed. While documenting discovery might be time consuming, it may be beneficial to an attorney not only because it can help organize the discovery process and help demonstrated to the court that proper discovery protocol has been followed, but it may also provide much needed support for the evidentiary issues.

Scheindlin & Capra, *supra*. at 484. Documenting the efforts to collect ESI is particularly important. *Id.* at 209 ("[I]t is always wise to document the steps taken to collect responsive ESI."). Documentation is even more important when the client is left to self-collect ESI, as discussed above. And documenting the processes and efforts made to preserve ESI is fundamentally important. The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. 341, 405 (2019); Lundberg, *Electronically Stored Information and Spoliation of Evidence*, 53 Res Gestae at 133 (Case law "illustrates the importance of lawyers taking a thoroughly documented leadership role in directing client compliance with the often-rigorous demands of e-discovery"). This is particularly true when preservation efforts are likely to be challenged. The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. at 378. "Counsel should document conversations with 'key players' regarding preservation efforts and the steps taken to collect and produce responsive information. This documentation should be done contemporaneously with the meetings and communications to avoid misunderstandings or lapses in memory."

Wood & Miller, *What You and Your Client Can and Should Do to Avoid Spoliation of Electronic Evidence*, 27 Antitrust ABA at 88. Indeed, documentation of the litigation hold process is so important that the Sedona Conference established a guideline addressing why and how to document this process. *Id.* at 404-05.

Moreover, counsel are better able to accurately explain and defend their actions taken during the ESI process if documentation exits. For example, in *A PDX Pro Co. v. Dish Network Serv., LLC,* 311 F.R.D. 642 (D. Colo. 2015), counsel repeatedly emailed his client about perceived discovery deficiencies, and when it turned out that the client had not been forthcoming, the court found that the information in those emails established that counsel engaged in a reasonable inquiry. *Id.* at 655-56. So, sanctions were not awarded against that counsel. *Id.* at 656.

In this case, the lack of documentation on all manner of issues was pervasive. As shown, the absence of documentation—which at times appears intentional—of the ESI discovery process not only increases the difficulty to defend actions and decisions, but it also increases the fact finder's suspicion of witnesses' testimony. This is more so when the actions and decisions were already shown to be inadequate and counsel had reason to question the credibility of a client left unmonitored to self-collect ESI but, nevertheless, continued to fail to document.

\* \* \*

Lest Defendants and the former defense counsel think this Court is being hypersensitive, the issues in this case are issues that vex federal trial court judges

183

nationally.  Attorneys' failures to understand their client's data and e-discovery practices, search for data appropriately or diligently, search the data itself appropriately or diligently, deliver complete productions, act timely or act at all, comply with court orders, and understand e-discovery itself or turn to someone who does for assistance are all failures that federal trial court judges identify as requiring corrective action.  George Socha, *Exterro and Duke/EDRM Judges Survey 2019 Series: Part 2, Taking Affirmative Action to Address E-Discovery Problems*, ACEDS.org (April 15, 2019), https://aceds.org/exterro-and-duke-edrm-judges-survey-2019-series-part-2-taking-affirmative-action-to-address-e-discovery-problems.  This Court is not picking nits.  Indeed, a reason why this Court has cited so many authorities from such a vast swath is to show that the fundamental principles of ESI identification, preservation, collection, review, and production was not cabined to a tiny patch of the legal profession.  Electronic discovery is—and has been for years—ubiquitous.  The multiple failures in this case were fundamental.  Alone, each failure was problematic.  Collectively, they were cataclysmic.  The errors were disastrous not only to Plaintiff but also to the Court and the other litigants seeking the resources of the Court.

### D. Legal Authority to Impose Sanctions

184

Plaintiff seeks sanctions under a full arsenal of authority, including inherent authority, civil contempt, 28 U.S.C. § 1927, Rule 11, Rule 26(g), Rule 37, and Rule 56(h).[49]

## 1. Bases the Court Will Not Use

### a. Inherent Authority and Civil Contempt

The Court will not impose sanctions under either its inherent authority or civil contempt at this time.

Initially, when conduct could be adequately sanctioned under the Federal Rules of Civil Procedure or a specific statute, a court should generally rely on those rules or statute to impose sanctions rather than on its inherent authority.

---

[49] Plaintiff did not seek to impose sanctions under two other excellent candidates: Rule 16(f) and the prior version of Rule 37(e). Initially, Rule 16(f) allows for sanctions, even on the court's own motion, against a party or its attorneys for failing to obey a scheduling order or other pretrial order, both of which happened here. Fed. R. Civ. P. 16(f)(1)(C). Those sanctions include, but are not limited to, sanctions authorized by Rule 37(b)(2)(A)(ii) – (vii) as well as reasonable expenses. Fed. Rs. Civ. P. 16(f)(1), (2); *see Hart v. Blanchette*, No. 13-cv-6458, 2019 U.S. Dist. LEXIS 55061, at *107-12 (W.D.N.Y. Mar. 29, 2019) (for an excellent discussion of sanctions under Rule 16(f)). But because (1) Plaintiff did not cite this rule and the parties did not brief this rule, (2) similar standards apply to other rules invoked by Plaintiff, and (3) sufficient authority to impose sanctions exists under other rules invoked by Plaintiff and addressed by the parties, in its discretion, the Court will not *sua sponte* rely on Rule 16(f). *Hart*, 2019 U.S. Dist. LEXIS 55061, at *108 n. 23. Next, because this case was filed in 2012, the 2015 amendments do not necessarily apply. The amendments renumbered and substantially revised what was former Rule 37(f). *See* Philip T. Favro, *The New ESI Framework Under the Proposed Rule 37(e) Amendments*, 21 Rich. J. L. & Tech. 8, (2015). And, theoretically, had this Court applied former Rule 37(f) to these circumstances, the Court would have imposed significantly harsher sanctions (and not "curative measures"). *See, e.g., The End of Sanctions? Rules Revisions and Growing Expertise are "De-Risking" eDiscovery*, Logikcull (2019), https://www.logikcull.com/public/files/The-End-of-Sanctions.pdf. (Only Stamatis addressed the issue, and wisely, argued against applying former Rule 37(f).) Because Plaintiff did not move for sanctions under former Rule 37(f), the Court will apply Rule 37(e) as adopted in 2015. The Court will not *sua sponte* apply the former and potentially applicable rule, despite good reasons to do so. Defendants and the former defense counsel are catching a break.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). Here, Rules 26(g) and Rule 37 provide adequate authority. Moreover, inherent authority requires a finding of bad faith designed to obstruct the judicial process or to violate a court order; clumsy lawyering is not enough. *Fuery v. City of Chicago*, 900 F.3d 450, 463-64 (7th Cir. 2018).[50] The Court is not currently finding subjective bad faith—as that term is defined in this context—at this time, although there is more than sufficient evidence to impose sanctions under other rules and impose curative measures under Rule 37(e). Finally, with respect to the loss of ESI, the Court still believes that its ability to rely on inherent authority has been removed. *Snider v. Danfoss, LLC*, No. 15 CV 4748, 2017 U.S. Dist. LEXIS 107591, at *7 n.8 (N.D. Ill. July 12, 2017); *see also Philmar Dairy, LLC v. Armstrong Farms*, No. 18-cv-0530, 2019 U.S. Dist. LEXIS 115384, at *4 (D.N.M. July 11, 2019); *Nuvasive, Inc v. Kormanis*, No. 1:18CV282, 2019 U.S. Dist. LEXIS 40195, at *5-7 (M.D.N.C. Mar. 13, 2019); Matthew Hamilton & Donna Fisher, *New Best Practices Under E-Discovery Spoliation Rule*, Law360 (Aug. 30, 2019, 1:13 PM EDT), https://www.law360.com/articles/1193820/new-best-practices-under-e-discovery-spoliation-rule. But there are good arguments why this belief may be incorrect. Hon. James C. Francis IV & Eric Mandel, *Limits on Limiting Inherent Authority: Rule 37(e) and the Power to Sanction*, 17 Sedona Conf. J. 613, 643-47 (2016); Casey

---

[50] The Seventh Circuit has never addressed whether the bad faith requirement to impose sanctions under inherent authority is objective, like under Rule 26(g), or subjective. The circuits appear divided on that issue. *See Clemens v. Nissan Motor Co.*, No. 04-CV-2584, 2007 U.S. Dist. LEXIS 116916, at *2 n.1 (N.D. Tex. Apr. 20, 2007). This Court can tackle that issue another day.

C. Sullivan, *Kicking the Hornet's Nest: Judge Francis on eDiscovery, Inherent Authority, and the Supreme Court*, Logikcull (May 25, 2017), https://www.logikcull.com/blog/kicking-the-hornets-nest-judge-francis-on-ediscovery-inherent-authority-and-the-supreme-court.  However, these arguments were not raised by the parties and the Court declines to resolve this thorny issue *sua sponte*.  Deciding whether an Advisory Committee Note—not the text of a rule—can abrogate federal courts' inherent authority can await another day.

Civil contempt rests on a court's inherent authority.  *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 737 (7th Cir. 1999).  So, all the same reasons for rejecting inherent authority apply to civil contempt at this time.  Civil contempt would not be a good source of authority for at least one other possible reason.  Defendants and the former defense counsel significantly violated unambiguous demands in court orders when they failed to make reasonable and diligent efforts, such as failing to timely disclose and produce ESI even when ordered to do so.  *See SEC v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010) (identifying elements for civil contempt).  But their actions and inactions occurred when the undersigned was a magistrate judge.  When a contemptuous act is committed when a magistrate judge is hearing a case on a referral, a cumbersome and time intensive process is necessary.  28 U.S.C. § 636(e)(6).  Part of this process includes a certification to "a district judge" who then holds a hearing and metes out punishment. *Id.* This Court is unsure how that process would work under these particular circumstances now that the undersigned

187

is the district judge assigned to the case. Currently, the Court has neither the time nor desire to resolve that unique problem.

### b. Rule 11

Although, unquestionably, false representations were made in papers filed with the Court, including declarations under oath and representations in filings based on those declarations, *see, e.g.*, dkts. 253, 253-1, the Court will not impose sanctions under Rule 11. All the papers related to motions filed for various discovery failures. *See, e.g.*, Dkt. 239, at 7-8. And Rule 11 cannot be used as authority for sanctions for motions under Rules 26-37. Fed. R. Civ. P. 11(d) ("This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37."); *see Moeck v. Pleasant Valley Sch. Dist.*, 844 F.3d 387, 391 n.8 (3d Cir. 2016) (Rule 11 not applicable to incidents that "arose in the context of discovery"). Further, more applicable rules exist that address the discovery violations at issue here. 2 James Wm. Moore et al., *Moore's Federal Practice* § 11.02[8], at 11-14 (3d ed. 2019). This Court will not rely on Rule 11 as a basis for sanctions.

### c. Rule 56(h)

This Court likewise is disinclined to impose sanctions under Fed. R. Civ. P. Rule 56(h). There is very little case law on this rule. *Allegheny Ludlum Corp. v. Nippon Steel Corp.*, No. 89-5940, 1991 U.S. Dist. LEXIS 204, at *11 (E.D. Pa. Jan. 7, 1991). Indeed, sanctions are rarely awarded under this rule. *AMTRAK v. Cimarron Crossing Feeders*, Nos. 16-1094 & 18-1081, 2018 U.S. Dist. LEXIS

193595, at *142 (D. Kan. Nov. 14, 2018) (even actions that were "certainly disturbing" did not result in sanctions); *Gress v. Smith*, No. 2:13-cv-0328, 2018 U.S. Dist. LEXIS 54823, at *13 (E.D. Cal. Mar. 30, 2018). And when sanctions have been awarded, the conduct has been particularly egregious. *Scalia v. E. Penn Mfg. Co.*, No. 18-1194, 2020 U.S. Dist. LEXIS 103459, at *29 (E.D. Pa. Jun. 13, 2020); *Allegheny Ludlum Corp.*, 1991 U.S. Dist. LEXIS 204 at *11. The paucity of case law imposing sanctions may be based on several factors. First, the rule requires direct evidence of a prior inconsistent statement. *Gress*, 2018 U.S. Dist. LEXIS 54823 at *13. Second, before sanctions can be imposed, a court must have relied on the affidavit. 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.94[6], at 56-242 (3d ed. 2019). Third, an elevated burden of proof must be met to impose sanctions under this rule. *Bowers v. Rector & Visitors of the Univ. of Va.*, No. 3:06-cv-00041, 2007 U.S. Dist. LEXIS 75064, at *10 (W.D. Va. Oct. 9, 2007) ("clear evidence" required); *see also* 2 James Wm. Moore et al., *Moore's Federal Practice* § 11.02[8], at 11-14 (2019) (Rule 56(h) standard more stringent than Rule 11 standard). Fourth, sanctions require that the affidavit be based on subjective bad faith or "solely for delay." Fed. R. Civ. P. 56(h); *Bowers*, 2007 U.S. Dist. LEXIS 75064 at *10 (subjective bad faith required). "Solely" is a critical word, whether used in a rule, statute, or opinion. *See Kallenbach v. Colvin*, No. 15 CV 50120, 2016 U.S. Dist. LEXIS 140780, at *7 (N.D. Ill. Oct. 11, 2016). The law rarely finds that an action occurred for a singular purpose.

The Court will not impose sanctions under Rule 56(h) for three reasons. First, there are other, more applicable rules that address the conduct raised in the sanctions motion, which is focused primarily on discovery issues. Second, although declarations were submitted to this Court that were undoubtably untrue, at this time, the Court is not currently finding these declarations were necessarily made with subjective bad faith or done solely for delay. But the Court is finding that false representations were made with gross negligence. *See Liberty Life Assurance Co. v. Devillalvilla*, No. 6:12-cv-1320, 2013 U.S. Dist. LEXIS 184334, at *5 (M.D. Fla. Nov. 12, 2013), *objection overruled*, 2014 U.S. Dist. LEXIS 10316 (M.D. Fla. Jan. 28, 2014) ("Wielding Hanlon's razor, the Court declines to infer malice from conduct that can be adequately attributed to incompetence."). Third, the erroneous declarations were not ultimately relied upon by the Court in ruling on the summary judgment motions because no judge ever ruled on the motions.

### d. 28 U.S.C. § 1927

Exercising its discretion, the Court will not impose sanctions under 28 U.S.C. § 1927.

This statute allows courts to sanction attorneys for unreasonably protracting litigation:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. This statute is dense. First, under the plain language of the statute, it applies only to counsel, not to parties. *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345-46 (2d Cir. 1991). Second, the actions must multiply the proceedings, meaning prolong the case. *See Mandel v. Bd. of Trs. of the Cal. State Univ.*, No. 17-cv-03511, 2019 U.S. Dist. LEXIS 89156, at *3 (N.D. Cal. May 28, 2019). Third, the attorney's actions must be both unreasonable and vexatious. 28 U.S.C. § 1927. "Vexatious" means "without reasonable or probable cause or excuse; harassing; annoying." *United States v. Lain*, 640 F.3d 1134, 1137 (10th Cir. 2011) (citing *Vexatious,* Black's Law Dictionary 1596 (8th ed. 2004); *Cruz v. Savage*, 896 F.2d 626, 632 (1st Cir. 1990) ("vexatious" means "harassing or annoying"); *see also BDI, LLC v. Summit Drilling Co.*, No. 16-CV-0226, 2017 U.S. Dist. LEXIS 94365, at *10 (N.D. Okla. June 20, 2017) ("vexatious" means "intended to harass"). And, in the Seventh Circuit, the unreasonableness standard is objective; subjective bad faith is not required. *Claiborne v. Wisdom*, 414 F.3d 715, 721 (7th Cir. 2005) (reckless or gross negligence is sufficient). Fourth, the Court has discretion to impose sanctions. *Rojas v. Town of Cicero*, 775 F.3d 906, 908-09 (7th Cir. 2015).

Certainly, among other things, the former defense counsel's repeated misrepresentations have been annoying to the Court. *See, e.g.*, Tr. 920, 923 (Stamatis representation to Court on August 14, 2018 that Yahoo! chat had been searched was false); Tr. 1042; Dkt. 253-2, at 4 (Life's representation to Court that GoDaddy support emails were forwarded to Yahoo! account was false). And

Plaintiff unquestionably believes it has been harassed. *See, e.g.*, Dkt. 239, at 4, 6 ("Again, this is but one more example among many that demonstrates a pattern of litigation misconduct."). But, in its discretion, the Court will not invoke 28 U.S.C. § 1927 to impose sanctions. The Court is not currently finding that the former defense counsel sought to delay or prolong this case. Instead, having been at least partially hoodwinked by Duke, they bumbled through e-discovery. And, because 28 U.S.C. § 1927 does not apply to Duke—who is just as culpable as the former defense counsel—the statute is not a good source to impose sanctions, especially when several specific rules address the actions.

### 2. Bases for Sanctions

Instead of these bases, the Court will impose sanctions under the applicable provisions of Rule 26(g) as well as sanctions and curative measures under Rule 37.

### a. Rule 26(g)

Plaintiff seeks sanctions for Defendants' and the former defense counsel's various failings under Rule 26(g), including their failure to conduct reasonable inquiries. Dkt. 294, at 59, 81; Dkt. 381, at 15, 21.

Attorneys have obligations when they sign initial disclosures and discovery responses, among other discovery documents. When signing a discovery disclosure, objection, request, or response, attorneys or parties certify to the best of their knowledge, information, and belief formed after a reasonable inquiry that:

> (A) with respect to disclosures, the disclosure is complete and correct when made; and

(B) with respect to a discovery request, response, or objection, it is:

>   (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

>   (ii) not interposed for any improper purpose such, as to harass, cause unnecessary delay, or needlessly increase the costs of litigation; and

>   (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

Fed. R. Civ. P. 26(g)(1)(A), (B).

>   If a certification violates [Rule 26(g)] without substantial justification, the court . . . ***must*** impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Fed. R. Civ. P. 26(g)(3) (emphasis added).

Although the signature "does not require the signing attorney to certify the truthfulness of the client's responses to a discovery request," it forces an attorney to "stop and think" about discovery responses and "certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." Fed. R.

Civ. P. 26(g) advisory committee's note to 1983 amendment; *see also Colyer v. City of Chicago*, No. 12 C 04855, 2016 U.S. Dist. LEXIS 40, at *86-101 (N.D. Ill. Jan. 4, 2016). Despite Leavens' allusions to the contrary, the reasonable inquiry standard does not require subjective bad faith. Dkt. 379, at 7, 13.

> [The standard] is an objective standard similar to the one imposed by Rule 11. In making the [reasonable] inquiry, the attorney may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances. Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances.

Fed. R. Civ. P. 26(g), advisory committee's note to 1983 amendment (citation omitted); *see also Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 407-08 (7th Cir. 1998); *Tec-Air v. Nippondenso Mfg. USA*, No. 91 C 4488, 1994 U.S. Dist. LEXIS 2026, at *25-27 (N.D. Ill. Feb. 24, 1994). An attorney must be sanctioned for failing to conduct an objectively reasonable inquiry because of "carelessness and inattentiveness;" therefore, "even honest mistakes can be sanctionable." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 583-85 (7th Cir. 2019) (discussing objectively reasonable inquiry under Rule 11).[51] If an attorney or

---

[51] District Court Judge for the District of Maryland Paul Grimm recently emphasized the importance of Rule 26(g):

> [T]he signature requirement is no mere formality; it is a certification that before propounding, answering, or objecting to a discovery request, the lawyer has made a reasonable inquiry, which eliminates "empty head, pure heart" excuses for failure to comply with the rule.

Hon. Paul Grimm, *Good Faith in Discovery*, 46 Litig. 23, 25 (2020). Attorneys would be wise to familiarize themselves with Rule 26(g) as most federal trial court judges believe that it is the most neglected e-discovery rule. George Socha, *Exterro and Duke/EDRM Judges Survey 2019 Series: Part 1, Failure to Comply with Federal Rules* ACEDS.org (April 1, 2019), https://aceds.org/exterro-edrm-judges-survey-2019-series-part-1-failure-to-comply-

party violates Rule 26(g), sanctions are mandatory, though the nature of the sanctions is left to the Court's discretion. *Rojas v. Town of Cicero*, 775 F.3d 906, 909 (7th Cir. 2015) ("Rule 26(g)(3) gives the judge discretion over the nature of the sanction but not whether to impose one."); *see also Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 407-08 (7th Cir. 1998).

Courts must impose sanctions under Rule 26(g)(3) when attorneys fail in their duties "to make a reasonable investigation to assure that their clients have provided all available responsive information and documents." *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1333 (S.D. Fla. 2007). Rule 26(g) requires counsel to make a "*careful inquiry*." *Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1229 (10th Cir. 2015) (emphasis in original). Counsel are only permitted to rely on their clients' assertions if that reliance is appropriate under the circumstances. *A PDX Pro Co. v. Dish Network Serv., LLC*, 311 F.R.D. 642, 653 (D. Colo. 2015); *HM Elecs.*, 2015 U.S. Dist. LEXIS 104100, at *40. "[C]ounsel cannot simply take a client's representation about such matters at face value." *Brown*, 2014 U.S. Dist. LEXIS 90123, at *51. Blind reliance on a client's representation is rarely a reasonable inquiry. *Bernal*, 479 F. Supp. 2d at 1327. Reliance on clients' representations is even less reasonable after counsel has reason to question the clients' previous representations. *A PDX Pro Co.*, 311 F.R.D. at 657 (once counsel

---

with-federal-rules. According to a recent survey, federal trial court judges "feel attorneys are failing to meet their Rule 26(g)(3) obligations to ensure their discovery disclosures and requests and responses are complete and correct." *Id.*

became skeptical of clients' representations and information, he could no longer reasonably rely on them).

Rule 26(g)(3) authorizes the court to sanction the attorney signing initial disclosures, the party the attorney represents, or both. Fed. R. 26(g)(3). Here, that means this Court can sanction Leavens, Life, or Duke. *See, e.g.*, *Perkins v. Gen. Motors Corp.*, 965 F.2d 597, 600-01 (8th Cir. 1992). The rule contemplates that sanctions must be imposed not only on attorneys who fail to conduct a reasonable investigation, but also upon clients if they are complicit in the violation of the rule. *Bernal*, 479 F. Supp. 2d at 1334. So, when attorneys and their clients are equally culpable, they should be equally sanctioned. *See Id.*; *Brown*, 2014 U.S. Dist. LEXIS 90123 at *51; *Laukus*, 292 F.R.D at 505-06.

Defendants' initial disclosures implicate Rule 26(g) in at least two ways. First, the initial disclosures did not provide any of the relevant emails regarding the recordings, nor did they provide all the Las Vegas trade show recordings. Tr. 979. According to Leavens theory, these recordings supported the defamation claim, so they were required to be disclosed under Rule 26(a)(1)(A)(ii). Tr. 972-73. Second, Defendants' initial disclosures in which they assert that "[e]lectronic records are located at 1535 North Ashland Avenue, Chicago, Illinois and reside on three or four computers located there" also implicate Rule 26(g)(1)(A). Pl.'s Ex. 50, at 5; Dkt. 294-2, at 621. This disclosure was signed by Attorney Leavens on November 26, 2012, on behalf of Duke. Pl.'s Ex. 50, at 6; Dkt. 294-2, at 622. These initial disclosures were reviewed by Duke more than once and contained his input. Tr. 1029. These

initial disclosures were not supplemented before the June 1, 2015, supplement date. So, in addition to Rule 26(g), sanctions under Rule 37(c)(1) come into play in two ways. Fed. R. Civ. P. 37(c)(1) (authorizing sanctions for the failure to provide information required by Rule 26(a) or (e)); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1358 (N.D. Ga. 2012). These initial disclosures were not complete and correct at the time they were made, nor were they timely supplemented.

Defendants' various discovery responses implicate Rule 26(g)(1)(B) because they were made without reasonable inquiry. The responses relied solely on Duke's representations without any careful inquiry or reasonable investigation, particularly after they had good reason to question Duke's credibility when his previous representations turned out to be untrue. Rather than learning from their mistakes, they continued unfazed down the same path, belittling Plaintiffs' repeated and legitimate concerns in the process.

### b. Rule 37

Plaintiff moved for sanctions under every provision of Rule 37, except for subsection (d). Dkt. 294, at 58-81; Dkt. 381, at 21. Plaintiff correctly did not invoke Rule 37(d) because Defendants did not totally fail to respond to a discovery request. *Stevens v. Greyhound Lines, Inc.*, 710 F.2d 1224, 1228 (7th Cir. 1983); *Charter House Ins. Brokers, Ltd. v. New Hampshire Ins. Co.,* 667 F.2d 600, 604 (7th Cir. 1981). Instead, Plaintiff argues that the disclosures and discovery responses were

incomplete, not provided after a reasonable inquiry, not timely supplemented, and that ESI was lost.

### i. Rule 37(a)

When a party provides incomplete or evasive disclosures, answers to interrogatories, or responses to requests to produce, the other party can seek to compel complete and non-evasive productions, answers, and responses. Fed. R. Civ. P. 37(a). If the court grants the motion, the non-complying party or its attorney or both must pay the moving party's reasonable expenses, including attorneys' fees, unless the non-complying party's position was substantially justified or an award of expenses would be unjust. Fed. R. Civ. P. 37(a)(5). Rule 37(a) sanctions should encompass all the expenses that would not have been sustained had the opponent conducted itself properly. *Lightspeed Media Corp. v. Smith*, 830 F. 3d 500, 507 (7th Cir. 2016). The plain language of the rule mandates attorneys' fees be paid by the opposing party or counsel or both, provided their position was not substantially justified or an award would be unjust.

Rule 37(a) applies because the GoDaddy accounts were not searched with the agreed upon search terms. As a result, after years of litigation, Plaintiff has been deprived of thousands of relevant and responsive documents because Defendants never produced them. Dkt. 318. In addition to GoDaddy emails, there appear to be additional ESI that was not produced. *Id.*

### ii. Rule 37(b)

If a party "fails to obey an order to provide or permit discovery, including an order under" Rule 37(a), the court may issue further just orders. Fed. R. Civ. P. 37(b)(2). "As long as the sanction is 'just,' there are virtually no limitations on judicial creativity in fashioning a response or remedy to a violation of a discovery order." 7 James Wm. Moore et al., *Moore's Federal Practice* § 37.51[10] at 37-120 (3d ed. 2019). In addition to the non-exhaustive list of possible sanctions, such as prohibiting the disobedient party from introducing designated matters in evidence, a court may order the party, the attorney advising the party, or both, to pay reasonable expenses caused by the failure to comply with the order, unless the failure was substantially justified or an award would be unjust. Fed. R. Civ. P. 37(b)(2)(A)(ii), (b)(2)(C). Standing alone, the failure to comply with a district court's discovery order is enough to impose sanctions under Rule 37(b). *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011). Culpability only determines which sanctions to impose, not whether sanctions are appropriate. *Id.* A violation of a court order does not need to be in bad faith; a negligent violation can trigger Rule 37(b) sanctions. *Id.* at 642-43. Sanctions under Rule 37(b) must be proportionally tailored to the severity of the disobedient party's conduct. *Nelson v. Schultz*, 878 F.3d 236, 239 (7th Cir. 2017).

Rule 37(b) is implicated in this case because Defendants failed to comply with this Court's June 11, 2015, order requiring documents relating to Webrecsol and Kirti Saraswat's SEO work with Defendants be produced by June 15, 2015. Dkt. 132. Former defense counsel claimed that no additional documents existed based

merely upon a single conversation with Duke.  Tr. 1227.  That claim was false.  Tr. 1223-24, 1227-28.  Responsive documents existed but were not disclosed by June 15, 2015.  Dkt. 234-1.  Instead, responsive documents were dumped on Plaintiff years later during summary judgment briefing.  Dkt. 234-1; Tr. 1199, 1283, 1284.[52]  Moreover, even though Duke used Yahoo! chat to communicate with Saraswat, he never searched Yahoo! chat for responsive documents.  Tr. 138, 139.

### iii. Rule 37(c)

If a party fails to provide information, such as ESI, as required by Rule 26(a) or (e), the party is barred from using that information in a motion or at trial, unless the failure was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1).  In addition to or in lieu of barring the information, among other things, a court may also order the party to pay reasonable expenses and inform the jury of the party's failure.  Fed. R. Civ. P. 37(c)(1)(A)—(C).  Monetary sanctions under Rule 37(c) may only be imposed on a party, not counsel.  *Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir. 2003); *see also Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1226-27 (10th Cir. 2015).  Sanctions under Rule 37(c) are automatic and mandatory unless the non-movant can establish that the failure was substantially justified or harmless.  *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

---

[52] Defendants also violated this Court's case management order by failing to provide Rule 26(e) supplements by June 1, 2015.  Dkt. 116.  But that is a violation of a scheduling order that is more appropriately addressed by other rules, such as Rule 16(f) or Rule 37(c)(1).  *In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1354-55 (N.D. Ga. 2012); *see also Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011).  The Court is using Rule 37(c)(1) to address this violation of a court order.

Rule 37(c) is implicated here because voluminous, relevant ESI was not disclosed either in the initial disclosures or by the Rule 26(e) supplement date. The information was not disclosed until years after the Rule 26(e) supplement date, completion of expert discovery, and the filing of dispositive motions. Despite this blatant violation of Rules 26(a) and (e), Defendants and the former defense counsel attempted to use undisclosed ESI in response to Plaintiff's summary judgment motion and in support of their summary judgment motion. Dkt. 233, at 24-25; Dkt. 234-1 (disclosing communications between Kirti Saraswat and Duke and Frank Gu and Duke for first time). Producing and, more importantly, attempting to use undisclosed ESI in response to a summary judgment motion can only be described as dirty pool. Indeed, as Judge Tharp recently stated, "It is a general proposition of law that, after discovery is closed, a party may not rely on documents that it had in its possession but failed to produce during discovery. There is no need for an order that states as much." *Worldpay, US, Inc. v. Haydon*, No. 17-cv-4179, 2018 U.S. Dist. LEXIS 193562, at *7-8 (N.D. Ill. Nov. 14, 2018). Plus, there is likely significantly more relevant and responsive ESI that has not been produced. Dkt. 318.

### iv. Rule 37(e)

Rule 37(e) provides the sole source to address the loss of relevant ESI that was required to be preserved but was not because reasonable steps were not taken, resulting in prejudice to the opposing party. *Snider v. Danfoss, LLC*, 12 CV 4748, 2017 U.S. Dist. LEXIS 107591, at *7-8 (N.D. Ill. July 12, 2017). Rule 37(e) establishes an analytical decision tree. *Oracle Am., Inc. v. Hewlett Packard Enter.*

*Co.*, 328 F.R.D. 543, 549 (N.D. Cal. 2018).  The decision tree process can be visualized by a flow chart, such as this:

### RULE 37(e) SANCTIONS FLOW CHART



*See* Hon. Iain D. Johnston & Thomas Y. Allman, *What Are the Consequences for Failing to Preserve ESI: My Friend Wants to Know,* Circuit Rider 57-58 (2019). Other flow charts exist.[53] *See, e.g.*, *The End of Sanctions? Rules Revisions and Growing Expertise are "De-Risking" eDiscovery*, Logikcull (2019); Jarrad Smith, *It's Purple Raining Sanctions: Litigation Regarding Prince's Estate Provides Framework for Determining When Sanctions Apply Under FRCP 37(e)*, JDSupra (April 24, 2019), https://www.jdsupra.com/legalnews/it-s-purple-raining-sanctions-18106; *FRCP & E-Discovery: The Layman's Guide*, Exterro, www.exterro.com/frcp-e-discovery-guide/rule-37e/ (last visited Jan. 14, 2021); Hon. James C. Francis IV & Eric Mandel, *Limits on Limiting Inherent Authority: Rule 37(e) and the Power to Sanction*, 17 Sedona Conf. J. 613, 618 (2016). Luckily, they all illustrate the rule properly. The Court is partial to its chart for obvious reasons.

Rule 37(e) has five threshold requirements: (1) the information must be ESI; (2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI; (3) the relevant ESI should have been preserved at the time of the litigation was anticipated or ongoing; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery. Fed. R. Civ. P. 37(e); *Snider*,

---

[53] The Court envisions the creation of these various flow charts by ESI wonks as being akin to characters in "Close Encounters of the Third Kind" creating images and replications of Devil's Tower: People vexed by an interaction, furiously creating something tangible in an attempt to make sense of a new phenomenon. *Close Encounters of the Third Kind Mashed Potatoes*, YouTube (May 30, 2011), https://www.youtube.com/watch?v=yecJLI-GRuU.

2017 U.S. Dist. LEXIS 107591, at *8-10.  If any of these requirements are not met, then curative measures and sanctions are unavailable under Rule 37(e).

   If all these threshold requirements are met, then the court must determine if the party seeking the ESI has suffered prejudice or if the party with possession, custody, or control of the ESI intended to deprive the seeking party of the ESI.  Fed. R. Civ. P. 37(e)(1), (2).  If prejudice but not intent exists, then the court can impose curative measures.  Fed. R. Civ. P. 37(e)(1).  A curative measure recognized by the Advisory Committee notes is barring evidence.  Fed. R. Civ. P. 37(e), advisory committee note's to 2015 amendments ("In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence. . ."); *see also, e.g.*, *Charlestown Capital Advisers, LLC. v. Acero Junction, Inc.*, 18-CV-4437, 2020 U.S. Dist. LEXIS 180982, at *54 (S.D.N.Y. Sep. 30, 2020).  A common curative measure courts impose is instructing the jury that it can consider the circumstances surrounding the loss of the ESI.  Thomas Y. Allman, *Dealing with Prejudice:  How Amended Rule 37(e) Has Refocused ESI Spoliation Measures*, 26 Rich. J. L. & Tech. 1, 64-66 (2020) (collecting cases).[54]  If intent (which presumes

---

[54] Some courts have held that awards of attorneys' fees are curative measures authorized under Rule 37(e)(1).  *See, e.g.*, *Karsch v. Blink Health Ltd.*, 17-CV-3880, 2019 U.S. Dist. LEXIS 106971, at *74 (S.D.N.Y. June 20, 2019).  This view is held by ESI gurus.  *Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502 (S.D.N.Y. 2016) (Francis, J.).  Even knowing it is in the distinct minority on this issue, this Court is not so sure attorneys' fees are available but is open to being convinced otherwise.  *Snider*, 2017 U.S. Dist. LEXIS 107591, at *12-13 (attorneys' fees are not identified in Rule 37(e) but are specifically identified in all other sections of Rule 37); *Newman v. Gagan, LLC*, No. 2:12-CV-248, 2016 U.S. Dist. LEXIS 123168, at *20-21 (N.D. Ind. May 10, 2016).  Because the Court is not

prejudice) exists, then the court can impose sanctions, including presuming that the information was unfavorable, instructing the jury to presume the information was unfavorable, or entering dismissal or default.  Fed. R. Civ. P. 37(e)(2).

Rule 37(e) is implicated in this case because relevant Yahoo! chats and GoDaddy emails, which could have and should have been preserved through reasonable measures, have been lost and cannot be recovered, prejudicing Plaintiff. In the Court's view, the only unresolved aspect of Rule 37(e) is whether Defendants intended to deprive Plaintiff of this ESI.[55]

### v. Rule 37's Exceptions for Sanctions

Except for subsection (e), all the other provisions of Rule 37 prohibit district courts from imposing sanctions if the party's actions were (a) substantially justified or (b) harmless or sanctions would be unjust.  Fed. R. Civ. P. 37(a)(5)(A)(ii), (iii); Fed. R. Civ. P. 37(b)(2)(C); Fed. R. Civ. P. 37(c)(1); 37(d)(3).  Rule 37(c) provides that courts need not impose sanctions if, in addition to the non-compliant party's position being "substantially justified," the violation was "harmless."  Fed. R. Civ. P. 37(c).  In contrast, under Rules 37(a) and (b), a court may decline to impose monetary sanctions if "other circumstances make an award of expenses unjust." Rule 37(e) incorporates the concepts of harmlessness and justification in its

---

imposing an award of attorneys' fees under Rule 37(e), it need not conclusively address this issue now.  All attorneys' fees imposed are under other rules.  Imposing attorneys' fees as a sanction under this rule at this time would be redundant.

[55] ESI may have been lost when the former defense counsel's email system was migrated and when the hard drive containing the images of the four hard drives crashed.  The Court is not imposing any sanctions for these unfortunate incidents.  The evidence, if relevant, was not lost because of a failure to take reasonable steps to preserve it.

requirements that corrective measures or sanctions can only be imposed if reasonable steps were not taken that resulted in prejudice.  Fed. R. Civ. P. 37(e).

Whether a party's failure to comply with the discovery rules is "substantially justified" or "harmless" is within the broad discretion of the district court.  *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).  The same is true for a finding that that the imposition of sanctions would be "unjust."  *See Worldcom Network Sevs. v. Metro Access, Inc.*, 205 F.R.D. 136, 141 (S.D.N.Y. 2002).  The party facing the sanctions (the non-complying party) bears the burden to establish that the failure was substantially justified or harmless or the imposition of sanctions would be unjust.  *Salgado by Salgado v. Gen. Motors, Corp.*, 150 F.3d 735, 742 (7th Cir. 1988); *see also Torres v. City of L.A.*, 548 F.3d 1197, 1213 (9th Cir. 2008) ("[T]he burden is on the party facing the sanction to demonstrate that the failure to comply with Rule 26(a) is substantially justified or harmless"); *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001) ("Rather it is the obligation of the party facing the sanctions for belated disclosure to show that its failure to comply with the Rule was either justified or harmless. . . ."); *Lorillard Tobacco Co. v. Elston Self Serv. Wholesale Groceries*, 259 F.R.D. 323, 327 (N.D. Ill. 2009) (burden on non-complying party to show award would be unjust); 7 James Wm. Moore et al., *Moore's Federal Practice*, § 37.97[3] at 37-184 (3d ed. 2019).

"Substantially justified" means a reasonably debatable contention based on both fact and law.  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Misunderstanding the law does not make an action "substantially justified."

*Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). "Harmless"
means a lack of prejudice to the party entitled to the information. *Am. Stock Exch.,
LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002).

The "unjust" provision is a "rather flexible catch-all provision." *Slabaugh v.
LG Elecs. USA, Inc.*, No. 1:12-cv-01020-RLY, 2014 U.S. Dist. LEXIS 161687, at *2
(S.D. Ind. Nov. 17, 2014). Black's Law Dictionary unhelpfully defines "unjust" as
"[c]ontrary to justice; not fair or reasonable." *Unjust*, Black's Law Dictionary (11th
ed. 2019). But "[t]he definition of 'unjust' in the context of Rule 37 is unclear." *Smith
v. Bradley Pizza, Inc.*, No. 17-cv-02032, 2019 U.S. Dist. LEXIS 98337, at *35-36 (D.
Minn. June 12, 2019). The term may also be defined as "inequitable" or "harsh."
*Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 241 (3d Cir. 2007) (discussing
identical language in Fed. R. Civ. P. 16(f) context). According to the Third Circuit,
these definitions "invite a consideration of the degree of the sanction in light of the
severity of the transgression which brought about the failure to produce." *Id.*
Essentially, this is a proportionality concept. Therefore, in determining whether
sanctions are "unjust," courts may consider the nature of the offending party's
discovery failures and the degree of prejudice and harm visited upon the prevailing
party relative to the prevailing party's own abuses of the discovery process (if any).
*See, e.g.*, *Pelayo v. Platinum Limousine Servs.*, No. 15-00023, 2018 U.S. Dist. LEXIS
2573, at *13-17 (D. Haw. Jan. 5, 2018); *SEC v. Yorkville Advisors, LLC*, No. 12 Civ.
7728, 2015 U.S. Dist. LEXIS 24578, at *22-25 (S.D.N.Y. Feb. 27, 2015); *HSBC Bank
USA, N.A. v. Resh*, No. 3:12-cv-00668, 2014 U.S. Dist. LEXIS 10176, at *26-34 (S.D.

W. Va. Jan. 28, 2014). And the Rule's "unjust" exception allows a court to deny attorneys' fees "where the prevailing party also acted unjustifiably," Fed. R. Civ. P. 37(a)(4) committee notes to 1970 amendment.

Under the Rules' plain language, the "unjust" provision is in addition to the "substantially justified" provision. To some extent, "substantially justified" and "unjust" embody the concept of "just;" therefore, a district court's sanction imposed because a party's position was not "substantially justified" is also likely "just." 7 James Wm. Moore et al., *Moore's Federal Practice*, § 37.51[9][a] at 37-115; §37.97[3] at 37-184. But "although the two terms' meanings may overlap, 'unjust circumstances' must necessarily differ from 'substantial justification' lest the two provisions render one or the other surplusage. The primary difference between the two is that the 'unjust circumstances' standard focuses on conduct of the moving party; the 'substantial justification' standard is not so limited." *Lorillard Tobacco Co. v. Elston Self Serv. Wholesale Groceries*, 259 F.R.D. 323, 328 n.1 (N.D. Ill. 2009).

The ability of the district court to reopen discovery after its closure does not make a party's action substantially justified or harmless. *Finwall v. City of Chicago*, 239 F.R.D. 494, 501 (N.D. Ill. 2006). Untimely disclosures and discovery responses and supplements to them are generally not substantially justified or harmless. *Amari Co. v. Burgess*, No. 07 C 01425, 2012 U.S. Dist. LEXIS 157229, at *14 (N.D. Ill. Nov. 2, 2012). Indeed, supplements made after the close of fact discovery are by definition "untimely." *Mitchell v. Iowa Interstate R.R. Ltd.*, No. 07-1351, 2010 U.S. Dist. LEXIS 157594, at *2-3 (C.D. Ill. May 25, 2010).

A district court need not make an explicit finding as to substantial justification or harmlessness. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). But the courts of appeal, including the Seventh Circuit, have identified several factors the district courts should consider when determining substantial justification or harmlessness, even though these factors seem to be just reiterations of the rule: (1) the prejudice or surprise caused by the failure, (2) the ability to cure the prejudice, (3) the extent of trial disruption, and (4) the bad faith or willfulness in failing to disclose. *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012).

### E. Application of Findings to Relevant Law

Multiple violations of several rules of the Federal Rules of Civil Procedure occurred. And the violations were not substantially justified or harmless, nor would sanctions be unjust. Accordingly, sanctions are warranted.

### 1. Sanctions are Warranted under Rules 26(g), 37(a), (b), (c)

#### a. Rule 26(g)

Rule 26(g) authorizes a court to sanction attorneys, the parties they represent, or both, if disclosures and discovery responses are made without reasonable inquiry. Fed. R. Civ. P. 26(g). The "stop-and-think" requirement of this rule was not met in this case on more than one occasion by both Leavens and Duke. Because Stamatis did not sign any disclosures or discovery responses, he cannot face sanctions under this Rule. Fed. R. Civ. P. 26(g); Dkt. 378, at 22.

In Plaintiff's memorandum in support of its motion for sanctions, it specifically cited Rule 26(g) and argued the lack of a reasonable inquiry by

Defendants and the former defense counsel.[56]  Defendants' 35-page response brief

made no mention of Rule 26(g) at all.  Dkt. 347.[57]  Because of this absence, the

Court flagged the failure.  At the outset of the evidentiary hearing, the Court

addressed this with the current defense counsel.  Tr. 8 ("I will ask the Defendants

this question now:  Is it the Defendants' position that Rule 37(e) abrogates all other

possible applicable rules relating to sanctions and a court's inherent authority?").

The Court did not flat out tell all the interested parties to address all the bases for

the sanctions, but it certainly gave a big hint.  Of course, it is not the Court's duty to

tell parties to address all relevant arguments.  Nevertheless, the current defense

counsel seemed to recognize the Court's point.  Tr. 9 ("Obviously, I believe that to

the extent there is other discovery violations, okay, in addition to spoliation of ESI,

like intentional withholding of documents and some of the other things that

Plaintiffs have accused Defendants and the former defense counsel of, that there is

certainly – the court has authority to address that.").  Then during the hearing, the

Court flagged the issue again.  At one point, Defendants objected to a line of

---

[56] Dkt. 294, at 51 ("A court is also *required* to impose sanctions against a party and/or its counsel, pursuant to Rule 26(g)(3), when he/she falsely certifies that 'to the best of that person's knowledge, information, and belief formed after *reasonable inquiry*,' discovery responses are complete and such disclosures have not been made for an improper purpose.") (emphasis in original); Dkt. 294, at 71 ("This Court is also *required* to impose sanctions against Defendants and their counsel, pursuant to Rule 26(g)(3), because they wrongfully certified that 'to the best of their knowledge, information, and belief formed after *reasonable inquiry*,' their discovery responses and objections were complete and disclosures had not been made for an improper purpose.  *Id.* 'The point of Rule 26(g) is to hold someone personally responsible for the completeness and accuracy of discovery responses.'") (emphasis in original).

[57] Defendants were given up to 75 pages to respond, so they had plenty of room to address this issue.

questioning based on relevance.  Tr. 388.  After Plaintiff responded, the following

colloquy occurred:

>THE COURT:        Based upon that, overruled.  That's where I assumed he

was going.

>MR. SALAM:        And, your Honor, I just -- I respect your ruling.

>THE COURT:        Oh, thanks.

>MR. SALAM:        My concern is I still don't see how that is relevant to the

issues in the sanctions motion, as to -- when I say "sanctions," I know they have

raised it.  I'm trying to understand what the relevance is to Rule 37 sanctions, the

issues in Rule 37 about whether or not there has been any ESI lost and not

otherwise recovered.

>THE COURT:        Well, remember that their motion was much more than

just Rule 37(e).

>So overruled.

>MR. SALAM:        Thank you, your Honor.

Tr. 389-90.

By this point, all the parties and the former defense counsel were on notice that the

sanctions motion was not limited to Rule 37(e).

Defendants' post-hearing brief made a terrible tactical decision to

intentionally not address Rule 26(g).  Despite Plaintiff's explicit reliance on the rule,

dkt. 294, at 51, 71, and despite the Court's warning that all the bases should be

addressed, Tr. 8, 390, Defendants took the position that Plaintiff's reliance on Rule

26(g)(3) was perfunctory and therefore waived, so it did not need to address the

rule.  Dkt. 382, at 2.  Ironically, Defendants made that argument in a footnote.  Dkt.

382, at 2 n.2.  And undeveloped arguments made in footnotes are waived.  *Harmon*

*v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013).  Besides being waived, Defendants'

assertion is wrong.  Plaintiff's Rule 26(g) argument was adequately presented and

should have been addressed, especially after the Court confirmed that Plaintiff's

motion for sanctions was not cabined to Rule 37(e).  Tr. 7, 390.  Regardless, even if

Plaintiff's Rule 26(g) argument was not sufficiently developed, the Court has the

authority to raise a Rule 26(g) violation *sua sponte.*  *Liguria Foods, Inc. v. Griffith*

*Labs., Inc.*, 320 F.R.D. 168, 188 (N.D. Iowa 2017); *St. Paul Reinsurance Co. v.*

*Commercial Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000).  The Court will

address and impose sanctions under Rule 26(g).

Leavens only argument as to Rule 26(g) was on the final page of the brief,

which stated, "[R]easonable reliance and good faith prevent sanctions from being

entered under Rule 26(g)."  He went on to note that, "Rule 26(g) allows sanctions

when a party or counsel makes false certifications based upon reasonable inquiries."

Dkt. 379, at 25.  The discussion concluded by stating that there is "no evidence" that

Leavens engaged in this type of conduct and that "the repeated unsupported

suggestions to the contrary are merely indicative of the hyperbolic rhetoric that this

litigation has come to include."  Dkt. 379, at 25.  Although the Court agrees that

this case has been and still is full of hyperbolic rhetoric, evidencing the belief that

litigation is war and the courtroom is a battlefield, it disagrees that there is "no

212

evidence" that Leavens failed to make reasonable inquiries. The preceding 200-plus pages are littered with the evidence.

Rule 26(g) requires disclosures and discovery responses to be made upon reasonable inquiry, with disclosures being complete and correct when made and discovery responses being consistent with the Federal Rules of Civil Procedure. Fed. R. Civ. P. 26(g)(1)(A),(B)(i). The rules that discovery responses must be consistent with include the following: Rule 33(b), addressing interrogatory answers and objections; Rule 34(b)(2), addressing document production and responses; and Rule 37(a)(4), requiring complete and non-evasive discovery responses. With good reason, no party contested either the completeness or consistency prong of Rule 26(g). Instead, Leavens—the only party to address the Rule 26(g) violations— claimed that he made reasonable inquiries. Dkt. 379, at 25-26. But that's wrong. He didn't.

But before addressing Leavens' lack of reasonable inquiry, consider all the ESI that was not produced before the close of discovery in this "eight figure case." Dkt. 267, at 64; *Tec-Air*, 1994 U.S. Dist. LEXIS 2026, at *28-29 (in multimillion dollar lawsuit the lack of an efficient system to ensure relevant documents produced shows lack of reasonable inquiry). This includes about 112 pages of Yahoo! emails produced on March 29, 2018. Dkt. 294-2, at 2-114. This also includes nearly 15,000 pages of Yahoo! emails produced on May 31 and June 1, 2018. And it includes nearly 23,000 GoDaddy documents that contain the agreed-upon search terms that have yet to be produced. Dkt. 318-1, at 13. The untimely produced ESI also

included the email communications between Duke and Edmiston, as well as at least one recording of the Las Vegas trade show encounter. Additionally, consider the ESI that was *never* produced, including the Yahoo! chats and the GoDaddy emails, because it was destroyed during the pendency of this case. Tr. 216, 219, 927 (chats destroyed); Tr. 67, 164, 168, 173, 180, 936, 938-39 (GoDaddy emails destroyed); Tr. 1498-1500 (chats destroyed in 2018); Dkt. 382, at 7; Dkt. 372 at 7-11 (chats destroyed in 2016).

With regard to ESI, reasonable inquiry necessitates a proper custodian interview. A proper custodian interview has been required for years before this case was even filed. Kenneth J. Whithers, *Computer-Based Discovery in Federal Civil Litigation*, 2000 Fed. Cts. L. Rev. 2, 3-4 (2000). A custodian interview required Leavens to take an active and affirmative role to investigate 21 Century Smoking's information technology structure by asking difficult, thorough questions to identify custodians and locations of potentially relevant ESI. *See, e.g., HM Elecs., Inc.*, 2015 U.S. Dist. LEXIS 104100, at *40; *Phoenix Four Inc.*, 2006 U.S. Dist. LEXIS 32211, at *17-18. None of that happened. And a proper custodian interview prevents blind reliance on a client's general description of its information systems. Scheindlin & Capra, *supra*, at 209; Whithers, *Computer-Based Discovery in Federal Civil Litigation*, 2000 Fed. Cts. L. Rev. at 3-4. Leavens never conducted a custodian review nor had any of his associates conduct a custodian interview. Tr. 243, 773-75, 783, 995-96, 1127-28. The absence of a custodian review is strong evidence that counsel did not conduct a reasonable inquiry. *Metro Opera Ass'n.*, 212 F.R.D. at

221; *see also, Small*, 2018 U.S. Dist. LEXIS 134716, at *149-50; *HM Elecs., Inc.*, 2015 U.S. Dist. LEXIS 104100, at *46 ("it was unreasonable to ask one person"). And recall that a custodian interview is not a new concept; instead, it is merely a modern outgrowth of a client interview, which long ago were needed to establish a reasonable inquiry. Dessem, *supra*, at 9-10, 17; Mauet, *supra*, at 29-32.

Armed with the information obtained from the custodian interview, counsel should have a reasonable understanding of the client's information systems. Counsel is required to have that understanding. *A PDX Pro Co.*, 311 F.R.D. at 657; *see also HM Elecs.*, 2015 U.S. Dist. LEXIS 104100, at *57-58. The absence of a reasonable understanding of the client's information systems is strong evidence that counsel did not conduct a reasonable inquiry. *A PDX Pro Co.*, 311 F.R.D. at 657; *Metro. Opera Ass'n.*, 212 F.R.D. at 221-23; *Small*, 2018 U.S. Dist. LEXIS 134716, at *149-50; *HM Elecs., Inc.*, 2015 U.S. Dist. LEXIS 104100, at *46. As shown throughout this order, Leavens did not have a reasonable understanding of Defendants' information systems. *See, e.g.,* Dkt. 256, at 13-14 ("I just don't have the technological background necessarily to make the technical distinction that escapes us here, which is that those emails would not be revealed in the search that was done of those four computers.").

The understanding of the client's information systems allows counsel to create a systematic process and plan for responding to discovery requests. *Nat'l. Ass'n. of Radiation Survivors*, 115 F.R.D. at 552-53. The absence of a process and a plan is strong evidence that counsel did not conduct a reasonable inquiry. *Metro.*

*Opera Ass'n.*, 212 F.R.D. at 221; *Nat'l. Ass'n. of Radiation Survivors*, 115 F.R.D. at 556; *see Tec-Air*, 1994 U.S. Dist. LEXIS 2026, at *28-29.  Leavens had no process or plan for responding to discovery requests.  Tr. 891 ("I don't know whether we did or not, the methodology of collecting the documents to respond to a document request.").  He just had his associates call Duke for the ESI.  Tr. 1104-06.  And Duke was even left on his own to determine the materiality of the ESI.  Tr. 786.  The complete lack of a process and plan (or any systemized structure) to any aspect of discovery is evidenced in other ways, including the lack of documentation, Tr. 759, the lack of directions to the associates working on ESI issues, Tr. 767, 773, and the lack of direction to the ESI vendor, other than having his associate tell the vendor to copy the hard drives.  Tr. 813.

Part of the process and plan includes monitoring of the identification, preservation, collection, and production of ESI.  The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. 341, 358 (2019) (collecting cases and other authority dating back to 2004); *see, e.g., Charlestown Capital Advisors, LLC*, 2020 U.S. Dist. LEXIS 180982, at *34.  The absence of reasonable monitoring is strong evidence that counsel did not conduct a reasonable inquiry.  *Metro. Opera Ass'n.*, 212 F.R.D. at 221-22; *see also Franklin v. Howard Brown Health Ctr.*, No. 17 C 8376, 2018 U.S. Dist. LEXIS 171609, at *6-7 (N.D. Ill. Oct. 4, 2018).  Leavens completely failed to monitor the process.  He failed to monitor his own associates and he failed to monitor Duke.  Tr. 786, 1104-06.  The absolute complete lack of monitoring is evidenced by this simple

216

fact: During the pendency of this case, significant and relevant ESI—the Yahoo! chats and certain GoDaddy emails—were destroyed.

The most telling evidence that a reasonable inquiry was not conducted is the ease and speed with which a large volume of ESI is produced once a reasonable inquiry is done. *HM Elecs.*, 2015 U.S. Dist. LEXIS 104100, at *35 ("There can be no doubt that Defendants and their attorneys failed to make reasonable inquiries, because Defendants' lead attorneys were able to identify masses of responsive ESI in September and December when they finally inquired of their vendors about the ESI."); *Qualcomm*, 2008 U.S. Dist. LEXIS 911, at *35; *Tec-Air*, 1994 U.S. Dist. LEXIS 2026, at *28 ("Finally the documents that were belatedly produced after the close of discovery were found with little effort once it was decided to conduct a focused search for documents from 1974."). Here, once the former defense counsel asked obvious questions that should have been asked during a reasonable custodian interview, an avalanche of relevant and responsive ESI was produced. And after the Yahoo! email failure came to light, it was unreasonable for any of them not to conduct the same inquiry about the GoDaddy emails.

Much of the prejudice that occurred because of the Rule 26(g) violations could have been avoided had Duke simply been candid with the former defense counsel. *See Metro. Opera Ass'n.*, 212 F.R.D. at 221 ("The client is charged with knowledge of what documents it possesses."). He affirmatively told them that all the electronic records were located on the four computer hard drives and that they had all the ESI. Tr. 604-07, 609, 629, 1029, 1242; LS Ex. 7. But Duke knew his web-based

emails were not located on these hard drives, and never told the former defense counsel. Tr. 129-31, 238-39, 281-82, 838, 908. Indeed, Duke participated in the collection of the emails from the hard drives, so he knew the productions would be incomplete. Tr. 118, 611, 1037, 1428, 1430-31; Dkt. 288, at 4. And even though he was fully aware that the Yahoo! emails were not produced because they were web-based, he never disclosed that the GoDaddy emails—which were likewise web-based—had not been searched until another year past. Tr. 281-82, 1401-02, 1410-11. At its core, Rule 26(g) requires objective good faith of not only counsel but also the parties. *See Nat'l Ass'n of Radiation Survivors*, 115 F.R.D. at 554-55. Duke's actions were not in good faith.

Both Leavens and Duke must pay Plaintiff's attorneys' fees because both violated Rule 26(g). *Bernal*, 479 F. Supp. 2d at 1334; *Brown*, 2014 U.S. Dist. LEXIS 90123, at *51. These violations could not have occurred without both Duke's dishonesty and Leavens' disinterest and dereliction of duty.

### b. Rule 37(a)

When a party provides incomplete or evasive disclosures, answers to interrogatories, or responses to requests to produce, the other party can seek to compel complete and non-evasive productions, answers, and responses. Fed. R. Civ. P. 37(a). If the court grants the motion, as the Court has done here, then the non-complying party or its attorney or both must pay the moving party's reasonable expenses, including attorneys' fees, unless the non-complying party's position was

substantially justified or an award of expenses would be unjust. Fed. R. Civ. P. 37(a)(5).

In Plaintiff's memorandum in support of its motion for sanctions, it specifically cited and relied upon Rule 37(a). Dkt. 294, at 50-51, 71.[58] Like Rule 26(g), in Defendants' 35-page response brief, they never addressed Rule 37(a). Dkt. 347. Again, this failure caused the Court to flag the issue before and during the evidentiary hearing. Tr. 8, 389-90. In Defendants' post-hearing brief, they recognized that Plaintiff relied upon Rule 37(a) and represented that they would address the rule. Dkt. 382, at 2. But they never did. None of the former defense counsel's post-hearing briefs addressed Rule 37(a) either. Dkts. 378-79, 383. And nowhere did any of their briefs argue that their actions were substantially justified or that an award of attorneys' fees would be unjust under Rule 37(a). So, they have forfeited their objections to sanctions under Rule 37(a). *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 354 F. Supp. 3d 877, 883 (N.D. Ill. 2018); *see also Henry v. Hulett*, 969 F.3d 769, 785-86 (7th Cir. 2020).

Once Plaintiff filed the motion for sanctions under Rule 37, the Defendants and the former defense counsel were on notice that the Court could sanction any of

---

[58] Rule 37(a) was flagged many ways on at least three pages. Dkt. 294 at 50-51 ( "Multiple provisions of this Rule have been triggered by Defendants conduct in this case, including: Rule 37(a)(3)(A) which governs motions to compel disclosure and for appropriate sanctions. . . Rule 37 also provides for the recovery of the moving party's expenses, including attorneys' fees from the non-compliant party's discovery violations, and *requires* the payment of these expenses for certain misconduct.") (emphasis in original); Dkt. 294 at 71 ("Plaintiffs' recovery of reasonable expenses, including attorneys' fees is required under several provisions of Rule 37. Pursuant to Rule 37(a)(5)(A), Defendants must pay Plaintiffs' reasonable expenses incurred in making this and earlier Rule 37 motions.").

them under this rule.  *DeVaney v. Cont'l Am. Ins. Co.*, 989 F.2d 1154, 1160 (11th Cir. 1993).  Further, the Court has authority to impose sanctions *sua sponte* under Rule 37.  *Elmore v. City of Greenwood*, No. 3:13-cv-01755, 2015 U.S. Dist. LEXIS 80904, at *14 (D.S.C. June 23, 2015).

For the sake of completeness and to resolve a clear basis upon which Plaintiff sought sanctions and this Court can impose sanctions, the Court addresses this rule.  The Court does so despite Defendants' and the former defense counsel's forfeiture of any arguments to the contrary.  The Court focuses on the more than 23,000 documents in Defendants' GoDaddy email accounts and the 15,000 pages of documents in the Yahoo! account that contained the agreed-upon search terms. Dkt. 318-1, at 13; Dkt. 370, at 3-5; Tr. 912; Pl.'s Ex. 91.  These were required to be produced years ago. Dkt. 116.

Defendants provided incomplete disclosures and responses to document requests.  The GoDaddy email accounts, containing thousands of relevant and responsive documents, still have not been produced.  Dkt. 318-1, at 13.  And the Yahoo! account was likewise not searched with the agreed-upon terms before the close of fact discovery, and those documents were not produced until Plaintiff had already filed its summary judgment motion and response.  Plaintiff's motion for sanctions under Rule 37(a) is completely meritorious.  Defendants are ordered to produce all responsive documents to Plaintiff's production requests, including producing all GoDaddy emails that contain the agreed-upon search terms.[59]  The

---

[59] The Court is not precluding a privilege and relevance review of those documents.

documents must be provided in native, searchable format within 30 days of the entry of this order.  Because the Court is granting the motion, Defendants must pay Plaintiff's reasonable expenses, including attorneys' fees.  Rule 37(a) authorizes the Court to impose an attorneys' fees sanction against a party and its attorneys.  The Court requires both Defendants as well as Leavens and Stamatis to pay the attorneys' fees.

Although Stamatis was not involved in the initial discovery including the e-discovery, he abdicated his responsibilities as a lead attorney by blindly relying on Duke and leaving the problems to be solved by other counsel. *Laukus*, 292 F.R.D. at 509, Tr. 1290, 1390-91.  And just like Leavens, Stamatis was on notice as to the discovery problems by the spring of 2018 at the latest.  And like Leavens, he undertook no investigation.  Stamatis merely asked Duke for an explanation, which he took at face value and ordered the other former defense counsel to ensure that there would be no more problems.  Tr. 1290, 1310 ("Well, we looked at it.  And I don't know what the results were.  I still don't know."), 1357 ("I took [Duke's representations] as face value, and we moved on from there."), 1390-91, 1399-1400.  Stamatis' main argument against sanctions is that much of the discovery occurred before he filed an appearance.  Dkt. 378, at 2, 5-6, 13.  But being late to the party is not an excuse.  *HM Elecs.*, 2015 U.S. Dist. LEXIS 104100, at \*68-69 ("This excuse shows [counsel] did not, and still do not, comprehend that it is their duty to become actively engaged in the discovery process, to be knowledgeable about the source and extent of the ESI, and to ensure that all gathered data is accounted for, and that

221

these duties are heightened—not diminished—when there is a transition between firms or other personnel critical to discovery."); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 555 (N.D. Cal. 1987) (if counsel relies on investigation of preceding counsel or a party, the duty remains on counsel to acquire knowledge and facts sufficient to enable counsel to certify discovery responses).  And being late to the party is even less of an excuse when Stamatis was on notice of the multiple discovery problems.  *Bankdirect Capital Fin.,* 2018 U.S. Dist. LEXIS 224705, at *12 (after prior errors are discovered "[t]hat ought to have put counsel on their most careful behavior, but it clearly didn't happen"); *Qualcomm*, 2008 U.S. Dist. LEXIS 911, at *36, *48 (sanctions imposed, in part, because counsel failed to heed several warning signs that ESI search and production was inadequate).  As a lead counsel, Stamatis was waist deep in this case when the Yahoo! production errors came to light.  But instead of taking the e-discovery issues seriously, he belittled Plaintiff's valid concerns.  And he did so even after the Court gave explicit warnings about the e-discovery failures, including the dangers relating to self-collection.  Dkt. 249, at 23-26; Dkt. 256, at 16; Dkt. 267, at 30, 65; Dkt. 274.  And like Leavens, Stamatis never conducted any reasonable investigation into the e-discovery issues after the Yahoo! email failure arose.  Simply asking a client who has already been less than candid for an explanation and then blindly accepting the explanation is not a reasonable investigation.  This is particularly true because the Court warned Stamatis about investigating the matter.  Dkt. 249, at 23, 25-26 ("I see this whole thing blowing up. * * * I would spend a lot of time talking to Mr. Duke about what

happened with the ESI.").  The brief San Diego meeting, which none of the participants recalled with any clarity, is in no way a reasonable investigation. Nevertheless, his late involvement is why the Court has apportioned a smaller percentage of the fees to be paid by him.

Duke must pay as well.  He was not candid with his counsel.  Duke provided misleading and false information to them, repeatedly telling them they had all the data when they didn't, and he knew they didn't.  Tr. 604-05, 609, 1242, 1401-02, 1410-11; LS Ex. 7; Dkt. 318-1 at 13.  And when he knew that the GoDaddy emails had not been searched, he failed to correct that error.  The facts establish that Duke knew the GoDaddy emails had not been searched and produced no later than the spring of 2018.  In fact, he likely knew this when he personally participated in the imaging of his four hard drives in early 2015.  The facts also establish that despite this knowledge, he did not notify the former defense counsel that the GoDaddy email accounts had not been searched until May 2019.

For these reasons, as well as the reasons explained throughout this order, Defendants, Leavens, and Stamatis are sanctioned under Rule 37(a).

For the reasons stated below, the failure to produce these documents was not substantially justified nor would the award of fees be unjust.

### c. Rule 37(b)

When parties fail to obey court orders, district courts are authorized to impose just sanctions, including attorneys' fees and prohibiting the violating party from introducing matters into evidence.  Fed. R. Civ. P. 37(b)(2).  Intent to violate

an order is not required to impose sanctions under this rule; the violator's mental state only goes to the type and extent of sanctions. *e360 Insight*, 658 F.3d at 642. The mental state is also captured in the factors courts should consider in fashioning an appropriate sanction. *Tribble*, 670 F.3d at 760.

Plaintiff's motion sought sanctions for violating this Court's June 11, 2015, order, among other orders. Dkt. 294, at 52-54, 73. Defendants did not respond to this argument in their response brief. Dkt. 347. Plaintiff's post-evidentiary hearing brief continued to seek sanctions under Rule 37(b) for violating this order. Dkt. 381, at 20, 25. Leavens did not respond to Plaintiff's request for sanctions under this rule. Dkt. 379. So, Leavens has forfeited his objections to the imposition of sanctions under Rule 37(b). *See Kenall Mfg. Co.*, 354 F. Supp. 3d at 883; *see also Henry*, 969 F.3d at 785-86. Stamatis noted that he was not involved in the violation of the June 11, 2015, order, so no sanctions are warranted against him. Dkt. 378, at 14, 22. The Court agrees. In contrast to their response brief, in their post-hearing brief, Defendants addressed the request for sanctions under Rule 37(b)(2) for violating the June 11, 2015, order. Dkt. 382, at 17-18.

The June 11, 2015, order granted Plaintiff's motion to compel production of documents, including communications, relating to Saraswat's and Webrecsol's SEO work for Defendants. Dkt. 132; Dkt. 269, at 17-18. The Court gave Defendants until June 15, 2015, to produce the documents. Dkt. 132. At the hearing granting the motion, the Court stated that it wanted "a complete production, so [Plaintiff's counsel] are not getting them piecemeal and then something else happens, so that

224

they get all the documents that are responsive." Dkt. 269, at 17-18. Following this order, Life contacted Duke and requested that these documents be produced. Tr. 1127-28. Duke told Life that no documents existed. Tr. 1227-28. Duke made this representation even though he used Yahoo! chat to communicate with Saraswat, and he never even searched Yahoo! chat. Tr. 138, 139. Moreover, by this time, Leavens—who should have been supervising Duke—knew that Duke used both Yahoo! email and Yahoo! chat for 21 Century Smoking's business. Tr. 783-84. But Leavens never followed up with Duke to confirm that he searched either. Instead, working under the direction of Leavens, Life blindly took Duke at his word and informed Plaintiff's counsel that no responsive documents existed. Tr. 1227; Dkt. 294-2, at 656; Pl.'s Ex. 55.

Duke's representation to Life and Life's representation to Plaintiff's counsel were false. Tr. 1223-24, 1227-28. Responsive documents existed but were not disclosed by June 15, 2015. Tr. 1228. Rather than a complete production per the Court's order, Defendants made no production.

At the hearing, Duke testified he was not asked for these documents until March of 2018. Tr. 205. Defendants did not make this argument in their post-hearing brief and, even if they did, the Court has already explained in detail that this testimony is not credible. Instead, Defendants' post-hearing brief argued that Duke "honestly" stated that all the responsive documents Defendants were aware of had been produced. Dkt. 382, at 17. Duke's purported honesty is not a defense to the imposition of sanctions under Rule 37(b)(2), which provides for sanctions even