# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| DR Distributors, LLC, | ) |
| | ) |
| Plaintiff-Counterdefendant, | ) |
| | ) |
| v. | ) No. 12 CV 50324 |
| | ) Judge Iain D. Johnston |
| 21 Century Smoking, Inc, and Brent | ) |
| Duke, | ) |
| | ) |
| Defendants-Counterclaimants, | ) |
| | ) |
| v. | ) |
| | ) |
| CB Distributors, Inc., and Carlos | ) |
| Bengoa, | ) |
| | ) |
| Counterdefendants. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's Motion for an Order Deeming the Marital Privilege Waived and for Other Relief. Dkt. 500. The issue for the Court to resolve is whether Defendants waived the marital communications privilege by disclosing numerous electronic communications to Plaintiff during discovery, and, if so, to what extent has the privilege been waived. For the following reasons, the Motion is granted in part and denied in part.

## BACKGROUND FACTS

This case has generated a significant number of written decisions. A brave soul can review those decisions to obtain more background information if needed. But, in summary, this case involves a mark used by competing electronic cigarette sellers: 21st Century Smoke.

Defendants are 21 Century Smoking, Inc. and Brent Duke. 21 Century Smoking is a small corporation, owned and operated by Brent Duke. Brent Duke's wife, Laurie Duke, also works for 21 Century Smoking, performing a variety of duties, including some accounting. From reviewing the hundreds of pages of emails provided to the Court for two *in camera* inspections, some marital discord exists—some of which seemingly stems from the manner that Laurie Duke perceives Brent

1

Duke is operating the business. In short, at times, Laurie Duke is highly critical of the way Brent Duke is operating 21 Century Smoking. Interspersed within the emails are unkind words, heated language, cussing, and extremely serious accusations—some related to the business operations, some related to the marital relationship, and some related to a mix of both.

After receiving these emails in discovery, Plaintiff mined them for several visceral allegations by Laurie Duke that 21 Century Smoking was failing because of Brent Duke's poor business decisions, including personnel, purchasing, and investment decisions. Apparently, Plaintiff intends to use these assertions to defend against 21 Century Smoking and Brent Duke's counterclaims that Plaintiff has harmed them. Under Plaintiff's theory, 21 Century Smoking's business troubles are its own doing, not Plaintiff's.

## FACTS RELATED TO WAIVER ISSUE[1]

Discovery in this case was—and still is—cursed. The fact that this Court is issuing an opinion on a discovery problem a decade after this action was filed evidences that fact.[2]

Fact discovery ended on July 1, 2015—before the Chicago Cubs last won the World Series! Before that date, the marital communications privilege was a nonissue. No documents were identified on any privilege log as being withheld or even redacted based on the marital communications privilege. Dkt. 500-2, at 1-9.

In May and June of 2018, after Defendants' former counsel's first discovery of a failure to produce responsive electronically stored information—following the close of fact and expert discovery and the filing of summary judgment motions—they produced a tranche of thousands of emails. But the former defense counsel withheld from this production 16 documents (apparently emails) and redacted 32 other emails. Dkt. 500-2 at 15-24. The withholdings and redactions were made based on the assertion of the marital communications privilege. This is the very first time Defendants raised this privilege.[3] The privilege review process used by the former defense counsel is unknown. No evidence has been presented as to what was done to identify any privilege, including the marital communications privilege. These productions related to the failure to produce ESI from Defendants' Yahoo! account.

Included in this production were some emails that contained marital communications that were not identified on a privilege log. Dkt. 501, at 9 ("It appears FDC inadvertently failed to claim privilege with respect to other marital

---

[1] The Court has done its best to explain the facts based upon the parties' submissions. In this case, however, analyzing the parties' assertions is akin to flipping back and forth between CNN and Fox News. You're not even sure they're talking about the same events.

[2] But wait. There's more. Also pending before the Court is a second motion for sanctions relating to 20 boxes of allegedly unproduced documents. Dkt. 497.

[3] As discussed later, Defendants produced another tranche later, including ESI from Defendants' GoDaddy account.

communications contained therein which were not listed in FDC's privilege logs."). The following is a list of at least some of the emails between Laurie and Brent Duke produced but redacted by former defense counsel on June 1, 2018.  Dkt. 500-1, at 3-6.

- April 5 – 6, 2009, string:  This email string is not even related to 21 Century Smoking, Inc.  It relates to Brent Duke's business venture called Sportsdoctrine.  The string starts with an April 5, 2009, email from Brent to Kirti Saraswat, the search engine optimization consultant, about the Sportsdoctrine website.  The subject matter is "fixes."  The next day, Brent then forwarded his email on to Laurie, with the following communication: "here is the email, the full email...see any winks??  I essentially said do this, I'll pay you so I don't have to worry about it anymore...but if I can't figure out how to fix things on my own I expect that someone there will help me..."  Apparently, there is some back and forth between Brent and Laurie, all of which is redacted.  But as occurs in other productions, the redactions are not consistent.  For example, Brent's statement is later redacted, despite not being redacted in the original document.

- May 30, 2012, string:  The subject matter of this string is "cartridge flavors," but the topics discussed in this lengthy string go beyond that subject matter.  The general discussion relates to the 21 Century Smoking website, including the content and photographs on the website.  During this email exchange between Brent and Laurie, Laurie wrote that she "really really hate[d] the direction the site is going."  She also claimed that Rob Hough—who was supposed to be working on the website and was hired by Brent—was not a good employee.  Random redactions were made to this string, and it was produced by the former defense counsel at least twice.  As will be discussed later, the current defense counsel also produced this email string—again, more than once—and with different redactions.

- April 16 – 17, 2013, string:  This string between Laurie and Brent has no subject matter identified.  The string begins with Laurie asking for a passcode for Bluepay because she is unsure of shipments.  She noted that the sales numbers were off.  After Brent responded with the passcode, Laurie responded but the response in *this production* is redacted.  As will be shown later, the response is sharp.  Then there is a long general discussion of sales, shipments, and the possibility of opening new kiosks, but interspersed are random redactions, allegedly based upon the marital communications privilege.

- August 4, 2013, string:  This string starts with an email from Laurie (using the support@21centurysmoking.com email account) to Brent.  The subject of this email chain is "My fax message from 'unknown'."  It is a fax cover page

3

with a hand-written sales compilation attached. The body of the email has been redacted. The next email in the string is the same with the same redaction, but with the body of Brent's email response included. The response is heated, including statements made in all capital letters. The response captured a clear communication breakdown as to how sales sheets should be handled and also recognized that sales sheets were not handled well before and that even the current process "isn't perfect". (Obviously, this information goes to Defendants' sales data, which is relevant, and would have been useful in cross examining Defendants' experts.) The next email in the chain is Laurie's reply to Brent's response. But her reply is redacted. Brent's response remains as does the original redaction. The next email is a later reply by Laurie to Brent's response, but this time, her reply is *not* redacted. In her reply, Laurie complained about having to do the work of others and the poor quality of Defendants' employees. The initial redaction remains in place. The next email in the chain is Brent's rejoinder to Laurie's reply. It starts with, "how dumb who is?" He then defended his hiring decisions. The final email in the chain is Laurie's sur-rejoinder, again criticizing the quality of the employees. Laurie exclaimed that "they can't sell, can't fill out the sheets. makes me wonder why you hired them. oh yeah, they showed up for the interview and you had to get back for a game. and then vacation . . . someone needs to tell me sales and payroll, my time is too valuable." The redactions throughout the string do not remain consistent. Statements that were redacted on one document are not redacted on other documents.

- August 8, 2013, string: The original email is from a vendor selling animation videos. Laurie forwarded the email to Brent, asking "We're paying them to promote their own product??? They've had 1 order from a REPEAT customer in 2 weeks. Glad they are worth the money we pay." Laurie's next statement is redacted.

- August 13, 2013, string: This string is related to the August 8, 2013, string. It contains the same subject matter "Whiteboard Animation Video." The original email was from a vendor selling animation videos. Brent then forwarded the email on to Laurie, causing a debate to ensue about the cost. One consistent redaction is made throughout the production.

- July 8, 2014, string: This string appears to begin with an email from Brent to Laurie at the support@21centurysmoking.com email account. But the topic may have been a subject of a prior communication. The subject matter of this string is "website task list." The original email from Brent to Laurie contains ten bullet points. The focus of these points is the problems tracking sales on the website as well as the website's functionality in general. All of Laurie's replies and communications appear to have been redacted. The string contains another communication from Brent to Laurie. In this

4

communication, Brent stated, among other things, "The reason our sales are down is because of our website."

As explained in painful detail in a previous order, after these productions, the former defense counsel then learned that emails from a GoDaddy account had *not* been searched and produced. This realization resulted in the withdrawal of the former defense counsel. Current defense counsel then appeared on August 8, 2019.

Plaintiff filed a motion for sanctions and a memorandum in support of the motion. The motion and memorandum attached numerous exhibits, including a document labeled Exhibit HHH.[4] Exhibit HHH is a redacted September 7, 2009, email from Laurie to Brent. Plaintiff's counsel, not Defendants' counsel, redacted the document; meaning, Defendants produced this document with no redactions. The marital communications privilege was only asserted after it was produced. Plaintiff's counsel made these redactions to "remove irrelevant, personal material." Dkt. 500-1, at 2. About a quarter of the email is redacted. A sentence or line is redacted here and there as well as what appears to be at least two full paragraphs. The email stated, among other things, that Brent did not understand how links worked on websites, which would be critical knowledge for an ecommerce business. In this email, Laurie also criticized Kirti Saraswat, whom Defendants hired to increase search engine optimization. Laurie sarcastically stated that Brent was "like the guy on shark tank, perfect." Laurie also complained about being shut down by PayPal, and blamed Brent for this, after Brent allegedly blamed her. And because of the poor quality of the website of this ecommerce business, Laurie told Brent, "[Y]ou lost a lot of money in the last week." There's more, but the point is made.

The current defense counsel responded to the motion for sanctions. In response, among other exhibits, *Defendants* attached the February 4, 2012, email between Laurie and Brent Duke. Dkt. 502, at 2; Dkt. 500-1, at 2. This email stated, among other things, that Laurie made a sale to one of Plaintiff's customers. Dkt. 294-2, at 249; Dkt. 348, at 581; Dkt. 500-2, at 45.

Immediately before the scheduled evidentiary hearing on Plaintiff's motion for sanctions, on November 13, 2019, through the current defense counsel, Defendants produced over 30,000 pages of documents. Dkt. 361. The privilege review process used by the current defense counsel is unknown. No evidence or

---

[4] Because of the serious and repeated problems with document production, the Court required the unproduced ESI to be provided to Plaintiff in both hard copy and native format. This is unusual. Although some ESI should be produced in native format, the Court does not require all native production all the time, for obvious reasons. But the Court felt this type of production was necessary under the circumstances. In hindsight, it was a good decision. It turns out that Exhibit HHH, as well as other ESI, was not produced in hard copy, but only in native format. Of course, that only raises other questions about this specific production and discovery control in general. The Court is mindful that discovery need not be perfect, only reasonable. But, at some point, multiple imperfections—some larger than others—make discovery productions unreasonable.

even any information has been presented as to what was done to identify any privilege, including the marital communications privilege, for this document production. Like the May 31/June 1, 2018, production, the privilege review process for the November 13, 2019, production is a complete mystery.

Beginning on November 15, 2019, the Court held a lengthy evidentiary hearing. During the evidentiary hearing, numerous exhibits were used and entered in evidence, including the February 4, 2012, email. Dkt. 502, at 2; Dkt. 500-1, at 2. Plaintiff used this email to show that relevant and responsive ESI had not been produced and that it was prejudiced. Plaintiff also used this email to show customer confusion in support of its Lanham Act claim. There was *no* objection based on the marital communications privilege to this exhibit. In fact, the only reference to the marital communications privilege anywhere in the 1,500 page transcript is that the 48 documents identified in the May 31, 2018, privilege log were redacted or withheld under this privilege. Dkt. 500-2, at 15-24.

Following a lengthy briefing schedule and satellite motions, on October 23, 2020, the Court informed counsel of its anticipated ruling on the sanctions motion. Dkt. 420. The Court specifically notified Defendants that they would be required to search for and produce relevant and responsive documents within 30 days of the order being entered. Dkt. 421, at 14-15. The Court then gave the parties an opportunity to resolve the case. Dkt. 420.

Despite the best efforts of Magistrate Judge P. Michael Mahoney (ret.), the case did not settle, obviously. Dkt. 430. Despite some suggestions to the contrary, by January 2, 2021, Plaintiff made it clear that the case would not settle. Dkt. 434. On January 4, 2021, the Court informed the parties that nothing had changed in the Court's draft order, other than that the document was longer. Dkt. 436. On that date, the Court notified the parties that it would enter the order on January 19, 2021, absent a settlement. Dkt. 436. So, by this time, Defendants were on notice that they would need to search for and produce relevant and responsive ESI for over 60 days.

On January 19, 2021, the Court issued a comprehensive order imposing several sanctions. Dkt. 439. As Defendants had already been told, the Court also required Defendants to search for and produce relevant responsive documents, which had not been previously searched for or disclosed. These documents included ESI from Defendants' GoDaddy account. The Court required the production by February 28, 2021. The sanctions order prohibited Defendants from using any of these subsequently produced documents. Dkt. 439, at 9.

On February 2, 2021, over Plaintiff's reasonable objection, the Court extended the date to produce the documents that were overdue by years. Dkt. 446. The Court expressed dismay as to Defendants' apparent dawdling. The new date to produce the ESI was March 19, 2021, so the Court eventually gave Defendants 60 days to produce the documents. In the order granting the extension, the Court stated, "To speed up the privilege review, by way of this order, the Court *sua sponte* will apply Federal Rule of Evidence 502(d) to the fullest extent available, so that privileges and protections are not waived by disclosure. Fed. R. Evid. 502(d).

Likewise, the Court will apply Federal Rule of Civil Procedure 26(b)(5)(B) liberally to ensure that privileges and protections are not breached." Dkt. 446, at 2.

On March 19, 2021, Defendants complied with the order and produced relevant ESI. Thousands of documents that were relevant to claims and defenses under Rule 26 and responsive to production requests—but that had not been timely produced when they were due years before—were finally produced. Dkt. 468.

Defendants also withheld documents based on privilege, including the marital communications privilege. Some documents were produced but with redactions, again based on the marital communications privilege. The redacted documents produced by the current defense counsel in March 2021 included the following ESI.

- April 5 – 6, 2009, string: This email string was previously produced by the former defense counsel. Again, this email relates to a different business called Sportsdoctrine. When the current defense counsel produced this email string, they made different redactions and left unredacted a communication by Laurie that she was "done" with that particular business and its website.

- May 30, 2012, string: This email string was previously produced by the former defense counsel. The subject line is "cartridge flavors." This production by the current defense counsel contains similar, but not identical, redactions based on the marital communications privilege. Again, Laurie complained about 21 Century Smoking employees, stating among other things that Rob Hough "drives me f'ing crazy." In this email string, Laurie expressed numerous concerns about 21 Century Smoking, including that she "really really hate[d] the direction the site is going."

- June 20 – 21, 2012, string: This is a lengthy email string, but the subject line is blank. The email contains communications, starting with Laurie, about the myriad of problems facing 21 Century Smoking, including that the employees are subpar (including Brent's brother/Laurie's brother-in-law), that the website has numerous problems, that the sales data is compromised, and that the company is making very little, if any, money. There are many complaints about the search engine optimization. Here is just one sampling of one of the communications: "What has Robert done, other than recreate AutoCigs website into zencart, to help get that business going? We have had THREE sales. We have spent a lot of money on Robert, so we are assuming a HUGE loss at this point. If you thought Rob could do SEO and get traffic to the website, then HE HAS FAILED. Yes, after buying the company and acquiring the product in February and recreating the site, we have ZERO new customers and ONLY ONE

retainer that hasn't ordered in a long time." These statements are relevant to many issues in this case and certainly would have been useful when deposing Defendants' expert witnesses. The sense one gets from reading this string is that the business was in total chaos and completely dysfunctional. The production contained multiple redactions throughout the string based upon the marital communications privilege.

- July 12, 2012, string: The subject matter of this email string is "nowhere is 'bryan wants to do this' a definition of the word 'discussion.'" The string begins with a cut and paste of the definition of the word "discussion" from the internet. That set the tone for the entire email chain, covering a variety of topics including tents and banners to be used apparently at neighborhood festivals. The string contains multiple redactions but left unredacted numerous communications, including this communication from Laurie to Brent: "we do NOT have enough employees to do 2 events at the same time. we don't have enough for displays, we don't have enough product...we don't have enough money to go and NOT MAKE SALES." Also left unredacted were statements by Brent about the amount of work he was doing on the website. Brent stated, in part, "make sure to have the right number of links and use the exact keywords the exact correct number of times. meta tag all of the pics and links correctly as well." This statement is relevant on many levels, including impeachment of Brent because he testified that he did not have the skills to include metadata on the website, which is where the infringing mark was located. Laurie concluded this email string by continuing to criticize the employees Brent hired.

- April 16 – 17, 2013, string plus a stray email: This email string was previously produced by the former defense counsel on June 1, 2018. But this production by the current defense counsel, while possessing some of the same redactions, contains not only different redactions but also does *not* redact communications previously redacted. As stated previously, this email string starts with Laurie asking Brent for the Bluepay passcode. Brent responded with the passcode, to which Laurie references the lack of sales and concludes by stating, "Sorry to bother your hungover ass." This statement was redacted by the former defense counsel but is initially not redacted in this production by the current defense counsel. Later, however, the current defense counsel redacted that communication. The email string about shipment, sales, and business difficulties continued. Again, this production contains several redactions but did *not* redact one of Brent's communications to Laurie about a DHL shipment that stated, "dhl is still holding our

shipment. i'm going to email dhl and then pay for shipment...first i had to reply to this insulting email." An April 17, 2013, email was produced as well. This email was *not* previously produced by the former defense counsel. The current defense counsel redacted this email based on the marital communications privilege but left the following communication by Laurie unredacted: "All my history was cleared from the computer when I was trying to get internet back up. I don't have the http address for zen cart admin settings and can't find it on any of the computers here. Can you please email it to me when you possibly can..."

- May 2, 2013, string: This email string starts with an email from Laurie to Brent shortly around midnight and spans until the afternoon of May 2, 2013. Nearly the entire communication is redacted. The only communication not entirely redacted occurred at 10:40 a.m., and even that communication contains a partial redaction. This particular communication is from Brent to Laurie. In this communication, Brent identified various people he had sent 21 Century Smoking product to, and the results or possible results of those actions. Brent went on to state the following: "how do you think *21st century smoke* got to 15 million?? they got their product out there...i bet they spent 50-100k sending out samples...maybe you are happy with our growth rate, I'm not...we have 20k in the bank and you are mad about sending out 30 dollars of product." (Emphasis added.) This would have been an extremely useful document for Plaintiff to possess during discovery and summary judgment briefing.

- August 8, 2013, string: This email string was previously produced by the former defense counsel. This production appears to be identical to the previous production.

Defendants do *not* seek to claw back *any* of these redacted emails. Dkt. 500-4, at 71; Dkt. 500-4, at 76-78 (none of the documents identified in the claw-back letters identify these documents). But Defendants do seek to claw back 262 documents based on the marital communications privilege. Dkt. 500-4, at 76-78. The current defense counsel has filed a declaration that he "inadvertently produced numerous marital communications between Brent and Laurie Duke. [His] production of such communications was not done with the intent to waive [the marital communications privilege]." Dkt. 502, at 2. But the declaration provides no facts supporting the assertion that the production was inadvertent. And, importantly, the declaration provides no facts as to the reasonable actions—or any actions—used to avoid the disclosure of the privileged documents. The declaration is completely silent as to the privilege review process.

9

On March 23, 2021, Defendants provided a privilege log. Dkt. 500-4, at 72. Plaintiff provided a status report of its review of the documents.

The Court provided Plaintiff with time to review the new production, and report to the Court its findings in a status report.

On May 17, 2021, Plaintiff filed another status report about its review of this second tranche of production. Dkt. 473. In this status report, Plaintiff raised concerns about ESI being withheld and redacted under the marital communications privilege. The Court provided Plaintiff with another 60 days to review all the document production. In what turned out to be a futile attempt to head off more briefing and discovery disputes, the Court ordered Defendants to provide—by June 14, 2021— unredacted copies of all ESI withheld or redacted based on the marital communications privilege for an *in camera* inspection. Dkt. 474; Dkt. 475.

On June 11, 2021, the current defense counsel sent the first claw-back letter. Dkt. 500-4, at 71-72. In this letter, for the first time, the current defense counsel sought to claw back 23 documents that "were inadvertently produced in error"—on November 13, 2019, which was 20 months earlier. Dkt. 500-4, at 71. The first claw-back letter also made a demand under Rule 26(b)(5)(B) that the documents be returned, sequestered, or destroyed. Dkt. 500-4, at 72. The current defense counsel also provided an updated privilege log. Dkt. 500-4, at 73.

On June 16, 2021, the current defense counsel provided the Court with the documents it claimed were privileged under the marital communications privilege.

The Court then spent a weekend reviewing the hundreds of documents. And, on June 28, 2021, the Court entered an order stating its finding that the documents were, in fact, covered by the marital communications privilege. Dkt. 480.

On July 19, 2021, the current defense counsel sent a second claw-back letter to Plaintiff's counsel. Dk. 500-4, at 76-78. This letter asserted that there were 267 additionally privileged documents that Defendants were seeking to claw back, claiming that they were inadvertently produced. Five of these newly identified documents were produced in November 2019. Dkt. 500-4, at 76. The remaining documents were produced in March 2021. Dkt. 500-4, at 76-78. So, in total 28 documents were produced in November 2019, and 262 were produced in March 2021. The total number of documents the claw-back letters sought is 290. Of relevance to this motion, of the 267 additional documents sought to be clawed back, 148 were sought to be clawed back because of the marital communications privilege. Dkt. 500-4, at 78.

Then a letter-writing campaign began, with emails and letters being sent to the Court. On September 9, 2021, the Court ordered that the 148 newly claimed marital communications privileged documents be provided. Dkt. 496. And after the Court reminded counsel that requests for relief must be made by motion, Plaintiff filed the Motion to find that the marital privilege had been waived. Dkt. 498; Dkt. 500. Defendants then responded. Dkt. 501; Dkt. 502; Dkt. 503.[5]

---

[5] Dkt. 502 and Dkt. 503 are identical. Apparently, Defendants filed the document twice. Both filings contain a declaration of one of the current defense counsel, a timeline, and

Although none of the parties alerted the Court to this critical fact, the Court gleaned for itself from the claw-back letters and other filings that the Defendants do *not* seek to claw back *any* of the emails previously described in the bullet points, which the parties discuss at length in their briefs.

## ANALYSIS

### The Marital Communications Privilege

The marital communications privilege is recognized under federal common law. *Wolfle v. United States*, 291 U.S. 7, 12 (1934); *see also Trammel v. United States*, 445 U.S. 40, 51 (1980). The marital communications privilege covers information privately disclosed between husband and wife in the confidence of the marital relationship. *United States v. Brock*, 724 F.3d 817, 820 (7th Cir. 2013). The marital communications privilege exists to ensure that spouses feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law. *Id.* at 820-21. Like all privileges, the marital communications privilege inhibits the truth-seeking process, so it is narrowly construed. *Ryan v. Commissioner of Internal Revenue*, 568 F.2d 531, 542 (7th Cir. 1977); *United States v. Pugh*, 162 F. Supp. 3d 97, 111-12 (E.D.N.Y. 2016). And, like all evidentiary privileges, the marital communications privilege can be waived. *Brock*, 724 F.3d at 821.[6] The privilege can be waived by disclosing the privileged communication

---

various emails and letters. No declarations were provided by Brent Duke, Laurie Duke, or Defendants' ESI consultant.

[6] Each side waived an argument. First, Plaintiff waived the argument that the communications between Laurie and Brent about business matters are not confidential under the marital communications privilege. *See Veracities PBC v. Strand*, No. 3:19-cv-172-SI, 2022 U.S. Dist. LEXIS 82349, *9 (D. Or. May 6, 2022) (recognizing business exception to the marital communications privilege); *see also Hanger Orthopedic Group, Inc. v. McMurray*, No. 97-696-CIV-ORL-22, 1997 U.S. Dist. LEXIS 23414, at *14-16, 18 (M.D. Fla. Dec. 12, 1997) ("As a matter of law, no reasonable person could have believed that business-related communications between Roy and Crystal McMurray were in confidence."); *Atlantic Richfield Co. v. Triad Petroleum, Inc.*, 113 F.R.D. 686, 687 (S.D.N.Y. 1987) ("Thus, it was held long ago in New York that communications concerning 'ordinary business matters,' which would have been made if a third party were present, are not protected."); *McCormick on Evidence*, §80 (8th ed.) ("The fact that the communication relates to business transactions may show that it was not intended as confidential. Examples are statements about business agreements between the spouses, or about business matters transacted by one spouse as agent for the other, or about property or conveyances."). Because Plaintiff never raised this argument, it is waived. *See* Dkt. 500 at 15 (identifying three exceptions to the privilege but not the "business communications exception"). Because the issue was not raised and briefed, the Court declines to attempt to determine where a marital communication stops and a business communication begins, which is a difficult proposition as Todd Presnell has properly noted. *See* Todd Presnell, *Honey, I Shrunk the Profits! Court Adopts "Business Communications" Exception to the*

voluntarily, and voluntarily simply means knowing that the holder is disclosing the communication. *Id.* at 822.

Defendants bear the burden of showing that no waiver occurred because of the allegedly "inadvertent" disclosure. As conceded by Defendants, four required elements must exist for a communication to be protected by the marital communications privilege: (1) there must be a communication; (2) there must have been a valid marriage at the time of the communication; (3) the communication must have been made in confidence; and (4) the privilege must not have been waived. Dkt. 501, at 3 (*citing SEC v. Lavin*, 111 F.3d 921, 925 (D.C. Cir. 1997)). The party invoking a privilege has the burden to establish all essential elements of the privilege, including the lack of waiver. *See United States v. Hamilton*, 19 F.3d 350, 354 (7th Cir. 1994) ("The party asserting an evidentiary privilege, such as the marital communications privilege, bears the burden of establishing all the essential elements."); *United States v. Nat'l Ass'n of Realtors*, 242 F.R.D. 491, 494 (N.D. Ill. 2007) ("The burden of showing that the privilege was not waived and that any disclosure was inadvertent is on the party asserting the privilege."); *see also Kleban v. S.Y.S. Rest. Mgmt.*, 994 F. Supp. 932, 936 (N.D. Ill. 1998); *Harmony Gold U.S.A. v. FASA Corp.*, 169 F.R.D. 113, 116 (N.D. Ill. 1996) ("The party claiming an inadvertent disclosure has the burden of proving that the disclosure truly was inadvertent."). A finding of waiver of privilege is reviewed under the abuse of discretion standard. *See Wade v. Ramos*, 26 F.4th 440, 445 (7th Cir. 2022); *United States v. Davis*, 1 F.3d 606, 609 (7th Cir. 1993).

According to one federal court, "Courts have uniformly held that the marital communications privilege can be waived. This commonly occurs 'when the holder of the privilege . . . is in possession of the materials at issue and fails to take adequate precautions to maintain their confidentiality, i.e., negligent or inadvertent disclosures. . .'" *United States v. Hamilton*, 778 F. Supp. 2d 651, 655 (E.D. Va. 2011). Indeed, at least three state courts have held that the inadvertent disclosure of communications waives the marital communications privilege. *Anderson v. State*, 992 P.2d 409, 418 (Okla. Ct. Crim. App. 1999) ("[T]he letters could be properly introduced through the third party that inadvertently found them."); *Zimmerman v. State*, 750 S.W.2d 194, 200 (Tx. Ct. Crim. App. 1988) ("[W]e feel the more applicable

---

*Marital Communications Privilege*, https://presnellonprivileges.com/2022/05/24/honey-i-shrunk-the-profits-court-adopts-business-communications-exception-to-the-marital-communications-privilege/ (last visited July 17, 2022). Second, Defendants waived the argument that the production of the emails did not waive the marital communications privilege because Laurie did not waive the privilege, and the privilege is held by both spouses. Besides that, Laurie never invoked the privilege before the Court, she has never appeared, and the current defense counsel have not stated they represent her. Defendants waived this argument by making it in passing in a footnote. *Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 848 F.3d 822, 829 (7th Cir. 2017) (*citing United States v. Warner*, 792 F.3d 847, 856 (7th Cir. 2015); *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) (arguments made in passing in footnotes are waived); *see also Eichwedel v. Chandler*, 696 F.3d 660, 670 (7th Cir. 2012); *Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012).

rule is the one enunciated in a Kansas Supreme Court opinion which holds 'that where a written confidential communication between husband and wife falls into the hands of a third party inadvertently and without the consent or connivance of the addressee-spouse, the third party should be permitted to testify as to the communication.'") (*citing State v. Myers*, 640 P.2d 1245, 1248 (Kan. 1982)).

### Federal Rule of Evidence 502 Is Inapplicable

Defendants rely on Federal Rule of Evidence 502 as the proper standard to be applied to this case. Dkt. 501, at 8. The Court assumes they have done so because (1) it is a more generous standard to claw back documents, and (2) it bolsters their "detrimental reliance"[7] argument—that this Court's order *sua sponte* entering a Rule 502 order that would be applied to the fullest extent available caused them to be less careful.

Defendants' detrimental reliance strategy is bold. As will be seen, that bold strategy didn't pay off for them. Defendants' argument is summed up neatly in a single sentence: "During [the current defense counsel's] production, i.e., after 1/19/21 ruling, [the current defense counsel] acted reasonably in focusing on complying with the Court's order, while relying on the Court's statement that it would apply FRE 502(d) to [the] 'fullest extent possible' and Rule 26(b)(5)(B) 'liberally'." Dkt. 501, at 12. So, apparently, according to Defendants, the Court wears the jacket, at least partially, for their "inadvertent" disclosure. But the Court refuses to accept *any* blame for Defendants' failures. Here are just a few of the facts supporting that refusal.

- This is a 2012 case.
- The fact discovery cut-off was July 1, 2015.
- Because of Defendants' monumental ESI production blunders, in 2019, the Court was required to hold a five-day evidentiary hearing to determine what occurred.
- In 2021, after determining that Defendants had failed to produce an astronomical number of relevant and responsive documents because of reckless negligence—at the very least—the Court warned Defendants of the consequences. The Court explicitly told Defendants that they would be required to produce these relevant and responsive documents that should have been produced years ago.
- Defendants knew of the impending production requirement for more than 60 days before the Court even entered the order.
- The Court then ordered that the documents be produced in 30 days after the order was entered.

---

[7] The use of the term "detrimental reliance" is the Court's, but the term captures Defendants' argument.

- Over Plaintiffs' understandable and reasonable objection, the Court granted Defendants a 30-day extension to produce the documents that, again, should have been produced years earlier.
- To provide Defendants *some* protection if *attorney-client privileged* or *work-product protected* documents were inadvertently produced, the Court—on its own—entered a Rule 502(d) order.

The chutzpah of Defendants' argument is almost too much to take. *See Global Tech. & Trading Inc. v. Tech Mahindra Ltd.*, 789 F.3d 730, 733 (7th Cir. 2015) (it takes chutzpah to blame others for one's own failings).

But, besides the boldness of the Defendants' position, there are at least three significant problems with Defendants' premise that the framework of Rule 502 applies and excuses their failures. The first is textual. The second is causal. The third is analytical.

First, as the plain language of Rule 502 makes clear, the rule only applies to the attorney-client privilege and the work-product doctrine. Fed. R. Civ. P. 502; *see* The Sedona Conference, *Commentary on the Effective Use of Federal Rule of Evidence 502(d) Orders*, 23 Sedona Conf. J. 1, 31-33 (2022). Indeed, the terms "attorney-client privilege" and "work-product protection" are even defined in the rule. Fed. R. Civ. P. 502(g). So, it's unsurprising when Judge Paul Grimm stated, "Rule 502 is titled 'Attorney-Client Privilege and Work Product; Limitations on Waiver.' As the title makes clear, the rule applies only to the attorney-client privilege and the work product doctrine. It has no effect on any other evidentiary privilege, such as the vast array of governmental, or other common law privileges, *including the confidential marital privilege. . .*" Hon. Paul W. Grimm, Lisa Yurwit Bergstrom, and Matthew P. Kraeuter, *Federal Rule of Evidence 502: Has It Lived Up To Its Potential?*, 17 Rich. J. L. & Tech. 8 (Spring, 2011) (emphasis added). For those who don't like textualism and prefer "legislative history,"[8] the Advisory Committee Notes nevertheless provide the same answer: The rule is limited to the attorney-client privilege and the work-product doctrine. Fed. R. Civ. P. 502(g), Advisory Committee Notes ("The rule's coverage is limited to attorney-client privilege and work product. The operation of waiver by disclosure applied to other evidentiary privileges remains a question of federal common law.").

Second, for some of the documents Defendants seek to claw back, the Court's order had no causal effect. The Court *sua sponte* entered the order on February 2, 2021. Dkt. 446. So, Defendants could not have relied upon this Court's invocation of the rule when they—in November of *2019*—"inadvertently" produced 28 of the documents they sought to claw back in 2021. Cause and effect are just that. An action causes an effect. The phrase is not "effect and cause." The Court's February 2, 2021, order could not have caused Defendants' "inadvertent" disclosure of these

---

[8] *See United States v. All Assets Held at Bank Julius, Baer & Co.*, 228 F. Supp. 3d 118, 124 (D.D.C. 2017) (referring to Advisory Committee Notes as "legislative history"); *see also Republic of Ecuador v. Mackay*, 742 F.3d 860, 864-65 (9th Cir. 2014) (discussing the use of Advisory Committee Notes as "legislative history").

documents, which occurred over a year earlier. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 925 (7th Cir. 2007); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-69 (7th Cir. 2006) (if a decision-maker is unaware of an event, then the event cannot cause the decision-maker to act); *see also Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005). Defendants could not have detrimentally relied on the February 2, 2021, Rule 502 order *after* they had already produced these 28 documents protected by the marital communications privilege. The Court addresses later whether Defendant's detrimental reliance theory applies to the remaining documents, which were produced in March of 2021.

Third, assuming Rule 502 applied to the marital communications privilege—which it doesn't—a simple cost-benefit analysis counsels against blindly relying on a Rule 502(d) order to justify the failure to implement a reasonable document review process. Although Rule 502(d) is a mighty powerful tool, at least some courts have found it still has limits. No doubt, some courts have found that the existence of a Rule 502(d) order allows a disclosing party to claw back attorney-client privileged and work-product protected documents without a showing of even a reasonable privilege review process. *See, e.g., Rajala v. McGuire Woods, LLP*, No. 08-2638-CM-DJW, 2013 U.S. Dist. LEXIS 1761, *113-15 (D. Kan. Jan. 3, 2013); *Brookfield Asset Mgmt. v. AIG Fin. Prods. Corp.*, No. 09 Civ. 8285 (PGG) (FM), 2013 U.S. Dist. LEXIS 29543, *3 (S.D.N.Y. Jan. 7, 2013) ("Accordingly, AIG has the right to claw back the minutes, no matter what the circumstances giving rise to their production were."). Indeed, as Magistrate Judge Andrew Peck (ret.) has noted, a Rule 502(d) order can be viewed as a "get-out-of-jail-free-card." *Commentary on the Effective Use of Federal Rule of Evidence 502(d) Orders*, 23 Sedona Conf. J. at 17 n.23. But other courts have found that, despite the existence of a Rule 502(d) protective order, a completely reckless disclosure can result in waiver. *See, e.g., Sure Fit Home Prods., LLC v. Maytex Mills Inc.*, No. 21 Civ. 2169 (LGS) (GWG), 2022 U.S. Dist. LEXIS 90833, *3, *6-7 (S.D.N.Y. May 20, 2022). And other courts have gone further and explicitly rejected the notion that a Rule 502(d) order will allow for the claw back of attorney-client privileged and work-product protected documents irrespective of the reasonableness of counsel's privilege review process or even if one existed at all. *See, e.g., irth Sols., LLC v. Windstream Communs. LLC*, No. 2:16-cv-219, 2017 U.S. Dist. LEXIS 121241, *33-36 (S.D. Ohio Aug. 2, 2017). Additionally, counsel who simply dump documents on opposing counsel without first conducting a reasonable privilege review may get in hot water with attorney regulators. *See* Edwin M. Buffmire, *Enter the Order, Protect the Privilege: Considerations for Courts Entering Protective Orders Under Federal Rule of Evidence 502(d)*, 81 Fordham L. Rev. 1621, 1624 (2013) ("But nothing in either Rule 502(d) or the model order inherently reduces the level of care taken in reviewing documents. Litigators should still undertake a thorough privilege review of documents that are likely to contain substantive communications between an attorney and client that a client wants to keep confidential. In fact, they are obligated to do so under state ethical rules."); *Commentary on the Effective Use of*

*Federal Rule of Evidence 502(d) Orders*, 23 Sedona Conf. J. at 21 n.35. Counsel who produce documents without a reasonable privilege review do so at their own risk—even when a Rule 502(d) order exists. The chances of being struck by lightning might not be great, but when it happens, the consequences are significant, so why risk walking around in a thunderstorm?

### The Correct Standard

Because of the unambiguous text of Rule 502 as well as the guidance provided by the Advisory Committee Notes, unlike some courts,[9] this Court declines to graft Rule 502 onto another common-law privilege, such as the marital communications privilege. *See United States v. Broombaugh*, No. 14-40005-10-DDC, 2017 U.S. Dist. LEXIS 98305, at *15 (D. Kan. June 26, 2017) (declining to use Rule 502 outside attorney-client privilege and work-product doctrine). If the drafters of Rule 502 wanted the rule to apply to other privileges, they could have stated so. Instead, they specifically chose to state that the rule does *not* apply to other privileges.

Rather than Rule 502, the Court will apply the balancing test used in the Seventh Circuit before the promulgation of Rule 502. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 387-88 (7th Cir. 2008). The balancing test is a three-part test. First, as a threshold matter, the court must determine if the document is privileged. If the document is not privileged, the inquiry ends. If the document is privileged, the court must determine if the disclosure was inadvertent. Lastly, even if the document is found to be privileged and inadvertently produced, the court must still determine whether the privilege was waived. *Id.*

### Are the Documents Privileged?

As noted previously, the marital communications privilege protects communications that occurred during a valid marriage, that sought to communicate a message from one spouse to the other, and that were made in confidence. *See Pugh*, 162 F. Supp. 3d at 101-02. Communications between spouses with third parties present are not privileged because they are not confidential. *Id.* at 109-10. Communications shared with third parties are likewise not privileged for the same reason. *Id.*

---

[9] *See, e.g.*, *Bayliss v. N.J. State Police*, No. 11-890 (MLC), 2014 U.S. Dist. LEXIS 129821 (D.N.J. Sept. 17, 2014) *aff'd* 622 F. App'x 182 (3d Cir. 2015); *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571, 58-84 (Fed. Ct. Cl. Sept. 13, 2012) (applying Rule 502 to deliberative process privilege).

### Was the Disclosure "Inadvertent"?

There is no bright-line rule for determining whether a disclosure was inadvertent; instead, courts look at the circumstances surrounding the disclosure. *Judson Atkinson Candies*, 529 F.3d at 388. Factors courts consider include the number of documents produced and the care with which the pre-production document review was performed. *Coburn Grp., LLC v. Whitecap Advisors LLC*, 640 F. Supp. 2d 1032, 1037-38 (N.D. Ill. 2009).

The parties must use the utmost care in selecting the methodology to review documents for privilege. *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 262 (D. Md. 2008). Simply running keyword searches may not be enough. *Id.* at 260. As usual, the Sedona Conference has provided helpful commentary: "To avoid a potential waiver of privilege, and to avoid the damage that can be caused by an inadvertent production whether or not the production results in waiver, the parties and their counsel should design and implement a reasonable and auditable procedure for the identification and logging of privileged documents." *Commentary on Protection of Privileged ESI*, 17 The Sedona Conference Journal 95, 147-48 (2016). The Sedona Conference has identified the following factors to consider using in reviewing ESI for privilege: include steps to identify privileged ESI in the collection process; create and implement a document review protocol that includes using an experienced senior attorney who is charged with oversight responsibilities for implementing the protocol; educate and train the review team that includes detailed discussion on the law of privilege; apply an escalation process that uses more experienced counsel to resolve privilege issues; segregate privileged information; use quality control and sampling processes under the direction of a senior attorney; use advanced analytical software applications and linguistic tools to screen for privilege; contemporaneously document the privilege review process; and consider disclosing the privilege review process to opposing counsel. *Id.* at 146-50. In a nutshell, counsel should design an internal privilege workflow that is consistent with an established protocol. Phil Favro, *Solving the Privilege Conundrum*, Practical Law (March 4, 2022).

### Even if the Documents are Privileged and the Disclosure "Inadvertent," Was the Privilege Waived?

In the third part of the test, the court balances five factors: (1) the reasonableness of precautions taken to prevent disclosure; (2) the time to rectify the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. *Judson Atkinson Candies*, 529 F.3d at 388. No single factor is controlling. *Nartron Corp. v. Cooper-Standard Auto.*, No. 10-CV-12293, 2011 U.S. Dist. LEXIS 169900, *9 (E.D. Mich. May 27, 2011).

### Application of the Correct Standard to the Three Productions

Again, the parties have been unclear as to some critical facts. So, the Court has combed through the filings to find the relevant facts to apply the factors to the three different productions that apparently resulted in the "inadvertent" disclosure of ESI containing privileged communications.

### May 31/June 1, 2018, Disclosures

As to documents produced in this disclosure, other than the emails previously discussed that Defendants are *not* seeking to claw back because they are not identified on any claw-back request, the Court is unsure what documents are at issue. But the Court takes Defendants at their word when they stated, "It appears [former defense counsel] inadvertently failed to claim privilege with respect to other marital communications contained [in the May 31, 2018, production] which were not listed on [former defense counsel's] privilege logs." Dkt. 501, at 9.

Because these documents have not been specifically identified, the Court is unsure if they were even provided for an *in camera* inspection. But Defendants have the burden of showing that the production was inadvertent and that the privilege was not waived. And Defendants have presented no evidence about what steps were taken to review the documents for privilege before they were produced. So, even if documents protected by the marital communications privilege were produced (and not redacted), Defendants have failed to meet their burden that the production was "inadvertent." Even if these documents were privileged and "inadvertently" produced, Defendants have failed to meet their burden to show that the privilege was not waived. Again, no evidence has been presented at all as to the precautions that were taken to prevent the disclosures during the May 31/June1, 2018, production. Additionally, no attempts were made to claw back those documents until June 11, 2021—3 years later. Finally, at this point, it would be unfair to require Plaintiff to return those documents. Therefore, the Court finds that Defendants have waived the marital communications privilege as to any documents produced on May 31/June 1, 2018, that were not redacted or identified on a privilege log.

### November 13, 2019, Disclosures

There were numerous emails produced on November 13, 2019, that Defendants sought to claw back in June and July of 2021. The Court has already found that these emails are privileged marital communications. Dkt. 480.

But Defendants have completely failed to meet their burden of establishing that the production of these communications was "inadvertent" and that the privilege was not waived. Defendants have presented *no evidence* whatsoever as to the documents produced at that time, save one: the February 4, 2012, email. Defendants' sole declaration never discusses the November 13, 2019, production.

There is no evidence as to the privilege review process. Dkt. 502. Indeed, the only discussion in Defendants' brief related to the November 13, 2019, production is about the February 4, 2012, email, which again Defendants are not seeking to claw back. Dkt. 501, at 5-6; Dkt. 500-4, at 71-72, 76-78. There is no evidence that the production of these communications was "inadvertent" and even if the production was "inadvertent", there is no evidence that the privilege had not been waived. No evidence has been presented as to any aspect of this document production or the privilege review process. And Defendants did not seek to claw these documents back until June and July of 2021—more than a year later. Despite being privileged, there is no evidence that the production was "inadvertent" and Defendants have failed to meet their burden that the privilege was not waived.[10] Those communications can't be clawed back.

### March 19, 2021, Disclosures

### Are The Documents Privileged?

This Court has already found that a previous batch of ESI was privileged under the marital communications privilege. Dkt. 480. In the midst of briefing the waiver issue, Defendants submitted another 148 documents for an *in camera* inspection, again asserting the marital communications privilege. Dkt. 496. Some of these emails were produced on March 19, 2021. Dkt. 500-4, at 76. As discussed previously, the business communications exception to the marital communications privilege was not raised. The Court declines to apply that exception *sua sponte* or to accept additional briefing on this issue. [11]

After reviewing this second batch of emails, the Court will again find that most are privileged. But interspersed among the emails are communications that are clearly not privileged because they are from third parties, or third parties are

---

[10] The Court wonders why it was forced to spend a weekend reviewing documents for privilege if Defendants make absolutely no attempt to explain their production of these documents. *Victor Stanley*, 250 F.R.D. at 265 ("*In camera* review, however, can be an enormous burden on the court, about which the parties and their attorneys often seem to be blissfully unconcerned.").

[11] If the business exception to the marital communications privilege had been raised, the Court's decision may have been very different for many of the emails. No doubt, some emails are completely related to the marital relationship; however, others are purely business. But again, in many instances, drawing the line between what is a marital communication and what is a business communication can be extremely difficult. For example, an email about the corporation dissolving is a business communication; however, the marital strife that results is different. And some of the emails intersperse extremely personal, private topics with undoubtably business issues. For example, within some of the very same emails, a discussion of both marital fidelity and search engine optimization and email links exist. Indeed, the best example of a nearly impossible distinction between a marital communication and a business communication is this: "what will really hurt the business is you and i getting a divorce." 21C3015210.

included in the communication. *See, e.g.*, 21C3049084. A good example of an email that is not privileged is a communication with Bryan Scott. *See, e.g.,* 21C3018706; 21C3046818; 21C3046826. There's no basis for withholding or clawing back that document. Also scattered in this second batch of allegedly privileged communications are emails that have already been produced and which Defendants are not seeking to claw back. *See, e.g.,* 21C3048895; 21C3048896; 21C3046930 ("nowhere is 'Bryan wants to do this' a definition of the word 'discussion'"). Defendants' consistent inconsistency in asserting the privilege will be considered later in the analysis.

The emails with or involving third parties are not privileged and cannot be clawed back. The same is true for the emails already produced that were not previously clawed back. The Court finds the remaining emails privileged, so the Court must next determine whether the production of these privileged emails was "inadvertent" and even if these emails are privileged and were "inadvertently" produced, whether the privilege was waived.

### Was the Disclosure "Inadvertent" and Even if the Disclosure was "Inadvertent," Was there Waiver?

Other than the February 4, 2012, email, the only *evidence* about the March 19, 2021, production is the following sentences: "In the rush to properly comply and while under the threat of sanctions for failing to comply, I inadvertently produced numerous marital communications between Brent and Laurie Duke. My production of such communications was not done with the intent to waive [the marital communications privilege]." Dkt. 502, at 1-2. That's it. And that's hardly enough evidence for Defendants to meet their burden that the production was "inadvertent" and that the privilege was not waived. *See Harmony Gold U.S.A. v. FASA Corp.*, 169 F.R.D. 113, 116 (N.D. Ill. 1996) ("Standing alone, Harmony Gold's self-serving declarations that their disclosures were inadvertent are insufficient to satisfy its burden.").

In their brief, Defendants contend several factors support a finding that the production was "inadvertent" and that they did not waive the marital communications privilege. But arguments in briefs, "unsupported by documentary evidence, are *not* evidence." *United States v. Stevens*, 500 F.3d 625, 628 (7th Cir. 2007) (emphasis in original). Indeed, "it is universally known that statements of attorneys are not evidence." *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002). And even accepting these arguments as evidence, Defendants have still not met their burden.

Defendants' brief conflates—to some extent, understandably so—the second and third parts of the test. Dkt. 501, at 11-12. Defendants argue, first, that the volume of documents being reviewed was substantial. Defendants claim that over 1 million documents were extracted from over 50 devices and data repositories, which were searched, resulting in a production of about 155,000 documents. Of these, 5,800 were reviewed for privilege, with 1,928 being identified as containing some

kind of privilege. (Notably, Defendants do not identify how many contained only confidential marital communications. Dkt. 501, at 11.) Second, Defendants contend that the former defense counsel "lacked any system to document what they reviewed and produced." Dkt. 501, at 11. Third, the review and production processes were complicated. Dkt. 501, at 11. For example, according to Defendants, "[N]ot only was the [current defense counsel] tasked with running Plaintiffs [sic] 20 search terms across all ESI that [former defense counsel] missed, but [current defense counsel] had to develop queries in Relativity to search these 1.1 Million documents for any that were responsive to *any* of Plaintiffs' multiple written discovery requests. . . Only then could [current defense counsel] develop developing [sic] queries and search for privilege across the production set exceeding 150,000 documents." Dkt. 501, at 12 (emphasis in original).[12] Fourth, Defendants assert that the document review was more complicated because it was done remotely during the pandemic. Dkt. 501, at 11.[13] Again, there is no evidence to support any of this. This is all just argument.

## Precautions

Although no single factor is dispositive, because the precautions and care taken in reviewing the production for privileged documents is contained in both the first and third step of the test, this factor should be given more weight. Defendants have failed to provide any evidence and barely even any argument on the privilege review process. Defendants argue about the collection and production process. However, other than asserting that they developed queries to review for privilege and did not intend to waive privilege by the "inadvertent" disclosures, no other information is provided.

Simply put, the Court has no idea *what* the privilege review process was or *how* it worked. Here are just a few of the unanswered questions: Did Defendants use a key word search, and if so, what were those key words, and why were they chosen? Did Defendants use technology-assisted review as part of the review process and then follow up with key word and/or manual review? Did Defendants use any advanced analytical software applications or linguistic tools as part of the

---

[12] Defendants also note that their current defense counsel were dealing with the "20 Boxes" production. Dkt. 501, at 12. This is a reference to Defendants apparent failure to search and produce relevant and responsive documents located in 20 boxes of which former defense counsel have claimed they were unaware. Arguing that current defense counsel was busy trying to understand yet another failure to comply with discovery isn't much of an excuse for "inadvertently" disclosing hundreds of documents protected by the marital communications privilege.

[13] Notable by its absence is any evidence or argument as to the cost of the production and privilege review. The Court takes judicial notice that Defendants' insurance carrier has been paying significant sums of money to "defend" this case. *Diamond State Ins. Co. v. Duke*, No. 1:14-cv-07764 (N.D. Ill), Dkt. 115, at 24-25, Dkt. 107, at 19; *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 545 (7th Cir. 2014). The Court gets the sense that the carrier seems to believe that—to its displeasure—it is also bankrolling Defendants' counterclaims.

review process, and if so, what were they, who used them, how were they used, and were the results checked for quality or audited in any way? Did Defendants use a manual privilege review, and if so, how many attorneys were used, who were they, how were they trained, what was their experience, what was their knowledge of the case, and was their work quality checked and audited, and if so by whom?

This is fundamental information courts need to determine the reasonableness of the privilege review process. Fourteen years ago, Judge Paul Grimm wanted similar information to determine whether privileged documents were produced "inadvertently" and whether privilege had been waived by disclosure. *See Victor Stanley*, 250 F.R.D. at 259-60. In finding that the producing party failed to demonstrate that the privilege review process was reasonable, Judge Grimm stated, "Defendants neither identified the keywords selected nor the qualifications of the person who selected them to design a proper search; they failed to demonstrate that there was quality-assurance testing; and when their production was challenged by the Plaintiff, they failed to carry their burden of explaining what they had done and why it was sufficient." *Id.* at 262. This Court requires the same evidence. When a producing party fails to provide it, the party has failed to meet its burden.

And even if the Court were provided with this information, there are issues just begging for explanations. For example, the first attempted claw back occurred on June 11, 2021, but a month later, on July 19, 2021, Defendants sent a second claw-back letter. What processes were done and how were they different than the processes that were done to generate the first claw-back letter? In other words, how was it discovered that additional privileged documents were produced and why was that process not implemented earlier?

Finally, the numerous examples of repeated inconsistent and often conflicting redactions are strong evidence that a standardized and audited protocol by knowledgeable and careful counsel was not used. No doubt, three different lawyers could look at documents and reach different conclusions as to what is privileged, but, in the end, there must be consistency, otherwise the process is not defensible.

## Lapse of Time

The amount of time that lapsed before Defendants sought to claw back the documents weighs in favor of waiver. In this case, this production occurred on March 19, 2021. Defendants first sought to claw back these documents on July 19, 2021. Dkt. 500-4, at 76-78. So, four months passed. That's not timely. *See Victor Stanley*, 250 F.R.D. at 263. Moreover, Plaintiff put Defendants on notice of the marital communications privilege documents on May 17, 2021, and Defendants did not act on *these* documents until July 19, 2021. Dkt. 473; Dkt. 500-4, at 76-78. Again, that's not timely. *Id.* And, critically, Defendants did nothing regarding this production until more than a month after they sent the June 11, 2021, letter, which only identified 23 documents. Dkt. 500-4, at 71-72. As mentioned previously, Defendants' actions during that month are unexplained.

## Scope of Discovery

For those unfamiliar with modern civil litigation, the scope of the discovery may seem to weigh in favor of Defendants. Although the discovery scope was significant, it was not onerous, especially considering the amount in controversy. Searching a million documents in an eight-figure case is unsurprising these days. The more-than-reasonable amount of time the Court provided to Defendants to conduct this discovery must also be considered. Defendants were on notice that they would need to produce these documents as far back as October 23, 2020, when the Court previewed the order on sanctions. Dkt. 420; Dkt. 421, at 14-15. And, if Defendants were asleep at the switch then, the wake-up call certainly occurred on January 2, 2021, when Plaintiff made absolutely clear that the case would not settle, so Defendants would need to produce the documents within 30 days of the entry of the order. Dkt. 434. Finally, over Plaintiff's objection, the Court extended the production date another 30 days. So, Defendants were on notice for over 60 days that they would need to produce these documents, and then the Court generously gave Defendants 60 days to produce the documents, which were due years earlier. Defendants' dawdling does not help their cause.

## Extent of Disclosure

The extent of the disclosure weighs in favor of waiver. Defendants produced hundreds of privileged documents. This "inadvertent" production was not a stray document here and there; the disclosure was not an aberration. *Victor Stanley*, 250 F.R.D. at 263 ("[T]his case does not present an instance of a single document slipping through the cracks."). The production of privileged documents was systemic. The volume of disclosures, particularly when considering the substance of the disclosures,[14] evidences a fundamental failure in the privilege review process.

## Fairness

Fairness also weighs in favor of finding waiver. Initially, seldom is it unfair for the truth to be revealed. *New Bank of England v. Marine Midland Realty Corp.*, 138 F.R.D. 479, 483 (E.D. Va. 1991). Moreover, there is nothing unfair with a court requiring—even under a threat of sanctions—Defendants to comply with their discovery obligations after years of failing to do so. This Court used utmost fairness when, in its discretion, it did not impose harsher sanctions on Defendants for their

---

[14] The Court is convinced that no human put eyes on these documents. A soulless, unfeeling machine might miss flagging these documents as containing marital communications, but no reasonable person could make that mistake. So, it is unsurprising that Plaintiff's counsel quickly notified the Court and Defendants' counsel of the marital privilege communications issue upon reviewing the disclosure. Despite Defendants' protestations, there is no evidence that Plaintiff violated Federal Rule of Civil Procedure 26(b)(5)(B).

misconduct. Finally, to the extent Defendants' counsel misunderstood the scope of Rule 502, that's not a fairness issue; instead, that's a competency issue.

### Scope and Consequences of the Waiver

So, the Court has found a waiver of the marital communications privilege, now what? Plaintiff argues that because privileged documents were produced, subject matter waiver results. Dkt. 500, at 17-18. In doing so, Plaintiff frames the subject matter as "communications about the operation of Defendants' business." Dkt. 500, at 18, 19. To get to this conclusion, however, Plaintiff makes three mistakes.

First, as has happened before in this case, when Defendants err, Plaintiff engages in disproportional and dramatic overreach. *See, e.g.*, Dkts. 453, 452, 450. This is not a new phenomenon in this decade-old case.

Second, more importantly, Plaintiff seeks to broadly define the subject matter. But when waiver occurs, both the subject matter and the scope of the waiver should be narrow. *McCullough v. Hanley*, No. 17 CV 50116, 2019 U.S. Dist. LEXIS 135225, *27-28 (N.D. Ill. Aug. 12, 2019). "Communications about the operation of Defendants' business" is essentially everything.

Third, and most importantly, Plaintiff mistakenly argues that Defendants are using the privilege as both a sword and a shield. Dkt. 500, at 15-17. This Court has addressed this specific issue before. Relying on luminaries like Magistrate Judge James "Jay" Francis IV (ret.), the Court found that for subject-matter waiver to occur, there must be an affirmative attempt to use communications protected by a privilege to influence a decision maker. *McCullough*, 2019 U.S. Dist. LEXIS 135225 at *35-36. ("'[T]he critical inquiry is whether protected information has been partially disclosed to a decisionmaker in an effort to influence a decision. Without any use of the previously privileged/now disclosed information, the sword has not been wielded. When a privilege holding party will not or does not use the disclosed information affirmatively to influence a decisionmaker, no subject-matter waiver is found because unfairness is lacking.") (cleaned up). But, out of the hundreds of documents identified as being privileged, Defendants used only the February 4, 2012, email and did so at the sanctions hearing for the narrow purpose of putting the email into context *after Plaintiff had already identified the email on its exhibit list*. Dkt. 500-1, at 2; Dkt. 501, at 5; Dkt. 502, at 2. And Defendants are not even seeking to claw back this email. Dkt. 502, at 2. Indeed, Defendants' failure to search for and produce documents before 2021 is precisely why the documents are being produced now and, obviously, were not used previously. And there is another obvious reason why Defendants have not used these documents to influence the Court to date and will not be used later: These documents are devastating to Defendants' case. Finally, and dispositively, Defendants will not use these documents to influence any decisionmaker—including this Court—because in previously sanctioning Defendants, the Court *already* ordered that they *cannot* use these documents. Dkt. 439, at 8-9.

Although the Court finds that Defendants have failed to meet their burden to show that the disclosure of the documents was "inadvertent" and that the privilege was not waived, a finding of subject matter waiver does not necessarily follow. *irth Sols*, 2017 U.S. Dist. LEXIS 121241, at *43-44.

Whether these documents will ever be used at trial—because the Court doesn't want to see summary judgment motions in this case—is left for another day. Obviously, the admissibility of these documents is subject to numerous rules of evidence, including Federal Rule of Evidence 403.

## CONCLUSION

Plaintiff's Motion is granted in part and denied in part. Defendants will not be allowed to claw back the emails. But the Court does not find that Defendants waived subject matter. Nothing in this order should be viewed in any way as an indication on the admissibility of any of these documents. Defendants have not waived any objection as to admissibility.

Entered: July 22, 2022

By: _____

Hon. Iain D. Johnston
United States District Judge