**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| DR DISTRIBUTORS, LLC, | |
| *Plaintiff-Counterdefendant*, | |
| *v.* | |
| 21 CENTURY SMOKING, INC., and BRENT DUKE, | No. 3:12-cv-50324 |
| *Defendants-Counterclaimants*, | HON. IAIN D. JOHNSTON |
| *v.* | |
| CB DISTRIBUTORS, INC., and CARLOS BENGOA, | |
| *Counterdefendants*. | |

## MEMORANDUM OPINION AND ORDER

By far, this case is the oldest rat in the barn. Resolution of this case has been repeatedly stymied by Brent Duke's actions and inaction. Extreme prejudice resulted—to Plaintiff, to the Court, and to the other litigants attempting to have their cases resolved. Too much time and energy and too many resources have been unnecessarily spent on this case. The litigation in this case has resulted in numerous court orders—many of them caused by Duke's misconduct. This order will be the Court's last. The Court is entering case-terminating sanctions. Two separate motions filed by Plaintiff necessitate this result. The first motion is based upon Plaintiff's demand that Duke pay the $1,263,372 Duke owes Plaintiff on account of the Court's first sanctions order. Dkt. 578, 573, 572, 541. The second

1

motion is based upon Duke's additional misconduct, including, but not limited to, withholding 20 bankers boxes of physical documents. Dkt. 552, 497, 488, 449. Some of the relevant facts dovetail for the analysis for both motions. But independently the motions provide their own bases for the sanctions imposed here— default on Plaintiff's claims and dismissal of Duke's counterclaims. Each motion would provide an independent basis for case-terminating sanctions. When combined, the motions provide even more grounds for case-terminating sanctions. Of course, the actions and inaction that have resulted in this order can't be viewed in a vacuum. The Court must look to not only the straw that broke the camel's back, but the bales that preceded it. *Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 507 (7th Cir. 2016).

## I. FIRST BASIS FOR CASE TERMINATING SANCTIONS: PLAINTIFF'S MOTION TO BE PAID BASED ON FIRST SANCTIONS ORDER

To be absolutely clear at the outset, this Court is *not* entering case-terminating sanctions *solely* because Duke didn't pay the $1,263,372 required by the first sanctions order based on his financial inability to pay the sanctions. Instead, for this motion, the case-terminating sanctions have four independent bases, which are all combined with and related to his failure to pay what he rightfully owes. The first basis is Duke's culpability, evidenced by his overall misconduct, including both continuing misconduct and newly proven misconduct. The second basis is Duke's bad faith (as evidenced by his recklessness) and fault, which show an established contumacious attitude toward this Court's orders. The third basis is that any lesser sanctions this Court might be inclined to impose in

addition to those sanctions previously imposed would be tantamount to case-terminating sanctions.  Any reasonable, lesser sanctions imposed on top of the previously imposed sanctions would lead to the same result.  The fourth basis is that the probable merit of Duke's case—to the extent his defense to Plaintiff's claims and his counterclaims have merit—is not strong enough to counterbalance other considerations.  Among other things, the probable merits of Duke's case are critically weakened by the previous sanctions and any "lesser sanctions" that should be imposed for his continued misconduct.  Again, each basis alone, when combined with Duke's failure to pay the previously imposed monetary sanctions, would be sufficient.  But, when combined, there's only one reasonable conclusion: claim- and action-terminating sanctions should be imposed.

## A.  FACTS

In an attempt to avoid another *War and Peace* opinion, the Court focuses on the critical facts.  But because of the nature of the motion—which requires the Court to consider the totality of the circumstances—many critical facts exist.  Additionally, when a court decides to impose the ultimate discovery sanctions, it benefits all involved to understand the factual framework upon which the decision is based.

At its core, this is a trademark case, with supplemental state-law claims and counterclaims, including a frivolous counterclaim asserting defamation.  Plaintiff is DR Distributors, LLC, which owns the registered trademark "21st CENTURY SMOKE."  Carlos Bengoa is the principal of DR Distributors.  Defendants are 21 Century Smoking, Inc., and Brent Duke.  Duke owns and operates 21 Century

Smoking.  Both companies sell electronic cigarettes, and their marks are used in their respective businesses.  The parties agree that the marks are confusingly similar.

The Court has lived with this case for over a decade.  During that time, the Court has had multiple opportunities to interact and observe Bengoa and Duke, including during testimony and two failed settlement conferences.  Bengoa presents as a likeable, knowledgeable, and credible witness.  His personal journey is a coming-to-America success story.  Since immigrating to the United States decades ago, Bengoa has become an extremely successful businessman.  So successful, in fact, that he has been able to personally bankroll this litigation to the tune of over two million dollars.  Dkt. 606, at 37.  His distribution business operates across the nation, working with the country's largest retailers.  Dkt. 606, at 36-40.

Duke presents very differently.  Duke presents as evasive, cavalier, and certainly not credible.  Indeed, after a lengthy evidentiary hearing during which Duke testified, this Court found, "[O]n the key issues in this case, he was not a credible witness." *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 884 (N.D. Ill. 2021).  As the Court stated at the time, "[T]he Court was left with the firm conviction that Duke took advantage of the ineptitude, carelessness, or disinterest of his attorneys." *Id*. at 873.  A review of the Court's previous sanctions order identified over 20 clear misrepresentations by Duke; several of those

misrepresentations were when he was under oath.[1]  Importantly, Duke has a penchant for not providing critical, relevant information when reasonable people in the same situation would know they are dutybound to disclose it.  *DR Distribs.*, 513 F. Supp. 3d at 868, 873, 944-46 (citing Restatement (Third) of Torts: Liability for Economic Harm § 13 (Am. Law Inst. 2020)).  Duke's habit for keeping mum instead of speaking up is one of many bases for this Court's order.  Despite possessing a business degree from Stanford University, he has been unsuccessful in business.  As the Court described in a prior order, 21 Century Smoking is a shambolic company.  *DR Distribs.*, 616 F. Supp. 3d 769, 778-79 (N.D. Ill. 2022) ("The sense one gets from reading this string [of emails] is that the business was in total chaos and completely dysfunctional.").  And the financial records provided to the Court to date establish that 21 Century Smoking has produced very little income for Duke.  Dkt. 583.  He currently receives $500 per month in wages from 21 Century Smoking.  Dkt. 583-1, at 1.  His primary source of income is driving for Uber, making about $2,000 per month.  *Id.*

Plaintiff's counsel has estimated its damages are less than a million dollars.  In this litigation, the real value Plaintiff seeks is the right to the mark.

Estimates as to the value of Duke's counterclaim have varied greatly.  Alleged damage calculations up to 2015 ranged from $5 to $35 million.  Later, Duke's counsel estimated the value of the counterclaim to be "eight figures," which

---

[1] *See, e.g.*, *DR Distribs.*, 513 F. Supp. 3d at 867-68, 870, 873-75, 881 n.21, 884, 886, 887 ("Nearly every aspect of that testimony is demonstrably false."); *id.* at 903 ("During his deposition, Duke also falsely testified to other critical matters in this case.").

means between $10 million and $99 million. Again, according to Duke's counsel, that estimate would be conservative because Bengoa has been profiting off of Duke's mark for years after the initial estimate.

Of course, damage calculations are different from the merits of a case. Damages are irrelevant without establishing liability. No doubt, one of Duke's previous attorneys stated that he believed Duke had a meritorious case. But those statements occurred before at least two critical events. First, they were made before the Court imposed significant evidentiary sanctions for Duke and his former defense counsel's previous misconduct—which included Duke spoliating evidence. A case will always look better to an attorney when the client hides and destroys unfavorable evidence. Second, they were made before this same former defense counsel learned that Duke was not candid with him and before this counsel implied Duke's newly discovered misconduct should absolve the former counsel of his own misconduct. Dkt. 533, at 2. Moreover, it is rare for an attorney to tell a court that his client's case is weak.

To be fair, the previous district court judge decided that Duke was the senior user of the mark. Dkt. 80. But that decision is interlocutory and was based on a record far less complete than what is now before this Court.

To obtain obviously relevant information—the "probable merits" of Duke's counterclaims—this Court specifically questioned Duke about his views of the merits of his case. But this Court was stymied by Duke and his counsel. Dkt. 606, at 55-56. When the Court asked Duke about his thoughts on the merits of his case,

6

his attorneys objected to the Court's questioning based on the attorney-client privilege and instructed Duke not to answer the Court's questions. Duke then refused to answer the Court's questions seeking information fundamental to the motion. *Id.* at 56.

Plaintiff previously filed a motion seeking sanctions for extensive discovery misconduct by Duke and his former defense counsel. To resolve that motion, the Court held a comprehensive, multi-day evidentiary hearing. During the hearing, testimony established that sometime in late 2012, Duke met with one of his former defense counsel at his "warehouse." *DR Distribs.*, 513 F. Supp. 3d at 889-91. During that meeting, Duke showed counsel information on his computer as well as other business-related items. Then, around May of 2014, a different former defense counsel met with Duke at the same location and discussed various discovery matters. *Id.* at 895. She obtained certain boxes of documents, brought them back to the former defense counsel's office, and copied them. *Id.* at 877 n.17.

At the conclusion of this hearing and after extensive post-hearing briefing, the Court entered a lengthy order, granting, in part, Plaintiff's motion for sanctions. *Id.* at 863-64. Plaintiff requested the Court dismiss the counterclaims and enter default on its claims. The Court was sympathetic to that request, in part because monetary sanctions could be merely a hollow victory. The Court explicitly recognized that other reasonable jurists could have imposed case-terminating sanctions. But the Court chose to use lesser sanctions before entering terminating sanctions. So, the Court imposed numerous sanctions, including evidentiary

7

sanctions and monetary sanctions. *Id.* As to the monetary sanctions, the Court required Duke to pay 50% of the sanction, which reflected his culpability in the misconduct, including his spoliation of evidence. After the parties briefed the fee petition, on October 6, 2022, the Court awarded $2,526,744.76 in attorneys' fees and costs. Dkt. 541. Duke was required to pay 50% of that amount: $1,263,372. Duke has not paid the fee award, even after this Court entered an order months ago requiring him to immediately pay the monetary sanctions. Dkt. 572, at 2.

The Court also ordered Duke to search for and produce all responsive electronically stored information (ESI) to Plaintiff. Under the sanctions order, Plaintiff was allowed to use this information, but Duke was prohibited from using it. *DR Distribs.*, 513 F. Supp. 3d at 863.

Shortly after the Court entered the sanctions order, in February of 2021, the existence of 20 bankers boxes of hard copy documents (tangible documents) arose. Dkts. 444, 442. (Although through consolidation and movement of the boxes, the approximate number of boxes has varied from 16 to 19 to 20, the Court will simply refer to the "20 bankers boxes.")

After the Court required Duke to search for and produce responsive ESI, his current counsel sought "clarification" of the Court's sanctions order. Dkt. 442, at 2-3. The entire evidentiary hearing and the motion for sanctions related to ESI. So, not surprisingly, the Court's order addressed ESI. In doing so, the Court ordered Duke to conduct "a reasonable search for all responsive ESI and produce the responsive material to Plaintiff." Dkt. 439. But Duke then sought clarification as

to whether he needed to produce just ESI or non-ESI (tangible documents), too. Dkt. 442, at 3. Duke also sought clarification as to whether the sanctions order included "review for responsiveness to Rule 33 interrogatories." *Id*.

Duke's current counsel informed the Court that "non-ESI and other tangible items had not been reviewed by current counsel for responsiveness to Plaintiffs' Rule 34 discovery requests or responsiveness to written Interrogatories." Dkt. 442, at 4. According to Duke's current counsel, the "non-ESI and other tangible items consist[ed] of . . . 20 boxes of documents in the possession of Brent Duke" and "[a]pproximately 30-35 Boxes in the possession of former defense counsel." Dkt. 442, at 4. The motion for clarification then stated, "Out of an abundance of caution, current defense counsel interprets this Court's Order to Defendants to review all *non-ESI* for responsiveness to Plaintiffs' Rule 34 production Requests." Dkt. 442, at 5 (emphasis in original). Attached to the motion for clarification was a photograph of the 20 banker's boxes of documents located in Duke's closet in California. Dkt. 442-1, at 3. Here's the photograph:



The Court was concerned by many aspects of Duke's motion for clarification:

"The request for clarification seeks clarification that the Court is requiring

Defendants to produce responsive non-ESI documents in addition to responsive ESI

documents.  The only reasonable inference from that request is that there are non-ESI documents (i.e., physical documents) that are not only responsive but also have not been produced."  Dkt. 443, at 1.

Plaintiff responded to the motion for clarification by blowing a gasket.  Dkt. 444.  According to Plaintiff, the motion "raise[d] more disturbing questions about the conduct of this case."  *Id.* at 3.  Plaintiff's response continued and noted the obvious: "It is now clear(er) as to why all defense counsel (past and present) had continually urged the motion for sanctions was only about 'ESI.' "  *Id.* at 4-5.  Plaintiff pointedly argued, "They let this Court and Plaintiffs spend years seeking answers about discovery—and they intentionally attempted to focus on ESI only, without disclosing that they had committed the same sanctionable conduct with regard to non-ESI documents."  *Id.* at 5.

On February 11, 2021, the Court entered an order granting, in part, Duke's motion for extension of time.  Dkt. 446.  But the Court stated its concerns: "The primary thrust of Plaintiffs' sanctions motion related to undisclosed ESI; that ESI was either untimely produced, yet to be produced, or spoliated.  Defendants' motion for an extension of time and clarification seems to indicate that non-ESI had not yet been reviewed for responsiveness.  Defendants must produce *all* responsive documents—whether the documents are electronically stored information (ESI) or tangible/physical documents—by March 19, 2021.  The Court should not have to order parties to produce responsive documents.  The Federal Rules of Civil Procedure and Rules of Professional Conduct mandate that counsel conduct

reasonable inquiries so that responsive documents are produced. These rules are self-executing. No court order is required." Dkt. 446, at 1-2.

The Court then set the case for a status conference on February 17, 2021. *Id.* at 2. To set the stage for the status conference, the Court identified the problems as it saw them, what it expected to be covered, and reinforced Duke's discovery obligations:

> The other issues to be addressed during the status call seem more difficult and troubling. The main thrust of the sanctions motion and the evidentiary hearing related to ESI. To be cautious and in light of the history of this case, the Court's January 19, 2021, sanctions order required the production of all relevant documents that had not been produced. The Court was hoping to avoid further discovery problems. That hope may have been dashed. The motion as well as a filing in the underlying declaratory judgment action seem to indicate that there may be upwards of 20 boxes of non-ESI (physical/tangible documents) that may not have been searched for responsive documents. The Court certainly hopes that is not the case. If these 20 boxes of documents—or any other material within Defendants' possession, custody, or control, for that matter—contain non-privileged responsive material (whether responsive to a production request or an interrogatory) that was not previously produced, then the Court will entertain an additional motion for sanctions. The Court does not currently have sufficient information to make that determination. There may be no problem. *But, at a minimum, Defendants' counsel must be prepared to explain if these materials were provided to the former defense counsel; if they were provided to the former defense counsel, when and whether they were searched; if they were not searched, why not; did Brent Duke ever search these materials for responsive documents; if so, when, and what did he locate, and did he provide those documents to the former defense counsel?* The Court is forced to wonder if, in addition to these boxes of documents, whether any other non-privileged, responsive documents that have not been searched for or produced exist. As stated in the Court's previous order, the motion raises more questions than answers. Obviously, the Court is withholding judgment until it is provided with all the relevant information regarding any non-ESI that was not searched or produced. *The Court needs a full accounting of the content of these boxes and their history relating to discovery in this case and any other documents (both ESI and non-ESI) that may exist.* Again, discovery is self-executing.

> Non-privileged, responsive documents (both ESI and non-ESI) must be
> timely produced without court intervention. That is how the system is
> designed to work. Parties that use their own discovery system and rules
> are liable for the consequences of that decision.

*Id.* at 3 (emphasis added).

Typical of this case, despite the Court's clear mandates, the February 17,
2021, status hearing raised more questions than it answered. As shown in more
detail below, no "full accounting" was provided and the Court's explicit questions
were unanswered. As to the 20 bankers boxes, Duke's current counsel made several
representations, based in turn on representations Duke had made to him; he
informed the Court that he did not "have any reason to believe there are documents
that weren't produced, but [he was] not really in a position to figure out in the short
term what was produced." Dkt. 452, at 11. (N.B.: The representation that the
documents had been produced was false. As will be shown later, the 20 bankers
boxes of documents contained thousands of documents that had not been previously
produced.) The Court then asked, "A simple question: Did [Duke] ever give those
20 boxes to the former defense counsel?" The response was this: "My
understanding from Brent is that these were the boxes that he showed Mr. Leavens,
as he testified to, at the time when he came to look, and that they were then—they
took the boxes, scanned, and produced whatever they decided was responsive and
returned them to him. So his understanding is that these boxes were the ones that
were reviewed by [Duke's former defense counsel], . . . and that was used to respond
to the Rule 33 and Rule 34 requests. . . . So that's my understanding and that's
Brent's understanding." *Id.* at 11-12. (Again, as will be shown later, this

representation was false. The contents of the 20 boxes were not the same because those boxes contain documents that postdate the production of "the boxes that [Duke] showed to his former defense counsel" and a review of both sets of documents undisputedly establish that the two sets of documents were not the same.) The Court then asked if there were any types of indices or programs (such as Summation) that showed what documents had been produced and not produced. Stunningly, in a case that was filed in 2012, there were none. *Id.* at 15-16, 18. Counsel for the former defense counsel[2] then informed the Court of the following two points. First, as she had previously informed Duke's current counsel, she stated that there was no way for the former defense counsel to know "what are in a bunch of boxes that Mr. Duke presently holds and has had for years," and that they could not make any representations at to what was in the 20 bankers boxes. Second, she reiterated the testimony from the evidentiary hearing: "Our clients did pick up some physical boxes from Mr. Duke very early in this litigation. Nobody on my client's side believes that there were 20 boxes or near 20 boxes, but . . . we collected those boxes, scanned and imaged the documents that were inside, and produced them in the normal course of business." *Id.* at 18. Duke's current counsel then reiterated what is now known to be false: There was "no reason to believe there is anything in there that would be responsive, but [former defense counsel was] not sure." *Id.* at 20. (But, again, as will be shown later, it is undisputedly established that thousands of responsive and not previously produced documents

---

[2] By this time Duke and his former defense counsel were adverse, as he had given them notice that he intended to sue them for legal malpractice.

existed in the 20 bankers boxes.)  A different counsel for a different former defense counsel chimed in and explained that his client understandably did not know what was contained in the 20 bankers boxes as the paper discovery occurred before he joined the case.  *Id.* at 21.  Duke's current counsel then reiterated that "based on [his] conversations with [Duke]," the physical documents that were taken from his warehouse were copied and returned to him and that these were the same documents in the 20 bankers boxes.  *Id.* at 23-24. (Again, those representations from Duke to his current defense counsel to the Court have been proven to be untrue.[3])  The Court then asked—as it said it would—whether Duke reviewed the boxes for responsive material.  Unfortunately, Duke's current counsel was unable to answer that question, despite the Court specifically stating that it expected to be informed of that at the hearing.  *Compare* Dkt. 446, at 3, *with* Dkt. 452, at 25. Plaintiff's counsel then was given an opportunity to speak at the status hearing.  He explained that in May of 2014 they were given access to four or five boxes of documents—certainly not 20 boxes—and that they asked that those documents be sent out for copying and provided to them.  Dkt. 452, at 26-29.  His recollection of the number of boxes of documents was consistent with Duke's former defense counsel.  *Id.* at 26-27.  (Indeed, the Court pauses at this point to wonder why alarm bells were not going off.  In twenty plus years as a litigator, the undersigned never confused five bankers boxes of documents with 20 bankers boxes of documents.  And

---

[3] To Duke's current counsel's credit, his representations to the Court were nearly always prefaced by stating that he was conveying representations made to him by Duke.  The Court credits Duke's current counsel over Duke in this regard.  The Court has no doubt that Duke's current counsel was simply informing the Court what Duke had told him.

set aside the fact that the undersigned—like any competent litigator—kept meticulous track of what documents were produced, not produced, and withheld because of privilege, using widely available software programs.) Plaintiff's counsel also rightly noted that Duke's current counsel stated that the 20 bankers boxes contained "sales records," which would have been responsive to discovery requests and relevant to the claims and defenses in this action. *Id.* at 28.

On March 19, 2021, Duke crawfished, filing a declaration that walked back many critical representations his counsel had made to the Court. Dkt. 456. Again, the declaration raised more questions than provided answers. According to Duke's declaration, sometime in the fall of 2012, one of his former defense counsel came to Duke's "warehouse," at which time Duke showed the former defense counsel "a number of boxes of tangible (as opposed to electronic) documents and items. The boxes of documents were mostly sales records used by [his] wife in her work for the company." Dkt. 456, at 2. (At the evidentiary hearing, the accuracy of Duke's wife's summary of sales records was challenged based on withheld ESI. *DR Distribs.*, 513 F. Supp. 3d at 891. These suspect summary documents were used by experts in discovery and then incorporated into the summary judgment filings. *Id.*) Duke's declaration went on to explain that "[s]ometime thereafter" his former defense counsel "arranged to pick up certain boxes of documents and items and/or to have [him] drop them off." Dkt. 456, at 2. (At this point, several representations jump out. First, when is "sometime thereafter"? Is it in 2012 or 2014 or 2019? Second, what are the "certain boxes of documents"? Are they the same as the 20 bankers

16

boxes?  Is it the same boxes that he showed his former defense counsel?  Indeed, Duke has never presented any evidence that the boxes of documents he showed his former defense counsel are the same as the 20 bankers boxes of documents.  And there's good reason for that failure.  The 20 bankers boxes contain documents that postdate Duke showing the former defense counsel the boxes.)  Third, note the inclusion of confusion as to who did what.  (Did the former defense counsel pick the boxes up as he previously represented to his current defense counsel, which was represented to the Court, or did he drop them off, which would be inconsistent with the representations and everybody else's recollections and testimony?)  Duke went on to declare that "[a]lthough [he] thought all documents and items taken by them were returned, [he] did not have any specific recall as to exactly what was returned."  *Id.*  (Note here that now Duke seems to be declaring that the former defense counsel took the documents, not that he dropped them off.)  Duke then divined that based upon new information, "all of the documents and items taken by [his former defense counsel] were not returned."  *Id.*  Critically, Duke swore that he did *not* search "the boxes" for responsive documents.  Dkt. 456, at 2-3.  (Again, are "the boxes" the boxes shown to his former defense counsel in 2012, the five boxes that everybody else recalls being produced in 2014, or the 20 bankers boxes of documents that suddenly appeared in 2021?)  Duke then swore that he sent all of the requested documents to his current defense counsel in January of 2021.  *Id.* at 3.

17

On the same day, March 19, 2021, Duke's current defense counsel also filed a declaration. Notably, this declaration did not clarify the discrepancies between his previous representations to the Court—based upon representations Duke made to him—and the sworn statements in Duke's declaration. But the current defense counsel's declaration seemingly put to rest Duke's confusion as to whether Duke dropped off "a number of boxes of documents" with his former defense counsel or they picked up the documents, made copies, and returned the documents to him. It was the latter. Dkt. 458, at 5. Duke's current defense counsel explained that the former defense counsel continued to state that they did not know what was contained in the 20 bankers boxes and that the former defense counsel picked up a number of boxes from Duke, but not 20 bankers boxes. *Id.* Duke's current counsel then informed the Court that upon a review of different boxes of documents maintained by the former defense counsel, he identified 788 pages of documents that were responsive that had not been previously produced to Plaintiff. *Id.* at 6. But Duke's counsel's declaration was silent as to the critical issue of whether the 20 bankers boxes contained documents that had been previously produced or whether those 20 bankers boxes contained responsive documents that had not been produced.

So, to summarize at this point—through his current defense counsel, Duke represented to the Court that nothing was withheld and nothing in the 20 bankers

boxes was responsive.[4]  (Duke can find no quarter in slippery phrases such as "there's no reason to believe.")  As foreshadowed previously, and as will be shown later, the reality is undisputed:  The 20 bankers boxes of documents were "mutually exclusive" of the five boxes of documents produced in 2014 and those 20 bankers boxes of documents contained tens of thousands of responsive documents that had not been produced until 2021—nearly six years after the close of fact discovery.[5]  Dkt. 497-1, at 5-7.

After Plaintiff had finally been provided with the 20 bankers boxes of documents in 2021, its counsel began an extensive review of the documents and a comparison of those documents with the documents that had previously been produced, including the five boxes produced in 2014.  Dkts. 488, 473.  Their review of the 20 bankers boxes of documents established that tens of thousands of documents contained therein were relevant, responsive, and withheld.  *Id.*  Indeed, the documents contained in the five boxes—a number which Duke's attorney finally admitted was correct, Dkt. 530-1, at 4—and the 20 bankers boxes are mutually

---

[4] Of course, if true, these representations would have raised obvious other issues:  Why would Duke have produced 20 bankers boxes of unresponsive documents?  And if he did, in fact, produce 20 bankers boxes of unresponsive documents, the Court is exceedingly confident that Plaintiff would have rightfully complained about that during discovery. Moreover, there's also the time-space continuum problem with Duke's representation that the boxes contained the same documents:  The 20 bankers boxes contained documents that postdate him showing the former defense counsel "certain boxes" or "a number of boxes." These problems just go to show Duke's persistent habit of engaging in discovery misconduct, being caught in the misconduct, lying about the misconduct, and then getting caught in lying about the misconduct.  The Court identified this pattern previously.  *DR Distribs.*, 513 F. Supp. 3d at 875.  Lies are unrepentantly stacked on top of lies.
[5] Duke does *not* contest that thousands of documents contained in the 20 bankers boxes are relevant.  Indeed, it is admitted the sales documents—which compose a large portion of the documents in the 20 bankers boxes—are relevant.  Dkt. 530, at 10.

19

exclusive.  Dkts. 488, 473.  The 20 bankers boxes contained not only relevant,

responsive documents that pre-dated the 2014 production of the five boxes but also

relevant, responsive documents that post-dated that production—none of which had

been produced.  Dkt. 473, at 3.  The documents included sales documents, such as

"Defendants' Online Order Confirmation forms," "Merchant Statements,"

"individual sales report transmittal forms" and "Daily Sales Reports."  Dkt. 488, at

8-9; Dkt. 473, at 3-4.  According to the status reports, the documents also showed

customer confusion and contained customer criticisms of defendants' products.  Dkt.

488, at 4-7.  The documents also included evidence establishing Duke's unsuccessful

marketing campaigns.  *Id.* at 9.  (Duke's wife repeatedly complained about the lack

of increased sales despite expensive marketing efforts.)  Documents regarding

customer confusion, customer criticisms of 21 Century Smoking's products, and the

unsuccessful marketing efforts of 21 Century Smoking are undisputably relevant

and were responsive to discovery requests.

On September 13, 2021, Plaintiff filed its second motion for sanctions.  Dkt.

497.  Attached to that motion was a supporting declaration.  Dkt. 497-1.  The

evidence in the supporting declaration was consistent with the previously filed

status reports.  According to the declaration, five boxes of documents were produced

by Defendants on May 15, 2014.  *Id.* at 5.  The 20 bankers boxes contained 39,148

documents totaling 47,631 pages.  *Id.*  The 20 bankers boxes and "the vast majority

of their contents were never previously produced or made available to Plaintiffs for

inspection and copying and are mutually exclusive of the five boxes of hard copy

20

documents that were produced by Defendants for inspection and scanning on May 15, 2014 during discovery." *Id.* at 5. The documents produced on May 15, 2014, contained documents with date ranges from 2009 through May of 2013. *Id.* at 6. The supporting declaration continued and swore "that the newly produced documents in the '20 Boxes' ranged in date from 2009 through mid-2015 and were therefore mostly all in existence and available for production during discovery in this matter, as fact discovery did not close until mid-2015. . . . [T]he vast majority of documents in the '20 Boxes' pre-dated Defendants' May 15, 2014 production of hard copy documents, yet . . . those documents were not included in the 2014 production." *Id.* As to the online order forms, there was no overlap between the five boxes produced in 2014 and the '20 Boxes' produced in 2021." *Id.* Over 6,000 documents in the 20 bankers boxes were responsive to requests. Dkt. 497-1, at 7. Generally, the supporting declaration's representations as to the content of the recently produced documents was consistent with the representations made in the status reports. *Compare id.* at 8-12, *with* Dkts. 488, 473. Critically, Duke admits that the documents in the 20 banker's boxes are relevant. Dkt. 530, at 10.

Unsurprisingly, Plaintiff's counsel "spent a ton of time . . . looking through the production" to determine if responsive documents were withheld. Dkt. 529, at 14. "It was a big project." *Id.* at 15. Plaintiff's counsel asserted that they "did a very meticulous search to go through and look at it and say this was requested, this is responsive, and it was withheld and never produced." *Id.* at 16.

21

Despite the facts in the supporting declaration, none of the former defense counsel contested those facts with any evidence.  Indeed, other than Attorney Shonder, who provided a declaration that resolved an unrelated factual issue, none of the former defense counsel filed any evidence contesting any of the facts established by the second motion for sanctions.  Duke's counsel—not Duke—filed a declaration in response to the second sanctions motion.  Dkt. 530-1.  That declaration does *not* contest the facts contained in the declaration supporting the second motion for sanctions regarding the 20 bankers boxes.  *Id.*  Specifically, Duke presented zero evidence that contradicts Plaintiff's evidence that the 20 bankers boxes contained tens of thousands of relevant, responsive documents that had not been previously produced.  Instead, according to Duke's counsel, "The 20 boxes is a red herring."  Dkt. 529, at 22.  The Court disagrees.

On December 6, 2023—more than a year after entering the order determining the monetary sanction award—the Court ordered that the monetary sanction against Duke was immediately payable.  Dkt. 572, at 2.  Obviously, Duke has not paid the monetary sanction.  Having reviewed Duke's financial information that the Court ordered him to file, the Court finds that Duke is currently financially unable to pay back the entire monetary sanctions award.  Dkt. 583.  The adjusted gross income for Duke and his wife is about $36,000.  Among other expenses, the Dukes' rent is north of $3,000 per month.[6]

---

[6] At this point, readers of *this* opinion who have not subjected themselves to the library of *prior* opinions in this case would wonder how Duke could afford to pay counsel to represent him.  Here's the answer.  Duke possessed an insurance policy for 21 Century Smoking.  The

Duke has taken no actions whatsoever to pay the monetary sanction. Before the Court required him to do so, Duke had not investigated obtaining a bond or litigation funding to pay the monetary sanction. Duke has never attempted to create a payment plan. Duke has taken no actions to set up a savings program to pay the monetary sanction. Duke has presented no evidence as to any property (real, tangible, or intellectual) that he has attempted to sell or license to pay the monetary sanction. Duke has presented no evidence that he leases fewer or less expensive vehicles to save money to pay the monetary sanctions. (Duke currently leases *four* vehicles for a business: a 2023 BMW i4, a 2021 Toyota Highlander XSE, a 2021 Toyota Highlander L, and a 2021 Toyota RAV XLE. Dkt. 583-1, at 2.[7]) Duke has presented no evidence that he has sought a personal loan from friends or family to pay the monetary sanction. Instead, Duke's sole plan to pay the monetary sanction is to win his counterclaims and recover an amount sufficient to offset the $1,263,372 he owes Plaintiff. When the Court questioned him about any backup plans in the off chance that he does not prevail in this litigation, Duke responded by stating, "I live my life outside of this case, I guess." Dkt. 606, at 48. The only reasonable inference from this nonresponsive answer is that he has zero backup

---

insurance company has been ordered to defend him in this litigation. But by "defending" Duke under this policy, the insurance company has bankrolled Duke's counterclaims to the tune of over $2,000,000. So, Duke has no financial skin in the game. He's a judgment proof defendant but a fully financed plaintiff.

[7] For readers who are not gear heads, the 2023 BMW i4 is a sweet ride. According to *Car and Driver*, "[I]t's an exciting and refined sedan with a supple ride and deeply satisfying sports-sedan handling." Austin Irwin & Eric Stafford, *2023 BMW i4*, Car & Driver, https://www.caranddriver.com/bmw/i4-2023 (last visited June 3, 2024).

plans and has not thought of any in the years since he knew he would be ordered to pay monetary sanctions.

Having grown frustrated by the lack of any movement or effort to pay the monetary sanctions, the Court ordered Duke to contact bonding and litigation financing companies to determine if there were alternative sources of funds. The responses were illuminating. For example, the bonding companies required 100% cash or letter of credit as collateral. Dkt. 599, at 2. No litigation funder was willing to provide Duke funds for this litigation. And a litigation funder stated one reason why it would not fund Duke's litigation was the ongoing sanctions proceedings and the possibility that the counterclaims would be dismissed. *Id.* at 3. This particular litigation funder also stated that it would seek three times the amount of money provided as non-recourse (if no recovery, then no money owed). *Id.* So, under the facts of this case, if this funder were to provide the approximately $1,250,000 Duke owed, and Duke were to prevail, it would recover $5,000,000 (the $1,250,000 plus $3,750,000, which is three times the $1,250,000). Despite representations that Duke's counterclaims were meritorious and conservatively would result in an "eight figure" judgment, this litigation funder refused to fund the litigation.

## B. PROCESS AND CONSIDERATIONS BEFORE ENTERING TERMINATION SANCTIONS WHEN A PARTY FAILS TO PAY MONETARY SANCTIONS

The law on the specific issue of when a district court can enter claim- or action-terminating sanctions for a party's failure to pay monetary sanctions is not fully developed and a little unclear.

24

When ruling on a motion seeking sanctions against a party,[8] a district court has three options: deny the motion; grant the motion; or deny the motion in part and grant the motion in part. If the district court denies the sanctions motion, the process is concluded. But if the district court grants the sanctions motion—even in part—the district court must exercise its discretion and determine the type and quantum of sanctions to impose. The type and quantum of sanctions must fulfill the purposes of sanctions, including to punish, deter, and make the harmed party whole. *Goodyear Tire & Rubber Co. v. Heger*, 581 U.S. 101, 107 (2017) (reimburse); *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976) (penalize and deter). Although a district court can exercise significant discretion and be creative in imposing sanctions, *DR Distribs.*, 513 F. Supp. 3d at 245-46, sanctions generally fall into three categories: (1) claim- or action-terminating sanctions, such as default or dismissal; (2) evidentiary sanctions, including allowing or prohibiting certain evidence, requiring that certain evidence be accepted as true, and giving adverse jury instructions (both mandatory and permissive);[9] and (3) monetary sanctions, including attorneys' fees, costs, and even fines. Fed. R. Civ. P. 37.

If a district court chooses to use monetary sanctions, then the district court must next decide whether to stay enforcement (i.e., defer payment until judgment) or enforce the order (i.e., make the sanctioned party immediately pay). *Advanced*

---

[8] This explanation assumes sanctions imposed on a party, not counsel. The ability to sanction one or the other or both depends on the source of the authority. *See, e.g.,* Fed. R. Civ. P. 37(a) (court can sanction counsel and party); Fed. R. Civ. P. 37(c) (court can sanction party, not counsel); 28 U.S.C. § 1927 (court can sanction counsel, not party).

[9] Striking affirmative defenses may fall between claim- or action-terminating sanctions and evidentiary sanctions.

*Training Grp. Worldwide, Inc. v. Proactive Tech. Inc.*, No. 19 cv 0505, 2021 U.S. Dist. LEXIS 263423, at *7-14 (E.D. Va. Jan. 8, 2021) (denying motion to stay enforcement of monetary sanctions). This determination will be made either by the district court *sua sponte* in the sanctions order or based on a motion filed by a party. If the district court stays the sanctions order until judgment, no issue of payment arrives until that point.

But if the district court determines in its discretion to enforce the sanctions order, two outcomes exist: (1) the sanctioned party pays, or (2) the sanctioned party does not pay.[10] If the sanctioned party pays, then that is the end of the analysis in the district court.[11] But if the sanctioned party does not pay, the district court must make findings regarding that failure to pay.

At this point, the decision is binary: either the sanctioned party possesses the financial ability to pay or it does not. The district court must investigate the sanctioned party's financial ability to pay. *Gay v. Chandra*, 682 F.3d 590, 595 n. 2 (7th Cir. 2012).

---

[10] A sanctioned party can't file an interlocutory appeal to challenge the monetary sanction. *Annie Oakley Enters. v. Amazon*, No. 21-2262, 2021 U.S. App. LEXIS 38892, at *1-2 (7th Cir. Sept. 16, 2021); *see Cunningham v. Hamilton County*, 527 U.S. 198, 210 (1999). The fact that the sanctioned party must wait until judgment is entered before appealing does not mean that a district court must wait until the end of the litigation to award sanctions, however. *YCA, LLC v. Berry*, No. 03 C 3116, 2004 U.S. Dist. LEXIS 16289, at *2-3 (N.D. Ill. Aug. 13, 2004). In other words, sanctions orders can be immediately enforceable but not immediately appealable. *Mgmt. Registry, Inc. v. A.W. Cos.*, No. 17-5009, 2020 U.S. Dist. LEXIS 197472, at *4-6 (D. Minn. Oct. 23, 2020).

[11] Once judgment is entered, the sanctioned party can appeal the sanctions order. *Annie Oakley*, 2021 U.S. App. LEXIS 38892, at *1-2; 28 U.S.C. § 1291.

If the district court determines that the sanctioned party has the financial ability to pay, then, in its discretion, it can order the sanctioned party to pay immediately. And if the sanctioned party pays, the analysis ends. The sanctioned party can challenge the sanctions order on appeal. But if the sanctioned party does not pay at this point, the district court may enter claim- or action-terminating sanctions in response. *Selletti v. Carey*, 173 F.3d 104, 113 (2d Cir. 1999) ("On remand, the district court may consider whether dismissal is appropriate based on a finding that plaintiff was in fact able to pay the sanctions or post the required bond . . . ."); *see also Williams v. Adams*, 660 F.3d 263, 266 (7th Cir. 2011).[12] After all, in this circumstance, the party's failure to pay is plainly contumacious, which allows for the most severe sanctions. *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 192 (7th Cir. 2011) (if contumacious conduct exists, the court need not consider less severe sanctions). The sanctioned party can then appeal the judgment.

But the court must consider a sanctioned party's assertion that it does not have the financial ability to pay.[13] *Gay*, 682 F.3d at 594 ("[A] court may not ignore an indigent litigant's inability to pay."); *Owens v. Cowell*, 969 F.2d 465, 473 (7th Cir.

---

[12] Likewise, if the sanctioned party does not provide information showing the lack of financial ability to pay, a district court can consider that failure in imposing terminating sanctions. *Newman v. Metro. Pier & Expo. Auth.*, 962 F.2d 589, 591 (7th Cir. 1992).

[13] The procedure to be used to make this determination as well as the quantum and burden of proof have not been articulated. But, regarding the procedure, Rule 43(c) would allow a district court to consider documentary evidence and hold an evidentiary hearing, if necessary. Fed. R. Civ. P. 43(c). In the Seventh Circuit, the quantum of evidence would be no higher than the preponderance of the evidence standard. *Rameriz v. T&H Lemon, Inc.*, 845 F.3d 772, 776-78 (7th Cir. 2016). As to who bears the burden, as the entity with the best access to the necessary evidence, the burden would fall on the party claiming it does not have the financial ability to pay. *Schaffer v. Weast*, 546 U.S. 49, 60 (2005).

1992). The district court cannot simply enter a claim- or action-terminating sanction because the sanctioned party is financially unable to pay. *Gay*, 682 F.3d at 594. In other words, a court cannot just automatically enter claim- or action-terminating sanctions. *Spiker v. Erskines*, No. 22-1991, 2022 U.S. App. LEXIS 34482, at *7 (7th Cir. Dec. 14, 2022) ("[I]nability to pay a fine does not automatically justify dismissal."). On the flipside, the district court cannot simply refuse to enter a claim- or action-terminating sanction because the sanctioned party does not have the financial ability to pay. *Williams*, 660 F.3d at 265-66 ("[M]isconduct itself might warrant dismissal if a plaintiff's financial circumstances eliminate the effectiveness of sanctions as a remedy or deterrent." (*quoting Selletti*, 173 F.3d at 112 n.12)); *Moon v. Newsome*, 863 F.2d 835, 839 (11th Cir. 1989) ("A party's claim that destitution prevented him from complying with the order is not an absolute bar to dismissal."). This conclusion reflects two policy considerations. On the one hand, courts are disinclined to bar parties from seeking justice because they lack financial resources. *Gay*, 682 F.3d at 594-95. On the other hand, judgment-proof parties cannot be allowed to abuse the justice system without consequence. *Williams*, 660 F.3d at 266 ("A plaintiff who gratuitously imposes huge unrecoverable costs on his adversary cannot successfully oppose dismissal on the ground that he can't pay those costs, for then abuse of the litigation process to harass a defendant would be undeterred."); *Moon*, 863 F.2d at 838 ("No one should be permitted to misuse the courts with impunity."); *see also Dotson v. Bravo*, 321 F.3d 663, 668 (7th Cir. 2003).

Between these extreme guideposts, case law has identified four factors to consider before entering claim- or action-terminating sanctions once the district court finds that the sanctioned party lacks the financial ability to pay a monetary sanction. These factors are the following: (1) alternative sources of funds to pay the monetary sanctions, which can be related to the merits factor; (2) the merits of the sanctioned party's claim or action, (3) the existence of other remedies, including effective lesser sanctions; and (4) the actions or inaction of the sanctioned party that bear on the party's bad faith, fault, or other or continuing misconduct.[14]

### 1. Alternative Source of Funds

If a sure alternative source of funds is available to pay the monetary sanctions, that source should be exhausted. *See Williams*, 660 F.3d at 266. Possible and even speculative sources of funds should be considered. But, unlike a sure source of funds allowing for payment, other considerations diminish the value of possible and speculative sources, including expense, timeliness, and certainty.

The alternative source of payment might overlap with the merits factor. The theory goes like this. According to the sanctioned party, its claim or action is so meritorious—so likely to succeed—that it will set off or even surpass the monetary

---

[14] In the Seventh Circuit, bad faith and fault are different. *Brown*, 664 F.3d at 191. *In this context*, bad faith is shown by recklessness. *Id.* Fault does not require ill will or malice. *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006); *In re TCI, Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985). In fact, fault does not even require reckless behavior. *Brown*, 664 F.3d at 191; *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992). Instead, fault is akin to unreasonable behavior. *Brown*, 664 F.3d at 191. But fault is more than a mere mistake. *Id.* Nevertheless, depending on the source of authority used to sanction, negligence might be sufficient. *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642-43 (7th Cir. 2011) (Rule 37(b) implicated even for negligent violation of a court's discovery order).

29

sanctions awarded. So, by succeeding on its meritorious claim or action, an alternative source of funds exists. *Gay,* 682 F.3d at 595 n.2; *Williams*, 660 F.3d at 265-66.

### 2. *Probable Merits*

The district court must also consider the relative merits of the sanctioned party's claim or action. *Gay*, 682 F.3d at 595 n.2. This is not surprising. District courts should always consider the relative merits of a claim or action before entering terminating sanctions. *Donelson v. Hardy*, 931 F.3d 565, 569 (7th Cir. 2019) (considerations include the weakness of the case). And even cases that "may well have . . . some merit" can be dismissed as a discovery sanction. *Dotson*, 321 F.3d at 669. With respect to the precise issue presented—dismissal for failure to pay a monetary sanction—the Seventh Circuit counsels district courts to consider the "probable merits." *Gay*, 682 F.3d 595 n.2. But the Seventh Circuit does not define this term, nor state where on the merits spectrum "probable merits" falls.

Other case law does not provide much guidance. In passing, and without citing any authority, the Second Circuit suggested that a district court "may consider" whether the sanctioned party could survive summary judgment before entering terminating sanctions. *Selletti*, 173 F.3d at 113.[15] But, importantly, the Second Circuit did not hold that a district court must find that the sanctioned party would not survive summary judgment before terminating sanctions could be imposed for failing to pay a monetary sanction because of the financial inability to

---

[15] This Court is not bound by the Second Circuit. *Laudicina v. City of Crystal Lake*, 328 F.R.D. 510, 515 (N.D. Ill. 2018).

do so. Indeed, the disjunctive nature of the Second Circuit's menu of options for possible consideration prevents that reading. *Selletti*, 173 F.3d at 113.[16]

Having said that, the Seventh Circuit has noted that a sanctioned party's ability to survive summary judgment bears consideration on the merits inquiry. *Williams*, 660 F.3d at 266. But the Seventh Circuit's focus on proportionality as the touchstone for terminating sanctions makes equating the probable merits inquiry with the summary judgment inquiry an uncomfortable fit. *Williams*, 660 F.3d at 266 ("To ignore a party's inability to pay a sanction could result in a *disproportionate* punishment—as this case illustrates." (emphasis added)). In fact, the Seventh Circuit has recognized this incongruity when noting the need for a district court to make factual findings to support its case-terminating sanctions decision. *Maynard v. Nygren*, 372 F.3d 890, 892 (7th Cir. 2004) ("[T]his is not a motion for summary judgment.").

Proportionality has been an explicit aspect of all discovery issues since at least 1983. Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment. And the Seventh Circuit has repeatedly and explicitly stated that all discovery sanctions, including terminating sanctions, must be proportional to the violations. *Donelson*, 931 F.3d at 569; *Nelson v. Schultz*, 878 F.3d 236, 238-39 (7th Cir. 2017); *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 672 (7th Cir. 1996). The same

---

[16] "On remand, the district court may consider whether dismissal is appropriate based on a finding that plaintiff was in fact able to pay the sanctions or post the required bond; based on plaintiff's overall conduct apart from his non-compliance with those requirements; or based on a conclusion that the evidence already received by the district court demonstrates defendants' entitlement to summary judgment, *see* Fed. R. Civ. P. 56." *Selletti*, 173 F.3d at 113.

proportionality concept that exists in sentencing a criminal defendant—so as to punish, deter, and cure the harm caused, but no more, 18 U.S.C. § 3553(a)—exists in determining the appropriate discovery sanction. *Houston v. Hyatt Regency Indianapolis*, 302 F.R.D. 268, 281 (S.D. Ind. 2014) ("[T]he punishment should fit the crime."). So, in this context, focusing on proportionality—rather than a summary judgment standard—makes sense. Proportionality requires consideration of the sanctioned party's recovery-in-expectation. Proportionality ensures that terminating sanctions are not disproportionate as compared to the misconduct and likewise ensures that sanctions are fair in light of the sanctioned party's relative ability to eventually recover the amount of monetary sanctions through a judgment in the action. And assessing recovery-in-expectation requires a district court to consider matters it cannot when using the summary judgment procedure.

The summary judgment process fails in this regard for at least six reasons. First, during summary judgment, the district court does not consider the relative merits of each side's case; it does not and cannot decide which party's version of events is true. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021); *Payne v. Pauley*, 237 F.3d 767, 770 (7th Cir. 2003). Second, unlike determining the relative merits of a party's case, summary judgment is binary. *See Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 732 F. Supp. 482, 488 (D. Del. 1990) (summary judgment is a "yes-or-no" decision). In deciding a summary judgment motion, a district court must decide one question and only one question: Based on the evidence of record, whether any material disputes of fact requiring trial exist.

*Stewart*, 14 F.4th at 760; Fed. R. Civ. P. 56. Either such a dispute exists or it does not. James Wm. Moore et al., 11 *Moore's Federal Practice* § 56.24[1] (3d ed. 2023). Third, in making this determination, the district court cannot weigh evidence or gauge the credibility of witnesses. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Indeed, the scales are skewed against the moving party in that a district court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Stewart*, 14 F.4th at 760. Fourth, because of Seventh Amendment concerns, in summary judgment proceedings, courts cannot determine factual disputes. *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 676 (7th Cir. 2002) ("The Seventh Amendment does not entitle parties to litigate before a jury when there are no factual issues for a jury to resolve."). But in determining sanctions—even case-terminating sanctions—district courts can and do make factual findings. *See Maynard*, 372 F.3d at 892 (determining whether discovery violation was willful is a factual determination for district court to decide). Doing so does not violate the Seventh Amendment. *SEC v. Blockvest, LLC*, No. 18 CV 2287, 2020 U.S. Dist. LEXIS 94724, at *21-22 (S.D. Cal. May 29, 2020) (citing *In re U.S. Fin. Sec. Litig.*, 609 F.2d 411, 422 & n.34 (9th Cir. 1979)); *see also KCI USA, Inc. v. Healthcare Essentials, Inc.*, 801 F. App'x 928, 936-37 (6th Cir. 2020) (no Seventh Amendment violation for imposing action-terminating sanctions). Fifth, as any experienced judge knows, even weak cases survive summary judgment and are

33

allowed to go to trial.[17]  Only cases that possess nothing more than a mere scintilla

of evidence do not.  *Anderson*, 477 U.S. at 252.  Those are cases that possess only a

very insignificant or trifling amount of evidence.  *Cottingham v. Sec'y of HHS*, 154

Fed. Cl. 790, 795 (Fed. Ct. Cl. 2021).  This entire process is the antithesis of

determining the "probable merits" as mandated by the Seventh Circuit.  Instead, all

the actions that the summary judgment procedure prohibits are necessary in

determining the merits of a sanctioned party's claim or action.  Finally, sixth, using

the summary judgment procedure does not truly inform the decision-making

process.  A district court always possesses the ability to *sua sponte* grant summary

judgment provided notice and an opportunity to be heard is provided.  *Golden Years

Homestead, Inc. v. Buckland*, 557 F.3d 457, 461-62 (7th Cir. 2009).  A district court

has this authority regardless of whether a sanctioned party has the financial ability

to pay a monetary sanction.

The Court recognizes that no perfect analog exists.  And, despite extensive

research, the Court was unable to find a case that provided one.  The parties

certainly did not provide one either.

---

[17] *See, e.g., Walker v. White*, No. 16 CV 7024, 2021 U.S. Dist. LEXIS 52156, at *27-28 (N.D.
Ill. Mar. 19, 2021); *Resnick v. Sebelius*, No. CV-11-00172-PHX-ROS, 2014 U.S. Dist. LEXIS
206481, at *15-16 (D. Ariz. Jan. 30, 2014); *Brown v. CSX Transp.*, No. 11-cv-1569, 2013
U.S. Dist. LEXIS 132437, at *12 (D.S.C. Sept. 17, 2013); *Rodriguz v. Wet Ink, LLC*, No. 08-
cv-857, 2012 U.S. Dist. LEXIS 44464, at *41 (D. Colo. Mar. 30, 2012); *Mandengue v. ADT
Sec. Sys.*, No. 09-3103, 2012 U.S. Dist. LEXIS 34159, at *100 (D. Md. Mar. 14, 2012);
*Hanson v. Experian Info. Sols., Inc.*, No. 10 C 2022, 2012 U.S. Dist. LEXIS 11450, at *12
(N.D. Ill. Jan. 27, 2012); *Fleming v. Am. Home Prods. Corp.*, No. 91 Civ. 2348 (PNL), 1992
U.S. Dist. LEXIS 10580, at *1 (S.D.N.Y. Jul. 20, 1992). In fact, sometimes weak cases
survive summary judgment but do not settle, prompting plaintiff's counsel to attempt to
withdraw rather than try the case. *Burns v. GMC*, No. 06-CV-499, 2007 U.S. Dist. LEXIS
93041, at *2 (S.D. Ind. Nov. 30, 2007).

But, in other contexts, district courts are called upon to make similar merits-type decisions. For example, a district court can deny a motion to amend a pleading if the pleading would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). And, in that context, "futile" means the inability to survive a motion to dismiss. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014). In making that determination, a district court can and should "draw upon its own judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). But even in this context, courts are limited in what they can consider. *N. Ind. Gun & Outdoor Shows v. City of South Bend*, 163 F.3d 449, 452-53 (7th Cir. 1998). A better analog to determine the merits—one that includes the realities of a case and allows a district court to use judicial experience and common sense—is the process used in determining whether to grant a new trial. Unlike the summary judgment setting, in making the decision to grant a new trial, a district court must weigh the evidence. *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011). Indeed, the district court has "the power to get a general sense of the weight of the evidence." *Id.* And, in doing so, the district court can consider the credibility of witnesses and "anything else which justice requires." *Id.* (*quoting Bob Wilson Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir. 1989)).

If a district court is required to consider the probable merits of a claim or action before imposing terminating sanctions on a party that does not have the financial ability to pay, then the district court should be authorized and empowered to consider the realities of the case, using its own experience, common sense,

evaluation of witness credibility, and understanding of which side has better and more evidence. The district court should not be constrained by the artificial (but constitutionally required) barriers created by the summary judgment process. Instead, the district court should focus on the touchstone of discovery sanctions—proportionality. *Nelson*, 878 F.3d at 238-39; *Newman v. Metro. Pier & Expo. Auth.*, 962 F.2d 589, 591 (7th Cir. 1992) ("judge must be guided by the norm of proportionality"); *Houston*, 302 F.R.D. at 281 ("[T]he guiding principle is that a sanction must be proportional to the abusive conduct."). And determining proportionality requires that the district court consider all the circumstances. *Maynard*, 372 F.3d at 893; *see Melendez*, 79 F.3d at 672 (court considers "entire record"); *see Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 8 (D.C. Cir. 2015) ("The totality of the circumstances [when reviewing discovery sanctions] can include events which did not occur in the case proper but in other cases and are, by their nature, relevant to the pending controversy." (quoting *Thibeault v. Square D Co.*, 960 F.2d 239, 246 (1st Cir. 1992)); *Mulero-Abreu v. P.R. Police Dep't.*, 675 F.3d 88, 93 (1st Cir. 2012) ("The totality of the circumstances should be considered when assessing the appropriateness of a discovery sanction.").

### 3.  Other Remedies

The district court should also consider the existence of other remedies to cure, punish, or prevent the harm the sanctioned party—and others like it—has caused or will cause. *Gay*, 682 F.3d at 595-96. These remedies include statutory remedies, remedies available within the district court's inherent authority, and effective lesser

sanctions—meaning sanctions other than claim- or action-terminating sanctions. *Id*.

### 4. Recklessness and Fault in Other or Continuing Misconduct

The final consideration goes to the sanctioned party's recklessness or fault in other or continuing misconduct, separate and distinct from its failure to pay the monetary sanctions. *Selletti*, 173 F.3d at 113 ("plaintiff's overall conduct apart from his non-compliance with [paying sanctions]"); *Owens*, 969 F.2d at 473 ("It is well-established that, when reviewing the dismissal of a claim or action, we must consider the case's procedural history, as well as its status at the time of dismissal."). This recklessness or fault is evidenced by the sanctioned party's actions or inaction. *Selletti*, 173 F.3d at 113; *Owens*, 969 F.2d at 473 ("Even if the plaintiffs could not have satisfied the monetary sanctions, their conduct related to the imposition of these sanctions, such as ignoring the court's orders or continuing to file frivolous motions despite previous warnings, well might justify dismissal."); *see Moon*, 863 F.2d at 838 (sanctioned party "made no attempt to comply with the sanction order, nor did he ask the court to devise a way for him to comply partially").

\*     \*     \*

The case law is silent as to which—if any—consideration carries more weight. In the absence of any authority, a district court should exercise its discretion in weighing these considerations to determine whether to impose claim- or action-terminating sanctions after a sanctioned party fails to pay a monetary sanction due to its financial inability. It is important to remember that a district court is only

37

required to "consider" whether a sanctioned party has the financial ability to pay a monetary sanction before imposing claim or action terminating sanctions. *Gay*, 682 F.3d at 595 n.2 ("And while inability to pay a fee imposed in a pending suit is not an 'automatic defense' to dismissal for failing to pay it, a court abuses its discretion when, as here, it fails even to consider a party's lack of resources before ordering dismissal." (cleaned up)). In this context, "consider" does not *require* a district court to impose or not impose those types of sanctions. The case law only holds that a district court must consider this fact, and in doing so, before imposing terminating sanctions, look to other factors in exercising its discretion.

## C. CONTENTIONS REGARDING MOTION FOR IMMEDIATE PAYMENT

Plaintiff contends that Duke must pay the monetary sanction immediately, and that if he does not pay immediately, then this Court must impose claim- and action-terminating sanctions for the failure to pay. Dkt. 578, at 12. This contention is not entirely accurate.

Duke essentially contends that there is nothing the Court can do. According to Duke, the Court cannot enter judgment on the sanctions award. Duke also contends the Court cannot enter claim- and action-terminating sanctions because of Duke's inability to pay. Dkt. 577, at 3. Of course, this is incorrect. Indeed, the very case upon which Duke relies rejects this contention. *Williams*, 660 F.3d at 266 ("Not that inability to pay is an automatic defense to an alternative sanction of dismissal.").

## D. ANALYSIS

### 1. *Court Discretion in Fashioning Sanctions*

The Court recognizes that its decision is not unreviewable. *Owens*, 969 F.2d at 472. It would be improper and presumptuous to think otherwise. *See Dunphy v. McKee*, 134 F.3d 1297, 1300 (7th Cir. 1998). But it is incredibly difficult to challenge a district court's imposition of sanctions. *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 223 (7th Cir. 1992). And, when the district court's discretionary sanctions rest upon factual findings made based on credibility determinations, finding clear error hardly ever occurs. *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). Moreover, it is important to recognize that as long as a reasonable jurist could conclude that claim- or action-terminating sanctions were appropriate, then the decision will be affirmed. *Long v. Steepro*, 213 F.3d 983, 986 (7th Cir. 2000). So, a district court's decision to impose discovery sanctions will only be "reversed upon a showing of a *clear* abuse of discretion." *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 888 (7th Cir. 2004) (emphasis added) (quoting *McCarthy v. Option One Mortgage Corp.*, 362 F.3d 1008, 1012 (7th Cir. 2004)); *Patterson v. Coa-Cola Bottling Co.*, 852 F.2d 280, 283 (7th Cir. 1988). The Seventh Circuit is not alone in requiring a *clear* abuse of discretion to reverse a district court's discovery sanction. *See Ware v. Rodale Press, Inc.*, 322 F.3d 218, 221 (3d Cir. 2003); *California v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998); *Boardman v. Nat'l Med. Enters.*, 106 F.3d 840, 843 (8th Cir. 1997); *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1182 (11th Cir. 1987); *Davis v. Duplantis*, 448 F.2d 918, 921 (5th Cir. 1971). This recognition is based on the broad and vast discretion district courts possess in

determining appropriate sanctions. *Chatman v. Davis*, 839 F.3d 679, 687 (7th Cir. 2016); *Park v. City of Chicago*, 297 F.3d 606, 614 (7th Cir. 2002); *Talbert v. City of Chicago*, 236 F.R.D. 415, 419 (N.D. Ill. 2006). Indeed, '[t]he district courts have 'wide latitude in fashioning appropriate sanctions.'" *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011) (quoting *Johnson v. Kakvand*, 192 F.3d 656, 661 (7th Cir. 1999)).

> 2. *Applying Considerations to Facts Leads to Conclusion that Terminating Sanctions Should Be Imposed*

> > a. Alternative Funds

As to possible alternative funds, Duke alludes to his malpractice claims against his former defense counsel as a source. Dkt. 577, at 3. But there are obviously real problems with Duke's malpractice claims against his former defense counsel. First, legal malpractice cases are notoriously difficult to win. David Levine, *The Case Against the "Case-Within-A-Case": How to Disarm the Many Traps That Lie in Wait for Legal Malpractice Plaintiffs*, 66 S.D. L. Rev. 110, 113 (2021); Susan Saab Fortney*, Civil Litigation Ethics at a Time of Vanishing Trial: A Tort in Search of a Remedy: Prying Open the Courthouse Doors for Legal Malpractice Victims*, 85 Fordham L. Rev. 2033, 2034 (2017); Benjamin Barton, *Do Judges Systematically Favor the Interests of the Legal Profession?*, 59 Ala. L. Rev. 453, 493 (2000). Like most jurisdictions, in Illinois, to succeed on a legal malpractice claim, the plaintiff must prove the case-within-a-case; namely, the plaintiff must establish that but for the attorney's negligence, the plaintiff would have prevailed in the underlying case. *Tri-G, Inc. v. Burke Bosselman & Weaver*, 856 N.E.2d 389, 590 (Ill.

2006). So, to win on his malpractice claims against the former defense counsel, Duke must establish that he would have prevailed on his counterclaims. And that is no small feat. Second, the Court has already found as a matter of fact that Duke is equally culpable. *DR Distribs.*, 513 F. Supp. 3d at 873. This is why the Court required Duke to pay 50% of the monetary sanctions. The Court's finding that he was equally culpable was made before his withholding of the 20 bankers boxes came to light. Moreover, the Court specifically found that Duke spoliated evidence and engaged in pervasive discovery misconduct. Importantly, this Court found that Duke intentionally was both affirmatively dishonest with his former defense counsel and failed to inform them of critical facts when he was dutybound to do so. The Court assumes that in any legal malpractice case the former defense counsel— or more accurately, the former defense counsel's insurance carriers—will persuasively argue that this Court's specific factual findings operate as collateral estoppel. *See generally Am. Fam. Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000). Third, Duke himself would have to prevail on the malpractice claims. He cannot simply assign his claims to Plaintiff. *Brandon Apparel Grp. v. Kirkland & Ellis*, 887 N.E.2d 748, 755 (Ill. App. Ct. 2008). Duke even recognized this fact. Dkt. 584, at 3. So, Duke's malpractice claims against the former defense counsel are doubtful alternative source of funds.

Duke also continues to assert that he has meritorious counterclaims against Plaintiff, which would offset the $1,263,372, he owes after he prevails against

41

Plaintiff. Dkt. 577, at 3. This argument merges with the "probable merits" consideration.

### b. Probable Merits

In determining the probable merits of Duke's counterclaims,[18] the Court looks to the totality of the circumstances. In doing so, the Court considers the realities of the case, using its own experience, common sense, evaluations of witness credibility, and the weight and sources of the evidence.

On the positive side of the ledger, the previous district judge found that Duke was the senior user of the mark. But that decision is interlocutory. *See White v. Gerardot*, 509 F.3d 829, 833 (7th Cir. 2007). This Court can reconsider that decision. *Terry v. Spencer*, 800 F.3d 890, 893 (7th Cir. 2018). And that decision was made on a record far less complete than is currently before this Court.

Also on the positive side of the ledger is the opinion of one of Duke's former defense counsel, who—at the time—opined that Duke had a strong case. But that opinion must be taken with a Department of Transportation storage dome of salt. First, counsel rarely tell judges anything but that their client's case is strong. *See Salmeron v. Enter. Recovery Sys.*, 579 F.3d 787, 797 (7th Cir. 2009) ("Salmeron presents little more than her personal opinion to support her assertion that her lawsuit had merit."). Second, that opinion was given before it was discovered that

---

[18] When the Court is referring to Duke's counterclaims, it is focusing on those related to the trademark issue. It is not referring to the defamation counterclaim. That counterclaim is meritless. The claim was weak from the start. Then, at the sanctions hearing, improperly withheld documents were finally produced. Those documents established, among other things, that no defamatory statements were made. *DR Distribs.*, 513 F. Supp. 3d at 893-94, 921. That counterclaim does not even pass Rule 11 standards.

Duke had withheld significant harmful evidence from this counsel (and obviously from Plaintiff and the Court). Third, that opinion was given before the Court imposed significant evidentiary sanctions against Duke because of his misconduct. Fourth, when given the opportunity to confirm that opinion, Duke lawyered up and refused to explain to the Court why he thought his case had merit.

On the negative side of the ledger exist many reasons for finding that the probable merits of Duke's case are not strong. Duke never addressed any of these at any time.

First, the Court's sanctions order imposed significant evidentiary sanctions against Duke. And Duke's additional misconduct identified in this order—including but not limited to withholding 20 bankers boxes of relevant and responsive documents—would not and cannot go unsanctioned. Because monetary sanctions are worthless against Duke, assuming the Court did not enter case-terminating sanctions, it would impose even more evidentiary sanctions against Duke. This would further weaken his case.

Second, the production of the previously withheld ESI has provided significant evidence undermining Duke's case. Among other things, the previously withheld ESI includes evidence undermining Duke's claimed market penetration, evidence showing that his marketing efforts were unsuccessful, and that evidence upon which his expert relied was unreliable. Although the newly disclosed ESI evidence also casts additional doubt on Duke's credibility, that is equivalent to bringing sand to the beach at this point.

43

Third, the bonding and litigation companies' reactions show Duke's case lacks merit. When a bonding company requires 100% cash collateral to post a bond, that speaks volumes. And if Duke had such a great case on the merits—one that could lead to a recovery of almost $100 million—one would think a reasonable investor would be more than willing to pony up $1,263,372 to get a chunk of that highly likely recovery. The absence of such an investor says a lot about the merits of Duke's case; the market has spoken loudly that it is without merit.

Fourth, this Court's own view of the probable merits of Duke's case is consistent with the market. Duke's claim would likely survive summary judgment because he claims under oath that he did not include Plaintiff's mark in 21 Century Smoking's website. But Duke has claimed a host of critical facts under oath that have proven to be untrue.

Moreover, this Court has reviewed the summary judgment briefing filed in this case. The remainder of Duke's contentions are not particularly strong. When the filings are viewed in light of the evidentiary sanctions already imposed, those contentions are even weaker. Take the declaration of Kirti Sarawat as an example. Her declaration is undermined in large part by the evidentiary sanctions. Additionally, Saraswat's declaration is just that—a declaration. Although it can be used for summary judgment purposes, it is inadmissible at trial because it is hearsay. *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 604 (7th Cir. 2000). And Saraswat was never (and will not be) deposed, so there is no former testimony that will be admissible at trial. Fed. R. Evid. 804(b)(1). And because Saraswat resides

overseas, the chances of her testifying at trial in Rockford, Illinois are exceedingly remote.

The Court also has had multiple opportunities to observe the principals in this litigation. As described above, Bengoa presents as very likeable and extremely credible. His life story is a coming-to-America success story. The Court is confident that jurors would feel the same way. On the other hand, Duke presents as evasive and cavalier. And Duke is certainly not a credible witness. If the case were to go to trial, Duke would be demolished on cross examination. A decent trial advocacy student would be able to eviscerate Duke with his double-digit inconsistent statements, not to mention the trove of other impeachment material in the record. Finally, without doubt, one theme of Plaintiff's case will be that Duke was riding on Bengoa's coattails. After all, Bengoa is an extremely successful businessman. In contrast, Duke is an extremely unsuccessful businessman, despite possessing a Stanford University diploma. The Court is confident that this theme will resonate with a jury in the Western Division of the Northern District of Illinois.

In short, the probable merits of Duke's case are not strong. Sure, he might be able to squeak by some aspects of summary judgment. But surviving summary judgment does not equate to a strong case: his recovery-in-expectation is very small. And because Duke's case is weak, not only are claim- and action-terminating sanctions proportional, but also his belief that his counterclaims provide an alternative source of funds is unfounded.

c.  Other Remedies

As stated earlier, district courts have wide discretion in fashioning appropriate sanctions to remedy discovery violations.  But the remedies generally fall into one of three categories: monetary (such as attorneys' fees, costs, and even fines), evidentiary (such as barring evidence, requiring that certain evidence be deemed admitted, or giving adverse jury instructions), and terminating sanctions (such as dismissal and default).[19]

The Seventh Circuit has repeatedly noted the ineffectiveness of monetary sanctions against judgment-proof parties.  *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015); *Hoskins v. Dart*, 633 F.3d 541, 544 (7th Cir. 2011) ("Monetary sanctions are generally not as effective against a pro se plaintiff proceeding as a pauper, as Hoskins does here."); *see also Freeman v. Anderson*, No. 23-1609, 2023 U.S. App. LEXIS 31213, at *4 (7th Cir. Nov. 22, 2023); *Spiker*, 2022 U.S. App. LEXIS 34482, at *7.  This case is Exhibit A in that regard.  Monetary sanctions against a party that cannot or will not pay is no sanction:  They have no remedial, punitive, or deterrent value.  So, that category of sanctions is not an option here.  It is now not an option for the misconduct the Court has already found.  Plus, it is not an option to reimburse Plaintiff for all the time it had to spend determining that the 20 bankers boxes of documents were never previously produced and were responsive, despite Duke's representations that they were

---

[19] Because Duke is not a prisoner or even a frequent litigant, remedies such as barring him from filing other lawsuits in the future are not suitable.  *See Gay*, 682 F.3d at 595-96.

produced and were not responsive. This is additional prejudice to Plaintiff that monetary sanctions will not cure.

The sanctions order already imposed various evidentiary sanctions. The Court barred Duke from using any documents not previously produced, barred Duke from contesting certain critical facts at issue, allowed the jury to hear evidence about Duke's failure to provide requested documents, and authorized a permissive adverse jury instruction. *DR Distribs.*, 513 F. Supp. 3d at 863. In theory, the Court could impose additional evidentiary sanctions against Duke. For example, it could require a jury to accept that Duke and/or Saraswat included Plaintiff's mark in 21 Century Smoking's website to drive customers to its website. Perhaps, the Court could bar Duke's expert witnesses. Maybe the Court could now impose a mandatory adverse jury instruction so that the jury would be instructed that it must find that Duke destroyed evidence to prevent Plaintiff from using the evidence in this case. But imposing those types of sanctions on top of the already imposed evidentiary sanctions is tantamount to dismissal and default. This avalanche of evidentiary sanctions is equivalent to death by a thousand paper cuts. *Secrease*, 800 F.3d at 402; *see Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1381 (7th Cir. 1993) ("When a district court prevents a defendant from presenting any evidence whatsoever on a claim this normally leads to a default judgment."). Imposing these types of additional sanctions merely puts off the inevitable, while imposing additional financial burdens on Plaintiff, the Court, and the other litigants seeking to have access to the Court's resources. Interestingly, Duke does

not even bother suggesting other evidentiary sanctions that should be imposed instead of imposing claim and action terminating sanctions. That silence is likely because even Duke understands that additional evidentiary sanctions would be the death knell to his case.

With monetary and evidentiary sanctions removed from the Court's sanctions toolbox, what remains are claim- and action-terminating sanctions. Again, Duke offers no alternatives. His view is that the Court is simply powerless. Dkt. 577, at 5. According to Duke, the Court can only let the litigation play out so that if Duke prevails there will be an offset. *Id.* at 2-4. Of course, if Duke does not prevail, Duke walks away unscathed, despite his repeated, egregious misconduct. As already established, Duke's understanding of the law is simply incorrect. The Court does have power to enter claim- and action-terminating sanctions. What the Court cannot do is automatically enter those type of sanctions without considering the relevant factors.

           d. Duke's Recklessness, Fault, and Additional or Continuing Discovery Violations

Besides Duke's failure to pay, his additional behavior—both before and after the Court imposed the monetary sanctions—weighs heavily in favor of terminating sanctions.

Duke's failure to produce the 20 bankers boxes of documents meets both the reckless and fault standards of misconduct. These boxes contained thousands of relevant and responsive documents. And these boxes contained documents that both predated and postdated the 2014 production. Moreover, Duke knew about

48

these 20 bankers boxes of documents sitting in his closet during the entirety of the five-day evidentiary hearing. Again, the undisclosed evidence was not a thumb drive sitting in a junk drawer. This evidence is not easily overlooked. And the entire subject of the hearing was his withholding and destroying relevant documents. But at no time during that hearing or during the months between the hearing and the Court's extensive sanctions order did Duke inform the Court or Plaintiff about these documents. Instead, he sat silent. *See Marrocco*, 966 F.2d at 224 (party stood idly by instead of investigating). By the Court's count, this would be at least the third time Duke sat by and watched the Court and Plaintiff struggle to determine what he withheld all the while knowing that there were even more withheld documents.

And if withholding thousands of relevant and responsive documents and sitting silent when a clear duty to speak exists is not enough, then consider Duke's contumacious conduct, too. In 2021, when Plaintiff and the Court finally learned about the 20 bankers boxes, Duke represented to his attorney—knowing that the attorney would pass on these representations to Plaintiff and the Court—that the documents in the 20 bankers boxes had already been produced and that the documents were not responsive. The undisputed evidence proves that these representations were false. These false representations sit atop a mountain of other false representations Duke has made to the Court. *Maynard*, 372 F.3d at 893 (sanctioned party's continued untruthfulness factor in dismissing the party's action

for failure to pay). And these false representations came after the Court already called out Duke for making false representations—some of which were under oath.

The Court also considers Duke's inaction since it ordered him to pay monetary sanctions. This inaction show a completely cavalier attitude and disregard for his obligations. *e360 Insight*, 658 F.3d at 643 (discovery obligations should be taken seriously). Since the monetary award, Duke has done absolutely nothing to pay Plaintiff what is rightfully owed. Duke never offered to set up a payment plan with Plaintiff and the Court. *Compare Williams*, 660 F.3d at 265 (sanctioned party at least "offer[ed] to pay off the sanctions debt" despite the proposed plan being "risible"), *with Maynard*, 372 F.3d at 893 (sanctioned party failed to pay any portion of monetary sanction "or even offer to pay them on an installment plan"). Duke never approached the Court to propose a way to pay Plaintiff at least some of the money. *Moon*, 863 F.2d at 838. He has presented no evidence that he has tried to operate using fewer or less expensive vehicles. *Id.* (suggesting that the sanctioned plaintiff might reasonably be expected to dispose of one car to at least partially comply with the sanctions order). He has not sold any property of any kind. *Id.* at 838 n.4. Mind you, the Court was not expecting Duke to pawn his wife's wedding ring. But even a tiny effort would have shown some recognition by him that he took his discovery responsibilities seriously. Perhaps, Duke could have forgone his vacation to Mexico and paid that money to Plaintiff. Dkt. 597, at 4. He has not presented any evidence that he sought a loan of any kind, including from a financial institution or lender or even friends or family. *Id.*

Despite not seeking a loan from these sources to pay the monetary sanctions, Duke has accepted thousands of dollars from family members to book Airbnbs for him. Dkt. 597, at 4-5. That's money that could've been paid to Plaintiff. Tellingly, Duke has no backup plan to pay the sanctions award if he fails to prevail on his less than stellar case. Perhaps, none of this inaction is surprising given that Duke freely admits that he lives his life outside of this case. Duke could not even be bothered to timely provide the Court with an accurate and full accounting of the 20 bankers boxes of documents and timely answer the Court's questions about these boxes. In short, Duke has taken zero responsibility or even considered enduring even the slightest inconvenience of any kind to pay the $1,263,372 he owes Plaintiff. Duke just does not care about this Court's orders and the consequences of his failure to follow them.

So, besides his failure to pay the monetary sanction, Duke has engaged in additional discovery misconduct, made misrepresentations about his proven misconduct, and completely ignored his responsibilities to make *any* effort to pay Plaintiff *any* portion of the monetary sanction it is rightfully entitled to. This is what is called a pattern of discovery misconduct. *Lightspeed Media*, 830 F.3d at 507 ("As a result, both the district court and we are entitled to evaluate Steele's entire pattern of vexatious and obstructive conduct."); *e360 Insight*, 658 F.3d at 642 (sanction order reviewed not in isolation but in light of the entire procedural history of the case); *Newman*, 962 F.2d at 591 ("But as soon as a pattern of noncompliance

with the court's discovery orders emerges, the judge is entitled to act with swift decision.").

*     *     *

A court has inherent authority to enforce its orders, including the authority to enter dismissal and default for the failure to comply with the court's orders. *Mac Naughton v. Harmelech*, 932 F.3d 558, 566 (7th Cir. 2019); *see Int'l Union, WMW v. Bagwell*, 512 U.S. 821, 833 (1994). The whole judicial system would collapse if parties could disregard orders they disagreed with. *Mac Naughton*, 932 F.3d at 566.

Rather than entering case-terminating sanctions when it could have done so, this Court entered lesser sanctions, including the payment of attorneys' fees. The Court's sanctions order was entered in 2021. The Court then calculated the amount of attorneys' fees Duke owed for his misconduct. That order was in 2022. The Court then ordered immediate payment of the monetary sanctions. That order was entered months ago. During this time, Duke made no attempts to even investigate how to pay those sanctions, offer to make partial payments, seek a loan to pay the amount, or reduce his outside expenses so he could make payments. Indeed, he did not even seem to care about the monetary sanctions he owed: "I live my life outside of this case, I guess." Dkt. 606, at 48. Instead, during those years, he engaged in additional misconduct by not informing anybody about the 20 bankers boxes containing tens of thousands of relevant, responsive documents, not immediately producing the 20 bankers boxes of documents when it was obvious they should have

52

been produced earlier, and making misrepresentations about the 20 bankers boxes of documents when questioned about them.

The Court has carefully and thoroughly considered all the recognized factors when a party cannot pay monetary sanctions because of a financial inability to do so. Having conducted that analysis, in its broad discretion, the Court finds that dismissal of his counterclaims and default on Plaintiff's claims is appropriate. Alternate sources of funds, including any malpractice claims he has against his prior counsel are speculative at best. The merits of his counterclaims (those that had any merit to begin with) are not remotely sufficient to warrant forbearance of payment, especially after the Court has already rightfully imposed evidentiary sanctions against him. No "lesser sanctions" are available. Obviously, additional monetary sanctions serve no purpose. And imposing additional reasonable and appropriate evidentiary sanctions would simply be tantamount to dismissal and default. Finally, Duke's continued contumacious conduct, fault, recklessness, and cavalier view of his discovery obligations strongly weigh in favor of case-terminating sanctions. The Court wishes it could live its life outside this case, but Duke's continued misconduct over the course of a decade has prevented it from tending to other matters on its docket. *Secrease*, 800 F.3d at 402; *Bankdirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, No. 15 C 10340, 2018 U.S. Dist. LEXIS 224705, at *23 (N.D. Ill. Nov. 8, 2018). And despite Duke's desire to compartmentalize his life, his misconduct has caused significant prejudice to Plaintiff. *Salmeron*, 579 F.3d at 797 ("A district court certainly can consider the extent of the prejudice to the opposing

party when determining an appropriate sanction."). His speculative hope that he might someday prevail on his counterclaims while not having to pay for his legal representation or the consequences of his misconduct is an insufficient basis to excuse him from paying what he rightfully owes. At some point, a decade's worth of misconduct comes home to roost. That point is now.

Standing alone, this Court is on solid ground entering claim and action terminating sanctions for Duke's failure to pay the monetary sanctions already imposed. But when combined with his other discovery violations identified below, action- and claims-terminating sanctions are doubly appropriate.

## II. SECOND BASIS FOR CASE TERMINATING SANCTIONS: PLAINTIFF'S SECOND MOTION FOR SANCTIONS

After the Court entered its first motion for sanctions in 2021, additional misconduct by Duke came to light, including his failure to produce tens of thousands of relevant, responsive documents, which, among other things, violated the Court's scheduling order. Additionally, after having the opportunity to review the ESI that was finally produced after the first sanctions order, Plaintiff identified additional prejudice it suffered because of Duke's discovery misconduct.

### A. FACTS

The complaint in this case was filed on September 7, 2012. Dkt. 1. On October 3, 2012, 21 Century Smoking filed counterclaims, including trademark infringement, seeking, among other things, cancellation of Plaintiff's trademark application and registration. Dkt. 8.

On January 18, 2013, Plaintiff served Rule 34 document requests on 21 Century Smoking. Dkt. 497-2, at 57-61. Production request number 6 reasonably sought relevant information including, "documents which refer, relate to or involve the marketing, distribution, sale, advertising, and/or promotion of Defendant's products and/or services bearing the 21 Century Smoking trademark and/or service mark." *Id.* at 61. Although unnecessary because of Rule 26(e), the document request instructed, "This request is a continuing one and requires further and supplemental production by you as you acquire additional documents between the time of initial production and the time of trial or hearing." *Id.* at 60.

On February 15, 2013, 21 Century Smoking responded to Plaintiff's production request. *Id.* at 78-83. As per standard and terrible operating procedure, the responses contained "General Objections." *Id.* at 78-79. These boilerplate objections are useless and improper; they are a nullity. *See Liguria Foods, Inc. v. Griffith Labs., Inc.*, 320 F.R.D. 168, 185-87 (N.D. Iowa 2017); *Burkybile v. Mitsubishi Motors Corp.*, No. 04 C 4932, 2006 U.S. Dist. LEXIS 57892, at *20-21 (N.D. Ill. Aug. 2, 2006). Setting aside the boilerplate objections, in response to the specific production request, 21 Century Smoking responded by stating, "Defendant agrees to produce relevant and non-privileged documents requested in Request No. 6." Dkt. 497-2, at 80. Other responses to production request contained objections indicating that no documents would be produced. *Id.* at 81-83. The response to the production request was signed by one of Duke's former defense counsel. *Id.* at 83.

As already described in detail, Duke previously showed his former defense counsel five boxes of documents—not 20 boxes of documents. In 2014, Plaintiff's counsel were shown the five boxes of documents at Duke's "warehouse," at which time they asked that the documents be copied and produced. The five boxes were copied and produced in 2014. Included in this 2014 production were sales reports from 2009-2011. No post-2011 sales reports were provided even though it has now been proven that sales reports from 2011-2014 existed at the time of this 2014 production.

On February 17, 2015, Plaintiff served supplemental production requests on Duke and 21 Century Smoking, seeking similar relevant documents. *Id.* at 110-17, 128-34. Duke and 21 Century Smoking responded in a similar manner. There were general boilerplate objections but with representations that responsive documents had been and would be produced. *Id.* at 148-57; Dkt. 497-3, at 1-12. These responses also contained the phrase "Investigation Continues." Dkt. 497-2, at 148-57; Dkt. 497-3, at 1-12. ("Investigation continues" is a worthless addition to a discovery response. No judge finds its inclusion valuable. *See, e.g.*, *Gevas v. Wexford Health Sources, Inc.*, Case No. 20 C 50146, 2021 U.S. Dist. LEXIS 233691, at *6-7 (N.D. Ill. Dec. 7, 2021); *Flentye v. Kathrein*, No. 06 C 3492, 2007 U.S. Dist. LEXIS 74260, at *3-4 (N.D. Ill. Oct. 2, 2007).) Each of the responses was signed by one of Duke's former defense counsel. Dkt. 497-2, at 157; Dkt. 497-3, at 12.

Around the same time, the parties filed an agreed motion to extend fact discovery. After noting in particularly snarky language that discovery had already

been extended several times, on March 4, 2015, the Court granted the agreed extension. Dkt. 116. To ensure completion of fact discovery, the Court even gave the parties 30 days more than they requested. *Id.* at 2. The Court warned the parties that "these revised dates will not be moved." *Id.* As a result, all Rule 26(e) supplements were due on June 1, 2015, and all fact discovery closed on July 1, 2015. Duke provided no supplements or corrections between this order and June 1, 2015.

The 20 bankers boxes of documents were not produced in response to either the 2013 production request or the 2015 supplemental production requests, which were served on both Duke and 21 Century Smoking. These documents were not produced by the June 1, 2015, supplement and correction date. Instead, the 20 bankers boxes were not produced until March of 2021—nearly six years after the date contained in the Court's order. Again, there is no dispute that the sales reports from 2011 through 2015 were not only relevant but also responsive to the production requests. Advertising and marketing documents were likewise relevant and responsive. Those types of documents—which existed in 2014—were contained in the 20 bankers boxes and not produced until 2021.

As established earlier, the documents in the five boxes produced in 2014 and the documents in the 20 bankers boxes produced in 2021 were "mutually exclusive." Dkt. 497-1, at 5-7. And the 20 bankers boxes of documents contained tens of thousands of relevant, responsive documents that existed at the time of the 2014 production. *Id.* at 4-8.

57

Duke has presented no evidence that he ever searched the 20 bankers boxes for responsive documents. In fact, he admits that he did not. Dkt. 456, at 2-3. And Duke has presented no evidence that he showed the 20 bankers boxes to his former defense counsel before July 1, 2015—or even before 2019. In fact, the only reasonable inference is that he did not show these 20 boxes containing tens of thousands of relevant, responsive documents to the former defense counsel. Again, the 20 bankers boxes contained documents that postdated the 2014 document production.

## B. CONTENTIONS

Plaintiff's second motion for sanctions covers numerous discovery violations. Although Plaintiff raises several strong bases to impose sanctions, the Court focuses on the 20 bankers boxes of documents. The Court does not minimize many of Plaintiff's other arguments. Indeed, several of those arguments would likewise lead to terminating sanctions. But the violations relating to the 20 bankers boxes is sufficient because it is so egregious. Again, the violations relating to the 20 bankers boxes alone are sufficient to enter claim- and action-terminating sanctions under the totality of the circumstances of this case at this point. But when combined with Duke's failure to pay the monetary sanctions already imposed, even more justification exists to impose these types of sanctions.

Plaintiff's argument as to why sanctions should be imposed regarding the 20 bankers boxes is simple and straightforward: The 20 bankers boxes contained tens of thousands of relevant, responsive documents that were requested in 2013 and again in 2015 but were not produced until 2021—nearly six years after the Rule

26(e) supplement and correction due date provided in the Court's March 4, 2015,

order. Plaintiff contends that these violations have prejudiced it.

In contrast to Plaintiff's simple, straightforward argument, Duke's argument

regarding the failure to produce tens of thousands of admittedly relevant and

responsive documents is difficult to follow and is impossible to accept. Duke's

argument is that the thousands of responsive and relevant documents were not

"hidden or improperly withheld." Dkt. 530, at 8, 11. There are two ways to

interpret Duke's argument. The first way is the most charitable and generous

interpretation. Under this view, Duke makes an estoppel type of argument.

("Estoppel" is the Court's term, not Duke's. But "estoppel" is the closest legal

concept the Court could discern from Duke's argument.) According to Duke,

Plaintiff must have known that Duke's and 21 Century Smoking's production

responses were deficient because the responses obviously omitted the responsive

and relevant sales records from 2012-2015 and by not grumbling back in 2014—

"when they were obliged to speak up"—Plaintiff can't complain now. The corollary

to this estoppel-type argument is that Plaintiff was not prejudiced by Duke's failure.

According to Duke and 21 Century Smoking, because they did not produce to

Plaintiff what it was entitled to receive, it's Plaintiff's fault that Duke and 21

Century Smoking produced the documents half a decade late in violation of a court

order. The second way to interpret Duke's argument is breathtakingly offensive.

Under this view, it is no violation of the Federal Rules of Civil Procedure to

knowingly not produce, unprivileged, responsive, and relevant documents. Dkt.

530, at 8-11. Instead, it is only a violation to "hide" or "improperly withh[o]ld"[20]
relevant, responsive documents and absent a court order requiring the production of
relevant, responsive documents, no sanctions can be imposed. Dkt. 530, at 10.
Regardless of which view one takes, neither is supported by any evidence[21] or any
law. Tellingly, Duke doesn't cite a single case or rule in support.

Despite the lack of evidence or law to support the argument, according to
Duke, not only are the 20 bankers boxes of documents a "red herring," "the whole
hubbub over the '20 boxes' is much ado over nothing." Dkt. 530, at 11. The Court
vehemently disagrees. Indeed, this entire argument is a prime example of Duke's,
21 Century Smoking's, and its various counsel's complete lack of understanding of
basic discovery principles. It is truly astonishing to take the position that a
responding party can (1) inform the requesting party that responsive documents to
a production request will be produced, (2) fail to search a trove of documents kept in

---

[20] Duke never defines or even hints at what "improperly withhold" means. One could
reasonably assume that a party can "properly withhold" documents that are privileged,
provided they are identified on a privilege log and no court order requiring production
exists. But Duke makes no argument that the documents are privileged. They are not.
[21] Years after the requests and production, Duke's current defense counsel—who was not
personally involved in the case, let alone the discovery—cobbled together a timeline based
on various documents. From this, he implies in his brief that there was either some kind of
"understanding" that the failure to produce the thousands of relevant, responsive
documents was acceptable to Plaintiff or that Plaintiff *knew* that these documents existed
and took no action. Again, there is no evidence supporting either implication. None of the
former defense counsel submitted declarations or affidavits attesting to this. Neither did
Duke. And, unsurprisingly, Plaintiff said neither happened. Duke's current counsel's
argument is pure speculation. His conclusions are not based upon any reasonable
inferences. Instead, it is an after-the-fact, fantastical concoction to justify the abject failure
to comply with discovery rules. *See Haynes v. Alumax Recycling Grp., Inc.*, 719 F. Supp.
707, 713 (N.D. Ill. 1989) ("All Haynes has shown is that it is possible to devise almost any
story post hoc to mix facts with total fancy. As a proposed solution to a connect-the-dots
puzzle, the lines it seeks to draw between the factual dots are the random paths of wild
improbabilities rather than the straight line of reasonable inferences.").

the ordinary course of business, (3) fail to produce tens of thousands of responsive documents that are admittedly relevant to the requesting party's claims, (4) fail to supplement and correct the document production by a court-ordered date, (5) proceed through fact and expert discovery and summary judgment briefing that undoubtedly would have been different had the documents been produced, (6) sit silently by during a five-day evidentiary hearing regarding the failure to produce other relevant, responsive electronically stored documents without mentioning the tens of thousands of tangible relevant, responsive documents that existed, (7) then after the Court enters an order imposing sanctions for the failure to produce electronically stored documents, suddenly produce the tens of thousands of relevant, responsive documents that were required to be produced years ago under the document request and required to be produced years prior under the Court's scheduling order, and (8) then take the position that the consequences of this series of actions and inaction is no big deal.

## C. APPLICABLE RULES

Several of the Federal Rules of Civil Procedure are applicable to the second motion for sanctions. Although Rule 26(g) is the most prominent rule—particularly when applied to the responses to the Rule 34 production requests—other rules are at play, including Rule 16(f), Rule 26(e), Rule 37(b), and Rule 37(c).

### 1. *Rule 26(g)*

The Court starts with the text of Rule 26(g). This rule requires that every discovery response must be signed by an attorney (or the party if unrepresented). Fed. R. Civ. P. 26(g)(1). "By signing, an attorney or party certifies that to the best of

61

the person's knowledge, information, and belief formed after a reasonable inquiry," a discovery response is "consistent with these rules." Fed. R. Civ. P. 26(g)(1)(B)(i). "If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3).

Several of the phrases in the text of Rule 26(g) are terms of art that have specific definitions. First, "reasonable inquiry" requires counsel to stop and think about the discovery responses. *DR Distribs.*, 513 F. Supp. 3d at 952. "Reasonable inquiry" means that under the totality of the circumstances the investigation was reasonable. Fed. R. Civ. P. 26(g) advisory committee's note to the 1983 amendment. "These rules" means the Federal Rules of Civil Procedure. Hon. Paul Grimm, *Good Faith in Discovery*, Litigation, Winter 2020, at 23, 25. And "substantial justification" requires a reasonable basis in both fact and law, so that a reasonable person would think that the action was appropriate. *Heller v. City of Dallas*, 303 F.R.D. 466, 477 (N.D. Tex. 2014) (*citing Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

Rule 26(g) requires attorneys and parties to respond to discovery requests, such as Rule 34 requests to produce, in good faith. Fed. R. Civ. P. 26(g) advisory committee's note to the 1983 amendment. "Good faith" under Rule 26(g) is an objective standard. *St. Paul Reinsurance Co. Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 516 (N.D. Iowa 2000). The objective good faith standard is violated by carelessness and inattentiveness or even by an honest mistake. *DR Distribs.*, 513

F. Supp. 3d at 953. The burden to show both reasonable inquiry and substantial justification rests on the responding party if the discovery response is being challenged. *Lamb v. Outback Steakhouse of Fla., LLC*, No. 19 CV 150, 2021 U.S. Dist. LEXIS 189772, at *29 (M.D. Ga. Sept. 30, 2021) (burden to show substantial justification is on respondent); *Fuhs v. McLachlan Drilling Co.*, No. 16-376, 2018 U.S. Dist. LEXIS 184264, at *62 (W.D. Pa. Oct. 26, 2018) (same); *N.T. v. Children's Hosp. Med. Ctr.*, No. 13 CV 230, 2017 U.S. Dist. LEXIS 222936, at *18 (S.D. Ohio Sept. 27, 2017) (burden on respondent to show reasonable inquiry); *Kellgren v. Petco Animal Supplies, Inc.*, No. 13-cv-644, 2016 U.S. Dist. LEXIS 187848, at *11 (S.D. Cal. May 24, 2016) (same). If the respondent fails to show substantial justification, it has no refuge in claiming that the violation was harmless. *Simmonds v. Evans*, No. 22-cv-00051, 2023 U.S. Dist. LEXIS 186128, at *15 n.2 (D.V.I. Oct. 17, 2023).

Under Rule 26(g), sanctions are mandatory, but the nature and extent of the sanctions fall within the court's discretion. *Rojas v. Town of Cicero*, 775 F.3d 905, 909 (7th Cir. 2015). Courts are authorized to impose claim- and action-terminating sanctions for a violation of Rule 26(g). *Laukas v. Rio Brands, Inc.*, 292 F.R.D. 485, 514 (N.D. Ohio 2013); 6 *Moore's Federal Practice* § 26.154[4][d]. In determining the nature and extent of the sanctions, courts can consider the delay and increased costs imposed on the movant/requesting party, *see In re Delta / Air Tran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012), and the costs imposed on the judicial system. *Perkins v. General Motors Corp.*, 965 F.2d 597, 601-02 (8th Cir. 1992); *see FEC v. Salvi*, 205 F.3d 1015, 1018 (7th Cir. 2000) ("[C]ourts

have discretion to impose sanctions to protect the judicial process.").  Rule 26(g) authorizes a court to sanction parties who are complicit in violating the rule.  Fed. R. Civ. P. 26(g)(3); *DR Distribs.*, 513 F. Supp. 3d at 954.  Authorizing party sanctions makes perfect sense: "The client is charged with knowledge of what documents it possesses." *Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 221 (S.D.N.Y. 2003).  So, objective good faith is required by the parties, too.  *DR Distribs.*, 513 F. Supp. 3d at 965.

The Advisory Committee Notes provide important guidance for Rule 26(g). For example, according to the Advisory Committee Notes, "Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37."  Fed. R. Civ. P. 26(g) advisory committee's note to the 1983 amendment.  Moreover, "[i]f primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." *Id*.  Additionally, "[c]oncern about discovery abuse has led to widespread recognition that there is a need for more aggressive judicial control and supervision.  Sanctions to deter discovery abuse would be more effective if they were diligently applied not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id*. (cleaned up).

Guidance can also be found in now retired Judge Paul Grimm's excellent article, *Good Faith in Discovery*, Litigation 23, Winter 2020.  Rule 26(g) is "designed

to ensure that, from the moment litigation commences through all the steps that follow, it is conducted in good faith." *Id*. at 24. Rule 26(g) "must become internalized by all who participate in pretrial discovery." *Id*. at 26. "[T]he parties and the lawyers have an obligation to conduct themselves in good faith." *Id*. And contrary to Duke's view, Dkt. 530, at 4 n.4, "the signature requirement is no mere formality." Grimm, *supra*, at 25.

### 2. *Rule 34*

Federal Rule of Civil Procedure 34 directs how parties must respond or object to production requests. Fed. R. Civ. P. 34(b)(1)(B), (C). "For each item or category, the response must either state that inspection . . . will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(1)(B). "An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." Fed. R. Civ. P. 34(b)(1)(C). To state the obvious, in responding to production requests, a party is required to reasonably and diligently search for and produce responsive documents within its possession, custody, or control. *Milke v. City of Phoenix*, 497 F. Supp. 3d 442, 465 (D. Ariz. 2020). Duke did not search the 20 bankers boxes. Dkt. 456, at 2-3. And the documents were not timely produced.

### 3. *Rules 16(f), 26(e), 37(b), and 37(c)*

Rule 16 requires district courts to enter scheduling orders—also known as case management orders (or "CMOs" for short)—that govern the parties' pretrial actions, particularly discovery. Fed. R. Civ. P. 16(a), (b). Scheduling orders are

required to contain limits on the time to join parties, amend pleadings, complete discovery, and file motions. Fed. R. Civ. P. 16(b)(3)(A). The order may also modify the timing of required supplements and corrections. Fed. R. Civ. P. 16(b)(3)(B)(ii). Scheduling orders may be modified for good cause and with the judge's consent. Fed. R. Civ. P. 16(b)(4). Because scheduling orders can be modified, some counsel view scheduling orders as merely aspirational or hortatory. *See, e.g.*, *Pinello v. Andreas Stihl AG*, No. 08-CV-452, 2010 U.S. Dist. LEXIS 157253, at \*14 (N.D.N.Y. Jan. 11, 2010). But this Court—and any court engaged in good, active case management—does not. *McCann v. Cullinan*, No. 11CV50125, 2015 U.S. Dist. LEXIS 91362, at \*7-8 (N.D. Ill. July 14, 2015); *see also Culliver v. BP Expl. & Prod.*, No. 21-cv-4942, 2022 U.S. Dist. LEXIS 167209, at \*2 (N.D. Fla. Sept. 16, 2022) (Jones, J.); *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 376 (D. Md. 1999) (Grimm, J.). Scheduling orders are not second-class orders, possessing less authority than other judicial orders. The use of and adherence to scheduling orders is critical for a district court to manage its docket. *O'Connell v. Hyatt Hotels*, 357 F.3d 152, 155 (1st Cir. 2004). If there were any doubt that counsel should comply with "mere" scheduling orders, that doubt is removed by Rule 16(f), which authorizes the district court to sanction parties and attorneys who "fail[] to obey a scheduling or other pretrial order" unless the failure was substantially justified or sanctions would be unjust. Fed. R. Civ. P. 16(f)(1)(C), (2). Rule 16(f) empowers a district court to sanction a party, its attorney, or both, and the sanctions include the entire waterfront of possible sanctions. Fed. R. Civ. P.

16(f)(2).  Rule 16(f) permits a court "to make such orders as are just for a party's failure to obey a scheduling or pretrial order, including dismissal."  *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1227 (9th Cir. 2006).  The purpose of these sanctions is to both penalize violators and also deter would-be violators.  *Id.*  And like Rule 26(g), the violation of a pretrial order under Rule 16 authorizes a district court to impose sanctions, but the harshness of the sanction "depend[s] on whether the court feels that the party acted improperly or recklessly."  Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 61 *Federal Practice and Procedure* § 153 (3d ed. 2010).  Despite being harsh, terminating sanctions can be imposed for violating a pretrial order. *Id.*

Rule 26(e) requires parties to supplement and correct their disclosures and discovery responses.  Fed. R. Civ. P. 26(e).  The text of the rule makes supplementing discovery responses mandatory; the rule uses the word "must."  *Id.*  Supplements and corrections must be made "in a timely manner," absent a court order directing when supplements and corrections must be made.  Fed. R. Civ. P. 26(e)(1)(A), (B).  Using best practices, this Court always includes a Rule 26(e) date in its scheduling orders.  That date is always at least 30 days before the close of fact discovery, so that if a party must supplement or correct its discovery responses, the requesting party still has at least another month to conduct discovery based upon the supplement or correction, while keeping the fact discovery cut-off date intact.  "The duty to supplement and correct disclosures and responses is a continuing duty and no motion to compel further supplementation is required."  6 *Moore's Federal*

*Practice*, § 26.131[3]. "The duty to supplement does not depend on repeated requests by an adversary for updated information . . . [and] *is not limited to circumstances in which the failure to amend constitutes a knowing concealment.*" *Id.* (emphasis added). "A party may not escape the burden of full compliance with the rules of discovery by placing a duty of repeated requests on its adversary." *Id.* "Rule 26(e) does not require that a discovery order be violated before sanctions can be imposed. Consequently, for sanctions to be imposed under Rule 26(e), there need be no motion to compel compliance with the discovery request." *Id.* § 26.132[3]. In the general context—rather than the nonsense involved when "experts" attempt to "supplement" their reports, *see, e.g.*, *Jackson v. Teamsters Local Union 922*, 312 F.R.D. 235, 237 (D.D.C. 2015), "supplement" means providing new documents and information that did not exist or that the responding party was unaware of despite reasonable inquiry, and "correction" means just that—correcting inaccuracies. In other words, "supplement" means to provide additional information; whereas "correct" means to provide new, different, and accurate information. *See Correction*, *Black's Law Dictionary* (11th ed. 2019) (defining "correction" as "the act . . . of making right what is wrong"); *Supplemental*, *Black's Law Dictionary* (11th ed. 2019) (defining "supplemental" as "[s]upplying something additional; adding what is lacking").

Rule 37(b) authorizes courts to sanction parties for failing to obey orders. Fed. R. Civ. P. 37(b)(2). But the text of the rule is more restrictive; it is limited to orders to provide discovery. "If a party . . . fails to obey an order to provide . . .

discovery, including an order under Rule 26(f), 35, or 37(a), the court . . . may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). Those just orders include directing allegations be taken as true, striking pleadings, or entering dismissal or default. Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii). This list is not exhaustive. *DR Distribs.*, 513 F. Supp. 3d at 955. Some courts have found that the violation of a scheduling order is sanctionable under Rule 37(b). *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011); *see also In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d at 1227. Alone, a violation of a court order authorizes sanctions under Rule 37(b); culpability only determines which sanction to impose, not whether sanctions are appropriate. *e360 Insight*, 658 F.3d at 642-43.

Rule 37(c) authorizes a district court to sanction a party for failing to comply with Rule 26(e). Fed. R. Civ. P. 37(c)(1). "If a party fails to provide information . . . as required by Rule 26(a) or (e)," absent harmlessness or substantial justification, a court may order payment of reasonable expenses, inform the jury of the party's failure, or impose any "other appropriate sanctions," including those listed in Rule 37(b)(2)(A). Fed. R. Civ. P. 37(c)(1)(A)-(C). Some courts have found that the violation of a scheduling order is sanctionable under Rule 37(c). *In re Detlat/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d at 1354-55.

### D. RULES WERE VIOLATED

The first issue for the Court to address is whether there was a violation of a rule authorizing sanctions. There were clear violations.

### 1. *Rule 26(g) Was Violated*

Duke's actions and inaction were the antithesis of objective good faith. Duke failed to meet his burden of showing that a reasonable inquiry was made to ensure that the production responses were consistent with Rule 34 or that the failure to produce the 20 bankers boxes of documents was substantially justified.[22]

It is undisputed that Plaintiff repeatedly requested documents relating to sales, marketing, and customer confusion. These types of documents are critical to any trademark case. *Ziebart Int'l Corp. v. After Mkt. Assocs.*, 802 F.2d 220, 225 (7th Cir. 1986) (customer confusion key to trademark case); *Nat'l Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1394-99 (3d Cir. 1985) (market penetration critical to trademark case). It is undisputed that at the time of the production requests Duke possessed tens of thousands of responsive documents that were not produced. Duke presented no evidence that he even showed these documents to his former defense counsel or told them about *these documents*. Indeed, he repeatedly and falsely told them that everything was on four hard drives. *DR Distribs.*, 513 F. Supp. 3d at 877, 884. Moreover, despite possessing tens of thousands of responsive documents, Duke never searched for them in the 20 bankers boxes. Dkt. 456, at 2-3. Plain and simple, this was not a reasonable inquiry and the production was not done in objective good faith consistent with Rule 34. At best, the production was reckless or careless, which still violates Rule 26(g). Again, these are 20 bankers

---

[22] At the outset, the documents were not privileged. Moreover, Duke's general objections were worthless, particularly when viewed in light of the specific response that stated responsive documents would be produced.

boxes of documents that fill an entire closet. They would be impossible to miss. The documents were not scanned onto a thumb drive or disc, which was then stashed away somewhere. The production response was irresponsible, reckless, and careless. And Duke has failed to meet his burden to show otherwise.

Duke has also failed to establish that the failure to timely produce these tens of thousands of documents was substantially justified. Again, these documents were not withheld because of an asserted privilege, nor was there even a specific proportionality objection to the request. The response stated that responsive documents would be produced. Further, there is no dispute that these tens of thousands of documents are relevant to the case and responsive to the production requests. Duke has established no legal or factual basis for the failure to produce these documents. The argument that Plaintiff should have known that Duke did not produce this trove of documents does not support a substantial justification argument. Instead, in the best light, the argument is akin to harmlessness, or in the more reasonable light, the argument is simply victim blaming.

Neither argument is available under Rule 26(g). First, the text of Rule 26(g) does not require a showing of prejudice. Second, case law rejects Duke's preposterous "it's-your-fault-for-trusting-us" argument. Third, even if harmlessness were an excuse under Rule 26(g), Duke has failed to show the violation was harmless. Indeed, both Plaintiff and the Court were clearly prejudiced.

Unlike other sanction rules, Rule 26(g) does not excuse a violation for harmlessness. *Simmonds*, 2023 U.S. Dist. LEXIS 186128, at *15 n.5. For example,

71

Rule 37(c)(1) and Rule 37(e)(1) explicitly excuse violations if the violation is harmless/does not result in prejudice. Fed. R. Civ. P. 37(c)(1), (e)(1). Rule 26(g) does not contain this type of harmlessness excuse. *Simmonds*, 2023 U.S. Dist. LEXIS 186128, at *15 n.5. The exclusion of this type of excuse in Rule 26(g) but inclusion in other sanction rules shows that harmlessness is not an excuse under Rule 26(g). *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (when a term or phrase is used elsewhere in same statute but is not included in another section of the same statute, the absence is presumed to be intentional).

Next, Seventh Circuit case law explicitly rejects Duke's argument that no sanctionable conduct occurred because Plaintiff should have known Duke did not or would not produce relevant, responsive documents. "A trial court's authority to dismiss a case is not dependent on a showing of prejudice by the defendant." *Daniels v. Brennan*, 887 F.2d 783, 788 (7th Cir. 1989). Case-terminating sanctions serve not only to protect opposing parties but also to aid courts in controlling their dockets and deterring other litigants from engaging in similar behavior. *Id.* at 789. In *Salmeron*, the Seventh Circuit rejected arguments identical to Duke's. First, in arguing that dismissal was an improper sanction, the plaintiff argued that the defense counsel was at fault "for not protecting their client from an adversary who might not be trustworthy." 579 F.3d at 796. The Seventh Circuit made quick work of that argument: "We cannot accept this assertion." *Id.* Second, like in this case, the plaintiff argued that dismissal was an improper sanction when it had a

meritorious case and the "misconduct had 'no meaningful impact on the course of the litigation.'" *Id*. at 796-97. The *Salmeron* court rejected both contentions, and in doing so noted that although a district court *can* consider the extent of the prejudice to the opposing party, curing prejudice to the opponent is not the only goal of sanctions. *Id*. Sanctions also punish the offender and deter others. *Id*. So, Duke's argument that no violation occurred or no sanctions should be imposed because Plaintiff should have known of his misconduct is meritless.

Finally, even if harmlessness were a consideration under Rule 26(g), Duke has failed to show that his misconduct was harmless. The Court can start with the obvious prejudice to Plaintiff. It had to spend "a ton of time" reviewing the 20 bankers boxes of documents and comparing those documents to the documents produced in 2014. And Plaintiff was required to spend this time and money because Duke represented to Plaintiff and the Court that the documents in both sets of boxes were the same and that there was no reason to believe responsive documents had been withheld. Through Plaintiff's extensive time and effort, those representations were proved false. How is Plaintiff to be compensated for that time and effort? Obviously, monetary sanctions are worthless. *See Milke*, 497 F. Supp. 3d at 463. And Duke provides no suggestions, apparently believing that Plaintiff should eat the costs of having to remedy his misconduct.

Additionally, as Plaintiff has argued and as courts have recognized when discovery misconduct comes up late in litigation, the requesting party's entire litigation strategy would have likely been different. *Laukas*, 292 F.R.D. at 513-14.

Fact discovery would have been different.  For example, Plaintiff persuasively notes that had the requested marketing materials been timely produced, the deposition of Duke would have been very different.  Dkt. 497, at 23.  How would Plaintiff be made whole for that obvious violation?  Again, monetary sanctions would do no good and Duke offers not alternatives.  Another example is expert discovery.  As Plaintiff persuasively argues, it could have engaged in expert discovery differently, including in how it deposed Duke's expert.  Dkt. 497, at 40; *see also DR Distribs.*, 513 F. Supp. 3d at 907, 913, 975.  The case would have to be restarted more than a decade later from scratch.  *Laukas*, 292 F.R.D. at 513-14.

Additionally, Plaintiff is harmed by the substantial delay in reaching a resolution of this action.  There can be no doubt that this case has been completely derailed because of Duke's discovery misconduct.  It is now 2024.  Duke's discovery misconduct was raised by Plaintiff throughout the case.  Each time, Plaintiff's concerns were mocked and belittled by Duke and all his counsel.  But each time, Plaintiff's concerns proved to be valid.  The 20 bankers boxes containing tens of thousands of relevant, responsive documents is just the latest example.  This case is so fundamentally tainted by Duke's discovery misconduct that the likelihood of reaching a decision on the merits is minimal.  *Laukas*, 292 F.R.D. at 513-14.

Moreover, Duke should not be allowed to decide years later in hindsight when responding to a sanctions motion how Plaintiff would have used or not used relevant, responsive documents that he failed to produce.  In fact, Duke's assertion that the parties consented to proceed by using sales summaries is contrary to the

very facts of this case. Dkt. 530, at 10. There is no evidence that Plaintiff thought that the sales summaries were acceptable. It did not. Indeed, as Duke well knows, the veracity and accuracy of the sales summaries were hotly disputed by Plaintiff—and rightfully so. *DR Distribs.*, 513 F. Supp. 3d at 891, 913. Much time was spent during the five-day evidentiary hearing establishing that the sales summaries were unreliable, which is why Plaintiff sought the underlying documents. These were the same documents Duke failed to produce for six years.

Finally, Duke's misconduct has harmed not only the Court but also all the other litigants that are trying to have their actions resolved in a timely manner. *Secrease*, 800 F.3d at 402; *Bankdirect Capital Fin.*, 2018 U.S. Dist. LEXIS 224705, at *23. This Court has spent thousands of hours addressing the various aspects of Duke's litigation misconduct. Those are hours that the Court was required to unnecessarily devote to this case instead of helping other parties resolve their disputes. And, importantly, the Court has been harmed by Duke's repeated lies to it—often under oath. Contempt attacks the very integrity of the judicial process.

In an attempt to address the prejudice to the Court, Duke once again blames Plaintiff for not engaging in "pre-motion dialogue" with Duke's counsel. Dkt. 530, at 32. According to Duke, "[T]here [were] multiple issues that could have been cleared up without the need for motion practice." Dkt. 530, at 32. The Court is at a loss as to how discussions between the parties would have resolved the fact that Duke thinks his failure to produce tens of thousands of relevant, responsive documents is a red herring and much ado about nothing. Dialogue with a party that just doesn't

get it is unproductive.  Furthermore, as already noted, throughout this case, each time Plaintiff raised concerns about Duke's discovery responses, Duke's counsel pooh-poohed the concerns, claiming everything was fine and that Plaintiff's counsel were wrong and/or overreacting.  As this order and the Court's previous sanctions order establish, Plaintiff's counsel's concerns were justified.

Therefore, Duke violated Rule 26(g) when his attorneys certified that the responses to the production requests were made after a reasonable inquiry and were consistent with Rule 34.  He has failed to meet his burden of showing either reasonable inquiry or substantial justification.  Having found that Rule 26(g) was violated, sanctions are mandatory.  *Rojas*, 775 F.3d at 909.

### 2.    *Rule 16 and Rule 26(e) Were Violated*

On March 4, 2015, the Court entered a scheduling order requiring that all supplements and corrections under Rule 26(e) were due by July 1, 2015.  Dkt. 116, at 2.  The Court warned the parties that 26(e) date and fact discovery cut-off date would not be extended.  *Id*.  Despite the Court's explicit scheduling order, Duke failed to correct and supplement the responses to the production requests.  Tens of thousands of responsive documents existing at the time of production were not produced.  And, on top of that, between the time of the production requests and the Rule 26(e) cut-off date, additional responsive documents were generated that were not produced either.  *Lee Valley Tools, Ltd. v. Indust. Blade Co.*, 288 F.R.D. 254, 260 (W.D.N.Y. 2013).

Duke's attempt to blame Plaintiff for his failure to produce the tens of thousands of relevant, responsive documents by the supplement and correction date

76

fares no better under Rule 26(e) than it did under Rule 26(g). According to Duke, if Plaintiff truly wanted him to produce these documents, Plaintiff was "obliged to speak up then." Dkt. 530, at 10. As already established, that simply isn't the law for reasons so obvious the Court is at a loss why it would have to explain this to Duke. Plaintiff was not required to hound Duke for the responsive documents that he knew of and possessed. 6 *Moore's Federal Practice* § 26.132[3]. Instead, Duke was obligated to produce them without Plaintiff filing a motion to compel and the Court granting that motion. *Id.* § 26.131[3]. ("The duty to supplement and correct disclosures and responses is a continuing duty and no motion to compel further supplementation is required."). And Duke's assertion that he can only be sanctioned for hiding or improperly withholding the documents—as opposed to not producing the documents (to the extent there's a difference)—finds no support under Rule 26(e). *Id.* ("*The duty to supplement* does not depend on repeated requests by an adversary for updated information . . . [and] *is not limited to circumstances in which the failure to amend constitutes a knowing concealment*." (emphasis added)). Supplementing and correcting are mandatory; a party *must* supplement and correct. Fed. R. Civ. P. 26(e).

To the extent Duke contends that Plaintiff must have suffered prejudice for sanctions to be imposed under Rule 16(f), that contention fails, too. Similar to Rule 26(g), Rule 16(f)'s text contains no excuse for harmlessness. There is no need to suffer prejudice for sanctions to be imposed when the text of the rule does not require it. *Meline Indus. v. C.R. Bard, Inc.*, 511 F. Supp. 3d 883, 889 (N.D. Ill.

2021).  And even if Rule 16(f) allowed Duke to avoid sanctions by proving a lack of prejudice to Plaintiff, as already established, there was prejudice aplenty.

So, there's no doubt that the Court's March 3, 2015, scheduling order was violated, the only issue is which rule is the most appropriate vehicle to use to impose sanctions:  Rule 16(f), Rule 37(b), or Rule 37(c).  Rule 16(f) authorizes sanctions for failing to obey a scheduling order so long as the sanction is just.  Fed. R. Civ. P. 16(f).  Similarly, Rule 37(b) authorizes sanctions provided they are "just." Fed. R. Civ. P. 37(b)(2).  Rule 37(c) provides for sanctions unless the responding party establishes that the violation was either substantially justified or harmless. Fed. R. Civ. P. 37(c)(1).  Again, as previously discussed, Duke has failed to meet his burden to show that his violations were substantially justified or harmless.

As to the 20 bankers boxes of documents, Plaintiff relies in large part on a violation of Rule 26(g).  Dkt. 497, at 50.  Duke's response is very limited in this regard.  Dkt. 530, at 10-11; 36.  Duke simply contends that documents were not "hidden" or "improperly withheld."  Dkt. 530, at 36.  As already shown, it is the improper certification under Rule 26(g) and his failure to produce the tens of thousands of relevant, responsive documents that results in the violations.  Plaintiff also relied upon the violation of the scheduling order, and in doing so, relied on the applicable rules, including Rule 16(f), Rule 26(e), and Rule 37(b).  Dkt. 497, at 52-54; Dkt. 554, at 338-40.  As best as the Court can tell, in addition to the argument that he did not "hide" or "improperly withhold" the 20 bankers boxes, Duke contends that these documents were produced in response to previous sanctions

78

orders and he can't be sanctioned again. Dkt. 530, at 37. Duke doesn't say so, but the Court assumes Duke means the February 11, 2021, order. Dkt. 446. Regardless of what order Duke is referring to, he's wrong. The Court's first sanctions order never addressed the 20 bankers boxes. The existence of those boxes did not arise until after the first sanctions order was entered. And the Court's follow-up order on February 11, 2021, imposed no sanctions. That order only stated that the Court need not tell Duke to follow the rules and orders and to meet his discovery obligations. The second motion for sanctions is the Court's first time addressing the 20 bankers boxes. In fact, the Court specifically stated in the February 11, 2021, order that it wouldn't impose sanctions—if at all—on this issue until the parties investigated and after parties' positions were heard. Dkt. 446.

Importantly, regardless of which rule Plaintiff relied upon in its second motion for sanctions, on its own motion, the Court is authorized to impose sanctions under Rule 26(g) and for violating a scheduling order entered under Rule 16. Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 26(g). And Duke was given 50 pages to address all the issues in the second sanctions motion. He was given notice and was heard. The problem is that his response is meritless under all applicable rules.

### E. DEFAULT AND DISMISSAL ARE JUSTIFIED

Having found that various discovery rules were violated, including rules that mandate sanctions for violations,[23] the next issue is determining a just sanction.

---

[23] Whether the Court imposes sanctions under Rule 16(f), 37(b)(2), or 37(c)(1) is immaterial under the facts of this case. All roads lead to sanction city because a scheduling order was violated. The violation was not harmless or substantially justified and imposing sanctions

The answer is that default on Plaintiff's claims and dismissal of the counterclaims are just sanctions under the totality of the circumstances of this case.

Claim- and action-terminating sanctions are appropriate when a party's actions were in bad faith or fault is shown. *Marrocco*, 966 F.2d at 224. In this context,[24] "bad faith" means reckless or careless and "fault" means a lack of reasonableness. *Brown*, 664 F.3d at 191-92; *Marrocco*, 966 F.2d at 224. Sanctions,

---

is just. Having said that, under these particular facts, Rule 16(f) is likely the best candidate of the three rules. Remember that Rule 16(f) specifically authorizes sanctions for violating discovery orders. In contrast, Rule 37(b)(2) authorizes sanctions when a party "fails to obey an order to provide . . . discovery." Fed. R. Civ. P. 37(b)(2). The wording of this rule suggests that a preexisting order mandating discovery exist. *Cronick v. Pryor*, No. 20-cv-457, 2024 U.S. Dist. LEXIS 2099, at *7 (D. Colo. Jan. 4, 2024); *Stone Brewing Co., LLC v. Millercoors LOLC*, No. 18-cv-331, 2020 U.S. Dist. 19239, at *5 (S.D. Cal. Oct. 14, 2020). Moreover, in contrast with Rule 16(f), Rule 37(c)(1) specifically authorizes sanctions "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e)." This language seems to indicate the rule is more concerned with initial disclosures and supplements to initial and mandatory disclosures under Rule 26(a). Rule 26's focus on initial disclosures as well as supplements and corrections is partly about timing. These must be made timely so as to avoid surprise and concomitant prejudice to the other side.7 *Moore's Federal Practice* § 37.60[1] ("The purpose of this sanction is to provide parties with an incentive to timely disclose all material evidence in support of their positions that they intend to use at any point during the course of the litigation, thus attacking the temptation some parties might feel to try to gain a tactical advantage at trial by exposing for the first time at that stage evidence that is favorable to their position."). Remember that Rule 26(e) contains two aspects of timing for supplements and corrections. One aspect mandates supplements and corrections in a timely manner when there is no specific date in a scheduling order. Fed. R. Civ. P. 26(e)(1)(A). And remember that scheduling orders are not required to contain a date for supplements and corrections, unlike other dates that are required under Rule 16(a)(3). *Compare* Fed. R. Civ. P. 16(a)(3)(A) (required contents), *with* Fed. R. Civ. P. 16(a)(3)(B)(i) (allowing court to modify the dates for timing of disclosures under 26(e)(1). So, Rule 37(c)(1)'s authority to sanction for failing to provide information as required by Rule 26(e) seems to apply when there is no scheduling order under Rule 16 containing a supplementation and correction date. As a result, in this case, this Court's view—fully recognizing that other circuits have reasonably authorized sanctions under both Rule 37(b)(2) and 37(c)(1)—is that the more appropriate rule is Rule 16(f). Indeed, the Court believes that Rule 16(f) should be used in lieu of other rules to sanction parties and counsel for those actions and inaction identified in Rule 16(f)(1). But, again, regardless of which rule is used, sanctions are authorized under the facts of this case.

[24] In a different context, "bad faith" possesses an intent component. *See Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013).

including terminating sanctions, are presumed to be proportional in a number of settings, including when (1) bad faith (recklessness or carelessness) exists, or (2) a pattern of (a) contumacious conduct, (b) dilatory tactics, or (c) the failure of less drastic sanctions exists. *Crown Life Ins.*, 995 F.2d at 1383. Terminating sanctions may be appropriate even when a "case may well have . . . some merit," as Duke claims. *Dotson*, 321 F.3d at 669.

As already established, the failure to produce—even after the Court's February 11, 2015, scheduling order establishing the Rule 26(e) supplementation and correction date—tens of thousands of relevant, responsive documents was at best reckless or careless. Duke never searched these 20 bankers boxes of documents. Dkt. 456, at 3 ("I did not go through the boxes searching for or selecting any physical documents."). And he has not even established that he even showed his former defense counsel *these boxes*, even when given multiple opportunities to say so. The nature of the relevant, responsive documents was such that no reasonable person would not have known they existed—the 20 bankers boxes were transported from Chicago to California and then piled in Duke's closet.

The Ninth Circuit identifies five factors for a court to consider when entering terminating sanctions for failure to comply with a court order, including a scheduling order. *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d at 1226. All those considerations weigh in favor of claim- and action-terminating sanctions in this case. First, the expeditious resolution of litigation weighs in favor of terminating sanctions because of the age of this case. This case was filed over a

decade ago. Its resolution has been completely stymied by Duke's discovery misconduct. *Id*. at 1227. Second, the Court's need to manage its docket weighs in favor of terminating sanctions. The Court entered a case management order so that the case could proceed in an orderly fashion. It begrudgingly granted an extension of the fact discovery cut-off date and the supplementation and correction date. In doing so, the Court warned the parties that the dates would not be extended. Despite that order, Duke failed to supplement and correct his responses to numerous production requests, resulting in his failure to produce tens of thousands of relevant, responsive documents. Third, the prejudice to Plaintiff weighs in favor of terminating sanctions. "Failing to produce documents as ordered is considered sufficient prejudice." *Id*. Unreasonable delay presumes prejudice. *Id*. Producing tens of thousands of relevant, responsive documents six years after the supplementation and correction date—and after expert discovery and summary judgment briefing—is an unreasonable delay. Prejudice is also found by increasing costs to the opponent. *Id*. at 1228. As already established, Duke's failure to produce the documents inflicted substantial costs, which are not recoverable, onto Plaintiff. Fourth, Duke's discovery misconduct has impeded progress of the case so that it could be resolved on the merits. *Id*. A case that is stalled because of a party's failure to comply with deadlines and discovery obligations cannot move forward toward resolution on the merits. *Id*. Finally, less drastic sanctions are not available. *Id*. Again, Duke cannot pay monetary sanctions. Moreover, simply piling on more evidentiary sanctions will just lead to the same result, but only after

expending additional time and money. The lack of other sanctions weighs in favor of case-terminating sanctions. *Milke*, 497 F. Supp. 3d at 467.

The foregoing exercise may have been unnecessary. In the Seventh Circuit, there is no "row of artificial hoops labeled 'bad faith' and 'egregious conduct' and 'no less severe alternative,' through which a judge must jump" to be permitted to enter default or dismissal as a sanctions for discovery violations. *Newman*, 962 F.2d at 591. "A plaintiff's failure to comply with discovery orders is properly sanctioned by dismissal of the suit, a defendant's by entry of a default judgment." *Id.* Those sanctions can be imposed so long as the sanction is proportional. *Id.* And when "a pattern of noncompliance with the court's discovery orders emerges, the judge is entitled to act with swift decision." *Id.*

In other contexts, both the Seventh Circuit and Congress have looked to baseball's three-strikes principle. *Bank of Am., N.A. v. Knighty*, 725 F.3d 815, 819 (7th Cir. 2013); 28 USC 1915(g). Doing so may be a little too quaint or cute to some, but this analogy has a logical basis. Dismissal and default are available when a pattern of discovery abuse exists. *Newman*, 962 F.2d at 591; *Jones v. M/A Mgmt. Corp.*, 773 F. App'x 844, 846-47 (7th Cir. 2019). And three plain discovery violations—whether by action or inaction—is a pattern.

In this case, three specific examples exist of Duke not speaking up and informing his counsel and the Court of his actions and inaction that would have saved Plaintiff and the Court countless of hours of work and millions of dollars in expenses. Despite telling his counsel that everything was on four hard drives, he

knew his Yahoo! emails were cloud-based and could not be recovered by copying the hard drives, but he never said a word. Then he did the exact same thing with regard to his Go Daddy emails. Finally, as Plaintiff and the Court struggled to understand the failure to produce the ESI, he sat by silently, knowing there were 20 bankers boxes of documents sitting in his closet that he never bothered to search.

And beside these three times when Duke did not speak up when he should, there are numerous—far more than three—times when Duke engaged in misconduct. Here's just a few, which likewise establish a pattern. He has repeatedly lied, often while under oath. He allowed ESI to be spoliated. He failed to search for documents. He misrepresented to his counsel the nature, scope, and location of relevant documents. And he has taken zero steps to compensate Plaintiff for the harm these actions have inflicted on Plaintiff or even recognize and accept the harm he has inflicted on the Court and the judicial system. He lives his life outside of this case, while Plaintiff and the Court are left to deal with the chaos and damage inflicted by his behavior *in this case.*

In *Milke v. City of Pheonix*, 497 F. Supp. 3d 442 (D. Ariz. 2020), the district court initially sanctioned the plaintiff by imposing attorneys' fees and costs but did not enter dismissal, although it felt it could have. Following that sanctions award, additional discovery misconduct by the plaintiff came to light, including the failure to review boxes for responsive documents. As a result, the withholding—not the "hiding"—of those documents "rendered [the plaintiff's] initial discovery responses materially incomplete." *Id*. at 465. The defendant was only able to obtain the

84

information that should have been provided by the plaintiff "after expending a great deal of time and effort." *Id*. at 467. This improperly shifted the burden of correcting the plaintiff's inadequate discovery responses to the defendant. *Id*. The plaintiff could not pay the monetary sanctions initially imposed, so the court's sanction options for the newly discovered misconduct were limited. *Id*. at 463. The inability "to pay any meaningful portion of the costs and fees" left "dismissal as the appropriate sanction." *Id*. at 467.

Likewise, in this case, the Court entered significant sanctions, including monetary sanctions, against Duke for egregious discovery misconduct, which could easily have resulted in case terminating sanctions instead. Since that order, Duke's other discovery misconduct, including the failure to produce tens of thousands of relevant, responsive documents (which were contained in 20 bankers boxes that he never searched), has been established. Plaintiff was required to spend significant time and money to establish that the documents were not the same documents and were responsive to discovery requests—contrary to Duke's representation. Duke cannot or will not pay the monetary sanctions previously entered. So, he obviously cannot or will not pay monetary sanctions for shifting the burden to Plaintiff to correct his previously inaccurate discovery responses. Dismissal and default are the appropriate sanctions.

No court should be expected to play Charlie Brown to a litigant's Lucy, gullibly trusting that—despite the litigant's pattern of behavior—the litigant will change its ways. Instead, a court is entitled to take swift action. *Newman*, 962

F.2d at 591. In this case, before taking swift action, the Court tried lesser sanctions. Clearly, those sanctions failed to have any impact on Duke. Default and dismissal are warranted.

## III.    CONCLUSION

The Court dismisses Duke's and 21 Century Smoking's counterclaims and enters a default judgment in favor of Plaintiff on its action. The bases for doing so are (1) Duke's failure to pay the monetary sanctions already imposed, after considering other relevant factors, and (2) Duke's failure to produce tens of thousands of relevant, responsive documents, which violated numerous Federal Rules of Civil Procedure, including Rules 16(f), 26(e), 26(g), 34, 37(b)(2), and 37(c)(1).

Judgment entered in favor of Plaintiff on all claims. All pending motions are denied as moot. Civil case terminated.

Entered:__6/5/2024_____

By: _____
Iain D. Johnston
U.S. District Judge